HEATHER E. WILLIAMS, SBN 122664
Federal Defender
MIA CRAGER, SBN 300172
MEGHAN McLOUGHLIN, SBN 354051
Assistant Federal Defender
Designated Counsel for Service
801 I Street, Third Floor
Sacramento, CA 95814
T: (916) 498-5700
F: (916) 498-5710

Attorneys for Defendant
ROBERT POOLEY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  2:21-CR-111-WBS |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE** |
| vs. | |
| ROBERT POOLEY, | Date:   March 4, 2024<br>Time:  9:00 A.M.<br>Judge: Hon. William B. Shubb |
| Defendant. | |

## NOTICE OF MOTION

**TO:    UNITED STATES ATTORNEY PHILLIP A. TALBERT AND ASSISTANT UNITED STATES ATTORNEYS KATHERINE LYDON AND DHRUV SHARMA, COUNSEL FOR PLAINTIFF:**

PLEASE TAKE NOTICE that on the above-noted date and time, or as soon thereafter as the matter may be heard, Mr. Pooley will and hereby does move to suppress the physical, documentary, and electronic evidence seized during the execution of the search warrant at the Lodi Parachute Center, as described in more detail below.  The motion is supported by the concurrently filed memorandum of points and authorities, the files and records of this case, and any argument which may be presented at the above-captioned hearing.

# TABLE OF CONTENTS

I.   Factual Background ................................................................................................. 1
   A.   The Lodi Parachute Center versus the Federal Aviation Administration ............................ 1
   B.   Agent DuBois's criminal investigation and application for a search warrant ..................... 2
   C.   Information omitted from the search warrant affidavit ................................................. 4
   D.   Issuance of the warrant ........................................................................................ 5
   E.   Search of the Lodi Parachute Center ....................................................................... 9
II.  Applicable Law ..................................................................................................... 10
   A.   Review of a warrant by the district court. ............................................................... 10
   B.   Omissions of material fact ................................................................................... 10
   C.   Specificity of the warrant .................................................................................... 11
   D.   Seizure of evidence beyond the scope of the warrant ................................................. 12
III. Argument ............................................................................................................ 12
   A.   The warrant failed to state probable cause to search Mr. Pooley's locker or the computer
        where he worked. .............................................................................................. 13
        1.   Fraud regarding Tandem Instructor ratings ........................................................ 13
        2.   Fraud regarding customers skydiving with uncertified instructors .......................... 14
        3.   Falsification of record in an investigation ........................................................... 14
   B.   The warrant was overbroad and lacked particularity. ................................................. 16
   C.   The agents' wholesale seizures of evidence outside the scope of the warrant calls for
        suppression of all the evidence. ........................................................................... 22
IV.  Conclusion ......................................................................................................... 23

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                        **Page(s)**

*Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) ............................................... 10

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011) ..................................................... 20

*In re Grand Jury Subpoenas*, 926 F.2d 847 (9th Cir. 1991) ..................................................... 10

*SDI Future Health*, 568 F.3d 684 (9th Cir. 2009) ............................................ 10, 16, 17, 18, 21

*United States v. Adjani*, 452 F.3d 1140 (9th Cir. 2006) ................................................ 10, 11, 16

*United States v. Atencio*, 2022 WL 1288734 (D. Idaho Apr. 29, 2022) ............................... 15, 21

*United States v. Calandra*, 414 U.S. 338 (1974) ..................................................................... 9

*United States v. Chen*, 979 F.2d 714 (9th Cir.1992) ........................................................... 11, 22

*United States v. Contreras-Aguilar*, 2021 WL 149014 (E.D. Wash. Jan. 15, 2021) .......................... 15-16

*United States v. Davis*, 714 F.2d 896 (9th Cir. 1983) ............................................................. 10

*United States v. Elliott*, 322 F.3d 710 (9th Cir. 2003) ........................................................ 9, 10

*United States v. Grant*, 682 F.3d 827 (9th Cir. 2012) ......................................................... 14, 15

*United States v. Greathouse*, 297 F. Supp. 2d 1264 (D. Or. 2003) ........................................... 14

*United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) ........................................................... 9

*United States v. Luong*, 470 F.3d 898 (9th Cir. 2006) ............................................................ 9

*United States v. Martinez*, 588 F.2d 1227 (9th Cir. 1978) ........................................................ 9

*United States v. Perkins*, 850 F.3d 1109 (9th Cir. 2017) ......................................................... 10

*United States v. Ramirez*, 976 F.3d 946 (9th Cir. 2020) ........................................................ 11

*United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) ......................................................... 10

*United States v. Rettig*, 589 F.2d 418 (9th Cir.1978) ....................................................... 11, 13, 22

*United States v. Tamura*, 694 F.2d 591 (9th Cir.1982) ....................................................... 11, 22

*United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013) ..................................................... 9

*United States v. Williams*, 2022 WL 2195351 (D. Ariz. May 10, 2022) ................................... 21

**Federal Statutes**

18 U.S.C. § 1343 ................................................................................................................... 3, 4

18 U.S.C. § 1349 ...................................................................................................................... 3

18 U.S.C. § 1519 ...................................................................................................... 3, 14, 18, 19

**Other**

14 C.F.R. § 105.45 ................................................................................................................. 2, 3

U.S. Const. Amend. IV ........................................................................................................ 9, 10

**MOTION TO SUPPRESS AND REQUEST FOR EVIDENTIARY HEARING**

For the below-detailed reasons, Mr. Pooley, by and through counsel, hereby moves this Honorable Court to suppress evidence in this case under the Fourth Amendment, to wit, the evidence seized from his locker and the computer with serial number Z3TQ24TJ, on which he worked.  Mr. Pooley moves for an evidentiary hearing, which he estimates will take no longer than one court day.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   FACTUAL BACKGROUND

### A.  The Lodi Parachute Center versus the Federal Aviation Administration

The FAA and the Lodi Parachute Center have a long history.  Owner Bill Dause opened the Center in 1964, serving a community of skydivers who wanted to jump cheap and often. Many lived at the airport or in the hanger in tents.  The Parachute Center is known to be the cheapest and largest skydiving center in Northern California.

