## TABLE OF EXHIBITS

| EXHIBIT | DOCUMENT |
|---------|----------|
| A | Search Warrant for the Lodi Parachute Center |
| B | DOT OIG Memorandum of Interview of Glen Sheets |
| C | Email from FAA Aviation Safety Inspector David Jensen |
| D | DOT OIG Memorandum of Interview of Peter Swann |
| E | DOT OIG Evidence Custody Document |
| F | Search warrant execution photos of closed lockers |
| G | Search warrant execution photos of lockers after agents opened them |
| H | DOT OIG Computer Crimes Unit Media Data Extraction request form |

# Exhibit A:

# Search Warrant for the Lodi Parachute Center

ORIGINAL
FILED

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

JAN 25 2018

for the

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

In the Matter of the Search of                    )
                                                   )
23597 North Hwy 99, Acampo, CA, 95220             )    Case No.   2:18-SW-.  46  EFB
                                                   )
                                                   )

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed
*(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire, Radio or Television |
| 18 U.S.C. § 1349 | Attempt and Conspiracy to Commit Fraud |
| 18 U.S.C. § 1519 | Destruction, Alteration or Falsification of records in Federal Investigations |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian DuBois
Special Agent, DOT-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-25-2018

_____
*Judge's signature*

City and state:  Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

Exhibit A: Page 1 of 27

## AFFIDAVIT IN SUPPORT OF

## APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Brian DuBois, being duly sworn, hereby depose and state:

### I. Purpose

1. I am a Special Agent with the United States Department of Transportation – Office of Inspector General. I make this affidavit in support of an application for issuance of a search and seizure warrant for the following premises:

   a. 23597 North Hwy 99, Acampo, CA, 95220

   The premises to be searched are more fully described in Attachment A.

2. I am informed, and believe, and thereon allege that there exists probable cause to believe that at the aforementioned premises, evidence, instrumentalities, fruits, or proceeds of violations of the following federal criminal statutes will be found:

   a. **Title 18, United States Code 1343** (Fraud by Wire, Radio, or Television)
   b. **Title 18, United States Code 1349** (Attempt and Conspiracy to Commit Fraud)
   c. **Title 18, United States Code 1519** (Destruction, Alteration, or Falsification of records in Federal Investigations)

   The items to be seized are documents, records, or information constituting evidence, instrumentalities, fruits, or proceeds relating to the defrauding of customers, by both Parachute Center, and Robert Pooley and Yuri Garmashov for the purposes of defrauding Parachute Center customers as well as Tandem Instructor students, as more fully set forth in Attachment B.

### II. Agent Training, Knowledge, and Experience

3. I am a Special Agent with the U.S. Department of Transportation- Office of Inspector General, San Francisco, CA, and have been assigned to this position since December 2016. As part of my training as a Special Agent, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in August 2013, and the Naval Criminal Investigative Service's Special Agent Basic Training Program in March 2014. As a Special Agent of the DOT-OIG, I have been involved in executing search warrants,

POOLEY 00019987

and conducting investigations involving fraud, false claims, false statements and other crimes under the jurisdiction of the Federal Aviation Administration (FAA), an agency of the United States Department of Transportation. I have knowledge of FAA regulations and electronic media/communications. Additionally, as a former Coast Guard Investigative Service Special Agent, I reviewed emails and other electronic communication in support of criminal investigations.

4. The information in this affidavit is based on my personal knowledge, my training and experience, evidence developed during the investigation, and information obtained from other agents and witnesses. Information is further based on witness interviews, document reviews, and investigations conducted by other government agencies. Because the affidavit is submitted for the limited purpose of establishing probable cause in the application of a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## III. Tandem Skydiving Operations Background

5. The Federal Aviation Administration (FAA) regulates various aspects of parachute operations, including tandem skydiving. 14 CFR 105.45 requires, among other things, that one of the parachutists using the tandem parachute system "hold a master parachute license issued by an organization recognized by the FAA" and "Has been certified by the appropriate parachute manufacturer or tandem course provider as being properly trained on the use of the specific tandem parachute system used." The organization recognized by the FAA to issue these licenses is the US Parachute Association (USPA), a non-governmental organization that governs parachuting in the United States and issues licenses. Parachutists earn additional ratings by completing certain tasks on a USPA Proficiency Card. These ratings include the Tandem Instructor rating. These cards are signed off by USPA licensed Evaluators and Examiners, and are subsequently submitted to USPA for final approval. USPA Examiners provide final sign-off on the proficiency cards, though Evaluators can provide instruction under an Examiner's supervision.

6. Tandem skydiving is a type of skydiving in which two individuals use the same parachute. A Tandem Instructor with a parachute on their back has another individual attached to their front. Tandem skydiving is commonly seen with individuals who are skydiving for the first time and they "ride" with an experienced skydiver.

POOLEY 00019988

## IV. Summary of Facts Supporting Probable Cause

7.  Parachute Center, which also operates under the name Skydivers Guild, Inc., is a parachute operation at 23597 North Hwy 99, Acampo, CA, operating out of several hangers at the Lodi Airport. It is operated by William Dause, and assisting him is his wife, Katherine Dause. Parachute Center claims to be one of the largest and oldest drop zones in the United States, operating since 1964. Parachute Center offers skydiving services to both experienced and new skydivers. First time skydivers are offered a tandem skydive with a "certified instructor". Dause also offers an accelerated training program for customers to become USPA licensed parachutists.

8.  Parachute Center has a history of accidents and fatalities associated with their operations. Based on open source reporting, to include news reports, since 2009 there have been at least nine fatalities and one plane crash, with the most recent fatality in September 2017. Based on the governments' investigations into Parachute Center, it appears some fatalities were likely due to poor training, some to equipment problems or malfunctions, and one possible suicide.

