PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:21-CR-00111-WBS |
| Plaintiff, | UNITED STATES' OPPOSITION TO POOLEY'S MOTION TO STRIKE SURPLUSAGE |
| v. | DATE: March 4, 2024 |
| ROBERT ALLEN POOLEY, | TIME: 9:00 a.m. |
| Defendant. | COURT: Hon. William B. Shubb |

UNITED STATES' OPPOSITION TO POOLEY'S MOTION TO STRIKE SURPLUSAGE

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND.................................................................................2

    A.    Tandem Skydiving is a Regulated Activity ...............................................2

    B.    Parachute Center Offered Tandem Skydives to Customers, as well as Tandem Instructor Courses to Experienced Skydivers .........................................................3

    C.    Pooley's Examiner Ratings were Suspended.............................................3

    D.    Pooley Nevertheless Accepted and Taught Tandem Instructor Candidates ......................4

    E.    Kwon Died in a Skydiving Accident, Prompting the FAA to Obtain the Documents and Witness Accounts that Form the Basis of Both Aggravated Identity Theft Counts. .......................4

    F.    Kwon's Death Prompted the USPA to Investigate the Accident, Uncover Pooley's Fraud, Exchange Letters with Pooley Containing Key Admissions, and Invalidate the Tandem Instructor Ratings of Each of the Wire Fraud Victims Who Will Testify at Trial. ........................5

    G.    In the Wake of Kwon's death, Pooley's Students Learned Their Ratings Were Invalid and Demanded Refunds.............................6

    H.    Pooley Made Various Admissible Statements in a Videotaped Deposition in a Wrongful Death Lawsuit..........................8

III.  LEGAL AUTHORITY ..........................................................................................8

IV.   ARGUMENT.........................................................................................................10

    A.    Pooley Faces No Prejudice from Mention of Kwon's Death in the Indictment ...............10

    B.    Pooley Fails to Demonstrate that Kwon's Death is an Irrelevant and Immaterial Fact ..............11

        1.    Pooley May Not Bar Reference to the Accident Because it would Deprive the Jury of Foundation for Key Documents and a Coherent and Comprehensible Story of the FAA's Investigation.........................12

        2.    Removing References to the Accident Would Distort Evidence Generated in the Course of the USPA Investigation .............................15

        3.    Eliminating Discussion of the Accident Would Hamper the Testimony of the Victims.................................16

        4.    Pooley Should Not Be Allowed to Force Conjecture Regarding Kwon's Unavailability to Testify........................17

        5.    To Excise the Accident From The Story Would Enable Pooley to Inaccurately Minimize the Significance of his Fraud ............................18

V.      CONCLUSION ..................................................................................................................19

**<u>Table of Authorities</u>**

**Cases**

*Castrejon v. United States*,
2020 WL 4904870 (C.D. Cal. 2020) ............................................................. 10

*Moyer v. United Dominion Indus., Inc.*,
473 F.3d 532 (3d Cir. 2007) ....................................................................... 11

*Old Chief v. United States*,
519 U.S. 172 (1997) ......................................................................... 11, 12, 15

*United States v. Abel*,
469 U.S. 45 (1984) ..................................................................................... 11

*United States v. Accetturo*,
966 F.2d 631 (11th Cir.1992) .................................................................... 18

*United States v. Copple*,
24 F.3d 535 (3d Cir. 1994) ................................................................... 12, 16

*United States v. Curtin*,
489 F.3d 935 (9th Cir. 2007) ...................................................... 12, 17-18, 18

*United States v. Daly*,
974 F.2d 1215 (9th Cir. 1992) ........................................................ 12, 13, 14

*United States v. Eisenberg*,
773 F.Supp. 662 (D.N.J. 1991) ................................................................... 9

*United States v. Fahey*,
769 F.2d 829 (1st Cir. 1985) ...................................................................... 9

*United States v. Graves*,
5 F.3d 1546, 1550 (5th Cir. 1993) ....................................................... 8, 9-10

*United States v. Hans*,
738 F.2d 88 (3d Cir. 1984) ........................................................................ 12

*United States v. Hedgepeth*,
434 F.3d 609 (3d Cir. 2006) ............................................................. 9, 10, 11

*United States v. Hicks*,
103 F.3d 837 (9th Cir. 1996) ..................................................................... 12

*United States v. Kemper*,
503 F.2d 327 (6th Cir. 1974) ...................................................................... 9

*United States v. Laurienti*,
611 F.3d 530, 546–47 (9th Cir. 2010) ...................................................... 8, 9

*United States v. Oakar*,
111 F.3d 146 (D.C. Cir. 1997) ................................................................... 10

*United States v. Pac. Gas & Elec. Co.*,
2014 WL 4954040 (N.D. Cal. 2014) ..................................................... 8, 9, 19

*United States v. Pineda-Doval,*
    614 F.3d 1019 (9th Cir. 2010) ................................................................. 12

*United States v. Prejean,*
    429 F.Supp.2d 782 (E.D. La. 2006) ......................................................... 10

*United States v. Ramirez,*
    710 F.2d 535–45 (9th Cir. 1983) ................................................................ 8

*United States v. Rasheed,*
    663 F.2d 843 (9th Cir. 1981) ................................................................... 12

*United States v. Rivera-Gomez,*
    67 F.3d 993–98 (1st Cir. 1995) ................................................................ 18

*United States v. Terrigno,*
    838 F.2d 371 (9th Cir. 1988) ..................................................................... 9

**Rules**

Fed. R. Evid. 401. ....................................................................................... 11

**Other**

14 C.F.R. § 105.45 ............................................................................. *passim*

PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.  2:21-CR-00111-WBS |
|---|---|
| Plaintiff, | UNITED STATES' OPPOSITION TO POOLEY'S MOTION TO STRIKE SURPLUSAGE |
| v. | DATE: March 4, 2024 |
| ROBERT ALLEN POOLEY, | TIME: 9:00 a.m. |
| Defendant. | COURT: Hon. William B. Shubb |

The United States hereby opposes Pooley's Motion to Strike Surplusage from the Indictment.

