1  PHILLIP A. TALBERT
   United States Attorney
2  KATHERINE T. LYDON
   DHRUV M. SHARMA
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5  Facsimile:  (916) 554-2900

6
   Attorneys for Plaintiff
7  United States of America

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          CASE NO.  2:21-CR-111 WBS

12                      Plaintiff,     UNITED STATES' OPPOSITION TO POOLEY'S
                                       MOTION TO SUPPRESS/MOTION FOR *FRANKS*
13              v.                     HEARING

14  ROBERT POOLEY,                     DATE: March 4, 2024
                                       TIME: 9:00 a.m.
15                      Defendant.     COURT: Hon. William B. Shubb

16

17

18

19

20

21

22  **UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS AND MOTION FOR *FRANKS***
                                    **HEARING**

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL AND REGULATORY BACKGROUND .........................................3

    A.    FAA regulations require that in order to jump with a customer, a Tandem Instructor must hold "ratings," which are issued by USPA and the tandem equipment manufacturer (UPT) and require sign-off by a certified Examiner..................3

    B.    Parachute Center, a fatality-prone dropzone in Lodi, and its owner and staff, offered tandem skydiving to customers, purportedly with "certified" Tandem Instructors, and purported to offer USPA and UPT rating courses to professional skydivers...................................................................4

        1.    Parachute Center's history. ....................................................4

        2.    Parachute Center offered tandem jumping to customers. .........5

        3.    Parachute Center offered Tandem Instructor ratings courses taught by Robert Pooley, who held himself out to be an Examiner until August 2016...................................................5

    C.    Unbeknownst to skydiving customers or Tandem Instructor Candidates, Robert Pooley's Examiner rating was suspended in July 2015. ...........5

    D.    Nonetheless, after his Examiner rating was suspended, Pooley continued holding himself out as an Examiner and accepting Tandem Instructor candidates' money to provide them ratings he had no ability to deliver. ..........6

    E.    On August 6, 2016, a Tandem Instructor trained and certified by Robert Pooley died along with a tandem customer. .......................................6

    F.    Kwon and Turner's deaths sparked FAA, USPA, and ultimately DOJ investigations. ...................................................................................6

    G.    Kwon held no valid Tandem Instructor rating when he jumped with Tyler Turner.............................................................................................7

    H.    Numerous Tandem Instructors realized they had been defrauded, approximately 140 of them had their ratings suspended or revoked entirely or were required to undertake refresher training, and many incurred further monetary losses to retrain with a legitimate Tandem Examiner...................7

    I.    USPA permanently revoked all Pooley and Y.G.'s ratings and licenses.............8

    J.    As late as December 2017 and January 2018, Parachute Center continued representing to customers they would jump with "certified instructors" and then actually sending them up with uncertified Pooley and Y.G. ......................8

    K.    In January 2018, SA DuBois applied for and Magistrate Judge Brennan signed a warrant authorizing the search of the Parachute Center.................................9

L.   The search of Parachute Center pursuant to the search warrant revealed evidence of wire fraud, conspiracy to commit wire fraud, and falsification of records in a federal investigation. .................................................11

    1.   Bill Dause's computer.........................................................................11

    2.   Robert Pooley's locker........................................................................13

M.   Pooley was indicted, and now seeks to suppress the evidence against him. ..................15

III.   ARGUMENT ...............................................................................................15

A.   Pooley lacks standing to contest the search of Bill Dause's computer and has not established standing to challenge the search of the Parachute Center locker...................................................................................................15

    1.   Pooley lacks standing to move to suppress Bill Dause's computer because Pooley lacks any ownership interest or reasonable expectation of privacy in the computer. ...............................................................15

    2.   The Court should deny Pooley's motion with respect to the locker unless Pooley submits an affidavit with facts meeting his burden of demonstrating standing to contest the search of his locker.................................18

B.   The Court should deny Pooley's motion to suppress because he fails to show the magistrate's findings of probable cause lacked any substantial bases.........................19

    1.   The magistrate had a substantial basis to find probable cause that the crime of wire fraud had been committed. .............................................19

    2.   The Affidavit provided a (non-stale) substantial basis for the magistrate's finding of probable cause to search for evidence of falsification of records in a federal investigation..................................................21

    3.   The magistrate had a substantial basis for the finding of probable cause to search the Parachute Center, including lockers and computers, as described on Attachment A,.................................................................23

C.   This Court should deny Pooley's motion for a *Franks* hearing because Pooley has not shown that SA DuBois recklessly or intentionally misstated or omitted information that should have been included in the affidavit, or that any alleged misstatement or omission was material to the probable cause finding. ...........................25

    1.   Alleged Omission #1: the credit cards machines at Parachute Center were available only for customers. ..........................................................25

    2.   Alleged Omission #2: SA DuBois' statement that after Kwon's death, Dause provided FAA with Kwon's Tandem Proficiency card "during a subsequent FAA investigation" rather than specifying the date Dause provided the card...........................................................................27

    3.   Alleged Omission #3: Omission of a witness' statement that Pooley left the Parachute Center and returned.....................................................28

D.   The search warrant was sufficiency particular and not overbroad ...................................29

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING

1          1.     Legal standard for particularity and overbreadth...................................29

2          2.     The defendant has not shown any of the categories of evidence the warrant authorized be searched for and seized lacked particularity or were overbroad..........................................................................................29

4          3.     Even if some category in the warrant were deemed to be insufficiency specific, suppression of the entire warrant (or even the entire category of document) would not be warranted. ...................................................36

6    E.     Agents complied with the warrant and suppression is unwarranted..............................36

7          1.     The search was conducted and evidence seized in compliance with the warrant. ......................................................................................................36

8                 a.     Pooley's Locker. ........................................................................37

9                 b.     Bill Dause's Computer.............................................................38

10          2.     Even if certain of the items seized were construed not to be "created, modified, or in use" as of July 1, 2015 or after, the rest of the items seized should not be suppressed. ..............................................................40

12    F.     Agents reasonably relied on the facially valid warrant in good faith. ..............................41

14  IV.     CONCLUSION.......................................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Illinois v. Gates,*
    462 U.S. 213 (1983) ................................................................ 21, 22, 24, 25

*Katz v. United States,*
    389 U.S. 347 (1967) ................................................................ 16

*Schmuck v. United States,*
    489 U.S. 705 (1989) ............................................................... 19, 20

*Smith v. Maryland,*
    442 U.S. 735 (1979) ............................................................... 15

*United States v. Adjani,*
    452 F.3d 1140 (9th Cir. 2006) ............................................... 24, 35, 36

*United States v. Alvarez,*
    358 F.3d 1194 (9th Cir. 2004) ............................................... 21, 23

*United States v. Anderson,*
    154 F.3d 1225 (10th Cir. 1998) ............................................. 16

*United States v. Brock,*
    667 F.2d 1311 (9th Cir.1982) ................................................ 29

*United States v. Brown, No. 119CVR00256NONESKO6,*
    2021 WL 3207265 (E.D. Cal. July 29, 2021) .......................... 28

*United States v. Caymen,*
    404 F.3d 1196 (9th Cir.2005) ................................................ 16, 18

*United States v. Cella,*
    568 F.2d 1266 (9th Cir. 194) ................................................. 9

*United States v. Chen,*
    979 F.2d 714 (9th Cir. 1992) ................................................. 39. 40

*United States v. Clark,*
    31 F.3d 831 (9th Cir.1983) .................................................... 19

*United States v. Cormier,*
    220 F.3d 1103 (9th Cir. 2000) ............................................... 15

*United States v. Dozier,*
    844 F.2d 701 (9th Cir. 1988) ................................................. 21, 22, 23

*United States v. Flores,*
    802 F.3d 1028 (9th Cir. 2015) ............................................... 30, 36

*United States v. Foster,*
711 F.2d 871 (9th Cir.1983) ................................................................................ 21

*United States v. Gil,*
58 F.3d 1414 (9th Cir. 1995) .............................................................................. 19

*United States v. Gomez–Soto,*
723 F.2d 649 (9th Cir.1984) ................................................................................ 36

*United States v. Gourde,*
440 F.3d 1065 (9th Cir. 2006) ........................................................................ 22, 24

*United States v. Greany,*
929 F.2d 523 (9th Cir. 1991) .............................................................................. 21

*United States v. Hayes,*
794 F.2d 1348 (9th Cir. 1986) ........................................................................ 29, 32

*United States v. Hernandez-Escarsega,*
886 F.2d 1560 (9th Cir. 1989) ............................................................................ 23

*United States v. Honore,*
450 F.2d 31 (9th Cir.1971) ................................................................................. 30

*United States v. Huberts,*
637 F.2d 630–38 (9th Cir.1980) ...................................................................... 21, 23

*United States v. Jinian,*
725 F.3d 954 (9th Cir. 2013) .......................................................................... 19, 20

*United States v. Kow,*
58 F.3d 423 (9th Cir. 1995) ........................................................................... 40-41

*United States v. Lee, No. 321CR00117TMBSAO1,*
2023 WL 3170523 (D. Alaska May 1, 2023) ......................................................... 41

*United States v. Lofstead,*
574 F. Supp. 3d 831 (D. Nev. 2021) .................................................................... 30

*United States v. Marques,*
600 F.2d 742 (9th Cir.1979) ............................................................................... 30

*United States v. Norris,*
942 F.3d 902 (9th Cir. 2019) .............................................................................. 25

*United States v. Noster,*
590 F.3d 624–30 (9th Cir. 2009) ......................................................................... 25

*United States v. Offs. Known as 50 State Distrib. Co.,*
708 F.2d 1371 (9th Cir. 1983) ........................................................................ 32, 36

*United States v. Perkins,*

850 F.3d 1109 (9th Cir. 2017) ................................................................ 25

*United States v. Reeves*,
210 F.3d 1041 (9th Cir. 2000) ................................................................ 19

*United States v. Reid*,
634 F.2d 469 (9th Cir. 1980) ............................................................ 21, 22

*United States v. SDI Future Health, Inc.*,
568 F.3d 684 (9th Cir. 2009) ............................................................ 16, 17

*United States v. Shryock*,
342 F.3d 948 (9th Cir. 2003) ................................................................ 16

*United States v. Stanert*,
762 F.2d 775 (9th Cir. 1985) ............................................................. 25, 4

*United States v. Struckman*,
603 F.3d 731 (9th Cir. 2010) ................................................................ 25

*United States v. Tamura*,
694 F.2d 591 (9th Cir.1982) ................................................................. 29

*United States v. Towne*,
997 F.2d 537 (9th Cir. 1993) ................................................................ 29

*United States v. Underwood*,
725 F.3d 1076 (9th Cir. 2013) .............................................................. 41

*United States v. Whitten*,
706 F.2d 1000 (9th Cir. 1983) .......................................................... 30, 39

*United States v. Wong*,
334 F.3d 831 (9th Cir. 2003) ............................................................ 16, 34

*United States v. Ziegler*,
474 F.3d 1184 (9th Cir. 2007) .............................................................. 16

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978) ............................................................................. 24

**Statutes**

18 U.S.C. § 1028A ............................................................................... 15

18 U.S.C. § 1343 ................................................................................. 15

18 U.S.C. § 1519 ..................................................................... 10, 23, 24

**Regulations**

14 C.F.R. § 105.45 ................................................................................ 3

PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-111 WBS |
| Plaintiff, | UNITED STATES' OPPOSITION TO POOLEY'S MOTION TO SUPPRESS/MOTION FOR *FRANKS* HEARING |
| v. | |
| ROBERT POOLEY, | DATE: March 4, 2024 |
| Defendant. | TIME: 9:00 a.m. COURT: Hon. William B. Shubb |

## I.     **INTRODUCTION**

Robert Pooley filed a motion for a *Franks* hearing and to suppress evidence seized pursuant to a search warrant from a computer owned by Bill Dause and from a locker Pooley used at Parachute Center. Mot. to Suppress, ECF No. 45. The Court should deny Pooley's motion.

