# Exhibit J:

## Declaration of Mia Crager

HEATHER E. WILLIAMS, #122664
Federal Defender
MIA CRAGER, #300172
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax: 916-498-5710

Attorneys for
ROBERT POOLEY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  2:21-cr-00111-WBS |
| Plaintiff, | DECLARATION IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE |
| vs. | |
| ROBERT POOLEY, | Judge: Hon. William B. Shubb |
| Defendant | |

I, Mia Crager, do declare the following:

1.  I am an Assistant Federal Defender appointed to represent Mr. Pooley in this case.

2.  On February 28, 2024 at 5:11 p.m., I received an email from AUSA Katherine Lydon explaining that, prompted by the motion to suppress and in preparation to file its opposition, the government filed a Request seeking authorization from a magistrate judge to search the forensic images of the devices discussed in the motion to suppress.

3.  In the email on February 28, AUSA Lydon attached the Request and the Order signed by Magistrate Judge Jeremy D. Peterson, both dated February 15, 2024.

4.  The Request and the Order are attached here as Exhibit K (Request) and Exhibit L (Order).

I affirm that the above is true and correct to the best of my personal knowledge.

DATED: February 29, 2024, in Sacramento, California.

*/s/ Mia Crager*

1

# Exhibit K:

Request to Analyze Copies of Electronic Devices Seized Pursuant to Search Warrant

1  PHILLIP A. TALBERT
   United States Attorney
2  KATHERINE T. LYDON
   DHRUV M. SHARMA
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5  Facsimile:  (916) 554-2900



**FILED**

**Feb 15, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

6

7  Attorneys for Plaintiff
   United States of America

8

9              IN THE UNITED STATES DISTRICT COURT

10             EASTERN DISTRICT OF CALIFORNIA

11 IN THE MATTER OF THE  APPLICATION      CASE NO.:  2:18-SW-46 EFB
   OF THE UNITED STATES OF AMERICA
12 FOR SEARCH WARRANTS CONCERNING:       REQUEST TO ANALYZE COPIES OF
                                          ELECTRONIC DEVICES SEIZED PURSUANT TO
13 23597 NORTH HWY 99, ACAMPO, CA,       SEARCH WARRANT
   95220

14

15     <u>**REQUEST TO ANALYZE COPIES OF ELECTRONIC DEVICES SEIZED PURSUANT TO**</u>
                               <u>**SEARCH WARRANT**</u>

16         The government hereby seeks authorization to analyze copies (also known as "images") of

17 electronic devices already imaged pursuant to a search warrant, including by re-extracting data from the

18 images using forensic tools.

19         On January 25, 2018, U.S. Magistrate Judge Edmund F. Brennan authorized the government to

20 search the business premises of Parachute Center and seize certain evidence, including evidence stored

21 electronically.  Pursuant to the search warrant, the government seized evidence, including electronic

22 devices, and imaged and extracted those devices in January and February 2018.  The government is now

23 preparing for trial and gathering information to respond to a motion to suppress evidence with respect to

24 one of the electronic devices.  Doing so most effectively requires the Computer Crimes Unit of the

25 Department of Transportation-Office of Inspector General to analyze and extract data from the images

26 of the electronic devices, including by using different programs and methods than those utilized during

27 the initial extraction.

28

Rule 41 specifies that, ordinarily, judicial authorization is not required to go back and search the original image of an electronic device seized pursuant to search warrant, and that authorization to search the image later is included in the original warrant.[1]  Here, however, the original search warrant affidavit[2] contemplated that, after the device was imaged, "the personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application from the Court."  Affidavit, ¶ 28(g).

According, to comply with the warrant, the government hereby makes application to the Court seeking authorization to analyze, including by re-extraction, the original images of the electronic devices seized pursuant to the search warrant.

