```
  1                    IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF CALIFORNIA (SACRAMENTO)
  2
     UNITED STATES OF AMERICA, .    Case No. 2:21-CR-00111-WBS-1
  3                                 .
                 Plaintiff,         .    Sacramento, California
  4                                 .
             v.                     .
  5                                 .
     ROBERT ALLEN POOLEY,           .
  6                                 .    Monday, April 29, 2024
                 Defendant.         .    9:00 a.m.
  7    . . . . . . . . . . . . . .  .

  8
                      TRANSCRIPT OF HEARING ON MOTIONS IN LIMINE
  9                 BEFORE THE HONORABLE WILLIAM B. SHUBB
                    UNITED STATES SENIOR DISTRICT COURT JUDGE
 10
     APPEARANCES:
 11
     For the Plaintiff:           United States Attorney's Office
 12                               BY: KATHERINE THERESA LYDON, ESQUIRE
                                      DHRUV M. SHARMA, ESQUIRE
 13                               501 I Street, Suite 10-100
                                  Sacramento, California 95814
 14
     For the Defendant:           Office of the Federal Public Defender
 15                               BY: MIA CRAGER, ESQUIRE
                                      MEGHAN McLOUGHLIN, ESQUIRE
 16                               801 I Street, Third Floor
                                  Sacramento, California 95814
 17
     Electronic Court             Jenny Wood
 18  Recorder Operator:           United States District Court
                                  Robert T. Matsui United States
 19                                 Courthouse
                                  501 I Street
 20                               Sacramento, California 95814

 21  Transcription Service:       Liberty Transcripts
                                  9107 Topridge Drive
 22                               Austin, Texas 78750
                                  (847) 848-4907
 23                               dbpatel1180@gmail.com
                                  www.libertytranscripts.com
 24
     Proceedings recorded by electronic sound recording;
 25  transcript produced by transcription service.
```

2

1        SACRAMENTO, CALIFORNIA, MONDAY, APRIL 29, 2024, 9:00 A.M.

2             THE CLERK:  -- in session; the Honorable William B.

3    Shubb, Judge, presiding.

4             Thank you, may you be seated.  Case Criminal 21-111,

5    United States v. Robert Allen Pooley.

6             Counsel, your appearances, please?

7             MS. LYDON:  Good morning, Your Honor.

8             Katherine Lydon here with Dhruv Sharma on behalf of

9    the United States.

10             MS. CRAGER:  Good morning, Your Honor. Mia Crager and

11    Meghan McLoughlin on behalf of the Federal Defender for

12    Mr. Pooley, who is present out of custody.

13             THE COURT:  Good morning.  How are the arguments

14    broken down?  Which of you is going to address which issues?

15             MS. LYDON:  I will be handling the issue with the

16    defendant's motion to exclude the accident, and Mr. Sharma will

17    be handling the other two contested motions in limine.  The

18    remaining two, the Government did not oppose.

19             THE COURT:   All right.

20             MS. McLOUGHLIN:  Good morning, Your Honor.

21             Meghan McLoughlin.  I'll be handling motion limine

22    number one regarding the accident and the deaths and motion

23    limine number four, which I don't believe there's too much

24    argument to be had regarding emergency procedures training.

25             THE COURT:  Well, that doesn't leave much for

1  Ms. Crager.

2        MS. CRAGER:  Yes, Your Honor, but I'll be handling

3  the other ones.

4        THE COURT:  The other one is uncontested, right?

5        MS. CRAGER:  There's three others.  One of them is

6  contested.

7        THE COURT:  Okay.

8        MS. CRAGER:  the one about the 2014 suspension.

9        THE COURT:  All right.  Well, I'd like to address the

10  motion number one first, so I think we'll be talking to

11  Ms. Lydon and Ms. McLoughlin.  That was the reason we scheduled

12  this hearing.  I had asked you if there were any motions in

13  limine that needed to be heard before trial to avoid ringing a

14  bell that would have to be unrung.

15        And this was the one that I thought that needed to be

16  identified and at least considered before trial.  We can get to

17  the others as well as long as we're here, but let me start the

18  discussion here.  I don't know exactly what evidence the

19  Government intends to produce that might relate to this

20  accident/death, but it would seem that at least superficially

21  or upon first blush that the accident and death would not be

22  relevant to any of the elements of the offense charged.

23        It seems to me, to oversimplify, that the offense of

24  wire fraud is, first, that the defendant made false promises,

25  representations, et cetera; second, that the victims relied

4

1    upon them and were damaged.  Now, I would like to have you

2    discuss, and perhaps we could start with the Government, what

3    specific evidence you intend to offer that might either

4    directly or indirectly talk about the death and accident that

5    the motion addresses.

6            I don't know as much about this case as you do,

7    obviously, and there's no way I'm going to know as much about

8    the evidence that you intend to offer than you do.  That's why

9    we generally don't decide these issues before trial.  We learn

10   much more about the evidence once we begin the trial.

11           We learn the context that that evidence is offered

12   in, and we're much better able to address these motions.  But I

13   understand you to be saying that both testimony of witnesses

14   and exhibits are going to be offered by the Government to prove

15   the elements of the offense charged, but that the testimony and

16   exhibits would also mention or talk about the accident and

17   death.  I'd like to have you explain to me what the evidence is

18   that you're going to offer, and then how it is that it has to

19   talk about the accident and the death.

20           MS. LYDON:  Absolutely, Your Honor.

21           THE COURT:  All right.  Let's start with you.

22           MS. LYDON:  Okay.  If it's all right with Your Honor,

23   I'll start with the elements that relate to the deaths and then

24   go through each of the pieces of evidence really granularly

25   that prove those elements will mention the deaths.  So with --

5

1          THE COURT:  All right.  Go ahead.

2          MS. LYDON:  So with respect to wire fraud, the fact

3   that the victim who passed away, Kwan (phonetic), was acting as

4   a tandem instructor, was skydiving at Parachute Center with

5   customers.  Tens --

6          THE COURT:  Giving the lessons or taking the lessons

7   or both?

8          MS. LYDON:  Giving lessons.

9          THE COURT:  Okay.

10          MS. LYDON:  He was jumping with customers, and that

11   is how he passed away, on a tandem skydive with another

12   customer --

13          THE COURT:  All right.

14          MS. LYDON:  -- with a customer attached to him.

15          That tends to make it more probable that he believed

16   that he was a certified tandem instructor, which makes it more

17   probable that Pooley, Kwan's examiner, led him to believe that

18   by telling him that he was an examiner who could certify him,

19   and by filling out those forms, the tandem proficiency card

20   with Yuri Garmashov's signature on it.

21          The Defense argues that there is other evidence that

22   can show that Kwan was skydiving at Parachute Center at that

23   time.  They do not flag any evidence.  I'm not aware of any.

24   That is the fact that he was jumping with a customer on that

25   day is the strongest evidence that shows that he was --

6

1          THE COURT:  Okay.  And can we address that --

2          MS. LYDON:  Yes.

3          THE COURT:  -- in a little bit more detail now?

4  Specifically, what is that evidence?  Why cannot it be offered

5  without showing that he subsequently died or that he had an

6  accident?

7          MS. LYDON:  It's really inextricably intertwined with

8  that.  So --

9          THE COURT:  Tell me why.

10          MS. LYDON:  Okay. For just one example, FAA Inspector

11  David Jensen received Kwan's tandem proficiency card from Bill

12  Dause, the owner of Parachute Center, while he was at Parachute

13  Center investigating the deaths.  The whole reason he was there

14  was because the death sparked an investigation by the FAA.

15          So in order to have a comprehensible story about what

16  he was doing there, why he asked the owner for this particular

17  individual's tandem card, we need to say that there was an

18  accident and he passed away.

19          THE COURT:  I don't see that.  I just don't see it.

20  He can say what his job is.  He doesn't have to talk about

21  investigating accidents or deaths.  And he can say that he

22  asked for a card and he got it.

23          MS. LYDON:  I think that that is what would have to

24  happen for that particular piece of evidence for it to come in.

25  But it creates a narrative hole.  It creates unanswered

1    questions.  And that's what <u>Old Chief</u> tells us and its progeny.

2          THE COURT:  No, the unanswered questions have nothing

3    to do with the elements of the crime.  For all the jury knows,

4    it's just routine for inspectors to go out into these

5    businesses and do routine investigations to make sure

6    everything is complied with.

7          MS. LYDON:  That piece of evidence, perhaps.  But the

8    fact that Kwan was jumping does go to the elements of the

9    crime.  It shows that he believed Pooley's representations,

10   that he was a tandem instructor, which he was not.

11         THE COURT:  That's fine.  He was jumping. That

12   doesn't show that he died.

13         MS. LYDON:  We don't have other evidence to show that

14   he was jumping.

15         THE COURT:  I'd like to see -- they'll probably

16   stipulate he was jumping.  I'm not going to ask him to

17   stipulate to that.  But it sounds to me like nobody's going to

18   contest the fact that he was jumping.

19         MS. LYDON:  Well, they haven't offered to stipulate.

20   <u>Old Chief</u> says the Government doesn't have to stipulate away

21   the actual evidence in its case.

22         THE COURT:  I'm not asking him to stipulate.  I'm not

23   asking him to stipulate.

24         MS. LYDON:  Uh-huh.

25         THE COURT:  I just find it hard -- I will talk to him

8

1    in a minute.  I find it hard to believe that there's not

2    another way that you can show he was jumping.  You can call his

3    wife and say, did he go to work that day?  What did he do?  He

4    jumped.

