# Exhibit A:
## Excerpts of FAA Enforcement Investigation Report

# SECTION B
# Statement of Case and Factors Affecting Sanction

## Statement of Case
## "Unable to substantiate regulatory noncompliance"

The purpose of this Enforcement Investigation Report (EIR) is to show and prove that a Mr. Robert
Pooley violated Federal Aviation Regulations (FAR) F.A.R. Title 14, Section 105.45(a)(1), (iv).
(a) No person may conduct a parachute operation using a tandem parachute system, unless—
(1) One of the parachutists using the tandem parachute system is the parachutist in command, and meets
the following requirements:
(iv) Has successfully completed a tandem instructor course given by the manufacturer of the tandem
parachute system used in the parachute operation or a course acceptable to the Administrator.

On August 6, 2016 a Mr. Yonghyeon Kwon to perform a tandem parachute operation with a Mr. Tyler
Turner.
Mr. Kwon and Mr. Turner were both fatally injured in the tandem parachute operation from high velocity
impact with the ground.

This report will show that Mr. Kwon was not properly certified, licensed nor rated to perform this tandem
parachute operation and he was not properly trained for emergency tandem operation with a tandem
parachute rig.
A Mr. Bill Dause owns the Parachute Center, Acampo, Ca., operates aircraft N153KD used in this
parachute operation and owns the United Parachute Technologies (U.P.T.) Harness-Container parachute
rig (Sigma model, serial #54851) used in this operation.

ASI interviewed Mr. Pooley about Mr. Kwon USPA documents that had Mr. Garmashov signatures with
a date of 7/1/16 when Mr. Garmashov was in Russia at this date.
Mr. Pooley had no answer except that he stated Bill Dause handles all the paperwork at the Jump Center.
Asked Mr. Pooley about his USPA and U.P.T. tandem instructor/examiners ratings being suspended by
the USPA/U.P.T since July 2015 and that he was not authorized to conduct the tandem courses at the
Parachute Center. Mr. Pooley stated he had known of his suspensions and had no answer except, that he
stated "he figured it would be automatically reinstated after a years' time".

ASI received documents from Mr. Dause that were Mr. Kwons applications for USPA membership,
USPA A License proficiency card, USPA B, C & D License application, USPA Coach rating card, USPA
Tandem instructor rating card and U.P.T. Instructor certification form (IOP #5).
It appears these applications were completed and ready to be sent to USPA and U.P.T.
The most important document is the USPA Tandem Instructor Rating Course Proficiency Card
application. This is the USPA rating with a issued card that is needed to perform tandem parachute
operations with the paying public (Tyler Turner).
This application has a date of 7/1/16 and this is when Mr. Garmashov was in Russia.

Mr. Kwon was not a United States Parachute Association (USPA) Member, did not have a USPA A
License, did not hold a USPA Canopy proficiency card, not have a USPA D License, not hold a USPA
Coach rating card.

---

Robert Pooley                                                                                    2016WP2700067

POOLEY_00022228

**Summarized Conclusion & Recommended Sanction:**
Inspector Jensen recommends maximum civil penalty.

3/27/17 Harlows Voorhees, AWP-230  memo, (titled (Oakland FSDO Manager, Dennis Thorpe requested that I review 3 EIRs prior to official transfer to AWP-230)) was received by FSDO management and Inspector advised that basically the Tandem Parachute F.A.R's, 105.45(a)(1)(iii)(iv)(v) are very difficult to prosecute.  Mr. Voorhees statement in regards to course instructor Mr. Pooley is as follows...
Regarding the Course Instructor, the EIR does not explain how his alleged action (endorsing completion of a required course at a time when he was reportedly not authorized to do so) is connected to the applicable requirements of 105.45.
If Mr. Kwon knowingly performed a tandem jump using an unauthorized endorsement, he (jumper) could be held responsible, but Mr. Kwon is deceased.
There may be a theory that the Course Instructor fraudulently made an endorsement allowing Mr. Kwon to make a tandem jump but we would have to provide proof of intent and it would likely involve a criminal act rather than a violation of a safety regulation.
There is no discussion or proof of such an act offered in the case. There was no information that conclusively excludes this endorsement from meeting the requirements of I05.45(a)(iv).

