1                    UNITED STATES DISTRICT COURT    `ORIGINAL`

2               FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        BEFORE THE HONORABLE
          WILLIAM B. SHUBB, DISTRICT JUDGE PRESIDING

4    _____

5    UNITED STATES OF AMERICA,        )  Case No. 2:21-cr-00111-WBS
                                      )
6    Plaintiff,                       )  Trial Day 7
                                      )
7              v.                     )  Closing Arguments
                                      )
8    ROBERT ALLEN POOLEY,             )  Date:  Thursday, May 23, 2024
                                      )
9    Defendant.                       )
                                      )
10   _____

11              **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                      Pages 1 through 44

13   APPEARANCES:

14   For the Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                              501 I Street
15                            Suite 10-100
                              Sacramento, California 95814
16                            By:  KATHERINE THERESA LYDON, ESQ.
                              By:  DHRUV M. SHARMA, ESQ.
17
     For the Defendant:       OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                            801 I Street
                              3rd Floor
19                            Sacramento, California 95814
                              By:  MIA CRAGER, ESQ.
20                            By:  MEGHAN MCLOUGHLIN, ESQ.

21   OFFICIAL REPORTER:       Abigail R. Torres, CSR, RPR/RMR, FCRR
                              CSR No. 13700
22                            United States District Court
                              Eastern District of California
23                            501 I Street, Suite 4-100
                              Sacramento, California 95814

24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

1        **SACRAMENTO, CALIFORNIA; THURSDAY, MAY 22, 2024; 9:09 A.M.**

2                              -oOo-

3            (The jury panel entered the courtroom.)

4            THE COURT:  All the jurors are present.  Defendant is

5    present with counsel.

6            There used to be a judge on this court years and years

7    ago who used to remark that anything with more moving parts

8    than a crowbar is bound to break down, and he had no idea of

9    what modern technology would come up with in the years to come.

10           We had a short delay this morning because the lawyers

11   want to use some technical equipment in making their arguments,

12   and we had a whole group of people in here from various

13   departments trying to set it up so that it would work, and I'm

14   not sure it works the way they want it to work yet, but it

15   works enough so that we can proceed with the opening argument

16   on behalf of the Government.

17           Now, I want to remind you that the statements of the

18   lawyers, what they say or what they show you, is not evidence

19   in the case.  If anything that the lawyers say is not supported

20   by the evidence, then you should disregard it.

21           Just as an example, you may recall that in the opening

22   statements, one of the lawyers made some comment with regard to

23   the reason for Mr. Pooley's privileges being suspended by the

24   USPA.  Well, there's no evidence of why his privileges were

25   suspended, and there's good reason for that.  It has nothing to

1    do with the case.  It could be a number of reasons that they

2    talked about in the process.  Don't forget, this is not a

3    Government agency, the USPA, and there could be a number of

4    reasons that they talked about, and they could be disputed.

5            And if we were to get into those reasons and the

6    dispute over those reasons in this trial, it probably would

7    have lasted twice as long and distracted your attention from

8    the issues in the case.

9            So if you heard anything like that, disregard it.

10           All right.  Now, we'll begin with the argument on

11   behalf of the Government.

12           I understand, Ms. Lydon, you're going to make that

13   argument.

14           MS. LYDON:  Yes.  Thank you, Your Honor.

15           THE COURT:  You may proceed.

16           MS. LYDON:  Thank you.

17           Is this mic working?  Yes.

18           Good morning.  The defendant, Robert Pooley, made

19   promises he wasn't allowed to make and that he knew he couldn't

20   keep.  Over the summer of 2016, the defendant held himself out

21   as a tandem instructor candidates as an examiner, someone

22   certified to award ratings that would allow those skydivers to

23   make tandem skydives throughout the United States and all over

24   the world.  Pooley hid the reality from those students that his

25   tandem examiner rating was suspended, and the reason that he

1  hid that fact was so that he could get money.

2       The defendant and Parachute Center received over a

3  thousand dollars cash from each tandem instructor candidate

4  that walked through the door to take his tandem instructor

5  courses, and a key thing that they paid for was the signature

6  of a certified examiner on their USPA and UPT certification

7  forms.

8       Now, at the end of the course, Pooley either didn't

9  deliver that paperwork at all or he provided doctored paperwork

10  with the signature of Yuri Garmashov.

11       That's the story that you've heard over the course of

12  this trial.  It is -- until now, all of the evidence of that

13  story has come in piecemeal with each document and piece of

14  witness testimony telling its own slice of the story.  It's now

15  time to weave that evidence together and apply it to the law.

16       All right.  You're going to ask -- to be asked to

17  decide six counts.  I'm going to spend the rest of this

18  presentation going over those counts and the charges in great

19  detail, but for now, here is the big picture.

20       The first four counts charge wire fraud.  All of the

21  wire fraud counts concern the same overall scheme that we just

22  talked about to defraud the tandem instructor candidates.

23       The specific counts are each e-mails set in

24  furtherance of the scheme.  So the specific wirings are all

25  just instances in which the defendant used e-mail to further

1    his scheme.

2            We'll list the e-mails.  Count 1 is an e-mail from

3    Fabrisio Palomino to Parachute Center on June 28, 2016.

4            Count 2, an e-mail from Pooley to Palomino on June 29,

5    2016; Count 3, an e-mail from Palomino to Pooley on the 4th of

6    July; Count 4 is an e-mail on August 1st from Pooley to USPA

7    and Lachlan Mackay.  All right.  The inspected -- Counts 5 and

8    6 charge aggravated identity theft.

9            We'll go over this in great detail throughout the

10   presentation.

11           But big picture, that's where the defendant issued

12   Yuri Garmashov's signature to commit the wire fraud charged in

13   the indictment to commit that scheme to defraud.

14           And Count 5 concerns Pooley's use of Garmashov's

15   signature on Yeonghon Kwon's form -- forms.  And Count 6

16   concerns his use of Garmashov's signature on Lachlan Mackay's

17   forms.  All right.

18           Now, your job at the end of these arguments would be

19   to find the facts and apply the law.  The facts are going to be

20   in the exhibits which you'll have in the jury deliberation room

21   with you, the testimony that you've heard, and stipulations or

22   agreements between the parties.

23           The lawyers' statements, just like the Court just told

24   you, are not evidence.  If anything that I say or Ms. Crager

25   says conflicts with your recollection of the evidence, your

1    recollection controls.  And you then will apply the law that

2    the Judge will give you in the jury instructions to those

3    facts.

4          Quick note on Government evidence organization.  The

5    main documents supporting the six counts have exhibit numbers

6    that correspond to the count number; so that e-mail from

7    Fabrisio Palomino to Pooley in Count 1, that's Exhibit 1, and

8    so on.  The same documents support Counts 4 and 6 of the

9    indictment, so that document is in evidence as Count 4.

10          Then the series of exhibits pertaining to specific

11   people are in the 20 series through the 60 series.  20s are

12   about Palomino; 30s, North; 40s, Munoz.

