1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
2                          --oOo--

3 UNITED STATES OF AMERICA,   ) Case No. 2:21-CR-00111-WBS
                           )
4                            ) Sacramento, California
                Plaintiff,   ) May 21, 2024, 1:31 p.m.
5             v.              )
                           )
6 ROBERT ALLEN POOLEY,      ) Re: Trial Day 5,
                           )     Afternoon Proceedings
7               Defendant.   )

8

9                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE WILLIAM B. SHUBB
           SENIOR UNITED STATES DISTRICT JUDGE
10

11 APPEARANCES:

12 For the Government:     U.S. DEPARTMENT OF JUSTICE by
                             MS. KATHERINE THERESA LYDON
                             ASSISTANT U.S. ATTORNEY
13                             MR. DRUV SHARMA,
                             ASSISTANT U.S. ATTORNEY
14                             501 I Street, Suite 10-100
                            Sacramento, 95814
15

16 For the Defendant:      OFFICE OF FEDERAL PUBLIC DEFENDER by
                             MS. MIA CRAGER
                             MS. MEGHAN McLOUGHLIN
17                             801 I Street, Third Floor
                            Sacramento, California   95814
18

19                MARYANN VALENOTI, RMR, CRR
                 Official Court Reporter
20                501 I Street, Suite 4-200
                 Sacramento, CA 95814
21               mvalenotiRMRCRR@gmail.com
                  (916)930-4275

22 Proceedings reported via mechanical steno - transcript produced
via computer-aided transcription
23

24

25

1                    I N D E X

2    WITNESSES                                      PAGE

3    RASMUS OCTAVIUS JAMES
          Direct Ms. McLoughlin  ..................... 26
4
     YURIY GARMASHOV
5         Direct Ms. Crager ......................... 35

6    DEFENSE EXHIBITS
          No. 2189 ................................. 30
7         No. 2190 ................................. 34
          No. 2132 Pages 8 and 9 ................... 46
8         No. 2044 ................................. 57
          No. 2046 ................................. 62
9         No. 2132 Page 1 .......................... 68
          No. 2133 ................................. 70
10        No. 2060 ................................. 73
          No. 2068 ................................. 102
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA, TUESDAY, MAY 21, 2024

2                              --o0o--

3          (In open court in the presence of the jury.)

4              THE COURT:  All right.  The jurors are all present.

5     Defendant is present with counsel.  You may call your next

6     witness.

7              MS. LYDON:  The government rests its case, Your Honor.

8              THE COURT:  The government rests.

9          All right.  Ms. Crager, how do you wish to proceed?

10             MS. CRAGER:  Your Honor, at this time we have motions.

11             THE COURT:  All right.  Well, how long do you think it

12    will take?

13             MS. CRAGER:  Maybe a half hour.

14             THE COURT:  All right.  Ladies and gentlemen,

15    sometimes you see me get a little upset when lawyers delay

16    matters and it takes up your time.  This is not quite the same

17    because this is actually saving you time.  The lawyers had

18    previously estimated 11 days for trial.  Obviously, for

19    whatever reason, they've been able to present it in much less

20    time, so we are going to use this time to your advantage.

21    There are some things that we have to go over before the matter

22    is finally presented to you anyway, so I'm going to use that

23    time.  She says a half hour; I'm going to accept that.

24             It's a little windy out there, I was going to say take

25    a walk, I couldn't even get out there this afternoon.  I hope

1     the wind goes down soon.

2           Anyway, remember the admonition.  We'll try to get

3     this done quickly, and we're now getting closer to the end of

4     the trial than we thought we were.

5           All right.  One half hour.

6         (In open court outside the presence of the jury.)

7           THE COURT:  All right.  The jurors are outside the

8     courtroom.

9           I assume you have a Rule 29 motion, if that's what you

10    want to talk about, but in the process of doing that, I think

11    we're going to be talking about how to instruct the jury.  So,

12    I want to discuss jury instructions at the same time.

13          You may proceed, Ms. Crager.

14          MS. CRAGER:  Thank you, Your Honor.  I have three

15    bases for a Rule 29 motion, and then Ms. McLoughlin will

16    present a motion as well.

17          My first basis for the Rule 29 motion is as to Counts

18    4 and 6.  Those counts relate to Lachlan, Morgan, MacKay.

19    There has not been evidence presented sufficient to show that

20    he was part of any scheme to defraud.

21          THE COURT:  All right.  Let me ask the government,

22    what is the evidence on MacKay?

23          MS. LYDON:  The evidence has shown an overall scheme

24    to defraud all tandem instructor candidates trained during the

25    period where Mr. Garmashov was out of the country, and Pooley

1   was training them without any certification without disclosing

2   that to them.  Mr. MacKay was trained during that period,

3   that's shown through Government Exhibit 4, which is his -- I'm

4   sorry, his UPT and USPA ratings.

5        So, we also have evidence presented from all of the

6   three victims who testified uncontroverted that no one -- that

7   Rob Pooley never told them that his ratings were suspended.

8   There's no reason to believe that any tandem candidate would

9   have attended or that anyone knew that his ratings were

10  suspended.  So, Mr. MacKay was part of the overall class of

11  defrauded tandem instructor candidates.

12       The wiring sending in Count 4, sending his information

13  to USPA, was in furtherance of the scheme to defraud.  The

14  defendant presented these USPA documents to candidates, and it

15  appears that the wiring to USPA was an actual attempt to try to

16  hoodwink USPA into issuing a rating which would have continued

17  the scheme.

18       A lulling wiring, which -- lulling was one of the

19  functions served by e-mailing it to USPA and copying Lachlan,

20  MacKay and --

21            THE COURT:  Hold on a second.  Would you go to my

22  office and get the indictment that's on my desk?

23            Go ahead.

24            MS. LYDON:  Lulling wirings are in furtherance of a

25  scheme to defraud.  Here we have evidence from the tandem

1  instructor candidates that they were asking about their

2  ratings, that they wanted them sent in.

3          THE COURT:  But not MacKay.

4          MS. LYDON:  Correct, Your Honor, he's part of the

5  overall class of defrauded candidates, and it's just one

6  example wiring.

7          THE COURT:  Well, hold on just a second.  I'm going to

8  get the indictment.

9          MS. LYDON:  Two of the particularly relevant

10 paragraphs for discussion are Paragraphs 36 and 37.  Other

11 paragraphs are relevant as well.

12         THE COURT:  I have a fundamental question you both

13 could probably answer for me.  1343, as well as the mail fraud

14 statute, talk about whoever having devised a scheme or artifice

15 to defraud, causes the wires to be used in interstate commerce,

16 that causes the mail to be used.

17         It's not clear to me -- I know it's clear to you, so

18 you could straighten this out -- is the crime devising the

19 scheme and then causing the mail to be used, or is the crime

20 causing the mail to be used in furtherance of the scheme?  Now,

21 that's what sounds like simply a language question, but it's a

22 question that I have.

23         If you had the scheme to defraud and you sent out a

24 thousand e-mails, which these days can happen easily, I mean,

25 the people that send me e-mails in furtherance of their schemes

1  to defraud have undoubtedly sent out thousands of them.  Do you

2  commit a thousand violations of Section 1343, or do you just

3  commit one violation of 1343 because it is one scheme and

4  you've caused the mails or the wires to be used in furtherance

5  of it?  What is the correct way to look at this?

6          MS. CRAGER:  My understanding is that each wire could

7  be charged as a separate count.

8          THE COURT:  All right.  So, in my hypothetical, which

9  is not just a hypothetical, it happens everyday to all of us,

10  right?  There's a scheme to defraud, and you get an e-mail in

11  furtherance of that scheme, the person that sent you that

12  e-mail has committed thousands of separate felonies, right?

13          MS. CRAGER:  Yes, Your Honor, they could be charged

14  that way.

15          THE COURT:  Then that's the way it goes.  If just the

16  government had said that, I would have asked you if you agree,

17  but that's -- it's not -- it's not reasonable, but a lot of it

18  we deal with these days from the legislature is not.

19          MS. LYDON:  Could I add a little gloss to that?  I

20  think this is what Your Honor was saying, but I want to make

21  sure we're on the same page.  I agree with Ms. Crager that the

22  unit of prosecution for each count is the individual wire, but

23  the scheme to defraud can be much broader than the victim of

24  the individual wire.  There could be an overall -- virtually in

25  every wire fraud case there is an overall scheme to defraud.

1           THE COURT:  Yes.

2           MS. LYDON:  Excellent.

3           THE COURT:  That was my point.  In the hypothetical I

4    gave you there is an overall scheme to defraud.

5           MS. LYDON:  Yes.

6           THE COURT:  Okay.  So, MacKay is correctly pled as a

7    separate crime, which means now you have to have all the

8    elements with regard to that crime.  You've got the scheme to

9    defraud.

10          Now, if a communication regarding MacKay is in

11   furtherance of that scheme, he doesn't even have to know about

12   it.  He doesn't have to know he's a victim.  He doesn't have to

13   have intended to do anything.  There's the scheme to defraud,

14   which may be the scheme to defraud somebody besides MacKay.  It

15   could be the scheme to defraud -- I can't remember the name

16   anyway, one of the other victims, and if this is in furtherance

17   of that scheme, then it's a crime, right?

18          MS. CRAGER:  It has to be to carry out or attempt to

19   carry out an essential part of the scheme.  So in theory, yes,

20   if it's to carry out part of the scheme against somebody else,

21   then that could qualify.  The e-mail that was sent here, it was

22   not sent to anybody else, it was sent to Mr. MacKay, and it was

23   sent to the USPA.

24          THE COURT:  Well, but in my hypothetical the e-mail is

25   only sent to me.  It's a different e-mail.  It's got my name on

1    it, or my address on it, so that makes it different than all

2    the other e-mails, even though they only had to push one button

3    to do it, that's because they have been clever enough to set up

4    their computers to do that, but that's why I'm having trouble

5    with this.

6            It's one scheme, as the government points out, as you

7    agree, and it doesn't even have to be directed at a victim.  It

8    could be something else in furtherance of the scheme.  It could

9    be an e-mail to the bank saying, I want to set up an account so

10   that I could deposit all the fruits of my criminal activity,

11   and that would be a violation.

12           Now, it doesn't have to be directed at a victim.  It

13   could be directed -- there could be a dozen e-mails that go out

14   to banks saying, I want to set up an account in each one of

15   your banks so that I could store all this money and launder it

16   and do whatever I do, but you're not the victim.  The bank's

17   not the victim.  The victims are the people that I'm

18   defrauding.  So, that's the slippery slope we've walked down

19   when we say each separate wire communication in furtherance of

20   the scheme is a separate crime.

21           MS. CRAGER:  Yes, Your Honor.  Our contention is that

22   the government just said that this e-mail shows that they were

23   trying to hoodwink the USPA.  Our point is we believe

24   Mr. MacKay was also involved in that.

25           THE COURT:  She told me at sidebar a long time ago

1    that they can't go on that theory.

2         MS. CRAGER:  Right.

3         THE COURT:  It's not because it's not a viable theory

4    it's because it's not the scheme that's alleged in the

5    indictment.

6         MS. CRAGER:  Right.  So the wire here was about

7    hoodwinking the USPA.

8         THE COURT:  Why?

9         MS. CRAGER:  That's what she represented, that the

10   wire here was sent to the USPA attempting to hoodwink them.

11        THE COURT:  What count are we talking about, then?

12        MS. CRAGER:  Count 4, Your Honor.

13        THE COURT:  All right.  Hold on.  E-mail from Robert

14   Pooley to a USPA representative, who's Victim Number 7?

15        MS. CRAGER:  MacKay.

16        THE COURT:  And MacKay attaching a USPA tandem

17   instructor rating.  So what exhibit number is that?

18        MS. CRAGER:  I believe it's Number 4, Your Honor.

19        THE COURT:  Exhibit 4.  So, it's not trying to

20   hoodwink the USPA, it's just trying to further their scheme to

21   hoodwink customers.

22        MS. CRAGER:  Right, my point about MacKay is that

23   there was no testimony about anything that was represented to

24   MacKay.  No one even testified he --

25        THE COURT:  There doesn't have to be, that's the

1    point.  This is a terrible thing for the defense because it can

2    result in hundreds of charges.  Fortunately for defendants, it

3    reaches a point where the Court can't impose them consecutively

4    under the guidelines, but there doesn't have to be any

5    testimony about MacKay.  If this was in furtherance of their

6    scheme to hoodwink or to defraud their customers in general,

7    then they've met all the elements of the charge.

8          MS. CRAGER:  Well, I don't see the explanation for how

9    this e-mail was in furtherance of the whole scheme versus just

10    about Mr. MacKay.

11          THE COURT:  Well, because the scheme has is umpteen

12    victims, so no e-mail is going to be in furtherance of

13    defrauding all the victims, but you defraud them one at a time.

14          MS. CRAGER:  Well, the point is that there's no

15    evidence that he himself was defrauded.  This is the only

16    paperwork that was sent to USPA.  I think he is different than

17    these other people, especially these people who testified.

18    There's no evidence that he was defrauded by Mr. Pooley.

19    There's no evidence that he was in any of the classes that the

20    other alleged victims talked about.  There's no evidence of any

21    representations made to him by Mr. Pooley or anyone else, for

22    that matter.  We have no idea what he was told.

23          THE COURT:  Believe me, I do understand what you are

24    saying.  That's your first count.

25          What about Count 6?

1          MS. CRAGER:  Count 6 is in regards to the same e-mail.

2          THE COURT:  In connection with the aggravated identity

3     theft.

4          MS. CRAGER:  Yes, Your Honor, and it's on the

5     paperwork, the same paperwork for Mr. MacKay.

6          THE COURT:  So, this is a simpler argument now.  Let's

7     take a look at it.  What's your argument here?

8          MS. CRAGER:  I have two bases for the argument:  The

9     first is what we covered already, that Mr. MacKay was not part

10    of the scheme to defraud, so there's no predicate fraud offense

11    to base this identity theft count on.

12         Separately, as to both aggravated identity theft

13    counts, after the *Dubin* case, the government must show that

14    Mr. Garmashov's signature played a central role on the fraud on

15    the students.

16         There's not been a showing that the signature played

17    any kind of central role on the fraud on the students.  There

18    has also not been a showing that a signature was used during

19    and in relation to the fraud.  One of the alleged victims said

20    that Mr. Pooley never presented the signature to him.  So I

21    don't understand how the signature could be central to the

22    fraud on the students if an alleged victim is saying, He never

23    showed that to me.

24         The government -- you know, the defense's position in

25    cross-examining the witnesses has been that the paperwork is

1   what had the truth on it in black and white.  The truth was

2   that Mr. Pooley was not the examiner, and so his name was not

3   on the paperwork as the examiner.

4        The truth was that another person was signing off on

5   the paperwork, and that person was the examiner, and that

6   person's name was Yuri Garmashov.  The candidates were not

7   deceived about who Mr. Pooley was or who Mr. Garmashov was.

