```
 1                  UNITED STATES DISTRICT COURT          ORIGINAL

 2             FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                       BEFORE THE HONORABLE
               WILLIAM B. SHUBB, DISTRICT JUDGE PRESIDING
 4  _____

 5  UNITED STATES OF AMERICA,      )  Case No. 2:21-cr-00111-WBS-1
                                   )
 6  Plaintiff,                     )  Jury Trial Day 6
                                   )
 7             v.                  )  Date: 5/22/2024
                                   )
 8  ROBERT ALLEN POOLEY,           )
                                   )
 9  Defendant.                     )
                                   )
10  _____

11            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

12                     Pages 1 through 136

13  APPEARANCES:

14  For the Plaintiff:     UNITED STATES ATTORNEY'S OFFICE
                           501 I Street
15                         Suite 10-100
                           Sacramento, California 95814
16                         By:  KATHERINE THERESA LYDON, ESQ.
                           By:  DHRUV M. SHARMA, ESQ.
17
    For the Defendant:     OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                         801 I Street
                           Third Floor
19                         Sacramento, California 95814
                           By:  MIA CRAGER, ESQ.
20                         By:  MEGHAN McLOUGHLIN, ESQ.
    _____
21  OFFICIAL REPORTER:     Abigail R. Torres, CSR, RPR/RMR, FCRR
                           CSR No. 13700
22                         United States District Court
                           Eastern District of California
23                         501 I Street, Suite 4-100
                           Sacramento, California 95814
24
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.
```

1    **SACRAMENTO, CALIFORNIA; WEDNESDAY, MAY 22, 2024; 8:58 A.M.**

2                            -oOo-

3          (Jurors are identified by participant number only.

4           Any reference to personal identifiers regarding

5           jurors have been redacted.  Release of personal

6           information requires a motion and Court order.)

7                            -oOo-

8          THE COURT:  I heard that there's one juror that's a

9    little late.

10         MS. MCLOUGHLIN:  Your Honor?

11         THE COURT:  Yes.

12         MS. MCLOUGHLIN:  This is Meghan McLoughlin here.

13         For efficiency's sake, I thought I'd bring up one

14   issue that the parties do have.

15         THE COURT:  All right.

16         MS. MCLOUGHLIN:  And that is the question of whether

17   the text messages brought up in yesterday's testimony do

18   qualify under the Jencks Act and would require disclosure to

19   the Government.

20         THE COURT:  All right.  What's your position?

21         MS. MCLOUGHLIN:  Our position is that, first, the text

22   messages are statements of two different people, not just

23   statements of the witness.  They're the statements of

24   Mr. Pooley himself, as well.  And the plain language of the

25   rule states just the statements of the witness himself.

```
1              It also --
2              THE COURT:  That would depend on -- on what the
3    statements are.  For example, on the Government's side, if it
4    was an interview with the Government witness, question and
5    answer, then, I think, although I can never be sure until I see
6    what the Ninth Circuit says about something, that it would
7    qualify as a Jencks Act statement.  But the -- the questions
8    would be considered in the context of the answers.  So it
9    depends on what this line of e-mails or texts looks like.
10             MS. MCLOUGHLIN:  Yes, Your Honor.
11             And the second point is that while Mr. Garmashov is a
12   defense witness, the purpose of the rule is to provide
13   statements to be used to impeach him.  Ms. Crager has been
14   impeaching him this entire time.  These -- these text messages
15   are a bit different than the text messages between prospective
16   witnesses and FBI agents --
17             THE COURT:  Let's look at the statute itself.
18             What's the number?
19             MS. MCLOUGHLIN:  The rule is 26.2 in the Rules of
20   Criminal Procedure, Your Honor.
21             THE COURT:  It's technically not Jencks Act, of
22   course.  Jencks Act is a statute, and the rules apply to
23   statute.
24             MS. MCLOUGHLIN:  Yes, Your Honor.  The statute would
25   be 18, United States Code 3500.
```

```
 1                THE COURT:  All right.  But you want me to look at the

 2    rule?

 3                MS. MCLOUGHLIN:  Yes, Your Honor.

 4                THE COURT:  Are all the jurors here yet?

 5                THE CLERK:  No, Your Honor.  There's still the one.

 6                THE COURT:  Okay.  Good.

 7                All right.  What part of Rule 26?

 8                MS. MCLOUGHLIN:  Yes, Your Honor, 26.2, and that would

 9    be subsection F, define statement.

10                THE COURT:  All right.  The rule talks about

11    statements of the witness that relate to the subject matter of

12    the witness's testimony, and then it goes on to say that if the

13    statement contains information that is privileged or does not

14    relate to the subject matter of the witness's testimony, the

15    court must -- of course, must inspect the statement in camera.

16    And then the court may size any privilege to unrelated

17    portions.

18                So although it may not literally be what the rule's

19    referring to, I would suggest that I look at this statement and

20    redact anything that is contained in there that is a statement

21    of the defendant, rather than the witness, and then I give it

22    back to you, and we turn it over to the Government.

23                Does that sound reasonable?

24                MS. MCLOUGHLIN:  That sounds reasonable, Your Honor.

25                MR. SHARMA:  Your Honor, we typed up a brief last
```

 1    night on this when we were advised of the issue, so --

 2              THE COURT:  You what?

 3              MR. SHARMA:  We typed up a quick brief on this, and so

 4    we can file that for you to read.  There's at least one case I

 5    found where the court --

 6              THE COURT:  Can you ever work something out?  Give me

 7    the brief.  You can never work anything out.  You always want

 8    me to decide everything, and then when it finally comes down to

 9    push versus shove, you usually agree.

10              MS. LYDON:  Your Honor, we --

11              THE COURT:  We're in the middle of the trial.  You've

12    got the jury out there.  You're giving me briefs in the middle

13    of the trial, while the jury went through all the effort to get

14    here on time, which is really hard to do with the traffic.

15              I live five miles away from the courthouse, and I have

16    to leave an hour before I want to get here to make sure I get

17    here.  Now, the jurors are not used to commuting to this

18    courthouse like I am, and so they really have to work hard in

19    order to get here on time.  All of them are here on time with

20    the possible exception of one.

21              Is she here now?

22              THE CLERK:  Yes.

23              THE COURT:  So they're all here now, and I'm given a

24    brief.

25              MS. LYDON:  Your Honor, may I quickly clarify?

1          We agree with the defense that Your Honor should

2     review it.  What we want to -- all that we're trying to do is

3     provide some authority that we found that could be helpful.

4     But we agree with the position that the defense --

5               THE COURT:  Well, if you agree, you --

6               MS. LYDON:  Exactly.

7               THE COURT:  -- agree.  I suggest something -- I don't

8     have the time or the resources to read all these things that

9     you hand me in the middle of the trial.  They work really well

10    on appeal, you know, because I don't think I've ever seen a

11    Court of Appeals comment on the fact that the district judge

12    had to rule on it on the spur of the moment when they've had

13    months in briefing and oral argument to consider it.

14              So all right.

15              MS. LYDON:  If --

16              THE COURT:  Then bring the jury in.

17              (The jury panel entered the courtroom.)

18              THE COURT:  Everyone is here.

19              Good morning, ladies and gentlemen.

20              We are ready to proceed.  The defendant is present

21    with counsel.

22              You may continue with your direct examination of the

23    witness.

24              MS. CRAGER:  Thank you, Your Honor.

25                    CONTINUED DIRECT EXAMINATION

```
 1    BY MS. CRAGER:
 2    Q.  Good morning, Mr. Garmashov.
 3    A.  Good morning.
 4    Q.  Where we left off yesterday was talking about the letter
 5    that was written that you have called Rob's, quote, confession.
 6        So I'd like to pull that up, again, just so we all remember
 7    what we're talking about, Exhibit 1100.
 8        If we go to page 2.  Okay.  So this is the letter that
 9    we've been talking about, and we've been talking about whose
10    words are in this letter and where this came from.  Okay?
11    A.  Okay.
12    Q.  All right.  I believe we left off yesterday at
13    Exhibit 2068, which I believe has been admitted into evidence.
14            THE COURT:  It is.
15            MS. CRAGER:  Okay.  Thank you.  Thank you, Your Honor.
16            I'd like to pull that up.
17    BY MS. CRAGER:
18    Q.  Okay.  Now, this is an e-mail chain between you and your
19    lawyer friend, Evan Beecher?
20    A.  Correct.
21            MS. CRAGER:  Okay.  Let's go to the next page, please.
22    BY MS. CRAGER:
23    Q.  And down here, this is the first e-mail in this chain in
24    which, on September 5th, Evan Beecher writes to you:  "Based on
25    what you told me, here's one way a letter could be worded."
```

1         Is that what it says?

2    A.  Yes, that's what it says.

3    Q.  Okay.  "Hopefully, he will fess up.  Call if you want to

4    discuss."

5         And then he writes a draft of the letter; correct?

6    A.  That's what it says here, yes.

7              MS. CRAGER:  Okay.  Let's go to the next page, please.

8    BY MS. CRAGER:

9    Q.  Okay.  And this is the first draft of the letter that was

10   written?

11   A.  I would assume so.

12   Q.  Well, you know that because you received this draft;

13   correct?

14   A.  I received this draft, yes.

15   Q.  Okay.

16   A.  I'm not sure if it's the first draft or the second draft or

17   whichever draft.  That's one of the letters that I received

18   from Evan.  Yes.  Correct.

19   Q.  Okay.  So your point is, maybe he did other drafts

20   himself before --

21   A.  Yes.

22   Q.  Okay.  So this is the first draft he sent to you?

23   A.  I don't have access to my e-mails right now, so I wouldn't

24   know.  It might be as well.

25   Q.  Okay.  So there might have been other correspondence before

```
 1    this where you guys did other drafts?
 2    A.   I -- like I said, you have my e-mails.  I don't have my
 3    e-mails in front of me, so I can't tell you that for sure.
 4    Q.   We don't know for sure, but this is definitely a letter
 5    that was written --
 6    A.   It is a letter written by Evan, and sent an e-mail to me,
 7    yes.
 8    Q.   Okay.  And there you see some blanks that are in there;
 9    right?
10    A.   Yes.
11    Q.   Okay.  And then there's some wording in this paragraph that
12    I'll ask you about in a minute, if you want to just take a
13    quick look at that.
14         This is, for the record, the paragraph that starts:
15    "Approximately one year ago, my certification with the
16    Parachute Association and UPT was suspended."
17    A.   Okay.
18            MS. CRAGER:  All right.  We can get out of that.
19    Let's go back to page 1.
20    BY MS. CRAGER:
21    Q.   Okay.  Now, this is the next e-mail in the chain which is
22    an e-mail from you to your lawyer friend, and you write:  "What
23    do you think about this?"
24    A.   Yes.
25    Q.   And then below that, you've pasted another version of the
```

1    letter; correct?

2    A.   Correct.

3    Q.   Where there have been some edits made --

4    A.   Uh-huh.

5    Q.   -- for instance, to this paragraph right here.

6         Let's just blow that paragraph up real quick.

7         And that does look like it was edited from the previous

8    version we just looked at; correct?

9    A.   Sure.

10   Q.   Do you agree with me?

11   A.   I guess I didn't read the second paragraph, yes, but if you

12   say --

13            THE COURT:  You have to speak a little louder.

14            THE WITNESS:  If you say it's edited, then it's

15   edited.  Like, I haven't -- word for word, but, yes, okay.

16   Like I said, yes, yes.

17   BY MS. CRAGER:

18   Q.   Okay.  I'm just trying to get your testimony here.

19        So if you could just look at this paragraph and let me know

20   whether, in your opinion, it's been edited?

21   A.   Can I have the other one to compare them to?

22   Q.   Sure.  If you want to flip to your binder at Exhibit 2068,

23   and if you go to the last page of that exhibit, you can compare

24   them both at the same time.

25   A.   Yes.  It looks like it's been edited, yes.

```
1   Q.   Okay.  And then we saw some blanks on the first version of

2   it, and it appears that in this version --

3        We can get out of there, please.

4        In this version, the blanks have been filled in.  And you

5   can see that on this page, and then the following page --

6        If we could flip one page.

7   A.   Yes.

8   Q.   There are no longer any blanks here; right?

9   A.   Yes.

10  Q.   Okay.  So this version was edited by you; right?

11  A.   No.

12  Q.   Okay.  I think that's where we ended yesterday.

13       So tell me who edited this letter?

14  A.   I don't know, to be honest with you.  I can tell you what

15  happened.  I came to Rob.  I said, "I will need the letter of

16  you telling them what was going in, so that I can sent" -- "so

17  it could be sent to USPA."

18       He said, "I'm not going to write it.  You can draft it

19  yourself, and then I'll sign it.  I'll read it over.  I'll take

20  it to my lawyers, and I'll sign it."

21       So I ask my friend Evan.  He drafted the letter.  I

22  e-mailed the letter.  I'm not sure if I e-mailed the letter or

23  if I printed it out and gave it to Rob.

24       He took it to his lawyers.  He consulted his lawyers.  He

25  brought me the edited version or e-mailed me the edited
```

1    version.  I don't remember how that exactly happened.  And

2    that's what I e-mailed to Evan.

3    Q.   Okay.  Let's take that step by step.

4         So, first, we agree Evan Beecher, your lawyer friend,

5    drafted a letter?

6    A.   Yes.

7    Q.   He sent the letter to you?

8    A.   Correct.

9    Q.   Let's go back to page 1.

10        Next from your e-mail address, there is another version of

11   the letter sent back to your lawyer friend saying, "What do you

12   think about this?"

13   A.   Yes.

14   Q.   And you're saying that was not edited by you?

15   A.   Yes, that's what I'm saying.

16   Q.   Would it surprise you that there are no e-mails of this

17   draft of the letter to Rob Pooley?

18   A.   No, it wouldn't surprise me.  I printed it out and gave it

19   to him.  Like I said, I don't remember exactly how it happened.

20   Maybe I e-mail it to him.  Maybe I printed out and gave it to

21   him.  I don't remember how exactly it happened.  But what

22   happened was that the draft of the letter that Evan sent me

23   ended up being in Rob's hands.

24   Q.   It ended up in Rob's hands.

25        Okay.  So it was drafted, and now you're saying if there's

1    no e-mail to be found, then you printed this letter?

2    A.   I -- yes, I would assume so, yes.

3    Q.   Okay.  You didn't --

4    A.   I printed the letter and I gave it to Rob.  Rob took it to

5    his -- well, he told me he took it to his lawyer and gave me

6    the edited version that I e-mailed back to Evan.

7    Q.   Okay.  So your -- your testimony is you have this e-mail

8    version of a letter, and instead of forwarding the e-mail to

9    Rob Pooley, you printed it out?

10   A.   Like I said, I don't remember what exactly I did.  Maybe I

11   printed it out.  Maybe I e-mailed it to him.

12   Q.   Okay.  Well, if no e-mail exists, would you agree that the

13   way you gave it to him was that you printed it out?

14   A.   Then, yes.

15   Q.   Okay.  So your testimony is you printed --

16   A.   Or maybe I showed it to -- maybe I showed it to him on my

17   computer.  Like I said, I don't remember exactly how it

18   happened, but he read that letter.

19   Q.   Okay.  And then you have another step in here.

20        You said he showed it to his lawyer?

21   A.   Yes.  That's what he told me.  He said, "I need to consult

22   with my lawyer or my attorney, and I'll get back to you on

23   that."

24   Q.   Did he have a lawyer back in 2016?

25   A.   How would I know?

```
 1    Q.   So you don't know whether he actually had a lawyer?

 2    A.   No.

 3    Q.   Okay.  So you're saying you either showed it to him on your

 4    computer or you handed him a printed copy; right?

 5    A.   Correct.

 6    Q.   Okay.  And then he got into his car and drove with the

 7    printed copy or your computer in his hands to see his lawyer?

 8    A.   I don't know what he did.  What I'm saying is, I gave him

 9    the letter.  It took him a day or two to get back to me.  It

10    did not happen the same day --

11    Q.   Okay.

12    A.   -- I think.

13    Q.   Well, at base, I think we can agree that this letter came

14    from your e-mail address --

15    A.   Yes.

16    Q.   -- back to Evan Beecher --

17    A.   Yes.

18    Q.   -- your lawyer friend --

19    A.   Yes.

20    Q.   -- with edits?

21    A.   Yes.

22    Q.   Okay.  Let's see what happened next.  I would like you to

23    turn to Exhibit 2069, which I don't believe has been admitted

24    yet.

25         No?  Okay.  One moment.
```

1      And does that look like an e-mail -- the next e-mail in

2  this chain that we've been looking at on September 6th from

3  your lawyer friend, Evan Beecher, to you?

4  A.  Yes.  It looks like an e-mail from Evan to me.

5          MS. CRAGER:  Okay.  I'd move to admit Exhibit 2069.

6          MS. LYDON:  No objection.

7          THE COURT:  Exhibit 2069 is received in evidence.

8      (Defense Exhibit 2069 was admitted.)

9          MS. CRAGER:  I'd like to publish, please.

10  BY MS. CRAGER:

11  Q.  Okay.  So the -- the e-mail you were just looking at is

12  this one; is that right?

13  A.  Yes.

14  Q.  Okay.  So that's the one from you saying:  "What do you

15  think about this version?"; right?

16  A.  Yes.

17  Q.  Okay.  So let's look at the next e-mail that happened.

18      Your e-mail was on September 6th.  That's 3:25 p.m.?

19  A.  Uh-huh.

20  Q.  And just a half an hour later, your lawyer friend responds

21  to you?

22  A.  Okay.

23  Q.  Okay.  Is that what happened?

24  A.  Well, that's what the paper is saying, yes.

25  Q.  Okay.  And you agree that this looks like an e-mail that

1    you received?

2    A.    Yes, it looks like an e-mail that I received.

3    Q.    Okay.  And your lawyer friend said:  "Besides typos, it's

4    better than nothing."

5         Is that what he said?

6    A.    That's exactly what it says here, yes.

7    Q.    Okay.  And then he did have a suggested edit?

8    A.    That's what it says here.

9    Q.    Okay.  And his edit was that you add:  "To make sure

10   students would receive their ratings, I assisted the candidates

11   in completing their paperwork, signed their forms for Yuri, and

12   held the paperwork for Yuri's return at which time he could

13   make sure they met all the requirements for the UPT and USPA

14   rating."

15   A.    That's what it says here.

16   Q.    Okay.  So that's what he suggested that you edit in the

17   letter?

18   A.    No.  That's what he suggested we put in the letter.

19   Q.    I see.  That's what your lawyer suggested that you put in

20   the letter?

21   A.    That's what my lawyer suggested to be in the letter.  He

22   didn't suggest that I put it in the letter.  He said what it

23   says right here.  "I would like to have this sent" -- that's

24   what he's suggested.

25        He didn't suggest -- I don't see anything here saying that

1   "you type this" or "you do this" or "you add this."  This is

2   correspondence from my lawyer directly to Rob -- well, to me,

3   and I showed it to Rob.  Yes.

4   Q.  All right.  But it was an e-mail sent to you?

5   A.  Yes, it is an e-mail sent to me.

6   Q.  Okay.  And you had control over this letter at this moment?

7   A.  Yes.  It is an e-mail sent to me, and I have it in my

8   mailbox.  Yes.

9   Q.  Okay.  So he suggested you edit that, and he would change

10  it to the following, which is right here.

