```
 1                   UNITED STATES DISTRICT COURT          [ORIGINAL]

 2              FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                        BEFORE THE HONORABLE
            WILLIAM B. SHUBB, DISTRICT JUDGE PRESIDING
 4   _____

 5   UNITED STATES OF AMERICA,      )  Case No. 2:21-cr-00111-WBS
                                    )
 6   Plaintiff,                     )  Jury Trial Day 7
                                    )
 7            v.                    )  Date: 5/23/24
                                    )
 8   ROBERT ALLEN POOLEY,           )
                                    )
 9   Defendant.                     )
                                    )
10   _____

11       REPORTER'S PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

12                     Pages 1 through 66

13   APPEARANCES:

14   For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                             501 I Street
15                           Suite 10-100
                             Sacramento, California 95814
16                           By:  KATHERINE THERESA LYDON, ESQ.
                             By:  DHRUV M. SHARMA, ESQ.
17
     For the Defendant:      OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                           801 I Street
                             3rd Floor
19                           Sacramento, California 95814
                             By:  MIA CRAGER, ESQ.
20                           By:  MEGHAN McLOUGHLIN, ESQ.
     _____
21   OFFICIAL REPORTER:      Abigail R. Torres, CSR, RPR/RMR, FCRR
                             CSR No. 13700
22                           United States District Court
                             Eastern District of California
23                           501 I Street, Suite 4-100
                             Sacramento, California 95814
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

1          **SACRAMENTO, CALIFORNIA; THURSDAY, MAY 22, 2024; 10:20 A.M.**

2                                  -oOo-

3                    (Prior record previously produced.)

4             THE COURT:  All right.  We'll take a 15-minute recess

5     at this time.  Continue to heed the Court's admonition, ladies

6     and gentlemen.  We'll resume in 15 minutes.

7                    (The jury panel exited the courtroom.)

8                    (Brief recess was taken.)

9                    (The jury panel entered the courtroom.)

10            THE COURT:  Everyone is present.  Ms. Crager, you may

11    proceed with your argument on behalf of the defendant.

12            MS. CRAGER:  Thank you, Your Honor.

13            Good morning, ladies and gentlemen.

14            The Government has failed to prove that Mr. Pooley

15    used Yuri Garmashov's signature to deceive the candidates.

16    They have failed to meet their burden, and because of that,

17    Mr. Pooley must be found not guilty.

18             You've just heard the Government spin a story for you,

19    taking the evidence that they spoke about in the most negative

20    possible light, the most cynical possible version of what could

21    have happened here.

22             No matter what the evidence is, I submit to you the

23    Government would tell you that evidence points to guilt, and

24    that's not surprising, because the prosecutors in this case and

25    the agents in this case have spent literal years of their lives

1   gathering facts and thinking about how those facts lead to

2   guilt for Mr. Pooley in this trial.

3          Now, that's not what you, as the jury, are charged

4   with doing.  What you are charged with doing is maybe the

5   opposite of that:  Looking at every piece of and questioning,

6   does it really mean that Mr. Pooley's guilty?  What does it

7   really mean?

8          Now, I want to walk you through some of the evidence,

9   but before I do that, I wanted to discuss some of the

10  principles that you will need to apply when evaluating the

11  evidence in front of you, and I want to talk about those

12  because it is different than what we do outside this courtroom

13  in our ordinary life.

14         In our ordinary life when there's a dispute between

15  two people, two children, two friends, whatever is happening in

16  your life, you know, you ask them to come to you and tell you

17  what their version is, and then you ask them both to come with

18  their evidence, and then you make a decision based on which one

19  sounded more reasonable, who had the evidence to prove what was

20  going on, which one made more sense.  That's typically how we

21  evaluate these situations.

22         The problem is in the jury room, it's different.  We

23  don't use that kind of common sense in the jury room.  We have

24  to use a very specific way of evaluating the evidence that is,

25  honestly, a little bit unnatural to all of us.

1          The way we have to do that is put out, in the jury

2   instructions to you, concerning the Government's burden of

3   proof.  The burden of proof is always on the Government, and

4   you've heard that many times.  But what that really means is

5   that the Government needs to come with everything.

6          I and Mr. Pooley are not required to show you

7   anything, and we have no burden of proof.  So if we're telling

8   you there's another way to interpret the events of this case,

9   it is not my responsibility, it is not Mr. Pooley's

10  responsibility to prove it to you.  It is the Government's

11  responsibility to disprove it.

12         So you may be back in the jury room and another juror

13  says, "Well, what Ms. Crager said could be correct, but I

14  didn't hear from the defense that such-and-such evidence" --

15  or, you know, "I would have really liked to have the defense

16  put on something about" and fill in that evidence.

17         There will be questions that you're left with.  There

18  are a lot of questions in this case, and we're going to talk

19  about those.  If you're left with questions, that means that

20  the Government has not proved their case.

21         I also want to talk about the concept of reasonable

22  doubt, and this is another concept that can be unnatural,

23  because it's not how we make decisions in our ordinary lives.

24         Now, the Government has given you a version of the

25  story, connecting all the dots of various pieces of evidence,

1   and told you how to use those dots to check these boxes.  Okay.

2   Now, in your ordinary life, that might be totally

3   reasonable if someone gives you a reasonable version of events

4   and saying, "Look, this meets this element.  We checked this

5   box.  We move on."

6   That's not enough here in this courtroom and back in

7   the jury room.  Just because the Government has shown you a way

8   to connect the dots that you think is reasonable and meets the

9   elements, does not mean they have proved their case beyond a

10  reasonable doubt.

11  And I want to say that again in a slightly different

12  way.  Just because the prosecutor has told you their story

13  containing evidence that meets the elements, they have not

14  proved it beyond a reasonable doubt.

15  The Government must prove not only that their version

16  of events is reasonable; they must also prove that it is the

17  only reasonable way to interpret the evidence.  So not only is

18  it even more reasonable than another version; they must prove

19  that it is the only reasonable interpretation.

20  Now I'm going to walk you through one way that I think

21  the dots connect in this case of what I think really happened

22  here.  There might be other ways to connect the dots.  That's

23  up to you.

24  You saw the witnesses in this case, you saw their

25  demeanor, and I think that's important.  You saw all the

6

1    exhibits that came in, and you're going to have that back in

2    the jury room with you.  You could all disagree about how to

3    connect the dots.  Each and every one of you could have a

4    different interpretation of what you think really happened

5    eight years ago.  You just need one reasonable doubt.  If you

6    have a reasonable doubt, you must find Mr. Pooley not guilty.

7           So just to sum that up:  If there are two or more

8    versions of what happened that are consistent with the evidence

9    in the case, you must find Mr. Pooley not guilty.

10          All right.  I want to go back to some of the things

11   that the Government has asked you to do to connect the dots in

12   this case.  The Government has told you that Mr. Pooley sent

13   out or other people sent out e-mails after a suspension,

14   falsely claiming that he could get people tandem ratings.

15          Here's another version consistent with the evidence,

16   and I'm going to walk you through that.  Mr. Pooley's

17   representations that he could get people tandem ratings, he did

18   not intend for those to be false.  He would sent out these

19   e-mails.  You saw these e-mails.

20          He would say at the Parachute Center, "We can get you

21   your ratings."  And then people came.  Often when they came

22   during this period, Yuri was there.  And Yuri testified about

23   that; that he was, in fact, there a lot, and he would train

24   people.

25          For instance, we talked about a person, Mr. Keir.  You

1    didn't hear from Mr. Keir, but we did see some evidence about

2    him.  I want to pull that up real quick.

3              If we could pull up 707, please.

4              So this is the e-mail where Mr. Keir reaches out to

5    the Parachute Center, and he's referred to Rob Pooley.

6              I'd like to go now to 913.  Okay.

7              And this is correspondence between, as you see, Rob

8    Pooley and Mr. Keir.  They talk about the tandem ratings.

9    "Come anytime you want."  They talk about what he has to do to

10   do those tandem ratings.

11             We can take that down.

12             And then what happened is he came to the Parachute

13   Center, and he was trained by Yuri.  Yuri said, "Yeah, that was

14   one of the guys I trained."  Yuri said, "Yeah, that guy got his

15   ratings."  And James Crouch, the Government's witness, the

16   first witness on the stand, he also confirmed, yes, Richard

17   Keir did get his ratings.

18             Now, the same thing happened for two other people that

19   we pointed out.

20             If we could pull up 706, please.

21             All right.  This is Government's Exhibit 706.  More

22   correspondence with a person named Michael Jeffit about getting

23   his tandem ratings.  And you heard from both Yuri Garmashov and

24   Jim Crouch, this person, in fact, got his ratings, was trained

25   by Yuri and got his ratings.

1             There's one more I want to look at.  701, please.

2             And here, again, is a person, Gavin Creagh.  And Gavin

3    Creagh, as well, came to the Parachute Center, trained with

4    Yuri and, as Jim Crouch confirmed, got his ratings.

5             You can take that down.

6             So at least for some of these people, Rob Pooley did

7    not intend to deceive them.  They, in fact, came, and they, in

8    fact, got their ratings at the Parachute Center.

9             All right.  I want to move on to the summer of 2016

10   and what the Government has told you about what that all means.

11            The Government has told you that Rob Pooley led people

12   to believe he could legitimately get their ratings that summer.

13   I'll submit to you that's not necessarily what the evidence

14   shows.  Rob Pooley let the candidates know that he was trying

15   to get their ratings.  The candidates knew Rob was going to

16   train them.  Yuri was signing off.  Yuri was signing off as the

17   examiner.  And the candidates knew that to get their ratings,

18   they would have to lie to the USPA.

19            Now, that's not a legitimate rating.  Like, if I was

20   trying to get you a driver's license and I had to lie to the

21   DMV about that, like, you would know that is not a legitimate

22   way to do it.

23            And I submit to you that Rob Pooley was making it

24   clear to these people, "Sure, I can get you these ratings, but

25   it's going to be under the table.  We're going to have to lie

1   to the USPA."

2        That was not being hidden from them.  It was not told

3   to them upfront in e-mail, number one, but that was not hidden

4   from them.  Now, I don't want you to take my word for that.  I

5   want to look at the evidence.

6        And let's pull up Exhibit 614 and page 8, please.

7        Okay.  So this is the paperwork that you heard so much

8   about.  This is what Rob Pooley handed to the tandem candidates

9   when -- at the completion of the course.  And as you can see

10  down here, these are all the signatures of Yuri Garmashov.

11  Those were all prefilled on there.

12        Let's go to the next page, please.

13        Okay.  And here, as we saw, there are many more

14  signatures.  Some of them specified signature of the examiner.

15  And specifically down here, it states:  "USPA tandem instructor

16  examiner, Yuri Garmashov."

17        THE COURT:  I'm going to get

18  [Participant No. 101138626] some water here.  I think --

19        MS. CRAGER:  Sure.

20        THE COURT:  But I don't know who to ask to do it.

21        Ross, could you do that?  Is it --

22        MS. CRAGER:  I have some up here too.

23        THE COURT:  All right.

24        MS. CRAGER:  Okay.  So going back to this paperwork.

25  It clearly states on the paperwork handed to the candidates the

1    examiner's name is Yuri Garmashov.

2           Now, at this point, the candidates know that Yuri

3    Garmashov didn't train them; right?  It was Rob Pooley who

4    trained them.  And then Mike Spurgeon, he was helping out

5    sometimes and doing some of the training, but it certainly was

6    not Yuri Garmashov who was training them.

7           So at the point that Rob Pooley hands them this

8    paperwork, they know who trained them, and they get this

9    paperwork that says Yuri Garmashov is the examiner.

10          Now, I've read this with some of the witnesses, but I

11   think this is important.  This paperwork says:  "I have

12   personally examined and recommend this applicant for the USPA

13   tandem instructor rating.  Signed Yuri Garmashov."

14          Now, the candidates knew that was a lie.  That was a

15   lie to the USPA.  Now, some of the witnesses, the three people

16   we heard of, said, basically, "Maybe I didn't see that.  Maybe

17   I didn't look very closely."

18          That's not what's important here.  What's important

19   here is what Mr. Pooley intended.  He's the one that the

20   Government is trying to put in prison.  It's important what he

21   intended.  What he did was give people this paperwork,

22   informing them that to get their ratings, they would have to

23   lie.  He was not communicating to them, "I can get your

24   ratings, and it will all be above board."  That is not what was

25   happening here.

1           I'd like to turn to page 10.

2           And here, again, it states clearly in black and white,

3    the name of the examiner is Yuri Garmashov.

4           I'd like to go to page 16.

5           I want to take a look at this endorsement by the

6    examiner.  Now, this one, I think, is important because, first

7    of all, of course, it says name of the examiner, Yuri

8    Garmashov.  Okay.  That was not being hidden from the

9    candidates, and that is right above a part where the candidate

10   has to sign.  They put their name here and they sign.  They

11   say:  "I hereby certify that I have been properly trained."

12          The candidates have to read that.  If Rob Pooley hands

13   them paperwork or they have to sign to say they certified

14   something, if they're now saying, "Oh, I didn't look at that.

15   I didn't think about it," that's not Mr. Pooley's fault.  The

16   candidates knew that what they were certifying was a lie.  That

17   was not hidden from them.

18          We can take that down.

19          I want to talk about some of the other evidence in

20   black and white.

21          Now, we've -- the Government pulled out the text

22   messages, a couple of them, from Brad North.  Now, it's

23   important to me about those text messages, another way to read

24   those text messages is that they show that Brad North knew that

25   Yuri's signature was there, knew that Yuri didn't train him,

1    and knew that he was lying on that paperwork.

2         He asked Rob Pooley, "Oh, so I just put the dates next

3    to Yuri's signatures."  Casual way like that, not, "Wait.  You

4    want me to certify I was properly trained by Yuri?"

5         He knows.  He knows what's going on there.

6         Another thing about those text messages is that

7    Mr. Pooley is telling him exactly how it's going to go.  He's

8    going to send the paperwork to Yuri Garmashov.  Yuri is going

9    to review it, and after that, they're going to submit it.

10        Now, the Government has tried to make a lot of hay

11   about how, oh, he was asked a lot of times, and then he didn't

12   send it.  So that was all a lie.  But, actually, they were

13   going to send in the paperwork after Yuri came back.  And we'll

14   see that in Yuri's text messages, as well, that I'm going to

15   cover in a little bit.

16        Right now what I wanted to talk about is if he was

17   trying to deceive these people, why would he hand them that

18   paperwork?  If he wanted them to think, "Oh, I'm the tandem

19   examiner and everything is completely fine," why would he hand

20   them paperwork with someone else's name on it with lies that

21   the candidate would have to sign?  Why would he do that?

22        If he wanted to deceive them, he could have given them

23   blank paperwork, had them fill it out, and then gone back to

24   his desk secretly, and put Yuri's name on it.

25        Or how about this:  He could have had the signatures

1  prefilled, saying, you know, signature on this line, but just

2  not had the name "Yuri Garmashov" written there in black and

3  white.  Wouldn't that have made a lot more sense?

4      Then he could have told these people, "Oh, don't

5  worry.  That's my signature.  I just prefilled it."  And then

6  later, for the USPA, he could have written "Yuri Garmashov."

7      That would make a lot more sense, if he was trying to

8  hide it from these people.  He was not trying to hide it, in

9  fact.  He took the paperwork, and he handed this paperwork to

10  the candidates.

11      Now, you heard it's the responsibility of the examiner

12  to do the paperwork.  That's not what he did.  He involved the

13  candidates in filling out the paperwork.  He showed them Yuri's

14  signature.  He showed that all to them in a time that they knew

15  Yuri hadn't been there.

16      Now, another way we know what the candidates knew at

17  the time is from some things that Mr. Garmashov admitted on the

18  stand.  Now, as you saw, he was not happy to be here.  He was

19  not happy to answer my questions.  He was fighting me every

20  step of the way.

21      But he did admit one thing, which is that he comes

22  back to the Parachute Center in August, and he talks to some of

23  these people who were trained.  And what do they know?  They

24  know Yuri's signature is on their paperwork.  They know Rob is

25  training them and Yuri is signing off.  They know that the

