IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

United States of America,
        Plaintiff,

vs.                                Sacramento, California
                                   No. 2:21-cr-00111
Robert Allen Pooley,               Thu., May 16, 2024
        Defendant.                 9:05 a.m.
_____/

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
---oOo---

APPEARANCES:

For the Plaintiff:          United States Attorney
                            501 I Street, Suite 10-100
                            Sacramento, California  95814
                            By:  Katherine Lydon
                            Dhruv M. Sharma
                            Assistants U.S. Attorney

For the Defendant:          Office of the Federal
                            Defender
                            801 I Street, 3rd Floor
                            Sacramento, California  95814
                            By: Mia Crager
                            Meghan McLoughlin
                            Assistants Federal Defender

Official Court Reporter:    Kimberly M. Bennett,
                            CSR, RPR, RMR, CRR
                            501 I Street
                            Sacramento, CA 95814

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription

1                                  INDEX

2

      <u>GOVERNMENT WITNESSES:</u>                                      <u>PAGE:</u>
3

4

      JAMES CROUCH
5     DIRECT EXAMINATION BY MS. LYDON.....................15
      CROSS-EXAMINATION BY MS. CRAGER.....................89
6     REDIRECT EXAMINATION BY MS. LYDON..................109
      RECROSS-EXAMINATION BY MS. CRAGER..................111
7
      WILLARD LEE STOKES
8     DIRECT EXAMINATION BY MS. LYDON....................114
      CROSS-EXAMINATION BY MS. CRAGER....................166
9     REDIRECT EXAMINATION BY MS. LYDON..................173
      RECROSS-EXAMINATION BY MS. CRAGER..................176
10
      MARK PROCOS
11    DIRECT EXAMINATION BY MR. SHARMA...................180
      CROSS-EXAMINATION BY MS. CRAGER....................198
12    REDIRECT EXAMINATION BY MR. SHARMA.................203
      RECROSS-EXAMINATION BY MS. CRAGER..................204
13
      RONALD BELL
14    DIRECT EXAMINATION BY MR. SHARMA...................206
      CROSS-EXAMINATION BY MS. CRAGER....................220
15

16

17

18

19

20

21

22

23

24

25

1

## GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

2

<u>NO.:</u>                                                          <u>PAGE:</u>

3

4

80, PAGE 1.........................................39
80, PAGE 126.......................................67
80, PAGE 128.......................................68
80, PAGES 165-166..................................69
80, PAGE 167.......................................70
80, PAGES 193-194..................................71
80, PAGES 327-238..................................73
905...............................................78
911...............................................79
912...............................................84
102..............................................119
100, PAGE 1......................................125
100, PAGE 6......................................127
100, PAGES 7-8...................................129
100, PAGE 47.....................................134
100, PAGE 17.....................................140
100, PAGE 5......................................141
901..............................................153
103, PAGE 1......................................162
101, PAGES 1, 6, 17, 47..........................164
105..............................................186
104..............................................189
910..............................................191
4................................................214

5

6

7

8

9

10

11

12

13

14

15

16

17

## DEFENSE EXHIBITS RECEIVED IN EVIDENCE

18

<u>NO.:</u>                                                          <u>PAGE:</u>

19

2000, PAGE 12....................................171

20

21

22

23

24

25

1          (Call to order of the court, 9:05 a.m.)

2          (Jurors identified by Juror Participant Number.)

3                    THE COURT:  Good morning.  I understand we're waiting

4    for one more juror to arrive.

5          I have good news.  I've cleared everything for next week,

6    including the meeting that I had with the Marshal Service and

7    my calendar on Monday.  So we're going to have every day next

8    week available for this trial.

9                    MS. LYDON:  Thank you, Your Honor.

10                    THE COURT:  Anything else we need to discuss before

11   we bring the jury in?

12                    MR. SHARMA:  No, Your Honor.

13                    MS. LYDON:  No.

14                    MS. CRAGER:  No, Your Honor.

15                    THE COURT:  Any issues with what you're going to show

16   the jury during your eight-minute opening statement?

17                    MR. SHARMA:  No, Your Honor.

18                    THE COURT:  See if the jury is ready.

19         (Jury present, 9:11 a.m.)

20                    THE COURT:  Good morning, ladies and gentlemen.

21         Mr. Juror 101126368, we made arrangements to cover the cost

22   of a hotel for you.  You're close enough to the border that

23   there is no problem.

24                    JUROR 101126368:  Perfect.  Thank you.

25                    THE COURT:  All right.  All of the jurors are

1    present.  Defendant is present with counsel.

2         As I informed you yesterday, ladies and gentlemen, this is

3    the time for the opening statements of counsel.  The attorneys

4    on each side are allowed to give you a statement setting forth

5    what they believe the evidence will show.  What they say in

6    their opening statements is not evidence, but it is intended to

7    help you understand the evidence when it is presented.

8         Who wishes to make the opening statement on behalf of the

9    government?

10             MR. SHARMA:  I do, Your Honor.

11             THE COURT:  All right.  Mr. Sharma.

12                 OPENING STATEMENT BY MR. SHARMA

13             MR. SHARMA:  In 2015, Rob Pooley had a serious

14   problem.  Back then, he taught courses that certified skydivers

15   on taking tandem passengers on tandem skydives.  Basically, he

16   was teaching the folks that jump out of planes with members of

17   the public strapped to their chest.  But in August of that

18   year, he lost the certification that he needed in order to be

19   able to teach the course.  Now, at first, he was able to make

20   do by working with another certified teacher; they're called

21   examiners in the industry.  But in the summer of 2016, his

22   problem got worse.  The person he was working with left the

23   country and took with him the only legitimate means that Pooley

24   had to continue making money off these courses.

25        So what did Pooley do?  Well, he kept teaching these

1    courses anyway.  He falsely told his students that if they took

2    this course with him, he would get them the certifications they

3    needed -- a course that he wasn't certified to teach in the

4    first place.  Basically, he made promises he wasn't allowed to

5    make.  And he did it to line his own pockets.

6        And to keep the scheme going, he used the signatures of

7    another person, the other examiner, who had nothing to do with

8    these courses.  That conduct is at the center of the

9    government's case against Rob Pooley.  At the end of this

10   trial, you will decide charges against Mr. Pooley that focus on

11   the fraud that he committed against the students in the summer

12   of 2016 and his use of another person's signatures in

13   committing that fraud.

14       Now, in order to understand some of the evidence the

15   government will present, you'll need to learn a little bit

16   about tandem skydiving.  It's an inherently dangerous activity.

17   An inexperienced, first-time jumper, someone trying to check

18   something off their bucket list, is strapped to the front of a

19   more experienced skydiver controlling the parachute.  Now,

20   because it's dangerous, you need a certification to be able to

21   take people on tandem skydives.

22       You will hear from representatives of two organizations who

23   have developed courses that teach these skydivers how to be

24   safe tandem skydivers and gets them the certifications they

25   need.  It's called a tandem instructor rating.  A rating is

1  just another term for certification, just signifies that these

2  people have completed the training they need to do and have

3  their requisite experience.

4      Now, because of the dangers associated, these courses can

5  only be taught by highly qualified, experienced teachers known

6  as examiners.  An examiner is another rating that they provide.

7  It's the highest rating that they offer.

8      You will hear that Rob Pooley was such an examiner until

9  August of 2015 when he was suspended for violating basic safety

10 requirements.  In an e-mail exchange that he -- that you will

11 see that he had with the director of safety and training, you

12 will see that he knew that he was suspended, and he understood

13 what it meant for him practically, which is he could not teach

14 a tandem instructor course without another examiner present,

15 supervising.

16     But as I mentioned earlier, that's exactly what he did.

17 And you'll hear from the students that took those courses with

18 him.  These students came to his drop zone in Lodi, California,

19 from places as near as Santa Cruz and as far away as South

20 America and South Korea.  They will tell you that they wanted

21 this rating not just to become safe certified tandem skydivers

22 but also because it helps them make more money in the field.

23 These ratings are accepted the world over and are required at

24 the majority of drop zones in the US if you want to take people

25 on tandem skydives.  So they will tell you that they wanted to

1  come to Lodi, get their ratings, go back to their home bases,

2  their home countries, and be able to take customers on tandem

3  skydives.

4      They will tell you that they trusted Pooley when he told

5  them he could get them the ratings they needed; that they came

6  to Lodi and they paid him money, over a thousand dollars each;

7  and that they took these courses with Pooley.  In some, he

8  provided instruction; others, he was barely there, letting them

9  do their training jumps and then showing up on the last day to

10 collect some cash.  But they will all tell you, without a

11 doubt, he was the man in charge.  He was the only examiner

12 involved in their course.  He was the guy running the show.  He

13 didn't tell any of them that he was suspended.  And they will

14 all tell you that had he told them that, they wouldn't have

15 taken this course with him.

16     Now, after they finished their courses, these students

17 needed their paperwork signed off on by a certified examiner.

18 But Pooley couldn't sign off on their paperwork; he was

19 suspended.  So you will hear how he gave these people doctored

20 forms, forms that contained the preprinted signatures of the

21 other examiner that he worked with previously, a guy that had

22 nothing to do with these courses, a guy that wasn't even in the

23 country at the time.

24     Now, ultimately, his scheme unraveled.  People found out

25 what he was doing.  His students didn't get the ratings that

1    they paid him for.  They didn't get any refunds.  Some of them

2    gave up on becoming tandem instructors altogether.  Others had

3    to take the courses with other examiners, do it all over again.

4         Ladies and gentlemen, when Rob Pooley told his students

5    that he could get them a tandem instructor rating, knowing that

6    he didn't have the ability to do so; when he took his students'

7    money; when he led a course he didn't have a license to lead,

8    he committed wire fraud.  And when he used someone else's

9    signature, a means of identification, to commit that fraud, he

10   committed aggravated identity theft.

11        At the end of this trial, my co-counsel will have a chance

12   to stand before you and, in a closing argument, will connect

13   the facts that you have heard with the law that applies, and at

14   that time, we will ask for you to render the only verdict

15   supported by the evidence, and that is guilty on all counts.

16              THE COURT:  Thank you.

17        Ms. Crager, do you wish to make an opening statement at

18   this time, or Ms. McLoughlin?

19              MS. MCLOUGHLIN:  Yes, please, Your Honor.

20              THE COURT:  Ms. McLoughlin.

21                 OPENING STATEMENT BY MS. MCLOUGHLIN

22              MS. MCLOUGHLIN:  Good morning.

23        The candidates knew what was going on.  They knew the deal.

24   They knew that Rob Pooley was going to be doing their training

25   and that another examiner with current ratings was going to be

1    signing off on their paperwork.  That examiner was Yuri

2    Garmashov.  They knew this because Rob Pooley told them.  Rob

3    Pooley was conducting and coordinating tandem instructor

4    courses at the Parachute Center, a drop zone in Lodi.  And this

5    drop zone is famous in the skydiving community for being

6    accessible to everyone.  They have some of the cheapest jump

7    tickets.  And so skydivers from all over the world flock to

8    Lodi, California, to get their ratings, take courses, get in as

9    many jumps as they can, and be part of something.

10       When candidates contact the Parachute Center of this drop

11   zone to get their tandem ratings, they're usually put in touch

12   with Rob Pooley -- they were put in touch with Rob Pooley.  He

13   would contact them and say, We can get you your ratings here.

14   He'd give them information on pricing, course preparation, and

15   basically tell them, You can come whenever works for you.  Come

16   whenever you like.

17       The candidates would show up.  When they showed up,

18   oftentimes Yuri Garmashov was also at the drop zone, which, as

19   you've heard, is a totally acceptable training arrangement.

20   And this is -- you know, who is it acceptable to?  This is an

21   acceptable training arrangement to one of the organizations

22   you're going to hear from today, the United States Parachute

23   Association.  I'm saying that now because you're going to hear

24   lots of names and lots of acronyms.  In an effort to avoid too

25   many acronyms, I'm going to be calling it Parachute

1    Association.

2        And so you'll hear that several tandem instructors got

3    their ratings under this arrangement.  Other times, candidates

4    would show up, and Yuri Garmashov wasn't there, and Rob Pooley

5    told them how the course was going to go.  He would do their

6    training, and Yuri Garmashov would sign the paperwork.  He did

7    not deceive them.  They knew what was happening.  He would do

8    their training and Yuri Garmashov, as the examiner, would sign

9    off on the paperwork.

10        The government has already mentioned, and I think everyone

11   can probably -- everyone already knows skydiving is an

12   incredibly dangerous activity.  You may hear evidence

13   suggesting that because it's so dangerous, these candidates

14   trusted Rob Pooley more, that that makes this fraud different,

15   that he may have had some sort of additional obligation to tell

16   them more.  Of course it's incredibly dangerous.  You are

17   risking your life each time you leave the ground when you go

18   skydiving.  You'll also hear that for that reason, the

19   guidelines of the sport actually emphasize that each individual

20   person, regardless of their experience, has the final

21   responsibility for him or herself; that there is an

22   understanding that in this community, every person is going to

23   be vigilant about their own safety.

24        I want to be very clear that that is not to shift focus

25   onto the candidates, to scrutinize what they did or didn't do

1    under any circumstances.  The point of this evidence, rather,

2    is to -- is important when you're considering the expectations

3    you place on Rob Pooley.  Did he have some sort of affirmative

4    duty or obligation to say more even if he wasn't asked?

5        So I've been referencing this agreement between Rob Pooley

6    and Yuri Garmashov, an arrangement.  You're going to hear that

7    Yuri Garmashov now denies that he ever gave Rob Pooley

8    permission to use his signature for the courses at the drop

9    zone when Yuri wasn't there.  As the jury, you are tasked with

10   determining Yuri Garmashov's credibility.  Because you're also

11   going to hear that he knew Rob Pooley was using his signature

12   for these courses at the drop zone when Yuri Garmashov was not

13   there and that Yuri Garmashov consented to it.

14       Please pay attention to Yuri Garmashov's motives to tell a

15   story that shows him in the best light.  You should also pay

16   attention to the testimony of the candidates themselves.  And

17   again, the candidates are the experienced skydivers who took

18   the course with Rob Pooley.

19       They may testify that Rob Pooley didn't tell them anything.

20   And that's because in early August 2016, when the Parachute

21   Association found out that Yuri Garmashov's signature was on

22   paperwork for candidates he did not train, they wanted to hold

23   anyone involved accountable.  And so when asked, these

24   candidates minimized what they knew.  Specifically, they

25   minimized what they knew about the arrangement between Rob

 1   Pooley and Yuri Garmashov.

 2       You're probably getting a sense that this case involves

 3   paperwork; so I want to talk a little bit about exactly what

 4   that paperwork is.

 5       The paperwork is the application packet that's used to get

 6   these candidates their examiner ratings.  And the application

 7   packet has a preprinted name and signature of Yuri Garmashov.

 8   And he was listed as the examiner.  This paperwork had lies in

 9   it.  And the lie was that under Yuri Garmashov's signature --

10   or above it, actually, it stated that he personally examined

11   and recommends each applicant for the tandem instructor rating.

12       That lie was not meant for the candidates.  They knew that

13   Yuri Garmashov wasn't there.  They knew that Rob Pooley did

14   their training.  That lie was not meant to trick them.  It was

15   meant to trick the Parachute Association.  As you can imagine,

16   when the Parachute Association discovered this lie, there was

17   some fallout.  That fallout included Rob Pooley losing all his

18   ratings, and it was clear he was not going to get them back

19   ever.  It was during that time frame he signed a letter

20   basically taking the blame for Yuri Garmashov, taking the blame

21   for everything and for all of Yuri Garmashov's involvement.

22       Years later, when law enforcement started their criminal

23   investigation, he also spoke at length about what happened.

24   He's never said that he misled these candidates.  What is clear

25   is that Rob Pooley, Yuri Garmashov, and the candidates were not

1  honest with the Parachute Association.  Together, they tried to

2  pull one over on the Parachute Association.  They tried to get

3  the skydivers their ratings without following all the rules.

4      And this is the most important thing.  What I'm about to

5  say is the most important thing.  If you remember one thing,

6  please remember this.  Rob Pooley is not charged with

7  defrauding the Parachute Association; he's charged with

8  defrauding these candidates.

9      At the end of the case, my co-counsel, Mia Crager, will

10 also come up here and ask you to find Rob Pooley not guilty on

11 all charges.  Rob Pooley did not use Yuri Garmashov's signature

12 to deceive these candidates.  He told them about the

13 arrangement.  And what he told them was true.

14     Thank you.

15         THE COURT:  Thank you.  That concludes the opening

16 statements.  We'll now begin with the evidence in the case.

17     The government may call its first witness.

18         MS. LYDON:  The government calls James Crouch.

19         THE CLERK:  Please step forward all the way to your

20 right.  All the way up to the witness stand.  All the way up on

21 the stand.  And remain standing.

22     Face me, please.  Raise your right hand.

23     (The Witness, JAMES CROUCH, is sworn.)

24         THE WITNESS:  I do.

25         THE CLERK:  Thank you.  You may be seated.

1      Please state your full name.  Spell your last name for the

2  record.

3              THE WITNESS:  James Crouch, C-R-O-U-C-H.

4                       DIRECT EXAMINATION

5  BY MS. LYDON:

6  Q.  Good morning, Mr. Crouch.

7  A.  Good morning.

8  Q.  What do you do for a living?

9  A.  I'm a professional pilot.  I fly aerial survey jobs, LiDAR

10  and imagery survey work.

11  Q.  Before you were a professional pilot, did you work at the

12  United States Parachute Association?

13  A.  Yes.

14  Q.  Did you interact with Robert Pooley in 2015 and 2016?

15  A.  Yes.

16  Q.  All right.  Let's start with an overview of the United

17  States Parachute Association and your career at USPA.

18      Briefly, what is USPA?

19  A.  USPA is a -- it's an association for skydivers.  And it --

20  it's -- represents skydiving in the US to the -- for the FAA.

21  And we generate licenses and ratings for -- for our members and

22  establish rules and guidelines.

23  Q.  You said USPA is recognized by the FAA; is that right?

24  A.  Yes.

25  Q.  Are any other industry organizations who don't manufacture

1    skydiving equipment recognized by the FAA?

2    A.   Not to my knowledge.

3    Q.   It's just USPA?

4    A.   Yeah.

5    Q.   All right.  How did you end up working at USPA?

6    A.   In 2000, the director of safety and training at the time

7    left his -- left his position there.  And the position was open

8    for a few months.  And a friend of mine who worked at the

9    association kept bugging me to submit a resumé.  And so I sent

10   a resumé in after the position had been open for about three

11   months and was hired at that time, July of 2000.

12   Q.   July of 2000, you were hired as the director of safety and

13   training, you said?

14   A.   Yes.

15   Q.   Did you hold that position your entire time at USPA?

16   A.   Yes.

17   Q.   When did you leave USPA?

18   A.   October of 2018.

19   Q.   Okay.  19 years?

20   A.   Little over 18.

21   Q.   Okay.  Where were you based geographically while at USPA?

22   A.   The first six years was Alexandria, Virginia.  And the last

23   12 years was in Fredericksburg, Virginia.

24   Q.   What were your job responsibilities as director of safety

25   and training?

1   A.   I was in charge of development of student and instructor

2   rating programs; the licensing programs at the association,

3   which issues licenses to members; developing the manuals;

4   editing the manuals for the association; and tracking accidents

5   and fatalities; and quite a bit of writing, submitting five

6   different articles every month for the magazine -- for the

7   monthly magazine.

8   Q.   Okay.  Did you interact with skydivers as part of your job?

9   A.   Every day.

10  Q.   What types of interactions did you have with skydivers,

11  typically, on a normal day?

12  A.   Ran a wide range of topics.  Anything from skydivers

13  interested in getting -- earning ratings, wanting to know what

14  to do, or to the top-level examiners who might have had

15  questions on the manuals or had suggestions for changes or

16  edits or things like that.  So I -- I interacted with a wide

17  variety of people.

18  Q.   Did you help put people who were looking to become tandem

19  instructors in contact with examiners who could run their

20  courses?

21  A.   Yeah.  A lot of times, we -- we maintained a rating course

22  calendar.  A lot of times, I would just refer them to them,

23  unless they were looking for something specific.

24  Q.   Okay.  Are you a skydiver -- or were you a skydiver

25  yourself?

1    A.   Yes.  I haven't jumped in six years, but I was a skydiver.

2    Q.   During the time period at USPA, did you also have an

3    occupation outside the organization with respect to skydiving?

4    A.   Yes.  I -- the same 18-year period, I owned a skydiving

5    center myself that operated on weekends.

6    Q.   Did -- a lot of people who were high up in USPA, did they

7    also have other jobs, outside of that, in skydiving?

8    A.   Yeah.  The vast majority of the membership had a regular

9    Monday-through-Friday-type job, and then they would

10   recreational skydive on the weekends.

11   Q.   Okay.  Did you hold USPA certifications?

12   A.   Yes.  I held every instructor rating -- which there are

13   four different instructor ratings -- and I held two of the four

14   examiner ratings, coach and tandem examiner.

15   Q.   So you yourself were a tandem examiner?

16   A.   Yes.

17   Q.   Okay.  And did you ever teach tandem instructor courses as

18   an examiner?

19   A.   Yes.  Yes, I did.  I was an examiner for 18 years.

20   Q.   All right.  And were you ever a tandem instructor?

21   A.   Yes.  For 22 years.

22   Q.   Okay.  So, briefly, what is tandem skydiving?  Could you

23   describe how it works?

24            THE COURT:  Can you have him explain the difference

25   between an instructor and an examiner?

1           MS. LYDON:  That's a good question.  Of course.

2    Q.  BY MS. LYDON:  What is a tandem instructor?

3    A.  Okay.  So a tandem instructor has a rating which allows him

4    to take a first-time jump student on a tandem skydive.  So

5    somebody who doesn't know anything about skydiving, they can

6    take them and train them on the ground and take them out for a

7    skydive.

8    Q.  And how -- how is that set up?  Could you describe the

9    relative body positioning of the tandem instructor and the

10   customer when they're jumping out of the plane?

11   A.  Yeah.  So a tandem skydive is unique to skydiving because

12   it's the only method where you're physically attached to the

13   student for the entire exit from the airplane, free fall; once

14   the parachute opens, you stay -- remain attached to the

15   student, and it's a -- and you land with the parachute still --

16   with the student still attached to the front of you.

17   Q.  So the student is in the front?

18   A.  Yep.

19   Q.  And the tandem instructor is attached to them, behind them;

20   is that right?

21   A.  Right.  Yeah.  Both facing the same direction.  So I'd be

22   looking at the back of the student's head, more or less.

23   Q.  As a tandem instructor?

24   A.  Tandem instructor, yeah.

25   Q.  Who controls the parachute?

1    A.   The tandem instructor controls the parachute.  There are

2    handles that a student can steer the parachute.  Sometimes

3    tandem is used for training, and the student will help steer

4    the parachute too.

5    Q.   But a typical tandem jump, is the tandem instructor kind of

6    running the show and the customer is along for the ride?

7    A.   Probably 99 percent of the tandems in the US, yeah, the

8    student doesn't do anything once the parachute opens; the

9    tandem instructor handles everything.

10   Q.   And who teaches the tandem instructor how to do their job?

11   A.   Tandem examiner will train some -- a very experienced

12   tandem instructor how to be a tandem examiner.

13   Q.   Tandem instructor?

14   A.   Tandem instructor.  I'm sorry.  A very -- a tandem examiner

15   will train a very experienced skydiver how to be a tandem

16   instructor.  So somebody that is learning.

17   Q.   Okay.  Let's talk about -- you mentioned that USPA offered

18   certifications -- is that right? -- and licenses?

19   A.   Yes.

20   Q.   How many licenses does USPA offer?

21   A.   Four different licenses; A, B, C, and D.

22   Q.   Which is the highest?

23   A.   D is the highest.

24   Q.   How many jumps do you have to have in order to obtain a D

25   license?

1    A.  500 jumps.

2    Q.  All right.  And is a D license required in order to be a

3    tandem instructor?

4    A.  Yes.

5    Q.  So before becoming a tandem instructor, a person has to

6    have done 500 solo jumps; is that right?

7    A.  That's correct.

8    Q.  Okay.  And now, those are licenses.  Now, there are

9    ratings.  What are ratings?

10   A.  A rating is a -- is authorization for somebody to train

11   somebody -- train somebody in the first jump method.

12       So USPA has four different instructional ratings.  Three of

13   them are for students who are making solo jumps; so they're not

14   attached like a tandem.  And then the fourth rating is tandem

15   rating where the -- where they are attached to the student.

16   Q.  So is it fair to say that licenses enable skydivers to do

17   things themselves and ratings enable them to teach other people

18   and do things with other people?

19   A.  Yes.

20             MS. CRAGER:  Objection.  Leading.

21             THE COURT:  Sustained.  Rephrase the question.

22             MS. LYDON:  Okay.

23   Q.  BY MS. LYDON:  What's the difference between licenses and

24   ratings?

25   A.  A license just proves -- shows skydiving experience.  So

1   each license requires a minimum number of jumps; A is 25, B is

2   50, C is 200, and D is 500.  And that allows -- once somebody

3   obtains that license, that gives them the authority to do

4   different things within skydiving.  And some of the ratings

5   require a C or a D license.  The tandem requires a D.

6       And ratings are certifications which proves somebody has

7   been through a -- a training course and has earned a rating to

8   teach a new student; so somebody who has no skydives.  They can

9   teach somebody within that discipline how to become a skydiver.

10  So there are different ways you can advance through training to

11  become a licensed skydiver.  So there are three -- four

12  different methods.  Three of them are solo jump, where the

13  student wears solo equipment -- accelerated free fall, static

14  line, instructor assisted deployment -- and then tandem.

15  That's the four different ratings.

16  Q.  Okay.  Those are a really comprehensive overview.  Thank

17  you.  Let me break that down.

18      Did you say licenses enable students to do things -- or

19  people to do things --

20  A.  Yes.

21  Q.  -- and ratings enable skydivers to teach things to other

22  people?

23  A.  Right.  Yeah.

24  Q.  Okay.  And there is an entry level rating -- did you say

25  that? -- called coach?

1  A.  Yeah.  There is coach rating as well, yeah.

2  Q.  Okay.  And then after that, there are -- you mentioned

3  there are four other ratings, and one of them is tandem?

4  A.  I'm sorry.  I didn't hear that.

5  Q.  Sorry.  You mentioned four other ratings after coach, and

6  one of those is tandem?

7  A.  Yes.

8            MS. CRAGER:  Objection.  Leading.

9            MS. LYDON:  I'm summarizing his testimony.

10           THE COURT:  Overruled.  Go ahead.

11           MS. LYDON:  Thank you.

12  Q.  BY MS. LYDON:  All right.  About how many drop zones are

13  there in the United States?

14  A.  There is probably 300ish.  Between 250 and 300 in the US, I

15  would think.

16  Q.  All right.  I should ask, what's a drop zone?

17  A.  I'm sorry.  What?

18  Q.  What's a drop zone?

19  A.  A drop zone is where people go to make skydives.

20  Q.  All right.  And of those 250 to 300 drop zones in the

21  United States, approximately how many are USPA member drop

22  zones?

23  A.  I would guess probably somewhere around 270ish -- or 220 to

24  270, in that range, would be group members.

25  Q.  Okay.  So fair to say the vast majority of drop zones in

1    the United States are USPA member drop zones?

2    A.   Yes.

3    Q.   What does it mean to be a USPA member drop zone?

4    A.   A USPA group member drop zone signs a pledge to follow

5    the -- the association's rules and recommendations and use

6    USPA-rated instructors only to train students.  And to --

7    that's basically it.  Just to follow the rules and regulations

8    and use rated instructors.

9    Q.   Okay.  So those USPA drop zones, if a person wanted to jump

10   tandem with a customer, they needed -- what would they need?

11   A.   They would have to --

12   Q.   I guess, what rating would they need?

13   A.   They would need to have a USPA tandem instructor rating to

14   work with tandem students.

15   Q.   Was Parachute Center in Lodi a USPA group member?

16   A.   No.  Not to my knowledge.

17   Q.   Did it have -- skydivers who jumped there, were some of

18   them USPA members?

19   A.   Yeah.

20   Q.   In your role as safety and training director, did you

21   interact with individuals who sought tandem instructor ratings?

22   A.   Yes.

23   Q.   What skills -- and you yourself are a tandem instructor; is

24   that right?

25   A.   I'm sorry.  What?

1   Q.  You were a tandem instructor --

2   A.  Yes.

3   Q.  -- you testified?

4   A.  Yes.

5   Q.  And a tandem examiner?

6   A.  Yes.

7   Q.  What skills do tandem instructor candidates depend on their

8   examiner to teach them?

9   A.  They generally have a basic knowledge of what tandem is,

10  but they're depending on the examiner to train them on the best

11  ways to -- to work with students and to manage the skydive

12  safely and how to operate the equipment and -- and how to fly

13  and land the parachute safely.

14  Q.  These students who wanted to be tandem instructors were

15  also experienced solo skydivers, right?

16  A.  Yes.

17  Q.  What is the difference between solo skydiving and tandem

18  skydiving as an instructor?

19  A.  The -- if you're training students for solo skydiving, both

20  people have their own parachute system on and they're not

21  hooked together like tandem.  So the student will be out in

22  free fall with their -- with their own parachute system; they

23  deploy themselves, and then the instructor deploys his own

24  parachute system, and they land separately.

25  Q.  Okay.  Let me ask, what did the students need to learn

1    about the tandem equipment?

2    A.  Virtually nothing.  The -- the tandem instructor handles

3    everything from -- from deploying the parachute --

4            THE COURT:  You wanted to talk about what the

5    examiner does now, right?

6            MS. LYDON:  Well, I guess --

7            THE COURT:  I understood -- you need to differentiate

8    when you're asking about what an examiner needs to teach and

9    what an instructor needs to teach.

10           MS. LYDON:  Exactly.  I think the terminology is a

11   little confusing because the people who ride in front are

12   called students, but then with -- there are different levels of

13   classes.

14   Q.  BY MS. LYDON:  So what I'm asking is what does a solo

15   skydiver need to learn about tandem skydiving in their tandem

16   instructor course.

17   A.  Okay.  So a tandem candidate --

18   Q.  Yes.

19   A.  -- would be a way to differentiate.

20       So the tandem candidate in the course, they need to learn

21   the parachute system, the differences in the parachute system.

22   There is -- it's more complex than the solo equipment they're

23   used to.

24   Q.  How so?

25   A.  There are two extra handles.  So a solo parachute system,

1   there are three handles; main deployment handle, and then a

2   cutaway handle that releases the main parachute if there is a

3   malfunction with it, and a reserve ripcord that deploys the

4   reserve parachute, the backup parachute.

5       So with a tandem system, there is a drogue parachute that

6   trails behind the pair in free fall, and two handles that

7   release that drogue.  And that drogue parachute then opens the

8   main parachute.  And then there is also a reserve ripcord and a

9   cutaway handle for that.  So instead of three handles, there

10  are five handles.  And the emergency procedures are -- are more

11  complicated because the system is more complex --

12  Q.  Okay.

13  A.  -- for the tandem.

14  Q.  So two handles for -- sorry.  Three handles for solo, five

15  handles for tandem?

16  A.  Correct.

17  Q.  What's a drogue?

18  A.  A drogue parachute is a -- it's a 3-foot-diameter parachute

19  that is connected on about a 20-foot piece of material called a

20  bridle.  And it just trails off the back of the parachute

21  system.  So when the tandem pair exits the airplane, the

22  instructor reaches back to their butt area and grabs this

23  drogue parachute, throws it into the airstream, and it inflates

24  and trails attached to the back of the parachute system right

25  off the back of the tandem pair.

