```
 1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF CALIFORNIA
 2

 3       United States of America,
                  Plaintiff,
 4

         vs.                            Sacramento, California
 5                                      No. 2:21-cr-00111
         Robert Allen Pooley,           Friday, May 17, 2024
 6            Defendant.                 8:45 a.m.
         _____/
 7
                           TRANSCRIPT OF JURY TRIAL
 8          BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
                              ---oOo---
 9

10       APPEARANCES:

11        For the Plaintiff:            United States Attorney
                                        501 I Street, Suite 10-100
12                                      Sacramento, California  95814
                                        By:  Katherine Lydon
13                                      Dhruv M. Sharma
                                        Assistants U.S. Attorney
14

15        For the Defendant:           Office of the Federal
                                        Defender
16                                      801 I Street, 3rd Floor
                                        Sacramento, California  95814
17                                      By: Mia Crager
                                        Meghan McLoughlin
18                                      Assistants Federal Defender

19

          Official Court Reporter:     Kimberly M. Bennett,
20                                      CSR, RPR, RMR, CRR
                                        501 I Street
21                                      Sacramento, CA 95814

22

23       Proceedings recorded by mechanical stenography, transcript
         produced by computer-aided transcription
24

25
```

INDEX

GOVERNMENT WITNESSES:                                    PAGE:


RONALD BELL
CROSS-EXAMINATION CONTINUED BY MS. CRAGER..........16

FABIAN MUNOZ BECERRA
DIRECT EXAMINATION BY MR. SHARMA....................25
CROSS-EXAMINATION BY MS. CRAGER.....................53
REDIRECT EXAMINATION BY MR. SHARMA.................76

BRADLEY DAVID NORTH
DIRECT EXAMINATION BY MS. LYDON.....................98
CROSS-EXAMINATION BY MS. MCLOUGHLIN.................177
REDIRECT EXAMINATION BY MS. LYDON...................194
RECROSS-EXAMINATION BY MS. MCLOUGHLIN...............202

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

NO.:                                                    PAGE:


12...............................................35
40...............................................40
41-A.............................................44
31...............................................117
8P...............................................130
801-804, 812-817, 819, 825.......................133
30...............................................156
32R..............................................165

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

NO.:                                                    PAGE:


2134.............................................15

1          (Call to order of the court, 8:45 a.m.)

2          THE COURT:  Can we begin the discussion about this

3     Exhibit 2134?

4          MS. CRAGER:  Your Honor, I would like to make a

5     record about something that happened yesterday.

6          THE COURT:  All right.  We're meeting outside the

7     presence of the jury.  Defendant is present with counsel.

8       Proceed.

9          MS. CRAGER:  Thank you, Your Honor.

10     And I -- again, I just want to make a record about this.  I

11     feel that the prosecution was intentionally misrepresenting

12     something to the jury yesterday.  It concerns the exhibit --

13     the manual -- Exhibit 2000 that we attempted to put into

14     evidence, took a few tries to get it in over the government's

15     objections.

16     The government was at least strongly implying to the jury

17     that our exhibit was false or doctored because it came from the

18     defense, as a first proposition.  I don't think that should

19     ever happen.  But in this situation, as became clear when

20     Mr. Procos took the stand, the defense received the exhibit

21     from Mr. Procos, a government witness.  And I think that was

22     surprising, based on the government's representations, because

23     the Court, in fact, remarked, Oh, it wasn't Ms. Crager's fault

24     that the dates aren't there.

25     I find this disturbing because the government knew this

1    entire time where we got that exhibit.  It came from their

2    witness.  And I know that because after we sent the subpoena to

3    Mr. Procos, he forwarded it and all of our correspondence with

4    him to the government.  And I know that because it was then

5    produced back to me in discovery.  So the government knows this

6    whole time that the defense received this exhibit from a

7    government witness; it is an authentic exhibit that we received

8    from him.

9         This whole thing about the dates, we received a

10   different -- I mean, basically the same version but a different

11   document in discovery from the government, another version of

12   the same manual with the same page that I introduced into

13   evidence yesterday that was also undated.  So when we received

14   that, the defense felt we couldn't move forward only using that

15   because it didn't have a date on it; so that's why we obtained

16   a subpoena and served the subpoena on Mr. Procos for the manual

17   effective at the relevant time period.

18        And the fact that the government knew all of that and then

19   at least strongly implied to the jury that it was a false

20   exhibit and that I had to get up with another witness and

21   clarify that I got it directly from him and that he made an

22   affirmative representation to me that it was authentic, I think

23   that is possibly prosecutorial misconduct.

24        I would say, in addition to the remark made in opening

25   about the safety violations, they put on a witness yesterday

1  who talked at length about the importance of emergency

2  procedures.  They've been talking a lot about how dangerous

3  this is.  And as Your Honor has already ruled, how dangerous

4  this is is not even relevant to this case.

5      And I just want to put this on the record right now because

6  I think if this continues like this, we might need to move for

7  a mistrial at some point.  At this point, I just wanted to put

8  this all on the record, Your Honor.

9          THE COURT:  All right.  Here is how I see this.  I

10 don't know whether the government deliberately did anything

11 wrong, but I did observe that until the last witness testified,

12 I was left with the impression -- and I thought that the jury

13 might have been left with the impression -- that somehow

14 Ms. Crager was responsible for offering an exhibit that was

15 undated.  And the reason I thought that was that the witness

16 before the very last witness said, Oh, you can always tell the

17 date on these.  And he told where the date typically is.  And

18 that date does not appear on these documents.  And that

19 bothered me.

20     But when the next witness testified, it became clear to me

21 that it was not Ms. Crager's fault at all, that she had gone

22 out of her way to actually subpoena -- in other words to use

23 court processes -- to see if she could get the correct copy of

24 the manual.  And the one that she was provided did not have a

25 date on it.  To this moment, I don't know why.  It was an

1    unclear explanation.  It was not an explanation as to why the

2    first witness testified they always have the dates on them, and

3    this one, because it came offline, or for whatever reason -- I

4    don't know -- didn't have a date on it.

5         But that having been said, I thought I made it clear to the

6    jury that it was not Ms. Crager's fault.  So anything that had

7    been implied, whether through intentionally or inadvertent

8    misunderstanding, was cleared up.  And so as we left it, I

9    don't think the jury believes that Ms. Crager was responsible

10   for it.  I think they understand that she was not.  So I think

11   -- in that part of your motion, I think it's no harm, no foul.

12        MS. LYDON:  May I respond as well to that part?

13        THE COURT:  Well, the other part of it is the

14   reference in the opening statement to safety violations.  I

15   intend to do something about that, but I want to wait until the

16   appropriate time.  And I will be receptive to what both of you

17   suggest I might say.

18        Just by way of suggestion, I would consider telling the

19   jury, probably after they've heard all the evidence, that they

20   are reminded the opening statements and the closing arguments

21   of counsel are not evidence in the case.  If they heard any one

22   of the attorneys for the government or the defendant talk about

23   something that's not in evidence, then the jury is reminded

24   those statements are not evidence.  And I could even say the

25   lawyers by name.  If this lawyer said something in his opening

 1    statement that he was going to prove and there is no evidence

 2    for it, disregard what that lawyer said in his opening

 3    statement.  And on the converse, if the other side did the

 4    same, disregard it.  The statements made by the lawyers are not

 5    evidence.

 6        Now, I could go further, but even if I don't, that opens

 7    the door for defense counsel to come in and say, Mr. Sharma,

 8    remember him standing up here, and he said that the reason that

 9    Mr. Pooley's certification was suspended was for some sort of

10    safety violations.  You didn't hear one drop of evidence about

11    any safety violations.  That was an attempt to prejudice you

12    against Mr. Pooley, and you ought to know that.

13        Now, if that's the way you wanted to handle it, I would be

14    inclined to let you do that.

15        The other thing I could consider would be being more

16    specific.  If you wanted me to tell the jury that, Ladies and

17    gentlemen, you heard reference in the opening statement to a

18    reason why Mr. Pooley's certification was suspended.  Well, you

19    didn't hear any evidence of that, and there is a good reason

20    for it.  It's totality irrelevant.  And if you heard some

21    suggestion as to the reasons it was suspended, that's just

22    wrong.

23        I could do something like that too.  But I'm open to -- to

24    discussion about what I do to take care of that.  That's how I

25    want to take care of that.  So we've got the two points here

1  about the lack of the date on this exhibit and the reference to

2  safety violations, and I'm proposing that we take care of those

3  in the way that I suggested.

4      Now, that means you both have to be careful not to let

5  something like this seep into the trial later on, because the

6  more it does, the more Ms. Crager is going to be arguing it's

7  cumulative.

8      Now, whatever you want to say, go ahead.

9          MS. LYDON:  Thank you, Your Honor.

10         THE COURT:  Let's not take a lot of time because I'm

11 going to bring this jury back at 9 o'clock.  And I'm going to

12 tell you, in a minute, why.

13         MS. LYDON:  I'll be brief.

14     With respect to the prosecutorial misconduct allegation,

15 there was -- the government's objections were attempting to

16 show there was no foundation for this.  Honestly, I did not

17 know the date of the exhibit for a few reasons.

18         THE COURT:  I know that.  But you did -- you know, in

19 the course of talking about it, you just said something about

20 this -- this -- Ms. Crager just came up with this, or something

21 like that.  You made reference and emphasized the fact that she

22 presented this rather than some witness, and that was the

23 impression I got.  But, again, I think I took care of that --

24         MS. LYDON:  I think you did.

25         THE COURT:  -- satisfactorily.

1          MS. LYDON:  Yes.

2          THE COURT:  So let's go on to the next thing.  Okay?

3          MS. LYDON:  All right.  With respect to the opening

4   statement --

5          THE COURT:  No.  No.  The opening statement -- I want

6   to get to that later.

7       All right.  Let's get to it now.  But I'm going to tell

8   you --

9          MS. LYDON:  We can get to it later, Your Honor.

10          THE COURT:  Yes.  Because let me tell you what I'm

11   going to tell you right now.

12       It's very, very important, in my view, that every time I

13   tell the jury to be here at 9 o'clock, we start at 9 o'clock.

14   They have all come from great distances.  Even some of them

15   have to stay in hotels because they're coming at such great

16   distances to serve you in this case.  Even if they don't stay

17   in hotels, the traffic is becoming worse and worse and worse in

18   Sacramento.  And if -- I do not go on Highway 50, and so if

19   they have to go on Highway 50, they've got a problem.  If they

20   have to go on 5, they've got a problem.  If they've got city

21   streets, they've got a problem.  They're making a great

22   sacrifice to be here promptly at 9 o'clock in the morning, and

23   I want to start at 9:00 in the morning when they get here.  We

24   owe them that respect.

25       And the same is true after short recesses.  If all of them

1   show up after a short recess and one or more of them doesn't

2   show up, that holds all the rest of them.  If they start to get

3   the idea that it really doesn't start when this judge says it

4   starts, then you start down the slippery slope.  And I don't

5   want to go down that slope.  Okay.  Now, that's number one.

6       Number two is some judges are more receptive to motions in

7   limine than others.  And I will acknowledge being in what

8   appears now to be the minority of not favoring motions in

9   limine.

10      That being said, I tried to tell you at the beginning of

11   the case how I wanted to deal with motions in limine.  And what

12   I hoped to have said was that they're reserved for the

13   situations where you cannot un-ring the bell.  In all other

14   situations, I wanted your anticipated motions in limine in your

15   trial briefs, and that I would consider them when the question

16   came up at trial so that we could deal with it without delay

17   and without taking the jury's time by simply referencing your

18   trial brief.

19      Now, you file all these motions in limine.  You file your

20   trial briefs.  And then this Exhibit 2134 comes up for

21   discussion yesterday, and I have Mr. Sharma telling me it's so

22   important that we have to discuss it outside the presence of

23   the jury.  Well, if it was that important, I would have thought

24   it would have been in your trial brief.  I would have thought

25   it would have been in the motions in limine that I said we

1    would get to later.

2        Now, I looked them over this morning.  I don't see them.

3    So if it's there, we'll discuss it.  But if not, I am not going

4    to spend a lot of time when you think this is so damned

5    important that we have to discuss it outside the presence of

6    the jury but you didn't put it in your trial brief.

7        So let's talk now about Exhibit 2134.  Why are you

8    objecting to it, and where is your trial brief?

9            MS. LYDON:  It's the defense exhibit.  And it's

10   hearsay.  And that's why we object to it.

11           THE COURT:  All right.  But it was identified.  It

12   was marked.  You knew it was there.

13           MS. LYDON:  It was on their exhibit list, correct.

14           THE COURT:  Okay.  Where is this discussion in your

15   trial brief?

16           MS. LYDON:  Our trial brief was filed the same day as

17   their exhibit list.

18           THE COURT:  Okay.  Okay.  I'm sorry.  Gee whiz, I

19   should have ordered you to file your trial brief later.  You

20   didn't know -- my fault.  My fault.

21           MS. LYDON:  Your Honor, no need for apologies.  Our

22   concern was just that we were --

23           THE COURT:  There is no need for apologies because

24   you should have anticipated, if this is so important, that you

25   should have put it in your trial brief.  This is one of those

1    things.

2        Okay.  It's hearsay.  Big deal.  Why is it so important

3    that we had to discuss it outside the presence of the jury?

4    Let's hear it.

5             MS. LYDON:  Because it's hearsay that opens the door

6    to the death, which Your Honor and the parties are striving to

7    keep out.

8             THE COURT:  Opens the door to a death.

9             MS. LYDON:  Yes.

10            THE COURT:  Hi, mate.  I hope you are doing okay with

11   everything that is going on.  I was hoping you could let me

12   know what stage my rating was at or was at so that I can figure

13   out how to proceed.  Australian Steve was also interested to

14   know.  Cheers, Morgan.

15       I guess we -- you see --

16            MS. LYDON:  Your Honor, this is --

17            THE COURT:  Okay.  No.  Okay.  By the end of the day

18   today, I want, in writing, now that you know what their

19   exhibits are, every single objection you are going to make to

20   every exhibit they are going to offer.

21            MS. LYDON:  Your Honor, hearsay is in our trial

22   brief.  This is something --

23            THE COURT:  Oh, I guess I didn't know there was a

24   hearsay rule.  Hearsay is in your trial brief.

25            MS. LYDON:  Your Honor --

1              THE COURT:  Don't give me that.  You didn't talk

2    about hearsay in connection with this document.  Of course you

3    object to hearsay.

4              MS. LYDON:  We do object to hearsay.

5              THE COURT:  All right.  Objection is overruled.

6              MS. LYDON:  I'm sorry, Your Honor.  You're putting --

7    you're letting this exhibit in through --

8              THE COURT:  Yes.

9              MS. LYDON:  -- a witness who is not on it?

10             THE COURT:  Yes.  Because you didn't object.

11             MS. LYDON:  I did -- we did object, Your Honor.

12   This --

13             THE COURT:  All right.  I'm sorry.  I thought you

14   were a better lawyer than this.

15        So you think that if you put an objection to -- We object

16   to all hearsay, that that preserves your record and you don't

17   have to make -- okay.  That's fine.

18        What is the hearsay that's in this?

19             MS. LYDON:  It is an out-of-court statement by

20   Lachlan Mackay.

21             THE COURT:  Yes.  To prove what?

22             MS. LYDON:  It is the defense offering it.

23             THE COURT:  No.  No.  I know you are at least this

24   good of a lawyer that you know that in order to be hearsay, it

25   has to be an out-of-court statement that's offered to prove the

 1   truth of the matters asserted.

 2       So what are the matters asserted in this exhibit that it's

 3   offered to prove the truth of?

 4            MS. LYDON:  It is -- I don't know the purpose for

 5   which the defense is offering it, but I don't see a non-hearsay

 6   purpose.

 7            THE COURT:  Okay.  What's the purpose?

 8            MS. CRAGER:  The purpose is this relates to the

 9   e-mail in Count 4 and Count 6 in which Mr. Pooley sends Lachlan

10   Mackay's rating -- Morgan Mackay's rating card.  The e-mail is

11   signed "Yuri."  The government is going to argue that the

12   e-mail is signed "Yuri," and Morgan Mackay thought that it was

13   all aboveboard and that Yuri was sending it.

14            THE COURT:  Is this one signed "Yuri"?

15            MS. CRAGER:  No.  This e-mail shows that Mr. Mackay

16   knew that Rob Pooley was the one who sent the rating card.

17            THE COURT:  It doesn't show that.

18            MS. CRAGER:  It shows that he knew to follow up with

19   Rob Pooley.

20            THE COURT:  The objection is overruled.  It's not

21   hearsay.  And then we'll take it from there.

22       In the meantime, I want your objections -- oh, no.  I'm

23   sorry.  You've -- you've preserved your objection.  You object

24   to all hearsay.  All right.

25       Bring the jury in.

1              MS. LYDON:  Your Honor --

2              THE COURT:  No.

3              MS. LYDON:  -- we are very concerned that if this

4     document comes in in its entirety, it opens the door, because

5     the defense will argue, based on the contents of this

6     out-of-court statement, that Lachlan Mackay knew about the

7     fraud but he's sending this "how are you doing with everything"

8     e-mail.  It -- the reason that he is --

9              THE COURT:  What you're afraid they're going to

10    argue, we can take up later.

11         Bring the jury in.

12         And read the hearsay rule again so next time it comes up,

13    you can be prepared to discuss it in a little bit more -- with

14    a little bit more accuracy.

15         Bring the jury in.

16         (Jury present, 9:05 a.m.)

17             THE COURT:  Everyone is present.  Good morning,

18    ladies and gentlemen.

19         We're ready to proceed again today, and everyone is

20    present, including the defendant and all the jurors.

21         The last exhibit made reference to was 2134.  That is

22    received in evidence.

23         (DEFENDANT'S EXHIBIT 2134 ADMITTED INTO EVIDENCE.)

24             MS. LYDON:  Your Honor, the parties have agreed to a

25    redacted version of that exhibit which we jointly would propose

1    be swapped out.

2              THE COURT:  All right.  So it's redacted, and the

3    jury will see that.

4              MS. CRAGER:  It's labeled in the exhibits as 2134R,

5    just for the record.

6              THE COURT:  All right.  It's called 2134R.

7              MS. CRAGER:  Okay.

8         (The Witness, RONALD BELL, previously sworn.)

9                   CROSS-EXAMINATION CONTINUED

10   BY MS. CRAGER:

11   Q.  Good morning, Mr. Bell.  Thank you for coming back today.

12   A.  Yes, ma'am.

13   Q.  I just want to go back to the e-mail we were looking at

14   yesterday.

15        And I believe you testified the e-mail came from Rob

16   Pooley?

17   A.  That's what it indicates, yes.

18   Q.  And the e-mail went to Susan Sullivan, who works at the

19   Parachute Association?

20   A.  Correct.

21   Q.  The e-mail also went to morgan@verticalfilms.com.au?

22   A.  Correct.

23   Q.  And I believe we covered yesterday that this e-mail

24   address, morgan@verticalfilms.com.au, appears to be the e-mail

25   address for the person whose application this is?

1    A.  Correct.

2    Q.  And this e-mail is signed "Yuri"?

3    A.  It is.

4    Q.  Even though it came from Rob Pooley?

5    A.  Correct.

6    Q.  And I believe you testified you don't know whether

7    morgan@verticalfilms -- Morgan Mackay -- knew that Rob Pooley

8    sent this e-mail?

9    A.  I couldn't determine from the form.  If the form was

10   properly filled out, there was no nefarious intent behind

11   filling out the form, it would indicate that he spent several

12   days with him.  If you include that, I can't specifically say

13   that the form indicates that they met.

14   Q.  So the forms that he sent indicate that Morgan Mackay would

15   have spent several days with Yuri Garmashov?

16   A.  Correct.

17   Q.  Okay.  I'd like to pull up Exhibit 2134R.  2134R, for

18   redaction.  Thank you.

19        Is this e-mail from the same Morgan Mackay e-mail address?

20   A.  It is.

21   Q.  And this e-mail is to an address rpooley75@gmail.com?

22   A.  Correct.

23   Q.  Are you familiar with that e-mail address?

24   A.  Not specifically, no.

25   Q.  Okay.  And in this e-mail it states, I was hoping you could

1  let me know what stage my rating is at or was at so I can

2  figure out how to proceed.

3      Is that what it says?

4  A.  Yes.

5  Q.  And it's signed "Morgan"?

6  A.  Yes.

7  Q.  And the date is August 11th of 2016?

8  A.  Yes.

9          MS. CRAGER:  Thank you.  Nothing further.

10         THE COURT:  Any cross-examination?

11         MR. SHARMA:  Redirect, Your Honor.  No.  Thank you.

12         THE COURT:  All right.  Any reason, then, why this

13 witness, Mr. Bell, should not be excused?

14         MR. SHARMA:  No, Your Honor.  He can be excused.

15         MS. CRAGER:  No, Your Honor.

16         THE COURT:  Thank you, Mr. Bell.  You're excused.

17         THE WITNESS:  Thank you, sir.

18         THE COURT:  The government may call its next witness.

19         MR. SHARMA:  Your Honor, may I ask for a sidebar,

20 please?

21         THE COURT:  No.  We just met outside -- I'll tell you

22 what.  We just spent a little time outside the presence of the

23 jury where we could discuss legal issues so that the jury's

24 time wouldn't be taken up.  We brought them in, and then just a

25 minute later, you want to do something outside the presence.

1          MR. SHARMA:  Your Honor, I didn't get an opportunity

2     to discuss this witness with you.  He's going to elicit some

3     testimony we need to discuss.

4          THE COURT:  Oh, boy.  All right.

5      I'm sorry about this, ladies and gentlemen.  I got these

6     lawyers here, and I gave them a big lecture about why we didn't

7     want to take your time up.  And he's telling me he didn't get a

8     chance to bring this up.  That's wrong.  But I'm going to give

9     him the chance.  So go back into the jury room.

10     15-minute recess, ladies and gentlemen.  I'm very sorry.

11          MS. LYDON:  Your Honor, we expect this will only take

12     a minute.

13          THE COURT:  I don't care.  I'm going to take a little

14     5-minute recess myself.

15      (Recess taken, 9:10 a.m. - 9:16 a.m.)

16          THE COURT:  All right.  Who is the next witness?

17          MR. SHARMA:  Your Honor, it's Fabian Munoz.  I

18     believe we've sorted out the issues with the defense.  That's

19     the good news.

20          THE COURT:  Well, I don't know that that's good news

21     or not because every time we have one of these issues come up

22     where you ask either that the jury be excused or we have a

23     discussion at sidebar, it seems like you come to an agreement.

24      Now, you ought to be able to come to the agreement before

25     we have to send the jury out or take their time with some

1   sidebar.  So I don't know that that's good news.  It took up as

2   much of their time as it would have if you hadn't come to an

3   agreement.

4       So you came to an agreement.  Now, Mr. Munoz, how long is

5   his testimony going to be?

6           MR. SHARMA:  It's going to go for over an hour, Your

7   Honor.

8           THE COURT:  Okay.  Do you foresee any issues that are

9   going to come up during that testimony?

10          MR. SHARMA:  Well, I can tell you what the reason --

11  why we asked for the sidebar.  He's going to mention a person

12  that has since died, and we wanted to make sure that we were

13  scrupulously adhering to the issue of not mentioning deaths at

14  the trial.

15      We've talked to the defense.  It's not an issue.  He's just

16  going to mention that he's passed away so the jury understands

17  why that person is not here testifying.

18          THE COURT:  All right.  We talked about that,

19  actually, before trial.  There is nothing wrong with mentioning

20  the fact that somebody is deceased.  It happens all the time.

21  It doesn't imply any untoward conduct.

22          MR. SHARMA:  Right.  So we're just trying to be

23  absolutely diligent.

24          THE COURT:  All right.  Is there anything else you

25  see that's going to come up during the testimony of this

 1   witness?

 2           MR. SHARMA:  And the other issue, Your Honor, we're

 3   going to play a video.  But we've -- the defense has asked we

 4   not play the sound to the video, and so we're not going to do

 5   that.

 6           THE COURT:  Okay.  Does it have sound?

 7           MR. SHARMA:  It does have sound.

 8           THE COURT:  Is it a conversation?  What kind of sound

 9   is it?

10           MR. SHARMA:  The video is of a -- the witness

11   conducting a tandem passenger jump when he was at the course.

12           THE COURT:  It's not somebody talking?

13           MR. SHARMA:  There are some parts of it where they're

14   interviewing the passenger that goes on the jump.  And the

15   defense is asking us to -- to mute that so that we don't hear

16   the passenger talking.

17           THE COURT:  I mean, is it obvious that he's talking?

18   Did he have a microphone or something?

19           MR. SHARMA:  Yeah.  It's sort of like an interview.

20   It's not a microphone, but they're asking her how she feels

21   about going on a tandem passenger jump.

22           THE COURT:  All right.  So why don't you mention,

23   then, when you do it, that both sides have agreed that there is

24   no sound.

25           MR. SHARMA:  Sure.

1              THE COURT:  All right.  Now, Ms. Crager, is there

2    anything you see that's going to come up during the testimony

3    of this witness that we ought to address outside the presence

4    of the jury?

5              MS. CRAGER:  I don't believe so, Your Honor.

6              THE COURT:  All right.  I'm going to take both of you

7    at your word.  And you're going to be embarrassed if somebody

8    starts asking about a sidebar or excuse the jury during the

9    testimony of this witness.

10             MS. LYDON:  Your Honor, I may -- I may -- because you

11   asked, we don't foresee anything coming up in our direct

12   examination.  It's hard for us to anticipate what the defense

13   will do in their cross.  They have just provided us with new

14   exhibits that don't have this witness on them.  They're e-mails

15   with a friend of his who --

16             THE COURT:  Are these exhibits going to be used

17   during the testimony of this witness?

18             MS. CRAGER:  I'm sorry.  Which one?

19             MS. LYDON:  The Joaquin Gomez Passi e-mails.  We

20   can't predict if we will object to their cross.  We don't know

21   their questions in advance or exhibits.

22             THE COURT:  Not every objection has to be heard

23   outside the presence of the jury.  So if you have an objection,

24   it doesn't mean you call for a sidebar; it means you make the

25   objection, and you say, Objection.  Hearsay; Objection.

1   Irrelevant; or whatever.  And I'm usually able to understand

2   the basis for an objection, and there doesn't have to be a lot

3   of discussion.  I can usually rule on it without a sidebar.

4          MS. LYDON:  Absolutely.  The concern previously was

5   limited to we didn't want to open the door to the death because

6   we want to be very careful with that pursuant to the Court's

7   prior comments.  We totally agree.  Typical objections can be

8   handled by just saying, Objection.

9          THE COURT:  All right.  Bring the jury back in.

10      Does this witness need an interpreter?

11         MR. SHARMA:  Yes, Your Honor.

12         THE COURT:  Are you certified?

13         THE CLERK:  Yes, he is.

14         THE INTERPRETER:  Yes, Your Honor.  I am.

15         THE COURT:  What's your name?

16         THE INTERPRETER:  Alejandro Franco.

17         THE COURT:  And what language?

18         THE INTERPRETER:  Spanish.

19         THE COURT:  You'll be interpreting Spanish?

20         THE INTERPRETER:  Yes, sir.

21         THE COURT:  All right.  Both sides agree that he's

22   qualified --

23         MS. CRAGER:  Yes, Your Honor.

24         THE COURT:  -- as an interpreter?

25      All right.  I'll explain that to the jury.

1          (Jury present, 9:22 a.m.)

2              THE COURT:  All right.  The jurors are all returned.

3    Defendant is still present with counsel.

4         The next witness, ladies and gentlemen, is going to be

5    testifying in Spanish.  We do this all the time, and it works

6    pretty well.  The witness testifies in Spanish; we have a

7    certified Spanish to English and English to Spanish

8    interpreter, Mr. Franco, who is here and will be interpreting

9    the questions and my comments, which are in English, to the

10   witness.  And then he will be interpreting the witness's

11   Spanish answers to English for you and the rest of the people

12   in the court.