Since 1985, according to news reports, twenty-eight fatalities and multiple accidents have occurred at the Center, leading to "several" FAA investigations.  However, the FAA, which governs aviation safety, has had difficulty pinning any problems on Mr. Dause or otherwise penalizing him or his Parachute Center.  The agency previously imposed civil penalties in excess of $1 million against Mr. Dause, however enforcement was dropped by the U.S. Attorney's Office due to his "inability to pay."  As a result, the agency has had to resort to sending strongly worded letters and conducting frequent surveillance of the Center.  Mr. Dause, for his part, reportedly "laughed off" the civil penalties against him.

In August 2016, the Center saw its 21st and 22nd fatalities when a parachute attached to two men on a tandem skydive failed to deploy properly.  The FAA investigated the fatalities, but closed its investigation in 2017 with no action taken.  In July 2017, Mr. Dause received a letter advising that the investigation did not establish a violation of the FAA regulations and that the matter was closed.

Two further, apparently unrelated fatalities occurred at the Center in May 2017 and September 2017.

### B.  Agent DuBois's criminal investigation and application for a search warrant

Meanwhile, the Department of Transportation ("DOT," the FAA's parent agency) had begun a criminal investigation headed by Special Agent Brian DuBois.  DuBois interviewed FAA instigators with extensive knowledge of past actions against the Parachute Center.  He also interviewed witnesses with firsthand knowledge of daily business and skydiving at the Parachute Center.  His investigation is laid out in paragraphs 7 through 26 of an affidavit in support of an application for a search and seizure warrant for the Parachute Center, signed and submitted to a federal magistrate judge on January 25, 2018.  *See* Exh. A.

In summary, the affidavit explained that, following the August 2016 fatalities, the FAA reportedly learned that one of the men who died was a tandem instructor, named Yonghyon Kwon, who had been trained by a person named Rob Pooley.  The other was a customer Mr. Kwon was taking on a skydive.

Rob Pooley, DuBois learned, is a skydiver who lived and worked at the Center, skydiving for sport and training others to skydive.  In 2015 he had a "Tandem Examiner rating" issued by the U.S. Parachute Association (USPA).  *Id.* ¶ 15.  Mr. Pooley's Tandem Examiner rating permitted him to train others to become "Tandem Instructors" under the USPA rules, which in turn allows the instructor to take paying customers on tandem skydives: the customer is strapped to the front and the instructor is in the back working the parachute.  Despite its name, the USPA is not a governmental body; "[t]he United States Parachute Association (USPA) is a voluntary not-for-profit membership association of individuals who enjoy and support the sport of skydiving."  USPA, ABOUT USPA, "What is USPA," https://www.uspa.org/about-uspa/what-is-uspa [hereinafter "USPA Website"].  The FAA however "recognize[s]" the USPA as an organization capable of issuing "master parachute license[s]" (i.e., Tandem Instructor licenses).  14 C.F.R. § 105.45.

To be recognized by USPA as a Tandem Instructor, the person must submit paperwork to the USPA, including a "Tandem Instructor Proficiency Card."  The proficiency card includes various signatures, including the signature by the Tandem Examiner and any other instructors who assisted with the training.

Agent DuBois learned that in July 2015, the USPA suspended Mr. Pooley's Tandem

Examiner rating because he was not properly submitting paperwork.  Despite the suspension, he was still permitted to assist with Tandem Instructor training, as long as he was being "supervised" by a current Tandem Examiner.  *Id.* ¶¶ 9, 15.

DuBois's affidavit indicates that after Mr. Pooley's suspension, "he purported to provide instruction under [the] supervision" of a Tandem Examiner named Yuri Garmashov.  *Id.* ¶ 9.  "According to Garmashov, Pooley was only to provide instruction when Garmashov was at the Parachute Center to directly supervise him."  *Id.*  However, later it was learned that "Pooley and Garmashov used pre-filled Tandem Instructor Proficiency Cards which included Garmashov's signature already in the necessary signature blocks."  *Id.* ¶ 14.

DuBois's affidavit also recounts that, following the double fatality in 2016, Mr. Dause provided a document to the FAA purporting to be Mr. Kwon's Proficiency Card, but the document contained Garmashov's signature on a date he was out of the country.  *Id.* ¶ 14.  The affidavit does not state when Mr. Dause provided the document to the FAA.  The document had never been provided to USPA.