9.  Robert Pooley and Yuri Garmashov provided Tandem Instructor classes at Parachute Center until fall 2016. This information obtained regarding Pooley and Garmashov's activities was obtained through interviews of individuals familiar with Parachute Center, Pooley, and Garmashov, as well as the review of FAA and USPA investigations regarding Parachute Center operations. Initially, Pooley provided training and certification at Parachute Center's facility by himself. Students paid Pooley as much as $1,600.00 for training to get Tandem Instructor rated. Pooley then paid Dause for any services and fees charged by Parachute Center, to include harness use, aircraft fees, etc. Once the training was complete, newly certified Tandem Instructors could use this certification to jump with customers for payment; several were employed by Dause to conduct tandem parachute jumps at Parachute Center. In July 2015 Pooley's Examiner rating was suspended, after which he purported to provide instruction under Garmashov's supervision. At times, Garmashov provided Tandem Instructor training and certification at Parachute Center's facility as an Examiner. According to Garmashov, Pooley was only to provide instruction when Garmashov was at Parachute Center to directly supervise him.

10. Based on interviews of former Parachute Center skydivers and individuals familiar with Parachute Center's current parachute operations, first time or "bucket list" skydivers can pay $100 to $200 to tandem jump with a certified Tandem Instructor. Tandem skydiving customers will sign a waiver and are supposed to complete training prior to skydiving. Customers can pay with cash and credit card. Recently, in November 2017, an undercover agent observed that there are as many as six credit card processing machines at Parachute

POOLEY 00019989

Center. Based on my training and experience, my knowledge of credit card payments systems, as well as conversation with other agents, I believe customer transactions by credit card at Parachute Center cause the interstate transmission of signals in connection with Parachute Center's business and that use of these system resulted in interstate transmissions to complete sales. Customers receive "tokens" with denominations, which they provide to the Tandem Instructor they parachute with, and the videographer who records the parachute jump. Those instructors later give those tokens to Dause to get paid for the services they provide. Customer financial transactions, customer preparation, parachute rigging, and other key Parachute Center operations take place in Parachute Center's hanger marked as Hanger "A" in Attachment A. In addition to any receipts or payment information, the liability forms signed by customers provide a record of potential customers who conducted tandem skydives at Parachute Center.

11. According to a witness who conducts business with Parachute Center skydivers, tandem customers can pay for videos of their tandem skydives. A videographer will document the experience with video and photographs, to include the customer preparing for the jump, boarding and jumping out of the plane, and finally landing. Videographers will use their own cameras to include Go-Pros and digital cameras to document the parachute jumps. Upon completion of the parachute jump, footage is edited on computers at Parachute Center's facility. Pooley worked on the computers editing videos. The customer is provided the video and photographs. Some videos of customers' skydives are posted to Youtube and linked to the Facebook page "Skydive Lodi Parachute Center." Observable in the videos are other skydivers, to include customers and Tandem Instructors, all potential witnesses. This witness had regular access to Parachute Center and conducted rigging work for Parachute Center skydivers; additionally, the witness conducted contract work for the U.S. military.

12. The Youtube user page "Skydive Lodi Parachute Center" is associated with Parachute Center. Videos posted to the page include tandem skydiving customers parachuting at Parachute Center, Lodi, CA. In the opening sequence of these videos, aerial shots of Parachute Center's facility are shown and the title "The Parachute Center" appears on the video. Furthermore, a watermark appears in the lower left hand corner of the videos with Parachute Center's logo. Other customers and tandem instructors on the ground and in the plane can be seen in the videos.

13. On August 6, 2016, Tandem Instructor Yonghyon Kwon, and the customer skydiving with him, Tyler Turner, were killed skydiving at Parachute Center when their parachute failed to properly deploy. During the FAA's regulatory investigation, they learned Turner paid for the parachute jump with credit card and completed a liability waiver. Kwon was not recognized by USPA as a USPA licensed skydiver or a Tandem Instructor.

POOLEY 00019990

14. During a subsequent FAA regulatory investigation into the Kwon and Turner fatalities, Dause presented FAA officials with a copy of Kwon's Proficiency Card. Though Kwon's card indicated he completed Tandem Instructor training at Parachute Center in July 2016, his paperwork was never submitted by Pooley or Garmashov to the USPA, and Kwon was not recognized by the USPA as a Tandem Instructor or holding a master parachute license. Garmashov told FAA investigators that he was out of the country at the time of Kwon's training and that he could not have signed Kwon's Proficiency Card. A review of Garmashov's passport appears to corroborate he was out of the country when Kwon's Proficiency Cards were signed. I further obtained Customs and Border Protection border crossing records that corroborated his travel into and out of the United States. During a review of Proficiency Cards submitted by Pooley and Garmashov, USPA officials discovered that Pooley and Garmashov used pre-filled Tandem Instructor Proficiency Cards which included Garmashov's signature already in the necessary signature blocks. As a result of USPA's internal investigation following the fatalities, the USPA revoked all of Pooley and Garmashov's skydiving licenses and ratings in fall 2016. According to USPA, their licenses and ratings were never re-instated. This meant that after fall 2016, Pooley and Garmashov were not certified to conduct tandem skydives in the United States, and that any customers conducting tandem skydives with Pooley or Garmashov in the United States were not skydiving with "certified instructors."

15. Pooley previously had been a Tandem Instructor Examiner, but only from 2012 until July 2015. In July 2015 the USPA revoked his Examiner rating due to his repeated failure to properly submit paperwork, to include failing to submit USPA Proficiency Cards to the USPA. Pooley had a history of issues with the USPA as early as 2013 when he was initially certified as an Examiner. He repeatedly failed to properly handle and submit Proficiency Cards, causing some of his students not be properly certified. He was required to complete retraining in 2014. Following continued failures to properly handle paperwork, to include failing to submit paperwork properly, his Examiner rating was suspended in July 2015. Initially the suspension was for one year, but ultimately his Examiner rating was never reinstated.