## I.     **INTRODUCTION**

In what appears to be an opening salvo on admissibility, Pooley's motion seeks to strike all references to the death of one of his victims in a skydiving accident. However, language in an indictment may only be stricken if it is prejudicial and irrelevant. The language that Pooley seeks to strike is neither prejudicial nor irrelevant and, accordingly, his motion should be denied.

Pooley seeks to strike language that is simple and factual, serving to explain the victim's absence and to state a fact within the chronology of events without which other facts would not make sense. Neither of the two grounds for prejudice that Pooley argues in his motion – upsetting the jury or confusing the issues at trial (see Mot. at 5) – would plausibly result from the words Pooley seeks to strike. To the extent any risk exists, it could be eliminated by simply not reading the Indictment to the jury. In other words, Pooley fails to meet his burden to demonstrate that he would suffer any prejudice

from the language of the Indictment. For this reason alone, the Court should deny his motion.

In addition, Pooley should not be permitted to artificially excise the accident because it is an inextricable, relevant, and material part of the charges and narrative to be presented at trial. The accident sparked investigations by the Federal Aviation Administration (FAA), the United States Parachute Association (USPA), Uninsured United Parachute Technologies (UPT), and the Department of Justice, into Pooley's fraudulent practices. Within days of the death and in connection with the death investigations, USPA and UPT permanently revoked Pooley's ratings, each of the victims learned that Pooley had defrauded them and that they had no valid ratings to conduct tandem jumps, and the owner of Parachute Center, Bill Dause, provided the evidence underlying Count 5 to an FAA investigator. The accident informs nearly every witness's testimony, explains important documentary evidence, and provides context for Pooley's recorded and unrecorded admissions. Any effort to erase the accident from the chronology of events would greatly distort the factfinding process. Because the fact of the accident is relevant and material, references to it in the Indictment are not surplusage.

In sum, because Pooley cannot meet the exacting standard to strike language from an indictment as surplusage, with respect to either prejudice or irrelevance, his motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  Tandem Skydiving is a Regulated Activity

By way of background, tandem skydiving is a form of skydiving in which two skydivers jump together, i.e., in tandem. It typically involves a first-time or novice skydiver (often a paying member of the public) harnessed to the front of an experienced skydiver (known as a tandem instructor) who controls all operation of the parachute. (*See* ECF No. 1, ¶ 1). Tandem skydiving is regulated by 14 C.F.R. § 105.45. This regulation requires, *inter alia*, that a person conducting tandem jumps: (i) have a certain level of experience; (ii) possess a master parachute license issued by an organization recognized by the FAA; and (iii) complete a tandem instructor course given by, and be certified by, the manufacturer of the tandem parachute system. *See* 14 C.F.R. § 105.45(a)(1).

The USPA is the only organization recognized by the FAA to issue a master parachute license. (*See* ECF No. 1, ¶¶ 13-14). It also issues a Tandem Instructor certification (known as a "rating") upon the successful completion of prerequisites and a Tandem Instructor Rating Course conducted by a

certified USPA Tandem Instructor Examiner ("Examiner"). (*Id.*) During the Tandem Instructor Rating Course, the candidate is required to complete tasks that are recorded on a USPA Tandem Instructor Rating Course Proficiency Card. (*Id.*) The USPA Examiner is the only one who can provide final certification, by signing the final "Rating Recommendation" and attesting, "I have personally examined and recommend this applicant for the USPA Tandem Instructor rating."  (*Id.* at ¶ 15).

Similarly, UPT, a manufacturer of tandem parachute systems, issues a Tandem Instructor rating after candidates complete five jumps under the supervision of a qualified Tandem Examiner. (*See id*. at ¶¶ 16-19). UPT requires that the five jumps be recorded on a UPT Tandem Instructor Certification form, followed by the UPT Tandem Examiner's signature. (*Id.*) UPT's guidelines specifically require Tandem Examiners to be present during the execution of certain certification jumps and "present and participating during all certification processes." (*Id.* at ¶ 19). These guidelines further state that UPT Tandem Examiners cannot sign off unless they were present during the "entire certification process." (*Id.*)

**B.     Parachute Center Offered Tandem Skydives to Customers, as well as Tandem Instructor Courses to Experienced Skydivers**

Parachute Center was a skydiving business that operated out of Acampo, California, and that offered tandem skydives to paying customers. (*See* Exhibit 1, at Bates 00000081-82). It was known as the cheapest and largest skydiving center in the area. (*Id*. at Bates 00000081). Parachute Center also offered classes to experienced skydivers through which the skydivers could obtain ratings, including ratings allowing them to jump with paying customers as Tandem Instructors. (*Id*. at Bates 00000082). Pooley and Y.G. (referred to as "Person 2" in the Indictment) were two individuals at Parachute Center that ran Tandem Instructor ratings courses, at least until August of 2016. (*See* ECF No.1, ¶¶ 2, 4; Exhibit 2, at Bates 00001394-95). Pooley obtained his Examiner rating from USPA in 2010, and Y.G. obtained his Examiner rating in 2014. (*See* Exhibit 3, at Bates POOLEY_26234, 26257).

**C.     Pooley's Examiner Ratings were Suspended.**

In August of 2015, after ongoing errors with candidate paperwork, and violations of various safety requirements, USPA sent Pooley a letter informing him that his Examiner rating had been suspended for a period of one year, effective July 26, 2015. (*See* Exhibit 4, at Bates 00020920). The

letter further informed him that his rating could only be reinstated after that one year if USPA's entire Board of Directors approved. (*Id*.) Reflecting a reciprocity agreement, UPT also sent Pooley a letter in August of 2015, informing him that it too had suspended his Examiner rating. (*See* Exhibit 5). As discussed above, one of the practical consequences of these suspensions meant that Pooley was no longer able to teach Tandem Instructor courses unless under the direct supervision of another Examiner. (*See* Exhibit 2, at Bates 00001394). It also meant that Pooley was not permitted to certify Tandem Instructor candidates and thus could not bestow Tandem Instructor ratings to enable these candidates to engage in tandem jumps with customers. (*See* ECF No. 1, ¶¶ 15, 19; *see also* Exhibit 2, at Bates 00001394-1395). In an email exchange with a USPA representative on August 28, 2015, Pooley acknowledged his suspension, stating "I understand the terms of the suspension" and "I know (the courses) need to be run by another (instructor examiner)." (*See* Exhibit 6).