First, with respect to the computer, Pooley's motion fails for lack of standing. The computer belonged to Parachute Center owner Bill Dause, was located in a giant common room within Parachute Center, was used by multiple other people, and was unprotected by any password or privacy protections. Pooley's decision to use Dause's computer to create the fraudulent USPA and UPT documents he used to carry out his fraud does not confer upon Pooley legal standing to challenge the search of the computer. With respect to the Parachute Center locker Pooley used, it is possible Pooley has standing but he has not currently carried his burden to demonstrate it. Unless and until Pooley submits a

declaration asserting a subjective expectation of privacy and offering facts sufficient to establish an objectively reasonable expectation of privacy, his motion should be denied with respect to his locker contents as well.

Pooley's argument that the warrant was unsupported by probable cause lacks merit. The magistrate had a substantial basis to find probable cause that the crime of wire fraud had been committed, to find probable cause to search Parachute Center for evidence of falsification of records in a federal investigation, and to find probable cause to search the entirety of Parachute Center, as set forth in Attachment A.

Pooley's motion for a *Franks* hearing should be denied. Pooley has not shown, with respect to any of the three purported material omissions offered in his motion, that SA DuBois recklessly or intentionally omitted information that should have been included in the affidavit, much less that any such alleged omission was material to the probable cause finding.

The search warrant was sufficiently particular and not overbroad. None of Pooley's specificity challenges—to each of the eleven categories of evidence in the warrant—are meritorious. Even if there were any arguable overbreadth, the remedy would be suppression only of the evidence which should not have lawfully been authorized to be seized, not of the entire warrant.

Pooley's overseizure argument fails too. Agents executed the search warrant in diligent compliance with the warrant and its temporal limitation. With respect to Bill Dause's computer, the issue seems to stem from Pooley's misunderstanding of a form used by the DOT-OIG Computer Crimes Unit as describing the Attachment B review, when in reality, Attachment B review is the responsibility of the case agent. That said, to avoid any doubt, going forward a technological fix will prevent the case agent from viewing any documents not created, modified, or in use during the temporal period set forth in the warrant. With respect to the contents of the locker, virtually all of the items seized appear to comply with the temporal limitations in the warrant. The seized items which Pooley complains had dates prior to the temporal limitation of July 2015 were still "in use" as of that time because USPA and UPT recordkeeping requirements mandated that Pooley maintain those records. In any event, even if there were some seizure outside the scope of the warrant, the appropriate remedy would be suppression of those items only, not the rest of the warrant, because the agents did not demonstrate flagrant disregard

of the warrant.

Finally, even if there were some defect in the warrant, which there was not, suppression would not be proper because agents relied in good faith on the facially valid search warrant.

## II.   FACTUAL AND REGULATORY BACKGROUND

### A.   FAA regulations require that in order to jump with a customer, a Tandem Instructor must hold "ratings," which are issued by USPA and the tandem equipment manufacturer (UPT) and require sign-off by a certified Examiner.

Tandem skydiving is a type of skydiving in which two individuals use the same parachute. Indictment, ¶ 1.  A Tandem Instructor with a parachute on their back has another individual, typically a first-time skydiving or "bucket list" customer, attached to their front.  Indictment, ¶ 1.

FAA regulations require that to jump with customers, Tandem Instructors must hold a certification issued by United States Parachute Association (USPA) and be trained and certified by the tandem parachute manufacturer (here, Uninsured United Parachute Technologies, LLC ("UPT").  *See* Indictment, ¶¶ 12-19.  Specifically, federal regulation 14 C.F.R. § 105.45 requires, among other things, that one of the parachutists using the tandem parachute system "hold a master parachute license issued by an organization recognized by the FAA" and have "been certified by the appropriate parachute manufacturer or tandem course provider as being properly trained on the use of the specific tandem parachute system used."  *See* Indictment, ¶¶ 12, 16.

With respect to the first requirement, the only organization recognized by the FAA to issue master parachuting licenses is the United States Parachute Association (USPA), a non-governmental organization that governs parachuting in the United States and issues licenses.  Indictment, ¶ 13.  To earn a USPA Tandem Instructor certification, or "rating," a Tandem Instructor candidate must complete certain requirements and complete and Tandem Instructor Rating Course conducted by a certified USPA Tandem Instructor Examiner ("IE" or "Examiner").  Indictment, ¶ 14.  During the Tandem Instructor Rating Course, the candidate is required to complete tasks that are recorded on a USPA Tandem Instructor Rating Course Proficiency Card.  Indictment, ¶ 14.  The USPA Examiner is the only one who can provide final certification, by signing the final "Rating Recommendation" by attesting, "I have personally examined and recommend this applicant for the USPA Tandem Instructor rating."  Indictment, ¶ 15.

3

UPT, the manufacturer of the vast majority of tandem equipment used in the United States, issued guidelines for the certification of Tandem Instructors, using terminology similar to USPA. Indictment, ¶ 18.  Tandem instructor candidates are required to make at least five jumps under the "direct supervision of a qualified and currently rated Tandem Vector/Sigma Examiner."  Indictment, ¶ 18.  UPT requires that the five jumps be recorded on a UPT Tandem Instructor Certification form, followed by the UPT Tandem Examiner's signature.  Indictment, ¶ 18.  UPT mandates that "Tandem Examiners must be present during the execution of the five certification jumps."  Indictment, ¶ 19. UPT's guidelines state that "direct supervisions means being present and participating during all certification processes" and state that UPT Tandem Examiners could not sign off unless they were present during the "entire certification process."  Indictment, ¶ 19.

> **B.    Parachute Center, a fatality-prone dropzone in Lodi, and its owner and staff, offered tandem skydiving to customers, purportedly with "certified" Tandem Instructors, and purported to offer USPA and UPT rating courses to professional skydivers.[1]**

> 1.    Parachute Center's history.

Parachute Center, which also operated under the name Skydivers Guild, Inc., is a drop zone in Lodi, California.  Affidavit, ¶ 7.  Parachute Center is operated by William Dause, assisted by his wife, Katherine Dause.  Affidavit, ¶ 7.  Parachute Center offered skydiving services to both experienced and new skydivers.  Affidavit, ¶ 7.

Parachute Center has a history of accidents and fatalities.  Affidavit, ¶ 8.  From 2009 until the search warrant of Parachute Center in January 2018, there have been at least nine fatalities and one plane crash, with the most recent fatality within that time span occurring in September 2017.  Affidavit, ¶ 8. Based on the government's investigations into Parachute Center, it appears some fatalities were likely due to poor training, some to equipment problems or malfunctions, and one possible suicide.  Affidavit, ¶ 8.

---

[1] Because the Court's review is limited to the "information and circumstances contained within the four corners of the underlying affidavit," the factual recitation until the execution of the search warrant (Sections II.B – II.K) relies only on the information contained in the Affidavit.  *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985).  The legal and regulatory background section (II.A) cites to the Indictment.

2.    Parachute Center offered tandem jumping to customers.

Parachute Center offered customers tandem skydives with a "certified Instructor."  Affidavit, ¶¶ 7, 24.  Based on interviews of former Parachute Center skydivers and individuals familiar with Parachute Center's current parachute operations, first time or "bucket list" skydivers could pay $100 to $200 to tandem jump with a certified Tandem Instructor.  Affidavit, ¶ 10.  Tandem skydiving customers would sign a waiver and were supposed to complete a training prior to skydiving.  Affidavit, ¶ 10. Customers could pay with cash and credit card.  Affidavit, ¶ 11.

3.    Parachute Center offered Tandem Instructor ratings courses taught by Robert Pooley, who held himself out to be an Examiner until August 2016.

Parachute Center also offered classes to experienced skydivers through which the skydivers could obtain ratings, including ratings allowing them to jump with paying customers as Tandem Instructors.  Particularly relevant here, Robert Pooley and Y.G.[2] provided Tandem Instructor classes at Parachute Center until Fall 2016.  Affidavit, ¶ 9.  Initially, Pooley taught Tandem Instructor classes at Parachute Center's facility by himself.  Affidavit, ¶ 6.  Students paid Pooley as much as $1,600.00 for training to get Tandem Instructor rated.  Affidavit, ¶ 6.  Pooley then paid Bill Dause for any services and fees charged by Parachute Center, to include harness use, aircraft fees, etc.  Affidavit, ¶ 6.  Once the training was complete, newly certified Tandem Instructors could use this certification to jump with customers for payment; several were employed by Dause to conduct tandem parachute jumps at Parachute Center.  Affidavit, ¶ 6.

C.    Unbeknownst to skydiving customers or Tandem Instructor Candidates, Robert Pooley's Examiner rating was suspended in July 2015.

Pooley was a rated Tandem Examiner from 2012 until July 2015.  Affidavit, ¶ 15.  Even during his tenure as a legitimate rated Examiner, Pooley had issues; USPA required him to complete retraining in 2014.  Affidavit, ¶ 15.  Ultimately, after repeated failure to properly submit documents including Proficiency cards, USPA suspended Pooley's Examiner rating in July 2015 for one year.  Affidavit, ¶ 15.  After that, Pooley's Examiner rating was never reinstated.  Affidavit, ¶ 15.

---

[2] Y.G. is referred to in the Indictment as Person 2 and is the person whose means of identification was used with respect to the aggravated identity counts. *See* Indictment, ¶ 2.  Although his name is not masked in the Affidavit, which Pooley filed publicly as Exhibit A to his motion, the government refers to him herein by his initials to comport with Department of Justice policy.

As discussed above, that meant that, after the date of his suspension in July 2015, Pooley could not certify Tandem Instructor candidates and thus could not bestow Tandem Instructor ratings to enable his students to jump with customers.  Affidavit, ¶¶ 15, 18.

### D.    Nonetheless, after his Examiner rating was suspended, Pooley continued holding himself out as an Examiner and accepting Tandem Instructor candidates' money to provide them ratings he had no ability to deliver.

After Pooley's July 2015 Examiner rating suspension, Pooley continued to provide Tandem Instructor training, purportedly under the supervision of Y.G.  Affidavit, ¶ 9.  As an Examiner, Y.G. could certify Tandem Instructor candidates.  Affidavit, ¶ 16.  According to witness interviews and a subsequent USPA investigation, from at least Fall 2015, Pooley and Y.G. worked together providing training at Parachute Center's facilities and using Parachute Center equipment, aircraft, and computers for their work.  Affidavit, ¶ 16.  According to Y.G., Pooley was only allowed to provide instruction when Y.G. was at Parachute Center to directly supervise him.  Affidavit, ¶¶ 9.

During the summer of 2016, Y.G. left the country.  Affidavit, ¶¶ 14, 16.  A subsequent USPA investigation revealed that Pooley used pre-filled cards that contained Y.G.'s signature to train and certify Tandem Instructor candidates, including during the period that Y.G. was physically out of the country and not present for training.  Affidavit, ¶ 16.

### E.    On August 6, 2016, a Tandem Instructor trained and certified by Robert Pooley died along with a tandem customer.

On August 6, 2016, Tandem Instructor Yonghyon Kwon and the customer skydiving with him, Tyler Turner, died skydiving at Parachute Center.  Affidavit, ¶ 13.

### F.    Kwon and Turner's deaths sparked FAA, USPA, and ultimately DOJ investigations.

Unsurprisingly, the unusual tandem accident resulting in deaths immediately prompted investigations.  During the FAA regulatory investigation, Bill Dause gave FAA officials a copy of Kwon's Tandem Proficiency Card.  Affidavit, ¶ 14.  The Proficiency Card reflected Kwon had completed Tandem Instructor training at Parachute Center in July 2016.  Affidavit, ¶ 14.  The Proficiency Card also contained what purported to be Y.G.'s signature.  Affidavit, ¶ 14.  But, it turned out, at the time of Kwon's training, Y.G. was out of the country. Affidavit, ¶ 16.  Y.G. told FAA investigators that he was out of the country during Kwon's training and could not have signed the card.

Affidavit, ¶ 14.  Special Agent DuBois reviewed Y.G.'s passport and Customs and Border Protection border crossing records for Y.G., which both corroborated that Y.G. was out of the country when Kwon's paperwork was purportedly signed by him.  Affidavit, ¶ 14.