Dated: February 15, 2024

PHILLIP A. TALBERT
United States Attorney

By:  /s/ Katherine T. Lydon
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys

---

[1] Rule 41(e)(2)(B) (Warrant Seeking Electronically Stored Information) of the Federal Rule of Criminal Procedure provides: "A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."

[2] The original search warrant affidavit is attached hereto as Exhibit 1.

# EXHIBIT 1

AO 106 (Rev. 04/10)  Application for a Search Warrant

ORIGINAL FILED

# UNITED STATES DISTRICT COURT

JAN 2 5 2018

for the

Eastern District of California

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of                    )
                                                   )        2: 1 8 - SW -   4 6   EFB
23597 North Hwy 99, Acampo, CA, 95220             )    Case No.
                                                   )        SEALED
                                                   )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed
*(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Fraud by Wire, Radio or Television |
| 18 U.S.C. § 1349 | Attempt and Conspiracy to Commit Fraud |
| 18 U.S.C. § 1519 | Destruction, Alteration or Falsification of records in Federal Investigations |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian DuBois
Special Agent, DOT-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1-25-2018

_____
*Judge's signature*

City and state:  Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF

## APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Brian DuBois, being duly sworn, hereby depose and state:

### I. Purpose

1. I am a Special Agent with the United States Department of Transportation – Office of Inspector General. I make this affidavit in support of an application for issuance of a search and seizure warrant for the following premises:

   a. 23597 North Hwy 99, Acampo, CA, 95220

   The premises to be searched are more fully described in Attachment A.

2. I am informed, and believe, and thereon allege that there exists probable cause to believe that at the aforementioned premises, evidence, instrumentalities, fruits, or proceeds of violations of the following federal criminal statutes will be found:

   a. **Title 18, United States Code 1343** (Fraud by Wire, Radio, or Television)
   b. **Title 18, United States Code 1349** (Attempt and Conspiracy to Commit Fraud)
   c. **Title 18, United States Code 1519** (Destruction, Alteration, or Falsification of records in Federal Investigations)

   The items to be seized are documents, records, or information constituting evidence, instrumentalities, fruits, or proceeds relating to the defrauding of customers, by both Parachute Center, and Robert Pooley and Yuri Garmashov for the purposes of defrauding Parachute Center customers as well as Tandem Instructor students, as more fully set forth in Attachment B.

### II. Agent Training, Knowledge, and Experience

3. I am a Special Agent with the U.S. Department of Transportation- Office of Inspector General, San Francisco, CA, and have been assigned to this position since December 2016. As part of my training as a Special Agent, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in August 2013, and the Naval Criminal Investigative Service's Special Agent Basic Training Program in March 2014. As a Special Agent of the DOT-OIG, I have been involved in executing search warrants,

and conducting investigations involving fraud, false claims, false statements and other crimes under the jurisdiction of the Federal Aviation Administration (FAA), an agency of the United States Department of Transportation.  I have knowledge of FAA regulations and electronic media/communications. Additionally, as a former Coast Guard Investigative Service Special Agent, I reviewed emails and other electronic communication in support of criminal investigations.

4.  The information in this affidavit is based on my personal knowledge, my training and experience, evidence developed during the investigation, and information obtained from other agents and witnesses. Information is further based on witness interviews, document reviews, and investigations conducted by other government agencies.  Because the affidavit is submitted for the limited purpose of establishing probable cause in the application of a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

### III.  Tandem Skydiving Operations Background

5.  The Federal Aviation Administration (FAA) regulates various aspects of parachute operations, including tandem skydiving. 14 CFR 105.45 requires, among other things, that one of the parachutists using the tandem parachute system "hold a master parachute license issued by an organization recognized by the FAA" and "Has been certified by the appropriate parachute manufacturer or tandem course provider as being properly trained on the use of the specific tandem parachute system used."  The organization recognized by the FAA to issue these licenses is the US Parachute Association (USPA), a non-governmental organization that governs parachuting in the United States and issues licenses.  Parachutists earn additional ratings by completing certain tasks on a USPA Proficiency Card.  These ratings include the Tandem Instructor rating.  These cards are signed off by USPA licensed Evaluators and Examiners, and are subsequently submitted to USPA for final approval.  USPA Examiners provide final sign-off on the proficiency cards, though Evaluators can provide instruction under an Examiner's supervision.