5            MS. LYDON:  We can't, Your Honor.  We can't --

6            THE COURT:  I know you can't.  I'll bet you, if he

7    didn't die, you would have a way to prove that he was jumping.

8    You've got the resources to do that and --

9            MS. LYDON:  We will call him, Your Honor. We will

10   call him to testify.  But he's in -- his entire family is in

11   Korea.

12           THE COURT:  All right.  So that's number one.

13           MS. LYDON:  So that's one.

14           THE COURT:  There's a piece of paper out there that

15   you're talking about that shows that he died while jumping, and

16   that's the way you're going to prove that he was jumping?

17           MS. LYDON:  No.  The piece of paper is the tandem

18   certification card, is the count for Count 5.  It has -- for

19   the aggravated identity theft count.  So the investigation that

20   arose from his death is how the Government obtained the

21   aggravated identity theft document that proves Count 5.

22   Another --

23           THE COURT:  But that card doesn't show he was dead?

24           MS. LYDON:  Correct.

25           THE COURT:  Okay.

9

1          MS. LYDON:  Correct.

2          THE COURT:  So what is the document that shows he was

3    dead that you think you have to put into evidence?

4          MS. LYDON:  I'll give you a few.  So one example --

5          THE COURT:  Let me just say, we can clearly --

6    there's no problem showing he's dead.  A lot of people die.

7    Very few people die from jumping out of a plane.  So if the

8    jury knows he's dead, that's not going to cause any prejudice

9    to the defendant.  We can show he's dead.  That's not the

10   problem.

11         MS. LYDON:  So going --

12         THE COURT:  You think you need a document that shows

13   he died in a skydiving accident?

14         MS. LYDON:  I think that that fact, that he died in a

15   skydiving accident, is woven through much of the evidence the

16   Government's going to show.  And if I may, may I pass up --

17         THE COURT:  That's what I'm asking you to show.

18         MS. LYDON:  Yes.  May I pass up a deposition

19   transcript?

20         THE COURT:  All right.  Go ahead.

21         MS. LYDON:  So this is the deposition of the

22   Defendant, Robert Pooley, which contains a number of extremely

23   relevant statements that the Government will introduce into

24   evidence.  The deposition is taken by the victim's family, the

25   customer who died with Pooley.  In order to -- and it discusses

10

1    Kwan throughout.  The jury will have a lot of questions about

2    why this videotaped deposition was taken and why these

3    statements were made. So for just some examples.

4           THE COURT:  No, the jury may have those questions.

5    It's not relevant.  It's not relevant why this deposition was

6    taken, is it?

7           MS. LYDON:  It is, Your Honor.

8           THE COURT:  Why?

9           MS. LYDON:  Under the inextricably intertwined case

10   law, the Government is entitled to tell a comprehensible,

11   coherent narrative.  And if the jury is sitting there with a

12   number of unanswered questions, and they don't understand

13   what's going on, they don't understand how the evidence that

14   they're looking at was generated --

15          THE COURT:  Okay.  I'm going to take issue with that.

16   I'm going to take issue with that, because it mischaracterizes

17   the role of the jury.  The jury's job is very simple.  It's to

18   listen to the evidence, decide what the facts are, and then

19   apply those facts to the instructions that I give them.

20          The only thing the jury has to determine is whether

21   the Government has proved each of the elements of the offenses

22   charged beyond a reasonable doubt.  So the jury is to look at

23   the judge's instructions, see what the elements are, and then

24   look to the evidence and see whether the evidence persuades

25   them beyond a reasonable doubt that the Government has proved

11

1   each of those elements.

2

3        They can have all kinds of questions.  And it's not a

4   proper role of the jury to do some sort of an inquisition to

5   have their curiosity answered.  It's only the role of the jury

6   to determine whether the Government has proved the elements of

7   the charge beyond a reasonable doubt.  So I don't care whether

8   the jury has unanswered questions.  If they're not pertinent to

9   the elements of the offense charged, they don't need answers to

10  the questions.

11        MS. LYDON:  I hear what you're saying, Your Honor.

12  They are pertinent to the elements charged, and the Ninth

13  Circuit has over and over said, for example, I'm quoting from

14  the Daly case, the Ninth Circuit, in 1992, "A jury is entitled

15  to know the circumstances and background of a criminal charge.

16  It cannot be expected to make its decision in a void without

17  knowledge."

18        THE COURT:  If you applied that language out of

19  context, literally, you'd get reversed nine-tenths of the times

20  you applied it, because that's taken out of context.  Read it

21  again.

22        MS. LYDON:  "A jury is entitled to know the

23  circumstances and background of a criminal charge. The

24  background of the criminal charge."

25        THE COURT:  The background of the criminal charge.

12

The background of the criminal charge is not relevant.  And I
don't care what the Ninth Circuit said there out of context.
If you were to follow that literally, you'd get reversed most
of the time, because the Government would just come in and show
the background.  They'd say, oh, the defendant is a career
criminal.  Oh, the defendant has a reputation in the community.
We were out in the community because we heard a rumor that the
defendant had committed all these crimes, blah, blah, blah,
blah.  And that's not the law.

MS. LYDON:  Of course not, Your Honor.  But --

THE COURT:  Of course.  But if you applied that
literally, you would do that.

MS. LYDON:  Well, I would --

THE COURT:  That's why you can't take it out of
context.

MS. LYDON:  I agree with you.  I agree with you.  We
would never seek to bring in reputation in that way or anything
like that.  But this quote in context is about the Government's
ability to prove up questions that the jury wants to understand
that are relevant.  And this is.

THE COURT:  Wrong.  I will never follow that.  I will
never follow that advice, because I don't think the Ninth
Circuit has ever actually said that.  It's just wrong.  Sorry.

MS. LYDON:  I think, Your Honor, where Your Honor
started made a lot of sense on -- and I want to continue and

13

1   answer Your Honor's question about --

2         THE COURT:  All right.  What I want to do, if your

3   only theory is that it's going to show why there was an

4   investigation and that's the only way it's relevant, I'm not

5   going to side with you on that.

6         MS. LYDON:  It's not.  That's not our only reason.

7         THE COURT:  Okay.  So I just want you to know that.

8   I want you to go through the actual evidence that you're going

9   to present and show me why it is so inextricably intertwined

10  with the evidence that you need to present that you can't

11  redact it.

12        MS. LYDON:  Okay.  Before -- I also have a theory on

13  why it's relevant to the aggravated identity theft count.

14        THE COURT:  All right. Let's hear that.

15        MS. LYDON:  Okay.  The aggravated identity theft

16  count with respect to Mr. Kwan charges that by using

17  Garmashov's signature on the tandem certification forms, Pooley

18  was acting in furtherance of the wire fraud scheme.  The

19  Government has to prove that.

20        And the fact that our theory is that by using those,

21  and what we'll argue in closing, is that by affixing

22  Garmashov's signature to that tandem certification card, Pooley

23  was lulling his victims, who at that point had already paid

24  him, into believing that they had gotten what they paid for, a

25  tandem rating.  And --

14

1          THE COURT:  Okay.  Was that done before or after the

2    accident?

3          MS. LYDON:  Before the accident.  And Kwan's behavior

4    afterwards, after he received that tandem card, shows that he

5    believed Pooley --

6          THE COURT:  All right.

7          MS. LYDON:  -- that it succeeded in lulling him, that

8    he jumped with customers as a certified tandem instructor.  And

9    during that time period that he was doing that, Pooley was

10   continuing to hold himself out as a certified examiner.

11         THE COURT:  Well, I assume you're going to address

12   this.  He could have been as much duped by Pooley's false

13   statements as the other victims were.

14         MS. LYDON:  Indeed.  And I believe he was.

15         THE COURT:  Okay.  Okay.

16         MS. LYDON:  And his behavior by jumping with

17   customers shows that he was in fact duped by Pooley.

18         THE COURT:  But the other inference is that he was a

19   part of the scheme.  You get two inferences from that.  One,

20   that he was duped by Pooley, and that's why he was giving

21   lessons.  Two, he was part of the scheme, and he was defrauding

22   as much as Pooley was.  Now, which inference should adopt?  I

23   don't know.

24         MS. LYDON:  The fact -- the Government will argue

25   that the fact that Pooley doctored his card, which he never

15

1   sent into USPA and UPT.  Pooley never submitted those

2   documents. But the fact that he forged another examiner's

3   signature on that card shows that Pooley was duping Kwan

4   because Kwan was not part of the scheme.  Because --

5           THE COURT:  Well, you can show that without showing

6   that Kwan died.

7           MS. LYDON:  We have to show he was jumping, Your

8   Honor.

9           THE COURT:  All right.  So the whole case so far that

10  we've developed in this discussion is that the reason you need

11  to show that he died was to show that he was jumping, and

12  there's no other way to show he was jumping other than to show

13  he died.  Is that correct?

14          MS. LYDON:  That's the evidence we have.

15          THE COURT:  Okay.

16          MS. LYDON:  Yes.  We --

17          THE COURT:  So maybe we ought to stop there.

18          MS. LYDON:  We have other evidence too, Your Honor.

19  I --

20          THE COURT:  All right.

21          MS. LYDON:  I'm just trying to answer your question

22  methodically and in a detailed fashion by marching through

23  particular pieces of evidence, which I agree with you is the

24  most relevant, useful way to go about this.