Inspector Jensen's answer to Mr. Voorhees statement as follows...
ASI interviewed Mr. Pooley, Mr Pooley did not ejndorse documents. Documents are mass produced via copies of older documents or whatever. with signatures in all boxes or on appropriate lines. All they then do is date the documents. This has been a issue with the USPA for years from the Parachute Center.
The 105.45(a)(1)(iv) rule states that a Tandem Instructor (Kwon) must...
(iv) Successfully completed a tandem instructor course given by the manufacturer of the tandem parachute system used in the parachute operation or a course acceptable to  the Administrator.
Mr. Kwon did not successfully complete the ground tandem course performed by a Mr. Pooley. So this is the closes FAR violation on Mr. Pooley's part.
There is no theory and no proof of intent of Pooley's fraudulent activity, he admitted this activity states this is how they process USPA documents and that Mr. Dause is in handles documents. Mr. Pooley knows the activity of mass producing documents is a105.45 violation.
Criminal acts are being investigated by U.S. D.O.T. Office of Inspector General.
Mr. Kwon USPA documents that had Mr. Garmashov signatures with a date of 7/1/16 when Mr. Garmashov was in Russia at this date.
Mr. Pooley had no answer to Mr. Garmashov signatures with a date of 7/1/16; except that he stated Bill Dause handles all the paperwork at the Jump Center.
Asked Mr. Pooley about his USPA and U.P.T. tandem instructor/examiners ratings being suspended by the USPA/U.P.T since July 2015 and that he was not authorized to conduct the tandem courses at the Parachute Center. Mr. Pooley stated he had known of his suspensions and had no answer except, that he stated "he figured it would be automatically reinstated after a years' time"

FSDO Management Thorpe stated to close EIR with "No Action" on Mr. Pooley based on Harlows Voorhees  AWP-230  memo or recommendations.
Legal Runkel supposedly was involved with review and decision.

---

Robert Pooley                                                                                          2016WP2700067

POOLEY_00022230

With revision to this EIR & PTRS,  revised the 2150-5 form with "No Action" in box 25 as Directed by FSDO Management Thorpe and submitted EIR to FSDO Management/EIS support staff for closure.
.

Robert Pooley                                                                                                    2016WP2700067

POOLEY_00022231

# Exhibit B：
## Transcript of
## Trial Setting Hearing
## Feb. 13, 2023

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America,
      Plaintiff,

vs.                                        Sacramento, California
                                         No. 2:21-cr-00111
Robert Allen Pooley,                       Mon., Feb. 13, 2023
      Defendant.                           9:00 a.m.
_____/

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
---oOo---

APPEARANCES:

  For the Plaintiff:                       United States Attorney
                                      501 I Street, Suite 10-100
                                      Sacramento, California  95814
                                      By:  Christopher Stanton
                                      Hales
                                      Katherine Theresa Lydon
                                      Assistants U.S. Attorney

  For the Defendant:                       Office of the Federal
                                      Defender
                                      801 I Street, 3rd Floor
                                      Sacramento, California  95814
                                      By: Hannah Rose Labaree
                                      Assistant Federal Defender

  Official Court Reporter:                 Kimberly M. Bennett,
                                      CSR, RPR, RMR, CRR
                                      501 I Street
                                        Sacramento, CA 95814

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

1          (Call to order of the court, 9:01 a.m.)

2               THE CLERK:  Criminal 21-111; United States versus

3     Robert Allen Pooley.

4          Counsel, please state your appearances.

5               MR. HALES:  Good morning, Your Honor.  Christopher

6     Hales and Kate Lydon on behalf of the United States.

7               MS. LABAREE:  Good morning, Your Honor.  Hannah

8     Labaree for Mr. Pooley, who is present and out of custody.

9               THE COURT:  What is the status of this matter?

10               MS. LABAREE:  Your Honor, I believe the government is

11     asking for a trial date in September.  I would be asking for a

12     trial date later than that based on my schedule, based on the

13     fact that I don't know yet who my cocounsel is going to be, and

14     there is really a massive amount of discovery in this case my

15     cocounsel is going to have to come up to speed with.  So my

16     request for a trial date would be in early 2024.

17               THE COURT:  Mr. Hales, what do you think about that?

18               MR. HALES:  So the government's request for September

19     is sort of geared off of two things.