13          You don't have to write this down.  You'll get a sense

14   of it when you look at the exhibits, but I just wanted to give

15   you a sense of where to find things.

16          Documents pertaining to other victims and other --

17   other people are sort of sprinkled throughout the exhibits.

18   For example, there are documents pertaining to the

19   border-crossing records of many folks in the 1400 series.  And,

20   generally, the exhibits are chunked somewhat by category.  So

21   the 200 series is Pooley's deposition videos, and 800 series

22   are the search warrant photos and so on.

23          One quick note, you will not get a copy of this

24   presentation, so if a particular document or a particular piece

25   of evidence seems important to you, jot a quick note for

1    yourself.

2           During the rest of this closing presentation, I will

3    explain the things that the Government is required to prove

4    about each crime, called "elements of each crime in order to

5    convict."

6           Elements are like a checklist.  Once you find that an

7    element has been met, you check it off, and you move on.  And

8    once you get -- once you've checked off all of those elements,

9    you find the defendant guilty.

10          Most of the time in this closing will be spent on the

11   one element that the defendant really disputes, which is

12   whether the defendant scammed the tandem instructor candidates

13   by holding himself out as an examiner when he wasn't, as the

14   evidence has shown, or whether he was honest with the victims,

15   and they knew the deal and were in on it, as you heard from the

16   defense at the beginning of the trial.

17          At the end of this presentation, once I've explained

18   the evidence proving each element of each count, I'll ask you

19   to return the only verdict consistent with the evidence, and

20   that's guilty.  All right.  All right.

21          So these are the short versions of the elements.  And

22   I'm going to go through the elements in a -- in a short way

23   throughout this presentation.  You'll have the full elements

24   and jury instructions with you.

25          Let's start with wire fraud.  So there are four

1  elements of wire fraud.  Again, these are simplified.  The

2  defendant knowingly participated in a scheme to obtain money by

3  false or fraudulent pretenses, representations, promises, or

4  omitted facts.  Second, the statements were material.  Third,

5  the defendant had an intent to defraud; and, finally, that he

6  used wire communications, e-mails, in furtherance of that

7  scheme.

8          Let's start with the first element, that the defendant

9  knowingly pretended to be a legitimate examiner to get tandem

10 instructor candidates' money.  We'll do it in pieces because

11 there's a few -- a lot of words in that first one.  Most of

12 them are easy.

13         It was obviously a scheme to obtain money.  There's

14 the safe in Parachute Center.  The defendant didn't do this for

15 free.

16         Brad Palomino -- I'm sorry -- Brad North paid him a

17 thousand dollars, $100 -- $1100 in cash.  Fabian Munoz paid him

18 $2,000 for the tandem course and the coach course.  Fabrisio

19 Palomino paid him $1100.  There's a scheme to get money, and

20 Pooley participated in it.

21         Now, beyond participated, this was Pooley's scheme.

22 He had told the skydivers to come to the course.  He took their

23 money.  He taught the course.  He jumped with them.  He gave

24 them the USPA and UPT forms with preprinted signatures.

25         And he used other people, too.  Bill and Katie Dause,

1    for example, sent students looking for ratings to him while he

2    was suspended.

3            And he acted knowingly.  You'll get a jury instruction

4    on the definition of "knowingly."  It means an act is done

5    knowingly if the defendant is aware of the act and does not act

6    through ignorance, mistake, or accident.  And, of course,

7    Pooley knew he was an examiner and couldn't get ratings -- give

8    ratings.  He was suspended, he acknowledged he was suspended,

9    and he still continued teaching the courses.

10           Let's walk through that evidence.

11           Pooley was suspended.  He knew he was not a rated USPA

12   and UPT examiner and he couldn't bestow tandem instructor

13   ratings because USPA told him so.  On August 7th, USPA sent --

14   of 2015, USPA sent Pooley a letter suspending him for a year.

15   And UPT told him so.  The manufacturer sent him its suspension

16   letter about ten days later.

17           So Pooley knew he was suspended and, of course, after

18   getting these letters, he clearly knew it, and he admitted he

19   knew it in his e-mail exchange with Jim Crouch, the director of

20   safety and training at USPA, and the first victim -- or the

21   first witness that you heard from in this case.

22           Let's start with what Crouch e-mailed Pooley.  Jim

23   Crouch wrote Pooley on August 28, 2015:  "I just wanted to make

24   sure you understood that the suspension applies to both coach

25   and tandem courses."  And he said:  "The courses must be run

 1  completely by other examiners from start to finish."

 2          Pooley could participate as an evaluator, but he

 3  couldn't run the courses.

 4          And let's see what Pooley said in response:  "I

 5  understand the terms of the suspension," Pooley stated.  He

 6  knew they need to be run by another instructor examiner.  And

 7  Pooley took it seriously.

 8          And we'll go through every single document in this

 9  presentation where it would be far too long, but you saw other

10  evidence of -- for example, he appealed.  That's Government

11  Exhibit 912.  He asks the letter -- the USPA to reconsider his

12  suspension.

13          And what does that tell you?  It tells you he knew he

14  was suspended.  What did he do with that knowledge?  He still

15  held himself out as an examiner so he could keep making money.

16  For this scheme to work, he had to keep pretending to be an

17  examiner, and he did that in a few ways.  He did it by actually

18  lying to the students and telling them that he was an examiner,

19  and that he would give them ratings.  He did it by acting like

20  an examiner and making students believe that he was one, and he

21  did it by keeping a secret from them by simply not telling them

22  that the examiner's ratings were suspended.

23          Now, there are legal phrases in the jury instructions

24  to describe the ways that Pooley deceived the students -- or

25  the tandem instructor candidates; "false or fraudulent

1    pretenses, representations, promises, or omitted facts."

2         And this part of the element is where the action is in

3    the case, so I'm going to spend most of the presentation on it.

4         Now, you only need to find that he deceived the

5    students in one of these three ways, but in this case, you

6    heard evidence that he used all of them.  We'll go through them

7    one by one, starting with the straight-out lies, the false

8    representations and promises.

9         So let's look at what he told Brad North.  On the last

10   day of the course when Brad North saw Garmashov's signatures on

11   the forms and flagged them, questioningly, Pooley falsely told

12   North, "Yuri is supervising the course."

13        Then you saw the text messages where Pooley makes more

14   false statements.  On July 14th, Pooley promised North, "I will

15   send the paperwork in Monday."  This wasn't true.  Pooley knew

16   he couldn't send the paperwork in to USPA or UPT.  Yuri was out

17   of the country.  Submitting the paperwork would raise red

18   flags, would blow the whole scheme up and put a stop to the

19   classes and Pooley's income stream.

20        On August 4th, Pooley claimed to North that, "I sent

21   your docs to Yuri for review."  Well, a search warrant to

22   Google for both their accounts didn't find such evidence

23   because Pooley didn't send them, you can infer.