8   Mr. Pooley didn't come and say, "Hi, candidates.  My name is

9   Mr. Garmashov, and this is my signature and I'm an examiner."

10       THE COURT:  Okay, I see your point.  Now, if *Dubin*

11  stands for one thing, it's what was just argued here, that it

12  has to be central.  So, how is this signature of Yuri on this

13  document with regard to Mr. MacKay central to the scheme if the

14  victim never even saw it, didn't even know anything about it?

15       MS. LYDON:  Absolutely, Your Honor.  I want to address

16  both sub arguments that Ms. Crager just articulated going to

17  the same point.

18       So, we agree that under *Dubin* the signature needs to

19  be at the crux of the fraud scheme, and here it is.  The

20  victims all testified that they knew going in that an examiner,

21  a certified, rated, USPA and UPT examiner needed to sign that

22  paperwork, and they were very focused on that signed paperwork.

23       THE COURT:  But not MacKay.

24       MS. LYDON:  Well, this is the overall fraud scheme

25  again, Your Honor, so it goes back to that same point.

1          THE COURT:  I'm more concerned with this crux argument

2     in *Dubin*.

3          MS. LYDON:  Exactly, that's what I'm addressing.  The

4     signature is at the crux of the fraud scheme because the

5     signatures were so central to the students.

6          THE COURT:  Don't pluralize it.  You said the

7     "signatures were so central."  I'll buy that, but not in the

8     case of MacKay; he had nothing to do with it because he never

9     even saw it.  He was never even told that it was on there.

10          MS. LYDON:  Well, he received the e-mail in Count 4

11     with those signatures on it and Count 6.

12          THE COURT:  Count 6.

13          MS. LYDON:  Exactly, yes.  The aggravated identity

14     theft count.

15          THE COURT:  So you're saying he received it?

16          MS. LYDON:  Yes, and that signature, those signatures

17     received the properly filled out paperwork, or supposedly,

18     apparently properly filled out paperwork with the signature of

19     a certified examiner served to keep the scheme going in two

20     ways:  When students saw properly filled out paperwork, they

21     were lulled into thinking things were moving along.

22          THE COURT:  Not MacKay.  I'm going to deny the motion,

23     but you are going to have to defend it on appeal because they

24     are good arguments to be made that I'm sure will be made on

25     appeal if the defendant should lose on this count.  It's not

1  going to change anything insofar as I could tell with regard to

2  the other counts.  Although a good argument could be made that

3  if Counts 4 and 6 weren't there, they might have reached

4  another result on the other counts, so you may lose on

5  everything.

6           I don't know how many cases you had go up on appeal,

7  but, you know, you can never predict what's going to happen,

8  and one of the things you don't want to have happen is to try

9  the case again.  If you took Counts 4 and 6 out of this, you

10  wouldn't have to even address this argument on appeal, but now

11  you will.  Okay?

12           MS. LYDON:  Okay.

13           THE COURT:  So what's your next motion?

14           MS. CRAGER:  Your Honor, similar to that, our argument

15  was that it was not during the fraud.  We cross-examined the

16  alleged victim about seeing the paperwork that said Mr. Pooley

17  was not their examiner, and then the government got up on

18  redirect and said, Oh, you didn't see that paperwork until

19  later.  That was after you decided to come to the Parachute

20  Center, after you decided to part with your money and after you

21  gave that money to Mr. Pooley.  This was not something that

22  happened during any of a scheme to defraud.

23           THE COURT:  Would that apply to more than just Count

24  6?

25           MS. CRAGER:  Count 5 and Count 6, Your Honor.

1           THE COURT:  So Count 5 as well?

2           MS. CRAGER:  Yes, Your Honor.

3           THE COURT:  So it would pull out all of the aggravated

4    identity theft.

5           MS. CRAGER:  Yes, Your Honor.  The scheme, as it's

6    been stated by the government --

7           THE COURT:  That's a different argument now.  Is that

8    in your brief?  I would like to look at it.

9           MS. CRAGER:  I don't believe we briefed the -- whether

10   it is during the scheme to defraud.  We weren't sure how the

11   evidence would come in about that, but it turned out coming in

12   as, you know, we tried to present the paperwork to people and

13   say, You saw this paperwork that says Rob Pooley was not the

14   examiner.  Rob Pooley gave you that paperwork, and the

15   government got up and said, That was later, that didn't happen

16   before you --

17          THE COURT:  Let me just point something out:  One way

18   or the other, that's going to end up on appeal.

19          I get hit at the end of the trial for the first time

20   with an argument that I have to decide within a few short

21   minutes while the jury is waiting out there.  If I decide it

22   wrong, I think the correct result would be to set aside the

23   whole thing because their argument could be made that it taints

24   the other counts as well.  I just want to point that out.

25          I'm not sure I appreciate the whole argument.  Make it

1  again on this point that both 5 and 6 should be dismissed

2  because it occurred after the crime was complete, make that

3  argument.

4         MS. CRAGER:  Yes, Your Honor.  So, the scheme in the

5  light most favorable to the government, as I understand it, is

6  that people would come to the Parachute Center on

7  representations by Mr. Pooley and others that they could get

8  their tandem ratings and that Mr. Pooley would be their

9  examiner.  Then they got there, and they met Mr. Pooley, and

10  they believed that Mr. Pooley was their examiner.  They decided

11  to part with their money, and they, in fact, paid that money.

12  At the end of the course they were presented with paperwork.

13         THE COURT:  You know, it's even broader than that.

14  What was represented to them is that if they completed the

15  course, they'd get their USPA certifications, and Mr. Pooley

16  knew very well that they would not be able to get their USPA

17  certifications because he himself was not certified to teach

18  the course.  That's -- that's the fraud.

19         MS. CRAGER:  Yes.

20         THE COURT:  Right.

21         MS. CRAGER:  Yes.  So that occurred, and they decided

22  to part with their money.  Then later Mr. Pooley comes with

23  paperwork with signatures on it -- at least to two of the

24  people who testified -- saying, I am not your examiner, this

25  other person is your examiner, showing that that other person

1   is signing off and showing that the statements made in the
2   paperwork saying, "I, Yuri Garmashov, personally examined this
3   candidate." The students knew that wasn't true because they
4   had just done a course with Mr. Pooley.

5           THE COURT: This is a very persuasive argument, as I
6   hear it now, because just on the aggravated identity theft
7   counts, the defendant had to have knowingly possessed and used
8   a means of identification of another person during and in
9   relation to.

10          MS. CRAGER: Exactly.

11          THE COURT: Exactly. A felony, which in this case is
12  the wire fraud counts.

13          Now, the means of identification of another person are
14  set forth on Page 10 at the top as the signatures of Yuri on
15  the application sent to USPA with regard to these two victims.
16  And the crime was complete as to each of those victims if you
17  buy the argument that there's enough evidence to establish that
18  crime. It was complete as soon as the fraud was committed.

19          MS. LYDON: So, I think I see where the defense is
20  going with this, but they're slicing the crime of wire fraud
21  too thin. As Your Honor explained at the outset of this
22  hearing, you really seized on the overall scheme to defraud to
23  being what's charged here, and so these uses in Counts 5 and 6
24  of the signatures kept were in furtherance of the overall
25  scheme of the defendant holding himself out as an examiner in

1   these ongoing, repeated courses when he was not.  Had he not

2   used those signatures, had he not presented students with

3   paperwork that appeared to be bearing the signature of a

4   legitimate candidate, had he --

5         THE COURT:  No, this is -- these particular

6   communications are not to the students, they're to the USPA.

7         MS. LYDON:  Well, they're to both.  So, the first one

8   was -- is not a wiring, Count 5, that one is just the use of

9   the signatures, and the most reasonable inference from the

10   evidence is that he handed those to Mr. Kwon because they

11   have -- those papers have Mr. Kwon's signature on them in

12   Korean.  So the use of the signature there was presented to Mr.

13   Kwon.

14         THE COURT:  Okay.  All of that is after the fact.  In

15   other words, I see now what you are saying.  If this gets

16   affirmed on appeal I will be shocked, but I see what you are

17   saying.

18         The defendant is on this scheme to defraud a bunch of

19   people, and if some of these signatures are used early on in

20   the scheme, but the scheme is going on afterwards, then it's

21   not after the fact.

22         MS. CRAGER:  So, I think what the government is saying

23   is that the paperwork was used to lull people.

24         MS. LYDON:  To lull people and to keep the scheme

25   going.  The scheme would have blown up had --

1       THE COURT:  If the scheme would've blown up, it would

2   have died a natural death.  They would have stopped it.

3       MS. CRAGER:  But what *Dubin* says, though, is that the

4   signature has to be at the crux of the fraud on the students.

5   It can't be something that happens later to lull somebody.  If

6   it were at the crux of the fraud, it would be in every fraud,

7   and there's one alleged victim, Mr. Munoz, who said, Rob Pooley

8   never even showed me that signature.  So, it can't be at the

9   crux of the fraud if it wasn't even used in the fraud.

10      MS. LYDON:  That's not quite what *Dubin* says.

11  *Dubin* doesn't say that it has to be at the crux of every -- it

12  has to be at the crux of the crime, and here it is at the crux

13  of the scheme to defraud with the use of these signatures.

14      Mr. Pooley stated, and *Dubin* certainly doesn't say

15  that --

16      THE COURT:  I hear your arguments.

17      MS. LYDON:  Okay.

18      THE COURT:  Now, is there more to the motion?

19      MS. CRAGER:  I have more issues, Your Honor.

20      THE COURT:  All right.

21      MS. CRAGER:  Are we moving on?

22      THE COURT:  Yes.  Before I finally rule on this, I

23  want to hear what the whole thing is because I don't want to

24  say, "This is denied," and then, "Oh, wait a minute, we got

25  another one."  Then, "This is denied," and "Oh, wait, we got

1    another one."

2          If I'm going to grant one of these I want to hear what

3    they all are.  They're all good arguments, incidentally.  They

4    all make a lot of sense.

5          MS. CRAGER:  The third one is about the fraud counts,

6    and we are contending that there's insufficient evidence for

7    this to go on an omissions theory.  As Your Honor is aware, in

8    order to -- in order to be convicted of wire fraud based on an

9    omission, the government has to show either a fiduciary duty, a

10   fiduciary relationship, or an informal trusting relationship in

11   which one party acts for the benefit of another and induces the

12   trusting party to relax the care and vigilance it would

13   ordinarily exercise.

14         As I understand it, the government's theory has been

15   that skydiving is dangerous.  Tandem skydiving is different

16   than solo skydiving, so these candidates didn't know how to do

17   this yet, so they really trusted Mr. Pooley.  I don't believe

18   that shows that Mr. Pooley induced them to relax their care and

19   vigilance.  This Court has ruled already that the safety

20   concerns inherent in skydiving are not relevant.  It also seems

21   suspect that a student's subjective trust in their teacher

22   could confer some kind of duty to disclose.

23         THE COURT:  Now, isn't that a question for the jury,

24   though, whether this duty exists?

25         MS. CRAGER:  My point is that there's insufficient

1    evidence of there being a duty to disclose.

2         THE COURT:  That's in your proposed instructions.  The

3    requirements that would have to be met in order to establish a

4    duty are in your proposed instructions, I assume.

5         MS. CRAGER:  Yes, Your Honor, that's in the model

6    instruction.  My point is that it's -- there's just been

7    insufficient evidence of that, so it shouldn't go to the jury

8    at all.

9         THE COURT:  What's your next argument?

10        MS. CRAGER:  The next issue will be argued by Ms.

11   McLoughlin.

12        MS. MC LOUGHLIN:  This is a different motion to

13   dismiss that we filed under Rule 12 back in February, and that

14   would be a motion to dismiss Counts 5 and 6, the aggravated

15   identity theft counts, on the basis that 18 U.S.C. Code 1028(a)

16   is unconstitutionally vague.  Procedurally --

17        THE COURT:  Refresh my recollection, what discussion

18   did we have on this one where you made your motion to dismiss?

19        MS. MC LOUGHLIN:  Yes, Your Honor.  Your Honor denied

20   that motion without prejudice.  We had made a facial challenge

21   and a light, as-applied challenge, and the understanding was

22   that we would -- we articulated that we intended to renew the

23   motion after the evidence had come in so we could do a more

24   robust, as-applied challenge to the statute.

25        THE COURT:  All right.  I need to go back and look at

1   the motion that you had at that time.  This is different than

2   the motion that you made to suppress the evidence seized during

3   the execution of the warrant.

4           MS. MC LOUGHLIN:  It is, Your Honor, it would be

5   Docket 43 was the original motion that we filed.

6           THE COURT:  And was my ruling on it oral or in

7   writing?

8           MS. MC LOUGHLIN:  It was oral, Your Honor, at the

9   hearing.

10          MS. LYDON:  I believe this is the motion based on

11  Justice Gorsuch's concurrence.

12          MS. MC LOUGHLIN:  That's correct.

13          THE COURT:  He's back there getting the wrong motion,

14  so let me get it.  That was the motion based on Justice

15  Gorsuch's dissent, right?

16          MS. MC LOUGHLIN:  His concurrence, Your Honor, yes.

17          THE COURT:  What else did you want to say about that?

18          MS. MC LOUGHLIN:  Well, just to emphasize as the

19  theories of the case have played out, that Mr. Pooley's case

20  exemplifies Mr. Gorsuch's concerns.  He is not put on notice

21  that his conduct falls within the conduct prescribed by the

22  statute, and I would just say generally, you know, in these

23  fraud cases in the facts of *Dubin* and the hypotheticals, they

24  discuss there's usually, you know, one transaction where

25  someone's means of identification is used in the Court in the

1  majority and the concurrence is discussing whether or not the

2  means of identification was at the crux of the fraud, what made

3  it criminal.

4  THE COURT:  Right.  You know, that's the problem.

5  Where the Ninth Circuit seems to be right now is that -- just

6  hypothetically we discussed this before when you raised the

7  motion, if two people conspired to commit a crime and they had

8  a credit card which was in the name of Defendant B, and their

9  scheme was that this credit card would be used to further the

10  scheme to defraud, if B used the credit card, it's not identity

11  theft.  But where the Ninth Circuit seems to be now is that if

12  A used that credit card with B's knowledge and consent and it

13  was part of the plan, then A would be guilty of identity theft,

14  and it would carry with it an additional minimum mandatory

15  two-year sentence.  That, with all due respect, doesn't make

16  any sense, but that seems to be where the Ninth Circuit is, and

17  I'm bound by the Ninth Circuit.

18  Now, Justice Gorsuch had some thoughts on this, but he

19  was not in the majority.  I can only predict what would happen

20  if the matter were to get to the Supreme Court, but it hasn't

21  gotten there yet, so that's the problem, that seems to be where

22  we are.

23  MS. MC LOUGHLIN:  Right, Your Honor, we just hope to

24  make that record because Mr. Pooley's case is quite complicated

25  factually.  I think the question of whether the signature was

1       at the crux is, you know, as we've been discussing, is a heavy

2       one.

3               THE COURT:  Well, it's not so much whether it's at the

4       crux because we don't have evidence right now unless there's

5       going to be more offered on this subject later as to whether

6       Yuri consented to have his name used.  Under the Ninth Circuit

7       law, as I understand it, where it stands right now, it doesn't

8       make any difference.  It's the same.