11       And we can blow that one up.

12       He says:  "I would change it to 'to make sure students

13  would receive their ratings, I assisted the candidates in

14  completing their paperwork, signed their forms with Yuri's name

15  without him knowing, and held the paperwork for Yuri's return,

16  at which time, I can tell them about the situation and have him

17  help me make sure the candidates met all the requirements for

18  UPT and USPA ratings.'  In retrospect, I realize it was wrong

19  of me to assume Yuri would have been okay with the situation."

20  A.  That's what it says here.

21           MS. CRAGER:  Okay.  We can take that down.

22  BY MS. CRAGER:

23  Q.  Now, you incorporated the edits from your lawyer; right?

24  A.  I'm not sure I understand what you're implying by me

25  incorporating the edits.  If you're saying that I typed up the

1   letter and provided it to Rob with the suggestions made by my

2   attorney friend, then yes.

3   Q.  Okay.  So you typed it up with the suggestions from your

4   attorney friend, and then you made some more changes?

5   A.  I don't think so.  I didn't think I changed anything

6   besides what my attorney friend suggested to change.

7   Q.  Okay.  Well, let's take a look -- let's go to 1104, which I

8   believe has been admitted.  Okay.  So this is -- let's just

9   zoom in up there for a minute.  This is an e-mail from you to

10  Rob Pooley.

11  A.  Yes.

12  Q.  And this e-mail was on September 8th of 2016?

13  A.  Yes.

14          MS. CRAGER:  Okay.  Let's get out of there.

15  BY MS. CRAGER:

16  Q.  The subject of this e-mail is "letter."

17  A.  Okay.

18  Q.  Is that right?

19  A.  Yes.

20  Q.  Okay.  And this e-mail contains a version of the same

21  letter we've been looking at; right?

22  A.  It appears that way, yes.

23  Q.  Okay.  Let's zoom in there a little bit so we can see this

24  a little bit better.  Okay.

25      Okay.  And, now, I just want to point you to one part of

1   this.  This part has been added to this version of the letter?

2   A.  Okay.

3   Q.  Does that look right?

4   A.  Yes, that looks right.

5   Q.  And it says that:  "While Yuri was gone, several of the

6   students, Marcus Trula, Eduardo Kim, Aaron Maxson, Taylor

7   Smits, Luis Lopez Fleitas, Richard Keir, and Garreth Hemmingway

8   gave me their paperwork and asked to send it in for them, but I

9   didn't."

10  A.  Okay.  Yes.  That's what it says here.

11  Q.  Okay.  Does that look like it's different from the previous

12  letter we saw?

13  A.  I don't have a photographic memory, but if you say so, yes.

14  Q.  Okay.  Did you want to take a look at it?

15  A.  Sure.  Let's take a look at it.

16  Q.  Okay.  So it was the one that you were just on.  It's 2069.

17  A.  Yes, it looks like it's different.

18  Q.  Okay.  So would it surprise you that this is the first time

19  this letter was sent to Rob Pooley's e-mail address?

20  A.  No, it wouldn't.

21  Q.  Okay.  So this letter that your lawyer drafted, that you

22  edited, you had Rob sign this letter?

23  A.  You're putting words in my mouth that I didn't say.  You

24  said that "your lawyer drafted," and "you had Rob sign" it.

25      No.  What happened is the lawyer drafted the letter.  It

1    was a lot of exchanges back and forth between me and Rob

2    regarding this letter, because he was taking it -- yes, he was

3    telling me that he was taking it to his attorney for

4    consultation.

5         There were some corrections that he was making to that

6    letter that I was consulting Evan with.  And once that letter

7    was e-mailed to Rob, I e-mailed it to him.  I showed him on the

8    computer before e-mail it to him.  Then he printed it out and

9    signed it.  Yes.

10   Q.  Okay.  Well, let's see the version that he printed out.

11            MS. CRAGER:  Let's go to Exhibit 1103, which I believe

12   has also been admitted.

13   BY MS. CRAGER:

14   Q.  Okay.  Now, this is an e-mail from you to Rob Pooley.  And,

15   I'm sorry, this was actually on September 7th.

16        So I guess this was the first e-mail that went to him about

17   the letter; correct?

18   A.  Yes.  It says September 7th here, and it's September 8th,

19   so it appears to be the first e-mail.

20   Q.  Okay.  And let's -- and there's an attachment here; right?

21   A.  Yes.

22   Q.  It appears to be from you; right?

23   A.  I'm sorry.  Can you repeat that?

24   Q.  The attachment is from you to Rob?

25   A.  Yes.  It is an e-mail from me to Rob; correct.

1    Q.   Okay.  So let's go to page 2.  This says:  "Scanned by

2    CamScanner."

3    A.   Yes.

4    Q.   And you had a CamScanner?

5    A.   Yes.

6    Q.   Okay.  Let's go to page 3.

7         And this also says:  "Scanned by CamScanner"?

8    A.   Correct.

9    Q.   And then this is the first time we see it signed; right?

10   A.   Yes.  Yes.

11   Q.   Okay.  Let's go back to page 1.  Actually, I'm sorry.

12   Let's go to page 1 of 1100.  All right.

13        Now, this letter was sent to the Parachute Association?

14   A.   This letter was sent to Joshua Hall, yes.

15   Q.   And it was -- let's just zoom in up here.

16        This was sent to Joshua Hall at the Parachute Association

17   in September 8th of 2016.

18   A.   Yes.  That's what it says here.

19   Q.   Okay.  And this is an e-mail from you?

20   A.   Yes.

21   Q.   You sent the letter, supposedly, from Rob?

22   A.   Correct.

23   Q.   Okay.  And you said:  "How is the investigation going?"

24   A.   Yes.

25   Q.   And you said:  "I don't know if Rob sent you this letter"?

1    A.   Yes.

2    Q.   "But here is what he gave me"?

3    A.   Yes.

4    Q.   And then you attached the letter?

5    A.   Correct.

6         MS. CRAGER:   We can get out of that.

7         You can take it down.   Thanks.

8    BY MS. CRAGER:

9    Q.   Now, you sent this to the Parachute Association, hoping

10   that it would ensure that your ratings weren't taken away?

11   A.   No.   I sent this letter to the Parachute Association to

12   assist them in the investigation.

13        And I wasn't sure if Rob sent that letter to them.   That's

14   why I can see that in the e-mail.   I'm not sure if Rob send it

15   to them or not.   But here's the letter that he gave to me.

16   Q.   Well, didn't you know Rob didn't send it because you had

17   just sent it to Rob?

18   A.   How would I know what Rob does?   I'm not Rob.

19   Q.   I see.

20        My question is:   You hoped that this letter would mean that

21   the USPA would believe you?

22   A.   Yes.

23   Q.   And that they would not take your ratings away?

24   A.   Yes.   I was hoping that they would do the investigation,

25   and once they check all the facts, they will see that I have

```
 1   nothing to do with that particular incident.

 2   Q.   Okay.  And one of the things that you were giving them for

 3   facts was this letter?

 4   A.   Correct.

 5   Q.   But they still didn't believe you?

 6   A.   I guess so, yes.

 7   Q.   Well, that was your understanding?

 8   A.   That is my understanding.

 9   Q.   When the Parachute Association told you they didn't believe

10   you, you asked Rob to write another letter?

11   A.   Yes.

12   Q.   You wanted it to say that the first letter was true?

13   A.   No.  I came to Rob.  I said, "They don't believe that this

14   letter is from you because you never sent them the letter.  So

15   I need to e-mail the letter, proving that this letter is true."

16   And he did that.

17   Q.   Sorry.  You're saying that they didn't believe you just

18   because the letter came from your e-mail?

19   A.   I don't know why they didn't believe me.  I went through my

20   hearing with USPA, and they suspended my ratings, so they told

21   me that they didn't believe Rob send that letter -- Rob wrote

22   that letter.  They didn't believe that because he didn't send

23   it to them.

24       They asked me why Rob didn't send it to them.  I told them

25   that I didn't know why he didn't send it to them, but I did.
```

1   And, yeah, so they didn't believe me.

2       I came to Rob, and I said, "They don't believe me because

3   you haven't sent the e-mail to them, so could you write another

4   letter?"  And he did.

5   Q.   Okay.  So you asked him to write another letter because you

6   thought that would show he really meant the things in the first

7   letter?

8   A.   I asked him to write a letter confirming that it was him

9   who wrote the letter.

10  Q.   Okay.  But, actually, he didn't write that letter?

11  A.   Yes.  My lawyer friend drafted the letter.

12  Q.   Okay.  But you still wanted him to write a letter saying

13  that he wrote the letter?

14  A.   I wanted him to validate that the letter that I presented

15  to USPA was true.

16  Q.   Okay.  But the letter he wrote didn't actually say that the

17  first one was true?

18  A.   Okay.

19  Q.   Is that correct?  Is that your understanding?

20  A.   No, that's not my understanding.

21  Q.   Okay.  Let's take a look at 1107.  All right.

22      Now, you recognize this; right?

23  A.   Yes.

24  Q.   Okay.  This actually came from you; right?

25  A.   What do you mean, "came from" me?

1   Q.   There was a meeting you had with the special agent at your

2   house?

3   A.   Yes.

4   Q.   And at that time, you showed him some documents?

5   A.   Yes.

6   Q.   And one of the documents you showed him was this one?

7   A.   Yes.

8   Q.   Okay.  Let's take a look at that.

9        Okay.  I want to focus on this part where he talks about

10   the letter.

11   A.   Okay.

12   Q.   "A letter was written by myself on Yuri's behalf" -- okay.

13        Well, that wasn't true; right?  He didn't write the letter?

14   A.   Sure.  Yes.

15   Q.   Correct, he didn't write the letter?

16   A.   He didn't write the letter.

17   Q.   Okay.  Stating:  "I did not believe he had any knowledge of

18   what was going on with the parachute center while he was in

19   Russia.  The validity of that letter was questioned and,

20   therefore, in addition to e-mailing this letter, I will make a

21   notarized hard copy available."

22        Is that what it says?

23   A.   That's what it says.

24   Q.   Okay.  So this doesn't say everything in the first letter

25   was true?

1   A.   It doesn't.   It says:   "The validity of the letter was

2   questioned.   And, therefore, in addition to this in my letter,

3   I'll make Rob a copy of this e-mail available."   Yes.

4   Q.   Okay.   So then you asked him to notarize this letter?

5   A.   Yes.

6   Q.   Okay.   And let's get out of here and go to page 2.

7        And he did notarize that letter?

8   A.   No.   He notarized that letter, not I did.

9   Q.   Yes.   I'm sorry.   I misspoke.

10        He did notarize that letter; correct?

11   A.   That's what it appears to be, yes.

12   Q.   Okay.   And then he gave it to you?

13   A.   Yes.

14   Q.   And you have the physical copy of the notarized letter?

15   A.   Yes.

16   Q.   Okay.   You sent this letter to the USPA?

17   A.   Yes.   I didn't send it to them.   I presented it to them

18   physically.

19   Q.   Okay.   So you presented it to them physically.

20        And then what happened next is that they still didn't

21   believe you?

22   A.   Yes.

23   Q.   So then there was another letter that you asked Rob to

24   write?

25   A.   Yes.

1    Q.   Okay.  So let's take a look at that, 1101.  Okay.

2        Now, this is also a letter that you showed a special agent

3    at your house?

4    A.   Yes.

5    Q.   Okay.  So let's take a look at this letter.  Now, this

6    regards the string of e-mails being used to suggest that

7    Yuri G. was doing something wrong, according to the USPA rules.

8        Are those e-mails that we talked about yesterday?

9    A.   Yes.

10   Q.   Okay.  "The e-mail messages presented are not relevant to

11   the claims made by USPA.  This fact is self-evident.  The date

12   on the messages shows they're from approximately one year

13   before any issues being discussed.  The messages are nothing

14   more than coordination between Yuri and myself for the courses

15   he conducted at the Parachute Center."

16       Is that what it says?

17   A.   That's what it says.

18   Q.   Okay.  That's your explanation of what these e-mails show;

19   right?

20   A.   Can you repeat that again?

21   Q.   Well, when I was examining you about the e-mails yesterday,

22   you said, "Oh, those don't show that I was out of town.  It

23   just shows that we were coordinating courses."

24   A.   No, that's not what I said.

25   Q.   Okay.  What did you say yesterday about these e-mails?

1    A.   I said that that e-mail -- you never asked any questions

2    about this e-mail yesterday.   So you were saying -- you were

3    pointing out the dates on the e-mails.   And that e-mail was, in

4    fact, just a coordination between candidates -- that we had

5    candidates done before I left the country.   Yes.

6    Q.   You don't remember me asking you questions about that

7    e-mail on August?

8    A.   No.   You asked plenty of questions about that e-mail.   I

9    remember you asking questions about the e-mail.   But what you

10   said just now, you didn't ask that particular question.

11   Q.   Sure.   Okay.

12        So your explanation about those e-mails is that you and Rob

13   were coordinating courses?

14   A.   Yes.   Well, it's not my explanation.   It's Rob's

15   explanation.   It's a letter from Rob.

16   Q.   Sure.   But, I mean, your explanation is that you were

17   coordinating courses with Rob?

18   A.   That is the explanation that Rob gives to that particular

19   string of e-mails, yes.

20   Q.   Okay.   So you and Rob have the same explanation for that?

21   A.   Yes.

22   Q.   Okay.   You presented to the USPA this notarized letter?

23   A.   Yes.

24   Q.   Ultimately, the USPA revoked all of your ratings?

25   A.   USPA revoked all of my ratings way before I presented them

1   all these letters.  The USPA revoked all my ratings, I believe,

2   in October after the formal hearing.

3   Q.  Okay.  Let's talk about that.

4       The USPA revoked your ratings, and you appealed to the

5   higher-ups?

6   A.  Yes, I did.

7   Q.  And that process took some time?

8   A.  Yes.

9   Q.  And after you appealed to the higher-ups, you filed a

10  lawsuit?

11  A.  No.

12  Q.  No?

13  A.  I appealed several times.  I believe I appealed two times.

14  Q.  You appealed two times to the USPA.  Okay.

15      So that process took some time; correct?

16  A.  Yes.

17  Q.  And during that time is when these other letters were

18  written?

19  A.  Yes.

20  Q.  Okay.  Now, the USPA didn't just revoke your examiner

21  rating; right?

22  A.  Yes.  They revoked all my ratings.

23  Q.  They revoked all your ratings?

24  A.  And membership.

25  Q.  All your licenses?

```
 1   A.   Yes.

 2   Q.   And your membership?

 3   A.   Yes.

 4   Q.   You can't even be a member of the USPA anymore?

 5   A.   Yes.

 6   Q.   They kicked you out?

 7   A.   Yes.

 8   Q.   All right.  I want to talk to you about why losing your

 9   ratings was such a big deal to you.

10   A.   Let me ask you a question.  If you lose your Bar, will it

11   be a big deal to you?

12   Q.   Yeah.  Let's talk about that.

13        At the point that this was all going down in about 2016,

14   you'd been skydiving for almost 20 years?

15   A.   Yes.

16   Q.   You were introduced to the sport by your father?

17   A.   Yes.

18   Q.   You were a successful skydiver?

19   A.   Yes.

20   Q.   You were world-famous?

21   A.   Well, people know me.

22   Q.   People know you.

23        You were a world-class competitor in canopy piloting?

24   A.   Correct.

25   Q.   You were on the cover of the Parachutist magazine?
```

1   A.   Yes.

2   Q.   Why don't we take a look at that just quickly.

3        Can you turn to 2110 in your binder?  Binder 6.  And I can

4   approach, if it will help.

5        I think I have the wrong exhibit number.  Hold on.

6        I won't waste time with that.  I think I have the number

7   written down here, but -- oh, I'm sorry.

8        2059 is the right exhibit number.  Sorry about that.

9   A.   Which one?

10  Q.   2059, so that would be in Binder 5.

11       I'm sorry again.  2058.

12       And that is a picture of you?

13  A.   Yes.

14  Q.   In July of 2013, it looks like?

15  A.   Yes.

16  Q.   And you were competing at the championships of the USPA

17  National Piloting Competition?

18  A.   Yes.

19           MS. CRAGER:  All right.  Move to Exhibit -- move to

20  admit Exhibit 28.  Page 1 is fine.

21           THE COURT:  Just one page?

22           MS. CRAGER:  Yes.

23           THE COURT:  All right.  Any objection?

24           MS. LYDON:  No.

25           THE COURT:  Exhibit 2058 is received in evidence.

```
 1        (Defense Exhibit 2058 was admitted.)

 2   BY MS. CRAGER:

 3   Q.   Okay.  So that was you in 2013?

 4   A.   Yes.

 5   Q.   All right.  And you knew that if your ratings were taken

 6   away, you wouldn't be able to compete in USPA competitions?

 7   A.   Okay.  Yes.

 8   Q.   It wasn't just that you loved the sport.  You also had some

 9   financial considerations to think about.

10   A.   What do you mean by that?

11   Q.   What I mean by that is that you were teaching skydivers

12   around the country and around the world?

13   A.   Yes.

14   Q.   And that's how you supported yourself?

15   A.   Yes.

16   Q.   And that's how you supported your family?

17   A.   Yes.

18   Q.   In 2016, you were married?

19   A.   Yes.

20   Q.   You had two kids?

21   A.   Yes.

22   Q.   You had a third kid on the way?

23   A.   Yes.

24   Q.   If the Parachute Association took your certifications, you

25   wouldn't be able to work in your field?
```

1    A.   In the U.S.

2    Q.   In the U.S.

3         You also wouldn't be able to work training people under the

4    USPA rules?

5    A.   Yes.

6    Q.   Having your ratings was essential to your ability to

7    continue to work and support yourself and your family?

8    A.   In the U.S., yes.

9    Q.   Having your ratings was essential to your ability to

10   continue to work and support yourself and your family?

11   A.   In the U.S.A., yes.

12   Q.   You're still in the U.S.A.?

13   A.   Yes.

14   Q.   Is this a statement that you made to the USPA, that it was

15   essential to your ability to continue to work and support

16   yourself and your family?

17   A.   Yes.

18   Q.   I want to talk about why you're still here today, saying

19   that you did not give Rob consent to use your signature.

20        To this day, the Parachute Association has not given your

21   ratings back?

22   A.   Correct.

23   Q.   Has not given your membership back?

24   A.   Correct.

25   Q.   As we talked about, you appealed multiple times?

```
 1   A.   Uh-huh.
 2   Q.   And you lost?
 3   A.   Yes.
 4   Q.   You had to become a truck driver to make ends meet?
 5   A.   Yes.
 6   Q.   And as we've talked about, you have an understanding about
 7   why they're not giving your ratings back?
 8   A.   Yes.
 9   Q.   They don't believe your story that Rob used the signature
10   without your consent?
11   A.   No.
12   Q.   Did you --
13        THE COURT:  Now, that's subject to interpretations.
14   They -- yes, they don't?  Or, no, they don't?
15        MS. CRAGER:  I'm sorry.  Let me rephrase.
16   BY MS. CRAGER:
17   Q.   It is your understanding that the Parachute Association
18   does not believe you when you say, "Rob used my signature
19   without my consent"?
20   A.   No.
21   Q.   Did you tell a special agent --
22        THE COURT:  Look, look.  It's still ambiguous.  Okay?
23   I -- it's not ambiguous.  Maybe it is.  It's up to you.
24        MS. CRAGER:  I'll try one more time, Your Honor.
25        THE COURT:  It's ambiguous to me, but maybe it is.  I
```

 1    don't have a question with it.