```
 1   paperwork is going to be submitted when Yuri gets back.

 2          Now, there's no reason that Yuri Garmashov should

 3   have, on the stand, said those things if they weren't true.

 4   Like, that's not part of this narrative that he's spinning for

 5   himself, but he still admitted that is what happened.

 6          All right.  And then I wanted to talk about Exhibit 4

 7   and what this paperwork shows, as well.  Okay.

 8          So this is the e-mail that the -- the Government was

 9   just talking about where Mr. Pooley sends the application for a

10   Lachlan Mackay, who goes by "Morgan."

11          Let's go to the next page, please.  Third page,

12   actually.  Sorry.  Okay.

13          And then this was signed off by Yuri Garmashov, having

14   trained, as we've talked about.

15          Now, is there any evidence that Mr. Mackay knew that

16   this was Rob Pooley sending this paperwork?  Let's take a look

17   at that, because this e-mail was signed "Yuri."  So the

18   Government is saying that was deceptive, that was deceptive on

19   Mr. Mackay.  But was it?

20          I would like to pull up Exhibit 2134.  Oh, I'm sorry.

21   34-R.  2134-R.

22          MS. LYDON:  Objection to that not-in-evidence

23   document.

24          MS. CRAGER:  Ignore that.  Sorry.

25          THE COURT:  All right.  It's off the screen.
```

1          MS. CRAGER:  Yeah.  It's off now.  It's redacted now.

2     I'm sorry about that.

3          MS. LYDON:  That was up for about eight seconds.

4          THE COURT:  All right.  That was a mistake, and

5     nobody -- nobody saw it.  I didn't even -- I think I must have

6     been looking down.  Anyway, if there was something on there

7     that wasn't in evidence, the jury will disregard it.

8          MS. CRAGER:  Okay.  So this e-mail is from the same

9     Morgan, Morgan Mackay, at that same e-mail address.

10         What's important about this e-mail is that he is

11     reaching out to Rob Pooley about his ratings.  He says:  "I was

12     hoping you could let me know what stage my rating is at or was

13     at so I can figure out how to proceed?"

14         Now, if he had been misled by Mr. Pooley into

15     believing that, "Oh, this was all above board.  Don't worry.

16     Yuri is going to send this e-mail to sign to Yuri," why would

17     he be reaching out to Rob Pooley?  And this is at Rob Pooley's

18     personal e-mail address, not even the e-mail address that

19     originally sent the paperwork.

20         The candidates were not deceived.  They knew that to

21     get their paperwork -- sorry -- to get their ratings that Rob

22     Pooley and them, they would have to lie in the paperwork to

23     USPA.

24         You can take that down.

25         All right.  And I want to talk about an important

1    point that the Government has brought up, which is that people

2    were upset.  Now, I agree people were upset about this after

3    this happened.  Okay.  What I take issue with is that the

4    Government has tried to connect the dots to say people were

5    upset about this and, therefore, that's how we knew they were

6    defrauded.

7           Here's another version.  Rob Pooley let them know what

8    the plan was in the paperwork.  The plan didn't work.  They

9    didn't get what they wanted, and so they were legitimately

10   upset about that.

11          They were upset at Mr. Pooley because this was

12   Mr. Pooley's idea.  No one came to the drop zone saying, "Oh, I

13   really want to get my ratings, but I also want to lie to the

14   USPA."  Like, no one started out there.  They got there.  This

15   became clear.

16          It was Rob Pooley's idea.  So when it doesn't work

17   out, of course they blame Rob Pooley and, honestly, of course,

18   he says "I'm sorry" because he's not a jerk.  He knows that it

19   was his idea to do it this way.  He doesn't need to get petty

20   about it and point out, "Well, I did tell you this thing

21   because the paperwork showed you what was happening here, so

22   how could you say that?"

23          He says, "I'm sorry.  I'm trying to make it right.

24   I'm trying to set up more classes.  I'm trying to get refunds.

25   There's so many people that I need to give refunds to.  I'm

1    sorry."

2            Now, don't take my word for it.  I want to look at

3    those text messages that the Government was looking at on 32-R

4    at page 5.  Let's go down here.

5            All right.  So this is a text message, I believe, that

6    was quoted by the Government just now.  And I want you to pay

7    attention, question very closely what's happening here.  Okay?

8            Brad North says:  "You, Rob Pooley, are responsible

9    for this because of a choice you made to surreptitiously

10   conduct a course while being unsupervised and unqualified."

11           Okay.  He's saying, "This was your idea to do this

12   surreptitiously with the USPA and not follow their rules, and

13   try to go under the radar of the USPA.  That was your idea, and

14   I'm mad about that, and you are responsible."

15           Let's also look at Exhibit 20.  And this is the e-mail

16   where Mr. Palomino is very upset; again, legitimately upset.

17   So let's look at that.

18           And is there a 30-R?  Sorry.

19           MS. LYDON:  Yes.

20           MS. CRAGER:  A 20-R.  Okay.  Let's do the 20-R.  It's

21   just expletives that are taken out.  Sorry about that.

22           Okay.  Now, this is the e-mail where, after the fact,

23   Mr. Palomino is very upset with Rob Pooley and with Bill Dause

24   and with a lot of other people.  Okay.  And this is what he's

25   upset about.  This is what he's blaming Rob Pooley for.  Okay.

1          And this is a reasonable interpretation of what he's

2     saying here:  "You, Rob Pooley, were willing to falsify my

3     ratings.  It was your idea to go to the USPA and try to get me

4     false ratings."  This does not say that he was deceived the

5     whole time.

6          All right.  We can take that down.

7          Now I want to talk about something that I think was

8     implicit in what the Government was saying to you.  It's clear

9     we only heard from three people who were trained that summer.

10    And I think what's implicit to what the Government is saying is

11    that "Don't worry about all these other people.  They were all

12    part of the same scheme, and if they testify, they would have

13    said essentially the same thing."

14         I think that's implicit to what they're saying because

15    they're charging in the document a whole scheme with everyone

16    who was trained that summer, and yet they only bring three

17    people who, honestly, say three very different things.

18         So the truth is, who knows what all of these other

19    people would have said?  We know that they existed.  We know

20    that the Government found them.  We know that they chose not to

21    come here.  There are a couple of other people that, of course,

22    the Government could not bring because, unfortunately, they're

23    now deceased.  I'm not saying that's the fault of the

24    Government at all, of course.  What I'm saying is you can't

25    just assume what they would have said.  You can't assume that

1   they would have gotten on the stand and told you that they were

2   deceived.  There's no evidence of what they would have said.

3          Now, you also can't assume -- and I just wanted to

4   emphasize this.  You can't go back to the jury room and say,

5   "Well, let's assume that all the other people felt the same as

6   these three people on the stand, unless the defense can show us

7   something different."

8          As we've talked about, that's the opposite of your job

9   back there.  Okay.  So if you didn't hear from somebody, we

10  don't know what they would have said, and that's the end of

11  that.

12         Now, the very problem, I think, is they brought three

13  people to talk about what happened here.  They have to prove

14  that there was the scheme, beyond a reasonable doubt.

15         So imagine if they just brought one person.  They had

16  a whole scheme of what happened, and they brought a single

17  person to say, "Rob Pooley told me individually" these things.

18         Would that be enough?  I submit to you that three

19  people is not some magic number where you can just extrapolate

20  to everybody else who was there, especially when these three

21  people are talking about conversations that happened eight

22  years ago.  Honestly, I think they have some credibility

23  problems that we'll talk about.

24         But just taking what they said in saying that must

25  have happened to everybody, that is not an inference that you

1  can make, it's not justified by the evidence, and it is not

2  proof beyond a reasonable doubt.

3      Now, the Government spent quite a while playing

4  different statements that Mr. Pooley has made to agents.  The

5  issue with this, I think, is mostly that this is all a red

6  herring.  These statements happened years later in 2018 and

7  2021.

8      What Rob Pooley was concerned about at that time,

9  working at the Parachute Center where they executed the search

10  warrant -- and he was there, and he was there again in 2021.

11      What everyone was concerned about was how the FAA felt

12  about this, whether they could continue running the parachute

13  organization there.  They were not concerned with explaining

14  the details of what the candidates knew and didn't know.

15      In fact, as you've heard, he never said, "Oh, I was

16  doing this, and I was hiding it from the candidates."  He has

17  never said that.  What he's saying in most of these clips is

18  he's trying to justify why, I guess, maybe, the training might

19  have been okay to the FAA.  That's what this is about.

20      So all of those clips are quite confusing, honestly.

21  And I submit to you that's a red herring with later,

22  after-the-fact justifications of what happened that don't go to

23  the core issue in this case, which is what he told the

24  candidates and what he represented to them on the paperwork.

25      Now, the Government has also talked a lot about how he

1   didn't submit the paperwork, and they want you to infer that,

2   therefore, he never intended to submit the paperwork and,

3   therefore, it was fraud.

4          Now, there are a few problems with this.  One is that

5   he did submit some of the paperwork.  Count 4 is him submitting

6   the paperwork.  So if he never intended to submit the

7   paperwork, why did he submit the paperwork?

8          The other problem with it is that there is evidence

9   that the plan was, they'll submit the paperwork when Yuri comes

10  back.  That's what he told to Brad North in the text messages.

11         And also I want to look at 2060, which is the text

12  messages with Yuri.  You can read these text messages and

13  interpret what you want to interpret.

14         Let's go to page 2.

15         Now, you heard Yuri Garmashov testify in this text

16  message -- let's just zoom in here -- in this text message --

17  excuse me -- he was asking:  "How many candidates were trained

18  this summer?  How much paperwork do we have that hasn't been

19  submitted yet?"  Right?

20         And Rob responds:  "The ones you have."  Right?

21         Let's zoom out of there.  Let's go to the next page.

22         And this is the last thing that he says:  "Anything