1    Q.   What's the function of the drogue?

2    A.   Drogue slows the pair down because two people stacked

3    together would fall at about 160, 170 miles an hour, where a

4    solo parachute falls at 110, 120.  So the drogue system slows

5    the pair down to a solo speed of about 110, 120, which makes

6    the parachute opening softer and slows the free fall down.

7         It is also used to extract the main parachute from the --

8    from the parachute container.  So it needs to be out, inflated

9    during the free fall so a handle can be pulled to release it

10   and allow it to extract the -- the main parachute at that

11   point.

12   Q.   Okay.  So people who want to be tandem instructors wouldn't

13   have had a drogue in their previous skydiving experience,

14   right?

15   A.   Correct.

16   Q.   Okay.  Who are they depending on to teach them how to use

17   this drogue?

18   A.   The examiner.

19   Q.   And are there emergency procedures associated with the

20   drogue --

21   A.   Yes.

22   Q.   -- that tandem instructors need to know?

23   A.   Yes.

24   Q.   What are some of the things that can go wrong with drogues

25   that tandem instructors need to learn -- tandem instructor

1    candidates need to learn from their examiner?

2    A.  Well, they need to learn how to pack it properly, because

3    there is a -- the packing is -- has a lot to do with how it --

4    how it interacts with the air when you throw it out in the air.

5    So they need to learn how to pack it.  They need to learn how

6    to throw it properly in the airstream.  They need to know what

7    to do if it becomes entangled around the bodies of the student

8    and the instructor.  Need to know what to do if it does not

9    inflate when you throw it out.  I think that's most of the key

10   things with it.

11   Q.  Okay.  Are there other emergency procedures unique to

12   tandem that tandem instructor candidates need to learn from

13   their examiner?

14   A.  Oh, yes.

15   Q.  Can you describe some of the main ones?

16   A.  Main parachute malfunction, or how to handle two parachutes

17   out with -- with the -- with the larger parachutes in the

18   tandem pair.  If there is a total malfunction, in other words

19   the main cannot be deployed for any reason, both with the

20   drogue -- if the drogue is out -- and if the drogue is not out.

21   High speed malfunction, if the bag locks where the main

22   parachute is out and extended by lines but not out of its bag.

23   So that's pretty much it.  There is a -- there is different

24   ranges of extremism for each one of those.

25   Q.  Okay.  So the malfunctions can occur to varying degrees?

1    A.   Yeah.

2    Q.   Okay.  Before taking the tandem instructor course, had --

3    do skydivers have any experience jumping as tandem instructors?

4              MS. CRAGER:  Objection.  Speculation.

5              THE COURT:  Typically, you're asking?

6              MS. LYDON:  If they're complying with USPA

7    guidelines, do they have any experience --

8              THE COURT:  Do they need to, you mean?

9              MS. LYDON:  Yes.

10             THE COURT:  All right.  Overruled.

11   Q.   BY MS. LYDON:  Well, may they have any experience jumping

12   with -- as the tandem instructor, the person in the back, prior

13   to taking the tandem instructor course?

14   A.   Almost -- almost never.  There is a possibility they --

15   they might have jumped as a -- with another experienced tandem

16   instructor on the back, but it would be very rare.

17   Q.   They're not -- are they permitted to be the person in

18   command of the tandem system prior to taking and completing --

19   A.   No.

20   Q.   -- prior to taking that course?

21   A.   No.

22   Q.   Okay.  So would the tandem instructor course be the first

23   experience that tandem instructor candidates have using this

24   tandem parachute system?

25   A.   Yes.

1   Q.   And who are they depending on to teach them how to use it

2   correctly?

3   A.   The examiner of the course.

4   Q.   And then once they complete the tandem instructor course,

5   at that point are they able to jump with customers?

6   A.   Once they complete their -- there are ten jumps required.

7   So the initial part of the course is five jumps with -- with

8   course staff, which would be the -- the examiner or a -- what

9   am I trying to say -- or a staff working underneath the

10   examiner.

11   Q.   Okay.  So you said there are five jumps during the course

12   they have to complete with the examiner or someone under the

13   examiner --

14   A.   Correct.

15   Q.   -- is that right?

16   A.   Yes.

17   Q.   After that, you mentioned other jumps.  What are they?

18   A.   There are five more jumps that can be done at the course

19   there, or sometimes they can and they will go home to their

20   home drop zone and do five.

21   Q.   What are those jumps called, the five jumps after the

22   course?

23   A.   Those five jumps are called -- we always call them Phase 2.

24   But I forget what the name on the form is for those jumps.

25   Q.   Okay.  But -- so is that ten jumps total before they're

1    allowed to jump with customers?

2    A.   Correct.

3    Q.   Okay.  And at that point, are they on their own with that

4    tandem system and customers?

5    A.   Yes.

6    Q.   Okay.  Let's talk about why candidates want USPA tandem

7    ratings in addition to the training.

8        What impact does having a USPA tandem instructor rating

9    have on the ability of a skydiver to make money as a tandem

10   instructor?

11   A.   It's -- it's widely recognized.  It's a -- required almost

12   exclusively in the United States for people to make tandem

13   jumps at drop zones across the US.  And even worldwide, it's

14   recognized quite a bit in other countries as a -- as a rating

15   that doesn't require any other training; so they can -- people

16   can go to other countries and work as a tandem instructor as

17   well.

18   Q.   Okay.  So in the United States, it's -- I think you said

19   it's basically required to have a tandem instructor rating in

20   order to be a tandem instructor?

21   A.   Yes.

22   Q.   Is it mandatory at those USPA drop zones?

23   A.   Yes.

24   Q.   And then do some non-USPA drop zones also required their

25   instructors to have tandem instructor ratings?

 1   A.   Most of them do, yeah.

 2          THE COURT:  When you say it's required, required by

 3   the government or required by the -- just by the --

 4          THE WITNESS:  Required by the drop zone.

 5          THE COURT:  By the drop zone?

 6          THE WITNESS:  Yeah.

 7   Q.   BY MS. LYDON:  All right.  And then with respect to

 8   skydivers abroad, do some foreign drop zones require tandem

 9   instructors to be USPA certified?

10   A.   Yes.  Some -- in some countries, yes.

11   Q.   Okay.  Can you throw out some examples?

12   A.   Well, there is, like, China, they don't have their own --

13   they don't have their own skydiving guidelines; they use

14   USPA --

15   Q.   Okay.

16   A.   -- for their --

17   Q.   Are there other countries that do have their own skydiving

18   guidelines that allow conversion from USPA ratings to their

19   guidelines?

20   A.   Yes.

21   Q.   Can you throw out some of those countries?

22   A.   New Zealand or Australia --

23   Q.   Okay.

24   A.   -- they have shorter courses.

25   Q.   All right.  Let's turn now to examiners.

1      As part of your job, did you talk to examiners frequently?

2   A.   Yes.

3   Q.   On what types of topics?

4   A.   Everything from -- from questions with course materials or

5   questions without it, how to handle something with a candidate,

6   or just calling to -- to get a course scheduled.

7   Q.   Okay.  If an examiner happened to be traveling, is that

8   something that you might learn in the course of your work,

9   communicating with examiners?

10  A.   Yes.

11  Q.   Do you recall that you were in communication -- or whether

12  you were in communication with Yuri Garmashov over the summer

13  of 2016?

14  A.   I -- I don't recall, no.  I don't -- I don't remember ever

15  having any interaction with him.

16  Q.   Is there anything that might refresh your recollection as

17  to whether you communicated with Yuri Garmashov over the summer

18  of 2016 via e-mail?

19  A.   If I saw the e-mail, it might -- I mean, I --

20  Q.   Could you take a look at the binder behind you, Binder 8.

21           THE COURT:  Do you want to help him find it?

22  Q.   BY MS. LYDON:  It will be Tab 1001.  Just read it silently

23  to yourself and look up when you're finished.

24  A.   Okay.  Yep.  I remember this.

25  Q.   All right.  Can you -- you can mark that page, but maybe

1    close the binder.

2        All right.  Did looking at that e-mail refresh your

3    recollection as to whether you communicated with Mr. Garmashov

4    over the summer of 2016?

5    A.  Yes.  I recall that now.

6    Q.  And was -- did you learn that Mr. Garmashov was abroad?

7    A.  Yes.

8    Q.  How did you learn that?

9    A.  In the e-mail, he said he was out of the country.

10   Q.  All right.

11               MS. CRAGER:  Objection.  Hearsay.

12               THE COURT:  I didn't know we had a problem with that

13   microphone.  When we have a break, could you see if we can work

14   something out so that it doesn't do that.

15               MS. LYDON:  It might be user error, too.

16               THE COURT:  It shouldn't be a problem.  So I lost --

17   I didn't hear the objection.

18               MS. CRAGER:  Objection.  Hearsay.

19               THE COURT:  What was the question?

20               THE WITNESS:  If Yuri was out of the country.

21               THE COURT:  Oh.  But you -- you already had him say

22   that he had this e-mail.  Let me see the e-mail.  I --

23               MS. LYDON:  It's at Tab 1001.  I'm not entering the

24   e-mail into evidence at this time.  I'm asking whether he was

25   in communication with Mr. Garmashov over the summer of 2016 and

1      learned that he was out of the country.

2                THE COURT:  Okay.  Well, "learned that he was out of

3      the country," that's hearsay.

4                MS. LYDON:  It's not for the truth; it is for the

5      fact that the USPA had knowledge of examiners' whereabouts.

6                THE COURT:  That's the truth.  So I'm going to

7      sustain the objection.

8           Disregard the question and the answer about whether

9      Mr. Garmashov was out of the country, ladies and gentlemen.

10          Go ahead.

11                MS. LYDON:  All right.

12     Q.  BY MS. LYDON:  Aside -- setting aside Mr. Garmashov, did

13     you often have knowledge when an examiner was traveling?

14     A.  Yes.

15     Q.  And about how many examiners were there in the country --

16     tandem examiners?

17     A.  Tandem examiners, probably 200 to 250.

18     Q.  Okay.  And did USPA -- let's turn now to what USPA made

19     sure that its examiners knew.

20          Did USPA provide written materials to examiners and the

21     general skydiving community?

22     A.  Yes.

23     Q.  All right.  What are -- what's -- what's the main document

24     that USPA provided to instructor examiners?

25     A.  The Instructional Rating Manual, which is the rather large

1   document that had all the rating course materials for all the

2   disciplines.

3   Q.  Who wrote the Instructional Rating Manual?

4   A.  I did, with a lot of assistance.  But I was one of the

5   major controllers of that document.

6   Q.  All right.  So you were one of the main authors of the

7   document.  And then was the -- was the Instructional Rating

8   Manual revised from time to time?

9   A.  Yes.  It was revised every -- the board would hold meetings

10  twice a year, every six months, and there would generally be

11  edits to that manual done at one or both of the meetings.

12  Q.  Okay.  And were examiners like Mr. Pooley expected to be

13  familiar with and understand the USPA Instructional Rating

14  Manual?

15  A.  Yes.

16  Q.  All right.  Could you -- could you grab Binder 2 behind

17  you.

18      I believe Binder 2 consists of a tab marked Government's

19  Exhibit 80.  What is Government's Exhibit 80?

20  A.  I'm sorry.  What?

21  Q.  What is Government's Exhibit 80, the document in front of

22  you?

23  A.  This is the Instructional Rating Manual, 2014-2015 edition.

24          MS. LYDON:  Okay.  Move to admit Government 80.

25          THE COURT:  The entire manual?

1              MS. LYDON:  Yes.

2              THE COURT:  Any objection?

3              MS. CRAGER:  I believe the whole manual is hearsay,

4    Your Honor.  But portions of it would be fine.

5              THE COURT:  Well, I haven't seen the whole manual.

6    I'm sure there probably is hearsay in it.

7              MS. LYDON:  None of it is for the truth.  It's all

8    for the knowledge of Mr. Pooley as to the requirements.

9              THE COURT:  I don't know that that's true or not

10   because we haven't -- how big is the manual?  Is that the whole

11   thing?

12             THE WITNESS:  Yes.

13             THE COURT:  I can't receive that entire thing in

14   evidence without some further discussion.  So do you have some

15   particular part of it right now you want to ask him about?

16             MS. LYDON:  We could go page by page.

17             THE COURT:  It's up to you.  I can't receive the

18   whole exhibit without some further discussion.

19   Q.  BY MS. LYDON:  All right.  So this 2015 -- 2014-2015

20   Instructional Rating Manual, when was it current through?  When

21   was it the operative Instructional Rating Manual?

22   A.  It would generally -- it could be used for two years after

23   its -- after its time period, to allow for the next version to

24   be edited and put into place.  So we always had a date that --

25   that said it was valid through whatever date.

1    Q.   Okay.  The Instructional Rating Manual in front of you,

2    when was it operative through, month and year?

3    A.   Through November 2016 is on the first page.  It says it's

4    good for courses held through November 2016.

5    Q.   All right.  And you said that examiners like Mr. Pooley

6    were expected to be familiar with this manual; is that correct?

7    A.   That's correct.

8              MS. LYDON:  Move to admit page 1, the title page.

9              THE COURT:  I'm getting my copy here in front of me,

10   which will make it easier.

11             MS. CRAGER:  No objection to page 1, Your Honor.

12             THE COURT:  All right.  Page 1 of Exhibit 80 is

13   received in evidence.

14      (GOVERNMENT'S EXHIBIT 80, PAGE 1 ADMITTED INTO EVIDENCE.)

15   Q.   BY MS. LYDON:  Does pages -- we can publish page 1, please.

16      We have an hourglass while the computer system is waking

17   up.

18      While that is getting set, does page 3 through 5 of the

19   document consist of a table of contents generally describing

20   what's in the manual?

21   A.   Yes.

22             MS. LYDON:  Move to admit pages 3 through 6 as

23   general overview of information examiners are expected to know.

24   And then we'll go through particular points.

25             MS. CRAGER:  No objection, Your Honor.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1            THE COURT:  3 through 6 --

2            MS. LYDON:  Yes.

3            THE COURT:  -- Exhibit --

4            MS. LYDON:  No.  I'm sorry.  Page -- this is all

5   Exhibit 80, because Your Honor wants to go page by page.

6            THE COURT:  No.  I don't want to go page by page.

7   I'm just not going to let you put the entire manual in until we

8   have an opportunity to discuss it, because, you see, when

9   something comes into evidence, it goes into the jury room at

10   the end of the trial, and the jury can look at everything in

11   there, and I don't want to confuse this jury with what looks

12   like a couple thousand pages --

13            MS. LYDON:  Okay.

14            THE COURT:  -- without giving them some guidance as

15   to what this is all about.

16            MS. LYDON:  We'll proceed step by step.

17   Q.  BY MS. LYDON:  So now it looks like we have the first page

18   up.

19        Do you see that note that this manual may be used as a

20   valid textbook for USPA ratings through December -- through

21   November 2016?

22   A.  Yes.

23   Q.  All right.  So it was operative over the summer of 2016?

24   A.  Yes.

25   Q.  Okay.  And over the summer of 2015?

1    A.  Yes.

2    Q.  Okay.  General organization of the manual.  Could we look

3    at page 004.

4        Does this page generally cover the tandem instructor rating

5    course requirements as well as the instructor examiner

6    requirements?

7    A.  Yes.

8    Q.  All right.  If you turn to page 8 of the document.  Does --

9    does page 8 cover the purpose of the Instructional Rating

10   Manual?

11   A.  Yes.

12   Q.  Does it also cover some paperwork requirements in the

13   second column?

14   A.  Yes.

15           MS. LYDON:  Move to admit page 8.

16           MS. CRAGER:  No objection to page 8.

17           THE COURT:  Well, before we do this, we need to have

18   a discussion here.  So is it -- is this a good time for a

19   recess, or can you go into something else before we get to the

20   recess?

21           MS. LYDON:  Moving off of the Instructional Rating

22   Manual?

23           THE COURT:  Right.

24           MS. LYDON:  Now is the time that I was planning on

25   describing Mr. Pooley's knowledge.

```
 1                 THE COURT:  Let's take a short recess.  Let's take a
 2      15-minute recess.
 3         Remember the admonition, ladies and gentlemen.  We'll take
 4      a 15-minute recess.  We'll call you when we're ready for you to
 5      come back.
 6         (Jury not present, 10:09 a.m.)
 7                 THE COURT:  All right.  The jurors are outside the
 8      courtroom.
 9         Ms. Lydon, what would be the purpose of any of these pages
10      separately or collectively from this exhibit?
11                 MS. LYDON:  So right now, we're still just on
12      organization.  Like, this thing --
13                 THE COURT:  Who cares?  Here is the point.
14                 MS. LYDON:  Okay.
15                 THE COURT:  Who cares how it's organized?  Do you
16      really want the jury to spend some time figuring out how this
17      is organized?
18                 MS. LYDON:  Well, I was providing the table of
19      contents so that if they became interested during the
20      deliberations, based on all of the information --
21                 THE COURT:  Why should they be interested?
22                 MS. LYDON:  Because this information in this manual
23      advises Mr. Pooley of what was expected of him and required of
24      him and advises tandem instructor candidates as to what was
25      expected and required of them with respect to --
```

1           THE COURT:  So you want to bring it in to show what

2   Mr. Pooley knew?

3           MS. LYDON:  Yes.

4           THE COURT:  So, first, you have to lay the foundation

5   that he read this somehow.

6           MS. LYDON:  I did.  Examiner candidates are expected

7   to be familiar with and recognize this document.

8           THE COURT:  You haven't --

9           MS. LYDON:  We'll be covering training on this

10  document with respect to --

11          THE COURT:  I assume there is no dispute about it.

12  But I don't remember you talking about what Mr. Pooley -- I

13  don't remember you talking about Mr. Pooley at all except in

14  the opening statement.

15          MS. LYDON:  Well, we haven't gotten to that part yet.

16          THE COURT:  I know it.  So that's the point.  So if

17  it's to show what Mr. Pooley knew, you don't have to show that

18  he knew several hundred pages of detail.  You have to show that

19  he knew -- you want to show that he knew something in this

20  manual?

21          MS. LYDON:  Um-hum.

22          THE COURT:  Why can't you just go to the part of the

23  manual that you want to show that he knew?

24          MS. LYDON:  I --

25          THE COURT:  See, what I would do if I were trying to

1   prove something like that is I would call a witness, and I

2   would say, Do you know what a -- an instructor such as

3   Mr. Pooley would have received and read in order to become

4   whatever he is?  And then you'd lay that foundation.  And then

5   you'd point out what it is in this that you want the jury to

6   know -- anyway, I don't care.

7       You make an eight-minute opening statement, and then you

8   have thousands -- literally thousands -- of paragraphs that you

9   want to put in.

10      And if there is no objection, why don't you just put in the

11  whole manual?  I don't want -- I don't want you to nitpick this

12  apart.  I'm trying to protect this jury.  It's not fair to

13  them.  Look at it.  Look at it.  It's not fair to them to send

14  this into the jury room without telling them why they have it.

15  What it is they're supposed to learn from this?  And I don't

16  know.  I don't have a clue.

17      Do you have an objection to the whole --

18          MS. CRAGER:  I do object, Your Honor.  I think most

19  of it is irrelevant.

20          THE COURT:  It's all irrelevant.  All of it is

21  irrelevant so far.  100 percent of it.  I don't see anything.

22  There is no foundation that Mr. Pooley ever saw this yet.

23          MS. LYDON:  I can lay additional foundation.  I'd be

24  happy to lay additional foundation, Your Honor.

25          THE COURT:  It's up to you.

1          MS. LYDON:  Yes.  We're just getting -- we're just

2     started.  We're about to get into the parts that are important.

3          THE COURT:  But right now you're offering things into

4     evidence where there is no showing as to why it's relevant and

5     for what purpose it's even offered.

6        You want to show Mr. Pooley knew something.  Okay.  What is

7     it you want to show he knew?

8          MS. LYDON:  It's sort of a question-by-question

9     process.  I can -- I will go through that with the witness.

10    But it goes to who is required to fill out the paperwork, that

11    examiners are required to check their own currentness --

12          THE COURT:  All right.

13          MS. LYDON:  -- before signing paperwork.

14          THE COURT:  You don't have to have a few thousand

15    pages in order to point that out.

16          MS. LYDON:  Right.  I'm going to go through page by

17    page because that's --

18          THE COURT:  I can see why it's 11 days if you're

19    going through it page by page.

20        Bring the jury back in.

21          MS. LYDON:  I think -- didn't they take a 15-minute

22    break?

23          THE COURT:  Okay.  We'll take the rest of the break.

24        (Recess taken, 10:14 a.m. - 10:24 a.m.)

25          THE COURT:  All right.  I think the time is up.  Is

 1    everybody ready for the jury to come back?

 2              MS. LYDON:  Yes, Your Honor.

 3              THE COURT:  All right.  Bring the jury back.

 4              MS. LYDON:  We've agreed on which pages should come

 5    in.  And I only have about five minutes on this.

 6              THE COURT:  All right.  Great.

 7              MS. LYDON:  Your Honor, outside the presence of the

 8    jury --

 9              THE COURT REPORTER:  I'm sorry.  Microphone, please.

10              MS. LYDON:  -- I've been informed that the defense

11    has objections to some of the next series of e-mails and

12    letters to Mr. Pooley that are coming in; so it may be fruitful

13    to address that outside the presence of the jury.

14              THE COURT:  All right.  Let's do it.

15              MS. LYDON:  The first one is a set -- the first set

16    is a set of letters and e-mails describing the USPA and UPT's

17    investigation of infractions that led to his retraining.

18              THE COURT:  Okay.  Are these --

19              MS. LYDON:  This is Exhibit -- starts with

20    Exhibit 85.

21              THE COURT:  85 to what?

22              MS. LYDON:  The only one for this particular

23    retraining is -- for this witness is 85.  And then it will go

24    into the 2015 suspension.

25         (Jury entering courtroom.)

```
 1                 THE COURT:  Apparently, we're still talking, ladies
 2     and gentlemen.
 3                 THE CLERK:  Sorry about that, Judge.
 4                 THE COURT:  No problem.
 5          (Jury exited courtroom.)
 6                 THE COURT:  What's the objection to Exhibit 85?
 7                 MS. CRAGER:  Exhibit 85 is an e-mail and a letter
 8     describing why the Parachute Association decided to revoke
 9     Mr. Pooley's rating in 2014.
10                 THE COURT:  All right.  Now, let me ask you a
11     question.  I heard the opening statement.  And I heard
12     Mr. Sharma say that Mr. Pooley was suspended for violating
13     basic safety requirements, and a red light went off in my head.
14     Because while it is relevant and important to show that he was
15     suspended, it is not relevant to show why, in my opinion.
16          So what would be the relevance to show why he was
17     suspended?
18                 MS. LYDON:  The specific correspondence around the
19     two suspensions at issue in this case demonstrates to
20     Mr. Pooley the way that the USPA investigates violations of
21     paperwork, violations of their rules.  It shows that on two
22     separate occasions, they went to candidates; they wrote these
23     multipage letters; and they took action, including revoking the
24     students who were improperly certified by his ratings.
25          And that knowledge, Your Honor, goes to Mr. Pooley's
```

1   knowledge.  The knowledge that when he improperly certified

2   students in the fraud in this case, when he submitted paperwork

3   that was signed by an examiner who was out of the country,

4   there was a very high likelihood that the USPA and UPT would do

5   just what they did in 2015 and 2014, and look into that, and

6   that those students -- the victims in this case -- wouldn't get

7   ratings at all just like the ones -- the ones --

8          THE COURT:  There is no doubt in anybody's mind

9   they're not going to get ratings.  You don't have to go through

10  all that, do you?  If he's not certified, isn't it very clear

11  from the evidence that you're going to present that the

12  students that he attempts to teach to become instructors are

13  not going to get their instructor certifications?

14         MS. LYDON:  No, Your Honor.  Because, just like the

15  defense said in their opening, Pooley hid it by using

16  Garmashov's signature.  His plan was a hope and a prayer that

17  the USPA and UPT wouldn't put two and two together and realize

18  that that signature was fraudulent.  And so these e-mails and

19  letters show that he was on notice that that was not a plan

20  likely to succeed.

21     It was not just, as Ms. McLoughlin said --

22         THE COURT:  I understand what you're saying.  Let me

23  look at these e-mails.

24         MS. CRAGER:  Your Honor, if I may respond?

25         THE COURT:  What?

1              MS. CRAGER:  If I may respond?

2              THE COURT:  All right.  What did you want to say?

3              MS. CRAGER:  Our position is that it's not relevant

4    why exactly he was suspended these other times.  What the

5    government appears to be saying is that the process by which

6    the Parachute Association would go about investigating is

7    relevant, but that doesn't make it relevant why exactly he was

8    suspended.

9        I will also say this first exhibit --

10             THE COURT:  Can we show -- can we allow the

11   government to show the process that they undertake without

12   talking about whether -- the reason for the suspension is one

13   thing or another?

14             MS. CRAGER:  I have no objection to that, Your Honor.

15             MS. LYDON:  We cannot do that, Your Honor.  It's

16   shown in this correspondence where they describe their detailed

17   investigation.

18             THE COURT:  I'm not going to allow it.

19             MS. LYDON:  That's --

20             THE COURT:  Then it's under Rule 403.  The probative

21   value that you have suggested, which arguably would be relevant

22   -- the prejudicial effect of showing that he was suspended for

23   safety reasons far outweighs the probative value.

24             MS. LYDON:  Let's look at maybe this particular

25   letter.  It looks -- it never says as far -- in a quick scan,

1    it doesn't say the word safety.

2              THE COURT:  That's why I asked you if we could do

3    this.  And you said no, you cannot separate the reasons why he

4    was suspended from the procedures that they undertook in that

5    proceeding.  And that's why -- that's why I said I wouldn't

6    allow it.  Now, if you can separate them, we can talk about

7    that.

8              MS. LYDON:  So this letter here describes the reasons

9    for the suspension, but it doesn't say the word safety.

10             THE COURT:  Well, okay.  The word safety --

11             MS. LYDON:  It says --

12             THE COURT:  Let me look at it and see what it does

13   say.

14             MS. CRAGER:  Your Honor, the BSRs that are referenced

15   in the letter, that's what I believe was referenced in opening

16   about the safety requirements.

17             MS. LYDON:  We don't have to define BSR.  What I'm

18   going to direct him to is the bottom of the first page, the

19   USPA investigated and --

20             THE COURT:  Well, look, I can't read the whole thing.

21      Ms. Crager, what is there about the contents of this letter

22   that you think is prejudicial that either refers to safety or

23   that the jury would infer it's referring to safety?

24             MS. CRAGER:  Well, the government said in opening

25   that he was revoked for safety reasons, and that is what that

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1  is.

2          THE COURT:  I wish they hadn't said that, but that's

3  now water under the bridge.

4      How do we keep this thing here from adding further

5  prejudice?

6          MS. CRAGER:  My -- my request would be that this

7  letter does not come in.  The fact that he was revoked and the

8  process by which he was told --

9          THE COURT:  But where is the evidence of the process?

10  Is that in the letter?

11          MS. LYDON:  Yes.  It says -- the bottom of the first

12  page -- that a representative notified him that one of his

13  instructor -- his tandem instructor students did not have three

14  years in the sport of skydiving at the time you qualified him

15  to be a tandem instructor, which is a requirement.  So he was

16  suspended.

17      It then says, Separate from this, around this time, you and

18  I have been working together to correct a number of

19  deficiencies in your documentation for your USPA students which

20  prejudiced several of your students in -- in your -- by

21  delaying the issuance of their licenses and ratings.

22      That shows -- the first paragraph I described shows that

23  they look into these paperwork violations.  And that paragraph

24  that I just read now shows that Mr. Pooley should know --

25          THE COURT:  That they --

1          MS. LYDON:  -- the consequence was they wouldn't get

2    their rating.  That it prejudiced students --

3          THE COURT:  So is there anything else in here that

4    talks about safety or you think the jury might draw an

5    inference that safety reasons were involved?

6          MS. CRAGER:  Yes, Your Honor.  It's talking about

7    people not having the requirements to safely skydive.

8          THE COURT:  But where does it say that?

9          MS. CRAGER:  The requirements in that last paragraph

10   she was talking about.

11         THE COURT:  It didn't say safety.  Did it say safety?

12         MS. CRAGER:  It did not say safety.  It just said

13   that he did not meet the requirements of having three years in

14   the sport.

15         THE COURT:  That doesn't talk about safety.

16         MS. CRAGER:  Yes.  My -- it does reference -- so

17   BSRs, in the paragraph under violation and offense, that is

18   defined in the manual.

19         THE COURT:  But unless we let the whole manual in,

20   they're not going to know that it has anything to do with

21   safety, are they?

22         MS. CRAGER:  I -- I think that will be discussed.

23         MS. LYDON:  We're not going to bring in the

24   definition of BSRs.  We can avoid that.

25         THE COURT:  All right.  With that understanding,

1    then, I'm inclined to allow this exhibit into evidence.

2              MS. CRAGER:  I think that this is still 403 because

3    the exact facts about what he did not do and what he did do in

4    the year 2014, that's not even the suspension to which he was

5    later training people.

6              THE COURT:  I don't know how you can undo the opening

7    statement either.  So they've already heard about safety.  I

8    don't know.

9              MS. CRAGER:  Well, we -- our position is, and has

10   been, that it is irrelevant why he was suspended.

11             THE COURT:  I think you're right.

12             MS. CRAGER:  But --

13             MS. LYDON:  But the process by which he's suspended,

14   the fact that USPA looks into it, all that stuff is relevant.

15             THE COURT:  You may be right as well.  So the

16   question is how can we allow evidence of the process that they

17   go through without allowing the evidence of the reasons why,

18   particularly the safety concerns.

19             MS. LYDON:  This letter, as Your Honor just observed,

20   doesn't mention it.

21             THE COURT:  It does.  You're right.  So we can -- I'm

22   inclined to allow this -- this into evidence.

23             MS. CRAGER:  I mean, this is exactly what the reason

24   was.  So saying that the reason is irrelevant -- I don't see

25   why a witness couldn't testify about what the process was that

1   they went through without going into exactly what the reason

2   was.

3            THE COURT:  Because they want to show that Mr. Pooley

4   was aware of the process.

5            MS. CRAGER:  Correct.  So --

6            THE COURT:  Okay.

7            MS. CRAGER:  -- couldn't the witness say that he was

8   advised about those, not to put in the letter?

9            THE COURT:  I don't know who would say that.  The

10  letter is what they want to use to prove it.

11           MS. LYDON:  Correct.

12           THE COURT:  Okay.  I'm going to allow the letter.

13      We'll talk later about how we undo the statement in the

14  opening statement, that the reason for the suspension was

15  violating basic safety requirements.  So we can talk about that

16  later.  That doesn't have anything to do with this.

17      Is there anything else before we bring the jury back in?

18           MS. LYDON:  There is a number of correspondence that

19  goes -- once we get to 2015, it's similar.  So there is another

20  letter, Exhibit 903; this is now the 2015 suspension, the one

21  at issue in this case.  This is putting him on notice of his

22  suspension.  And --

23           THE COURT:  Okay.  Is there anything in there,

24  Ms. Crager, that you think prejudices Mr. Pooley?

25           MS. LYDON:  Again, it doesn't discuss safety.

 1                    MS. CRAGER:  One moment.  I'd like to look at the

 2     letter.  903?