13        Now, you don't have to understand Spanish.  As a matter of

14   fact, it's much better if you don't, because my instruction to

15   you is that you have to go by the English translations.  So if

16   you happen to speak Spanish and you hear something that you

17   think is a little bit different from the way the interpreter

18   translated it, you have to follow the interpreter's translation

19   into English.  So that's easier for you if you don't speak

20   Spanish.  And if you do, put it out of your mind.  Go by the

21   English interpretation.

22        All right.  Who is the witness?

23              MR. SHARMA:  Your Honor, the government calls Fabian

24   Munoz.

25              THE COURT:  All right.  Mr. Munoz.

```
 1                THE CLERK:  Sir, please step forward all the way up
 2    to the witness stand.
 3         Please raise your right hand.
 4         (The Witness, FABIAN MUNOZ BECERRA, is sworn.)
 5                THE WITNESS:  I swear, yes.
 6                THE CLERK:  Thank you.  You may be seated.
 7         Please state your full name.  Spell your last name for the
 8    record.
 9                THE WITNESS:  Fabian Esteban Munoz Becerra.
10                THE CLERK:  Please spell your name.
11                THE WITNESS:  Fabian, F-A-B-I-A-N.
12                THE CLERK:  Full name.  I need to know the spelling.
13                THE WITNESS:  Munoz, M-U-N-O-Z.
14                THE CLERK:  What was the last name?  Becerra?
15                THE WITNESS:  B-E-C-E-R-R-A.
16                THE CLERK:  That's good enough.  Thank you.
17                          DIRECT EXAMINATION
18    BY MR. SHARMA:
19    Q.  Good morning, Mr. Munoz.
20    A.  Good morning.
21    Q.  I just want to start by addressing your use of an
22    interpreter.
23         Is Spanish your first language?
24    A.  That's correct.
25    Q.  Do you understand some English?
```

1   A.  That's correct.

2   Q.  Can you carry on a conversation in English?

3   A.  That's correct.

4   Q.  For important situations where you want to make sure that

5   you are communicating clearly, do you prefer to use -- do you

6   speak in Spanish?

7   A.  Yes.  I would rather use Spanish.

8   Q.  Okay.  And specific situations like when you're in court

9   and you want to make sure that you are communicating clearly?

10  A.  That's correct.

11  Q.  Okay.  Where do you live, sir?

12  A.  Santiago, Chile.

13  Q.  Did you come from Chile just for this hearing?

14  A.  That's correct.

15  Q.  Do you have any other reason to be here?

16  A.  No.

17  Q.  And after you're done here today, are you going back to

18  Chile?

19  A.  Yes.  I'll go back to my family.

20  Q.  Great.  Could you tell the jury what you do for work?

21  A.  I'm a marketing and sales manager for a skydiving company

22  in Chile.

23  Q.  Do you skydive for work?

24  A.  I am a skydiver, but currently, I do the marketing side of

25  the business.

1    Q.  Have you ever done skydives for work?

2    A.  That's right.

3    Q.  Okay.  And where did you work when you were working -- when

4    you did skydive work?

5    A.  In Chile, for a company called Skydive Andes.

6    Q.  Anywhere else?

7    A.  Yes.  I also worked in Mexico for a company called Skydive

8    Mex.

9    Q.  Were you in the Chilean Army at some point?

10   A.  That's correct.  I belong to the Chilean Army.

11   Q.  And did you skydive when you were with the Army?

12   A.  That's correct.  I took courses, and I did skydiving

13   exercises.

14   Q.  Did you learn a lot of technical -- did you have a

15   technical understanding of skydiving from those courses?

16   A.  That's right.

17   Q.  Okay.  Great.

18       Let me -- let's talk about Skydive Andes.  Is that where

19   you worked in 2016?

20   A.  That's right.

21   Q.  And what did you do for them?

22   A.  Marketing and sales manager.

23   Q.  Okay.  Now, I know you said earlier that you did some

24   skydiving for them as well.  Can you explain what you did in

25   the term -- in terms of skydiving?

1    A.   My initial work was packaging the parachutes.

2    Q.   Okay.  Did you ever take customers on skydives when you

3    were at Skydive Andes?

4    A.   No, not back then.  Not until I decided to take the

5    instructor tandem skydiving classes here in the United States.

6    Q.   Okay.  So let's talk about that.

7         Do you know of a skydiving center called the Parachute

8    Center in Lodi?

9    A.   Yes, sir.  That's correct.

10   Q.   What do you know about it?

11   A.   It's a skydiving center where they do classes, they do

12   skydiving, and they also do tandem skydiving.

13   Q.   How did you first learn about Parachute Center?

14   A.   Through some friends.

15   Q.   Okay.  Can you tell us about those friends?  Were they at

16   the Parachute Center?

17   A.   That's correct.  I was in Chile, and they were at the

18   Parachute Center.  We had a phone conversation.  We spoke about

19   it.  And I decided to come to take the classes here.

20   Q.   And was that in 2016?

21   A.   In July 2016.

22   Q.   Who were these friends?  What were their names?

23   A.   The friends who were there was Carlos Obaid, Carlos

24   Martinez, Francisco Espinoza, and Joaquin Passi.

25   Q.   You said you made the decision to go to the Parachute

1   Center.  What -- why did you want to go there?

2   A.  Because I wanted to take the instructor course.

3   Q.  Which -- the tandem instructor course?

4   A.  The tandem instructor course.

5   Q.  Now, why did you want to become a tandem instructor?

6   A.  Because I needed it for my career in Chile.

7   Q.  And when you say you needed it for your career, what do you

8   mean by that?

9   A.  It would also help me have another source of income besides

10  my -- the commercial aspect.

11  Q.  Okay.  Do you know what USPA and UPT is?

12  A.  That's right.

13  Q.  What do you know of them?

14  A.  It's an organization that watches over the safety and

15  regulations of skydiving worldwide.

16  Q.  When you say you wanted tandem instructor ratings, did you

17  want the USPA/UPT tandem instructor ratings?

18  A.  Yes, sir.  That's right.

19  Q.  And why, specifically, USPA/UPT tandem instructor ratings?

20  A.  Because that association is the one that is qualified in

21  the area where I worked.

22  Q.  Do you know anything -- do you know if those ratings are

23  accepted at other drop zones also?

24          THE INTERPRETER:  Counsel, would you please repeat

25  the question.

1    Q.  BY MR. SHARMA:  Do you know if the USPA/UPT ratings are

2    accepted at other drop zones also?

3    A.  That's right.

4    Q.  So if you got USPA/UPT ratings, would that open the

5    opportunities for you to work at many different drop zones?

6    A.  That's right.

7    Q.  Now, did you know what the requirements for becoming a

8    tandem instructor were?

9    A.  That's right.

10   Q.  And what were they?

11   A.  To have jumped 500 to 600 times and to be involved in the

12   sport for three years.

13   Q.  Did you know if the person that taught you the tandem

14   instructor course needed a rating?

15   A.  Can you repeat the question?

16   Q.  Yes.  The person that taught you a tandem instructor

17   course, did you know if that person needed a rating?

18   A.  He told me that, yes, that it was necessary.

19   Q.  Okay.  So was it your understanding that the person that

20   taught you that course needed a certification or a rating?

21         THE COURT:  Who -- can you establish who this person

22   is that told him this?

23         MR. SHARMA:  Yes.

24   Q.  BY MR. SHARMA:  Who told you -- who told you that he

25   needed -- that the person that taught you the course needed a

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    rating?

2    A.  Everyone that's in this knows the person who teaches the

3    course has to be a person who is qualified and has been

4    certified to teach the course.

5              THE COURT:  That answer is stricken.

6       The question was you said somebody told you that he had to

7    be certified.  Who was that that told you?

8              THE WITNESS:  I don't quite understand the question,

9    then.  Do you mean --

10             THE COURT:  No.  I'll let the lawyer ask the

11   question.

12   Q.  BY MR. SHARMA:  You said you wanted to get a tandem

13   instructor rating?

14   A.  That's correct.

15   Q.  And to get a tandem instructor rating, you wanted to take a

16   course?

17   A.  That's right.

18   Q.  And who did you expect would teach you that course?

19   A.  An examiner.

20   Q.  Okay.  What do you understand an examiner to be?

21   A.  The examiner gives the course, and that is the person that

22   signs the certificates that need to be turned over to the USPA.

23   Q.  Thank you.

24      I want to go back to when you learned about Parachute

25   Center from your friends.  Were you involved in a phone

1    conversation with Rob Pooley?

2    A.  Yes, sir.  That's right.

3    Q.  And how did you come about to being involved in the phone

4    conversation with Rob Pooley?

5    A.  I was in Chile, and my friend Carlos was at the sky center.

6    I spoke to Carlos, and I told him that I wanted to take the

7    instructor course.  And he said, Why don't you speak right now

8    to Rob Pooley?  And he's standing right next to me.

9    Q.  Okay.  And then -- so did he hand over the phone to Rob

10   Pooley?

11   A.  That's right.

12   Q.  And what did you discuss with Rob Pooley?

13   A.  Hi, Rob.  My name is Fabian Munoz.  And I want to do the

14   course up there in the United States.

15   Q.  Okay.  Which course did you talk about?

16   A.  The tandem instructor course.

17   Q.  Okay.  Did you explain to him why you needed that course?

18   A.  Yes.  I told him that I needed it for my career.

19   Q.  And what did Mr. Pooley say to you in response?

20   A.  There is no problem.  You can come here.  You need to bring

21   money.  And we can do the course.

22   Q.  Did he say how to bring the money?  Was it cash or a check

23   or something?

24   A.  Yes.  In cash.

25   Q.  And did he say how much cash to bring?

1    A.   $2,000.

2    Q.   Who did Mr. Pooley tell you would teach the course?

3    A.   Yes, he was.

4    Q.   Did he tell you if he was going to be your examiner?

5    A.   That's right.

6    Q.   Did he tell you if he was a USPA examiner?

7    A.   That's right.

8    Q.   And who did he say would sign off on your paperwork?

9          THE COURT:  The question is, first, did he say who

10   would sign?

11   Q.   BY MR. SHARMA:  Did he say to you who would -- did he say

12   that someone would sign off on your paperwork?

13   A.   He was.

14   Q.   And did he say that he would sign off on the paperwork?

15   A.   My -- my understanding is that whoever imparts the --

16         THE COURT:  No.  No.  That's not the question.

17   We don't want to know your understanding.  We want to know

18   what Mr. Pooley said.  Did he tell you who would sign the

19   paperwork?

20         THE WITNESS:  Yes.  He was.

21   Q.   BY MR. SHARMA:  Did you trust his statement that he would

22   be your tandem examiner?

23   A.   Absolutely.

24   Q.   Did you trust his statement that he would sign your

25   paperwork?

1    A.   Definitely.

2    Q.   And then based on that conversation, did you make the

3    decision to travel to Parachute Center?

4    A.   That's correct.  I organized my -- my work and my job site.

5    I asked for permission.  I made arrangements with my family.

6    And I asked for a permit at work to be absent from work during

7    the days that I was taking the course.

8    Q.   Okay.  So you had to take leave from work to attend this

9    course?

10   A.   A work permit to take the course.

11   Q.   Let's talk about when you got to the Parachute Center.

12   When did you get to the Parachute Center?

13   A.   Around the 6th or 7th of July.  Around there.

14   Q.   In 2016?

15   A.   That's right, sir.

16   Q.   Did you have any other reason to go to the US, or was this

17   the only reason you came?

18   A.   It was the only reason for me to come here to the United

19   States.

20            MR. SHARMA:  I'm going to approach and show him an

21   exhibit.

22            THE COURT:  Yes.

23            MS. CRAGER:  I'm sorry.  What exhibit?

24            MR. SHARMA:  12.

25            MS. CRAGER:  Thank you.

1    Q.  BY MR. SHARMA:  Referring you to -- Exhibit 12 is in the

2    government's binder --

3              MR. SHARMA:  Counsel, do you want a second?

4    Q.  BY MR. SHARMA:  Do you recognize that picture?

5    A.  That's right, sir.

6    Q.  And how do you recognize that photo?

7    A.  I remember that day because my mother gave me that shirt as

8    a gift when I was -- for -- to take the trip.

9    Q.  Okay.  So let me back up.

10        Is that a picture of you?

11   A.  That's correct.  I was younger.

12             MR. SHARMA:  Government moves to enter Exhibit 12.

13             MS. CRAGER:  No objection.

14             THE COURT:  Exhibit 12 is received in evidence.

15        (GOVERNMENT'S EXHIBIT 12 ADMITTED INTO EVIDENCE.)

16   Q.  BY MR. SHARMA:  Where was that picture taken, sir?

17   A.  I suppose that photograph was taken at the airport.

18   Q.  Okay.  And you mentioned that shirt that you are wearing.

19        Do you recognize that shirt?

20   A.  Definitely.

21   Q.  That's because your mother gave it to you, you said?

22   A.  That's right.  It was a gift from my mother.

23   Q.  And that was a gift given to you right before you took this

24   trip?

25   A.  She arrived at the airport with that gift; so I went into

 1    the bathroom and changed shirts.

 2    Q.  Okay.  Thank you.  Nice shirt.

 3         Now, when you arrived to the Parachute Center, where did

 4    you stay?

 5    A.  At the Parachute Center.

 6    Q.  Did they have a hotel there?  Or where exactly did you stay

 7    at the Parachute Center?

 8    A.  There was a bedroom available; so I -- I rented it.

 9    Q.  And how much did you -- did you pay money for rent?

10    A.  That's correct.

11    Q.  How much money did you pay?

12    A.  About 300, 350 dollars.

13              THE COURT:  Per month?

14              THE WITNESS:  For the days that I would be there.

15    Q.  BY MR. SHARMA:  So in total for the time you were there, it

16    was 300 to 350 dollars?

17    A.  That's correct, sir.

18    Q.  Okay.  And how long were you there for?

19    A.  For three weeks.

20    Q.  Now, when you arrived at the Parachute Center, who did you

21    first meet from the people that worked there?

22    A.  The owner of the parachute area.

23    Q.  What was his name?

24    A.  Mr. Bill.

25    Q.  Where did you meet Mr. Bill?

1   A.  At the manifest.

2   Q.  Can you explain to the jury what the manifest was?

3   A.  The manifest is an area at the parachute area where they

4   organize the flights.  The passengers or the parachutist go to

5   the manager, and they indicate whether they're going to take

6   Flight 1, 2, or 3, and the general organization of the flights.

7   Q.  So you met Mr. Bill there.

8       Did you introduce yourself to him?

9   A.  That's right.  I introduced myself.

10  Q.  What did you say to him?

11  A.  Hi, Bill.  My name is Fabian Munoz.  I'm from Chile.  And

12  I'm here to take the instructor course.

13  Q.  Okay.  And then did Mr. Bill tell you where to go?

14  A.  He said, Welcome.

15  Q.  Okay.  Did he direct you to someone else or a different

16  part of the Parachute Center?

17  A.  Yes.  Automatically, I just went to speak to Rob Pooley.

18  Q.  Okay.  Did you go to speak to Rob Pooley because Mr. Bill

19  told you to speak to him, or did you just go looking for him?

20  A.  Because Mr. Bill told me that Rob Pooley was the one in

21  charge of doing the classes.

22  Q.  Where was -- did you see Mr. Pooley then?

23  A.  Yes.  I waited until he came back from a flight, and I

24  waited until he finished folding his parachute.

25  Q.  Okay.  And where did you meet him in the Parachute Center?

1  A.  At the center itself, where they pack the parachutes.

2  Q.  Okay.  And what did you say to Mr. Pooley?

3  A.  Hi, Rob.  I'm here.  Do you remember me?  We had a

4  conversation on the phone.

5  Q.  And what did Mr. Pooley say?

6  A.  He said, Yes, I remember you.  No problem.  Just let me

7  fold the parachute, and we'll talk.

8  Q.  And then did you talk about the course?

9  A.  Once he finished folding the parachute, we started talking

10  about the course.

11  Q.  Okay.  What did Mr. Pooley tell you about the course?

12  A.  That the course would start on the following Monday and

13  that I needed to have my coach rating and that I needed the

14  medical certificate.

15  Q.  And when you say you needed the coach rating and the

16  medical certificate, did he say that you would get that at the

17  Parachute Center also?

18  A.  Definitely.

19  Q.  Did you pay -- we talked about you bringing $2,000 in cash.

20  Did you pay Mr. Pooley at that point?

21  A.  That's right.  I handed it to him.

22  Q.  Now, did you have to pay additional money for getting your

23  medical certificate?

24  A.  That's correct.  I had to pay for the transportation and I

25  had to pay for the medical certificate.

1    Q.  And how much did that cost?

2    A.  $500.

3    Q.  Now, based on this first meeting that you had with

4    Mr. Pooley, did you continue to believe that he was your

5    examiner?

6    A.  Yes.

7    Q.  Now, you said the course would start the following Monday.

8    What did you do between the time you arrived and before the

9    course started?

10   A.  I did the coach class, and I did some jumps, skydiving with

11   friends.

12   Q.  Did you do some traveling in the area?

13   A.  I went to downtown Sacramento.  I went out to eat at some

14   places.

15   Q.  Can I turn you to Exhibit 40 in the binder.

16       Do you recognize that picture?

17   A.  Definitely.

18   Q.  And what is that picture of?

19   A.  It's a photograph with my friends at the Parachute Center.

20   Q.  And are you in that photograph?

21   A.  That's right.

22           MR. SHARMA:  Government moves to enter Exhibit 40

23   into evidence.

24           MS. CRAGER:  No objection.

25           THE COURT:  Exhibit 40 is received in evidence.

1     (GOVERNMENT'S EXHIBIT 40 ADMITTED INTO EVIDENCE.)

2     Q.  BY MR. SHARMA:  Okay.  So zoom in a little bit over here.

3     So this is a picture of you and your friends at Parachute

4     Center, you said?

5     A.  That's right, sir.

6     Q.  Starting from the person on the left in the green shirt,

7     could you tell us who that is?

8     A.  That person is Carlos Obaid.

9     Q.  That's the person that you spoke with on the phone?

10    A.  That's right, sir.

11    Q.  From Chile?

12    From Chile?

13    A.  That's right, sir.

14    Q.  Okay.  I'm sorry to bring this up, but has Mr. Obaid passed

15    away since then?

16    A.  Yes.  That was a terrible news, a friend who passed away,

17    who is no longer here.

18    Q.  Okay.  I'm sorry for your loss, sir.

19    A.  It's okay.

20    Q.  I want to move on down through the picture.

21    The person next to Mr. Obaid is in a blue shirt.  Who is

22    that?

23    A.  The next person, the one that has the bottle of water,

24    that's me.

25    Q.  And the person next to that in the white shirt, who is

1    that?

2    A.   That's Francisco Espinoza.

3    Q.   And the person in the black shirt next to him?

4    A.   Carlos Martinez.

5    Q.   And then, finally, the person in the blue shirt?

6    A.   Joaquin Passi.

7    Q.   And are you sitting underneath the sign that says Parachute

8    Center?

9    A.   I'm sitting right below the -- the Parachute Center sign.

10   Q.   Okay.  Thank you.

11   A.   May I have some water?

12   Q.   Of course.

13           THE COURT:  Yes.

14           THE WITNESS:  I'm ready.

15   Q.   BY MR. SHARMA:  Okay.  So we talked about the first week

16   before the course started.

17       Can you tell us about the second week, when the course --

18   when you were doing the course?

19   A.   Right.  I started the course with Rob Pooley and other

20   people.

21   Q.   Okay.  Did you know any of the other people?

22   A.   I did not know them.

23   Q.   And was Mr. Pooley teaching the course to you?

24   A.   That's right.

25   Q.   What was he teaching you?

1   A.  He taught me -- we work on the theory portion using the

2   USPA manual.

3   Q.  Did he give you the USPA manual?

4   A.  No.  I acquired it through my own means.

5   Q.  And what about -- what were you talking about in the

6   manual?  What, specifically, were you discussing?

7   A.  Security, emergency procedures, the procedures regarding

8   the plane, and possible complications in the air.

9   Q.  How many days was this theory part of the course?

10  A.  Around three days.

11  Q.  Okay.  And did Mr. Pooley teach you all three days?

12  A.  That's right.

13  Q.  Was there any other examiner involved in teaching that

14  course?

15  A.  No.

16  Q.  Now, after you finished the theory part of it, did you then

17  do a practical part of the course?

18  A.  That's right.  I finished the theory -- the theory portion

19  of the class, and then I started the practical part of the

20  course, which was three -- ten skydiving jumps to qualify.

21  Q.  And those ten skydiving jumps, were they tandem jumps?

22  A.  That's right.

23  Q.  How many -- how many days did you do jumps -- how many --

24  over how many days did you do those ten jumps?

25  A.  If I'm not mistaken, between three and four days.

1   Q.  Okay.  And was Mr. Pooley involved in your jumps?

2   A.  That's right.

3   Q.  Did he do any jumps with you?

4   A.  If I recall correctly, it was Jumps 2 and 3.

5   Q.  And so Mr. Pooley did Jumps 2 and 3 with you?

6   A.  That's right.

7   Q.  Now, when you say that he did the jumps with you, what do

8   you mean?  Was he riding with you tandem?

9   A.  As a passenger, yes.

10  Q.  So does that mean that he's up front?

11  A.  That's right.

12  Q.  Now, when you were at the Parachute Center, did you

13  participate in any tandem jumps with customers?

14  A.  That's right.

15  Q.  And was that a requirement of the course?

16  A.  Rob Pooley told me that once I finished my ten tandem

17  jumps, I had to do one with a customer --

18  Q.  Okay.

19  A.  -- to qualify.

20  Q.  And turning to Exhibit 41-A in the binder.

21      Now, is that a CD before you?

22  A.  Yes, sir, it is.

23  Q.  Have you watched that -- the video on that CD?

24  A.  Yes, sir.

25  Q.  Did you sign the CD after you watched it?

1   A.  That's correct, sir.

2            MR. SHARMA:  Your Honor, we move to enter

3   Exhibit 41-A into evidence.  Pursuant to the parties'

4   agreement, we're not going to play the sound, just the video.

5            THE COURT:  This is a video, I understand, ladies and

6   gentlemen, that the lawyers have agreed, even though it does

7   appear that there was some talking on it, that it comes in

8   without sound.  So there is not sound on this video.

9        With that understanding, Exhibit 41-A is received in

10  evidence.

11      (GOVERNMENT'S EXHIBIT 41-A ADMITTED INTO EVIDENCE.)

12  Q.  BY MR. SHARMA:  Do you recognize the person on this video?

13  A.  Yes, sir.

14  Q.  Who is she?

15  A.  A passenger.

16  Q.  Is this the passenger that you took on your tandem jump?

17  A.  That's correct, sir.

18  Q.  Okay.

19      (Media presented.)

20      Can we pause it right there.

21      The person behind this lady, is that you, sir?

22  A.  That's correct, sir.

23  Q.  In the black shirt?

24  A.  That's correct, sir.

25  Q.  And what are you doing over here?

```
 1    A.   Placing a harness on the passenger.

 2    Q.   Okay.  Keep playing.

 3         (Media presented.)

 4         Can we pause it right there.

 5         Is that you in the skydiving suit?

 6    A.   That's correct, sir.

 7    Q.   So what's happening at this -- at this point in the video?

 8    A.   We're -- we're going to the plane.

 9    Q.   Okay.  To go on a tandem jump?

10    A.   That's correct, sir.

11    Q.   Play.

12         (Media presented.)

13         Pause right there.

14         Just to confirm, is that you doing the tandem jump with

15    that passenger?

16    A.   Definitely, sir.

17    Q.   Okay.  Thank you.

18         You can keep playing the rest.

19         (Media presented.)

20         Mr. Munoz, did you do any other tandem jumps with

21    passengers when you were at the Parachute Center?

22    A.   Yes, sir.

23    Q.   Did you do any tandem jumps with customers?

24    A.   Yes, sir.

25    Q.   Any other tandem jumps with customers?
```

1   A.  Yes, sir.

2   Q.  Okay.  After you did those jumps, did you -- when did the

3   course finish?

4   A.  The course ended on Jump Number 10.  And after that, I did

5   jumps with passengers like as appeared in that video.

6   Q.  Okay.  Was there a point where you had completed all the

7   requirements of the course?

8   A.  At that -- at that point, I had problems getting my

9   certification documentation from Mr. Pooley.  I thought I

10  needed them to be able to make those tandem jumps.

11  Q.  Okay.  We'll talk about that certification.

12      But did you finish the requirements of the course in terms

13  of doing the jumps and the theory?

14  A.  Yes.

15  Q.  At that point, once you finished all those training

16  requirements, did you trust that you had done everything you

17  needed to get your tandem ratings?

18  A.  I did everything that the examiner requested.

19  Q.  And your examiner was Rob Pooley?

20  A.  That's correct, sir.

21  Q.  Now let's go back to the paperwork you were talking about.

22      So after you completed the course, did you -- did you fill

23  out any forms or other documentation?

24  A.  Yes.  I completed the documents requiring my credit card

25  information, my name, my -- my address.

1    Q.   Okay.  Was this USPA and UPT specific documentation?

2    A.   That's correct, sir.

3    Q.   Okay.  And how did you get this documentation to fill out?

4    A.   I went into the internet, and I had them print -- and I

5    printed them.

6    Q.   So you printed out the documents yourself?

7    A.   That's right, sir.

8    Q.   And did those documents need your examiner's signature on

9    them?

10   A.   Definitely.

11   Q.   And so did you go to Mr. Pooley and ask for his signature?

12   A.   Of course.

13   Q.   And what did he say to you?

14   A.   That not to worry, that everything was all right, and that

15   he would sign the documents.

16   Q.   But did he sign it in front of you?

17   A.   He never gave me a document.

18   Q.   Now, did you see the paperwork of the other students that

19   were involved in your class?

20   A.   At the end of the course, I was able to see the documents

21   that another student had.

22   Q.   Okay.  And that other student's documents, did you notice

23   any signatures on that document?

24   A.   That's correct, sir.

25   Q.   Whose signatures were on that document?

1   A.  It was not -- it was not Rob Pooley.  It was from another

2   person.

3   Q.  And how do you know it was a different person and not Rob

4   Pooley?

5   A.  Because of a signature would have one's name, and his name

6   was not from Rob Pooley.

7   Q.  The person whose signature you saw on that card, had they

8   been involved in your course?

9   A.  I never saw him.

10  Q.  Did that strike you as being strange?

11  A.  Definitely.

12  Q.  Why did it strike you as being strange?

13  A.  Because the -- usually, the people that do the course are

14  the ones that sign the documents, and those would be the people

15  that participated in all the classes.

16  Q.  Did you talk to Mr. Pooley about someone else's signature

17  on the cards?

18  A.  Yes.  I told him that I did not need the signature from

19  someone else, that I needed his signature, the one who had

20  given me the class.

21  Q.  And why did you tell him that?

22  A.  Because I saw -- I noticed that the documents that other

23  people had were not the ones that I needed.

24  Q.  So after you gave Mr. Pooley the documents, how many more

25  days were you around at the Parachute Center?

1          THE COURT:  Did he say he gave Mr. Pooley the

2    documents?  I thought he said he saw other people's documents.

3    I'm trying to figure out what happened, because I -- I'm just

4    curious.

5          So -- withdraw the question.  I may not have heard the

6    answer.  And I'm not the jury anyway.

7          MR. SHARMA:  I can clarify.

8    Q.  BY MR. SHARMA:  Did you give your documents to Mr. Pooley

9    to sign?

10   A.  That's right.

11   Q.  Okay.  And did he give them back to you?

12   A.  He never gave me any document.

13   Q.  Okay.  Did you ask him about those documents when he was

14   still at the Parachute Center after the course?

15   A.  Every day -- morning, noon, and evening.

16   Q.  And how many days were you there?

17   A.  Before my flight to Chile, a week.

18   Q.  So every day for a week, you asked him about your

19   documents?

20   A.  That's correct, sir.  I told him that before returning to

21   my country, I had to have those documents, because if I didn't

22   have those documents before going back, then I would have

23   failed to complete my objective for the trip.

24   Q.  And what did Mr. Pooley tell you when you asked him for

25   your documents?

1   A.   Not to worry.  He said not to worry, that he would give me

2   the documents.  That he would give them to me the next day.

3   And then another day went by.  I -- I kept insisting so much

4   that one time I told him, Stop, give me my documents.  Don't --

5   don't make me ask for them so much.

6   Q.   And what did he say to you?

7   A.   He told me not to worry anymore.  And at that point, I felt

8   that I was being discriminated against somehow because of the

9   fact that I was Hispanic.

10  Q.   Did -- did you think about complaining to the USPA?

11  A.   Yes.  I -- I told Rob that if he didn't give me the

12  documents, I would complain to the corresponding entities.

13  Q.   Okay.  And what did Mr. Pooley say to you when you said

14  that?

15  A.   He said, No, don't do that.  Everything is all right.  I

16  will give you your documents.

17  Q.   And I know we've talked about this before, but did he ever

18  give you your documents?