In September of 2016, USPA then revoked all of these men's ratings.  *Id.*  Both Mr. Pooley and Mr. Garmashov were suspected to have continued jumping with customers after their suspensions.  DuBois's affidavit recounts that sometime after August 2016, "at least two instructors" were doing tandem jumps with customers without being "properly rated by the USPA."  *Id.* ¶ 17.  However, when an undercover agent emailed the Center, Kathy Dause (then wife of Mr. Dause) at the "Parachute Center's email address" responded, "You will definitely go with certified Instructors."  *Id.* ¶ 24.

The affidavit concludes that there is probable cause for violations of 18 U.S.C. § 1343 (wire fraud), § 1349 (attempt and conspiracy to commit wire fraud), and § 1519 (destruction, alteration or falsification of records in federal investigations).  Exh. A at 1.  Specifically, DuBois states,

27. Based on the foregoing, I believe there is probable cause to believe that the following has occurred::

    a.  Individuals who paid Pooley and/or Garmashov for Tandem Instructor training and ratings at Parachute Center did not, and in some cases could not, have received the Tandem Instructor ratings for which they paid;

    b.  Some Parachute Center customers have likely jumped with Tandem Instructors they were told were certified when in fact they were not; and

    c.  In the case of Kwon's Proficiency Card, the document Dause provided to the FAA contained Garmashov's signature that in fact could not have been made by Garmashov at the time stated due to him being out of the country.

*Id.* ¶ 27.

### C.  Information omitted from the search warrant affidavit

DuBois chose to omit certain information that he had learned from the investigation.  For instance, his affidavit included that customers of the Parachute Center hoping to "ride" with an experienced skydiver could, and in some cases did, use credit cards to pay for their ride; however, the affidavit omits the fact that experienced skydivers seeking Tandem Instructor training from Mr. Pooley and/or Mr. Garmashov would pay only in cash.  As Agent Dubois learned a few months before seeking the search warrant, the credit card machines at the Center were available only for customers (i.e., members of the public hoping to do a skydive with a professional skydiver) – not to skydivers taking courses, such as the Tandem Instructor course.  *See* Exh. B at 2 ("Sheets [the witness] stated a lot of money, all cash, went through Parachute Center.  Only 'bucket list' customers used cards for payments.  If someone was buying a parachute rig or paying for a course, they paid cash.  If people sold items to Dause, they were paid in cash; in one example, Sheets stated Dause paid $12,000 cash for a car.  Dause would allow people to pay for small items, such as batteries and an altimeter with a card, but everything else cash.").

The affidavit also omitted information about the FAA investigation that Mr. Dause was under suspicion of obstructing (per 18 U.S.C. § 1519).  In particular, DuBois omitted the date on which Mr. Dause provided the apparently false proficiency card to the FAA.  The date was early

August 2016 – almost a year and a half before the search warrant was sought.  *See* Exh. C (Email from David Jensen, Aviation Safety Inspector at the FAA, on August 12, 2016, noting that "Dause did give me copies" of Kwon's paperwork).

Finally, the affidavit omits that Mr. Pooley left the Parachute Center shortly after the fatal accident in August 2016.  He returned, according to a witness DuBois interviewed days before swearing out his affidavit, sometime in late 2017, just a few months before DuBois sought his search warrant. *See* Exh. D at 1.

**D.  Issuance of the warrant**

On January 25, 2018, DuBois presented his search warrant application to U.S. Magistrate Judge Brennan, who signed it that same day.  *See* Exh. A at 1.

The warrant authorized the agents to search for the following extensive list of items:

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The evidence to be searched for and seized concerns violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), in whatever form, whether physical, digital, electronic, or otherwise, and is described as follows, **for items created, modified, or in use during the period of July 1, 2015 to present:**

1. Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.

2. Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.

3. Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.

4. Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.

5. Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.

6. Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.

7. Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.

8. Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.

9. Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.

10. Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.

11. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

    a. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the press to restore it;

    b. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form;

    c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CDRWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes other information necessary to access the computer equipment, storage device or data.

### E.  Search of the Lodi Parachute Center

Agents executed the search warrant on January 30, 2018.  During the search, agents opened and searched dozens of personal lockers, including one they identified as "Pooley locker."  *See* Exh. E.  In pictures documenting the search, the lockers can be seen labeled on the outside with names.  *See* Exh. F.  The lockers contained a number of personal items, including personal wingsuits, helmets, water bottles, shoes, laundry, coffee mugs, snacks, computers, notebooks, and personal photos.  *See* Exh. G.  Some, including Mr. Pooley's locker, *see id.* at 3, 26, had padlocks on them.  From another room, agents also seized a computer with serial number Z3TQ24TJ, on which Mr. Pooley had worked.

In all, agents seized boxes upon boxes of physical documents.  Judge Brennan had authorized seizure of documents only within a certain timeframe (July 2015 to January 2018).  *See* Exh. A, Att. B.  Yet agents seized a huge number of documents outside this timeframe.  For instance, the agents seized a total of 707 pages of documents from "Pooley locker."  But almost 500 of these were dated earlier than July 2015, often years earlier.  Similarly, the agents seized financial records from the Parachute Center, but again, many were outside the timeframe authorized by Judge Brennan.

As to the electronic data, agents seized dozens of electronic devices and storage media.  The devices were forensically imaged, namely preserved and downloaded in full by the agents, and sent to DOT OIG's Computer Crimes Unit for data extraction and searching.