16. After Pooley's Examiner rating was revoked in July 2015, he continued teaching at times with Garmashov, a Tandem Instructor Examiner. As an Examiner, Garmashov could certify students. According to witness interviews and the USPA investigation, as early as fall 2015, Pooley and Garmashov worked together providing training at Parachute Center's facility. They continued to use Parachute Center facilities, equipment, aircraft, and computers at Parachute Center for their work. Based on the USPA's investigation and the fact Garmashov was out of the country when some forms were executed, it was apparent Pooley was using pre-filled cards that contained Garmashov's signature. These pre-filled

POOLEY 00019991

proficiency cards were used to train and certify students while Garmashov was out of the country and not present for training; including Kwon's proficiency card.

17. Following the August 6, 2016 fatalities of Kwon and Turner, Garmashov submitted the certification paperwork for over ten previously trained Tandem Instructors to the USPA, some as old as six months, that he failed to previously submit. This meant over ten Tandem Instructors were likely operating under the assumption they were certified when in fact the USPA had no knowledge they completed the training, and they were not certified to conduct Tandem Parachute operations. At this point, the investigation has identified at least two instructors that were in fact conducting Tandem Parachute jumps without being properly rated by the USPA. There is reason to believe further investigation may identify others.

18. The investigation thus indicates Pooley and/or Garmashov received payments from students but at least some of those students did not receive the Tandem Instructor ratings they were paying for; indeed in the instances where Garmashov was not present the students could not have received such ratings because Pooley was not certified to provide the training by himself. In addition, some of Pooley and Garmashov's students were not properly trained, according to USPA's investigation. As a result of the above problems, in September 2016, the USPA required approximately 140 Tandem Instructors who were trained by Pooley and/or Garmashov to complete refresher training, and/or had their ratings suspended or revoked. The USPA required these individuals to take refresher courses or have their licenses suspended completely. Moreover, these individuals (who had been students of Pooley and Garmashov) had to seek out new Examiners to complete the retraining in accordance with USPA standards at costs of up to $800. These costs were in addition to what they originally paid Pooley and Garmashov for the initial training.

19. Following a September 14, 2017 fatal accident involving a wingsuit skydiver at Parachute Center, FAA initiated an investigation into the accident separate to their investigation into the Kwon/Turner fatality. As part of this investigation, FAA inspectors interviewed Dause at Parachute Center. When questioning Dause at the front counter about the accident, Dause stepped away and returned a short while later with a document titled "Manifest", that contained lists of names on given flights. During follow-up visits, FAA inspectors observed blank copies of these manifest forms on the main customer desk.

20. In addition to FAA inspectors observing manifest sheets during the interview, a picture posted to the "Skydive Lodi Parachute Center" Facebook page on September 14, 2017, shows a woman reviewing "Manifest" sheets and cash next to her and the comment "Michelle Hart counting her riches."

POOLEY 00019992

21. On November 28, 2017, an undercover agent approached Dause at Parachute Center and inquired about tandem skydiving. He was told by Dause they could be jumping in 30 minutes. When the undercover agent asked additional questions regarding safety and training, Dause stated if they wanted to jump rather than talk about jumping, give him $100 and he would get them up. This exchange took place in Hanger "A" as depicted in Attachment A. The undercover agent also observed Parachute Center operations, paperwork and records, and spoke with Parachute Center employees and/or contractors in Hanger "B" as depicted in Attachment A. Parachute Center operations in Hanger "B" included storage and maintenance of aircraft.

22. On December 5, 2017, a witness familiar with Parachute Center's operations observed and photographed Pooley and Garmashov conducting tandem parachute operations with customers at the Parachute Center. Pooley and Garmashov's did not have USPA licenses and Tandem Instructor ratings at this time, and were not certified to conduct tandem parachute operations in the United States. The witness, previously identified in the affidavit, works at Lodi Airport and provides rigger services to Parachute Center skydivers.

23. On December 29, 2017, FAA inspectors conducted a regulatory inspection at Parachute Center and asked a tandem instructor for his USPA license with Tandem Instructor rating. The instructor retrieved his licenses from a personal locker maintained at Parachute Center, indicating tandem instructors maintain licenses and records in their personal lockers. FAA inspectors observed these lockers in a public area, that customers, employees and/or contractors have access to inside Hanger "A".

24. On January 2, 2018, "Kathy Dause" sent an email from Parachute Center's email address, "paractr@softcom.net", in response to an undercover agent's emailed request for information. In her email she stated "You will definitely go with certified Instructors." The email address "paracte@softcom.net" was found on Parachute Center's website; Katherine Dause operates Parachute Center with her husband William Dause.

25. On January 2, 2018, a video titled "Tandem Skydive with Wael by Brian" was published to the "Skydive Lodi Parachute Center" Youtube page. This video shows a customer's tandem skydive. The video shows the customer boarding an aircraft operated by Parachute Center. Later in the video, the same customer is seen in the aircraft sitting next to an individual that appears to be Robert Pooley. Pooley appears to be wearing a tandem parachute rig. Pooley is not currently licensed to conduct tandem operations; his USPA license and tandem instructor rating was revoked in 2016.

26. Based on witness interviews of individuals familiar with Parachute Center's facilities, and the observations of the undercover agent, Hanger "C" is used by Parachute Center

POOLEY 00019993

skydivers, and includes approximately a dozen tents where individuals appear to be living. Dause allows employees and/or contractors to live in this hanger.