### D.   Pooley Nevertheless Accepted and Taught Tandem Instructor Candidates

Despite his suspension, Pooley continued to accept and teach Tandem Instructor candidates at Parachute Center. Initially, Pooley helped Y.G. run these courses, which was permissible. (*See* Exhibit 2, at Bates 00001394). However, in late May of 2016, Y.G. left the country. (*See* Exhibit 7, at Bates POOLEY_00022198). Pooley nevertheless continued to accept and teach a number of candidates seeking to obtain their Tandem Instructor rating, without any Examiner overseeing the course. (*See* Exhibit 2, at Bates 00001394; *see also* Exhibit 8, at Bates 00002521 and Exhibit 9, at Bates POOLEY_00018873). One of these candidates was Yonghyeon Kwon (referred to as "Victim 2" in the Indictment). (*See* Exhibit 1, at Bates 00000082).

### E.   Kwon Died in a Skydiving Accident, Prompting the FAA to Obtain the Documents and Witness Accounts that Form the Basis of Both Aggravated Identity Theft Counts.

On August 6, 2016, Kwon died in a tandem skydiving accident along with a paying customer, 18-year-old Tyler Turner. (*See* Exhibit 1, at Bates 00000082). The accident prompted the FAA to open an investigation. (*See* Exhibit 7, Bates POOLEY_00022199). The investigator assigned, David Jensen, met with the owner of Parachute Center, Bill Dause, and obtained documents from Dause purportedly indicating that Kwon was a certified tandem instructor. (*See* Exhibit 1, at Bates 00000082). Among the documents that Dause gave Jensen were Kwon's USPA Tandem Instructor Rating Course Proficiency

Card and UPT Tandem Instructor Certification Form. (*See* Exhibit 10, at Bates POOLEY_ 00000073-74, 76). These documents appeared to verify the completion of several training-related activities and certify Kwon's authorization to conduct tandem jumps. For example, the USPA card verified that Kwon "[d]emonstrated five practice tandem cutaways wearing tandem equipment and with a simulated student in the student harness in the presence of a USPA Tandem Instructor or Tandem Instructor Examiner." (*Id*. at Bates POOLEY_00000074). Following the completion of all training activities, on July 1, 2016, his Tandem Instructor Examiner, Y.G., purportedly signed off on the cards, attesting that he had "personally examined and recommend(ed) this applicant for the USPA Tandem Instructor rating. He or she [had] demonstrated the ability to train and jump with tandem students…" (*Id*.)

However, when Jensen contacted Y.G. to discuss Kwon's credentials, Y.G. informed him that he was in Russia from May through August of 2016, and thus did not (and could not have) signed off on Kwon's paperwork. (Exhibit 7, at Bates POOLEY_00022208). Further investigation revealed that it was in fact Pooley that had conducted Kwon's tandem instructor course, without any Examiner oversight, and that he had used pre-printed forms with Y.G.'s signature in order to process the certifications. (*See* Exhibit 1, at Bates 00000082; Exhibit 7, at Bates POOLEY_00022198).

Jensen confronted Pooley with this fact. Pooley acknowledged his suspension and could not provide a satisfactory answer about why he was nevertheless still teaching a tandem instructor course without any involvement by a certified Examiner. (Exhibit 7, at Bates POOLEY_00022207). In further interviews with Department of Transportation (DOT) investigators, Pooley admitted that he was Kwon's examiner and that he certified him using pre-printed forms with Y.G.'s signature. (*See* Exhibit 11, at Bates POOLEY_00003270, 3300-3301; Exhibit 12, at Bates 00002542-43).

In essence, the FAA investigation revealed that Kwon was uncredentialed. He was not authorized, by law or by the various entities involved in regulating the activity, to conduct the tandem jump that led to his, and Turner's, deaths. (*See* Exhibit 7, at Bates POOLEY_00022199).

    **F.**    **Kwon's Death Prompted the USPA to Investigate the Accident, Uncover Pooley's Fraud, Exchange Letters with Pooley Containing Key Admissions, and Invalidate the Tandem Instructor Ratings of Each of the Wire Fraud Victims Who Will Testify at Trial.**

Following the accident, the USPA also conducted an investigation and determined that a number

of candidates (including Kwon) had been improperly taught and/or certified. (*See* Exhibit 13, at Bates 00000077). USPA specifically confirmed that it had not certified Kwon, and also confirmed that UPT had no record of Kwon being certified. (Exhibit 2, at Bates 00001394). Based on this revelation, USPA determined that Pooley was using certification forms that had been pre-filled with Y.G.'s signature to certify students that he was teaching during the period of time that his certification to teach such courses had been suspended. (*Id*. at 1394-95). Noting that "[p]ost-course rating applications may have been submitted under false pretenses or with forged signatures since…the course examiner had been suspended and was not authorized to conduct courses," the USPA identified approximately 140 impacted tandem instructors, and required them to attend further training or re-certify entirely, at their expense. (*See* Exhibit 13, at Bates 00000077-80). On August 10, 2016, USPA suspended Pooley's membership and all ratings with the organization, basing its decision on Pooley's role in enabling the tandem jump that led to Kwon's death. (*See* Exhibit 14, at Bates 00001485). Several months after the accident, Pooley sent USPA a letter in which he admitted instructing Kwon and using Y.G.'s signature (without Y.G.'s knowledge) to complete Kwon's paperwork. (*See* Exhibit 15, at Bates 00020382-83).