###   G.    Kwon held no valid Tandem Instructor rating when he jumped with Tyler Turner.

The USPA advised that, although the card Dause had provided the FAA indicated Kwon had completed Tandem Instructor training and been certified by Y.G., Kwon's paperwork had never actually been submitted to the USPA.  Affidavit, ¶ 14.  Accordingly, Kwon was not recognized by USPA as a Tandem Instructor, or even a USPA-licensed skydiver.  Affidavit, ¶ 13.  In short, Kwon was not actually a "certified instructor" when he jumped with Tyler Turner.  During the FAA's regulatory investigation, it learned Tyler Turner paid for the parachute jump with a credit card and completed a liability waiver. Affidavit, ¶ 13.

###   H.    Numerous Tandem Instructors realized they had been defrauded, approximately 140 of them had their ratings suspended or revoked entirely or were required to undertake refresher training, and many incurred further monetary losses to retrain with a legitimate Tandem Examiner.

Following the August 6, 2016 fatalities of Kwon and Turner, Y.G. submitted the certification paperwork for over ten previously trained Tandem Instructors to the USPA, some as old as six months, that he had failed to previously submit.  Affidavit, ¶ 17.  This meant over ten Tandem Instructors were likely operating under the assumption they were certified when in fact the USPA had no knowledge they completed the training, and they were not certified to conduct Tandem Parachute operations.  Affidavit, ¶ 17.  At the point the affidavit was submitted, the investigation had identified at least two instructors that were in fact conducting Tandem Parachute jumps without being properly rated by the USPA. Affidavit, ¶ 17.  SA DuBois noted there was reason to believe further investigation may identify others. Affidavit, ¶ 17.

Pooley and/or Y.G. received payments from Tandem Instructor candidates, but at least some of those students did not receive the Tandem Instructor ratings they were paying for.  Affidavit, ¶ 18.  In in the instances where Y.G. was not present, the students could not have received such ratings because Pooley was not certified to provide the training by himself.  Affidavit, ¶ 17.  In addition, some of Pooley and Y.G.'s students were not properly trained, according to USPA's investigation.  Affidavit, ¶ 18.

As a result of the above problems, in September 2016, the USPA required approximately 140 Tandem Instructors who were trained by Pooley and/or Y.G. to complete refresher training or suspended or revoked their ratings entirely pending a completely new Tandem Instructor course with a new Examiner. Affidavit, ¶ 18. These individuals had to seek out new Examiners to complete the retraining in accordance with USPA standards at costs of up to $800. Affidavit, ¶ 18. These costs were in addition to what they originally paid Pooley and/or Y.G. for the initial training. Affidavit, ¶ 18.

### I.   USPA permanently revoked all Pooley and Y.G.'s ratings and licenses.

During a review of Proficiency Cards submitted by Pooley and Y.G. following the fatalities, USPA officials discovered that Pooley and Y.G. had used pre-filled Tandem Instructor Proficiency Cards which included Y.G.'s signature already in the necessary signature blocks. Affidavit, ¶ 14. Accordingly, the USPA revoked all of Pooley and Y.G.'s skydiving licenses and ratings in fall 2016. Affidavit, ¶ 14. USPA advised both mens' licenses and ratings were never re-instated. Suspending all their licenses and ratings (which meant they could not tandem jump with customers) went much further than suspending Pooley's earlier Examiner rating suspension (which had mean that he could not certify Tandem Instructor candidates to receive Tandem Instructor ratings). This meant that after fall 2016, Pooley and Y.G. were not certified to conduct tandem skydives in the United States, and that any customers who purchased tandem skydives with Pooley or Y.G. in the United States were not skydiving with "certified instructors." Affidavit, ¶ 14.

### J.   As late as December 2017 and January 2018, Parachute Center continued representing to customers they would jump with "certified instructors" and then actually sending them up with uncertified Pooley and Y.G.

On December 5, 2017, a witness, who worked at Lodi Airport and provided rigger services to Parachute Center skydivers, observed and photographed Pooley and Y.G. conducting tandem parachute operations with customers at the Parachute Center. Affidavit, ¶ 22. Pooley and Y.G. did not have USPA licenses and Tandem Instructor ratings at this time, and were not certified to conduct tandem parachute operations in the United States. Affidavit, ¶ 22.

On December 29, 2017, FAA inspectors conducted a regulatory inspection at Parachute Center and asked a tandem instructor for his USPA license with Tandem Instructor rating. Affidavit, ¶ 23. The instructor retrieved his licenses from a personal locker maintained at Parachute Center, indicating

tandem instructors maintain licenses and records in their personal lockers.  Affidavit, ¶ 23.  FAA inspectors observed these lockers in a public area, that customers, employees and/or contractors have access to inside Hanger "A."  Affidavit, ¶ 23.

On January 2, 2018, "Kathy Dause" sent an email from Parachute Center's email address, "paractr@softcom.net", in response to an undercover agent's emailed request for information.  Affidavit, ¶ 24.  In her email she stated: "You will definitely go with certified Instructors."  Affidavit, ¶ 24.  The email address "paracte@softcom.net" was found on Parachute Center's website; Katherine Dause operates Parachute Center with her husband William Dause.  Affidavit, ¶ 24.

On January 2, 2018, a video titled "Tandem Skydive with Wael by Brian" was published to the "Skydive Lodi Parachute Center" Youtube page.  Affidavit, ¶ 25.  This video showed a customer's tandem skydive.  Affidavit, ¶ 25.  The video showed the customer boarding an aircraft operated by Parachute Center.  Affidavit, ¶ 25.  Later in the video, the same customer was seen in the aircraft sitting next to an individual that appears to be Robert Pooley.  Affidavit, ¶ 25.  Pooley appeared to be wearing a tandem parachute rig.  Affidavit, ¶ 25.  As discussed above, Pooley was not licensed to conduct tandem operations in January 2018; his USPA license and tandem instructor rating was revoked in August 2016.  Affidavit, ¶ 25.

Based on witness interviews of individuals familiar with Parachute Center's facilities, and the observations of an undercover agent who interacted with Dause at Parachute Center in November 2017, Hanger "C" was used by Parachute Center skydivers, and included approximately a dozen tents where individuals appear to be living.  Affidavit, ¶¶ 21, 25.  Dause allows employees and/or contractors to live in this hanger.

### K.   In January 2018, SA DuBois applied for and Magistrate Judge Brennan signed a warrant authorizing the search of the Parachute Center.

The same month the video was posted in January 2, 2018 depicting Pooley wearing a tandem parachute rig on a plane with a customer, SA DuBois sought a criminal search warrant.  *See generally* Affidavit.  In the affidavit SA DuBois specified the three criminal statutes the affidavit established probable cause had been violated and summarized the multi-level fraud schemes under investigation:

I am informed, and believe, and thereon allege that there exists probable cause to believe that at the aforementioned premises, evidence, instrumentalities, fruits, or proceeds of violations of the following federal criminal statutes will be found:

    a.  **Title 18, United States Code 1343** (Fraud by Wire, Radio, or Television)
    b.  **Title 18, United States Code 1349** (Attempt and Conspiracy to Commit Fraud)
    c.  **Title 18, United States Code 1519** (Destruction, Alteration, or Falsification of records in Federal Investigations)

The items to be seized are documents, records, or information constituting evidence, instrumentalities, fruits, or proceeds relating to the defrauding of customers, by both Parachute Center, and Robert Pooley and [Y.G.] for the purposes of defrauding Parachute Center customers as well as Tandem Instructor students, as more fully set forth in Attachment B.

Affidavit, ¶ 2.

In addition to the factual narrative summarized above, SA DuBois specified facts in the affidavit showing that Parachute Center and the individual subjects under investigation had caused interstate wires to be sent as part of the multi-level fraud set forth in the indictment, including a detailed explanation of credit card machines used by customers.  Affidavit, ¶ 10.  He also noted videos of tandem skydiving customer and instructors edited by Pooley on the Parachute Center computer and then sent to customers and sometimes loaded to YouTube or Parachute Center's Facebook page using the Internet (Affidavit, ¶¶ 11-12), an email sent by Katherine Dause on January 2, 2018 from Parachute Center's email address to an undercover agent stating "You will definitely go with certified Instructors" (Affidavit, ¶ 24), and Parachute Center's telephone number emblazoned on a giant yellow sign next to the words SKYDIVING on the hanger which houses skydivers who work for Parachute Center. (Affidavit, Attachment A).

The affidavit included an electronic search protocol which advised that executing agents would make a forensic image (an exact physical copy) of all computers or other media searched, ideally on-site, which would later be searched for data responsive to attachment B.  (Affidavit, ¶ 28(a)–(h)).

Attachment A described the property to be searched thoroughly with pictures and specified that the search "shall include any and all lockers and containers on the premises[.]"]  Attachment B to the search warrant authorized the search evidence of 11 specific categories of material, in physical or electronic form, constituting evidence of violations of wire fraud, conspiracy to commit wire fraud, and falsification of records in a federal investigation.  It included the temporal parameter of: "items created,

1  modified, or in use during the period of July 1, 2015 to present."

2      **L.      The search of Parachute Center pursuant to the search warrant revealed evidence**
3      **of wire fraud, conspiracy to commit wire fraud, and falsification of records in a**
       **federal investigation.**

4      United States Magistrate Judge Edmund F. Brennan issued the warrant on January 25, 2018, and

5  agents executed it January 30, 2018.

6      During the search, agents found evidence of violations of all three statutes under investigation.

7  *See* Exhibit 1 (Evidence Custody Documents).[3]   The defendant does not seek to challenge most of the

8  evidence seized from Parachute Center, but rather moves to suppress a computer owned by Bill Dause

9  and used by numerous people with serial number Z3TQT24TJ and evidence seized from the locker at

10 Parachute Center used by Robert Pooley.  A detailed discussion of the search of the computer and the

11 locker and the evidence recovered is below.

12      1.      Bill Dause's computer.

13     Agents seized electronic devices pursuant to the search warrant, including the below-pictured

14 computer with serial number Z3TQT24TJ.[4]

15 

16 

17

18

19

20

21

22

23

24

25

26     [3] Unless otherwise noted, references to Exhibits hereto refer to exhibits to the Declaration of
   Katherine T. Lydon accompanying this brief.

27     [4] The left picture is attached hereto within Exhibit 2 (photos of the computer taken by the
   Computer Crimes Unit) at POOLEY_1823, and right picture is attached hereto within Exhibit 3 (search
28 warrant photos), and was produced as Pooley_27277.

1      Dause's computer was seized from a large communal room in Parachute Center's main building

2  with blue mats on the ground and numerous cubbies. The room is pictured below from various angles,

3  with Dause's computer circled. In the third photo, it is just out of frame.





      Data on the computer confirmed that the computer belonged to Parachute Center owner Bill

Dause. *See* Declaration of Frederick E. Cooper V (hereinafter, "Cooper Decl."), ¶ 4 (the System Name

of the computer was "BILL-HP" and the Registered Owner was "Bill"), attached to the Lydon Decl. as

Exhibit 4. There was no password required to log onto the computer. Cooper Decl., ¶ 6. In addition,

homegroup sharing was enabled, allowing other people logged into computers on the same network to

remotely access files and folders on the computer. Cooper Decl., ¶ 5. Analysis indicated that multiple

people did, indeed, use the computer, including Bill Dause, Kathy Dause, Rob Pooley, and other

individuals like "David" "Lew" "erikadufort" "gabbycurrie" and "florajean." *See* Cooper Decl., ¶ 7

(computer had passwords saved for what appeared to be multiple peoples' accounts at various websites), ¶ 8 (Bill and Kathy Dause's iPhones regularly backed up to the computer), ¶ 9 (the "Documents" folder contained numerous subfolders including "David's research" "Lew's Thesis" "Parachute center docs" and "Robs docs"); ¶ 10 (the Desktop had folders including "Bills phone music" "Bill's Videos" and "Kathys pics 23517" as well as various Parachute Center business documents).

Analysis of the computer revealed that in August of 2015 Rob Pooley had used his boss Bill Dause's computer to create the doctored USPA and UPT documents, including the Tandem Proficiency cards with Y.G's pre-printed signature, which he used to carry out the fraudulent scheme charged in this case.