6.  Tandem skydiving is a type of skydiving in which two individuals use the same parachute. A Tandem Instructor with a parachute on their back has another individual attached to their front.  Tandem skydiving is commonly seen with individuals who are skydiving for the first time and they "ride" with an experienced skydiver.

## IV. Summary of Facts Supporting Probable Cause

7. Parachute Center, which also operates under the name Skydivers Guild, Inc., is a parachute operation at 23597 North Hwy 99, Acampo, CA, operating out of several hangers at the Lodi Airport. It is operated by William Dause, and assisting him is his wife, Katherine Dause. Parachute Center claims to be one of the largest and oldest drop zones in the United States, operating since 1964. Parachute Center offers skydiving services to both experienced and new skydivers. First time skydivers are offered a tandem skydive with a "certified instructor". Dause also offers an accelerated training program for customers to become USPA licensed parachutists.

8. Parachute Center has a history of accidents and fatalities associated with their operations. Based on open source reporting, to include news reports, since 2009 there have been at least nine fatalities and one plane crash, with the most recent fatality in September 2017. Based on the governments' investigations into Parachute Center, it appears some fatalities were likely due to poor training, some to equipment problems or malfunctions, and one possible suicide.

9. Robert Pooley and Yuri Garmashov provided Tandem Instructor classes at Parachute Center until fall 2016. This information obtained regarding Pooley and Garmashov's activities was obtained through interviews of individuals familiar with Parachute Center, Pooley, and Garmashov, as well as the review of FAA and USPA investigations regarding Parachute Center operations. Initially, Pooley provided training and certification at Parachute Center's facility by himself. Students paid Pooley as much as $1,600.00 for training to get Tandem Instructor rated. Pooley then paid Dause for any services and fees charged by Parachute Center, to include harness use, aircraft fees, etc. Once the training was complete, newly certified Tandem Instructors could use this certification to jump with customers for payment; several were employed by Dause to conduct tandem parachute jumps at Parachute Center. In July 2015 Pooley's Examiner rating was suspended, after which he purported to provide instruction under Garmashov's supervision. At times, Garmashov provided Tandem Instructor training and certification at Parachute Center's facility as an Examiner. According to Garmashov, Pooley was only to provide instruction when Garmashov was at Parachute Center to directly supervise him.

10. Based on interviews of former Parachute Center skydivers and individuals familiar with Parachute Center's current parachute operations, first time or "bucket list" skydivers can pay $100 to $200 to tandem jump with a certified Tandem Instructor. Tandem skydiving customers will sign a waiver and are supposed to complete training prior to skydiving. Customers can pay with cash and credit card. Recently, in November 2017, an undercover agent observed that there are as many as six credit card processing machines at Parachute

Center. Based on my training and experience, my knowledge of credit card payments systems, as well as conversation with other agents, I believe customer transactions by credit card at Parachute Center cause the interstate transmission of signals in connection with Parachute Center's business and that use of these system resulted in interstate transmissions to complete sales. Customers receive "tokens" with denominations, which they provide to the Tandem Instructor they parachute with, and the videographer who records the parachute jump. Those instructors later give those tokens to Dause to get paid for the services they provide. Customer financial transactions, customer preparation, parachute rigging, and other key Parachute Center operations take place in Parachute Center's hanger marked as Hanger "A" in Attachment A. In addition to any receipts or payment information, the liability forms signed by customers provide a record of potential customers who conducted tandem skydives at Parachute Center.