25          Would you like to move on to the statements?

16

1        THE COURT:  Well, I'd be curious to see whether the

2  defense has response to that.  So let's hear from them.

3        MS. LYDON:  Okay.

4        MS. McLOUGHLIN:  Thank you, Your Honor.

5        There is other evidence that Kwan was tandem

6  skydiving, as Your Honor has already said.  The fact that he

7  died is not relevant.

8        THE COURT:  Okay.  Why don't you tell me what that

9  other evidence is?

10        MS. McLOUGHLIN:  The Government elicited statements

11  from other alleged victims who stated that Kwan was skydiving,

12  stated that he was skydiving that day, and that they knew he

13  was skydiving.  And so they would be able to state that Kwan

14  was skydiving.

15        THE COURT:  Who are those witnesses?

16        MS. McLOUGHLIN:  I believe specifically Danny Overeem

17  (phonetic).

18        THE COURT:  Who?

19        MS. McLOUGHLIN:  Danny Overeem, who's listed in the

20  indictment as Victim Number 4.

21        THE COURT:  Who else?

22        MS. McLOUGHLIN:  I believe Fabian Munoz, who's listed

23  as Victim Number 8.

24        THE COURT:  Anybody else?

25        MS. McLOUGHLIN:  Those are the two that are coming

1   off the top of my head, Your Honor. It's just them.

2          THE COURT:  All right.  So let's back up there now.

3

4   You've got Overeem and Munoz.  Are they going to testify?

5          MS. McLOUGHLIN:  Overeem, we don't know.  He's

6   located in Thailand right now.  He's --

7          THE COURT:  Where?

8          MS. McLOUGHLIN:  Thailand.

9          THE COURT:  All right.

10          MS. McLOUGHLIN:  He's moving to Canada.  He has

11   representation appointed for him.  He's considering whether to

12   come to the United States.  We don't have subpoena power over

13   him, as you know.  He had initially indicated he was willing to

14   testify.  Now he has some concerns.  So I don't know.  I can't

15   guarantee that Daniel Overeem will testify, although we are

16   doing everything we can to -- and we hope that he does.  Fabian

17   --

18          THE COURT:  How about Munoz?  How about Munoz?

19          MS. McLOUGHLIN:  Fabian Munoz does intend to testify,

20   although he is also located outside the country.  He is willing

21   to come voluntarily.

22          THE COURT:  All right.

23          MS. McLOUGHLIN:  He was not at Parachute Center the

24   day of the accident.

25          THE COURT:  So see, again, I don't know as much about

1    the facts as you do.  They say he's going to -- he could

2    testify that Kwan was giving lessons.  You say no.  What am I

3    supposed to do with that?

4            MS. McLOUGHLIN:  Well, I can explain, perhaps.  He's

5    aware that Kwan passed away, is skydiving, because everyone in

6    the community is aware of the accident.  That's what started.

7    That's how all the victims figured out that their ratings were

8    canceled.  So he certainly knows about the accident.  But he

9    wasn't there at the day of the accident.

10           THE COURT:  All right.  Well, we can't have him

11   testifying about --

12           MS. McLOUGHLIN:  So he can't testify he saw.

13           THE COURT:  He can't have been testifying about

14   hearsay.  What's your point?

15           MS. McLOUGHLIN:  There are many, many people who were

16   there at the Parachute Center in Lodi on that date that could

17   testify.  I was referring specifically to two of the alleged

18   victims.  There are many, many others who were there.  And of

19   course --

20           THE COURT:  You have to tell me who they are.  They

21   say there's nobody that can testify.  And you say there are

22   many that can.  I have to make a determination.

23           MS. McLOUGHLIN:  Of course, Your Honor.

24           In terms of people, there is Bill Dause, who's the

25   owner of the Parachute Center.  There is also a man named Peter

1   Swan, whose testimony, statements we've received, who was at

2   the Parachute Center that day.

3          THE COURT:  Anybody else?

4          MS. McLOUGHLIN:  There's somebody else named JP, Your

5   Honor.  We don't know the last name.  There's lots of names

6   used in discovery and throughout this case, where people use

7   nicknames.  But someone named JP.

8          Also, Your Honor, if a representative from the

9   Parachute Association or United Parachute Technologies or the

10  FAA were to discuss that they were investigating Mr. Kwan's

11  proficiency card, and that he was skydiving, the Defense would

12  not say, oh, he was skydiving, how do you know that?  We would

13  not open the door for them to then --

14         THE COURT:  So who --

15         MS. McLOUGHLIN:  -- ask for further information as to

16  how they know specifically that he was skydiving.

17         THE COURT:  So those people would say they saw some

18  documentation that proved he was skydiving?

19         MS. McLOUGHLIN:  I think those people would state

20  that they know that he was skydiving that day, yes.

21         THE COURT:  How would they say they know that?

22         MS. McLOUGHLIN:  I believe at least one of them

23  reviewed all the videos.  I believe one of them was present and

24  perhaps walked over to the area.  One of them inspected the rig

25  that he was using.

20

1          THE COURT:  But you see, then you do have to show

2     that there was an accident.

3          MS. McLOUGHLIN:  I don't believe so, Your Honor.  He

4     was skydiving on other days in addition to the day that he

5     died.

6          THE COURT:  I know you said he went over and examined

7     the area.  Area of what?

8          MS. McLOUGHLIN:  Where he had fallen.  And, Your

9     Honor, it's true we're talking about the specific date that he

10    died, but he was skydiving on other days, as well.

11         THE COURT:  You're telling me people would be able to

12    say they looked at records that show he was diving.  That would

13    be hearsay.  So we've got to have the records that they looked

14    at that showed that he was diving.

15         MS. McLOUGHLIN:  Well, Your Honor, I believe that

16    there are people in addition to those who were at the Parachute

17    Center and maybe saw him on August 6th that he was skydiving on

18    other days, as well.

19         THE COURT:  Who are those people?  You have to tell

20    me.  They're saying there's no people.  You're saying there's

21    gobs of people that can testify to this.  I have to make a

22    determination.

23         MS. McLOUGHLIN:  Your Honor, I mean, we have an

24    alleged victim who is, I believe, served with a trial subpoena

25    who's supposed to come here and could testify that he was

1   skydiving.

2          THE COURT:  That Kwan was skydiving?

3          MS. McLOUGHLIN:  Yes.

4          THE COURT:  Who's that victim?

5          MS. McLOUGHLIN:  That victim would be Victim Number

6   8, Fabian Munoz.  Even if he was not there on the date that he

7   fell, the date of the incident.

8          THE COURT:  Oh, that's okay.  He can say that Kwan

9   was skydiving?

10          MS. McLOUGHLIN:  Yes, Your Honor.

11          THE COURT:  All right.  So, Ms. Lydon, there appears

12   to be at least one witness that you say you're going to bring

13   here.  They say they're going to bring him here.  And that one

14   witness, at least, appears to be able to testify that Kwan was

15   skydiving.  Is that correct?

16          MS. LYDON:  I don't have the Fabian Munoz report in

17   front of me.  I don't recall him saying that he saw.  It's

18   possible.  But I don't think we should make this decision in a

19   vacuum without us looking at that statement.  I know that

20   Fabian Munoz was aware that Kwan died.  I don't know that he

21   ever saw him skydiving with a customer.

22          THE COURT:  Well, this isn't a vacuum.  This is a

23   court hearing.  So, the reason we're here is because both of

24   you agreed that I had to make a determination, at least a

25   preliminary determination, before we begin the trial.  This was

1   the time we were going to do that.

2           MS. LYDON:  Yeah.  What I'm saying is I don't think

3   -- the Defense has not cited that statement in their brief or

4   their reply.  And so I'm saying we should not make it on -- we

5   certainly should not exclude relevant evidence that I can

6   continue marching through pieces of evidence that touch on that

7   death that the Government's entitled to prove --

8           THE COURT:  So --

9           MS. LYDON:  -- based on the attestation that they

10  believe that Fabian Munoz saw him skydiving before.  I don't

11  know that to be true.

12          THE COURT:  Do you want to take a look at something?

13  Take a break?  What do you want to do?

14          MS. LYDON:  I think we should continue marching

15  through pieces of evidence that touch on that death to

16  underscore --

17          THE COURT:  Okay.

18          MS. LYDON:  -- and really show what this trial would

19  look like if we tried to excise something this important and

20  this pivotal of an event.

21          THE COURT:  He's only one of the people that you say

22  was duped by the defendant.  If we left him out of the picture

23  altogether, we'd only lose one count of indictment, right?

24          MS. LYDON:  Yes, Your Honor.  We should not lose

25  counts based on precluding relevant evidence if there's not a

23

1    showing that it is so unfairly prejudicial as to substantially

2    outweigh.

3          THE COURT:  There is that showing right now.  You

4    can't escape the fact that it is prejudicial to the defendant

5    to make even a suggestion that as a result of his conduct, a

6    man was killed.  And that conduct that you're talking about

7    seems to be the very conduct that's the subject to this case.

8          They are subject to making the inference that the

9    defendant's failure to be properly certified caused the death

10   of Mr. Kwan.  If they're going to make that inference, that is

11   highly prejudicial.  You can't escape that fact.  So we're

12   trying to avoid that.