20          Prior to this hearing, Your Honor, Ms. Labaree and the

21     government had spoken and she had asked for additional time to

22     set another status.  Our request to set trial in September was

23     geared towards, you know, setting something on the calendar,

24     but giving enough time for the defense to get through the rest

25     of the discovery and prepare.  The case has been around for

1   some time and that's why we'd like to set it in September,

2   putting us about seven months out.  The discovery is about

3   20,000 pages.  There are 800 megabytes of materials that we --

4          THE COURT:  I can't imagine 20,000 pages of anything.

5   Now, I mean, there may be 20,000 pages, but are they relevant?

6   Does counsel have to look at all 20,000 pages in order to

7   defend this case?  That's the question.

8          MR. HALES:  Well, I think the parties might differ a

9   bit in that regard.  From the government's perspective -- a lot

10  of that, from our perspective, is not relevant because the

11  investigation went into other areas that didn't involve

12  Mr. Pooley as much and aren't charged here.

13      I think from the defense perspective they feel like -- I

14  don't want to speak too far for Ms. Labaree, but I assume she

15  feels like she needs to go through that material and --

16         THE COURT:  Well, I assume somebody has gone through

17  this material because it was filed in 2021, and so that's been

18  two years that somebody has had the opportunity to go through

19  this.  And I assume Ms. Labaree or -- Ms. Crager was on this

20  case before?

21         MS. LABAREE:  Well, this has really been my case.

22  Ms. Crager was sort of babysitting it for me when I was on

23  parental leave.  But I have gone through the material.

24         THE COURT:  I assume you have, and you're going to

25  know what your cocounsel is going to have to look at and it's

1    not all 20,000 pages.

2              MS. LABAREE:  Well, if I could just make my record on

3    it, Your Honor.

4        You know, I have gone through the discovery.  We've been

5    diligent in our duty.  The issue is that -- twofold.  First, I

6    don't know who my cocounsel is going to be.  And many lawyers

7    in my office right now have a number of trials coming up.  And

8    so I want to give maximum flexibility to identify somebody for

9    whom the trial date will work.

10       And there is a good amount of material to come up to speed

11   with here.  Whether or not the full 20,000 pages is going to

12   come directly at relevant issues in trial is another thing.

13   Certainly what the government thinks is relevant to prove their

14   case is not always directly one to one with what the defense

15   can use to craft a good defense.  And so, you know, we are very

16   interested in having cocounsel be able to come up to speed with

17   the discovery as it's been produced.

18       I was on parental leave from early January through July of

19   last year, so that while this case has been pending there is a

20   good chunk of time in there when me and Mr. Pooley were not

21   able to work directly together.

22       Just before I went on leave, I sent a pretty extensive

23   request inquiring about various points of discovery regarding

24   some of the technological aspects of it, what the particular

25   file formats were that we were confused by, me and my

1    paralegal, and needed help with.  And we received a response

2    from the government, I believe, if my records are correct, in

3    April of -- when I was on parental leave.  So when I got back,

4    I met with my paralegal and we were able to work through what

5    those answers were and we were able to make more sense of it.

6         The defense does continue to have investigation to do.  And

7    so, you know, for example, right now the government counsel

8    asked me how many days do we need for trial.  I simply do not

9    know because I don't have yet our witness list anywhere near

10   done.

11              THE COURT:  You know --

12              MS. LABAREE:  I don't understand -- I don't know how

13   many days we would need.

14              THE COURT:  But if you put this over a year, which is

15   what you want to do, all kinds of things can happen between now

16   and then; somebody else can go on parental leave; there can be

17   another COVID wave; anything could happen to individuals during

18   that period of time.  So it just becomes a perpetual problem.

19   I'll put it over another year, but, you know, whether I'll be

20   here by then -- I'm 85 years old -- you'll have another judge,

21   you'll have another lawyer.

22        The case doesn't look to me to be that complicated, really.

23   I mean, I've looked at the indictment.  It's a pretty simple

24   alleged scheme.  It sounds like the scheme is that they weren't

25   qualified to teach people to be instructors and they

1  represented that they were qualified, and some people gave, as

2  federal cases go, a pretty small amount, a few thousand

3  dollars, in order to take these courses.  And that seems to be

4  the case.  20,000 pages?  I mean, I don't know.  That -- that

5  doesn't seem to me to be that complicated.

6       So I'll put it over a year and I'll just forget about it

7  between now and 2024.  I don't even want to see a calendar.