24        The purpose of all these lies was to convince Brad

25   North that everything was fine, things were moving along toward

1   his ratings, and allowed Pooley to keep running the classes and

2   the scheme.

3          Let's look at what he told Fabrisio Palomino.  When

4   Palomino showed up at Lodi Parachute Center, Pooley told him,

5   "I can't be there for the jumps today.  I'll meet you at Lodi

6   on Sunday and sign your paperwork."

7          That wasn't true.  He wasn't going to sign the

8   paperwork.  He knew he was going to use Yuri's preprinted

9   forms.  And then he told -- after the -- they'd done the

10  paperwork and Fabrisio had filled it out, Pooley told him,

11  "I'll send it in to USPA and UPT."  That's false for the same

12  reason we talked about with Brad North.

13         There were also false statements by others at

14  Parachute Center to tandem instructor candidates.  The way that

15  the scheme worked was people who wanted to be tandem

16  instructors would reach out to Parachute Center, and Parachute

17  Center, Bill and Kathy Dause, would funnel them to Pooley.

18         And the documents indicate that Parachute Center

19  personnel told the tandem candidates that Pooley was a

20  certified instructor examiner who could give them tandem

21  ratings during the suspension.

22         You saw this -- communications like this from Fabrisio

23  Palomino, for example, in his words, in the wake of the fraud.

24  And it's a little coarse.  He was angry, but he's expressing to

25  his friend what happened, and he says, "I went to get ratings

 1  to Lodi.  Bill told me Rob was my examiner."

 2        Similarly, in this e-mail, Fabrisio Palomino wrote:

 3  "Bill Dause and Pooley asking for accountability from Bill

 4  Dause since you refer me to him as your drop zone examiner."

 5        The false statements by Bill Dause are another way

 6  that Pooley ran his scheme to defraud.

 7        Moving on to Fabian Munoz.  Before the course when

 8  Fabian was in Chile, and he was on the phone with his friend

 9  Carlos Hunvaid [phonetic.]  Carlos handed the phone to Rob

10  Pooley.  Rob Pooley told Fabian Munoz, "I'm a USPA examiner"

11  and also, in the same conversation, said, "I'll sign the

12  paperwork."

13        And then after the course when he didn't get paperwork

14  and Fabian Munoz was following up with him over and over,

15  Pooley told him, "No, no, don't report me to USPA.  I'll get

16  the paperwork to you tomorrow."

17        You can infer that was false.  He didn't do it.  He

18  didn't intend to.

19        And Rob's Pooley's own testimony is the best evidence

20  of what Pooley told Yeonghon Kwon about who he was.

21        Now, elsewhere in the Pooley deposition, he sticks to

22  his story that Yuri was somehow supervising the course from

23  another continent, and that he was the evaluator helping with

24  it.  But here he slips up, and he tells the person taking that

25  deposition -- what you can infer he told the students,

 1   including Yeonghon Kwon, he claims he was the examiner.

 2          (Media played.)

 3          MS. LYDON:  There you go.  We'll go through these

 4   quickly.  Just more false promises and representations by

 5   others at Parachute Center that helped Pooley run the scheme.

 6   You don't have to read all of this and write it down, but I

 7   want to flag some recurring themes.

 8          In response to this tandem -- this person interested

 9   in tandem ratings, Kathy Dause wrote:  "I'm going to give you

10   Rob Pooley's e-mail address and phone number.  He is the one

11   that gives the tandem ratings."

12          This is during the suspension.  Rob Pooley does not

13   give the tandem ratings.

14          Again, on October 3rd, 2015, Kathy Dause wrote:  "Rob

15   Pooley can switch you over to the Sigma UPT rating."

16          No, Rob Pooley cannot do that.

17          And the false statements of certification using

18   Garmashov's signature and name, and even in once instance,

19   sending those to USPA, those were false statements too, and

20   they were false statements through which Pooley ran his scheme.

21          He put Garmashov's signature next to statements

22   attesting that the examiner had been present and certified.

23   And by using forms with Garmashov's signature attesting

24   Garmashov did things that he never did, Pooley provided

25   students paperwork purporting to be signed by a legitimate

1   examiner, and this was false.

2        The effect of providing that paperwork purporting to

3   be signed by a legitimate examiner was to tell the students

4   that they had a rating, that they had been probationarily

5   certified by an examiner, and they could jump.  That wasn't

6   true.

7        You heard Jim Crouch's testimony, while going through

8   sample tandem cars, that if the examiner who signed it wasn't

9   certified or if the signature was forged, then it didn't count.

10  So Kwon, Mackay, the others who got those doctored forms, you

11  can infer had been told they were certified, even though on --

12  they never actually had been.  Okay.

13       So that's the straight-out false statements.

14       He also engaged in a lot of false pretenses, and

15  that's a basis for conviction.  Pooley gave students the false

16  impression he was an examiner through things like e-mails to

17  students, setting up courses, acting like an examiner by

18  running the courses, and providing and filling out ratings

19  forms.  And he gave that impression to a lot of people.

20       Let's look at some e-mails.  You don't have to read

21  all of these in the presentation.  They're all in evidence.

22  I'm just giving you a flavor of some recurring themes.

23       The e-mails show that Pooley knew the students were

24  looking for tandem ratings.  The e-mails mention the words

25  "tandem," "ratings," "license," "UPT," "USPA."  And even though

1   he was suspended and not allowed to do these courses

2   unsupervised, Pooley routinely e-mailed prospective tandem

3   instructor candidates, "We can do it here any time you want."

4   Not "At a time when there's a rated examiner here to supervise

5   me."

6           Also, quick point on time period.  So the conspiracy

7   charged here is for the summer of 2016, the period where

8   Garmashov was out of the country.  But Pooley and Parachute

9   Center broadly, from the evidence, were running a similar

10  scheme starting immediately after his suspension.

11          And during his entire suspension, Pooley held himself

12  out as an examiner.  He directly claimed, "We can all do all

13  the USPA stuff.  No problem."  He couldn't do USPA stuff no

14  problem.  He had a big problem.  His rating was suspended.  So

15  these representations are relevant to how he was holding

16  himself out during the period of his suspension.

17          Another example of this one is from Kathy Dause

18  holding him out as an examiner.  She e-mailed students seeking

19  tandem ratings, telling them to reach out to Rob Pooley.  This

20  was a false pretense.  It gave the students the impression he

21  was an examiner who could get them ratings.  Often she forwards

22  them to Pooley or copies Pooley.

23          And Pooley doesn't respond to these e-mails saying,

24  "No, I'm not.  You'll have to go elsewhere."  He does the

25  opposite.  We've got the examples of him setting up courses

1   with students like Fabrisio Palomino.

2          One of the false pretenses that Pooley put on was by

3   conducting courses like he was the examiner.  For Fabian Munoz

4   and Brad North, he did things that examiners are supposed to

5   do.  For Palomino, he just showed up to collect money, do a

6   couple jumps, and handle the USPA/UPT forms.  And you have

7   Pooley on video explaining how he conducted Kwon and Brad

8   North's course.

9          (Media played.)