9               MS. MC LOUGHLIN:  Well, and I do believe that that

10      case that you're referring to was decided prior to *Dubin*.

11      There is language in *Dubin* about --

12              THE COURT:  You're right, we talk about that.  He was,

13      but it's not -- it didn't overturn that.  The Ninth Circuit law

14      as it existed before *Dubin* is still the Ninth Circuit law until

15      the Supreme Court gets around to it and corrects that.  That's

16      the problem.

17              MS. MC LOUGHLIN:  Yes.

18              THE COURT:  I think I have to rule on that one the

19      same way as I did when I ruled on the motion to dismiss.  Under

20      current Ninth Circuit law the evidence is sufficient.  On these

21      other questions, I probably have to think about them.

22              You make very good points, and it's caught me a little

23      flatfooted to rule on some of these things knowing that the

24      jury is waiting out there to come in and never having seen your

25      briefs before today.  It's not even in your briefs.  It makes a

1   lot of sense, but all the motions are denied.

2          So where do we go next?

3          MS. CRAGER:  The defense intends to put on a case,

4   Your Honor.

5          THE COURT:  All right.  I think we could bring them

6   in.  It's been a half hour.

7          THE CLERK:  Yes, it's been 45 minutes.

8          THE COURT:  All right.  Let's bring them in.

9       (In open court in the presence of the jury.)

10         THE COURT:  All right.  The jurors have all returned.

11  Is this your witness up here?

12         MS. MC LOUGHLIN:  It is, Your Honor.

13         THE COURT:  There is a gentleman standing here I

14  didn't recognize.

15         MS. MC LOUGHLIN:  The defense calls Special Agent

16  Rasmus Octavius James.

17     RASMUS OCTAVIUS JAMES, DEFENDANT'S WITNESS, SWORN

18         THE CLERK:  Please state your full name and spell your

19  name for the record.

20         THE WITNESS:  Rasmus Octavius James, R-A-S-M-U-S

21  O-C-T-A-V-I-U-S J-A-M-E-S.

22         THE CLERK:  Thank you.

23                     DIRECT EXAMINATION

24  BY MS. MC LOUGHLIN:

25  Q    Good afternoon, Special Agent James.

James - Direct by McLoughlin

1   A    Good afternoon.

2   Q    So, you are a special agent with the Department of

3   Transportation, Office of the Inspector General, correct?

4   A    Yes.

5   Q    And you primarily work in the Los Angeles area, as I

6   understand it.

7   A    That's correct.

8   Q    You have come up to this district to work in the past,

9   though, right?

10  A    Yes.

11  Q    Including in 2018, when you were brought up to assist in

12  the execution of a search warrant?

13  A    Yes.

14  Q    And the execution of that search warrant occurred on

15  January 30, 2018, right?

16  A    Yes.

17  Q    And it was at the Parachute Center in Lodi, California?

18  A    Correct.

19  Q    And so you participated in the execution of that search?

20  A    Yes, I did.

21  Q    And it included the entire premises of the Parachute

22  Center?

23  A    Yes, what was listed in the search warrant.

24  Q    Right.  And so that also included any lockers of

25  particular individuals, right?

1   A    That's correct.

2   Q    And one of those lockers was Yuri Garmashov's locker?

3   A    Correct.

4   Q    And so you were the person to take items from that locker

5   and put it in an envelope to keep for purposes of the case,

6   right?

7   A    Yes.

8   Q    I have two of those envelopes here.  I'm going to show

9   them to you.

10      Does this look like one of those envelopes?  And I'll show

11  it to you.

12  A    Yes, it does.

13  Q    I'll show you this envelope.  It's a manila envelope.  At

14  the top it says "Rasmus O. James."  It has "A1LL," which I

15  believe is the location code that you were using.

16  A    Correct, yes.

17  Q    Which is described as Yuri Garmashov's locker on

18  January 30, 2018, so that's one envelope.

19      I have a second envelope here which is similarly labeled,

20  "Special Agent Rasmus O. James" is indicated on top.  "A1LL" is

21  the location, which is labeled as Yuri's locker.  And this also

22  says "30 January 2018."

23      What I'd like to have you do is look through these

24  envelopes to find documents responsive to my question, and if I

25  may approach, I'll hand these over.

James - Direct by McLoughlin

1          THE COURT:  You may.

2          THE WITNESS:  May I move this?

3    BY MS. MC LOUGHLIN:

4    Q    You could move that.  Let's start with the first envelope

5    and that's marked with a big number "2."  Could you open that

6    envelope and take out all the documents inside, and I'll ask

7    you to just look through -- you could ignore the smaller sheets

8    of paper actually.  Can you look through and pull out any

9    documents that look like applications or skydiving ratings that

10   are blank except for preprinted signatures?

11   A    That are blank except for preprinted signatures?

12   Q    Yes, or have preprinted signatures and are otherwise

13   blank.

14   A    Understood.

15   Q    And we will standby.  To be clear, we don't need anything

16   that has anybody's personal information on it.  So if there's

17   names, we don't need those items.

18   A    Okay.

19          THE COURT:  I thought the documents were all blank

20   except signatures, so there wouldn't be anything else on it.

21          MS. MC LOUGHLIN:  There's many documents in this pile.

22          THE COURT:  I know, but you said he's only going to

23   pull the ones that are blank except for preprepared signatures.

24          MS. MC LOUGHLIN:  Yes.

25          THE COURT:  So we don't have to worry about personal

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

James - Direct by McLoughlin

1    information.

2          MS. MC LOUGHLIN:  Absolutely, Your Honor, I just

3    wanted to make sure that my request was clear.

4          THE WITNESS:  Your Honor, may I stand?

5          THE COURT:  Are there such documents in there?

6          MS. MC LOUGHLIN:  There are, Your Honor.  I think

7    he's, based on my review --

8          THE COURT:  You could stand up if you want.

9          MS. MC LOUGHLIN:  It shouldn't be too much longer.

10   Your Honor, may I retrieve those documents?

11         THE COURT:  Yes.

12         MS. MC LOUGHLIN:  Your Honor, I would like to offer

13   these into evidence as USPA documents obtained from Yuri

14   Garmashov's locker.

15         THE COURT:  All right.  How many pages?

16         MS. MC LOUGHLIN:  Twenty-two pages, Your Honor.

17         THE COURT:  All right.  Any objection?

18         MS. LYDON:  Could we just see them briefly?

19         MS. MC LOUGHLIN:  Yeah, of course.

20         MS. LYDON:  No objection.

21         THE COURT:  What did you say the number was?

22         MS. MC LOUGHLIN:  2189.

23         THE COURT:  Exhibit 2189 is received in evidence.

24      (Defendant's Exhibit 2189 admitted in evidence.)

25         MS. MC LOUGHLIN:  Thank you, Your Honor.

James - Direct by McLoughlin

1  BY MS. MC LOUGHLIN:

2  Q    I won't go through all of these, but I'd like to just go

3  through some of them.  I'm going to be publishing some of these

4  documents, and I'll bring it down here.

5       The title of this document is "Tandem Instructor Rating

6  Course Proficiency Card," right?

7  A    Yes.

8  Q    As we can see it's blank.  Here where there's items for or

9  places to put personal information, and then at the bottom here

10 we see signatures, right?

11 A    Correct.

12 Q    There's no dates next to those signatures?

13 A    That's correct.

14 Q    And each signature is exactly the same?

15 A    Correct.

16 Q    Let me go to the second page of that document.  And this

17 is also -- it's blank where it says "Candidate Name" and

18 "Member Number."  There's no dates here.  There's just these

19 same signatures, correct?

20 A    Yes, that's correct.

21 Q    And at the end here, under "Rating Recommendation," it has

22 that same signature and the printed name "Yuri Garmashov,"

23 right?

24 A    Correct.

25 Q    Let's look at another document quickly.  The title of this

1    document is a "Coach Rating Course Proficiency Card," right?

2    A    That is correct.

3    Q    And it's similarly blank where there's personal

4    information to be filled out, right?

5    A    Correct.

6    Q    And at the bottom it has those same signatures?

7    A    That is also correct.

8    Q    With no dates?

9    A    Correct.

10    Q    And here the second page, same signatures on the left hand

11    column, right?

12    A    Correct.

13    Q    And under "Rating and Recommendation," there is the

14    printed name "Yuri Garmashov" above that same signature.

15    A    That is correct.

16          MS. MC LOUGHLIN:  Your Honor --

17    BY MS. MC LOUGHLIN:

18    Q    That's all I'll review with you at this point.

19          MS. MC LOUGHLIN:  Your Honor, my plan for the actual

20    exhibit was to put it in a clear leaflet and mark it as an

21    exhibit that way.

22          THE COURT:  Do you want to do that?

23          MS. MC LOUGHLIN:  Yes, please, Your Honor.

24          THE COURT:  All right.  So, there will be 22 pages in

25    that clear leaflet.

James - Direct by McLoughlin

1   MS. MC LOUGHLIN:  Yes, Your Honor.  Thank you.  I'll

2   fumble with that in a minute.

3   BY MS. MC LOUGHLIN:

4   Q    Special Agent James, I'm going to have you look at the

5   manila envelope behind you as well, and as I approach you, I'll

6   give you this and help you gather.

7   That's the second envelope we discussed, right?

8   A    Yes.

9   Q    If you pull that out, there should be a binder in there.

10  Now, I'd like to ask you to look for the same type of

11  documents:  Blank application, rating application forms with

12  preprinted signatures on them.  If you can just look in --

13  there's colored tabs, you could just limit your search to those

14  tabs.

15  A    Understood.

16  THE COURT:  So where is this envelope from?

17  MS. MC LOUGHLIN:  This binder was also from the locker

18  of Yuri Garmashov.

19  THE COURT:  All right.  Different place or the same as

20  the previous one?

21  MS. MC LOUGHLIN:  The same locker, so the same

22  location.

23  THE WITNESS:  I finished with the colored tabs.

24  BY MS. MC LOUGHLIN:

25  Q    Thank you so much, I'll come and retrieve those.

James - Direct by McLoughlin

1    MS. MC LOUGHLIN:  I'll show these to the government
2  first.  Your Honor, I'll move to admit these seven pages of
3  documents that were retrieved from the binder in Yuri
4  Garmashov's locker.
5    MS. LYDON:  No objection.
6    THE COURT:  This is number?
7    MS. MC LOUGHLIN:  It should be 2190.
8    THE COURT:  Exhibit 2190 is received in evidence.
9    (Defendant's Exhibit 2190 admitted in evidence.)
10    MS. MC LOUGHLIN:  I'll be very brief.
11  BY MS. MC LOUGHLIN:
12  Q    This looks like a similar form from what we saw last time,
13  right, the Tandem Instructor Rating Course Proficiency Card?
14  A    That's correct.
15  Q    Same signatures on the bottom with no dates.
16  A    Yes.
17  Q    The second page of that document, similar, filled out with
18  signatures but with no dates.
19  A    Correct.
20  Q    And Yuri Garmashov's handwritten name.
21  A    That's correct.
22    MS. MC LOUGHLIN:  And I'll do the same procedure, Your
23  Honor.  I'll put these in a leaflet marked with the exhibit
24  number.
25    THE COURT:  All right.

1        MS. MC LOUGHLIN:  And that's all I have.  Thank you.

2        THE COURT:  You may cross-examine.

3        MS. LYDON:  No cross-examination.

4        THE COURT:  All right, Mr. James, thank you.  You are

5   excused.

6        MS. MC LOUGHLIN:  Your Honor, I'm going to retrieve

7   the documents.

8        THE COURT:  Yes.

9      (Witness is excused.)

10       THE COURT:  Do you have any other witnesses?

11       MS. MC LOUGHLIN:  Yes, we do.

12       THE COURT:  Ms. Crager?

13       MS. CRAGER:  Your Honor, the defense calls Yuri

14   Garmashov to the stand.

15       THE CLERK:  Sir, please step forward to your right.

16   All the way up to the witness stand, and remain standing.

17        YURIY GARMASHOV, DEFENDANT'S WITNESS, SWORN

18       THE CLERK:  Please state your full name and spell your

19   name for the record.

20       THE WITNESS:  Yuriy Garmashov, Y-U-R-I-Y, last name is

21   G-A-R-M-A-S-H-O-V.

22       THE CLERK:  Thank you.

23                    DIRECT EXAMINATION

24   BY MS. CRAGER:

25   Q    Good afternoon, Mr. Garmashov.

Garmashov - Direct by Crager

1  A    Hello.

2  Q    I want to start with some things we could probably agree

3  on.  Between August of 2015 and April of 2016, there were times

4  that you were at the Lodi Parachute Center training people.

5         MS. LYDON:  Objection, leading.

6         THE COURT:  I'm going to permit leading questions on

7  this witness on both sides.  You may proceed.

8         MS. CRAGER:  Thank you, Your Honor.

9  BY MS. CRAGER:

10  Q    Were there times during that period that you were at the

11  Lodi Parachute Center training people?

12  A    Yes.

13  Q    You were training people as a instructor examiner.

14  A    It depends what kind of training you're talking about.

15  Q    Okay.  One of the types of training you did was an

16  instructor or examiner to train tandem candidates?

17  A    Correct.

18  Q    And you made money doing that?

19  A    Yes.

20  Q    At the time, instructing the skydivers was one of the

21  primary ways you earned money?

22  A    Yes.

23  Q    Also, there were times during that period, August of 2015

24  through April of 2016, when Rob Pooley was training people and

25  you were supervising him.

Garmashov - Direct by Crager

1   A    Yes.

2   Q    Okay.  I want to talk about a few of the people that you

3   trained during that period.  One of them is Richard Keir, did

4   you train that person?

5   A    I believe so.  I'm not really ringing any bells, but the

6   name sounds familiar, yes.

7   Q    That name sounds like somebody that you trained?

8   A    Probably.  Name sounds familiar.

9   Q    Would it help -- would it help you remember if you saw

10  some of your correspondence about him?

11  A    Sure.

12          THE COURT:  Now, just to make it clear from your

13  previous questions, you're asking him about whether he trained

14  him as an examiner?

15          MS. CRAGER:  Yes.

16          THE COURT:  All right.  Trained him to be an examiner?

17          MS. CRAGER:  Trained him to be a tandem instructor

18  while he was an examiner.

19          THE COURT:  While he was an examiner?

20          MS. CRAGER:  Yes.  If I may approach, Your Honor, I'll

21  pull out a binder.

22          THE WITNESS:  Yes.

23  BY MS. CRAGER:

24  Q    We're looking at 2061.

25  A    Okay.

Garmashov - Direct by Crager

1  Q    Does that help you remember that Richard Keir was a person

2  that you trained?

3  A    Yes.

4  Q    And he got his ratings?

5  A    I believe so.

6  Q    Also a person named Michael Jeffet, that was a person you

7  trained?

8  A    I don't remember the name.

9  Q    Let me refer you to a different exhibit.  Hold on, let me

10  approach one more time.  Now we are looking at Exhibit 2187,

11  and after you've reviewed the first couple of pages, I could

12  refer you to Page 4.