 2            MS. CRAGER:  I'll try one more time.

 3            THE COURT:  Because it's an important question and --

 4    and you say that, you know, the USPA doesn't believe you.  No.

 5    All right.  Maybe that's clear to other people.  It's not clear

 6    to me.

 7    BY MS. CRAGER:

 8    Q.  Okay.  Let me pull up something I think might help.  One

 9    second.  So let's start here.

10        You do have an understanding about why the USPA revoked

11    your ratings; right?

12    A.  Yes.

13    Q.  Now, isn't it because the USPA is saying you were fully

14    aware of what Rob Pooley was doing while you were out of the

15    country?

16    A.  I don't think so, no.

17    Q.  Okay.  You were interviewed by two special agents on

18    April 29th of 2021?

19    A.  Okay.

20    Q.  Do you remember that?

21    A.  I remember being interviewed by special agents.  I don't

22    remember the date.

23    Q.  Okay.  Do you think it was about April of 2021?

24    A.  Sure.

25    Q.  If that doesn't sound right --

1   A.   You have all the documents in front of you, so if you're

2   saying I was interviewed on April 21st, that means that I was

3   interviewed on April 21st.  I don't remember the dates.  I've

4   been interviewed by them, yes.

5   Q.   That's fine.  And I can point you to the transcript of what

6   was said in that interview, if this would help.

7   A.   Go ahead.

8   Q.   So if you turn to Exhibit 2104 and go to page 4 of that

9   exhibit.

10  A.   Okay.

11  Q.   Okay.  Now, you were asked by Special Agent Lee:  "Okay.

12  Do you know the reason for the suspension still?"

13       And your answer was:  "Well, well, they say" -- "Well, I'm

14  not" --

15  A.   What line is that?

16  Q.   Oh, I'm sorry.  On line 56, and I'll let you look at that

17  for a minute.  56 through 62.

18  A.   Yes, I see it.

19  Q.   Okay.  And when asked about the reason for the suspension,

20  you say:  "I'm not so sure about the UPT, but the USPA is

21  saying that I was fully aware of what Rob Pooley was doing when

22  I was out of the country.  And they think that I gave him an

23  okay to do that without my consent."

24  A.   That is what it says there.

25  Q.   Okay.  Thank you.

1         You can put that away.

2    A.   I believe it owns an explanation.  It says "they say."  It

3    doesn't say that I know what they're doing.  It says they're

4    saying that I think that -- that -- they think that I know what

5    Rob was doing.  That's what they say.  But I think the real

6    reason is different.

7    Q.   Okay.  So I am just asking about your understanding about

8    what they were saying, so that's --

9    A.   Well, that is my understanding.  They're saying one thing,

10   but in the reality, it's a different thing.

11   Q.   I see.  Okay.

12        So after you did all the appeals with the USPA and they

13   didn't give your ratings back, you sued them?

14   A.   Yes.

15   Q.   Trying to get your ratings back?

16   A.   Yes.

17   Q.   Trying to show that you are innocent?

18   A.   Yes.

19   Q.   The Parachute Association offered you money?

20   A.   Yes.

21   Q.   If you promised never to come back?

22             THE COURT:  Never to come back to where?

23             MS. CRAGER:  To the Parachute Association.

24             THE COURT:  I see.

25             THE WITNESS:  No.

1    BY MS. CRAGER:

2    Q.   Well --

3    A.   I'm not sure I can talk about this case here.  I will need

4    to consult my attorney about that.

5    Q.   Okay.  I'm just going to ask you about things that are --

6            THE COURT:  Wait a minute.  He has to answer any

7    questions that you ask, unless I say he doesn't.  His attorney

8    doesn't get to make that call.

9            MS. CRAGER:  Yes, Your Honor.  And I will note that he

10   does have an attorney I've been in contact with.  He is not

11   here today.

12           THE COURT:  All right.  But if you think you want to

13   ask a question, you ask it.  I'll make the decision.

14           MS. CRAGER:  Thank you, Your Honor.

15   BY MS. CRAGER:

16   Q.   Okay.  The Parachute Association lawyer asked if you would

17   be seeking to reapply for membership again because "the point

18   of this deal is that Yuri goes away."

19   A.   You have to bring out the first e-mail, the first e-mail in

20   that string, what USPA has offered, and how it was worded.

21   Q.   All right.  My -- my question is:  The Parachute

22   Association offered you a deal, the point of which was that

23   Yuri goes away?

24   A.   That wasn't the deal that they offered.

25   Q.   I'm just asking you whether that's what the Parachute

 1  Association says.  "The point of this deal is that Yuri goes

 2  away."

 3       For them, that was the point?

 4  A.  Well, that's what it says in the e-mail, yes, but that

 5  wasn't the deal that they offered.

 6  Q.  You said no to the deal where you would go away?

 7  A.  Yes.  I said, no, that I would go away.  I will not go

 8  away.

 9  Q.  You will not go away.

10       You did not agree to give up your ability to go back and

11  try to get your ratings?

12  A.  Can you repeat that again?

13  Q.  You did not give up your ability to go back at any time and

14  apply for your ratings?

15  A.  Correct.

16  Q.  So if Rob Pooley is convicted of stealing your signature,

17  you will take the guilty verdict, and you will show it to USPA?

18  A.  I don't think I need to do that.  USPA is in this

19  courtroom.  They see everything that's going on.

20  Q.  So USPA is here, and you want them to see Mr. Pooley found

21  guilty of stealing your signature?

22  A.  I don't care about Mr. Pooley.  What I care about is my

23  ratings and my livelihood.

24  Q.  And you -- to get your livelihood back, it would really

25  help you if a court and a jury found that Mr. Pooley had stolen

1    your signature and used it without your consent?

2    A.   I don't think so.

3    Q.   That won't help you at all?

4    A.   I don't know.

5    Q.   You don't know if that's going to help you?

6    A.   I don't know if that's going to help me.

7    Q.   You're here trying to prove that you're innocent?

8    A.   Yes.  Well, I'm here as a witness.

9    Q.   Trying to prove that you're innocent?

10   A.   I was never guilty.  I was never charged with anything.  So

11   what am I proving?  I'm here as a witness.

12          MS. CRAGER:  Thank you.  Nothing further.

13          THE COURT:  All right.  Now, do you want to deal with

14   that Jencks issue now?

15          MS. CRAGER:  Yes, Your Honor.  We can do that.

16          THE COURT:  All right.  How long do you think that

17   will take?  I don't know what -- how long the statement is.

18          MS. CRAGER:  I believe there are quite a few messages,

19   so we might want --

20          THE COURT:  Well, the rule that you pointed out to me,

21   it says I have to do this outside the presence of the jury;

22   right?

23          MS. CRAGER:  Yes, Your Honor.

24          THE COURT:  It says "in camera."  That means outside

25   the presence of the jury.

1          MS. CRAGER:  Yes, Your Honor, so you may want to

2     excuse the jury.

3          THE COURT:  Okay.  Defense has to provide the

4     Government with any statements that they have from this witness

5     prior to the time that the Government cross-examines the

6     witness.  And the rules require that I have to review those

7     statements in camera, which means outside the presence of the

8     jury, and rule upon what they have to turn over.

9          So that's what we have to do.  That's why I'm asking

10    how long it's going to take.

11         Do you have a copy, so I can just see how long it

12    looks?

13         MS. CRAGER:  Yes, Your Honor.

14         THE COURT:  And let the jury know how long we think

15    this is going to take?

16         MS. MCLOUGHLIN:  All the text on there, Your Honor, is

17    not --

18         THE COURT:  It's a bunch of text which is really hard

19    to read.  Well, let's try for 15 minutes.

20         Remember the admonition, ladies and gentlemen.  We'll

21    take a 15-minute recess, and I'll see what I can do during that

22    time.

23         (The jury panel exited the courtroom.)

24         THE COURT:  All right.  This is very, very hard to

25    read because it's hard to tell what's the text and what's all

1    the information that goes along with a text.

2              Maybe what you could do is in yellow-highlight what

3    the actual text is.

4              MS. MCLOUGHLIN:  I'm happy to do that, Your Honor.  I

5    just wanted to give the original document that we have, and I'm

6    happy to do that.

7              THE COURT:  All right.  Now, if you can't agree on

8    something, it's going to take a while.

9              MS. MCLOUGHLIN:  Well, Your Honor --

10             THE COURT:  First of all, you have to mark for me what

11   the text is, and then I have to look at it, and then we're

12   going to get the arguments about every single thing that's

13   redacted, every single thing that's in there.  And I'm going to

14   have to make a decision on-the-fly here.

15             If you could agree upon it, it would be far

16   preferable.  If not, I don't know what to tell you as to how

17   long I think it's going to take.

18             MS. MCLOUGHLIN:  Understood, Your Honor.  And -- we

19   want to follow the procedure --

20             THE COURT:  All right.  So let's -- how long will it

21   take you to mark the parts in this that are actually the text?

22             MS. MCLOUGHLIN:  That should only take me a couple

23   minutes --

24             THE COURT:  All right.  Why don't you do that.  And

25   I'll just go back and read this.  And you let the clerk know

1    when you've done that.

2              (Brief recess was taken.)

3              THE COURT:  So while we're putting this together, what

4    is this that we have here?  This is a series of text

5    communications between Mr. Pooley and the witness; is that

6    right?

7              MS. CRAGER:  Yes, Your Honor, and they date back to

8    2016 and, I think, 2017.

9              THE COURT:  All right.

10             MS. CRAGER:  To be clear, we have no statements from

11   Mr. Garmashov.  He refused to speak with us before trial.

12             THE COURT:  So we're sure that the inverse Jencks Act

13   applies to this?

14             MS. CRAGER:  Honestly, I've never dealt with this

15   issue, and we're not sure --

16             THE COURT:  You know, I've never had an argument about

17   this inverse Jencks Act before, and it's a little strange,

18   because ordinarily the defendant doesn't have to disclose who

19   their witnesses are at all.  And, anyway, it doesn't -- it

20   doesn't usually come up.

21             But many cases -- I just think of all the hundreds of

22   cases I've tried, I would say the great majority have been

23   cases where the defendant has had discussions in the past with

24   one or more of the witnesses that they call.

25             So the defendant may call his wife.  The defendant may

1   call his coworkers.  The defendant may call other people

2   involved in the factual background of the offense.  And I've

3   never had an issue over the inverse Jencks Act requirement.

4           And you think that we'd be doing that all the time.

5   You know, defendants commonly know the witnesses that they

6   call, and they commonly have had discussions with them on the

7   subject matter involving the case before.

8           But, anyway, that's the way it goes.

9           We can take whatever time it takes.  Maybe we'll have

10  to send the jury home for -- for a while, while we do this.

11          Do you have the paper?

12          MS. CRAGER:  Yes, Your Honor.  I believe we were

13  highlighting it to make it a little bit more readable.

14          MS. LYDON:  We were talking about that during the

15  brief recess, Your Honor.  And we want to get this one right.

16  And we don't want to waste the jury's time, as we were saying.

17  So we would be agreeable to sending the jury home.  So we

18  cannot make this decision or these decisions on the --

19          THE COURT:  All right.  Let's do it.  I'm going to

20  tell you something.  I'm very sorry I have to do this.  I have

21  to follow the law, and I don't always agree with what I have to

22  do.  But one of the things I like to do -- one of the

23  contributions I like to make to the trial is to not impose upon

24  the jury too much.

25          I really think that it's important that we preserve

1    the confidence of jurors, and if we do this too much, we're

2    going to lose the jury system.  And maybe we're going to lose

3    the jury system anyway, because we're the only country in the

4    world that has the kind of system that we do.

5          But if you start bringing them in here -- they had to

6    come in great distances to come here.  They sit here for

7    15 minutes, and then we send them home.  It's a terrible thing

8    to have to do.  I just -- I just -- it makes me want to retire,

9    because I don't want to be a part of this system any longer

10   that does this to citizens.

11         Bring the jury in.  I'll send them home.

12         How much time -- one day enough, or two?

13         MS. CRAGER:  Definitely one day is enough.  And

14   another way we could handle it would be to send them for an

15   extended lunch and try to come back later.

16         THE COURT:  Another way you could do this is just turn

17   this damn thing over to the Government.

18         What harm does it do to turn this over to them?

19         MS. CRAGER:  Honestly, our only issue is that we don't

20   know if, under the rule, the rule requires us to give over

21   statements of my client.  And I feel very uncomfortable giving

22   statements of my client as an ineffective-of-assistance matter,

23   unless I'm actually required to.  So that's the part that we're

24   seeking --

25         THE COURT:  All right.  Can you suggest to me why this

1   is the first time that either your office or I have ever had to

2   deal with this?  Because it just seems common to me that just

3   about every case would involve conversations between the

4   defendant and one or more of his witnesses.

5          MS. CRAGER:  Right, Your Honor.  And I -- candidly, it

6   did not occur to me that this could be Jencks until the

7   prosecutor mentioned it yesterday.

8          THE COURT:  Well, I'm wondering -- that's why I asked

9   you the question.  Are we sure --

10          MS. CRAGER:  We're not sure --

11          THE COURT:  Let me use the time to find that out.

12   Let's use the time to find that out.

13          Is this really an inverse Jencks Act situation?

14   Does -- does the law really contemplate this?  Because if it

15   does, it's another finger in the eye of the justice system,

16   because it's going to mean delays at every single case just

17   like this one; every single case.  We're going to lose the

18   justice system.  You don't care.  I don't care anymore either,

19   to be honest with you.

20          MS. CRAGER:  Yes, Your Honor.  And I just want to make

21   sure I'm not disclosing my client's own statements when I'm not

22   required to under the rule.  So if Your Honor is going to make

23   a ruling about that and the ruling is "they must go to the

24   prosecution," that's fine.  I just -- I don't feel that I can

25   disclose --

```
1              THE COURT:  All right.  Bring the jury in.

2              (The jury panel entered the courtroom.)

3              THE COURT:  Ladies and gentlemen, a question has come

4    up, and I'm trying to find out a way to handle this that

5    doesn't inconvenience you too much.

6              There is a rule that I have to review some things

7    here, and the rule says I have to do it outside of the presence

8    of the jury.  And it is extremely voluminous and difficult to

9    read, and I have to get it right.  And there was no way that I

10   could have compelled the -- anybody to present this to me

11   sooner.

12             So I'm going to give you your lunch break now until

13   1:00 o'clock and see if I can work this out.  I'm very

14   sensitive about your time.  If I have to do this too many times

15   in cases like this, I don't want to be a judge anymore, because

16   I don't want to take the time of people like you unnecessarily

17   and require you to do this.  It's just not fair.  It's not

18   right.

19             So I'm going to excuse you till 1:00 o'clock and try

20   to do this as quickly as I can.  And ask you to remember the

21   admonition.

22             (The jury panel exited the courtroom.)

23             THE COURT:  All right.  Let's go through this line by

24   line.  First line:  "Hey, Rob.  Did find Jake.  I need his log

25   book."
```

1           That's a statement by the witness?

2           MS. MCLOUGHLIN:  It is, Your Honor.

3           THE COURT:  All right.  Next statement -- any problem

4   with turning that statement over?

5           MS. MCLOUGHLIN:  Your Honor, I'm just noting the

6   statute says "in camera."  I don't know if that's in chambers

7   or outside the -- the point is we would just be disclosing all

8   the statements to the Government right now.

9           THE COURT:  Okay.  So how do you want me to do this in

10  camera?  I need to ask you questions about it, and that means

11  I'm meeting with the defense outside the presence of the

12  Government; right?

13          MS. MCLOUGHLIN:  Yes, Your Honor.  If --

14          THE COURT:  All right.  Any objection to proceeding

15  that way?

16          MS. LYDON:  I'm trying to think it through on-the-fly.

17          THE COURT:  Oh, I wouldn't want you to do that.

18          MS. LYDON:  I'm sorry, Your Honor.  I would like to

19  have the opportunity to provide the Government's perspective on

20  these issues.

21          THE COURT:  I --

22          MS. LYDON:  I don't know if a sidebar, where you have

23  questions just for the --

24          THE COURT:  No.  I want you to tell me right now if

25  you have any objection to me proceeding in camera with the

```
 1   defendant and his lawyer present while I go through these

 2   things?

 3          MS. LYDON:  Without the presence of the Government?

 4          THE COURT:  Why don't you talk to the people that

 5   wrote the rule about that.

 6          Can we look at the rule again?  Rule 262.

 7          MS. LYDON:  Yeah.  I think --

 8          THE COURT:  If -- if the party who called the witness

 9   claims that the statement contains information that is

10   privileged or does not relate to the subject matter of the

11   witness's testimony -- and they do.  They claim that it's,

12   number one, I think, privileged, if it's the defendant's

13   statement; and, number two, that it doesn't relate to the

14   subject matter of the witness's testimony, the court must,

15   m-u-s-t, must inspect the statement in camera, i-n,

16   c-a-m-e-r-a.  Period.

17          You need to brief that?  Or can you tell me whether

18   you have an objection to my doing that?

19          MS. LYDON:  No.  I absolutely think Your Honor should

20   review it in camera.  My concern is to ex parte --

21          THE COURT:  All right.  Does that mean that -- what?

22          MS. LYDON:  My concern is the rule doesn't contemplate

23   having the huddle with the defense without the Government.  We

24   would both like to -- I think both parties should be present to

25   address any questions the Court has.
```

1          THE COURT:  Maybe I ought to declare a mistrial,

2    because I can't handle this, to be honest with you.  I don't

3    know what this is.  I have to ask somebody about it.

4          MS. LYDON:  I understand, Your Honor.

5          If Your Honor would like to proceed with the defense

6    in this instance, we agree, but we would like to briefly make a

7    record as to our position, so that Your Honor has it, and we've

8    had an opportunity to let you know our views before we are sent

9    out.

10          THE COURT:  All right.  How much time do you need --

11          MS. LYDON:  I was just --

12          THE COURT:  -- to let me -- did you say you wanted to

13    e-mail them to me?

14          MS. LYDON:  No, Your Honor.  No.  I would just like to

15    have a discussion --

16          THE COURT:  How much time do you need?  Going to be a

17    brief?

18          MS. LYDON:  No, Your Honor.  The brief that we

19    provided was in an effort to provide helpful authority to the

20    Court as you make these decisions.  We've noted, on the record,

21    Your Honor, yesterday that we did not want any delay.

22          And so although we understand that the defense has the

23    ability to wait until the end of direct, we wanted to avoid

24    delay, so we are not happy with the delay either.  And this is

25    not something that the Government is doing.  I just want to be

1    very clear on that.

2           The -- our view is that the reason that this is

3    different, that this doesn't come up in another case in

4    response to Your Honor's question earlier, is that it is

5    unusual that a defendant would provide his text messages to his

6    attorney with a witness, as Mr. Pooley has done here.  So

7    while --

8           THE COURT:  Well, wait a minute.  It doesn't just have

9    to be in the hands of his attorneys.

10           If it's in his hands, it's still required to be

11    disclosed; right?

12           MS. LYDON:  I don't -- I have not reached that issue,

13    Your Honor, but I think that's the reason it doesn't come up.

14    Here, where the defendant and defense attorneys have used

15    those -- a portion of those statements affirmatively to

16    cross-examine a witness with both sides of the conversation,

17    it's clear that the entire text chain is in the hands of the

18    defense and is a witness statement just like any other --

19           THE COURT:  So I can't -- look, I wish I had counsel

20    here myself because I'd like to talk to somebody at the Ninth

21    Circuit and ask them what they expect me to do here.

22           I -- there's page after page after page after page

23    after page of texts.  I don't know what they're talking about.