23  that I submit from now on can't be processed by the USPA."

24  That refers to a previous part of a conversation.

25         We can take that down.

1         Now, I submit to you that this is an acknowledgment by

2    Yuri Garmashov that he comes back to the country, and Rob

3    Pooley gives him the paperwork.  So when he asked, "How many do

4    we have?  How many have been submitted?  Because we can't

5    submit it.  I'm very nervous about this."

6         Rob Pooley says, "Oh, the ones you have, the ones I

7    already gave you."

8         Now, I submit to you that that's evidence that Yuri

9    Garmashov is lying to you.  He did allow Rob Pooley to do this.

10   And he came back and he looked at the paperwork, and they were

11   just going to submit it.

12        Let's look back at the text message, actually, one

13   more time.

14        2060, please.

15        And it's clear that they have some conversation.

16        "Should we chat sometime?"  They talk about when to

17   meet, and then after they chat -- and I submit to you that the

18   conversation went, "Well, we have this paperwork.  Let's just

19   try to submit it and see if we can get it through."

20        After that conversation, Rob gets wind of something,

21   and he says:  "Yuri, have things changed since we talked this

22   morning?"

23        And Yuri replies:  "Yes.  Things have changed because

24   UPT will not process any paperwork because" -- I don't know

25   anything about USPA yet -- because he was not in the country

1    when the training was happening, and USPA and UPT know that.

2         The plan changed only because the Parachute

3    Association and UPT found out about it before they submitted

4    the paperwork.  That is why the paperwork was never submitted.

5    Mr. Pooley intended to submit the paperwork, but this is why

6    this never happened.

7         You can take it down.

8         I want to talk briefly about the jury instructions.

9    There are a lot of elements in there, and I'm not going to

10   rehash what the Government already told you.  You will have

11   jury instructions that go through each and every element.  You

12   should study those closely.

13        I know they said, question each piece of evidence to

14   determine whether it really proves those elements.  I did want

15   to touch on some of the elements that you're going to see in

16   there.  One of them is that the Government must prove that Rob

17   Pooley had an intent to deceive the candidates; the candidates,

18   not the USPA.

19        We all know that Rob Pooley was trying to deceive the

20   USPA and, in my opinion, so was Yuri Garmashov and so were some

21   of the candidates.  But in terms of whether Mr. Pooley had an

22   intent to deceive, that is only about his intent towards the

23   candidates.  He must have been trying to deceive them in order

24   to be guilty of any crime here.

25        Also, I wanted to talk briefly about what the

1    Government called a "trust relationship" because, as the

2    Government acknowledged, it's not just that they have to prove

3    that there were things Rob Pooley didn't tell them.  It was

4    clear there were some things Rob Pooley didn't tell them up

5    front.  That doesn't get them all the way to a fraud

6    conviction.

7           What they need to prove is that Rob Pooley had a

8    special legal duty to tell the candidates those things.  That's

9    the only way that it's criminal fraud, which is what we're

10   talking about here today.  So the Government has just told you

11   that all they need to show is that the candidates trusted

12   Mr. Pooley.  That is not correct.

13          Look at the jury instructions and what they say.  I'll

14   just emphasize that you need to focus on what Mr. Pooley

15   induced the candidates to do, and whether he induced them to

16   just not look and relax.  Okay.  And, specifically, about the

17   paperwork.  We all know that skydiving is dangerous and

18   different than other skydiving.  That's not what this is about

19   either.

20          We have to look at what Rob Pooley wanted these people

21   to do with their paperwork, what he was communicating with

22   about -- communicating to them about the paperwork.

23          Now, you have heard that an examiner is responsible

24   for the paperwork.  An examiner should handle the paperwork.

25   So they trusted him to do that, but that's actually not what he

1    did.  What he did was he brought the paperwork to them.  He

2    said, "Sign this paperwork."  He said, "Fill out the dates in

3    this paperwork."

4         He didn't have to do that.  If he was trying to induce

5    these people to relax and not look any further, why would he

6    involve them in that?  Why would he involve them in the lies in

7    the paperwork?

8         I want to talk about Counts 5 and 6, which are in your

9    jury instructions in Instruction 12, which you'll get after the

10   Judge instructs you.  Those are about counts -- the aggravated

11   identity theft counts.

12        Now, what's important about these counts is that the

13   Government must prove that the signature itself on that

14   paperwork was used to defraud the candidates, that the

15   signature itself was a deception to the candidates.

16        It's clear it was deceptive to the USPA, but that's

17   not what we're talking about.  The Government must prove it was

18   deceptive to the candidates.  The Government must also prove

19   that that signature on that paperwork was central to the whole

20   fraud, was at the crux of the fraud, is how the jury

21   instructions describe it.

22        So what was the crux of the fraud?  Let's start there.

23        As the Government has told you, the central theme of

24   this fraud was supposedly Rob Pooley holding himself out as an

25   examiner, but the signature proved that he wasn't the examiner.

1    That's the opposite of the fraud.

2            The Government has also said the signature was used to

3    lull these people, to make them happy, make them think that

4    everything was fine.  That's the opposite of what happened.

5            Fabian Munoz saw the signature on somebody else's

6    paperwork, supposedly, and got up in arms about it.  That's

7    what set off tons of red flags for him, supposedly.

8            And these other people, they look at it.  They're at

9    least questioning what is going on here.  Even Mr. Palomino,

10   who said, "Oh, actually, I didn't really look at it much.

11   Didn't ask about it," he admitted that it was strange.  And you

12   also heard he did make a previous statement where he admits he

13   did ask about that.

14           It was very strange, at the very least.  That is not

15   something that keeps a fraud going.  That is not something that

16   makes people happy.  That is something that sets off a red

17   flag, and that is why the signature could never be at the

18   center of this alleged crime.

19           I want to talk, briefly, about the witnesses you did

20   hear from.  Now, Yuri Garmashov, I have talked about a bit

21   before, and as the Government just pointed out in their

22   argument, he didn't get on the stand and admit, "Oh, yeah, I

23   did let Rob Pooley use my signature" because, obviously, he's

24   not going to admit that right now, given everything going on in

25   his life.

1          Also, we learned during his testimony that the

2  Parachute Association representative is, apparently, sitting in

3  the room, so of course he's not going to admit that.  But it's

4  clear he's got something to hide.  There is evidence that he

5  allowed Mr. Pooley to train people while he was out of the

6  country.  And you might remember the exchange I had with him

7  about the paperwork for a person named Vicki Allen.

8          I'd like to pull up 2132 at page 9.

9          So if you recall, this is the portion that I was

10 questioning him about most, that these dates are on August 22nd

11 when, according to -- and I'll give you the number --

12 Exhibit 61 at page 7 -- he was in Canada.

13         He tried to walk that back and to say, "Oh, no, no,

14 no.  That's actually not part of the training."

15         But does that make any sense?  This is all on the

16 paperwork that he has to sign off on.  He let Rob Pooley use

17 his signature while he was out of the country.

18         Let's look briefly at these other dates.

19         This is 821 here.  We can pull out of that.

20         All of these dates here are August 21st, and I won't

21 go through all of it right now, but if you look at Exhibit 61

22 at page 7, that shows the CBP record of him getting on a plane.

23 He was sitting on a plane that day.  He was not at the

24 Parachute Center doing detail training with people.  He was

25 sitting on a plane.

1          This proves that he was letting Rob Pooley use his

2    signature while he was out of town; that in addition to the

3    text messages we looked at earlier with his response, asking

4    Rob, "Oh, how many people were trained this summer?"  Rob says,

5    "The ones you have."

6          That is the evidence that Yuri Garmashov was lying to

7    you.

8          We can take that down.

9          I want to talk to you, also, about the three people

10   that were trained that summer who decided to come.

11         Now, Fabian Munoz -- I will just submit to you that

12   his version of events doesn't really line up with what the

13   evidence shows in this case.

14         Rob Pooley never introduced himself to anybody saying,

15   "Oh, hi.  I'm the USPA tandem examiner, and I shall train your

16   course and sign off on your paperwork."

17         We have Mr. Pooley's communications with people.

18   Those are in e-mails at Exhibit 2, 913, 914, and 915.  And he

19   was not telling people, "Oh, hi.  I'm the examiner."

20         So what the Government had on the slides for you with

21   quotes, that was Fabian Munoz's memory of a phone conversation

22   that happened in his non-native language eight years ago.

23         As to Mr. Palomino, I think it's clear that it was

24   kind of unclear who his examiner was, and that was unclear to

25   him.  But he did take a look at the paperwork and acknowledged,

1    that, yeah, those were lies to the USPA, and those were on his

2    paperwork.

3           Brad North -- I want to talk about Brad North.  Now,

4    you can have your own evaluation of him on the stand, but he

5    seemed like a smart guy.  He seemed like he knew what to say on

6    the stand, and he was being a little bit defensive, at least

7    when my cocounsel was questioning him.

8           Now, his story was, "I thought Rob Pooley was an

9    examiner because he examined me on my coach rating, and

10   everything was above board.  And Rob Pooley signed off on my

11   papers for my coach rating.  That proved to me that he was my

12   examiner, and so when I came back later, of course I assumed

13   that he was my examiner."

14          Now, the prosecutor got up then while he was

15   testifying and went over that point over and over and over

16   again, but it turns out that was completely untrue.

17          So let's look at the evidence.

18          I want to turn to 2188, page 2, please.

19          This is Brad North's coach proficiency card, and look

20   at what's on it; a whole pile of signatures of Yuri Garmashov.

21          Let's go to the next page, please.

22          More signatures of Yuri Garmashov with the same rating