 3                    MS. LYDON:  Um-hum.

 4                    THE COURT:  You're losing valuable jury time to do

 5     this.  I'd like to bring them back in if we can --

 6                    MS. LYDON:  Well, this is important evidence for our

 7     case.  This is the core of it, really, that he's on notice of

 8     all these requirements and that he was on notice of his

 9     suspension.

10                    THE COURT:  Do you want to send the jury home until

11     this afternoon, then?

12                    MS. LYDON:  No, Your Honor.

13                    THE COURT:  If it's so important that we can't --

14                    MS. LYDON:  I don't want to have -- I think it would

15     be efficient to streamline through this.  And I can tell you

16     exactly why -- with the next two documents, why they're

17     relevant.

18                    THE COURT:  Which two documents?

19                    MS. LYDON:  903, it's just --

20                    THE COURT:  93, you say?

21                    MS. LYDON:  903.  This is the letter saying that they

22     were --

23                    THE COURT:  903?

24                    THE COURT REPORTER:  I'm sorry, Counsel.

25                    THE COURT:  I don't see an Exhibit 903.  I'm sorry.

1    We're on 80, right?  Okay.  903.  Okay.

2            MS. LYDON:  This will be a very quick hit.  This is

3    just his advisal that they are contemplating suspending his

4    examiner ratings in 2015.  Then it doesn't mention safety at

5    all.

6            MS. CRAGER:  Your Honor, our position is still that

7    the reasons for his suspension is irrelevant.

8            THE COURT:  Yes.  Absolutely.  Absolutely.  I don't

9    know what we're talking about.  I thought -- I intended to make

10   it clear that I -- I believe and agree with Ms. Crager that the

11   reasons for the suspension are irrelevant.  And to the extent

12   that they may be relevant, their probative value is outweighed

13   by the prejudicial effect.

14      I thought I also made it clear that I was inclined to agree

15   with Ms. Lydon that -- that the process by which they go

16   through the suspension and Mr. Pooley's knowledge of the -- of

17   the process is relevant.

18      And I thought what I was trying to say, unartfully, was

19   that if we could get the evidence of the process in without

20   going into the reasons for the suspension, I was going to allow

21   it.

22           MS. CRAGER:  Yes, Your Honor.  And I do have three

23   witnesses from the Parachute Association testifying.  I'm aware

24   -- I don't see why one of them couldn't explain what the

25   process was and that it was communicated to Mr. Pooley.

1             MS. LYDON:  Let's go document by document.  I think

2      we can -- we're almost finished with the ones that can cause --

3             THE COURT:  Every time you get to it, she says, I

4      still object to the reasons for the suspension.  And I'm trying

5      to figure out if there is something in any of these documents

6      that talk about the reason.  If you are just laying a trap for

7      me --

8             MS. LYDON:  I'm not, Your Honor.

9             THE COURT:  -- I'll take it.

10             MS. LYDON:  I'm not, Your Honor.  I'm trying to get

11      this --

12             THE COURT:  Then tell me --

13          Why don't we start with Ms. Crager.

14          What is there in any of these exhibits that you would like

15      to have stricken or that you would like to call to my attention

16      that you think might create an inference about the reasons for

17      the suspension?

18             MS. LYDON:  Let's go to 905.  I'll skip 903.

19             MS. CRAGER:  These -- these letters explain why he's

20      being suspended.  So all of the letters have --

21             THE COURT:  Tell me where they say that.

22             MS. LYDON:  905.  We're going to withdraw 903.  905.

23             MS. CRAGER:  I'm sorry.  I'd like to start talking

24      about 903 that we were just looking at.

25             MS. LYDON:  I just said we can not do 903.  So let's

1    spend our time on the one the government is still seeking to

2    admit, 905.

3              THE COURT:  They dropped 903.

4              MS. CRAGER:  Understood.

5              MS. LYDON:  This is the letter informing him of his

6    suspension at issue in this case.

7              THE COURT:  Okay.

8              MS. LYDON:  And I can go through the relevance of it.

9              THE COURT:  No.  It's relevant that he was suspended.

10             MS. LYDON:  Absolutely.  And he was advised of it via

11   this letter.

12             THE COURT:  I know.  Look --

13             MS. LYDON:  So now the specific words of it are also

14   relevant.  The first sentence describes the terms of the

15   suspension.  USPA Coach Examiner, USPA Tandem Instructor

16   Examiner rating for a period of one year beginning --

17             THE COURT REPORTER:  I'm sorry.

18             THE COURT:  Stop talking.  I can read faster than you

19   can say it.  So let me just read it.

20             MS. LYDON:  All right.  I'll describe, when you're

21   ready, the rest of the paragraph.

22        The second sentence --

23             THE COURT:  I'm -- I'm doing something.

24             MS. LYDON:  Okay.

25             THE COURT:  All right.  Now, the second paragraph

1    says, The decision to suspend your ratings was due to the

2    ongoing errors with candidate paperwork and violating safety

3    requirements by training members to conduct tandem jumps

4    without a tandem instructor rating or valid medical.

5        Now, you -- you take the position for the government that

6    the reason for the suspension somehow makes a difference in

7    what it tells Mr. Pooley about the process, right?

8               MS. LYDON:  Yes.

9               THE COURT:  Okay.  Tell me that.  Why does it -- if

10   the -- if the second paragraph was entirely out of that, what

11   would be the difference?

12              MS. LYDON:  Well, taking it in turn.  Due to the

13   ongoing errors with candidate paperwork -- he continued to

14   submit those Yuri Garmashov signed documents.  And he's going

15   to argue that he wasn't defrauding the candidates because he

16   thought USPA would issue those ratings.

17              THE COURT:  So if we struck everything after the word

18   "paperwork," what would be the difference?

19              MS. LYDON:  We could do that.  Everything after

20   "paperwork"?

21              THE COURT:  Right.

22              MS. LYDON:  That's agreeable.

23              THE COURT:  Okay.

24              MS. LYDON:  Should we move on?

25              THE COURT:  If that's agreeable.

1              That sounds pretty good to me, Ms. Crager.

2                    MS. CRAGER:  That's fine, Your Honor.

3                    THE COURT:  All right.

4                    MS. LYDON:  Then 911 is also -- that's probably our

5     most important piece of evidence in the trial.  And I don't see

6     any reason that that shouldn't come in.

7                    THE COURT:  911?

8                    MS. LYDON:  Yes.

9          Do you have an objection to 911, Ms. Crager?

10                   THE COURT:  Is there anything in this that refers to

11    safety?

12                   MS. CRAGER:  I don't believe so, from my memory, Your

13    Honor.  But I'd just like to take a look.

14                   THE COURT:  Then what is it that you wanted to talk

15    about?

16                   MS. CRAGER:  I didn't want to talk about this.  I

17    think Ms. Lydon is just advising she intends to admit this.

18                   THE COURT:  She's saying she wants to admit it.  The

19    only reason I would talk about it is if you don't want her to

20    admit it.

21                   MS. CRAGER:  Correct.  I don't think I have an

22    objection to this one.

23                   THE COURT:  Okay.  Let's not take any more time with

24    this one, then.

25                   MS. LYDON:  Okay.  912, which is a Pooley letter

1  appealing his suspension, showing he knew about it, he took it

2  seriously, this mattered to him.

3          THE COURT:  Is there anything here that you think

4  would prejudice Mr. Pooley?

5          MS. CRAGER:  I'm sorry.  Which?

6          MS. LYDON:  912.

7          MS. CRAGER:  This goes into the reasons for the

8  suspension.  It's his --

9          THE COURT:  Where does it go into --

10          MS. CRAGER:  I'm sorry.  On the -- so the e-mail is

11  the first page, which attached is a letter talking about the

12  reasons for the suspension and the details.

13          THE COURT:  Okay.  So what about that, Ms. Lydon?

14          MS. LYDON:  Is Ms. Crager suggesting a specific

15  redaction?

16          THE COURT:  I haven't read the whole thing, but it

17  says the reason; so I assume there may be some discussion about

18  the reasons here.

19          MS. LYDON:  We could redact paragraph 2.

20          MS. CRAGER:  Well, the entire letter is about the

21  reasons, and we believe that the reasons are irrelevant.

22          THE COURT:  That's the reason for the appeal, not the

23  reason for the suspension.

24          MS. CRAGER:  Sure.  But the reasons for the appeal

25  are the reasons he's contesting the reasons for the suspension.

1          THE COURT:  Maybe.  Maybe not.

2          MS. CRAGER:  Those are the reasons for the

3    suspension, and he discusses each of them at length.

4          THE COURT:  So why do we even need to know the

5    reasons for the appeal?  Is it the fact that he took an appeal?

6    Is that what you --

7          MS. CRAGER:  We have no objection to that fact.

8          THE COURT:  All right.  So, Ms. Lydon, if we just

9    struck, The reasons for the appeal are as follows, and then

10   everything after that, is that all right?

11         MS. CRAGER:  We would also like to strike the

12   previous paragraph starting, The reasons for the suspension due

13   to ongoing errors and violating safety requirements --

14         THE COURT:  Right.  Right.  Absolutely.

15     What are you trying to prove with this, that he took an

16   appeal?

17         MS. LYDON:  And took it very seriously.  This is not

18   something he thought was just a silly requirement, it didn't

19   matter.  The fact that he was suspended was a big deal to him.

20         MS. CRAGER:  We have no objection to just the first

21   paragraph of the letter.

22         THE COURT:  Let's just go to the first paragraph,

23   then.

24         MS. LYDON:  And redacting the entire rest of the

25   letter?

 1          THE COURT:  Right.  Because all it does is set out

 2    the reasons for the appeal.  And maybe the last paragraph.  Let

 3    me look at the last paragraph.

 4        For the reasons stated above, as well as my excellent

 5    reputation within the skydiving community and my years of loyal

 6    service to the USPA, I request disciplinary action suspending

 7    my USPA Coach Examiner and Tandem Instructor Examiner ratings

 8    be reconsidered.

 9          MS. LYDON:  Okay.  I'm fine with that.  Keeping the

10    first paragraph, keeping the last paragraph.

11          THE COURT:  Okay.

12          MS. CRAGER:  No objection.

13          THE COURT:  All right.  That's what we'll do.

14        Now, is that it?

15          MS. LYDON:  No.  Because 916 --

16          THE COURT:  Look, I told you I don't want to have the

17    jury sitting there.  Since the time I said that, we've had

18    several minutes of discussion, all of which -- 100 percent of

19    which has resulted in the two of you coming to an agreement.

20        So we have to sit there with that jury, all those people

21    that came here to hear this trial, sitting in there, twiddling

22    their thumbs while you come to agreements on things that you

23    could have agreed on some other time.  I'm not going to do it

24    anymore.  If we have to talk about this now, I'm going to send

25    the jury home until after lunch, and we can talk about it.

 1          What do you want to do?  Do you want to bring them back?

 2   Do you want to agree, or do you want me to send them home until

 3   after lunch?

 4          MS. CRAGER:  We'd like to move on with the jury, Your

 5   Honor.  And if there is an objection, we'll make an objection

 6   in the moment.

 7          THE COURT:  Well, the next question there will

 8   probably be an objection and we'll send the jury back out

 9   again.

10      All right.  Bring the jury in.

11      So far, what we've agreed upon is that -- I'm not going to

12   try to summarize it.  But we've redacted exhibit -- certain

13   exhibits.  And when we get to those, I would hope that you

14   would redact them suitably so that the jury can't read through

15   what you've done --

16          MS. LYDON:  We're working on it.

17          THE COURT:  -- before you show them to the jury.

18          MS. LYDON:  We're working on doing that.  The

19   government did already redact a number of exhibits.  But -- we

20   didn't realize the --

21          THE COURT:  Bring the jury in.

22          MS. LYDON:  -- this intense of a sentence-by-sentence

23   objection.

24      (Jury present, 10:53 a.m.)

25          THE COURT:  All right.  The jurors are all present.

1    Defendant is still present with counsel.

2         I'm sorry, ladies and gentlemen, but I do believe that the

3    time that we take outside of your presence to go over some of

4    these legal matters ultimately results in saving you some time.

5         I think I told you yesterday that the evidence from which

6    you have to decide what the facts are consists of not only the

7    sworn testimony of the witnesses but any exhibits that are

8    received in evidence.

9         And so when the lawyers offer an exhibit into evidence, I

10   have to be careful that we don't receive something that you

11   shouldn't receive or that we do receive everything that you

12   should, because at the end of the trial, when you're

13   deliberating on your verdict, you will have all the documents

14   that are received in evidence in the room with you.  And so I

15   don't want to let something come in that's just going to do

16   nothing but confuse you, which is literally thousands of pages.

17        So what I tried to get the lawyers to do is to tell me

18   exactly which pages, which parts they really want you to see so

19   when you get into the jury room at the end of the trial, you

20   are looking at the relevant evidence and not just a lot of

21   papers.

22        So I think we went a long way toward that.  And they're

23   going to hopefully tell us now exactly which pages and which

24   parts of pages they really want you to see.  And then I'll rule

25   upon whether those can be received in evidence.  And if they

1    are, they'll be evidence in the case.

2         So I hope we've saved you some time.  But I don't like the

3    fact that we bring you all the way into court here and then

4    just have you sit in a room while lawyers argue with the judge.

5    I'm trying to avoid that as much as I can.

6         All right.  So let's proceed.

7              MS. LYDON:  All right.  Thank you.

8    Q.  BY MS. LYDON:  Mr. Crouch, welcome back.

9    A.  Thanks.

10   Q.  We're going to zip through this manual.

11   A.  Okay.

12   Q.  I want to ask you about a couple provisions.  But first,

13   what -- were tandem examiners allowed to have people help them

14   with the courses?

15   A.  Yes.

16   Q.  What were those people called?

17   A.  Evaluators.

18   Q.  Okay.  Whose final responsibility was it to sign off that a

19   tandem instructor candidate had learned all the things they

20   needed to know to jump out of that plane with a customer?

21   A.  It was the examiner that managed the entire course, along

22   with the evaluators.

23   Q.  Okay.

24              MS. LYDON:  Move to admit page 126.

25              THE COURT:  Of Exhibit 80?

1              MS. LYDON:  Yes.

2              MS. CRAGER:  No objection, Your Honor.

3              THE COURT:  Page 126 of Exhibit 80 is received in

4    evidence.

5         (GOVERNMENT'S EXHIBIT 80, PAGE 126 ADMITTED INTO EVIDENCE.)

6              MS. LYDON:  Thank you.  Please publish.

7    Q.  BY MS. LYDON:  All right.  Does this section at the top of

8    page 180, Evaluators are appointed by the instructor

9    examiner --

10             THE COURT:  You mean 126?  You said 180.

11             MS. LYDON:  I'm sorry.  Of Exhibit 80, page 126.

12             THE COURT:  Yes.

13   Q.  BY MS. LYDON:  Does it describe that, Evaluators are

14   supervised by the instructor examiner who is responsible for

15   all evaluations?

16   A.  That's correct.

17   Q.  All right.  And then if we could zoom out of there.

18        And does the manual also state, at Subsection H, that in

19   order to become an instructor examiner, they have to administer

20   a course under the supervision of a current, appropriately

21   rated instructor examiner?

22        Is that right?

23   A.  That's correct.

24   Q.  Did USPA care about the currency -- the current rating

25   status of instructor examiners who taught courses?

1   A.  Yes.

2   Q.  Okay.

3           MS. LYDON:  Can we move to admit page 128?

4           THE COURT:  Any objection?

5           MS. CRAGER:  No objection, Your Honor.

6           THE COURT:  Exhibit 80, page 128 is received in

7   evidence.

8       (GOVERNMENT'S EXHIBIT 80, PAGE 128 ADMITTED INTO EVIDENCE.)

9           MS. LYDON:  Thank you.

10  Q.  BY MS. LYDON:  If we look at Subsection 5 on Commencement

11  of Privileges, does this section describe when the privileges

12  of an instructional rating commenced?

13  A.  Yes.

14  Q.  With respect to a tandem instructor rating, did the

15  privileges to be a tandem instructor commence upon successful

16  completion of the rating course?

17  A.  Yes.

18  Q.  And after that, were they valid for 30 days with a

19  candidate logbook endorsement by the instructor examiner?

20  A.  Yes.

21  Q.  So after that endorsement by the instructor examiner, were

22  the tandem instructor candidates able to jump with the

23  public -- I'm sorry -- to conduct jumps?

24  A.  Yes.

25  Q.  And after those ten jumps that you described at the

1    beginning of this examination, were they able to jump with the

2    public?

3    A.  Yes.

4    Q.  The conferring of the ability to jump as a

5    parachutist-in-command only applies upon the actual signature

6    of the examiner; is that what that's saying?

7              MS. CRAGER:  Objection.  Leading.

8              THE WITNESS:  That's correct.

9              THE COURT:  Sustained.  Sustained.

10        Re-ask the question in a different form.

11   Q.  BY MS. LYDON:  If the examiner wasn't actually currently

12   certified, did they have any ability to sign tandem instructor

13   forms certifying students?

14   A.  No.  If they weren't currently, they couldn't.

15   Q.  Okay.  Moving on to the provisions of the course that

16   applied to instructor examiners.  Could we look at --

17             MS. LYDON:  Move to admit Exhibits [sic] 165 through

18   166.

19             MS. CRAGER:  No objection, Your Honor.

20             THE COURT:  165 through 166 of Exhibit 80?

21             MS. LYDON:  Um-hum.

22             THE COURT:  Those pages are received in evidence.

23        (GOVERNMENT'S EXHIBIT 80, PAGES 165-166 ADMITTED INTO

24   EVIDENCE.)

25             MS. LYDON:  Could we publish 165, please.

1   Q.  BY MS. LYDON:  Does the manual state that an instructor

2   examiner is the highest of the three instructional ratings?

3   A.  Yes.

4   Q.  All right.  And moving on to 167 --

5           MS. LYDON:  Can we move to admit 167, if it hasn't

6   been.

7           MS. CRAGER:  I believe it was admitted.

8           MS. LYDON:  Could we publish 167, please.

9           THE COURT:  Do you want to offer 167?

10          MS. LYDON:  We're in agreement it's already been

11  admitted.

12          THE COURT:  You say it's been admitted?

13          MS. CRAGER:  We have no objection to 167.

14          THE COURT:  All right.  Hasn't been admitted yet.

15      There is no objection now; so Exhibit 80, page 167 is

16  received in evidence.

17      (GOVERNMENT'S EXHIBIT 80, PAGE 167 ADMITTED INTO EVIDENCE.)

18          MS. LYDON:  Publish.  All right.

19  Q.  BY MS. LYDON:  Does Subsection G deal with the requirements

20  of keeping a USPA instructor examiner rating current?

21  A.  Yes.

22  Q.  And was there an annual renewal provision?

23  A.  Yes.

24  Q.  And there is a number of specific requirements basically,

25  it wasn't -- if you get an instructor examiner, were you an

1    instructor examiner forever?

2    A.  No.

3    Q.  Okay.  Did you have to satisfy requirements of the USPA?

4    A.  Yes.  You had to meet certain requirements to renew the

5    rating.

6    Q.  All right.

7          MS. LYDON:  Move to admit pages 193, 194 of this

8    document.

9          MS. CRAGER:  No objection.

10          THE COURT:  Exhibit 80?

11          MS. LYDON:  Yes.

12          THE COURT:  Pages 193 and 194 are received in

13    evidence.

14      (GOVERNMENT'S EXHIBIT 80, PAGES 193-194 ADMITTED INTO

15    EVIDENCE.)

16    Q.  BY MS. LYDON:  And does that section, Mr. Crouch, deal with

17    the instructor examiner responsibilities?

18    A.  Yes.

19    Q.  Can we look at 194, please.

20      Does the course records responsibilities of the instructor

21    examiner include a requirement that the candidate obtain

22    original proficiency cards or a copy for their own personal

23    records?

24    A.  Yes.

25    Q.  And was the instructor examiner also required to maintain

1    those records?

2    A.   Yes.

3    Q.   All right.  Did USPA make -- eventually change its

4    processes and require examiners like Mr. Pooley to submit --

5              MS. CRAGER:  Objection.  Leading.

6    Q.   -- candidate forms?

7              THE COURT:  What's your objection?

8              MS. CRAGER:  I'm sorry.  Objection.  Leading.

9              THE COURT:  Sustained.

10   Q.   BY MS. LYDON:  What were, in the 2015/2016 era, USPA's

11   requirements with respect to who should submit the tandem

12   instructor forms?

13   A.   They could be submitted by the candidate themselves or the

14   examiner.

15   Q.   Okay.

16             MS. LYDON:  Move to admit page 320 of this document.

17             THE COURT:  Any objection?

18             MS. LYDON:  I'm sorry.  327.

19             THE COURT:  327?

20             MS. LYDON:  Which is a Tandem Instructor Rating

21   Course Proficiency Card.  It is blank.

22             THE COURT:  Not 320?  You're offering 327?

23             MS. LYDON:  327.

24             THE COURT:  Any objection?

25             MS. CRAGER:  No objection, Your Honor.

1          MS. LYDON:  And it goes into 328.

2          THE COURT:  All right.  Exhibit 80, pages 327 to 328

3  are received in evidence.

4     (GOVERNMENT'S EXHIBIT 80, PAGES 327-238 ADMITTED INTO

5  EVIDENCE.)

6  Q.  BY MS. LYDON:  All right.  Do you recognize the document in

7  front of you, Tandem Instructor Rating Course Proficiency Card?

8  A.  Yes.

9  Q.  What is it?

10  A.  That's the card that's used to track all the requirements

11  are done in the course.  It's sort of like a checklist to just

12  make sure all the materials are covered and that the training

13  is covered and signed for the specific requirements for the

14  rating.

15  Q.  Is -- the top right section here, Verifying Officials, does

16  it state that -- what you just said, that this is supposed to

17  record the candidate's requirements and that the level of

18  official verification is indicated with each requirement, each

19  of the undersigned certifies that he or she has personally

20  verified those qualifications listed?

21  A.  Yes.

22  Q.  Zooming out, are there a series of things that should be

23  done prior to arrival at the course?

24  A.  Yes.

25  Q.  All right.  And can those be done by the candidate,

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    verified by people other than their actual examiner?

2    A.  Yes.

3    Q.  Moving to the second page, 328.

4        There are certain things that can be verified by -- like at

5    the top left, a supervising USPA tandem instructor -- is that

6    right? -- someone other than the examiner?

7    A.  That's correct.

8    Q.  All right.  But other things, like item 9, who needs to

9    verify item 9?

10   A.  The course examiner needs to verify that with the logbook.

11   Q.  Okay.  So although there are jumps that need to be done

12   prior to the course starting, is the examiner supposed to check

13   whether they have been done?

14   A.  Yes.

15   Q.  Okay.  Moving on to the next section at the USPA instructor

16   rating course -- we don't have to blow it up, actually, just

17   yet -- are there a number of things that need to be signed off

18   by the examiner in particular --

19   A.  Yes.

20   Q.  -- indicated in bold?  Okay.

21       There are also some items that can be signed off by

22   examiners -- sorry -- evaluators?

23   A.  Yes.

24   Q.  Okay.  This rating recommendation section, does it state, I

25   have personally examined and recommend this applicant for the

1  USPA tandem instructor rating.  He or she has demonstrated the

2  ability to train and jump with tandem students and to train and

3  supervise non-method-specific students for the USPA license?

4  A.  Yes.

5  Q.  It includes a requirement at the bottom there that the

6  tandem instructor examiner include their name, member number,

7  and signature.

8      Why is that?

9  A.  Because, basically, he or she is verifying that everything

10  has been done and it's got my authority to issue the rating.

11  Q.  Does USPA verify that signature?

12  A.  Yes.

13  Q.  And the very bottom box on the right of the page, it

14  includes a checklist for the course examiner verification and

15  indicates, in parentheses, Examiners, please verify the

16  following.

17      Is that right?

18  A.  That's correct.

19  Q.  And the very first item is the examiner membership and

20  their own rating expiration date; is that right?

21  A.  That's correct.

22  Q.  Okay.  We are finished with this manual.  Now let's move on

23  to your interactions with Mr. Pooley.

24      Do you recall that Pooley went through a disciplinary and

25  retraining process in 2014?

1    A.   Yes.

2    Q.   Were you copied on some of the correspondence with Pooley

3    pertaining to that?

4    A.   Yes.

5    Q.   Okay.

6             MS. LYDON:   Move to admit Government's Exhibit 85.   I

7    believe that is one that will have no redaction.   The defense

8    can correct me if they have an objection to that.

9             THE COURT:   We talked about 85.   Let me get that.

10   Hold on a second.

11       What did we agree on 85, Ms. Crager?   Do you recall?

12            MS. LYDON:   I recall you indicated this one comes in.

13            MS. CRAGER:   We do have an objection to the relevance

14   of the information.

15            MS. LYDON:   But --

16            THE COURT:   But with --

17            MS. CRAGER:   I don't believe we agreed on a

18   particular redaction.

19            THE COURT:   Well, we talked about a lot of these, and

20   I want to make sure I don't get the exhibits mixed up.   So let

21   me just take a minute.

22       I, quite frankly -- go on to something else.   I'm not

23   recalling what we said about this one.   So we'll skip that one

24   for now and go on to the next one.

25            MS. LYDON:   All right.

1    Q.   BY MS. LYDON:   Without discussing the particular document

2    at this time, do you recall whether USPA conducted an

3    investigation before deciding on the 2014 suspension?

4    A.   I believe it was before 2014, yeah, there was.

5    Q.   In 2014, do you recall that USPA notified Mr. Pooley

6    regarding the suspension?

7    A.   Yes.

8    Q.   And did -- do you recall whether USPA explained its

9    investigation to Mr. Pooley?

10   A.   Yes.

11   Q.   And did it explain -- without saying why, did it explain to

12   Mr. Pooley why it was suspending him?

13   A.   Yes.

14   Q.   Did it do so in some detail over the course of several

15   pages?

16   A.   Yes.

17   Q.   Now let's move on to 2015, the suspension most at issue in

18   this case.

19          MS. LYDON:   Move to admit Government's Exhibit 905,

20   subject to the redactions discussed with the Court.

21          THE COURT:   With that qualification, any objection?

22          MS. CRAGER:   One moment.

23      No objection.

24          THE COURT:   Exhibit 905 is received in evidence.

25          MS. CRAGER:   With the redaction, I assume.

1              THE COURT:  Correct.

2         (GOVERNMENT'S EXHIBIT 905 ADMITTED INTO EVIDENCE.)

3    Q.  BY MS. LYDON:  All right.  This communication is dated

4    Friday, August 7th, from someone named Ray Lallo.

5         Who is he?

6    A.  Ray Lallo, he was the secretary of the -- secretary of the

7    association -- secretary of the executive committee for the

8    board of directors of the association.

9    Q.  Who is it e-mailed to?

10   A.  Who did -- I'm sorry?

11   Q.  Who did he send it to?

12   A.  To -- sent it to Rob Pooley, to me, and to the president of

13   the association, Sherry Butcher.

14   Q.  All right.  Let's move on to the body of the letter.

15        All right.  And Mr. Lallo advises, Dear, Mr. Pooley, it is

16   my duty, as the secretary of USPA --

17             MS. CRAGER:  Your Honor, the document speaks for

18   itself.

19             THE COURT:  It's in evidence.  Anybody can read from

20   it.

21        Go ahead.

22   Q.  BY MS. LYDON:  All right.  Does he inform Pooley of the

23   decision to suspend his coach examiner and USPA tandem

24   instructor rating for a period of one year beginning July 26,

25   2015?

1  A.  Yes.

2  Q.  Does it say what is required after the year suspension if

3  Pooley wants to get his rating back -- his examiner rating?

4  A.  Yes.

5  Q.  Okay.  So was it automatic the rating be reinstated, or did

6  Mr. Pooley have to do something after July 26, 2016?

7  A.  No.  He would need to take steps to get it back.  It

8  wouldn't be automatic.

9  Q.  All right.  And does it provide, in that final paragraph, a

10 process for Pooley to appeal?

11 A.  Yes.

12 Q.  Okay.  Let's turn to 911.

13      MS. LYDON:  Move to admit 911, which the Court ruled

14 in recess comes in.

15      THE COURT:  Right.  With the understanding --

16      MS. CRAGER:  No objection, Your Honor.

17      THE COURT:  Exhibit 911 is received in evidence.

18  (GOVERNMENT'S EXHIBIT 911 ADMITTED INTO EVIDENCE.)

19 Q.  BY MS. LYDON:  Okay.  Did you, Mr. Crouch, have a specific

20 e-mail communication with Mr. Pooley to ensure he understood

21 the terms of the suspension?

22 A.  Yes.

23 Q.  Okay.  We're going to go through those communications.

24      It starts -- the e-mail chain starts out with an e-mail

25 from you on 911, page 4.  You advise -- can we -- we don't

1     actually have to look at that one.

2          But basically, did you advise him that you weren't going

3     to -- because he was suspended, USPA wasn't going to charge his

4     credit card for the next year?

5     A.   Yes.   That's correct.

6     Q.   All right.   Then did Mr. Pooley respond to you?

7          Let's look at page 911-002.   We'll start with this e-mail

8     from Pooley to you on Monday, August 10th.   It starts with,

9     Thank you, Jim.   And then goes over to the next page.

10         Let's look at 911-003.

11         Did Mr. Pooley advise that the fee still needs to be paid

12    because he's already brought in another instructor examiner to

13    sign off on ratings?

14    A.   Yes.

15    Q.   And did he indicate in the next paragraph that he intends

16    to appeal?

17    A.   Yes.

18    Q.   And he's hired an attorney?

19    A.   Yes.

20    Q.   Moving on to the 911-002.

21         Did you respond to him, advising the process for the

22    appeal?

23    A.   Yes.

24    Q.   And inquiring, Who is the examiner you mentioned below that

25    will be using the fee to run courses at Lodi?

1   A.   Yes.

2   Q.   In the top e-mail on this page, does Mr. Pooley respond to

3   you, indicating that he's talked to several examiners?

4   A.   Yes.

5   Q.   And that Yuri Garmashov will be our primary instructor

6   examiner for now?

7   A.   Yes.

8   Q.   Now, moving to the first page of 911, on Friday,

9   August 28th, did you indicate that you got a call from a

10  candidate who was worried his ratings would not be processed;

11  he did not give a name; it sounded like he was currently in a

12  coach course with you from what he described -- I just wanted

13  to make sure that you understood that the suspension applies to

14  both coach and tandem courses?

15  A.   Yes.

16  Q.   You told him his instructional ratings are still in place?

17  A.   Yes.

18  Q.   And what did that enable him to do?

19  A.   To jump as an evaluator in the courses.

20  Q.   Okay.  And did you tell him, But the courses must be run

21  completely by other examiners from start to finish?

22  A.   Yes.

23            THE COURT:  So what's an evaluator?  We talked about

24  instructors and examiners.  What is an evaluator?

25            THE WITNESS:  An evaluator jumps with the candidates

1    in the courses.  So he could --

2              THE COURT:  Is that different than an instructor?

3              THE WITNESS:  Yes.

4              THE COURT:  You can go into that, if you want.

5              MS. LYDON:  Sure.

6    Q.  BY MS. LYDON:  So who runs the courses?  Who is in charge?

7    A.  The examiner runs the whole course as the director of the

8    whole thing, in charge of the whole course.

9    Q.  Does the USPA require the examiner be physically present

10   throughout the course --

11   A.  Yes.

12   Q.  -- or may he be offsite?

13   A.  No.  Physically present.

14   Q.  Okay.  What does the physical presence requirement mean in

15   the context of a tandem course?