19  A.   Never, sir.

20  Q.   Did you ever -- sorry.

21       Did you ever see any documents -- any of your documents

22  with Mr. Pooley's signature?

23  A.   Never, sir.

24  Q.   So after you left the Parachute Center, did you -- you

25  returned to Chile?

1    A.   That's correct, sir.  I went back to my country.

2    Q.   And did you try to follow up with Mr. Pooley when you were

3    there?

4    A.   That's correct.  I sent him messages through Facebook, and

5    he did not respond.

6    Q.   Now, at any point in time when you -- before you got to the

7    Parachute Center, when you were at the Parachute Center, did

8    Pooley tell you that his examiner rating had been suspended?

9    A.   Never, sir.

10   Q.   And would you have attended the course at the Parachute

11   Center if he had told you that he was suspended?

12   A.   If I had known he did not have his certification, I would

13   not have taken the trip -- I would not have taken the trip from

14   Chile, I would not have asked for a work permit to travel to

15   the US, and I would not have spent my money.

16   Q.   How much money did you spend in total, including travel,

17   everything, to come and take the course?

18   A.   Around 5,000 to 6,000 dollars.

19   Q.   Did you ever ask Mr. Pooley for a refund?

20   A.   After going back to my country, I no longer had any contact

21   with him.

22   Q.   And he didn't respond to your Facebook message, right?

23   A.   I never saw him again.

24   Q.   Did you ever get your tandem ratings -- your tandem

25   instructor ratings?

1   A.   I repeated the course in Chile.

2   Q.   And that was with a different examiner?

3   A.   Just by -- by chance, two months later, an examiner from

4   Brazil happened to be in Chile.  So I enrolled again, I paid

5   again, and I completed the course in Chile.

6   Q.   And did you have to pay for that course?

7   A.   That's correct, sir.

8   Q.   Knowing what you know now, sir, do you believe -- do you

9   believe that Mr. Pooley defrauded you?

10  A.   That's correct, sir.  He committed fraud on me, and he

11  discriminated against me.

12          MS. CRAGER:  Objection, Your Honor.  Calls for a

13  legal conclusion.

14          THE COURT:  You should have objected when the

15  question was asked.

16          MS. CRAGER:  Move to strike, Your Honor.

17          THE COURT:  You waited until the answer was given.

18  So the objection is overruled.  It's moot and untimely.

19          MR. SHARMA:  No further questions, Your Honor.

20          THE COURT:  All right.  It's a good time to take a

21  15-minute recess.  We do that midmorning.

22      Remember the admonition, ladies and gentlemen.  15-minute

23  recess.

24      (Recess taken, 10:24 a.m. - 10:44 a.m.)

25          THE COURT:  Everyone is present.

1          Ms. Crager, do you wish to cross-examine?

2                MS. CRAGER:  Yes.  Thank you, Your Honor.

3                THE COURT:  You may proceed.

4                          CROSS-EXAMINATION

5     BY MS. CRAGER:

6     Q.  Good morning, Mr. Munoz.

7     A.  Good morning, miss.

8     Q.  Mr. Munoz, today is not the first time you've talked about

9     the course you took with Rob Pooley?

10    A.  Before I traveled to the United States?

11    Q.  I'm asking is today the first time you've ever spoken about

12    the course with Rob Pooley?

13    A.  Can you explain that question a little bit better?

14    Q.  Well, you spoke to a federal agent in 2021?

15    A.  That's right.

16    Q.  And at that time, the agent asked you a lot of questions

17    about Rob Pooley?

18    A.  That's right.

19    Q.  And the agent asked you a lot of questions about the course

20    you took with him?

21    A.  I remember that well, yes.

22    Q.  And about the paperwork?

23    A.  That's right.

24    Q.  I want to talk about some of the things that have changed

25    in your version of events.

1          Today, you testified that you printed your own paperwork;

2     is that right?

3     A.   That's right.

4     Q.   You testified that Rob never gave you any paperwork?

5     A.   That's right.

6     Q.   You testified that you expected Rob Pooley to sign your

7     documents?

8     A.   Can you please repeat the question?

9     Q.   Did you testify earlier that you expected Rob Pooley to

10    sign your documents?

11    A.   That's right.

12    Q.   And you testified earlier that you confronted Rob Pooley

13    and demanded that he sign your documents?

14    A.   That's right.

15    Q.   All right.  That's not what you said in 2021.

16         In 2021, you said during the course, Rob Pooley handed you

17    paperwork.

18    A.   Back then, I said that Rob Pooley was the person that would

19    be handing the documents.  But that's not the way it happened.

20    Q.   I'm asking you about what you said in 2021.

21         And what you said at that time was that Rob Pooley was the

22    one to hand you the documents.

23    A.   He handed me some documents having to do with the coaching

24    courses.

25    Q.   I see.

1       Your testimony today is that in 2021, you're only talking

2   about the coach course?

3   A.  I was speaking about the coaching course and the instructor

4   course.

5   Q.  Okay.  And in 2021, you said Pooley gave you documents for

6   USPA and UPT.

7   A.  He handed documents regarding the coach course.

8   Q.  You also said, in 2021, the courses you were taking with

9   Rob Pooley for paperwork were coach, a D license, a canopy

10  proficiency card, a new membership, and a tandem instructor

11  course.

12  A.  Those documents, I printed.

13  Q.  I understand that's your testimony today.  I'm asking what

14  you said in 2021.

15  A.  So much time has passed since 2021 that I would have to

16  start trying to remember.

17  Q.  I see.  So it's hard to remember exactly what you said back

18  then?

19  A.  Um-hum.

20  Q.  Okay.  So you don't know whether you said that or not

21  because it was so long ago?

22  A.  I do remember.

23  Q.  You do remember.  Okay.

24      So do you also remember in 2021, you told a federal agent

25  that the documents Rob Pooley gave you were already signed?

1   A.  The documents that he gave to the other students were

2   already signed.

3   Q.  My question is in 2021, you said Rob Pooley gave you

4   documents that were already signed?

5   A.  He didn't give any to me.  I saw other documents that were

6   already signed.

7   Q.  Is it your testimony that you did not say these things in

8   2021?

9   A.  I -- I believe having said it, yes.

10  Q.  Okay.  And you also said that the paperwork was signed by

11  another guy, not Mr. Pooley.

12  A.  The documents had somebody else's signature, not

13  Mr. Pooley's.

14  Q.  Correct.  The documents that he gave you, as you stated in

15  2021.

16      And you also said that the other guy whose signature was on

17  that paperwork was not there.

18  A.  I never saw any other person.  I always dealt with

19  Mr. Pooley.

20  Q.  Yes.  And my question is in 2021, you said Rob Pooley gave

21  you documents signed by another person and that you knew that

22  person wasn't in Lodi?

23  A.  I never knew if that person was in Lodi.  The only thing I

24  knew was that Rob Pooley taught that class.  And I always dealt

25  with him regarding the course.  I never dealt with anybody

1    else.  At all times, I dealt with him.  And he always assured

2    me that everything was all right.

3    Q.  I'll stop you there.  I understand -- I understand your

4    testimony today.

5        What I'm asking you is what you told a federal agent in the

6    year 2021, the first time you were contacted by law

7    enforcement.

8        And my question is you told law enforcement your paperwork

9    from Rob Pooley was signed by another person, and you knew that

10   that person was not in Lodi?

11   A.  I did not know that that person was not in Lodi.

12   Q.  Are you saying you never said that to a federal agent?

13   A.  When I had that -- my conversation with the -- with the

14   agent, I -- starting -- I started remembering about my case,

15   and that's what I told them about.

16   Q.  So you did say that in 2021 to the federal agent?

17   A.  In 2021, I started generally explaining my story to a

18   federal agent.

19   Q.  My question is did you say that to an agent in 2021?

20   A.  I told them that the person that had given the course was

21   not the proper person and that it had not been signed by the

22   correct person.

23   Q.  And you're saying that in 2021, you told them that, that

24   your paperwork was signed by someone who knew -- you knew was

25   not in Lodi?

1        My question is a yes or no question.  I understand your

2    explanation.

3    A.  I don't remember.

4    Q.  You don't remember if you said that?

5    A.  I don't remember having said that.

6    Q.  Would it help you remember if you saw some notes written by

7    the agent from that interview?

8              MR. SHARMA:  Objection, Your Honor.

9              THE COURT:  What's the objection?

10             MR. SHARMA:  It's not his statement.  He can't be

11   refreshed based on someone else's statement.

12             THE COURT:  It's done all the time, but you're quite

13   right.  But sometimes looking at somebody else's statement does

14   refresh their recollection.  Let's let him look at it.

15       And I'm going to explain to him what we're asking him to

16   do.

17       Mr. Munoz, you're going to be shown the statement that was

18   made by an FBI agent after speaking with you.  The only reason

19   it's being shown to you is to see if reading that statement

20   helps you remember what you said to the FBI agent.  If it

21   doesn't help you remember what you said to the FBI agent, just

22   tell us.  But if it does help you remember, tell us that.

23   We're just interested in your recollection, not what the agent

24   said.

25       Understood?

1          THE WITNESS:  Yes, I understand.

2          THE COURT:  All right.  Go ahead.

3    Q.  BY MS. CRAGER:  I'm going to direct you to Exhibit 2140.

4    And if I may approach, I'll just pull it out for you.

5          THE COURT:  Don't read it out loud.  Just read it to

6    yourself.

7          THE INTERPRETER:  Counsel, the document is in

8    English.  Did you --

9          THE COURT:  There you are.  Right.  So he -- he said

10   he can read English, but he prefers to read Spanish.  So I

11   guess it's not going to refresh his recollection.

12         MS. CRAGER:  Okay, Your Honor.  I understand.

13         THE COURT:  Unless he can read English.

14      Well, let me -- ask him if he talked to the agent in

15   English or Spanish.

16   Q.  BY MS. CRAGER:  When you corresponded with the agent by

17   e-mail, you wrote to them in English; is that correct?

18   A.  That's correct.  English through e-mail.

19   Q.  And they wrote to you in English as well?

20   A.  That's correct, miss.

21   Q.  And you responded to their e-mails?

22   A.  That's correct.

23   Q.  If you could just take a quick look at those notes --

24         THE COURT:  What you're asking about is the e-mail

25   communications he had with the agent?

1           MS. CRAGER:  Yes.

2           MR. SHARMA:  Your Honor, this is not -- he can't

3    refresh his recollection on a different document.

4           THE COURT:  Of course he can.  He can look at

5    anything if it might refresh his recollection.  Anything.  The

6    question is does it refresh his recollection.

7        So read those e-mails -- how many pages?

8           MS. CRAGER:  There is just --

9    Q.  BY MS. CRAGER:  If you could just read that one page.  It's

10   just the interview notes.

11          THE COURT:  Wait a minute.  The interview by e-mail

12   or interview --

13          MS. CRAGER:  No.  I was just asking about the e-mails

14   to establish that he can read and write English.  But this is

15   the interview notes from the 2021 interview, Your Honor.  If it

16   doesn't refresh his recollection, that's fine as well.

17          THE COURT:  Read that, and just tell us if it

18   refreshes your recollection as to what you told the agent.  And

19   if it doesn't, we'll stop there.

20          THE WITNESS:  It doesn't refresh my memory, not much.

21   Q.  BY MS. CRAGER:  You can put that aside, then.  Thank you.

22       I want to move on to another way that your version of the

23   story has changed.

24       Today you testified that Rob Pooley got on the phone with

25   you and he said, I am a United States Parachute Association

1   tandem examiner.  Was that your testimony from earlier?

2   A.  That's correct.

3   Q.  And also, testifying earlier, you recounted the entire

4   conversation you had with Mr. Pooley on the phone; is that

5   correct?

6   A.  That's correct.

7   Q.  You said, Hi, Rob.  My name is Fabian Munoz.  Is that what

8   you said?

9   A.  That's correct.

10  Q.  And you explained why you wanted to take a course?

11  A.  I told him that I was going to take the course.  And he

12  responded, No problem.

13  Q.  Okay.  So you remember specifically that he responded, No

14  problem?

15  A.  Yes.  I remember he said to me, No problem.

16  Q.  And you remember specifically he said, Bring money?

17  A.  Of course.

18  Q.  And he said specifically, Bring money in cash?

19  A.  That's correct.

20  Q.  And he said specifically, Yes, I teach the course?

21  A.  That's correct.

22  Q.  And he said, I am the examiner?

23  A.  That's correct.

24  Q.  And he said, I am the US Parachute Association examiner?

25  A.  When he said "examiner," my understanding is that he was

1    from USPA.

2    Q.  I see.  So that part was just your understanding; that's

3    not something he said?

4    A.  That's what he told me, "USPA examiner."

5    Q.  Okay.  So he did say "USPA examiner"?

6    A.  That's correct, miss.

7    Q.  Okay.  That's your specific recollection of that

8    conversation?

9    A.  That's correct.

10   Q.  And you also specifically remember, as you testified, he

11   said, I will sign your paperwork?

12   A.  That's correct.

13   Q.  Okay.  Well, that's not what you said in 2021.  In 2021,

14   you did not say that you had any phone conversation with Rob

15   Pooley.

16   A.  I did have a conversation with Rob Pooley.

17   Q.  I understand that's your testimony today.  My question is

18   you did not say that in 2021?

19   A.  They didn't ask me that.  And I gave them my story

20   regarding my situation here in the United States.

21   Q.  I see.  Well, let me talk to you more about this phone

22   conversation.

23       You are testifying today in Spanish?

24   A.  That's right.

25   Q.  You are not very comfortable with spoken English?

1    A.  The thing is that since so many years have passed by, I've

2    lost practice in utilizing English.  And being in this type of

3    situation, I don't feel comfortable using English.

4    Q.  I understand that.

5        And in another situation, when the agents reached out to

6    you in 2021, you told them, My English is not very good?

7    A.  That's right.

8    Q.  Now, all of the conversations you've testified about today

9    with Rob Pooley occurred in 2016?

10   A.  I didn't quite understand that.  Can you repeat that

11   question?

12   Q.  Let me be more specific.

13       This phone conversation that you testified about occurred,

14   as you say, in 2016?

15   A.  That's correct.

16   Q.  And 2016 was approximately eight years ago?

17   A.  It's been a long time ago.

18   Q.  And so your testimony is that eight years ago, Carlos, your

19   friend, passed the phone to someone?

20   A.  That's right.

21   Q.  You believed that person was Rob Pooley?

22   A.  He told me, Rob Pooley is right next to me.  Speak to him

23   so you can make arrangements to do your course with Rob Pooley.

24   Q.  All right.  You're familiar with the Lodi drop zone?

25   A.  That's right.

1    Q.  The Lodi drop zone is a busy place?

2    A.  What do you mean, a very busy place.

3    Q.  There are lots of skydivers there?

4    A.  That's correct.  It's often a very busy place.

5    Q.  And there are lots of customers there?

6    A.  I suppose so, yes.

7    Q.  When there are customers there, there are safety videos

8    playing on a loop at the center?

9    A.  Um-hum.

10   Q.  Was that a yes?

11   A.  Yes.

12   Q.  When you go outside of the center, there is a highway

13   there.

14   A.  That's right.

15   Q.  A busy highway?

16   A.  That's correct.

17   Q.  And the Lodi drop zone has an airport?

18   A.  That's correct.

19   Q.  And there are planes taking off?

20   A.  That's correct.

21   Q.  And there are planes landing?

22   A.  That's correct.

23   Q.  So in this environment, you're saying you get on the phone

24   with a person you think is Rob Pooley, and he's speaking

25   English?

1    A.  That's correct.

2    Q.  And you've never spoken to him before?

3    A.  No.

4    Q.  Now, after you spoke with the agents in 2021, you had a

5    chance to follow up with them?

6    A.  After 2021, no.

7    Q.  After your interview in 2021, they let you know you should

8    reach out to them if you remember anything else important?

9    A.  Of course.

10   Q.  And, in fact, you did follow up with them a few days later?

11   A.  I was always in contact with the agent.

12   Q.  And when you contacted them a few days later, you said --

13   I'm sorry -- you sent a few things, including the video we

14   watched earlier?

15   A.  That's correct.

16   Q.  But you never followed up with them saying, I just

17   remembered something really important, that I had this phone

18   conversation?

19   A.  They were the ones who asked the questions.

20   Q.  I see.  But they did let you know that you could follow up

21   with them if you thought of anything important?

22   A.  That's right.

23   Q.  And you never followed up to say, Rob Pooley told me, I am

24   a USPA tandem examiner?

25   A.  Rob Pooley told me that he was an examiner for USPA.

1    Q.   I understand that's your testimony today.

2         Now, the truth is Rob told you it was necessary to have a

3    valid examiner sign the paperwork?

4    A.   He didn't tell me that.  I always understood that he said,

5    I am the examiner.

6    Q.   I see.  So you never said that Rob told you it was

7    necessary?

8              THE INTERPRETER:  Counsel, would you please repeat

9    that?

10             MS. CRAGER:  I'm sorry.

11   Q.  BY MS. CRAGER:  So your testimony is Rob never told you it

12   was necessary to have somebody sign off on your paperwork who

13   had an examiner rating?

14   A.   Can you repeat that again?

15   Q.   Let me get to my point here.

16        The truth is Rob told you that another guy who wasn't

17   there, but who was an examiner, would sign off on your

18   paperwork?

19   A.   He never told me that.

20   Q.   Okay.  I understand that's your testimony right now.  I

21   want to talk some more about other things that have been added

22   since you spoke to agents in 2021.

23        You testified to -- that after you finished the course, Rob

24   Pooley told you you had to do a tandem jump with a customer?

25   A.   That's correct.

1   Q.   That's not something you said in 2021?

2   A.   I did say it.

3   Q.   Is it your testimony that in 2021, you told the agents, I

4   only did this tandem jump because Rob Pooley made me do it?

5   A.   Since I arrived at the United States, I did everything that

6   Rob Pooley asked me to do.  For me, my reference -- he was my

7   reference.  He was my examiner.  And I did everything that he

8   requested of me.  Besides, I spoke to him by phone; he assured

9   me; I felt confident, and that's the reason I traveled.

10  Q.   Okay.

11  A.   And when I met -- when I met him in person --

12  Q.   I understand your testimony, and I understand your

13  explanation.

14  A.   I -- I feel that your questions are confusing me somewhat.

15  Q.   Okay.  I'm sorry about that.  Let me try to be clear.

16       I'm asking you, in the year 2021, when you spoke with a

17  federal agent, you did not tell him, I only jump with a

18  customer because Rob Pooley made me do it?

19  A.   I didn't tell him at that time.  But as time went by and my

20  memory was refreshed, I started telling my story with much more

21  details.

22  Q.   I see.  Okay.  So I do want to talk about when you sent the

23  video to the agent.  And as you just clarified, you did not

24  tell him, at that time, Rob Pooley made me do this.

25       What you did tell him at the time was that, This video

1    shows my work as a -- sorry -- as an instructor.

2    A.   When I spoke to the agent, he told me to send him

3    everything that was necessary.  So I sent everything that I had

4    to prove that I had been there.  I sent my Facebook photographs

5    and information verifying that what I was saying was the truth.

6    Q.   Okay.  And when you sent the video that we watched earlier,

7    you did not say, This is a video where Rob Pooley forced me to

8    do a tandem jump with a customer.  You said, This video shows

9    my work as an instructor?

10   A.   Continue, please.

11   Q.   That was my question.  Would you like me to repeat it?

12   A.   Yes, please.

13   Q.   Okay.  Here is my question.  When you sent the video that

14   we watched earlier today, you did not say to the agent, This

15   video shows the tandem jump that Rob Pooley forced me to do.

16   Instead, you said, This video shows my work as an instructor?

17   A.   That video shows what I did in the United States, just as

18   the photographs that I sent, just the same as the story that I

19   related.

20   Q.   I understand.

21       My question is when you sent it to the agent, you said,

22   This video shows my work as an instructor?

23   A.   I didn't say this -- work as an instructor.  I said, This

24   is the material that I have.  Because they asked me, What do

25   you have to prove that you had -- that you were there?  So I

1    sent them everything that was handy.

2    Q.  Okay.

3    A.  I would like to -- to mention that for me, this is

4    something new.

5    Q.  I'm sorry.

6    A.  And when --

7    Q.  The way this works is you need to respond to a question.

8    I'm sorry.  We can clarify.  I'm about to do that.

9    A.  I feel -- I think that your questions are confusing me.

10   Q.  I'm sorry about that.

11        Let me direct you to Exhibit 2139.  It should be in the

12   binder in front of you, if I may approach.

13        This is an e-mail from you?

14   A.  Yes.

15   Q.  This is an e-mail to Reggie Lee?

16   A.  That's right.

17   Q.  Reggie Lee is the federal agent you have been communicating

18   with in this case?

19   A.  That's right.

20            MS. CRAGER:  Your Honor, I move to admit

21   Exhibit 2139.

22            THE COURT:  Any objection?

23            MR. SHARMA:  It's hearsay, Your Honor.  Objection.

24            MS. CRAGER:  It's impeachment, Your Honor.

25            THE COURT:  All right.  So let me look at it.  If

1  it's impeachment, it can be received for that purpose.  So

2  2139?

3          MS. CRAGER:  Yes, Your Honor.  It's in Binder 7.  The

4  impeachment is the third bullet point there.

5          THE COURT:  So it looks like these are just

6  attachments.

7          MS. CRAGER:  So the top e-mail is an explanation

8  written by the witness explaining what the attachments are.

9          THE COURT:  Why don't you take -- Karen, would you

10  show this to her and ask her what she's referring to.  Flag on

11  my copy what you're referring to.

12      (Pause in proceedings.)

13          THE COURT:  All right.  I think the way to handle

14  this, the third bullet point, ask him if he told that to Agent

15  Lee.  I think he probably said he didn't.  So I -- I don't

16  think that's necessary to repeat.  So he can just -- if you

17  show it to him -- he can't read English.  Maybe he can.  Maybe

18  he can't.  I don't know.

19          MS. CRAGER:  He wrote this e-mail, Your Honor.  I can

20  just ask him about the e-mail.  That's fine.

21  Q.  BY MS. CRAGER:  Mr. Munoz, when you wrote this e-mail to

22  Reggie Lee, you said, The video shows my work as an instructor.

23  A.  When I wrote the e-mail, I used the translator so that my

24  writing wouldn't be so informal.

25  Q.  Okay.  Are you saying that the part about Rob forcing you

1    to do it didn't make it through the translator?

2              MR. SHARMA:  Objection, Your Honor.  That's not what

3    he said.

4              THE COURT:  Is the translator a person, or is it a

5    software?  What is it?

6              THE WITNESS:  It's a -- it's a software, and it's --

7    during some occasions, I utilize my son, who speaks English

8    quite well.

9              THE COURT:  Okay.  Let me just pick this up because

10   we'll just be on this forever.

11        Look at this e-mail here, Mr. Munoz.  Do you see where --

12   do you see -- let me point to the part I'm talking about.  This

13   right -- this right here.  All right.

14        Now, that's what you said in English, that's what you said

15   in English, and is that what you intended to say?

16             THE WITNESS:  What I was attempting to say is that

17   that -- this was the video of what I did in the United States.

18             THE COURT:  All right.

19             MS. CRAGER:  All right.

20             THE COURT:  That's what he intended to say.

21             MS. CRAGER:  Thank you, Your Honor.  We'll move on.

22   Q.  BY MS. CRAGER:  Okay.  You testified earlier that when Rob

23   Pooley didn't give you your paperwork after you demanded it,

24   you threatened to complain to the United States Parachute

25   Association.

1  A.  I told him that if he did not give me my documents, I would

2  be speaking to the USPA.

3  Q.  And he didn't give you your documents?

4  A.  At no time -- I felt that at no time did he treat me in a

5  professional manner.  He always avoided me once the course was

6  finished, after I had paid for everything.

7  Q.  I see.  And you never complained to the United States

8  Parachute Association?

9  A.  No.  I never filed a formal complaint to the USPA --

10  Q.  Okay.

11  A.  -- because I felt that he -- like any other place in the

12  world, he would be the individual that after one pays -- as a

13  client, one pays for a service.  I felt that that individual

14  should respond and comply with what I was paying for.  But

15  since I didn't have any kind of receipt, since I have paid in

16  cash, how would I -- how would it be possible for me to

17  complain to the USPA if I didn't have a receipt showing what I

18  paid for.

19  Q.  Okay.  Let's move on, then, to -- I do want to talk about

20  the money.  I want to talk now about why you are testifying to

21  these new and different things today.

22      You want to help the prosecutor?

23  A.  I'm here because I feel that God has led me to do the right

24  things.

25  Q.  You wrote an e-mail to the prosecutor in which you said --

1    I'm sorry -- to the agent -- the prosecutor's agent in which

2    you said, I have every predisposition to help you.

3    A.   Definitely.

4    Q.   And in return, you want the prosecutor and the government

5    to help you.

6    A.   What do you mean with "help"?

7    Q.   You want them to help you get money.

8              MS. LYDON:  Objection --

9              THE WITNESS:  The -- the truth is that if it's

10   required and if the Court feels that I need to be compensated,

11   that it should be whatever the judge decides.

12       There is no doubt that I'm here testifying because I'm also

13   a witness that was affected by this.  I've lost time.  I've

14   lost money.  I've left my family behind.  And I've almost --

15   and I've almost -- I almost lost my job because I was not able

16   to complete the objective that I had.  Luckily, I had the -- I

17   was lucky that there was an examiner from Brazil that happened

18   to be in Chile.

19   Q.   BY MS. CRAGER:  Okay.  Let's --

20   A.   And I had to get some credit.  I had to get credit to pay

21   again.

22   Q.   I'm sorry.  I'm not trying to stop your explanation.  I'm

23   just -- we need to stay on the question.

24   A.   I want to be as honest as possible.

25   Q.   I see.  So if you show that you're a victim of Rob Pooley,

1    you know that you can get paid money?

2              THE COURT:  Not by this case here.  Not by this jury.

3    That's not part of their job.

4              MR. SHARMA:  And I would object on that basis, Your

5    Honor, for the record.

6              THE COURT:  Well, he may misunderstand.  You know,

7    he's not versed in United States law.  But I just wanted to

8    make sure that he understands and the jury understands that

9    it's not part of their job to compensate Mr. Munoz for

10   anything.

11             MS. CRAGER:  Right, Your Honor.  And I can clarify.

12   Q.  BY MS. CRAGER:  You asked the agent about whether you could

13   get paid for testifying?

14             MR. SHARMA:  Objection.  That is not borne by the

15   facts, Your Honor.  That mischaracterizes all the evidence and

16   the testimony.

17             THE COURT:  It's a question.

18      Yes or no, did you ask the agent whether you could get paid

19   for testifying?

20             THE WITNESS:  If I asked the agent if he could pay me

21   for coming here to testify?

22   Q.  BY MS. CRAGER:  Did you ask --

23             THE COURT:  Is that what you're saying?  You asked

24   the agent if he could pay you?

25             THE WITNESS:  I -- I didn't ask him for that.  I said

1   that I could help, that I could come to testify.

2   Q.  BY MS. CRAGER:  Did you also say to Reggie Lee, the agent,

3   Will you help me cover my expenses in Chile while I'm away to

4   testify?  How are we going to solve this?

5   A.  Of course I asked the necessary questions.  I need to find

6   out if the expenses to come up here, I would have to pay from

7   my own pocket.

8   Q.  Of course.

9       So you've talked to the federal agent about -- and the

10  government about whether you can get any money from this whole

11  situation, because you've never been reimbursed?

12          MR. SHARMA:  Objection, Your Honor.  That's

13  mischaracterizing what he said and what he said to Mr. Lee.

14          THE COURT:  It's cross-examination.  Overruled.

15          THE WITNESS:  No.

16  Q.  BY MS. CRAGER:  You never talked to them about whether you

17  could get money from Rob Pooley?

18  A.  No.

19  Q.  You never asked them for their help in suing Rob Pooley for

20  money?

21  A.  What I asked the agent, that if I came to testify here,

22  since I was a witness that had been affected, what would happen

23  regarding of the losses that I suffered here.  The losses

24  regarding of everything that I invested in.  And he said that

25  it would be the judge who would decide that.

1   Q.  I see.  So the judge will decide, in your understanding,

2   about whether you eventually get money?

3   A.  I am here.  Whatever the judge decides, that's what I'll

4   do.

5   Q.  You want to show that Rob Pooley is to blame for you losing

6   money?

7   A.  Do you believe that that's not -- that I didn't?

8   Q.  Are you here testifying trying to show that Rob Pooley was

9   to blame for you losing money?