The Computer Crimes Unit has a form for agents to complete to request extraction and searching of data.  *See* Exh. H.  The form prompts the agent to specify "Case Specific Keywords" which should be "agreed upon by the case agent and the [analyst]."  *Id.*  The form also requests a "Time Frame," which the form defines as, "Dates as determined by the warrant."  *Id.*

Although the warrant provided the answer to what kinds of search terms and what timeframe in which to search, the agent disregarded both directives.  Instead, he requested that the analyst "search the recovered digital media to locate all documents, email, and videos related to the operations of the Parachute Center."  *Id.*  In the box for "Time Frame [] as determined by the warrant" the agent wrote, "NA."

## II.  APPLICABLE LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  The sword that enforces this fundamental right is the exclusionary rule, which directs the Court to strike illegally obtained evidence.  *See generally United States v. Calandra*, 414 U.S. 338 (1974).  It acts as a deterrent to "compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it."  *Id*. at 347 (quotations omitted).

### A.  Review of a warrant by the district court

"A search warrant is supported by probable cause if the issuing judge finds that, 'given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983).  This Court "should find that probable cause is not met when the [] judge [who issued the search warrant] lacked a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* (quoting *Gates*, 462 U.S. at 238-39) (internal quotation marks omitted).  Probable cause remains a significant threshold; "even strong reason to suspect" a crime has occurred is not enough.  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citations omitted).

"All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath."  *United States v. Luong*, 470 F.3d 898, 904 (9th Cir. 2006) (quoting *United States v. Gourde,* 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc)).  "[T]he warrant cannot be supported by outside information." *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir. 1978).

### B.  Omissions of material fact

Where facts are omitted from a search warrant affidavit, and those facts are material to the finding of probable cause, the Court should hold a *Franks* hearing to determine whether the omissions were "made knowingly and intentionally, or with reckless disregard for the truth." *United States v. Elliott*, 322 F.3d 710, 714 (9th Cir. 2003).  If the Court so finds, the Court must

determine whether "probable cause is lacking because of alleged misstatements or omissions in the supporting affidavit." *Id.* (citation omitted); *see United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) ("A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information."). "The key inquiry is whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions." *United States v. Perkins*, 850 F.3d 1109, 1119 (9th Cir. 2017) (internal quotation marks omitted). An omission is material if it would "cast doubt on the existence of probable cause." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (quoting *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992)). The *Franks* inquiry turns on the truthfulness and completeness of the affidavit; "[t]he fact that probable did exist and could have been established by a truthful affidavit does not cure the error." *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983).

### C. Specificity of the warrant

A valid warrant must "particularly descri[be]" the "things to be seized." U.S. Const. Amend. IV. This requirement "prevents officers from engaging in general, exploratory searches by limiting their discretion and providing specific guidance as to what can and cannot be searched and seized." *United States v. Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006). The Ninth Circuit directs reviewing courts to consider both the warrant's "breadth" and "particularity." *SDI Future Health*, 568 F.3d 684, 702 (9th Cir. 2009).

"Breadth" means the scope of the warrant must be limited to the probable cause on which it is based. *In re Grand Jury Subpoenas*, 926 F.2d 847, 857 (9th Cir. 1991). "Particularity" means "the warrant must make clear to the executing officers exactly what it is that he or she is authorized to search for and seize." *Id.* The Ninth Circuit has provided a non-exhaustive list of factors to consider in these inquiries: (1) whether probable cause existed to seize all items of a particular type; (2) whether the warrant sets out objective standards for officers to differentiate items subject to seizure; and (3) whether the government could have more particularly described

11

the items in light of information available at the time the warrant was issued.  *Adjani*, 452 F.3d at 1148.

If the Court determines that any portion of the warrant is invalid, the Court should next consider how significant the overbroad portion is.  *See SDI Future Health*, 568 at 706-07.  "[W]hen the valid portion of a warrant is a relatively insignificant part of an otherwise invalid search," the Court should suppress all evidence from the search – even the portion arising from valid provisions of warrant.  *Id.* (quoting *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995)).  Indeed, "[t]he Fourth Amendment's particularity requirement is not a mere technicality; it is an express constitutional command."  *United States v. Ramirez*, 976 F.3d 946, 951 (9th Cir. 2020).

### D.  Seizure of evidence beyond the scope of the warrant

Officers may seize only those items specifically enumerated in a warrant.  *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982).  Wholesale seizure of records not described in a warrant for later detailed examination is **"the kind of investigatory dragnet that the fourth amendment was designed to prevent."** *Id.* (citation omitted).  Items seized by officers outside the scope of the warrant must be suppressed.  *Id.*

Further, the Ninth Circuit has recognized that in certain situations, all evidence – even the portion of the evidence *within* the scope of the warrant – should be suppressed.  For example, all evidence should be suppressed where officers "flagrantly disregarded" the terms of the warrant, where they exceeded the "scope of the warrant in the *places* searched," where they used the warrant as a pretext to search for evidence of unrelated crimes, or where they engaged in "indiscriminate fishing."  *See United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992), *Tamura*, 694 F.2d at 597; *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978).

### III. ARGUMENT

The search of Mr. Pooley's belongings and data was invalid for three independent reasons.  First, the warrant failed to state probable that evidence of the specified crimes would exist in Mr. Pooley's locker or on the computer where he worked.  The agent omitted from the warrant certain information that bears on probable cause and a *Franks* hearing is warranted.

Second, the warrant's list of items subject to search and seizure is overbroad and fails the specificity requirement of the Fourth Amendment. Finally, the agents exceeded their authority by seizing a large amount of documents and data outside the terms of the warrant. The agents' patent disregard for the warrant's limitations calls for suppression of all evidence in Mr. Pooley's locker and on the computer where he worked.