27. Based on the foregoing, I believe there is probable cause to believe that the following has occurred::

    a.  Individuals who paid Pooley and/or Garmashov for Tandem Instructor training and ratings at Parachute Center did not, and in some cases could not, have received the Tandem Instructor ratings for which they paid;

    b.  Some Parachute Center customers have likely jumped with Tandem Instructors they were told were certified when in fact they were not; and

    c.  In the case of Kwon's Proficiency Card, the document Dause provided to the FAA contained Garmashov's signature that in fact could not have been made by Garmashov at the time stated due to him being out of the country.

## V. Procedures For Electronically Stored Information

28. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

Forensic Imaging

a.  After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are

POOLEY_00019994

added, the length of time that the agents must remain onsite can become dangerous and impractical.

b. If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within sixty (60) days of seizure, unless the government is otherwise permitted by law to retain such original devices, and/or the Court grants an extension of this time period upon application of the government.

Identification and Extraction of Relevant Data

c. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

d. Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular

POOLEY 00019995

relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.  It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.  Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify

POOLEY_00019996

data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this Court.

h. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

Genuine Risks of Destruction

i. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant or of this investigation, will there be a genuine risk of destruction of digital or electronic evidence by the subject.

Prior Attempts to Obtain Data

j. The United States has not attempted to obtain this data by other means.

## VI. Conclusion

Based on the foregoing, I believe there is probable cause to believe that evidence, instrumentalities, fruits, or proceeds of violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), as further described in Attachment B, will be located at the following premises:

a. Parachute Center, 23597 North Hwy 99, Acampo, CA

29. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the premises described in Attachment A and the seizure of the items described in Attachment B.

## VII. Request for Sealing

30. The United States request that the Court order this search warrant and search warrant affidavit be kept under seal until further order of the Court, with the exception that a copy

POOLEY_00019997

of the search warrant will be left at the scene of the search. Without such an order, individuals may conceal, damage, or destroy other evidence relevant to this ongoing investigation.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

BRIAN DUBOIS
Special Agent, United States Department of Transportation – Office of Inspector General

Sworn and Subscribed to me on January 25, 2018

Edmund F. Brennan
United States Magistrate Judge

Approved as to form:

CHRISTOPHER S. HALES
Assistant United States Attorney

POOLEY_00019998

## ATTACHMENT A

### *Description of Location to be Searched*

Parachute Center is located 23597 North Hwy 99, Acampo, CA, and is comprised of a set of hangers located on the Lodi Airport. It is located on North Hwy 99 Frontage Road, on the west side of Hwy 99. Marking the location is a painted sign, pictured below, with "SKYDIVE" in black letting and a red arrow beneath it.



The facility includes several hangers:



POOLEY_00019999

The hanger in which customers pay and get ready, indicated by the "A" on the above map, is a two story white/beige hanger (Picture Below). Attached to the side of the hanger facing Hwy 99 Frontage Road, is a painted blue and multicolored sign with "SKYDIVE" painted on it, pictured below. There is a single brown door on the North side of the hanger with a brown sign with white stenciling.





Hanger "B", pictured below, is located northeast of Parachute Center's main hanger. This hanger houses aircraft leased to Dause and is where maintenance is conducted on the



POOLEY_00020000

aircraft.  There are offices in this building where Parachute Center personnel conduct business.

Hanger "C" is directly south of Parachute Center's main hanger and is a smaller hanger, with a yellow sign labelled "Skydiving 209-369-1128".  This is Parachute Center's telephone number.  This hanger houses skydivers who work for Parachute Center and spaces to prepare and rig equipment.



The search of the aforementioned premises shall include any and all lockers and containers on the premises, to include the lockers identified in Hanger "A."

POOLEY_00020001

## ATTACHMENT B

## ITEMS TO BE SEIZED

The evidence to be searched for and seized concerns violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), in whatever form, whether physical, digital, electronic, or otherwise, and is described as follows, **for items created, modified, or in use during the period of July 1, 2015 to present**:

1. Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.

2. Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.

3. Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.

4. Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.

5. Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.

6. Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.

POOLEY_00020002

7. Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.

8. Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.

9. Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.

10. Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.

11. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

    a. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the press to restore it;

    b. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form;

    c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

POOLEY_00020003

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CDRWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes other information necessary to access the computer equipment, storage device or data.

POOLEY_00020004

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of )
)
)          Case No.    **2: 1 8 - SW - .   4 6       EFB**
23597 North Hwy 99, Acampo, CA, 95220 )
)
)

## SEARCH AND SEIZURE WARRANT

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before   *2-8-2018*   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern
District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ ˉfor _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:  *1-25-2018*
                       *at 1:30 p.m.*                                    _____
                                                                              *Judge's signature*

City and state:        Sacramento, California                    Edmund F. Brennan, U.S. Magistrate Judge
                                                                        *Printed name and title*

Exhibit A: Page 20 of 27

POOLEY_00020005

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____                    _____
Signature of Judge                                                    Date

POOLEY_00020006

# ATTACHMENT A

## *Description of Location to be Searched*

Parachute Center is located 23597 North Hwy 99, Acampo, CA, and is comprised of a set of hangers located on the Lodi Airport. It is located on North Hwy 99 Frontage Road, on the west side of Hwy 99. Marking the location is a painted sign, pictured below, with "SKYDIVE" in black letting and a red arrow beneath it.



The facility includes several hangers:



POOLEY_00020007

The hanger in which customers pay and get ready, indicated by the "A" on the above map, is a two story white/beige hanger (Picture Below). Attached to the side of the hanger facing Hwy 99 Frontage Road, is a painted blue and multicolored sign with "SKYDIVE" painted on it, pictured below. There is a single brown door on the North side of the hanger with a brown sign with white stenciling.