###    G.    In the Wake of Kwon's death, Pooley's Students Learned Their Ratings Were Invalid and Demanded Refunds

Many of the other impacted skydivers learned of their ratings being "pulled" in the days following the accident. Victim 1 was informed that he had lost his Tandem Instructor rating soon after the accident, and learned it was because Pooley's Examiner rating had been suspended when Victim 1 took the course. (*See* Exhibit 8, at Bates 00002521; *see also* Exhibit 16, at Bates 00003161). It led to him unsuccessfully asking Pooley for a refund and paying $2,500 to retake the course. (*See* Exhibit 8, at Bates 00002521). In an email, Pooley acknowledged that Victim 1 was owed a refund and apologized, saying "You have no idea how sorry I am that all of this has happened." (*See* Exhibit 17, Bates 00020979).

Victim 3 was in the same course as Kwon and remembered Kwon. (*See* Exhibit 18, Bates 00002501-02). Victim 3 was trained by Pooley, but received paperwork after the course that had been pre-filled with Y.G.'s signatures just like Kwon's paperwork, even though Y.G. was not involved in any way with their course. (*Id*.) Several weeks after completing the course, Victim 3 had not received his

approved credentials, and contacted Pooley, who told him that it would be coming soon. (*Id*.) Not long after that conversation, Victim 3 learned of the accident. (*Id*.) Victim 3 reached out to Pooley and asked Pooley if the deceased was Kwon, and Pooley confirmed it was. (*Id*.) Victim 3 learned that Pooley's rating had been revoked and that Pooley had not been certified to teach the course and realized why his paperwork had been pre-filled with Y.G.'s signatures. (*Id*.) Victim 3 asked Pooley for a refund; Pooley essentially told him to wait in line. (*Id*., at Bates 00002502 and POOLEY_00003168).

Likewise, Victim 4 was in the same course as Victim 3 and Kwon. (*See* Exhibit 19, at Bates 00018906-907). He was also instructed by Pooley and also received paperwork that contained pre-filled signatures. (*Id*.) After completing the course, several skydivers, including Victim 4, asked Pooley about the status of their paperwork, and Pooley told them to wait. (*Id*.) In his interview with investigators, Victim 4 recalled Kwon's accident vividly as he was at the location that day. (*Id*.) Following the accident, Victim 4 and other skydivers continued to ask Pooley about the status of their paperwork, and Pooley continued to tell them that it was being processed. (*Id.*) Pooley attempted to find another examiner to run the course again, but refused to offer Victim 4 a refund. (*Id*.) Eventually, Victim 4 left Parachute Center and re-took the tandem instructor course at a different location. (*Id*.)[1]

Victim 7 also took a tandem instructor course from Pooley. (*See* Exhibit 20). After completing his training exercises, Victim 7 completed his own paperwork, but when he gave it to Pooley, Pooley rejected it and asked him to instead complete paperwork that had been pre-signed by Y.G. (*Id*.) After learning about Kwon's accident on the news, Victim 7 knew that his ratings had been cancelled because Pooley was not certified to provide Tandem Instructor training. (*Id*.)  Victim 7 did not ask Pooley for a refund; he explained that he was more focused on the fact that two people had died. (*Id*.)

Victim 8 (not mentioned in the Indictment but will testify at trial) also took the same course as Kwon and Victims 3 and 4. (*See* Exhibit 9, Bates POOLEY_00018873-74). Like the other victims, he too asked Pooley about the status of his paperwork after the accident, and Pooley told him not to worry.

---

[1] Victim 5's statement was also consistent with the other victims. He took the same course as Kwon and Victims 3 and 4, and received the same, pre-filled paperwork. He also unsuccessfully asked Pooley for a refund after the accident, and had to re-take a course at a different location. After the filing of the Indictment, however, Victim 5 passed away in an unrelated skydiving accident. Although he will not be available to testify at trial, the government mentions his statement to demonstrate the consistency in the victims' narratives.

(*Id*.) He also subsequently asked for a refund, to no avail, and had to re-take the course after returning to his home country. (*Id*.) In his interview with investigators, Victim 8 recalled feeling very sad for Kwon and his family on his flight home. (*Id*.)

### H.   Pooley Made Various Admissible Statements in a Videotaped Deposition in a Wrongful Death Lawsuit

On February 23, 2018, Pooley was sued (along with several other people and entities) by Turner's parents for Wrongful Death, Negligent Infliction of Emotional Distress, Fraud and Alter Ego Liability. (*See* San Joaquin Superior Court Case No. 2018-0002192). Pooley gave a videotaped deposition in connection with that lawsuit on January 21, 2020. During that deposition, Pooley confirmed that he "participated" in Kwon's training and verified his qualifications. (*See* Exhibit 21, at POOLEY_00002300). He admitted that his USPA rating was suspended at the time that he conducted Kwon's course. (*See id*. at POOLEY_00002307). Pooley expounded on his interpretation of the relevant FAA, USPA and UPT regulations. (*See id*. at POOLEY_00002308-09). Finally, he admitted that Y.G. was in Russia at the time of Kwon's training, and that all the paperwork that they used in connection with that course was pre-signed with Y.G.'s signature. (*See id*. at POOLEY_00002312-13.)

### III.   LEGAL AUTHORITY

Federal Rule of Criminal Procedure 7 permits a defendant to move to strike "surplusage from the indictment...." Fed. R. Crim. P. 7(d). "The purpose of Rule 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Ramirez*, 710 F.2d 535, 544–45 (9th Cir. 1983). In other words, "language in an indictment that is relevant to the charges is not surplusage, and a court need not balance relevance against prejudice in deciding a motion to strike." *United States v. Pac. Gas & Elec. Co*., 2014 WL 4954040, at *2 (N.D. Cal. 2014) [citing *United States v. Laurienti*, 611 F.3d 530, 546–47 (9th Cir. 2010) ("Even if the use of the word "unlawful" could be considered prejudicial, we hold that the district court nevertheless did not abuse its discretion because the allegation was relevant") and *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993) ("For language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial.")].