> This PC > OS (I:) > Users > Bill > Documents > Robs Docs > New Docs

| Name | Date modified | Type | Size |
|---|---|---|---|
| New A-License Prof Card | 8/17/2015 10:36 PM | Adobe Acrobat D... | 661 KB |
| Yur_Rob Canopy Prof Card | 8/17/2015 10:41 PM | Adobe Acrobat D... | 290 KB |
| Yuri Canopy Prof Card | 8/17/2015 10:09 PM | Adobe Acrobat D... | 197 KB |
| Yuri Coach Prof Card Signed | 8/17/2015 9:23 PM | Adobe Acrobat D... | 1,492 KB |
| Yuri D License App Signed | 8/17/2015 10:50 PM | Adobe Acrobat D... | 308 KB |
| Yuri License App Signed | 8/17/2015 10:45 PM | Adobe Acrobat D... | 279 KB |
| Yuri Signed Adjusted log Page 3 | 8/18/2015 12:38 AM | Adobe Acrobat D... | 1,994 KB |
| Yuri Signed Adjusted log Page 4 | 8/18/2015 12:38 AM | Adobe Acrobat D... | 1,938 KB |
| Yuri Tandem Prof Card Signed | 8/17/2015 9:35 PM | Adobe Acrobat D... | 2,404 KB |
| Yuri UPT Rating Application and CCA | 8/18/2015 12:30 AM | Adobe Acrobat D... | 1,292 KB |
| Yuri UPT Waiver | 8/18/2015 12:32 AM | Adobe Acrobat D... | 835 KB |

Analysis of the computer yielded other evidence of the multi-level fraud scheme set fort in the Affidavit.  For example, it contained emails from Kathy Dause at the Parachute Center email address referring potential Tandem Examiner candidates who were interested in getting their ratings to Rob Pooley, during the period when Pooley's Examiner rating was suspended and he could not legitimately provide such ratings.  *See* Exhibit 5.

2.    Robert Pooley's locker.

Agents seized evidence from the below Parachute Center locker used by Pooley, which was

located near the end of a long row of lockers along the front right of Parachute Center's main entrance.



UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING

1  Exhibit 2, at POOLEY_0131.

2     Agents seized evidence from Pooley's locker.  *See* Exhibit 6 (index of evidence seized from

3  Pooley's locker).  Among the evidence was a white three-ring binder entitled "Tandem Instruction for

4  Dummies" which contained copies of each variety of doctored USPA and UPT form with Y.G.'s pre-

5  printed signature, organized in colored plastic translucent file organizer, along with other documents

6  Pooley used in his Tandem Instructor courses.  Agents also seized a stack of USPA and UPT documents

7  bearing the names and information of Tandem Instructor students certified by Pooley. Some had the

8  preprinted Y.G. signature, some did not.  They also seized two electric memory cards.  *See* Exhibit 2 at

9  POOLEY_1830, 1832.

10    **M.**  **Pooley was indicted, and now seeks to suppress the evidence against him.**

11     A grand jury charged Pooley with four counts of wire fraud in violation of 18 U.S.C. § 1343 and

12  two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. Indictment, ECF No. 1. The

13  case is now set for trial to begin May 14, 2024.  On March 5, 2024, Pooley filed the instant motion

14  seeking to suppress the evidence found on Bill Dause's computer and in the locker he used.  Mot., ECF

15  No. 48.

16       **III.**  **ARGUMENT**

17    **A.**  **Pooley lacks standing to contest the search of Bill Dause's computer and has not**
    **established standing to challenge the search of the Parachute Center locker.**
18

    1.  Pooley lacks standing to move to suppress Bill Dause's computer because Pooley
19        lacks any ownership interest or reasonable expectation of privacy in the computer.

20     The Court should deny Pooley's motion with respect to the search of the computer with serial

21  number Z3TQ24TJ, because Pooley lacks standing to challenge the search of the computer.  Pooley may

22  now regret his decision to create and save his doctored USPA and UPT forms on a computer which

23  belonged to Bill Dause, was used by a slew of people, lacked password protection, and was located in a

24  common areas of the Parachute Center.  But he cannot move to suppress that evidence, because Pooley

25  has not shown he has any reasonable expectation of privacy in the computer.

26     A person does not have a reasonable expectation of privacy in an item in which he has no

27  possessory or ownership interest.  *United States v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000).  And a

28  criminal defendant may invoke the protections of the Fourth Amendment only if he can show that he

had a *legitimate* expectation of privacy in the place searched or the item seized. *Smith v. Maryland,* 442 U.S. 735, 740 (1979). This expectation is established where the claimant can show: (1) a subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy. *See id.* (citing *Katz v. United States,* 389 U.S. 347, 351-361 (1967)); *United States v. Shryock,* 342 F.3d 948, 978 (9th Cir. 2003). It is the defendant's burden to prove both elements. *United States v. Caymen,* 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted). Here, Pooley has not asserted a subjective expectation of privacy and he has not (and cannot) show he had an objectively reasonable expectation of privacy in the workplace computer.

The question of whether an employee has a reasonable expectation of privacy in a work computer is fact-specific and turns on issues such as exclusive use and password protection. Where a computer is kept in an employee's private office, for their exclusive use, and password protected, the Ninth Circuit has held the employee has an expectation of privacy. *See United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007). However, where the computer is shared among employees, not password protected, and not in an employee's private office, it is not established that an employee has standing to contest the search of it. Where the employee has retained a computer without authority of the employer or after the employment relationship ended, the former employe will also lack standing. *See United States v. Wong,* 334 F.3d 831, 839 (9th Cir. 2003).

In a case not specific to computers, the Ninth Circuit has explained the test for whether an employee has standing to challenge the search of a workplace area as follow, approvingly citing and adapting a test from the Tenth Circuit:

> [E]xcept in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized. To adapt *Anderson,* although all the circumstances remain relevant, we will specifically determine the strength of such personal connection with reference to the following factors: (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material;[7] (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization. Absent such a personal connection or exclusive use, a defendant cannot establish standing for Fourth Amendment purposes to challenge the search of a workplace beyond his internal office

*United States v. SDI Future Health, Inc.,* 568 F.3d 684, 698 (9th Cir. 2009) (overruled on other grounds) (citing *United States v. Anderson*, 154 F.3d 1225, 1230-32 (10th Cir. 1998)).

Here, Pooley cannot challenge the search of the computer because he did not have either exclusive access to the computer or the "personal connection" factors highlighted in *SDI Future Health.*. Crucially, Pooley did not have "exclusive use" of Bill Dause's computer.  *See SDI Future Health, Inc.*, 568 F.3d at 695–96, quoting *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1335 (9th Cir.1987) (it is "crucial" to Fourth Amendment standing that the place searched be "given over to [the defendant's] exclusive use.").  Dause's computer was in a giant common room, not tucked away in a private locked office belonging to Pooley.  At most, Pooley had "mere access" to the computer of Bill Dause, along with at least half a dozen other people.  *See* Cooper Decl., ¶¶ 7-10.   And in the Ninth Circuit, "mere access to, and even use of, the office of a co-worker does not lead [courts] to find an objectively reasonable expectation of privacy."  *SDI Future Health, Inc*., 568 F.3d at 696 (internal citation omitted).  In an analogous case, the Ninth Circuit has held that the corporate officer of a hospital did not have standing to challenge the seizure of records from the hospital print shop, reasoning that even though the defendant "had access to and control of the print shop operations, his rights did not include any expectation of privacy over documents which were kept at the print shop premises but over which [he] did not show an independent possessory or proprietary interest." *United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir. 1977).  Pooley's decision to create, and likely print, his fraudulent documents from Bill Dause's computer and then leave them saved there, does not confer standing.

Pooley also fails to establish a "personal connection" to the computer according to the three factors described in *SDI Future Health*. The first factor –"the employee's relationship to the item seized" --- "really addresses whether the item seized was personal property without any relationship to work." *SDI Future Health, Inc*., 568 F.3d at 697.  Pooley's documents were not his personal property without any relationship to work. The computer and the documents on it were used by Pooley and many others for Parachute Center work.  Kathy Dause used it to email students false assurances that they would jump with certified instructors, and email Tandem Instructor candidates that Rob Pooley could get them a rating. *See* Exh. 5.  Pooley used to create documents to enable him to run a fraudulent operation of certifying Tandem Instructors he had no right to certify.  *See* Cooper Decl., ¶ 11.  The second factor

1   "whether the item was in the immediate control of the employee when it was seized" also points toward

2   no standing.  The computer was in a common room outside Pooley's immediate control.  *See* Ex. 3.

3   Finally, the factor of "whether the employee took actions to maintain his privacy in the item" *see SDI*

4   *Future Health Inc.*, 568 F.3d 684, 697, citing *Anderson,* 154 F.3d at 1232, likewise indicates Pooley

5   lacks standing.  The computer was not password protected.  *See* Cooper Decl., ¶ 6. The screen was

6   physically out in the open in a large common room.  S*ee* Exh. 3.  It was also virtually out in the open,

7   with anyone in the Parachute Center network able to remotely access files on the computer.  *See* Cooper

8   Decl., ¶ 5.  And Pooley chose to put his files in a subfolder within the main "documents" folder, which

9   was used by numerous people including Bill Dause, Kathy Dause, Rob Pooley, "David" and "Lew".

10  Cooper Decl., ¶ 9.

11       The Court should deny Pooley's motion with respect to Bill Dause's computer because Pooley

12  has no standing to move to suppress the computer.

13               2.       The Court should deny Pooley's motion with respect to the locker unless Pooley
                          submits an affidavit with facts meeting his burden of demonstrating standing to contest
14                        the search of his locker.

15       Unlike Bill Dause's computer, for which the documented facts negate any possibility Pooley has

16  standing, it is possible that Pooley does have standing to contest the search of the locker he used at

17  Parachute Center.  But, it is Pooley's burden to affirmatively demonstrate standing.  *Caymen,* 404 F.3d

18  1196, 1199 (9th Cir. 2005).  As the record currently stands, Pooley has not submitted facts to meet his

19  burden.  The search warrant affidavit and search warrant photos indicate some of the lockers were ajar

20  and were located in a public place.  *See* Affidavit, ¶ 23 (FAA inspectors observed the lockers in a public

21  area which customers, employees, and/or contractors have access to inside Hanger A).  Based on the

22  legal framework already described above, a satisfactory affidavit must: (1) state that Pooley had a

23  subjective expectation of privacy in the locker; and (2) provide facts from which the Court can

24  determine whether he had an objectively reasonable expectation of privacy.  To meet his burden on the

25  latter point, Pooley could attest under penalty of perjury (if true, of course) that he always kept his

26  locker locked, that it was locked on the day of the search (in his brief through counsel he avers that his

27  locker had a padlock "on" it but does not claim that it was locked), and that he did not allow anyone else

28  to access or keep items in his locker.  Absent a legally sufficient declaration, the Court should deny the

1    motion for lack of standing.

2        **B.**    **The Court should deny Pooley's motion to suppress because he fails to show the**
         **magistrate's findings of probable cause lacked any substantial bases.**

3        "A magistrate judge's finding of probable cause is entitled to great deference and this Court will

4    not find a search warrant invalid if the magistrate judge had a 'substantial basis' for concluding that the

5    supporting affidavit established probable cause." *United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir.

6    2000) (quoting *United States v. Clark,* 31 F.3d 831, 834 (9th Cir. 1994)). Probable cause exists when the

7    magistrate judge finds that, "[c]onsidering the totality of the circumstances," there is "'a fair probability

8    that contraband or evidence of a crime will be found.'" *United States v. Gil,* 58 F.3d 1414, 1419 (9th

9    Cir. 1995) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

10       Here, the magistrate had a substantial basis for concluding that there was a fair probability that

11   evidence of each crime listed in the search warrant would be found at Parachute Center.

12            1.    The magistrate had a substantial basis to find probable cause that the crime of
                    wire fraud had been committed.