11. According to a witness who conducts business with Parachute Center skydivers, tandem customers can pay for videos of their tandem skydives. A videographer will document the experience with video and photographs, to include the customer preparing for the jump, boarding and jumping out of the plane, and finally landing. Videographers will use their own cameras to include Go-Pros and digital cameras to document the parachute jumps. Upon completion of the parachute jump, footage is edited on computers at Parachute Center's facility. Pooley worked on the computers editing videos. The customer is provided the video and photographs. Some videos of customers' skydives are posted to Youtube and linked to the Facebook page "Skydive Lodi Parachute Center." Observable in the videos are other skydivers, to include customers and Tandem Instructors, all potential witnesses. This witness had regular access to Parachute Center and conducted rigging work for Parachute Center skydivers; additionally, the witness conducted contract work for the U.S. military.

12. The Youtube user page "Skydive Lodi Parachute Center" is associated with Parachute Center. Videos posted to the page include tandem skydiving customers parachuting at Parachute Center, Lodi, CA. In the opening sequence of these videos, aerial shots of Parachute Center's facility are shown and the title "The Parachute Center" appears on the video. Furthermore, a watermark appears in the lower left hand corner of the videos with Parachute Center's logo. Other customers and tandem instructors on the ground and in the plane can be seen in the videos.

13. On August 6, 2016, Tandem Instructor Yonghyon Kwon, and the customer skydiving with him, Tyler Turner, were killed skydiving at Parachute Center when their parachute failed to properly deploy. During the FAA's regulatory investigation, they learned Turner paid for the parachute jump with credit card and completed a liability waiver. Kwon was not recognized by USPA as a USPA licensed skydiver or a Tandem Instructor.

14. During a subsequent FAA regulatory investigation into the Kwon and Turner fatalities, Dause presented FAA officials with a copy of Kwon's Proficiency Card. Though Kwon's card indicated he completed Tandem Instructor training at Parachute Center in July 2016, his paperwork was never submitted by Pooley or Garmashov to the USPA, and Kwon was not recognized by the USPA as a Tandem Instructor or holding a master parachute license. Garmashov told FAA investigators that he was out of the country at the time of Kwon's training and that he could not have signed Kwon's Proficiency Card. A review of Garmashov's passport appears to corroborate he was out of the country when Kwon's Proficiency Cards were signed. I further obtained Customs and Border Protection border crossing records that corroborated his travel into and out of the United States. During a review of Proficiency Cards submitted by Pooley and Garmashov, USPA officials discovered that Pooley and Garmashov used pre-filled Tandem Instructor Proficiency Cards which included Garmashov's signature already in the necessary signature blocks. As a result of USPA's internal investigation following the fatalities, the USPA revoked all of Pooley and Garmashov's skydiving licenses and ratings in fall 2016. According to USPA, their licenses and ratings were never re-instated. This meant that after fall 2016, Pooley and Garmashov were not certified to conduct tandem skydives in the United States, and that any customers conducting tandem skydives with Pooley or Garmashov in the United States were not skydiving with "certified instructors."

15. Pooley previously had been a Tandem Instructor Examiner, but only from 2012 until July 2015. In July 2015 the USPA revoked his Examiner rating due to his repeated failure to properly submit paperwork, to include failing to submit USPA Proficiency Cards to the USPA. Pooley had a history of issues with the USPA as early as 2013 when he was initially certified as an Examiner. He repeatedly failed to properly handle and submit Proficiency Cards, causing some of his students not be properly certified. He was required to complete retraining in 2014. Following continued failures to properly handle paperwork, to include failing to submit paperwork properly, his Examiner rating was suspended in July 2015. Initially the suspension was for one year, but ultimately his Examiner rating was never reinstated.