13         MS. LYDON:  I think there's a way to avoid that

14   without suppressing or excluding relevant evidence.  The

15   standard, as Your Honor articulated, is that the evidence must

16   be so unfairly prejudicial that it substantially outweighs the

17   relevant information.  And the Court in PG&E really --

18         THE COURT:  Well, that's Rule 403.  But before we get

19   to Rule 403, we're still struggling with Rule 402.

20         MS. LYDON:  Yes.  And I think it is relevant because

21   it goes to elements, as I've articulated, for wire fraud and

22   for aggravated identity theft.  And it is inextricably

23   intertwined with other evidence.  So as we went through, and

24   both of those are independent pieces for relevance.

25         As we go through the particular pieces of evidence,

24

1    it becomes clear it's impossible to excise this death with

2    things like, for example, Mr. Pooley's deposition, which

3    contains --

4              THE COURT:  Okay, so let's go back to that.  What

5    parts of his -- you took the deposition, right?

6              MS. LYDON:  I did not.  This deposition was taken by

7    Tyler Turner's family, the --

8              THE COURT:  Okay.

9              MS. LYDON:  -- the customer who died with Mr. Pooley.

10             THE COURT:  Okay.  So it's in a civil case in San

11   Joaquin County, right?

12             MS. LYDON:  Yes.

13             THE COURT:  Okay.

14             MS. LYDON:  And there's a number, if you'll bear with

15   me, this is a really important deposition.  It has a lot of

16   statements by the defendant that bear on the elements.  So I'm

17   going to march through a few of them.

18             On Page 28, he discusses that he -- first, he says,

19   you only do tandem jumps in conjunction with the parachute

20   sender when people do walk-ins.  That would be the case.  And

21   are you properly rated at this point to do tandem jumps? Yes.

22             That's false.  Under penalty of perjury, the

23   defendant stated in the deposition that he was currently rated

24   to do tandem jumps.  He states his interpretation of what it

25   means to be properly rated, which is an issue with this case.

25

1    And then at the beginning of Paragraph 29, they start talking

2    about Mr. Kwan.

3              Did Mr. Kwan have all those qualifications, as you

4    know, in 2016?  I believe he did.  He says he participated in

5    these trainings.

6              THE COURT:  So?

7              MS. LYDON:  We could redact this deposition.

8              THE COURT:  That's what I'm suggesting.

9              MS. LYDON:  But going on to -- it's all about

10   Mr. Kwan. So going on to Page 37.  We talked a little bit, and

11   I've got documents I'll show you in a little while, but we

12   talked a little bit about Mr. Kwan's training.  What part did

13   you have in Mr. Kwan's training?  And he discusses that

14   extensively.

15             THE COURT:  All right.  So far, no problem.

16             MS. LYDON:  Well, we'll get there.  On to Transcript

17   Page 44, Do you know -- on Line 22, Do you know if Mr. Kwan's

18   name was on the job board the day that Mr. Turner died?

19             THE COURT:  Mr. Turner died?  Okay.

20             MS. LYDON:  Yes, that's the customer who died with

21   Mr. Kwan.  And it goes through what motivates Mr. Kwan,

22   beginning with Page 45.

23             THE COURT:  Okay.  So the language in here is the day

24   that Mr. Turner died.

25             MS. LYDON:  Yes.

26

1          THE COURT:  Okay.  So you'd have to redact that

2    somehow.  And we could simply put in the date.  Admittedly,

3    we're rewriting the deposition in a way, but that's not

4    prejudicial.  So you could just say, do you know if Mr. Kwan's

5    name was on the board on such and such a date?  So we could do

6    that.

7          MS. LYDON:  And the jury's going to --

8          THE COURT:  All right.

9          MS. LYDON:  The Government then has to explain --

10         THE COURT:  I'm about ready just to grant this

11   motion.  I'm giving you the opportunity to show me the

12   overwhelming necessity to bring out this death and this

13   accident.  And you say, oh, but we can't change the wording on

14   the day Mr. Turner died to put in a specific date.  That's not

15   good enough.

16         MS. LYDON:  What I'm trying to show, Your Honor, is

17   that so much evidence and it can only be done --

18         THE COURT:  Okay.  We're going through it.  We're

19   going through it.

20         MS. LYDON:  Yeah, I am going through it.

21         THE COURT:  And everything you tell me -- you know

22   what it really looks like here, Ms. Lydon, is you're looking

23   for an excuse.  You're looking for a rationalization to bring

24   this in --

25         MS. LYDON:  No, Your Honor.

27

1          THE COURT:  -- to prejudice the defendant because --

2          MS. LYDON:  That I vehemently object to.

3          THE COURT:  Well, but these things you're telling me

4    are so trivial.  You've got a long deposition and there's one

5    phrase in it that you say, well, it says the day Mr. Turner

6    died, that's it.  We got to put in the whole thing.  Show me

7    what else, and we'll work with it.  We'll work to see if we can

8    redact it to not mislead the jury, but to not necessarily tell

9    them about something that is so prejudicial.  This never would

10   get past the Ninth Circuit.

11         You know the other thing is, if I rule in your favor

12   and it goes up to the Ninth Circuit, they scrutinize these

13   things.

14         MS. LYDON:  They do, Your Honor.

15         THE COURT:  And I don't want to try this twice.

16         MS. LYDON:  I agree, Your Honor.  Neither do I, which

17   is why we have been so careful to try to strike the right

18   balance.  The Government is not going to argue causation.  We

19   are proposing the exact same balance that the Court hit in

20   PG&E, where the Government can state the bare fact that Kwan

21   died in a tandem skydiving accident on this date.

22         We will not bring in the details of the death, the

23   errors that led to the death, the name of the customer who

24   passed away, any unnecessarily inflammatory details.  We are

25   trying very hard to avoid that.  I also don't want to try this

case again.

And that is that line between avoiding causation and letting in a bare fact that is relevant is what the Ninth Circuit allows.  They have allowed it in much more prejudicial cases than this one, including ones that involve deaths, including the Mamadella (phonetic) case that we cited, which was they let in evidence of the excruciating death of a child who was, I think, 12 and 42 pounds.  And it was a white-collar case.  The charges included wire fraud.  It was not a (indiscernible) case.

THE COURT:  The next time we get that same case, it could do just the opposite.  You don't know.  We can't predict the Ninth Circuit.  So strike what I said about the Ninth Circuit.  Let's go on to something else.

Let's go through -- you have told me something on Page 44 that there's six words here that you say, justify putting the whole thing in.  What else is there in this deposition that we need to talk about?  Because if that's the only thing in this deposition --

MS. LYDON:  Yeah, I'm trying to go through because --

THE COURT:  -- I'm ready to rule that we'll just strike those six words.

MS. LYDON:  I think -- yeah, there's also a number of interviews that he's given to law enforcement, two interviews in particular, which are recorded.  In the 2013 interview, he

1    stated, I was the examiner for the instructor that died.  And

2    that language is quite relevant because he's saying he was the

3    examiner, which is what's at issue at this case.  He was

4    allowed to be an evaluator.  He wasn't allowed to be an

5    examiner.  The two words "that died" are what is prejudicial.

6    You could just say Mr. Kwan.  You don't have to say the

7    instructor that died.

8            MS. LYDON:  But he didn't say that.

9            THE COURT:  Okay.

10           MS. LYDON:  On tape, he said --

11           THE COURT:  Okay.  Okay.  I'm ready to rule unless

12   you've got something else.

13           MS. LYDON:  I can march through additional pieces of

14   evidence, like the investigation that was launched by the USPA,

15   the fact that each of the customers who will testify -- you

16   know, not customers, victims will testify, have this death very

17   much bound up with how they found out about the fraud.

18           If I asked them a question, how did you find out that

19   you had been defrauded, the first thing that they would say if

20   they weren't extremely coached and I led them through this

21   area, which is an unpersuasive and poor way to conduct a direct

22   examination, is we found out when Kwan died.  It prejudices the

23   Government to not bring in a pivotal fact.  And we would do it

24   in a non-prejudicial way.

25           THE COURT:  I don't know that you need to show how

1  they found out they were defrauded.  The pertinent fact is that

2  they were defrauded.  You can say, did Mr. Pooley tell you that

3  he was certified, or whatever it is that he said that caused

4  them to think he was certified.  The false statement.  And then

5  you could say -- you don't even have to ask them how you found

6  out he was not certified.  The fact that if you had known that

7  he was not certified, would you have signed up for this and

8  they say, no.  You don't have to show how they found out.

9         MS. LYDON:  I think what we're doing here, if we just

10  excise a huge, pivotal, smack dab in the middle of the

11  Government's evidence portion of the Government's case, it

12  really prejudices the Government.  It makes the story not make

13  sense.  And that's what we are concerned about.

14         THE COURT:  I don't see it.  I don't see it.  It

15  makes sense.

16         Okay, anything else?

17         MS. McLOUGHLIN:  If Your Honor is inclined to grant

18  the motion, I would have nothing to add.

19         THE COURT:  Here's what I'm going to do. I'm not

20  going to let you make any reference to the accident or the

21  death in your opening statement.  I'm not going to definitively

22  rule on this motion in limine or any other motion in limine

23  this morning. I'm going to give you my tentative views on this

24  motion, as well as the other motions, and require that before

25  you offer any evidence by way of questions, exhibits, or

31

otherwise on this subject, that you address the Court outside
the hearing of the jury and tell me specifically why it is you
want to offer that testimony or that exhibit and that it cannot
be avoided or redacted.  And we'll deal with that when it comes
up.