8            THE CLERK:  Okay.

9            THE COURT:  You give me a calendar.  2024?  Who knows

10  what will be happening in 2024.

11      And then you've got Mr. Pooley.  Now, I'm sure this is

12  affecting his life, and to have this thing hanging over his

13  head year after year after year has got to be really stressful.

14  So it's not just the government, it's not just the attorneys,

15  there are the defendants in these cases who I would think would

16  like to get the matter behind them.

17      If he thinks he's got a defense, he wants to present it to

18  a jury and have it decided.  And if he doesn't think he has a

19  defense, he probably wants to work something out to get the

20  thing behind him.

21      So that is where you stand.  If you want -- I'm not going

22  to argue with you if you want to put it over to 2024, but it

23  doesn't -- my intuition tells me that it ought to be sooner.

24      The other thing is, as long as we're here, you've got this

25  aggravated identity theft count.  And it was interesting to me

1  that in another case that I had, the government took the

2  position that the phrase "without lawful authority" didn't mean

3  that the defendant had no authority from the person whose

4  identity he stole, it meant that he didn't have authority to do

5  what he was doing; in other words, he was committing a crime.

6  And so I had another case in which two coconspirators -- and it

7  may have been your case --

8          MR. HALES:  No, I don't think it was mine, Your

9  Honor.

10         THE COURT:  But two coconspirators got together and

11  one of them used the other one's credit card in furtherance of

12  the conspiracy.  And the government took the position that that

13  was without lawful authority.  And defense counsel said he had

14  done the research, the government cited the case, and everybody

15  agreed that that was enough.  So you can have aggravated

16  identity theft if one coconspirator uses the credit card or

17  identification of another coconspirator with that other

18  coconspirator's permission.

19      So now it looks like what you've got here is you add one

20  more thing, and that is a signature can be a means of

21  identification.

22         MR. HALES:  That is accurate.

23         THE COURT:  Okay.  So here we are.  Now, I have

24  hardly ever seen a wire fraud case that didn't involve some

25  documents with a signature on it.  Take any mortgage case.

1    Take anything.  So every wire fraud case becomes an aggravated

2    identity theft case.  And that's really unusual.  And they call

3    it identity theft but it's -- it has nothing to do with

4    identity theft.  And so there you are.  And it has a

5    consecutive sentence.

6         And I think it's mandatory, right?

7              MR. HALES:  It's mandatory, yeah.

8              THE COURT:  So there you are.

9         Now, by the time you get to 2024, some court is probably

10   going to say there is something wrong with this theory.

11   That -- so that just -- if you're going to go that far into the

12   future, you ought to be thinking about that.

13             MR. HALES:  Well, can I clarify, Your Honor, this

14   case?

15        So, Your Honor is right about the Ninth Circuit law.  It

16   comes from a passport case where I think one brother used the

17   other brother's passport, and that was where we got the law

18   Your Honor is talking about.  In this case, the government

19   expects evidence to be presented that Mr. Pooley did not have

20   the authority to be using the signature of the person whose

21   signature we allege he was using on these forms.

22             THE COURT:  But he's Person No. 2, right?

23             MR. HALES:  Correct.

24             THE COURT:  Person No. 2 is -- maybe didn't give

25   authority on a particular occasion to use his signature, but it

1    sounds like he's part of the conspiracy from the rest of the

2    indictment.

3              MR. HALES:  I think that's going to be a -- probably

4    a factual contention between the parties.  Our contention will

5    be that that signature was used without his permission, while

6    documents show that he was actually out of the country, in

7    Russia or elsewhere --

8              THE COURT:  Without your permission is something

9    different than over your objection.

10             MR. HALES:  I guess you can't object if you don't

11   know it's being used.

12             THE COURT:  Or if it's part of the conspiracy and

13   just assumes that they're going to use his name on documents.

14             MR. HALES:  Yeah.

15             THE COURT:  But even -- but take the average mortgage

16   case.  There are a lot of --

17             MR. HALES:  In those, the people were mostly signing

18   on their own.  It's like their own 1006 loan application.

19   Right?  Like, I make $15,000 a month and it's a lie.  So that

20   --

21             THE COURT:  I know, but somebody else uses it, you

22   see?  You see what I'm saying?  Somebody makes a false

23   statement on a loan application or something else, and one of

24   the coconspirators uses it, he causes it to be mailed, he

25   causes it to be sent in.