10         MS. LYDON:  So Pooley states he coordinates courses,

11  assigns evaluators, and performs other functions, which you

12  heard from Jay Stokes are the responsibility of the examiner.

13         By doing these things --

14         THE COURT:  A lot of moving parts out there.

15         MS. LYDON:  I'll step away.

16         THE COURT:  Does anybody here know what the problem

17  is?  There's a feedback on one of the microphones, but I don't

18  know which one.

19         MS. LYDON:  All right.  Thank you.

20         By doing these things, Pooley reinforced the students'

21  impression that he's an examiner.

22         Tandem certification forms, Pooley also provided at

23  least some students with the USPA and UPT ratings certification

24  forms.  We'll talk about these quite a bit with response --

25  concerning specific counts and specific documents, so I won't

1    spend much time on this now.

2         But you've heard evidence that the examiner is the

3    person in charge of guiding the students through these forms,

4    and by carrying out that role, by directing the students to

5    fill in dates and jump information and give the forms back to

6    him so that he could submit them, Pooley further falsely

7    indicated to the students that he was their examiner.

8         So these are the ways that Pooley used false pretenses

9    to defraud his students in addition to the explicit false

10   statements.

11        Let's move on now to the secret that he kept from the

12   skydiving community and, specifically, all of the tandem

13   instructor candidates.

14        So in addition to the ways that we just discussed,

15   Pooley did not -- then he would claim to be and falsely held

16   himself out as an examiner.  Pooley did not disclose to the

17   tandem instructor candidates that his examiner ratings were

18   suspended.

19        And the Judge will instruct you in the wire fraud

20   instruction that omissions of material fact are a little

21   different then false statements and pretenses.

22        To convict based on the material omissions, you need

23   to find that Pooley had a relationship of trust between -- with

24   him and the tandem candidates.

25        Now, realistically, holding himself out as an examiner

1    is the same thing as -- in terms of the behavior that he

2    engaged in is much the same thing as failing to disclose that

3    his ratings were suspended.

4          So it's a bit academic.  But you have ample evidence

5    to convict, either way, because they did have a relationship of

6    trust.  Pooley did have a duty to disclose his suspension

7    because the relationship was a relationship of trust.

8          Pooley's course was the first time any of the students

9    had jumped out of an airplane wearing an unfamiliar tandem rig,

10   very different from the rigs that they had jumped in solo as

11   the parachutist in command.

12         Some of the students' first couple jumps were with

13   Pooley.  It's common sense.  It's hard to imagine a situation

14   where there would be more trust than when you jump out of a

15   plane, strapped to someone's chest or back, and they're in

16   control of the parachute.

17         And by the time the students finished the courses,

18   they needed to know the skills to get themselves and someone

19   else to the ground safe and sound.

20         So as Fabian Munoz -- and this picture is Fabian Munoz

21   doing just that for the first time with a customer in this

22   picture -- in this video still.

23         As Fabrisio Palomino explained, there's a level of

24   trust among skydivers.  It's a small community.  We take care

25   of each other every time we get in an airplane.  And you also

1    see the relationship-of-trust dynamic in play with how two of

2    the victims responded when they saw those forms with

3    Garmashov's signature on them.

4           Brad North asked him about it, and Pooley claims that

5    Yuri was supervising the course, and Brad didn't press him

6    further.  He followed Brad's -- Pooley's instructions to put in

7    the dates on the card.

8           Fabrisio Palomino also saw that the documents Pooley

9    handed to him had looked like they had preprinted signatures on

10   them.  It looked like they were photocopied.  And he didn't

11   ask.  He explained he was rushing to get a train.  And he just

12   saw it was signed.  But Rob Pooley told him he would send it to

13   USPA and UPT.  And Fabrisio Palomino testified he trusted him.

14   As he put it, "The examiner is like your professor.  He takes

15   you from beginning to end."

16          Because of that relationship of trust, Pooley was

17   obligated under the law to tell the students his ratings were

18   suspended, and he didn't, and he hid that from them to keep

19   making money.

20          So you can check off that first element of wire fraud.

21   The defendant knowingly participated in a scheme to obtain

22   money by false or fraudulent pretenses, representations,

23   promises, or omitted facts.

24          The rest of the elements will go much faster.

25          Next, the statements were material.  Let's move to

1    that element.  So the Judge will instruct you that false

2    pretenses and false statements are material if they have a

3    natural tendency to influence or are capable of influencing a

4    person to part with money or property.

5         Pooley's false pretenses that he was an examiner who

6    could get the students ratings, obviously, was capable of and

7    did influence his students to part with money.  Each testifying

8    victim explained that the only reason they paid Pooley to take

9    his course was they believed that he was a USPA and UPT

10   examiner who could give them those USPA and UPT ratings.

11        North, Palomino, and Munoz were each asked, "If you'd

12   known that his ratings were suspended, would you still have

13   taken his course?"  And they all said absolutely not, in sum

14   and substance.

15        These ratings mattered for people like this who wanted

16   to make a living as tandem instructors.  They mattered to the

17   other people, you saw evidence of in the e-mails, the broader

18   tandem instructor class.

19        This group of people wrote in the e-mails referring to

20   tandem rating courses, asked specifically about the

21   availability of an examiner.  And the value of the ratings made

22   a lot of economic sense, as you understand from the testimony

23   of many of the witnesses, including the victims.

24        Now, the folks on this page, testifying victims and

25   Kwon, each had their own particular reasons in their lives that

```
 1   USPA and UPT ratings were an opportunity for them that would

 2   make their life better, that they were willing to pay for.

 3            Fabian Munoz told you that he took the course because

 4   he needed ratings for his career in Chile.  USPA was the

 5   certification accepted at the drop zone where he worked.  And

 6   other drop zones in the area, it would allow him to work there

 7   as well.

 8            Brad North told you that he was a tandem videographer,

 9   and he wanted to become a tandem instructor because it was more

10   dependable work, especially with the advent of GoPros, that it

11   was more steady and it was more highly paid.

12            Fabrisio Palomino wanted to be able to tell the

13   customers at his drop zone that he was UPT-rated.  He explained

14   that it makes you more legit.  And he testified that now he and

15   all of his instructors are USPA- and UPT-rated.

16            And, again, misspoke.  He wanted to tell the customers

17   he was UPT- and USPA-rated.

18            Now, Kwon has passed away, but you heard a recording

19   of Pooley explaining exactly why Kwon wanted to take his

20   course.  He wanted to get that USPA and UPT rating.

21            Let's see what Pooley said.

22            (Media played.)

23            MS. LYDON:  So --

24            (Media played.)

25            THE COURT:  The jury is having a hard time hearing it.
```

1    I don't know if there's anything more you can do.  That's one

2    of the problems we had with the equipment.