13       MS. LYDON:  I don't believe the government has this

14  exhibit -- actually -- sorry.

15       MS. CRAGER:  No worries.

16       THE WITNESS:  What was the name you said, I'm sorry?

17  BY MS. CRAGER:

18  Q    Michael Jeffet.

19  A    I do not see his name here.

20       MS. CRAGER:  If I may approach, I could help.

21       THE COURT:  Yes.

22       THE WITNESS:  Okay.  I see the name, and I can't put

23  the name and the face together.  I met a lot of Michaels during

24  my lifetime.

25

Garmashov - Direct by Crager

1    BY MS. CRAGER:

2    Q    So you don't remember specifically whether or not you

3    trained with that person?

4    A    I don't remember especially that person you are showing

5    me.

6    Q    In approximately August and September of 2016, were you in

7    contact with the Parachute Association?

8    A    August, September of '16?

9    Q    Yes.

10   A    Yes, I was.

11   Q    And they were very interested to know who you trained?

12   A    Yes.

13   Q    You understood they were trying to identify which people

14   you had trained?

15   A    Yes.

16   Q    And you informed them that you trained both Michael Jeffet

17   and Gavin Creagh?

18   A    I might have so, done so.  I don't remember the exact

19   details since it's been like, what, eight years ago almost.

20   Q    I understand.  So looking at that Exhibit 2187, you

21   informed them that you trained the people on those lists -- on

22   that list; is that correct?

23   A    That means it's correct, yes.

24   Q    And it includes those two people?

25   A    If it's in my e-mail, then it is, yes.

Garmashov - Direct by Crager

1   Q    And it is in the exhibit that you're looking at now; is

2   that a yes?

3   A    I would assume so, yes.  Yes, I believe this is my

4   correspondence with Jim Crouch, yes.

5   Q    It's your understanding that there were also people

6   trained by Rob Pooley when were you not there?

7   A    Could you clarify the question?

8   Q    It's your understanding that some tandem instructor

9   candidates were trained by Rob Pooley when were you not at the

10  Lodi Parachute Center?

11  A    My understanding is that since May of 2016, up until

12  August 2016 when I was out of the country, there was some

13  training done that I wasn't present for.

14  Q    Okay.  I want to talk about what Rob Pooley shared with

15  those people who were trained.  You spoke to several of the

16  tandem candidates when you returned to Lodi in August of 2016?

17  A    I spoke with many people in August of 2016, so you have to

18  be specific when I did that and who I talked to.

19  Q    Sure.  You recall speaking to at least some of the people

20  who informed you that they were trained that summer with your

21  signature on their paperwork.

22  A    You're talking about my e-mail correspondence between me

23  and USPA?

24  Q    No, I'm talking about conversations you had at the Lodi

25  Parachute Center when you returned from Russia with people who

Garmashov - Direct by Crager

1  had been trained, who informed you that your signature was on

2  their paperwork.

3  A    When specifically are you talking about?  I'm not sure I

4  understand the question.

5  Q    Sure.  In August of 2016, when you returned from Russia --

6  A    Correct.

7  Q    -- did you speak with some people at the Lodi Parachute

8  Center who informed you that they had been trained by Rob

9  Pooley with your signature on their paperwork?

10  A    Yes.

11  Q    And they let you know that Rob had taught them and you

12  were supposed to sign off.

13  A    Yes.

14  Q    And they let you know that they were under the impression

15  that you and Rob had an agreement.

16  A    Correct.

17  Q    Their impression was the agreement was Rob Pooley trains

18  them and you sign off.

19  A    That's what they told me.

20  Q    And they told you their impression was their paperwork

21  would be submitted when you got back.

22  A    Yes.

23  Q    So I want to talk now about what exactly your agreement

24  with Rob Pooley was about training.

25      You had a digital signature that you used sometimes?

Garmashov - Direct by Crager

1    A    Yes.

2    Q    And you used it on tandem instructor paperwork.

3    A    Correct.

4    Q    You allowed Rob Pooley to use that signed tandem

5    instructor paperwork.

6    A    I'm not sure I'm following your questions.  Could you

7    rephrase the question, please?

8    Q    Sure.  Let's start here:  So there were times when Rob

9    Pooley would train people, and you would sign off on it.

10   A    Correct.

11   Q    And when that happened, you would have Rob use your

12   presigned paperwork?

13   A    Correct.

14   Q    Even when you are out of town sometimes, you let him use

15   your presigned paperwork.

16   A    What do you mean by that?

17   Q    Sometimes when you are out of town, he would continue to

18   train people, train tandem instructor candidates, and you

19   allowed him to use the presigned paperwork?

20   A    No.

21   Q    All right.  Let's talk about a person named Jason

22   Spurgeon.

23   A    Okay.

24   Q    This is a person who was trained using paperwork with your

25   signature?

Garmashov - Direct by Crager

1    A    Yes.

2    Q    You were out of town when he was trained.

3    A    No.

4    Q    Rob had to tell you by e-mail that he had trained Jason

5    Spurgeon because you weren't there?

6    A    No, that is not correct.  If that's the e-mail you're

7    referring to, you could read it out loud and say what exactly

8    it says.  It says, "Two candidates this week.  When are you

9    coming back?"

10   Q    So, I think you are --

11   A    It says nothing about training.

12   Q    Okay.  I understand your explanation.  Let's do that,

13   let's look at that e-mail.  It sounds like you already know

14   what I'm talking about.  If we could pull up Exhibit 1111.

15        So, this first e-mail from Rob to you, it says, "Two

16   candidates this week.  Jason Spurgeon and Vikky (I can't

17   remember her last name right now)."  Is that what it says?

18   A    Yes.

19   Q    "I will forward you their paperwork tomorrow"; is that

20   what it says?

21   A    Yes.

22   Q    And you said "Okay."

23   A    That's what I said, yes.

24   Q    All right.  And Rob Pooley asked you, "When will you be

25   back?"

Garmashov - Direct by Crager

1   A    Okay.

2   Q    Is that what it says?

3   A    Yes.

4   Q    So he's asking you when you will be back, indicating that

5   you were not there --

6   A    Correct.

7   Q    -- when he sent this e-mail.

8   A    Yes.

9   Q    So, my question was you were out of town when he trained

10  Jason Spurgeon?

11  A    No.

12  Q    You're saying that's not what this e-mail chain says?

13  A    No.  Those candidates were trained with me being on the

14  drop zone before I left for a competition.  I am not sure if it

15  was World Cup or world championships in Canada.  So those

16  candidates were training with me on the drop zone present and

17  then I left.

18  Q    I see.  So, this e-mail, though, says that he's informing

19  you of two candidates this week, correct?

20  A    Uh-huh.

21  Q    And he's asking you, "When will you be back?"

22  A    Okay.  Yes.

23  Q    Okay.  So, we are in agreement that's that what this

24  e-mail says?

25  A    Yes.

Garmashov - Direct by Crager

1    Q    You indicate you will be back on the 30th --

2    A    Yes.

3    Q    -- because when you had this e-mail exchange you were not

4    at the Lodi Parachute Center.

5    A    Correct.

6    Q    All right.  This e-mail also mentions a person named

7    Vikky.  Do you see that?

8    A    Yes, I see that.

9    Q    And Vikky was trained while were you away.

10   A    No, I don't think -- Jason Spurgeon and Vikky, they were

11   both trained at the same time when I was in the country.

12   Q    Okay.  They were both trained at the same time --

13   A    Maybe not at the same, same time.  I guess in the same

14   space continuum, I guess.

15   Q    So, you're saying that you trained Vikky?

16   A    It was under my direct supervision, is what I'm saying.

17   Q    Got it.  She was trained under your direct supervision?

18   A    Correct.

19   Q    Got it.  Let's look now at exhibit -- I can't pull this up

20   for you.  It's not admitted yet.  Let me approach one more

21   time.  We're looking at Exhibit 2132.

22            MS. LYDON:  What exhibit is that?

23            MS. CRAGER:  2132.

24            MS. LYDON:  Thank you.

25

Garmashov - Direct by Crager

1    BY MS. CRAGER:

2    Q    Mr. Garmashov, I'll refer you to Page 2 of that exhibit.

3    A    Okay.

4    Q    This appears to be the USPA application, various

5    applications for USPA for Vikky Lee Allen; is that correct?

6    A    Yes.

7    Q    And if you will turn to Page 8, that appears to be the

8    Tandem Instructor Rating Course Proficiency card for Vikky

9    Allen.

10   A    Okay.

11   Q    And Page 9 is the second page of that application.

12   A    Okay.

13   Q    Your Honor, I move to admit Exhibit 2132, at this point

14   just Pages 8 and 9?

15              THE COURT:  Any objection?

16              MS. LYDON:  For what purpose?

17              MS. CRAGER:  Your Honor, he just testified that he was

18   at the Lodi Parachute Center while training this person.

19              THE COURT:  All right.  Exhibit 2132, Pages 8 and 9

20   are received in evidence.

21         (Defendant's Exhibit 2132 Pages 8 and 9 admitted in

22         evidence.)

23              MS. CRAGER:  Okay.  Thank you, Your Honor, I would

24   like to publish 2132, Page 8.

25

Garmashov - Direct by Crager

1    BY MS. CRAGER:

2    Q    Okay.  So, this is the Tandem Instructor Rating card, and

3    if you will see down here, there's some dates for her training,

4    and these dates are August 21, 2015; is that right?

5    A    Yes.

6    Q    So, let's get out of there and go to Page 9, please.  And

7    she conducted five practice jumps as part of her course; is

8    that correct?

9    A    Yes.

10   Q    And those five practice jumps occurred on August 22, 2015?

11   A    Yes, that's what the paperwork says.

12   Q    Mr. Garmashov, you were not in the country on August 22,

13   2015.

14   A    I will need to check my passport, I'm not sure.

15   Q    Okay, sure.  Let's pull up Exhibit 61, Page 7, please.

16   This is has already been admitted.

17        THE COURT:  Don't you want to show him his passport.

18        MS. CRAGER:  These are the CBP records, I don't have

19   his physical passport with me.

20   BY MS. CRAGER:

21   Q    This is your name, correct?

22   A    Yes.

23   Q    And this is your date of birth?

24   A    Yes.

25   Q    Is this your passport number?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1    A    I don't remember it by heart, but I would assume so, yes.

2    Q    And this date, August 21, 2015?

3    A    Yes.

4    Q    And the departure location was SFO?

5    A    Okay.

6    Q    Is that what this says?

7    A    That's what it says.

8    Q    And SFO stands for San Francisco airport.

9    A    Correct.

10   Q    And the destination airport is YUL.

11   A    Yes.

12   Q    That stands for Montreal airport in Canada?

13   A    I would assume so, yes.

14   Q    So August 21, 2015, were you sitting on a plane in San

15   Francisco headed towards Montreal, Canada?

16   A    Yes.

17   Q    Thank you.  You could put that down.  All right.  Now,

18   when you -- when Rob trained these people when you weren't

19   there, you would let Rob send in the paperwork on your behalf?

20   A    When you say, When you let Rob train people when you were

21   not there, that is wrong statement.  I never did that.  So the

22   initial training consists of five tandem skydives.  The person

23   does solo tandem skydive, and the person must be on the front

24   of a tandem examiner, experienced tandem evaluator, and then

25   that person does three tandem skydives when he acts as a

Garmashov - Direct by Crager

1   parachute on command.  So that is the initial training that is

2   required by USPA and UPT.

3        After that, candidates are led off to evaluators.  They do

4   five more jumps with evaluators.  After they complete 10

5   skydives, they can start skydiving with experienced jumpers

6   would be licensed or above -- 200 jumps or above and they could

7   jump with those people.  So, when you say you weren't in the

8   country on the 22nd of August, were you in Canada, those would

9   be the jumps that were done without me needing to be present

10  there.

11  Q   Let's unpack that.  So, you're saying that the five jumps

12  listed on that paperwork, you're saying that those were not

13  part of the tandem instructor course?

14  A   What I'm saying is it was eight years ago.  I don't

15  remember how exactly it was done.  What I'm saying is those two

16  candidates were trained in Lodi Parachute Center when I was

17  there, and when I came back we dealt with the paperwork.

18  Q   I'm talking about Vicky Allen's paperwork that specified

19  that on August 22, 2015, she did five jumps as part of her

20  tandem instructor course, okay?

21  A   Okay.

22  Q   You were not in the country at that time.

23  A   Correct.

24  Q   Is it your testimony that you did not have to be there as

25  the examiner?

Garmashov - Direct by Crager

1    A     No, that's not my testimony.  My testimony is that initial

2    training with first initial tandem skydives, when they're

3    happening, I was at the drop zone, and then I left.  That was

4    the correspondence between Rob and me.

5         We had two candidates this week before I left the country,

6    and if you look at the dates of the e-mail, you could see I

7    think he sends it to me the 20th or 21st, something like that,

8    I don't remember the dates exactly, but you could bring it up

9    and we could look at those.

10        The initial training was done with me being in the drop

11   zone, and then I left the country for skydiving competition.

12   When I came back that's when we dealt with the candidates and

13   the paperwork.

14   Q     When you left the country and then on August 22, Vicky

15   Allen did five jumps for her tandem instructor course.

16   A     I don't know the answer to that question.

17   Q     Well, that's what the paperwork says.

18   A     That's what the paperwork says, correct.

19   Q     You weren't in the country on August 22?

20   A     No, I wasn't in the country on August 22.

21   Q     I'm sorry, you were not in the country?

22   A     I was not in the country on August 22, I was in Canada.

23   Q     So, are you saying as the examiner you were not required

24   to be there on the 22nd for those jumps?

25   A     That's not what I'm saying.  What I'm saying is the jumps

Garmashov - Direct by Crager

1    that we did initial training, I was on the drop zone.  I was

2    present, I witnessed the initial training.

3    Q    Where is the initial training, where is that on the

4    paperwork?  Why don't we just pull up the paperwork again.  I'm

5    looking at 2132, Page 8, please.

6         So, tell us where the initial training part is documented.

7    You could look on the screen, it should be there.

8    A    So, this says, "Conducted five practice tandem skydives."

9    Those are tandem skydives that are done after the training is

10   complete with experienced jumpers.

11   Q    Okay.  Let me make sure we understand what you are saying.

12   What page are you on?

13   A    I'm on Page 9.

14   Q    Let's turn to Page 9.  Then on the screen I'm marking on

15   Item 19 --

16   A    Correct.

17   Q    Okay.  So, what is your claim about what these jumps were

18   about?

19   A    Those are the five practice jumps that are conducted after

20   the tandem training.

21   Q    So, your testimony is that these five practice jumps are

22   not part of the tandem instructor training?

23   A    The way tandem instructor training is done, you go with

24   five initial skydives when the examiner has to be present in

25   the airplane, on the ground, or be in front, or with the

1  candidate, so those are the five initial jumps.

2      After the candidate is done with those five initial jumps,

3  he is then passed off to an evaluator.  So, that is considered

4  to be training that is done by the examiner.  Now, that

5  candidate is passed on to an evaluator, an experienced tandem

6  master that could teach him how to become a better tandem

7  person, yes.