24    How do I know whether it relates to the matters of the -- how

25    do I know?  How do I know?  Any help there?

1           MS. MCLOUGHLIN:  This is difficult, Your Honor.  I

2    don't believe there's any Ninth Circuit case law on whether

3    text messages between a defendant and another witness comes in.

4    The Jencks case was primarily about texts between Government

5    agents and Government witnesses.  So this does -- this is, kind

6    of, a different realm, I believe.

7           MS. LYDON:  I think under *Nobles*, the rule applies to

8    both sides.  And under -- well, we did some research last night

9    and were able to find the First District court case that was

10   provided.

11          From a commonsense perspective, both sides of the text

12   chain are necessary to understand the context because text

13   messages just proceed in these short bursts, and you can't

14   understand what's being said without seeing both sides.

15          And that's supported by the case that was provided

16   where the Government was offered -- ordered to produce an

17   unredacted version of a text chain where the agents -- both

18   sides were unredacted.

19          Admissibility is a separate issue, which we would also

20   want to consider carefully.

21          So it's Your Honor's decision what is -- what

22   redactions would be appropriate because they are not necessary

23   for context, like -- and they are -- to understand

24   Mr. Garmashov's statements, and they're not --

25          THE COURT:  You know what, I can't even understand

1    Mr. Garmashov when he's testifying here in court.  I have to

2    keep looking down at the realtime to understand what he's

3    saying there.

4          All right.  I don't know what else to say.  I'll take

5    a recess of a half hour, and let you know what I think.

6          MS. LYDON:  Thank you, Your Honor.

7          (Recess was taken.)

8          THE COURT:  We're meeting outside the presence of the

9    jury.  Defendant is present with counsel.

10         The Court has gone over several matters in camera

11   and -- since you put your positions in writing, I'm ruling with

12   a written order, and I'll ask the clerk to give each of you a

13   copy of my order.

14         Here.  I think this is enough.  I think that's it.

15         As you'll see from my order, I am going to have

16   defense counsel note for me each of the statements on the list

17   of texts that the defense contends does not relate to the

18   subject matter of the witness's testimony.

19         When defense counsel makes those notations, I will

20   then take the paper into my chambers and review it in camera,

21   as I am required to do, and I will make a determination as to

22   which of those statements shall or shall not be turned over to

23   the Government.

24         As you will see from the order, the Court is not going

25   to order that any of the statements of the defendant in these

 1    text communications be turned over through -- to the

 2    Government.

 3              One of the possibilities I thought of was to say that

 4    the defendant waived his -- both attorney-client privilege and

 5    his Fifth Amendment privilege by calling the witness, knowing

 6    that there was Jencks material that contained his statements,

 7    which could not be practically excised from the rest of it.

 8              However, I decided not to do that.  Particularly, in

 9    light of the strong privilege against self-incrimination, a

10    strong privilege in the Fifth Amendment not to be a witness

11    against himself, and the concept that such rights are not

12    presumed to be waived easily.

13              So with that in mind, I'm going to take the next

14    recess and have the defense highlight for me on the e-mail -- I

15    don't know how you want to do it.  But each statement that you

16    think is another subject or unrelated to the subject matter of

17    the witness's testimony, you mark that in a particular way.  If

18    you don't mark it, I'll assume that they'll -- that you're

19    agreeing that they're all related.

20              Understood?

21              MS. MCLOUGHLIN:  Yes, Your Honor.

22              THE COURT:  All right.  I'm going to go back into

23    chambers now, and you tell me when you're ready.

24              MS. CRAGER:  Thank you, Your Honor.

25              (Recess was taken.)

1          THE COURT:  All right.  I thought I could do this

2    calmly and efficiently, but, you know what, I can't talk to you

3    about what's in this.  It makes it very difficult for me to do

4    anything.

5          And I'm just going to talk to you about it now, and I

6    don't care whether I'm violating the law by doing that, because

7    I want to tell you my problem.  And that is, there are

8    statements when you deal with somebody you know, that unless

9    somebody explains to you what they mean, you don't understand

10   them, such as the statement -- and I'm not saying that it's in

11   here or not, but you can draw whatever inference you want.

12         The statement:  "Did you get any M?"  Now, how am I

13   supposed to know what something like that means?  How am I

14   supposed to know whether it's related or not?

15         You tell me, please.

16         MS. MCLOUGHLIN:  Your Honor, I would say the standard

17   being related to the subject of the testimony, that statement

18   was not discussed.  There was not any reference to anything

19   referred to as "M" or anything of that nature.

20         THE COURT:  One solution is that the party who claims

21   that it's not related has the burden of proof, and I don't know

22   whether that's true or not.  I just pulled that out of thin air

23   because nobody has told me who has the burden of this.

24         Does the party that claims that the statement is

25   unrelated have the burden of showing that, or does the party

 1   who claims that it's related have the burden of showing that?

 2   What's the answer?

 3            MS. MCLOUGHLIN:  Well, the rule, of course, is silent

 4   as to the burden, Your Honor.  And I believe -- I believe it's

 5   left in the Court's discretion.  I -- I am happy to present any

 6   more argument on it, but that would be -- my input on that

 7   would be that the testimony didn't --

 8            THE COURT:  All right.

 9            MS. MCLOUGHLIN:  -- discuss that.

10            THE COURT:  All right.  Then we're going to assume

11   that you have the burden of proving that a statement here is

12   not -- not related.  Then I'm prepared to tell you what to turn

13   over.

14            Can we get her a copy?  It would be the ones that --

15   where I put the "O" on it and ones where I put the question

16   mark on it.

17            Maybe we could highlight them -- highlight them with

18   another color.

19            THE CLERK:  Just one copy?

20            THE COURT:  Just one copy for the defense, and we'll

21   highlight the ones where I put those marks on it with a

22   different color.  And the question that, obviously, comes to

23   mind with regard to everything in this document is, what's the

24   big deal?

25            You don't have to answer it because we have to follow

1    the law.  The big deal is we've got to follow the law.  But

2    when you look at the things that they're talking about, big

3    deal.  You probably know what all those things mean, because

4    you have been -- you're sitting alongside the man that was

5    involved in that conversation, but I don't -- I don't have the

6    benefit of that, and I'm not allowed to talk to you about it.

7    That would be the easy way to determine it.

8            I have to put it together in a way that I think you'll

9    be able to understand it.

10           (Recess was taken.)

11           THE COURT:  Instead of marking this exhibit, what I'm

12   having done is having a list typed up of the ones that you turn

13   over and the ones that you don't.  And it's -- references the

14   same pages that you gave me.  I think that's easier than trying

15   to mark up the exhibit myself.

16           MS. MCLOUGHLIN:  Thank you, Your Honor.

17           THE COURT:  I'm ordering that most of the statements

18   of the witness be turned over.  There's only a handful that I

19   am not, and the reason is that they appear, to me, to be

20   clearly unrelated to the subject matter of the witness's

21   testimony.  And where I had a doubt, I'm ordering that it be

22   turned over.

23           And, admittedly, it may be hard to know the context of

24   the witness's statements without knowing what was said by the

25   defendant, but that's what I've discussed in my order.

```
1              (Recess was taken.)

2              THE COURT:  All right.  I'm having the list given to

3    defense counsel, and what it says is that:  "All of

4    Mr. Pooley's text messages shall be redacted," and then it

5    lists the text messages from Mr. Garmashov that shall be

6    redacted by page and text number.

7              And then it says that:  "All other text messages from

8    Mr. Garmashov shall not be redacted."

9              All right.  So you can put that together, and I hope

10   that we can proceed, then, with the jury at 1:00 o'clock.

11             MS. CRAGER:  Yes, Your Honor.  We'll proceed --

12             THE COURT:  We'll proceed with the jury at

13   1:00 o'clock.

14             MS. LYDON:  I'll review them as soon as I get them.

15             THE COURT:  Okay.  We probably won't resume with the

16   jury at 1:00 o'clock, but we'll try.

17             (Noon recess was taken.)

18                            -oOo-

19

20

21

22

23

24

25
```

```
1        SACRAMENTO, CALIFORNIA; WEDNESDAY, MAY 22, 2024; 1:03 P.M.

2                              -oOo-

3             THE COURT:  All right.  Is everybody ready to bring

4    the jury in?

5             MS. LYDON:  Yes.  These text messages -- we've just

6    received a stack.  They're not -- we're not going to use them,

7    I don't think.  I don't think they're useful.  We don't

8    understand them.

9             THE COURT:  I see why you would think that.  I could

10   understand.

11            MS. LYDON:  They're not comprehensible, so we will

12   proceed with cross of Mr. Garmashov, and go from there.

13            THE COURT:  All right.  I have Karen -- she's the one

14   that came into my office and got me, so she should be here.

15            (The jury panel entered the courtroom.)

16            THE COURT:  Everyone has returned.  Thank you for your

17   patience, ladies and gentlemen.

18            Are you ready to do cross-examination?

19            MS. LYDON:  Yes, Your Honor.  Thank you.

20            THE COURT:  You may proceed.

21                          CROSS-EXAMINATION

22   BY MS. LYDON:

23   Q.  Good afternoon, Mr. Garmashov.

24   A.  Hello.

25   Q.  I'd like to begin with where the defense left off about why
```

 1   you're here.

 2   A.   Okay.

 3   Q.   Defense counsel asked you some questions about whether the

 4   reason you're here in this courtroom is to somehow get your

 5   ratings back.

 6        Do you recall that, that line of questioning?

 7   A.   Yes.

 8   Q.   Or whether you're here to convince USPA of something.

 9        Do you recall that?

10   A.   Yes.

11   Q.   The reason you're here is that you got a subpoena to

12   be here --

13   A.   Yes.

14   Q.   -- from the defense; right?

15   A.   Correct.

16   Q.   Okay.  All right.  Let's go back to the beginning.

17        Rob Pooley was suspended in 2015; right?

18   A.   Correct.

19   Q.   Describe what he said to you and you said to him about how

20   you would proceed together after he was suspended.

21   A.   Rob said:  "My rating got suspended over some BS reason,

22   some paperwork issue.  And can we work together?"

23        I said, "Sure, while I'm here."

24        Because I just -- I was a brand new-examiner at that point.

25   I think it was only, like, a year since I'd been an examiner,

```
 1    and all the stuff from the course was still fresh in my memory.
 2    So that's why I told him, "We can do it as long as I'm on the
 3    drop zone."
 4    Q.   How did that relate to working together, the fact that you
 5    were new, and Rob, supposedly, were to work together?
 6    A.   I'm not sure I understand your question.
 7    Q.   You had mentioned you were new.  I was wondering why you
 8    brought that up.
 9    A.   I said I was a new examiner.  I just -- well, it was about
10    a year since I got my examiner's rating.  So what I'm trying to
11    say is that the rules that were explained by Jay Stokes were
12    still fresh in my memory at that point, and I knew the rules.
13         And according to the rules, I offered him a way of him
14    teaching -- continue teaching.  And when the -- when his
15    appeal, I guess, or hearing about his suspension would come up
16    in the year, I would be able to put in a good word for him
17    since we're working together.
18    Q.   Okay.  You mentioned that you said "as long as I'm in the
19    drop zone"?
20    A.   Correct.
21    Q.   What did you say to him, and what did he say to you about
22    that provision of the agreement?
23    A.   He just nodded his head, like, yeah, sure.  Understandable.
24    Q.   And how exactly did you agree to work together?
25    A.   Well, he can teach the courses now, supervising the
```

```
 1   courses.  I would be asking him what he's teaching his
 2   students, and I'm going to do my own suggestions and stuff like
 3   that.
 4   Q.  And did you have an agreement about who would -- whose
 5   signatures would appear on the paperwork?
 6   A.  Well, since he was suspended, my signatures would be on the
 7   paperwork for all the jumps required to be signed by an
 8   examiner, yes.
 9   Q.  Okay.  Let's talk about those preprinted forms.
10        How did it come about that either of you were using
11   preprinted forms?
12   A.  Yes.  I saw Rob using those, and I thought it was really
13   efficient when you're going through several students.  When
14   we're done with the course, I would sit down and fill out the
15   forms all together.  So I thought it would increase efficiency.
16   Q.  Okay.  So you saw Rob using preprinted forms.
17        And what did you say to him, and what did he say to you
18   about that?
19   A.  I said, "Those are cool.  Can we use them for me, as well?
20   Can you do -- make forms for me as well?"
21   Q.  What did he say?
22   A.  "Sure."
23   Q.  Was this before or after his suspension?
24   A.  I'm not sure.
25   Q.  And did he make you preprinted forms?
```

```
1    A.   Yes.

2    Q.   Okay.  Why did you agree to help him?

3    A.   It's going to be a lengthy explanation.

4    Q.   Okay.

5    A.   So I'm an immigrant to this country, and the way I was

6    brought up, you know, you help your friends.  And when I first

7    started skydiving at Lodi, Rob was one of the few people who

8    was actually nice and not rude, I guess.  And he would talk to

9    me.  He would give me advice.  And he had way more experience

10   than I did at that time, and I would be listening to him, and

11   his advice was really good.  And he's a good instructor.  And I

12   was watching him teaching his students, and I really liked

13   that.

14   Q.   Okay.

15   A.   So when he approached me and explained why his rating was

16   suspended, I decided why not help him, you know.  Everybody

17   gets -- stumble on some trouble, and people should help each

18   other.

19   Q.   Okay.  Would you consider yourself, at the time, friends

20   with Mr. Pooley?

21   A.   I would think so, yes.

22   Q.   Did you ask for any money as part of the exchange?

23   A.   No.

24   Q.   Did you ask for anything as part of the exchange?

25   A.   No.
```

1    Q.   Why not?

2    A.   He helped me without asking for money before.  Why would I

3    do that?

4    Q.   All right.  And then how did the arrangement continue until

5    May?  Did you work with him at the drop zone?

6    A.   I was supervising the courses that he was teaching, yes.

7    Q.   In May, you left the country; correct?

8    A.   Correct.

9    Q.   Did you have a conversation with Mr. Pooley about that?

10   A.   Yes.

11   Q.   What did you say to him and what did he say to you?

12   A.   I was leaving on that date.  We were finishing up some

13   students, and as I was leaving, Rob showed up in the drop zone.

14        I told him, "I'm leaving.  When is your hearing?"

15        He said, June, I believe, or July.  I don't remember the

16   exact date.

17        And I said, "Okay.  So I'm going to be out of the country.

18   If you need me to testify or to put a good word for you, put me

19   on the call, and I will do that."

20        But you have to understand since I'm leaving, you cannot do

21   any courses.

22   Q.   What did he say?

23   A.   He says, "Understandable."

24   Q.   "Understandable" or --

25   A.   That's what he said.

```
1   Q.  Did he say, "I won't do any other courses," in sum and

2   substance?

3   A.  No.  I don't remember.

4   Q.  Did he convey to you that he would not do other courses,

5   even if you don't recall the exact words?

6   A.  My understanding was when you say something, you know, to a

7   man and he says, "Yes, that's understandable," my understanding

8   was that he got what I was implying with that statement.

9   Q.  When you said, "You can't do any courses" --

10  A.  Right.

11  Q.  -- "while I'm abroad" --

12  A.  Correct.

13  Q.  All right.  It's hard for the court reporter if we talk

14  over each other, so I'll try to wait until you're finished.

15  And --

16  A.  Sorry.

17  Q.  -- just wait till it -- it happens all the time.

18      Did you bring him any paperwork in the context of that

19  conversation?

20  A.  There was paper [verbatim] that was brought up, because

21  we'd just finished several students.  I don't remember all of

22  the names.  And I said, "We finished the students.  Let's get

23  some of the paperwork.  Some of them, I ask you to scan it so

24  that they can e-mail it to USPA."

25      My direction to them was, "Ask Rob to scan this for you and
```

1   e-mail it to the USPA," and I gave them the e-mail address.

2   Q.   Okay.  Why?  What did that have to do with you leaving the

3   country?

4   A.   Some of the people who show up there for the courses, they

5   were foreigners, as well, and not everybody has access to

6   scanners and stuff.  So we had a scanner at the drop zone, and

7   Rob had access to it.  So that's why.

8   Q.   Okay.  Was the idea to get everything wrapped up before you

9   left?

10  A.   Correct.

11  Q.   Okay.  When you returned, did you learn that he had, in

12  fact, been using your signature while you were gone?

13  A.   Could you repeat that question, please?

14  Q.   When you came back --

15  A.   Uh-huh.

16  Q.   -- from Russia, did you learn that Pooley had, in fact,

17  been using those preprinted forms with your signature while you

18  were away?

19  A.   Yes.

20  Q.   What did you say to him about that, and what did he say to

21  you?

22  A.   Well, I don't know how to answer this question with being

23  given the specific instructions of not talking about --

24  Q.   Yes.  Yes.  Yes.  Okay.

25      Setting that part aside, and not talking about that --

```
 1  A.   Uh-huh.
 2  Q.   -- can you describe what you and he said to each other,
 3  specifically, on the topic of the fact that he was using your
 4  signature while you were away?
 5  A.   Well, those text messages were brought up by the defense.
 6  And in those text messages, that's pretty much when I first,
 7  you know, learned that that happened.
 8       That's when I asked him in the text message, "How many,
 9  Rob?  How many people?"
10       And, yes, so that's pretty much what I learned.  And you
11  could see the answer that he gives me in those text messages.
12  Q.   Were you angry?
13  A.   Yes.  I mean, my whole work was jeopardized now, because
14  that's something that I've been working for for a very long
15  time for.
16  Q.   Did he apologize?
17  A.   I don't remember.
18  Q.   You described the process of the letter being written.
19  A.   Yes.
20  Q.   Why did you want that letter?
21  A.   Well, I wasn't sure what -- whether he was going to tell
22  the truth to the USPA or not, so I wanted to cover my end.
23  Q.   Uh-huh.  Was the letter true?
24  A.   Yes.
25  Q.   Do you remember what his edits were, what he wanted
```

1    changed?

2    A.   There were some lines in there that he didn't like or his

3    lawyer didn't like.  I'm not really sure which lines were --

4    those were.  But like I said, I tried to -- I asked my lawyer

5    friend to draft that letter, and I gave it to Rob, whatever

6    corrections he did, and you can see that correspondence between

7    me and Evan Beecher.  What I was -- I was just trying to make

8    everybody happy.

9    Q.   Uh-huh.

10   A.   And my end being covered.

11   Q.   And was he willing to sign it?

12   A.   I'm sorry?

13   Q.   Was he willing to sign it?

14   A.   Yes.  He signed it himself.

15   Q.   Was he willing to?

16   A.   Yes.

17   Q.   Then there was another letter in response to the validity

18   of the first letter being questioned?

19   A.   Yes.

20   Q.   How did that letter come about?

21   A.   After the USPA investigation, they denied me my ratings,

22   and they said that they don't believe Rob wrote that letter.  I

23   came to him and said, "USPA doesn't believe that you wrote that

24   letter.  Can you write another letter saying that this letter

25   is true?"

1    He said, "Okay.  Sure.  I'll do something.  I won't write a

2    lengthy letter but, like, a short version, couple lines saying

3    that the letter is true.  I will do."

4    And he did, and I asked him to notarize it too, because

5    USPA didn't believe it was his signature on that letter, as

6    well, so he notarized.  He wrote it to me, and I present it to

7    USPA.

8    Q.  Okay.  Your dispute with USPA came up in your questioning

9    by the defense counsel.