23   recommendation:  "I have personally examined and remember this

24   applicant for the USPA coach rating."

25          What Brad North told you was a lie.  He had been

1   through this all before.  He filled out these dates.  He filled

2   out this date right under Yuri Garmashov's signature.  He'd

3   been through this before.  He had seen these signatures before.

4   So when he got on the stand and said, "I was caught off guard

5   with his signatures.  I didn't know what to do," that was a

6   lie.  He had been here before, he had seen the signatures, and

7   he was doing it again.

8          Now I want to talk about what was not presented to you

9   during this case, because I think there are some serious

10  questions that remain about what really happened here.  And

11  these serious questions, those are reasonable doubts.

12         You've heard from three people, but where is everyone

13  else?  Where is Richard Keir, Mr. Jeffit, Mr. Creed, who all

14  got their legitimate ratings?  Where is Vicki Allen and

15  Spurgeon, who were trained while Yuri was out of the country or

16  out of town?  Where is Danny Overeem?  Carlos Martinez?

17  Joaquin Gomez Pasis?  Sang Yeul Jeong?  Where are these people?

18  They were trained that summer.  Where are they?

19         And this is a big one:  Where is Morgan Lachlan

20  Mackay?  He's charged in Count 4 and Count 6.

21         Also, who is Morgan Lachlan Mackay?  We didn't hear a

22  single person tell us anything about Morgan Lachlan Mackay.  We

23  didn't hear anything about what he was told about the

24  paperwork.

25         And here's a question:  Why was Mr. Mackay's paperwork

1    the only paperwork that was submitted?  You know that everyone

2    was asking for their paperwork to be submitted, according to

3    the Government's case.  So why was it only Mr. Mackay's

4    paperwork?

5            I submit to you that is a serious question in this

6    case.  You cannot answer that question because there's no

7    evidence of it, and for that reason, the Government has failed

8    to meet their burden.

9            The Government is asking you to guess.  The Government

10   is asking you to presume.  The Government is asking you to

11   guess this man's way into federal prison.  This is a serious

12   matter, and the Government needs to bring proof beyond a

13   reasonable doubt.

14           After I sit down, the Government is going to have the

15   last word, and I ask you to not just take them at their word

16   but to really scrutinize the evidence.  Look at the evidence in

17   black and white.  Look what's really written there.  Think

18   about whether there are other interpretations of what could

19   have happened.  When you're evaluating that, think about the

20   witnesses they had.  Think about how forthcoming the witnesses

21   were, and the Government was in presenting this case to you.

22           When they put on Brad North, they were endorsing his

23   story about how, of course, Rob trained him and used Rob's own

24   signature, and that just was not true.  And they didn't show

25   you that paperwork.  We had to bring it for you.

1          You might remember a whole discussion we had about the

2   Sigma tandem manual.  I didn't think a manual could be that

3   controversial, because they tried very hard to try to prove

4   that this manual either didn't exist or wasn't the right date.

5   Who knows what was happening with this manual.  They tried to

6   get their witnesses to say that Rob Pooley had never mentioned

7   this manual to them.

8          Think about why that is, and look at that.  That's

9   Exhibit 2000.  Take a look at that and think about why the

10  Government didn't want you to see that.

11         Also, the Government never brought Yuri to see you.

12  Yuri was only here because I had to bring him to show you what

13  he's really like.  Yuri was cooperating with the Government

14  since the beginning of this.  Yuri was providing evidence to

15  the Government, supposedly, these letters, anything else that

16  he had to prove his case.  The Government wanted him to remain

17  in the shadows.  And after he testified, I think you know why.

18         Now, the last thing I'll say is, the Government, I

19  believe, is twisting some of the facts in this case.

20         I want to talk specifically about Counts 5 and 6 that

21  require the Government to prove to you that Rob Pooley used the

22  signature of Yuri Garmashov deceptively on the students.

23         The Government has told you that what was happening

24  here was Rob Pooley was pretending to be an examiner, and

25  that's what this case is about, and that he used this

1    paperwork, apparently, to help him do that.  That's twisting

2    the facts, though.

3           That paperwork clearly says in black and white he is

4    not the examiner.  Somebody else is the examiner.  How could

5    that be part of the fraud?

6           The Government also told you that Exhibit 4, Lachlan

7    Mackay's paperwork, is at the crux of this crime, and it was

8    furthering the whole thing, but they told you five minutes

9    before that, that the reason Rob Pooley didn't submit any

10   paperwork is that it would have blown the whole scheme up.

11          They're twisting everything on its head, and why are

12   they doing that?  They want to win.  They want Mr. Pooley to be

13   guilty of aggravated identity theft.  And these are the

14   gymnastics that they have to go through to try to get you to

15   believe that.

16          Ladies and gentlemen, in this case, it isn't black and

17   white that Rob Pooley let these people know how he was going to

18   get their ratings.  They were not deceived.  He did not use

19   Yuri Garmashov's signature to deceive them.

20          The Government has not proved its case, and I ask you

21   to return the only just verdict in this case:  Not guilty.

22          Thank you.

23          THE COURT:  Ms. Lydon, would you like to begin your

24   rebuttal argument at this time?

25          MS. LYDON:  Yes.  I need just a few minutes.  If we

1    want to do an early lunch break, we can do that --

2              THE COURT:  You wanted to do what?

3              MS. LYDON:  -- to organize notes.

4              THE COURT:  Pardon?

5              MS. LYDON:  If we could do an early lunch break, if

6    the jury wants to go now, or I can just take two minutes --

7              THE COURT:  Just take a couple of minutes.  I want to

8    use the time.

9              MS. LYDON:  All right.  Excellent.

10             So I used perhaps too much technology the first

11   go-round, and now we're going to go the very low-tech route.

12   But I just want to respond to a few points that defense counsel

13   just made.

14             As an overarching point, it is really convenient how

15   the -- as the defense argued, the defendant committed fraud, a

16   fraudster, but somehow committed fraud in exactly the way that

17   makes him innocent in this case.

18             The construction provided just now is not consistent

19   with the evidence, and it's not consistent with reason and your

20   common sense.  You'll be instructed that a reasonable doubt has

21   to be one based in reason and common sense.  Use your common

22   sense.

23             Let's think about some things.  The defense argued

24   that all the victims who testified against Pooley are lying.

25   You are the judges of credibility.  The jury instruction

1  provides specific criteria that you can evaluate when you're

2  considering who's telling the truth and who's lying.

3          The defense counsel all asked -- asked each of these

4  witnesses, didn't they know?  Didn't they realize that Rob

5  wasn't the examiner?  And they squarely answered.  The idea

6  that they would have signed up for his course, knowing that he

7  was a revoked, suspended examiner doesn't satisfy common sense.

8          And just now, defense counsel seems to have admitted

9  that they didn't know that.  She said, "No one came to the drop

10  zone saying, 'I want to lie to the USPA.'"

11          It was Rob Pooley's idea.  Ladies and gentlemen, if

12  Rob Pooley lured these students to his drop zone by convincing

13  them that he was a certified USPA examiner who could give them

14  their ratings and then he took their money, that's fraud, and

15  he's guilty.  There's no evidence that he did anything other

16  than that.

17          I want to go through some specific, sort of,

18  aspersions cast on various witnesses and theories.  We'll start

19  with the -- the three testifying tandem examiners.

20          So defense counsel argued that Fabian Munoz's

21  testimony was not credible because Rob Pooley wouldn't have

22  said, "I'm the USPA examiner," because he didn't say that in

23  the e-mails.  Use your common sense.  You know how people talk

24  in e-mails.  It's different than how they talk on phone calls,

25  especially when the person they're speaking with may be asking

1    them direct questions about whether they're a USPA examiner,

2    because that's something that the witness cares about.  You

3    heard Fabian Munoz testify about that.  You're the judge of

4    credibility.

5           Fabrisio Palomino, defense counsel claimed, said it

6    was unclear who Fabrisio Palomino's examiner was.  Well, the --

7    the contemporaneous documents don't reflect any lack of clarity

8    on that -- in that regard.

9           THE COURT:  That's pretty heavy.

10          MS. LYDON:  Yes.  We need some physical comedy here.

11          But I want to show you a contemporaneous text message

12   that shows what Fabrisio Palomino thought at the time.  All

13   right.  This is a little coarse because Fabrisio Palomino was

14   upset.  He said:  "Bill told me Rob was my examiner."  That's

15   pretty darn clear.  This is to his friend Surgii.  He's not on

16   the stand.  He's not -- not that he was -- in this

17   contemporaneous text message and on the stand, Fabrisio

18   Palomino had no interest in the outcome of the case, which is a

19   fact you can consider.  He had no reason do anything other than

20   testify truthfully here.

21          And to be candid with his friend Surgii, when he said,

22   "Bill told me Rob was my examiner," you can infer because he

23   wrote that, because that's what happened, and that's what he

24   believed.

25          With respect to Brad North, now, Brad North testified

1   at length.  He explained his reaction when he saw the paperwork

2   with Yuri Garmashov's signatures on it on his tandem instructor

3   course.  You saw his contemporaneous text messages directly

4   between him and the defendant, explaining how the defendant

5   defrauded him, using some very clear wording.

6           The defense counsel just argued that his -- because

7   his coach rating card also included Yuri Garmashov's signature,

8   he lied to you.  Now, that's true.  It did include Yuri

9   Garmashov's signature.  We don't know what Brad North would

10  have said about that if asked about it.

11          Defense counsel didn't ask him about it.  Now, you'll

12  get a jury instruction on witness credibility, and it says,

13  essentially -- I mean, I'm paraphrasing; I'll read it to you in

14  a moment -- some people don't notice things, and some people

15  forget.  Sometimes a witness may say something that is not

16  consistent with something else he or she said.  Sometimes