16   A.  On the airport property and ensuring that the course is

17   running, that he's -- that the -- besides the ground training,

18   he's also supervising evaluators who are helping with the

19   course.  So they're acting as simulated students on these

20   evaluation jumps.

21   Q.  The evaluators are acting as simulated students?

22   A.  Yes.

23   Q.  Okay.  So the examiner -- to sum up your testimony -- let

24   me know if I have this right -- the examiner must be physically

25   present and supervising; is that right?

1   A.  Yes.

2   Q.  But he or she can ask other trusted persons to help with

3   the course?

4   A.  Yes.

5   Q.  Are they known as evaluators?

6   A.  They're the evaluators, yeah.

7   Q.  Okay.  So your e-mail left off with, But the -- or that

8   first paragraph left off with, But the courses must be run

9   completely by other examiners start to finish.

10      Did Mr. Pooley respond to you?

11  A.  Yes.

12  Q.  And did he explicitly confirm, I understand the terms of

13  the suspension?

14  A.  Yes.

15  Q.  I am still helping with the courses, but I know they need

16  to be run by another instructor examiner?

17  A.  Yes.

18  Q.  Okay.  And he indicates he does plan to do an appeal?

19  A.  Yes.

20          MS. LYDON:  Move to admit Government 912, subject --

21  with the redactions discussed with the Court.

22          THE COURT:  With that understanding, any objection?

23          MS. CRAGER:  No objection, Your Honor.

24          THE COURT:  All right.  Exhibit 912, as redacted, is

25  received in evidence.

1          (GOVERNMENT'S EXHIBIT 912 ADMITTED INTO EVIDENCE.)

2     Q.  BY MS. LYDON:  All right.  Did Mr. Pooley appeal?

3     A.  Yes.

4     Q.  Let's move to the second page of this document with the

5     redaction.

6          All right.  He advises he is appealing.  His formal request

7     for an appeal.  You can scroll to the next -- all the way down

8     to the next page.

9          Was it a fairly thorough appeal?

10    A.  The --

11             MS. CRAGER:  Objection.  Vague.

12    Q.  BY MS. LYDON:  Did it appear to you that Mr. Pooley was

13    taking his suspension seriously?

14             MS. CRAGER:  Objection.  Relevance.

15             THE COURT:  Overruled.

16    Q.  BY MS. LYDON:  Did it appear to you that he was --

17    A.  Yes.

18    Q.  -- taking his suspension seriously?

19    A.  Yes.

20    Q.  It mattered -- did it appear to you from this letter that

21    it mattered to him?

22    A.  Yes.

23             MS. CRAGER:  Objection.  Foundation.

24             THE COURT:  Well, I let the first one in -- he's

25    taking it seriously.  "That it mattered" is a little vague.  I

1    don't know what that -- if that's any different than taking it

2    seriously or not, but if it is, it may be -- it may be vague.

3    So I'm going to sustain the objection to that question.

4        If there is something else you're trying to ask him about,

5    you can rephrase the question.

6            MS. LYDON:  Without getting in the substance of the

7    e-mail, I'm trying to convey what Mr. Pooley conveyed to USPA.

8            THE COURT:  I thought you did when you asked him if

9    he took -- if he sounded like he took it seriously.  That's

10   what I thought you were trying to convey.

11           MS. LYDON:  That's sufficient.

12           THE COURT:  Let me explain something else to the

13   jury.

14       You've heard a couple of references to something being

15   redacted.  I'm trying to make it simpler on you, and that's why

16   all of these pages that you've heard us talking about are not

17   coming into evidence.  They're not going to help you, in any

18   way, arrive at your decision as jurors.

19       Likewise, within some documents, there may be things that

20   are just not going to help you; they're going to confuse you,

21   and they're not necessary for you to know or understand or have

22   anything to do with in reaching your verdict in the case.  So

23   those may be redacted.  And you're not to speculate as to why

24   something might have been redacted.  There are always good

25   reasons for it.

1    Q.  BY MS. LYDON:  Did Mr. Pooley ever get his ratings back?

2    A.  No.

3    Q.  I think we're -- without going into any documents on this

4    -- and please answer this yes or no -- did USPA eventually

5    discover that a tandem instructor named YongHyeon Kwon had been

6    conducting tandem jumps without ratings?

7    A.  Yes.

8    Q.  Did USPA then investigate Mr. Pooley more broadly?

9    A.  Yes.

10   Q.  In response to what it learned, did USPA put in place a

11   retraining requirement with respect to certain students?

12   A.  Yes.

13   Q.  Did the students who needed to be retrained need to pay for

14   a new -- retraining courses themselves?

15   A.  Yes.

16   Q.  All right.  One last topic.  And this is just foundation

17   for a document that will come in later.

18       In connection with what we just discussed, did you

19   personally look for records of students trained by Pooley

20   and/or Garmashov?

21   A.  Yes.

22   Q.  Did you find records -- some records?

23   A.  Yes.

24   Q.  Did you find records that had been sent by Pooley to Susan

25   Sullivan?

1  A.  By Pooley what?  I'm sorry.

2  Q.  To Susan Sullivan.

3  A.  Yes.

4  Q.  Who is Susan Sullivan?

5  A.  Susan Sullivan was my assistant in the department.  She

6  processed all rating and license applications.

7  Q.  What was her title?

8  A.  Her title was license and rating coordinator.

9  Q.  All right.  Where was she based geographically?

10  A.  In Virginia.

11  Q.  Did you work with her frequently?

12  A.  Yes.  Every day.  Every weekday.

13  Q.  Did she regularly receive tandem proficiency cards?

14  A.  Did she regularly -- I'm sorry.  I'm a little deaf.

15  Q.  Did she, as a regular practice, receive tandem proficiency

16  cards sent by examiners?

17  A.  Oh, yes.

18  Q.  Was that a regular practice of USPA, to receive such

19  documents?

20  A.  Yes.

21  Q.  When Ms. Sullivan received those documents from examiners,

22  did she make a record of the fact that she received it?

23  A.  Yes.

24  Q.  What did she do to make that record?

25  A.  She would -- the records would be batched into -- they were

1    called batch files.  So they'd be processed, put in batch

2    files, and then stored in the document room.

3    Q.  Okay.  Was that process of printing batched files and

4    storing them in the document room a regular practice of USPA?

5    A.  Yes.

6    Q.  Did the document room have a nickname?

7    A.  I think they call it the dungeon.

8    Q.  Were they stored in roughly chronological order?

9          MS. CRAGER:  Objection.  Leading.

10         THE COURT:  Overruled.

11         THE WITNESS:  Yeah.  Everything was stored in -- by

12   date -- by month and year -- by each day of the month.

13   Q.  BY MS. LYDON:  Did USPA make a record of the e-mail

14   communication to Susan Sullivan as well?

15   A.  Yes.

16   Q.  And were the -- the e-mails and the cards, were they stored

17   together or separately?

18   A.  Little of both.  Usually separately.  The e-mail would be

19   in electronic archive unless there was something that needed to

20   be noted with the rating paperwork, and then it would be

21   attached with the -- with the physical paperwork.

22   Q.  In your review, did you find tandem instructor cards that

23   were stapled together with the e-mails and the cards stored in

24   the same place?

25   A.  Yes.

1    Q.  Was that done as a regular practice?

2    A.  Yes.

3    Q.  Did USPA rely on the records stored in the dungeon

4    regularly?

5    A.  Did USPA do what?

6    Q.  Rely on those records?

7    A.  Oh, yes.

8              MS. LYDON:  Nothing further.  Thank you, Mr. Crouch.

9              THE COURT:  All right.  Ms. Crager, you may

10   cross-examine.

11             MS. CRAGER:  Thank you, Your Honor.

12                          CROSS-EXAMINATION

13   BY MS. CRAGER:

14   Q.  Good morning, Mr. Crouch.

15   A.  Good morning.

16   Q.  Mr. Crouch, in August and September of 2016, you were

17   looking into paperwork for candidates trained by Rob Pooley and

18   Yuri Garmashov?

19   A.  August 2013?

20   Q.  I'm sorry.  2016.

21   A.  2016.  Yes.

22   Q.  You were trying to determine which people were trained by

23   Yuri and which were actually trained by Rob Pooley with Yuri

24   signing off?

25             MS. LYDON:  Objection.  Outside the scope.

 1                THE COURT:  Well, except with the mention of this

 2     last name -- who did you say --

 3                MS. CRAGER:  Yuri Garmashov is the person --

 4                THE COURT:  I know, but did you mention somebody

 5     else?

 6                MS. CRAGER:  Rob Pooley as well.

 7                THE COURT:  I thought you mentioned a third person.

 8         No.  Overruled.

 9     Q.  BY MS. CRAGER:  Is that what you were trying to determine?

10     A.  In some cases.  I mean, in some, it was obvious, but

11     others, it -- it was -- it took a little determination, yeah.

12     Q.  And you were trying to determine this because the Parachute

13     Association only wanted to issue ratings to people who were

14     properly trained with an actual examiner?

15     A.  That's -- I mean, that's not why I was looking through

16     those records.

17     Q.  Let me rephrase that.

18         Is that one of the things that you were trying to

19     determine?

20     A.  If somebody was -- trying to determine who needed

21     retraining.

22     Q.  Sure.  And a person who would need retraining is a person

23     who was trained by Rob Pooley when Yuri Garmashov was not

24     there?

25     A.  Correct.  Or also, we determined to retrain everyone that

1   had been trained by Rob Pooley with his signature -- not full

2   retraining but partial retraining.

3   Q.   I understand.   But the people who needed full retraining

4   were the people who had been trained by Rob Pooley when Yuri

5   Garmashov wasn't there?

6   A.   Not entirely.

7   Q.   Not entirely.

8        That was one -- one of the categories of people you were

9   looking for?

10  A.   Correct.

11  Q.   Your understanding was Yuri Garmashov was a valid examiner?

12  A.   Correct.

13  Q.   And if Rob Pooley was participating in the course run by

14  Yuri Garmashov or supervised by him, then that would be a

15  proper certification?

16  A.   Correct.

17  Q.   I want to talk about a few of the candidates who were

18  trained by Yuri Garmashov.

19       Do you recall a person named Gavin Creagh?

20            MS. LYDON:   Outside the scope.   Objection.

21            THE COURT:   What's the relevance?

22            MS. CRAGER:   Your Honor, this goes to alleged

23  misrepresentations by Rob Pooley that he could get these people

24  their ratings and he did actually get them their ratings.

25            THE COURT:   All right.   Overruled.

1       You may answer the question.

2    Q.  BY MS. CRAGER:  Do you recall a person named Gavin Creagh?

3    A.  I do not, without -- not off the top of my head.

4    Q.  Would it help to look at the spreadsheet that you made?

5    A.  Yes.

6    Q.  Okay.  I'm going to --

7           MS. CRAGER:  If I may approach, Your Honor?  I'll

8    pull a binder out.

9           THE COURT:  All right.  You can tell him which one

10   you want him to look into.

11          MS. CRAGER:  Sure.  It's Binder 7, Exhibit 2129.

12          MS. LYDON:  I'm going to object, Your Honor, to

13   introducing the contents of a spreadsheet on a topic not

14   covered on direct.

15          THE COURT:  I haven't seen it.

16      Is it a spreadsheet?

17          MS. CRAGER:  I don't intend to introduce it.  I'm

18   just trying to refresh his recollection, Your Honor.

19          THE COURT:  You can look at it to refresh your

20   recollection.

21      Do you have the binder there?

22          MS. LYDON:  I'm also objecting as to relevance.

23          THE COURT:  All right.  I've overruled the objection

24   on relevance.

25   Q.  BY MS. CRAGER:  Do you have the spreadsheet in front of

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    you?

2    A.   What number is it?

3    Q.   I'm sorry.   2129.

4    A.   Binder 7?

5    Q.   Yes.

6    A.   I've got 300 --

7              MS. CRAGER:   Your Honor, may I approach?   I think he

8    has the wrong binder.

9              THE COURT:   Yes.   It's probably that you -- you have

10   your binders, and they have their binders.

11   Q.   BY MS. CRAGER:   Is this a spreadsheet that you're familiar

12   with?

13   A.   I -- I remember creating a spreadsheet, yeah, and using it

14   for -- for the process.

15   Q.   And looking at the first page of that spreadsheet, does

16   that help you remember whether you were aware of a person named

17   Gavin Creagh at the time you made the spreadsheet?

18   A.   At the time I -- I dealt with all these names.   I -- I

19   don't remember anything specific about that name, no.

20   Q.   But it was a name that you put on a spreadsheet?

21   A.   It's a name on a spreadsheet, yeah.

22   Q.   And is it a person -- sorry.   Is he a person for whom

23   you --

24              MS. LYDON:   Objection, Your Honor.   The process of

25   refreshing recollection is show the document, you take it away,

1    and you ask.

2              THE COURT:  That's true.  It hasn't refreshed his

3    recollection.

4              MS. CRAGER:  Sure.

5    Q.  BY MS. CRAGER:  Do you recall whether you issued -- I'm

6    sorry -- whether the Parachute Association issued a rating for

7    Gavin Creagh?

8    A.  I don't specifically recall.  But I would assume, if he was

9    in this spreadsheet, yeah, there was a rating issued.

10   Q.  Could you take a look at the spreadsheet and see if it

11   refreshes your recollection --

12             MS. LYDON:  Objection.

13   Q.  -- about whether he was on the spreadsheet?

14             THE COURT:  The question -- I think I better look at

15   the spreadsheet.

16        But the question is is it going to refresh your

17   recollection as to whether he was issued a license?  Right?

18             MS. CRAGER:  It's a spreadsheet that he made about

19   licenses being issued to certain people.

20             THE COURT:  So that's all right.  You can look at the

21   exhibit.

22        And the question is does that refresh your recollection as

23   to whether he was issued a license?

24             MS. CRAGER:  Yes, Your Honor.

25             THE COURT:  All right.

1          THE WITNESS:  Again, I would say if his name is in

2    this spreadsheet, then he was issued a rating.  But I don't

3    specifically remember any -- any detail or anything special

4    about this one person, no.

5    Q.  BY MS. CRAGER:  I understand.

6        You would have put him on a spreadsheet if you had issued

7    him a rating?

8    A.  Yep.

9    Q.  How about a person named Michael Jeffet.  Do you remember

10   whether you issued him a rating?

11          MS. LYDON:  Objection.

12          THE COURT:  Overruled.

13          MS. LYDON:  My objection is to the process of --

14          THE COURT:  Right.

15          MS. LYDON:  -- of having this exhibit in front of

16   him.

17          THE COURT:  But that -- no.  That's all right.  I

18   think it's an appropriate process.  He can look at the exhibit,

19   and if it does refresh his recollection as to the names of

20   these people, he can say that.  But beyond that, if he -- if he

21   knows that the fact that the person is on the spreadsheet means

22   something else, he can say that.

23       How do you spell the person's last name?

24          MS. CRAGER:  J-E-F-F-E-T.

25          THE WITNESS:  Same answer.  If he was on the

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    spreadsheet, he was probably issued a rating.  But I don't

2    remember anything specific about it.

3    Q.  BY MS. CRAGER:  By looking at the spreadsheet, does that

4    remind you whether or not he was on the spreadsheet?

5    A.  Remind me what?  I'm sorry.

6    Q.  By looking at the spreadsheet, does it remind you that he

7    was on the spreadsheet?

8    A.  Yes.

9    Q.  And there is one more I wanted you to look at, if you don't

10   recall.  Richard Keir.  K-E-I-R.

11   A.  Again, he's on -- he's on the spreadsheet, but I don't

12   remember any specifics or any specific dealings with that --

13   Q.  You would have put him on the spreadsheet if he received a

14   rating --

15   A.  Yes.

16   Q.  -- is that correct?

17       Thank you.  You can put that aside.

18       Now I wanted to talk to you a little bit about the manuals

19   -- the Parachute Association Instructor Rating Manual.

20       That's the one that you wrote; is that correct?

21   A.  I wrote and managed, but not in its entirety.  But yeah.

22   Q.  And you developed the idea for that manual?

23   A.  Not me on my own.  I mean, I worked with a lot of people on

24   it.  But yeah.

25   Q.  The manual was intended to be a comprehensive -- sorry --

1   comprehensive curriculum?

2   A.  Yes.

3   Q.  For rating courses?

4   A.  Yes.

5   Q.  Including the tandem instructor rating course?

6   A.  Yes.

7   Q.  It was updated frequently?

8   A.  Yes.

9   Q.  The manual was intended for the Parachute Association --

10  Association to communicate instructions about the rating

11  courses?

12  A.  That's correct.

13  Q.  To the skydiving community?

14  A.  Yes.

15  Q.  There was another manual called the Skydiver's Information

16  Manual?

17  A.  Yes.

18  Q.  You also wrote part of that manual?

19  A.  Yes.

20  Q.  It had information about how to get Parachute Association

21  licenses?

22  A.  That's correct.

23  Q.  And how to get ratings?

24  A.  Yes.  Where to go to get ratings, yeah.

25  Q.  It was available online?

1    A.  Yep.

2    Q.  For free?

3    A.  Yep.

4    Q.  And it was also intended to communicate to the entire

5    skydiving community?

6    A.  Correct.

7    Q.  I'd like to look now at Exhibit 80 that the government

8    admitted.

9        Let's see.  Do you still have that with you, or should I

10   help you re-locate it?

11   A.  I'm not quite sure where it was.

12           THE COURT:  That's a big exhibit.  So why don't you

13   point out which part of it you want him to look at.

14           MS. CRAGER:  I'm hoping that you'll look at page 2.

15           THE WITNESS:  I've got the wrong one.

16           MS. LYDON:  Page 2 is not in evidence.

17           THE COURT:  No, but she wants him to look at it.

18           MS. CRAGER:  Yes.

19           THE COURT:  Don't ask him about the contents unless

20   you're going to offer it into evidence.

21           MS. CRAGER:  I will offer it into evidence, Your

22   Honor.

23       I'm sorry.  May I approach?

24           THE COURT:  Yes.  It was up there earlier.  It's the

25   whole manual.

```
 1                THE WITNESS:  80, page what?

 2                MS. CRAGER:  Page 2.

 3                THE WITNESS:  Page 2.

 4   Q.  BY MS. CRAGER:  Are you at page 2?

 5   A.  Yep.

 6   Q.  Thank you.  This is not a page that the government attorney

 7   asked you about, correct?

 8   A.  It is not, no.

 9   Q.  This is an important notice to the skydiving community?

10   A.  Yes.

11                MS. CRAGER:  Your Honor, I move to admit page 2 of

12   Exhibit 80.

13                THE COURT:  Any objection?  You were going to offer

14   the whole thing; so I don't think you have an objection, do

15   you?

16                MS. LYDON:  If we're going page by page, I don't

17   quite understand the relevance.

18                THE COURT:  All right.  Well, let me look at it.

19                MS. CRAGER:  Your Honor, it goes to the care and

20   vigilance that the students were supposed to exercise as to the

21   duty --

22                MS. LYDON:  I don't --

23                THE COURT:  Wait a minute.  Wait a minute.

24                No.  No.  Why -- no.  You want to open the Pandora's

25   Box?
```

1          MS. CRAGER:  Your Honor, the government has made the

2     claim that it's a very dangerous sport --

3          THE COURT:  It is a dangerous sport.  You agree to

4     that.  Everybody agrees to that.  Right?

5          MS. CRAGER:  Yes, Your Honor.

6     This notice is telling people that they have responsibility

7     for themselves as well.  The ultimate responsibility is with

8     the person doing the skydiving.

9          THE COURT:  The objection is sustained.

10    I've looked at paragraph 2, and the prejudicial effect

11    outweighs the probative value.

12          MS. CRAGER:  So I was intending to look at other

13    parts of that same page, on page 2.

14          THE COURT:  Other parts.  Okay.

15          MS. CRAGER:  The portions I intended to introduce was

16    the second sentence on the page and then two other sentences on

17    the second column.

18          THE COURT:  This case is not about safety, is it?

19          MS. CRAGER:  No, Your Honor.

20          THE COURT:  Then I'm sustaining the objection to all

21    of page 2.

22          MS. CRAGER:  Understood, Your Honor.

23    Q.  BY MS. CRAGER:  I'd like to go next to page 8, which has

24    already been admitted.  If we could pull up page 8, please.

25    This manual is intended for both candidates and examiners?

1   A.   Yes.

2   Q.   The purpose of this manual is to provide necessary course

3   outlines, all related support materials for both candidates and

4   examiners of instructional courses; is that correct?

5   A.   That's correct.

6   Q.   Instructor candidates, the students in the classes, are

7   expected to read the manual?

8   A.   That's correct.

9   Q.   Now, this portion, portion B, is it directly addressed to

10  the candidates?

11  A.   Yes.

12  Q.   And the candidates are the people in the course learning

13  how to be tandem instructors, correct?

14  A.   That's correct.

15  Q.   One of the things the candidates are directed to be aware

16  of is the requirements for getting their rating?

17  A.   That's correct.

18  Q.   And they're advised, You must complete all the requirements

19  listed in the outline and on the proficiency card to qualify

20  for your rating?

21  A.   That's correct.

22  Q.   The proficiency card is the document that you went through

23  with the prosecutor, showing where all the signatures should

24  go?

25  A.   Right.

1  Q.  This section also refers the candidates to the introduction

2  and orientation section of the course outline?

3  A.  Correct.

4  Q.  So let's turn to that.  It's already been admitted as well,

5  page 128.  126.  I'm sorry.

6      So this section is meant to be read by tandem instructor

7  candidates?

8  A.  I'm sorry.  Is what?

9  Q.  This is part of the section for the tandem instructor --

10  instructor course?

11  A.  That's correct.

12  Q.  And the candidates are advised about who may conduct this

13  course?

14  A.  Correct.

15  Q.  And that would include --

16      I'm sorry.  Zoom in on this.

17      That would include a tandem examiner?

18  A.  Yes.

19  Q.  We can zoom out of that.  Thank you.

20      This section, also about the tandem instructor course for

21  tandem instructors, also advises about the requirements for

22  what someone needs to do to be an examiner?

23  A.  Correct.

24  Q.  The tandem candidates are aware that the course should be

25  administered under the supervision of a current, appropriately

1  rated examiner?

2  A.  Correct.

3  Q.  Thank you.  We can take that down.

4      I would like to discuss now what the Parachute Association

5  is and what it is not.

6  A.  Okay.

7  Q.  The Parachute Association is not a government agency?

8  A.  That's correct; it is not.

9  Q.  And it's not part of the government at all?

10  A.  No.

11  Q.  USPA stands for United States Parachute Association?

12  A.  Correct.

13  Q.  Which is a voluntary not-for-profit membership association?

14  A.  Yes.

15  Q.  It's an association of individuals who enjoy and support

16  the sport of skydiving?

17  A.  That's correct.

18  Q.  Is that how USPA bills itself on its website?

19  A.  Yes.

20  Q.  You testified earlier that the FAA, the government,

21  recognizes the Parachute Association?

22  A.  That's correct.

23  Q.  So I want to talk about what that means and what that

24  doesn't mean.

25      The -- what it means is that there is one regulation that

1      provides the requirements for operating a tandem parachute.

2              MS. LYDON:  Objection.  Calls for a legal conclusion.

3      Outside the scope.

4              THE COURT:  Well, she's asking him if that's what it

5      means to be recognized by the FAA.  And I, frankly, had the

6      same question in my mind when he said that on direct

7      examination.  What does it mean to be recognized by the FAA?

8          Now, if she's stating it in a way that he can understand

9      it, then he can answer the question.

10         If he can't understand the question, then you can rephrase

11     it.  So why don't you ask him the question again, and let's see

12     if he understands it.

13     Q.  BY MS. CRAGER:  Okay.  There is one FAA regulation that

14     governs tandem skydiving?

15     A.  There is one section.

16     Q.  One section.

17     A.  Yeah.  Yes.

18     Q.  Part of that section says that to operate a tandem

19     parachute, a person needs what's called a master parachute

20     license?

21     A.  That's correct.

22     Q.  And the parachute --

23              THE COURT:  So from who, though?

24              MS. CRAGER:  That's what I'm getting to, Your Honor.

25              THE COURT:  Okay.

1    Q.  BY MS. CRAGER:  The Parachute Association is an

2    organization that can issue a master parachute license?

3    A.  That's correct.

4    Q.  So that's the extent to which the FAA recognizes the

5    Parachute Association?

6    A.  Not entirely.

7    Q.  The -- the master parachute license -- let's talk about

8    that -- is the Parachute Association D license?

9    A.  Yes.  It used to have the title of -- used to say D master

10   behind it, but USPA removed the titles around 2003.

11   Q.  And the D license is what the FAA recognizes?

12   A.  Yes.

13   Q.  The license isn't actually issued by the government?

14   A.  No.

15   Q.  The license is provided by the USPA?

16   A.  Correct.

17   Q.  The Parachute Association.  And the Parachute Association

18   is not the government?

19   A.  No.

20   Q.  The Parachute Association has rules above and beyond what

21   the law requires?

22   A.  By "law," you mean --

23   Q.  In this --

24   A.  -- federal law?

25              THE COURT:  What do you mean?  FAA regulations --

1        MS. CRAGER:  Yes.

2        THE COURT:  -- or something else?

3        THE WITNESS:  Yes.

4   Q.  BY MS. CRAGER:  For instance, the Parachute Association has

5   a rule that if you want to do a tandem skydive operating the

6   parachute, you need a tandem instructor rating?

7   A.  That's correct.

8   Q.  That is not what the federal regulation requires?

9   A.  Not a USPA tandem instructor rating.  It's not solely

10  required, no, by the FAA.

11  Q.  What the regulation requires is a D license?

12  A.  One of the requirements, yes.

13  Q.  Right.  It does not require a tandem instructor rating from

14  the USPA?

15  A.  Not entirely.  It recognizes -- the language says it must

16  have been trained by the manufacturer or an entity recognized

17  by the FAA, and -- which is -- USPA is the only other -- USPA

18  is the only one that meets that requirement.

19  Q.  Right.  I understand that.

20      I'm saying the license that you need under the regulation

21  is a D license?

22  A.  Yes.

23  Q.  Regulation does not discuss a tandem instructor rating?

24  A.  No.

25  Q.  That is not required under the regulation?

1    A.   No.

2    Q.   And I have one more question about the regulation.

3         That regulation concerns the person operating the

4    parachute?

5    A.   Yes.

6    Q.   I want to talk just briefly about the tandem instructor

7    course and the language used.

8         The Parachute Association is based in the United States?

9    A.   Yes.

10   Q.   And all of the forms and the textbook are in English?

11   A.   Correct.

12   Q.   Including the proficiency card that we went through earlier

13   with government counsel?

14   A.   Yes.

15   Q.   When foreigners take a rating course, the forms are still

16   in English?

17   A.   Yes.

18   Q.   And foreigners are expected to bring an interpreter if they

19   need one?

20   A.   I would guess that would be the only way to handle it,

21   yeah, was with an interpreter, if they don't fully understand

22   English.

23   Q.   Now I want to move on to what happened with Mr. Pooley's

24   ratings with the Parachute Association and his membership.

25              THE COURT:   This might be a good time to take the

1    recess, then, if you're getting into a new subject.

2              MS. CRAGER:  I actually only have about five

3    questions here; so we might want to finish this up.

4              THE COURT:  All right.  Let's finish it up.

5              MS. CRAGER:  Okay.  Thank you.

6    Q.  BY MS. CRAGER:  In August of 2016, the Parachute

7    Association decided not to reinstate Mr. Pooley's tandem

8    examiner rating?

9    A.  Correct.

10   Q.  Also in August of 2016, the Parachute Association suspended

11   all of his ratings?

12   A.  Correct.

13   Q.  The Parachute Association even suspended his membership?

14   A.  Correct.

15   Q.  And that all occurred in August of 2016?

16   A.  Yes.

17             MS. CRAGER:  Thank you.  No further questions.

18             THE COURT:  Is there any redirect?

19             MS. LYDON:  Very briefly.

20             THE COURT:  Do you want to see if we can finish that

21   before we take the noon recess?

22             MS. LYDON:  I think I can do it.

23        I only have two topics, Mr. Crouch, that you covered with

24   Ms. Crager.

25   ///

REDIRECT EXAMINATION

1

BY MS. LYDON:

2

3   Q.  First, she had you look at a spreadsheet.  Do you recall

4   that?

5   A.  The what?  Spreadsheet?

6   Q.  She had you look at a spreadsheet.

7   A.  Yes.

8   Q.  Okay.  The fact that someone was listed on that spreadsheet

9   just meant you looked up records related to them, right?

10  A.  Correct.

11  Q.  You didn't do any -- the spreadsheet didn't reflect

12  anything about who actually trained that person, right?

13  A.  Correct.

14  Q.  It listed an examiner that was listed on their documents;

15  is that correct?

16  A.  Correct.

17  Q.  And the spreadsheet also included a variety of dates; do

18  you recall that?

19  A.  Correct.

20  Q.  Many of them in 2015, right?

21  A.  Yes.

22  Q.  Including with respect to two of the individuals she asked

23  you about, Mr. Jeffet and -- I'm forgetting the first

24  gentleman's name, but him as well?

25  A.  Yes.

1    Q.  All right.  So just from that spreadsheet, you can't tell

2    whether their training was legitimate, can you?

3    A.  No.

4    Q.  And a number of people on that spreadsheet had to retrain

5    at their own expense?

6    A.  Correct.

7    Q.  All right.  Now on to the second topic, the regulations.

8    This case is not about the FAA regulations.  I just want to

9    clear up a couple quick things.

10        Is it right that under the FAA regulations, to conduct a

11   tandem jump with a customer, you need a USPA D license?

12   A.  Correct.

13   Q.  All right.  And there are other regulations from the FAA

14   that pertain to tandem jumping as well?

15   A.  Yes.

16   Q.  One requirement is that the tandem instructor be trained in

17   the use of the tandem parachute rig?

18   A.  Correct.

19   Q.  And another one is that they have taken a course either by

20   the parachute rig manufacturer or by another organization

21   approved by the FAA?

22   A.  Correct.

23   Q.  And does USPA offer courses that are approved by the FAA?

24   A.  Yes.

25   Q.  And do they offer trainings in the use of the various

1    parachute -- the tandem parachute rigs?

2    A.  Yes.

3    Q.  So is that what you meant when you were saying there were

4    other ways --

5    A.  Yes.

6    Q.  -- that the USPA can satisfy the regulation?

7    A.  Yes.

8              MS. LYDON:  All right.  Nothing further.

9              THE COURT:  All right.  Any recross?

10             MS. CRAGER:  Yes, Your Honor.  Briefly.

11                         RECROSS-EXAMINATION

12   BY MS. CRAGER:

13   Q.  Just going back to the spreadsheet from earlier, you did

14   actually do other investigation to find out if these people

15   were properly trained?

16             MS. LYDON:  Objection.  Outside the scope.

17             THE COURT:  I'm going to sustain the objection.  Not

18   just because it's outside the scope but because it would be

19   hearsay.

20             MS. CRAGER:  Well, he -- he was just asked that he

21   did not do any investigation.  I am attempting to show that he

22   actually did do an investigation to determine --

23             THE COURT:  Right.  But I thought the question was

24   related to whether Mr. Pooley was the -- Mr. Pooley was the one

25   who trained them.

1          MS. CRAGER:  Let me rephrase.

2     Q.  BY MS. CRAGER:  The people we discussed earlier -- Gavin

3     Creagh, Michael Jeffet, Richard Keir -- you did determine that

4     they were properly trained by a valid examiner, namely Yuri

5     Garmashov?

6     A.  I couldn't say yes or no.  I don't recall.

7     Q.  Can you look at Exhibit 2137?

8          MS. CRAGER:  Your Honor, may I approach?

9          MS. LYDON:  I'm going to object to relevance and

10    outside the scope.