10  A.  Not just money.  I lost time.  I was unable to do other

11  things in my country.  I lost my family and my job.

12  Q.  And you are hoping to get 5 or $6,000 from Rob Pooley?

13  A.  The truth is I am not expecting to get money out of all

14  this.  What I expect is for justice to be done.

15          MS. CRAGER:  I see.  No further questions.

16          THE COURT:  Any redirect?

17          MR. SHARMA:  Briefly, Your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. SHARMA:

20  Q.  Mr. Munoz, just a few questions.

21      The defense counsel made -- talked a lot about things you

22  didn't mention in 2021 when you spoke with agents.  Do you

23  remember that?

24  A.  Yes.

25  Q.  Now, when the agent called you in 2021, you weren't

1    expecting his call, were you?

2    A.   I wasn't expecting to get the call.

3    Q.   Was it a surprise to get that call?

4    A.   Yes.  For me, this was completely unexpected and a

5    surprise.

6    Q.   Okay.  So fair to say you weren't prepared to talk to the

7    agent that day, right?

8              THE INTERPRETER:  Counsel, will you please repeat

9    that?

10   Q.   BY MR. SHARMA:  Fair to say you weren't prepared to talk to

11   the agent that day?

12   A.   Honestly, I was not prepared for any of these situations.

13   I'd like to mention that it is my first time that I've been in

14   a courthouse in my whole life.

15   Q.   Okay.  But in 2021, when the agent called you, you hadn't

16   prepared to answer his questions?

17   A.   No, I didn't prepare the -- the only thing I did is I

18   responded to whatever was being asked.

19   Q.   Right --

20             THE COURT:  Have we established whether this

21   conversation was in English or Spanish?

22             MR. SHARMA:  I am -- that's my next question.

23   Q.   BY MR. SHARMA:  Did someone help translate for you on that

24   phone call?

25   A.   That's correct.  My son.

1    Q.   So your son spoke to you in Spanish?

2    A.   That's correct.

3    Q.   And then spoke to the agent in English?

4    A.   That's correct.

5    Q.   And you --

6            THE COURT:   So he didn't talk to the agent directly;

7    his son did.   Is that right?

8            MR. SHARMA:   That's right.

9            THE COURT:   Is that right?

10           THE WITNESS:   That's correct.

11   Q.   BY MR. SHARMA:   And you didn't give any written statements,

12   did you?

13   A.   That's correct.

14   Q.   So if something didn't show up in the agent's report from

15   2021, it's possible you didn't discuss that with the agent,

16   right?

17           MS. CRAGER:   Objection.   Leading.

18           THE COURT:   Sustained.   And whether something is

19   possible is not the question.

20   Q.   BY MR. SHARMA:   Did you only respond to the agent's

21   questions in that 2021 interview?

22   A.   That's correct.

23   Q.   Then after that 2021 interview, you spoke with agents

24   again, right?

25   A.   That's correct.

1   Q.  And in that second interview, that subsequent interview,

2   you discussed --

3            THE COURT:  See, again, you're asking if he

4   discussed.  Let's make sure we understand.

5       Is this another conversation where his son had the actual

6   conversation with the agent, or did he?

7            MR. SHARMA:  Understood.

8   Q.  BY MR. SHARMA:  That second conversation that you had with

9   agents, there was a translator there, right?

10  A.  That's correct.

11  Q.  Okay.  And in that conversation, you told agents about the

12  phone conversation with Pooley?

13  A.  That's correct.

14  Q.  And you told agents about having to bring cash to the

15  Parachute Center?

16  A.  That's correct.

17  Q.  And you told agents that Pooley was going to be your USPA

18  examiner?

19  A.  That's correct, sir.

20  Q.  Okay.  You suffered losses because of Mr. Pooley, right?

21  A.  Yes, sir.

22  Q.  And you said it was 5 to $6,000 earlier?

23  A.  That's correct.  My -- my stay, the cost for the course,

24  and -- and the expense for my trip.

25  Q.  And you've had to miss work to come here today?

1    A.   Yes, sir.

2    Q.   And you've come all the way from Chile for this hearing?

3    A.   Yes, sir.

4              MR. SHARMA:  No further questions, Your Honor.

5              THE COURT:  Any recross?

6              MS. CRAGER:  No, Your Honor.  Thank you.

7              THE COURT:  So if we excuse Mr. Munoz, is he free to

8    go back to Chile?

9              MR. SHARMA:  Yes, Your Honor.

10             MS. CRAGER:  Yes, Your Honor.

11             THE COURT:  All right.  Thank you, Mr. Munoz.  You

12   may return home.

13             THE WITNESS:  Thank you.

14             THE COURT:  It's quarter to 12:00.  Would you like to

15   start with your next witness?

16             MS. LYDON:  We can take a break for lunch early, or

17   we could go --

18             THE COURT:  Okay.  Let's do that.  We'll take an hour

19   and a half for lunch, but we -- we'll then return at 1:15.

20   We'll return at 1:15 for the rest of the trial today, ladies

21   and gentlemen.  Remember the admonition.

22        (Jury not present, 11:42 a.m.)

23             THE COURT:  All right.  The jurors are outside the

24   courtroom.

25        I want to give you an opportunity to make any requests or

1   motions or bring up anything now that you think we would need

2   to discuss in connection with the testimony this afternoon so

3   that you don't get into trouble and we can move smoothly

4   through the testimony this afternoon.

5       Who are the witnesses that are left for today?

6           MS. LYDON:  The government plans to call Brad North

7   next.  It's another victim.  I'm not aware of any issues the

8   defense has with what we plan to discuss with him.

9       The next witness we will call is Special Agent Lee.  I

10  don't know if we will get to him, depending on how long

11  Mr. North goes.  We would plan to admit evidence through Mr. --

12  Special Agent Lee.

13          THE COURT:  What evidence are you planning to admit

14  through him?

15          MS. LYDON:  Probably start with search warrant

16  photos, which are pretty uncontroversial.  And then we do have

17  recordings of interviews with the -- an interview with the

18  defendant, as well as the excerpts from a videotaped deposition

19  of the defendant.  I understand that the defense does plan to

20  oppose some of those recordings.

21          THE COURT:  All right.  So let's talk about Mr. Lee's

22  testimony.

23      Have you shown the photos to Ms. Crager?

24          MS. LYDON:  Yes.  All of the photos and all of the

25  clips are on our exhibit list and have been provided to the

 1    defense --

 2            THE COURT:  Ms. --

 3            MS. LYDON:  -- electronically.

 4            THE COURT:  Excuse me.

 5       Ms. Crager, do you have any issues with any of the photos?

 6            MS. CRAGER:  We have no objection to the photos, Your

 7    Honor.

 8            THE COURT:  All right.  How about this interview with

 9    the defendant, Ms. Crager, do you have any problems with that?

10            MS. CRAGER:  We do have several objections.  There

11    are three different statements -- three different interviews.

12    So let me just get oriented about which ones will be introduced

13    through Mr. Lee.

14            THE COURT:  Ms. Lydon, are you going to offer all

15    three of them?

16            MS. LYDON:  Yes, but not all through Mr. Lee.  The

17    200 series is coming in through Special Agent Lee.  That's the

18    deposition.  The 300 series is coming in through a different

19    agent.

20            THE COURT:  So when you said excerpts from the video

21    deposition and you also said interview, those are two separate

22    sets of --

23            MS. LYDON:  Yes.

24            THE COURT:  And only the latter is coming -- only the

25    excerpts from the video deposition are coming in through

1    Mr. Lee?

2              MS. LYDON:  Only the video deposition and another

3    interview.  There are two interviews, three total recordings.

4              THE COURT:  So do you know which ones she's talking

5    about here, Ms. Crager?

6              MS. CRAGER:  Yes, Your Honor, I do.

7              THE COURT:  So let's talk about any issues you have

8    with regard to the interviews that she's bringing in through

9    Mr. Lee.

10             MS. CRAGER:  Okay.  So the first objection I had is

11   they want to play a clip of Mr. Pooley stating that -- I think

12   two years after the events of this case -- he conducted tandem

13   jumps.  And we -- our position is that that is irrelevant and

14   improper.

15             THE COURT:  What would be the relevance of that?

16             MS. LYDON:  I actually think we are not planning on

17   introducing that.

18             THE COURT:  Actually what?

19             MS. LYDON:  That particular -- I'm looking to see

20   which specific exhibit they're referring to.

21             MR. SHARMA:  Do you have a number?

22             MS. CRAGER:  That's 203.

23             MS. LYDON:  Oh, this is -- well, Pooley lies in

24   this -- he changes his story in the middle of this statement.

25   So that is the relevance of that.  He states that he does not

1  do tandem jumping with skydivers.  Then --

2          THE COURT:  If he lies about something, that's not

3  even an issue in the case.  You don't -- it doesn't suddenly

4  become relevant.

5          MS. LYDON:  So this one, I think -- sorry.  We're --

6  I had not heard they had an objection to this particular one;

7  so I'm thinking how I intended to use this one.

8      This one is for impeachment, if Mr. Pooley testifies.

9          THE COURT:  Okay.

10          MS. LYDON:  Because it is --

11          THE COURT:  All right.

12          MS. LYDON:  Yeah.

13          THE COURT:  Then we don't need to address it now.  We

14  can address it later, if he decides to testify.

15          MS. CRAGER:  Yes, Your Honor.

16      I would just -- so if we could be advised which ones are --

17  what is the first one you intend to introduce through Mr. Lee?

18  Maybe we can do it that way to not waste any time.

19      Is 208 -- I have 208 that we would object to.

20          THE COURT:  What's that?

21          MS. CRAGER:  208 discusses the death of both Mr. Kwon

22  and Tyler Turner.

23          MS. LYDON:  208, we would introduce because it is an

24  admission that he trained Mr. Kwon recently to the fatality.

25          THE COURT:  Well, that's the whole crux of everything

1   we discussed before trial.  If somehow you could show that he

2   trained Mr. Kwon and/or Mr. Turner, then you could do that.

3   But if the only way you can do it is by showing that they died

4   while he was training them, it's a Rule 403.  So I'm not going

5   to let it in if you're going to have to show that he -- that

6   these people died while skydiving.

7               MS. LYDON:  Yes.  That's not the purpose that we have

8   to show --

9               THE COURT:  I know.  But if it happens to show that

10  they died while skydiving, it's inadmissible under Rule 403

11  because its probative value is going to be substantially

12  outweighed by the prejudicial effect.

13              MS. LYDON:  I think with respect to 208, that might

14  be right.

15      Let me review it and see, again, if there are other

16  statements -- if there is any other statements in there we

17  can't get in through another piece of evidence.  I know there

18  is one excerpt that is an admission that we have not succeeded

19  in figuring out how we can extricate the statement of the

20  death.

21              THE COURT:  You had plenty of time to do that.

22              MS. LYDON:  Right.  I'm saying there --

23              THE COURT:  So it's not going to help to give you

24  more time to see if you can do it.

25              MS. LYDON:  Okay.  I agree with you about 208.

1          The next one I think they have concerns about, I don't

2     think we can resolve.

3               THE COURT:  So we've taken care of the first two.

4     Now there is one more left, right?

5               MS. CRAGER:  I have -- I have multiple more that we

6     object to.

7          209, we object to.

8               THE COURT:  Okay.  What's -- I don't know.  What's

9     209?

10               MS. CRAGER:  209 is Mr. Pooley saying that Kwon, the

11    person who died, wanted to go back to Korea after he got his

12    tandem instructor rating.  I think it's prejudicial because

13    there is going to be records in the case showing that he did

14    not actually go back.

15               THE COURT:  What's the relevance of whether he wants

16    to go back to Korea anyway.

17               MS. LYDON:  It's materiality.  So the exact statement

18    is he only wanted to get -- he was only there from his country

19    to get the tandem ratings and then go home.  It's very

20    difficult and expensive to get the rating elsewhere.  That's an

21    admission by Mr. Pooley that he knew what mattered to Mr. Kwon,

22    that the ratings were --

23               THE COURT:  How do statements of Kwon come into

24    evidence?

25               MS. LYDON:  Through Mr. Pooley's admissions.  The

1   other witnesses -- the other victims can testify what they

2   wanted was USPA ratings.  Mr. Kwon cannot testify, for obvious

3   reasons.  Mr. Pooley is admitting he knew what --

4           THE COURT:  Is there a transcript I can look at?

5           MS. LYDON:  Also -- this one does not mention the

6   death.

7           MS. CRAGER:  I can read the transcript into the

8   record, Your Honor.

9           THE COURT:  Let me look at it really quickly.  I'm

10  trying to figure out why the government wants 209 in.  And they

11  say they want it in to show that Mr. Kwon wanted to return to

12  Korea.

13          MS. LYDON:  No.  No.  It's that he wanted the

14  ratings.  He wanted the ratings and then to go home to his

15  country.

16          THE COURT:  Well, that's what I'm saying.  He wanted

17  to return to Korea so that he could teach.

18          All right.  Now, this is very enlightening here

19  because the statement that you want to bring in is not only

20  Mr. Pooley's alleged statement that Mr. Kwon was there to get

21  his tandem rating and then go home, but it's part of another

22  sentence.

23      It's part of a sentence that says:

24      Question:  Do you know if Mr. Kwon had any other business

25  other than at the Parachute Center?

1     Answer:  I don't know for sure.  But I can't imagine.  I

2  don't want to speculate, but he was only there from his country

3  to get the tandem rating and then go home.

4     So that is not a statement that he knows that as a matter

5  of fact.  It implies that he doesn't know that.  He said three

6  times, I don't know for sure; I can't imagine; I don't want to

7  speculate.  And then he goes on to say this.

8     So I'm going to exclude that.

9          MS. LYDON:  The -- I think the answer he's saying he

10  doesn't know if Mr. Kwon had any other business, but then he

11  says affirmatively he was only there from his country to get

12  the tandem rating.

13          THE COURT:  But it doesn't say how he knows that.

14  That's --

15          MS. LYDON:  This doesn't mention the death at all.

16          THE COURT:  No.  But --

17          MS. LYDON:  I don't see the prejudice.  It's relevant

18  to materiality.  It's the only evidence that we have to prove

19  that the rating mattered to Kwon.

20          THE COURT:  It's not -- you're right.  It doesn't

21  refer to the death.  But it --

22          MS. CRAGER:  Your Honor, our position is that it's

23  speculation; it's hearsay within hearsay.

24          THE COURT:  He's a defendant.

25          MS. CRAGER:  Yeah.  I meant the -- the statement of

1    Kwon that, I want my ratings and then to go home.

2              MS. LYDON:  It's not a statement.  It's a statement

3    of what he knew.

4              THE COURT:  Here is the thing.  I could either give

5    it a qualifying instruction or just leave it alone, but it

6    would only be received to show Mr. Pooley's state of mind as to

7    why Mr. Kwon was in the country, not the truth of the matters

8    as to why he was in the country.

9         Do you want me to give a qualifying instruction or just

10   leave it alone?

11             MS. CRAGER:  I -- I think it's still irrelevant that

12   he wanted to go home after.  That's the part that I believe is

13   403, because there will be evidence that he didn't actually go

14   homes afterwards because he only entered the United States and

15   never left.

16             THE COURT:  Doesn't make a difference whether he went

17   home or not.  If his purpose was -- if his sole -- just like

18   Mr. Munoz, if his sole purpose of coming to the United States

19   and taking this course from Mr. Pooley was so that he could go

20   home and teach, that's for the purpose of showing materiality.

21   That's for the purpose of showing that he relied upon it to his

22   detriment.

23        Now, the fact that he didn't get home doesn't change that.

24             MS. CRAGER:  Your Honor --

25             THE COURT:  If -- if on the way home he got struck by

1    lightning, it would still be the same.

2           MS. CRAGER:  Your Honor, if this goes to materiality,

3    then it matters not what Mr. Pooley thought but what Mr. Kwon

4    said.  And that part --

5           THE COURT:  That's true also.

6           MS. LYDON:  It goes to his intent to defraud, also,

7    that he knew Mr. Kwon wanted those ratings.

8           THE COURT:  Materiality is a strange concept because

9    it's not in the statute.  We judges made it up because we

10   didn't have anything better to do.  But it relates to the

11   defendant's state of mind.  He has to know it's material, too.

12      And so to that -- to that extent, materiality does go to

13   Mr. Pooley's state of mind.  But you're right.  To the other

14   extent that it has to actually, in fact, be material, that

15   doesn't depend on what Mr. Pooley knew or understood.  So it's

16   a two-prong thing.

17      Judges -- judges have made it up.  And we've made it up in

18   a strange way that makes it hard to explain to a jury but also

19   a little bit difficult to analyze.

20      To the extent that it shows Mr. Pooley's state of mind, I

21   think it's relevant here.  Do you want me to give a qualifying

22   instruction or just leave it alone?

23           MS. CRAGER:  We would ask for a qualifying

24   instruction, Your Honor.

25           THE COURT:  All right.  So the reason I ask you is it

1  kind of highlights it.  When we stop in the middle of a video

2  and say, Stop there.  This statement is only admitted to show

3  Mr. Pooley's state of mind.  It is not admitted to show whether

4  this, in fact, was Mr. Kwon's intention --

5              MS. CRAGER:  I understand.  Maybe -- it's a short

6  clip.  We can leave it alone.  That's fine.

7              THE COURT:  If that's your preference, I can

8  understand it.

9              MS. CRAGER:  That's fine.

10             THE COURT:  All right.  So that's how we're dealing

11  with 209.

12     Now maybe you can kind of see the drift of things here and

13  agree on something so we don't have to discuss a whole bunch of

14  other excerpts from this deposition.

15             MS. CRAGER:  I would like to go through them,

16  hopefully quickly.

17     209, we -- sorry.  Not 209.  210, we object to.

18             THE COURT:  All right.  Now that I have it in front

19  of me, I can look at it.  Hold on.

20     What's the objection?

21             MS. CRAGER:  The objection is that it's confusing and

22  irrelevant.  He talks about his interpretation of the

23  regulations.  He's not charged with violating any regulations.

24  I think -- I think it's just confusing to the jury, and 403.

25             THE COURT:  If it's confusing to the jury, that's the

1    government's problem.  If they confuse the jury, that's their

2    problem.  It doesn't hurt the defendant that they've put on

3    evidence that confuses the jury unless that evidence also

4    prejudices the defendant.

5         Now, you're saying the prejudice is that it suggests that

6    he violated some regulations.

7              MS. CRAGER:  Yes.

8              THE COURT:  What language are you talking about

9    there?

10             MS. CRAGER:  I'm sorry.  I handed up my only

11   transcript -- no.  Wait.  We have another one.

12        So in the last few questions, it says:

13        I don't believe that's correct.  A USPA examiner rating is

14   not required by the FAA.  The FAA only requires that the

15   examiner be trained by the manufacturer --

16             THE COURT:  That doesn't suggest he violated any

17   regulation.  I'll overrule the objection to that.

18             MS. CRAGER:  I think they're going to argue that this

19   shows that he's lying about the regulations.

20             THE COURT:  So what?

21             MS. CRAGER:  I just think it's confusing to the jury.

22             THE COURT:  It doesn't suggest he's violating the

23   regulations.  It just suggests he's lying about them.

24             MS. CRAGER:  Sure.  I think that's also confusing to

25   the issues here.

1              THE COURT:  Again, if they confuse the jury, then

2    that's to your benefit.

3              MS. CRAGER:  Our next objection is 301.

4         Do you plan to introduce the 301 series?

5              MR. SHARMA:  Not --

6              MS. CRAGER:  Not -- okay.

7              MS. LYDON:  So no objections to the rest of the

8    deposition clips?

9              THE COURT:  Okay.  Good.

10             MS. CRAGER:  Yeah.  We only have objections on the

11   300 series after that.

12             THE COURT:  So now we've covered everything that you

13   expect is going to come in through Mr. Lee.  You have my

14   rulings on it.

15             MS. LYDON:  Any objection to the 400 series, the one

16   interview that Mr. Lee did?

17             MS. CRAGER:  Just one second.

18        No.  We have no objections.

19             THE COURT:  All right.  So we can anticipate that

20   we're going to be able to go right through the testimony of the

21   next two witnesses without any -- without any interruptions for

22   bench conferences or excusing the jury.

23        Now, if you have objections on something else, that's fine.

24   We can deal with those.

25             MS. MCLOUGHLIN:  Your Honor, I would like to bring up

1    Brad North, the next witness.  We had kind of moved on to

2    Agent -- Special Agent Lee's testimony, but I just have one

3    issue.

4        The government has it on their exhibit list, text messages

5    that were -- that are between Mr. -- the witness and

6    Mr. Pooley.  I also have an exhibit of those text messages.  I

7    also have a redacted exhibit as well.  And so I just wanted to

8    bring that up because the redactions involve mentions of the

9    death.  I didn't want to have to get into it or --

10            THE COURT:  So have you agreed on the redactions?

11            MS. MCLOUGHLIN:  We have not agreed on redactions.

12   I'm not quite sure if they actually plan on entering the text

13   messages.  If we can have a brief moment to talk about that.

14            THE COURT:  You need to talk between yourselves

15   because I can't resolve it until I know what the dispute is.

16       Do you want to talk right now?

17            MS. MCLOUGHLIN:  If that's all right with Your Honor.

18            THE COURT:  Yes.  Let's get it out of the way.

19       (Pause in proceedings.)

20            MS. MCLOUGHLIN:  I'm sorry.  They did have a redacted

21   version.  That's my fault.

22       (Pause in proceedings.)

23            MS. MCLOUGHLIN:  Thank you, Your Honor.  We have an

24   agreed upon redaction.

25            THE COURT:  Good.  Then we're all set for this

1   afternoon.

2           MS. LYDON:  Thank you, Your Honor.

3           THE COURT:  All right.  See you at 1:15.

4           MS. LYDON:  Actually, are you -- what we're trying to

5   do with international witnesses is present it in a coherent

6   fashion.  Would the defense be agreeable to Special Agent Lee

7   testifying about -- introducing a couple topics today, perhaps

8   just the search warrant photos, depending on how much time we

9   have, crossing him on anything within the scope of that, and

10  then him retaking the stand later to testify with other issues

11  so that --

12          MS. CRAGER:  No.  Let's just do the whole testimony.

13          MS. LYDON:  Well, the issue is --

14          THE COURT:  The problem --

15          MS. LYDON:  -- international flights --

16          THE COURT:  The problem with that suggestion, which

17  superficially makes sense -- but in practice, it's hard to

18  divide up a question.  You say, I'm going to question him on

19  this issue.  Well, something that might relate to this issue

20  could also relate to another issue.

21          MS. LYDON:  It would --

22          THE COURT:  So it's very difficult to hold somebody

23  to that.

24          MS. LYDON:  It would be just -- it -- basically, the

25  agreement that I'm requesting would be to allow him to, say, do

1    search warrant photos and introduce other evidence and then

2    have them question on that fully however they would like --

3                   THE COURT:  I know.

4                   MS. LYDON:  -- and then have -- when our next

5    international witness flies in on Monday, allow that witness to

6    testify, and --

7                   THE COURT:  You can always take witnesses out of

8    order.  But I -- the other thing, you can't always limit the

9    cross-examination of a witness when you put them on.

10        For example, not Mr. Lee, but a witness testifies.  You

11   say, I want to only ask -- ask him about this transaction.  So

12   you ask him about this transaction.  And the cross-examination

13   of that witness may be, Have you ever been convicted of a

14   felony?  See?  So there may be things that relate to other

15   issues.  You can't always limit the scope of the

16   cross-examination.

17                  MS. LYDON:  That makes sense.

18                  THE COURT:  Right.

19                  MS. LYDON:  My question is just whether we can agree

20   that Mr. Lee can -- Special Agent Lee can testify today and

21   then testify again later about a different subject -- about

22   different topics.

23                  THE COURT:  I would -- I would let you do that.  I

24   would also let you call any witness out of order.  But I'm not

25   going to limit the cross-examination of Mr. Lee or any other

 1     witness now.

 2               MS. LYDON:  That makes sense.  Unless it's, like,

 3     completely afield of topics.  Like, if I don't cover

 4     interviews --

 5               THE COURT:  If it's not in the scope --

 6               MS. LYDON:  Yes, exact --

 7               THE COURT:  If it's outside the scope of direct, then

 8     of course.

 9               MS. LYDON:  Okay.  Thank you.

10          So Mr. Lee can testify in separate -- twice, basically --

11               THE COURT:  But I'm not going to, at this point,

12     limit the scope of the cross-examination.  When we get there,

13     you can make an objection, and I might sustain it.  But there

14     might be a reason why I would allow something that you would

15     think was outside the scope of your direct examination.

16               MS. LYDON:  Okay.  Thank you.

17               THE COURT:  All right.

18          (Recess taken, 12:05 p.m. - 1:17 p.m.)

19               THE COURT:  Everyone is present.

20          You may call your next witness.

21               MS. LYDON:  Thank you, Your Honor.  The government

22     calls Bradley North.

23               THE COURT:  Sir, please step forward, all the way to

24     your right, up to the witness stand.

25          Please remain standing.  Face me.  Raise your right hand.

```
 1              (The Witness, BRADLEY DAVID NORTH, is sworn.)

 2                   THE WITNESS:  I do.

 3                   THE CLERK:  Thank you.  You may be seated.

 4        Please state your full name.  Spell your last name for the

 5   record.

 6                   THE WITNESS:  Bradley David North, N-O-R-T-H.

 7                   THE CLERK:  Thank you.

 8                        DIRECT EXAMINATION

 9   BY MS. LYDON:

10   Q.  Good afternoon, Mr. North.

11   A.  Good afternoon.

12   Q.  Before we get into your background, what do you do for a

13   living now?

14   A.  I'm currently an installation manager for a company that

15   provides video security and surveillance.

16   Q.  Like a home and business security company?

17   A.  We do multi-tenant commercial and things like that.

18   Q.  Okay.  And are you also a parachutist?

19   A.  I am, but not professionally at the moment.

20   Q.  Just for fun at the moment?

21   A.  Yeah.

22   Q.  In the summer of 2016, did you take a course to get

23   certified as a tandem instructor with Rob Pooley?

24   A.  I did.

25   Q.  All right.  Before we get to Pooley, let's briefly tell the
```

1   jury a little bit about your background in parachuting and how

2   you made your way to Mr. Pooley's course.

3       Can you just tell us when and how you got into parachuting?

4   What attracted you to it?

5   A.  I started as a parachute packer in 2011 in Hollister.  And

6   it was basically just a summer gig, kind of a side gig to make

7   some more money.  I had never been skydiving previously, but I

8   had also wanted to, and I figured that that was a great way to

9   get my foot in the door and probably get to do that someday.

10  Q.  And when did you start skydiving?

11  A.  Started skydiving -- gosh, I did my first skydive

12  February 14, 2011.  That was a tandem skydive.  And then by

13  July of 2011, I was certified to jump on my own with an A

14  license.

15  Q.  Okay.  February 14th.  Did you take a Valentine's Day

16  skydive date?

17  A.  I was working.  My girlfriend was not there at the time.

18  Q.  Okay.  Then by July 2011, you were certified to do solo

19  skydiving.

20      How did you get certified?

21  A.  I went through a series of seven jumps.  It's a course

22  called AFF, which stands for accelerated free fall.  And it's

23  basically you do several jumps with two instructors.  You're

24  wearing your own parachute; they're wearing their own

25  parachutes.  And it's a progression of progressively more

1   involved maneuvers like turning, learning how to get stable

2   from an unstable position, and just basically the basics to

3   make you a safe skydiver on your own.

4   Q.   Who ran the accelerated free fall course that you took?

5   A.   That was a guy named Mako Igarashi.  He was the drop zone

6   owner at Skydive Hollister at the time.

7   Q.   Okay.  Was it a USPA or UPT course?

8   A.   It was a USPA course.

9   Q.   All right.  Was Mako -- what role did he play in the

10  course?

11  A.   He was my instructor on several jumps.  But I also had

12  several other instructors that were jumping with me.

13  Q.   Was he the examiner?

14  A.   Wouldn't be considered an examiner as such.  They were all

15  AFF instructors.  But yes, he was a rated AFF instructor.

16  Q.   Okay.  And is that -- AFF was a course where -- were you

17  learning how to skydive better yourself as opposed to teaching

18  someone else?

19  A.   Yes.  So when I went through the AFF course, I was a raw

20  student.  I had one skydive that was a tandem; so I had no

21  experience skydiving on my own or flying my own parachute.  And

22  so that course of seven jumps gave me the skills to be a safe

23  skydiver on my own.  And from there, you know, you obviously

24  build with every jump.  Never stop learning is kind of my -- my

25  way in life.