**A. The warrant failed to state probable cause to search Mr. Pooley's locker or the computer where he worked.**

The warrant attempts to make out probable cause on three theories.

*1. Fraud regarding Tandem Instructor ratings*

The affiant states,

27. Based on the foregoing, I believe there is probable cause to believe that the following has occurred::

    a. Individuals who paid Pooley and/or Garmashov for Tandem Instructor training and ratings at Parachute Center did not, and in some cases could not, have received the Tandem Instructor ratings for which they paid;

Exh. A ¶ 27. Although the affiant does not specify what makes this activity a crime, this appears to be an allegation that Mr. Pooley and/or Mr. Garmashov engaged in fraud.

The problem with this allegation is that it does not make out any federal crime. A search warrant affidavit must provide probable cause on all elements of a crime. *See* Transcript of Hearing, *United States v. Stinson*, 2:20-cr-114-WBS (Dkt. 52) at 165:15-18 ("[The Court] ha[s] a very strong belief that there should be some probable cause shown in an affidavit for search warrant that each of the elements of the offense which you suspected is present."). As the Court is aware, wire fraud requires, as an element, a wire. But here, in regards to the suspected defrauding of persons attempting to gain Tandem Instructor ratings, there was no suspected wiring.

The affiant appears to have been aware that a wire was indeed required to make out a violation of the wire fraud statute. For this reason, the affidavit stated that "customers can pay with cash and credit card" and the Center had "as many as six credit card processing machines."

Exh. A ¶ 10.

However, the affiant concealed the fact that Mr. Pooley and/or Mr. Garmashov were paid for the Tandem Instructor courses only in cash.  As Agent Dubois learned a few months before seeking the search warrant, the credit card machines were available only for customers (i.e., members of the public hoping to do a skydive with a professional skydiver) not to skydivers taking courses, such as the Tandem Instructor course.  *See* Exh. B at 2.

The defense requests a *Franks* hearing to determine whether Dubois made this omission knowingly and intentionally, or with reckless disregard for the truth.

   *2.  Fraud regarding customers skydiving with uncertified instructors*

Next, the affidavit concludes that there is probable cause that

   b.  Some Parachute Center customers have likely jumped with Tandem Instructors
       they were told were certified when in fact they were not; and

Exh. A ¶ 27.  According to the affidavit, "at least two instructors" were jumping without proper certifications.  *Id.* ¶ 17.

This theory does not provide probable cause to search through documents in Mr. Pooley's locker or the computer he worked on.  The only information in the affidavit about the lockers is that one unnamed skydiver kept his "licenses" in his locker.  *Id.* ¶ 23. In Mr. Pooley's case, there was no probable cause to believe that he too kept his license in his locker.  First of all, what one person keeps in his locker is not particularly probative of what another person keeps in his own. Second, the affidavit established that Mr. Pooley did not have a license, so there was no probable cause to believe that there would be a license in his locker.  *Id.* ¶ 22 ("Pooley and Garmashov's [sic] did not have USPA licenses and Tandem Instructor ratings at this time . . . .").

   *3.  Falsification of record in an investigation*

The affidavit's final conclusion about criminal activity is that:

   c.  In the case of Kwon's Proficiency Card, the document Dause provided to the FAA
       contained Garmashov's signature that in fact could not have been made by
       Garmashov at the time stated due to him being out of the country.

1   Exh. A ¶ 27.  This appears to try to make out probable cause for Title 18 U.S.C. §1519 (as cited

2   on the first page of the warrant application), which makes it a crime to "knowingly alter[],

3   destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record,

4   document, or tangible object with the intent to impede, obstruct, or influence the investigation or

5   proper administration of any matter within the jurisdiction of any department or agency of the

6   United States . . . ."

7          This allegation provides no probable cause to search Mr. Pooley's belongings.  Indeed,

8   the affidavit does not attempt to make out probable cause that a violation of § 1519 was

9   committed by Rob Pooley.  Indeed, the person who provided Kwon's Proficiency Card to the

10  FAA was Mr. Dause, not Mr. Pooley, and there was no suggestion that Mr. Pooley had "intent to

11  impede, obstruct, or influence" the FAA investigation.

12         Even if there were probable cause related to Mr. Pooley, the information was –

13  unbeknownst to the magistrate judge – stale.  Specifically, the affidavit noted that "Dause

14  presented FAA officials with a copy of Kwon's Proficiency Card[,]" *see* Exh. A ¶ 14, but the

15  affiant failed to mention that Mr. Dause provided it in early August 2016, *see* Exh. C.

16         The search occurred at the end of January 2018 – almost 18 months after Dause provided

17  the document to the FAA.  There is no reason to believe that any evidence of the suspected

18  obstruction would still exist at the Parachute Center nearly 18 months later.  *See United States v.*

19  *Grant*, 682 F.3d 827, 835 (9th Cir. 2012) ("[B]ecause evidence can be moved or disposed of, the

20  affidavit must support an inference that it is presently in the [place] to be searched, regardless of

21  its past position."); *United States v. Greathouse*, 297 F. Supp. 2d 1264, 1272–73 (D. Or. 2003)

22  (holding that a 13-month delay between the information of criminality and the search warrant

23  execution was too long so the information in the warrant was stale).