Hanger "B", pictured below, is located northeast of Parachute Center's main hanger. This hanger houses aircraft leased to Dause and is where maintenance is conducted on the



POOLEY_00020008

aircraft. There are offices in this building where Parachute Center personnel conduct business.

Hanger "C" is directly south of Parachute Center's main hanger and is a smaller hanger, with a yellow sign labelled "Skydiving 209-369-1128". This is Parachute Center's telephone number. This hanger houses skydivers who work for Parachute Center and spaces to prepare and rig equipment.



The search of the aforementioned premises shall include any and all lockers and containers on the premises, to include the lockers identified in Hanger "A."

POOLEY_00020009

## ATTACHMENT B

## ITEMS TO BE SEIZED

The evidence to be searched for and seized concerns violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), in whatever form, whether physical, digital, electronic, or otherwise, and is described as follows, **for items created, modified, or in use during the period of July 1, 2015 to present**:

1. Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.

2. Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.

3. Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.

4. Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.

5. Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.

6. Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.

POOLEY_00020010

7. Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.

8. Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.

9. Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.

10. Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.

11. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

   a. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the press to restore it;

   b. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form;

   c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

POOLEY_00020011

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CDRWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes other information necessary to access the computer equipment, storage device or data.

POOLEY_00020012

Exhibit B:

DOT OIG Memorandum of Interview of Glen Sheets

United States Department of Transportation – Office of Inspector General

# Memorandum of Activity

| Case Number:<br>I16A0120900 | Office:<br>JRI-5 Western (San Francisco) | Type of Activity:<br>**Interview** |
|---|---|---|
| Date of Activity:<br>08/11/2017 | Date Report Drafted:<br>09/11/2017 | Location of Activity: |
| Subject of Activity:<br>SHEETS, GLEN | Activity Conducted By (Name(s)):<br>Brian DuBois | Signature:<br>B D |

On August 11, 2017, Glen "Scotty" Sheets, Stockton, CA, was interviewed by Special Agent Brian DuBois, U.S. Department of Transportation, Office of Inspector General, San Francisco, CA. The interview took place at Sheets' residence, ▮▮▮▮▮▮▮▮▮ Stockton, CA. After the interviewing agent identified himself, displayed his credentials for inspection and apprised Sheets the purpose of the interview was to discuss Parachute Center and William Dause, Sheets provided the following pertinent information:

Sheets is a former Stockton police officer, and previously served in the U.S. Army and the French Foreign Legion. He first began skydiving with the military in 1972. He started parachuting at Parachute Center around 1982, and that was when he met Dause. Sheets conducted camera jumps and was a tandem instructor at Parachute Center. Sheets last jumped in November 2016. He currently flies for Parachute Center with other qualified pilots; Sheets does not fly skydivers alone because he does not have the commercial pilot's license to do so.

Dause taught Sheets Accelerated Freefall course. During which, Dause served as the pilot and jump master on the training flights, which Sheets felt was dangerous because Dause could not safely help students parachute and fly the plane. When he described Dause, he stated "his way or the highway." Nothing happened at Parachute Center that Dause was not aware of, hearing and knowing everything. He was ruthless and Sheets doubted he had friends. Sheets knew Dause's wife, Katherine Dause, and described her as an absolute love. However, Dause treated her like everyone else, and Sheets felt it was a psychologically abusive relationship. Sheets saw Dause fire his staff as well as customers.

Sheets stated the equipment at Parachute Center was great. After three years, Dause would sell the equipment to other drop zones. The aircraft were well-maintained, though not cosmetically beautiful.

Skydivers at Parachute Center did not pay attention to regulations when jumping. For example, it was not until a Caravan crash last year that skydivers started using the seat belts. Additionally, skydivers would parachute in the clouds, which is unsafe. Dause would not focus on safety. For example, it is recommended skydivers have a "C" License and 200 jumps to be able to conduct camera skydives, recording other skydivers. Sheets was counseling an "A" license student about these criteria when Dause "ripped" into him about it. He told Sheets that he decides who wears a camera and that they were not a "USPA Dropzone" and as long as someone could do good video they were hired.

Sheets worked with Robert Pooley. He described Pooley as an excellent instructor, and as "solid." Pooley would use Sheets, Michael LNU, and another individual as coaches, instructors, and evaluators. This was between 2014 and 2016.

Sheets would coach for Pooley, and as a coach he worked under Pooley's instruction. However, Sheets and Pooley had an arrangement that if Sheets felt a student performed the criteria for a given task well enough, Sheets would sign off using Pooley's "number" and signature. Pooley was aware of it. When asked if this was a common practice, he did not know how common of a practice it was elsewhere, but Pooley gave him permission

This report is the property of the Office of Inspector General, and is For Official Use Only. It contains sensitive law enforcement information, the use and dissemination of which is subject to the Privacy Act, 5 U.S.C. § 552a. This information may not be copied or disseminated without the written permission of the OIG, which will be granted only in accordance with the Privacy Act and the Freedom of Information Act, 5 U.S.C. § 552. Any unauthorized or unofficial use or dissemination of this information will be penalized.

Office of Inspector General - Investigations
U.S. Department of Transportation

POOLEY_00001605

to do it because Pooley would end up signing the students record off anyway if Sheets said the student was ready.  Sheets stressed no safety standards were ever cut; when Sheets worked with students, he would explain what the procedures were, why they did what they did, etc.  When Sheets became an instructor, he did not permit any of his coaches to sign his name.