"Although the Ninth Circuit has not fully articulated the applicable relevance standard in the

context of surplusage, it has implied that "relevance" for indictment purposes is a fairly broad standard," by "repeatedly affirming district courts' decisions not to strike surplusage on relevance grounds." *Pac. Gas & Elec. Co*., 2014 WL 4954040, at *2. For example, in *Laurienti*, the Ninth Circuit upheld the use of the adjective "unlawful" in an indictment to describe certain sales practices, even though the conduct was not unlawful per se, because the government intended to prove unlawfulness at trial. *See Laurienti*, 611 F.3d at 547. Similarly, in *United States v. Terrigno*, 838 F.2d 371 (9th Cir. 1988), the Ninth Circuit allowed an indictment's description of embezzled funds as "destined for the 'poor and homeless,'" even though this characterization of the intended recipients of the funds (i.e., poor and homeless) was not a fact necessary to prove that the funds were embezzled. *See Terrigno*, 838 F.2d at 373; *see also Pac. Gas & Elec. Co*., 2014 WL 4954040, at *2 (the *Terrigno* court's holding is "best understood as applying a broad and permissible definition of relevance at the grand jury stage.")

Likewise, using this broad standard of relevance, the Northern District of California denied a motion to strike allegations describing a gas line explosion that killed eight people, injured fifty-eight others and damaged 108 homes in an indictment charging the Pacific Gas and Electric Company ("PG&E") with one count of obstructing a National Transportation Safety Board investigation, and twenty-seven counts of record-keeping and maintenance-related violations of the Natural Gas Pipeline Safety Act (PSA). *Pac. Gas & Elec. Co*., 2014 WL 4954040, at *1-4. Although the deaths, injuries and property loss of the impacted victims could fairly be described as prejudicial to the defendant, and not facts necessary to prove a *prima facie* case, the court nevertheless held these facts relevant and not surplusage. *Id*. at *3-4. Specifically, it found the facts relevant to infer PG&E's intent to obstruct the investigation, and relevant to the PSA counts because the pipeline explosion made it at least somewhat more likely that the pipeline was improperly maintained, as explosions are a foreseeable consequence of poor maintenance and monitoring contemplated by the PSA. *Id*.

Indeed, "the standard under Rule 7(d) has been strictly construed against striking surplusage." *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974); *see also United States v. Hedgepeth*, 434 F.3d 609, 611 (3d Cir. 2006) ("Motions to strike surplusage are rarely granted"); *United States v. Eisenberg*, 773 F.Supp. 662, 700 (D.N.J. 1991) ("It is an exacting standard which is met only in rare cases.") (citing *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990)). While the decision to

strike surplusage is subject to the district court's discretion, *see Laurienti*, 611 F.3d at 546, the "scope of a district court's discretion to strike material from an indictment is narrow." *United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997).

## IV.   ARGUMENT

### A.   Pooley Faces No Prejudice from Mention of Kwon's Death in the Indictment

At the outset, the Court should deny Pooley's motion because he cannot identify any prejudice that he would suffer should the language remain in the Indictment. As discussed above, in order for a court to strike surplusage, the language in question must be both prejudicial and irrelevant. *See Laurienti*, 611 F.3d at 547; *see also Hedgepeth*, 434 F.3d at 612 (the court may strike surplusage from the indictment when it is both irrelevant (or immaterial) and prejudicial). Courts regularly deny motions to strike where the movant fails to demonstrate prejudice. *See e.g. Hedgepeth*, 434 F.3d at 612 (no prejudice was shown where the jury was neither shown nor read the indictment); *United States v. Fahey*, 769 F.2d 829, 842 (1st Cir. 1985) (use of the word "numerous" and the phrase "among other things" in mail and wire fraud indictment was not inflammatory or prejudicial, and thus not surplusage); *Graves*, 5 F.3d at 1550 (identification of defendant's official position in conspiracy count was neither inflammatory nor prejudicial); *Castrejon v. United States*, 2020 WL 4904870, at *4 (C.D. Cal. 2020) (denying motion where petitioner failed to demonstrate that purportedly surplus allegations were prejudicial); *United States v. Prejean*, 429 F.Supp.2d 782, 796 (E.D. La. 2006) (in prosecution against nurse, physicians, and clinics for conspiracy to illegally dispense prescription drugs, descriptions in indictment of street uses of prescription medications were not unnecessary or inflammatory).

Here, the language that Pooley seeks to strike is simple and factual. The Indictment mentions that Kwon is "now deceased" and that he died with a tandem customer on August 6, 2016, near the premises of Parachute Center. (*See* ECF No. 1, ¶ 6). This is a factual statement that helps explain Kwon's unavailability. Similarly, the phrase "after his fatal accident" in paragraph 32 establishes a timeline of events, i.e., that the FAA obtained Kwon's paperwork after his fatal accident. (*See id.* at ¶ 32). Finally, the reference in paragraph 38 establishes a chronology as to when candidates began asking for their refunds from Pooley. (*See id.* at ¶ 38).

Contrary to Pooley's assertion that these statements could "upset a jury" and result in a

"conviction for unrelated deaths," the Indictment presents these facts in a non-suggestive and uninflammatory manner. It does not delve into any details of the accident. It does not even draw any connections between the accident and the charges against Pooley. Pooley has not shown a risk that this language could upset a jury or that it would result in a jury convicting Pooley for "unrelated deaths" instead of his fraud.[2]

In any event, if the defense is concerned about prejudice, there is a simple solution: the jury does not need to be read the Indictment. The government would not oppose a defense request to forego reading the Indictment to the jury, and there is no legal reason the Indictment needs to be read. Obviously, if the Indictment is not read at trial, it could not cause any prejudice. *See Hedgepeth*, 434 F.3d at 612. In sum, because Pooley cannot demonstrate any prejudice resulting from these statements, his motion to strike them from the Indictment should be denied.