13

14       The affidavit alleged a multi-level fraud wire fraud scheme, "by both Parachute Center, and

15   Robert Pooley and [Y.G.] for the purposes of defrauding Parachute Center customers as well as Tandem

16   Instructor students[.]" Affidavit, ¶ 2.  The scheme involved defrauding Tandem Instructor candidates by

17   holding Pooley out as an Examiner who could validly certify them; and then defrauding paying

18   customers by holding out those uncertified candidates as certified Tandem Instructors.  In his motion,

19   Pooley compartmentalizes the overall wire fraud scheme into two distinct crimes, and, from there,

20   argues that the affidavit does not establish probable cause because, Pooley argues, the affidavit set forth

21   evidence of interstate wires only as to defrauded customers, not defrauded Tandem Instructor

22   candidates.  *See* Mot. at 13-14.  Pooley's argument is misplaced.  The silo approach urged by Pooley,

23   where each level of a multi-level fraud scheme requires its own interstate wire, is without legal basis.

24       Probable cause of an interstate wire in the form of customer payments is sufficient to support the

25   magistrate's finding of probable cause to search for evidence of the entire wire fraud scheme.  Once

26   probable cause of a wire incident to any essential part of the scheme is found, that element of the crime

27   of wire fraud is satisfied as to the entire scheme.  *See e.g.*, *Schmuck v. United States*, 489 U.S. 705

28   (1989); *United States v. Jinian*, 725 F.3d 954, 962 (9th Cir. 2013).

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING

*Schmuck,* a mail fraud case, illustrates that a mailing (or a wiring) at the lowest level of a multi-level fraud scheme is sufficient to support convictions on the entire scheme. The fraudulent scheme in *Schmuck* was devised by a used-automobile distributor who rolled back odometers and sold the vehicles to dealers at artificially inflated prices. 489 U.S. at 707. The dealers then resold the automobiles to customers. *Id.* In order to complete the resale of each automobile to its customers, the dealers had to obtain title to each vehicle. *Id.* To that end, the dealers mailed title application forms to the state on behalf of their customers. *Id.* Schmuck was indicted on—and convicted of—twelve counts of mail fraud, *id.,* and challenged his conviction on the basis that the mailings were routine, occurred after the fraud came to fruition, and were "merely tangentially related to the fraud," *id.* at 711.

The Supreme Court disagreed with Schmuck's characterization of the mailings. *Id.* Focusing upon the "scope" of the fraudulent scheme, the *Schmuck* Court observed that Schmuck did not engage in a "'one-shot' operation in which he sold a single car to an isolated dealer" but rather maintained "an ongoing fraudulent venture." *Id.* at 711. The scheme, the *Schmuck* Court reasoned, "did not reach fruition until the retail dealers resold the cars and effected transfers of title" and would have "come to an abrupt halt" if the dealers were unable to resell the cars they purchased from Schmuck. *Id.* at 712. Thus, it concluded that, "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id..* On this basis, the Supreme Court held that a rational jury could have found that the title-registration mailings were part of the execution of Schmuck's fraudulent scheme. *Id.* at 712.

Here, the whole point of becoming a Tandem Instructor was to jump with paying customers. *See* Affidavit, ¶ 6. Like *Schmuck,* Pooley did not engage in a "one-shot" fraudulent Tandem Instruction class, but rather maintained "an ongoing fraudulent venture" teaching and certifying a recurring series of classes that in total certified up to approximately 140 Tandem Instructors during the period of his suspension in July 2015 and Kwon's death in August 2016. *See* Affidavit, ¶ 16-18; *see id.* at 712. Then, newly certified Tandem Instructors could use the certification to jump with paying customers, including at Parachute Center. Affidavit, ¶ 9. The scheme "would have come to an abrupt halt" if the Tandem Instructors were unable to use those certifications to make money. *See id.* Thus, although the

customers' credit card payments for tandem jumps may not have contributed directly to the duping of

the Tandem Instructors, they were necessary to the perpetrations of both levels of the holistic fraud

scheme under investigation.   *See id*.  It is also "wholly irrelevant" whether Pooley himself was involved

or even know of the use of interstate wires.  *Jinian*, 725 F.3d at 954.  The probable cause of the

customer credit card transactions set forth in the affidavit constituted sufficient substantial basis for the

magistrate's finding of probable cause as to the wire fraud scheme.[5]

> 2.      The Affidavit provided a (non-stale) substantial basis for the magistrate's finding of probable cause to search for evidence of falsification of records in a federal investigation**.**

Pooley next argues that because Dause provided the FAA Kwon's Tandem Instructor Rating

Course Proficiency Card to the FAA in August 2016, the probable cause was too stale to support the

magistrate's finding of probable cause to search Parachute Center evidence of that statutory violation.

See Mot. at 14-16.  Pooley's arguments are without merit.

There is no bright-line rule for when information in a warrant becomes too stale to support a

finding of probable cause.  *See United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991).  The "mere

lapse of substantial amounts of time" does not control.  *United States v. Dozier*, 844 F.2d 701, 707 (9th

Cir. 1988).  *See also United States v. Foster,* 711 F.2d 871, 878 (9th Cir. 1983).  Rather, "the nature of

the criminal activity involved and the kind of property for which authorization to search is sought are

also important factors in evaluating probable cause."  *United States v. Reid*, 634 F.2d 469, 473 (9th Cir.

1980).  *See also United States v. Huberts,* 637 F.2d 630, 637–38 (9th Cir. 1980).  "The facts submitted

to the magistrate must provide a substantial basis for the judge to conclude that the object of the search

is probably on the premises to be searched at the time the warrant is issued."  *United States v. Alvarez*,

358 F.3d 1194, 1203 (9th Cir. 2004) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).  As always, "a

---

[5] As a side note, the Affidavit contained evidence of interstate wires in addition to the customer credit card transactions, including the use of email to run the Parachute Center's business and send fraudulent statements to customers (*see* Affidavit, ¶ 24), videos of tandem skydiving customer and instructors edited by Pooley on the Parachute Center computer and then sent to customers and sometimes loaded to YouTube or Parachute Center's Facebook page using the Internet (*see* Affidavit, ¶¶ 11-12), and Parachute Center's use of a telephone (*see* Affidavit, Attachment A, reflecting Parachute Center's telephone number emblazoned on a giant yellow sign next to the words SKYDIVING on the hanger which houses skydivers who work for Parachute Center.  There is no need that the affidavit include a legal argument regarding interstate wires, only the facts.  The facts provided supporting additional likely interstate wires further support the magistrate's finding of probable cause.

magistrate's determination of probable cause is afforded 'great deference' by reviewing courts." *Id.* at 1204 (quoting *Gates*, 462 U.S. at 236).

Here, key evidence of all three statutes the magistrate found probable cause to search for related to the same pre-printed documents: the USPA and UPT forms with Y.G.'s signature, which were used to carry out the multi-level fraud scheme and which and Dause presented signature to the FAA in a federal investigation of Kwon's death.  These documents were likely created on computers, and the affidavit contained evidence that such evidence tends to be stored on computers for a long time or even permanently.  *See* Affidavit, ¶ 16 (as early as Fall 2015, Pooley and Y.G. used "Parachute Center facilities, equipment aircraft, and computers for their work"; USPA's subsequent investigation indicated "it was apparently Pooley was using pre-filled cards that contained [Y.G.'s] signature"); Affidavit, ¶ 24 (Kathy Dause emailed false representations to undercover agent from Parachute Center email address); Affidavit, ¶ 28(d) (probable cause as to electronic records storage on the computers).[6]  The Ninth Circuit has recognized that evidence tends to be recoverable from computers forever.  "Thanks to the long memory of computers, any evidence of a crime was almost certainly still on [Parachute Center] computer[s], even if he had tried to delete the images*.*"  *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006).

The affidavit also set forth evidence that Parachute Center and Tandem Instructors utilize and maintain hard copy documents, including USPA documents.  *See, e.g.,* Affidavit, ¶ 19-20 (Parachute Center maintained manifest sheets reflecting names of potential fraud victims), Affidavit, ¶ 21 (in November 2017, an undercover agent observed Parachute Center paperwork and records in Hanger B), Affidavit, ¶ 23 (during a December 2017 regulatory inspection, a Tandem Instructors retrieved his license from his personal locker, indicating Tandem Instructors maintain licenses and records in their

---

[6] The forensic review information in the Affidavit supported probable cause that evidence as to the creation, transmission, and printing of the pre-filled cards with Y.G.'s signature which Pooley used to perpetrate the fraud and which Dause provided to the FAA for Kwon would be found on the computer that created, transmitted, or printed them.  Specifically: "The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  . . . Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image." Affidavit, ¶ 28(d).

personal lockers), Affidavit, ¶ 26 (Parachute Center employees and/or contractors live on-site in Hanger C).   Documents in general are likely to be retained over long periods of time.  *See, e.g., Reid*, 634 F.2d at 473 (9th Cir. 1980) (reasonable for magistrate to have inferred business would likely store blank identification cards and birth certificate forms for at least approximately a year and a half); *Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) ("The documentary records sought are the type of records typically found to be maintained over long periods of time.").

Pooley's staleness arguments fall particularly flat considering the affidavit provided evidence that in the two months prior to the execution of the warrant, the subjects of the Section 1519 investigation were still at the Parachute Center committing crimes.  As of December 2017 and January 2018, multiple subjects including Pooley were *still* actively continuing to carry out one level of the multilevel fraud scheme described in the Affidavit by still defrauding paying customers who believed they were paying for tandem jumps with "certified" tandem instructors.  *See* Affidavit, ¶¶ 22, 24-25. The ongoing nature of the criminal enterprise, which might lead to "the maintenance of tools of the trade" militates against any staleness. *Dozier*, 844 F.2d at 707.  *See also Huberts*, 637 F.2d at 638 (noting as factor leading to conclusion of no staleness "the evidence points toward ongoing counterfeiting activities, rather than completed criminal acts").  Together, these factors all show that Pooley was engaged in the type of long-running fraud that makes his "staleness argument lose much of [its] force." *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989).

In sum, the affidavit set forth ample reason to believe that evidence relating to the doctored paperwork which Pooley used to teach Tandem Instruction courses and which Dause presented to the FAA would be on the premises and in the computers of Parachute Center.  *Alvarez*, 358 F.3d at 1204. The magistrate judge had a substantial basis to find probable cause that the Parachute Center was likely to contain evidence of the violation of Section 1519.

>    3.    The magistrate had a substantial basis for the finding of probable cause to search the Parachute Center, including lockers and computers, as described on Attachment A,

Pooley next attacks the magistrate's finding that there was probable cause to search specific sub-sections of Parachute Center described in Attachment A, including computer and lockers.  *See* Mot. at 14-15.  Pooley's argument in this regard again employs a siloed approach, suggesting the magistrate was

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING

1  required to find for each individual statute and theory of liability that there was probable cause that a

2  specific document or category evidence would be in Pooley's locker specifically, or that Pooley himself

3  was guilty of the violation in order to search his locker or Bill Dause's computer.  *See* Mot. at 14-16.

4  This misconstrues the nature of the probable cause inquiry.

5      "Probable cause exists if 'it would be reasonable to seek the evidence in the place indicated in

6  the affidavit.'" *United States v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006).  "A lawful search of fixed

7  premises generally extends to the entire area in which the object of the search may be found and is not

8  limited by the possibility that separate acts of entry or opening may be required to complete the search."

9  *Id.* Pooley's arguments that the warrant was invalid insofar as it permitted *his* locker be searched

10  because "the affidavit does not attempt to make out probable cause that a violation of § 1519 was

11  committed by Rob Pooley" (Mot. at 14) – "misunderstands Fourth Amendment jurisprudence.  *Adjani*,

12  452 F.3d at 1146.  "Property owned by a person absolutely innocent of any wrongdoing may

13  nevertheless be searched under a valid warrant." *Adjani*, 452 F.3d at 1147 (9th Cir. 2006) (quoting

14  *United States v. Tehfe,* 722 F.2d 1114, 1118 (3d Cir. 1983)). "The critical element in a reasonable search

15  is not that the owner of the property is suspected of crime but that there is reasonable cause to believe

16  that the specific "things" to be searched for and seized are located on the property to which entry is

17  sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

18      Probable cause is also not so itemized and technical that it would require, as Pooley argues,

19  establishing that a particular document is likely to be in Pooley's particular locker.  *See* Mot. at 14.