16. After Pooley's Examiner rating was revoked in July 2015, he continued teaching at times with Garmashov, a Tandem Instructor Examiner. As an Examiner, Garmashov could certify students. According to witness interviews and the USPA investigation, as early as fall 2015, Pooley and Garmashov worked together providing training at Parachute Center's facility. They continued to use Parachute Center facilities, equipment, aircraft, and computers at Parachute Center for their work. Based on the USPA's investigation and the fact Garmashov was out of the country when some forms were executed, it was apparent Pooley was using pre-filled cards that contained Garmashov's signature. These pre-filled

proficiency cards were used to train and certify students while Garmashov was out of the country and not present for training; including Kwon's proficiency card.

17. Following the August 6, 2016 fatalities of Kwon and Turner, Garmashov submitted the certification paperwork for over ten previously trained Tandem Instructors to the USPA, some as old as six months, that he failed to previously submit. This meant over ten Tandem Instructors were likely operating under the assumption they were certified when in fact the USPA had no knowledge they completed the training, and they were not certified to conduct Tandem Parachute operations. At this point, the investigation has identified at least two instructors that were in fact conducting Tandem Parachute jumps without being properly rated by the USPA. There is reason to believe further investigation may identify others.

18. The investigation thus indicates Pooley and/or Garmashov received payments from students but at least some of those students did not receive the Tandem Instructor ratings they were paying for; indeed in the instances where Garmashov was not present the students could not have received such ratings because Pooley was not certified to provide the training by himself. In addition, some of Pooley and Garmashov's students were not properly trained, according to USPA's investigation. As a result of the above problems, in September 2016, the USPA required approximately 140 Tandem Instructors who were trained by Pooley and/or Garmashov to complete refresher training, and/or had their ratings suspended or revoked. The USPA required these individuals to take refresher courses or have their licenses suspended completely. Moreover, these individuals (who had been students of Pooley and Garmashov) had to seek out new Examiners to complete the retraining in accordance with USPA standards at costs of up to $800. These costs were in addition to what they originally paid Pooley and Garmashov for the initial training.

19. Following a September 14, 2017 fatal accident involving a wingsuit skydiver at Parachute Center, FAA initiated an investigation into the accident separate to their investigation into the Kwon/Turner fatality. As part of this investigation, FAA inspectors interviewed Dause at Parachute Center. When questioning Dause at the front counter about the accident, Dause stepped away and returned a short while later with a document titled "Manifest", that contained lists of names on given flights. During follow-up visits, FAA inspectors observed blank copies of these manifest forms on the main customer desk.

20. In addition to FAA inspectors observing manifest sheets during the interview, a picture posted to the "Skydive Lodi Parachute Center" Facebook page on September 14, 2017, shows a woman reviewing "Manifest" sheets and cash next to her and the comment "Michelle Hart counting her riches."

21. On November 28, 2017, an undercover agent approached Dause at Parachute Center and inquired about tandem skydiving.  He was told by Dause they could be jumping in 30 minutes.  When the undercover agent asked additional questions regarding safety and training, Dause stated if they wanted to jump rather than talk about jumping, give him $100 and he would get them up.  This exchange took place in Hanger "A" as depicted in Attachment A.  The undercover agent also observed Parachute Center operations, paperwork and records, and spoke with Parachute Center employees and/or contractors in Hanger "B" as depicted in Attachment A.  Parachute Center operations in Hanger "B" included storage and maintenance of aircraft.

22. On December 5, 2017, a witness familiar with Parachute Center's operations observed and photographed Pooley and Garmashov conducting tandem parachute operations with customers at the Parachute Center.  Pooley and Garmashov's did not have USPA licenses and Tandem Instructor ratings at this time, and were not certified to conduct tandem parachute operations in the United States.  The witness, previously identified in the affidavit, works at Lodi Airport and provides rigger services to Parachute Center skydivers.

23. On December 29, 2017, FAA inspectors conducted a regulatory inspection at Parachute Center and asked a tandem instructor for his USPA license with Tandem Instructor rating. The instructor retrieved his licenses from a personal locker maintained at Parachute Center, indicating tandem instructors maintain licenses and records in their personal lockers.  FAA inspectors observed these lockers in a public area, that customers, employees and/or contractors have access to inside Hanger "A".