        That's the best I can do right now.  There may be
something that comes up.  I've tried to give you the
opportunity to tell me what it is now.  I'm not hearing it.
But if it comes up during trial, and in my opinion at that
time, it justifies going outside my ruling, then I'll make that
determination at that time.

        MS. LYDON:  I hear Your Honor.  I'm trying to figure
out how to implement that as we put together our trial
exhibits, including clipping video exhibits and the statements
of Mr. Pooley.

        MS. McLOUGHLIN:  And, Your Honor, could I --

        MS. LYDON:  How would Your Honor -- is there anything
Your Honor would be comfortable with that allows the Government
to explain the context for Mr. Pooley's statements or even the
fact that we're not calling Mr. Kwan?

        THE COURT:  I could put it to the Defense and see if
we can work something out.  This would not be because it's my
ruling.  It would be because I'm trying to see what the Defense
might accept.  So if that's all right with you, we could talk
about that.

1          For example, would it be acceptable when they start

2   talking about Kwan to say Mr. Kwan is dead, therefore he's not

3   available and he can't be brought to trial?

4          MS. McLOUGHLIN:  Yes, Your Honor.

5          THE COURT:  It would?

6          MS. McLOUGHLIN:  Yes, Your Honor.

7          THE COURT:  Okay.  So that's one way to deal with the

8   fact that he's dead.  They'll know he's dead.  That's one way

9   to deal with that.

10         MS. McLOUGHLIN:  And, Your Honor, I don't mean to

11  interrupt at all, but in furtherance of this discussion, we

12  would be willing to stipulate that Kwan was performing tandem

13  jumps with customers.

14         THE COURT:  So that's another way to deal with it.

15  And as far as I'm concerned, although I haven't asked for these

16  stipulations, they seem to have resolved just about everything

17  that you've pointed out so far.

18         MS. LYDON:  My main concern is the continuity of

19  evidence and explaining where evidence came from, including

20  that tandem card that Inspector Jenson got from Dause,

21  including Pooley's multiple statements to investigating agents

22  talking about the tandem --

23         THE COURT:  Okay, let's back up.  Who are the

24  investigating agencies and who are the people that we're

25  working for that are going to testify?

1          MS. LYDON:  David Jenson from the FAA, who

2    interviewed Pooley and obtained --

3          THE COURT:  Okay.

4          MS. LYDON:  -- very incriminating statements,

5    including that Pooley had no answer when he confronted him with

6    the fact that he wasn't certified at that time to be teaching.

7          THE COURT:  Okay, good, good.

8          MS. LYDON:  The USPA and UPT investigators.

9          THE COURT:  USPA?

10         MS. LYDON:  Uh-huh.  The United --

11         THE COURT:  What does it stand for?

12         MS. LYDON:  The United States Parachutist

13   Association.  They're the industry organization that basically

14   regulates parachuting under the federal regulation.  They're

15   recognized by the FAA.

16         THE COURT:  Okay.  And what was the other one?

17         MS. LYDON:  UPT, the manufacturer of the parachute

18   that also is incorporated into the licensing regimen under the

19   applicable regulation.

20         THE COURT:  Now, the jury -- I could ask them during

21   jury selection, whether they've ever heard of the USPA or

22   whether they've heard of the USPT.  My guess would be they

23   would say they have not.  And if they have, we could go into it

24   and say, do you know what their function is, do you know why

25   they might do investigations, et cetera, et cetera.  They've

34

1   probably heard of the FAA, but they probably don't know the

2   scope of when and under what circumstances the FAA makes

3   investigations.

4          And I don't see why the jury couldn't just assume

5   that these are routine investigations that the FAA makes it

6   time to time to make sure everything is copacetic.  They don't

7   need to know why they were making an investigation, and they're

8   not going to be puzzled over the fact that they're making an

9   investigation.  Government agencies are making investigations

10  all the time.  All the time.  That's all they do is make

11  investigations, make regulations, intrude in people's

12  businesses.  That's what government agencies do.

13         So I don't think that there's any necessary reason to

14  think the jury is going to be confused if you don't tell them

15  why they're making this investigation.

16         MS. LYDON:  Can we say that there was an event that

17  they are investigating?

18         THE COURT:  No.  Why do you have to say that?  You

19  know that Government agencies don't just investigate events.

20  They do inspections all the time.

21         MS. LYDON:  We have to tell a story about why he was

22  there.  We can't --

23         THE COURT:  No, you don't.  You don't.  We go back to

24  my earlier statement.  That's not an element.  That's not

25  something the Government has to prove.  If you want, maybe we

1    could talk about this.  At some point in time, I could tell the

2    jury, you're not to speculate why the Government does anything,

3    why they make an investigation, why they pass regulations, why

4    they do anything.  They're the Government.  They just do

5    things.

6            I could instruct them that they don't have to

7    speculate about why the Government was there.  That's one

8    option.  I don't know what the Defense would think about that.

9    But I don't --

10           MS. LYDON:  I think --

11           THE COURT:  I don't see that it's necessary.

12           MS. LYDON:  Yeah, I think the real issue, the main

13   thing that I think -- I hear Your Honor and you don't see the

14   concern about not having a comprehensible narrative.  I hear

15   what you're saying.

16           THE COURT:  It's comprehensible to the extent that it

17   needs to be comprehensible.

18           MS. LYDON:  I think beyond a reasonable doubt is

19   pretty a high standard as it should be.  And we shouldn't leave

20   the jury not understanding.  But I think that the main issue

21   that I don't see how we're going to surmount without mentioning

22   the death is Pooley's statements.  He made admissions on tape

23   that go to the heart of the crime that include references to

24   the death.

25           THE COURT:  You haven't -- maybe we deal with that

36

1    now.  Maybe we deal with that when we get into trial.  But you

2    don't have to put the whole deposition in word for word

3    verbatim, without any redactions, just to prove some things in

4    the deposition.  When people are --

5              MS. LYDON:  Well, we're not planning to put the whole

6    thing in.  We're putting the relevant part in.

7              THE COURT:  When people are impeached with

8    depositions all the time, we take snippets from the depositions

9    and put them in.

10             MS. LYDON:  Uh-huh.  I'm concerned because the

11   relevant statements are from the clips that we would use are

12   encapsulated in there.  But we will work on that.  I think

13   there's another issue that it could come out.  It could very

14   well come out in jury selection when you ask who knows about

15   Parachute Center.

16             THE COURT:  Right.

17             MS. LYDON:  Because this place is notorious.  They

18   kill about a person a year.  And --

19             THE COURT:  See, you're telling me they kill a

20   person.  That shows me your mindset.  You're not about here to

21   just say, oh, we're not going to make any suggestion that

22   Mr. Turner died because of Mr. Kwan.  We're not going to make

23   any of this.  No, no, no.  But you tell me they kill a person a

24   year.

25             MS. LYDON:  Well, Your Honor, I speak differently

1    when I'm being candid with the Court about what a juror might

2    say --

3            THE COURT:  That goes with your mindset.

4            MS. LYDON:  -- what a juror might say versus what I

5    would say being extremely careful to the jury about this.  I am

6    afraid a juror will say that at jury selection.  So I think we

7    need to go into this --

8            THE COURT:  We do.

9            MS. LYDON:  -- very cognizant of --

10           THE COURT:  We do.

11           MS. LYDON:  -- and that there is a high chance the

12   jurors will be aware of events like this.  And the fact that it

13   comes out cannot -- I'm concerned about a mistrial, to be

14   honest.  I think we need to understand that risk --

15           THE COURT:  Well, when we get finished with this --

16           MS. LYDON:  -- that there is a risk that they will

17   know it and they will say it.

18           THE COURT:  You're quite right.  When we get finished

19   with this, we should talk about jury selection and voir dire.

20   Because what we can do -- yeah.

21           What we can do is ask them, have you heard anything

22   about this place, have you heard anything about anything

23   happening at this place?  Tell them a little bit about the

24   place, where it is, what they do.  And then if somebody says,

25   yeah, I think I've heard something, we pull them aside and ask

38

1    them outside the hearing of the other jurors what they've heard

2    to avoid polluting the jurors that haven't heard about it.  So

3    that's one of the things we can do.

4          But I am afraid that if we don't do it really

5    thoroughly during that part of the voir dire, that as the trial

6    gets along and they start to hear more about what's going on, a

7    light goes off and they say, oh yeah, I remember that.  There

8    was an accident out there.  They killed some guy.  So I don't

9    want that to happen.

10          Or worst case scenario is that it goes all the way

11    into jury selection, they don't bring it to the Court's

12    attention.  And then when they start to deliberate, somebody

13    says, I know something about that place.  And they discuss it

14    during deliberations.  That's the worst thing that could

15    happen, because then nobody ever got a chance to talk about it.

16    I didn't get the chance to tell them, you may not consider

17    this, it's not an element.  You didn't get a chance to argue

18    that it wasn't caused by anything that your client did.

19          And so that's the worst thing that could happen.  And

20    it would be worse than telling them about it upfront.

21          MS. LYDON:  I agree, Your Honor.

22          THE COURT:  Yeah.

23          MS. LYDON:  I think those questions of, if they were

24    to know that the bare fact that one of the victims died

25    skydiving and they were --

1          THE COURT:  No.

2          MS. LYDON:  -- the Defense would be able to examine

3    them on that, to really thoroughly voir dire them, it could

4    result in challenges for cause of --

5          THE COURT:  Well, that's another -- they don't want

6    to take that approach.  But that's another approach you could

7    take.  In other words, put it all up front and say, look,

8    somebody died, well, we'll tell you right now, during jury

9    selection, somebody died in the process of skydiving.  And

10   there's no claim in this case that anything that Mr. Pooley,

11   the defendant in this case, did caused directly or indirectly

12   that accident or the death of the person.