1          MR. HALES:  I see.  I don't think -- I'm not aware of

2     a case where that active mailing in something that, you know,

3     someone else has signed in their own name has been used as ag

4     ID theft.  And that's definitely not what the government is

5     trying to do in this case.

6          THE COURT:  All right.  Well, at least it's not that

7     bad.  But if a signature is a means of identification, and if

8     that Ninth Circuit case where the -- the brothers used their --

9     each other's identification holds up, the logical progression

10    would be anything -- if you use anything with a signature of a

11    real person on it to do an illegal act, you have committed

12    aggravated identity theft.  That would be the logical

13    extension.

14         MR. HALES:  Yeah.  And from a public policy

15    standpoint, that slippery slope, I totally get it, but this

16    case is not a part of that slippery slope.  Like, the way the

17    government is arguing it is, the other guy is out of the

18    country, Mr. Pooley is using his signature on these forms

19    without his permission.

20         THE COURT:  That is different.  He doesn't approve of

21    it.  He doesn't -- he would not approve of it if he knew.

22         MR. HALES:  Yeah.  That's -- yeah.

23         THE COURT:  All right.  Well, pick a date in 2024

24    then.

25         MS. LABAREE:  I request to be early February.

1          THE COURT:  All right.

2          THE CLERK:  February 6th or 13th.

3          MS. LABAREE:  6th is fine.

4          THE COURT:  All right.  February the 6th.

5     How about a date for trial confirmation?

6          MR. HALES:  The government -- I'm just interjecting.

7  I think normally we do about four weeks.  In this case we'd

8  request about six weeks out, if possible, because of the

9  holidays, among other things.

10         THE COURT:  Six weeks out is going to be during the

11 holidays.

12         MR. HALES:  It might be right -- I guess right before

13 the holidays.

14         THE CLERK:  18th December.

15         MS. LABAREE:  That's fine.

16         MR. HALES:  Yeah.

17         THE COURT:  What date are you picking?

18         THE CLERK:  December 18th, Your Honor.

19         THE COURT:  Everybody will be out of town December

20 the 18th.  You know how it is.

21         THE CLERK:  11th?

22         THE COURT:  How many people were here December 18th

23 of this year?

24         MR. HALES:  I was.  And I'll probably be here this

25 year, too.

1              MS. LABAREE:  We can do a week earlier.

2              THE COURT:  I don't care.  I don't care.

3              MR. HALES:  I'm fine to do it a week earlier.

4              THE COURT:  Do it a week earlier.

5              THE CLERK:  The 11th.  December 11th.  9 o'clock.

6              THE COURT:  So the Court has to deal with excludable

7    time now, and why don't you make your record on that.

8              MS. LABAREE:  Your Honor, the defense is going to

9    need additional time to do investigation and preparation for

10   trial, we're going to need to get cocounsel up to speed in

11   reviewing the up to 20,000 pages of discovery, and for that

12   reason we would ask for a T4 exclusion for continuity of

13   counsel and defense preparation.

14             THE COURT:  All right.  The Court will find

15   excludable time under Local Code T4 for the reasons stated.

16        Mr. Hales and Ms. Lydon, you'll prepare the order?

17             MR. HALES:  Yes, Your Honor.  We can prepare an order

18   for the Court's signature.

19             THE COURT:  All right.  Have you talked about some

20   sort of a settlement of the case?  Maybe you want to do that

21   between now and --

22             MR. HALES:  Well, I -- yes, Your Honor, in the sense

23   that the government did, in October of last year, make a plea

24   offer which is now expired.

25        And so just to be clear on the record, for right now the

1    government wants to make clear that offer is expired.  All

2    outstanding plea offers are withdrawn.  That's where we are.

3         We are also meeting on Wednesday with Ms. Labaree to show

4    some discovery that's been made available since near the

5    beginning of the case, and we've provided a discovery index.

6         So I can tell the Court I think we'll be talking, and we

7    are trying to do things that will, you know, either lead to a

8    resolution or help streamline what we're going to do at the

9    trial when it comes.

10            THE COURT:  All right.  Well, as I said, I would

11   think that Mr. Pooley wants to get this matter behind him.  So

12   with that end in mind, you might continue with your discussions

13   with the government.