3            But if you can probably move that microphone, you

4    should have that closer to the speaker.

5            MS. LYDON:  Should I stand close to it while I'm --

6            THE COURT:  No.  It's that microphone.

7            Isn't that the other microphone, Karen?

8            (Brief pause in proceedings.)

9            THE COURT:  Go back to the beginning of this cut.

10           MS. LYDON:  Yes.  Let's try this again, and let's hear

11   what Pooley said about why Kwon wanted those tandem ratings.

12           (Media played.)

13           MS. LYDON:  All right.  Is that tech workaround

14   succeeding?  Great.  All right.

15           So you can check the materiality element off.

16           Now we'll move to intent to defraud, and this is

17   pretty simple.  The Judge will instruct you --

18           THE COURT:  Okay.  There's -- that other microphone

19   needs to be off.

20           MS. LYDON:  I'm still using this.  Yes, we can turn

21   the other microphone off.

22           THE COURT:  Let's just have it off altogether.  All

23   right?

24           MS. LYDON:  Yes.

25           THE COURT:  Speak.  You're good.  I think you're okay

1    now.

2              MS. LYDON:  Terrific.

3              We'll get there.  Thank you.

4              All right.  The Judge will instruct you that intent to

5    defraud just means intent to deceive and cheat, and there's

6    ample evidence that Pooley intended to do both.

7              He knew he intended to deceive his victims.  He knew

8    he couldn't award certifications because he wasn't an examiner.

9    His change in practice post-suspension, creating documents with

10   Yuri's signature preprinted instead of his own, shows he knew

11   he couldn't award ratings himself, and he also admitted that in

12   the deposition videos and the audio clips, which you'll have

13   with you in the jury room.

14             So when he told victims that he was the examiner and

15   held himself out as one and hid his suspension from them to get

16   their money, he intended to deceive them, and he acted with the

17   intent to cheat them.

18             People signed up for the tandem course thinking they

19   were going to get legitimate, aboveboard USPA and UPT ratings.

20   That's what they were paying for, and Pooley knew he wouldn't

21   and he couldn't deliver those.

22             At best, Pooley knew he could offer a hope and a

23   prayer of getting USPA and UPT ratings if somehow USPA and UPT

24   didn't notice the irregularities with the paperwork when he

25   submitted them.  He knew the fraudulent paperwork he was

1    signing was likely to be discovered and that the skydivers, who

2    paid him over a thousand dollars each, would walk away with no

3    ratings and lost money.

4           And how do you know Pooley was aware that his ratings

5    would be under a cloud and might never result in ratings at

6    all, and certifications would be under a cloud and may never

7    result in ratings at all?  Well, he acquired that knowledge

8    through his prior experience, his prior contacts and

9    disciplinary action by USPA and UPT.

10          Particularly after his suspension and retraining in

11   2014, he knew USPA and UPT had rules, that they investigated

12   violations of those rules and paperwork, specifically

13   diligently, and enforced them.

14          And he knew that when the red flags with paperwork

15   amounted to serious violations, tandem ratings were yanked.

16   Look at his experience in 2014.  This candidate, Ezekiel, got

17   his ratings yanked.

18          This is an e-mail from Tom Nunan saying that Pooley

19   needed to advise Ezekiel, "He is not authorized to perform

20   tandem skydivings" -- "skydives using any equipment

21   manufactured by UPT."

22          Pooley had every reason to believe the tandem

23   candidates that he certified wouldn't get ratings or could lose

24   them when the fraud was discovered.  And that's what happened.

25          Moreover, Pooley knew that USPA stayed in close

1    contact with tandem examiners because he was one.  He knew that

2    that's how they worked and were likely -- that they were likely

3    to know Yuri Garmashov's geographic location.  So he had to

4    know that his plan to sign paperwork using Yuri's signature

5    during a period where Yuri Garmashov was out of the country,

6    and hold all the paperwork till Yuri returned, in the hopes

7    that USPA and UPT wouldn't notice, was unlikely to succeed.

8         Keep in mind, though, that the exact odds of USPA and

9    UPT discovering the fraud, whether he had somehow carried off

10   and some ratings would eventually get issued, really doesn't

11   matter legally because once you conclude that Pooley knew that

12   his candidates were seeking legitimate, aboveboard tandem

13   instructor ratings, and that he knew he couldn't deliver those,

14   you know that he intended to cheat his victims.

15        So that's enough to conclude that Pooley acted with

16   the intent to defraud, and check off that third element.

17        But there's more.  We have Pooley's statements both

18   after the fraud came to light.  He told different things to

19   different people.  He -- to victims, he had apologies and

20   promises of refunds but no actual refunds.  To FAA, Pooley had

21   no answer to the facts.  To USPA and UPT, he basically

22   confessed.  And when the validity of that letter was

23   questioned, he wrote two more letters and got them notarized,

24   and told agents that he'd signed it without anyone forcing him.

25   And in depositions and to agents later, he made a serious of

1    excuses and false statements.

2          So when victims confronted him, he apologized.  He

3    told Fabrisio Palomino, "You have no idea how sorry I am," and

4    said that he was trying for refunds.

5          These apologies make sense to victims.  They knew the

6    deal.  They -- I mean, they didn't know the deal.  They knew

7    what they had agreed with Pooley.  They thought that he was an

8    examiner, and he knew that because he had held himself out to

9    be one to them, so he couldn't gaslight them with the kind of

10   statements that he made in depositions and recorded interviews.

11         He knew he'd scammed them.  E-mails like this one with

12   Palomino are straight-up admissions.  They're true.

13         Refunds, of course, didn't happen.  Fabrisio Palomino

14   paid for his own retraining.

15         His texts with Brad North are likewise revealing.

16   These are in evidence with you.  And I know there's a lot of

17   words on this page, but I think they're really important

18   because they show what Pooley believed and what North believed

19   at the time.

20         North wrote on August 24th, "Ignoring me is not going

21   to make this go away, Rob.  I need a gesture of good faith.

22   You intend on making the situation right by repaying the $1100

23   I paid you to conduct a viable UPT/USPA tandem instructor

24   training course."  "You are responsible for this, because the

25   choices you made to surreptitiously conduct a course while

1    being unsupervised and unqualified to conduct the course on

2    your own."

3            Brad wrote -- or, sorry -- Pooley wrote, "Brad, I'm

4    sorry.  I did not intend to ignore you.  It got late.  I didn't

5    get to return your voicemails.  I do want to give you your

6    refund."

7            Now, Brad North had long since gotten a different

8    phone by the time of trial.  He and Pooley wrote these texts

9    candidly to each other in the moment.  They weren't on a group

10   text or a message board.  They weren't performing for anyone.

11   Brad was expressing exactly how Pooley had scammed him, to

12   Pooley.

13           So it's especially illuminating and credible how

14   precisely Brad articulates what he paid Pooley for and how

15   Pooley defrauded him.  And it's especially revealing that

16   Pooley apologized, owning up to Brad's characterization and

17   acknowledging that he deserved a refund.