8  Q    So you're saying that these five practice jumps are when

9  you passed Vicky Allen to an evaluator, correct?

10 A    It wasn't me who passed Vicky Allen to an evaluator.  I

11 was supervising examiner on that particular training.

12 Q    So you weren't actually training her?

13 A    No.  Vicky and Jason were trained by Rob and I was

14 supervising them, yes.

15 Q    So, you were supervising them, and Rob Pooley sent them to

16 Mike Spurgeon; is that what you are saying happened?

17 A    After we did the initial training?

18 Q    After the initial training; is that your testimony?

19 A    Yes, then they were passed on to Mike Spurgeon who was

20 acting as an evaluator for them, yes.

21 Q    Okay, thank you.  And those five jumps are documented on

22 this paperwork in Item 19?

23 A    Yes.

24 Q    Okay.  And those are dated August 22, 2015?

25 A    Yes.

Garmashov - Direct by Crager

1   Q    When you were not in the country?

2   A    Yes.

3   Q    And you're saying you didn't even have to be there because

4   an examiner did not have to be there for that?

5   A    Yes.

6   Q    Okay.  Let's zoom in here, please.  This is the part that

7   you signed, correct?

8   A    Yes.

9   Q    As the examiner --

10  A    Yes.

11  Q    -- when you are signing off on training?

12  A    Yes.

13  Q    Even if it's training that Rob Pooley did, this is where

14  you would sign off?

15  A    Yes.

16  Q    Okay.  And this rating recommendation says, "I have

17  personally examined and recommended this applicant for the USPA

18  tandem instructor rating"; is that what it says?

19  A    Yes.

20  Q    Okay.  So, don't you need to personally examine their five

21  jumps?

22  A    No.

23  Q    So this does not mean that you have to examine those five

24  jumps?

25  A    Yes.

Garmashov - Direct by Crager

1    Q    So why are these five jumps on this form?

2    A    Those five jumps on that form is to show USPA that the

3    candidate has not only completed his initial training on five

4    jumps, but has gained five more jumps as an experienced -- with

5    experienced tandem instructor on the front or experienced

6    jumpers on the front.

7    Q    And you're saying that you don't have to examine that at

8    all?

9    A    Yes.

10   Q    You don't have to examine it, right?

11   A    Yes.

12   Q    Okay.  But it's still on this form, right?

13   A    Yes.

14   Q    And it's right above the part where you sign the rating

15   recommendation, right?

16   A    Yes.

17   Q    And it's right above the part that says, "I have

18   personally examined and recommend this applicant," right?

19   A    Yes.

20   Q    Thank you.  We could take that down.

21        So, when Rob Pooley was training people and some of the

22   jumps occurred when you were out of the country, you would

23   allow him to use the presigned paperwork, correct?

24   A    I feel like you're trying to put me in the corner with

25   that question.  Could you rephrase the question, please?

Garmashov - Direct by Crager

1  Q    Let's just look at the paperwork we had for Vicky Allen.

2  So that was your presigned paperwork, correct?

3  A    Yes.

4  Q    And you were supervising Rob, correct?

5  A    Correct.

6  Q    And then you left the country, correct?

7  A    After we did the initial training, yes.

8  Q    After the initial training, and then those five jumps

9  occurred.

10  A    Yes.

11  Q    On the form.

12  A    Yes.

13  Q    While you weren't there.

14  A    Possibly.

15  Q    We did just establish that you were in Canada.

16  A    Yes, I was in Canada.

17  Q    So you weren't there during those jumps.

18  A    Yes.

19  Q    And you let Rob Pooley use your presigned paperwork.

20  A    Yes.

21  Q    And you also let Rob Pooley send in the presigned

22  paperwork to the Parachute Association?

23  A    Yes.

24  Q    And when he did that, sometimes he would sign "Yuri" on

25  the e-mails?

Garmashov - Direct by Crager

1    A    I didn't know that.

2    Q    You didn't know that.  Okay.  I would like to turn to

3    Exhibit 2044.  I don't believe this has been admitted yet.  If

4    I may approach.

5                THE COURT:  You may.

6    BY MS. CRAGER:

7    Q    This is an e-mail that you received, correct?

8    A    Yes.

9    Q    And it's an e-mail that was forwarded to you, correct?

10   A    Yes.

11   Q    By Sheryl Bothwell?

12   A    Yes.

13   Q    And Sheryl Bothwell is someone who works at UPT?

14   A    I would assume so, yes.

15   Q    Are you aware of that person?

16   A    I've never personally met that person, but we've exchanged

17   e-mails several times when we were dealing with the paperwork.

18   Q    Okay.  So, she deals with the paperwork for UPT.

19   A    Yes.

20   Q    She forwards you this e-mail, and this e-mail concerns the

21   paperwork for Jason Spurgeon.

22   A    Okay.

23   Q    Is that correct?

24   A    Yes.

25   Q    Okay.

Garmashov - Direct by Crager

1    MS. CRAGER:  Your Honor, I would move to admit -- we

2    could just do the first two pages of 2044.

3        THE COURT:  Any objection?

4        MS. LYDON:  I would suggest the whole document come

5    in.

6        THE COURT:  You just want one and two, or do you want

7    the whole document?

8        MS. CRAGER:  Let's just do one and two for now.  We

9    might get into the paperwork later.

10       MS. LYDON:  No objection.

11       THE COURT:  Pages 2044, Pages 1 and 2 are received in

12   evidence.

13       (Defendant's Exhibit 2044 admitted in evidence.)

14       MS. CRAGER:  I would like to publish that.

15   BY MS. CRAGER:

16   Q    I would like to go to Page 2.  So, this shows the

17   attachments to the e-mail, and the attachment is

18   jasonspurgeonUPT, correct?

19   A    Yes.

20   Q    That's paperwork that would be for tandem instructor

21   rating.

22   A    Yes.

23   Q    So, let's go back to Page 1.  The original e-mail in the

24   string is from Rob Pooley; is that right?

25   A    That's what it says here, yes.

Garmashov - Direct by Crager

1    THE COURT:  Excuse me, is this 2044 or 2040?

2    MS. CRAGER:  2044.

3    THE COURT:  I'm sorry, I misheard you, 2044.  I'm

4 sorry, go ahead.

5 BY MS. CRAGER:

6 Q    This e-mail is from Rob Pooley at

7 Parachutecentervideodesk@gmail.com?

8 A    Okay, yes.

9 Q    And it's to Terri at UPT?

10 A    That's what it says.

11 Q    And Terri is another person at UPT who handles paperwork?

12 A    I would assume so.

13 Q    And then also cc'd is JCSpurge@gmail.com?

14 A    Yes.

15 Q    It sounds like it might be the Jason Spurgeon who is in

16 the application.

17 A    Yes.

18 Q    And the e-mail from Rob Pooley says, "Paperwork for Jason

19 Spurgeon," right?

20 A    Yes.

21 Q    It says, "Thank you.  Yuri Garmashov."

22 A    That's what it says.

23 Q    You knew that Rob sent that e-mail, right?

24 A    I knew Rob sent the paperwork to UPT.  I didn't know the

25 specifics of the e-mail.

Garmashov - Direct by Crager

1   Q    But you did know that he signed the e-mail "Yuri."

2   A    No, I didn't.

3   Q    Okay.  Let's look at this e-mail up here.  Now, this whole

4   e-mail chain that we just talked about was forwarded to you.

5   A    The top portion, not the bottom, from Terri, I don't think

6   that was forwarded to me, I don't know.  I don't remember.

7   Q    You're saying that this e-mail didn't come into your --

8   A    No, this e-mail, the one that says on the top "Subject" up

9   to the point, "Sheryl@UPTvector.com," that's what I probably

10  got because I think that's the e-mail correspondence between me

11  and Sheryl.

12  Q    Interesting.

13       MS. CRAGER:  Let's come out of that, please.

14  BY MS. CRAGER:

15  Q    Your testimony is that this e-mail, "Forward new paperwork

16  package for Jason Spurgeon," your testimony is that the e-mail

17  that you received was only this top portion right here?

18  A    That's not my testimony.  Like I said, it was almost eight

19  years ago.  Eight years ago, nine years ago, I don't remember

20  what looking at that e-mail particularly.

21       What I remember is that the paper for Jason was sent to

22  UPT, and I received the correspondence from UPT saying, Hey,

23  we'll get this processed.  The fee is $50 right now, that's

24  what was important to me and that's what I paid attention to.

25  Q    If I told you that this e-mail, this entire e-mail,

1    including everything you see on this page was in your inbox,

2    would you be surprised about that?

3    A    Probably not.

4    Q    So probably this whole e-mail was sent to you?

5    A    Probably.

6    Q    Okay.  And let's go here again.  So, you received this

7    forwarded message from UPT directed to you, "Hi, Yuri."

8    A    Yes.

9    Q    "I will go get this processed."

10   A    Yes.

11   Q    Now, to understand what she was getting processed, you

12   would probably have to look at the rest of the e-mail; is that

13   right?

14   A    That's the e-mail about Jason's paperwork, I know his

15   e-mail.  So, I didn't need that paperwork to be processed,

16   because the whole paperwork was done, and it was scanned.  So,

17   I saw the paperwork when it was done and how it was scanned and

18   when it was sent, I don't know exactly when it was sent because

19   Rob did that.

20   Q    Okay.  I'm just asking when you saw this message, "I'll

21   get this processed," wouldn't you have to look down at the rest

22   of the e-mail to know what she was talking about?

23   A    I guess -- I don't know.  I saw the e-mail.  When I look

24   at an e-mail, I see, "Hi, Yuri.  I'll get this processed.  The

25   fee is $50," that's all I see.

Garmashov - Direct by Crager

1  Q    Okay.  So, you weren't curious about what she was

2  processing; you didn't read the rest of the e-mail?

3  A    She's processing the paperwork for Jason Spurgeon because

4  he is in the cc.  The paperwork was completed and filled out, I

5  double checked that the paperwork was completed correctly.  So

6  when the paperwork was e-mailed, if she needed something else

7  from me, she would get it from me, but my assumption was that

8  she got the whole package, and it says here that she will

9  process it.

10  Q    So, your testimony is you saw this e-mail, and you only

11  looked at the paperwork, you didn't look at anything else?

12  A    No, what I looked at -- and like I said, it was more than

13  eight years ago, I don't remember what exactly I saw.  What I'm

14  saying is even now, if I look at this e-mail, and I know that

15  the paperwork was supposed to be sent for processing, and they

16  get a confirmation e-mail that says I will process this

17  paperwork, that's all I need, I'm looking for confirmation in

18  this e-mail.

19  Q    Let's go out of that, please.  I understand you don't have

20  a specific recollection of this now nine years ago, but you

21  would agree that what was forwarded to you was a message from

22  Rob Pooley signed Yuri Garmashov.

23  A    Yes.

24  Q    Okay.  We could take that down.

25       After you got that e-mail, you didn't respond to UPT

Garmashov - Direct by Crager

1    saying that wasn't me who sent that?

2    A    No, I didn't.

3    Q    All right.  And you didn't respond saying, "UPT, Rob

4    Pooley doesn't speak for me"?

5    A    No, I didn't.

6    Q    And you also didn't say, "UPT, don't accept paperwork from

7    Rob Pooley that's signed 'Yuri'"?

8    A    No, I didn't.

9    Q    Hold on a second.  And then there's one more e-mail I

10   would like to look at, 2046, which is two tabs away.  You

11   actually did respond to that e-mail, the one that we were

12   looking at before, correct?

13   A    I guess, yes.

14        MS. CRAGER:  Your Honor, I move to admit Exhibit 2046.

15        THE COURT:  Any objection?

16        MS. LYDON:  Just a moment.  No.

17        THE COURT:  Exhibit 2046 is received in evidence.

18        (Defendant's Exhibit 2046 admitted in evidence.)

19        MS. CRAGER:  I would like to publish Page 1, please.

20   BY MS. CRAGER:

21   Q    So, down here is the e-mail we've just been talking about;

22   is that right?

23   A    Yes.

24   Q    And then you did respond, and you said, "I was waiting for

25   his logbook, that's why 35 is there"; is that right?

1   A    Yes.

2   Q    We could take that down.

3        MS. CRAGER:  I'm sorry, I have to grab one exhibit.

4   I'm sorry, I'm not as organized as I thought I was.  Okay, we

5   could move on.

6   BY MS. CRAGER:

7   Q    So, we talked about how at least sometimes you were out of

8   the country or out of town while at least some of the training

9   was going on that's documented on that Tandem Instructor card,

10  correct?

11  A    No.

12  Q    So let's talk again about Vicky Allen.

13  A    Initial training was complete with direct supervision of

14  examiner.  The rest of the training the examiner doesn't have

15  to be present.

16  Q    Okay.  So the examiner doesn't have to be present, but you

17  still sign off, right?

18  A    Yes, because the person went through the training and they

19  witnessed that the training was done.

20  Q    Okay, I see.  So, there were times when that part of the

21  training would occur and you weren't there, and would you let

22  Rob Pooley sign off?

23  A    Any evaluator could sign off on those jumps.

24  Q    Right, I meant the final endorsement signed by you.

25  A    Okay.

Garmashov - Direct by Crager

1   Q    I want to talk about why you might give Rob Pooley some

2   leeway using your signature.  I want to rewind to 2015, in

3   August, and Rob Pooley came to you, and he said my ratings are

4   suspended and I need your help.

5   A    Yes.

6   Q    Temporarily?

7   A    Yes.

8   Q    And your understanding was it was a one-year suspension?

9   A    Yes.

10  Q    And after one year they would consider reinstating him?

11  A    Yes.

12  Q    And at that time you had known Rob for a long time.

13  A    Yes.

14  Q    For 10 years at that point.

15  A    I don't know exact date when I met Rob first time, but

16  yes, I think it would be safe to assume so.

17  Q    So it was probably about 10 years, so maybe around 2005

18  you met him?

19  A    Probably.

20  Q    And you respected him as a skydiver.

21  A    Yes.

22  Q    And, in fact, he had a lot more experience than you.

23  A    Yes.

24  Q    He became a tandem examiner years before you did.

25  A    Yes.

Garmashov - Direct by Crager

1    Q    In 2014 you decided you wanted to be a tandem examiner.

2    A    Yes.

3    Q    To become a tandem examiner, you need to do training.

4    A    Under the supervision of an examiner, yes.

5    Q    Sorry, to become a tandem examiner, the process includes

6    that you have to undergo some training, correct?

7    A    Yes.

8    Q    And part of that process is that you need to study under

9    someone who's currently a tandem examiner?

10   A    No, part of the training is that you have to teach a

11   course on the direct supervision of current examiner.

12   Q    So, a current examiner needs to oversee you while you lead

13   the course?

14   A    Yes.

15   Q    Okay.  As kind of like an apprenticeship where someone's

16   helping you learn how to do something new?

17   A    I would say so.

18   Q    And when you are in that process you chose Rob Pooley?

19   A    Yes.

20   Q    To be your -- to be an apprentice to him basically?

21   A    I guess you could put it that way, yes.

22   Q    He was your supervising examiner?

23   A    For that course that I taught under his supervision,

24   correct.