10    Do you recall that?

11    A.  Yes.

12    Q.  Without getting into all the details of the back-and-forth

13    with USPA, were the issues at USPA broader -- or the issues

14    between you and USPA broader than just the summer of 2016?

15    I'll ask a specific question:  Did USPA also have concerns

16    with things like using preprinted signatures at all?

17    A.  After that, yes, they did, but before, no.

18    Q.  Okay.  So you were addressing other issues in your

19    discussions with USPA beyond the summer of 2016; is that right?

20    A.  I'm not sure I understand your question.

21    You asked me whether other issues were brought up.  The

22    electronic signature, the preprinted signature on the paperwork

23    was never brought up, was never a problem until the event.  And

24    after that, it became an issue.

25    Q.  Right.  My question is targeting your post-summer of 2016

1    back-and-forth with USPA with the appeals and the ratings

2    issues.

3    A.   Yes.

4    Q.   My question is:  In those proceedings, they were also upset

5    about the use of preprinted signatures, generally; right?

6    A.   Yes.  Yes.

7    Q.   Okay.  And then that third letter, how did that letter come

8    about pertaining to Mr. Lancaster's explanation of those

9    e-mails that you looked at with defense counsel?

10   A.   After -- I don't remember which appeal to USPA.  Even with

11   the letter and with the notarized second letter, USPA was

12   saying that because of the string of e-mail, they considered

13   that as proof that I knew what Rob was doing.

14       So I came to Rob and said, "They think that -- because of

15   this string of e-mails, they think that I knew what you were

16   doing.  Could you write a letter explaining that string of

17   e-mails?"  And he did it himself, too.

18   Q.   Okay.  He wrote that letter himself?

19   A.   Yes.

20   Q.   Do you know how they got that string of e-mails?

21   A.   When -- with my lawsuit to USPA, with all the draft papers,

22   so I got access to it.  So that's when I found out that Rob

23   sent that e-mail to USPA.

24   Q.   Did you find out about that before or after he wrote that

25   third letter explaining that you had nothing to do with

1   anything?

2   A.   After.   I only find out about that, I believe, in 2021 or

3   2020 when my lawsuit against USPA was happening.

4   Q.   How did you feel about that?

5   A.   I'm not familiar with all the legal terms, but I -- I think

6   when the lawsuit was happening, there was, like, some

7   documentation, and all that stuff was exchanged between the

8   parties.   And my attorney sends -- sent those documents to me

9   to look over.

10  Q.   Did you ever confront Rob about that?

11  A.   Yes.   I asked him why did he do that.

12  Q.   What did he say?

13  A.   He just shook his head.

14  Q.   So you've talked about the -- Rob's use of your signature

15  over the summer of 2016 many times; right?

16  A.   Yes.

17  Q.   And you've always been consistent that you did not know he

18  was still using your signature; right?

19  A.   Correct.

20  Q.   And you said from the start that you told him before you

21  left that he couldn't use your signature while you were abroad?

22  A.   Yes.

23  Q.   You said that in every statement since?

24  A.   Yes.

25  Q.   And that's what you testified today?

1    A.   Yes.

2    Q.   Is that true?

3    A.   Yes.

4         MS. LYDON:  No further questions.

5         THE COURT:  Any redirect?

6         MS. CRAGER:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. CRAGER:

9    Q.   Mr. Garmashov, you indicated you're here on a subpoena;

10   right?

11   A.   Correct.

12   Q.   I issued that subpoena?

13   A.   I don't know who issued it.  Somebody issued, and I'm here.

14   Q.   Actually, the Court issued the subpoena, but I requested

15   the subpoena.

16        Is that your understanding?

17   A.   Yes.

18   Q.   You also received a subpoena from the Government?

19   A.   Correct.

20   Q.   And you were under the impression that the Government might

21   call you as their witness?

22   A.   Yes.

23   Q.   But they didn't?

24   A.   No, they didn't.

25   Q.   And so you were informed that you had to come on the

1   subpoena for the defense?

2   A.   Yes.

3   Q.   And that's why you're here today?

4   A.   Yes.

5   Q.   You didn't have a choice about whether to come here today?

6   A.   No.

7   Q.   You refused to speak with me before today?

8   A.   I don't think that's what happened.  What happened was you

9   contacted my attorney, and he said that you cannot talk to me.

10  It wasn't me.

11  Q.   Okay.  So we've never spoken before today?

12  A.   No.

13  Q.   You did speak with the prosecutors before today?

14  A.   Yes.

15  Q.   And the -- the agents before today?

16  A.   Could you repeat that?

17  Q.   And you spoke with the federal agents before today?

18  A.   Yes.

19  Q.   Okay.  I'd like to look at Exhibit 2060, which is the text

20  chain with Rob Pooley that you were just talking about.

21       If we could pull that up.

22       Now, you just testified that you were angry when you found

23  out that Rob Pooley was training people that summer?

24  A.   Yes.

25  Q.   And you testified that this text chain was around the time

1    that you found out?

2    A.   Yes.

3    Q.   Okay.  So let's just look at that.  Now, this first text

4    here, Rob reaches out to you.  He says:  "We should chat

5    sometime."

6         Is that what he said?

7    A.   That's what it says right here.  Yes.

8    Q.   Okay.  He says:  "Do you have some time tonight or

9    tomorrow?"

10   A.   That's what it says.

11   Q.   Okay.  And you indicate:  "I'll be in Lodi tomorrow"?

12   A.   Correct.

13   Q.   Okay.  And he says:  "I'll find you at the drop zone" --

14   sorry.  "I'll find you tomorrow."

15   A.   Yes.

16   Q.   Okay.  And then as we talked about yesterday, I believe, it

17   looks like you and Rob Pooley had some kind of conversation in

18   person?

19   A.   Yes.

20   Q.   And then he texts you the next day:  "Have things changed

21   since we talked this morning?"

22   A.   Yes.

23   Q.   And that's when you say:  "Yes, things have changed."

24   A.   Yes.

25   Q.   And in that text message, you indicate:  "Things changed

1    because UPT found out that you weren't in the country for the

2    training."

3    A.   What it says right here is:  "Yes.  You need to refund all

4    those people.  UPT will not process any paperwork from me" --

5         (Court reporter interruption.)

6         THE WITNESS:  The text message says:  "Yes.  You need

7    to refund all these people.  UPT will not process any paperwork

8    from me from Lodi.  I don't know anything about USPA.  I was

9    not in the country when the guy was trained, and both USPA and

10   UPT know that.

11   BY MS. CRAGER:

12   Q.   Okay.  Thank you.  Let's go to page 2, quickly.  Okay.

13        And you asked Rob how many people he had trained over the

14   summer; correct?

15   A.   I'm sorry.  Where you at?

16   Q.   Oh, I'm sorry.  I'm down here.  You can see on the screen.

17   "How many, Rob?"

18   A.   Yes.

19   Q.   Is that what you said?

20        And he said:  "Okay.  The ones you have."

21   A.   Okay.

22   Q.   Is that what it says?

23   A.   That's what it says.

24   Q.   All right.  Thank you.

25        MS. CRAGER:  Nothing further.

1          THE COURT:  Any recross?

2          MS. LYDON:  Maybe briefly.

3                    RECROSS-EXAMINATION

4   BY MS. LYDON:

5   Q.  So those -- you referred to the texts when I asked you

6   about you and Rob's conversations when you returned; right?

7   A.  Yes.

8   Q.  Were -- had you and Rob talked before the conversations

9   reflected in those texts?

10  A.  Yes.

11  Q.  Okay.  What did you say to him, and what did he say to you,

12  just to clear things up, in that conversation where you --

13  without mentioning anything that shouldn't be discussed?

14      What did you say to him, and what did he say to you about

15  the fact that he'd broken your instructions and used your

16  signatures anyway?

17  A.  To be honest with you, I don't remember exactly, and I can

18  only speculate what was said at that particular conversation.

19  But I don't remember it.  But knowing myself, it would be

20  something to the extent --

21          MS. CRAGER:  Objection.  Speculation.

22          THE COURT:  Sustained.

23  BY MS. LYDON:

24  Q.  Okay.  Did you and Rob ever have -- Rob Pooley ever have a

25  deal that you would send in the paperwork when you -- at any

```
 1   time when you got back from Russia?

 2   A.  I'm sorry.  Could you rephrase that question?  I'm not sure

 3   I understand what you mean.

 4   Q.  Yeah.  So the defense counsel asked --

 5           MS. CRAGER:  Objection.  Outside the scope.

 6           THE COURT:  I don't think that's within the scope of

 7   the redirect, is it?

 8           MS. LYDON:  It's -- it was insinuated with respect to

 9   the text messages.

10           THE COURT:  The text messages were part of the direct

11   examination.  This is recross.

12           MS. LYDON:  And she just went over the texts again.

13           THE COURT:  All right.  Proceed.

14           MS. LYDON:  Thank you.

15   BY MS. LYDON:

16   Q.  Defense counsel asked you a leading question that:  Didn't

17   those text messages reflect that you and Rob had a deal for you

18   to send in the documents?

19       Do you recall that question?

20   A.  Yes.

21   Q.  So I'm just asking you straight out:  Did you ever have a

22   deal like that?

23   A.  No.

24           MS. LYDON:  All right.  Thanks.

25           THE COURT:  All right.  Mr. Garmashov, thank you.
```

1    You're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Do you have any other witnesses?

4              MS. CRAGER:  We do not have any other witnesses, Your

5    Honor.  There is one exhibit that we just wanted to make sure

6    was in evidence before we closed our case.

7              THE COURT:  All right.  You want to check with the

8    clerk?

9              MS. CRAGER:  We have discussed it.  The exhibit is

10   Exhibit 80, page 8.  And we reviewed the transcript.  It looks

11   like the Government moved to admit it.  We had no objection.

12             For whatever reason, the proceedings got diverted

13   then, so it wasn't actually admitted, but it was later referred

14   to by --

15             THE COURT:  All right.

16             MS. CRAGER:  -- at least by our side, and it was

17   published to the jury, so I think it was not admitted just by

18   accident, so we would move to admit that page now.

19             THE COURT:  Is that correct?

20             MS. LYDON:  Yes.  We have no objection to moving that

21   in.

22             THE COURT:  Exhibit 80, page 8 is received in

23   evidence.

24             MS. CRAGER:  Thank you, Your Honor.

25        (Defense Exhibit 80, page 8 was admitted.)

1          THE COURT:  Any other evidence or witnesses?

2          MS. CRAGER:  The defense rests, Your Honor.

3          THE COURT:  Any rebuttal?

4          MS. LYDON:  No, Your Honor.

5          THE COURT:  All right.  Let me talk to you at sidebar,

6    then.

7          (Sidebar discussions:)

8          THE COURT:  I have a draft of instructions that we

9    could go over this afternoon.  I think there will probably be

10   some discussion, but I'm hopeful we can dispose of that this

11   afternoon, and go into the arguments tomorrow morning.

12         MS. CRAGER:  That's fine.

13         MS. LYDON:  Good to see.

14         THE COURT:  All right.  I'm going to tell the jury

15   that.  Okay?

16         MR. SHARMA:  Yes, Your Honor.

17         THE COURT:  All right.

18         (Sidebar discussions concluded.)

19         THE COURT:  We're back on track, ladies and gentlemen.

20   Both sides have rested.

21         The next thing that has to happen, insofar as you're

22   concerned, is that the lawyers will present their final

23   summations or arguments to you.

24         It begins with a summation or argument on behalf of

25   the Government, and then a summation or argument on behalf of

1    the defendant, and then a rebuttal argument on behalf of the

2    Government.

3              The arguments or summations are not evidence.  And if

4    the evidence, as you recall it, differs from what you hear in

5    the arguments, your memory of the evidence controls.  And then

6    after the arguments, I will instruct you on the applicable law.

7              We expect that all that should be able to be

8    accomplished tomorrow.  But there's one other thing that the

9    law requires me to do before we begin with the arguments, and

10   that is that I have to meet with the lawyers here and read

11   whatever suggestions they want to make to me as to how they

12   think I should instruct you on the law.

13             And then I listen to what they have to say, and I tell

14   them how I rule upon their request, and then I give them a copy

15   of the instructions that I will give you, so that they will

16   know what I'm going to instruct you on the law at the time that

17   they make their arguments.

18             So all of that has to take place before we hear the

19   arguments.  And I'm relatively confident that we will be able

20   to accomplish all of that on schedule.

21             So I'm instructing you to continue to heed the Court's

22   admonition.  You still haven't heard anything.  You've

23   heard all -- everything.  You've heard all the testimony, but

24   you haven't heard my instructions, and you haven't heard the

25   arguments of counsel.

1          So still keep an open mind.  Don't seek or receive any

2    information about the case.  Follow all the rest of the Court's

3    admonitions.  Leave your books on your seats and come back here

4    tomorrow morning at 9:00 o'clock.

5          (The jury panel exited the courtroom.)

6          THE COURT:  We had to make sure that we knew whether

7    the defendant was going to testify and some other things before

8    we finalized the draft.

9          But my clerk is going to do that right now, and he'll

10   get you a copy of the proposed instructions, along with the

11   verdict forms.  And feel free to have a discussion about these,

12   because this is just a draft, and if there are any suggestions

13   you have, or comments, we can have that this afternoon.

14         MS. LYDON:  Thank you, Your Honor.

15         There's one thing that -- just for any future

16   collateral-attack purposes, could the Court just question --

17   ask the defendant whether he's made the decision of his own

18   accord, fully advised not to testify, so that it's on the

19   record?

20         THE COURT:  Do you care if I ask him, Counsel?

21         MS. CRAGER:  That's fine, Your Honor.

22         THE COURT:  All right.  Mr. Pooley, you understand

23   that you have a right to testify if you want to?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And you don't have to?

 1              THE DEFENDANT:  I understand.

 2              THE COURT:  Did you discuss that fully with your

 3    lawyers?

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Did you decide that you don't want to

 6    testify?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  Is that your decision?

 9              THE DEFENDANT:  I agree with the decision.

10              THE COURT:  And is that your decision?

11              THE DEFENDANT:  Yes.

12              THE COURT:  All right.

13              MS. LYDON:  Thank you, Your Honor.

14              THE COURT:  All right.  Let me just direct your

15    attention to some portions of the proposed instructions, and

16    then we can start discussing them.

17              Up to Instruction No. 9, they're pretty much

18    boilerplate instructions that are given in every case.

19              Instruction No. 9 is something that was requested by

20    the Government.  It's a generic instruction.  It's not clear

21    what past acts you're referring to or what the purpose of those

22    acts might be.  It's -- it's questionable.  But I put it in

23    there.  We can talk about it.

24              MS. LYDON:  I could -- I don't think we actually need

25    that anymore.  There was -- we always put in more because it's

1    always easier to take it out than put it in.  But it hasn't --

2    such evidence hasn't come in.

3         Does the defense agree?

4         MS. CRAGER:  We agree, Your Honor.

5         THE COURT:  So we can decide right now that that

6    instruction won't come in.

7         The next one speaks for itself.  You've heard

8    testimony of a witness who testified in the Spanish language,

9    Instruction No. 11.  I already told them about that during the

10   trial.  I don't think there's any reason to give that again.

11   So we can talk about that.

12        Instruction No. 12, there was something controversial

13   about Agent Noel's testimony, I just assumed, not get into

14   opinion evidence because it's not important in the context of

15   that testimony.  So we can talk about that.

16        Instruction No. 13, proposed by the defendant, but we

17   need to discuss it because you want me to tell the jury that

18   the Government has failed to produce a witness whose testimony

19   would have been material to an issue in the case.

20        And I think you're probably talking about Mackay, but

21   I generally don't express opinions about whether the Government

22   has or has not done certain things.  So we need to talk about

23   13, if you want me to give it.

24        Now, beginning on Instruction No. 14, we talked about

25   the elements, so I think we need to make sure we're all in

1    agreement or that, at least, I've heard you on any objections

2    you have to those instructions on the elements.

3            And I want to talk about No. 16, and there was another

4    one.

5            MS. LYDON:  16 should be easy.  We also don't need

6    that instruction.

7            THE COURT:  You ask what?

8            MS. LYDON:  We don't need 16 anymore.

9            THE COURT:  Okay.  Good.

10           There's another one too, then, that talks about

11   schemers and coschemers.  Let me see if I can find that one.

12           19, are you still going on a theory that somebody else

13   committed the crime and the defendant aided and abetted?

14           MS. LYDON:  No.  I think we charged aiding and

15   abetting in the indictment.  I don't think we need 19.

16           THE COURT:  Okay.  So we can take 19 out.

17           Okay.  So those are the ones I wanted to highlight for

18   you.  Let's see if -- if we take 19 out -- excuse me.  If we

19   take 19 out, should we take 20 out, as well?  Defendant being

20   found guilty of the crimes, even if he did not personally

21   commit the acts, if he -- et cetera.

22           MS. LYDON:  This one, I'm just thinking it through.

23   The Government is not proceeding mainly on an

24   aiding-and-abetting theory, but it's hard to know.

25           It's kind of inherent in every charge.  I'm not sure

1   if the defense is planning to argue that someone else could

2   have performed some of the acts at issue in the --

3           THE COURT:  All right.  I can leave it in.  It's a

4   short one.

5           MS. LYDON:  Okay.

6           THE COURT:  So those are my comments.  If you want to

7   take a couple more minutes to look at them, and then we can

8   have some further discussion on the remaining jury

9   instructions.

10          MS. LYDON:  Thank you, Your Honor.

11          MS. CRAGER:  Thank you, Your Honor.

12          THE COURT:  All right.  We'll take about five minutes

13  here.

14          (Brief recess was taken.)

15          THE COURT:  Are you ready to talk about these?

16          MS. CRAGER:  Yes, Your Honor.

17          THE COURT:  All right.  Where would you like to start?

18          MS. CRAGER:  We could start at the beginning, I think.

19          Instruction 11 was the first one that Your Honor

20  identified.  That's the one about Spanish language.

21          THE COURT:  All right.

22          MS. CRAGER:  And the defense agrees that it's already

23  been said.  I don't think it needs to be said again.  But

24  either way, we have no objection.

25          THE COURT:  Agreed.

1          MS. LYDON:  We just propose reading it because the

2    expert-testimony instructions are one of those weird things

3    that the Ninth Circuit can get hung up on.  And it's short.

4          THE COURT:  We're talking about the Spanish language.

5          MS. LYDON:  Oh, sorry.  I guess the same reason but

6    with less --

7          THE COURT:  Should I read it in Spanish?

8          I already told them "during the course of the

9    examination."

10          MS. LYDON:  That's probably fine.

11          THE COURT:  All right.

12          MS. LYDON:  Okay.

13          THE COURT:  So we'll leave that one out.

14          MS. LYDON:  We would like the expert instruction.  But

15    can I jump the gun on arguing that one?  It's expert --

16    Instruction 12.  It doesn't matter very much, but it just makes

17    life easier on appeal.

18          THE COURT:  Both agree?

19          MS. CRAGER:  We have no objection, Your Honor.

20          THE COURT:  All right.  Take 12 out.

21          MS. LYDON:  12 stays, is what we're saying.

22          THE COURT:  12 stays.

23          Isn't quite opinion testimony.  It was expert because

24    you knew what he was doing in that sense.  But this -- this

25    instruction talks about it as opinion testimony.  His opinion

1  testimony is allowed because of the specialized knowledge.  He

2  didn't really talk about an opinion.  He just knew how these --

3  how these -- how to read these computers?