17  different witnesses will give different versions of what

18  happened.  People often forget things or make mistakes in what

19  they remember.

20          You saw Brad North.  You saw his demeanor.  You heard

21  his testimony that he did notice that Yuri Garmashov's

22  signature was on his tandem examiner -- or his tandem

23  instructor card, and about his conversation with the defendant

24  when he asked about it.

25          It's entirely possible you could infer he didn't

1    notice it on the coach card.  We don't have that in evidence.

2    But it is not a reason to conclude that Brad North lied to you,

3    as defense counsel said.

4            Defense counsel discussed Pooley's lack of intent to

5    defraud.  We went over this.  This was the -- this was, in

6    closing, in my first discussion with you.  But an intent to

7    defraud is an intent to deceive or cheat.  It's really simple.

8    You know that someone intends to defraud you when they lie to

9    you and they hide things from you, and that's what Pooley did

10   in this case.

11           And defense -- and the attempt to justify his, really,

12   tortured lies after the fact doesn't make sense.  It was stated

13   that the statements that Rob Pooley made to agents when he was

14   concerned about was -- or what he was concerned about was the

15   FAA.  He was trying to justify how the training might have been

16   okay in the eyes of the FAA.  This is not relevant.  What he

17   did is he lied about whether he was certified in the summer of

18   2016, by the manufacturer.

19           He lied to the agents.  And if he didn't have an

20   intent to defraud, he didn't need to do that.  Saying he was

21   lying for a different reason to try to justify his actions in

22   the eyes of the FAA does nothing to disturb the conclusion that

23   he is -- had the intent to defraud when he was lying to agents,

24   and that that is indicative of his intent to defraud the

25   students.

1        The idea that there was a plan to submit the documents

2   when Yuri got back, now, there's no evidence of that, and it

3   doesn't matter legally.  It is completely irrelevant.

4        So let's take those two things in turn.

5        The defense called Yuri Garmashov.  You heard him

6   testify.  He denied that.  Rob Pooley said that Yuri didn't

7   know about the -- any of his actions over the summer and was

8   not involved in the scheme.  He said that in a signed letter.

9   Then he got it notarized twice.  Then he told the agents that

10  he wasn't forced to say it.  So everyone was unanimous that

11  Yuri did not engage in any kind of plan over the summer of

12  2016.

13       Obviously, there was an agreement to use the

14  signatures beforehand.  But this is all a distraction.  It

15  doesn't matter if Yuri, as defense counsel insinuated, did

16  somehow become an after-the fact co-conspirator.  They came

17  back, and they had this conversation that there's no evidence

18  of in the record, that they -- he would submit things later.

19  That doesn't make Pooley any less guilty.

20       Pooley was a participant in the scheme to defraud.

21  Pooley ran the scheme to defraud.  But if Yuri helped, too,

22  that doesn't do anything to change that Pooley is guilty of

23  each and every element in this case.  It doesn't matter for

24  wire fraud.  It doesn't matter for aggravated identity theft.

25       Now, the aggravated identity theft argument appears to

1  be -- if I'm construing it right, is that there was -- the

2  signatures couldn't have been at the crux of the scheme because

3  the signatures raised red flags because students questioned the

4  signatures.

5       Signatures were at the crux of the scheme for the

6  reasons I explained earlier today.  The students knew that the

7  only way that they could get tandem instructor ratings was to

8  obtain forms signed by a certified, valid USPA and UPT

9  examiner.

10      Pooley told you -- Pooley -- you heard a recording

11 earlier today that Pooley admitted he wasn't a certified USPA

12 and UPT examiner, that USPA wouldn't have taken the forms with

13 his own signature on it, so Yuri had to sign.

14      The -- Yuri's signature was the tool that Pooley had

15 to commit the crime.  It was the signature of a certified USPA

16 examiner, so that's what he used.  The fact that some students

17 kind of raised their eyebrows when they saw it, that it didn't

18 go off completely without a hitch in every circumstance, that

19 it didn't succeed in completely quelling their concerns about

20 it, it doesn't mean that that's not how he used it and that

21 that wasn't the most important tool in his arsenal to keep

22 making money.

23      He could never have run these courses if he hadn't

24 been able to produce paperwork bearing the signature of a

25 certified USPA and UPT examiner.

1        We went over this at length in opening, so I won't

2   repeat all of that evidence.  But in summary, you saw what

3   happened to Fabian Munoz when Fabian said, "You need to sign

4   these forms."

5        Pooley didn't turn it over, and Fabian pestered him

6   day and night for a week.  The other students, the one he did

7   send forms to, and he said -- or he did provide forms to, took

8   them back and said, "I will send them to USPA and UPT."

9        They thought things were moving along, so they didn't

10  raise the alarm.  And Pooley was able to continue the cycle of

11  courses and the cycle of money, over a thousand dollars a pop

12  per student in cash to Pooley and the Parachute Center.

13        The signatures were the tool that enabled him to do

14  that.  This might be obvious but, obviously, Pooley couldn't

15  use his own signatures, not just because he couldn't send his

16  own signatures to USPA and UPT, but the -- if he handed out

17  forms with his own signature that was on them, the students

18  could have sent them to UPT.  That would have been a dangerous

19  tool.  It wouldn't have worked.  He didn't do it.  He chose to

20  use Yuri's signatures.

21        Defense counsel also said that it doesn't make sense

22  or you can't conclude that Pooley would have -- basically,

23  Pooley should have done the crimes smart -- in a smarter way.

24  It's not a defense that Pooley should have been a more

25  effective criminal, that he should have, as defense counsel

1   suggested, taken the forms back, not -- and then filled out

2   Yuri's signature.  He should have not provided them with the

3   name so visible.  Pooley -- if Pooley made mistakes in the way

4   that he carried out his crime, that does not constitute a lack

5   of intent to defraud.

6          I want to hit a few more discrete points on the

7   students' Live Point, because I'm just noticing some -- the

8   note-card organization method is not entirely succeeding, but I

9   want to make sure -- I want to respond to some of these because

10  they're important.

11         As defense counsel said, "I submit to you that Rob

12  Pooley told people we can get these ratings, but we're going to

13  have to do it under the table."  No witness testified to that.

14  That is nowhere in the record.  You are the judges of

15  credibility.  Evaluate whether that happened.

16         Defense counsel said the fact that some students got

17  their ratings means Rob Pooley did not intend to deceive them.

18  That's not what the jury instruction said.

19         The element that -- of the intent to deceive means

20  that Rob Pooley had the intent to deceive his students and

21  cheat them, and what he offered them was legitimate ratings,

22  and he knew he couldn't give those.  That is the intent to

23  deceive.  That element is met.  The fact that some of them got

24  their ratings does not negate that on there.

25         Defense counsel argued that the fact that they got

1   paperwork that said Yuri Garmashov was the examiner, they knew

2   he hadn't trained him.  He didn't say, "We'll get ratings and

3   we'll all be above board."

4           The witnesses testified that Pooley, the examiner, was

5   the one responsible for the ratings -- or for the ratings and

6   the paperwork.  They deferred to him on this critical point.

7   They raised questions, and he brushed them off.

8           North, in particular, he was questioned about filling

9   out, in compliance with Pooley's instructions, the dates on the

10  tandem examiner rating cards, and did that mean he knew?  And

11  faced squarely with that question, North explained, he said,

12  "Well, I didn't know what it meant to supervise or what the

13  requirements were for supervision."  He relied on his examiner,

14  and he filled out the forms.

15          Defendant's counsel argued, who knows what these other

16  people would have said?  And sort of listed off a series of

17  people who you've seen evidence of but you didn't hear from in

18  this case.

19          Now, I think two things on that.  You do have evidence

20  of what -- the scheme as it applied to the broader candidates.

21  You saw e-mails with them.  You saw the representations that

22  were being made to them.  You saw the false pretenses that

23  Pooley was engaging with and the false statements that others

24  in Parachute Center were affirmatively saying via e-mail to

25  those students; so, you know, the representations being made to

 1   the broader class through those ratings.

 2          You also know, based on the testimony here, about

 3   the -- the skydiving community and how small it was, and what

 4   happened when Pooley's fraud came to light.  Brad North

 5   explained that when the news did break that Pooley's ratings

 6   had been suspended and that no one had tandem examiner ratings

 7   who had been trained by him, it spread fast.  He didn't

 8   remember who had told him because he heard it from multiple

 9   people.

10          You can know from that that Pooley just didn't tell

11   people, because if he had, everyone would have known.  It all

12   would have come crashing down.  He kept this secret, and he

13   lied because he had to, to keep this cycle of classes going and

14   making money -- and continue making money.

15          And this is true with Fabrisio Palomino, Kwon, Munoz,

16   North, Morgan Lachlan Mackay, and all of the interest of the --

17   or the tandem instructor candidates.

18          The listing off of missing witnesses, obviously, some

19   students were located abroad.  You are here to assess the

20   evidence that came in in this courtroom.  That is the evidence

21   before you.  The Government bears the burden.  We welcome that

22   burden.  The burden never shifts.

23          The defense doesn't have to put on any evidence, but

24   they did here, and they, too, have subpoenas.  So the

25   invitation to -- to speculate should be rejected with respect

1    to those missing witnesses.

2          Same with the -- I'm not going to spend much time with

3    this, but the arguments about -- think about how forthcoming

4    the Government was about -- and then the discussion of

5    foundational objections to a tandem Sigma manual.  The Judge

6    instructed you the objections of the lawyers and questions of

7    the lawyers are not evidence.  That does not negate any of the

8    elements at issue in this case.

9          And I ask that you focus on what you're here to

10   decide, the elements, and will not get distracted by arguments

11   along those lines.

12          I want to close with the -- some of the contentions