11         THE COURT:  Let's see what it is first.  I don't know

12    what it is.

13         MS. LYDON:  I object to the question, regardless of

14    the exhibit, as to what he determined about various candidates

15    and the adequacy of their training.

16         THE COURT:  You already covered that.  It's come in

17    on cross-examination.  So the subject is relevant at this

18    point.

19       Now, what -- it's Exhibit 2137?

20         MS. CRAGER:  Yes.

21    Q.  BY MS. CRAGER:  And my question is you confirmed with Yuri

22    Garmashov that he had trained these people that you issued

23    ratings to?

24         THE COURT:  The objection is sustained.  That's

25    hearsay.

1              MS. CRAGER:  That's fine, Your Honor.

2              THE COURT:  Any other questions?

3              MS. CRAGER:  No, Your Honor.

4              THE COURT:  All right.  Is there any reason why

5    Mr. Crouch should not be excused at this time?

6              MS. CRAGER:  No, Your Honor.

7              MS. LYDON:  No, Your Honor.

8              THE COURT:  All right.  Thank you for coming,

9    Mr. Crouch.

10             THE WITNESS:  Thank you, sir.

11             THE COURT:  You're excused.

12        And we will take the noon recess, ladies and gentlemen.

13   Remember the admonition.  And we will resume at 1:30.

14        (Recess taken, 12:02 p.m. - 1:31 p.m.)

15             THE COURT:  Everyone is present.

16        You may call your next witness.

17             MS. LYDON:  Thank you, Your Honor.  The United States

18   calls Willard Jay Stokes.

19             THE CLERK:  Sir, please step forward, all the way up

20   to the witness stand, and remain standing.

21        Please raise your right hand.

22        (The Witness, WILLARD LEE STOKES, is sworn.)

23             THE WITNESS:  I do.

24             THE CLERK:  Thank you.  You may be seated.

25        Please state your full name.  Spell your last name for the

1    record.

2              THE WITNESS:  My full name is Willard Lee Stokes.  My

3    nickname is Jay.

4              THE CLERK:  Thank you.  Can you spell your last name

5    for the record?

6              THE COURT:  Spell your last name.

7              THE WITNESS:  S-T-O-K-E-S.  I'll make sure you hear

8    in my good ear.

9                          DIRECT EXAMINATION

10   BY MS. LYDON:

11   Q.  Good morning, Mr. Stokes.

12   A.  Good morning.

13   Q.  Or afternoon now.

14   A.  Yes, ma'am.

15   Q.  What do you do for a living?

16   A.  Well, currently, I'm the military manager for Skydive

17   Elsinore in Lake Elsinore, California.  Along with that, I'm

18   also still an examiner for USPA and for the manufacturers of

19   different tandem equipment.

20   Q.  Did you train Robert Pooley as an examiner in 2010 and then

21   retrain him again in 2014?

22   A.  Yes, I did.

23   Q.  All right.  Before delving into your interactions with

24   Mr. Pooley, I'd like to just run through a very brief overview

25   of your career, skydiving generally and with the manufacturer

1    and USPA.

2        Okay?

3    A.   Okay.

4    Q.   All right.  When did you get into skydiving?

5    A.   I started jumping out of airplanes in 1974.  I started in

6    the Army.  I did 24 years in the Army.  I was in special

7    forces.  I liked it so much that I kept jumping as a -- as a

8    military and also as a civilian.  I'm a military free fall

9    instructor.  I worked at the schoolhouse for the Army, which is

10   the proponent --

11           THE COURT REPORTER:  I'm sorry.  You've got to slow

12   down.

13           THE WITNESS:  Oh.  Sorry.  Can I continue?

14   Q.   BY MS. LYDON:  Yes, please.

15   A.   Okay.  So I've worked as an examiner for USPA since 1984 --

16   Q.   All right.  Let's start, then, with USPA.

17   A.   Okay.

18   Q.   Were -- what kind of examiner were you for USPA?

19   A.   Initially, there was only one rating that we had.  That was

20   a static line instructor rating.  So I was an instructor

21   examiner as a static line person.

22   Q.   Were you a tandem instructor?

23   A.   Yes.  I became a tandem instructor in 1984, '85 time frame.

24   Q.   Okay.  And did you become an instructor examiner for the

25   tandem system?

1  A.   Yes.  That would have been in 1989.

2  Q.   Okay.  So you've held certifications with USPA and the

3  manufacturer?  Did you say that?

4  A.   Yes, ma'am.  All US manufacturers for tandem equipment.

5  Q.   Okay.  Who manufactures most tandem equipment in the United

6  States?

7  A.   In the United States, that would be the United Parachute

8  Technologies.

9  Q.   Do they have an acronym that they're known by?

10 A.   UPT.

11 Q.   Does that sound a lot like -- or share a number of letters

12 in common with the United States Parachute Association?

13 A.   Yes, ma'am, it does.  USPA and UPT are quite well-working

14 together for a long time.

15 Q.   Okay.  I'll try to refer to UPT as the manufacturer and

16 USPA as USPA or the Parachute Association.  Okay?

17 A.   Very good.

18 Q.   All right.

19      You've described how you were an examiner and a tandem

20 instructor.  Did you hold other roles with the manufacturer in

21 your career?

22 A.   Yes.  In 2004, I became what we would call a program

23 manager.  So I started training examiners in the field on the

24 equipment, not just for USPA but also for UPT.

25 Q.   Okay.  How many UPT -- the manufacturer, how many program

1  managers did they have at the time?

2  A.  At that time, just myself.  Just one.

3  Q.  And what did you -- were you -- you said that as the

4  program manager, you trained the examiners?

5  A.  Yes, ma'am.

6  Q.  Were you the only person in the country at the time

7  authorized, then, to train examiners for the manufacturer?

8  A.  Actually, the only person in the world.

9  Q.  Okay.  And did you hold that role in 2010 and 2014?

10  A.  Yes.  From -- from 2004 to 2014.  Later that year, Tom

11  Noonan was hired by the manufacturer to take my role.  It

12  wasn't that I was doing a poor job; they just had a person to

13  come in and change things up.

14  Q.  So you moved out of that role --

15  A.  Exactly.

16  Q.  -- and someone else moved into it?

17  A.  Exactly.

18  Q.  Okay.  Did you also hold some roles with the United States

19  Parachute Association over the course of your career?

20  A.  Yes, ma'am.

21  Q.  Can you just run through briefly what roles you held?

22  A.  I'm an instructor examiner for everything the USPA does, to

23  include creating examiners.

24  Q.  Okay.  So you trained examiners for USPA?

25  A.  Exactly.  In static line and what we call accelerated free

1  fall, which is a little bit of a different program, tandem, and

2  also instructor assisted deployment.

3  Q.  Okay.  Did you hold management-type roles with USPA?

4  A.  Yes.  I was on the board of directors for, what, 12 years

5  total.  While I was on the board of directors, I was the vice

6  president for a term, president for three terms, and the

7  chairman of the board for one term.

8  Q.  Okay.  Around what date range were you in management with

9  USPA?

10  A.  2007 until 2016 or '19 -- '19.

11  Q.  Okay.  2007 to 2019.

12      Let's turn now to your role training Mr. Pooley.

13      Did Pooley take a tandem examiner course from you?

14  A.  Yes, in 2010.

15  Q.  Could you take a look in the -- one of the binders behind

16  you at Government's Exhibit 102.  And I can come help you find

17  the correct binder.

18      Do you recognize that document?

19  A.  Yes, I do.

20  Q.  Briefly, just what is it?

21  A.  It's a tandem examiner certification form for Mr. Rob

22  Pooley.  And it's endorsed by myself.

23          MS. LYDON:  Move to admit Government 102.

24          THE COURT:  Any objection?

25          MS. CRAGER:  No objection, Your Honor.

1          THE COURT:  Exhibit 102 is received in evidence.

2       (GOVERNMENT'S EXHIBIT 102 ADMITTED INTO EVIDENCE.)

3          MS. LYDON:  Thank you.  Please publish.

4  Q.  BY MS. LYDON:  As you said, it's a tandem examiner

5  certification form for Robert Pooley.

6       Person who signed it down here, as you testified, is

7  yourself.  Is that your signature?

8  A.  Yes, ma'am.

9  Q.  And date seems to be December 2, 2010; is that right?

10  A.  That is correct.

11  Q.  All right.  And you have some jumps recorded.  The dates

12  for those look like December 1, 2010; is that right?

13  A.  That is correct.

14  Q.  Okay.  What did it mean when you signed the --

15       We can zoom out of that.

16  A.  That I found the individual candidate to be satisfactory or

17  met the standards to attain that particular rating.

18  Q.  And who was the candidate?

19  A.  Rob Pooley.

20  Q.  And what was the rating?

21  A.  That would be tandem examiner.

22  Q.  All right.  Let's talk now about the things that you taught

23  Mr. Pooley that convinced you that he met that standard.

24  A.  Okay.

25  Q.  Before discussing particular aspects of the course, could

1    you just give us a brief, like, one-minute overview of what you

2    taught Pooley and other examiner candidates in that 2010

3    examiner course?

4    A.   Okay.  Basically, what we're required to do is to ensure

5    the examiners are able to train other folks -- other people as

6    tandem instructors.  To that end, we usually start off with

7    introductions.  We continue with the actual equipment, how the

8    equipment functions, specifics about that.  We move on into how

9    to teach, how to train aircraft procedures, free fall

10   procedures, everything, to include emergency procedures.

11       And normally, emergency procedures are the last thing we

12   teach, because we need them to be very good at teaching

13   those -- that subject, because in a given environment, a

14   stressful situation, we need the person to perform to standard.

15   Q.   Okay.  You mentioned you taught Pooley how to teach.

16   A.   Yes, ma'am.

17   Q.   How is teaching someone how to teach all of those things

18   that you just discussed different than teaching someone just

19   how to do them?

20   A.   Okay.  Well, if I want to train someone from the jury to

21   put a harness on a student, I could show them, but how do I

22   know they understand how to do it?  I would have to evaluate

23   their ability to do that particular subject.  So we wouldn't

24   just train them on how to do it.  Then we would go the next

25   step and have them train each other.

1      So kind of like a round robin, I guess would be the best

2  way to do it.  We're not just training them on how to put a

3  harness on a student but how to teach somebody to teach

4  somebody else how to do that particular subject.

5      And it -- and it goes along with everything else in the

6  program.  You have to teach them how to teach canopy control

7  for tandem.  It's different.  You're not jumping by yourself.

8  Every jump you make is with a different passenger who weighs

9  different poundage.  So the aerodynamic of what they're flying

10  is directly affected by the amount of suspended weight.  So

11  things change.

12      So trying to get that -- those points across can be very

13  difficult.  That's why we need somebody that has a lot of

14  experience, for instance, to be a tandem instructor -- or --

15  sorry -- to be a tandem examiner.  You have to have 500 tandem

16  jumps.  So you have to have experience as that person before

17  you can move forward to train another person to be in that

18  role.

19  Q.  That makes sense.

20      So to become a tandem instructor, you have to have how many

21  solo jumps?

22  A.  500 solo jumps.

23  Q.  And then to become an examiner, you have to have how many

24  tandem jumps?

25  A.  500 tandem jumps.

1    Q.   So fair to say you have to have mastered being a tandem

2    instructor before you can teach somebody else to do it?

3    A.   Yes.  That's the intention.

4    Q.   Okay.  What did you teach Mr. Pooley in your course with

5    the requirement of the examiner personally being present during

6    the whole course?

7    A.   Throughout training -- and this is -- whether it's tandem

8    or anything else, you know, our policy, our requirement is to

9    be present and attentive.  In other words, I need to physically

10   be there when you're training somebody to do something.  I have

11   to evaluate performance.  And the only way to do that is to

12   observe somebody else teaching a subject.

13        That said, the examiner that's in the field, who is not

14   necessarily under supervision in the field, we trust them.

15   They're doing the same thing.  They're required to be

16   physically present.  You can't just watch a video and do this.

17   Q.   Okay.  Can you explain more about what you told Mr. Pooley

18   about what he should be doing, while he was present in the

19   course, to be attentive?

20   A.   Well, everything -- everything is in our guideline.  We

21   have a very specific guideline from the manufacturer.

22        And, again, we're talking just the manufacturer right now.

23   Q.   Right now, yes.

24   A.   We have a very specific guideline that outlines in detail

25   what's taught per subject area.  We call it the modules.  Each

1   module is very specific to -- in nature to whatever that

2   particular information is, whether it be a tandem harness on a

3   student or canopy control, let's say.  Emergency procedures is

4   the longest module because it's the most involved and probably

5   the most stressful portion --

6              MS. CRAGER:  Objection, Your Honor.  I would say this

7   is nonresponsive and not relevant.

8              THE COURT:  Well, it is, generally.  If he seems to

9   be wandering from your question, ask the next question so you

10   stay on track.

11              MS. LYDON:  Thank you, Your Honor.  I think we can

12   break it down a little.

13   Q.  BY MS. LYDON:  So you mentioned the guidelines.

14   A.  Yes, ma'am.

15   Q.  All right.  Did you mention that UPT, the manufacturer, put

16   out guidelines for the training of tandem examiners?

17   A.  Of course they do.

18   Q.  And did those guidelines focus on specific ways that the

19   examiners needed to be physically present and attentive?

20   A.  Yes, ma'am.

21   Q.  Did you go over those guidelines with Pooley?

22   A.  Yes.  That's mandatory.

23   Q.  Please turn in your binder to Government's Exhibit 100.

24        Do you recognize that document?

25   A.  Yes, I do.

1    Q.   What is it?

2    A.   It is the Tandem Examiner Guidelines for Certification of

3    Tandem Instructors with the Vector/Sigma System.   This is the

4    11th edition, dated April 21, 2010.

5    Q.   All right.   Did you provide that document to Mr. Pooley in

6    your course?

7    A.   Yes.

8    Q.   How?

9    A.   I actually put together binders with the guidelines in it,

10   along with other documentation to support training, and also

11   DVDs and other CDs so that they would have the -- the

12   availability of other documents required to conduct the course.

13   Q.   And did you go over particularly relevant and important

14   portions of those guidelines, Government's Exhibit 100, with

15   Mr. Pooley?

16   A.   Yes, ma'am.

17   Q.   All right.   I'm going to move to admit portions of it,

18   starting with the first page, so the jury can just see what the

19   document looks like.

20           MS. LYDON:   Move to admit Government's Exhibit 100,

21   page 1.

22           MS. CRAGER:   No objection.

23           THE COURT:   All right.   So these are the

24   manufacturer's guidelines, right?

25           THE WITNESS:   Yes, sir.

1      THE COURT:  All right.  Page 1 of Exhibit 100 is

2  received in evidence.

3      (GOVERNMENT'S EXHIBIT 100, PAGE 1 ADMITTED INTO EVIDENCE.)

4  Q.  BY MS. LYDON:  11th Edition, April 21, 2010, appears on the

5  front.  Do you see that?

6  A.  Yes, ma'am.

7  Q.  Would this document -- these guidelines have been in force

8  when you trained Mr. Pooley in December of 2010?

9  A.  Yes, ma'am.

10  Q.  There is a drawing of someone who appears to have suffered

11  a mishap.

12      What is that object above the parachutist?

13  A.  It's called a drogue.

14  Q.  Okay.

15  A.  Do you need me to explain that?

16  Q.  No.

17      THE COURT:  Has he suffered a mishap, or is he just

18  in free fall?

19      MS. LYDON:  You know, you're right.  It's a happier

20  picture than I -- this was the first time I noticed this aspect

21  of it; so I wanted to flag that in case anyone else appeared

22  disconcerted.

23      THE COURT:  It says "uninsured" underneath it.  I

24  started to worry.

25      MS. LYDON:  Yeah.

1  Q.  BY MS. LYDON:  Maybe just briefly describe what's happening

2  in this -- in this, apparently, according-to-plan fall.

3  A.  Okay.  What's under -- what they're suspended by is called

4  a drogue.  The drogue is about 54 inches in diameter.  It's

5  extended out after they leave the aircraft so that it helps to

6  slow them down in free fall.

7      And then also, at the appropriate deployment altitude, they

8  would release the drogue, and it would become what we call a

9  pilot shoot.  It would actually collapse a little bit and then

10  start the deployment process for the main canopy.

11  Q.  So in this picture -- or this drawing, only the drogue has

12  been deployed, right?

13  A.  Correct.

14  Q.  To slow the pair down?

15  A.  To normal free fall speeds, which is 120 miles an hour.

16  Q.  Okay.  And the main parachute has not been deployed?

17  A.  Not yet.

18  Q.  Okay.  Please turn in your binder to the sixth page of

19  Government's Exhibit 100.  There are little yellow exhibit

20  stickers that tell you what page you're at.  100-6.

21  A.  Are we talking page 100 or --

22  Q.  I can help you.

23  A.  Okay.

24  Q.  Do you recognize page 6?

25  A.  Yes, ma'am.

1    Q.  Did you go over page 6 with Mr. Pooley?

2    A.  Yes, ma'am.  We went over the document cover to cover.

3              MS. LYDON:  Move to admit page 6.

4              THE COURT:  Any objection?

5              MS. CRAGER:  No objection.

6              THE COURT:  Page 6 of Exhibit 100 is received in

7    evidence.

8         (GOVERNMENT'S EXHIBIT 100, PAGE 6 ADMITTED INTO EVIDENCE.)

9              MS. LYDON:  Let's publish.

10   Q.  BY MS. LYDON:  All right.  Does this page deal with the

11   requirements to be certified as a tandem instructor?

12   A.  Yes, ma'am.

13   Q.  Did you go over with Mr. Pooley the requirement that in

14   order to become a tandem instructor for UPT, an applicant must

15   make at least five jumps under the direct supervision of a

16   qualified and currently rated tandem Vector/Sigma examiner?

17   A.  Yes, ma'am.

18   Q.  Direct supervision is underlined and bolded?

19   A.  Yes, ma'am.

20   Q.  Did you -- did you spend more time on the things that were

21   emphasized in the manual?

22   A.  I made sure that the candidate, no matter who the candidate

23   is, they need to understand direct supervision means present

24   and attentive.

25   Q.  Okay.  It also mentions a qualified and currently rated

1   examiner?

2   A.  Yes, ma'am.

3   Q.  Did you go over with Mr. Pooley anything with respect to

4   that requirement?

5   A.  Yes.  That it is the responsibility of that candidate or

6   the tandem examiner to renew their ratings on an annual basis

7   through the manufacturer.  And we went into detail on how to do

8   exactly that.

9   Q.  Okay.  If we could zoom out.  Actually, Vector and Sigma,

10  what are those?

11  A.  There are two types of tandem systems.  The Vector was the

12  original system built back in '83, '84 time frame that we used

13  for a very long time.  The Sigma came on the market in the

14  early 2000s.

15  Q.  Okay.  Are they both made by UPT?

16  A.  Yes, ma'am.

17  Q.  It goes over particular jumps for which the examiner needs

18  to be present and attentive.  They're listed below that

19  paragraph we just went over.

20  A.  Yes, ma'am.

21  Q.  Did you go over each of those jumps with Mr. Pooley?

22  A.  Yes, ma'am.  We have to do that.

23  Q.  And why?

24  A.  To make sure that there is no doubt in his mind what the

25  physical standard is or what the critical standards are to

1  accomplish those particular jumps prior to moving on into what

2  we call Phase 2.

3  Q.  Okay.  And we won't spend much time with them, but I just

4  want to briefly go over those five jumps.

5      Are the -- and the five jumps are the ones that need to be

6  done in the presence of the examiner; is that what you just

7  testified?

8  A.  That is correct.

9  Q.  Okay.

10         MS. LYDON:  Move to admit Government's 100, 7 and

11  100-8.

12         THE COURT:  Any objections?

13         MS. CRAGER:  No objection, Your Honor.

14         THE COURT:  Is it page 7 and 8 of 100?

15         MS. LYDON:  Yes.

16         THE COURT:  All right.  Pages 7 and 8 of Exhibit 100

17  are received in evidence.

18         MS. LYDON:  Thank you.

19    (GOVERNMENT'S EXHIBIT 100, PAGES 7-8 ADMITTED INTO

20  EVIDENCE.)

21  Q.  BY MS. LYDON:  So that first one, the familiarization jump,

22  what's that?  You don't have to read it all, but just tell us

23  what it is.

24  A.  Basically, it's either a solo jump done by the candidate

25  that's wishing to become an instructor, or it's a passenger.

 1   If it's in the passenger mode, the instructor that's jumping

 2   with that person would basically work with them, train them on

 3   what the person that they're going to jump later is going to

 4   feel like.

 5        There is an adage, walk a mile in someone else's shoes.  We

 6   want to make sure that the candidates that are going to become

 7   instructors understand what the passenger or the student is

 8   feeling when they're going through this process.  And it wakes

 9   people up a little bit.

10   Q.  Okay.  So one way that you could do this familiarization

11   jump is to -- the instructor candidate would jump wearing the

12   full tandem rig but with no passenger out in front; is that

13   correct?

14   A.  That's correct.  That is correct.

15   Q.  Okay.  Now can we flip to page 007 of this document.

16        All right.  And then here is Jump 2, the other one you were

17   describing?

18   A.  Right.

19   Q.  Where the applicant acts as passenger; is that right?

20   A.  That is correct.

21   Q.  Okay.  Is that also called a front ride?

22   A.  Yes, ma'am.

23   Q.  Okay.  Then there are the category proficiency jumps.  For

24   these jumps, the applicant acts as the tandem instructor while

25   carrying an experienced jumper; is that correct?

1    A.   That is correct.

2    Q.   Okay.  And that jumper doesn't have to be an examiner, does

3    it?

4    A.   No.  They -- but they must be an experienced skydiver.

5    Q.   Okay.  Does the examiner select those people?

6    A.   Yes.

7    Q.   Okay.  And we don't have to go through each of them in

8    detail, but Jump 3 and Jump 4, are they designed to teach the

9    candidate particular skills?

10   A.   Yes.  To take them through that process that they're going

11   to continue to use in their tandem instructor career.

12   Q.   Okay.  Can we flip to page 8.

13   A.   Sure.

14   Q.   All right.  Is this also intended to teach the candidate a

15   particular skill?

16   A.   Yes.  Jump Number 5 is specific.  We call it terminal

17   because we want the candidate to exit in an unstable attitude,

18   gain stability without use of the drogue, and then in

19   drogue-less free fall show that they can control that part of

20   it, that free fall.

21        It also allows them the opportunity to see what it feels

22   like, the speed, the other things that can happen in free fall.

23   And to understand that if you are in that -- in that -- get

24   that feeling of speed, that something is not right with the

25   system.  So it serves two purposes.

1          And then, of course, they're going to deploy the drogue

2     approximately 8,000 feet, 2,000 feet above the deployment

3     altitude for the canopy, and it seems to work out pretty well.

4     It gives them that opportunity to see what it feels like in the

5     future.  If they ever feel that way again, there are things

6     that we teach them to -- to take action with.

7     Q.  So all the candidates who are tandem instructors have

8     already had at least 500 solo jumps, right?

9     A.  Yes.

10    Q.  So they know what free fall feels like with their old rigs?

11    A.  Yes.

12    Q.  But tandem equipment is different, right?

13    A.  Exactly.

14    Q.  How?  How is the free fall experience different in a way

15    that they really need to be trained on?

16    A.  Well, the average person -- we call it terminal velocity --

17    it's 120 miles an hour.  With tandem, you've got another person

18    with you plus 50 pounds of gear.  It's actually 58 pounds.  So

19    in free fall, you could reach speeds of 170 to 180 miles per

20    hour.  That's a big difference.

21    Q.  Okay.  And did Pooley -- did you train Pooley --

22    A.  Yes.

23    Q.  -- that he needed to be present and attentive for each of

24    these five jumps?

25    A.  Yes.

1  Q.  Did he have to be -- were there particular vantage points

2  that you trained him he could be present and attentive from?

3  A.  I stress in courses that I conduct to have the examiners

4  ride on the front because if something does go wrong, that's

5  the best person to have in that position.  However, that's not

6  mandatory.  They can be in a safety position where they're

7  flying outside.  They can use a video camera to video the

8  process.  So there are other places the person can be, but

9  they've got to be present and attentive.

10 Q.  Okay.  Let's go over those particular positions that are

11 acceptable.

12      Could you turn to 047 in the same exhibit in front of you.

13 A.  47.  Okay.

14 Q.  Does 047 contain a discussion of the permissible ways that

15 the examiner can participate in those five certification jumps?

16 A.  Yes, it does.  There are five specific positions they could

17 be in.

18 Q.  Okay.  Let's --

19         MS. LYDON:  I move to admit page 47 -- 047 of this

20 exhibit.

21         THE COURT:  Is this still 100?

22         MS. LYDON:  Um-hum.

23         THE WITNESS:  Yes.

24         MS. CRAGER:  No objection.

25         THE COURT:  Is it page 47?

1          MS. LYDON:  Yes, it is.

2          THE COURT:  All right.  Page 47 of Exhibit 100 is

3   received in evidence.

4          (GOVERNMENT'S EXHIBIT 100, PAGE 47 ADMITTED INTO EVIDENCE.)

5          MS. LYDON:  All right.  Can we please publish.

6   Thank you.  All right.  Zoom in there.

7   Q.  BY MS. LYDON:  All right.  Your role during certification

8   jumps.  Did you go over this page with Mr. Pooley?

9   A.  Yes, I did.

10  Q.  Do you go over it with every tandem examiner candidate?

11  A.  Yes.

12  Q.  All right.  What are the five permissible positions that

13  the examiner can take during the certification jumps?

14  A.  Could be in the instructor position, the student position,

15  as a solo observer --

16  Q.  What does that mean?

17  A.  Solo observer means you're in free fall with the candidates

18  and you're observing.  You don't necessarily have video on, but

19  you are observing.  The video, obviously you have a video

20  camera on, and you're videoing so you can use that in your

21  debriefing.  And then as a ground observer, you could also be

22  there.

23  Q.  What is AFF?

24  A.  Accelerated free fall is a type of training method that we

25  use in skydiving.  Normally, one or two instructors are holding

1   on to a student in free fall, and the student is required to

2   perform certain actions and deploy their own main parachute.

3   Q.  Okay.  This paragraph says, Tandem examiners -- the bottom

4   paragraph here, Tandem examiners must be present during the

5   execution of the five certification jumps.  That means you must

6   perform in one of the five roles listed above.  Direct

7   supervision means being present and participating during all

8   certification requirements.  If the candidate wishes to qualify

9   for the USPA tandem rating, it's recommended that the candidate

10  perform the up to ten certification jumps with the examiner.

11      Do you see that?

12  A.  Yes.

13  Q.  Okay.  This is a UPT -- the manufacturer -- document, but

14  it refers to a USPA requirement.

15  A.  That is correct.

16  Q.  You mentioned that they work closely together?

17  A.  Yes, ma'am.

18  Q.  Do -- does a typical tandem instructor candidate want both

19  certifications, in your experience?

20  A.  If they're going to work in the United States, yes.

21  Q.  Okay.  So do their materials sometimes cross-reference each

22  other?

23  A.  They do.  As a matter of fact, USPA directly specifies in

24  its BSRs that we need to follow the manufacturer's rules of the

25  road, so to speak, their guidelines.

1   Q.  Okay.

2              THE COURT:  Well, I'm not sure that we all understand

3   this, then.  If you're certified by the manufacturer, that

4   doesn't mean you're certified by USPA, right?

5              THE WITNESS:  That's correct, sir.

6              THE COURT:  So how do you -- we're talking right now

7   about you certified Mr. Pooley --

8              THE WITNESS:  Yes, sir.

9              THE COURT:  -- by the manufacturer.

10             THE WITNESS:  Yes.

11             THE COURT:  Did you have anything to do with

12  certifying him by USPA?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  We haven't gotten to that yet.

15             MS. LYDON:  I'll ask a clarifying question.

16             THE COURT:  Okay.

17  Q.  BY MS. LYDON:  Did your course yield a certification for

18  Mr. Pooley for USPA and UPT?

19  A.  Ultimately, it did.

20  Q.  Okay.

21  A.  But we had to go -- but we had to break it apart.

22  Q.  All right.  Tell us how.

23     I guess, first question, do you cover both the

24  manufacturer's requirements and the Parachute Association's

25  requirements and material in the same course?

1  A.  Yes and no.

2  Q.  All right.  Could you explain that?

3  A.  Well, they overlap.  Okay.  So you have to cover some of it

4  with -- while you're doing one thing, something else is going

5  to happen.

6      But ultimately, we also conduct what we call an instructor

7  exam and rating course for USPA.  So it's an add-on.  And in

8  that course, they're required to perform what we call skill

9  analysis.  They observe a video.  They have to debrief the

10  video with a candidate.  They're required to teach other

11  classes, under direct supervision, for a score, to a standard

12  policy.

13     So they -- they actually -- they aid each other.  I guess

14  that's the best way to put it.

15  Q.  Okay.  And you trained Mr. Pooley on both?

16  A.  Yes, I did.

17  Q.  Okay.  Did you go over the USPA tandem examiner materials

18  as well with Mr. Pooley?

19  A.  Yes.

20  Q.  Okay.  We've already gone over that material with another

21  witness; so we won't go through that with you, sir.  Okay?

22  A.  Sure.

23  Q.  All right.  Did -- does page -- page 047 indicate whether

24  UPT, the manufacturer, would take it seriously if it learned

25  that an examiner was not present for the certification jumps?

1    A.  Yes.

2    Q.  Does the guideline state that any reports of examiner

3    signing off on paperwork when they were not, in fact,

4    present -- in fact, they were not present during the entire

5    certification process will be aggressively investigated and

6    dealt with?

7    A.  Yes.

8    Q.  All right.  So we've talked about the jumps and the

9    requirement that the examiner be physically present.

10        Did you teach Pooley anything about what he ought to be

11   doing, as an examiner, for the classroom portion of the course

12   he was teaching?

13   A.  Yes.

14   Q.  What did you tell him?

15   A.  Well, specifically, he's got to -- he's got to teach those

16   modules, those pieces and parts, to make sure that the

17   person --

18   Q.  Tell us again what modules are.

19   A.  A module is a part.  Let's say it's exits or aircraft

20   procedures or free fall, drogue fall procedures.  In other

21   words, what has to be accomplished during this particular part,

22   this event.  And that includes canopy control, landing, and

23   emergency procedures.

24   Q.  Okay.  You mentioned that he had to teach it?

25   A.  Yes.

1    Q.  All right.  Is that something that the examiner should

2    personally teach?

3    A.  Yes.

4    Q.  Did you tell Pooley that?

5    A.  Yes.

6    Q.  I have a bad tendency to speak like it's a conversation.

7    We have to be careful not to talk over each other.  So I think

8    you see where I'm going with a question, and you start

9    answering, but that's not ideal for the court reporter.  So

10   I'll try to wait until you finish your answer, and wait until I

11   finish my question.  Okay?

12   A.  Yes, ma'am.

13   Q.  Thank you.

14       All right.  Did the UPT guideline cover the requirement of

15   the examiner's participation in the classroom portion of the

16   course?

17   A.  Yes.

18   Q.  Could you turn to page 017.  It's now going backward in the

19   document in front of you.

20       Does 017 -- is that a portion of the guideline that you

21   covered with Mr. Pooley?