1    Q.   Okay.   What came next?   What did you -- what was the next

2    step in your skydiving career?

3    A.   So in, let's see, short order, by the end of the year, I

4    had probably close to 200 skydives.   And I had been building my

5    skills in, like, the realm of flying close to other people.

6    And so I began filming other skydivers.   And so that was my

7    first non-parachute packing job was to film other people in

8    free fall, largely on tandem skydives.

9    Q.   How did that work?   How did you make money doing that?

10   A.   So I would have my own parachute, and I would have a helmet

11   that was equipped with cameras, one for video, one for stills.

12   And I would jump with tandem pairs or AFF groups when students

13   were being trained, and I would leave the plane simultaneously

14   but unattached, and I would fly close enough to them to capture

15   their experience, basically.

16   Q.   And then would some people who you filmed purchase those

17   videos?

18   A.   Yes.

19   Q.   Okay.   How long were you a cameraman?

20   A.   I flew camera up until 2020.

21   Q.   Okay.   So about how many years?

22   A.   Gosh, nine, ten years or so.

23   Q.   Okay.   How -- so after a few years of being a flying

24   camera, did you take another step in your skydiving career?

25   A.   I did.   I eventually got my coach rating, which is a USPA

1    rating as well.

2    Q.   What is a coach rating?

3    A.   A coach rating allows you to jump with other skydivers.

4    Generally, it's less experienced but certified -- people who

5    have gone through the AFF training course.  And it's basically

6    a position that allows you to evaluate and build on existing

7    skills and make skydivers who have been trained better

8    skydivers.  Generally, you focus on, you know, one particular

9    skill on a jump.

10   Q.   Do you remember approximately when you got your coach

11   rating?

12   A.   Gosh, I don't exactly.

13   Q.   Okay.  Do you remember who taught your coach course?

14   A.   I do.

15   Q.   Who did?

16   A.   It was Rob Pooley.

17   Q.   How did you meet Rob Pooley?

18   A.   I met Rob Pooley, again, when I was working at Skydive

19   Hollister very early on.  And I want to say 2011.  He came to

20   Skydive Hollister to help out by doing some tandems.  We were

21   understaffed at the time, and so he came and helped out doing

22   tandems.

23   Q.   What was your relationship with Rob Pooley before you

24   signed up for his coach course?

25   A.   Early on, Rob and I kind of developed a -- maybe a

1    mentorship kind of position that he held with me.  We both had

2    similar interests.  Kind of like -- radio-controlled

3    helicopters was one of them.  He was a very skilled

4    videographer and as well as a canopy pilot; so flying

5    parachutes in, like, a technical way.  Both of those things

6    were obviously things that I was interested in.  And so he was

7    in a good position to lend his knowledge and experience to make

8    me a better skydiver in those respects.

9    Q.  Did he do that?

10   A.  He did.  Definitely.

11   Q.  All right.  How did you -- did you know at that time when

12   you took your coach course whether he held any positions with

13   USPA and UPT?

14   A.  I did.  I understood that he was a tandem instructor, a

15   tandem instructor examiner, and a coach examiner.

16   Q.  How did you know all those things?

17   A.  Largely just through word of mouth.  You know, I knew

18   people who had been through his courses.  Yeah.

19   Q.  Okay.  Word of mouth.  How -- can you describe how big or

20   small the skydiving community is?

21   A.  Gosh, I mean, it's the world big because skydiving happens

22   all over the place.  But as far as the, I guess, staff side of

23   skydiving, the professional skydiving world, it can be pretty

24   small regionally.  I like to say I have couches that I could

25   surf on all over the planet just through people that I've

1    worked side by side with.

2    Q.  In the skydiving community, is it generally known who the

3    examiners are in a particular area?

4    A.  Yes.  I would say so, yeah.

5    Q.  Okay.  And how is it known?

6    A.  Some of them go out of their way to advertise their -- you

7    know, it as a business.  There are several of those.  Others

8    are busy just through word of mouth or conducting courses at

9    their home drop zone that they don't need to advertise

10   necessarily.  And so, you know, just people talk.  Every year,

11   you know, a new batch of skydivers will progress to the stage

12   where they're ready for a rating, and they'll find somebody to

13   do that with.

14   Q.  Okay.  Did you know that there was a qualification or

15   credential required for someone to teach a USPA coach course?

16   A.  I did.

17   Q.  Okay.  And what was that credential?

18   A.  It's the USPA coach examiner rating.

19   Q.  Okay.  Did -- did you take -- can you describe, generally,

20   Pooley's coach course?

21   A.  So, effectively, like, you -- it's kind of an intro to --

22   you're not necessarily teaching somebody how to skydive, but

23   most of it is teaching you how to teach somebody.  Not

24   necessarily skydiving, but how to present information and how

25   to debrief.  So tell somebody how their jump went and how they

1    can improve, basically.

2    Q.   Okay.  And at the end of that course, did Pooley give you

3    signed papers enabling you to get a USPA and UPT coach rating?

4    A.   Yes.

5    Q.   Who signed those papers?

6    A.   Those were signed by Rob.

7    Q.   The examiner?

8    A.   Yes.

9    Q.   Okay.  Everything go smoothly?

10   A.   Yeah.

11   Q.   Okay.  Did you -- you've also mentioned AFF.

12   A.   Um-hum.

13   Q.   You took an AFF course.

14        Did you eventually become an AFF instructor?

15   A.   I did.

16   Q.   What is that?

17   A.   So an AFF instructor is somebody who is -- I liken it to a

18   swimming instructor.  You take somebody who has potentially

19   never been in the water before and you teach them first how to

20   float and, you know, maybe hold their breath or how to keep

21   their head above water.  Then you teach them the different

22   strokes on how to propel themselves and how to maneuver in that

23   new environment, basically.

24        And so, like I mentioned, AFF is a series of as few as

25   seven jumps -- seven skydives.  So you're teaching them through

1   a six- to eight-hour ground school before they get on the

2   airplane.  You teach them all about their equipment, potential

3   malfunctions, how to respond to them, basic body positions,

4   altitude awareness.  Things like that.

5   Q.  What's the difference between an AFF instructor and a

6   coach?

7   A.  So coaches aren't strictly tasked with actually physically

8   touching a student or saving a student.  You may see in movies

9   where people have to dive after a plummeting student.  A coach

10  doesn't have that responsibility; an AFF instructor does.

11  Because coaches are dealing with people who have already been

12  through the AFF course, and those people ostensibly already

13  know how to save themselves.

14      Coaches are -- I won't say held to a lower standard, but

15  there is a lower barrier as far as experience to become a coach

16  than to become an AFF instructor.

17  Q.  Okay.  Did you have both of those ratings at the time that

18  you became -- or you took the tandem instructor course?

19  A.  No.

20  Q.  Which one did you have?

21  A.  I had a coach rating.

22  Q.  That's the class you took with Rob Pooley?

23  A.  Yes.

24  Q.  All right.  At some point, did you decide that you wanted

25  to become certified as a tandem instructor?

1   A.   Yes.

2   Q.   What made you decide to be a -- to attempt to be a tandem

3   instructor?

4   A.   I'm slightly embarrassed to say, but it was largely a

5   monetary choice.  It's, you know, the next logical step to

6   making yourself marketable and opening up the world as far as

7   places where you can work and make money in the sport.  Yeah.

8   Q.   Okay.  So before that, you'd been a videographer and a

9   coach.  How would a -- how does tandem jumping offer a

10  different economic proposition than being a videographer?

11  A.   So a videographer -- an outside videographer, as we call

12  them, because we're not attached to the tandem pair like a

13  GoPro would be on a wrist.  The position of videographer is an

14  option for most tandem jumpers -- all tandem jumpers.  And

15  it's -- it's not strictly a cheap one.  It's over -- you know,

16  close to $150 on top of their cost of their tandem jump.  And

17  being that it's an option and an expensive one, not everybody

18  who comes to do a tandem will choose to have an outside video

19  flyer because it's expensive.  It's also -- can be

20  de-emphasized by the owners and managers of a drop zone

21  because, as one videographer, I take up one slot on the

22  airplane.  So for every two videographers who aren't on the

23  airplane, you can put another tandem pair on the airplane.

24       And so effectively, as a tandem instructor, you are

25  guaranteed work as long as people are coming in that day to do

1    a tandem jump.  You're put on a rotation with the other tandem

2    instructors in -- on staff at the drop zone.  And so until you

3    run out of tandem customers, you will be guaranteed to be

4    getting jumps.

5    Q.  Okay.  So it offered, it sounds like you're saying,

6    consistency and predictability?

7    A.  Yeah.  More stability.

8    Q.  And possibly -- do you make more money as a tandem

9    instructor than a videographer?

10   A.  Yes, in a way.  You generally make more in tips.  Also, as

11   a videographer, you are jumping your own equipment, and so it

12   can be very expensive to be a videographer because I have two

13   parachute systems; I have backup cameras; I have all sorts of

14   stuff that I have to pay for.

15   Q.  Okay.  Did it offer travel opportunities?

16   A.  Definitely.

17   Q.  Can you describe those?

18   A.  Yeah.  So you often see people doing their first skydive

19   in, you know, beautiful, you know, oceanfront places.  That

20   definitely appealed to me, being able to travel the world.

21   Since I started in skydiving in 2011, I was being told that

22   outside video -- because GoPros had just been invented and come

23   onto market, and handcam was replacing my job as an outside

24   videographer.  So everybody was telling me, Oh, don't get used

25   to, you know, this awesome job that you have flying video

1   because it's going to go away.  And so I saw a little bit of

2   that.  But I managed to stay pretty busy.

3   Q.  Good.

4       Were there also -- how about the work itself.  Were there

5   things that appealed to you about jumping with customers?

6   A.  Yeah, to a degree.

7       As an outside videographer, my experience with my clients,

8   the tandem passengers, was limited to meeting them on the

9   ground and doing, like, a pre-jump interview.  I would try to

10  talk to them in the plane or at least capture their, like,

11  nervousness or excitement on the way up to altitude.  And then,

12  obviously, we can't talk in free fall because it's very loud.

13  But I would, you know, be there to capture their, you know,

14  expression and their experience in free fall.  But as soon as

15  they deployed their parachute, I would continue falling and

16  deploy my parachute later so that I can land before them and

17  then capture them coming in to land.

18      So there is a piece of their skydive experience that I was

19  missing out on, and that's their time immediately after their

20  parachute is opened, their -- you know, I -- I've seen it on

21  video, but I've never really been there for it.  And so I

22  really enjoy flying parachutes.  It's -- you know, it's hard to

23  pick a favorite part of skydiving, but that was a piece that.

24  You know, I wanted to be there for that for them, you know.

25  Q.  The idea of experiencing people's first skydives was a cool

1  part of the job?

2  A.  Yeah.  Yeah.

3  Q.  Okay.  Is there a credential that you need in order to do

4  all those things that you were just talking about that appealed

5  to you?

6  A.  Yeah.  You need to be a USPA tandem instructor.

7  Q.  Okay.  A USPA tandem instructor.

8      Do you also need a certification by the manufacturer of the

9  parachute equipment?

10  A.  You do.

11  Q.  Who is that?

12  A.  That's UPT.  Uninsured [sic] Parachute Technologies.

13  Q.  Okay.  Can you be a tandem instructor without a credential

14  from USPA or UPT?

15  A.  I believe so, but not in the United States.  There are

16  other manufacturers that produce and manufacture different

17  tandem parachute systems, but the UPT Sigma is by and large

18  pretty much the gold standard.

19  Q.  Okay.  So in the US, most parachutes were UPT systems?

20  A.  Yes.

21  Q.  So you needed the UPT rating?

22  A.  Correct.

23  Q.  Did the drop zone where you wanted to work require a USPA

24  tandem instructor rating in order to jump tandem there?

25  A.  Yes.

1   Q.   Okay.  And is that the situation at most drop zones in the

2   country, that you know of?

3   A.   Yes.

4   Q.   Okay.  How do you get a tandem instructor rating?  What are

5   the qualifications you have to have before, I guess, you start

6   the class?

7   A.   So you need a minimum of three years of experience in the

8   sport.  You need a minimum of 500 jumps on a Ram Air parachute,

9   which is just the inflatable wing shape type parachute that we

10  pretty much by and large jump.  Let's see.  You need to hold a

11  USPA coach rating.

12  Q.   And you had the coach rating from your class with Rob

13  Pooley, the examiner?

14  A.   Correct.

15  Q.   Okay.  Did you also have three years skydiving and at least

16  500 jumps?

17  A.   I did.

18  Q.   How many jumps do you think you had total when you took the

19  course?

20  A.   When I took the course, I believe I had somewhere in the

21  neighborhood of 1500 jumps.

22  Q.   Okay.  How many do you think you have now?

23  A.   Over 6,000.

24  Q.   Wow.  All right.

25       So you take this course.  Who teaches the course?

1    A.   Rob was teaching the course.

2    Q.   Okay.  Setting aside Rob, is there a credential required to

3    teach the tandem instructor course for USPA and UPT?

4    A.   Yes.  The tandem instructor examiner rating.

5    Q.   Can you take a class taught by someone other than an

6    examiner?

7    A.   Yes.  There is a provision that you can be taught -- you

8    can -- you can conduct courses under the supervision of

9    somebody who holds the tandem instructor examiner rating.

10   Q.   I think we might have been saying the same thing.

11       You'd have to hold -- is it correct that you have to hold

12   the tandem instructor examiner rating in order to teach and

13   certify people as a tandem instructor?

14   A.   Yes.

15   Q.   Okay.  And at the completion of the course, what does the

16   examiner need to do in order to get you that USPA and UPT

17   rating?

18   A.   They need to, obviously, grade your exams.  They need to

19   have sufficiently determined that you are competent and capable

20   and have met the requirements.  And then they also fill out a

21   bunch of paperwork basically confirming those things.

22   Q.   Do they sign that paperwork?

23   A.   Yes.

24   Q.   And where do they sign that paperwork?

25   A.   Like, physically on the paper or in general?  Like,

1   geographically speaking?

2   Q.  Do they convey the completed paperwork to any entity or

3   entities?

4   A.  Yes.  So they send the paperwork off to the USPA and to UPT

5   for the manufacturer rating.

6   Q.  Okay.  Going into the course, did you have any reservations

7   or concerns about becoming a tandem instructor?

8   A.  Yes.

9   Q.  Could you describe those?

10  A.  As I said, I had spent, by and large, most of my time

11  flying my own parachute as a videographer and pretty much

12  solely being responsible for my own safety with the exception

13  of, you know, don't run into the tandem while I'm, you know, in

14  free fall with them.

15      But becoming a tandem instructor, obviously you become

16  responsible not just for your own safety but entirely the

17  safety of your passenger.  And it wasn't so much that I was

18  unconvinced that I was going to be able to do that reliably,

19  but there is a degree of sacrificing one's own personal comfort

20  to achieve those things.

21  Q.  It was a big responsibility --

22  A.  Yeah.

23  Q.  -- is that what you're saying?

24      All right.  Are there also more -- mechanically speaking,

25  big differences between individual skydiving and tandem

1   instructor skydiving that you would need to learn from your

2   tandem instructor course?

3   A.  Absolutely, yes.

4   Q.  Can you describe those main mechanical differences between

5   tandem and solo?

6   A.  Yeah.  So, obvious differences, the tandem parachute system

7   is much larger as far as the canopies are concerned, the

8   parachute itself, which I would say decreases the level of,

9   like, maneuverability.  You're much more at the whim, I would

10  say, of the wind.  They're still very controllable, but they're

11  much less precise than what I was used to flying.  I fly very

12  small high-performance parachutes.

13      You also -- there is part of the system called the drogue

14  parachute which stabilizes the -- the tandem pair and slows

15  them to a more manageable and gear friendly speed in free fall.

16  And that element of it introduces a lot of increased complexity

17  as far as malfunctions are concerned and how you would respond

18  to those.

19  Q.  Okay.  So the size of the canopy made it different to

20  maneuver in big ways than your small high-performance canopy

21  that you were flying with?

22  A.  Correct.

23  Q.  The drogue presented complexities, and you needed to learn

24  how to manage the drogue?

25  A.  Um-hum.

1    Q.  How about the passenger?

2    A.  Yeah.  So you don't get to pick your passenger, obviously.

3    And so you may be doing 10 or even 20 jumps a day as a tandem

4    instructor, and you don't get to pick your passenger.  And so

5    you may encounter passengers who are everything from a

6    110-pound ballerina to somebody who is much larger.  But you

7    will do that flying parachutes that are roughly the same size.

8    And parachute performance is dictated in large part by the

9    amount of weight that's suspended below that given parachute.

10   They call it wing loading.

11   Q.  Okay.  So you needed to learn how to manage the changing

12   mass and the unpredictable mass of flying with a passenger?

13   A.  Right.

14   Q.  How about the behavior of the passenger?

15   A.  Yeah.  So tandem passengers are -- or students, as we call

16   them, are generally wholly inexperienced, obviously, in free

17   fall.  And it's a very -- can be a very overwhelming

18   experience.  That's kind of the point.  And so it can be

19   difficult for people to follow your directions that are for

20   their safety.

21       Some people -- you know, part of being a tandem instructor

22   is controlling somebody in free fall so that they don't injure

23   themselves or injure you or complicate the skydive in any way.

24   Q.  Okay.  So the mechanical aspects of the weight and also

25   learning how to work with another human being --

1   A.  Right.

2   Q.  -- in the air?

3   A.  Sometimes un -- uncooperative or unaware.

4   Q.  Who was the person in the tandem instructor course that you

5   were depending on to teach you those skills?

6   A.  Rob.

7   Q.  Let's talk about your initial contact with Pooley.

8       Once you decided to become a tandem instructor, what was

9   the next step you took to make that happen?

10  A.  I carved out a Friday and -- before that, I -- I reached

11  out to Rob and asked him if he was going to be conducting a

12  course in the near future.

13  Q.  Okay.  At that point, you knew him to be an examiner; is

14  that right?

15  A.  Yes.  That was my understanding.

16  Q.  Okay.  Do you remember if you asked him explicitly, Are you

17  still an examiner?

18  A.  I did not.

19  Q.  Okay.  Did he say anything to disturb the opinion that he

20  knew you held, that he was an examiner?

21  A.  No.

22  Q.  Okay.  Do you recognize Mr. Pooley here in the courtroom?

23  A.  I do.

24  Q.  Can you identify him by a piece of clothing his wearing?

25  A.  Yeah.  He's wearing a grayish-colored shirt, long-sleeved.

1    Q.  All right.

2              THE COURT:  That may describe more than one person.

3    Would you be more specific as to whom you're referring to?

4              THE WITNESS:  Yes.  Sitting next to the two ladies at

5    the defense.

6              THE COURT:  Record will reflect he's identified the

7    defendant.

8              MS. LYDON:  All right.

9    Q.  BY MS. LYDON:  I'm going to ask you to turn to Government's

10   Exhibit No. 31.  I'll help you find it.  It's in the binder

11   behind you.

12       Do you recognize Government's Exhibit 31?

13   A.  I do.

14   Q.  What is it?

15   A.  This is a Facebook message excerpt from a conversation with

16   Rob that I had.

17   Q.  Okay.

18              MS. LYDON:  Move to admit Government's Exhibit 31.

19              THE COURT:  Any objection?

20              MS. MCLOUGHLIN:  No objection, Your Honor.

21              THE COURT:  Exhibit 31 is received in evidence.

22       (GOVERNMENT'S EXHIBIT 31 ADMITTED INTO EVIDENCE.)

23   Q.  BY MS. LYDON:  What is the date range of these

24   conversation -- the conversation reflected in there?

25   A.  Appears to be December 2014 to August 2016.

1    Q.   Okay.  So it covers a wide sort of swath of time of your

2    communications with Mr. Pooley; is that right?

3    A.   Yes.

4    Q.   All right.  Let me zoom in on that.  And it -- okay.

5         Do you know who provided this -- this document?

6    A.   I did.

7    Q.   Okay.  Did you screenshot it and send it to us at our

8    request?

9    A.   I did.

10   Q.   Okay.  It starts with a USPA coach rating.

11        Who is the person typing, I guess, in the gray boxes to the

12   left of the chat?

13   A.   That's Rob.

14   Q.   He says, I can do the D license and coach course if you

15   need them.  I don't usually do the coach course one on one.

16   I'm doing one next week if you want to join.  Both coach

17   courses and tandem courses are done on weekdays; so you

18   shouldn't miss any work.

19        Had you already started communicating with him at the point

20   that he sent those two chats about the coach course?

21   A.   Yes.

22   Q.   Okay.  And then you see a date below that, December 10,

23   2014.  Does that indicate it was around the 2014 and later era

24   that you were considering and took the coach course with him?

25   A.   Yes.

1   Q.   Okay.  You indicate, Sounds good.  I have my D already.

2        What's a D?

3   A.   That's a D license.  That's a -- effectively, the highest

4   sport jumper license that the USPA offers.

5   Q.   Did that also require some paperwork being sent in to USPA

6   to obtain your D license?

7   A.   Yes.

8   Q.   Okay.  You inquire, What are the days for the coach course?

9   I work for UPS Monday through Friday.  Peak volume just hit us;

10  so getting weekdays off might be a stretch.

11       Did you work for UPS at that time?

12  A.   I did.

13  Q.   And does the fact it was December have something to do with

14  peak volume?

15  A.   Yes.

16  Q.   Okay.  You ask again, Hey, what days are the coach course

17  next week?  How many heads are in it?  How much money?

18       He does not respond, on this chat anyway.

19  A.   Right.

20  Q.   Did you and Mr. Pooley communicate -- what methods did you

21  and Mr. Pooley use to communicate in your relationship and

22  acquaintance with him?

23  A.   We also corresponded via text message.

24  Q.   Did you ever see each other in person?

25  A.   Rarely after, you know, 2012.  In passing, sometimes.

1    Q.  Okay.  You'd mentioned that he, in the 2012 era, was

2    working at your same drop zone in Hollister?

3    A.  Yes.

4    Q.  Did he eventually leave the Hollister drop zone?

5    A.  Yes.  He was kind of filling in on a, you know, kind of

6    week-to-week basis.

7    Q.  Okay.  Did you ever talk on the phone with him?

8    A.  I believe maybe once or twice, but I can't recall exactly.

9    Q.  Okay.  So is it possible that you had other communications

10   that aren't reflected in this Facebook chat?

11   A.  Yes.

12   Q.  Then fast-forwarding almost ten months to October 8, 2015,

13   you say, Hey, I'm in for the coach course.  Let me know any

14   prep I need to do in advance.

15       Sometime after October 8, 2015, did you take a coach course

16   with Rob Pooley?

17   A.  I did.

18   Q.  Okay.  We can zoom out.

19       The March 26, 2016, message says, Well, I guess we'll cover

20   all of them.

21       You inquire in November 10, 2015, Hey, have you seen Jester

22   around Lodi the last week or so?  Someone put an MIA post up on

23   basejumper.com, and folks are worried.

24       Who is Jester?

25   A.  Jester is a skydiver and base jumper.  He's somewhat

1   legendary, I guess, in the sport.  Also one of my mentors.

2   Q.  Did he jump at Lodi sometimes?

3   A.  Sometimes.  He was actually my -- my mock student for my

4   coach course.

5   Q.  Did he turn out to be okay?

6   A.  Yes.

7   Q.  Good.

8   A.  Mostly.  Yes.

9   Q.  Okay.  Then in March -- on March 28, 2016, you ask, Hey,

10  Rob, are you having a TI rating course anytime soon?

11  A.  Yes.

12  Q.  He does not respond via this chat.  But did you eventually

13  communicate with him in some means about that TI rating course?

14  A.  Yes.

15  Q.  Does TI stand for tandem instructor?

16  A.  It does.

17  Q.  Fast-forwarding to the end of this presentation -- we'll

18  get to this -- you ask, on August 17, 2016, Hey, Rob, what's

19  the word on that $1,100 refund?

20  A.  Yes.

21  Q.  Is this the end of the Facebook chat that you have with

22  Mr. Pooley?

23  A.  I believe it is.

24  Q.  Okay.  When you screenshotted it and sent it to the agents,

25  was it the end of the Facebook chat with Mr. Pooley?

1    A.   Yes.

2    Q.   Do you recall anything happening since?

3    A.   No.

4    Q.   All right.  So Mr. Pooley didn't respond via Facebook?

5    A.   No.

6    Q.   All right.  Did Mr. Pooley give any indication to you, at

7    any point prior to taking his course, that his instructor

8    examiner rating with USPA and UPT was invalid?

9    A.   No, he did not.

10   Q.   All right.  How did you -- describe -- did you have a

11   conversation with Mr. Pooley about taking the tandem instructor

12   course?

13   A.   I did.

14   Q.   What did you say to him, and what did he say to you?

15   A.   I asked him when he was going to be conducting the course,

16   what preparation I needed to do, and how much it would cost.

17   Q.   Where were you when you were having this conversation?

18   A.   I couldn't recall.

19   Q.   Okay.  Do you recall whether it was in person, on the

20   phone, over text, or some other medium?

21   A.   I believe it was over text message.

22   Q.   Okay.  And what were his answers to those questions?  What

23   did he say you should do in advance to prepare?

24   A.   I needed to review the USPA SIM section, which is Skydivers

25   Information Manual, that pertains to tandem instructor

1     operations, basically.

2         I also needed to complete the tandem instructor knowledge

3     exam which deals with the information conducted -- contained in

4     the Skydivers Information Manual.

5         I also needed to review the UPT Sigma system, which is the

6     Parachute System Operators Manual, as well as complete a

7     knowledge test.

8         I needed to review what's called a malfunction tree for

9     that system, which effectively deals -- it's a flowchart for

10    all of the potential malfunction modes of the system and the

11    proper response to those things.

12    Q.  Okay.  Did he give any indication to you during that

13    conversation that his instructor examiner rating with USPA and

14    UPT was invalid?

15    A.  He did not.

16    Q.  Okay.  Did Pooley lead you to believe that you could

17    legitimately obtain your tandem instructor rating and UPT

18    tandem parachute system certification from taking his course?

19    A.  Yes.

20    Q.  How did he do that?

21    A.  He took my -- my money.

22    Q.  Did you believe, based on your experience with each other,

23    that he knew that you knew him to be a USPA and UPT certified

24    examiner?

25    A.  Yes.

1  Q.  And did he know that you were looking for a rating?

2  A.  Yes.

3  Q.  If he had told you that his examiner rating was suspended

4  by USPA and UPT, would you still have paid him your money to

5  take that course?

6  A.  No.

7  Q.  All right.  And you talked about the skills that you needed

8  and wanted as a tandem examiner -- sorry -- as a tandem

9  instructor that you were relying on Pooley to teach you.

10      During the course, what sorts of things -- well, we'll

11  cover that later, actually.

12      All right.  So did he tell you where you should show up and

13  when?

14  A.  Yes.

15  Q.  Where and when?

16  A.  Told me to show up at the Parachute Center in Lodi,

17  California.

18  Q.  All right.  Did you -- were you familiar with the Parachute

19  Center in Lodi before showing up there for the tandem

20  instructor course?

21  A.  I was.

22  Q.  Describe your experience with Lodi prior to that point.

23  A.  I had -- previously, I had taken my coach rating course

24  with Rob, and that was at Lodi.  Previous to that, I had spent

25  some time, maybe three or four days, you know, spread out, on

1    days off just jumping for fun with some of my friends.

2    Q.  As a sport jumper solo?

3    A.  Yes.

4    Q.  Okay.  What attracted skydivers to Parachute Center?

5    A.  It's -- it was the cheapest place in the world to skydive.

6    Q.  Could you explain that?

7    A.  Yeah.  So by and large, in this specific era, this time

8    frame, your average price to do a tandem jump was going to be

9    probably in the neighborhood of 150 to $200 anywhere else.

10   Lodi offered $99 tandem jumps.

11       As a sport jumper, you pay for jump tickets, which was

12   basically just like an airline ticket that you would buy to get

13   onto an airliner.  Lodi was charging, I think, $5 for a

14   hop-and-pop ticket, which is a ride, basically, just to 2,000

15   feet, where you would then get out, open your parachute

16   immediately.  And it was strictly a way -- a means for you to

17   practice your parachute maneuvers and your landing accuracy.

18       A full altitude skydive or jump ticket, I think was running

19   $10 or $15 at the time, whereas most other drop zones, you were

20   paying $25.