24         Moreover, there was no probable cause to believe that any evidence of such would lie in

25  Mr. Pooley's belongings in January 2018.  As the affiant was aware, "After [the August] 2016

26  skydiving accident, Pooley and Garmashov left the Parachute Center; however, they have since

27  returned.  [The witness] believes they have both been there for at least the last two or three

28  months [since October or November 2017]."  *See* Exh. D at 1.  If Mr. Pooley had ever had any

evidence of the suspected § 1519 violation, it seems unlikely that he would have left with it in August 2016 and then brought it back to the Parachute Center for the agents to find in January 2018.  *Cf. Grant*, 682 F.3d at 834-35 ("[T]here is no reasonable basis for believing that James would have kept the murder weapon for six months, gone home to get it after he was discharged from the hospital, taken it to Grant's home, and left it there when he departed. And even assuming that the affidavit plausibly sets forth such an unlikely chain of events, it provides no facts suggesting that the gun would still be in Grant's home over two months later, when the warrant was executed.").  The search of Mr. Pooley's belongings was without probable cause.

**B.  The warrant was overbroad and lacked particularity.**

The warrant in this case was extremely overbroad, authorizing seizure of many items not linked in any way to a federal crime.  The warrant fails the Ninth Circuit's twin test of "breadth" and "particularity" as to each of the eleven categories of items to be seized.  *See* Exh. A, Att. B. Each is discussed in detail below.

1.  "Mail, whether opened or unopened, correspondence, papers and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location."

These directions are extremely overbroad and extremely vague.  Courts have invalidated similarly broad, scattershot search terms, because they both permit seizure of anything that would identify a person and because they do not tell officers what "dominion and control" means.  *See, e.g.*, *United States v. Atencio*, 2022 WL 1288734, at *18 (D. Idaho Apr. 29, 2022) (suppressing evidence where warrant "allowed for seizure of evidence 'which would show occupancy, ownership and/or control of 611 16th Ave N.' [citation omitted] . . .  Under this broad category, officers could presumably search for any bills, deeds, insurance policies, mail, photographs, communications, clothing or other items belonging to [the target], or any other unspecified evidence in the home"); *United States v. Contreras-Aguilar*, 2021 WL 149014, at *2 (E.D. Wash. Jan. 15, 2021) ("The Court also disagrees with the Government's arguments about the broad category of unspecific documents subject to seizure under the dominion and control authorization.  Contrary to the Government's view, a warrant cannot give law enforcement

1    unfettered discretion (however reasonably executed) to determine which items are subject to

2    seizure. The warrant at issue provided no 'objective standards by which executing officers

3    [could] differentiate [which dominion and control documents were] subject to seizure from those

4    which [were] not.'") (citing *Adjani*, 452 F.3d at 1148) (other internal citations omitted).

5         2.   "Information related to corporate and business filings and ownership, including but

6              not limited to applications and articles of incorporation."

7    It is unclear how this category of items is even related to the suspected violations of law.  Thus

8    there is no "probable cause to seize all items of [this] particular type[.]"  *Adjani*, 452 F.3d at

9    1148 (citation omitted).  Notably, ownership of the Center is relevant to other kinds of actions

10   the FAA could bring.  Indeed, it would be relevant to assessment of a civil penalty on the Center

11   and the persons who own it.  However, these issues are unrelated to the suspected crimes in

12   DuBois's criminal search warrant.

13        3.   "Documents, records, and information tending to show the identities of Parachute

14             Center customers, the amounts they paid, and in what manner, and the dates on which

15             they jumped, to include liability waivers, receipts, checks, correspondence, and

16             emails."

17   This category too is overbroad, because there was no probable cause to believe that all, or even a

18   large proportion, of customers of the Parachute Center were victims of fraud.  *See SDI Future

19   Health*, 568 F.3d at 705 ("[W]here investigators believed that an art gallery was selling forged

20   Dali artwork, the warrant should have limited the search 'to items pertaining to the sale of Dali

21   artwork.'") (quoting *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747 (9th Cir.

22   1989), *abrogated on other grounds, J.B. Manning Corp. v. United States*, 86 F.3d 926 (9th Cir.

23   1996)).  The affidavit stated that "the investigation has identified at least two instructors" who

24   were conducting tandem jumps without proper certifications.  Exh. A ¶ 17.  Meanwhile, dozens –

25   possibly more than a hundred – tandem instructors passed through the center between 2015 and

26   2018.  And hundreds, if not thousands of customers had jumped during that same timeframe.  To

27   search for the identiteis of *all* customers when an 18-month-long investigation had only revealed

28   two instructors taking customers on unauthorized skydives reaches beyond what the Fourth

Amendment allows.

4.   "Documents, records, and information tending to show the identities of Parchute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records."

This  category is overbroad for the same reason as category #3: there was no probable cause to believe that all, or even a substantial portion of the Center's "employees and/or contractors" and their "serivces [] provided" involved fraud.  *Compare SDI Future Health*, 568 F.3d at 703 & n.11 (discussing situations where the fraudulent conduct committed at a business was "routine" or where the business was "permeated with fraud").

5.   "Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identiteis of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs."

Again, this category is overbroad because the affidavit sets out no probable cause that all or even many "parachute flight operations" and the persons on those flights had a connection with fraud.

6.   "Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos."