Sheets heard rumors from other skydivers that Dause was forcing Pooley to hurry students.  Sheets never saw this or dealt with this first hand.  Sheets knew Pooley was renting a room from Dause.  Dause had control over Pooley's living arrangements and employment, stating "Bill had him by the balls."  According to Sheets, Roger Hoffman had information pertaining to Dause pressuring Pooley.  Sheets heard Pooley ran good safe courses until Dause got involved and was telling him to cut corners.  He again stressed though that this was hearsay from Peter Swann who heard it from Hoffman.

At the peak of Parachute Center's activity, they were so busy they would run two aircraft at a time with one loading passengers on the ground while the other deployed skydivers from the air.  Sheets stated he would land and someone would be there to give him a newly packed parachute to board the next aircraft.  This "peak" of activity was prior to and a little after the Fall 2016 accident.  Despite the increased activity, their operations were still safe; Parachute Center was a "fine-tuned" machine.

Sheets knew of Pooley and Yuri Garmashov working together as coach, instructor, and examiner.

Sheets knew Mark Fisher, a skydiver who was fired by Dause and is currently conducting tandem courses in Southern California.  Sheets described him a s superb instructor who never returned after Dause fired him.

If someone wanted to conduct a "bucket list" skydive, they would go to the front desk, which was either manned by Dause or his wife.  They would sign a waiver and pay either $100 for just the parachute jump, or $175 for the parachute jump and a video.  Each customer would receive a lanyard with a number and tokens of different denominations, after which they would watch a video regarding the parachute jump.  Sheet's described as an antiquated video, though he stated the information was still good and relevant.  Dause maintained two "boards.  On one, tandem instructors are listed down the left-hand side of the board while the flight number is across the top.  The customer numbers would be placed on the board to reflect their flight and instructor information.  The second board pertained to camera jumpers.

After the video, customers would go to the tandem ready area and find their tandem instructor.  The tandem instructor would take the $20 token for themselves, and the $5 token to give to the rigger.  The camera jumper would get the $50 token.  They customer would then be harnessed up and make the parachute jump.

Every Monday morning, the Parachute Center staff would write down on a sheet of paper the values of all the tokens they collected for work performed and wrap the tokens in the paper.  Later in the morning, an announcement "All staff to front desk" would be made, and the staff would go and collect a sheet of paper with their earnings in cash wrapped in it.  There were "no records, no nothin'".  Robert Seaton, also known as "R2", handled the paying of the staff.  He also sometimes worked the front desk.  He was fired by Dause, and fired "for real."  Sheets stated "no body works there," indicating there were no employees at Parachute Center, it was just individuals who collected tokens for work.

Sheets stated a lot of money, all cash, went through Parachute Center.  Only "bucket list" customers used cards for payments.  If someone was buying a parachute rig or paying for a course, they paid cash.  If people sold items to Dause, they were paid in cash; in one example, Sheets stated Dause paid $12,000 cash for a car.  Dause would allow people to pay for small items, such as batteries and an altimeter with a card, but everything else cash.

Sheets explained that Dause would not answer questions about Parachute Center, such as the number of

This report is the property of the Office of Inspector General, and is For Official Use Only. It contains sensitive law enforcement information, the use and dissemination of which is subject to the Privacy Act, 5 U.S.C. § 552a. This information may not be copied or disseminated without the written permission of the OIG, which will be granted only in accordance with the Privacy Act and the Freedom of Information Act, 5 U.S.C. § 552. Any unauthorized or unofficial use or dissemination of this information will be penalized.

Office of Inspector General - Investigations
U.S. Department of Transportation

Exhibit B: Page 2 of 3

POOLEY_00001606

customers or the amount of money Parachute Center was taking in.  After a busy day, Sheets would ask how many customers they had and Dause would not give a number, but Sheets felt Dause knew exactly how many they had.  When asked if he felt it unusual that Dause would not answer questions, Sheets stated the "cop part of me- he had something to hide" and added he did not know what, if anything Dause claimed in taxes.  Sheets did not believe Dause maintained records because it would be dangerous.  He thought Dause maintained maintenance records for the aircraft.

If someone Dause does not know comes to Parachute Center to parachute with customers, he will check their log-book and cards.  Dause does not keep copies of licenses or track instructor's licenses.  However, if Pooley tells Dause an instructor is "good", Dause will let them jump with customers without checking their log-books.  Dause did not check instructors annually for their new, current parachute cards.

The only course Dause runs are "first jump" courses.  Coaching and other instructor courses are run by others at Parachute Center.  If a skydiver is at the level of additional training, they know who at Parachute Center to go to for training, and for the longest time that was Pooley.  Dause made money off of the classes Pooley ran.  He would receive $45 for the tandem rig the student would use and then $15 for the ride in the plane.  Each student needed at least 5 tandem parachute jumps.

Sheets wife, Maria Sheets also skydives at Parachute Center.  She parachutes with the U.S. Army's elite Golden Knights.  Robert Pooley was her instructor for her coaching course.  She never had issues or complaints of Pooley's instruction.

Reviewed By (Initials): L G      Date: 04/01/2019

This report is the property of the Office of Inspector General, and is For Official Use Only. It contains sensitive law enforcement information, the use and dissemination of which is subject to the Privacy Act, 5 U.S.C. § 552a. This information may not be copied or disseminated without the written permission of the OIG, which will be granted only in accordance with the Privacy Act and the Freedom of Information Act, 5 U.S.C. § 552. Any unauthorized or unofficial use or dissemination of this information will be penalized.

Office of Inspector General - Investigations
U.S. Department of Transportation

Exhibit B: Page 3 of 3

POOLEY_00001607

# Exhibit C:

# Email from FAA Aviation Safety Inspector David Jensen

# Skydiving inccident

| | |
|---|---|
| **From:** | "Jensen, David T (FAA)" ██████████ |
| **To:** | ██████████ |
| **Date:** | Fri, 12 Aug 2016 14:28:50 -0400 |

Hello Yuri,

David Jensen here, from the Oakland FSDO. As you may know, I am the Inspector in charge of this Kwon/Turner incident.
I would like to talk with you, I left a voice message on your phone and we can set up a date/time that is convenient for you.