### B.   Pooley Fails to Demonstrate that Kwon's Death is an Irrelevant and Immaterial Fact

The Court should also deny Pooley's motion because he fails to establish that the accident is irrelevant. In his motion, Pooley presents a myopic view of what constitutes relevance, arguing simply that because Kwon's "death is not an element of the offense, and proving the death is not required to secure a conviction," it should be stricken as being irrelevant. But Pooley mischaracterizes his burden. On the contrary, "[t]he definition of relevant evidence is very broad" and "does not raise a high standard." *Moyer v. United Dominion Indus., Inc.,* 473 F.3d 532, 544 (3d Cir. 2007). Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. A fact of consequence is not limited to the ultimate issue in a case, such as one of the defined essential elements of a crime, but, instead, can be any step along a path of inference that leads to an "ultimate fact." *Old Chief v. United States*, 519 U.S. 172, 179 (1997). This encompasses facts peripheral to the ultimate issue. *See e.g. United States v. Abel*, 469 U.S. 45 (1984) (witness bias as a fact of consequence, even

---

[2] To be clear, the government will be mindful of treating the death with sensitivity at trial and introduce only those facts that are necessary and relevant to the chronology of the fraud and its discovery, the charges, and witness accounts. The government will stay well away from gratuitous or irrelevant details and has no intention of introducing video or photos of the accident.

though it stands outside the evidentiary route leading to ultimate facts); *United States v. Hans*, 738 F.2d 88, 91 (3d Cir. 1984) (physical evidence corroborating a witness's story is relevant, even though it has nothing to do with a defendant); *United States v. Curtin*, 489 F.3d 935, 940 (9th Cir. 2007) (government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense); *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994) (in mail fraud prosecution, evidence about victims' losses and defendant's refusal to make good those losses was relevant to show defendant's specific intent to defraud); *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir. 1981) (losses to victims relevant to show fraud scheme). In presenting its case, a prosecution has a "need for evidentiary richness and narrative integrity in presenting a case" and is entitled "to present to the jury a picture of the events relied upon." *Old Chief*, 519 U.S. at 183, 187; *see also United States v. Pineda-Doval*, 614 F.3d 1019, 1034 (9th Cir. 2010). The government may offer "a coherent and comprehensible story regarding the commission of the crime." *United States v. Hicks*, 103 F.3d 837, 844 (9th Cir. 1996), overruled on other grounds by *United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992) (quoting *United States v. Moore*, 735 F.2d 289, 292 (8th Cir.1984)).

Here, Kwon's accident is an inextricable part of the narrative. It was a defining event that led to the discovery of critical facts and evidence in this case. For the reasons discussed herein, its mention in the Indictment is not surplusage, and accordingly should not be stricken.

1. **Pooley May Not Bar Reference to the Accident Because it would Deprive the Jury of Foundation for Key Documents and a Coherent and Comprehensible Story of the FAA's Investigation.**

As Pooley acknowledges in his motion, the accident was at the center of the many investigations that led to the discovery of Pooley's fraud. The FAA's investigation would not have been initiated but for Kwon's death. As discussed above, because of and in response to the accident, FAA Inspector Jensen obtained Kwon's documents from Dause. These documents form Count 5 and constitute aggravated identity theft because they show Pooley's use of Y.G.'s means of identification (Y.G.'s signature), in furtherance of Pooley's scheme to defraud. In other words, had it not been for the accident,

the FAA would not have initiated the investigation and would not have received the documents that form the basis of Count 5. The documents are, of course, relevant as they establish Pooley's scheme and intent to defraud, as well as his theft of Y.G.'s identity. And the manner in which Jensen obtained these documents is also relevant, as it is critical to demonstrate their materiality, legitimacy, and role in the crimes charged. Absent understanding *why* Jensen sought out these documents, and *how* he obtained them, a jury will not understand the very basis of the investigation and will be forced to consider these documents, and the FAA's investigation, in a void. Artificially removing any mention of the accident from Jensen's testimony would create such a void as it would deprive Jensen of the ability to explain why he was at the Parachute Center, or why he asked Dause for Kwon's documents. Consequently, it would deprive the government of being able to demonstrate where the documents that give rise to Count 5 came from.

Further, these documents led Jenson to interview both Y.G. and Pooley. These interviews resulted in critical statements and admissions. For example, Jensen asked Pooley directly about why he had taught Kwon a tandem instructor course despite being suspended by the USPA, and why Kwon's documents reflected Y.G.'s signatures, even though Y.G. was in Russia at the time. (*See* Exhibit 7, POOLEY_00022207). Pooley did not provide a satisfactory answer. (*Id*.) His failure to provide an adequate explanation regarding the discrepancy operates as an admission of wrongdoing, but would make no sense to a jury if Jensen did not explain why he was asking about Kwon's credentials in the first place. Similarly, Jensen interviewed Y.G., who also confirmed that he could not have signed Kwon's documents as he was in Russia at the time, and that [Kwon's] "USPA/U.P.T documents…were falsified and/or forged…" (*Id*., at POOLEY_00022208). Again, in the absence of context, why Jensen spoke with Y.G. would be confusing to a jury. It is hard to imagine a comprehensible direct examination of Jensen without Jenson stating the reason for his investigation. In turn, depriving Jensen of the ability to discuss the context of his investigation, and subsequent conversations with Pooley and Y.G., would undermine the credibility of a government witness.

Ultimately, Jensen's investigation led him to determine that Pooley had been teaching a tandem instructor course without possessing the appropriate rating, and that he had used Y.G.'s signatures to falsely certify Kwon's documentation. This is captured in the FAA's Enforcement Investigation Report,

which provides that "Dause provided the [FAA] investigator with [Kwon's] USPA and U.P.T. application document copies under false pretenses…[w]ith forged signatures dated July 1, 2016 of [Y.G.] who was in Russia from May 26, 2016 to August 2, 2016 and did not/could not have signed the USPA/U.P.T. documents. Rob Pooley had some initials on these documents." (*See id*., at POOLEY_00022198). The report concludes that it's "purpose…is to prove that Mr. Rob Pooley allowed [Kwon] to perform a tandem parachute operation with a [customer], when [Kwon] was not USPA licensed and not U.P.T tandem rated. In which both men were fatally injured." (*See id*. at POOLEY_00022199).