20  Pooley's argument that such specificity is required "seeks to sidestep the 'fair probability' standard and

21  elevate probable cause to a test of near certainty."  *Gourde*, 440 F.3d 1065 at 1072.  This is contrary to

22  clear Ninth Circuit and Supreme Court guidance that a magistrate judge is only required to answer the

23  "commonsense, practical question whether there is 'probable cause' to believe that contraband or

24  evidence is located in a particular place" – here, Parachute Center, and all lockers and computers thereon

25  – before issuing a search warrant. *Gates, 462 U.S.* at 230, Gourde, 440 F.3d at 1069.

26      The magistrate's finding of probable cause to search the Parachute Center, including all

27  computers and lockers, as set forth in Attachment A is well supported for all the reasons already

28  discussed.   The magistrate's finding should not be disturbed.

**C.      This Court should deny Pooley's motion for a _Franks_ hearing because Pooley has not shown that SA DuBois recklessly or intentionally misstated or omitted information that should have been included in the affidavit, or that any alleged misstatement or omission was material to the probable cause finding.**

Pooley argues SA DuBois recklessly misrepresented or omitted three facts from the affidavit. Pooley cannot meet his burden to make either of the showings required to obtain a _Franks_ hearing for any of them.

To obtain a _Franks_ hearing, a defendant must make two showings by a preponderance of the evidence. _United States v. Perkins_, 850 F.3d 1109, 1116 (9th Cir. 2017). First, the defendant must make a substantial preliminary showing that "the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant." _United States v. Norris_, 942 F.3d 902, 910 (9th Cir. 2019) (quoting _Perkins_, 850 F.3d at 1116). A negligent or innocent mistake will not suffice. _Perkins_, 850 F.3d at 1116.

Second, the defendant must show that "that the false or misleading statement or omission was material, _i.e._, 'necessary to finding probable cause.'" _Id._ (quoting _United States v. Martinez–Garcia_, 397 F.3d 1205, 1214–15 (9th Cir. 2005)).  In other words, the defendant must establish that the affidavit when "supplemented by the [misleading statements or] omissions would not be sufficient to support a finding of probable cause." _United States v. Stanert_, 762 F.2d 775, 782 (9th Cir.), _amended_, 769 F.2d 1410 (9th Cir. 1985).  Probable cause exists when there is a "fair probability" that a suspect has committed a crime based on the totality of the circumstances. _United States v. Struckman_, 603 F.3d 731, 739 (9th Cir. 2010); _see also Illinois v. Gates,_ 462 U.S. 213, 238 (1983). "Probable cause does not require proof beyond a reasonable doubt of every element of a crime."  _United States v. Noster,_ 590 F.3d 624, 629–30 (9th Cir. 2009).

For each alleged misstatement or omission, Pooley fails on both prongs. Each alleged misstatement or omission is discussed in turn below.

1.      Alleged Omission #1: the credit cards machines at Parachute Center were available only for customers.

Special Agent DuBois fully and accurately stated in the affidavit that the credit card machines were used by customers, and the facts that the credit card machines were for customers does not undermine probable cause of wire fraud.  Specifically, SA DuBois described the credit card machines,

specified the credit card machines were available to customers, and explained that customer transactions by credit card at Parachute Center cause interstate wires.  Affidavit, ¶ 10.  Pooley complains that DuBois' statement was misleading because SA DuBois did not include a specific statement from a witness that "the credit card machines were available only for customers (i.e., members of the public hoping to do a skydive with a professional skydiver) not to skydivers taking courses, such as the Tandem Instructor course."  Mot. at 14.

But SA Dubois did say that.  The entire paragraph concerning the credit cards machines was about *customers*, not Tandem Instructor candidates.  Paragraph 10 of the affidavit begins as follows:

> Based on interviews of former Parachute Center skydivers and individuals familiar with Parachute Center's current parachute operations, *first time or "bucket list" skydivers* can pay $100 to $200 to tandem jump with a certified Tandem Instructor.  *Tandem skydiving customers* will sign a waiver and are supposed to complete training prior to skydiving.  *Customers* can play with cash and credit card.  Recently in November 2017, an undercover agent observed that there are as many as six credit card processing machines at Parachute Center.  Based on my training and experience, my knowledge of credit card payment systems, as well as conversations with other agents, I believe *customer* transactions by credit card at Parachute Center cause [interstate wires].

Affidavit, ¶ 10 (emphasis added).

SA DuBois went on to make the connection that deceased defrauded tandem customer Tyler Turner had paid with credit card for the tandem skydive which Parachute Center represented would be with a certified instructor:

> On August 6, 2016, Tandem Instructor Yonghyon Kwon, and the customer skydiving with him, Tyler Turner, were killed skydiving at parachute center when their parachute failed to properly deploy.  During FAA's regulatory investigation, they learned Turner paid for the parachute jump with credit card and completed a liability waiver.  Kwon was not recognized by USPA as a USPA licensed skydiver or a Tandem Instructor.

Affidavit, ¶13.

In sum, SA DuBois accurately asserted that interstate wires caused by credit card payments made by customers, not Tandem Instructor candidates, were an essential part of one component of the multi-level fraud scheme described in the affidavit.  Pooley has not made a substantial preliminary showing that DuBois failed to disclose that the credit cards were only used by bucket list customers, much less that any such failure was intentional or reckless.

Regardless, even if the difference between the wording used by SA DuBois had some

1   vanishingly slight difference in meaning from the wording Pooley argues he should have used, Pooley is

2   not entitled to a Franks hearing because it was not necessary to the finding of probable cause that the

3   credit card machines be used by any other than customers.   As discussed above, interstate wires are a

4   one-way ratchet for PC such that once the affidavit established probable cause of an interstate wire

5   incident to an essential part of the scheme, probable cause of the interstate wire element of wire fraud

6   was established.  It does not matter if other parts of the same fraud scheme – as then conceived – did not

7   involve wires.

8          2.      Alleged Omission #2: SA DuBois' statement that after Kwon's death, Dause
               provided FAA with Kwon's Tandem Proficiency card "during a subsequent FAA
9              investigation" rather than specifying the date Dause provided the card.

10         Pooley next alleges that SA DuBois intentionally or recklessly omitted the date that Dause

11   provided the FAA with Kwon's Proficiency Card.  *See* Mot. at 4-5.  But DuBois' statement that Dause

12   provided the card "in the subsequent FAA investigation" – which DuBois wrote in the very next

13   paragraph following the discussion of Kwon's and Turner's deaths – did not give a misleading

14   impression of any significant elapsing of time between the deaths and Dause providing the card.  SA

15   DuBois said it in the first sentence of the very next paragraph, making it clear to the reader that the

16   accident happened (Affidavit, ¶ 13), the FAA launched a regulatory investigation (Affidavit, ¶ 13), and

17   then Dause provided the card in short order. *See* Affidavit, ¶ 14.

18         The defendant's argument that not providing the exact date Dause gave the FAA inspector

19   Kwon's Proficiency Card materially undermined probable cause is just as misplaced.  The defendant's

20   argument for materiality is that because Dause provided the card in early August 2016, the January 2018

21   search warrant for evidence of the crime of falsification of documents in a federal investigation was

22   "stale." *See* Mot. at 14-15.  This does not make sense.  The government was not searching for Kwon's

23   Tandem Proficiency Card – the government already had it from the FAA, who had gotten it from Dause,

24   as explained in the Affidavit.  Instead, the government was searching for evidence as to exactly how and

25   when and by whom that card came to have Y.G.'s signature on it while he was out of the country, and

26   whether when Dause provided it to the FAA he did not so knowing it was forged.  As explained above,

27   there was ample bases for the magistrates finding that such evidence was likely to be at Parachute

28   Center.  Pooley's assertion that DuBois' wording undermined probable cause is without merit.

3.   Alleged Omission #3: Omission of a witness' statement that Pooley left the
Parachute Center and returned.

The next statement Pooley argues should have been included is the following, from a January 2018 interview with a witness: "After a 2016 accident, Pooley and [Y.G.] left the Parachute Center; however they have since returned. [The witness] believes they have both been there for at least the last two or three months." *See* Def. Mot., Ex. E.   Pooley's argument fails.  This witness comment is just the sort of detail that would reasonably not make it into an affidavit, because the events at issue in the Affidavit were all during the time that Pooley was documented in the Affidavit to be present at Parachute Center engaged in apparent crimes.  Specifically, the Affidavit focuses on July 2015-August 2016, when Pooley was defrauding Tandem Instructor candidates and customers, and in the immediate months prior to the search, where Pooley was documented again defrauding customers by personally doing tandem jumps with customers with no certification contrary to Parachute Center's representations. *See* Affidavit, ¶¶ 9-26.  There is no need to include every single detail in the affidavit, and Pooley has no shown that SA DuBois' omission here was intentional or reckless, or anything other than the result of the normal process of distilling a wide ranging investigation into affidavit form.  *See United States v. Brown*, No. 119CVR00256NONESKO6, 2021 WL 3207265, at *4 (E.D. Cal. July 29, 2021) ("the relevant question under *Franks* is not whether the affiant failed to include every detail of the investigation in the supporting affidavit at issue," but rather "whether the affiant intentionally or recklessly omitted any information that was necessary to present an accurate depiction of the facts material to the probable cause determination").

And, the witness' statement that Pooley left and returned to Parachute Center was not necessary to present an accurate depiction of the facts material to the probable cause determination. The key events at issue, as noted above, were all while he was there.  Pooley's only argument as to how this undermines materiality is, again, that the gap in Pooley's presence at the parachute center makes the search warrant "stale." *See* Mot. at 15-16.  For the reasons already explained above, this argument lacks merit.  The omission of the witness' statement does not eliminate probable cause for the magistrate's decision that evidence of the three crimes set forth in the search warrant would be found at the Parachute Center in January 2018.

**D.**     **The search warrant was sufficiency particular and not overbroad**

1.     Legal standard for particularity and overbreadth.

The Fourth Amendment requires that search warrants be specific. "Specificity has two aspects: particularity and breadth. Particularity is the requirement that a warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) (internal quotation marks and citations omitted).

"A warrant need only be reasonably specific in its description of the objects of the search and need not be elaborately detailed." *United States v. Hayes*, 794 F.2d 1348, 1354 (9th Cir. 1986).  *See also United States v. Brock,* 667 F.2d 1311, 1322 (9th Cir. 1982). Thus, when probable cause exists, "all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search." *United States v. Tamura,* 694 F.2d 591, 595 (9th Cir.1982).

Courts in the Ninth Circuit therefore consider three factors in determining whether a warrant is impermissibly overbroad:

(1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available.

*United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *United States v. Lei Shi*, 525 F.3d 709, 731-32 (9th Cir. 2008)).

2.     The defendant has not shown any of the categories of evidence the warrant authorized be searched for and seized lacked particularity or were overbroad.

Pooley takes a shotgun approach, challenging each and every category of evidence the warrant sought.  *See* Mot. at 16 -22.  Pooley is not correct on any point.  Nonetheless, the government addresses each contention below.

1.   *Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.*

In the Ninth Circuit, warrants authorizing the seizure of items which establish the control of identity of persons are well established to be particular and not overbroad.  *United States v. Whitten*, 706 F.2d 1000, 1008-09 (9th Cir. 1983) (partially overruled on other grounds) (contention that warrant authorizing seizure of "telephone books, diaries, photographs, utility bills, telephone bills, and any other papers indicating the ownership or occupancy of said residence" was impermissibly broad).  See also *United States v. Marques,* 600 F.2d 742, 751 n. 5 (9th Cir.1979) ("articles of personal property tending to establish the identity of persons and control of premises"); *United States v. Honore,* 450 F.2d 31, 33 (9th Cir.1971) ("articles ... tending to establish the identify [sic] of the persons in control of the premises ... including but not limited to utility company receipts, rent receipts, cancelled mail envelopes, and keys").  The contention that this item is overbroad or lacks particularity is unserious.