24. On January 2, 2018, "Kathy Dause" sent an email from Parachute Center's email address, "paractr@softcom.net", in response to an undercover agent's emailed request for information.  In her email she stated "You will definitely go with certified Instructors." The email address "paracte@softcom.net" was found on Parachute Center's website; Katherine Dause operates Parachute Center with her husband William Dause.

25. On January 2, 2018, a video titled "Tandem Skydive with Wael by Brian" was published to the "Skydive Lodi Parachute Center" Youtube page.  This video shows a customer's tandem skydive.  The video shows the customer boarding an aircraft operated by Parachute Center.  Later in the video, the same customer is seen in the aircraft sitting next to an individual that appears to be Robert Pooley.  Pooley appears to be wearing a tandem parachute rig.  Pooley is not currently licensed to conduct tandem operations; his USPA license and tandem instructor rating was revoked in 2016.

26. Based on witness interviews of individuals familiar with Parachute Center's facilities, and the observations of the undercover agent, Hanger "C" is used by Parachute Center

skydivers, and includes approximately a dozen tents where individuals appear to be living. Dause allows employees and/or contractors to live in this hanger.

27. Based on the foregoing, I believe there is probable cause to believe that the following has occurred::

    a.  Individuals who paid Pooley and/or Garmashov for Tandem Instructor training and ratings at Parachute Center did not, and in some cases could not, have received the Tandem Instructor ratings for which they paid;

    b.  Some Parachute Center customers have likely jumped with Tandem Instructors they were told were certified when in fact they were not; and

    c.  In the case of Kwon's Proficiency Card, the document Dause provided to the FAA contained Garmashov's signature that in fact could not have been made by Garmashov at the time stated due to him being out of the country.

### V. Procedures For Electronically Stored Information

28. With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

Forensic Imaging

a.  After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are

added, the length of time that the agents must remain onsite can become dangerous and impractical.

b.  If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within sixty (60) days of seizure, unless the government is otherwise permitted by law to retain such original devices, and/or the Court grants an extension of this time period upon application of the government.

Identification and Extraction of Relevant Data

c.  After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

d.  Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular

relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.  It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.  Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify

data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this Court.

h. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

Genuine Risks of Destruction

i. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant or of this investigation, will there be a genuine risk of destruction of digital or electronic evidence by the subject.

Prior Attempts to Obtain Data

j. The United States has not attempted to obtain this data by other means.

## VI. Conclusion

Based on the foregoing, I believe there is probable cause to believe that evidence, instrumentalities, fruits, or proceeds of violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), as further described in Attachment B, will be located at the following premises:

a. Parachute Center, 23597 North Hwy 99, Acampo, CA

29. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the premises described in Attachment A and the seizure of the items described in Attachment B.

## VII. Request for Sealing

30. The United States request that the Court order this search warrant and search warrant affidavit be kept under seal until further order of the Court, with the exception that a copy

of the search warrant will be left at the scene of the search.  Without such an order, individuals may conceal, damage, or destroy other evidence relevant to this ongoing investigation.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.


BRIAN DUBOIS
Special Agent, United States Department of Transportation – Office of Inspector General



Sworn and Subscribed to me on January 25, 2018

Edmund F. Brennan
United States Magistrate Judge



Approved as to form:

CHRISTOPHER S. HALES
Assistant United States Attorney

## ATTACHMENT A

### *Description of Location to be Searched*

Parachute Center is located 23597 North Hwy 99, Acampo, CA, and is comprised of a set of hangers located on the Lodi Airport.  It is located on North Hwy 99 Frontage Road, on the west side of Hwy 99.  Marking the location is a painted sign, pictured below, with "SKYDIVE" in black letting and a red arrow beneath it.