13          Now, if any of you hear that somebody died during

14   skydiving, would you reach the conclusion that somehow it was

15   Mr. Pooley's fault?  If so, tell us now, and we'll excuse you.

16   Because you would not, as a matter of law, be entitled to make

17   that leap of faith.  That's another way we could take it.  And

18   the question is, what does the Defense think about that?

19          MS. CRAGER:  Your Honor, I think we'll take a little

20   while to think about that.  Our proposed voir dire is due on

21   May 6th, and so we would request to make a final determination

22   of exactly how we want to handle that.  But I think that is a

23   good option that we could take here.

24          THE COURT:  If it's a good option, it's a lot easier.

25   It's a lot easier.  And I'm willing to do it.  I'm willing to

40

1   go farther than the Government would probably have me go,

2   because I'm very much concerned about the possibility of

3   prejudice to the defendant in this case.  Even the slightest

4   inference that he might've done something to cause the death of

5   another man.  Well --

6            MS. McLOUGHLIN:  And Your Honor, I would just say

7   that, I mean, we appreciate this discussion.  I don't think

8   that the voir dire concerns necessarily make the evidence

9   relevant as the Government is suggesting.

10           THE COURT:  No, it doesn't.  But it means the

11   Government would not have to go through all of what they need

12   to go through to redact their evidence if we're going to handle

13   it this way.  So they need to know before trial.

14           MS. LYDON:  Yes, Your Honor.

15           THE COURT:  Well, today is the 29th.  When are jury

16   instructions due?

17           MS. CRAGER:  Next Monday, Your Honor.

18           THE COURT:  Do you want to come back Monday and

19   discuss it again?

20           MS. CRAGER:  We can, Your Honor.

21           MS. McLOUGHLIN:  Yeah.

22           THE COURT:  You know my inclination, I'm going to do

23   one or the other.  And it may be that the latter option that

24   we've just discussed is preferable to both sides, and I'm

25   willing to do it.  Shall we come back Monday and discuss that?

41

1          MS. LYDON:  I think that would make sense.  I think

2    we, in the meantime, the Defense and the Government can talk.

3    And it may be that we might reach an agreement in that regard.

4          THE COURT:  All right.  What else do I have on

5    Monday, Karen?

6       (Whereupon, the Court and Clerk confer briefly.)

7          THE COURT:  The one time we want to do something,

8    they're going to come in here and re-upholster all my

9    furniture.  We'll find another courtroom for you. If it has to

10   be the 16th floor or one of the other courtrooms, we'll find

11   that.

12         So how about next Monday at 10:00?

13         MS. LYDON:  Perfect.

14         MS. CRAGER:  Yes, Your Honor.  Thank you.

15         THE COURT:  So let's talk about the other ones that

16   you didn't agree on while we're still here.  Which one do you

17   want to address?

18         MS. McLOUGHLIN:  I believe in the motion of limine,

19   we can just go through numerically so we make sure we cover

20   everything.  Number two is to exclude evidence related to

21   Mr. Pooley's prior arrest.  The Government has agreed not to

22   introduce that, so I don't think we need to address anything

23   there.

24         THE COURT:  Okay, wait a minute.  Let me get these in

25   order.  Okay, motion number two, the Government doesn't object,

42

1   so that's moot.

2          MR. SHARMA:  As long as it doesn't become part of the

3   case, of the Defense's case, we don't have a problem with

4   number two.

5          THE COURT:  All right.  So what we're going to do is

6   assume it's not an issue.  If something comes up during the

7   trial, when the Defense thinks that the Government is offering

8   other acts that are inadmissible, you make your objection, and

9   then I'll rule at that time.

10          MS. CRAGER:  Yes, Your Honor.

11          THE COURT:  So I don't want anything we say here

12   today to suggest that we've resolved the issue.  We're just

13   saying we don't think it's going to come up.  But if it does,

14   we'll address it during trial.  I'll consider this brief as a

15   trial brief and use it to help me rule on the objection.

16          MS. CRAGER:  Yes, Your Honor.  And I will also note

17   that we have not received 404(b) notice yet from the

18   Government.  So there might be other things and we will raise

19   that as it comes up at trial.

20          For motion in limine number three, we move to

21   prohibit referencing the witnesses by what the Government is

22   calling victim number.  The Government does not oppose that.

23   To be clear, we're not saying that the Government can't say the

24   word "victim" in opening or closing.  That's not what I'm

25   trying to prohibit.

43

1        THE COURT:  Right.  I would concur in the Defense's

2   motion because I don't know what you're talking about when you

3   give them numbers instead of names.

4        MR. SHARMA:  We're not going to do that, Your Honor.

5

6        THE COURT:  All right.  So that's moot.

7        MS. CRAGER:  Motion in limine number four is

8   Ms. McLoughlin's.

9        MS. McLOUGHLIN:  And motion in limine number four,

10  Your Honor, the Defense was specifically referring to

11  statements elicited by witnesses expressing their opinions on

12  the quality of Mr. Pooley's training as it relates to the

13  criteria for that training and as it relates to other trainings

14  that they've received.  And it appears from the Government's

15  opposition that they do not seek to introduce any of that

16  evidence, as well.

17        THE COURT:  So there's another one that we're not

18  saying we're ruling on it today.  We're thinking it won't come

19  up.  But if something comes up where you think that a witness

20  is improperly being asked a question about Mr. Pooley's

21  qualifications that you don't think is relevant to the charges,

22  you'll object.  And I'll use this motion as a brief and I'll

23  rule on it at that time.

24        MS. McLOUGHLIN:  Understood, Your Honor.

25        MS. CRAGER:   And motion in limine number five is to

44

1    exclude evidence of a 2014 suspension of his tandem examiner

2    rating.  He was suspended in 2014 for 10 days for, the letter

3    says, failing to sufficiently verify that one of his tandem

4    instructor candidates had been in the sport of skydiving for

5    the three-year minimum.  He was then reinstated and it was

6    about a year, more than a year later, that he was suspended in

7    2015.  During the 2015 suspension is the time period of this

8    offense.

9              THE COURT:  So what was the suspension in 2014?

10             MS. CRAGER:  In 2014, he was suspended for failing to

11   sufficiently verify that one of his students had all of the

12   prerequisites of doing the course.

13             THE COURT:  Had or had not?

14             MS. CRAGER:  He failed to sufficiently verify that he

15   had.

16             THE COURT:  Okay.

17             MR. SHARMA:  Specifically, the number of skydives

18   that that student had conducted before he took the course with

19   Mr. Pooley.

20             THE COURT:  So is that part of the charge here?

21             MR. SHARMA:  Is that part of it?  It speaks to his

22   knowledge, Your Honor.  It speaks to his knowledge that

23   paperwork mattered to the USPA, to the UPT, that they had a

24   granular approach into conducting these investigations, that

25   they issued disciplinary actions like suspensions.  It speaks

45

1    to his motive when in 2015 or in 2016, he started inviting

2    these students to come in without having the certifications to

3    provide them the instructor rating that they were asking for.

4            When he used Yuri Garmashov's signature to cover up

5    the fact that he was doing that speaks to his motive.  Any

6    absence of mistake or accident, that's a theory proposed by the

7    Defense.  It's relevant for a whole number of reasons.

8            THE COURT:  What's your response?

9            MS. CRAGER:  My response is that what the Government

10   is saying is that it shows his knowledge that the USPA had

11   rules.

12           THE COURT:  And that they enforced them.

13           MS. CRAGER:  And, sure, and that they enforced rules.

14   But what they're really saying, I think that's no different

15   than saying somebody has a pattern of violating the law.

16   They're saying he has a pattern -- in fact, the Government said

17   it establishes a pattern of failing to follow USPA and UPT

18   guidelines.

19           THE COURT:  Well, knowledge of the guidelines, too.

20           MS. CRAGER:  Knowledge of the guidelines?

21           THE COURT:  Right.

22           MS. CRAGER:  There's a lot of other evidence that

23   they're going to put in about knowledge of the guidelines,

24   including his --

25           THE COURT:  Well, you can't argue with the fact that

46

1    it's cumulative.  They're entitled to prove their case more

2    than one way.

3            MS. CRAGER:  I mean, I would say that it's the same

4    as saying a drug dealer had knowledge of the law that drugs

5    were illegal because he was previously arrested for drug

6    dealing.  So I don't --

7            THE COURT:  Well, good analogy.  Suppose there's a

8    particular drug that it's questionable whether it's illegal or

9    not.  Would it then be relevant to show that the defendant had

10   previously been told that it was a prohibited drug?

11           MS. CRAGER:  I think that's different because, here,

12   the thing that he was told back in 2014 is he had to

13   sufficiently verify that someone had enough years in the sport

14   of skydiving.  What we're talking about in 2015 is a completely

15   different rule than that.  So they're not establishing his

16   knowledge of the relevant rules.  They're establishing his

17   knowledge of a different unrelated rule in the 2014 suspension.