14            MS. LABAREE:  Understood.  Thank you.

15            THE COURT:  Anything else?

16            MR. HALES:  Yes, Your Honor.  Just to say this.  We

17   were going to ask to set a schedule for Rule 12 motions in this

18   case and there was a difference of opinion between the parties

19   about when to set those.

20            THE COURT:  Was the Rule 12 motion on the aggravated

21   identity theft?

22            MR. HALES:  Well, it may be now after our discussion.

23   We'll see.  But I think, given that the trial has been set so

24   far out, what I'd like to do is try to talk to Ms. Labaree to

25   see if we can agree on the schedule that we can just submit to

1  Your Honor.  And then if there is disagreement, we'll submit

2  paper so the Court can make the call.

3           THE COURT:  All right.  Well, I don't -- as to a

4  disagreement, you mean sooner rather than later?

5           MR. HALES:  The government was thinking the trial

6  would be in September, we were going to ask to have motions

7  filed late March and then resolve them in June so all of that

8  was resolved well before trial.  Ms. Labaree was going to ask,

9  as I understand it, for a later schedule.  Now that we're set

10 for trial in February of next year, it would seem to make sense

11 to do -- to try and resolve those motions, you know, probably

12 in the fall.

13           THE COURT:  Well, it makes sense to resolve as early

14 as possible so everybody knows where you're headed, if they're

15 serious motions.

16    But what date were you going to suggest for the motions?

17           MS. LABAREE:  With a trial date in September in mind,

18 I was going to ask for June for the deadline.

19           THE COURT:  But do you have in mind what motions

20 you're going to make?

21           MS. LABAREE:  Not to the degree that late March being

22 set now.  If I had known about late March earlier, I think I

23 would have been able to make them.  But late March now, I

24 simply have plenty of deadlines between now and then I wasn't

25 going to be able to do that.

1           THE COURT:  Whatever you agree by stipulation I'll

2     approve.  I would think that you would want to do this as

3     quickly as possible.

4           MR. HALES:  Agreed.  I think a June filing date makes

5     sense to -- now that we're set for trial so far out.  So we can

6     either pick a date now and build a schedule off of that, or

7     it's probably easier for the Court for us to submit it on

8     paper.

9           THE COURT:  It's easier for you to submit because it

10    doesn't make that much difference to the Court what dates you

11    select.

12          MR. HALES:  Understood.

13          THE COURT:  Anything else?

14          MR. HALES:  No, Your Honor.

15       You did state on the record excludable time under T4 and

16    then we'll provide the order to you?

17          THE COURT:  It wasn't that long ago.  Yes, I did.

18          MR. HALES:  I'm just verifying.  I think that's it

19    for the government.

20          THE COURT:  All right.

21          MS. LABAREE:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          MR. HALES:  Thank you.

24              (Proceedings adjourned, 9:18 a.m.)

25                        ---oOo---

16

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4                              /s/ Kimberly M. Bennett
                               KIMBERLY M. BENNETT
5                              CSR No. 8953, RPR, CRR, RMR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C :
## Emails with Josh Hall

**From:** Jim Crouch ██████████████████

**To:** Joshua Hall ████████████████████, "Michael Wadkins" ████████████████████████████, Chuck Akers ███████████████████████████, Michael McGowan ████████████████████████, Tom Noonan ████████████████ >

**Subject:** RE: Letter from Rob

**Date:** Thu, 08 Sep 2016 21:39:14 +0000

**Importance:** Normal

---

That's some good tap dancing.

**From:** Joshua Hall ████████████████████
**Sent:** Thursday, September 08, 2016 4:42 PM
**To:** Jim Crouch; Michael Wadkins; Chuck Akers; Michael McGowan; Tom Noonan
**Subject:** Fwd: Letter from Rob

Not sure if anyone else received this letter. I just spoke with Rob and it's complete BS

Josh Hall

██████████████████

Begin forwarded message:

**From:** Yuri Garmashov < ████████████████████████ >
**Date:** September 8, 2016 at 12:30:26 PM CDT
**To:** Joshua Hall < ████████████████████ >
**Subject: Letter from Rob**

Hi Josh,
How is the investigation going?
I dont know if Rob sent you this letter, but here is what he gave me.
Blue skies,
Yuri.

POOLEY_00029807