18           You know what Pooley didn't do in these

19   communications?  He didn't tell victims they knew the deal.  He

20   didn't tell Fabrisio Palomino -- when Fabrisio said, "I might

21   have to sue you," he didn't say, "You can't sue me.  You knew

22   the whole time that I was suspended."

23           He didn't tell -- he didn't defend himself to Brad

24   North in these texts by saying, "You knew what was going on."

25           And after Fabian Munoz's course when Munoz was asking

1  for his paperwork and warning him he would need to contact USPA

2  and report him, Pooley didn't say, "You can't do that.  You

3  were -- you knew it was a scam.  You were in on it."  He didn't

4  say those things because those things weren't true.

5          Now, on August 12, 2016, FAA inspector David Jensen

6  went to the Parachute Center and talked with Pooley and

7  confronted him with two facts; the fact of his USPA suspension,

8  first.  Pooley -- David Jensen testified that Pooley had no

9  answer to that except to state that Bill Dause handled all the

10 paperwork.

11         Pooley also had no answer when Jensen confronted him

12 with the fact that Garmashov's signature was on Kwon's USPA and

13 UPT certifications while Garmashov was abroad.  Didn't tell him

14 anything about supervising the course.

15         And Pooley signed the letter to USPA, explaining what

16 he did.  He trained students without Yuri knowing, and he held

17 the paperwork, hoping it would somehow work out.

18         You saw this letter.  It's in evidence, the

19 Government's 1100.  And Pooley told agents years later he

20 wasn't forced to sign this letter.

21         (Media played.)

22         MS. LYDON:  All right.  You have -- okay.

23         And now we get to the lies.  In depositions and to

24 agents, Pooley made a series of false statements.  And making

25 false statements bears on your intent, because people who don't

1    intend to defraud don't need to lie about it.

2         For example, in depositions and to agents, Pooley

3    claimed he sent all the documents to Yuri.

4         (Media played.)

5         MS. LYDON:  All right.  Now, you heard Special Agent

6    Lee testify that he got a search warrant.  He looked for those

7    documents.  There's no evidence Pooley sent those documents to

8    Yuri.

9         Pooley falsely claimed to agents that he was not

10   suspended by UPT, the manufacturer, and, of course, he was.  We

11   just looked at that a few minutes ago.

12        (Media played.)

13        MS. LYDON:  He said, "The UPT stuff would have been

14   fine for him to sign with his own signature."

15        (Media played.)

16        MS. LYDON:  There are more false statements and

17   contradictions in those audio clips.  We're not going to go

18   through them all.  He claims he personally verified Kwon had

19   licenses that Kwon didn't have.  He claimed the examiner didn't

20   need to be at the drop zone.  He knew that wasn't true.

21        And, basically, his intent to deceive and cheat is

22   revealed by his initial admissions followed by his lies.  So

23   Pooley acted with the intent to deceive and cheat those tandem

24   instructor candidates.  You can check that element off.

25        Moving on to the wires.  Now, what the Judge says

1    controls, but a quick legal point:  A wiring is any electronic

2    signal sent from one state or country to another.  E-mail,

3    obviously, qualifies.  Here, all the wire fraud counts are

4    e-mails.

5         The -- it has to be to carry out or attempt to carry

6    out an essential part of the scheme.  It doesn't need to itself

7    contain false statements.  The defendant doesn't need to be the

8    one to send it.  It just has to be reasonably foreseeable to

9    the defendant that some wire communication would occur in

10   furtherance of the scheme.

11        And one more -- as I said at the beginning, the

12   overall -- they are in service of the overall scheme to

13   defraud.  So, basically, these are just -- each charged e-mail

14   is just an instance in which Pooley used e-mail to carry out

15   that bigger scheme.  Basically, these are examples.

16        So let's look at Count 1.  It's that June 28th -- -his

17   bottom e-mail, the June 28, 2016, e-mail from Fabrisio Palomino

18   to Parachute Center.  And communications like this one where

19   skydivers like Palomino e-mailed Parachute Center, seeking

20   tandem ratings from an examiner, were e-mails carrying out an

21   essential part of the scheme.

22        They're putting the tan- -- the paying customer, the

23   skydiving instructor -- want-to-be skydiving instructor in

24   touch with Parachute Center, who would, like Kathy Dause did in

25   this e-mail, forward the e-mail on to Pooley.  That outreach

 1   e-mail was essential.

 2        It was also reasonably foreseeable of Pooley that

 3   e-mails like this one would be sent.  He received

 4   communications like this, and Parachute Center received

 5   communications like this all the time, bearing evidence --

 6   there are a bunch in the 700 series.  They'll be in the exhibit

 7   room with you.

 8        And Fabrisio Palomino testified that he sent this

 9   e-mail from Ensenada, Mexico to Parachute Center in California.

10   So it's a foreign wire.

11        Count 2, this is the June 29, 2016, e-mail from

12   Palomino to Parachute -- to -- oh, I'm sorry.  This is from Rob

13   Pooley to Palomino, explaining the details of the tandem course

14   in his -- providing this information was necessary to an

15   essential part of the scheme of getting tandem candidates like

16   Fabrisio Palomino to sign up for the course.

17        Pooley explained to Special Agent Lee in this

18   interview clip that this e-mail was very typical of how he

19   advertised and communicated with the students.  Those are

20   essential objectives of the scheme to defraud.

21        (Media played.)

22        MS. LYDON:  You hear that?

23        THE COURT:  Not really.

24        MS. LYDON:  All right.

25        THE COURT:  We can hear it.  I just don't think it's

 1   very clear.

 2          MS. LYDON:  Fair enough.  All right.

 3          Well, it's -- your recollection of the evidence

 4   controls, and you have the recordings.

 5          But Pooley explained to Special Agent Lee, this e-mail

 6   was very typical of how he advertised and communicated with the

 7   students.  That's the relevance, the relevant part.  All right.

 8          Count 3, this one is from Fabrisio Palomino on the 4th

 9   of July of 2016, departing Mexico to Lodi, e-mailing Pooley to

10   get a question answered about his FAA medical.  These sorts of

11   precourse communications are necessary and foreseeable in the

12   scheme.  To quote Pooley's e-mail in Count -- in e-mails that

13   you've seen elsewhere, you must have your airman's medical done

14   before we can start the training.

15          So it's reasonably foreseeable to Pooley that he's

16   going to get questions about that requirement from tandem

17   candidates headed to Lodi to take his course, to pay him money.

18   And it was a foreign wire.  Fabrisio Palomino testified that he

19   sent this e-mail while he was in his car, waiting to get to the

20   parking area, basically, to cross the border on the Mexican

21   side.