25   Q    And when that was happening, he was basically training you

Garmashov - Direct by Crager

1    how to be a tandem examiner?

2    A    He was supervising me teaching a course.

3    Q    Sure, but you chose him so that he would show you the

4    right way to do it.

5    A    I chose him because he was there at the drop zone.  You're

6    not having other examiners there.  He was running the course

7    and that's why I chose him and asked him if I could run the

8    course for him and he could supervise me.

9    Q    I see.  Did you think he was a good examiner.

10   A    Yes.

11   Q    And you did think that he trained people well.

12   A    Yes.

13   Q    And that he knew what he was doing with the tandem

14   examiner training.

15   A    Yes.

16   Q    So when Rob Pooley came to you in 2015, you agreed to help

17   him?

18   A    Yes.

19   Q    You agreed to sign off on his trainings.

20   A    Yes.

21   Q    He would train and you would sign off.

22   A    Yes.

23   Q    Now, I want to talk about what happened in the summer of

24   2016 regarding the paperwork --

25   A    Okay.

1  Q    -- and specifically when you got the paperwork from the

2  people that were training that summer.

3       You returned to the United States to Lodi or to California

4  anyway on August 2 of 2016.

5  A    I believe so.

6  Q    On August 3 you went to Lodi and Rob Pooley handed you a

7  stack of papers from the tandem candidates that summer.

8  A    No.

9  Q    All right.  I would like to turn to Exhibit 2062.  You

10  believe it's in that same binder.

11      THE COURT:  We need to take a 10-minute recess.  While

12  the jury was out during that period of time, the court reporter

13  was working, so I need to take a recess for her.  A 10-minute

14  recess, ladies and gentlemen.  Remember the admonition.

15      (Recess taken 3:30 p.m. to 3:40 p.m.)

16      THE COURT:  Everyone is present, you may continue.

17  BY MS. CRAGER:

18  Q    I want to talk about what we were talking about just for a

19  moment.  I want to pull up the first page of Exhibit 2044,

20  which has already been admitted.

21      So, this is the e-mail we were talking about where Rob

22  sent paperwork signed Yuri Garmashov and it was ordered to you;

23  is that right?

24  A    Yes.

25  Q    This e-mail is dated August 26, 2015?

1    A    Okay.

2    Q    Is that right?

3    A    That's what it says.

4    Q    Okay, and we already covered that you didn't respond to

5    Sheryl Bothwell to say Rob shouldn't be sending paperwork like

6    that?

7    A    Correct.

8    Q    Now, I would like to turn to Page 1 of Exhibit 2132, I

9    don't think that's been admitted yet.  Do you have that binder

10   in front of you?

11   A    I don't.

12   Q    Okay, let me -- if I may approach.  I'll get that.

13        THE COURT:  So far we just have Pages 8 and 9.  Any

14   objection to Page 1?

15        MS. LYDON:  We're getting to that exhibit, sorry.

16   2132?

17        THE COURT:  Yes.

18        MS. LYDON:  No, Your Honor.

19        THE COURT:  All right.  Page 1 of Exhibit 2132 is also

20   received in evidence.

21        (Defendant's Exhibit 2132 Page 1 admitted in evidence.)

22        MS. CRAGER:  Thank you, Your Honor, I would like to

23   publish.

24   BY MS. CRAGER:

25   Q    This is the e-mail transmitting Vicky Allen's paperwork?

Garmashov - Direct by Crager

1   A    Correct, yes.

2   Q    And this e-mail is from Rob Pooley at

3   Parachutecentervideodesk@gmail.com?

4   A    That's what it says.

5   Q    It's to Susan Sullivan at the USPA?

6   A    That's what it says.

7   Q    And it's signed "Yuri."

8   A    That's what it says.

9   Q    And you never had a conversation with Susan Sullivan at

10  the USPA saying, "Rob Pooley can't use my name"?

11  A    No, I never did, and Susan never asked me that.  That

12  e-mail came from Rob's e-mail address.  So that never came up

13  and I never paid attention to it.

14  Q    I see.  You never paid attention to that, okay.  I would

15  like to turn to the next exhibit in your binder, 2133.

16       Does this appear to be a response by Susan Sullivan to the

17  e-mail we were just looking at?

18  A    Could you repeat that question, please?

19  Q    Does this e-mail appear to be a response to the e-mail

20  that we were just looking at?

21  A    I don't know.  Maybe.  That's what it says, I guess, yes.

22  Q    Okay.

23       MS. CRAGER:  I would like to admit Exhibit 2133, just

24  one page.

25       MS. LYDON:  No objection.

Garmashov - Direct by Crager

1          THE COURT:  Exhibit 2133 is received in evidence.

2          (Defendant's Exhibit 2133 admitted in evidence.)

3     BY MS. CRAGER:

4     Q    This is Susan Sullivan's e-mail response at the top.

5     A    That's what it says.

6     Q    And she responds just saying "Thanks."

7     A    And she responds to Rob, right?

8     Q    She responds to Rob Pooley at

9     Parachutecentervideodesk@gmail.com?

10    A    That's what it says, yes.

11         MS. CRAGER:  You could take that down.

12    BY MS. CRAGER:

13    Q    I would like to move on to when you received the paperwork

14    for the summer candidates.  My question is on August 3 you went

15    to Lodi, and Rob Pooley handed you a stack of paperwork for the

16    candidates who took the tandem instructor course that summer.

17    A    No.

18    Q    Okay.  So, now let's turn to Exhibit 2062 R.  Actually,

19    let's turn to that.  The R exhibit is right after 2062.

20         You corresponded with a David Jensen at the FAA, correct?

21    A    Yes.

22    Q    And you told him you flew into SFO around 11:00 p.m. on

23    August 2, correct?

24    A    That's what it says.

25    Q    You got home around 2 a.m., correct?

Garmashov - Direct by Crager

1   A    That's what it says.

2   Q    On August 3 you went to Lodi, correct?

3   A    Yes.

4   Q    We could put that away.  Now, isn't it true that until

5   approximately August 8 of 2016, you and Rob had a plan to just

6   submit all that paperwork?

7   A    No.  I don't know that Rob was training people while I was

8   out of the country.

9   Q    I understand that you're saying that now.  Let's talk

10  about that some more.

11       Isn't it true that you and Rob had text messages about

12  this?

13  A    We had text message about a candidate that was missing

14  some paperwork, and I got asked by Jim Crouch while I was in

15  Poland, I believe, or maybe it was in Lithuania, that there was

16  some papers missing.  I asked Rob to submit those papers that

17  were missing, yes.

18  Q    I'm talking about other text messages that you had with

19  him in August of 2016, about how you wouldn't be able to submit

20  that paperwork after all.

21  A    I'm not sure what you're talking about.

22  Q    You don't -- you didn't have text messages about that?

23  A    What text messages about what?

24  Q    Did you have text messages with him about how UPT had

25  found out that you were out of the country so you wouldn't be

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Garmashov - Direct by Crager

1    able to submit the paperwork after all?

2    A    I don't remember that.

3    Q    You don't remember that?

4    A    No.

5    Q    You don't remember asking Rob how many sets of paperwork

6    needed to be submitted?

7    A    No.

8    Q    All right.  Well, let's take a look at some of the text

9    messages.  We could turn to Exhibit 2060.  I need to pass you

10   another binder; it should be there.  Do you have that in front

11   of you?

12   A    Yes.

13   Q    Do those look like text messages you had with Rob Pooley?

14   A    Yes, they might as well be.

15   Q    You were discussing the paperwork and how he wouldn't be

16   able to submit it to you after all because UPT found out.

17   A    If you look on this text message, it says right here, Yes,

18   you need to refund all these people.  UPT will not process any

19   paperwork from me from Lodi.  I don't know anything about USPA.

20   I was not in the country when the guy was trained and both USPA

21   and UPT know that.

22         MS. CRAGER:  Your Honor, I move to admit Exhibit 2060,

23   maybe we'll just take a look at these.

24         MS. LYDON:  What is the foundation for Exhibit 2060?

25         MS. CRAGER:  He indicated these were text messages he

Garmashov - Direct by Crager

1  had with Rob Pooley.

2          MS. LYDON:  I think he said "looks like."

3          MS. CRAGER:  Yes.

4          MS. LYDON:  So they are not --

5          THE COURT:  Are you objecting to me or are you having

6  a discussion with her?

7          MS. LYDON:  The objection may be able to be cured, but

8  as of now I'm objecting on the foundation.

9          THE COURT:  He said "might as well be."  You could

10 clarify that.  I don't know if he was verifying it or not.

11 BY MS. CRAGER:

12 Q    Do these look like text messages that you had with Rob

13 Pooley?

14 A    Yes.

15 Q    Okay.

16         MS. CRAGER:  Move to admit Exhibit 2060.

17         MS. LYDON:  No objection.

18         THE COURT:  Exhibit 2060 is received in evidence.

19      (Defendant's Exhibit 2060 admitted in evidence.)

20 BY MS. CRAGER:

21 Q    I would like to publish Page 1, please.

22      All right.  The first text message here is from Rob Pooley

23 to you, correct?

24 A    Yes.

25 Q    And he says, "We should chat sometime."

1    A    Yes.

2    Q    Okay.  And then you reply, "I'll be in Lodi tomorrow."

3    A    Yes.

4    Q    And then the next day on August 8, it sounds like you had

5    some discussion, and on August 8 he texts you, "Have things

6    changed since we talked this morning?"

7    A    That's what it says here, yes.

8    Q    And you replied what you just read to us, "Yes,"

9    indicating that things have changed, correct?

10   A    I would assume so, yes.  I don't remember my exact state

11   of mind at that moment.  Like I said, it was nine years ago,

12   eight years ago, so that's what it says there.

13   Q    But it seems to indicate that you and Rob had a

14   conversation.

15   A    Okay.

16   Q    Is that right, on approximately August 8 you and Rob had a

17   conversation?

18   A    Yes.  Maybe.  I don't know.  I don't remember, like I

19   said.

20   Q    Sure.  I'm just asking about these text messages.  After

21   that conversation, it appears that he asked you if things have

22   changed since you talked.

23   A    Yes.

24   Q    And you indicated that things had changed.

25   A    What I sent him in the text message was, Yes, you need to

1    refund all those people, that's what I sent him in the text

2    message.

3    Q    So things had changed because "UPT will not process any

4    paperwork from me from Lodi"?

5    A    That's what it says here.

6    Q    Okay.  Now, at some point during this conversation you

7    asked him how many sets of paperwork?

8    A    No, what I'm asking is, "How many, Rob," that's what I'm

9    asking.  What I'm asking is how many people have you trained

10   while I was gone, that's what I'm asking here.

11   Q    Okay.  So, you're asking about how many people he trained

12   while were you gone.

13        Let's go to Page 2, please.  So, this says -- you just

14   said it refers to how many people he trained while you were

15   gone.  His response is, "Okay, the ones you have" --

16   A    Where?

17   Q    At the bottom of that same page we were just looking at,

18   Page 2, it's also on the screen.  I could go with that portion

19   of it.

20   A    Okay, yes.

21   Q    So you asked, "How many people had you trained this

22   summer," and he said, "The ones you have."

23   A    Yes.

24   Q    Okay.

25        MS. CRAGER:  Thanks, we could take that down.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Garmashov - Direct by Crager

1    THE WITNESS:  I believe I need to explain that

2  statement, though.

3  BY MS. CRAGER:

4  Q    Okay.

5  A    Do you want me to?

6  Q    You'll have an opportunity to do that when the prosecutor

7  asks you some questions.

8    I do want to talk about the paperwork that you had in

9  early August.  You had paperwork from the candidates, correct?

10  A    Yes.

11  Q    And I guess I'm curious, what is your contention today

12  about where you got that paperwork?

13  A    I got that paperwork from the candidates.

14  Q    You got the paperwork from the candidates?

15  A    Correct.

16  Q    Okay.  You didn't meet all the candidates, did you?

17  A    I didn't meet all the candidates, no.

18  Q    Some of them you never met to this day.

19  A    Some of them I never met to this day.

20  Q    Okay.  But in early August of 2016 you had paperwork from

21  candidates that you had not even met.

22  A    I'm not sure if I had paperwork from candidates that I

23  never even met.  What I had, I had paper from candidates who

24  gave it to me.  Well, not really gave it to me.  I took it from

25  them because I said, "That paperwork is fake.  It's not valid."

Garmashov - Direct by Crager

1    I forward all those names to USPA.

2    Q    Okay.  You just testified that you had paperwork because

3    you took it from the candidates.

4    A    Correct.

5    Q    Okay.  Then there were other candidates that you trained

6    that summer, correct?

7    A    Yes.

8    Q    And you've never met them?

9    A    Yes.

10   Q    Isn't it true that you had their paperwork?

11   A    I don't remember.  I don't know.  I will need to look at

12   the paperwork and see what paperwork I had.  What I remember is

13   when I talked to people who were trained by Rob and they asked

14   me to submit the paperwork, I took it from them because it

15   wasn't valid and that's what I had and that's what I forwarded

16   to USPA and to the investigator from FAA.

17   Q    So, your testimony is you're not sure if you had paperwork

18   from people you've never met.

19   A    Yes.

20   Q    Okay.  But you're saying today that you got paperwork from

21   the candidates.

22   A    Yes.

23   Q    Okay.  Then how did you get paperwork from people that

24   you've never met?

25   A    I just said that I don't remember having paperwork from

Garmashov - Direct by Crager

1    people that I never met.  What I said, I got the paper from the

2    candidates, and you have to excuse me, like I said, that whole

3    not only weekly, monthly, August, September, October, they were

4    pretty chaotic.  There were some things that I remember better

5    than other things.

6    Q    Okay.  Well, let's look at some of the statements you made

7    back then.  Let's turn to Exhibit 2061; are you there?

8    A    Yes.

9    Q    This is you corresponding in an e-mail with Tom Newman --

10   Noonan, I'm sorry.

11   A    Yes.

12   Q    And he was at UPT.

13   A    Yes.

14   Q    And he was interested in what paperwork you had.

15   A    Yes.

16   Q    And you listed some people's paperwork who you did meet

17   presumably.

18   A    Yes.

19   Q    Okay.  And you also listed here the paperwork you had from

20   people that you had not even met.

21   A    Yes, that's what it says here in the e-mail.

22   Q    And there are three names there of people you had not even

23   met.

24   A    Yes.

25   Q    And you had their paperwork?

Garmashov - Direct by Crager

1    A    Yes, I guess, yes.

2    Q    But that's what you said; isn't it?

3    A    Yes.

4    Q    I want to talk about what else you've said about this

5    paperwork.  For a long time it seemed like the tandem

6    instructor paperwork was the only thing people wanted to talk

7    to you about; is that how it was?

8    A    What do you mean by that?

9    Q    Well, let's just get into it.  There were a lot of times

10   that you talked about this paperwork.