4          MS. LYDON:  The one thing he said that I'm thinking of

5  as an opinion is he opined that when -- the date created for a

6  series of documents reflected the date that they were copied

7  over en masse from another device.

8          THE COURT:  Well, I know he said that, but I am no

9  computer expert at all.  I'm really low on the -- on the -- on

10  the list of people that understand computers, as Karen can tell

11  you.  But even I knew that.

12          I look at my orders, and as a matter of fact, I said,

13  Why didn't I see this order earlier?  Oh, it was changed.

14  That's why it's got this later date on it.

15          Even I knew that.  So that's not something really

16  sophisticated.  All right.  It's just -- somewhat detracts from

17  the importance of other instructions that the jury ought to be

18  thinking about to spend the time reading something like this.

19          MS. LYDON:  If the defense agrees that it's not

20  necessary and they're requesting it be removed, then we'll join

21  in that.

22          THE COURT:  Well, put it another way.  Is anybody

23  going to take issue with anything that he said about how to

24  read these computers?

25          MS. CRAGER:  No, Your Honor.

```
 1            THE COURT:  Then I think you're both in agreement.  We
 2   take it out.
 3            MS. LYDON:  Agreed?
 4            THE COURT:  All right.  Now let's go on to No. 13.
 5            MS. CRAGER:  Yes, Your Honor, and we're going to
 6   withdraw that one.  We looked at the notes more, and I don't
 7   think it applies in this circumstance.
 8            THE COURT:  All right.  Good.  We'll take that one
 9   out.
10            All right.  Where do you want to go next?  15?
11            MS. CRAGER:  Yes, Your Honor.
12            THE COURT:  All right.  Would either of you like to
13   talk about 15 or not?
14            MS. LYDON:  We have -- oh, no, no.  We're good on 15.
15            MS. CRAGER:  We're fine, as well, on that one.
16            THE COURT:  No problem on 15?
17            MS. CRAGER:  Nope.
18            THE COURT:  All right.  Well, 16 is out; right?
19            MS. CRAGER:  Yes.
20            THE COURT:  17?
21            MS. LYDON:  I do have a concern with a change from the
22   model instruction to Element 3, that in -- it specifies that
23   "the defendant did so in relation to the offense of wire fraud
24   charged in Counts 1 through 4."
25            I believe the defense will use that to argue that it
```

 1    has to relate to the victims or the wirings in Counts 1

 2    through 4.  And that's narrower than the offense of wire fraud,

 3    the overall scheme to defraud.  We would ask --

 4         THE COURT:  Well, that's a good point, but I'm not

 5    sure the defense could not make that argument with the language

 6    that I have in there right now.  I think -- I think they could.

 7         MS. LYDON:  They could.  That's why we're saying we

 8    would prefer it revert to the Ninth Circuit model that just

 9    says "the offense of wire fraud," not "the offense of wire

10    fraud charged in Counts 1 through 4."

11         MS. CRAGER:  I believe the offense needs to be charged

12    in the indictment, so I read this as saying the offense of wire

13    fraud.

14         THE COURT:  Right.

15         MS. CRAGER:  And it's been charged in Counts 1

16    through 4.

17         THE COURT:  Yes.  If, for example, the defendant did

18    so during and in relation to another wire fraud that wasn't

19    charged in the document, then they couldn't find them guilty

20    under this instruction.

21         MS. CRAGER:  Specifically, I would be concerned about

22    them saying, Maybe the misrepresentations to the USPA was wire

23    fraud.

24         THE COURT:  Exactly, because that's something I raised

25    at sidebar.

1           MS. CRAGER:  Right.

2           THE COURT:  I asked the question.  I said to you,

3   Ms. Lydon, couldn't they also find him guilty if he engaged in

4   a scheme or artifice to defraud the USPA?  P -- what is it?

5           MS. CRAGER:  USPA.

6           MS. LYDON:  USPA.

7           THE COURT:  USPA.  And you said, No, no.

8           MS. LYDON:  Right.

9           THE COURT:  It has to be what we charged in the

10  indictment.

11          MS. LYDON:  So let's say "charged in the document."  I

12  think that satisfies the objectives of everybody and doesn't

13  artificially narrow it to specific wirings.

14          THE COURT:  No, no, but the only crimes charged in the

15  indictment are 1 through 4.

16          MS. LYDON:  Yes.  But I think this language to -- of

17  specific counts implies that it is limited to those wirings.

18          MS. CRAGER:  Wait.  Counts 1 through 4 charged the

19  scheme to defraud.

20          MS. LYDON:  Exactly.

21          MS. CRAGER:  So that's what this says:  "Counts 1

22  through 4, charging the offense of wire fraud."

23          THE COURT:  The only change I would make would be:

24  "Counts 1 through 4 of the indictment," if you wanted me to do

25  that.

 1          MS. LYDON:  I actually do think that's somewhat
 2    better.
 3          THE COURT:  All right.  I could add that.
 4          Anything else about No. 17?
 5          MS. CRAGER:  We had one issue, Your Honor, and I
 6    think --
 7          MS. LYDON:  Oh, I'm sorry.
 8          MS. CRAGER:  I'm sorry.
 9          MS. LYDON:  I'm sorry.  I have one also about that
10    same instruction.
11          Is yours on this instruction?
12          MS. CRAGER:  Somewhat.
13          So in our proposed jury instructions at page 38 of our
14    proposed jury instructions, we proposed a paragraph at the
15    bottom of that page.  I think it would be best to characterize
16    it as the theory of defense instruction about -- about Counts 5
17    and 6.
18          So I just wanted to make clear, for the record, that
19    we do request that that instruction be given as a theory of
20    defense instruction --
21          THE COURT:  Okay.  Where is that now?
22          MS. CRAGER:  I'm sorry.  Page 38 of Docket 102.
23          MS. LYDON:  I disagree with the --
24          THE COURT:  Okay.  You're talking about the language
25    at the crux?

1          MS. CRAGER:  Yes.  The paragraph that starts at

2    line 16, being that "the crux requires more than a causal

3    relationship."

4          THE COURT:  Well, didn't -- did you turn the page on

5    No. 17?

6          MS. LYDON:  We have one page 17.

7          THE COURT:  You only have one page?

8          MS. CRAGER:  Yes.

9          THE COURT:  I asked my clerk to italicize it and put

10   in bold certain things on my copy, and I thought I made it

11   clear that I wanted them to stay in the draft that was given to

12   you, and that may not have happened.

13         So I want to make sure that there's no other example

14   of that, because I did intend that paragraph to be in this

15   instruction.

16         MS. CRAGER:  Thank you, Your Honor.

17         MS. LYDON:  The entire paragraph?  Or we can take a

18   look at it when it arrives.

19         THE COURT:  Right.  Okay.  That -- I'm told that's the

20   only thing that is missing, so you have the paragraph there

21   from her brief.

22         You tell me why it shouldn't be there, Ms. Lydon?

23         MS. LYDON:  I think the model instruction

24   successfully -- which is -- incorporates *Dubbin*, that the --

25   which is in the version that I have, the second-to-last

 1   paragraph, incorporates *Dubbin*.  That it has to be at the crux

 2   of what makes the conduct criminal.

 3        THE COURT:  Crux -- you know, the Supreme Court comes

 4   up with "crux," like everybody is supposed to know that.  But

 5   the jury doesn't know what the crux of -- of what makes the

 6   conduct criminal means.  And so you have to define it in some

 7   way.

 8        MS. LYDON:  In looking at *Dubbin* right now, I'm trying

 9   to find how the Supreme Court defined "crux," but --

10        THE COURT:  Well --

11        MS. LYDON:  -- there's --

12        THE COURT:  -- why don't you take a look at that,

13   because at least part of what the defense says is from the

14   decision.

15        MS. LYDON:  Well, it goes beyond.  There's a footnote

16   that says:  "To be clear, being that crux of the criminality

17   requires more than a causal relationship such as facilitation

18   of the offense or being a but-for cause" --

19        THE COURT:  Okay.  I took that -- okay.  I took that

20   out of there.

21        Would you type that up the way I had it, Ross?  I took

22   that out, too, because it -- yes, I have to define to them what

23   "crux" means, and you don't do that by talking about "but for,"

24   because nobody but a second-year-law student ever heard that

25   term before.

1          MS. LYDON:  All right.  We'll take a look at the

2   language, and then we can talk about it with this in front of

3   us.

4          While he's doing that, we had two other smaller

5   questions.  Is it okay to address those now?

6          THE COURT:  Well, let's not lose track of that.

7          MS. LYDON:  Okay.  We'll do that after.

8          THE COURT:  Hold on a second.

9          Before I finalize this, why don't you tell me,

10   Ms. Crager, what you think the definition of "at the crux"

11   ought to be?

12          MS. CRAGER:  Just taking the language from *Dubbin*, it

13   is not enough for the means of identification to facilitate the

14   success of the fraudulent scheme or for it to be the cause of

15   its success.

16          MS. LYDON:  I think that's actually a misquote of

17   *Dubbin*, though.

18          At Footnote 2 of the defendant's proposed jury

19   instructions, it quotes it accurately, and it says:  "It uses

20   facilitation of the offense or being a but-for cause of its

21   success as an example of what's required," not as you have to

22   go beyond that.

23          THE COURT:  What does it mean to be "at the crux"?

24   That's what I want to tell them.

25          MS. CRAGER:  I think *Dubbin* -- so the Government's

1    position in *Dubbin* was that all they had to show was that the

2    means of identification facilitated the crime.  And what *Dubbin*

3    held is that that was incorrect.  And, in fact, it needed to be

4    central to the fraud.

5            THE COURT:  "Central," is that their language?  Is

6    that their language?

7            MS. CRAGER:  They also -- the case also uses the term

8    "central role."  And the quote from *Dubbin* is:  "To be clear,

9    being at the crux of the criminality requires more than a

10   causal relationship, such as facilitation of the offense or

11   being a but-for cause of its success."  That's on page 131.

12           THE COURT:  Okay.  That's the sentence that says it

13   requires more.  So nobody is going to understand that, but what

14   they would understand is if we told them what it does require,

15   not just that it requires more than a but-for test.

16           MS. CRAGER:  Yes.

17           THE COURT:  So what should we tell them that it does

18   require?  There's one quote in here:  "Defendant must have used

19   the means of identification itself to defraud or deceive."

20           MS. CRAGER:  Yes.  And here, we would ask that it be

21   specified that he issued it to defraud or deceive the

22   candidates.

23           THE COURT:  Okay.  So that may be the best way to

24   describe what "at the crux" means.  It means that the defendant

25   must have used the means of identification itself to defraud or

1    deceive.

2              MS. CRAGER:  Yes.

3              THE COURT:  Okay.  So if we put that in there --

4              MS. LYDON:  I think that's in there in your draft.

5    And I agree that's the best way to do it.

6              MS. CRAGER:  Are further -- the reason that we think

7    it needs to be further clarified than that, Your Honor, is that

8    based on what was argued during the Rule 29 motion, it appears

9    that the Government is trying to argue that the scheme wouldn't

10   have worked without the signature.  And I think that's exactly

11   what *Dubbin* says is not enough.

12             THE COURT:  Okay.  How about this.  Take that one

13   sentence, "being at the crux requires more than a causal

14   relationship between the means of identification and the wire

15   fraud offense" -- period -- "the defendant must have used the

16   means of identification itself to defraud or deceive."

17             MS. CRAGER:  The candidates, yes.

18             MS. LYDON:  I think we should use the actual sentence

19   from *Dubbin*.  I read it differently.  I --

20             THE COURT:  If I use the actual sentence, I'm back to

21   "but for," and I don't want to do that.  Nobody knows what that

22   means.  Nobody -- that's a lawyer term.  That -- that -- as a

23   matter of fact, we don't even use that anymore in jury

24   instructions on causation.  We talk about substantial factor

25   now.

1          MS. LYDON:  So -- okay.  What's the proposal -- I'm

2     sorry.  Without it in front of me, what's the proposal --

3          THE COURT:  So my suggestion here is that I use that

4     first sentence of the paragraph that Ms. Crager is asking for,

5     and I put that right before the sentence at the end of the

6     paragraph that says:  "The defendant must have used the means

7     of identification itself to defraud or deceive."  And you want

8     to say, "the customers" -- what did you want to say?

9          MS. CRAGER:  "The tandem instructor candidates" or

10    "the candidates."

11         THE COURT:  The candidates --

12         MS. CRAGER:  The candidates, yeah.

13         THE COURT:  The candidates.

14         MS. LYDON:  Okay.

15         THE COURT:  So that whole paragraph now would say:  "A

16    means of an identification is used during and in relation to a

17    crime when the means of identification is used in a manner that

18    is fraudulent or deceptive toward the tandem instructor

19    candidates and is at the crux of what makes the criminal

20    conduct.

21         "Being 'at the crux' requires more than a causal

22    relationship between the means of identification and the wire

23    fraud offense.  The defendant must have used the means of

24    identification itself to defraud or deceive the candidates."

25         MS. CRAGER:  Yes, Your Honor.

1          THE COURT:  All right.  So that's what, in effect, I

2   wanted to do.

3          MS. LYDON:  I don't know, though, if it really has to

4   be -- I agree with wire fraud; that has to be "the false

5   statements has to be made against the tandem instructor

6   candidates."  I don't think that the aggravated identity theft

7   means of identification has to be used to deceive the tandem

8   instructor candidates.

9          THE COURT:  Wasn't *Dubbin* a -- a -- wasn't --

10         MS. LYDON:  Healthcare billing.

11         THE COURT:  Yeah, but that's an aggravated identity

12  theft case.

13         MS. LYDON:  Uh-huh.

14         THE COURT:  And this is the aggravated identity theft

15  instruction.

16         MS. LYDON:  But it's the tandem instructor candidates

17  that I'm -- I'm thinking through specifying that it has to -- I

18  agree, *Dubbin* says it has to be used in a manner that is

19  fraudulent or deceptive.  I don't think it has to be sent to

20  the --

21         MS. CRAGER:  Your Honor, it has to be "at the crux of

22  the criminal conduct."  There is no other criminal conduct.

23         THE COURT:  Right.  I'm comfortable with this.

24         MS. LYDON:  And our theory there, though, is that it

25  keeps the criminal conduct going.  It doesn't -- while some

1    means of the -- some uses of the signature deceived the tandem

2    instructor candidates.  Well --

3          MS. CRAGER:  That's exactly what *Dubbin* says can't be

4    an aggravated identity theft.  It can't just facilitate the

5    crime.

6          MS. LYDON:  I disagree with that.  It used

7    facilitation as an example from the -- just from that sentence

8    that's quoted in Footnote 2 of the defendant's proposed jury

9    instructions on page 38.

10          THE COURT:  Is that language from *Dubbin*?  Where did

11    the language that you wanted me to put in that I'm not putting

12    in there now come from --

13          MS. CRAGER:  Which --

14          THE COURT:  -- that says that it's not enough for the

15    means of identification to facilitate the success, et cetera?

16    Where did that come from?

17          MS. CRAGER:  I believe that is a paraphrase of what I

18    have cited.  It's on page 5 of my trial brief.  I'll just read

19    it, which says:  "To be clear, being at the crux of the" --

20          THE COURT:  I'm not going to put that in there.

21    This -- this -- you know, here's the thing about, particularly,

22    Supreme Court decisions.  The language of the Supreme Court

23    decisions was not meant to be a jury instruction.  The Supreme

24    Court writes to educate lawyers, not for juries.

25          And so a lot of times, the lawyers will come in here,

1    and they'll argue adamantly that because it's in the Supreme

2    Court, this is what we ought to tell the jury.  And, no, that's

3    not what's intended.

4              MS. CRAGER:  That's fine, Your Honor.

5              THE COURT:  All right.  So I'm comfortable with what I

6    just told you last.  We may have -- we may have to come back to

7    this.  But for right now, let's see if we have any discussion

8    about any -- because here -- were there others?

9              MS. CRAGER:  Let me take a look.

10             THE COURT:  We were going to talk about 20.

11             Did we decide that we wanted that or not?  You thought

12   they might -- somebody else committed the crime, like

13   Mr. Garmashov?

14             MS. LYDON:  I dont think somebody else committed the

15   crime, but I think other people were involved --

16             THE COURT:  I think Ms. Crager thinks Mr. Garmashov

17   committed the crime.

18             MS. LYDON:  That's possible.  That could be a theory

19   they would argue.  And I think that that would not make

20   Mr. Pooley less guilty, if he had a coconspirator.

21             I think, also, other people did some things; like Bill

22   Ross represented Mr. Pooley as a tandem examiner, things like

23   that.  So I think the instruction is correct.

24             THE COURT:  All right.  So I think we've discussed

25   everything.  Should I put together a new draft and see how it

1    looks?

2         MS. LYDON:  We have a couple more, very small ones

3    where we suggest reverting to the Ninth Circuit model.  One is

4    Instruction 7.  We would just suggest adding back the rest of

5    the language in the Ninth Circuit model, which is Government's

6    No. 38, page 49 of the Government's proposed instructions.

7         THE COURT:  I don't have that right now.  What

8    language -- this is what I give in every case.  What -- what is

9    it that you'd like to change here?

10        MS. LYDON:  The current version of the Ninth Circuit

11   model includes a paragraph about witness believability -- or

12   two paragraphs.

13        "Sometimes the witness may say something that is not

14   consistent with something else he or she said.  Sometimes

15   different witnesses will give different versions of what

16   happened.  People often forget things or make mistakes in what

17   they remember.  Also, two people may see the same event but

18   remember it differently.  You may consider those differences,

19   but do not decide that testimony is untrue just because it

20   differs from other testimony."

21        THE COURT:  All right.  If that's the model

22   instruction.

23        MS. LYDON:  Okay.

24        THE COURT:  It just makes it longer.

25        MS. LYDON:  Uh-huh.

```
1              THE COURT:  I'm not sure we got anything like that
2    here, two people remembering things differently.  Either one of
3    them is lying, or the other one isn't.
4              Let's see.  Hold on.
5              MS. LYDON:  There's the second paragraph -- the
6    paragraph after that we would also ask be added from the model.
7              THE COURT:  So this is it?
8              MS. LYDON:  The paragraphs beginning with "sometimes a
9    witness" and the paragraph beginning with "however, if you
10   decide."
11             THE COURT:  All right.  If they went through all the
12   trouble to add this, I'll put it in there.
13             MS. LYDON:  Thanks.
14             And another one, the Ninth Circuit model -- we would
15   just propose using the Ninth Circuit Model Instruction No. 22.
16             THE COURT:  Which one of mine does it relate to?
17             MS. LYDON:  The duty to deliberate.
18             THE COURT:  All right.  Hold on.
19             Okay.  Something that's been added to that?
20             MS. LYDON:  I think -- yes.  I'm -- I should have
21   tabbed it.  I'm sorry.
22             THE COURT:  I'm just curious that they just keep
23   tinkering with these.  So I usually don't care if -- about some
24   details that they want to add.  But in this case, you don't
25   have any concern that a witness may say something that -- is
```

1    there some -- different witnesses will give different versions

2    of what happened?

3            I mean, I'm just wondering why I waste my time talking

4    about that when there's no such situation here.

5            MS. LYDON:  I think the -- it's good -- I like the

6    language of that model in part because sometimes witnesses

7    forget things, and it says that.  And I think the defense is

8    going to argue that because Mr. North misremembered the -- or

9    didn't notice that Mr. Garmashov's signature --

10           THE COURT:  Okay.  But then you got "two people may

11   see the same event but remember it differently."  You see, you

12   get people thinking along the lines of something that isn't in

13   the case, and they stop thinking about the case.