13   made about the jury's task, and, specifically, "beyond a

14   reasonable doubt" construction, how you should think of

15   evidence.

16          The "beyond a reasonable doubt" instruction is really

17   sensibly written.  It will be with you in the jury room.

18   "Beyond a reasonable doubt" means proof that leaves you firmly

19   convinced, and a reasonable doubt is a doubt based on reason

20   and common sense.

21          The -- some of the statements made, like "There will

22   be questions you're left with," if you have a question, it

23   means the Government has not proved their case.  Well, that's

24   not consistent with the law.

25          The -- specifically, the Government is not charged

1    with coming up with an answer to every speculative question

2    that Ms. Crager raised.  A reasonable doubt is a doubt based on

3    reason and common sense, not based on pure speculation.

4           Your task is to assess whether each of the elements

5    have been met beyond a reasonable doubt, and you will be

6    instructed that if you do find that all of the elements have

7    been met beyond a reasonable doubt, then it is your duty to

8    find the defendant guilty, and that is the state of the

9    evidence in this case.

10          There's other statements made that are just not in the

11   "beyond a reasonable doubt" instruction, like if there are two

12   or more versions of events, you must find the defendant not

13   guilty.  Follow the instructions.

14          I just want to make sure I caught everything before we

15   get off to lunch.  All right.

16          Rob Pooley sold a product he was not authorized to

17   deliver, made promises he wasn't allowed to make.  And his

18   students lost a thousand dollars and more, each, as a result of

19   that.  And he used Yuri Garmashov's signature to commit that

20   crime.  He's guilty of wire fraud and identity theft.

21          Thank you.

22          THE COURT:  That concludes the arguments.

23          Ladies and gentlemen, if I instruct you before the

24   noon recess, we buy you lunch.  If I instruct you after the

25   noon recess, you'll be on your own.

1          So unless any of you have a serious problem with it, I

2     would propose to instruct you now.  My instructions will take

3     about a little more than a half hour to give you.

4          Does anybody need a break before I do that?

5          All right.  Would you like to take a five-minute

6     recess?  Let's do that, and then I'll instruct you on the law.

7          (The jury panel exited the courtroom.)

8          (Brief recess was taken.)

9          (The jury panel entered the courtroom.)

10         THE COURT:  Please be seated.

11         The jurors are all present.  Defendant is present with

12    counsel.

13         Ladies and gentlemen of the jury, now that you've

14    heard all the evidence and the arguments of the attorneys, it

15    is my duty to instruct you on the law that applies in this

16    case.  A copy of these instructions will be available in the

17    jury room for you to consult, if you should find it necessary.

18         It is your duty to find the facts from all the

19    evidence in the case.  To those facts, you'll apply the law as

20    I give it to you in these instructions.  You must follow the

21    law as I give it to you, whether you agree with it or not.

22         And you must not be influenced by any personal likes

23    or dislikes, opinions, prejudices, or sympathies.  That means

24    that you must decide the case solely on the evidence before

25    you.  You'll recall that you took an oath at the beginning of

 1    the trial, promising to do that.

 2         In following my instructions, you must follow all of

 3    them, and not single out some and ignore others.  They're all

 4    important.  And you must not read into these instructions or

 5    into anything that I may have said or done, any suggestion as

 6    to what I think your verdict should be.  That is a matter

 7    entirely up to you.

 8         The defendant has pled not guilty to the charges in

 9    this case.  The defendant is presumed to be innocent unless and

10    until the Government proves the defendant guilty beyond a

11    reasonable doubt.

12         In addition, the defendant does not have to testify or

13    present any evidence to prove his innocence.  The Government

14    has the burden of proving every element of each of the charges

15    beyond a reasonable doubt.

16         Now, proof beyond a reasonable doubt is proof that

17    you -- leaves you firmly convinced that the defendant is

18    guilty.  It's not required that the Government prove guilt

19    beyond all possible doubt.  A reasonable doubt is a doubt based

20    upon reason and common sense and is not based purely on

21    speculation.  It may arise from a careful and impartial

22    consideration of all the evidence, or from lack of evidence.

23         If, after a careful and impartial consideration of all

24    the evidence, you are not convinced beyond a reasonable doubt

25    that the defendant is guilty, it is your duty to find the

1    defendant not guilty.

2           On the other hand, if, after a careful and impartial

3    consideration of all the evidence, you are convinced beyond a

4    reasonable doubt that the defendant is guilty, it is your duty

5    to find him guilty.

6           The evidence from which you may decide what the facts

7    are consists of the sworn testimony of witnesses, the exhibits

8    that have been received in evidence, and any facts to which the

9    lawyers have agreed or stipulated.

10          In reaching your verdict, you may consider only the

11   testimony, exhibits, and stipulations received in evidence.

12   Certain things are not evidence, and you may not consider them

13   in deciding what the facts are.

14          I'll list them for you:

15          Arguments and statements by the lawyers are not

16   evidence.  The lawyers are not witnesses.  What they've said in

17   their opening statements, closing arguments, and at other

18   times, was not evidence.  It was intended to help you interpret

19   the evidence.  But, again, it is not evidence.  The facts -- if

20   the facts, as you remember them, differ from the way the

21   lawyers have stated them, your memory of them controls.

22          Next, questions and objections by the lawyers are not

23   evidence.  Attorneys have a duty to their clients to object

24   when they believe a question is not permitted under the Rules

25   of Evidence, but you should not be influenced by any objection

1    or by the Court's ruling on it.

2         Testimony that has been excluded or stricken or that I

3    have told you to disregard is not evidence and must not be

4    considered.  In addition, some testimony or exhibits may have

5    been received only for a limited purpose.  Whenever I have

6    instructed you that an item of evidence is admitted for a

7    limited purpose, then you must consider it for that purpose and

8    for no other.

9         Next, the charges in the -- against the defendant are

10   contained in a document that is called an Indictment, and we've

11   made reference to that during the course of the trial.  The

12   Indictment simply describes the charges the Government brings

13   against the defendant.

14        The Indictment is not evidence in the case.  As I

15   instructed you earlier, the defendant has pled not guilty to

16   the charges in the Indictment.

17        And, finally, anything that you may have seen or heard

18   when court was not in session is not evidence.  You are to

19   decide the case solely on the evidence received at trial.

20        Now, evidence may be direct or circumstantial.  Direct

21   evidence is direct proof of a fact such as testimony by a

22   witness about what that witness personally saw or heard or did.

23   Circumstantial evidence is proof of one or more facts from

24   which you could find another fact.

25        You should give consideration to both kinds of

1   evidence.  The law makes no distinction between the weight to

2   be given to either direct or circumstantial evidence.  It is

3   for you to decide how much weight to give to any evidence.  In

4   deciding the facts in this case, you may have to decide which

5   witnesses to believe and which witnesses not to believe.

6          You may believe everything a witness said or part of

7   it or none of it.  In considering the testimony of any witness,

8   you may take into account such things as: the opportunity and

9   ability of the witness to see or hear or know the things

10  testified to; the witness's memory; the witness's manner while

11  testifying; the witness's interest in the outcome of the case,

12  or any bias or prejudice; whether other evidence contradicted

13  the witness's testimony; the reasonableness of the witness's

14  testimony in light of all the evidence; and any other factors

15  that bear upon believability.

16         The weight of the evidence as to a fact does not

17  necessarily depend on the number of witnesses who testify.

18  What is important is how believable the witnesses were and how

19  much weight you think their testimony deserves.  Sometimes a

20  witness may say something that is not consistent with something

21  else that he or she said.  Sometimes different witnesses will

22  give different versions of what happened.

23         People often forget things or make mistakes in what

24  they remember.  Also, two people may see the same event, but

25  remember it differently.  You may consider these differences,

1  but don't decide that testimony is untrue just because it

2  differs from other testimony.

3         However, if you decide that a witness has deliberately

4  testified untruthfully about something important, you may chose

5  not to believe anything that witness said.

6         On the other hand, if you think the witness testified

7  untruthfully about some things but told the truth about others,

8  you may accept the part you think is true, and ignore the rest.

9         A defendant in a criminal case such as this has a

10  constitutional right not to testify.  In arriving at your

11  verdict, the law prohibits you from considering in any manner

12  the fact that the defendant did not testify.

13         You've heard testimony that the defendant made certain

14  statements.  It's for you to decide, first, whether the

15  defendant made the statements; and, second, if so, how much

16  weight to give to them.

17         In making those decisions, you should consider all the

18  evidence about the statements, including the circumstances

19  under which the defendant may have made them.

20         I'll now instruct you on the law as it applies to the

21  specific charges brought against this defendant in this case.

22         The indictment charges the defendant, Robert Allan

23  Pooley, with, first, four counts of wire fraud in violation of

24  Section 1343 of Title 18, United States Code; and second, two

25  counts of aggravated identity theft in violation of

1    Section 1028 (A)(a)(1) of Title 18, United States Code.

2           A separate crime is charged against the defendant in

3    each count.  You must decide each count separately.  Your

4    verdict on one count of the indictment should not control your

5    verdict on any other count of the indictment.

6           You're here only to determine whether the defendant is