22   A.  Yes.

23             MS. LYDON:  Move to admit 017.

24             THE COURT:  So we're clear, is this still part of

25   Exhibit 100?

1          MS. LYDON:  It is, yes.

2          THE COURT:  Exhibit 100, page 17 is received in

3    evidence.

4          MS. CRAGER:  No objection.

5        (GOVERNMENT'S EXHIBIT 100, PAGE 17 ADMITTED INTO EVIDENCE.)

6          MS. LYDON:  Let's publish.  Thank you.

7    Q.  BY MS. LYDON:  Up top, Section D reads, Classroom Session.

8    This portion of the course will run approximately six to eight

9    hours.  The tandem instructor training presentation will be

10   gone over, module by module, with continued discussion after

11   each module led by the examiner.

12        Is that what you taught Mr. Pooley?

13   A.  Yes.

14   Q.  And it notes, Never leave the candidate to review the

15   presentation without supervision.

16        Do you see that?

17   A.  Yes.

18   Q.  Can we zoom back out.

19        It also, at the bottom of the page, notes that once the

20   candidate is successful and has completed the certification

21   course, the examiner will file the necessary paperwork with the

22   United Parachute Technologies ASAP, within 3 days; is that

23   right?

24   A.  Yes.

25   Q.  Generally, did the examiner send in the documents for the

1    tandem instructors to UPT?

2    A.  Yes.

3    Q.  Okay.  All right.  We can zoom out.

4        One more section.  Could you turn backwards again to 10 --

5    sorry -- 005 of the same document.

6        And is 005 a page that you went over with Mr. Pooley?

7    A.  I'm sorry?

8    Q.  Did you go over this page 005 with Mr. Pooley?

9    A.  Yes, I did.

10            MS. LYDON:  Move to admit 005.

11            THE COURT:  All right.  Any objection?

12            MS. CRAGER:  No objection.

13            THE COURT:  Exhibit 100, page 5 is received in

14   evidence.

15       (GOVERNMENT'S EXHIBIT 100, PAGE 5 ADMITTED INTO EVIDENCE.)

16   Q.  BY MS. LYDON:  Does the last sentence of the paragraph on

17   the screen, in Section 1 -- the last two sentences, I suppose,

18   again emphasize that each examiner must supervise their tandem

19   candidates during the viewing of the training presentation?

20   A.  Yes.

21   Q.  This isn't supposed to be a do-your-own-distance-learning

22   project?

23   A.  No.  This is not distance learning; this is direct

24   supervision.

25   Q.  Okay.

1    A.   Must be present.

2    Q.   Okay.  Before you certified Mr. Pooley in 2010, were you

3    satisfied that he knew everything he needed to know about the

4    obligations of being a tandem examiner?

5    A.   Yes.

6    Q.   And that he could train other people?

7    A.   Yes.

8    Q.   In 2014, did you retrain Mr. Pooley on the requirements of

9    being a tandem examiner?

10   A.   Yes.  I was asked to retrain him.  And I did just that.

11   Q.   Were you on correspondence sent to Mr. Pooley around his

12   need to be retrained?

13   A.   Yes.

14   Q.   And did the correspondence describe to Pooley in detail the

15   specific issues that were being seen and USPA and UPT's

16   investigation of those issues?

17   A.   Yes.

18   Q.   Can you turn --

19        We're going to switch binders.  I'll help you find the

20   right one.  But I'm going to ask you to turn to Government's

21   Exhibit 901.

22        Take a minute to look it over.  And do you -- my question

23   will be do you recognize Government's Exhibit 901?

24   A.   Yes, I do.

25   Q.   Okay.  What is it -- without describing the contents, just

1   what is it?

2   A.  It's a -- a -- in this case, an e-mail from Tom Noonan at

3   UPT to Mr. Pooley.  And I'm cc'd on this particular e-mail.

4   Q.  All right.  And does it describe the need for retraining?

5   A.  Yes, it does.

6            MS. LYDON:  Move to admit 901.

7            MS. CRAGER:  Your Honor, I'd object as most of this

8   being irrelevant for reasons previously discussed, and 403.

9            THE COURT:  All right.  Let me look at it.

10           MS. LYDON:  The proper relevance, Your Honor, is for

11   Mr. Pooley's knowledge of USPA and UPT's intense investigation

12   of paperwork discrepancies and the consequences.

13           THE COURT:  One of the problems I have every time we

14   get into this is you -- you're equating UPT's requirements and

15   everything about their program to USPA's requirements, and I'm

16   not sure that's exactly what he has said.  The relationship

17   between the two is not that clear to me.

18       So when you ask me to rule on the exhibit here, which the

19   subject is, UPT Tandem Examiner Rating Follow-up, I don't know

20   how that relates to USPA, even though there is a lot of

21   discussion about USPA in this e-mail.

22           MS. LYDON:  May I ask a few more questions?

23           THE COURT:  Yes.

24           MS. LYDON:  That might eliminate that.  All right.

25   Q.  BY MS. LYDON:  Mr. Stokes, you mentioned that USPA and UPT

1    closely coordinate.  Do you recall that?

2    A.  Yes, ma'am.

3    Q.  Why do they coordinate so closely?

4    A.  We provide reciprocity.  In other words, if the

5    manufacturer recommends an action, then USPA will a hundred

6    percent follow suit and vice versa.  If we have an issue with a

7    person that's doing business for the USPA that involves tandem,

8    then we want the manufacturer to follow suit.  We call that

9    reciprocity.

10   Q.  Okay.

11         THE COURT:  I don't know what he said.  Reciprocity

12   could be a legal term.  They want the manufacturer to follow

13   suit.  What does that mean?

14         MS. LYDON:  Yeah.  I'll -- I'll flesh that out, Your

15   Honor.  Thank you.

16         THE COURT:  I don't know.

17   Q.  BY MS. LYDON:  So do most individuals have ratings at the

18   same level with both the manufacturer and USPA?

19   A.  Working in the United States, yes.

20   Q.  Okay.  And do most drop zones require a USPA rating?

21   A.  Yes.

22   Q.  And does -- at least with respect to tandem instructors, do

23   the regulations require a manufacturer rating?

24   A.  Yes.

25   Q.  Does USPA offer courses that satisfy the same requirement

1    under the regulations as the manufacturer courses?

2    A.  Only when -- only when they are working under the auspices

3    of the manufacturer.

4    Q.  Okay.  Do most tandem instructor courses bequeath both USPA

5    and manufacturer ratings?

6    A.  Yes.

7    Q.  You mentioned reciprocity.

8    A.  Yes.

9    Q.  Do USPA and UPT coordinate closely with respect to tandem

10   ratings?

11   A.  Yes.

12   Q.  When USPA suspends someone's rating, does -- is there a

13   policy about what UPT does?

14   A.  Yes.  UPT almost a hundred percent of the time will follow

15   suit.

16   Q.  Okay.  So when an investigation is underway, do they

17   coordinate on that investigation?

18   A.  Yes, they do.

19   Q.  Is that what happened with respect to Mr. Pooley in 2014?

20   A.  Yes, it did.

21   Q.  Okay.

22           MS. LYDON:  Does that clear up Your Honor's question?

23           THE COURT:  Well, I don't know.  He was suspended by

24   USP -- whatever the initials are -- USPA, right?

25           MS. LYDON:  He was suspended by both, both in 2014

1    and 2015.

2              THE COURT:  So this letter here is about his

3    suspension by UPT or his suspension by USPA or both?

4              MS. LYDON:  Both.

5              THE COURT:  I mean, this is sort of a loosey-goosey

6    thing.  They follow each other?  I mean, I don't understand.

7        And the fact that I don't understand it doesn't mean the

8    jury doesn't understand it, but it's hard for me to rule on --

9    on this exhibit because it's written by somebody from -- from

10   USPT -- or UPT, and he seems to be talking about the USPA

11   license application.  And it makes no sense to me.  So it

12   doesn't mean it doesn't make sense to the jury.

13       What's the question?  And I'll rule on the objection.

14             MS. LYDON:  So the relevance of it --

15             THE COURT:  Just tell me the question, and I'll rule

16   on the objection.

17             MS. LYDON:  I just moved to admit it.

18             THE COURT:  Oh.  You're moving to admit it?

19             MS. LYDON:  Yes.  For Pooley's knowledge of the way

20   that USPA, in conjunction with UPT, investigates paperwork

21   discrepancies.

22             THE COURT:  All right.  Is there anything in here

23   that you think needs to be redacted?

24             MS. CRAGER:  Yes, Your Honor.  If we could have a

25   sidebar, I can explain.

```
 1                THE COURT:  Okay.  Let's talk at sidebar for a
 2     second.
 3          (Bench conference.)
 4                MS. CRAGER:  Your Honor, this is the same issue.  It
 5     goes into great detail about the --
 6                THE COURT REPORTER:  I'm sorry.  I can't hear.
 7                THE COURT:  Why don't you point it out to me.  You
 8     said it goes into detail with the reasons for the suspension.
 9                MS. CRAGER:  So the suspension is about this person,
10     and it goes into --
11                THE COURT:  The Magnani issue.  Like I'm supposed to
12     know what the Magnani issue is.
13                MS. CRAGER:  I think this also will greatly confuse
14     the jury about the need to know all of this information.
15                THE COURT:  Okay.  So where is it?
16                MS. CRAGER:  That's his name.
17                THE COURT:  Okay.
18                MS. CRAGER:  It explains the exact paperwork issue.
19     And then it says things like, it places everyone involved in
20     the process at risk.  I think that's highly prejudicial.
21                THE COURT:  I don't know what it means.  Risk of
22     what?
23                MS. CRAGER:  Death.
24                THE COURT:  I don't know.  Maybe just risk of losing
25     their license.
```

1              MS. CRAGER:  Sure.  It's a major concern, the result

2    there is a skydiver out there that hasn't met the standards of

3    certification --

4              THE COURT:  I don't see anything there talking about

5    safety.

6              MS. CRAGER:  I think this is all at least very

7    confusing to the jury.

8              THE COURT:  So why -- who is -- let me ask the

9    government.

10        Who is Exequiel Magnani?

11             MS. LYDON:  He's an individual who Mr. Pooley

12   trained, and his -- his paperwork wasn't up to specification.

13   USPA and UPT investigated.  Mr. Magnani lost his rating, and

14   Pooley was put on notice of the intensity of their

15   investigation.  The same ruling that Your Honor made with

16   respect to Government's Exhibit 85 should apply to this.  This

17   is relevant for his knowledge, and it's not unduly prejudicial.

18   It hasn't been admitted, but Your Honor did rule on it.

19             THE COURT:  It hasn't; that's the point.  My clerk

20   even asked me, Did you admit it?  And I said, No.  You followed

21   it up and asked some questions, and that was all right, but I

22   never received the exhibit in evidence.

23             MS. LYDON:  But Your Honor did rule at sidebar that

24   it was --

25             THE COURT:  No.  The issue was relevant, not the

1   exhibit was relevant.  I said the issue was relevant.

2          MS. CRAGER:  This witness has already testified that

3   the -- the extent of the investigation into it was very

4   thorough and that Mr. Pooley knew about that.  That's the point

5   that she's trying to get across.

6          MS. LYDON:  That's not correct.

7          MS. CRAGER:  That's already been put into evidence,

8   and I think the probative value --

9          THE COURT:  You just wanted to show that he

10  appreciated that the consequences of not following the rules

11  and regulations could seriously result in his students not

12  receiving certifications.  That was the purpose that I thought

13  it was relevant to put --

14         MS. LYDON:  Correct, Your Honor.

15         THE COURT:  Now you're telling me this is the same

16  thing.  It may just be cumulative, then, because it's got a lot

17  of other things in here.

18         MS. LYDON:  Well --

19         THE COURT:  Didn't you, as effectively as you can,

20  already make the point?  And I -- you even -- I even kind of

21  coached you a little bit, and I said that -- isn't the purpose

22  that you offered this prove that he took it seriously.

23         MS. LYDON:  You know, I put -- I did that for that

24  particular exhibit, but Your Honor had already ruled that

25  exhibit comes in; so we were going to revisit that.

1           THE COURT:  I don't know that I've ruled the exhibit

2   comes in.  I said --

3           MS. LYDON:  We -- sorry.

4           THE COURT:  I thought I was just telling you that I

5   thought the issue was a valid issue to be discussed, not that

6   the exhibit necessarily came in.

7           MS. LYDON:  Defense is going to argue -- they did in

8   opening -- that he didn't defraud his students; he was trying

9   to get them ratings.  And the detail of this is relevant to

10  show his specific knowledge.  It's not as powerful to say he

11  knew in general.

12          THE COURT:  Does the government -- does the

13  government have to prove that he defrauded his students, or is

14  it -- is it sufficient that they just prove that he defrauded

15  the -- the -- the government or the -- the agency that he had

16  to report to?

17          MS. LYDON:  We're -- we allege he defrauded his

18  students.

19          THE COURT:  You allege he defrauded his students?

20          MS. LYDON:  Yes.

21          THE COURT:  I haven't been able to read all the way

22  through the indictment yet.

23          MS. LYDON:  That's the allegation, and we have to

24  prove it, and that is their contention.  So this is not unduly

25  prejudicial, and it is probative.  So it should come in, in my

1    view.  I won't spend a ton of time with it, but the detail of

2    it is more compelling than me just asking generally.

3              THE COURT:  I don't see anything in here.  If I did,

4    I would be concerned.  But I don't see anything in here that

5    talks about safety or anything like that.  These words that you

6    have, I think, are subject to other interpretations.

7              MS. CRAGER:  I think that the reasons behind those

8    suspensions in 2014 is not --

9              THE COURT REPORTER:  I can't hear.

10             MS. CRAGER:  Sorry.  The fact that his violations

11   place everyone involved in the process at risk --

12             THE COURT:  The reasons are irrelevant, but she's

13   offering it for a different purpose.  And unless this talks

14   about the reasons --

15             MS. CRAGER:  Right.  I'm saying that I think it's

16   403.  I mean, the government has said in their opening the

17   reasons that he was suspended was for safety reasons --

18             THE COURT:  We have to deal with that at some point.

19   We have to resolve that.  And the only way I can resolve it is

20   if you just ask me to do it.  But we haven't got there yet.

21             MS. CRAGER:  Your Honor, I --

22             THE COURT:  I'm going to let this in.  It's not

23   unduly prejudicial.

24             MS. CRAGER:  I -- I think that it will lead the jury

25   to make the conclusion that his -- his violation -- the nature

1    of the violation --

2         THE COURT:  It will not lead the jury to the

3    conclusion that it has anything to do with safety or injuries

4    or anything like that, though.  And so for that reason, I don't

5    think it's unduly prejudicial.

6         MS. CRAGER:  Okay.  I would at least ask for a

7    limiting instruction that this is only for the purposes of

8    showing that he -- the fact that the UPT or USPA investigated.

9         THE COURT:  I'm not sure that would help.  You might

10   want to think about that.  That's kind of like letting them

11   make their argument for them.

12        MS. CRAGER:  But I --

13        THE COURT:  It may not even, in their mind, prove

14   that.  When I say it's limited to that purpose, they may think

15   I --

16        MS. CRAGER:  I understand.  We can discuss limiting

17   instructions.

18        THE COURT:  We can discuss that later.  Right.

19        MS. CRAGER:  Yes.

20        THE COURT:  Okay.

21        MS. CRAGER:  Thank you.

22      (Bench conference concluded.)

23        THE COURT:  Years ago, when this courtroom was first

24   built, it had a number of features that we thought were really

25   innovative at the time, and one of them was this sound.  And

1     it -- so what we have is -- ordinarily in a courtroom, the

2     judge will confer with the lawyers at what they call sidebar,

3     off to the side, so they don't have to excuse everybody from

4     the courtroom, and the lawyers and the judge can have a

5     conversation about legal issues that doesn't involve the jury.

6     So they said, Well, instead of the court reporter getting up

7     and moving over there and everything, we'll put a microphone

8     over there, and you can talk into the microphone.  And to make

9     sure it doesn't get to the jury, we'll put this sound in the

10    background.  So that's what we do.  And that's why it sounds

11    like you're in an airplane when we go over there and talk.  But

12    that's -- that's the purpose of it.  One of the innovations of

13    the courtroom.

14        All right.  Exhibit 901 is received in evidence.

15             MS. LYDON:  Thank you, Your Honor.

16        (GOVERNMENT'S EXHIBIT 901 ADMITTED INTO EVIDENCE.)

17             MS. LYDON:  Please publish.

18    Q.  BY MS. LYDON:  All right.  Let's focus first on the

19    caption.

20        Who is Tom Noonan?  You've mentioned him a couple times.

21    A.  Tom Noonan was the tandem program manager for UPT at that

22    point in time.

23    Q.  Rpooley; Mr. Pooley?

24    A.  Yes.

25    Q.  Who is mostjumps?

1    A.   That would be me.

2    Q.   Quickly, why is that your e-mail address?

3    A.   Because I own the record for the most jumps in 24 hours.

4    Q.   How many jumps did you do in 24 hours?

5    A.   640.

6              THE COURT:  640 divided by 24 --

7              THE WITNESS:  Every 2 minutes, 15 seconds, sir.

8              THE COURT:  You've got to get up there to jump out,

9    you know.

10             THE WITNESS:  Yes, sir, you do.

11   Q.   BY MS. LYDON:  How many people were involved in achieving

12   that Guinness world record?

13   A.   Over 125.

14   Q.   All right.  So Mr. Noonan e-mailed Mr. Pooley and copied

15   you on January 30, 2014.  We can zoom out of there.

16       And Mr. Pooley -- Mr. Noonan notes, Hi, Rob.  I just wanted

17   to check back in with you on the Exequiel Magnani issue.

18       We won't go into detail about all of the facets of the

19   Exequiel Magnani issue, but was Mr. Magnani someone trained as

20   a tandem examiner by Mr. Pooley.

21   A.   He was being trained as a tandem instructor.

22   Q.   Thank you very much.  A tandem instructor by Mr. Pooley.

23   A.   Yes.

24   Q.   Mr. Pooley was the examiner; Mr. Magnani was the tandem

25   instructor?

1   A.  Correct.

2   Q.  All right.  And in sum and substance, did UPT discover

3   several issues with regard to the paperwork submitted by

4   Mr. Pooley with respect to Mr. Magnani?

5   A.  Yes.

6   Q.  Okay.  And did he not check certain things that he should

7   have, in sum and substance?

8   A.  That is correct.

9   Q.  Does the letter go into some detail about UPT's

10  investigation in conjunction with USPA?

11  A.  Yes.

12  Q.  Does this paragraph go over that a bit?

13      Does it note that Mr. Noonan was investigating Exequiel's

14  time in the sport with USPA?

15  A.  Yes.

16  Q.  Was that pretty typical, that USPA and UPT would work

17  together?

18  A.  Yes.

19  Q.  All right.  And did Mr. Noonan note at the end of this

20  paragraph to Mr. Pooley, It is our expectation that you would

21  validate this particular item before accepting someone into

22  your course?

23  A.  Yes.

24  Q.  All right.  This next paragraph goes into the consequences

25  for Mr. Magnani.

1          Do you see that?

2     A.   Yes.

3     Q.   Did UPT conclude that Mr. Magnani lacks the appropriate

4     rating and likely believes that he has the appropriate rating?

5     A.   That is correct.

6     Q.   And requests that Mr. Pooley reach out to Exequiel and

7     inform him that, in effect, he didn't have a rating; he is not

8     authorized to perform tandem skydives using any equipment

9     manufactured by UPT?

10    A.   Yes.

11    Q.   Zoom in on that last bit.

12         Does Mr. Noonan advise, I have cc'd your examiner course

13    director Jay Stokes on this e-mail so that he may be able to

14    assist you moving forward.  As of today, you are being placed

15    on inactive status?

16    A.   Yes.

17    Q.   Does he advise that he's on inactive status until he

18    completes a retraining with you and you agree to recertify him

19    as having a thorough understanding of the expectations set

20    forth by the examiner rating?

21    A.   That is correct.

22    Q.   Okay.  Can you take a look just one exhibit forward, at

23    902.  It's a continuation of this.  So other direction.

24    Forward.

25         This appears to be a -- what date is that document?

1   A.   February 2, 2014.

2   Q.   And it's a follow-up e-mail from Tom Noonan to Rob Pooley

3   without copying you, but does it reference a conversation with

4   you?

5   A.   Yes.

6   Q.   Who was the conversation with?

7   A.   This particular one is regarding Exequiel.

8   Q.   Does it reflect that you called Pooley and spoke with him

9   about Exequiel?

10   A.   Yes.

11          THE COURT:   Now I am going to give a limiting

12   instruction at this point because there are a lot of things

13   that are set forth in this letter that it says happened.

14   That's hearsay.   And so you don't consider it for the --

15   proving the truth of anything that this letter says happened.

16   This letter is to be considered by you only to show what was

17   communicated from Mr. Noonan to Mr. Pooley; the fact that it

18   was communicated to him, not the fact that it's true.

19       You're all nodding; so I assume you understand.

20       Go ahead.

21          MS. LYDON:   Thank you, Your Honor.   Exactly.

22   Q.   BY MS. LYDON:   I want to ask you about the knowledge that

23   was imparted to Mr. Pooley through these communications.

24          MS. LYDON:   I'd move to admit Government 902 for the

25   same reason.

1              THE COURT:  Well, is it cumulative, or is it

2      something different?

3              MS. LYDON:  It's two different things.

4              THE COURT:  Well, okay.  I have it here.  Let me look

5      at 902.

6              MS. LYDON:  Same topic.

7              THE COURT:  About another person or what?

8              MS. LYDON:  Same person.

9              THE COURT:  Exequiel?

10             MS. LYDON:  Um-hum.

11             THE COURT:  The problem is I have to read this to

12     make sure I don't see anything here that creates a problem.  So

13     give me a minute.

14         (Pause in proceedings.)

15         All right.  I've read the first one.  I'll have to read the

16     second one.

17         (Pause in proceedings.)

18         Oh, it's so complicated.  It involves nothing that has to

19     do with -- with the facts of this case.  You just are burdening

20     the jury with talks about how many jumps you can make --

21             MS. LYDON:  The bottom of the e-mail and the attached

22     second page, that's the same exhibit.  It's a continuation of

23     it.  So, really, the only new thing is that first e-mail.

24             THE COURT:  The first e-mail?

25             MS. LYDON:  Yeah.  The, Thank you for that update.

1          THE COURT:  Oh.  You don't want the second one?

2          MS. LYDON:  The second one already came in as 901.

3          THE COURT:  That's the same one?

4          MS. LYDON:  Um-hum.

5          THE COURT:  All right.  So you just want the top one?

6     You probably don't object to the top one, do you?

7          MS. CRAGER:  I think this is all not relevant as per

8     my previous objections, but I understand the Court's ruling on

9     that.

10          THE COURT:  Let me look at it.

11     It says, When I contacted USPA regarding Exequiel, they

12     asked who the examiner was, and upon hearing that it was you --

13     in other words, hearing that it was Mr. Pooley -- they told me

14     that they -- USPA -- had already had a number of issues they

15     had been dealing with regarding your paperwork courses.  I have

16     no idea as to the specifics as it's a USPA thing.  But it

17     sounds like from what you said in your reply, you're a good

18     trainer, but you could just use some help sorting out your

19     paperwork side of things.  That's not a unique situation,

20     talented examiners that struggle with paperwork compliance.

21     Every year or so, one or two do refresher training and get

22     themselves sorted out.

23     Number one, that's not anything to do with this case.

24     Nothing whatsoever to do with this case.

25     And, number two, it is quite favorable to Mr. Pooley.

1        So I'll sustain the objection.  We can't go -- we can't go

2    so far astray as you're trying to go with all this.  We just

3    can't keep doing it.  It's going to distract the jury from the

4    issues in this case, which have nothing to do with him being a

5    good trainer, as this person says, or a bad trainer, as

6    somebody else says.  Nothing to do with the evidence in this

7    case.  They're not going to find him guilty, if I have anything

8    to say about it, because he's a bad trainer.

9             MS. LYDON:  I'm certainly not trying to --

10            THE COURT:  They're not going to acquit him, if I

11   have anything to say about it, just because he's a good

12   trainer.

13            MS. LYDON:  I don't care whether he --

14            THE COURT:  Okay.

15            MS. LYDON:  I agree.

16            THE COURT:  All right.

17            MS. LYDON:  What I'm bringing this in for is very

18   different.

19            THE COURT:  I'm not going to let you confuse the jury

20   anymore.  So the objection is sustained.

21            MS. LYDON:  All right.

22   Q.  BY MS. LYDON:  Mr. Stokes, did you call Mr. Pooley after

23   receiving that e-mail and go over the need for retraining with

24   him?

25   A.  Yes.

1    Q.  Do you remember that conversation?

2    A.  That's a long time ago.

3    Q.  Okay.  Not in great detail, but in sum and substance, do

4    you remember what you said to him, what he said to you?

5    A.  We need to get you back into the fold.  We need to retrain

6    you specifically on administrative function and other things to

7    ensure that you do the right thing.

8    Q.  All right.  Did you, in fact, conduct retraining of

9    Mr. Pooley?

10   A.  Yes, I did.

11   Q.  Can you turn to Government's Exhibit 103.  And I'll grab

12   that and the other binder.

13        Do you recognize the first page of Government's

14   Exhibit 103?

15   A.  Yes.

16   Q.  What is it?

17   A.  It is a Tandem Instructor/Examiner Recertification Form.

18   Q.  And what does it reflect?

19   A.  It reflects that Rob Pooley, on said date, accomplished the

20   required training -- retraining, and he was reset as a tandem

21   examiner for United Parachute Technologies.

22             MS. LYDON:  Move to admit the first page of

23   Government 103.

24             MS. CRAGER:  No objection.

25             THE COURT:  Page 1 of Exhibit 103 is received in

1    evidence.

2         (GOVERNMENT'S EXHIBIT 103, PAGE 1 ADMITTED INTO EVIDENCE.)

3    Q.  BY MS. LYDON:  All right.  As you said, a Tandem

4    Instructor/Examiner Recertification Form signed by you.  Is

5    that your signature?

6    A.  Yes.

7    Q.  And what's the date?

8    A.  2/7/2014.

9    Q.  Is February 2014 approximately when you recertified

10   Mr. Pooley?

11   A.  That's correct.

12   Q.  Okay.  We can zoom back out of that.

13        All right.  Did you conduct a full retraining?  Was it the

14   same course basically all over again for Mr. Pooley in

15   February?

16   A.  Yes.

17   Q.  Were there other participants in the course as well?

18   A.  Yes.

19   Q.  Did you curtail it at all because it was a retraining or

20   just do the whole thing?

21   A.  No.  Best to do the whole thing.  Plus he can gain more

22   knowledge based on what he gets -- we get better with what we

23   do if we repeat it.

24   Q.  And did some -- were some of those other candidates in the

25   examiner course new examiner candidates so they needed to take

1    the course for the first time?

2    A.  Yes.

3    Q.  All right.  So did you go over all those same provisions of

4    the tandem examiner guidelines for UPT that we went over with

5    before?

6    A.  Yes.

7    Q.  Did you require him to bring those materials?

8    A.  I actually provided a new set of documents.

9    Q.  Okay.  Would you have -- the other binder -- the binder

10   underneath that binder -- could you look at Government's

11   Exhibit 101.

12   A.  101.  Yes.

13   Q.  Do you recognize that document?

14   A.  Yes.

15   Q.  What is it?

16   A.  Tandem Examiner Guidelines for the Certification of Tandem

17   Instructors.  And this was dated January 2013.

18   Q.  All right.  Would that have been the guidelines that you

19   gave him for your 2014 retraining course?

20   A.  Yes.  This was the latest document.

21   Q.  All right.

22           MS. LYDON:  Move to admit pages 1, 006, 017, and 047

23   of Government's Exhibit 101.

24           THE COURT:  Any objections?

25           MS. CRAGER:  I'm just looking at those pages, Your

1    Honor.  One moment.

2                   THE COURT:  It's 1, 6, 17, and 47.

3                   MS. CRAGER:  No objection, Your Honor.

4                   THE COURT:  Exhibit 101, pages 1, 6, 17, and 47 are

5    received in evidence.

6        (GOVERNMENT'S EXHIBIT 101, PAGES 1, 6, 17, 47 ADMITTED INTO

7    EVIDENCE.)

8                   MS. LYDON:  Please publish the first page of 101.

9    Q.  BY MS. LYDON:  Very similar looking, but still actually the

10   11th edition but January 2013; is that right?

11   A.  That's correct.  Sorry.

12   Q.  Okay.  Moving on to page -- publish page 006.

13       Do you see the same requirement of direct supervision in

14   2013?

15   A.  Yes.

16   Q.  And publish, please, 047.

17       Do you see that it emphasizes the same points about the

18   requirement that the examiner be present and attentive for each

19   of the five certification jumps?

20   A.  Yes.

21   Q.  And page 17, please.

22       Does it emphasize the same requirements that the tandem

23   instructor be present, participating, and going over, module by

24   module, with continued discussion, the entire classroom

25   portion?

1   A.   Yes.

2   Q.   Okay.   Did you tell Pooley all of that again in 2014?

3   A.   Yes.

4   Q.   At the end of the course, did Pooley give you any

5   impression about whether he understood the requirements and

6   would take it seriously?

7   A.   Yes.

8   Q.   What was the impression he gave you?

9   A.   The impression he gave me was that he could follow the

10  standard, he could follow the process or the modules, the

11  program and, in fact, train people to the specific standard

12  required so that they could conduct tandem jumps safely.

13  Q.   All right.   Did you -- in reliance on that, did you do

14  anything?

15  A.   Yes.   He had to physically perform just like he did before.

16  He had to teach.   He had to do things.

17  Q.   Did you -- so you taught him.   And then after the course,

18  did you write anything certifying your impressions after the

19  course?

20  A.   Yes.   I wrote an initial letter of recommendation to

21  reinstate.

22  Q.   Okay.

23          MS. LYDON:   Nothing further.   Thank you, Mr. Stokes.

24          THE COURT:   We'll take a 15-minute recess now.

25      Remember the admonition, ladies and gentlemen.   15 minutes.

1          (Recess taken, 2:45 p.m. - 3:03 p.m.)

2              THE COURT:  Everyone is present.

3        Ms. Crager, would you like to cross-examine?

4              MS. CRAGER:  Yes, Your Honor.  Thank you.

5              THE COURT:  You may proceed.

6                        CROSS-EXAMINATION

7    BY MS. CRAGER:

8    Q.  Good afternoon, Mr. Stokes.

9    A.  Good afternoon.

10   Q.  I'd like to continue talking a little bit about the

11   manuals.

12       There is a binder in front of you; is that UPT's Sigma

13   Tandem manual?

14   A.  Yes.  It's one of the editions.

15             MS. CRAGER:  I would move to admit the first page of

16   Exhibit 2000.

17             THE COURT:  Any objection?

18             MS. LYDON:  I -- I don't see, at this point, the

19   relevance or the foundation.

20             THE COURT:  All right.  I'll take a look at it.

21             MS. CRAGER:  This is just a continued discussion

22   about the guidelines for the tandem instructor course.

23             THE COURT:  The first page is just a picture.  Is

24   that all you're offering?

25             MS. CRAGER:  I will be offering other pages.  I'm

1    just establishing that this is the manual for the Sigma

2    Tandem --

3              THE COURT:  The first page is just a picture.

4              MS. CRAGER:  Yes.

5              THE COURT:  What do you want to offer that for?

6              MS. CRAGER:  Just so we know what the manual is.  But

7    I can go on.

8              THE COURT:  All right.  Go to your next one.

9    Q.  BY MS. CRAGER:  This -- this manual is a user manual for

10   the equipment?