21   Q.  Okay.  So let me unpack that a little bit.

22   A.  Yep.

23   Q.  There were the full altitude jumps at Lodi for 10 or $15?

24   A.  Yeah.

25   Q.  And next door was $25?

1   A.   Yes.

2   Q.   How high is a full altitude jump?

3   A.   Full altitude, generally about 13,500 feet.

4   Q.   Okay.  And a hop-and-pop was how high?

5   A.   2 to 3,000 feet in Lodi.

6   Q.   For 5 bucks?

7   A.   Yeah.

8   Q.   How many jumps did you -- for the various USPA and UPT

9   qualifications, did skydivers need to attain certain numbers of

10  jumps?

11  A.   Yes.

12  Q.   Was that something that impacted the attractiveness of

13  taking courses at Lodi?

14  A.   Yes.

15  Q.   What could skydivers do to get ready for courses at Lodi?

16  A.   So skydivers could do their required 500 jumps for much

17  cheaper in Lodi than they could at any other drop zone.

18  Q.   Okay.  Did -- those $5 hop-and-pops to 2,000 to 3,000 feet,

19  did they count as skydives for purposes of their logbook and

20  their requisite jumps?

21  A.   They did.

22  Q.   Okay.  Did it -- did Lodi attract people from outside the

23  country also to obtain those certification jumps and ratings?

24  A.   Yes.

25  Q.   Let's talk now about what you did and what you saw when you

1  arrived to Parachute Center to take Rob Pooley's tandem

2  instructor course.

3      Do you remember around what month and year you took that

4  course?

5  A.  That was in July of 2016.

6  Q.  Okay.  How is it that you remember?

7  A.  It was right around my birthday.

8  Q.  When is your birthday?

9  A.  July 3, 1985.

10 Q.  All right.  How did you get there?

11 A.  I drove myself.

12 Q.  In your car?

13 A.  I did.

14 Q.  When did you arrive, around?

15 A.  I want to say I arrived sometime -- noon, early afternoon,

16 maybe.  Between noon and 1:00.

17 Q.  Who did you talk to first when you walked in the door?

18 A.  I spoke with Rob.

19 Q.  What did you say to him, and what did he say to you?

20 A.  I said, Sorry I'm late.  He asked me if I was ready to go.

21 And I said, Yes.

22 Q.  Okay.  Did he ask you for anything?

23 A.  Yes.  He asked me for my completed USPA tandem instructor

24 exam answer sheet, basically.  Same with the UPT paperwork, as

25 far as the exam.  And for my course money.

1    Q.   Okay.  Had you completed those exams?

2    A.   Yes.

3    Q.   Are they, like, multiple choice?  Or how do those work?

4    A.   The -- yes.  The USPA is multiple choice.  I believe that

5    UPT actually details short responses, basically.

6    Q.   Okay.  Did you give those to him?

7    A.   I did.

8    Q.   Let's talk about the money.

9         Had he told you in advance how much money to bring?

10   A.   Yes.

11   Q.   Had he told you in advance in what form you should bring

12   that money?

13   A.   Yes.

14   Q.   What did he say?

15   A.   It was $1100 cash.

16   Q.   Did you bring that amount?

17   A.   I did.

18   Q.   Do you remember the denominations?

19   A.   No.

20   Q.   Okay.  What did you do with that $1100 when you arrived and

21   talked to Mr. Pooley?

22   A.   Rob instructed me to pay the front desk, Lodi, the

23   Parachute Center for my jump tickets and for my equipment

24   rentals.  For my -- my tandem course, you pay up front.  And

25   then I gave him the rest.

1    Q.   Okay.  What was the breakdown of how much went to Pooley

2    and how much went to Parachute Center, around?

3    A.   I want to say it was $400 or so to the Parachute Center for

4    my equipment rentals and my jump tickets, and the remainder

5    went to Rob.

6    Q.   Okay.  Do you remember that amount exactly, or is it now

7    approximate?

8    A.   Approximate, I would say.

9    Q.   Okay.  Who at Parachute Center did you hand that money to?

10   A.   Bill Dause.

11   Q.   Who is Bill Dause?

12   A.   Bill Dause is the owner of the Parachute Center.

13   Q.   Okay.  Did you know Bill Dause before you came to the

14   Parachute Center the day you took the tandem instructor class?

15   A.   Yes.

16   Q.   Could you look in the binder in front of you at Exhibit 8.

17   8P, specifically.

18   A.   I can find it under Tab 8?

19   Q.   Turn to Government's Exhibit 8P.

20        Do you see it?

21   A.   Yes.

22   Q.   Do you recognize the person there?

23             THE COURT:  Are you saying P or T?

24             MS. LYDON:  P, as in photo.

25             THE WITNESS:  I do.

1    Q.  BY MS. LYDON:  Who is in that picture?

2    A.  That's Bill Dause.

3            MS. LYDON:  Move to admit Exhibit 8P.

4            MS. MCLOUGHLIN:  No objection, Your Honor.

5            THE COURT:  Exhibit 8P is received in evidence.

6        (GOVERNMENT'S EXHIBIT 8P ADMITTED INTO EVIDENCE.)

7    Q.  BY MS. LYDON:  All right.  What was Bill Dause's role at

8    Parachute Center.

9    A.  He's the -- the king of the castle, I guess one would say.

10   He's the owner and the operator.  He owns the aircraft, the

11   buildings.

12   Q.  All right.  Do you remember what you said to Bill Dause,

13   what Bill Dause said to you that day?

14   A.  Told him that I was there for Rob's tandem rating course

15   and that I needed to pay for ten jumps worth of jump tickets

16   and rig rentals.

17   Q.  What did he say to you?

18   A.  He said, That will be -- I think it was, like, $40 -- like,

19   it was, like -- I can't remember the exact breakdown.

20   Q.  Yeah.

21   A.  But it was ten jumps; so I want to believe that it was $40

22   per jump.

23   Q.  And then the rental on top of that?

24   A.  No.  That was the jump ticket and the rental included.

25   Q.  Okay.  I think you said 40.  Did you mean to say -- before,

1  I believe you said 400.

2  A.  Right.  400 total.  And so it was ten jumps for the course,

3  and so I paid $40 per -- of the ten jumps.  So total, it would

4  have been $400.

5  Q.  Okay.  So the $40 was the jump with the rental?

6  A.  Correct.

7  Q.  Okay.  You just said you were there for Rob's tandem rating

8  course.

9      Did he direct you anywhere?

10  A.  No.

11  Q.  Okay.  Did he say, What do you mean Rob's tandem rating

12  course; he's not rated?

13  A.  No.

14  Q.  No.  Okay.

15      Did you then proceed to what you believed to be Rob's

16  tandem rating course?

17  A.  I did.

18  Q.  All right.  Where did you go next after paying Dause?

19  A.  I went to Rob and gave him the remainder of the payment

20  money for the course.

21  Q.  Okay.  Where did -- physically, where did you go next?

22  A.  So that exchange happened at the video concession counter,

23  basically.

24  Q.  With Rob?

25  A.  Yes.

 1   Q.   Okay.  Where did the exchange with Dause happen?

 2   A.   That was at manifest.  Or the front desk, if you want to

 3   call it that.

 4   Q.   Okay.  And then -- maybe let's set the scene for where all

 5   this happened.

 6       Could you -- I'm going to switch binders really briefly and

 7   have you look at some photos.

 8       All right.  Could you just take a moment and flip through

 9   Exhibits 801 through 804, 812 through 817, then 819 and 825.

10   A.   820 to 825?

11   Q.   Just 819 and 825.

12               THE COURT:  And or to?

13               MS. LYDON:  Just and.

14   Q.   BY MS. LYDON:  My question is what -- what do they -- what

15   business do they depict?

16   A.   That's the Parachute Center.

17   Q.   Do they depict areas of the Parachute Center that you're

18   familiar with and that you went to in the course of your tandem

19   instructor course --

20   A.   Yes.

21   Q.   -- visit with Pooley?  Okay.

22       Do they fairly and accurately depict the Parachute Center?

23   A.   Yes.

24               MS. LYDON:  Move to admit Government's Exhibits 801,

25   802, 803, 804, 812 all the way through 817, 819, and 825.

1          THE COURT:  Any objection?

2          MS. MCLOUGHLIN:  No, Your Honor.

3          THE COURT:  Exhibits 801 through 804, 812 through

4    817, 819, and 825 are received in evidence.

5        (GOVERNMENT'S EXHIBITS 801-804, 812-817, 819, 825 ADMITTED

6    INTO EVIDENCE.)

7          MS. LYDON:  All right.  Could we please publish

8    Exhibit 801.

9    Q.  BY MS. LYDON:  What do you -- what is 801?

10   A.  801 is -- that's, like, the main building where sport

11   jumpers generally pack their parachutes.

12   Q.  Okay.

13   A.  Sometimes there are tents in there too.

14   Q.  Tents in there?

15   A.  People camping.

16   Q.  People camping?

17   A.  Yes.

18   Q.  Why do people camp at Parachute Center in the hangar?

19   A.  Because they want to live at the drop zone, and that's --

20   yeah.

21   Q.  Are some of those people foreign?

22   A.  Yes.

23   Q.  Okay.  So it provides -- Parachute Center provides housing

24   in the form of tents in one of the hangars.  All right.

25       Do they charge money for that?  Do you know?

1  A.  I couldn't tell you.  I was never interested.

2  Q.  And you mentioned this is on top of the main sport packing

3  hangar.

4  A.  Yes.

5  Q.  Do the sport -- is the sport packing hangar a different

6  place than where customers do their business?

7  A.  Yes.  Tandem customers, yes.

8  Q.  Okay.  Is that in a different hangar?

9  A.  Yes.

10  Q.  Can we look at 802, please.

11     What is Government 802?

12  A.  That's a sign out in front of the parking lot of Parachute

13  Center.

14  Q.  Did you drive -- did you follow the arrows and the skydive

15  sign when you were driving in to take the tandem instructor

16  course?

17  A.  Correct.

18  Q.  Can we look at 803, please.

19     What do you see in 803?

20  A.  That's the main -- I guess that's where tandem customers

21  would enter the hangar.  Experienced skydivers as well.  That's

22  where the manifest, or the front desk, is located.

23  Q.  Okay.  Is this the front door to the main parachute

24  building?

25  A.  Yes.

1  Q.  And is this the door that you walked in when you went to

2  take your tandem instructor course with Rob Pooley?

3  A.  Yes.

4  Q.  Can we look at 804, please.

5      Do you recognize 804?

6  A.  I do.

7  Q.  What is 804?

8  A.  804 is a collection of couches.  It appears to be -- it's,

9  like, the waiting area where -- people who are about to get on

10 the airplane to go skydive, that's kind of where they would sit

11 and wait for the airplane to show up or wait for the truck with

12 the trailer to take you to the airplane if it was fueling.

13 Q.  Okay.  So the couches closest to the camera look rather

14 difficult to sit on.  Are they always stacked like this?

15 A.  I had never seen them in that configuration.

16 Q.  Okay.  Looks like there is a couch to the right, or further

17 off, under a colorful Parachute Center sign.  Is that an area

18 where people hung out to wait for planes?

19 A.  Yes.

20 Q.  All right.  And where would the planes land relative to

21 this picture?

22 A.  Planes would -- the -- the loading area, or the ramp, the

23 planes would come and turn around out of frame on the right.

24 Q.  Okay.  And then people would get off the couch, get into

25 line, walk onto the plane?

1    A.   Yep.

2    Q.   Okay.  Can we look at 825, please.

3         What is 825?

4    A.   825 is what skydivers would call manifest, or the front

5    desk.

6    Q.   Is this where Bill Dause was when you walked in?

7    A.   Yes.

8    Q.   Did Bill Dause usually hang out back at the manifest?

9    A.   Sometimes.

10   Q.   Okay.  He'd go other places as well?

11   A.   Yes.

12   Q.   But this was a common spot for him?

13   A.   Yes.

14   Q.   Did anyone else man the manifest?

15   A.   Yes.

16   Q.   Who -- who typically would be behind the manifest?

17   A.   His wife, Kathy Dause, also.

18   Q.   Okay.  Can you -- I'm going to show you one more additional

19   picture.

20        Do you recognize Government's Exhibit 17P?

21   A.   No.

22   Q.   Okay.  Never mind, then.

23        Why is it called the manifest, this counter?

24   A.   So on commercial airliners, there is a list of all the

25   souls on board, or all the people, and that's known as the

1   manifest.  So manifest as a physical place is where skydivers

2   would go to get onto a given manifest for a skydiving trip.

3   Q.  Okay.  Can we look at 814.

4       What is 814?

5   A.  814 appears to be the tandem student gear-up or preparation

6   area.

7   Q.  When you say "tandem students," is that a term that you

8   used earlier, I believe, to refer to tandem customers?

9   A.  Right.

10  Q.  What would tandem customers do in this area?

11  A.  They would generally don a jumpsuit if they should so

12  chose.  They would be with their instructor, and their

13  instructor would put one of these harnesses on them, which is

14  what you see hanging from the wall there with the bright orange

15  "Danger" labels.  They would be given goggles.  And they would

16  be kind of briefed on procedures for their responsibility for

17  the skydive.

18  Q.  Who would brief them?

19  A.  Their instructors.

20  Q.  Okay.  Did these video -- these screens have videos running

21  on them sometimes?

22  A.  Yes.

23  Q.  Okay.  What were those videos?

24  A.  So there is also a mandatory video produced by UPT which

25  features the owner of UPT explaining, effectively, the legal

1    side of embarking on a tandem jump.

2    Q.  Did they have that video running?

3    A.  Yes.

4    Q.  Were there safety videos running?

5    A.  Not to my knowledge.

6    Q.  Okay.  Do you know one way or another?  Did you hang out

7    there much?

8    A.  No.

9    Q.  Okay.  Can we move on to 812.

10       This is a little dark, and we have a number of different

11   views of this room because it -- it's rather large.  What is

12   this room covered with blue mats at the bottom?

13   A.  That's the room where tandem parachutes are packed.

14   Q.  Okay.  Did it have a -- a name?

15   A.  Not beyond that.  That's what I called it, because that's

16   what happened there.

17   Q.  Okay.

18   A.  It might have been referred to as the loft.  That's kind of

19   an industry term for where parachutes are maintained or

20   repaired as well.

21   Q.  Okay.  Can we look at 812.  That's Exhibit 812.  Can we

22   look at 813.

23       Is this a different view of the same room?

24   A.  It appears to be.

25   Q.  Can we look at 815, please.

1          Can we look at 816.

2          817.

3          What happened in this room?

4     A.   Tandem parachutes were packed there -- repacked for -- for

5     jumps.

6     Q.   Is this an area where Pooley held any part of his class?

7     A.   I believe that was -- yes, for a few moments.

8     Q.   What did you do in Mr. Pooley's class in this blue mat

9     room?

10    A.   So that was where we initially were given a rig.  He placed

11    a rig out on the floor and basically briefly, you know,

12    described the parts of the rig and -- yeah.  We demonstrated

13    repacking a drogue parachute.  But that was pretty much it.

14    Q.   Okay.  Is -- this blue mat room, the tandem parachute

15    packing area, is that the place you went after talking with Rob

16    Pooley and Bill when you arrived?

17    A.   Yes.

18    Q.   Okay.  How many other students, ish, were in the class?

19    A.   I would say between five and ten.  I couldn't remember

20    exactly.

21    Q.   Did you know any of them before taking the class?

22    A.   No.

23    Q.   Can you describe them by nationalities, to the extent you

24    recall?

25    A.   There were some who were American, I would assume -- I

1   guess -- and some who were not.

2   Q.  Okay.  Do you know what countries any of them were from?

3   A.  I believe two of them may have been from South Korea.

4   Maybe a couple, Latin American.

5   Q.  Okay.  All right.

6       So Pooley asked, I think you said, if you understood the

7   rigs and the parachute system in this area; is that right?

8   A.  Right.

9   Q.  And did you do any practicing in this room?

10  A.  So we would practice -- we -- one or two of us, I believe,

11  demonstrated emergency procedures, which basically involves

12  pretending that you're pulling various handles to operate

13  various parts of the system.

14      After that, we demonstrated our understanding of

15  adjusted -- don and adjusted the UPT tandem rig to our bodies,

16  because they are adjustable so they fit properly.

17      From there, it went towards harnessing up a student, which

18  would be one of the other people -- we harnessed each other up

19  as tandem instructor candidates to practice adjusting a

20  passenger harness to various body shapes and sizes.

21  Q.  Okay.  Who was telling you and the other students what to

22  do during this time?

23  A.  Rob was.

24  Q.  Okay.  Who was in charge of the course?

25  A.  Rob.

1    Q.   Did he do anything to check your work?

2    A.   Yeah.  So he supervised us, you know, and gave us advice,

3    basically, on how to adjust the harnesses for given body shapes

4    and types and things like that.

5    Q.   Is there a term to describe making sure someone -- coming

6    over to make sure that a harness is properly fitted to a

7    skydiver?

8    A.   Not a specific term that I'm aware of, but checking,

9    basically.

10   Q.   Okay.  Like, a rig check?

11   A.   Yeah.

12   Q.   Okay.

13   A.   Or gear check.

14   Q.   A gear check or rig check.  Who did that?

15   A.   Rob did that.

16   Q.   Were there any other -- for the indoor portion of the class

17   in this blue mat room, were there any other instructors or

18   evaluators involved?

19   A.   Eventually, when we went to do our -- our practice jumps --

20   or not our practice jumps but our evaluation jumps, yes, those

21   involved other skydivers.

22   Q.   Okay.  But for the indoor classroom portion, was anyone

23   other than Rob Pooley there?

24   A.   No.

25   Q.   Okay.  Just him and the students?

1   A.  Yes.

2   Q.  Did you do any bookwork?

3   A.  No.

4   Q.  Can you describe -- so you've alluded to the practice jumps

5   portion.  What did you do when you were done in the blue room?

6   A.  Done in the blue room, we immediately went to the jumping

7   portion of the course.

8   Q.  All right.

9   A.  The fun part.

10  Q.  What did you do first?

11  A.  The first jump was a solo jump on -- using the tandem

12  system.

13  Q.  Okay.  Describe your body positioning there.

14  A.  It's a belly-to-earth skydive like you've seen.  Standard.

15  Q.  Were you acting as the instructor there or the passenger?

16  Were you in front or behind on the tandem rig?

17  A.  So on the very first jump, there was no passenger.  We

18  jumped as in the instructor position, wearing the -- the

19  parachute rig without a passenger or without a passenger

20  harness in front of us.

21  Q.  And who told you that that was the first thing to do?

22  A.  That was Rob.

23  Q.  Describe that first jump.

24  A.  It was different.

25  Q.  How so?

1   A.  So sport rigs are, in most cases, custom-made for your

2   body.  The UPT Sigma rig is, like I mentioned, adjustable.  But

3   it's a one-size-fits-most affair.  And so there is some, I

4   would call it, wiggle room, I suppose.  Still very safe.

5       But also, the -- the drogue parachute that stabilizes the

6   tandem pair, it -- it is not strictly static and stable, I

7   guess.  It -- it wobbles around because it's in what's known

8   as, like, the burble or, like, the -- the wind shadow of the

9   tandem pair; so it has a tendency to kind of oscillate and

10  bounce around.  But you are hanging from it.  And so that

11  motion is transmitted down the bridle that connects it to you.

12  And so it -- it shakes you around.  And that was -- that was

13  somewhat new to me.

14  Q.  And at that time, you had hundreds and hundreds of jumps,

15  right?

16  A.  Yes.

17  Q.  But you remember that first jump in the tandem rig?

18  A.  Definitely.

19  Q.  The sensation is different, as you described.  Okay.

20      When you landed after that first jump, did you interact

21  with Rob Pooley at all?

22  A.  Yes.

23  Q.  What did he say, and what did you say?

24  A.  We -- I -- I went back in, and then it was -- I dropped my

25  rig to be repacked.  And then it was on to doing jumps with

1   live humans strapped to the front of me.

2   Q.  Okay.  Did he direct you, Okay, go pack your rig and do the

3   jump with live humans?  Who was running the show?

4   A.  Yes.

5   Q.  I'm sorry.  I think I asked two questions at once.  I'll

6   break them up.

7       Was it Rob Pooley who directed you to do the things you

8   just described?

9   A.  Yes.

10  Q.  All right.  What did you do for the rest of the day?

11  A.  As I mentioned, we did jumps with live mock students.  And

12  so they were experienced skydivers.  Some of them were tandem

13  instructors as well.  I believe my first jump may have actually

14  been with Rob.

15  Q.  Okay.  So your second jump?

16  A.  Correct.  Yes.  Second jump.

17  Q.  All right.  And was he in front or behind you?

18  A.  He was in front.

19  Q.  Okay.  What did he do during that second jump while he was

20  in front of you?

21  A.  He didn't really challenge me too much, I don't think, as I

22  recall, but gave me, you know, advice and tips, basically, on

23  -- under parachute on the way up as far as preparing, on the

24  plane ride, for when to attach certain connection points, when

25  to hand him his goggles, things like that.

1  Q.  Okay.  During these jumps, did you have -- what were your

2  interactions?  What was your job with the person acting as the

3  student?

4  A.  It was my job to bring them home safely.

5  Q.  Did you talk to them?

6  A.  Sometimes, yes.

7  Q.  Okay.

8  A.  Yes, we did.

9  Q.  Describe that.

10 A.  Generally, you know, we -- we're teaching them just as we

11 would teach somebody who is a real, live, I guess, tandem

12 student who had never skydived before.  We'd basically be

13 assuming that they knew nothing of how the system worked or

14 anything.  At certain points, they would, you know, lend their

15 own experience, you know, breaking character, I guess you would

16 call it, and, you know, giving advice or, you know, points of

17 help.

18 Q.  Who did you ride with other than Pooley in the front?

19 A.  The only ones that come to mind are a guy named -- named

20 Irish.  That was a nickname.  I don't actually know his real

21 name.  And Michael Spurgeon.

22 Q.  Did any of them -- those other folks who you rode with in

23 front, did they do anything to test your skills?

24 A.  Yes.

25 Q.  What did they do?

1  A.  Irish, couple seconds after I had deployed the drogue,

2  which happens immediately after you gain stability leaving the

3  airplane -- once you're in a belly to earth position,

4  basically, you throw the drogue so you stay there, he grabbed

5  my arms very forcefully and held on to them for what seemed

6  like a very, very long time, and then he used his legs to start

7  us kind of in a gentle spin or turn.

8  Q.  Did he debrief with you afterwards about that?

9  A.  Yes.  After he pretended to be unconscious under parachute.

10 Q.  Sounds like he really took you for a test drive there.

11     Did he tell you how you should handle that if a student did

12 it?

13 A.  Yes.

14 Q.  Who was directing traffic, saying which evaluator should go

15 with which students, things like that?

16 A.  I'm not sure.  It was kind of a -- a one-on-one thing.

17 Q.  Okay.  You aren't privy to the setup there?

18 A.  No.  I'm not sure.

19 Q.  Was it clear who was in charge?

20 A.  Yes.

21 Q.  Who was in charge?

22 A.  Rob.

23 Q.  What did Pooley do that day, other than anything we've

24 already discussed?  I just want to make sure we've covered

25 everything.

1   A.   I believe he may have also, like, supervised some landings,

2   and things like that.

3   Q.   Okay.   Throughout the day, who was acting as the examiner?

4   A.   Rob.

5   Q.   About how late did that first day run?

6   A.   I think I got out of there maybe 4:30, something like that.

7   Q.   Okay.   And then did you leave and come back another day?

8   A.   I did.

9   Q.   Do you remember about how late -- how soon or long after

10   you came back to do the second session of the course?

11   A.   I believe I did -- the first day was Friday, and I believe

12   the second day was a Monday, the following.

13   Q.   Okay.   Are you positive about that?   Or has it been a

14   while, and you're --

15   A.   It's been a long time.   But I remember that I didn't want

16   to miss my work as a skydiver because I was -- I needed the

17   money.   And so I took a Friday off -- like, a half day off, I

18   think.   And then Monday is -- my drop zone wasn't open, and so

19   I went back.

20   Q.   Okay.   During the course -- I guess -- can you describe

21   that second day?   What happened?

22   A.   Did the remainder of my tandem evaluation jumps.

23   Q.   Do you remember interacting with Pooley at all that day?

24   A.   Yes.

25   Q.   Describe those interactions.   Not -- before we hit the

1  paperwork; now just talking about the jumps.

2  A.   Right.   I believe we did one more jump together, he and I,

3  out of the remainder that I did during that day.

4  Q.   Okay.   During the course, both the first day and the second

5  day, did Pooley do anything to convey that he was not actually

6  a certified USPA or UPT examiner?

7  A.   No.

8  Q.   On the other side of the coin, did he conduct the course as

9  an examiner?

10  A.   Yes.

11  Q.   At the risk of belaboring it, what was it in his actions

12  and in his words that gave you the impression that he was an

13  examiner?

14  A.   He never said he wasn't.

15  Q.   Um --

16  A.   And he was conducting a tandem instructor rating course

17  with people that were paying for that service.

18  Q.   And only the examiner can bestow tandem instructor ratings,

19  right?

20  A.   Correct.

21  Q.   All right.   Now let's talk about the paperwork.

22         MS. LYDON:   Is this a good time to take a 2:30 break

23  before moving on to the --

24         THE COURT:   But, you see, we started off a little

25  bit -- I was going to break a quarter to, and then we would

1    resume at 3:00, and then we go to about 4:30.

2              MS. LYDON:  We can do that, Your Honor.  Sure.

3              THE COURT:  Right.

4              MS. LYDON:  Okay.  So break at 2:45, and resume at

5    3:00, you said?

6              THE COURT:  Thereabouts.

7              MS. LYDON:  Okay.

8    Q.  BY MS. LYDON:  Describe the -- what was supposed to

9    happen -- well, what was the first thing that happened with

10   respect to USPA and UPT paperwork?

11   A.  On the last day.

12   Q.  Okay.  On the very last -- yes.  Was there anything that

13   happened with respect to USPA or UPT paperwork that happened

14   before the last day of the course?

15   A.  No.

16   Q.  Okay.  So when you finished your jumps, what happened next?

17   A.  He handed me my UPT tandem instructor application form and

18   my USPA tandem instructor application form as well.

19   Q.  Where did this conversation -- where were you and where was

20   he when he brought you this paperwork?

21   A.  If I remember, he handed me the paperwork in my -- in the

22   tandem student gear-up area.

23   Q.  Okay.  One moment.  Could you switch binders?  Close the

24   one in front of you, and go back to the 800 series.

25        Was there a video concession stand in that area that you

1  described?

2  A.  It was -- short answer, no.  It was in a separate section

3  of the hangar.

4  Q.  Okay.  Where did you say that conversation happened?

5  A.  I believe he handed me my paperwork, like, directly after

6  my last evaluation jump.  And so I -- like, if I'm remembering

7  it, I dropped my rig and -- to be repacked, and he was there

8  waiting with my paperwork.

9  Q.  Okay.  We don't need to look at photos.  Let's just

10 describe the conversation.

11 A.  Okay.

12 Q.  Did you notice anything unusual about the paperwork that

13 Rob Pooley provided you?

14 A.  All of the signature fields were prefilled out and appeared

15 to be photocopied or Photoshopped signatures.

16 Q.  Whose signatures?

17 A.  I didn't recognize the signature itself, but the printed

18 name underneath them on the forms was Yuri Garmashov.

19 Q.  Did you know who Yuri Garmashov was?

20 A.  Yes.

21 Q.  Who is Yuri Garmashov?

22 A.  Yuri Garmashov is -- he was a tandem instructor, tandem

23 instructor examiner, and a skydiver as well.

24 Q.  How did you know Mr. Garmashov or know of him?

25 A.  I first met Yuri, I believe, actually, the first same

1    weekend that I first met Rob in Hollister.  Maybe the weekend

2    after that.  So 2011, I knew -- I met Yuri.

3    Q.  All right.  Were you acquaintances?  Friends?

4    A.  Acquaintances.

5    Q.  Had you seen Mr. Garmashov at any point during the course?

6    A.  No.

7    Q.  Had you seen him at the drop zone?

8    A.  No.

9    Q.  Did you see him at any point that summer?

10   A.  Not to my recollection.

11   Q.  What did you -- did you say anything to Pooley about this?

12   A.  I believe I, you know, asked him --

13   Q.  Did you point it out?

14   A.  I think I did, yeah.  And he said that Yuri was supervising

15   the course.