This category is overbroad because the affidavits fails to state probable cause of any federal crime involving "safety information" or "training videos."  Again, these categories relate to issues that could be raised by the FAA in a civil enforcement action or investigated in regards to general safety issues at the Parachute Center.  However, they do not relate to the suspected criminal violations set out in the search warrant affidavit.  This category is thus beyond the scope of probable cause set out by the warrant and is impermissibly overbroad.

7.   "Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications

1    of Parachute Center employees and/or contractors, and any invisitigations by the

2    FAA of USPA."

3  This category reeks of a fishing expedition.  There was no probable cause to seize all

4  communications "relating to Parachute Center's Tandem Parachute operations."  First of all,

5  most of the Center's business was Tandem Parachute operations.  There had been hundreds –

6  perhaps thousands – of Tandem Parachute operations at the center in the relevant period.

7  Permitting officers to seize all internal communications about the main operations of a business

8  is extremely broad and, indeed, unconstitutionally overbroad.  *See SDI Future Health*, 568 F.3d

9  at 704-05 ("Since internal documents typically cover a subject-matter far wider than do external

10 communications, this failure [to limit the scope of a search of internal memoranda and email]

11 constitutes an invitation to a general, 'exploratory rummaging in a person's belongings.'")

12 (quoting *United States v. Holzman*, 871 F.2d 1496, 1508 (9th Cir. 1989), *overruled on other*

13 *grounds by Horton v. California*, 496 U.S. 128 (1990)).  Similarly, the category of

14 correspondence about "ratings and certifications" is overbraod for the reasons discussed above

15 regarding categories #3 to #5: the affidavit states that "at least two" instructors had issues with

16 jumping without proper certification.  The affidavit provides no probable cause of illegality in

17 regards to most of the instructors.  Seizing all correspondence about "ratings and certifications"

18 therefore oversteps the bounds of probable cause.  Moreover, information about "accidents" are

19 irrelevant, because the affidavit does not even attempt to connect "accidents" at the Center to any

20 violation of federal criminal law.  Finally, any communications about USPA investigations is

21 also irrelevant.  Section 1519 (falsification of records in federal investigations) only relates to

22 investigations by a "department or agency of the United States."  18 U.S.C. § 1519.  The USPA

23 is not a department or agency of the United States; it is a private organization.  *See* USPA

24 Website, *supra* ("The United States Parachute Association (USPA) is a voluntary not-for-profit

25 membership association of individuals who enjoy and support the sport of skydiving.").  Even if

26 the affidavit had alleged obstruction of an USPA investigation – which it did not – obstructing a

27 "private association of individuals who enjoy . . . skydiving" is not a violation of federal criminal

28 law.  Searching for correspondence about USPA investigations is thus irrelevant and

1    unconstitutionally overbroad.

2        8.  "Documents, records, and information tending to show any efforts or intention to

3            falsify, alter, or destroy records related to accidents, employee and/or contractor

4            certifications, and investigations by FAA or USPA."

5    This category is also overbroad, simply expanding the fishing expedition of category #7.  To

6    begin, the affidavit states no probable cause that any person "falsif[ied], alter[ed], or destroy[ed]

7    records related to accidents[.]"  Similarly, the affidavit states no probable cause that any

8    employee or contractor certifications were falsified, altered, or destroyed.  The only suspected

9    "false" document was Mr. Kwon's proficiency card.  The proficiency card was apparently never

10   transmitted to the USPA and therefore Mr. Kwon had no "certifications" – falsified or otherwise.

11   Thus, this category directs the agents to search for false, altered or destroyed documents for

12   which there was no probable cause of their existence.  It is also overbroad in directing agents to

13   search for records related to USPA investigations.  Like category #7, as discussed above, a

14   violation of § 1519 cannot relate a USPA investigation, and accordingly, none is set forth in the

15   affidavit.

16       9.  "Documents, records, and information tending to show the nature, amounts charged,

17           and dates of credit and debit card transactions carried out at the Parachute Center."

18   This category lacks particularity by failing to limit the debit/credit card transactions to those that

19   relate to allegedly fraudulent activity.  The Parachute Center is a business with legitimate

20   credit/debit transactions.  The suspected fraud related to customers paying to jump with

21   instructors who were not properly certified.  However, this category calls for seizure of *all*

22   credit/debit card transactions, including many that were indisputably not fraudulent.  For

23   instance, as the affidavit sets out, the Parachute Center would take videos of skydives and sell

24   them to customers.  There is no allegation that the customers did not receive these videos.

25       10. "Video, picture, and other electronic media showing Parachute Center customers,

26           tandem instructors, and skydiving, to include videos of customers skydiving."

27   This category is also unconstitutionally overbroad, because, like #9, this category pulls in a large

28   amount of legal activities.  Indeed, the investigation had identified "at least two" tandem

instructors who had jumped without proper certification.  But the search is not limited to videos

of those instructors and customers jumping with those instructors.  Instead, this category pulls in

all videos and pictures of anyone "skydiving."  Seeing as hundreds or thousands of skydives

were happening every month at the Parachute Center, this category is extremely overbroad.