Do you have Kwon's original USPA & UPR document (applications) etc. Dause did give me copies. They are very light and are difficult to read.

Thank you,
David Jensen



**Federal Aviation Administration**

**David T Jensen**
Aviation Safety Inspector
Airworthiness Avionics

**Oakland FSDO**
**Flight Standards District Office**
1420 Harbor Bay Parkway, Suite 280
Alameda, CA. 94502-7083
T 510-748-0122 ████████
F 510-748-9559
E-mail: ██████████

Please consider the environment before printing this email.

Exhibit C: Page 1 of 1

Exhibit D:

DOT OIG Memorandum of Interview of Peter Swann

United States Department of Transportation - Office of Inspector General

# Memorandum of Activity

| Case Number:<br>I16A0120900 | Office:<br>JRI-5 Western (San Francisco) | Type of Activity:<br>Interview |
|---|---|---|
| Date of Activity:<br>01/12/2018 | Date Report Drafted:<br>01/12/2018 | Location of Activity: |
| Subject of Activity:<br>SWANN, PETER | Activity Conducted By (Name(s)):<br>Brian DuBois | Signature:<br>B D |

On January 12, 2018, Peter Swann, Lodi, CA, was interviewed by Special Agent Brian DuBois, U.S. Department of Transportation, Office of Inspector General, San Francisco, CA. Swann was previously interviewed by S/A DuBois. After being informed of the purpose of the interview, Swann provided the following information:

Swann observed Robert Pooley, Lodi, CA, and Yuri Garmashov, Lodi, CA, conduct tandem parachute jumps on December 5, 2017, and provided two pictures. He observed Pooley and Garmashov were wearing "Sigma" tandem parachutes and were followed by their customers as they boarded a plane at parachute center.

In addition to observing them conducting tandem parachute jumps, he knows they conduct jumps as cameramen for the tandem jumps as well. He has observed Pooley and Garmashov conducting Freefall Instruction courses at Parachute Center. Dause sells the course to customers, and Pooley and Garmashov provide the training.

After a 2016 skydiving accident, Pooley and Garmashov left the Parachute Center; however, they have since returned. He believes they have both been there for at least the last two or three months. Swann explained that the two were always "available for work."

Swann knows Dause maintains records on his desk and the Parachute Center counters. He has several filing cabinets throughout the warehouse where he keeps records. Dause is apparently "squeezed" for money right now. He does not have as many customers as he once did. Regarding the Lodi Airport, without Parachute Center, the airport would shut down. Swann knows Dause has a bi-plane and a Cessna 182 in a neighboring hangar that he shares with the owner of the airport. Dause also owns the D-3 by the café.

Swann observed Michael Spurgeon at the Parachute Center. Spurgeon does odd jobs for Dause such as packing parachutes. He lives close to the Parachute Center and is there a couple days a week. Spurgeon is not involved in running the Parachute Center. Dause runs the Parachute Center.

The pilots at Parachute Center include Bob Metz, John Haynes, Greg Behrens, and Dause. Dause reportedly conducted tandem skydives over the summer in 2017.

Swann indicated Harry Parker operated the Skydive Lodi Parachute Center website. He believed the site was run in coordination with Dause initially, but the two have since had a falling out. Swann thought Dause ran another Parachute Center website that was older.

Ian Flanagan visits Parachute Center to pick up his airplane and fly it to Canada for maintenance. He does it every couple months. Flanagan is a smart guy and an attorney. Swann did not know what kind of law he practiced.

Swann also observed Ed Pawlowski at Parachute Center; the last time was a couple weeks ago. Swann does not know how much longer Pawlowski will jump there because Dause is raising his rates.

This report is the property of the Office of Inspector General, and is For Official Use Only. It contains sensitive law enforcement information, the use and dissemination of which is subject to the Privacy Act, 5 U.S.C. § 552a. This information may not be copied or disseminated without the written permission of the OIG, which will be granted only in accordance with the Privacy Act and the Freedom of Information Act, 5 U.S.C. § 552. Any unauthorized or unofficial use or dissemination of this information will be penalized.

Office of Inspector General - Investigations
U.S. Department of Transportation

Exhibit D: Page 1 of 2

POOLEY_00001666

Reviewed By (Initials): W S      Date: 02/05/2018

This report is the property of the Office of Inspector General, and is For Official Use Only. It contains sensitive law enforcement information, the use and dissemination of which is subject to the Privacy Act, 5 U.S.C. § 552a. This information may not be copied or disseminated without the written permission of the OIG, which will be granted only in accordance with the Privacy Act and the Freedom of Information Act, 5 U.S.C. § 552. Any unauthorized or unofficial use or dissemination of this information will be penalized.