Kwon's accident also explains Pooley's admissions to DOT investigators. Specifically, in interviews following and regarding the accident, Pooley admitted to investigators that he used pre-printed forms with Y.G.'s signature to certify Kwon. Pooley's effort to bar reference to Kwon's death would make the agents' questions, and Pooley's answers, confusing.

Pooley made similar admissions to the attorneys for Turner's parents in a videotaped deposition in a civil case in which he was sued for Wrongful Death, in which he also explained his interpretation of FAA regulations and USPA/UPT guidelines, all of which the government intends to introduce at trial. Again, his statements would likely confuse a jury if not presented in context – a reasonable jury is likely to wonder about the source of the video deposition, or why Pooley was being deposed, or why he made these admissions or statements.

In sum, Kwon's skydiving accident is the event that runs through the entirety of the FAA investigation, from its inception, through the evidence uncovered, up to its ultimate conclusion. It also informs the DOT's subsequent investigation, and the civil lawsuit in which Pooley made relevant admissions. The accident is a fact of consequence that helps explain the relevance and significance of this evidence and investigation.

Stated succinctly, the accident is relevant and material to the charges against Pooley and references to it are not surplusage. Removing the accident from the narrative would permit Pooley to interfere with the presentation of evidence and the jury's fact-finding mission. This would sow confusion amongst the jurors and give the impression that facts are being withheld from them and that they are not hearing the whole story. *See Daly*, 974 F.2d at 1217 (jury is entitled to know the

circumstances and background of a criminal charge). Pooley should not be allowed to do so.

2.   **Removing References to the Accident Would Distort Evidence Generated in the Course of the USPA Investigation**

Kwon's death was also at the center of the USPA investigation that uncovered the wide-ranging nature of Pooley's fraud. The accident led USPA to try to verify Kwon's ratings, which led to the discovery that Kwon was not certified by either USPA or UPT. USPA determined that Pooley had taught courses in 2016 despite his own ratings having been suspended, and used Y.G.'s electronically-signed, pre-filled proficiency cards to certify candidates in Y.G.'s absence. A representative of USPA spoke with Pooley after the accident, noted that he was "distraught," and admitted to using blank forms with Y.G.'s signature electronically filled in when Y.G. was out of the country. (*See* Exhibit 2, Bates 00001394-95). The accident led to USPA uncovering the wide-ranging nature of the fraud and issuing a statement to its members requiring approximately 140 other tandem instructors and candidates to take some form of remedial training. (*See* Exhibit 13, at Bates 00000077-80). Ultimately, the accident was the reason cited in USPA's letter suspending Pooley's membership and all ratings. (*See* Exhibit 14). And, in a letter to USPA following the accident, Pooley also admitted the manner in which he used Y.G.'s signatures to complete candidates' paperwork, and specifically admitted his role in training Kwon in an effort to absolve Y.G. of responsibility. (*See* Exhibit 15).

As is clear, the accident was the focal point of USPA's investigation and is contextually critical to understand nearly all the evidence that it uncovered against Pooley. Excising the accident from the description of the investigation undermines the "narrative integrity" of the investigation. *Old Chief*, 519 U.S. at 183. For example, the accident is critical to allow a USPA representative to discuss why USPA looked into Kwon's credentials, or why he spoke with Pooley after the accident, or why Pooley was distraught when he admitted to using pre-filled certification forms. It is a fact that is pervasive in USPA's written documentation, including a statement in which it required approximately 140 members to take corrective action, its letter to Pooley suspending his membership, and in Pooley's letter admitting to his scheme and his involvement in training Kwon. These conversations and documents, none of which would have come to light and all of which are related to the accident in some form, will be introduced by the government to demonstrate the nature of Pooley's fraud, his knowing and intentional

participation in the scheme, and his use of Y.G.'s identity, all of which are essential elements of the charges against him. Kwon's death is inextricable from this admissible evidence.

### 3. Eliminating Discussion of the Accident Would Hamper the Testimony of the Victims

The accident will also inform the trial testimonies of each of Pooley's victims. Victims 3, 4 and 8 will all testify that they saw Kwon in the same course as them, and at least one victim will testify that he saw Kwon conduct a tandem jump. This demonstrates that Kwon believed he possessed the necessary rating to conduct tandem jumps after completing a course with Pooley. In turn, it will allow the jury to infer that this belief was enabled by Pooley's use of Y.G.'s signature on his rating documentation. In other words, the victims' testimony about Kwon will help establish Pooley's wire fraud scheme as well as the "use" element of Count 5.

Moreover, Kwon's accident is the event that led to his course-mates, and other candidates who had been taught by Pooley in the same timeframe, to realize they had been defrauded. As discussed above, the accident revealed that Pooley was teaching a tandem instructor course without possessing a valid rating, and many other victims of his fraud realized that they too had been impacted after the accident. Indeed, Victims 3, 4 and 8 were all in the same course as Kwon, driving their realization that, like Kwon, they too had been defrauded. To Victim 1, Pooley apologized after the accident, stating "You have no idea how sorry I am that all of this has happened." (*See* Exhibit 17, at Bates 00020979). Several victims will testify that they asked Pooley about the status of their paperwork and unsuccessfully demanded refunds from him after the accident.

These are relevant facts to establish the materiality of Pooley's scheme, as it demonstrates the impact of his fraud on his victims. *See Copple*, 24 F.3d at 545 (evidence about victims' losses and defendant's refusal to make good those losses was relevant to show defendant's specific intent to defraud). The victims should not be prevented from discussing why they asked Pooley about the status of their paperwork, or why they asked for refunds, and it would be impossible to present their testimony without referencing the event that led to the discovery of their victimization and influenced their subsequent actions. To do so would create unnecessary holes in their narrative and potentially impact their credibility.