2.   *Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.*

This category is analogous to the first category, but pertains to documents tending to show the identity of Parachute Center's various corporate entities.  The Affidavit indicated that Parachute Center had multiple corporate forms, also going by "Skydiver's Guild," operating a YouTube and Facebook pages called "Skydive Lodi Parachute Center" and sharing employees/stafff with other entities, such as Lodi Airport.  *See* Affidavit, ¶¶ 7, 11-12, 22.  Where potential criminal acts are committed by a corporation or corporations, documents tending to identify the specific corporations in play are just as relevant and proper as documents tending to identify a human wrongdoer exercising dominion and control over a space.

3.   *Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.*

Pooley argues this category is overbroad because, he asserts, there is "no probable cause to believe that all, or even a large proportion of customers of Parachute Center were victims of fraud."

Mot. at 17.  This argument is unavailing factually – in reality, the Affidavit sets forth facts from which a reasonable person could conclude most or even all tandem customers at Parachute Center from July 2015 through the execution of the warrant may well have been victims of fraud – and legally, because the Fourth Amendment does not require limiting evidence seized to demonstrated fraud victim.

Pooley seizes on language in the Affidavit asserting that at least two and possibly more instructors were jumping with customers without certifications (Mot. at 17-18), but ignores the other numbers in the affidavit constituting evidence that the scope of the fraud and the number of instructors without certifications was much higher.  The Affidavit set forth probable cause that, through at least January 2, 2018, Parachute Center represented to customers that "you will definitely go with certified Instructors." Affidavit, ¶ 24. The Affidavit states that according to a witness and a video, around that time period, Pooley and Y.G. were jumping with customers when both men lacked Tandem Instructor certifications.  Affidavit, ¶¶ 22, 25.  The Affidavit provides probable cause that over a much longer period of time, stretching back to July 2015, unsuspecting customers were likely jumping with tandem instructors who had been certified by Pooley after his certifications were suspended in July 2015. Specifically, the Affidavit set forth Pooley's suspension in July 2015 and the fact that he continued teaching thereafter (¶¶ 15-16).  It also explains that once Pooley's training was complete, newly (purportedly) certified Tandem Instructors could use this certification to jump with customers for payment; several were employed by Dause to conduct tandem parachute jumps at Parachute Center." Affidavit, ¶ 9.  Kwon was one example of those students, who received a fraudulent certification from Pooley and jumped with paying customers at Parachute Center thereafter.  *See* Affidavit, ¶ 13, 14.   The Affidavit sets forth probable cause that the number of Tandem Instructors Pooley fraudulently trained was significant: in September 2016, the USPA required approximately 140 Tandem Instructors who were trained by Pooley and/or Y.G. to complete refresher training and/or had their ratings suspended or revoked.  *See* Affidavit, ¶ 18.  The Affidavit notes further that after the August 2016 fatality of Kwon and Turner, Y.G. submitted certification paperwork for over ten previously trained Tandem Instructors to the USPA, some as old as six months, that he failed to previously submit. Affidavit, ¶ 17.  This meant over ten Tandem Instructors were likely operating under the assumption they were certified when in fact the USPA had no knowledge they completed the training and they were not certified to conduct tandem

Parachute Operations.  Affidavit, ¶ 17.  Each of the customers at Parachute Center who jumped with an uncertified Tandem Instructor – which the Affidavit contains probable cause to believe happened at Parachute Center between July 2015 (when Pooley was suspended but continued certifying Tandem Instructors, potentially more than 140 of them) and the date of the search warrant (when Pooley and Y.G. were still personally jumping with students without certifications) –  was a victim of fraud. Indeed, all tandem customers at Parachute Center during this time may well have been victims of fraud. They were assured they would jump with a certified Instructor, when in reality, there was no guarantee they would jump with a certified Instructor as multiple instructors lacked certifications. The crime of fraud was complete when the students paid Parachute Center in reliance on that promise instead of going elsewhere.

Pooley's legal argument fares no better.  The contention that this category should have been more narrowly drawn because, Pooley argues not all customers of Parachute Center were victims of fraud, is misplaced.  The Ninth Circuit has explained that where an affidavit sets forth probable cause of specific instances of violations of a particular law, it is not overbroad to seize all documents concerning all activity in which they had violations.  For example, in *United States v. Hayes*, the Ninth Circuit rejected a doctor defendant's contention that, because the affidavit supporting the search of his offices set forth information concerning 58 cases of potential violations involving Schedule II drugs that the warrants should have been limited to those 58 patient files, not all documents relating to controlled substances.   794 F.2d 1348, 1356 (9th Cir. 1986).  The Ninth Circuit explained this was sufficiently particular because "[t]he 58 known cases could fairly be considered as representative of more pervasive violations of the Act.  *Hayes*, 794 F.2d 1348, 1356 (9th Cir. 1986) (citing *See United States v. Offs. Known as 50 State Distrib. Co.,* 708 F.2d, 1371, 1374–75 (9th Cir. 1983)).  Here, the documented instances of tandem customers jumping with uncertified students could fairly be considered as representative of the pervasive fraud within Parachute Center's tandem operations. The authorization to search for specific categories of evidence demonstrating the identities of those likely fraud victims was neither insufficiently particular or overbroad.

> 4.  *Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they*

*were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.*

This is appropriate for largely the same reasons as the third category.  The specific evidence listed tends to show the identities of the purported Tandem Instructors who were jumping with customers.  Combined with evidence of whether those instructors held valid certifications, it will show when and with which Instructors likely illegal tandem jumps occurred.

5. *Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.*

This is sufficiently particular and is relevant and not overbroad for the same reason as explained in the third and fourth items above.

6. *Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.*

The categories of documents listed are sufficiently specific and provide detailed guidance to the executing agents about what may be seized.  In this wire fraud investigation obviously evidence of what representations the subject business made to a category of victims described in the affidavit is relevant and not overbroad.

7. *Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.*

This evidence category set forth types of documents which may be seized and was sufficiently particular.  It is also relevant and not overbroad because it authorizes seizure of communications and correspondence relating to specific areas where Parachute Center was pervaded with fraud for at least part of the time span in the search warrant.

8. *Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.*

This is tailored specifically to evidence of the falsification of evidence in federal investigation charge and not overbroad.   As shown by the Affidavit's description of the USPA investigation, the FAA investigation and USPA investigations of Kwon's death were simultaneous and shared information.   The argument that evidence tending to show efforts or intentions to falsify records in the USPA investigation is not relevant to an investigation of efforts to do so in the FAA investigation is without merit.   Similarly, efforts to destroy, falsify, or alter records related to other accidents or certifications are relevant to the investigation of the falsification and alternation of records in the investigation of Kwon's accident and certification.

> 9.  *Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.*

The affidavit explains that the credit and debit card machines were used by tandem customers. As explained above with respect to category #3, there is probable cause to believe that from the period January 2015 through the date of the search warrant in January 2015, that tandem customers were victims of fraud.   Clearly evidence reflecting amounts paid and for what by which potential fraud victims constitute sufficiently particular relevant evidence.

> 10. *Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.*

This is relevant for the same reason as explained with respect to categories three, four, and five. The videos, pictures and other documentation of tandem skydiving customers (who were told by Parachute Center that they would jump with certified instructors (*see* Affidavit, ¶ and (purported) instructors and their tandem instructors is clearly evidence of the multi-level fraud scheme described in the affidavit.

> 11. *Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. (and sub-items amounting to computers and electronic devices)*

This category is likewise specific and not overbroad.  Seizure and imaging of electronic devices

to search for evidence responsive to the warrant was proper because the affidavit established probable cause that evidence of the crime would be on those electronic devices. *See, e.g., Adjani*, 452 F.3d at 1145–46. "Probable cause exists if it would be reasonable to seek the evidence in the place indicated in the affidavit." *Wong,* 334 F.3d 831, 836 (9th Cir. 2003) (internal citation omitted).

Here, the affidavit set forth evidence of a multilevel wire fraud scheme carried out through email and phone and falsification of records in a federal investigation (likely prepared on computers). Specifically, the affidavit set forth evidence that subjects of the investigation made false statements to students via email (Affidavit, ¶ 24) and that Pooley carried out the fraud using "pre-filled" cards that contained Y.G.'s signature (Affidavit, ¶¶ 14, 16) with the logical inference being that those preprinted cards were likely created on a computer). It also noted that Parachute Center prominently displayed its phone number. Affidavit, Attachment A). Accordingly, "the government would have probable cause to search for and seize instrumentalities likely to have been used to facilitate the transmission. The magistrate judge could rightfully assume that there was a "fair probability" that such evidence could be contained on computers or storage devices found in [Parachute Center]." *Adjani*, 452 F.3d at 1145–46 (probable cause to search computers for crime of extortion).

Pooley seems to argue that this category lacked particularity because agents should have seized only specific portions of the computer, not imaged the whole thing to search for specific evidence. See Mot. at 22. Pooley's argument is supported by law and inconsistent with the practical reality of how computers work. The Ninth Circuit has established that where there is probable cause to believe a crime is carried out through electronic means, seizure and imaging of the entire electronic device to search for specific evidence set forth in attachment B, as occurred here, is sufficiently particular and not overbroad. Pooley does not suggest a preferred tailoring of areas of the computer search (instead limiting his argument to cell phones, which he does not seek to suppress in his motion). See Mot. at 21-22. In any event, no limitation to particular parts of the computers would be reasonable and was not required. In any event, "Avoiding that kind of specificity and limitation was not unreasonable under the circumstances here." *Adjani*, 452 F.3d 1140, 1149–50 (9th Cir. 2006). "To require such a pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to cast a sufficiently wide net to capture the evidence sought."

Computer files are easy to disguise or rename, and were we to limit the warrant to such a specific search protocol, much evidence could escape discovery simply because of Adjani's (or Reinhold's) labeling of the files documenting Adjani's criminal activity. The government should not be required to trust the suspect's self-labeling when executing a warrant. *See Guest v. Leis,* 255 F.3d 325, 335 (6th Cir.2001) ("Defendants may legitimately have checked to see that the contents of the directories corresponded to the labels placed on the directories. Suspects would otherwise be able to shield evidence from a search simply by 'misfiling' it in a directory labeled 'e-mail.'"); *cf. United States v. Tamura,* 694 F.2d 591, 595 (9th Cir.1982) ("[A]ll items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search.").

*Adjani*, 452 F.3d at 1150.

        3.     Even if some category in the warrant were deemed to be insufficiency specific, suppression of the entire warrant (or even the entire category of document) would not be warranted.

The Ninth Circuit has "embraced the doctrine of severance, which allows [courts] to strike from a warrant those portions that are invalid and preserve those portions that satisfy the Fourth Amendment. Only those articles seized pursuant to the invalid portions need be suppressed." *United States v. Gomez–Soto,* 723 F.2d 649, 654 (9th Cir. 1984). *See also 50 State Distrib. Co.*, 708 F.2d 1371, 1376 (9th Cir. 1983) (even if the warrant were found to be an insufficiently particular general warrant "[t]he remedy is not a return of all items seized but selective suppression or return of the items improperly seized."). Here, any arguable lack of specificity of the warrant would not entitle Pooley to suppression of the entire warrant – suppression would be proper only of evidence improperly seized. *See United States v. Flores*, 802 F.3d 1028, 1045 (9th Cir. 2015).

**E.**     **Agents complied with the warrant and suppression is unwarranted.**

        1.     The search was conducted and evidence seized in compliance with the warrant.

Pooley's conclusory allegations that agents seized vast amounts of evidence outside the time limitations within the warrant (*see* Mot. at 22-23) does not withstand scrutiny. Attachment B of the search warrant entitled agents to seize "items created, modified, or in use during the period of July 1, 2015 to the present." Affidavit, Attachment B. As explained below, with respect to both the locker Pooley used and Bill Dause's computer, Pooley has failed to show a violation of the warrant's

1   limitations.

2                         a.      Pooley's Locker.

3          Agents seized less than a full banker's box of hardcopy material from Pooley's locker, much of

4   which was undated.  *See* Exh. 6 (index of physical evidence seized from Pooley's locker).  It appears to

5   the government that all or virtually all of the material seized from Pooley's locker was "created,

6   modified, or in use" as of July 1, 2015 or later, for several reasons.