The facility includes several hangers:



The hanger in which customers pay and get ready, indicated by the "A" on the above map, is a two story white/beige hanger (Picture Below). Attached to the side of the hanger facing Hwy 99 Frontage Road, is a painted blue and multicolored sign with "SKYDIVE" painted on it, pictured below. There is a single brown door on the North side of the hanger with a brown sign with white stenciling.





Hanger "B", pictured below, is located northeast of Parachute Center's main hanger. This hanger houses aircraft leased to Dause and is where maintenance is conducted on the



aircraft.   There are offices in this building where Parachute Center personnel conduct business.

Hanger "C" is directly south of Parachute Center's main hanger and is a smaller hanger, with a yellow sign labelled "Skydiving 209-369-1128".   This is Parachute Center's telephone number.   This hanger houses skydivers who work for Parachute Center and spaces to prepare and rig equipment.



The search of the aforementioned premises shall include any and all lockers and containers on the premises, to include the lockers identified in Hanger "A."

## ATTACHMENT B

### ITEMS TO BE SEIZED

The evidence to be searched for and seized concerns violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), in whatever form, whether physical, digital, electronic, or otherwise, and is described as follows, **for items created, modified, or in use during the period of July 1, 2015 to present**:

1. Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.

2. Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.

3. Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.

4. Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.

5. Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.

6. Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.

7. Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.

8. Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.

9. Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.

10. Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.

11. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

   a. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the press to restore it;

   b. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form;

   c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.   Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CDRWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes other information necessary to access the computer equipment, storage device or data.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| 23597 North Hwy 99, Acampo, CA, 95220 | ) | Case No.   2:18-SW-   46   EFB |
| | ) | SEALED |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _2-8-2018_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: underline any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____

Date and time issued:  _1-25-2018_
_at 1:30 p.m._

City and state:      Sacramento, California _____

_____
*Judge's signature*

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                              Date

## ATTACHMENT A

### *Description of Location to be Searched*

Parachute Center is located 23597 North Hwy 99, Acampo, CA, and is comprised of a set of hangers located on the Lodi Airport. It is located on North Hwy 99 Frontage Road, on the west side of Hwy 99. Marking the location is a painted sign, pictured below, with "SKYDIVE" in black letting and a red arrow beneath it.



The facility includes several hangers:



The hanger in which customers pay and get ready, indicated by the "A" on the above map, is a two story white/beige hanger (Picture Below). Attached to the side of the hanger facing Hwy 99 Frontage Road, is a painted blue and multicolored sign with "SKYDIVE" painted on it, pictured below. There is a single brown door on the North side of the hanger with a brown sign with white stenciling.





Hanger "B", pictured below, is located northeast of Parachute Center's main hanger. This hanger houses aircraft leased to Dause and is where maintenance is conducted on the



aircraft. There are offices in this building where Parachute Center personnel conduct business.

Hanger "C" is directly south of Parachute Center's main hanger and is a smaller hanger, with a yellow sign labelled "Skydiving 209-369-1128". This is Parachute Center's telephone number. This hanger houses skydivers who work for Parachute Center and spaces to prepare and rig equipment.



The search of the aforementioned premises shall include any and all lockers and containers on the premises, to include the lockers identified in Hanger "A."

## ATTACHMENT B

## ITEMS TO BE SEIZED

The evidence to be searched for and seized concerns violations of Title 18, United States Code 1343 (Fraud by Wire, Radio, or Television), Title 18, United States Code 1349 (Attempt and Conspiracy to Commit Fraud), Title 18, United States Code 1519 (Destruction, Alteration, or Falsification of records in Federal Investigations), in whatever form, whether physical, digital, electronic, or otherwise, and is described as follows, **for items created, modified, or in use during the period of July 1, 2015 to present:**

1. Mail, whether opened or unopened, correspondence, papers, and other belongings tending to identify persons exercising dominion and control over the location or particular areas within the location.