18           THE COURT:  Are they related or unrelated?

19           MR. SHARMA:  I think they're related, Your Honor.

20   They're all rules within the same set of guidelines that the

21   USPA issues to its instructors and to the fact that they follow

22   up on these rules.  Independently, they're verifying

23   candidates' paperwork as it comes in.

24           THE COURT:  What was the violation in 2014?  What was

25   the qualification that the instructor lacked that he didn't

47

1    disclose?

2          MR. SHARMA:  He was supposed to have a certain number

3    of jumps before he even took the course with Mr. Pooley.  And

4    Mr. Pooley had not verified those jumps when he taught that

5    student the course.  And, obviously, the reason that jump

6    requirement exists is because you can't just go in and become a

7    tandem instructor.  You're taking members of the public jumping

8    out of a plane, so.

9          THE COURT:  What's required to be certified?

10         MR. SHARMA:  As a tandem instructor?

11         THE COURT:  Right.

12         MR. SHARMA:  You have to have, I think, 500 jumps

13   before you even come to the course, a medical certificate.  You

14   have to have a master parachute license, which is defined by

15   the USPA as what they call a D license.  You have to have a --

16   I can't remember any other requirements specifically, but --

17         THE COURT:  Okay, well, that's two.  Now, when

18   Mr. Pooley didn't qualify, what was he lacking?

19         MR. SHARMA:  Oh, so to that point, so to become a

20   tandem instructor, you have to be certified by someone who has

21   been separately trained to be the teacher.  You know, anyone --

22   you have to have a specific certification to be able to even

23   teach the course.

24         THE COURT:  So you have to have all those other jumps

25   and everything --

48

1          MR. SHARMA:  Right.

2          THE COURT:  -- plus be certified by somebody --

3          MR. SHARMA:  Correct.

4          THE COURT:  -- who's a teacher.

5          MR. SHARMA:  Correct.

6          THE COURT:  Okay.

7          MR. SHARMA:  It's the highest level of certification

8    that's available.

9          THE COURT:  It's the last step in becoming certified.

10   Is that fair?

11         MR. SHARMA:  You are the teacher of the teachers.

12         THE COURT:  Right.  And he didn't qualify for that

13   because of what?  I'm trying to see if there's a parallel

14   between what happened in 2014 and this.

15         MR. SHARMA:  Well, the parallel, Your Honor, is that

16   it goes to Mr. Pooley's knowledge and intent to defraud his

17   candidates because he knew in 2016, when he was inviting these

18   people to come in and get their ratings, more likely than not,

19   he knew that he would not be able to get them those ratings.

20   And the reason is because he knows from 2014 that when you

21   violate the guidelines, when you can't do your paperwork

22   correctly, when you try to cover up the paperwork in different

23   ways, you're not going to be able to get those ratings for

24   those people.

25         THE COURT:  All right.

1          MS. CRAGER:  Your Honor, if I may address that?

2          THE COURT:  Yes, because this is not the same league,

3     not even in the same league as the other motion that we had.

4     It's not going to really prejudice the jury to know that he had

5     some technical violation in 2014.  That's not going to be even

6     comparable in any way.

7          MS. CRAGER:  Yes, Your Honor.  I think the discussion

8     here, I think, just proves that this is going to confuse the

9     jury about what the purpose of putting this into evidence is in

10    the first place.  I think it's more likely the jury is going to

11    think this is a person who violates the rules all the time.  He

12    must have violated the rules again in 2016.

13         THE COURT:  But it's only one instance.  To say he

14    violates the rules all the time would be another big leap to

15    make.

16         MS. CRAGER:  Sure, Your Honor.  I guess it would be

17    then he violated the rules in 2014.  He must have done it again

18    in 2016.  I think that's the most logical inference for the

19    jury to make, and that's what we should not be doing under 404.

20         THE COURT:  All right.  I think that can be covered

21    by a limiting instruction at the time that they offer the

22    evidence.  So I would ask you to put together for me a proposed

23    limiting instruction when you anticipate the Government is

24    going to offer that evidence.  Give it to me with your jury

25    instructions, and I think that's the way to handle that.

50

1          MS. CRAGER:   Yes, Your Honor.  Do I understand that
2   we're able to discuss it further as the evidence is coming in
3   to see if this would even be admissible?
4          THE COURT:  You always can.
5          MS. CRAGER:  Thank you, Your Honor.
6          THE COURT:  But I think you need a position to take
7   in case I allow it, because right now I'm thinking I might
8   allow it.  So I want you to be prepared to tell me what it is I
9   should tell the jury at the very time that it's offered.  I
10  turn to the jury, as you know, and I say, ladies and gentlemen,
11  I told you at the beginning of the trial some evidence may be
12  received for a limited purpose.  This is an example of one of
13  those times.  They're about to show you evidence of something
14  that happened in 2014.  It's to be considered only for this
15  limited purpose.
16          And then I tell them to show Mr. Pooley's knowledge
17  that there were rules, and I tell you, you may -- and then I
18  tell them, you may not consider it for the purpose of showing
19  it because he violated the regulations before that he must have
20  violated again.  Something like that.
21          MS. CRAGER:  Thank you, Your Honor.
22          THE COURT:  So are those the only ones left now, or
23  was there one more?
24          MS. CRAGER:  That was the last one, Your Honor.
25          MR. SHARMA:  That's all of them, Your Honor.

51

1          THE COURT:  All right.

2          Okay.  I want to discuss scheduling while we're here.

3     The trial is starting on Tuesday the 14th.  I have to go to the

4     dermatologist.  It's the one time the dermatologist could see

5     me was the morning of Tuesday the 14th.  So I made the

6     appointment as early as I could in the morning, but you never

7     know with these people.  So I'm going to try to get back in

8     time, and I'm not sure that I will be able to do it.

9          So one of the options is to just take our chances and

10    hope that I get back in time.  Another would be to have the

11    jury come in Tuesday afternoon, or another, if we want to make

12    sure we have a full day, would be to have them come in

13    Wednesday morning.  So those are the three options.

14         Take our chances with Tuesday morning, but then the

15    jury sits around.  I always hate to do that.  Bring them in

16    Tuesday afternoon, which is a good option if we know that we

17    can finish the whole process of jury selection in the afternoon

18    because we don't want to bring the whole big panel in a second

19    day.  That's always risky for several reasons.  And I would

20    ordinarily say that's the best option, except that if we're

21    going to get into the possibility of asking the jury about

22    whether they've heard of this, and it might result in some

23    individual voir dire, that could make it a little bit more

24    complicated. So I would welcome your suggestions.

25         MS. LYDON:  Perhaps if there's a time, like

52

1    mid-morning that we could have them arrive at a time when you

2    would definitely be able to be here after your appointment?  I

3    don't know if that would work.

4            THE COURT:  Well, we never know for sure.  I always

5    make these medical appointments early in the morning.  And I

6    found that sometimes that's the other way around.  I say, oh,

7    gee, we don't have to get in until later because we don't have

8    anybody else early in the morning.  And they're late for it.

9            So let me just see exactly what time I set it up.

10   8:45. It's out in Morse Avenue, out in the north area.  I could

11   not be sure if I -- I could set it at 10:30, but I can't be

12   sure.  That's the option.  And that would give us a better

13   chance of finishing that day.  Is that your first choice?

14           MR. SHARMA:  I think so.

15           MS. LYDON:  Yes.

16           THE COURT:  What's your choice?

17           MS. CRAGER:  We think it would be cleaner just to

18   start the next day to not stress anybody out, but we're up into

19   either option.

20           MS. LYDON:  Well, it would stress -- we were trying

21   to fly in a lot of witnesses, which is why we're trying to

22   conserve as much time that week as possible.

23           THE COURT:  Well, but when are you bringing them in?

24   That'll stress you out too, because now you're wondering

25   whether we can finish the jury selection process in time.  If

53

1    you're flying them in, they'll be here the next day.

2         MS. LYDON:  Uh-huh.  I mean, we'll work with

3    whatever.

4         THE COURT:  It won't stress me as much --

5         MS. LYDON:  It will just change their flights.

6         THE COURT:  -- trying to get out of the doctor's

7    office and getting mad at the doctor because he's not there.

8         MS. LYDON:  Your Honor mentioned having to bring in

9    the whole panel.

10        THE COURT:  Yeah, if you don't complete the process

11   in one day, you have to bring the whole panel back the next

12   day.  And that's risky.  I don't have to explain it, but they

13   go away, they can get in for -- you've asked them before the

14   break whether they've heard anything about this.  I have

15   totally admonished them like I would during trial.  So they

16   come back and now they know about it, so I can't go back and

17   ask the questions all over again.  There's that risk.

18        MS. LYDON:  All right.  Let's do Wednesday.

19        THE COURT:  Wednesday?  All right.  We all feel

20   better about that, okay.

21        Let me see what else I wanted to discuss.

22        Karen, you'll make note of that?

23        THE CLERK:  I got it, Your Honor.

24        THE COURT:  Oh, yes.  This is a speaking indictment.

25   And I explain the indictment to the jury in two different ways.

54

1   One way is to have the U.S. Attorney stand up and read it.  But

2   when it's a speaking indictment, I don't want to do that if

3   that prejudices the Defense.

4          The other way I do it is to ask you to give me a

5   paraphrase of the indictment that I can read to the jury that

6   will eliminate any excess baggage.

7          MS. LYDON:  The Defense and the Government are going

8   to talk about a statement of the case.  We wanted to get --

9   obviously, if the fact of the accident is admitted, then that

10  would possibly impact the statement of the case.  So what we'll

11  do is talk with the Defense about the course that you proposed,

12  how they want to handle jury selection, come back on Monday.

13  And we will have also talked with them about the statement of

14  the case.

15         Hopefully, we can file something we agree upon.  If

16  not, we might file dueling statements of the case.  But we'll

17  have something to you.  I think both parties would prefer that

18  you read a statement rather than a --

19         THE COURT:  That's good.  I don't want to confuse two

20  different things.  There are two different times at the

21  beginning of the trial when I talk about what the charges are.

22  One is when the jury first comes in before I question then and

23  I tell them, I just want to tell you a little bit about what

24  the charges are so that you're better able to answer the

25  questions I'm about to ask.  And that's a very abbreviated

1    statement.  You know, one little simple paragraph.

2           Then there's the time at the beginning after that,

3    after the jury is selected, when I'm telling them more.  And

4    that's the one I'm talking about now.  That would be when I

5    would have the U.S. Attorney read the indictment.

6           MS. LYDON:  Ah, okay.  We will put something together

7    that paraphrases and that goes into basically the elements.  Is

8    that what Your Honor's contemplating?

9           THE COURT:  Yeah.  Just give me both.

10          MS. LYDON:  Okay.

11          THE COURT:  Give me both.

12          MS. LYDON:  We will.

13          Does Your Honor pre-instruct as to the elements?

14          THE COURT:  No, but I would if we're trying to avoid

15   the problems of reading the indictment, which is too long, I

16   would consider that at that time.

17          MS. LYDON:  Okay.  Thank you.

18          THE COURT:  Because I have in some cases when it's

19   complicated, I have pre-instructed in this simple way.  I've

20   said, you know, this is a mail fraud case.  And the elements of

21   a mail fraud are these and I simplify them.

22          MS. LYDON:  Yeah.

23          THE COURT:  So I said, so when you're listening to

24   the evidence, what you're trying to do is see whether the

25   Government has proved each of those elements to your

56

1    satisfaction beyond a reasonable doubt.  That's what your job

2    is, what I told you a little earlier.  So I have on occasion

3    done that.

4            MS. LYDON:  Okay.

5            THE COURT:  You give me what you think you'd like me

6    to do.  And the only reason we're getting into such detail on

7    it is it's a way to avoid reading the whole speaking indictment

8    to the jury.

9            MS. LYDON:  Okay.

10           THE COURT:  You want to do that Monday?

11           MS. LYDON:  We can file it Monday.  It may make sense

12   to come with -- we might want to have had the discussion that

13   we'll have in court on Monday to inform the final filed

14   version.

15           THE COURT:  Yeah.  Well, give me at least the version

16   that you would like me to give if we go on option number two,

17   and I'm instructing the jury at the beginning not to consider

18   the fact that somebody may have died.

19           MS. LYDON:  Okay, we will.

20           THE COURT:  Give me the version you'd like me to give

21   if that's the course we're going to take.

22           MS. LYDON:  Okay.

23           THE COURT:  By Monday.

24           MS. LYDON:  Will do.

25           THE COURT:  The trial may also be shorter if you

57

1    don't get into the death.  I don't know whether that affects

2    the length of the trial.  How long do we say the trial is going

3    to be?

4         MS. LYDON:  Two to three weeks, assuming full trial

5    days.  I don't expect it to change the length of the trial

6    because, like I said, all the Government would elicit is just

7    the mere fact of the death.  We are not intending to get into

8    the reason for the death.

9         THE COURT:  I think you may be a little

10   overestimating how long it's going to take.

11        MS. LYDON:  We may.

12        THE COURT:  But we'll tell the jury the same thing we

13   would have told them otherwise.  Now, I have to ask this

14   question.  Are we certain this case is going to trial on the

15   date set?  Are we certain of that?

16        MS. LYDON:  Unless there are some statements by the

17   Defense that -- unless discussions go in an unexpected

18   direction, yes, the Government expects to proceed to trial.

19        THE COURT:  Are we certain that the case is going to

20   trial?

21        MS. CRAGER:  Yes, Your Honor.  We expect to go to

22   trial on the stated date.

23        THE COURT:  You're certain?

24        MS. CRAGER:  Yes, Your Honor.

25        THE COURT:  All right.

58

1          Okay.  I think that covers -- anything else we've got
2    to discuss before we adjourn for the day and come back Monday?
3          MS. LYDON:  Aside from our new start date of
4    Wednesday the 15th and I think the Memorial Day holiday, are
5    there any other days we expect to be dark?  I know Your Honor
6    has a calendar on Monday mornings.
7          THE COURT:  Yeah.
8          MS. LYDON:  I ask only because we're planning witness
9    schedules and flights.
10          THE COURT:  Yeah, let me see.  Mondays, we're going
11    to not assume automatically that we're not going to be in
12    session.
13          MS. LYDON:  Exactly.  That's why I asked, Your Honor.
14          THE COURT:  Yeah.  Mondays, for example, this coming
15    Monday, Karen just told me we'd probably have a half a day.  So
16    if that were to happen in the middle of trial, we'd just say
17    we're taking some hours off, handle the calendar and do the
18    same, just go otherwise with the same schedule.
19          So I can tell you if there's going to be any days
20    that I know we're off.  Let's look at it.
21        (Whereupon, there was a brief pause in the proceedings.)
22          THE COURT:  Is it the Government we're waiting for?
23          THE CLERK:  Yes, it's due today.
24          THE COURT:  Okay.  We're waiting for the Government's
25    brief in the Luong (phonetic) case.  We have a hearing set

59

1    that's going to take some time. Is it Jason Hitt?

2         THE CLERK:  Yes, Your Honor.

3         THE COURT:  So you can talk to Mr. Hitt about that.

4    If he doesn't file his brief or if we have to continue the

5    Luong case, then we'll meet on the 20th.  But if not, we may

6    not be able to meet the 20th.  So the ball's in the

7    Government's court on that one.  We'll know by the end of the

8    day.

9         MS. LYDON:  In my experience, Mr. Hitt is virtually

10   always prompt.  We will discuss with him.

11        THE COURT:  All right.

12        MS. LYDON:  So that's a full day hearing for Luong on

13   the 20th, so we would not -- assuming it goes on?

14        THE COURT:  Oh, yeah.  Yeah, that -- we'll meet all

15   day if we can't hear Luong.  Now the 21st, that was at

16   marshal's meeting that I agreed to go to, security meeting.

17        THE CLERK:  That's the one -- let me see.  Oh, yeah.

18   Didn't you say they were moving it?  Is that --

19        THE COURT:  No, that's a different thing.

20        THE CLERK:  Oh, yeah.

21        THE COURT:  This is a marshal security.

22        THE CLERK:  Yeah, that's on the 21st.

23        THE COURT:  I'll confirm this with you next Monday.

24        MS. LYDON:  Okay.

25        THE COURT:  I may not be able to meet the 21st.  The

60

1    Marshal Service has some meeting that they asked me to attend.

2    And I didn't get the date.  I didn't get the hours on that

3    date, but I think it's all day.  So I'll let you know.  I'll

4    let you know next Monday.

5              MS. LYDON:  Thank you.

6              THE COURT:  Everything else is okay.

7              THE CLERK:  Was it the May 7th one that you --

8              THE COURT:  May 7th?  We're not even there yet.  This

9    doesn't start till the 14th.

10             THE CLERK:  Oh, that's right.  Let me see.

11             And then the 28th, if we're here.

12             THE COURT:  So we're going to meet the 22nd, the

13   23rd, the 24th.  And then there's a holiday in there.  The 28th

14   is a calendar.  Can't tell you yet whether we'll be able to

15   meet on that date or not.

16             We will meet the 29th, the 30th, and the 31st.  I

17   can't tell you yet about June the 3rd, Monday, but the rest of

18   that week we'll be meeting.

19             MS. LYDON:  Excellent.

20             THE COURT:  And then if we go into the following

21   week, it looks like every day that week, but the possibility of

22   Monday, we're also meeting.  So that should do it, right?

23             MS. LYDON:  Yes.

24             THE COURT:  All right.  I'll let you know on that one

25   day, next Monday.  I'll clear it up with the Marshal's Office.

61

1           MS. LYDON:  Thank you, Your Honor.

2           THE COURT:  I think it's all there, though.  I think

3    there's a conference they've got that they're hosting and they

4    wanted a judge to represent the Court at that meeting.

5           MS. LYDON:  Okay. Thank you.

6

7           THE COURT:  Anything else?

8           MS. CRAGER:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  Monday at 10:00, right?

10          MS. LYDON:  Yes.

11          MR. SHARMA:  Yes, Your Honor.

12          MS. CRAGER:  Yes, Your Honor.

13          THE COURT:  All right.  We'll see you then.

14          MS. LYDON:  Well, wait a minute, Your Honor, in which

15   Courtroom.

16          THE COURT:  You just wander around until you see me

17   in one of the courtrooms.

18          MS. LYDON:  Thank you.

19          THE CLERK:  I mean, if it happens either way, I'll

20   let you know.

21          MS. LYDON:  Thank you.

22          MR. SHARMA:  Thank you.

23       (Whereupon, at 10:20 a.m., the hearing was adjourned.)

24                          *  *  *  *  *

25

62

<u>CERTIFICATION</u>

    I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____        April 30, 2024

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

LIBERTY TRANSCRIPTS