22          Finally, Count 4, this wire -- this e-mail from Rob

23   Pooley sending Lachlan Mackay's tandem ratings course

24   proficiency card to the USPA and Lachlan Mackay served an

25   essential part of the scheme.  E-mailing USPA documents in, and

 1    copying the tandem candidate served a function.  It made the

 2    tandem candidate think that things were moving along, and they

 3    would soon have ratings.

 4            This kept the broader scheme going, too, because the

 5    tandem candidates would not raise the alarm, would not tell

 6    their friends, their drop zone, their broader skydiving network

 7    that Rob Pooley's classes didn't result in ratings and didn't

 8    result in paperwork.

 9            We'll talk about this in connection with this e-mail

10    quite a bit further in the presentation in the aggravated

11    identity theft count.

12            But it's important that Pooley's scheme was a rolling

13    one.  It wasn't just one-offs.  It was course after course

14    after course, student after student after student, and steps

15    like this that convinced students that things were moving

16    along, and even took a swing at moving things along, were an

17    essential part of keeping that fraud, that scheme going.

18            And it went interstate to Susan Sullivan at USPA in

19    Virginia.  Ron Bell testified that he went down to their

20    records desk and found -- or their records room and found it in

21    a dungeon.

22            So you can check off that last element of wire fraud

23    and find the defendant guilty of the first four counts.

24            Now we'll turn to the aggravated identity theft

25    counts.  To prove aggravated identity theft, the Government

1    must prove the following elements -- and, again, these are

2    simplified.  Go with the instructions that the Judge will give

3    you.  But I'm going to describe them in a simple way so that we

4    can understand what they're getting at.

5            First, the defendant used, without legal authority, a

6    means of identification of another person.  Second, the

7    defendant knew it was a real person, that the means of

8    identification belonged to someone who's a real, live human.

9    And, third, the defendant used the means of identification

10   during and in relation to the crime of wire fraud charged in

11   the indictment -- the scheme charged in the indictment.

12           Basically, these counts are for using Garmashov's

13   signature to commit that wire fraud that we just talked about,

14   that scheme.  Aspects of the first and third element relate to

15   how it was used to commit wire fraud, so I'm going to talk

16   about those as a chunk with respect to the third element.

17           And I'm referring to the use without legal authority.

18   We're going to get to that with the third element and discuss

19   it together.

20           So quick legal points relevant to the first element.

21   The means of identification here is a signature.  The signature

22   doesn't have to be stolen or used without consent.  Of course,

23   this doesn't matter so much for our case because there's just

24   no evidence of consent by Yuri over the summer of 2016.

25           According to Pooley in his signed letters, and

1   Garmashov's testimony, Garmashov did allow Pooley to put his

2   name and signature on paperwork earlier in the year when he was

3   at the drop zone, but he did not give permission to do it while

4   he was abroad.

5        So this legal point is not very implied here.  It

6   doesn't need to be.  And, here, the defendant used Garmashov's

7   signature, which you can see on his driver's license, on the

8   USPA and UPT forms, assuring them that they had been certified.

9        Here's how he used them with respect to specific

10   counts.  He used the signature in Count 5 by giving Kwon the

11   paperwork covered in Garmashov's signature, which Garmashov

12   then used to train, and we'll talk about how that was in

13   furtherance of the scheme further for Element 3.

14        And Pooley used his signature when he sent this e-mail

15   from his e-mail address, parachutecentervideodesk@gmail.com, to

16   USPA and Lachlan Mackay.  You know

17   parachutecentervideodesk@gmail.com belonged to Pooley due to

18   the attribution evidence that came in at trial, including

19   this -- the name on the account is Rob Pooley, the two-factor

20   authentication.  The password change went to Pooley's e-mail.

21   We know he sent e-mails from it.

22        So you can check that first element off.

23        And the second element that Pooley knew the means of

24   identification belonged to a real person is uncontested.

25   Garmashov is a real person.  You met him yesterday.  Pooley

1    knew him.

2            So beyond that, not only did Pooley know that

3    Garmashov was a real person, he knew he was a person with just

4    the credentials that Pooley needed to keep making money,

5    despite his suspension.

6            He went to him -- he got that rolling right away.

7    Look at the timing.  Tom Nunan from UPT, the manufacturer,

8    e-mailed Pooley August 11th -- or, I'm sorry -- August 18,

9    2015, and referred to a conversation last night, and sent the

10   suspension e-mail.

11           What was Rob Pooley doing last night relevant to this

12   e-mail.  The night of August 17, 2015, Pooley started sending a

13   series of e-mails to himself.

14           Government Exhibit 908 is on the screen.  Pooley

15   e-mailed himself Yuri's signature, and then in the next couple

16   hours, Pooley e-mails himself two more images of Garmashov's

17   and Pooley's own signatures and initials.  The documents found

18   in his locker show Pooley immediately started using these

19   doctored signatures for the next class of candidates.

20           So Pooley knew Yuri was a real person, and he knew he

21   could use that real person to keep the money flowing in.

22           You can check off that second element.

23           And, third, he used the signatures during and in

24   relation to the crime of wire fraud.

25           Quick legal point.  The uses of the signatures for the

1    aggravated identity theft counts, Counts 5 and 6, need to be in

2    furtherance of the overall wire fraud scheme charged in the

3    indictment.  They don't need to be tied to any particular

4    wiring or any particular victim.  It's the scheme.

5          So, here, the defendant's scheme to defraud involved a

6    rolling series of classes, and Pooley needed to deliver

7    signatures to keep those classes going.

8          You'll recall Pooley ran some organized classes of --

9    of a group of people, like the two classes that Fabian Munoz,

10   Brad North, Kwon attended.  He also had one-offs like Fabrisio

11   Palomino.  Pooley wrote in those copy/paste e-mails to

12   interested tandem candidates that "You can show up whenever you

13   want."  And by filling out the paperwork with Garmashov's

14   signatures, and in Count 6, of sending it to USPA, Pooley was

15   attempting to keep his students happy or at least placated, and

16   avoid word from getting out in the small skydiving community

17   that those -- his classes didn't work.  That served the

18   function of keeping those classes filled and keeping the money

19   coming in.

20         So for both Counts 5 and 6, you can infer from the

21   circumstances and what Pooley did that the uses of the

22   signature functioned to lull those particular victims, to

23   convince them everything was okay and, also, more broadly, to

24   further the scheme and prevent detection.

25         Now, how exactly does the signature have to be used

1   there for purposes of wire fraud?  You'll get a jury

2   instruction on this.  It explains the signature must be used in

3   a manner that is fraudulent or deceptive to tandem instructor

4   candidates, and at the crux of what makes the conduct criminal.

5          Basically, in plain English, use of the signature has

6   to be important to the scheme to defraud.  It can't be

7   irrelevant, ancillary, to the side.  It has to be kind of --

8   part of it has to matter who the signature belonged to, who it

9   was, what -- it had to matter what it signified.

10          And, here, Garmashov's signature was the crux of the

11   fraud because he was a certified examiner and Pooley wasn't.

12   That was the whole scam.  The victims knew that they needed

13   signed documents by an examiner, a certified currently rated

14   one, to get their ratings.

15          (Media played.)

16          MS. LYDON:  And Pooley knew that he needed the

17   signature of a real examiner to pull that off.

18          Now, let's talk about how he used that signature in

19   each particular count.  All right.

20          So Count 5, he provided Kwon fraudulent certification

21   cards.  He acted during and in relation to his wire fraud

22   scheme when he did so, when he did those -- provided those

23   cards bearing Garmashov's signature.

24          He intended to have this be a picture of the cards.

25   But you've seen the picture of those cards.  You know exactly

1    what they look like.  They have a date on them, July 1st.

2    That's the date that Garmashov was out of the country.  And

3    Pooley handed Kwon those cards, you can infer.

4         Kwon signed it himself in Korean.  Pooley admitted

5    that he trained Kwon.  And when Kwon received that filled-out

6    paperwork, purportedly containing an examiner signature, he

7    thought, you can infer, he got what he paid for.  And

8    accordingly, he started jumping as a tandem instructor.  You

9    can infer that Pooley believed that Kwon believed those

10   representations, based on his actions.  Fabrisio Palomino and

11   Pete Swan both testified that they saw Kwon jumping with

12   customers.

13        Compare this, Kwon jumping, thinking he's certified,

14   and not raising an alarm and not doing anything that would

15   disrupt Pooley's ongoing scheme, to the reactions of skydivers

16   when Pooley didn't deliver signed paperwork, specifically

17   Fabian Munoz.

18        So Fabian Munoz saw that other people in his class had

19   received paperwork with someone else's signature on it.  And he

20   went to Pooley and said, "I need the paperwork, and I need you

21   to sign it."  And he didn't get it.  And he testified he asked

22   Pooley every day, in his words, morning, afternoon, and night,

23   for a week before he left to go back to his country.

24        He testified that he told the defendant, "Before

25   returning to my country, I have to have these documents.  If I

1    fail to get them, I failed to achieve my objective of coming to

2    Lodi to take the tandem instructor courses."

3            And Fabian Munoz eventually told Pooley, "If you don't

4    give me the document, I'll have to report you to USPA."  Pooley

5    said, "No, no.  Don't do that.  Everything is all right.  I'll

6    give you your documents."  While Fabian was in Chile, he sent

7    Pooley messages to Facebook asking for them again.  Pooley

8    didn't respond.

9            So keeping his victims satisfied functioned to keep

10   them happy, made them think they got their ratings, and enabled

11   Pooley to continue his overall scheme.

12           Count 6, by sending this e-mail and the attachment

13   with the signatures to USPA and Mackay, again, it served to

14   keep the scheme rolling.  The pressure -- this is August 2nd.

15   The pressure to send in the forms was real -- oh, this was

16   August 1st -- was real at this stage in the defendant's scheme.

17           The evidence indicates Pooley hadn't been able to send

18   in the forms all summer because Garmashov was abroad and USPA

19   knew it, and candidates were getting impatient.  You saw that

20   from the text messages from Brad North and to Palomino's

21   testimony.

22           32-R is -- are the texts with Brad North in which he

23   repeatedly texted the defendant, asking, "Hey, have you sent it

24   in yet?"  "Where's this paperwork?"  "Has it gone out?"

25           Fabrisio Palomino e-mailed the defendant to mail it to

1   him so that he could send it in himself when the defendant

2   didn't send it in for weeks.

3          All three of the testifying victims explained they

4   were extremely focused on getting their paperwork to USPA, and

5   you can infer that the rest of the tandem instructor candidates

6   were no different.

7          So if Pooley never e-mailed the forms, he would

8   eventually be reported.  He was on the clock.

9          So the night before Yuri was supposed to return to the

10  United States, Pooley sent this e-mail in Count 6.  This one

11  seems to have been an attempt to get Mr. Mackay a rating.

12         He attached the tandem paperwork with Garmashov's

13  signature.  He signed his e-mail "Yuri."  It furthered the

14  ongoing scheme in an important way.  It lulled the candidate.

15  It attempted to get him a rating.  And by sending it, Pooley

16  attempted to prevent the scheme's detection; a critical

17  function of this e-mail.

18         And the signature mattered.  It mattered who it was.

19  It had to be Garmashov's signature.  It couldn't be Pooley's.

20  It couldn't be somebody who wasn't an examiner.

21         Jim Crouch testified that Susan Sullivan had gotten to

22  know individual examiner's signatures.  She could detect

23  forgeries.  USPA checked signatures, along with the names

24  accompanying them.

25         USPA, obviously, wouldn't have issued a rating if

1    Pooley had sent it using his own signature, and the whole

2    scheme would have blown up in his face.

3           So you can check off that last element of the

4    aggravated identity theft counts and convict Pooley.

5           So that's the evidence.  The standard you will apply

6    is beyond a reasonable doubt.  That means proof that leaves you

7    firmly convinced.  The Government always bears the burden of

8    proof.  We welcome that standard, and to meet it, we've

9    presented evidence that satisfies every element of every

10   charged offense.  We -- as well as context, evidence of context

11   to understand this defendant's scheme and his intent.

12          We sincerely appreciate your attention and your focus

13   and your service during this trial while we did that.

14          A few quick things on that standard.  It's not proof

15   beyond all doubt.  The doubt must be reasonable.  This is not

16   an exercise in unreasonable debate.  A reasonable doubt --

17   you'll get an instruction on this -- is a doubt based on reason

18   and common sense, not based on pure speculation.

19          You don't throw common sense out during this process.

20   Use it the way you would in your everyday life.

21          Does it make sense, the idea that the victims were

22   defrauded but were -- that were -- that victims were not

23   defrauded but were actually somehow in on the scheme?  Does it

24   make sense that they traveled thousands of miles, across

25   borders in some instances, to get certified by a suspended

1    examiner using a fraudulent signature?

2          Does it make sense that Pooley could have held himself

3    out as an examiner and kept the fact of his suspension from the

4    victims without intending to cheat them?

5          You don't leave your common sense at the door when you

6    go into that jury room, so use it.

7          Once you do, I ask that you return the only verdict

8    consistent with the law and the evidence in this case, and

9    that's guilty on all counts.

10          Thank you.

11          (Government's closing arguments concluded at

12          10:20 a.m.)

13                              -oOo-

14                    **C E R T I F I C A T E**

15          I, Abigail R. Torres, certify that I am a duly
      qualified and acting Official Court Reporter for the United
16    States District Court; that the foregoing is a true and
      accurate transcript of the proceedings as taken by me in the
17    above-entitled matter on May 23, 2024, and that the format used
      complies with the rules and requirements of the United States
18    Judicial Conference.
                                Dated:  May 29, 2024
19                              /s/ Abigail R. Torres

20                              _____
                                Abigail R. Torres, RPR/RMR, FCRR
                                CSR No. 13700
21                              U.S. Official District Court Reporter

22

23

24

25