11   A    Yes.

12   Q    And you talked about it in e-mails.

13   A    Sure.

14   Q    To the Parachute Association.

15   A    Yes.

16   Q    To the UPT.

17   A    Yes.

18   Q    To the FAA.

19   A    Yes.

20   Q    To federal agents.

21   A    Yes.

22   Q    To federal prosecutors.

23   A    Yes.

24   Q    And you talked to these prosecutors right here.

25   A    Yes.

Garmashov - Direct by Crager

1    Q    You talked to them multiple times.

2    A    Just once.

3    Q    You talked to other prosecutors another time.

4    A    No.

5    Q    You didn't talk to multiple prosecutors in this case.

6    A    I don't believe so.

7    Q    All right.

8    A    Maybe I was that I am not aware of.  These are the

9    prosecutors that I only talked to.

10   Q    Okay.  So, you're not aware of anybody else you talked to?

11   A    No.

12   Q    You also sat for a deposition.

13   A    Yes, I did.

14   Q    And then you also wrote a long statement to the Parachute

15   Association.

16   A    Correct.

17   Q    Let's talk about some of the things you said about the

18   paperwork and where it was.

19        So, as we just talked about, this e-mail to Tom Noonan,

20   that was on August 10 of 2016; is that correct?

21   A    That's what it says.

22   Q    And you said that you had the paperwork for people that

23   were trained that summer.

24   A    Yes.

25   Q    Okay.  Even people that you had never met?

Garmashov - Direct by Crager

1  A    Yes.

2  Q    And later, I guess today, you're saying that you got the

3  paperwork just from the candidates themselves?

4  A    Okay.  I got the paperwork from the candidates themselves.

5  Like I said, I don't remember getting paperwork, I never got

6  any paperwork from Rob for it to be submitted because that was

7  my assumption with your question.

8      I never got paperwork from Ron.  I got paperwork from

9  people who were there, whose paperwork was not submitted.  I

10  also got paperwork of people who were trained by Rob who are

11  out of the country.  I believe I got it from Bill.

12  Q    Now you're saying you got the paperwork from Bill?

13  A    That's what I believe so, yes.

14  Q    Okay.  You've never said that one before.  Have you ever

15  said that before?

16  A    I don't know, maybe I did.  I did.  Yes.  There was an

17  e-mail with the FAA investigator saying that I got paperwork

18  from Bill.

19  Q    Okay.  We'll get to that, then.

20      When you talked to the federal prosecutors in this case,

21  they asked you about where you got the paperwork, right?

22  A    Yes.

23  Q    And you said that you got it from the candidates.

24  A    Yes.

25  Q    But you didn't explain to them how you had paperwork from

Garmashov - Direct by Crager

1   people you never met.

2   A    Nobody asked me that.

3   Q    Okay.  Let's talk now about what you told Dave Jensen at

4   the FAA on August 17, 2016.  You told him that you didn't have

5   the paperwork.

6   A    Maybe then I didn't have the paperwork.  I don't know.

7   What did I have?

8   Q    Did you tell him you didn't have the paperwork on

9   August 17?

10  A    You have to put me in the direction where I could look at

11  the e-mail.

12  Q    Sure.  I actually misplaced that at the moment, so now I'm

13  going to come back to that one.  I do now want to talk about

14  the deposition that you sat for, and during that deposition

15  they asked you, they asked you, "What happened to the

16  paperwork?"

17  A    Okay, you have it in front of me.  I don't -- I don't

18  remember that as clear.  You studied this for a very long time,

19  and I don't have -- all I have is my notes, and you have those

20  notes that I written to USPA and stuff, so I would be going off

21  those notes.

22  Q    So, let's look at -- just so we're all looking at the same

23  thing, I'm going to look at 2080, look at Page 31.

24        MS. LYDON:  Your Honor, I'm going to object just

25  putting the document in front of the witness.

Garmashov - Direct by Crager

1    THE COURT:  Is this part of a deposition?

2    MS. CRAGER:  This is part of the deposition.  I just

3  wanted to ask him the question.  I wanted to make sure he had

4  the same information I have.

5  BY MS. CRAGER:

6  Q    My question is:  Did you say in your deposition that Rob

7  had the paperwork and you just didn't know what he did with it?

8  A    You have the deposition in front of you, I don't remember

9  what I said.  So, if it says there -- I believe it was all

10  stenographed, and it was all written down, so that means that's

11  what I said.

12  Q    So, if it would help you to remember if you look at the

13  transcript.

14  A    If the transcript is there, that means I said it.  I don't

15  know what you expect on it of me.

16  Q    I'm just trying to make sure we have everything correct.

17  A    If you have the transcript, the transcript is there.

18  Q    Okay.  So would you like to look at the transcript to see

19  if it helps you remember what you said?

20    THE COURT:  I think what he's saying is that he will

21  accept whatever is in the transcript.

22    MS. CRAGER:  Okay.

23    THE COURT:  Correct?

24    THE WITNESS:  Yes, sir.

25

Garmashov - Direct by Crager

1   BY MS. CRAGER:

2   Q    So, if the transcript says, "Question:  Did Rob say what

3   he did with the forms after affixing your signature on them?

4        "Answer:  No," is that what you said?

5   A    If that's what the transcript said, then it's yes.

6   Q    Okay.  Now, you also wrote a statement to the USPA as we

7   talked about.

8   A    Yes.

9   Q    And you wrote in a statement that candidates were chasing

10  you around holding their paperwork.

11  A    Those are the ones that I got the paperwork from.

12  Q    But in 2021 you talked to two federal agents who asked you

13  a lot of questions.

14  A    Yes.

15  Q    And they asked you who would have the paperwork in early

16  August?

17  A    I guess they did.  You have the transcript, like I said.

18  Q    So the transcript says that you said, "I have no idea,"

19  then that would be what you said?

20  A    If it says so, then yes.

21  Q    Okay.  A few months later in 2021 you talked to a federal

22  prosecutor and an agent; do you remember that?

23  A    Sure.

24  Q    Does it sound like something that happened?

25  A    Yes.

Garmashov - Direct by Crager

1  Q    Was your attorney there with you?

2  A    On the phone, yes.

3  Q    Okay.  And at that time they asked you what happened to

4  the paperwork?

5  A    Okay.

6  Q    Well, do you remember saying that you left the paperwork

7  in your locker?

8  A    Okay, I guess, yes.  That's what I remember.  You have

9  to excuse me, but the events that you are describing here, you

10  are describing 2016 when it all happened, and then you are

11  describing 2021, which is five years later.

12  Q    Yes.  Let me clarify.  So, I'm just asking you right now

13  all the different things you've said about the whereabouts of

14  the paperwork in August of 2016.

15  A    Okay.

16  Q    One of the things that you said in 2021 when interviewed

17  about the paperwork, was you left the paperwork in your locker?

18  A    Okay.

19  Q    You also said you believed it was still sitting in your

20  locker for more than a year.

21  A    No.

22  Q    You didn't say that?

23  A    I don't remember saying that.  Like I said, I left the

24  paperwork in my locker.  After I took that paperwork from the

25  candidates, the papers that I had, it was in my locker, but

Garmashov - Direct by Crager

1    after that there was a raid in Lodi, and there was a bunch of

2    federal investigators going in there and going through the

3    locker.  So, going back to my locker, the paperwork wasn't

4    there, and I'm not sure where it went after that.

5    Q    But at some point you did say you didn't give it to Bill,

6    you didn't give it to Rob, you left it in your locker.

7    A    Yes.

8    Q    You also claimed no one ever asked you for it.

9    A    If it says so, yes.

10        THE COURT:  Two different things.  There's the

11   deposition, which you've said you will accept the testimony

12   from the deposition, but she's now talking about something a

13   little different; that's an interview, which is not the same as

14   transcript from a deposition.  So you may or may not agree with

15   what the person that interviews you says.

16        THE WITNESS:  Okay.  Can we clarify what we're talking

17   about?

18        THE COURT:  Can you clarify what it is you're talking

19   about?

20        MS. CRAGER:  Sure.

21   BY MS. CRAGER:

22   Q    So in 2021, you spoke with a prosecutor and a federal

23   agent, and you had your attorney on the phone; do you remember

24   that meeting?

25   A    I believe I spoke with the federal agent and nobody said

1  anything about a prosecutor being there -- well, maybe it was

2  there.  I don't remember, like I said.  I spoke with people on

3  the phone, yes, and my attorney was on the phone as well.

4  Q    And it looks like it wasn't an in-person meeting, it was

5  like a video call; does that sound familiar?

6  A    Yes.

7  Q    And Special Agent Reggie Lee was there?

8  A    Yes.

9  Q    And your attorney Benjamin Alper was there?

10  A    Yes.

11  Q    And a person named Assistant United States Attorney

12  Christopher Hales was there?

13  A    That doesn't ring any bells.  I don't know.  Maybe.

14  Q    But you remember roughly those people being in a meeting

15  with you on a video call?

16  A    I don't remember a video call.  I remember a phone call.

17  I don't remember being a video call, okay.

18  Q    But you had a meeting with these people, and I'm saying in

19  this meeting they asked about the paperwork, and you said, "I

20  left it in my locker"?

21  A    Yes.

22  Q    And you also said you thought it was going to be still

23  sitting there until 2018 when the search warrant was executed?

24  A    Okay.

25  Q    Is that what you told them?

Garmashov - Direct by Crager

1   A    I don't remember.  It was three years ago.

2   Q    Sure.  Okay.  Would it help you remember if you looked at

3   some reports that was prepared about what you said?

4   A    I don't know, maybe.  I don't remember that conversation.

5   I can't give you details, but show me the report, I'll look at

6   it.  I don't know.

7   Q    So, we're going to turn to Exhibit 2108.  It should be in

8   Binder Number 7, I believe, in front of you.  I'm sorry, Binder

9   6.  If you don't have that, I could come up.

10       I know that's pretty long.  Let's look at Paragraph 4.

11  A    That looks correct.

12  Q    Okay so, you told them you had the paperwork and you left

13  it in your locker.

14  A    I don't remember the specifics of what I told them, but

15  yes, that would be correct statement, I'll have the paperwork

16  in my locker and then it was gone after the raid.

17  Q    And you also claim that no one ever asked you for the

18  paperwork.

19  A    Yes.

20  Q    Okay.  Let's move on.  I want to talk about why it might

21  be in your best interest to deny having an agreement with Rob

22  Pooley.

23  A    I never denied I had an agreement with Rob Pooley.

24  Q    Let me rephrase why it might be in your best interest to

25  deny that you knew about the trainings that summer and had the

1   paperwork.

2           THE COURT:  Well, he doesn't need to answer that.

3           MS. CRAGER:  Sure.

4           THE COURT:  You're just telling all of us where you're

5   headed.

6           MS. CRAGER:  Yes, exactly.

7           THE COURT:  You don't have that answer that question.

8   BY MS. CRAGER:

9   Q    So, your understanding was in early August there was an

10  investigation that began of the tandem ratings of a person

11  named Yung Kwon.

12  A    Yes.

13  Q    Yung Kwon, as you understand, had been doing tandem jumps,

14  but the Parachute Association and UPT had no record of him.

15  A    Okay.

16  Q    Is that your understanding?

17  A    Yes.

18  Q    Eventually, the Parachute Association and UPT found out

19  that your signature was on the paperwork.

20  A    Okay.

21  Q    The paperwork that had not yet been submitted.

22  A    Okay.

23  Q    Is that your understanding of what happened?

24  A    No.

25  Q    Did they eventually find out that your signature was on

1   the paperwork?

2   A    Yes, they did, and I believe I told them.

3   Q    And you told them.

4   A    I had a conversation when I met all those candidates the

5   next day, and I had a conversation with Tom Noonan, and I had a

6   conversation with Jay Stokes asking them what to do, what to do

7   in this case, and then --

8   Q    They knew?

9   A    Yes, they did know.

10  Q    They knew that your signature was on the paperwork, and

11  they knew that you were out of the country?

12  A    Yes.

13  Q    So, your signature was on paperwork for someone you didn't

14  train?

15  A    Yes.

16  Q    Or supervise their training?

17  A    Yes.

18  Q    And the Parachute Association knew that?

19  A    Yes.

20  Q    You knew that the Parachute Association could revoke your

21  ratings.

22  A    No, I didn't.

23  Q    Well, you had been told by Jay Stokes during your training

24  that a tandem examiner who signs off on paperwork for training

25  they didn't conduct could lead to a rating revocation.

Garmashov - Direct by Crager

1   A    Okay.

2   Q    Were you told that?

3   A    I don't remember.  There was a lot of words said during

4   the training.  If Jay Stokes says so, then it is yes.

5   Q    Okay.  But it's your understanding that if you signed off

6   on a training for someone you didn't train and you didn't

7   supervise, the Parachute Association would not like that.

8   A    Correct.

9   Q    And they might revoke your ratings.

10  A    Yes.  That's why when I called Tom Noonan and Jay Stokes,

11  I asked them what happened, what do I do, what's going on?

12  Q    We could talk about that later.  The point is you knew

13  that if the Parachute Association thought that you let Rob

14  Pooley do this, they would revoke your ratings?

15  A    That would be a pretty bold statement that I knew, you

16  know.  Nobody knows anything, but it would be a safe

17  assumption, yes.

18  Q    And that's what you assumed?

19  A    I don't think I assumed that.  I don't think I did

20  anything that was contradicting the DSRs.  I was using

21  evaluators who currently had their ratings, and Rob had his

22  tandem rating at that particular moment while I was using him,

23  while he was training under my supervision, yes.

24  Q    I'm asking if the Parachute Association knows that your

25  signature's on paperwork for someone you didn't train or

Garmashov - Direct by Crager

1    supervise, they might revoke your ratings?

2    A    You have to ask the USPA about that.

3    Q    So is your testimony that they would be totally fine with

4    that?

5    A    My testimony is that fraudulent activity is against the

6    law.

7    Q    Sure.  I'm asking your understanding about what would

8    happen to your ratings if the USPA thought you had given Rob

9    Pooley permission to do this.

10           THE WITNESS:  You have to ask USPA.

11           THE COURT:  Ask it again.  She's asking for your

12   understanding, not what the USPA actually would do.  She wants

13   to know your understanding of what you think they would do.  So

14   ask it again.

15   BY MS. CRAGER:

16   Q    Your understanding is that if the USPA knew that your

17   signature was on paperwork for someone you did not train or

18   supervise, they might revoke your ratings.

19   A    Yes.

20   Q    You did not want your ratings to be revoked.

21   A    No.

22   Q    And that was the time that you told them Rob must have

23   used your signature without your consent.

24   A    Yes.

25   Q    All right.  I want to talk about what happens next, which

Garmashov - Direct by Crager

1  has to do with a letter that I think you know what I'm talking

2  about.  The first thing that happened was that the Parachute

3  Association started investigating.

4  A    Yes.

5  Q    And they actually suspended your ratings for 60 days --

6  A    Yes.

7  Q    -- while they investigated.

8  A    Yes.

9  Q    The next day the UPT also suspended your ratings.

10  A    Okay, yes.  I don't remember the exact dates, but yes.

11  Q    But they also suspended your ratings while they

12  investigated.

13  A    Yes.

14  Q    Around September 1 of 2016, the Parachute Association

15  released a statement to the skydiving community; is that what

16  happened?

17  A    Sure.

18  Q    Do you remember that?

19  A    Okay, yes.

20  Q    And their statement indicated that they were investigating

21  you?

22  A    If you bring up the statement now, and yes, I think they

23  were investigating two people there, if I remember correctly.

24  Q    You and Rob Pooley?

25  A    Yes.

Garmashov - Direct by Crager

1  Q    Okay.  And the statement noted that your ratings were

2  suspended pending the investigation.

3  A    Yes.

4  Q    You were worried that the Parachute Association might

5  revoke your ratings permanently.

6  A    No.

7  Q    You weren't worried about that at all.

8  A    No.

9  Q    Okay.

10  A    Do you want me to explain?  I wasn't worried that my

11  ratings would be revoked permanently because I knew that -- I

12  hoped that once the investigation was over they will see what

13  was going on, and I would be following like I'm not associated

14  with that at all and get my ratings back.

15  Q    So, your hope was that you could prove that you were not

16  associated with Rob Pooley at all to get your ratings back.

17  A    Yes.

18  Q    Okay.  So let's talk about some of the steps you took to

19  make that work out for you.  You wanted to look good to the

20  Parachute Association.

21  A    If you say so, yes.

22  Q    Is that what you wanted?

23  A    I wanted to look good for everybody all the time.

24  Q    Including the Parachute Association --

25  A    Including the Parachute Association, correct.

Garmashov - Direct by Crager

1   Q    -- when they might revoke your ratings.

2   A    Yes.

3   Q    And you wanted them to see you in the best light.

4   A    No, I wanted them to see me as me.

5   Q    Okay.  But you in the best light, right?

6   A    No, I just wanted them to see me as me.  It don't matter

7  what the light is shining, you are you.

8   Q    So you wrote to dozens of people by e-mail after the USPA

9  statement went out asking them to write letters on your behalf.

10  A    Yes, I did.

11  Q    You said, "Before I send my protest to USPA, I would like

12  to get some support from you"?

13  A    Sure.

14  Q    Is that what you wrote?

15  A    Sounds like me, yes.

16  Q    Okay.  So you had lots of people -- you solicited letters

17  from a lot of people.

18  A    Yes, I sent out an e-mail, and people wrote e-mails to

19  USPA and to me as well, yes.

20  Q    But you asked them to write these letters for you.

21  A    I asked them to write letters describing my courses and

22  describing me as an examiner.

23  Q    Okay.

24  A    How I was doing my job, that's what I asked them to do.

25  Q    And in some cases you wrote a letter in support of

1  yourself and had somebody else sign it?

2  A    I don't really remember.  Maybe.

3  Q    That might have happened?

4  A    I don't think so.

5  Q    You don't think that happened?

6  A    I might have translated it, but no -- well, I remember

7  people actually asking me, they said no, I won't be translating

8  this for you.  So, there was actually a guy who wrote a letter

9  and he translated it and authorized it because he was in

10  Ukraine or something and sent a letter.

11  Q    Let's look at Exhibit 2112.

12  A    Okay.

13  Q    It's in that same binder.  The first page it looks like

14  it's in Russian.

15  A    Yes.

16  Q    And then that second page is a letter.

17  A    Yes.

18  Q    And it's a letter from your e-mail account.

19  A    This is, yes.

20  Q    Okay.  It's to -- that's in Russian, so I can't read it.

21  It's to a person with a Russian e-mail address.

22  A    Correct.

23  Q    And it's a letter in support of you?

24  A    Yes.

25         MS. CRAGER:  Okay.  I move to admit Exhibit 2112.

Garmashov - Direct by Crager

1      THE COURT:  2112.

2      MS. LYDON:  We're just finding it, one moment.

3      THE COURT:  Letter in Russian.

4      MS. CRAGER:  The second page is in English, just the

5  first page.

6      THE WITNESS:  This is, if you see, this is a letter

7  from Alexey Kharitonov.  He actually wrote this e-mail to me,

8  and sent me this letter, and this is the e-mail.  I send this

9  to somebody else showing like an example of a letter, what

10  other people have shown, if I remember correctly, yes.

11  BY MS. CRAGER:

12  Q    So you offered people examples of things that they could

13  write.

14  A    A lot of people written e-mails, yes.

15      THE COURT:  You still want it in evidence?

16      MS. CRAGER:  We don't, Your Honor, that's fine.

17  BY MS. CRAGER:

18  Q    And after these letters came in, you provided them to the

19  Parachute Association.

20  A    Yes.

21  Q    When you provided them to the Parachute Association, you

22  said all of them were unsolicited.

23  A    Yes.

24  Q    But that wasn't true.

25  A    Maybe my understanding of "unsolicited" and your

1 understanding of "unsolicited" were different.  My

2 understanding of "unsolicited" was when I say, "Could you write

3 me a letter of recommendation," and people write those letters

4 of recommendation, I think that's unsolicited.  I'm not asking

5 them what to write or how to write it.  I told them, "I'm in

6 trouble, can you help me out," and that's what they did.

7 Q    But didn't you say, "Before I send my protest to USPA, I

8 would like to get some support from you," and then you offered

9 people examples of letters they could write on your behalf?

10 A    Okay.

11 Q    Is that what happened?

12 A    When I asked people, because you have to understand, like,

13 a lot of students that I train, they were from Russia and

14 Ukraine, and they never spoke English, so when I ask them,

15 that's what I send them in that statement.  They send me

16 letters, and they ask, "Is this good, is this good?"

17      Usually, I say, "This is good.  This is good enough."

18      If somebody asked me for an example, I would send them a

19 sample of somebody else's letter.  This is what other people

20 did.  That's what I did.

21 Q    Okay.  You said they were all unsolicited?

22 A    Yes.

23 Q    I want to talk about another way that you took action to

24 look good to the USPA.  You wanted Rob to help you, right?

25 A    Yes.

Garmashov - Direct by Crager

1    Q    You wanted him to provide a letter taking the blame.

2    A    Yes.  I thought it would only be the correct course of

3    action when a person uses your credential and then just to

4    stand up, for instance, stand up and, you know, for your own

5    actions, that's what I thought.

6    Q    I see.  And you wanted Rob to tell the Parachute

7    Association the same thing you had told them.

8    A    I wanted Rob to tell them the truth, yes.

9    Q    Which was the same thing.

10   A    That from May of 2016 until August of 2016, I had no idea

11   what was going on in Lodi.

12   Q    That's what you wanted Rob to tell the Parachute

13   Association.

14   A    Yes.

15   Q    And that he had used your signature without your knowledge

16   or consent.

17   A    Yes.

18   Q    That's what you wanted him to say.

19   A    Yes.

20   Q    Okay.  A letter like that was eventually written.

21   A    Yes.

22   Q    I would like to pull up that letter, it's Exhibit 1100,

23   it's already been admitted.  You've talked about this letter

24   before calling it Rob's confession, you used those words.

25   A    Yes, sure, I did use those words, I guess.

Garmashov - Direct by Crager

1  Q    I want you to go to Page 2.  So, this was the letter that

2  was eventually written.

3  A    Yes.

4  Q    That you wanted Rob to write.

5  A    Yes.

6  Q    And let's go back to Page 1, please.  And when it was

7  done, it was you who sent it to the Parachute Association.

8  A    Yes.

9  Q    And you said, "I don't know if Rob has sent you this

10  letter, but here's what he gave me."

11  A    That's what it says there.

12        MS. CRAGER:  Okay.  We could get out of that now.

13  Thank you.

14  BY MS. CRAGER:

15  Q    Let's talk about where that letter came from and whose

16  words are in it.  In September of 2016 you had a lawyer.

17  A    It was a friend.  It wasn't a lawyer.

18  Q    You had a friend who was also a lawyer?

19  A    Yes.

20  Q    And that person wrote the first draft of what became this

21  letter?

22  A    Yes.

23  Q    When you received this from your lawyer friend, you read

24  it?

25  A    Yes.

Garmashov - Direct by Crager

1    Q    You made edits?

2    A    No.

3    Q    You didn't make any edits?

4    A    No.

5    Q    Okay.

6    A    I don't think so.

7    Q    Okay.  Well, let's take a look.  Let's look at Exhibit

8    2067, which I don't think has been admitted yet.  I'm sorry, I

9    think it's 2068.  Do you have that in front of you?  It should

10   be in the binder, Binder 5, 2068.

11   A    Okay.

12   Q    Do you have that in front of you now?

13   A    Yes.

14   Q    Okay.  So, this is an e-mail from you, correct?

15   A    Yes.

16   Q    To Evan Beecher, correct?

17   A    Yes.

18   Q    Evan Beecher was your lawyer friend.

19   A    Yes.

20        MS. CRAGER:  I move to admit Exhibit 2068.

21        THE WITNESS:  It's not an e-mail from me.  It's a

22   response e-mail from me to Evan.

23   BY MS. CRAGER:

24   Q    Sure.  Yeah.  We'll talk about that.

25        THE COURT:  We're not talking about the letter that I

Garmashov - Direct by Crager

1   spoke to the jury about earlier, and there was some other

2   exhibits right around that.  You can refresh my recollection as

3   to the numbers of those.

4           MS. LYDON:  Yes, a more complete version of the

5   documents in evidence already is 1102.

6           THE COURT:  1102, all right.  Hold on just a second.

7           MS. CRAGER:  I'll grab that version as well, Your

8   Honor.

9           THE COURT:  I just want to tie them together.  Is this

10  2068 similar to 1102?

11          MS. CRAGER:  One moment, Your Honor.  I'm trying not

12  to duplicate exhibits.  I'll do my best.

13          I believe this is part of the same e-mail chain.  This

14  is just another earlier one than 2068.

15          THE COURT:  So, you want this in separately?

16          MS. CRAGER:  I don't feel that strongly, we could just

17  go off 1102.  I think it will be easier separately.

18          THE COURT:  It's up to you, 2068, do you want it in

19  evidence?

20          MS. CRAGER:  Yes, Your Honor.

21          THE COURT:  All right.  Exhibit 2068 is received in

22  evidence.

23      (Defendant's Exhibit 2068 admitted in evidence.)

24  BY MS. CRAGER:

25  Q   I would like to publish and turn to Page 2.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Garmashov - Direct by Crager

1      The bottom is an e-mail on September 5, 2016, from Evan

2   Beecher, your lawyer friend.

3   A    Yes.

4   Q    He said, "Based on what you told me, here's one way a

5   letter could be worded"; is that right?

6   A    That's what it says here.

7   Q    And then it starts, "To whom it may concern."

8   A    Yes.

9   Q    All right.  Let's get out of here and go to the next page.

10   This is the first draft of the letter that your lawyer friend

11   sent you.

12   A    Sure.

13   Q    Is that correct?

14   A    I would think so, yes.

15   Q    Based on this e-mail, right?

16   A    Based on this e-mail.

17   Q    Let's go back to Page 1, please.

18      Now, you responded to that e-mail, right?  This is your

19   e-mail address; is that right?

20   A    Yes.

21   Q    You responded, "What do you think about this," right?

22   A    Yes, that's what it says here.

23   Q    And then you put in a new edited version of that same

24   thing that your lawyer had written.

25   A    Okay.

Garmashov - Direct by Crager

1  Q    Is that right, you made some edits on what your lawyer

2  sent?

3  A    Not me.

4  Q    Not you?

5  A    No.

6  Q    You sent this e-mail saying, "What do you think about

7  this?"

8  A    Yes.

9  Q    With edits.

10  A    Yes.

11  Q    From your e-mail address.

12  A    Yes.

13  Q    You're saying you did not make those edits.

14  A    Correct.

15          THE COURT:  So who did?

16          THE WITNESS:  Rob did.

17  BY MS. CRAGER:

18  Q    Rob did?

19  A    What happened was I presented this e-mail to him, the

20  original draft, he said, I don't want this, this, and this in

21  there, and that's -- that was the version that I sent to Evan.

22          THE COURT:  We're getting into the middle of this

23  discussion and I hate to interrupt you, but it is 4:30.  So, I

24  think we need to take a break, and we could pick up on this

25  tomorrow morning.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Garmashov - Direct by Crager

1        MS. CRAGER:  Yes, Your Honor.

2        THE COURT:  Come back tomorrow morning.

3        Remember the admonitions, ladies and gentlemen.  We'll

4   see you all 9 o'clock tomorrow morning.

5        You could step down.

6      (In open court outside the presence of the jury.)

7        THE COURT:  All right.  I assume you will finish with

8   him tomorrow morning.

9        MS. CRAGER:  Yes, Your Honor.

10       THE COURT:  What next, if you want to tell us or if

11  you know?

12       MS. CRAGER:  Sure.  I am not 100 percent sure at this

13  time, but Mr. Pooley may testify.  I don't know yet.

14       THE COURT:  All right.  Do you want to share with us

15  whether there may be any other witnesses besides him?

16       MS. CRAGER:  At this point I don't think so.  I will

17  endeavor to let the prosecution know within the next hour if we

18  do anticipate anybody.

19       THE COURT:  All right.  That's good enough.  Now,

20  should we be prepared to talk about jury instructions tomorrow?

21       MS. CRAGER:  Yes, Your Honor.

22       THE COURT:  All right, Ms. Lydon?

23       MS. LYDON:  We'll be prepared.

24       THE COURT:  And then depending on whether we're able

25  to settle on jury instructions, and if so, when, then would we

1   be ready to go straight into arguments?

2           MS. CRAGER:  Yes, Your Honor.

3           MS. LYDON:  Yes.  To avoid any delay, the government

4   makes a *Jencks* demand.  I know we have to wait until the close

5   of cross-examination, but we've received a fragment of text

6   chains between -- or a text chain between the defendant and

7   this witness, Mr. Garmashov.  It would be most efficient if we

8   could receive that before the end of direct so that we have

9   time to review it, the entire text chain.

10          THE COURT:  Well, that's up to Ms. Crager if she wants

11  to share that before the witness testifies on direct.  She can,

12  but she doesn't have to.

13          MS. LYDON:  Of course, Your Honor.  We just want to

14  avoid delay, so we wanted to get that out there that we will

15  need time to review the entire text chain.

16          THE COURT:  All right.  Understood.  I think that is

17  where we are.  The Court will put together something which will

18  be a draft of jury instructions for us to discuss as soon as

19  all of the evidence has been completed.

20          MS. LYDON:  Thank you, Your Honor.  The government

21  also filed a Supplemental Trial Brief.

22          THE COURT:  We saw it.

23          MS. LYDON:  There may be no need, but just in case.

24          THE COURT:  That's what we were talking about on the

25  motion under Rule 29.

1        MS. LYDON:  Exactly, Your Honor.  Thank you.

2        THE COURT:  All right.  Thank you.

3      (Proceedings adjourned at 4:36 p.m.)

4

5                    C E R T I F I C A T E

6

7      I certify that the foregoing is a true and correct

8    transcript of the proceedings in the above-entitled matter.

9

10   _____        June 17, 2024
11   MARYANN VALENOTI, RMR, CRR                 DATE
     Official Court Reporter
12   CA CSR #11266

13

14

15

16

17

18

19

20

21

22

23

24

25

              MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275