14           They can make this as long as they want.  It's another

15   example -- I'm going to give it, so don't worry.  But it's

16   another example of -- of talking too much about things that

17   don't really matter so that you distract them from the things

18   that really matter.

19           There's nothing wrong with all the things that didn't

20   really matter, but if they keep trying to think about all those

21   things, they stop thinking by the time they get to the things

22   that really matter.

23           You know, so you can -- because I don't just read

24   these.  I -- I speak them in a way that I hope the jury starts

25   to think about it.  So what I'll say, typically, is something

1   like this, and I'll read it this way:  "Sometimes a witness may

2   say something that is not consistent with something else that

3   he or she said.  Sometimes different witnesses will give

4   different versions of what happened.

5          "People often forget things or make mistakes in what

6   they remember.  Also, two people may see the same event but

7   remember it differently."

8          So they start to think, and -- and the wheels turn.

9   And then by the time they get to "this is what you have to

10  prove in order to show aggravated identity theft" -- anyway,

11  I'm going to give them all, but that's why I don't

12  necessarily -- I'm not necessarily a fan of these long jury

13  instructions on -- on how to evaluate evidence.

14         And, really, that's why you bring in juries.  They

15  know how to evaluate evidence.  And if they don't, they

16  shouldn't be on a jury.  That's why we have a jury.

17         See, I do this on the credibility of witness

18  instruction.  It makes them think that there's a question about

19  which witnesses I should believe.  I say:  "In deciding the

20  facts of this case, you may have to decide what testimony to

21  believe and what testimony not to believe.  You may believe

22  everything a witness says, part of it, or none of it."

23         And they're thinking, Wow.  There's something here.

24  But then you just keep going and going and going and going and

25  going with this instruction, and, you know, by the time you get

1   through, they've wasted a lot of mental energy in thinking

2   about how to evaluate witnesses, which is something -- you

3   think they get in the jury room and say, Wait a minute.  The

4   judge said we didn't have to believe everything a witness said.

5   Oh, yeah, I forgot that.  As a matter of fact, he said we could

6   believe part of it or none of it.

7            Oh, yes.

8            I don't think that's the kind of thing they talk

9   about.  I could be wrong.  Anyway, I'm giving them all, anyway,

10  if you want them.

11           MS. LYDON:  Thank you, Your Honor.

12           THE COURT:  So what else is there?

13           MS. LYDON:  I don't think we have anything else.

14  We'll -- if it would be possible to get a copy of the

15  proposed -- the ones coming out of this discussion --

16           THE COURT:  Right, right.  I'm going to do that right

17  now.

18           MS. LYDON:  Fantastic.  Thank you.

19           THE COURT:  Okay.  Ross, let's take a -- everything

20  takes way longer than I always think.  So let's take

21  15 minutes.  My law clerk says I didn't ask the defense if they

22  had anything else.  I thought I was asking both of you.

23           MS. CRAGER:  Your Honor, our only other thing, for the

24  record, I can't recall, but I believe I have to officially

25  renew my Rule 29 motion at this time, so I'm doing so for the

1    record.

2              Otherwise, on the jury instructions, we have no other

3    issues.

4              THE COURT:  Okay.  Hold that thought because I want to

5    put together these jury instructions, and we'll -- and we'll

6    finalize them, but then there may be something else.

7              You know, you put me under a lot of pressure on that

8    Rule 29 motion because one of the most interesting things you

9    were arguing wasn't even in your brief, and so I hope I was

10   listening to it for the first time, and there was nothing to

11   look at.

12             So maybe we could talk about it again, and you might

13   convince me of something that I missed the first time.

14             MS. CRAGER:  Yes, Your Honor.  When would Your Honor

15   like to do that?

16             THE COURT:  As soon as I come back, and we finish with

17   the jury instructions.

18             MS. CRAGER:  Yes, Your Honor.

19             THE COURT:  Look at the verdict form, too.  See if

20   there's anything in the verdict form that you want to talk

21   about.

22             Do you have the jury verdict forms there?

23             MS. CRAGER:  Yes, Your Honor.

24             THE COURT:  Do they look okay?

25             MS. CRAGER:  Yes, Your Honor.

1          THE COURT:  All right.  Give me a few minutes, and

2   I'll give you an updated version of the jury instructions.

3          MS. LYDON:  Thank you, Your Honor.

4          (Brief recess was taken.)

5          MS. LYDON:  We just have one, I think, substantive

6   thing to discuss on the aggravated identity theft revision.

7          THE COURT:  All right.

8          MS. LYDON:  The overall -- I think this is good, and I

9   just reread *Dubbin*.  The one issue that I think goes beyond

10  *Dubbin* and beyond the statute is the requirement that it be

11  fraudulent or deceptive toward the tandem instructor

12  candidates, and that the defendant use the means of

13  identification itself to defraud or deceive the candidates,

14  those last two words of that sentence.

15         The *Dubbin* opinion does not require at least -- I was

16  looking for it and didn't see any requirement that the means of

17  identification be used to deceive a particular victim.  And,

18  here, while some uses of the means of identification did

19  deceive victims, it also served to attempt to deceive USPA to

20  issue ratings which would help keep the statute going.  So --

21         THE COURT:  Well, don't forget, don't forget we're

22  talking about the definition of "at the crux."  That's what

23  this paragraph is.

24         MS. LYDON:  Uh-huh.

25         THE COURT:  And it reaches a point where, who knows

1  what's at the crux.  The Supreme Court pulled that concept, as

2  far as I can tell, out of thin air.

3       So we have to give the jury some guidance as to what

4  it means to be "at the crux."  And what you're talking about

5  now, arguably, is not a crux -- at the crux.

6       MS. LYDON:  That -- well, I think it shouldn't be

7  about whether it's toward the tandem instructor candidates.  I

8  found language from *Dubbin* that does attempt to define what the

9  crux is.  It states that -- as the instruction does, that with

10  fraud or deceit crimes, like the one in this case, a means of

11  identification, specifically, must be used in a manner that's

12  fraudulent or deceptive.  We have that.

13       And it goes on to say:  "Such fraud or deceit going to

14  identity can often be succinctly summarized as going to 'who'

15  is involved."

16       I think that makes some intuitive -- I think that

17  makes sense.  A jury can understand that.

18       THE COURT:  It doesn't make sense to me, but maybe it

19  does to somebody.

20       Who is involved with what?

21       MS. LYDON:  The -- well, here, it would be who's the

22  examiner, Garmashov or Pooley?

23       THE COURT:  Why isn't it who's the victim?

24       MS. LYDON:  I don't think that that is what the

25  identity theft statute requires, that the -- the means of

1  identification defraud or deceive the specific victims of the

2  wire fraud.

3          I think it has to be used in connection with and

4  furthering the crime of wire fraud, but I don't think it has to

5  be used to defraud or deceive the candidates, or that it be

6  fraudulent or deceptive toward the --

7          THE COURT:  But you're talking about --

8          MS. LYDON:  -- tandem instructor candidates.

9          THE COURT:  We're not talking about wire fraud.  We're

10 talking about -- we're defining "at the crux," which is the

11 identity theft.

12         MS. LYDON:  Exactly.  So I'm proposing that be removed

13 from the aggravated identity theft instruction.

14         THE COURT:  I don't know.  My problem is that I agree

15 these lists are general, and I cannot understand why the Ninth

16 Circuit decided these cases the way they did.  It baffled me,

17 to be polite about it, and it -- it -- it's hard for me to go

18 from there, because I don't know -- I don't know what they're

19 talking about.  I know what they're talking about.  I just

20 can't believe they decided this.  So I don't know.  I want to

21 see this get cleared up in the Appellate Court somehow.

22         MS. CRAGER:  I do, too, Your Honor, and I was

23 wondering if Your Honor wanted to move on to the Rule 29

24 arguments.

25         THE COURT:  Well, I want to -- she's still talking

1    about --

2            MS. CRAGER:  I'm sorry.

3            THE COURT:  -- this instruction.

4            MS. CRAGER:  Okay.

5            THE COURT:  I don't -- I just can't get past the point

6    where you can commit aggravated identity theft without

7    committing identity theft.  I just can't get past that.  It --

8    to then take it to the next step and start talking about it is

9    very difficult for me because I don't know how you can have

10   aggravated identity theft without having identity theft.

11           So, then, I don't know.  Now you're saying, Well, who

12   did they defraud?

13           I don't know who they have to -- I don't know.  Do

14   they have to defraud anybody?  No, they don't.

15           MS. LYDON:  But it has to be used in a manner that's

16   fraudulent or deceptive.  I agree with that.  I don't think --

17   *Dubbin* does say that.  So I think we should just hew to *Dubbin*

18   but not go further, and say that it has to be toward the tandem

19   instructor candidates.  That's not warranted by *Dubbin*.

20           MS. CRAGER:  Your Honor, what *Dubbin* says is that the

21   means of identification has to be at the crux of the

22   criminality.  The thing that's criminal that has been charged

23   is the wire fraud on the students.  There is no crime that's

24   wire fraud on the USPA.

25           So it needs to be at the crux of what has been charged

1    as a crime, which is a crime on the candidates.

2         THE COURT:  That -- that whole thing makes so much

3    sense to me, what she just said.  It makes so much more sense

4    than what you're saying.

5         MS. LYDON:  I think she can argue that in closing --

6         THE COURT:  But I didn't even understand what you

7    said, and it's because I -- I have a problem understanding what

8    the Ninth Circuit says.  I don't have a problem understanding

9    it.  I have a problem understanding why they said it.  And I

10   just can't get past it.  I just don't understand what you said.

11        MS. LYDON:  Well, I'm actually not even focused on

12   that aspect of it, but --

13        THE COURT:  I know, but you're saying all it has to do

14   is further the fraud, but not the fraud charged in the

15   document.  And what she said makes so much more sense.

16        MS. LYDON:  No.  I agree that it needs to be related

17   to the fraud charged in the document, but it doesn't need to be

18   used itself, the means of identification, to deceive the tandem

19   instructor candidates.

20        THE COURT:  That's what the crux is.

21        MS. LYDON:  I think there are other cruxes of the

22   fraud charge in the document.

23        THE COURT:  Well, if there is, let the Supreme Court

24   tell us.  I'm going to go with what Ms. Crager says because it

25   makes much more sense to me.

1          And until the Supreme Court or the Ninth Circuit

2     en banc straightens this out, I don't know what more I can do

3     to clarify it.

4          So was there anything else in this latest draft?

5          MS. LYDON:  We did not.  We just received it, so we

6     haven't gone through everything.  We focused on this.

7          THE COURT:  I'll take a further 15-minute break.  I

8     want you to have plenty of time.  I thought you had enough

9     time, but I want you to have plenty of time to go through this

10    last draft because unless we come back again before the jury

11    comes in tomorrow, this is the draft that's going to be given

12    to the jury.

13         MS. LYDON:  Thank you, Your Honor.

14         THE COURT:  So we'll take another 15 minutes.

15         MS. LYDON:  Thanks.

16         (Recess was taken.)

17         THE COURT:  Have they had a chance to review this

18    latest version of the instructions?

19         MS. CRAGER:  Yes, Your Honor.

20         THE COURT:  Any other discussion?

21         MS. LYDON:  Not from the Government.  Thank you.

22         MS. CRAGER:  There is one other issue we wanted to

23    raise.  Previously, we had discussed a statement made by the

24    prosecution in opening.  The statement was that Mr. Pooley's

25    tandem examiner rating was suspended for violating basic safety

1    requirements.

2            And the Court had previously at sidebar indicated that

3    this did seem improper, and that it should be addressed at some

4    point.  We would request that the Court make a statement about

5    that, noting that it was both irrelevant, and, honestly, we

6    believe it to be misleading, and specifically instruct that the

7    jury heard no evidence of it because it is irrelevant and

8    should not form part of their decision in the case.

9            THE COURT:  I would be willing do that.

10           Any further suggestions about how and what I should

11   say?

12           MS. LYDON:  No, Your Honor.  I would like to be heard

13   on that.

14           THE COURT:  All right.  Go ahead.

15           MS. LYDON:  I think this is covered by "the opening

16   statements are not evidence."  I think that specifically

17   addressing a statement made in opening by the Government,

18   which, at that point, the defendant did not move in limine with

19   respect to the 2015 suspension, only the 2014 suspension.  So

20   while both parties, over the course of the first day of trial,

21   refine their understanding of what could come in with respect

22   to safety at the time of opening, there had been no ruling with

23   respect to the 2015 suspension.  And we did not --

24           THE COURT:  I don't know what you mean, "there was no

25   ruling."  Maybe I didn't make it clear.  But my understanding

```
 1   was that the reasons for either of the suspensions were
 2   irrelevant.
 3         You could certainly bring in the suspensions because
 4   that was probative of the issues in the case.  But I thought it
 5   was clear that the reasons for any suspension were irrelevant.
 6         MS. LYDON:  That was very clear with respect to the
 7   2014 one.  The defense had not moved in limine at all with
 8   respect to 2015 --
 9         THE COURT:  Okay.  But let's not play gotcha.  If it
10   was very clear with regard to one suspension, it should have
11   been clear with regard to the other one.  The very reason for
12   it was the same.
13         MS. LYDON:  That was not clear to the Government.
14   The --
15         THE COURT:  Well, that's -- I'm going to do something
16   about it, but the question is what.  Now, my thought was to
17   take it extemporaneously and not treat it like it's a jury
18   instruction per se, but to tell them to remember that the
19   opening statements and arguments of the lawyers are not
20   evidence.
21         For example, in one of the opening statements, they
22   may recall that one of the attorneys mentioned a reason for the
23   suspension of Mr. Pooley.  They should also remember that there
24   is no evidence as to what the reason was for the suspension
25   simply because it's irrelevant.
```

1           The reasons for the suspension were not relevant to

2    any issue in the case.  And I think I'd be willing to go a step

3    further and say that, you know, bear in mind that the USPA is

4    not a Government agency.  It's not as if he was charged with

5    violation of some law.

6           They had some reason that they suspended him.  It was

7    disputed, just like a lot of things are disputed.  He called it

8    paperwork.  But they're not to draw any inference as to why he

9    was suspended because it has no bearing on the case.

10          MS. LYDON:  Your Honor, we would very much oppose Your

11   Honor expounding on --

12          THE COURT:  You know something.  I -- okay.  Fine.  He

13   shouldn't have made that statement.  Let that be a good lesson.

14          MS. LYDON:  Both --

15          THE COURT:  Because I didn't -- my fault, my fault, my

16   fault.  I'm the one that didn't say you can talk about the

17   reasons for one -- for one suspension but not the other.

18          But, you know, if I was listening to it, I would have

19   figured it out, that the reasons for the suspension of -- why

20   talk about safety unless you wanted to prejudice this jury?

21          MS. LYDON:  Your Honor --

22          THE COURT:  At the very, very beginning of this trial,

23   he wanted to set a mindset in this jury that there's something

24   unsafe that this defendant did, and let that sit there for

25   every day throughout the trial.

1          MS. LYDON:  That is not what he intended, Your Honor.

2     And both sides mentioned safety.

3          THE COURT:  No.

4          MS. LYDON:  The defendant prominently described how

5     skydiving -- and I'm quoting here -- "is an inherently

6     dangerous activity" in her opening statement.

7          THE COURT:  That's different.  That's different.  The

8     more you talk, the more I'm inclined to say more to the jury,

9     because you think it's important.  If you think it's that

10    important, then there must be something about it that you want

11    it to stay in this jury's mind.  And I want it out of their

12    minds.  So I'm going to say something.

13         MS. CRAGER:  Thank you, Your Honor.

14         THE COURT:  Okay.  So we're finished talking about the

15    jury instructions.

16         Let's talk about the Rule 29 motion.

17         MS. CRAGER:  Yes, Your Honor.

18         So we talked a lot about what "at the crux" means, and

19    we argued previously that the signature was not at the crux of

20    the alleged fraud in this case.  I think a helpful way to talk

21    about it would be to first talk about what was at the crux of

22    the alleged fraud on the students, you know, the candidates.

23         My understanding of the Government's case, in the

24    light most favorable to the Government, is that Mr. Pooley

25    represented to people, "I'm an examiner and I can get you your

1  ratings," and that people relied on the statement that he made

2  before they got there to travel there.  They relied on that

3  statement when they paid money to enroll in the course.  And

4  during that course, he presented himself as a tandem examiner,

5  and that that was the fraud.

6       The evidence was that after all of that happened,

7  Mr. Pooley came with the paperwork, and the paperwork had the

8  signature on it.  So our first argument is that it was not

9  during the fraud offense that occurred in this case in the

10  light most favorable to the Government.

11       Additionally, it cannot be at the crux of what

12  happened before.

13       THE COURT:  Okay.  So he -- here's your point that I'm

14  trying to follow.  When he sends off the papers to USPA, he's

15  not furthering his scheme to defraud -- actually, he's trying

16  to get them their certifications, hopefully, that he can put

17  one over on the USPA.

18       MS. CRAGER:  Yes.

19       THE COURT:  And so sending those papers to the USPA

20  are not part of his scheme to defraud that's charged in the

21  document.  They're -- I don't know what else to say.

22       Hold on a second.

23       All right.  Have I said that correctly?

24       MS. CRAGER:  Yes, Your Honor.

25       THE COURT:  All right.  Go ahead.

1          MS. CRAGER:  So our contention is that for that

2   reason --

3          THE COURT:  So under my instructions, can you still

4   make that argument to the jury, if I deny the motion?

5          MS. CRAGER:  I can make the argument to the jury.  Our

6   Rule 29 motion is that there is insufficient evidence.

7          THE COURT:  Right.  Right.  Because one of the things

8   I'm thinking of is that -- the Court can always take the motion

9   under submission and let it go to the jury, and see whether the

10  jury convicts.

11         MS. CRAGER:  Yes, Your Honor.

12         THE COURT:  And then you could renew it again.

13         MS. CRAGER:  We would intend to, Your Honor.

14         THE COURT:  But I want to make sure that you've got

15  all the tools you need to make that argument that you just made

16  to me, to the jury.

17         MS. CRAGER:  Thank you, Your Honor.

18         THE COURT:  Do you, in the instructions?

19         MS. CRAGER:  I believe we do, based on the

20  instructions, as we crafted them today, Your Honor.

21         THE COURT:  Okay.  Because I see your argument, but

22  I'm not sure it rises to the level of a Rule 29 motion because

23  there are inferences the jury can draw, and I don't know which

24  inferences they would draw.

25         MS. CRAGER:  Yes, Your Honor.

1          THE COURT:  All right.  But keep going.

2          MS. CRAGER:  Well, our -- our argument is that the --

3   even in the light most favorable to the Government, the

4   signatures were not being used to defraud the students at all.

5          In fact, the evidence from the students was that these

6   signatures set off red flags.  They thought that Robert Pooley

7   was their examiner, and then they saw this paperwork that he

8   handed them that said somebody else was their examiner.

9          And they thought that that was odd, and they thought

10  that that was strange, and they all had a different version of

11  what exactly they asked him.  And, of course, the defense

12  argument is that, no, they actually had a much longer

13  discussion.

14         But in the light most favorable to the Government,

15  this signature was a red flag to these people.  It was not

16  lulling them to continue the fraud.  It was not part of the

17  fraud scheme at all, and so it cannot be at the crux of the

18  criminality.

19         THE COURT:  Well, on this point, the fraud is not

20  complete at the time that he forges or puts a signature of Yuri

21  on the papers, because he's still lulling the candidates into

22  believing that their -- their applications are going to get

23  approved.

24         MS. CRAGER:  So -- okay.  So I suppose there's a

25  version where he was lulling them in some other way, and the

1    signature was presented to them during that period, so it was

2    literally during that period.  I don't think that solves the

3    problem of it needing to be at the crux of it.

4            THE COURT:  But, again -- okay.  So I follow -- this

5    isn't as easy to follow as the previous argument, but I think I

6    follow it.

7            Can you make this argument to the jury?  And I'm not

8    suggesting you do, because it reaches a point where if I can't

9    follow it, then maybe some jurors really can't follow it.

10           MS. CRAGER:  I understand.

11           THE COURT:  But if you wanted to make that argument,

12   would the instructions be there that you could make that

13   argument?

14           MS. CRAGER:  Yes, Your Honor.

15           THE COURT:  All right.  Well, I'm inclined to treat

16   that the same way.

17           MS. CRAGER:  Yes, Your Honor.

18           THE COURT:  Go ahead.

19           MS. CRAGER:  Our other argument --

20           THE COURT:  I thought -- I remembered you argued --

21           MS. CRAGER:  The last time we did this, I started with

22   an argument that there had been insufficient evidence about

23   Mr. Lachlan, Morgan Mackay, who is charged in Counts 4 and 6.

24           THE COURT:  No, no.  When we were here on your Rule 29

25   motion, you talked about the duty to disclose.

```
1            MS. CRAGER:  Yes, Your Honor.

2            THE COURT:  And I wanted you to follow up on that,

3    because I'm not sure that we had a thorough discussion on that.

4            MS. CRAGER:  Yes, Your Honor.

5            So to show a duty to disclose, the Government needs to

6    either show that there's a formal fiduciary relationship or an

7    informal trusting relationship.  Very specifically -- let me

8    find the language.

9            Okay.  "An informal trusting relationship in which one

10   party acts for the benefit of another and induces the trusting

11   party to relax the care and vigilance that it would ordinarily

12   exercise."

13           So our contention is that there's been insufficient

14   evidence that such a relationship existed, because Mr. Pooley

15   did not induce the candidates to relax the care and vigilance

16   that they would have ordinarily exercised.

17           THE COURT:  So where is that in the instructions?

18           MS. CRAGER:  So that is in the wire fraud instruction

19   at Instruction 11, and it states that:  "In order to convict on

20   an omissions theory, the jury must find that the defendant had

21   a duty to disclose the omitted fact arising out of a

22   relationship of trust."

23           It's in the --

24           THE COURT:  And then I say that duty can arise either

25   out of a formal fiduciary relationship or an informal -- are
```

1  you satisfied that that language there gives you what you need

2  in order to make that argument to the jury?

3          MS. CRAGER:  Yes, Your Honor.  It does take the

4  standard.  Our Rule 29 is just that there's insufficient

5  evidence on that point.

6          THE COURT:  Right.  Right.  So I think I can treat

7  this the same way.  I think I would be reaching too far into

8  the province of the jury to -- on either one of these arguments

9  to say that there's not enough to at least let them consider

10  it.

11          But I think there's certainly enough in these

12  instructions to -- to support you making the argument.  Now,

13  whether they understand it or not, you have to make that

14  determination.

15          MS. CRAGER:  Yes, Your Honor.

16          THE COURT:  I showed you that one -- or read that one

17  note that a juror sent out, which was not worth my addressing

18  with the juror, but it caused me some concern because it just

19  shows the -- the level at which they are thinking.  And it's

20  not the same level of sophistication that you're trying to make

21  here.  So you have to decide whether to make these arguments to

22  the jury or not.

23          MS. CRAGER:  Yes, Your Honor.

24          THE COURT:  All right.  Is there anything else you

25  wanted to discuss on the Rule 29 motion?

1          MS. CRAGER:  The final motion we would also renew, for

2    the record, which was that on Counts 4 and 6, there's

3    insufficient evidence that Mr. Mackay was part of a scheme to

4    defraud, such that the wire related to him was not in

5    furtherance of the scheme and could not be an aggravated

6    identity theft count.

7          THE COURT:  That's the only one that has that argument

8    in it.  And I don't know what -- why the Government thinks they

9    need that count and add an issue to the case that isn't

10   otherwise in it.

11         Make the argument again.

12         MS. CRAGER:  The -- so first I'll start with, just

13   that there's been almost no testimony about Mr. Mackay at all.

14   There were border crossing records showing that he was in the

15   United States at the time.  There's been no one who has placed

16   Mr. Mackay at the Parachute Center.  The defense asked one of

17   the Government witnesses whether they recognized him.  The

18   witness, Peter Swan, who had been working at the Center for

19   many years and was there in at least 2015, 2016, Mr. Swan did

20   not recognize him.

21         There's no evidence about him at all in the case

22   except -- there was no one in his class who testified, "He was

23   in my class and I saw him being trained."  There's no one who

24   testified about anything that was told to him by Rob Pooley,

25   either before he got there, or while he was there, or about the

1    paperwork.

2              The only evidence is the e-mail in Count 4, in which

3    his paperwork gets transmitted to USPA, on which he's cc'd.

4    And then the defense put in one e-mail showing that he knew

5    that it was Rob Pooley, and not Yuri Garmashov, who had sent

6    that paperwork.  That's all of the evidence in the record about

7    Mr. Mackay.

8              THE COURT:  So if the Mackay count was the only one in

9    the indictment, then they would have to prove that there was a

10   scheme to defraud somebody, and that the Mackay e-mail was in

11   furtherance of that scheme.

12             MS. CRAGER:  Yes, Your Honor.  The issue is it was

13   sent to USPA in an attempt to get ratings for Lachlan Morgan

14   Mackay.  There's --

15             THE COURT:  That's right.  It was -- it wasn't to

16   deceive anybody.  It was actually -- well, I guess it was to

17   deceive the USPA.

18             MS. CRAGER:  Correct.

19             THE COURT:  But the Government, I think, concedes that

20   that's not the charge in the document.

21             MS. CRAGER:  Yes, Your Honor.

22             THE COURT:  All right.  So give me the Government's

23   argument again on this.

24             MS. LYDON:  Well, as Your Honor flagged at the outset

25   of the hearing yesterday, this is an overall scheme to defraud

1    a number of tandem instructor candidates.  Mr. Mackay is one,

2    and he fits the pattern in several ways.  The --

3            THE COURT:  Suppose it's not.  Suppose it's not a

4    scheme to defraud Mackay.

5            MS. LYDON:  Well, it's a scheme to defraud all of the

6    tandem instructor candidates.  I'm not sure --

7            THE COURT:  No.  Because some of them may have known

8    exactly what was going on, and said, It's okay.

9            So every one of the other people that you had here,

10   you've got evidence that they were not told that somebody

11   else's signature was going to be on their papers, and that they

12   were told that they would be able to get their certificate if

13   they complete the course.

14           You don't have that with regard to Mackay.

15           MS. LYDON:  We have evidence that we presented that

16   makes it -- the jury could certainly infer that Mr. Mackay was

17   part of that scheme.  In particular, the evidence that the

18   skydiving community is extremely small.  And when it came to

19   light that Mr. Pooley's ratings were suspended, it spread

20   incredibly quickly, and everybody knew.

21           THE COURT:  But you don't have any evidence that

22   Mackay knew.  You don't have any evidence about what Mackay

23   knew or was told or thought or believed.

24           MS. LYDON:  The point I was getting to, Your Honor, or

25   trying to make, was that if it is -- given the evidence that

1  we've presented about how fast it spread, it's hard to imagine

2  that Pooley was telling anyone in addition, because everyone

3  would have known, in addition --

4        THE COURT:  Do you think that's proof beyond a

5  reasonable doubt, that he told Mackay -- just because it was

6  spreading rapidly in the community and it's hard to believe

7  that Mackay would not have been told, you think that's proof

8  beyond a reasonable doubt?

9        MS. LYDON:  What we've presented is proof beyond a

10 reasonable doubt of a generally applicable scheme to defraud

11 that he was running with multiple candidates.

12        And McKay appears to fit that profile.  The -- in

13 addition, we've presented evidence that what the students

14 wanted were legitimate USPA and UPT ratings.

15        THE COURT:  But we don't know what Mackay wanted.  We

16 don't know -- okay.  If this was only Mackay -- there's no

17 doubt that if I let this go to the -- the jury on Mackay, and

18 they find him guilty of Mackay, it's going to get reversed on

19 appeal.  There's no doubt in my mind about that.  I've been

20 reversed enough on a lot less than that.  There's no doubt

21 whatsoever in my mind.

22        The question is:  Do I let it happen and let the Ninth

23 Circuit do it, or do I do it now?  That's the question.

24        What's the prejudice of leaving it in here and just --

25 because you didn't get anything by dropping one count.  Is

1   there anything to be gained by the defense by dropping one

2   count out of this?

3          MS. CRAGER:  Well, Your Honor, he's charged in two

4   counts.  One is Count 4, wire fraud; and one is Count 6,

5   aggravated identity theft, which carries a mandatory two-year

6   sentence.

7          THE COURT:  Right.

8          MS. CRAGER:  And that majorly changes this case for

9   him.

10          THE COURT:  Well, but there's one other person that's

11   charged on -- on the aggravated --

12          MS. CRAGER:  Yes, Your Honor.

13          THE COURT:  So it doesn't --

14          MS. CRAGER:  I will just say that the Government is

15   also able to appeal that.  It's not -- it's not like an

16   acquittal where the Government is unable to appeal.  If the --

17   if charges -- if Counts 4 and 6 are thrown out on a Rule 29,

18   then the Government is able to contest that.  So I don't think

19   there's prejudice to the Government.

20          I think the correct legal ruling is that there's

21   insufficient evidence, and I don't think we need to wait for an

22   appellate court to see that.

23          THE COURT:  The law probably has changed since I

24   learned it, because when I -- when I learned it, it's a

25   judgment of acquittal.  It's not a dismissal.  And when I

1  learned it, if the judge, before it goes to the jury, grants a

2  judgment of acquittal, it is jeopardy, and he cannot be

3  recharged again.

4        Now, since you've represented otherwise, the law has

5  probably changed.  But that was my understanding.

6        MS. CRAGER:  That's fair, Your Honor.  I -- I'm not

7  extremely well-versed on this law.  I do know that, as far as

8  my understanding was, a Rule 29 ruling is appealable.

9        THE COURT:  I didn't know that, but since you say so.

10       MS. LYDON:  I don't know that either, Your Honor.  I

11  think there's enormous prejudice to not letting it go to the

12  jury.

13       MS. CRAGER:  In any case, I think the correct legal

14  ruling -- based on the lack of evidence about Mr. Mackay, the

15  correct legal ruling would be that there's insufficient

16  evidence to go to the jury.

17       There's a reason that that motion exists before

18  getting something to the jury.  And when there's almost zero

19  evidence in the record, that is the case such as this, where

20  the charges should be thrown out.

21       MS. LYDON:  We disagree, Your Honor.

22       THE COURT:  Well, I will tell you, there's no doubt in

23  my mind that there's not enough there.  I think that if I wait

24  and let it go to the jury and then I grant the motion, it may

25  be appealable by the Government.

1          I'm not sure.  Because I think more and more judges

2     are taking these motions under submission and ruling after the

3     verdict of the jury, simply so that they can preserve the

4     Government's right to appeal in case they're wrong.

5          So I think there is a distinction between doing it now

6     or doing it later.

7          MS. CRAGER:  I understand.  That's possible.  I'm not

8     terribly well-versed in that area of law.

9          THE COURT:  Did you ever see the movie with Harrison

10    Ford, Presumed Innocent?

11         MS. CRAGER:  I don't think so, Your Honor.

12         THE COURT:  That's what happened in that case.  A

13    judgment of acquittal was granted, and then it turned out that

14    he was guilty, so they couldn't do anything about it.

15         So the thing I could do would be to take it under

16    submission and then rule on it, if the jury finds him guilty,

17    and then I could grant judgment of acquittal, and the

18    Government could appeal.

19         MS. CRAGER:  That's my understanding.  We can -- we do

20    intend, if he is convicted on these counts, to renew the

21    motions.

22         THE COURT:  All right.  I'll take that motion under

23    submission, then.  There's such a thing as being too aggressive

24    on the part of the Government.

25         So -- all right.  From the fact that you called Yuri

1    and the questions that you asked him, it sounds to me like you

2    want to argue to the jury that he consented to have his

3    signature used on those documents.

4         MS. CRAGER:  So there are two reasons that we called

5    Yuri Garmashov to give that testimony.  So one of them is now

6    that we're talking about the aggravated identity theft -- one

7    of them is that -- let me find the instructions so I don't get

8    it wrong -- that Mr. Pooley had legal authority under the first

9    element to use the means of identification.

10        So that is -- that is one of the arguments we intend

11   to make.  I understand --

12        THE COURT:  So you intend to make that argument?

13        MS. CRAGER:  Yes.

14        THE COURT:  But bear in mind the instruction that

15   we've talked about giving.  We've all agreed to so far.

16        MS. CRAGER:  I understand.  It also says the

17   Government does not -- need not establish that the means of

18   identification was stolen or that the defendant did not have

19   consent to use it.

20        THE COURT:  Right.  So how do you want to deal with

21   that?

22        MS. CRAGER:  The term "legal authority" is in the

23   statute, and it's in the jury instructions so that the

24   Government must show that Mr. Pooley knowingly used, without

25   legal authority, the signature.

1            THE COURT:  And the definition of "legal authority,"

2    in the mind of this list in general, and in my mind, and in

3    your mind, is different than the definition of "legal

4    authority" in the mind of the Ninth Circuit.

5            So are how you going to deal with that?

6            MS. CRAGER:  I will say I believe that this issue is

7    actually currently in the Ninth Circuit.

8            The other thing I will say is that the -- there, the

9    definition of "legal authority" in the Ninth Circuit current

10   binding law that says:  "The term 'legal authority' means

11   permission to act on that person's behalf in a way that is not

12   contrary to law."

13           THE COURT:  Right.  But using it for mail fraud is

14   contrary to law?

15           MS. CRAGER:  Yes.

16           THE COURT:  So that -- so even if he had permission to

17   use the signature, he wasn't using it in a manner that was

18   legal.

19           MS. CRAGER:  Well, our contention is that the

20   signature was not used as part of that fraud on the candidates.

21   He used the signature on these forms.  They were attempting to

22   put one over on the USPA.  He was not attempting to defraud the

23   candidates with the signature.  So our contention would be he

24   did not use it without lawful authority.

25           THE COURT:  That's the argument you made to me, and I

1    told you you could make it to the jury.

2            MS. CRAGER:  Yes, Your Honor.

3            So that's one reason that we called Mr. Garmashov.

4    The other reason is that our contention about the wire fraud is

5    that Mr. Pooley told the candidates what was going on, and the

6    thing going on was that he had a deal with Mr. Garmashov to use

7    the signature, and that Rob would train and --

8            THE COURT:  You know, the thing was -- when Ms. Lydon

9    started to question him, he actually admitted that Mr. Pooley

10   could use his signature when he was here.  The only thing --

11           MS. CRAGER:  Correct.

12           THE COURT:  -- he didn't admit was that he could use

13   the signature when he was out of the country.

14           MS. CRAGER:  Yes.  Right.

15           THE COURT:  But I -- think about that for a minute.  I

16   don't know if it was developed as far, but you're still not

17   supposed to use somebody else's signature if they weren't the

18   examiner.

19           MS. CRAGER:  True.

20           THE COURT:  So if he thinks he's in such great shape

21   with the USPA, what he just admitted here in court is enough to

22   admit to them that he's in violation of their rules; right?

23           MS. CRAGER:  That's -- yes, Your Honor, we believe

24   that to be true.

25           THE COURT:  I was surprised with those answers.

1          MS. CRAGER:  Our contention is that we called

2     Mr. Garmashov to show that they, indeed, had this deal, and so

3     what Mr. Pooley told to the candidates was true, and it was not

4     fraudulent.

5          THE COURT:  Yeah.  The deal being that he could use

6     Yuri's signature when Yuri wasn't in the country or when he was

7     here.

8          MS. CRAGER:  The deal was he could use it even when he

9     was out of the country.

10          THE COURT:  But you didn't get him to admit that.

11          MS. CRAGER:  He did not admit that, Your Honor.  And

12     as you know, we were trying to impeach him on that.  And our

13     intention was that he was not telling the truth on that for the

14     reasons discussed during his examination.

15          THE COURT:  But you don't have any evidence from

16     anybody else saying that he did give his authority.  All you

17     have is he was saying he objected.

18          MS. CRAGER:  Yes, Your Honor.

19          THE COURT:  All right.  And what was the second reason

20     you wanted --

21          MS. CRAGER:  Oh, that was the second reason, that our

22     contention is a deal existed.  The tandem candidates knew about

23     it and, therefore, it wasn't fraud, what he was doing -- fraud

24     on the candidates.

25          THE COURT:  Well, all right.  Okay.  So with the

1   motions under Rule 29, the original motions were denied.  The

2   renewed motions are taken under submission.

3          MS. CRAGER:  Thank you, Your Honor.

4          THE COURT:  Is that your understanding, as well?

5          MS. LYDON:  That's how I understand your ruling, yes,

6   Your Honor.

7          THE COURT:  All right.  That's what I'm going to do.

8          MS. LYDON:  All right.  Thank you.

9          THE COURT:  All right.  How long is your argument on

10  behalf of the Government?

11         MS. LYDON:  Probably about an hour.

12         THE COURT:  How about the defense?

13         MS. CRAGER:  I plan to come in less than an hour, Your

14  Honor.

15         THE COURT:  All right.  And rebuttal, you don't know,

16  but probably half hour or so?

17         MS. LYDON:  Yes, Your Honor.

18         THE COURT:  All right.  So we'll finish with the

19  arguments probably in the morning, and it will probably go to

20  the jury in the afternoon.

21         MS. CRAGER:  Yes, Your Honor.

22         MS. LYDON:  Excellent.  Thank you.

23         THE COURT:  Okay.  Thank you.

24         (The proceedings were adjourned at 3:49 p.m.)

25                         -oOo-

1

**C E R T I F I C A T E**

2

        I, Abigail R. Torres, certify that I am a duly
qualified and acting Official Court Reporter for the United

3

States District Court; that the foregoing is a true and
accurate transcript of the proceedings as taken by me in the

4

above-entitled matter on 5/22/2024; and that the format used
complies with the rules and requirements of the United States

5

Judicial Conference.

                            Dated:  6/20/2024

6

                            /s/ Abigail R. Torres

7

                            _____
                            Abigail R. Torres, RPR/RMR, FCRR
                            CSR No. 13700

8

                            U.S. Official District Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF WITNESSES**

2    <u>CHRONOLOGICAL ORDER OF WITNESSES</u>                    <u>PAGE</u>

3    <u>YURI GARMASHOV, THE DEFENSE WITNESS</u>

4    Continued Direct by Ms. Crager......................6

5    Cross by Ms. Lydon.................................59

6    Redirect by Ms. Crager............................72

7    Recross by Ms. Lydon..............................76

8                            -oOo-

9

**INDEX OF EXHIBITS**

10
     <u>ADMITTED INTO EVIDENCE</u>                              <u>PAGE</u>
11
     Defense Exhibit 2069                              15
12
     Defense Exhibit 2058                              32
13
     Defense Exhibit 80, page 8                        78
14
                            -oOo-
15

16

17

18

19

20

21

22

23

24

25