7    guilty or not guilty of the charges set forth in the

8    Indictment.  The defendant is not on trial for any conduct or

9    offense not charged in the Indictment.

10          The Indictment also charges that the crimes charged

11   against the defendant were committed on or about certain dates.

12   The Government does not have to prove each crime occurred on an

13   exact date.  The Government only has to prove beyond a

14   reasonable doubt that each crime was committed on a date

15   reasonably close to the date alleged.

16          The defendant is charged in Counts 1, 2, 3, and 4 of

17   the Indictment with wire fraud.  For the defendant to be found

18   guilty of that charge, the Government must prove each of the

19   following elements beyond a reasonable doubt:

20           First, that the defendant knowingly participated in a

21   scheme or plan to defraud for the purpose of obtaining money or

22   property by means of false or fraudulent pretenses,

23   representations, or promises, or omitted facts.  Deceitful

24   statements or half truths may constitute false or fraudulent

25   representations.

1           Second, that the statements made or facts omitted as

2   part of the scheme were material.  In other words, that they

3   had a natural tendency to influence or were capable of

4   influencing a person to part with money or property.

5           Third, that the defendant acted with the intent to

6   defraud the tandem instructor candidates; in other words, with

7   the intent to deceive or cheat them.

8           And, fourth, that the defendant used or caused to be

9   used an interstate or foreign wire communication to carry out

10  or attempt to carry out an essential part of the scheme.

11          In determining whether a scheme to defraud exists, you

12  may consider not only the defendant's words or statements, but

13  also the circumstances under which they were used as a whole.

14          In order to convict the defendant of wire fraud based

15  on omissions of material facts, you must find that the

16  defendant had a duty to disclose the omitted facts arising out

17  of a relationship of trust.  That duty can arise either out of

18  a formal fiduciary relationship or an informal trusting

19  relationship in which one party acts for the benefit of another

20  and induces the trusting party to relax the care and vigilance

21  that would ordinarily be exercised.

22          A wiring is caused when one knows that a wire will be

23  used in the ordinary course of business or when one can

24  reasonably foresee such use.  It need not have been reasonably

25  foreseeable to the defendant that the wire communication would

1    be interstate or foreign in nature.  Rather, it must have been

2    reasonably foreseeable to the defendant that somewhere

3    communication would occur in furtherance of the scheme and an

4    interstate or foreign wire communication must have actually

5    occurred in furtherance of the scheme.

6              That is Counts 1 through 4.

7              The defendant is charged in Counts 5 and 6 of the

8    Indictment with aggravated identity theft.  In order for the

9    defendant to be found guilty of aggravated identity theft, the

10   Government must prove each of the following elements beyond a

11   reasonable doubt:

12             First, that the defendant knowingly used, without

13   legal authority, a means of identification of Yuri Garmashov.

14             Second, that the defendant knew that the means of

15   identification belonged to a real person.

16             And, third, that the defendant did so during and in

17   relation to the offense of wire fraud charged in Counts 1

18   through 4 of this Indictment.  A signature qualifies as a means

19   of identification.

20             The term "legal authority," as used in these

21   instructions, means permission to act on that person's behalf

22   in a way that is not contrary to law.

23             A means of identification is used during and in

24   relation to a crime when the means of identification is used in

25   a manner that is fraudulent or deceptive toward the tandem

1    instructor candidates and is at the crux of what makes the

2    conduct criminal.

3         Being at the crux requires more than a causal

4    relationship between the means of identification and the wire

5    fraud offense.  The defendant must have used the means of

6    identification itself to defraud or deceive the candidates.

7         The Government need not establish that the means of

8    identification of another person was stolen or that the

9    defendant did not have consent to use it.

10        An act is done knowingly within the meaning of these

11   instructions if the defendant is aware of the act and does not

12   act or fail to act through ignorance, mistake, or accident.

13   The Government is not required to prove that the defendant knew

14   that his acts or omissions were unlawful.  You may consider

15   evidence of the defendant's words, acts, or omissions, along

16   with all the other evidence, in deciding whether the defendant

17   acted willfully.

18        A defendant may be found guilty of the crimes charged,

19   even if the defendant did not personally commit the acts

20   constituting the crime, if the defendant willfully caused an

21   act to be done that, if directly performed by him, would have

22   been an offense against the United States.

23        A defendant who puts in motion or causes the

24   commission of an indispensable element of the offense may be

25   found guilty as if he had committed the element himself.

1            The punishment provided by law for these crimes is not

2     for the jury to determine.  It's for the Court.  In other

3     words, it's the Judge to determine, and you may not consider

4     punishment in deciding whether the Government has proved its

5     case against this defendant beyond a reasonable doubt.

6            Now, when you begin your deliberations, you should

7     select one member of the jury to serve as your foreperson.

8     That person will preside over your deliberations and speak for

9     you here in court.

10            You'll then discuss the case with your fellow jurors

11     to reach an agreement, if you can do so.  Your verdict must be

12     unanimous.  Each of you must decide the case for yourself, but

13     you should do so only after you've considered all the evidence,

14     discussed it fully with the other jurors, and listened to the

15     views of your fellow jurors.

16            Don't be afraid to change your opinion if the

17     discussion persuades you that you should, but don't come to a

18     decision simply because the other jurors think it's right.

19            It is important that you attempt to reach a unanimous

20     verdict but, of course, only if each of you can do so after

21     having made your own conscientious decision.  Don't change an

22     honest belief about the weight and effect of the evidence

23     simply to reach a verdict.

24            Perform these duties fairly and impartially.  You

25     should also not be influenced by any person's race, color,

1   religious beliefs, national ancestry, sexual orientation,

2   gender identity, gender, or economic circumstances.

3         Also, don't allow yourself to be influenced by

4   personal likes, dislikes, sympathy, prejudice, fear, public

5   opinion, or biases, including any unconscious biases.

6         It is your duty as jurors to consult with one another

7   and to deliberate with one other with a view toward reaching an

8   agreement, if you can do so.

9         During your deliberations, you should not hesitate to

10  reexamine your own views and change your opinion, if you become

11  persuaded that it was wrong, because you must base your verdict

12  only on the evidence received in the case and these

13  instructions.

14        I remind you once again not to be exposed to any

15  information outside the case or the issues it involves, except

16  for discussing the case with your fellow jurors during your

17  deliberations.  Still, do not communicate with anyone in any

18  way, and do not let anyone else communicate with you in any way

19  about the merits of the case or anything to do with it.  And

20  don't seek or receive any information from any outside source

21  about the case or anything to do with it.

22        Some of you, I noticed, have taken notes during the

23  trial.  Whether or not you took notes, you should rely on your

24  own memory of what was said.  The notes are only to assist your

25  memory, and you should not be overly influenced by them.  You

1   may, of course, take them into the jury deliberation room with

2   you.

3            A verdict form has been prepared for you.  It's

4   entitled "Verdict Form."  It has the title of the case and

5   number.  It says:  "We, the jury, find the defendant Robert

6   Allen Pooley as follows."  And then as to Count 1 of the

7   Indictment, there is a space for your foreperson to check

8   either "not guilty" or "guilty" as your finding may be on the

9   wire fraud count in Count 1.

10           Similarly as to Count 2, there is a space for your

11  foreperson to fill in either "not guilty" or "guilty" as may be

12  your finding as to the wire fraud count in Count No. 2.

13           On the second page, as to Count No. 3, there's a

14  space, again, for your foreperson to check either "not guilty"

15  or "guilty" as the case may be, as to your finding on Count 3,

16  the wire fraud count in Count 3.

17           And as to Count 4, your verdict as to Count 4.

18           As to Count 5 and 6 of the indictment, the aggravated

19  identity theft charges, again, there's a space for your

20  foreperson to check either "not guilty" or "guilty" as the case

21  may be, as to the aggravated identity theft involving the

22  signature of Yuri Garmashov on July 1, 2016.

23           And on Count 6, the signature of Yuri Garmashov on or

24  about August the 1st of 2016.

25           After you have agreed upon a unanimous verdict, your

1    foreperson should date it at the space in the bottom and sign

2    it and advise the marshals outside your door that you have

3    agreed upon a verdict.

4            If it should become necessary during your

5    deliberations to communicate with me, you may send a note

6    through the marshal, signed by your foreperson or by one or

7    more jurors, and you'll have a paper in there that you can use

8    to file -- or send a note.

9            But no member of the jury should ever attempt to

10   communicate with me except by a signed writing, and I will

11   communicate with any member of the jury on anything concerning

12   the case only in writing or orally here in open court.

13           If you send out a question, I'll consult with the

14   lawyers before answering it.  That may take some time.  So you

15   may continue with your deliberations while you're waiting for

16   the answer to any question.

17           But, remember, you're not to tell anyone, including

18   me, how the jury stands numerically, or otherwise, until after

19   you've reached a unanimous verdict or have been discharged.

20   Don't disclose any vote count in any note that you may send to

21   the Court.

22           Does counsel have any objections or exceptions to note

23   to these instructions?

24           MS. LYDON:  No, Your Honor.

25           MS. CRAGER:  No, Your Honor.  Thank you.

```
 1              THE COURT:  All right.

 2              MS. CRAGER:  Thank you.

 3              THE COURT:  The clerk is now going to take the

 4    exhibits and the Court's instructions into the jury room.

 5              With regard to the alternates,

 6    [Participant No. 101131455], [Participant No. 101126762], and

 7    [Participant No. 101139877], are any of your personal effects

 8    still in the jury room?

 9              Would you go out and get them now and bring them back

10    here.

11              Here comes the free lunch.

12              I'm putting a jury instruction together here that I

13    just read to you, and the clerk already has the exhibits.

14              So as to the 12 members of the jury, I'm going to ask

15    that the marshal take custody of those jurors to begin their

16    deliberations.

17              Would you administer the oath to the marshal, please?

18              THE CLERK:  Please come forward.  Raise your right

19    hand.

20              (The marshal was sworn.)

21              THE DEPUTY:  I do.

22              THE CLERK:  Thank you.

23              THE COURT:  All right.  The marshal will now take

24    custody of the jurors to begin their deliberations, just the 12

25    jurors, and the alternates will remain here.
```

1          (The jury panel exited the courtroom.)

2          THE COURT:  All right.  [Participant No. 101131455],

3   [Participant No. 101126762], and [Participant No. 101139877],

4   this may be the parting of the ways.

5          It used to be the law that once a jury began to

6   deliberate, the judge had to excuse the alternates because the

7   theory was that the deliberations of the jury are part of the

8   trial, and if something should happen to one of the jurors

9   during deliberations, you couldn't just bring in someone else

10  to take their place, because they would not have seen or

11  participated in that part of the trial.

12         But the state courts had a little different idea about

13  it, and they thought that if something happens to one of the

14  jurors during deliberations, the Court in its discretion might

15  be able to bring in an alternate and instruct all the jurors to

16  disregard their deliberations and to start them anew, and if I

17  did that, then I could use one of you in case something would

18  happen to one of the jurors.  I would have to decide whether to

19  do that, but it's possible that it could happen.

20         So what we ask is that you continue to heed the

21  Court's admonition and don't seek or receive any information

22  about the case.  Give Karen your cell phone numbers or the way

23  that she could reach you, and if we need you back, she'll call

24  you, and we'll let you know.

25         Now, we'll call you one way or the other because we

 1 don't want you waiting around forever in case we forget to

 2 excuse you.  So I'm going to make sure that she calls you.

 3          In case we don't see you again, I want to thank you

 4 for your service in this matter.  We couldn't handle it without

 5 alternates.  If something should have happened to one of these

 6 jurors during the deliberations, we would have had to start all

 7 over again if we didn't have an alternate.

 8          Fortunately, the trial didn't last as long as we

 9 anticipated, so we -- we didn't need your services, but those

10 also serve who only stand and wait.  And you can be proud of

11 the fact that you have served on a jury.

12          I forgot, had any of you ever served before?  All

13 right.  Well, I hope it's been a rewarding experience for you.

14          Would you leave your -- your badges on your seats, and

15 we'll pick them up.  You can keep your notebooks.  If you don't

16 need them when you come back, you can keep them as a souvenir.

17          You have the thanks of the Court.  All right.  Thank

18 you very much.

19          (The alternate jurors exited the courtroom.)

20          THE COURT:  All right, Counsel.  You'll be available

21 on ten minutes' notice; right.

22          MS. LYDON:  Yes, Your Honor.

23          THE COURT:  All right.  The Court will be in recess.

24          (Noon recess was taken.)

25                         -oOo-

1          **SACRAMENTO, CALIFORNIA; THURSDAY, MAY 23, 2024; 4:44 P.M.**

2                              -oOo-

3          THE COURT:  We haven't heard a word from the jury

4    since I sent them out to deliberate.  My thought was to bring

5    them in at a quarter to 5:00 and ask them if they wanted to

6    deliberate further today or to come back tomorrow morning and

7    resume at 9:00.  And I would probably just leave it up to them.

8          MS. LYDON:  That's agreeable with the Government, Your

9    Honor.

10         MS. CRAGER:  That's fine, Your Honor.

11         THE COURT:  All right.  So let's bring them in.

12         Are they calling us or are we calling them?

13         THE CLERK:  No.  They're calling me.  I'll be right

14   back.

15         THE COURT:  Well, that was a coincidence.

16         (Brief recess was taken.)

17         THE COURT:  The jurors -- the jurors' foreman is

18   [Participant No. 1011130600], Juror No. 10, and she says:  "We

19   would like to break for the evening and resume at 9:00 o'clock

20   tomorrow morning."

21         If I hadn't known better, I would have thought she was

22   listening in on our conversation, so we'll bring them in.

23         (The jury panel entered the courtroom.)

24         THE COURT:  There's one juror --

25         THE CLERK:  Oh, I'm sorry, Your Honor.

1              THE COURT:  Everyone is present.  Defendant is present

2    with counsel.  All the jurors are present.

3              [Participant No. 1011130600], you're the foreperson.

4    I have your note that says you "would like to break for the

5    evening and reconvene at 9:00 o'clock tomorrow morning."

6              Is that correct?

7              THE FOREPERSON:  Yes.

8              THE COURT:  Everyone agrees on that?

9              All right.  We will let you do that.  Now, remember

10   that you are still under the Court's admonition, so it is all

11   the more important that you remember not to seek or receive any

12   information about the case, not to talk about the case with

13   anyone, and to adhere the -- to the rest of the admonition.

14             You'll notice that the alternates are not here any

15   longer, so it's even more important that you come back tomorrow

16   morning on time to resume your deliberations.  No one will

17   interfere with what you have in the jury room, so you can leave

18   whatever you have in there.

19             Show up directly to the jury room tomorrow morning at

20   9:00 o'clock.  If you are all here, you may resume your

21   deliberations.  We won't have to call you into the courtroom to

22   do that.

23             If you're all there before 9:00 o'clock, you can

24   resume, just so long as all of the jurors are present.  And at

25   9:00 o'clock, I'm going to have Karen look in there just to

1    make sure everyone is present.

2          All right.  Have a nice evening.  Remember the

3    admonition and come back tomorrow morning at 9:00.

4          (The jury panel exited the courtroom.)

5          THE COURT:  All right.  Counsel, same for you and the

6    defendant.  You don't have to be in the courtroom, but be

7    available on ten-minutes notice after 9:00 o'clock.

8          MS. LYDON:  Thank you, Your Honor.

9          (The proceedings were adjourned at 4:51 p.m.)

10                            -oOo-

11                    **C E R T I F I C A T E**
           I, Abigail R. Torres, certify that I am a duly
12   qualified and acting Official Court Reporter for the United
     States District Court; that the foregoing is a true and
13   accurate transcript of the proceedings as taken by me in the
     above-entitled matter on 5/23/2024; and that the format used
14   complies with the rules and requirements of the United States
     Judicial Conference.
15                          Dated:  6/20/2024
                            /s/ Abigail R. Torres
16                          _____
                            Abigail R. Torres, RPR/RMR, FCRR
17                          CSR No. 13700
                            U.S. Official District Court Reporter
18

19

20

21

22

23

24

25