11   A.  Yes.

12   Q.  And this explains how to use the equipment?

13   A.  Yes.

14   Q.  All of that is covered during the tandem instructor course?

15   A.  That's correct.

16   Q.  The manual also explains how to become certified as a

17   tandem instructor on this particular equipment?

18   A.  Yes.

19   Q.  The tandem instructor candidates need to take an exam that

20   is contained in this manual?

21   A.  Actually, the exam is not in the manual itself.  The exam

22   is based on information from the manual.

23   Q.  I see.  So it's based on information that the tandem

24   instructor candidates can find in the manual?

25   A.  Yes.

1   Q.  It also explains the qualifications that someone needs to

2   be a tandem instructor?

3   A.  Correct.

4   Q.  Can you please turn to page 12.

5       Does this page discuss applicant qualifications for being a

6   tandem instructor?

7   A.  Yes.

8   Q.  And there is a list that lets the tandem instructor know

9   what they have to have before they start the course?

10  A.  Yes.

11          MS. LYDON:  Objection.

12          THE COURT:  Overruled.  It's just an explanation so

13  far.

14      You're offering this page into evidence?

15          MS. CRAGER:  Yes, Your Honor.  I offer page 12 into

16  evidence.

17          MS. LYDON:  The objection is based on it's unclear

18  what purpose or -- or whether it's for the truth or whether

19  it's for the effect on some listener.

20          THE COURT:  Is this a different exhibit -- manual

21  than the one we already have?

22          MS. CRAGER:  Yes, Your Honor.  I only --

23          THE COURT:  The manual itself, is this a different

24  manual?

25          MS. CRAGER:  Yes.

1          THE COURT:  So this is the manufacturer's manual?

2          MS. CRAGER:  Yes.

3          THE COURT:  All right.

4          MS. CRAGER:  I intend to offer it because it advises

5   about the care and vigilance that the students should have in

6   evaluating the credentials of the tandem examiner.

7          THE COURT:  All right.  Well, I -- I assume when it

8   says "applicant qualifications," that the objection is we don't

9   know what the application is for.  That's --

10          MS. CRAGER:  Yes, Your Honor.  He just testified, I

11   believe, that this is for the tandem instructor course.

12          THE COURT:  All right.

13          MS. LYDON:  And -- I can clarify the objection, Your

14   Honor.

15          THE COURT:  All right.

16          MS. LYDON:  The objection is that there is no

17   foundation that Mr. Stokes provided this manual to any of the

18   tandem instructor candidates.

19          THE COURT:  Do you want to lay the foundation?

20          MS. CRAGER:  Yes, Your Honor.

21   Q.  BY MS. CRAGER:  This manual is the manual that explains how

22   to use the equipment?

23   A.  Yes, it does.

24   Q.  And how to use the equipment is one of the things that is

25   covered in a tandem instructor course?

1  A.  From the aspects of -- are we talking instructor or

2  examiner?

3  Q.  Instructor.

4  A.  Yes.

5  Q.  And the tandem instructors need to take an exam in order to

6  be qualified, and they can find the answers to that exam in

7  this material and this manual?

8  A.  Yes.

9  Q.  And it is expected that tandem instructor candidates review

10  this manual?

11  A.  Yes.

12          MS. CRAGER:  I move to admit page 12.

13          MS. LYDON:  Objection.  It remains there's been no

14  showing of foundation that Mr. Stokes taught --

15          THE COURT:  Okay.  You -- you were Mr. Pooley's

16  instructor, right?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Do you know whether he got a copy of this

19  manual?

20          THE WITNESS:  This would be something they download

21  off the internet and they have as a backup document, yes, sir.

22          THE COURT:  Would you have instructed him on how to

23  find this manual?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Did you do that?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  All right.  Which pages are you offering?

3              MS. CRAGER:  Only page 12, Your Honor.

4              THE COURT:  Page 12.  Page 12 of Exhibit 2000 is

5    received in evidence.

6         (DEFENDANT'S EXHIBIT 2000, PAGE 12 ADMITTED INTO EVIDENCE.)

7              MS. LYDON:  To clarify, Your Honor, is it received

8    for the effect on Pooley?

9              MS. CRAGER:  We are offering it for the effect on

10   Mr. Pooley and the tandem instructor candidates, to be clear.

11             MS. LYDON:  And Mr. Stokes did not give it to any of

12   the tandem instructor candidates, nor has she shown they ever

13   received it.

14             MS. CRAGER:  At this point, it's for Mr. Pooley.

15             THE COURT:  Just its effect on Mr. Pooley?

16             MS. CRAGER:  Sure.

17             THE COURT:  Go ahead.

18             MS. CRAGER:  Thank you.  I'd like to publish page 12.

19   Q.  BY MS. CRAGER:  The top here is about the applicant

20   qualifications?

21   A.  Yes.

22   Q.  And that's for the tandem instructor candidates?

23   A.  Yes.

24   Q.  I would like to zoom in right here on this note.

25        It says, Each candidate has the responsibility to inspect

1   the credentials of the tandem examiner.

2        Is that what it says?

3   A.  Yes.

4   Q.  Certification paperwork filed by an examiner who is not a

5   current tandem instructor will be considered to be invalid by

6   the United Parachute Technologies.

7        Is that what it says?

8   A.  Yes.

9   Q.  And then it says, in all caps, Be sure your examiner is

10  holding a valid current tandem examiner license.

11       Is that what it says?

12  A.  Yes.

13  Q.  Thank you.  Do you know a person named Yuri Garmashov?

14  A.  Yes.

15  Q.  And did you train him to be a tandem examiner?

16  A.  Yes.

17  Q.  You trained him in the same course in 2014 as you trained

18  Mr. Pooley?

19            MS. LYDON:  Objection.  Outside the scope.

20  Relevance.

21            THE COURT:  Overruled.  You may answer.

22            THE WITNESS:  Yes.  Rob Pooley was there to be

23  retrained.  Yuri was receiving initial training.

24  Q.  BY MS. CRAGER:  I see.  And Yuri's training, you let him

25  know that a tandem examiner must be present during the various

1    stages of a tandem instructor course?

2    A.  Correct.

3    Q.  You also let him know that any reports of examiners signing

4    off on paperwork when, in fact, they were not present would be

5    grounds for examiner rating revocation?

6    A.  In accordance with the guidelines that are specific --

7    specified by the UPT, yes.

8    Q.  So you let Yuri Garmashov know that if he signed off and he

9    was not present, his ratings could be revoked?

10   A.  Yes.

11            MS. CRAGER:  Thank you.

12            THE COURT:  Any redirect?

13            MS. LYDON:  Just very briefly.

14                      REDIRECT EXAMINATION

15   BY MS. LYDON:

16   Q.  Mr. Stokes, Ms. Crager showed you the Sigma Tandem system

17   owner's manual.  Do you recall that?

18   A.  Yes.

19   Q.  But we don't know what year it was, do we?

20   A.  Normally, you would have a date of placed in service, or

21   words to that effect, on the bottom of the page.

22   Q.  And that's not here, is it?

23   A.  I don't see that.

24   Q.  And we don't have any reason to think that Pooley actually

25   showed this to any of his tandem instructor --

1                  MS. CRAGER:  Objection.  Argumentative.

2                  THE COURT:  Overruled.  But I -- you know, I -- I'm

3      just making sure that I didn't exclude something that might

4      have had the date on it, because I wasn't thinking of that at

5      the time you were offering pages.

6          Is there some other page on this that has the date

7      somewhere?

8          Mr. Stokes, is the date -- did you look at this?

9                  THE WITNESS:  Your Honor, normally, the date would be

10     at the lowest portion where it says, Section, Sigma Tandem

11     System, Chapter; there would be a date in there.  And I don't

12     see one --

13                 THE COURT:  There isn't one.

14                 THE WITNESS:  No, sir.  And the manuals are updated

15     periodically.

16                 THE COURT:  But there is no date on this one?

17                 THE WITNESS:  No, sir.

18                 THE COURT:  Do you know why?

19                 THE WITNESS:  I do not.

20                 THE COURT:  All right.

21     Q.  BY MS. LYDON:  So it's a defense exhibit, but there is no

22     date on it, right?

23     A.  That's correct.

24     Q.  And there is no reason -- you don't have a -- any facts

25     suggesting that Pooley actually gave this to any of his tandem

1    instructor candidates, right?

2    A.  I don't know that.

3    Q.  So -- and with respect to the point that the defense made

4    about the applicants checking their examiner's card, when

5    someone is suspended, they don't actually mail back their card,

6    do they?

7    A.  They wouldn't have the ability to show something they don't

8    have.

9    Q.  Well, when someone is suspended is the point I'm making.

10       So when Mr. Pooley became an examiner, he received a card,

11   right?

12   A.  Yes.

13   Q.  Then when he was suspended, he didn't physically return the

14   card to USPA or UPT -- right? -- as far as you know?

15   A.  No.  There -- there is no requirement to surrender.

16   Q.  So if Mr. Pooley were defrauding these students, he had a

17   card that he could have used to do so, right?

18            MS. CRAGER:  Objection.  Argumentative.  Speculation.

19            THE COURT:  Overruled.  If you know.

20            THE WITNESS:  He would have -- he would have a card.

21   It would have a date on it.

22   Q.  BY MS. LYDON:  So this business about showing them your

23   card wouldn't have made any difference to the students, would

24   it?

25            MS. CRAGER:  Objection.  Argumentative.  Speculation.

1              THE COURT:  Sustained.

2              MS. LYDON:  I'm done anyway.

3         Thank you, Mr. Stokes.

4              THE COURT:  All right.  Anything else?

5              MS. CRAGER:  Yes, Your Honor.

6                        RECROSS-EXAMINATION

7    BY MS. CRAGER:

8    Q.  Mr. Stokes, could you turn to Exhibit 2001, which is just

9    the next exhibit there.

10   A.  Okay.

11   Q.  Can you turn to the very last page of that exhibit, page

12   123.

13        Do you see that page?

14   A.  I am at that page.

15   Q.  There are some dates there.

16   A.  Yes.

17   Q.  This is entitled "Revision Log"?

18   A.  Yes.

19   Q.  The revision log is how UPT keeps track of what was changed

20   in the manual at what time?

21   A.  Correct.

22   Q.  And there are three revisions listed in this log?

23   A.  Yes.

24   Q.  They are dated July of 2016 and September of 2016?

25   A.  Yes.

1    Q.  And can you turn back to page 1 of that Exhibit 2001.

2    A.  Okay.

3    Q.  And this is the Sigma Tandem Owner's Manual we were talking

4    about before?

5            MS. LYDON:  Objection.  It's -- it's not --

6            THE COURT:  We don't know what this is.

7            MS. LYDON:  It's 2001.  It's a different exhibit.

8            THE COURT:  It is a different exhibit.  This one has

9    a date on it.

10           MS. CRAGER:  Yes, Your Honor.  I'm trying to lay the

11   foundation that the government was objecting to.

12           THE COURT:  Let's see if he knows -- see if he has an

13   explanation.

14   Q.  BY MS. CRAGER:  So this is a manual with dates for

15   revisions in July and September of 2016?

16   A.  Yes.

17   Q.  Okay.  Now, none of the revisions listed here relate to the

18   page 12 that we were talking about before?

19   A.  They relate to malfunction procedures and standardized

20   verbiage.

21   Q.  So those were the things that were changed in this revision

22   to the manual?

23   A.  I would have to say yes.

24   Q.  Okay.  And now can you turn to page 12 of 2001.  I'm sorry.

25   It's actually page 11 in this version.

1    A.   Okay.  I'm there.

2              MS. CRAGER:  Your Honor, I move to admit page 11 of

3    2001.

4              THE COURT:  How do we read the date on this?  Is

5    that -- is that at the bottom?

6              THE WITNESS:  It --

7              MS. LYDON:  Objection for various reasons.

8              THE COURT:  Well, let -- is there a date on this one

9    that I can find?

10             MS. CRAGER:  The dates -- Your Honor --

11             THE COURT:  I'm asking him.  This is his manual.

12             THE WITNESS:  If -- it -- the date should be at the

13   bottom of the page.

14             THE COURT:  So what -- on this one, it says MAN-013.

15             THE WITNESS:  Revision.

16             THE COURT:  Does that tell you the date or not?

17             THE WITNESS:  No, it does not.

18             THE COURT:  All right.  So does this surprise you

19   that neither of these have a date?

20             THE WITNESS:  It -- it does, because -- but it says

21   Pooley Defense, and then there is a number here.

22             THE COURT:  Right.

23             THE WITNESS:  That might have eliminated the date.

24             THE COURT:  Right.  But other than that, you just --

25   you just have to speculate, I guess.

1              THE WITNESS:  Yes, sir.

2              THE COURT:  All right.  There is no indication on

3    either one of these what the dates are.

4              MS. CRAGER:  Yes, Your Honor.  I think the dates are

5    noted on the last page on the revision log.

6              THE COURT:  Of 2001?

7              MS. CRAGER:  Yes.

8              MS. LYDON:  We would disagree with that

9    interpretation of the revision log.  It reflects that there

10   were certain revisions made on certain dates.  It doesn't tell

11   us anything about the date of either of these documents.

12             THE COURT:  No, it doesn't.  And this is his company.

13   If he can't find the date on it, then I'm not going to

14   speculate.

15             MS. CRAGER:  Yes, Your Honor.  We'll call another

16   witness about that.

17             THE COURT:  Anything else from him?

18             MS. LYDON:  No.  Thank you, Your Honor.

19             THE COURT:  Okay.  Mr. Stokes, thank you.  You're

20   excused.

21             THE WITNESS:  Thank you, sir.

22             MR. SHARMA:  Your Honor, the government calls Mark

23   Procos.

24             THE CLERK:  Sir, please step forward, all the way to

25   your right, up to the witness stand.

1    Remain standing.  Face me, please.  And raise your right

2  hand.

3        (The Witness, MARK PROCOS, is sworn.)

4            THE WITNESS:  I do.

5            THE CLERK:  Thank you.  You may be seated.

6    Please state your full name.  Spell your last name for the

7  record.

8            THE WITNESS:  Mark Procos.  P-R-O-C-O-S.

9                    DIRECT EXAMINATION

10  BY MR. SHARMA:

11  Q.  Good afternoon, Mr. Procos.

12  A.  Good afternoon.

13  Q.  Who do you work for?

14  A.  United Parachute Technologies.

15  Q.  Okay.  And what does United Parachute Technologies do?

16  A.  We are a manufacturer of harness and container systems and

17  tandem systems.

18  Q.  Tandem --

19  A.  Parachute systems.

20  Q.  Tandem parachute systems.

21      Any particular tandem parachute systems?

22  A.  The Sigma and the Micro Sigma.

23  Q.  How big of a market share does United Parachute

24  Technologies control in tandem parachutes?

25  A.  We estimate we -- in the US, we have about 90 percent of

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    the market.  And worldwide, about 85 percent of the market.

2    Q.  Okay.  So if a -- if a person is using a tandem parachute

3    in the United States, 90 percent of the time, it's going to be

4    a UPT parachute?

5    A.  Yes.

6    Q.  And what's your role with UPT, sir?

7    A.  I'm currently the senior executive and general manager of

8    United Parachute Technologies.

9    Q.  Just briefly, what are some of your duties in that role?

10   A.  I have a management team that runs various departments

11   within the company, and I oversee them, as well as the company

12   and around the world.

13   Q.  How long have you worked with UPT?

14   A.  Since 1998.

15   Q.  And have you always been the general -- the general

16   manager?

17   A.  I'd like to have been, but no.

18   Q.  What are some of the other roles you've had?

19   A.  No.  I started out and when I joined the company in '98 in

20   the quality department.  And I moved through various

21   departments, and up to then, I became sales and marketing

22   director.  And in 2003, I was also the tandem program director.

23   Q.  You're also a skydiver?

24   A.  Yes.

25   Q.  Have you been a tandem instructor or a tandem examiner?

1   A.   Yes.  Even before I joined the United Parachute

2   Technologies.

3   Q.   So both of them?

4   A.   Yes.

5   Q.   Does UPT require anything of skydivers that want to use the

6   UPT tandem parachute?

7   A.   Yes.  According to the rules of the FAA, they have to

8   undergo an instructor training course with one of our examiners

9   and have to be issued a rating by us or tandem -- somebody

10   approved by the administrator of the FAA.

11   Q.   Okay.  So what does UPT call that course we just talked

12   about?

13   A.   The instructor course.  The tandem -- it's called the

14   tandem instructor course.

15   Q.   Okay.  And what does that -- is there a certification that

16   comes out of that?

17   A.   Yes.  They would get a -- once they have completed the

18   training program and the probationary terms, they'll be issued

19   a tandem rating card.

20   Q.   A tandem rating card?

21   A.   A card, yes.

22   Q.   What are they called after that -- after they complete that

23   course?

24   A.   A tandem instructor.

25   Q.   Got it.  And would these be the same processes and

1   requirements in place as in 2016?

2   A.  Yes.

3   Q.  What was the primary concern or goal for UPT in developing

4   this tandem instructor course?

5   A.  To ensure that this is -- these tandem systems are a more

6   complex system; so we put this course in place.  We were

7   required to do it by the FAA.  We put this course in place so

8   we could keep the level of safety where it should be.

9   Q.  Okay.  Just briefly, who could teach a tandem instructor

10  course?

11  A.  A tandem examiner.

12  Q.  Got it.  And is that just a higher certification than a

13  tandem instructor?

14  A.  Yes.

15  Q.  Now, do you know an individual named Robert Pooley?

16  A.  Yes.

17  Q.  How do you know him?

18  A.  He was a tandem -- a tandem instructor and a tandem

19  examiner.

20  Q.  Got it.

21      Do you know when he got certified with UPT --

22  A.  His --

23  Q.  -- to be a tandem examiner?

24  A.  Yes.  In 2010.

25  Q.  Okay.  Does UPT keep records of tandem instructors and

1  tandem examiners that it has -- it certifies?

2  A.  Yes, we do.

3  Q.  How does it keep those records?

4  A.  There's two ways.  We have -- as soon as a person becomes a

5  tandem instructor, which is a prerequisite before any other

6  rating, when we receive the initial paperwork from the

7  training, we open up a file, and we keep all these -- the

8  original paperwork that was submitted to us, and we also put

9  that name into a database.

10 Q.  When you say you create a file, is that a hard copy file?

11 A.  Physical file.  Manila folder file.

12 Q.  Okay.  And where does that file go?

13 A.  That's kept in our tandem records room at United Parachute

14 Technologies.

15 Q.  And where physically or geographically is that located?

16 A.  In Florida.  DeLand, Florida.  At our facility in DeLand.

17 Q.  And who makes these -- these records -- these files?

18 A.  So the -- we normally have somebody that works as an

19 administrator to receive, initially, these things, in charge of

20 the rating fees and so on, and she does that.  Currently, her

21 name is Cheryl.

22 Q.  Okay.  Is it a regular practice of UPT to maintain those

23 records?

24 A.  Yes.

25 Q.  And are those records kept in the regular course of UPT's

1   business?

2   A.  Yes.

3   Q.  Okay.  Can I turn you to Exhibit 105.  So there is going to

4   be binders behind you, and it will be in Binder 6.  If you have

5   any trouble, just let me know.  I'll come over to help you.

6   A.  6.  Yes.

7   Q.  So number 105 is the tab.

8   A.  All right.  Tab 1 of 5?  105.  Got it.

9   Q.  Do you recognize that document?

10  A.  Yes.

11  Q.  And what is it, sir?

12  A.  So when a person -- a candidate does the initial training

13  to become a tandem instructor, this is a logbook in the

14  record -- the initial records we keep, which is part of the

15  whole package that gets submitted to us.

16  Q.  Is that the specific logbook for a person?

17  A.  Yes, it is.

18  Q.  Whose logbook is that?

19  A.  That's Rob Pooley's.

20  Q.  And how do you know that?

21  A.  His name is on it, his address, his phone number, date of

22  birth, all of the above.

23          MR. SHARMA:  Government moves to enter into evidence

24  Exhibit 105.

25          THE COURT:  Any objection?

1          MS. CRAGER:  I'm sorry, Your Honor.  I just got a

2     copy of it just now; so if you'll give me a moment.

3          MS. LYDON:  We provided it electronically, but it

4     didn't make it into the latest physical binder.

5          MS. CRAGER:  No objection, Your Honor.

6          THE COURT:  Exhibit 105 is received in evidence.

7          (GOVERNMENT'S EXHIBIT 105 ADMITTED INTO EVIDENCE.)

8          MR. SHARMA:  Okay.  Page number -- thank you.

9     Q.  BY MR. SHARMA:  So just looking at the first page of this

10    document, sir, is that -- up there, is that Rob Pooley's name?

11    A.  Yes.

12    Q.  Okay.  And so this is what you said was a logbook?

13    A.  Yes.  It's a -- a training logbook.

14    Q.  Can we turn to the next page, please.

15         So could you explain to us what's happening on this -- on

16    this page of the logbook?

17    A.  Okay.  I'll start on the top left-hand corner there.

18    That's Rob.  And -- Rob Pooley's name.  The person that gave

19    him his initial tandem instruction, James, which is signed off.

20    So in other words, he has -- this is the -- actually, the

21    second page.  So this is after he completed his initial five

22    training jumps.

23    Q.  Okay.

24    A.  And he is signed off.

25         Then you'll see at the bottom of the page these are jumps

1    that he would have performed with an experienced passenger,

2    somebody that is an experienced skydiver -- they call

3    consolidation jumps.

4        And on the right-hand side, Section B, is a continuation of

5    jumps.  Those jumps, he can perform with somebody that has not

6    done a tandem before.  In other words, that he's taking as a

7    student that has not jumped before.

8    Q.  Who is signing off on these jumps?

9    A.  On the jumps itself and the -- the -- those would have been

10   the person -- the jumper he took on those.  And jumps on the 6

11   through number 10, that's the jumper he took, the experienced

12   jumper; they would have signed off on it.

13   Q.  Got it.  So these are someone else's signatures?

14   A.  Yes.

15   Q.  Okay.

16   A.  And the signatures on the right-hand side would have been a

17   witnessing jump.

18   Q.  Got you.

19       Flip over to the next page, please, 105-003.

20       And are these just more of the jumps that he had to do in

21   his logbook?

22   A.  Yes.  So these are more consolidation jumps, performed with

23   inexperienced people, not experienced jumpers.

24   Q.  And just to -- just to circle back, these are all the jumps

25   that he would have done to become a tandem instructor?

1    A.   Yeah.  Those are the ones on the left.  If you look on the

2    right, those are his initial five training jumps that he would

3    have performed with the tandem examiner.

4    Q.   Got it.

5    A.   And would have been signed off by the examiner.

6         On the previous page, where signed off, there was the

7    signing of these initial five jumps.

8    Q.   Flip over to the next page.

9         And is that the final endorsement up there in the corner?

10   A.   Yes.  So after he has completed all his consolidation

11   jumps, his probationary jumps, he gets signed off by a tandem

12   examiner.

13   Q.   Okay.

14   A.   Or a tandem -- and this gets submitted to us.  We receive

15   that; we should have already had all the other paperwork, and

16   we'll issue a rating.

17   Q.   Got it.

18        Now flip over to page number 6 of the document.

19   A.   Yes.

20   Q.   What's this document, sir?

21   A.   This is our certification form.  And it has some of that

22   information that you saw in the logbook.  But this is the stuff

23   that gets immediately submitted to us.  So it's Rob's name;

24   it's his initial five training jumps, signed off by his tandem

25   examiner.

1   Q.   Okay.  And that stamp up there, the received stamp, is

2   that -- is that your -- is that UPT's stamp?

3   A.   That's the stamp of the date we received it.

4   Q.   Okay.  Let me -- let me turn you to Exhibit 104.  So just

5   the prior exhibit.

6   A.   Okay.

7   Q.   Do you recognize this document?

8   A.   Yes.

9   Q.   What is it?

10  A.   That's a recertification form or renewal form.

11  Q.   Okay.  And who is it for?

12  A.   It's for Rob Pooley.

13          MR. SHARMA:  Government moves to enter Exhibit 104

14  into evidence.

15          THE COURT:  Any objection?

16          MS. CRAGER:  One moment, Your Honor.

17      No objection, Your Honor.

18          THE COURT:  Exhibit 104 is received in evidence.

19      (GOVERNMENT'S EXHIBIT 104 ADMITTED INTO EVIDENCE.)

20  Q.   BY MR. SHARMA:  And so just looking at this document,

21  you've got Rob Pooley's name on top; is that right?

22  A.   Yes.

23  Q.   And it's signed off by Mr. Pooley?

24  A.   Yes.

25  Q.   And do you recognize that signature?

1    A.   Yes.

2    Q.   You've seen the signature before?

3    A.   Yes.

4    Q.   And the date is 2/20/15?

5    A.   The date he signed it, yes.

6    Q.   Yeah.  Okay.

7         And then it's signed by an endorsement -- there is an

8    endorsing signature below there?

9    A.   Yes.  So his examiner -- well, there is not an examiner.

10   He was -- this was signed off by another examiner at the time.

11   Q.   Right.  All right.

12        So did UPT ever -- did UPT initiate disciplinary action

13   against Mr. Pooley in 2015?

14   A.   Yes.

15   Q.   And do you remember approximately when that was?

16   A.   In July 2015.

17   Q.   Okay.  Let me turn you to Exhibit 910.  So that's a

18   different binder.  It will be Binder 8 behind you.  On the

19   second -- yeah.

20   A.   Do I keep -- do you want me to keep this one here?

21   Q.   No.  You can take that off.

22   A.   Where did you want me to go to?

23   Q.   Exhibit 910.

24   A.   910.  Okay.

25   Q.   Do you recognize this document, sir?

1    A.   Yes.

2    Q.   And what is it?

3    A.   It's an e-mail from Tom Noonan, who was the tandem program

4    director at the time, to Rob Pooley.

5    Q.   Okay.  And how do you know that?

6    A.   I see it's Tom's e-mail address, the date and UPT e-mail

7    address.  And this was also part of his file.

8    Q.   Okay.  And is there a second page to this document?

9    A.   Yes.

10   Q.   And what is that document?

11   A.   That's the action we took against Rob Pooley at the time,

12   the suspension of his rating.

13   Q.   Okay.

14          MR. SHARMA:  Your Honor, government moves to enter

15   Exhibit 910 into evidence.

16          MS. CRAGER:  No objection.

17          THE COURT:  Exhibit 910 is received in evidence.

18       (GOVERNMENT'S EXHIBIT 910 ADMITTED INTO EVIDENCE.)

19   Q.   BY MR. SHARMA:  This is the first page we were talking

20   about?

21   A.   Yeah.

22   Q.   Let me just start from the top here.

23       So this is an e-mail, you said, from Tom Noonan who worked

24   for UPT?

25   A.   Yes.

1    Q.   What was his role with UPT?

2    A.   The tandem program director.

3    Q.   Briefly, what does that mean?  What do they do?

4    A.   So his job was to oversee the whole tandem program, manage

5    that for us -- for our company, as well as issue -- he would do

6    the training courses for -- to train tandem examiners.

7    Q.   Okay.  And the date on this e-mail is August 18, 2015?

8    A.   Correct.

9    Q.   And it's sent to Rob Pooley?

10   A.   Yes.

11   Q.   And the subject line says, Letter of Suspension Re: USPA

12   action?

13   A.   Yes.

14   Q.   And there is an attachment to this e-mail, right?

15   A.   Yes.

16   Q.   And then -- zoom out, please.

17        And then the body of the e-mail says, Based on the

18   conversation last night, attached please find a letter of

19   reciprocity with the USPA.

20   A.   Yes.

21   Q.   Okay.  And then let's switch over to the next page.

22        So what's this letter?

23   A.   This is -- that's -- that was an e-mail.  This is the

24   official letter to him, informing him that we are suspending

25   his rating as a tandem examiner.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1   Q.  Got it.  Is this the attachment to that e-mail?

2   A.  Yes.

3   Q.  Okay.  And, again, the -- up top, we have the date, and

4   it's addressed to Rob Pooley?

5   A.  Yes.

6   Q.  And the subject line says, Suspension of UPT Tandem

7   Examiner Rating?

8   A.  Yes.

9   Q.  Okay.  And then in the body of the e-mail, the first

10  paragraph, it says, The tandem examiner rating has been

11  suspended effective July 26, 2015 --

12  A.  Yes.

13  Q.  -- for a period of one year.

14      So that's the USPA tandem examiner rating, right?

15  A.  Yes.

16  Q.  Okay.  And then if you move on in the same paragraph, it

17  says, We're also spending your UPT tandem examiner rating for

18  the same time period.  Correct?

19  A.  Yes.

20  Q.  And it has an effective end date of the suspension of July

21  25, 2016 --

22  A.  Yes.

23  Q.  -- is that right?

24      Unless USPA rescinds or modifies its decision or suspension

25  time frames?

1   A.   Yes.

2   Q.   Did that mean that after that date, Rob Pooley would have

3   automatically been reinstated as a UPT examiner?

4   A.   No.

5   Q.   What would he have had to do to get reinstated?

6   A.   He would have to have submitted a recertification form and,

7   if necessary at the time, retrain -- retraining.

8   Q.   Sorry.  What was the last part?

9   A.   Or retraining.

10   Q.   Okay.

11   A.   But he would have had to submit an application to get his

12   tandem rating reinstated.

13   Q.   Okay.  What did this suspension mean for Mr. Pooley?

14       In other words, what was he prohibited from doing during

15   that period of time?

16   A.   Training tandem instructors.

17   Q.   Okay.  Now, had UPT received any paperwork containing

18   Mr. Pooley's signature during that time period --

19   A.   No.

20   Q.   -- would UPT have issued any tandem ratings?

21   A.   No.

22   Q.   And had UPT received any paperwork containing another

23   examiner's signature, knowing that that examiner was not

24   physically present at the drop zone --

25   A.   No.

1   Q.  -- would UPT have issued --

2   A.  No, it would not.

3   Q.  Let me finish my question.

4   A.  Sorry.

5   Q.  Would UPT have issued any tandem examiner -- tandem

6   instructor ratings?

7   A.  No.

8   Q.  Did Mr. Pooley ever have his UPT ratings reinstated?

9   A.  No, he did not.

10  Q.  Now, we talked a little bit earlier about how UPT receives

11  tandem instructor cards, I think you said, right?  Proficiency

12  cards?

13  A.  Yes.

14  Q.  When it receives those cards, it makes -- does it put those

15  in those files that we talked about in the filing room?

16  A.  Yes.  We received that initial training card, the one we

17  spoke about earlier.

18  Q.  If you wanted to find out about a particular instructor or

19  when -- when they received their tandem instructor rating,

20  would you be able to go into that file and open it up and look

21  and find out that way?

22  A.  Yes.

23  Q.  Okay.  Did you receive a request from investigators to

24  determine if UPT had received tandem instructor cards for

25  certain individuals?

1   A.  Yes, we had.

2   Q.  Okay.  And when you got that request, is that how you

3   figured it out, by going into that filing room and opening up

4   those files?

5   A.  Yes.  There are two ways.  We can look in the filing room

6   and look on the database as well.

7   Q.  Tell me about the database real quick.

8   A.  So when we started a folder -- when we issue a rating, we

9   have a database -- an all-access database, and we keep all

10  the -- the applicant's information on there as well and the

11  date we issue the rating.

12  Q.  And we saw this earlier, but the -- the forms that you get,

13  they're signed off by the examiners, right?

14  A.  Correct.

15  Q.  So for a candidate, you'd be able to tell who their

16  examiner was?

17  A.  Yes.

18  Q.  Okay.  And for the list of people that the investigators

19  contacted you about, did you look to see if there was, A, any

20  paperwork and, B, if there was paperwork who their examiner

21  was?

22  A.  Yes.

23  Q.  Okay.  So I'm going to go through some names.  And they may

24  not make a lot of sense right now, but I just want to confirm,

25  for any of these people, whether you found paperwork that

1  showed either Rob Pooley or Yuri Garmashov as being their

2  examiner.

3  A.  Okay.

4  Q.  Okay.  Gonzalez Fabricio Palomino Benitez?

5  A.  No.

6  Q.  Bradley North?

7  A.  No.

8  Q.  Fabian Munoz?

9  A.  No.

10  Q.  YongHyeon Kwon?

11  A.  No.

12  Q.  Carlos Obaid?

13  A.  No.

14  Q.  Carlos Martinez?

15  A.  No.

16  Q.  Danny Overeem?

17  A.  No.

18  Q.  Sang Yeul Jeong?

19  A.  No.

20  Q.  Joaquin Gomez Passi?

21  A.  No.

22  Q.  Alejandro Guerrero?

23  A.  No.

24  Q.  Jens Peter Andersen?

25  A.  No.

1    Q.  Lachlan Mackay?

2    A.  No.

3    Q.  So just to summarize, for all those people, UPT did not

4    find any paperwork that showed that they had taken a course

5    with either Rob Pooley or Yuri Garmashov, right?

6    A.  Correct.

7                MR. SHARMA:  No further questions.

8                THE COURT:  Cross-examination?

9                MS. CRAGER:  Yes, Your Honor.

10                         CROSS-EXAMINATION

11   BY MS. CRAGER:

12   Q.  Good afternoon, Mr. Procos.

13   A.  Good afternoon.

14   Q.  On the topic of processing paperwork, when UPT processes a

15   tandem instructor rating, UPT already needs the USPA paperwork

16   to have gone through?

17   A.  No.

18   Q.  Typically, do people send their USPA paperwork in first and

19   then send to UPT?

20   A.  No.

21   Q.  Is that one way that it can be done?

22   A.  I don't know if somebody can or cannot do that, but that's

23   the incorrect way to do it.

24   Q.  So there is no way in which USPA membership or licenses or

25   ratings have any effect on what happens with UPT's process?

1   A.   No.   It does -- it -- the USPA credentials are used.   So in

2   other words, before a person can do a tandem instructor course,

3   he needs to have an expert license from USPA, which is a D

4   license.   And -- or from where -- we do foreign people too.

5   They would need the same thing from there -- wherever they came

6   from.   They would also need -- at the time, would have needed

7   some kind of instructor rating, coach rating, AFF instructor,

8   something before they could do a tandem instructor course.

9        So there is, in effect, but there is not a requirement to

10   involve USPA in this process.

11   Q.   Sure.   But UPT needs to in some way verify that the person

12   actually has the other ratings from USPA -- or the requirements

13   -- I'm sorry -- that you just mentioned?

14   A.   We can do that now.   We have access to USPA's database of

15   instructors.   At the time, it was the examiner's responsibility

16   to verify this information, and we would get physical -- in

17   those days, we used to have a physical copy of the instructor

18   rating, USPA rating.   It was a rating card.   So we -- they

19   would submit that to us as well.

20   Q.   So they needed to submit the USPA rating card to UPT?

21   A.   Yes.

22   Q.   I see.   So typically, that card would need to happen first

23   before they could submit it to UPT?

24   A.   Yes.   But not the -- it's not a tandem card.   That's just

25   an instructor rating card or coach rating card or USPA

1  membership, yes.

2  Q.  So that part would have to happen before they sent it to

3  UPT?

4  A.  I don't quite understand what you're saying.

5  Q.  I thought we were saying the same thing, that UPT needs to

6  receive the card showing the USPA information.

7  A.  Yes.

8  Q.  Okay.  That was my question.  Thank you.

9  A.  Okay.

10  Q.  I think this is been clear, but UPT is a private company?

11  A.  Yes.

12  Q.  It's called Uninsured United Parachute Technologies, LLC?

13  A.  Yes.

14  Q.  So it's a limited liability corporation?

15  A.  It is now.  We've changed from time to time.

16  Q.  I see.  But it is a for-profit company?

17  A.  Yes.

18  Q.  That manufactures equipment?

19  A.  Yes.

20  Q.  So it's not a government agency?

21  A.  No.

22  Q.  And it's not part of the government at all?

23  A.  No.

24  Q.  I want to talk briefly about the user manual for the Sigma

25  Tandem equipment.

1    A.   Okay.

2    Q.   And if I may approach, I'll pull a binder out for you.

3    A.   Okay.  I'll put this one away.

4    Q.   You received a subpoena, correct?

5    A.   UPT did, yes.

6    Q.   And you received a subpoena from me, actually?

7    A.   Sorry.  From who?

8    Q.   From me.

9    A.   Yes.  Okay.

10   Q.   And that subpoena requested the UPT Sigma Tandem Owner's

11   Manual effective in the summer of 2016?

12   A.   Yes.

13   Q.   There was a manual that was produced?

14   A.   Yes.

15   Q.   And you noted that to the best of your knowledge, that is

16   the manual that was in use at the time?

17   A.   Correct.

18   Q.   And can you look at that exhibit that's right in front of

19   you --

20   A.   Yes.

21   Q.   -- marked Exhibit 2000.

22        Is that the same exhibit -- I'm sorry -- the same manual?

23   A.   Yes.  I assume that's the same one I sent to you.

24             MR. SHARMA:  I'm going to object as this being

25   outside the scope.

1          THE COURT:  Something is getting straightened out.

2     And I hope nobody was criticizing Ms. Crager for the fact that

3     this didn't have a date on it, because she asked for the manual

4     that was in effect in 2016, apparently, and this is what he

5     gave her.

6          MS. CRAGER:  Yes, Your Honor.

7          THE COURT:  Ms. Crager wasn't responsible for the

8     fact that that earlier one wasn't dated.

9          MS. CRAGER:  Thank you, Your Honor.  That's all I

10    have.

11         THE COURT:  So why doesn't this have a date on it?

12         THE WITNESS:  So this was -- I didn't have --

13         THE COURT:  We just had a witness here who worked for

14    your company for a long time, and he said the date is always on

15    it.

16         THE WITNESS:  Yeah.  So this -- this manual was at

17    our lawyer's office.  All our manuals are reviewed by our

18    lawyer.  And we sent it to him before we published it.  I

19    didn't have a physical copy of that because they're normally

20    electronic copies.  So I didn't have a physical copy, but he

21    had the copy that we sent to them.

22         THE COURT:  So the electronic copies don't have

23    dates?

24         THE WITNESS:  Well, they do once we publish them.

25         THE COURT:  So --

1          THE WITNESS:  But -- we superseded that now.  So our

2    current manual has a current date on it.

3          THE COURT:  All right.  So this one that you provided

4    is the one you're telling us was in effect in 2016?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.

7          MS. CRAGER:  That's all, Your Honor.

8          THE COURT:  Did you have any questions?

9                    REDIRECT EXAMINATION

10   BY MR. SHARMA:

11   Q.  I think you said that this wasn't -- this wasn't the

12   published version of the manual?  Is that right?  Did I hear

13   that?

14   A.  I -- I -- so when we review a manual, before we release it,

15   we always send it to our legal counsel just so he can see

16   whatever changes we made.

17   Q.  Okay.

18   A.  So when I asked him -- I said, I don't have a copy.  He had

19   this on file.

20   Q.  Okay.  All right.  So we don't know if this is the -- the

21   actual physical document that a tandem instructor or a tandem

22   examiner would have received?

23   A.  I can't say 100 percent, yes.

24   Q.  And specifically as to Mr. Pooley, you don't have any

25   knowledge as to what documents he got or what documents he gave

1   on to his students, do you?

2   A.  I have no idea.

3              MR. SHARMA:  Okay.  Thank you.

4              THE COURT:  All right.

5              MS. CRAGER:  Just briefly, Your Honor.

6              THE COURT:  Yes.

7                          RECROSS-EXAMINATION

8   BY MS. CRAGER:

9   Q.  The owner's manual, Sigma Tandem rig, that contains

10  information about how to use the rig?

11  A.  It has a broad outline on how to use it, yes.

12  Q.  And that's very important information for a tandem

13  instructor to know?

14  A.  It's -- it's -- initial tandem instructor, it gives him the

15  background on how to operate the system.

16  Q.  And there is an exam that's in the manual as an addendum?

17             MR. SHARMA:  Objection.  This is, again, outside the

18  scope.

19             MS. CRAGER:  Your Honor, the government was

20  suggesting that this is not a manual that ever goes to a tandem

21  instructor candidate; so I'm trying to lay a foundation.

22             MR. SHARMA:  That's --

23             THE COURT:  Go ahead.

24  Q.  BY MS. CRAGER:  Is there an exam that is an addendum to

25  this manual that a tandem instructor must take to pass the

1    tandem instructor course?

2    A.  And that could be the exam, but the way it works -- this is

3    just the background information.  The examiner will have the

4    most current exam that he's used.

5    Q.  Sure.

6    A.  And he will have it, which is not in this manual.

7    Q.  I see.  But the answers to the exam can be found in the

8    manual?

9    A.  Yes.  If you read through the manual, most of the

10   answers -- some of the answers can be found.  Some of them,

11   they have to be -- you're going to have to find out during

12   training.

13              MS. CRAGER:  Thank you.

14              THE COURT:  All right.  Mr. Procos, thank you.

15   You're excused.

16              THE WITNESS:  That's it?  Thank you.

17              THE COURT:  You may call your next witness.

18              MR. SHARMA:  Yes, Your Honor.  Government calls Ron

19   Bell.

20              THE CLERK:  Sir, please step forward.  All the way to

21   your right.  All the way up to the witness stand.

22       Please remain standing.  Face me.  And raise your right

23   hand.

24       (The Witness, RONALD BELL, is sworn.)

25              THE WITNESS:  I do.

1          THE CLERK:  Thank you.  You may be seated.

2      Please state your full name.  Spell your last name for the

3   record.

4          THE WITNESS:  Ronald Bell, B-E-L-L.

5                    DIRECT EXAMINATION

6   BY MR. SHARMA:

7   Q.  Good afternoon, Mr. Bell.

8      Would you mind moving the microphone just a little bit

9   closer to your mouth?  Thank you.

10      Who do you work for, sir?

11   A.  United States Parachute Association.

12   Q.  Okay.  And what is your role with the US -- can I call it

13   the USPA?

14   A.  Yep.

15   Q.  What's your role with them?

16   A.  I'm the director of safety and training.

17   Q.  Okay.  And how long have you held that job?

18   A.  Little over five years.

19   Q.  What are some of your roles -- duties in that role?

20   A.  I work with the board to update ratings and licenses

21   programs.  I analyze incidents to update those programs.  Stuff

22   like that.

23   Q.  Okay.  Where is the USPA based geographically?

24   A.  Fredericksburg, Virginia.

25   Q.  Is that where you work as well?

1   A.   Correct.

2   Q.   Now, are you familiar with the USPA's tandem instructor

3   ratings course?

4   A.   I am.

5   Q.   Okay.  After a student completes a tandem instructor

6   ratings course, does the USPA require that student to fill out

7   any forms or paperwork?

8   A.   There is paperwork filled out during the course.  It should

9   be completed at the end of the course.  And then it's sent in

10  to USPA to get processed.

11  Q.   Okay.  And what do you call that paperwork?  Is there a

12  name for it?

13  A.   Tandem proficiency card, specifically for the tandem

14  course.

15  Q.   And you said that gets sent in to the USPA?

16  A.   Correct.

17  Q.   And is that -- is that how the USPA knows that someone has

18  taken one of its courses?

19  A.   Correct.

20  Q.   And --

21  A.   We issue the ratings.  So that would be a tandem rating so

22  that they could exercise and do tandems.  In order for them to

23  have that rating, it needs to be processed by us.  So we would

24  receive that paperwork, process it, and then issue that rating

25  so that they can exercise the privileges of that rating.

1   Q.   Okay.  So when you get these tandem proficiency cards for

2   the students, what do you do with those documents?

3   A.   After we process them, we file them in what I call our

4   dungeon.  It's a file room for USPA.

5   Q.   Is that located in Virginia as well?

6   A.   It's in the same building.

7   Q.   Okay.  Is it actually, like, in the basement, like a

8   dungeon?

9   A.   No.  It's a room in the center of the building.  It's got

10  no windows.  It's super dark.  And it's nothing but filing

11  cabinets.

12  Q.   How are the documents organized in that room?

13  A.   So we have processors that process the paperwork.  The

14  paperwork is also tied to our accounting department.  So when

15  they process the paperwork, it's tied to a batch.  So every

16  day, they open up a batch, process credit card payments.  That

17  batch is filed at the end of the day.  So everybody is filed --

18  each processor files a batch for that day.  They close it at

19  the end of the day, and then we file it.  It's a chronological

20  order of how they process it by processor.

21  Q.   And that's sort of based on the date that it receives the

22  documents?

23  A.   The date that it's processed.

24  Q.   The date it's processed.  Okay.

25       Are those documents kept in the regular course of USPA's

1    business activities?

2    A.   Absolutely.

3    Q.   Is keeping those documents a regular practice of USPA's

4    business activities?

5    A.   Yes.

6    Q.   Does the USPA also keep electronic records regarding tandem

7    instructor candidates?

8    A.   We do.

9    Q.   What sort of electronic records?

10   A.   We've pretty much moved over everything to digital now.

11   Q.   Okay.

12   A.   But yeah.  So we keep the same proficiency cards, but now

13   they're digitally attached to their files.

14   Q.   Got it.

15        When you -- when you receive -- when USPA receives tandem

16   proficiency -- tandem proficiency cards from students, does it

17   also print out the e-mail that it comes with if it comes by

18   e-mail?

19   A.   That was standard practice when we were doing things on

20   paper so that we knew when we received it.  Because, remember,

21   we file it by the date it's processed, but we also wanted a

22   record of when it was received.

23   Q.   Got it.  And does -- that hard copy printout of that

24   e-mail, does that go in those files in the dungeon?

25   A.   It gets attached with the proficiency card.  That way, we

1   know when we received it, and by batch number, we know when it

2   was processed.

3   Q.  I'll try to stop referring to it as the dungeon.

4       Now, did you receive a request from investigators to

5   determine if the USPA had record of receiving proficiency

6   cards -- tandem proficiency cards for certain individuals?

7   A.  I did.

8   Q.  How did you go about answering that question?

9   A.  We would have to go to the dungeon, and we'd also have to

10  search our digital records to find if we had that name on file

11  anywhere.

12  Q.  Okay.  And for the individuals that they asked you about,

13  if you did find any tandem proficiency card documents, would

14  you have been able to tell by looking at that if either Rob

15  Pooley or Yuri Garmashov was the examiner?

16  A.  If I found the tandem proficiency card, yes.

17  Q.  And how -- where would -- would that name be on the

18  document?

19  A.  Because they have to sign on the document in several

20  locations; so we can tell by the signature.  And they also

21  include a membership number, because sometimes signatures

22  aren't quite readable; so the membership number ties it to who

23  the individual is.

24  Q.  Okay.  So I'm going to list some names for you, and just

25  tell me if you found any tandem instructor proficiency cards

1  that had either Rob Pooley or Yuri Garmashov listed as the

2  examiner.

3  A.  Okay.

4  Q.  Okay.  Gonzalez Fabricio Palomino Benitez?

5  A.  No.

6  Q.  Bradley North?

7  A.  No.

8  Q.  Fabian Munoz?

9  A.  No.

10 Q.  Carlos Obaid?

11 A.  No.

12 Q.  Carlos Martinez?

13 A.  No.

14 Q.  Danny Overeem?

15 A.  No.

16 Q.  Sang Yeul Jeong?

17 A.  No.

18 Q.  Joaquin Gomez Passi?

19 A.  No.

20 Q.  Alejandro Guerrero?

21 A.  No.

22 Q.  Jens Peter Andersen?

23 A.  No.

24 Q.  So, to summarize, you looked through the dungeon for the

25 records for these folks?  You looked -- is that a yes?

1   A.  Huh?

2   Q.  Was that a yes to my question?

3   A.  Say the question again.

4   Q.  Sure.  So all those folks that I just listed, did you go

5   look in the dungeon for those people's paperwork?

6   A.  Yes.

7   Q.  Okay.  Did you look electronically to find any records of

8   theirs?

9   A.  Yep.  Several times, as a matter of fact.

10  Q.  And you didn't find anything for them?

11  A.  I found nothing.

12  Q.  Now, for some of those folks, did you find records that

13  they had taken tandem instructor courses with different

14  examiners?

15  A.  That would be correct.

16  Q.  And where did you find those records?

17  A.  The same time that we were looking for them.  But you guys

18  had specifically asked if they -- if they were that examiner.

19  Q.  Got it.  Did you also look through USPA records for a

20  Lachlan Mackay?

21  A.  I did.

22  Q.  And what did you find?

23  A.  We found the tandem proficiency card attached to an e-mail

24  of when we received that.

25  Q.  And where did you find that?

1   A.   When did I find that?

2   Q.   Where.

3   A.   Oh.   In the dungeon.

4   Q.   That's where you keep all your records?

5   A.   That's where we keep all the paper files, correct.

6   Q.   Right behind you, there are some binders -- let me come

7   help you, actually.

8   A.   Which one?

9   Q.   Do you recognize that document?

10   A.   I do.

11   Q.   What is it?

12   A.   This is the proficiency card and the e-mail of when we

13   received the proficiency card of Mackay.

14   Q.   For Lachlan Mackay?

15   A.   Yes.

16   Q.   That's the document you found when you went looking for

17   him?

18   A.   Correct.

19           MR. SHARMA:   Government moves to enter Exhibit 4 into

20   evidence.

21           THE COURT:   Any objection?

22           MS. CRAGER:   Just one moment, Your Honor.

23           THE COURT:   What's this one's name?

24           MR. SHARMA:   Sorry, Your Honor?

25           THE COURT:   What's the name?

```
 1                    MR. SHARMA:  The individual?  Lachlan Mackay.

 2                    THE CLERK:  Mackay.

 3                    MR. SHARMA:  Yeah.  That's L-A-C-H-L-A-N.

 4                    THE COURT:  Oh.  McClane?

 5                    MR. SHARMA:  No.  Sorry.  It's Lachlan.

 6     L-A-C-H-L-A-N, Mackay, M-A-C-K-A-Y.

 7                    THE COURT:  Oh, Mackay.  All right.

 8                    MS. CRAGER:  No objection, Your Honor.

 9                    THE COURT:  Exhibit 4 is received in evidence.

10          (GOVERNMENT'S EXHIBIT 4 ADMITTED INTO EVIDENCE.)

11                    MR. SHARMA:  Can we just publish that, please.

12     Q.  BY MR. SHARMA:  Let me just walk you through this document

13     here.  We're on the first page of the document.

14          So this -- this e-mail is sent by Rob Pooley?

15     A.  Correct.

16     Q.  On August 1, 2016?

17     A.  Correct.

18     Q.  And it's sent to Susan Sullivan?

19     A.  Yes, sir.

20     Q.  Who is Susan Sullivan?

21     A.  Susan Sullivan was our rating processor at the time.

22     Rating coordinator.

23     Q.  And where was she based?

24     A.  She worked in the same building.

25     Q.  In Virginia?
```

1    A.  Correct.

2    Q.  Okay.  What's the subject of the e-mail?

3    A.  Tandem rating for Lachlan Mackay.  And then his membership

4    number.

5    Q.  And is there an attachment to it?

6    A.  Yeah.  It was the proficiency card.

7    Q.  Got it.

8        Can we zoom out, please.

9        And then the body of the e-mail, it says, Attached is a

10   tandem instructor rating course proficiency card for Lachlan

11   Mackay.  And it says, Thanks, Yuri.

12   A.  Yes.

13   Q.  Okay.  And can we move over to the next page, please.

14       Is this the tandem instructor proficiency card we were

15   talking about?

16   A.  Correct.

17   Q.  Okay.  And so up here, looks like it's some biographical

18   information.

19   A.  Yeah.  That's all the personal information of the

20   candidate.

21   Q.  Okay.  So we've got the name -- right? -- Lachlan Mackay?

22   A.  Yep.

23   Q.  There is a mailing address.

24       Do you recognize that address?

25   A.  I do.

1    Q.   What's the -- how do you recognize it?

2    A.   It's the address of the drop zone, probably where he did

3    the course at.

4    Q.   Okay.  In California?

5    A.   Yep.

6    Q.   And then it's got -- it's got some other licensing

7    information, date of birth, and then a credit card information?

8    A.   Correct.

9    Q.   Okay.  And is that needed to be able to process his

10   ratings?

11   A.   Correct.

12   Q.   Can you zoom out.

13        And then down here, it's got some signatures.  What do

14   these signatures signify?

15   A.   So each one of those line items is something that he has

16   to -- the candidate has to perform.  So the signature is just

17   saying that that candidate met that criteria.

18   Q.   Okay.  And let me flip over to the next page, please.

19        You see some more signatures.  Is that also the same thing?

20   A.   Yeah.  Each line item is -- is something that the candidate

21   had to complete in order to complete the rating course.  So

22   each one requires a signature.

23   Q.   Okay.  And let me zoom in on this section right here.

24        So there is a -- in the corner over there, it says, Rating

25   recommendation, right?

1  A.  Yeah.  That's the final signoff by the examiner that ran

2  the course.

3  Q.  By the examiner.

4      And the examiner for this course was -- who does it say it

5  was?

6  A.  Yuri Garmashov.

7  Q.  And is that Yuri Garmashov's signature?

8  A.  It is.

9  Q.  And is the date July 17, '16 -- 2016?

10  A.  Yes.

11  Q.  Okay.  And in Acampo -- at the skydive school in Acampo?

12  A.  Yep.

13  Q.  Zoom out.  Does that signature look similar to all the

14  other signatures or almost all the other signatures on the same

15  card?

16  A.  It does.

17  Q.  Is there anyone else's signature on this card?

18  A.  For Item Number 19, that looks like Rob Pooley's signature.

19  Q.  And how do you know that?

20  A.  I've seen Rob Pooley's signature before.

21  Q.  You have.  Okay.

22      And you recognize it as being his signature?

23  A.  Yep.

24  Q.  Okay.  Turn your attention to Exhibit 6 in the same binder.

25  Can you just take a look at it and tell me if it's basically

1    identical to the first exhibit we just looked at?

2    A.  Yep.

3    Q.  Is that still the same paperwork you found for Mr. Mackay

4    in the dungeon?

5    A.  Yep.

6    Q.  All right.

7         MR. SHARMA:  Government moves to enter Exhibit 6 into

8    evidence.

9         THE COURT:  How is that different from 4?

10        MR. SHARMA:  It's just categorized differently based

11   on the counts.  So it's the same --

12        THE COURT:  I just was thinking you're going to have

13   one for each of those names that you mentioned, right?

14        MR. SHARMA:  No, we're not, because they didn't have

15   any paperwork for them.

16        THE COURT:  Any objection to Exhibit 6?

17        MS. CRAGER:  It's the same exhibit; so we would

18   object as cumulative.

19        THE COURT:  I don't know what it is.  It's getting

20   late in the day.  I asked him if it was the same, and I don't

21   know the answer.

22        MS. CRAGER:  I believe the answer was it was

23   literally the same.  They just have a different count for the

24   exact same paperwork; so they want to enter it twice.

25        THE COURT:  Is that the reason?

1              MR. SHARMA:  I think it will be easier for the jury

2    to be able to go --

3              THE COURT:  No.  It's not easier for the jury.  It's

4    the same as Exhibit 4; so I'm not going to duplicate it.

5              MR. SHARMA:  Okay.

6    Q.  BY MR. SHARMA:  Did you also look through USPA records for

7    a YongHyeon Kwon?

8    A.  I did.

9    Q.  Did you find any paperwork for him?

10   A.  I did find a proficiency card for him.

11   Q.  Now where did you find that, or how did you receive that?

12   A.  So that was not received in a normal process of a rating.

13   That was received for another process that was going on in

14   2018.

15   Q.  Okay.  So is it fair to say that those records weren't in

16   the dungeon?

17   A.  Yes.

18   Q.  Okay.  So it was outside the regular process of how USPA

19   receives those documents?

20   A.  Well, we received it by e-mail, but it had to do with a

21   completely different -- it was an appeal for -- for a member.

22   Q.  Okay.

23             MR. SHARMA:  No further questions.

24             THE COURT:  Cross-examination?

25             MS. CRAGER:  Yes, Your Honor.

1                              CROSS-EXAMINATION

2      BY MS. CRAGER:

3      Q.   Good afternoon, Mr. Bell.

4           I'd like to pull up Government's Exhibit 4.

5                THE COURT:  That microphone will be fixed by

6      tomorrow.

7                MS. CRAGER:  Thank you.

8                THE COURT:  Right, Karen?

9                THE CLERK:  I hope today, if they can come up.

10               MS. CRAGER:  I'm going to approach just for a minute

11     to get a binder for the witness.

12     Q.   BY MS. CRAGER:  Mr. Bell, you testified about this e-mail

13     that came from Robert Pooley; is that right?

14     A.   I did.

15     Q.   And the e-mail is to Susan Sullivan, correct?

16     A.   Correct.

17     Q.   And she works -- worked at the Parachute Association?

18     A.   She did.

19     Q.   And it's also to a morgan@verticalfilms.com.au?

20     A.   Correct.

21     Q.   Okay.  Can we pull up the second page of that exhibit.

22          And you see here, the e-mail address reported for the

23     applicant, Lachlan Mackay, is reported as

24     morgan@verticalfilms.com.au; is that correct?

25     A.   Correct.

1  Q.  So let's go back to page 1.

2      So you would agree with me that this e-mail was sent both

3  to the USPA and to the applicant?

4  A.  Correct.

5  Q.  This e-mail is signed "Yuri"?

6  A.  It is.

7  Q.  Do you, sitting here today, know whether the applicant,

8  Morgan, knew whether Yuri sent this e-mail or not?

9          MR. SHARMA:  Objection.  Calls for speculation.

10         THE COURT:  Do you know or not?  Yes or no?

11         THE WITNESS:  Can you say the question again?

12 Q.  BY MS. CRAGER:  Do you know whether Lachlan Mackay knew

13 that Rob Pooley or Yuri sent this e-mail?

14 A.  I don't know.

15 Q.  And let's go to page 2 again.  I'm sorry.  Page 3,

16 actually.

17     Now, from this paperwork, do you know whether Lachlan

18 Morgan Mackay knew Yuri Garmashov?  Can you tell that from this

19 paperwork?

20 A.  I cannot.

21 Q.  Okay.  I put a binder in front of you.  I'd like you to

22 look at that exhibit.  It's Exhibit 2134.

23     As you just testified, we don't know whether Mr. Mackay

24 knew that Rob Pooley sent this e-mail.

25         MS. CRAGER:  Your Honor, I would move to admit

1    Exhibit 21 -- I'm sorry.  Let me lay a little foundation.

2    Q.  BY MS. CRAGER:  Is the e-mail in front of you from a person

3    Morgan Mackay, morgan@verticalfilms.com.au?

4              MR. SHARMA:  Your Honor, we're going to object to

5    reading this e-mail into evidence and ask for a sidebar.

6              THE COURT:  Exhibit 21 --

7              MS. CRAGER:  I'm sorry.  2134.  2134.

8              THE COURT:  Let me look at it.

9              MS. CRAGER:  It's in Binder 7, Your Honor.

10             THE COURT:  I don't think there is any reason to ask

11   this witness -- this is not either to or from him or anyone

12   with whom he's affiliated.

13             MS. CRAGER:  Yes, Your Honor.  I would admit this

14   through a -- an agreement with the government about the

15   admissibility of these e-mails.

16             THE COURT:  All right.  Well, you just got an

17   objection from the government; so it doesn't sound like you

18   have a stipulation.

19             MS. CRAGER:  I believe we do have a stipulation about

20   the foundation for the e-mails.

21             MS. LYDON:  We agree that these e-mails came from Rob

22   Pooley's e-mail account.  We certainly do not have that

23   agreement as to admissibility, and we do not believe this is

24   admissible.

25             MS. CRAGER:  Right.  I'm trying to lay the foundation

1  for the relevance of this document.

2          MS. LYDON:  It's not about relevance.  It's also

3  about opening a big door.

4          THE COURT:  It's about whether this witness knows

5  anything about it.  Even if you have a stipulation that it's

6  from Robert Pooley's e-mail, it's from somebody other than this

7  witness.  And there is no suggestion in here that he has any

8  part in it; so he can't answer any questions about it.

9          MS. CRAGER:  I was just asking him about the -- the

10  sender and the recipient of this e-mail, e-mail addresses that

11  he does recognize.

12          THE COURT:  You asked him a few questions about

13  Morgan Mackay.  You can ask him questions about who that is.

14  The recipient is Robert Pooley.  We know who that is.  I don't

15  know what your next question is.

16          MR. SHARMA:  Your Honor, this is not a -- as you

17  pointed out, this is not a way to ask about this e-mail --

18          THE COURT:  I know.  That's my point.

19          MR. SHARMA:  Before the e-mail -- we talk about this

20  e-mail, we need to have a sidebar.

21          THE COURT:  We're not going to talk about this.

22          MR. SHARMA:  Okay.

23          THE COURT:  There is nothing to talk about.

24      Just tell me what your next question was going to be.

25          MS. CRAGER:  My -- my next question was going to be

1    did Morgan Mackay, the same applicant --

2              MR. SHARMA:  Your Honor, I'm going to object to

3    reading this e-mail.

4              THE COURT:  All right.  Let's take the evening

5    recess.  We'll resume with this tomorrow morning.

6        Have a nice evening, ladies and gentlemen.  As we told you

7    earlier, I think, I hope, you can leave your books on your

8    seats, and nobody will disturb them.  Don't worry about that.

9        We'll resume at 9 o'clock tomorrow morning.  9 o'clock

10   tomorrow morning.  Remember the admonition.

11       (Jury not present, 4:19 p.m.)

12             THE COURT:  I've been trying to get a simple

13   prescription from the pharmacy for the last couple of days, and

14   they open up at 8 o'clock in the morning.  I was there at

15   8 o'clock in the morning; I couldn't pick it up.  They close at

16   5 o'clock tonight.  When I get there, they'll probably be

17   closing up anyway.  But I would like to see if I can pick it up

18   now, if I can.  We can talk about this at quarter to 9:00

19   tomorrow morning.  But if I can't pick it up, we won't be able

20   to talk at quarter to 9:00 tomorrow morning because I'll be

21   back in there trying to get a prescription of some simple salve

22   to put on my skin.  That's all it is.  That's why we couldn't

23   start on Tuesday, because I had to -- so I'd like to take a

24   break now so I can go down the street and see if I can pick

25   that up.

1                MR. SHARMA:  Very good, Your Honor.

2                MS. CRAGER:  Yes, Your Honor.

3                MS. LYDON:  Thank you, Your Honor.

4                     (Proceedings adjourned, 4:20 p.m.)

5                          ---oOo---

6     I certify that the foregoing is a correct transcript from the

7     record of proceedings in the above-entitled matter.

8

9                          /s/ Kimberly M. Bennett
                           KIMBERLY M. BENNETT
10                         CSR No. 8953, RPR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25