16   Q.  He said Yuri was supervising the course?

17   A.  Right.

18   Q.  Did that make sense?

19   A.  I didn't question it.

20   Q.  Yeah.  Are you an expert on the requirements under USPA and

21   UPT guidelines to supervise a course?

22   A.  As a tandem instructor examiner, no.

23   Q.  Okay.  Who is the person who is supposed to know how forms

24   should be filled out?

25   A.  I -- it's Rob's responsibility -- or the examiner's

1    responsibility to ensure those things are filled out and

2    transmitted.

3    Q.   So Rob said -- you pointed out that it was prefilled with

4    Yuri's signature.  Do you remember any words he said or just

5    that you pointed it out?

6    A.   I think I just mentioned that, yeah, Yuri's signature was

7    on this.

8    Q.   Was it in an inquiring way?

9    A.   It may have been in a leading way but not in a pressing

10   way.

11   Q.   What is this?

12   A.   Right.

13   Q.   And he said, Yuri is supervising the course.

14       Did you follow up or push him?

15   A.   No.

16   Q.   Why not?

17   A.   I didn't have any reason to, necessarily.

18   Q.   Were you caught off guard?

19   A.   Yes.  It was strange that it wouldn't have been just signed

20   by him.  But I -- I didn't ask why Yuri would be supervising

21   the course, I suppose.

22   Q.   At this point, had the course finished?

23   A.   For myself, yes.  I think there were other candidates that

24   were still doing jumps.

25   Q.   Okay.  Did you see any of your paperwork -- or any of their

1    paperwork?

2    A.  No.

3    Q.  Was anyone else around for this conversation?

4    A.  Not to my recollection.

5    Q.  Okay.  So he just came up and handed that to you?

6    A.  Correct.

7    Q.  Was there any indication in the community that this was

8    anything other than a legitimate USPA and UPT course taught by

9    an examiner?

10   A.  No.

11   Q.  And as you understood it, who was the person trained in

12   making sure the paperwork was filled out properly?

13   A.  It was Rob.

14   Q.  Okay.  After Pooley gave you that paperwork, did he say

15   what you should do with it next?

16   A.  I needed to fill in my -- like, the -- I needed to transfer

17   my -- my jump log, basically -- so, like, my list of who I

18   jumped with and when, those things -- onto my application

19   paperwork.  Yeah.

20   Q.  Transfer from what?

21   A.  I believe I was keeping my log of my evaluation jumps just

22   on a sheet of notebook paper at that time.

23   Q.  Okay.

24   A.  Previously.  Yeah.

25   Q.  Did Pooley say anything about what you should -- who would

1    submit the paperwork?

2    A.  He said that he would.

3    Q.  Okay.  So submit the -- he told you to transfer the jumps.

4    And were there other sections you were supposed to fill out?

5    A.  I think I -- just, like, my name and my license and things

6    like that.

7    Q.  Okay.  Do you remember what parts -- we can go over that.

8    We'll go over those documents in a few minutes.

9        When agents first reached out in this case, did you think

10   that you had your USPA and UPT paperwork?

11   A.  Physically?

12   Q.  Yeah.

13   A.  No.

14   Q.  So last month, did you clean your house?

15   A.  I was cleaning up my -- my old gear bins, yes.

16   Q.  Okay.  And what did you find?

17   A.  I found my paperwork.

18   Q.  All right.  What did you do with those documents?

19   A.  I sent a photo of them to the investigators and then

20   eventually sent them via mail, the hard copies.

21           MS. LYDON:  Okay.  I wonder if now -- this exhibit

22   will take some time -- whether now would be --

23           THE COURT:  You want to take a break now?  All right.

24       We'll take a 15-minute recess now, ladies and gentlemen.

25   Remember the admonition.

1              (Recess taken, 2:44 p.m. - 2:59 p.m.)

2              THE COURT:  Everyone is present.

3      Mr. North, all the jurors need to hear you.  Could you just

4  be a little louder and closer to the microphone?

5              THE WITNESS:  You bet.  Is this better?

6              THE COURT:  You may continue.

7              MS. LYDON:  Thank you, Your Honor.

8  Q.  BY MS. LYDON:  All right.  One more question about your

9  class.

10      Do you now know that one of the other tandem instructor

11  candidates in your class was named YongHyeon Kwon?

12  A.  Yes.

13  Q.  Let's go back to the paperwork.

14      Can you look, in the binder in front of you, to what's

15  behind Tab 30; I can help you with it.

16  A.  I've got 300s here.

17  Q.  Do you recognize Government's Exhibit 30?

18  A.  I do.

19  Q.  What is it?

20  A.  It's the credit card authorization for my UPT tandem

21  instructor rating.

22  Q.  And can you flip through the rest of the exhibit.

23  A.  Yes.

24  Q.  What are -- just the whole package of documents, what is

25  that?

1   A.   So this is the package of documents, basically, that

2   pertains to applying for a UPT tandem instructor rating.

3   Q.   Are these the documents that Pooley gave you that you found

4   and sent to agents last month?

5   A.   Yes.

6   Q.   Okay.

7        MS. LYDON:   Move to admit Government 30.

8        MS. CRAGER:   No objection.

9        THE COURT:   All right.   No objection.   Exhibit 30 is

10  received in evidence.

11      (GOVERNMENT'S EXHIBIT 30 ADMITTED INTO EVIDENCE.)

12       MS. LYDON:   Please publish page 1.   Thank you.

13  Q.   BY MS. LYDON:   So this is just the credit card information?

14  A.   Yes.

15  Q.   Did Pooley give you this document, or did you fill it

16  out -- or did you print it on your own?

17  A.   I don't recall.

18  Q.   Okay.   Can we move on to page 2.

19      What's this document?

20  A.   This is the exam for operating the tandem Sigma system from

21  UPT.

22  Q.   Okay.   Can you flip the page, please.   Flip the page.

23  Onward to 5.

24      Okay.   What is this document 30-005?

25  A.   This is the tandem instructor certification form.   So

1   it's -- details my USPA license number, my personal

2   information, as well as my evaluation jump details, I guess.

3   Q.  Who provided you with this document?

4   A.  Rob.

5   Q.  Rob Pooley?

6   A.  Yes.

7   Q.  And you said this is for UPT; so the system -- the tandem

8   rig manufacturer?

9   A.  Yes.

10  Q.  All right.  The bottom here -- sorry -- the middle right,

11  it has some signatures.

12  A.  Yes.

13  Q.  Were those signatures on the page when you received the

14  document?

15  A.  Yes.

16  Q.  And there is a name printed down there, Yuri Garmashov.

17  Was that also printed on the document when Rob Pooley handed

18  you the document?

19  A.  Yes.

20  Q.  Did you fill in the rest of the information on the page?

21          THE COURT:  I'm not sure; where are the signatures?

22          MS. LYDON:  Right there, Your Honor, in the middle of

23  the page.  The preprinted signatures.  Yuri Garmashov.

24          THE COURT:  All right.

25  Q.  BY MS. LYDON:  Aside from the signatures which were

1   preprinted, you've testified, and the Yuri Garmashov name, did

2   you fill in the rest of the information on this page?

3   A.  I did.

4   Q.  Okay.  The date of first jump, 2/13/2011, and the number --

5   maybe the day before Valentine's day, it looks like, so you

6   might have been able to spend it with your girlfriend --  and

7   the number of jumps, 3,933.

8       Was that number accurate as of the time that you took the

9   course with Rob Pooley?

10  A.  Yes.

11  Q.  Okay.  And is the rest of the personal information that you

12  list accurate as of that time?

13  A.  Yes.

14  Q.  Move on to the next page.

15      What is this document?

16  A.  Tandem instructor training logbook.

17  Q.  All right.  Did you fill this out?

18  A.  I did.

19  Q.  Did Rob Pooley provide this to you, or did you already have

20  this?

21  A.  That was provided.

22  Q.  By whom?

23  A.  Rob Pooley.

24  Q.  Flip to the next page.  All right.

25      What is Government 30-007?

1    A.   This is the log, basically, of my evaluation jumps for the

2    tandem course.

3    Q.   Who filled that log out?

4    A.   I did.

5    Q.   And is this what you were referring to earlier when you

6    said that you've been keeping your jump numbers and jump

7    information on a piece of paper and you transferred it over?

8    A.   I don't think so.  Like I said, I think I was keeping it

9    on, like, an actual sheet of, like, notebook paper.  It might

10   have even been, like, the back side of my UPT -- the exam

11   answer sheet that I had made.

12   Q.   Okay.  But did you -- did you fill out this based on

13   information that you recorded contemporaneously?

14   A.   Yes.

15   Q.   Okay.  First jump is reflected as solo.  Is that what you

16   described earlier?

17   A.   Correct.

18   Q.   Passenger weight, I think you have "me" written there.  Is

19   that right?

20   A.   Yes.

21   Q.   Okay.  Jump 3, you have Rob listed --

22   A.   Correct.

23   Q.   -- as the passenger.

24        Is that the front ride that you talked about earlier?

25   A.   Yes.

1    Q.   Jump 4, you list Mike.  Who is Mike?

2    A.   I believe it may have referred to Mike Spurgeon.  I'm not

3    sure.

4    Q.   Okay.  Is -- and 5, Rob again.

5         Is that Rob Pooley?

6    A.   Correct.

7    Q.   The dates listed are June 27, 2016, for the first four and

8    then July 1, 2016.  Are those dates consistent with the dates

9    that you reflect -- that you recall taking Rob Pooley's tandem

10   instructor course?

11   A.   Yes.

12   Q.   All right.  Let's flip over to the next page -- oh, wait.

13   Actually, let's stay there for a moment.

14        Initial endorsement by UPT tandem instructor examiner.

15   This section reads, I hereby certify that the above-mentioned

16   applicant has fulfilled all requirements of the Uninsured

17   United Parachute Technologies, LLC, tandem instructor training

18   course.  There is a name, Yuri Garmashov, and a signature.

19        Was that on the form when Rob Pooley gave it to you?

20   A.   Yes.

21   Q.   Who filled in the date?

22   A.   That was myself.

23   Q.   Who told you to fill in the date?

24   A.   Rob.

25   Q.   Then there is your name and a signature.

1          Whose signature is that?

2    A.   Mine.

3    Q.   Can we flip over to the next page, please, 008.

4          And does 008 list Jumps 6 through 10?

5    A.   It does.

6    Q.   Looks like Jump 6 and Jump 10 were also with Rob; is that

7    right?

8    A.   Correct.

9    Q.   And someone named Alex.  Do you know who that is?

10   A.   I don't recall.

11   Q.   How about Happy?

12   A.   Happy, I believe, I have a mental image of.

13   Q.   Okay.  But not a name?

14   A.   No.  These were all Lodi jumpers who I didn't really

15   interact with before or after.

16   Q.   And then you mentioned Irish before?

17   A.   Yes.

18   Q.   Is the rest of the information about these jumps consistent

19   with what you recall?

20   A.   Yes.

21   Q.   Were you the one who filled those in based on your records?

22   A.   Correct.

23   Q.   Okay.  Next page, please.

24        That top section, Final Certification, indicates that, Upon

25   completion of the series of ten jumps -- and the rest of the

1    information submitted -- or discussed in that paragraph --

2    there is a final endorsement by a UPT tandem examiner or tandem

3    system owner.  I hereby certify that the above-mentioned

4    applicant has fulfilled Uninsured United Parachute Technologies

5    Tandem Instructor Training Program.

6        And the paperwork that Rob handed you had the signature of

7    Yuri Garmashov and his name; is that right?

8    A.  Yes.

9    Q.  Okay.  Let me go over to the next page.

10       And the final instructor candidate certification is filled

11   out by yourself, correct?

12   A.  Yes.

13   Q.  All right.  Can we go to the next page.

14       Now, the documents we were just looking at are from UPT --

15   right? -- the manufacturer?

16   A.  Yes.

17   Q.  What is the agency or the organization that's responsible

18   for this set of forms?

19   A.  This appears to be from the USPA.

20   Q.  And what document is it?

21   A.  This is the Tandem Instructor Rating Course Proficiency

22   Card.

23   Q.  All right.  And, again, it has information about yourself

24   on the top.

25       Who filled out that information?

1   A.  I did.

2   Q.  And on the bottom, it has a series of signatures and dates.

3       Were the signatures there when Rob Pooley handed it to you?

4   A.  Yes.

5   Q.  Are those the signatures that you flagged for him and

6   pointed out?

7   A.  Yeah.

8   Q.  The --

9   A.  Yes.

10  Q.  Okay.  There are also initials there under 7.

11      Were those initials there when you received the document?

12  A.  Yes.

13  Q.  There are dates.  Who filled in those dates?

14  A.  I did.

15  Q.  Per whose instructions?

16  A.  Rob's.

17  Q.  All right.  On to the next page, please.

18      Did you also fill out these dates after -- per Rob's

19  instructions?

20  A.  Yes.

21  Q.  This rating recommendation reads, I have personally

22  examined and recommend this applicant for the USPA tandem

23  instructor rating.

24      Did Yuri Garmashov recommend you and examine you for the

25  tandem instructor rating?

1    A.  Not as far as I could tell.

2    Q.  But who -- who was your examiner?

3    A.  Rob.

4    Q.  And what did he tell you about Yuri's role?

5    A.  That he was supervising the course.

6    Q.  Okay.  On to the next page.

7        And what's this document?

8    A.  This is my medical certificate, Third Class Airman.

9    Q.  Is that required to be a tandem instructor as well?

10   A.  Yes.

11   Q.  Okay.  I think that's the last page of the document.  You

12   can take that down.

13       Now, when agents first contacted you -- I guess all the

14   times agents have contacted you up until a few weeks ago, did

15   you recall vaguely having text message communications with Rob

16   Pooley about this?

17   A.  Yes.

18   Q.  But did you have the phone that you'd used during that era?

19   A.  I did not.

20   Q.  And then a few weeks ago, did the defense provide a series

21   of text messages?

22   A.  Yes.

23   Q.  Okay.  Can you turn in the binder in front of you to

24   Government 32R.

25       What is it?

1    A.   This is a printout of text messages.

2    Q.   Do you recognize one of the numbers in that text chain?

3    A.   Yes, I do.

4    Q.   And have you reviewed this text chain?

5    A.   I have.

6    Q.   What does it appear to be?

7    A.   It's an exchange between Rob Pooley and myself.

8    Q.   All right.

9              MS. LYDON:  Move to admit Government 32R.

10             THE COURT:  Any objection?

11             MS. CRAGER:  No objection.

12             THE COURT:  Exhibit 32R is received in evidence.

13        (GOVERNMENT'S EXHIBIT 32R ADMITTED INTO EVIDENCE.)

14   Q.   BY MS. LYDON:  All right.  So we just talked about the

15   dates for the course and looked at your forms.

16        You took the course on June 27, 2016, and July 1, 2016.  Do

17   you recall that?

18   A.   Yes.

19   Q.   So this chain starts July 8, 2016.  And it begins -- we'll

20   focus on the July 8th part.

21        It begins with someone using a 949 area code number, asking

22   a person with a 916 number, Are you back from Yosemite?

23        Do you recognize the 949 number?

24   A.   That's my phone number.

25   Q.   Okay.  And who were you texting?

 1   A.   Rob.

 2   Q.   All right.  Do you recall he was in Yosemite at the time?

 3   A.   I don't.

 4   Q.   And he responds, I'm back.

 5        And you indicate -- or you write back, Nice.  Glad to hear

 6   it.  Hope it was a fun trip.  So I have several questions about

 7   items on this paperwork.  Would a phone call be best or

 8   texting?

 9        He does not respond for more than an hour.  Then you text

10   again, Should I fill in the dates next to all of Yuri's

11   signatures?

12        I can zoom out to see the whole thing.

13        And he responds, Yes, please.

14        Do you see that?

15   A.   Yes.

16   Q.   Do you recall asking him that question?

17   A.   Yes.

18   Q.   Did you do what he told?

19   A.   I did.

20   Q.   And then on July 11, 2016, you write to him, Got that

21   paperwork off to you yesterday.  Did you get it?

22        He responds, Got the e-mail but haven't looked at it.  Will

23   today.

24        And then the next text appears to be from you and goes on

25   to the next page.  You say, Thanks.  Then a couple days later,

1    you say, How'd I do?

2         What did you mean by that?

3    A.   Just did I pass the course, you know.  Did I miss anything

4    filling out the paperwork.

5    Q.   Yeah.  He didn't respond.

6         And then you write, on July 13th, Did that paperwork get

7    out?

8         Do you remember inquiring with him about the status of

9    whether the paperwork had -- whether he'd sent it out?

10   A.   Yes.

11   Q.   Can everyone read this okay?  Okay.

12        He said, Not yet, but I'm on it.  It will go in an e-mail

13   on Monday with two other sets of paperwork.

14        You respond, Okay.  Can you cc me that e-mail minus the

15   other candidate stuff?  Also that invoice, please.

16        What invoice were you referring to?

17   A.   I was asking him for an invoice for my payment for the

18   course.

19   Q.   Why?

20   A.   I intended to write it off as a business expense.

21   Q.   Were you at that point -- did you have your own business?

22   A.   No.  But I was a 1099 independent contractor.

23   Q.   Oh, okay.  So the way that you file taxes, does having

24   business expenses documented make a difference?

25   A.   Yes.

1    Q.  Was becoming a tandem instructor part of your business?

2    A.  Yes.

3    Q.  He doesn't respond for ten days.

4         And you write, Never got that e-mail/invoice.  Did

5    everything go out to USPA/UPT Monday as planned?

6         No response until August 4th, when he writes, Sorry for the

7    delay in responding.  I sent your docs to Yuri for review.

8         Is that consistent with his statement to you that Yuri was

9    supervising the course?

10   A.  Consistent?  It -- in the -- yes, it involved Yuri, in some

11   capacity, reviewing my documents.  Yes.

12   Q.  And Yuri hadn't been involved in your course as far as

13   seeing him or interacting with him, right?

14   A.  Correct.

15   Q.  But Pooley had presented you with documents with Yuri's

16   name on it?

17   A.  Yes.

18   Q.  And now he's telling you that he sent it to Yuri for

19   review; is that correct?

20   A.  Yes.

21   Q.  And he'd already told you that Yuri was supervising?

22   A.  Yes.

23   Q.  He goes on to say -- after he said, I sent your docs to

24   Yuri for review -- He -- Yuri -- said that he would be back in

25   town the 3rd, which was yesterday, and he would review them.  I

1  did see him yesterday, and he said he would review everything

2  in the next few days.  I gave him quite a lot of paperwork.  I

3  expect him to get back to me today or tomorrow.  When he does,

4  your package will go in to USPA/UPT.  Figure no later than

5  Monday.

6       We can zoom back out.

7       There is another -- the next text is August 9th.  It goes

8  on to the next page.  It's from you.

9       Go to the next page.

10      It is -- there's a portion of this redacted, but from what

11  is still there, you wrote, Happen to know if my paperwork got

12  out?  And then you talk about a different topic.

13      Is that correct --

14 A.  Yes.

15 Q.  -- without discussing what it is?

16      He writes back a response on a different topic and, Your

17  papers are in limbo.  Bill has everything, and there is

18  discussion on how to proceed.

19      Who is Bill?

20 A.  Bill Dause, I imagine.

21 Q.  It might take a few days to sort out.  This is so bad.  You

22  have no idea.  A shitstorm of epic magnitude is upon us.  USPA

23  has suspended my membership, license, and ratings pending

24  investigation.  So I guess if I want to work at a drop zone, I

25  can pack.

1         Did Bill have a role in your course?

2    A.  Not beyond selling me my jump tickets and renting me the

3    gear.

4    Q.  Do you know why Pooley had given your papers to Bill?

5    A.  I do not.

6    Q.  Or why there was discussion with Bill about your papers?

7    A.  I do not.

8    Q.  Your response is candid.  I've got a lot of words burning

9    in my mouth right now, but I'm just going to take a deep

10   breath, exhale, and sum up my feelings with fuck.  I'll have

11   something more comprehensive later.

12        Can you describe what you meant by that?

13   A.  I was upset and in a bit of surprise and shock, I guess.

14   Q.  He writes, I'm working on getting refunds to everyone.

15   Brad, this is an enormous mess and literally going to ruin my

16   life, but I don't want anyone to get screwed.

17        He claims -- why do you -- did you surmise he was working

18   on getting refunds to everyone?

19   A.  Because --

20             MS. MCLOUGHLIN:  Objection, Your Honor.  I don't

21   think --

22             THE COURT:  Sustained.

23   Q.  BY MS. LYDON:  He writes, I make $200 from each rating

24   course, but I'm having to refund the full amount.  That's 15K I

25   don't have in my back pocket.  Bill isn't going to refund a

1    single dollar.  I'm trying to sell stuff, but that takes a bit

2    of time.

3        Do you have any reason to -- do you have any information

4    about his assertion that he makes $200 from every rating

5    course?

6    A.  No.

7    Q.  You gave him, I think you said -- how much?

8    A.  700.

9    Q.  As part of your 1100 total payment?

10   A.  Correct.

11   Q.  Okay.  Moving downward.  That was the 10th.

12       Then on the 17th, you wrote, How 'bout that refund?  And

13   you explain why.  The money would come in really handy right

14   about now since I have an opportunity to retake the course this

15   weekend with a legitimate examiner.

16       Can you explain what you meant by that?

17   A.  As it had come to light that my rating was not valid that I

18   had obtained from Rob's course, I happened to be in the same

19   boat as a number of other instructors candidates that had gone

20   through courses with Rob.  And it was being -- a retraining

21   course was being offered to these candidates by the USPA and

22   UPT.

23   Q.  You mentioned "come to light" without saying anything about

24   how.  By this time, did you know that Rob Pooley was not an

25   actually certified USPA and UPT examiner?

1  A.  I did.

2  Q.  Did you understand that information when you received his

3  "shitshow of epic proportions" text?

4  A.  Yes.

5  Q.  Had that already gotten around in the community?

6  A.  Yes.

7  Q.  Okay.  Without describing any other information about the

8  conversation, could you -- do you remember who first told you

9  that Rob Pooley was not actually a certified USPA and UPT

10  examiner?

11  A.  I don't.

12  Q.  Okay.  Did it become widely known quickly?

13  A.  Yes.

14  Q.  All right.  Zoom out.

15      The next text is the same day.  And it's from Pooley to you

16  in response to your text that the money would come in really

17  handy right now since you have an opportunity to retake the

18  course with a legitimate examiner.

19      Can we go to the next page.

20      He says -- the conversation continues on August 17th, which

21  is when -- the same day as the prior text we were discussing.

22  He says, I know JC will be there.  My plan was to pay for part

23  of it for everyone that I worked with here.

24      Who is JC?

25  A.  I believe it's JC Calderon, who is a designated tandem

1    instructor examiner.  I believe he's, like -- holds a special

2    place in UPT's heart, basically.

3    Q.  Okay.  And at that time, did you believe he was taking --

4    he was teaching a tandem instructor course?

5    A.  Yes.

6    Q.  And was he who you were referring to as a legitimate

7    examiner?

8    A.  Sure.  One of many.

9    Q.  Right.  But not Rob?

10   A.  Correct.

11   Q.  You write, Okay.  I haven't gotten the specifics of the

12   course yet, but I'm hearing it will cost us $300.

13         He responds, That's what I was told.

14         And you say, So you'll be covering that?

15         To which he says, Yes.  And some of the slots and gear

16   rental if I can.

17         There is a two-day gap, and the conversation continues on

18   August 19th.

19         You write, Will you be at BAS?

20         What's BAS?

21   A.  Bay Area Skydiving.

22   Q.  Is that where the course was going to be held?

23   A.  Yes.

24   Q.  He says, Not sure yet.

25         Then you write, Well, I just got word that this training

1  event -- is that supposed to be "event," do you believe? -- or,

2  this training even has been canceled?

3  A.  I can't say.

4  Q.  Okay.  So I'm doubting it.

5     He responds -- let's go to the next page.

6     He says, What?  When did this happen?

7     You say, As of 10 a.m.

8     And he responds with an expletive.

9     There is nothing until August 25th.  And you follow up

10  with, How about that refund?

11     He doesn't respond for a day.  Could you read the next

12  text.

13  A.  Yes.

14     I say, Ignoring me is not going to make this go away, Rob.

15  I need a gesture of good faith that you intend on making this

16  situation right by repaying me the $1100 I paid you to conduct

17  a viable UPT/USPA tandem instructor training course.  You are

18  responsible for this because of the choice you made to

19  surreptitiously conduct a course while being unsupervised and

20  unqualified to conduct the course on your own.  A good start

21  would be to return, at minimum, the $200 profit you claimed

22  from each prospective candidate.  This would go a long way to

23  demonstrate your integrity in the eyes of any judge you might

24  wind up in front of.

25  Q.  What did you mean by "surreptitiously conduct a course"?

1  A.  In that conducting a course without telling anybody that he

2  was not rated to do so.

3  Q.  He writes back, Brad, I'm sorry.  I did not intend to

4  ignore you.  It got late, and I didn't get to return any voice

5  mails or messages.

6       Zoom back out.

7       The next text is on the same day.  Can we go to the next

8  page.

9       That next text is still from Mr. Pooley.  I do want to give

10 you your refund.  I have no cash at this very moment, but I can

11 send you a good faith gesture after Tuesday.

12      You respond -- can you read that next text, please?

13 A.  Yes.  My PayPal address is deviltakeshindmost@gmail.com.  I

14 will greatly appreciate a concerted and sustained effort to

15 make this right and, once done, will again stand by your

16 character as I once was so sure it deserved.

17 Q.  And he responds, Thank you, Brad.

18      Then there is nothing for three days -- or -- sorry -- for

19 another day.  And you write to him, Just woke up to a message

20 from Jacky at Skydive Monterey Bay inviting me to come do some

21 tandems for them today.  Figured you should know since you're

22 the only reason I can't accept.

23      Who is Jacky, and what is Skydive Monterey Bay?

24 A.  That's Jacky Foust, and she's the drop zone manager for

25 Skydive Monterey Bay in Monterey, California.

1   Q.  Did people know you were taking a course to become a

2   certified tandem instructor?

3   A.  Yes.

4   Q.  And did people want to give you work as a certified tandem

5   instructor?

6   A.  Yes.

7   Q.  And could you accept any of it?

8   A.  No.

9   Q.  Why?

10  A.  Because I was not a holder of a valid tandem rating.

11  Q.  He wrote back -- Rob Pooley wrote back three days later, I

12  told you I'd have some money for you Tuesday.  The electrical

13  job I was relying on for that money was rescheduled for

14  Thursday.  I just wanted you to know what's up.  I'm not

15  forgetting about you or blowing you off.

16      You wrote, Appreciate the heads up.

17      Next page, please.  There is no next page.

18      Did Mr. Pooley ever give you a cent back?

19  A.  No.

20  Q.  Did Pooley ever deliver what he promised?

21  A.  No.

22          MS. LYDON:  No further questions.

23          THE COURT:  Ms. Crager or Ms. McLoughlin?

24      Ms. McLoughlin, you may cross-examine.

25          MS. MCLOUGHLIN:  Thank you, Your Honor.

                                CROSS-EXAMINATION

1

2       BY MS. MCLOUGHLIN:

3       Q.  Good afternoon.

4       A.  Good afternoon.

5       Q.  So you've talked a lot.  I'm going to start kind of at the

6       beginning of what you had testified on direct examination.

7           So you had testified that Rob told you, in preparation for

8       the -- for the course, to review the UPT Sigma Tandem system

9       owner manual, correct?

10      A.  Correct.

11      Q.  Okay.  Thank you.

12          You also reviewed the USPA or Parachute Association

13      instructional manual -- instructional rating manual, right?

14      A.  Correct.

15      Q.  And that manual provides information for candidates for any

16      instructional rating courses, not just tandem instructor

17      candidates, right?

18      A.  Yes.  There are various sections.

19      Q.  And everyone is expected to review this manual?

20      A.  Yes.

21      Q.  Okay.  Let's look back at that paperwork that you completed

22      in connection with the course.

23          If we could pull up Government's Exhibit 30 again.  You'll

24      have to excuse me.  We should refer to our own -- okay.  Thank

25      you.

1      So do you have that in a binder up there, or you can see it

2   on the screen?

3   A.  I've got it on my screen here.

4   Q.  Okay.  So this is the paperwork that Rob Pooley gave you to

5   fill out, correct?

6   A.  Correct.

7   Q.  And could we go to the next page, please.  And to the next

8   page, actually.  Keep going.  One more.  And another.  And then

9   one more.  And another.  I'm sorry.  Okay.

10      So I'd just like to look again at the endorsement section

11   right here.  And so you filled out the date here next to Yuri

12   Garmashov's printed name and signature, correct?

13   A.  Yes.  At Rob's direction.

14   Q.  Right.  And then if we could zoom out and go to page 12, I

15   believe it is, of Exhibit 30.  Thank you.

16      And then you also put a date here under Yuri Garmashov's

17   printed name and signature, correct?

18   A.  Yes.

19   Q.  And this is the portion where it says that according to the

20   documents, Yuri Garmashov had personally examined and

21   recommends you for the USPA tandem instructor rating, correct?

22   A.  That's what it says.

23   Q.  It doesn't have Rob's signature there, does it?

24   A.  It does not.

25   Q.  And so you said you asked Rob about the signatures on the

1  paperwork -- or I guess you didn't ask about the signatures

2  particularly, just that was Yuri supervising the course?

3  A.  Correct.

4  Q.  I guess you specifically referred to the signatures in the

5  text messages, that you should date next to Yuri's signatures?

6  A.  Yes.

7  Q.  And so Rob told you that he was the one teaching the course

8  and Yuri was supervising it?

9  A.  Correct.

10 Q.  Rob also told you that Yuri wasn't there, right?

11 A.  After the fact, yes.

12 Q.  So he told you that Yuri was out of town and he was coming

13 back on August 3rd?

14 A.  Yes.

15 Q.  Okay.  He told you that he sent your paperwork to Yuri?

16 A.  Yes.

17 Q.  Okay.  And that Yuri would be reviewing the paperwork when

18 he got there?

19 A.  Correct.

20 Q.  When he got back in town.  Okay.

21     So that was all in the text messages, right?  Where you had

22 had that conversation, at least in part in the text messages,

23 right?

24 A.  Yes.

25 Q.  Okay.  You were previously interviewed by federal law

1    enforcement agents about this case, right?

2    A.   Yes.

3    Q.   About two or -- about three times, I believe?

4    A.   Yes.

5    Q.   Okay.  And that's prior to coming to court today?

6    A.   Yes.

7    Q.   And I think you testified about this on direct examination,

8    but you initially didn't discuss these text messages with the

9    federal agents, correct?

10   A.   I hadn't recalled them.

11   Q.   They had asked you about your question -- about your

12   conversations with Rob Pooley, though, right?

13   A.   Yes.

14   Q.   And your communication with him -- with Rob?

15   A.   Yes.

16   Q.   Okay.  They asked you to get any and all communications

17   with Rob?

18   A.   Yes.

19   Q.   And you didn't discuss any text messages at all?

20   A.   I believe I may have mentioned that I -- we had conversed

21   during text or over text.

22   Q.   You didn't discuss the conversations you had via text that

23   we just read?

24   A.   No.  I didn't have my phone anymore; so --

25   Q.   But you didn't discuss the contents of those text messages?

1    A.   I believe I may have mentioned that I spoke to him after

2    the fact, after the course.

3    Q.   After you were confronted with the text messages, your

4    story changed.

5         Prior to reviewing the text messages with the agents, you

6    told them about your conversations with Rob Pooley, right?

7    A.   Yes.

8    Q.   In February 2024 -- I want to take you back there -- you

9    told them about when you asked Rob Pooley about the status of

10   your paperwork.

11   A.   Okay.

12   Q.   Okay.  And you told them that Pooley didn't respond to you.

13   A.   Okay.

14   Q.   Is that your testimony, that you did tell them -- in

15   February 2024, that you told them Rob did not respond when you

16   asked about the paperwork?

17   A.   I don't recall.

18   Q.   Okay.  Would looking at a memorandum of the interview

19   refresh your recollection?

20   A.   Perhaps.

21   Q.   Okay.  Could you turn back there to Binder No. 5 and take a

22   look at Exhibit 2038.  And I can come back there -- that will

23   be defense Binder 5.  I can come back there and help.

24              MS. MCLOUGHLIN:  If I may approach, Your Honor?

25              THE COURT:  Yes.

1          MS. MCLOUGHLIN:  If you'll excuse me, I'm going to

2    get the same binder.

3    Q.  BY MS. MCLOUGHLIN:  So we're looking at a memorandum --

4          MS. LYDON:  Objection, Your Honor.  Refreshing

5    recollection is handing the document, saying, Did it refresh

6    your recollection, taking it back, and re-asking the question.

7          THE COURT:  I don't know about taking it back.

8       What did you want to show him?

9          MS. MCLOUGHLIN:  I wanted to point his attention

10   to --

11         THE COURT:  You mentioned 2038.  Is that the

12   document?

13         MS. MCLOUGHLIN:  Yes, Your Honor.

14         THE COURT:  Okay.  You want him to look at 2038?

15         MS. MCLOUGHLIN:  I would like him to look at

16   Exhibit 2038.  Thank you.

17         THE COURT:  Specifically, what was the question you

18   wanted to ask him as to whether it refreshed his recollection?

19   Q.  BY MS. MCLOUGHLIN:  You had testified -- I would like to

20   ask you whether, in your interview in 2024, you remember

21   telling agents that you had reached out to Rob Pooley about the

22   status of your paperwork and he just didn't respond to you.

23         THE COURT:  All right.  And do you remember that you

24   did or did not tell them that?

25         THE WITNESS:  I don't recall specifically.

1          THE COURT:  All right.  She wants you to look at this

2     Exhibit 2038, read it to yourself, and then tell us whether

3     that refreshes your recollection.

4        Now, we don't want to know what's in that document.  We

5     don't care.  We just want to know whether it refreshes your

6     recollection as to whether you told them that.

7          THE WITNESS:  I understand.

8          THE COURT:  All right.  So take whatever time you

9     need.

10          MS. MCLOUGHLIN:  Your Honor, I do have a portion I

11     could point to specifically.  It's a two-page document.

12          THE COURT:  All right.  Tell him where you want him

13     to look.

14          MS. MCLOUGHLIN:  If that would be helpful.

15     Q.  BY MS. MCLOUGHLIN:  On page 2 -- technically, it's the

16     sixth paragraph on that page.  It's just one sentence.

17          THE WITNESS:  I see it.

18          THE COURT:  Now, does that refresh your personal

19     recollection or not?

20          THE WITNESS:  It does.

21          THE COURT:  All right.  Go ahead.  Now you can ask,

22     What is your recollection?

23          THE WITNESS:  Um --

24     Q.  BY MS. MCLOUGHLIN:  So when -- in your interview in

25     February 2024, you told agents that when you asked Rob about

1    the paperwork, you never received a response from him.

2    A.  This was based on my recollection at the time, which did

3    not include recent review of the text messages --

4    Q.  Okay.

5    A.  -- that you provided.

6    Q.  Let's go back to another interview you did with federal

7    agents on this same topic.  And that was -- well, in March '21,

8    when you -- 2021, when you spoke to them, you also said -- they

9    also asked you about your conversations about the paperwork,

10   and you told them that Rob told you it would be coming soon.

11        Is that correct, what you told them in 2021?

12   A.  If you say so, yes.

13   Q.  Would it help --

14   A.  It --

15   Q.  Sorry.

16   A.  I imagine you're asking because that's what I said at the

17   time?

18   Q.  I could show you or you could look at another exhibit to

19   help refresh your recollection as to whether that was something

20   you said at the time, yes.

21   A.  Um --

22   Q.  Would you like to look at --

23   A.  I can do that.

24   Q.  Okay.  It's the same binder, Exhibit 2037.

25        Are you there?

1    A.  I am.

2    Q.  And if you could go to the second page.

3    A.  Okay.

4    Q.  And it is the fourth full paragraph, second and third

5    sentences.  You can look up whenever you're done.

6    A.  I'm not exactly certain what you're referring to.  Can you

7    approach and point it out to me?

8    Q.  Absolutely.

9            THE COURT:  You may.

10           THE WITNESS:  Okay.  I've read it.  I'm refreshed.

11           MS. MCLOUGHLIN:  Thank you.

12   Q.  BY MS. MCLOUGHLIN:  So in your statements to federal agents

13   in 2021, you also said that when you contacted Rob Pooley about

14   the paperwork, he just said it would be coming soon.

15   A.  Yes.

16   Q.  In reality, you had a whole conversation with Rob Pooley

17   about the paperwork.

18   A.  Yes.

19   Q.  Including the plan that Yuri would be reviewing the

20   paperwork.

21   A.  Yes.

22   Q.  When he got back in town.

23   A.  The statements were based off of my recollection at the

24   time without recalling the specifics of the text messages that

25   detailed those -- those things, which I hadn't seen in years.

1    Q.  Understood.

2    A.  Okay.

3    Q.  But you just didn't -- you didn't disclose to the agents

4    that you'd had a conversation with Rob Pooley about the fact

5    that Yuri Garmashov would be reviewing the paperwork?

6    A.  Not that specific detail.

7    Q.  Okay.  You testified today about asking Rob Pooley for a

8    refund.  We read that in the text messages as well.

9        And, actually, can we bring up that exhibit.  That's 32R,

10   Government's Exhibit.  Thank you.  I just want to have that up

11   there.

12       So when you were speaking with agents, they asked you about

13   whether you asked Rob Pooley for a refund for the price of the

14   course?

15   A.  Correct.

16   Q.  And when you interviewed with them, you said that he told

17   you to get in line because other skydivers were asking for

18   refunds?

19   A.  Something to that effect, yes.

20   Q.  And you showed them the Facebook message that we saw

21   earlier in your direct testimony saying, How about that refund?

22   A.  Yes.

23   Q.  You said that he never responded?

24   A.  Yes, to my -- yes.

25   Q.  As we know from the text message, though, Rob Pooley even

1    brought up having the refund -- or Rob Pooley brought up

2    potentially providing you with a refund.

3    A.  He responded to my request for a refund.

4    Q.  Can we go to the third page of 32R.  Can we zoom in.

5        This is your -- at the top here, we're looking at your

6    statement that you're upset, and then about an hour later, Rob

7    Pooley responds, I'm working on getting refunds to everyone.

8        Right?

9    A.  Yes.

10   Q.  And he's explaining that he's working on trying to get the

11   funds to refund everybody?

12   A.  Yes.

13   Q.  And we can zoom out of that.

14       My point is you had a much more extensive conversation

15   about all of this by text with Rob Pooley that you never

16   disclosed to agents.

17   A.  I didn't recall it.

18   Q.  And you didn't disclose it to the agents until you were

19   confronted with the text messages.

20   A.  Correct.

21   Q.  Okay.

22   A.  I didn't -- yeah.

23   Q.  In your interviews, you also discussed the paperwork that

24   you had received from Rob Pooley with the agents, correct?

25   A.  Yes.

1   Q.   That was the paperwork Rob had given you?

2   A.   Correct.

3   Q.   In both interviews, you said that you completed the

4   paperwork yourself?

5   A.   Yes.

6   Q.   And then you gave it to Rob Pooley?

7   A.   Correct.

8   Q.   And that you didn't get any copies of the paperwork

9   yourself?

10   A.   I had misremembered that.

11   Q.   Okay.  You said specifically -- you told agents

12   specifically that you thought it was weird that you didn't get

13   your paperwork.

14   A.   And that points to my misrecollection that I --

15   Q.   Understood.  Just a yes or no.

16   A.   Yes.

17   Q.   Okay.  You described it as a red flag that Rob asked for

18   the paperwork.

19   A.   Okay.

20   Q.   And then as we heard on direct testimony, you found the

21   paperwork while you were cleaning out, I think you said, some

22   of your -- your supplies or your gear.

23   A.   Correct.

24   Q.   And provided it to the government.

25   A.   Yes.

1    Q.  So while you were describing to the agents that it was

2    weird, or a red flag, that Rob Pooley had your paperwork, you

3    actually had it the whole time?

4    A.  I had misremembered.

5    Q.  Okay.  So this paperwork, again, you filled it out; you

6    give it back to Rob, right?

7    A.  I believe I e-mailed him scanned copies.

8    Q.  Okay.  With the understanding that he would be forwarding

9    it to the Parachute Association and to UPT?

10   A.  Correct.

11   Q.  You were insisting that he submit that paperwork to the

12   Parachute Association and to UPT?

13   A.  Yes.

14   Q.  Even though you knew it had Yuri Garmashov's signature on

15   it?

16   A.  Yes.

17   Q.  Even though you knew Yuri Garmashov was not at the drop

18   zone during your training?

19   A.  I did not know that he was not at the drop zone during my

20   training.

21   Q.  Even when you knew he was not part of your training in any

22   way?

23   A.  Um --

24   Q.  Let me rephrase that.

25       You knew that he was not present for your course physically

1   while you were in that course?

2   A.  It's a large drop zone.  People watch the skydiving from

3   afar.  And I was not specifically knowledgeable in the extent

4   to which supervision was defined.

5   Q.  You testified on direct that you did not see Yuri Garmashov

6   at all during your course, correct?

7   A.  I did not.  I was busy skydiving.

8   Q.  So you never got your ratings from Rob Pooley's course,

9   right?

10  A.  No.

11  Q.  Okay.  And that's because the Parachute Association started

12  an investigation into his paperwork and his tandem instructor

13  course, right?

14  A.  Um --

15  Q.  Well, let me rephrase that.

16      You understood that --

17  A.  No.

18  Q.  You understood that he had submitted the paperwork when he

19  was not a legitimate examiner, in your words?

20  A.  He had not submitted the paperwork.

21  Q.  He was conducting a course when he was not a legitimate

22  examiner, in your words in the text messages?

23  A.  Correct.

24  Q.  Okay.  Now, the Parachute Association, as you explained on

25  direct, provides ratings for skydivers to be able to skydive in

1    various capacities, right?

2    A.   Correct.

3    Q.   You said you had your coach rating?

4    A.   Yes.

5    Q.   And I believe also an AFFI or accelerated free fall

6    instructor rating?

7    A.   I got my AFFI rating after this incident.

8    Q.   So you still have your coach rating?

9    A.   It is not currently valid.

10   Q.   Okay.  And what about your AFFI?

11   A.   AFFI is also lapsed.

12   Q.   Okay.  So the Parachute Association is the body that

13   governs who can skydive, how and where, basically, at certain

14   drop zones?

15   A.   In the United States, yes.

16   Q.   Right.  And if you can teach courses to other skydivers?

17   A.   Yes.

18   Q.   And you testified that that's what you had been doing at

19   your local drop zone; you were a skydiver, teaching courses to

20   others, making money?

21   A.   After taking the tandem instructor course from Rob, yes.

22   Q.   Okay.  So if you didn't have those licenses, you would not

23   be able to skydive on your own, right?

24   A.   I don't understand the question.

25   Q.   I don't think I'm being clear.  I apologize.

1        So you have several ratings, several licenses -- you did at

2    that time in 2016, correct?

3    A.   Um --

4    Q.   Apart from the tandem instructor.

5    A.   I had a coach rating.  So you may be conflating ratings and

6    licenses.  So licenses are, like, a measure of skill or

7    experience.

8    Q.   Sure.

9    A.   And ratings are a certification to conduct certain things,

10   courses or actions.

11   Q.   Right.  So licenses allow you to skydive solo, though,

12   right?

13   A.   For --

14   Q.   Just on your own.

15   A.   For example, yes.

16   Q.   Okay.  And then other ratings would allow you to

17   participate in courses -- teach courses -- teach other

18   skydivers things?

19   A.   Correct.

20   Q.   And make money off of those courses?

21   A.   Theoretically, yes.

22   Q.   Okay.  And if you don't have your license -- an A, B, C, or

23   D license or -- if you don't have a license from the Parachute

24   Association, you can't skydive?

25   A.   Incorrect.

1  Q.  Okay.

2  A.  So you can -- an A license, which is the first license, the

3  lowest level license -- I can explain this if you need it --

4  that can be attained at 25 skydives.  And all that enables you

5  to do is jump with other people.  I know skydivers that have

6  thousands of skydives that never bothered to get their A

7  license because they just like to jump by themselves.

8  Q.  So did you -- you were relying on your license to be a

9  videographer, though, correct?

10  A.  Yes.

11  Q.  Okay.  And make the money that you were making being a

12  videographer?

13  A.  Correct.

14  Q.  I guess my point is that these ratings are important to

15  you.  Apart from the tandem instructor ratings, these other

16  ratings are important to you, right?

17  A.  Yes.

18  Q.  Okay.  You need to keep those ratings in order -- well, I

19  guess they've lapsed now, but at the time, you needed to keep

20  those ratings to do what you were doing to work at your local

21  drop zone?

22  A.  I can shoot video with a D license.

23  Q.  Okay.

24  A.  And you can't lose a D license.

25  Q.  Okay.

1    A.  So no.

2    Q.  You wouldn't want the Parachute Association or UPT to know

3    that your applications had false statements in them, would you?

4    A.  No.

5    Q.  Okay.  And you knew that these applications had false

6    statements?

7    A.  I did not understand them to be false.

8    Q.  You want to remain in good standing with the Parachute

9    Association?

10   A.  Sure.

11            MS. MCLOUGHLIN:  Okay.  No further questions.

12            THE COURT:  Any redirect?

13            MS. LYDON:  Yes, briefly.

14                      REDIRECT EXAMINATION

15   BY MS. LYDON:

16   Q.  Just a few things.

17       So when agents first contacted you, did you generally

18   recall that you may have had text exchanges with Mr. Pooley?

19   A.  Yes.

20   Q.  And did you check your phone and see if you still had them?

21   A.  I did.

22   Q.  Did you?

23   A.  I did not.

24   Q.  Okay.  Did you describe to agents what you remembered, in

25   sum and substance?

1    A.  I did.

2    Q.  And then when you looked at the text messages a few weeks

3    ago, did they refresh your recollection?

4    A.  Yes.

5    Q.  And could you then provide more detail and elaborate on

6    those conversations?

7    A.  Yes.

8    Q.  All right.  And have you testified today to what you

9    recall?

10   A.  I have.

11   Q.  And did you tell agents what you could recall in each

12   interview?

13   A.  I have.

14   Q.  Were you honest?

15   A.  Yes.

16   Q.  Were you honest today?

17   A.  Yes.

18   Q.  You also looked for Facebook messages; is that right?

19   A.  I did.

20   Q.  And did you provide those to agents?

21   A.  I did.

22   Q.  Okay.  Did you look for e-mails?

23   A.  I did.

24   Q.  Did you find any of those?

25   A.  I did not.

1    Q.   Okay.  The defense attorney questioned you --

2    Ms. McLoughlin questioned you regarding the -- your comment

3    that Rob Pooley submitting the paperwork himself was a red

4    flag.  Was that something you pieced together in hindsight, or

5    was that something that you thought at the time?

6    A.   I think it was a hindsight thing.

7    Q.   Because at the time that you made that statement, had you

8    found those documents?

9    A.   I had not.

10   Q.   And did you think that Rob Pooley had submitted them -- had

11   said he would just submit them himself?

12   A.   Yes.

13   Q.   Okay.  So was that a reflection based on your memory at the

14   time?

15   A.   It was.

16   Q.   And now is your memory a bit refreshed by those text

17   messages?

18   A.   Yes.

19   Q.   Okay.  The -- what was the first time that you knew that

20   Yuri Garmashov's signatures were on the USPA and UPT paperwork

21   in connection with the class?

22   A.   When he handed them to me on the last day of my course,

23   after we were done jumping.

24   Q.   When you reached out to Rob Pooley about a tandem

25   instructor course, who did you believe would teach that tandem

1    instructor course?

2    A.   Rob Pooley himself.

3    Q.   Did you believe he was a certified, rated, current USPA and

4    UPT tandem examiner?

5    A.   I did.

6    Q.   Did he say anything to dissuade you of that view?

7    A.   No, he did not.

8    Q.   And had he previously certified you, as an examiner, in

9    your coach course?

10   A.   Yes, he had.

11   Q.   So as far as you knew, he knew you believed him to be an

12   examiner?

13   A.   Yes.

14   Q.   And did he know you were looking for ratings?

15   A.   Yes.

16   Q.   And then when you drove to Parachute Center, did you

17   believe him to be an examiner?

18   A.   I did.

19   Q.   Did you believe he would be signing the paperwork?

20   A.   I did.

21   Q.   And when you handed him $1100 in cash, why did you do that?

22   A.   Because I trusted Rob as a mentor, somebody that had helped

23   me become a, in my opinion, very talented and skilled skydiver,

24   and I had no reason to think that he wouldn't be -- that he

25   would lie to me.

1          MS. MCLOUGHLIN:  Your Honor, objection.  I believe

2     that mischaracterized the testimony.  I don't believe he

3     testified that he gave Rob Pooley $1100 cash.

4          THE COURT:  Well, I think he did, but I -- that's up

5     to the jury to -- to recall.

6     Q.  BY MS. LYDON:  Did Rob Pooley tell you to bring $1100 cash

7     to take his tandem instructor course?

8     A.  He did.

9     Q.  And then did you hand him about $600 of that cash?

10    A.  Thereabouts, yes.

11    Q.  Did you give the rest to Bill Dause?

12    A.  I did.

13    Q.  You explained just a minute ago why you gave him that

14    money, because you trusted him.

15         Could you describe a little bit more about the experiences

16    that led you to believe that he wouldn't lie to you?

17    A.  Like I said, he'd in no small way, and in ways that I'm

18    still grateful for despite all this, helped me become a

19    professional skydiver and a skilled one at that.  And in

20    much -- much faster, you know, than if I had been on my own

21    to -- to collect the -- the skills and the knowledge.

22    Q.  And then in that course, again, was he in a position to

23    teach you how to use an unfamiliar rig to jump out of a

24    plane --

25         MS. MCLOUGHLIN:  Objection, Your Honor.  Leading.

1              THE COURT:  Sustained.  Argumentative.

2    Q.  BY MS. LYDON:  Were you relying on and trusting Rob Pooley

3    again with respect to that course?

4    A.  Yes.

5    Q.  Is your relationship with Rob Pooley such that you would

6    think that he would tell you --

7              MS. MCLOUGHLIN:  Objection, Your Honor.  Leading.

8              THE COURT:  I think I know what you're going to ask,

9    and I think it's already been asked.

10             MS. LYDON:  I guess I'll ask a separate question.

11   Q.  BY MS. LYDON:  Setting aside your relationship with Rob

12   Pooley, which you just described as trusting, how about any

13   examiner running a tandem course, is that a relationship --

14             MS. MCLOUGHLIN:  Objection, Your Honor.

15   Q.  -- characterized by trust?

16             MS. MCLOUGHLIN:  This is outside the scope of

17   cross-examination.

18             THE COURT:  Sustained.

19   Q.  BY MS. LYDON:  So when you showed up and handed him

20   $1100 -- you handed him $600 and the rest of it -- 6 or 700 and

21   the rest of it to Dause, you believed he was a tandem examiner,

22   right?

23   A.  Yes.

24   Q.  And then when you jumped out of planes at least ten times

25   with him --

```
1              MS. MCLOUGHLIN:  Objection, Your Honor.  Asked and
2    answered.
3              MS. LYDON:  No.
4    Q.  -- did you believe that he was a tandem examiner?
5    A.  I did.
6    Q.  When was the first time -- when he handed you that
7    paperwork with Yuri Garmashov's signature on it, at that point,
8    did you still believe he was a tandem examiner?
9              MS. MCLOUGHLIN:  Objection, Your Honor.  Asked and
10   answered.
11             THE COURT:  It is.  But -- you know, I wasn't going
12   to interject here, but since you just keep going over and over
13   it again, I think this needs to be clarified for my
14   understanding, if not for the jury.
15        If it turns out that he actually had all the paperwork
16   himself and Mr. Pooley never had it, how could he have thought
17   at the time that Mr. Pooley had turned it over to Bill or had
18   done all these other things or even intended to submit it for
19   approval, if, in fact, he had it at the time?
20             MS. LYDON:  I'll clarify that, Your Honor.
21             THE COURT:  All right.
22   Q.  BY MS. LYDON:  Who handed you the paperwork?
23   A.  Rob Pooley.
24   Q.  And what did he tell you to do with it?
25   A.  Complete it.
```

1    Q.  And then do what with it?

2    A.  I e-mailed it to him.

3    Q.  And then what did you believe he was going to do with it

4    after you e-mailed it back to him?

5    A.  I believed that he was going to print it out and submit it.

6              THE COURT:  Okay.  So you didn't e-mail it to him?

7              THE WITNESS:  I did e-mail it to him, yes.

8              THE COURT:  So there are two copies of this?

9              THE WITNESS:  Correct.

10              THE COURT:  Okay.

11   Q.  BY MS. LYDON:  And did Pooley again tell you in that text

12   message that he was going to submit it?

13   A.  Yes.

14   Q.  When was the first time you realized with certainty that he

15   wasn't a valid tandem examiner?  The date, not the event.

16   A.  I'm not entirely sure of the date, but shortly after the

17   course.  Within a couple weeks, I'd say.

18   Q.  Was it around the time of that text --

19              THE COURT:  I really don't see what difference it

20   makes.  I thought you were finished.  And you just -- I -- you

21   know, you don't have to go to 4:30.  I just want you -- make

22   sure you know that.  But it sounds like you're just going over

23   these things.  I don't see what difference it makes, when he

24   found out.

25              MS. LYDON:  Here is my last question.

1             THE COURT:  All right.

2  Q.  BY MS. LYDON:  Had you already given him the money, taken

3  the course, sent in the paperwork --

4             MS. MCLOUGHLIN:  Objection.  Leading --

5  Q.  -- at the time that you --

6     (Crosstalk.)

7             THE COURT:  Hold it.  Hold it.  This is

8  argumentative.  Unless you have a question you haven't asked

9  that isn't argumentative, that isn't just filling up time, sit

10 down.

11            MS. LYDON:  All right.  I don't -- one moment.

12    I think we're finished.  Thank you, Mr. North.

13            THE COURT:  Anything further?

14            MS. MCLOUGHLIN:  Yes, Your Honor, briefly.  Thank

15 you.  I'll be brief.

16                    RECROSS-EXAMINATION

17 BY MS. MCLOUGHLIN:

18 Q.  You just said that you had a copy of the paperwork yourself

19 and you had scanned and e-mailed another copy to Rob Pooley.

20 A.  Yes.

21 Q.  Okay.  And didn't you also say that you had looked through

22 your e-mails to see if you had any correspondence with Rob

23 Pooley and you didn't find any?

24 A.  Yes.

25            MS. MCLOUGHLIN:  Okay.  Thank you.

1          THE COURT:  All right.  So, ladies and gentlemen,

2    this is the end of the day.  This is the end of the week.

3          Sometimes jurors ask me how to conduct themselves when they

4    have a longer delay, to make sure that they don't forget the

5    testimony they've heard at trial and also to make sure that

6    they comply with the Court's admonition.  My answer is that

7    it's simpler than you think.  You just put this case on the

8    back burner and don't think about the case.  That will prevent

9    you from talking about the case or looking up information about

10   the case or doing anything else that you shouldn't do.  But

11   don't forget the fact that you are a juror.  And if you do

12   that, you will remember the admonition, and you won't forget.

13   Because when you come back in Monday morning at 9 o'clock and

14   resume with the trial, believe me, it all comes back to you.

15         So you may leave your books on your seats.  Nobody will

16   bother them.  They'll be here when you come back in Monday

17   morning.

18         Be sure to be on time.  We'll start on time.  Have a nice

19   weekend.  Remember the admonition.

20         (Jury not present, 4:10 p.m.)

21         THE COURT:  All right.  Mr. North, you're excused.

22   Thank you for coming.

23         THE WITNESS:  Thank you.

24         THE COURT:  Counsel, have you discussed and disclosed

25   who your witnesses are for Monday?

1            MS. LYDON:  The first witness will be Fabricio

2    Palomino.  We are going to figure out the rest of the witnesses

3    and disclose it to defense.

4            THE COURT:  All right.  Well, I don't want to hear,

5    when you come in here Monday morning, that you're not ready to

6    go or that you need some discussion.

7        So is there anything right now that we should be discussing

8    so that we don't have any delays tomorrow -- Monday morning?

9            MS. LYDON:  Nothing known to the government, Your

10   Honor.

11           MS. CRAGER:  Not that I'm aware of right now, Your

12   Honor.

13           THE COURT:  All right.  Well, I'm not going to order

14   a transcript of that, but I'm going to keep it in my mind.

15       Have a nice weekend.  We'll see you Monday morning.

16               (Proceedings adjourned, 4:11 p.m.)

17                        ---oOo---

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20

21                    /s/ Kimberly M. Bennett
                      KIMBERLY M. BENNETT
22                    CSR No. 8953, RPR, CRR, RMR

23

24

25