11. "Computer passwords and other data security devices designed to restrict access or to

hide computer software, documentation, or data."  This category has four sub-sections

and seven sub-sub-sections delineating other things the agents could seize, including:

a.   "**Any computer equipment and storage device capable of being used to**

**commit, further or store evidence of the offense listed above**;

b.   "**Any computer equipment used to facilitate the transmission, creation,**

**display, encoding or storage of data**, including word processing equipment,

modems, docking stations, monitors, printers, plotters, encryption devices, and

optical scanners;

c.   "**Any magnetic, electronic or optical storage device capable of storing**

**data**, such as floppy disks, hard drives, tapes, CD-ROMs, CD-R, CDRWs,

DVDs, optical disks, printed or memory buffers, smart cards, PC cards,

memory calculators, electronic dialers, electronic notebooks, **cellular**

**telephones**, and personal digital assistants;

d.   "Any documentation, operating logs and reference manuals regarding the

operation of the computer equipment, storage devices or software[;] [and]

e.   "Any applications, utility programs, compilers, interpreters, and other

software used to facilitate direct or indirect communication with the computer

hardware, storage devices or data to be searched[.]" (emphasis added)

This category also is outrageously overbroad, calling for seizure of not only all electronic

devices, but all things capable of storing electronic media, including all cell phones.

Authorization to search even a single cell phone would be overbroad because the affidavit lays

out no probable cause that cell phones were used to carry out any crime.  *Cf. Dougherty v. City of*

*Covina*, 654 F.3d 892, 898-99 (9th Cir. 2011) ("[T]he affidavit does not even verify that

Dougherty owned a computer or the other targets of the search or had internet service or another means of receiving child pornography at his home."). Courts are hesitant to permit searches of phones without a clear showing that evidence would indeed be found on the phone. *See, e.g.*, *United States v. Williams*, 2022 WL 2195351, at *9 (D. Ariz. May 10, 2022), *report and recommendation adopted,* 2022 WL 2197095 (D. Ariz. June 17, 2022) (invalidating search warrant because the affidavit made "no attempt to link the crime to the phone, let alone an effort to detail why the phone is likely to contain evidence of a crime."). Furthermore, the warrant permitted not only manual searches of phones and computers or any other device or media; it also directed officers to seize all devices and conduct a forensic search of each device. *See* Exh. A ¶ 28.a.-j. "Forensic examinations of electronic devices are more comprehensive and intrusive than manual searches, and thus deserve greater protection under the Fourth Amendment." *United States v. Atencio*, 2022 WL 1288734, at *19 (D. Idaho Apr. 29, 2022) (citing *United States v. Cotterman*, 709 F.3d 952, 962–65 (9th Cir. 2013) (explaining that forensic examinations are akin to a "computer strip search" that are more intrusive than manual searches)). Because no probable cause existed to search every electronic device and storage media of any kind, this category is overbroad.

Taken together, all eleven categories of items to be seized are overbroad and/or lack particularity. Because all categories fail the Fourth Amendment's particularity requirement, suppression of all evidence in Mr. Pooley's locker and in his computer files is warranted. Even if the Court determines that some search categories are valid, suppression of all evidence is still warranted because any valid portion is a "relatively insignificant part." *See SDI Future Health*, 568 F.3d at 707.

### C. The agents' wholesale seizures of evidence outside the scope of the warrant calls for suppression of all the evidence.

The manner in which the agents chose to execute the warrant gives rise to another, independent basis for suppression of all evidence in Mr. Pooley's locker and in his computer files. The agents executed the warrant – which was exceedingly broad to begin with – with no regard to its express limitations.

For instance, the warrant states in bold type that officers may only seize "**items created,**

1   **modified, or in use during the period of July 1, 2015 to [January 2018**.]"  Exh. A, Att. B

2   (emphasis in original).  However, the agents seized documents in complete disregard for this

3   restriction, including hundreds of pages of documents from Mr. Pooley's locker and financial

4   records from the Parachute Center.

5          Even more troubling, the affiant promised the magistrate judge that, as to the electronic

6   devices, "All forensic analysis of the imaged data will employ search protocols directed

7   exclusively to the identification and extraction of data within the scope of this warrant."  Exh. A

8   ¶ 28.h.  However, the affiant's promise was never fulfilled.  Instead, the agents directed the

9   Computer Crimes Unit to search for "all documents, emails, and videos related to the operations

10  of the Parachute Center."  Exh. H.  This directive does not comport with the warrant, which –

11  while extremely broad – did limit the seizable items to something less than all things "related to

12  the operations of the Parachute Center."  The agents also disregarded the timeframe commanded

13  by the warrant, instead asking the devices to be searched for all data going back to the devices'

14  inception.

15         The agents here were engaged in a fishing expedition, hoping to find evidence about

16  "accidents" at the Center or other problems with the Center's operations.  The agents "flagrantly

17  disregarded" the warrant's terms, used the warrant as a pretext for searching for evidence of

18  other FAA violations, and engaged in "indiscriminate fishing."  *Chen*, 979 F.2d at 717; *Tamura*,

19  694 F.2d at 597; *Rettig*, 589 F.2d at 423.  Suppression of all evidence is warranted.

20                                  **IV.  CONCLUSION**

21         For the foregoing reasons, the defense respectfully moves the Court to suppress the

22  documentary, physical, and digital evidence located in Mr. Pooley's locker and on the computer

23  with serial number Z3TQ24TJ.

24                                  Respectfully submitted,

25                                  HEATHER E. WILLIAMS
                                    Federal Defender
26

27  Date: February 5, 2024           */s/  Mia Crager*
                                    MIA CRAGER
28                                  MEGHAN McLOUGHLIN
                                    Assistant Federal Defenders
                                    Attorneys for Defendant