Office of Inspector General - Investigations
U.S. Department of Transportation

Exhibit D: Page 2 of 2

POOLEY_00001667

# Exhibit E:

# DOT OIG Evidence Custody Document



U.S. Department of Transportation

Office of Inspector General

# EVIDENCE CUSTODY DOCUMENT

| CASE TITLE | PROJECT NUMBER | DATE AND TIME OF SEIZURE | LOG NO: |
|---|---|---|---|
| Parachute Center | I16A0120900 | 1/30/2018 | 18-02 |

| NAME OF PERSON FROM WHOM PROPERTY SEIZED | LOCATION WHERE PROPERTY SEIZED |
|---|---|
| As per Search Warrant | 23597 North Highway 99 Lodi, CA 95220 |

| TO BE RETURNED | GRAND JURY MATERIAL - DISSEMINATE ONLY UNDER RULE 6(e), F.R.C.P. | | |
|---|---|---|---|
| ☐ YES   ☐ NO | | ☐ YES | ☑ NO |

| ITEM | QUAN-TITY | DISPOSAL ACTION | DESCRIPTION OF ARTICLE - MODEL NUMBER, SERIAL NUMBER, IDENTIFYING MARKS, CONDITION, AND VALUE WHEN APPROPRIATE |
|---|---|---|---|
| | | | BOX/Container Number   8 |
| | | | Room Code          Description |
| 1 | 1 | | A1ss   (Pooley Locker) USPA and UPT applications; 25 CDs |

| NAME AND SIGNATURE OF WITNESS (IF AVAILABLE) | NAME AND SIGNATURE OF RECEIVING SPECIAL AGENT |
|---|---|
| | |

Form IGF 1600.14 (12/83)      Exhibit E: Page 1 of 1          CHAIN OF CUSTODY ON REVERSE

POOLEY_00022120

# Exhibit F:

# Search warrant execution photos of closed lockers



Exhibit F: Page 1 of 7



POOLEY_00027392



Exhibit F: Page 3 of 7



POOLEY_00027394



Exhibit F: Page 5 of 7



POOLEY_00027396



Exhibit F: Page 7 of 7

# Exhibit G:

# Search warrant execution photos of lockers after agents opened them



POOLEY_00027343



Exhibit G: Page 2 of 26



POOLEY_00027345



Exhibit G: Page 4 of 26



Exhibit G: Page 5 of 26

POOLEY_00027347



Exhibit G: Page 6 of 26



POOLEY_00027349



POOLEY_00027350



Exhibit G: Page 9 of 26





Exhibit G: Page 11 of 26

POOLEY_00027353


POOLEY_00027354



POOLEY_00027355



POOLEY_00027356



Exhibit G: Page 15 of 26



Exhibit G: Page 16 of 26



POOLEY_00027359



Exhibit G: Page 18 of 26



Exhibit G: Page 19 of 26



Exhibit G: Page 20 of 26

POOLEY_00027362



Exhibit G: Page 21 of 26



POOLEY_00027364



Exhibit G: Page 23 of 26



POOLEY_00027367



POOLEY_00027368

**Department of Transportation Office of Inspector General**
Case 2:21-cr-00111-WBS Document 48-1 Filed 02/07/24 Page 75 of 77
**FMC Pictures**

| | |
|---|---|
| **Case Name** | Parachute Center |
| **Case Number** | I16A0120900 |
| **Case Agent** | DuBois, Brian |
| **CCU Agent** | Wilkerson, Matt |
| **Seizure Location** | 23597 North Highway 99 |
| | Acampo, CA |

**Container Serial Number**     A1ss SDHC 4GB-1

**Media Serial Number**     A1ss SDHC 4GB-1



POOLEY_00001831

# Exhibit H:

# DOT OIG Computer Crimes Unit Media Data Extraction request form

# Computer Crimes Unit (CCU) Media Data Extraction (MDE)

**The following activity does NOT represent a full forensic examination of the underlying media. This information is provided for the purposes of ongoing investigative activity. Please ensure you request a full forensic analysis of any data that is found to be of potential investigative interest.**

| 1. Case #: I16A0120900 | 2. Case Title: Parachute Center | 3. Date MDE Completed: 02/09/2018 |
|---|---|---|

4. Description of Media: Provide a general description of the media
See Block #11 for details

5. Case Specific Keywords? Provide a listing of keywords agreed upon by the case agent and CCA

The CCU was requested to search the recovered digital media to locate all documents, emails, and videos related to the operations of the Parachute Center.

6. Time Frame: Dates as determined by the warrant
NA

7. Documents Extracted: ☑ Microsoft Office Documents (e.g. doc, xls)   ☑ PDFs   ☑ Graphic Files (e.g. jpg, tif)   ☐ Other:
All files by extension to include the following: doc,docx, rtf, xls, xlsx, wpd, ppt, pptx

8. Email Extracted: ☑ Outlook   ☐ Thunderbird   ☐ AOL   ☐ Lotus Notes   ☐ Express   ☐ Eudora   ☐ Exchange   ☐ Netscape   ☐
Entourage   ☐ Web-Based   ☐ Other:

9. Forensic Tools Used for Data Extraction: ☐ Encase   ☐ FTK   ☐ X-Ways   ☑ Other: Nuix Workstation 7.4

10. System Used for Data Extraction:
CCU Forensic Server

**Additional Information**

11. Additional Comments:   Use this section to describe how the extracted data was provided to the case agent and any other information that needs further explanation.

The following images were extracted for Media Data Extraction:

| | |
|---|---|
| 070C44B8ACDF8C06 | A1rr |
| 128Silver | A1ss |
| 000000009407 | A1z |
| 14022638 | A0525H13YD37002521 |
| 313633363133444232363245 | AD18GB1 |
| A1bb | E01Capture |
| A1D8GB2 | e0479e94 |
| A1D16GB | S251NSAG401498N |
| A1G32GB | Sony Memory |
| A1h | UFED LG CDMA LS665 2018_01_30 (003) |
| A1hhh | W3THPGXB |
| A1kk | WXC1A166P4H7 |
| A1nn | Z3TQ24TJ |
| A1p | Z4Z2NYR0 |
| A1Q2GB1 | |
| A1Q2GB2 | |
| A1Q-8GB-1 | |
| A1Q-32GB | |

FOR OFFICIAL USE ONLY

(Continue on Plain Bond Paper If Needed)

Exhibit H: Page 1 of 1

POOLEY_00001872