To further illustrate this point, Victim 7 said that it was the accident that caused him to *not* seek a refund from Pooley, as he felt that it was more important that two people had died in that moment. His decision to not seek a refund impacts his credibility as a witness – given that it is natural for a victim in these circumstances to ask for a refund, and the fact that all the other victims did ask for a refund, a jury will naturally question why Victim 7 did not ask for a refund. There is no way for Victim 7 to answer that question without referencing the accident. This is one more example of how the accident is a fact of consequence.

In sum, the accident informs nearly every victim's recollection of events, understanding of the nature of Pooley's fraud, and of their own victimization, and explanation of the impact the fraud had on them. Kwon's accident is at the center of their stories, and it would be impossible to extricate this fact from critical witness testimonies and documentary evidence. Pooley should not be allowed to undermine these victims' testimonies in this manner. For these reasons, the accident is a material fact of consequence; it is not surplusage and should not be stricken from the Indictment.

### 4. Pooley Should Not Be Allowed to Force Conjecture Regarding Kwon's Unavailability to Testify

Pooley should also not be allowed to make hay out of Kwon's obvious unavailability to testify. Kwon is the focus of Count 5 of the Indictment and is also one of the victims that was defrauded by Pooley's scheme. Kwon's course proficiency cards demonstrate how Pooley used Y.G.'s signatures to sign-off on his training requirements, including by certifying that Y.G. had "personally examined and recommend[ed] this applicant for the USPA Tandem Instructor rating." Under ordinary circumstances, Kwon would be a critical government witness to establish the falsity of these certifications – he would establish that it was Pooley that instructed him, not Y.G., and that Y.G. was not even present during the course. Indeed, it would be reasonable for a jury to expect Kwon to testify in this regard. Failing to inform the jury that Kwon is unavailable to testify because of his death leaves a gaping hole in the narrative, and runs the risk that the jury will fill this hole with conjecture. For example, the jury may speculate that Kwon refused to testify because of anticipated issues with his testimony, or that he disagreed with the prosecution of this Count. It is imperative that the jury not be left in the dark as to Kwon's absence so that they do not derive any improper and untrue conclusions, which makes the

accident a fact of consequence to the charges against Pooley. *See United States v. Rivera-Gomez*, 67 F.3d 993, 997–98 (1st Cir. 1995) (victim's death relevant to avoid "definite risk that the jury, if uninformed of [his] passing, would engage in speculation as to why the prosecution did not offer his testimony at trial."); *United States v. Accetturo*, 966 F.2d 631, 637 (11th Cir.1992) (holding the fact of a witness's death admissible as "relevant to explain the fact that [the witness] did not testify" and to prevent the jury from speculating).

Along the same vein, as discussed above, several other witnesses will need to place Kwon as a participant in Pooley's course since Kwon will not be there to talk about it himself. Having to discuss Kwon's participation in Pooley's course without acknowledging his death risks undermining the other witnesses' credibility.

### 5.   To Excise the Accident From The Story Would Enable Pooley to Inaccurately Minimize the Significance of his Fraud

Finally, Kwon's death is an obstacle to Pooley's foreshadowed defense that his scheme was of little consequence. *See Curtin*, 489 F.3d at 940 (government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense). Pooley has already telegraphed a defense strategy of refuting the materiality element of wire fraud with respect to his false statements and material omissions by trying to minimize the importance of the requirement that Tandem Instructor candidates may only be certified by a certified Examiner. (*See e.g.* Exhibit 22, at Bates POOLEY_00003299, 3318-3320). In prior statements, Pooley excused using Y.G.'s signature in his absence as being something simply to "appease the USPA" and characterized the requirement that Y.G. be physically present to supervise training as "silly." (*Id*., at Bates POOLEY_00003320). Kwon's accident is a problem for Pooley because it puts the lie to any such suggestion. In reality, the lie Pooley told his Tandem Instructor candidates – that he was a certified Tandem Examiner who could validly teach and certify them to jump with clients – mattered. It mattered for the safety of the Tandem Instructor candidates and it mattered for the safety of their future paying customers, who in turn were led to believe that they would jump from a plane thousands of feet in the air strapped to someone certified to conduct tandem jumps. It was not just "silly" paperwork when Pooley doctored Kwon's paperwork to put certified Examiner Y.G.'s signature under the attestation: "I have personally examined and recommend this applicant for the USPA Tandem

Instructor rating. He or she has demonstrated the ability to train and jump with tandem students and to train and supervise non-method-specific students for the USPA A license." Pooley's fraud undermined the very purpose of the tandem safety regulations contained in 14 C.F.R. 105.35. *See* Parachute Operations, 66 FR 23543-01 ("Through this rule, the FAA intends to enhance the safety of parachute operation in the National Airspace System"); *see also Pac. Gas & Elec. Co*., 2014 WL 4954040, at *4 (denying motion to strike references to explosions that resulted in death from indictment charging counts under Pipeline Safety Act because explosions are the "very consequence of poor maintenance and monitoring contemplated by the institution of the Pipeline Safety Act.")

Kwon should not have been engaged in tandem skydiving the day of the accident because he was not actually certified, and what enabled him to do so was the fraudulent certification by Robert Pooley. Pooley is not entitled to distort the evidence by excluding the consequences of his fraud so as to enable him to argue that his false statements were insignificant.

Because the accident is relevant for all the above-mentioned reasons, it is not surplusage, and the Court should deny the motion.

## V.   <u>CONCLUSION</u>

For the aforementioned reasons, because the language in question is not prejudicial, and not irrelevant, it is not surplusage and should not be stricken. The motion should be denied.

Dated:  February 20, 2024

PHILLIP A. TALBERT
United States Attorney

By:  /s/ DHRUV M. SHARMA
DHRUV M. SHARMA
Assistant United States Attorney