7          First, Pooley emphasizes in his motion that he left the Parachute Center after the August 2016

8   skydiving accident but returned by early fall 2017.  *See* Mot. at 15.  If Pooley left the Parachute Center

9   shortly after the August 2016 accident, obviously anything he brought back and put in his locker was "in

10  use" after July 1, 2015.

11         Second, the search team quite reasonably did not treat every individual sheet of paper as an

12  "item" where multiple sheets of paper were attached to or stored with each other in a collection.  Rather,

13  the search team treated each packet, binder, or collection that were stored as a unit as an "item"– for

14  example, the three-ring binder containing multiple documents, and the manilla folder containing an

15  entire collection of documents organized by Pooley with multiple dates, some with dates in 2016 and

16  some with dates ranging back to 2012.  *See* Exh. 6.  Similarly, the USPA and UPT student packets kept

17  by Pooley often have large time spans of dates on them, from the first training jumps on one form to the

18  final Instructor Examiner certification on another form, and the whole packet was reasonably treated as

19  one item. Multiple sheets of paper organized by Pooley as one item – particularly Pooley's giant manilla

20  folder of USPA and UPT documents – were quite reasonably and correctly treated by the search teams

21  as a single "item" as defined by Attachment B.

22         Third and finally, the defendant's apparent argument that anything bearing a date prior to July 1,

23  2015 was not "in use" after July 1, 2015, *see* Mot. at 9, is misguided.  The defendant's simplistic

24  contention that after a document is dated it ceases to be used may stem from a lack of understanding of

25  USPA and UPT paperwork retention requirements from the Examiner.  The vast majority of documents

26  with dates on them seized from Pooley's locker were packets of (and a large manilla folder containing)

27  USPA and UPT forms of students he taught in Tandem Instructor courses of other USPA/UPT courses.

28  *See* Ex. 6. USPA and UPT both required the Examiner retain some of all of those forms.   As is clear

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING

from the below clips of the operative sections of those organizations' respective guidelines for

Examiners, the USPA required the Examiner retain certain documents for "at least two years", and the

UPT required that the Examiner retain a copy of all submitted paperwork, without regard to date.

B. COURSE RECORDS
1. Each candidate should retain his original proficiency
   card (or a copy of it) for personal records
2. Items to be retained by the IE for at least two years
   a. After action report
   b. Candidate written tests
   c. Air skills evaluation forms
   d. Ground skills evaluation forms
   e. Copy of any letters of recommendations
   f. Copy of Proficiency cards

Exhibit 7 (excerpt from USPA Instructional Rating Manual, 2016-2017 Edition, Instructor Examiner
Administrative Responsibilities section) pages 171-172.

E. Record Keeping

The manufacture must have a copy of all the required paper work before the
candidate can continue doing tandems after the initial 5 training jumps (use the
Examiner check list), not submitting all information is grounds for loss of your
tandem examiner rating.

Examiners must maintain a copy of all submitted paper work.

Exhibit 8 (excerpt from UPT Tandem Examiner Guide Lines for the Certification of Tandem Instructors
with the Tandem Vector/Sigma System, Eleventh Edition-January 2013).

The items seized from Pooley's locker fall within the temporal scope of the warrant as

they all appear to have been created, modified, or in use during the period of July 15, 2018 through the

execution of the warrant.

b.      Bill Dause's Computer

As discussed above, Pooley has no standing to contest the search of Bill Dause' computer at all.

Even if Pooley, his arguments that the government over seized from it are misplaced.  The

warrant clearly authorizes imaging of the entirety of electronic devices seized.  See Affidavit, ¶ 28.

1    Pooley does not seem to argue that making a full forensic copy constitutes overseizure.

2          Pooley's argument that the investigation team disregarded the terms of the warrant appear to rest

3    on a Media Data Extraction (MDE) form internal to the Computer Crimes Unit form, which he

4    misinterprets.  With respect to the MCE form, Pooley misconstrues the generic description of the project

5    which the forensic officer filled out, as directing the CCU on how to sort through data on the computer

6    for responsiveness to attachment B.  *See* Mot. at 23 (construing the MDE as "the agents directed the

7    Computer Crimes Unit to search for "all documents, emails, and videos related to the operations of the

8    Parachute Center.").  That is not the function of that form or of the Computer Crimes Unit.  See Exhibit

9    9 (Declaration of Charles Wilkerson) ¶ 7.  In reality, the box is intended to be a generic description.  The

10   CCU agent who filled out the MDE, SA Charles Wilkerson, submitted a declaration explaining that it is

11   intended to be a general description" and "does not related to and is not intended to encompass or

12   describe the responsiveness review with respect to Attachment B of the search warrant."  *See* Wilkerson

13   Decl., ¶ 7.  CCU's function after the computer is imaged is primarily to use computer software (here, a

14   program called Nuix) to ingest the data into human-readable format.  *See* Wilkerson Decl., ¶ 4.

15   Wilkerson explains, "After the CCU ingests the data into Nuix, it is the case agent's responsibility to

16   review the documents for responsiveness to Attachment B."  Wilkerson Decl., ¶ 7.

17         Pooley's other argument about the form, that no data limitation was noted by CCU (*see* Mot. at

18   22-23), does not represent a legal problem because, again, the *case agent* reviews the extracted data for

19   responsiveness with attachment B, not CCU.  Wilkerson Decl., ¶ 7.  However, upon reflection while

20   preparing a response to the defendant's motion, the government looked into it, ascertained that the CCU

21   has the technical capability to apply date limitations (*see* Wilkerson Decl, ¶ 8), and determined it would

22   be prudent to retroactively apply those at a technical level.  Accordingly, the CCU temporarily removed

23   the case agent's access to the electronic case file while the CCU implemented this instruction.

24   Wilkerson, Decl., ¶ 9.  The case agents' access to the case will not be restored until the CCU has

25   finished applying date filters so that when the agents log into the case they will only be able view items

26   created, modified, or in use on or after July 1, 2015.  Wilkerson, Decl., ¶ 9.

27

28

2.     Even if certain of the items seized were construed not to be "created, modified, or in use" as of July 1, 2015 or after, the rest of the items seized should not be suppressed.

Even if there were some seizure outside the scope of the warrant, Ninth Circuit precedent would authorizes suppression of only those few outside-the-scope items, not the entire warrant (as the defendant asks the court to do), because any arguable over-seizing did not rise to the level of "flagrant disregard" of the warrant.  The Ninth Circuit adopted this rule forty years ago in *Whitten*:

> Absent ... flagrant disregard [for the terms of the warrant], the appropriate rule seems to be that where officers seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant.

*Whitten*, 706 F.2d at 1010) (quoting and adopting the rule articulated by the D.C. Circuit in *United States v. Heldt*, 668 F2d. 1238, 1254-69 (D.C. Cir. 1981).

The standard for "flagrant" disregard of a warrant justifying suppression of the entire warrant, not just the material seized outside the warrant's authorization, is extremely high and certainly unmet here.  *See e.g., Whitten*, 706 F.2d 1000, 1009-10 (no flagrant disregard although agents did not read or fully understand the terms of the warrant, and lacking time to go through documents at the house for responsiveness to the warrant, took more than a thousand photos and two lockboxes "intended to look through them more thoroughly later").  The Ninth Circuit has held wholesale suppression was unwarranted where agents executed searched with far less diligence than demonstrated by the search of the Parachute Center.  For example, in *United States v. Chen* (cited in defendant's argument for wholesale suppression, *see* Mot. at 12, 23), government agents installed three cameras to monitor defendant's business where the warrant only authorized one.  979 F.2d 714, 718 (9th Cir. 1992).  The Ninth Circuit held that this was not flagrant disregard of terms of the warrant, that the government's agreement to suppress the recordings taken by the unauthorized cameras was "a sufficient remedy," and that the "the district court clearly erred by determining that the installation and use of [the additional two cameras] justified suppression of evidence that was not tainted by the camera's operation."  *Id*. at 719.

Here, the search of Parachute Center was conducted diligently and in accordance with the terms of the warrant.  A quick scan of the evidence tags reflects agents were mindful of the temporal limitation in attachment B, noting when seizing 2015 documents that they were collecting documents dated July

1    2015 and later.  *See* Exhibit 1 at POOLEY_22108 ("Liability Form July 2015-2017, 22122 "Credit Card

2    Receipts July 2015-December 2015").  With respect to Pooley's locker, agents left most of the material

3    therein, seizing only evidence which was within the 11 categories enumerated by the warrant.  The items

4    they seized were generally either undated, USPA/UPT forms which Pooley was required to retain, or

5    items attached too and/or stored by Pooley together as one item comprising pre-and-post July 2015

6    papers, such that separating out the individual pages by date would not have been reasonable.  Even if

7    the Court were to conclude that the agents should have made different decisions with respect whether

8    certain documents constituted or were part of "items created, modified, or in use during the period of

9    July 1, 2015 to present," the agents' seizure decisions did not constitute flagrant disregard of the

10   warrant, and accordingly no blanket suppression is warranted.

11          The same is true of the search of Bill Dause's computer.  It was conducted precisely in

12   accordance with the warrant, with a full imaging and extraction and later review by the case agent to

13   identity items responsive to attachment B.   *See* Affidavit, ¶ 28(a)-(h); Wilkerson Decl., ¶¶ 2-8.  Even if,

14   in hindsight, it would have been ideal to have implemented the temporal limitation on the front end

15   (which is in the process of being done now (Wilkerson Decl., ¶ 9), the fact that the temporal criteria was

16   initially left to the case agent along with the rest of the review for responsiveness to Attachment B does

17   not constitute disregard of the warrant, let along flagrant disregard, and accordingly blanket suppression

18   would not be warranted.

19          **F.    Agents reasonably relied on the facially valid warrant in good faith.**

20          Finally, even if this Court were to find that the magistrate judge lacked a substantial basis to find

21   probable cause, or that the warrant were insufficiently particular, the Court should nonetheless deny

22   Benson's motion because agents reasonably relied on the facially valid warrant in good faith.

23          "Evidence seized pursuant to a facially valid search warrant that later is held to be invalid may

24   nevertheless be admissible if officers conducting the search acted in good faith and in reasonable

25   reliance on the warrant." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (citing *United States v.*

26   *Leon*, 468 U.S. 897, 926 (1984)). The good faith exception does not apply in only four circumstances:

27

28                    (1) where the affiant recklessly or knowingly placed false information in
                      the affidavit that misled the issuing judge; (2) where the judge wholly

1
2
3
4

abandon[s] his [or her] judicial role; (3) where the affidavit is so lacking in
indicia of probable cause as to render official belief in its existence
entirely unreasonable; and (4) where the warrant is so facially deficient—
i.e., in failing to particularize the place to be searched or the things to be
seized—that the executing officers cannot reasonably presume it to be
valid.

*United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (internal quotations omitted).

Here, none of the four circumstances is present, and therefore the good faith exception applies.

First, SA DuBois did not recklessly or knowingly place false information in the affidavit that misled the

magistrate judge. As discussed above, there is no basis for a finding that SA DuBois omitted any

material information from the affidavit, much less did not knowingly and recklessly, and the information

Pooley points to is immaterial to the finding of probable cause. *See United States v. Lee*, No.

321CR00117TMBSAO1, 2023 WL 3170523, at *13 (D. Alaska May 1, 2023) ("The incorrect

statements made by SA Nelson were not only minor, but were ultimately irrelevant to a finding of

probable cause, making them inappropriate as a basis for Lee's good-faith exception argument.").

Second, there is no evidence that the magistrate judge wholly abandoned his judicial role. Third, the

affidavit extensively details the criminal conduct under investigation at Parachute Center, by at least

three individuals set out by name in the warrant not limited to Pooley, and would provide any official

reviewing the warrant a reasonable belief that probable cause existed.  Finally, given this ample

probable cause, the warrant is not so facially deficient that an executing officer could not presume the

warrant to be valid.  As such, even if the Court were to find some aspect of the warrant lacking, the good

faith exception would preclude suppression.

## IV.    CONCLUSION

The United States asks this Court to deny Pooley's motion for a *Franks* hearing and motion to

suppress.

Dated:  February 20, 2024

PHILLIP A. TALBERT
United States Attorney


By:  /s/ KATHERINE T. LYDON
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS AND MOTION FOR FRANKS HEARING