2. Information related to corporate and business filings and ownership, including but not limited to applications and articles of incorporation.

3. Documents, records, and information tending to show the identities of Parachute Center customers, the amounts they paid, and in what manner, and the dates on which they jumped, to include liability waivers, receipts, checks, correspondence, and emails.

4. Documents, records, and information tending to show the identities of Parachute Center employees and/or contractors and the services they provided and the dates and amounts they were paid, to include training records, certificates, licenses, work schedules, time cards and pay records.

5. Documents, records, and information containing, referencing, or listing information regarding parachute flight operations and the identities of those who were on particular flights, to include passenger and crew manifests, and flight schedules and logs.

6. Documents, records, and information tending to show what representations Parachute Center made to prospective skydiving customers, to include promotional material, email correspondence, safety information and training videos.

7. Communications and correspondence in whatever form with Parachute Center employees and/or contractors, relating to Parachute Center's Tandem Parachute operations, accidents involving Parachute Center customers, ratings and certifications of Parachute Center employees and/or contractors, and any investigations by the FAA or USPA.

8. Documents, records, and information tending to show any efforts or intention to falsify, alter, or destroy records related to accidents, employee and/or contractor certifications, and investigations by FAA or USPA.

9. Documents, records, and information tending to show the nature, amounts charged, and dates of credit and debit card transactions carried out at the Parachute Center.

10. Video, pictures, and other electronic media showing Parachute Center customers, tandem instructors, and skydiving, to include videos of customers skydiving.

11. Computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

    a. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the press to restore it;

    b. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form;

    c. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CDRWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes other information necessary to access the computer equipment, storage device or data.

1   MCGREGOR W. SCOTT
    United States Attorney
2   CHRISTOPHER S. HALES
    Assistant United States Attorney
3   501 I Street, Suite 10-100
    Sacramento, CA 95814
4   Telephone: (916) 554-2700
    Facsimile:  (916) 554-2900
5

6   Attorneys for Plaintiff
    United States of America
7

**ORIGINAL FILED**

JAN 2 5 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

SEALED

8               IN THE UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF THE SEARCH OF          CASE NO. 2: 1 8 - SW -  4 6  EFB

12  23597 North Hwy 99, Acampo, CA, 95220   [PROPOSED] ORDER RE: REQUEST TO SEAL
                                            DOCUMENTS
13
                                            **UNDER SEAL**
14

15

16                          **SEALING ORDER**

17      Upon application of the United States of America and good cause having been shown,

18      IT IS HEREBY ORDERED that the search warrant and search warrant affidavit underlying the

19  search warrant in the above-entitled proceeding shall be filed under seal and shall not be disclosed to

20  any person, unless otherwise ordered by this Court.

21

22  Dated:  January 25, 2018                 _____
                                            Edmund F. Brennan
23                                          U.S. MAGISTRATE JUDGE

24

25

26

27

28

SEALING ORDER

# Exhibit L:

Order Authorizing Analysis of Copies of Electronic Devices Seized Pursuant to Search Warrant

PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900



**FILED**

Feb 15, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE  APPLICATION
OF THE UNITED STATES OF AMERICA
FOR SEARCH WARRANTS CONCERNING:

23597 NORTH HWY 99, ACAMPO, CA
95220

CASE NO: 2:18-SW-46 EFB

[PROPOSED] ORDER AUTHORIZING
ANALYSIS OF COPIES OF ELECTRONIC
DEVICES SEIZED PURSUANT TO SEARCH
WARRANT

Upon application of the United States of America and good cause having been shown,

IT IS HEREBY ORDERED that the United States is authorized to analyze the copies/images of

the electronic devices seized pursuant to search warrant no. 2:18-sw-46 EFB.  The 120-day time

parameter for identification and extraction of relevant data from the images in paragraph 28(g) of the

affidavit is removed.

Dated:  February 15, 2024

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE