```
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2

 3      United States of America,
                Plaintiff,
 4

        vs.                             Sacramento, California
 5                                      No. 2:21-cr-00111
        Robert Allen Pooley,            Monday, May 20, 2024
 6              Defendant.              9:01 a.m.
        _____/
 7
                           TRANSCRIPT OF JURY TRIAL
 8         BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
                            ---oOo---
 9

10      APPEARANCES:

11       For the Plaintiff:            United States Attorney
                                       501 I Street, Suite 10-100
12                                     Sacramento, California  95814
                                       By:  Katherine Lydon
13                                     Dhruv M. Sharma
                                       Assistants U.S. Attorney
14

15       For the Defendant:            Office of the Federal
                                       Defender
16                                     801 I Street, 3rd Floor
                                       Sacramento, California  95814
17                                     By: Mia Crager
                                       Meghan McLoughlin
18                                     Assistants Federal Defender

19

         Official Court Reporter:      Kimberly M. Bennett,
20                                     CSR, RPR, RMR, CRR
                                       501 I Street
21                                     Sacramento, CA 95814

22

23      Proceedings recorded by mechanical stenography, transcript
        produced by computer-aided transcription
24

25
```

INDEX

GOVERNMENT WITNESSES:                                    PAGE:


GONZALO FABRICIO PALOMINO BENITEZ
DIRECT EXAMINATION BY MR. SHARMA.................... 5
CROSS-EXAMINATION BY MS. CRAGER..................... 47
REDIRECT EXAMINATION BY MR. SHARMA................. 66
RECROSS-EXAMINATION BY MS. CRAGER.................. 79

PETER SWAN
DIRECT EXAMINATION BY MS. LYDON.................... 81
CROSS-EXAMINATION BY MS. MCLOUGHLIN................ 94
REDIRECT EXAMINATION BY MS. LYDON................. 104

DAVID JENSEN
DIRECT EXAMINATION BY MR. SHARMA.................. 106

KYUNG KEUM
DIRECT EXAMINATION BY MS. LYDON................... 114
CROSS-EXAMINATION BY MS. MCLOUGHLIN............... 166

BOBBI LEWIS
DIRECT EXAMINATION BY MS. LYDON................... 174
CROSS-EXAMINATION BY MS. MCLOUGHLIN............... 185

MICHAEL PIERCE
DIRECT EXAMINATION BY MS. LYDON................... 187
CROSS-EXAMINATION BY MS. MCLOUGHLIN............... 196

REGGIE LEE
DIRECT EXAMINATION BY MS. LYDON................... 198

1    GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

2    NO.:                                                    PAGE:

3
     21.............................................13
4    2..............................................16
     3..............................................20
5    25.............................................23
     24.............................................31
6    614, PAGES 8, 9, 10, 16, 20....................52
     20R............................................71
7    22R............................................73
     807............................................87
8    809............................................88
     808, 810, 831..................................89
9    5.............................................108
     1100..........................................144
10   1102, 1103, 1104..............................148
     1105..........................................151
11   1110..........................................162
     1111..........................................164
12   1112..........................................165
     1106C.........................................176
13   1107..........................................176
     18............................................183
14   1108C.........................................189
     1109..........................................195
15   830...........................................201
     821, 822, 823, 824, 826.......................202
16   1303..........................................202
     500...........................................207
17   501-519.......................................209
     205, 206, 207, 209, 210, 213, 216, 218........218
18   217, 211, 214.................................224

19

20

21

22

23

24

25

 1          (Call to order of the court, 9:01 a.m.)

 2              THE COURT:  Good morning.  I think she said we're

 3   just waiting on one juror.

 4              MS. LYDON:  May I -- one thing?

 5              THE COURT:  No.  We're ready.

 6              MS. LYDON:  Okay.

 7          (Jury present, 9:02 a.m.)

 8              THE COURT:  Good morning, ladies and gentlemen.

 9       Everyone is present.  The jurors are all present.

10   Defendant is present with counsel.

11       The government may call its next witness.

12              MR. SHARMA:  Thank you, Your Honor.  Government calls

13   Fabricio Palomino.

14              THE CLERK:  Sir, please step forward, all the way

15   forward to your right, up here to the witness stand.

16       Please remain standing.  Face me.  Raise your right hand.

17          (The Witness, GONZALO FABRICIO PALOMINO BENITEZ, is sworn.)

18              THE WITNESS:  Yes.

19              THE CLERK:  Thank you.  You may be seated.

20       Sir, please state your full name and spell your name for

21   the record.

22              THE WITNESS:  Gonzalo Fabricio Palomino Benitez.

23   G-O-N-Z-A-L-O F-A-B-R-I-C-I-O P-A-L-O-M-I-N-O B-E-N-I-T-E-Z.

24   ///

25   ///

```
 1                           DIRECT EXAMINATION

 2   BY MR. SHARMA:

 3   Q.  Good morning, Mr. Palomino.

 4   A.  Good morning.

 5   Q.  Sir, where do you live?

 6   A.  In Baja California.

 7   Q.  In Baja California?

 8   A.  Yes.

 9   Q.  Let's start with why you're here.

10       In 2016, did you take a tandem instructor certification

11   course where Rob Pooley was an examiner?

12   A.  Yes.

13   Q.  We'll come back to Mr. Pooley.  But let's start with your

14   background in skydiving.

15       Are you a skydiver?

16   A.  Yeah.

17   Q.  Do you skydive recreational or work or both?

18   A.  Both.  Recreation and work.

19   Q.  Okay.  How many jumps have you done in your career?

20   A.  (Inaudible.)

21               THE COURT REPORTER:  I'm sorry.  What was that?

22               THE WITNESS:  More than 10,000.

23               MR. SHARMA:  Just move the mic a little closer to

24   your mouth.

25               THE COURT REPORTER:  And, Counsel, if you could slow
```

1    down, that would be helpful.

2              MR. SHARMA:  Sure.  Thank you.

3    Q.  BY MR. SHARMA:  More than 10,000, you said?

4    A.  Yes.

5    Q.  And were those tandem jumps or solo jumps?

6    A.  Like, a thousand is, like, fun jumps, and the others is

7    tandem.

8    Q.  So almost 9,000 tandem jumps?

9    A.  Yeah.

10   Q.  Could you tell the jury what you do for work?

11   A.  I own --

12             THE COURT REPORTER:  I'm sorry.  I didn't understand.

13             THE WITNESS:  I own Skydive Baja.  It's a drop zone

14   down there in Ensenada in Baja California.

15   Q.  BY MR. SHARMA:  And what is Skydive Baja?

16   A.  It's a jump business where you -- where people get -- go

17   there and get -- to get into an airplane and jump, attached to

18   a tandem instructor, and go skydive.

19   Q.  So you own a business that does -- that offers tandem jumps

20   to the public?

21   A.  Yes.

22   Q.  Okay.  How long have you owned it?

23   A.  It's going to be 14 years this summer.

24   Q.  14 years?

25   A.  Yeah.

1    Q.   So in 2016, you owned it at that time as well?

2    A.   Yeah.

3    Q.   Do you skydive for work anywhere else?

4    A.   Yeah.  Other parts in the world.  Central/South America,

5    Europe, Japan.

6    Q.   So skydiving is, essentially, your career?

7    A.   Yes.

8    Q.   At Skydive Baja, how many people work for you?

9    A.   Five.

10   Q.   And are they -- are they tandem jumpers?

11   A.   Yeah.  Two tandem instructors, manifest, and, like, a

12   general help, ground support and a team person.

13   Q.   Now, the people that work for you -- let me start with

14   this.

15        Are they -- are you a USPA/UPT tandem instructor?

16   A.   Yes, I am.

17   Q.   And are the people that work for you USPA/UPT tandem

18   instructors?

19   A.   Yes, they are.

20   Q.   Is it important for you and for your employees to be

21   USPA/UPT tandem instructors?

22   A.   Yeah.  Well, in -- it's good to mention that in Mexico,

23   there is no regulations about skydiving, but we try to keep

24   with the USPA and UPT regulations because it's, like, the best

25   skydiving organization in the world.  So we follow their

1    regulations, and that's why I ask the tandem instructors to

2    have their ratings through UPT and USPA.

3    Q.  Okay.  There is no regulations in Mexico at all?

4    A.  No.

5    Q.  But you still require both for yourself and your employees

6    to have USPA/UPT ratings?

7    A.  Yes.

8    Q.  And why is that?

9    A.  Because it's -- it's -- it's certification that's

10   recognized worldwide.  And we can tell our customers that we

11   are UPT and USPA rated.  And they -- that builds, like, a

12   confidence of what -- with who they are jumping with.

13   Q.  Builds confidence for the customers?

14   A.  Customers.

15   Q.  Okay.  And how does that help your business?

16   A.  Just, like, you have, like, a -- like, that makes you more

17   legit and secure for them.

18   Q.  Okay.  Does that generate more business for you?

19   A.  Yes.

20   Q.  Do you advertise that to the public?

21   A.  Yes, I do.  I always put that our instructors are USPA and

22   UPT rated.

23   Q.  Okay.  Let's go back in time to 2016 now.

24   A.  Okay.

25   Q.  Did you have your USPA/UPT tandem instructor rating at that

1    point?

2    A.   In 2016, no.  I was looking after to get the ratings.

3    Q.   Yeah.

4    A.   So I start searching in different groups where to go get

5    it.

6    Q.   Why did you want your USPA/UPT tandem instructor rating in

7    2016?

8    A.   Because you are rated, you're allowed to jump in many drop

9    zones around the world.  It opens doors for you to visit new

10   places and do jumping.

11   Q.   And the different drop zones, does that open chances for

12   you to make more money?

13   A.   Yes.  For sure.

14   Q.   And how would you make that money by?

15   A.   Jumping.

16   Q.   With customers?

17   A.   Yeah.

18   Q.   Is there a safety benefit to getting a USPA/UPT tandem

19   instructor rating?

20   A.   Well, the training program is pretty solid.  And it has

21   been, like, mastering, like -- year in, year in, they keep

22   adding things to it to keep it safe.  And you can tell that,

23   like --

24   Q.   So --

25   A.   It keeps you -- yeah, it's a safe training.

1    Q.   Okay.  Now in 2016, when you were looking around for a

2    course, what was your understanding of what you needed to get a

3    USPA/UPT tandem instructor rating?

4    A.   Well, you need to find an examiner -- like, a

5    USPA/UPT-rated examiner who can conduct your ground school,

6    then your jumps.  And then you need to do more jumps with

7    experienced skydiver, like, D license.  And then, yeah, fill

8    out the paperwork and file it in.  That's it.

9    Q.   You mentioned an examiner.  What was your understanding of

10   what an examiner does?

11   A.   An examiner is this person that has the ratings to -- and

12   the knowledge to teach other skydivers to become tandem

13   instructors and certified by USPA and UPT.

14   Q.   Okay.  And is it important that you take a USPA/UPT tandem

15   instructor course with a certified examiner?

16   A.   Yeah.  If he's not or she is not a certified, no matter.

17   Jumps, ground school, everything will be, like, useless.

18   Q.   Why would it be useless?

19   A.   Because they cannot sign you off.

20   Q.   Got it.  And if they can't sign you off, can you get your

21   ratings?

22   A.   No.

23   Q.   So you said you decided to look -- look for drop zones that

24   were offering this course?

25   A.   Yeah.

1   Q.   Did you find any?

2   A.   There are several.  But I contact my friend Sergii.  He

3   was -- he used to work for me in Skydive Baja, and I know that

4   he was jumping in Lodi.  So I'm -- ask if there was an examiner

5   there so I can go there and do it, like, fast, because I had a

6   lot of work I had starting the summer; so I wanted to be rated

7   -- USPA rated.

8   Q.   Okay.  So you wanted to get your rating quickly because it

9   was the summer?

10  A.   Yeah.

11  Q.   That means you could do more jumps in the summer?

12  A.   Yeah.  We have a lot.

13  Q.   So your friend -- Sergii was his name?

14  A.   Sergii Osalech.

15  Q.   And he told you that you could come to Lodi?

16  A.   Yes.

17  Q.   Was he doing the same course in Lodi?

18  A.   No.  He was already a TI.

19  Q.   He was already a tandem instructor?

20  A.   Yes.

21  Q.   Did he get his tandem instructor from Lodi?

22  A.   I don't know, but when he worked for me, he was already

23  rated.  I don't know where he take -- got his.

24  Q.   Did you know anyone else who had done a tandem instructor

25  course at Lodi?

1    A.   I met with Amador Malinas and Carlos Obaid, Chilean, and

2    Fabian.  Yeah.  We're a small community, skydivers, you know.

3    You know one, you know a hundred.

4    Q.   Okay.  So is -- the Parachute Center in Lodi, does it -- is

5    it well-known in the skydiving community?

6    A.   It's known for being accessible.

7    Q.   What do you mean by "accessible"?

8    A.   Like, lower prices.

9    Q.   Got it.  Now, at the time before you -- before you went to

10   Lodi, did you already have USPA/UPT certifications?

11   A.   Yeah.  I had just my D license and my coach rating.

12   Q.   And how did you get your D license and coach rating?

13   A.   I did it in Skydive San Diego.

14   Q.   That's a different drop zone?

15   A.   Yes.

16   Q.   And who taught you the coach course?

17   A.   Jay Stokes.

18   Q.   Okay.  Was he an examiner?

19   A.   Yes.

20   Q.   And did he sign off on your paperwork?

21   A.   Yes.

22   Q.   Did you contact the Parachute Center?

23   A.   Yeah, I sent an e-mail to -- I went through the webpage and

24   I sent a e-mail to Parachute Center, to Bill -- Bill Dause, the

25   owner -- the drop zone owner asking how much, when, and how

1    many time will take to get my training.

2    Q.  You sent an e-mail?

3    A.  Yeah.

4    Q.  Turning to Exhibit 21 in your binder right there.  Do you

5    recognize that document in front of you?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's an e-mail from my e-mail address to Parachute Center.

9    Q.  That's your e-mail address on it?

10   A.  Yes.

11   Q.  Is this a copy of -- did you forward this e-mail to Special

12   Agent Reggie Lee?

13   A.  Yeah, I did.

14          MR. SHARMA:  Your Honor, government moves to enter

15   Exhibit 21 into evidence.

16          MS. CRAGER:  No objection.

17          THE COURT:  Exhibit 21 is received in evidence.

18      (GOVERNMENT'S EXHIBIT 21 ADMITTED INTO EVIDENCE.)

19   Q.  BY MR. SHARMA:  All right.  Let's talk about this e-mail

20   here.

21      All right.  So this is -- this is an e-mail from

22   skydivebajamx@gmail.com.

23      Do you recognize that e-mail?

24   A.  That's my company e-mail.

25   Q.  Your company e-mail address.

1          Is the date there 28 June, 2016?

2     A.   Yes, it is.

3     Q.   And the subject, is it Tandem Ratings?

4     A.   Yes.

5     Q.   And then the e-mail to parachute -- it says

6     paractr@softcom.net.  Is that the e-mail you got for the

7     Parachute Center?

8     A.   That's the e-mail on the webpage.

9     Q.   And in the e-mail, you say --

10              THE COURT REPORTER:  I'm sorry.  Counsel, please.

11              MR. SHARMA:  I'm sorry.

12    Q.   BY MR. SHARMA:  In the e-mail body, you say, I want more

13    info about getting my tandem ratings with you guys.

14         Can you explain what you meant by that?

15    A.   I wanted to see if they have an examiner available so I can

16    go there to Lodi and do the jumps -- well, the training and the

17    jumps.

18    Q.   Now, in the skydiving community, is the phrase "tandem

19    ratings" understood by everyone?

20    A.   Yes.

21    Q.   Is it understood to mean that it's USPA/UPT ratings?

22    A.   Yeah.  Well, in the US, it's just the only ratings you can

23    have, from USPA and UPT.  There are different countries, like

24    Europe or Australia, but if you're in the states, it's USPA and

25    UPT, the only that can certify you as a TI.

1    Q.  Because you're e-mailing a company in the US, did you

2    understand that the phrase "tandem rating" would mean USPA/UPT

3    tandem ratings?

4    A.  Yes.

5    Q.  And so you tell them in the e-mail that you're planning to

6    get to Lodi on July 6th.

7        Had you already planned your trip by that point?

8    A.  No.  I was looking ahead of my schedule because I had that

9    week off.  So I had that time to go there during the weekdays,

10   do the jumping, and come back home and keep working.  So it was

11   a good time to get it done.

12   Q.  And you mentioned you wanted to do it quickly so you could

13   come back and --

14   A.  And keep working.

15   Q.  -- keep working.

16       And then you ask a series of questions.  You say, How many

17   days it will take me to finish my training, which examiners you

18   have, and what is the cost of the full program, right?

19   A.  Yes.

20   Q.  Okay.  And where were you when you sent this e-mail?

21   A.  Ensenada.

22   Q.  In Mexico?

23   A.  Yeah.

24   Q.  Did you receive a response to this e-mail?

25   A.  Yes.

1    Q.   And who did you get that response from?

2    A.   Rob Pooley.

3    Q.   Can I turn you now to Exhibit 2 in the binder.

4    A.   2?

5    Q.   Yeah.

6    A.   Yes.

7    Q.   Do you recognize that document?

8    A.   Yes.

9    Q.   What is it?

10   A.   It's an e-mail from Rob Pooley to Skydive Baja.

11   Q.   Is that an e-mail you received from Mr. Pooley?

12   A.   Yes.

13          MR. SHARMA:  Your Honor, government moves to enter

14   Exhibit 2 into evidence.

15          MS. CRAGER:  No objection.

16          THE COURT:  Exhibit 2 is received in evidence.

17      (GOVERNMENT'S EXHIBIT 2 ADMITTED INTO EVIDENCE.)

18   Q.  BY MR. SHARMA:  Okay.  So let's look at the caption page.

19      The e-mail is from Rob at rpooley75@gmail.com?

20   A.   Yes.

21   Q.   Had you exchanged any e-mails with Rob Pooley before?

22   A.   No.  This was the first time.

23   Q.   It's sent June 29, 2016.

24      Is that the date after you sent your e-mail to Parachute

25   Center?

1   A.  Yes.

2   Q.  And that's your -- skydivebajamx is your e-mail address?

3   A.  Yes.

4   Q.  And it says, Tandem Course Lodi?

5   A.  Yep.

6   Q.  Okay.  Then in the body of the e-mail -- all right.

7       So you get -- Mr. Pooley tells you how many days it will

8   take -- take two days if you don't waste time doing practice

9   jumps, right?

10  A.  Yes.

11  Q.  And then he gives you the cost of the course.

12      How much was the cost of the course?

13  A.  $1100.

14  Q.  Tells you if you need a coach course, it will take another

15  two days and cost $250?

16  A.  Yes.

17  Q.  And then you must have your airman's medical done?

18  A.  Yes.

19  Q.  What is that?

20  A.  It's, like, a FAA medical certificate for conducting

21  tandem, Class 3.

22  Q.  Is that something you need in Mexico?

23  A.  No.

24  Q.  Can you get it in Mexico?

25  A.  Yes.

1   Q.  And then he says, If you have any more questions, e-mail me

2   directly, right?

3   A.  Yep.

4   Q.  And then, Look forward to seeing you on the 6th?

5   A.  Yeah.

6   Q.  And where were you located when you got that e-mail?

7   A.  Ensenada.

8   Q.  What was your understanding, from this e-mail, about what

9   he was offering you?

10  A.  He was going to be my tandem examiner and was going to

11  conduct our -- my jumps and training.

12  Q.  And when he said, E-mail me directly, did that help your

13  understanding that he was your examiner?

14  A.  Yeah.  Instead of sending the mail --

15          MS. CRAGER:  I'm sorry.  Objection.  Leading.

16          THE COURT:  Sustained.

17  Q.  BY MR. SHARMA:  Did you trust his representations in this

18  e-mail?

19  A.  Yes.

20  Q.  Is there a level of trust among skydivers?

21  A.  Yeah.  It's, like, a -- it's, like, a small community, and

22  we know each other; so we'd be able to, like --

23  trustworthiness, friendship, relationship, all the time.  And

24  so yeah.  We take care of each other every time we get into an

25  airplane.  That's how it works.

1    Q.  And can you speak to that level of trust with respect to

2    examiners?

3    A.  Well, you --

4              MS. CRAGER:  Objection.  Vague.

5              THE COURT:  Sustained.

6    Q.  BY MR. SHARMA:  You talked about a level of trust in the

7    community.

8    A.  Yes.

9    Q.  Does that extend to the examiners in the community?

10   A.  Yes.

11   Q.  Do you trust your examiners?

12   A.  Yes.

13   Q.  From that e-mail, was it your understanding that if you

14   went to Lodi -- what was your understanding of what would

15   happen if you went to Lodi?

16   A.  That when I get there, I was going to be trained by Rob,

17   and my jumps, and be back by the end of the weekend so I can

18   keep jumping back at home.

19   Q.  And that you would get your ratings?

20   A.  Yes.

21   Q.  So based on this e-mail, did you decide to go to Lodi?

22   A.  Yes.

23   Q.  Did you contact Rob Pooley by e-mail again before you began

24   your journey?

25   A.  I think I -- we sent another e-mail.  I think he sent me

1    his phone number, and then we start texting.

2    Q.  So let me turn to Tab 3 in your binder.

3        Do you recognize that document?

4    A.  3?

5    Q.  Yeah.

6    A.  Yes.

7    Q.  What is it?

8    A.  It's another e-mail.

9    Q.  Okay.  So -- it's two pages, right?

10   A.  Yes.

11   Q.  So is this an e-mail chain?

12   A.  Yes.

13   Q.  And who is it between?

14   A.  Rob Pooley and me.

15          MR. SHARMA:  Government moves to enter Exhibit 3 into

16   evidence.

17   A.  Say again?

18          MS. CRAGER:  No objection, Your Honor.

19          THE COURT:  Exhibit 3 is received in evidence.

20      (GOVERNMENT'S EXHIBIT 3 ADMITTED INTO EVIDENCE.)

21   Q.  BY MR. SHARMA:  I'm going to focus you on page 2 of the

22   exhibit, please.

23      So right here at the bottom, is that the first e-mail that

24   we discussed?

25   A.  Yes.

1   Q.  The one that you got from Rob Pooley?

2   A.  Yes.

3   Q.  Okay.  And then the e-mail right above that --

4       We can just get the date on there, too, please.  Thank you.

5       All right.  So this is an e-mail dated July 4, 2016?

6   A.  Yes.

7   Q.  And that's from your e-mail address, skydivebajamx?

8   A.  Yes.

9   Q.  And you send it to Rob Pooley?

10  A.  Yes.

11  Q.  And you tell him you're on your way to Lodi, right?

12  A.  Yes.  I was on my way to Lodi.

13  Q.  Can I get my airman's medical in Sacramento?

14  A.  Yeah, because the -- the -- the --

15          THE COURT REPORTER:  I'm sorry.  I didn't understand.

16          THE WITNESS:  The AFF [sic] doctor in San Diego was

17  super busy.  So I ask him if I can get them in Sacramento.

18  Q.  BY MR. SHARMA:  Got it.  So the -- the doctor from whom you

19  would get your airman's medical in San Diego was busy?

20  A.  Yes.

21  Q.  Okay.  And in the same e-mail, you ask Mr. Pooley, Any

22  phone number to call you, right?

23  A.  Yes.

24  Q.  Did you get his phone number?

25  A.  I think, yes.

1   Q.   You said you had some text messages with him?

2   A.   Yeah.  He sent it to me, like, Facebook Messenger or those.

3   Q.   Where were you located when this e-mail was sent?

4   A.   I was sitting in my car, making the line to cross the

5   border.

6   Q.   So you were still in Mexico?

7   A.   Yeah.

8   Q.   All right.  We'll come back to Exhibit 3.

9        Let's talk about when you got to Parachute Center.

10       When did you -- so if you were line to get through the

11  border on July 4th, is that the date you were heading towards

12  Parachute Center?

13  A.   Yes.

14  Q.   Is that roughly the date that you got there?

15  A.   It was, like, 12-hour journey from San Diego.  Went with

16  the Amtrak from San Diego to LA, then commute to the other

17  line, and then to Sacramento next day in the morning.

18  Q.   So you crossed the border, you said, in your car?

19  A.   Well, I -- I drove, and then I parked it in Mexico side and

20  then walk and cross by foot.

21  Q.   Okay.  And then you took the train?

22  A.   Yeah.

23  Q.   To Sacramento?

24  A.   Yeah.

25  Q.   Okay.  Turning to Exhibit 25 in your binder.  Do you

1    recognize that document?

2    A.   Yes.

3    Q.   What is it?

4    A.   It's a border crossing card.  Like, a tourist visa for

5    Mexicans.

6    Q.   Is that your border crossing card?

7    A.   Yes.  That's the actual one, not the one in that.

8    Q.   Sorry?

9    A.   This is the actual one.  It's, like, good, whatever, ten

10   years.

11   Q.   But it's your card, right?

12   A.   Yes.

13        MR. SHARMA:  Your Honor, government moves to enter

14   Exhibit 25 into evidence.

15        MS. CRAGER:  No objection.

16        THE COURT:  Exhibit 25 is received in evidence.

17   (GOVERNMENT'S EXHIBIT 25 ADMITTED INTO EVIDENCE.)

18   Q.   BY MR. SHARMA:  So I know the date of issue on this one is

19   May 4, 2018.  Was the card that you used to cross the border in

20   2016 similar to this one?

21   A.   Yeah.

22        THE COURT:  Is there some possible reason why that's

23   relevant?  I'm just curious.

24        MR. SHARMA:  Your Honor, just --

25        THE COURT:  I'm just curious.

1       Okay.  Thank you.  Go ahead.

2    Q.  BY MR. SHARMA:  Did you go straight to Parachute Center

3    after you crossed the border?

4    A.  Yeah.  I took the trolly to San Diego train station and

5    jump to the Amtrak and go to the -- yeah.

6    Q.  Did you have any other reason for being in the US?

7    A.  No.

8    Q.  Where did you stay when you got there?

9    A.  At Lodi Parachute Center, in the bunk house.

10   Q.  In the bunk house?

11   A.  Yeah.

12   Q.  So that's on the campus or --

13   A.  In the drop zone.  Like, a warehouse with beds.

14   Q.  Did you have to pay to stay there?

15   A.  Yeah.  $10 a night.

16   Q.  Who did you first meet when you got there from the

17   Parachute Center?

18   A.  Sergii.

19   Q.  Your friend?

20   A.  Yeah.

21   Q.  And then did you meet anyone else that works at the

22   Parachute Center?

23   A.  He took me with Bill and present me with him.  And then by

24   then, I had a text from Rob that was saying that he was not be

25   able to conduct my training that weekend because had some

1    issues with her -- with his girlfriend.  And he told me that

2    Mike Spurgeon was going to do the jumping with me.  That was

3    another, supposedly, TI examiner.  So yeah.  I start doing the

4    training with Mike.

5    Q.   Okay.  So let's break that up.

6         So you got a text message from Rob Pooley?

7    A.   Yeah.  On my way to Sacramento -- to Lodi.

8    Q.   And he told you that he was not going to be able to help

9    you do your jumps?

10   A.   Yes.

11   Q.   Did he say anything about whether he would be present in

12   your course at all?

13   A.   Again?

14   Q.   Did he say anything about when he would meet him -- when

15   you would meet him?

16   A.   Because he had -- he was going through some personal

17   issues.

18   Q.   Okay.  Did he tell you about -- anything about signing your

19   paperwork?

20   A.   No.  He told me that we were going to -- that I do the

21   jumps with Mike and do the training, and we're going to meet on

22   Sunday to do the paperwork.  And he was going to do the last

23   jump with me to sign me off.

24   Q.   Okay.  So he would meet you on Sunday?

25   A.   Yeah.

1  Q.  After you did your jumps?

2  A.  Yeah.

3  Q.  Do a last jump with you?

4  A.  Yes.

5  Q.  And then sign your paperwork?

6  A.  Yes.

7  Q.  Did he -- what did he say about Mike Spurgeon just to do --

8  what did he say?

9  A.  That Mike was going to take care of me.  That I gave him

10  the money; he was going to take care of the -- of everything.

11  And then the rest, I will give to Rob when -- Sunday, when he

12  show up.

13  Q.  So based on that exchange, was it your understanding that

14  Rob Pooley was still your examiner?

15  A.  Well, it was supposed to be, but he was not there.  I did

16  the jumping with Mike.

17  Q.  Okay.  But he said he was going to sign your papers?

18  A.  Yes.

19  Q.  Okay.  And who signs USPA/UPT paperwork?

20  A.  Certified tandem examiner.

21  Q.  Examiner.  Okay.

22     So then based on this exchange, were you still expecting

23  Rob Pooley to sign your paperwork --

24  A.  Yes.

25  Q.  -- as your certified examiner?

1      So did you follow his instructions?

2  A.  I just -- I follow his instructions, went with Mike.  He --

3  Mike handled the money for the gear rental and to Bill.  And

4  yeah, we start doing -- we went again through the emergency

5  procedures and, like, a little bit of the ground school again

6  to refresh memory, and we start jumping.

7  Q.  Okay.  Did you receive any books or manuals -- did you meet

8  Pooley at all initially?

9  A.  No.

10  Q.  So you didn't get any books or manuals from him?

11  A.  They are online.  So you can -- you can go ahead and start

12  studying and reading them.

13  Q.  Okay.  How many -- how many days were you there?

14  A.  Four.

15  Q.  How many -- what did you do during those days?

16  A.  Jumping and -- yeah.

17  Q.  And you did jumps with who?

18  A.  I did the jumps with Mike and then the other five jumps

19  with a licensed skydiver.

20  Q.  Okay.  Do you know what an evaluator is?

21  A.  Sorry.  What?

22  Q.  An evaluator.

23  A.  Evaluator?

24  Q.  Yeah.

25  A.  Something can --

1   Q.  In a tandem course.

2   A.  No.

3   Q.  Okay.  So tell me about your first day doing jumps with --

4   in this course.

5   A.  Well, first, you do a single -- solo jump with the gear --

6   with the tandem gear so you get used to where the handles and

7   the drogue, and you go by yourself.  Then you start doing

8   tandems with your examiner.

9       And, unfortunately, on my second jump with Mike, I had a

10  cutaway.  It was my very first tandem cutaway during my tandem

11  career.

12  Q.  So explain what that means.

13  A.  It's when you have a malfunction at the opening, and then

14  you cannot solve it, and then you need to release the main

15  canopy.

16  Q.  So your second jump in the course, you had to cut away your

17  main parachute?

18  A.  Yes.

19  Q.  And is this a pretty serious problem?

20  A.  Depends.  Sometimes can be serious.  Sometimes you can

21  solve it.  But it's -- it's designed to -- to land under a good

22  canopy and land safe.

23  Q.  Yeah.  Was this the -- was this the second time you've done

24  a tandem jump at all?

25  A.  Yes.

1    Q.   So you'd never done tandem jumping before that?

2    A.   No.

3    Q.   Can you explain the difference between solo jumping and

4    tandem jumping?

5    A.   By solo, you jump by yourself, and the gear has, like, less

6    handles and less procedures, and emergency procedures are

7    different.   And on the tandem, you have the responsibility.

8    You have person in front of you, and you need to take care of

9    whatever is going to be the reaction of that person you have in

10   front of you, and also, you have to be, like, super alert.

11   Q.   Is the gear different?   Is the parachute different?

12   A.   Yes.

13   Q.   How so?

14   A.   The size.   And the tandems, you had the drogue to slow the

15   speed when you free fall, because you go, like, full speed, and

16   the opening, it will just slam you.   And you have more handles.

17   The emergency procedures are different than the solo jumping.

18   Yeah.

19   Q.   Okay.   And so when you're taking a tandem course, are you

20   expecting to learn how to use new equipment?

21   A.   Yes.

22   Q.   How many jumps did you do in total while you were there?

23   A.   It was 12.

24   Q.   12.

25        And is that an approximate number?

1   A.  Yeah.  The -- the -- the minimum.  It's the minimum you

2   need to do to get your tandem ratings.

3   Q.  Okay.  So you --

4   A.  At least 25 with experience -- total 25 with experienced

5   skydivers, but --

6   Q.  So the 12 was a minimum jumps that you did?

7   A.  Yeah.

8   Q.  Did you do any more jumps, possibly?

9   A.  There, no.

10  Q.  Okay.  Did you need to do any classroom time or studying

11  time?

12  A.  No.  I did it before.

13  Q.  You'd already done it before?

14  A.  Yeah.

15  Q.  And you said earlier that you already had your D license,

16  right?

17  A.  Yes.

18  Q.  So it was just a short course --

19  A.  Yes.

20  Q.  -- to do some jumps -- tandem jumps?

21  A.  Yes.

22  Q.  Okay.  Turning to Exhibit 24 in your binder.

23  A.  Yes.

24  Q.  Do you recognize that?

25  A.  Yeah.  It's me and Malina.

1    Q.   Is it a photograph?

2    A.   Yes.

3              MR. SHARMA:   Your Honor, government moves to admit

4    Exhibit 24 into evidence.

5              MS. CRAGER:   No objection.

6              THE COURT:   Who is Malina?

7    Q.   BY MR. SHARMA:   Who is Malina?

8    A.   Another TI D-license skydiver that do the front ride in

9    order to come to my front -- the next jumps I need to do.

10   Q.   So a tandem instructor?

11   A.   Yeah.

12   Q.   So an experienced tandem jumper?

13   A.   Tandem and, yeah, solo jumper.

14   Q.   So she was riding on your front?

15   A.   Yes.

16   Q.   This was part of your course?

17   A.   Yes.

18             THE COURT:   Exhibit 24 is received in evidence.

19       (GOVERNMENT'S EXHIBIT 24 ADMITTED INTO EVIDENCE.)

20   Q.   BY MR. SHARMA:   So, like you said, that's Malina up front?

21   A.   Yes.

22   Q.   And you're her -- you're the tandem instructor behind her?

23   A.   Yes.

24   Q.   Is there another page?  No, that's it.  Okay.  Thank you.

25        When you did your course at Parachute Center, was there

1    anyone else involved in your course?  Any other students?

2    A.  No, it was just me.

3    Q.  Did you see anyone else doing tandem jumps?

4    A.  Yeah.  There was -- there are a lot of tandem instructors

5    over there.

6    Q.  Did you see anyone that was getting tandem instruction

7    training?

8    A.  No, just me.

9    Q.  Did you see a person named YongHyeon Kwon?

10   A.  Yes, I saw him.

11   Q.  Did you see him getting trained?

12   A.  No.  I just see him.  He was in line with me going to

13   airplane.

14   Q.  Did you see him doing tandem jumps?

15   A.  Yes.

16   Q.  With customers?

17   A.  Yes.

18   Q.  You mentioned Carlos Obaid earlier.  Did you see him as

19   well?

20   A.  He was not doing tandems; he was just, like, fun jumping

21   and getting, like -- he was swooping.  Doing, like, hop-n-pops

22   to do -- to do swooping.

23   Q.  But he was at the Parachute Center?

24   A.  Yeah.

25   Q.  Now, was Rob Pooley around any of those days when you were

1    doing your course jumping?

2    A.   No.  He just showed up on Sunday, the last day I was there.

3    Q.   Let's talk about that.

4         So he showed up on the last day --

5    A.   Yeah.

6    Q.   -- you said?

7         And what happened on that last day?

8    A.   He talk with Bill and Mike and -- like, to check if I'm as

9    good -- I was good to go.  And then we went for the -- for

10   the -- for -- with him -- went with him to the front ride.  We

11   jumped.  And then -- yeah.

12   Q.   So let me slow that down.

13        So you -- he talked to Bill and Mike about your training?

14   A.   Yes.

15   Q.   And then you went on a front jump with him?

16   A.   Yeah.

17   Q.   So he was riding in front of you?

18   A.   Yeah.

19   Q.   And was that a jump you had to do for the course?

20   A.   Yes.

21   Q.   What number jump was that; do you remember?

22   A.   I think it was 12, 13.

23   Q.   One of your last jumps?

24   A.   Yeah.

25   Q.   And then what happened?

1   A.  We just landed, and he just says me to fill up all the --

2   the photocopies of the paperwork.  Told me to fill up all the

3   blank spaces, and he was going to take care of the rest and

4   collect the money.  And then I started, like, packing up

5   because I had to go catch a train to go back to -- back home.

6   Q.  Okay.  So you paid some money for the course?

7   A.  Yeah.

8   Q.  Did you give him $1100?

9   A.  What?

10  Q.  Did you pay the $1100?

11  A.  No.  I -- I gave that -- I gave some money -- I don't

12  remember.  It was, like, years ago.  But I -- I give some money

13  to -- to Mike Spurgeon, and Mike paid to Bill, and then they

14  split the rest.  I don't know how they deal with it.  But it

15  was less, like, $150 that I hand to Rob that day.

16  Q.  Okay.

17  A.  Something like --

18  Q.  You don't remember exactly?

19  A.  The amount, yeah.

20  Q.  But you -- you paid some to different people?

21  A.  Yes.

22  Q.  Including Rob?

23  A.  Yes.

24  Q.  Okay.  In total, did you pay the $1100 that Rob Pooley had

25  said in his e-mail was cost of the course?

1    A.  Yeah, was the total.

2    Q.  Was this the first time you had met Rob Pooley when he

3    showed up on that day?

4    A.  Yes.

5    Q.  You mentioned paperwork.  So tell me about the paperwork.

6    A.  All the forms, you need to fill up to file them in USPA and

7    UPT.  Like, general information card in front and license and

8    number of jumps and that -- who you call in case of an

9    emergency.  And you sign the waiver.

10       And then you need to -- there is a written test that you

11   need to answer.  And that's the same with the -- it's the

12   same -- almost the same, UPT and USPA.

13   Q.  So this was a USPA/UPT-specific forms?

14   A.  Forms.

15   Q.  Were they tandem instructor forms?

16   A.  Tandem instructor ratings.

17   Q.  And did Pooley give them to you?

18   A.  No.  He kept them and told he was going to send them to

19   UPT/USPA.  And then --

20   Q.  Let me -- before you filled them out, did he give you the

21   forms to fill out?

22   A.  Yes.  Yes, he gave me forms.

23   Q.  Did you notice if that -- if those -- if that paperwork had

24   any signatures on them?

25   A.  I saw they were signed already.

1    Q.   They were already signed --

2    A.   Yeah.

3    Q.   -- before you --

4    A.   But it was a copy.  Like, a -- like, a ink sign.

5    Q.   So, like, a photocopy?

6    A.   Yeah.

7    Q.   Okay.  And it already had signatures on there --

8    A.   Yes.

9    Q.   -- before you filled it out?

10   A.   Yes.

11   Q.   Whose signatures were on there?

12   A.   Later, I knew it was Yuri Garmashov's signature.  But I

13   don't know Yuri Garmashov's signature.  So that -- I don't --

14   when everything happened, I know that it was signed by Yuri.

15   Q.   Signed by Yuri?

16   A.   Yeah.

17   Q.   Did it have Yuri Garmashov's name on it?

18   A.   I don't remember.

19   Q.   Okay.

20   A.   But I seen a signature.

21   Q.   Did it have Rob Pooley's name on it?

22        Did it have Rob Pooley's name on it?

23   A.   I didn't check.

24   Q.   But you saw signatures that were Yuri Garmashov's

25   signatures?

1  A.  Later, I knew it was Yuri Garmashov, but at that moment, I

2  couldn't tell that was Yuri Garmashov's signature.

3  Q.  Okay.  Did -- when he gave you this paperwork, did he have

4  more copies of the paperwork, or was it the only --

5  A.  Yeah.  He had a handful of them.

6  Q.  A handful of them?

7  A.  Yeah.

8  Q.  They were all -- they all had pre -- pre-signatures?

9  A.  Yes.

10  Q.  Did Yuri Garmashov -- do you know him?

11  A.  No.  I know him because he's a -- like, a skydive

12  celebrity.  Everybody knows him.  But I don't know him in

13  person.

14  Q.  Did he -- was he -- did he conduct any part of your

15  training at Parachute Center?

16  A.  No.

17  Q.  Was he present at all there?

18  A.  No, he was not in Lodi.

19  Q.  You didn't see him at all?

20  A.  No.

21  Q.  Did you find it strange that Pooley had paperwork that

22  contained Yuri's signatures on it?

23  A.  Later, then I was, like, yeah.

24  Q.  So did you talk to Rob about it?

25  A.  No.  That day, I just left and -- and then I was waiting

1    for -- I give him an address -- well, I -- I text him to see

2    what was -- what timeline was the process of my ratings.  And

3    yeah.

4    Q.  What did he tell you about the paperwork -- what would

5    happen with the paperwork?

6    A.  He told me that he had no time to send it.  So I sent him

7    an address, and I told him, Okay.  Send it to me, and I put it

8    on the mail to expedite the thing.  And the day after, then

9    Sergii call me to told me that our ratings were pulled.

10   Q.  Okay.  Did he -- did Pooley tell you that he was going to

11   send it to USPA/UPT?

12   A.  Yes.

13   Q.  Okay.  And from your understanding, what an examiner does,

14   was that what you expected your examiner to do?

15   A.  Yeah.  He is, like, your professor from the beginning to

16   the end, the whole process, and you get your card.  Yeah.

17   Q.  Okay.  Whose job is it to know how the paperwork works?

18              MS. CRAGER:  Objection.  Speculation.

19              THE COURT:  Sustained.

20   Q.  BY MR. SHARMA:  Did -- did you trust your examiner to know

21   that he would handle your paperwork?

22   A.  Yes.

23   Q.  So when you left the Parachute Center, did you -- you left

24   your paperwork there, or did you take it with you?

25   A.  No.  I left it there, and, yeah, back home.

1    Q.  You left it with Pooley?

2    A.  Yes.

3    Q.  Did he say anything about whether he was going to submit it

4    to USPA or UPT?

5    A.  It was -- was to -- put it on the envelope and mail it or

6    fax it.  I don't know what's the process he -- well -- the way

7    he filed it.  But yeah, I just left and was waiting for my --

8    for my cards to get to the others.

9    Q.  Okay.  So you left it with him, and you were just waiting

10   for your cards to come in the mail?

11   A.  Yeah.

12   Q.  Okay.  Now, at any point in time when you were at Parachute

13   Center or before you got to Parachute Center, did Rob Pooley

14   tell you that his examiner rating was suspended?

15   A.  No.

16   Q.  And if he had told you that, would you have still attended

17   the course at Parachute Center?

18   A.  No.

19   Q.  So after you left Parachute Center, did you go straight

20   back to Mexico?

21   A.  Yes.

22   Q.  And then did you get your cards in the mail?

23   A.  No, I never get them.

24   Q.  You never got them?

25   A.  No.

1    Q.   When did you realize that they were not coming?

2    A.   I got an inbox [sic] from Sergii on August 8th, I think, or

3    9th, and he text me that contact Yuri; so -- because all the --

4    all the -- all the ratings that was signed by him were pulled

5    out from USPA, and there was this -- like, 140 people at least.

6         So I was super confused because he -- I get to -- I paid to

7    Rob and get to be signed by Rob, but then was -- Yuri involved

8    in it, and I didn't even know him in person.  Yeah.

9         So I, like, super pissed.  And I was like I don't know -- I

10   don't know what to do.  And a -- I try to connect -- to contact

11   Bill and Rob to ask them for a refund.  And I -- they said,

12   like, no.

13   Q.   Okay.  So let me -- let's break that up.

14        So you contacted Rob about your ratings?

15   A.   Yeah.

16   Q.   Okay.  Turning back to Exhibit 3.  Let's go to the second

17   page, please.  So focus on this e-mail here.

18        So did you send this e-mail to Rob?

19   A.   Yes.

20   Q.   And in it, you say, Can you send my papers, please, to this

21   address so I can finish the paperwork?

22   A.   Yes.

23   Q.   Then you have an address there in California?

24   A.   Yes.

25   Q.   Whose address is that?

1   A.   My friend Rich.

2   Q.   What did you mean by "finish the paperwork"?

3   A.   To put them in the mail or send them, like -- somehow to

4   get -- so the paperwork get to UPT and USPA.

5   Q.   Okay.  So did you want the paperwork to come to you so that

6   you could send it to USPA?

7   A.   Yeah.

8   Q.   Because at that point, you hadn't gotten your cards yet?

9   A.   No.

10  Q.   Okay.  And then zoom out.  Go to the first page.  Let's

11  start with this e-mail down here.

12       So August 8th -- August 12, 2016 -- right? -- is that what

13  the date is there?

14  A.   Yes.

15  Q.   Is this an e-mail you got in response to your e-mail asking

16  for your paperwork?

17  A.   No.  Then I -- I ask him what was -- because by then, we

18  already knew that we were having no ratings because they were

19  pulled.

20  Q.   Okay.  So this is in the same chain of e-mails -- right? --

21  A.   Yeah.

22  Q.   -- with Rob?

23       So Rob says, I have a lot of people to deal with.

24       Right?

25  A.   Yes.

1    Q.  Anyone doing their training here in the last 9 weeks will

2    need to retake their course.

3         Does that apply to you?

4    A.  Yes.

5    Q.  I'm trying to make arrangements to give people refunds for

6    their tandem course and help them find a new course.

7         Did you mean -- did you understand -- understand that to

8    mean that it applied to you?

9    A.  I had to get retrained, yeah.

10   Q.  Okay.  He says, You have no idea how sorry I am.

11        Why do you think he was sorry?

12             MS. CRAGER:  Objection.  Speculation.

13             THE COURT:  Sustained.

14   Q.  BY MR. SHARMA:  What is your understanding of his

15   statement, You have no idea how sorry I am?

16             MS. CRAGER:  Objection.  Relevance.

17             THE COURT:  His understanding?  He has no idea how

18   sorry he is; that's his understanding.

19        Sustained.

20   Q.  BY MR. SHARMA:  He says, I'm trying to take care of

21   everyone I can, but I have a lot of angry people to deal with.

22        Were you one of those angry people?

23   A.  Yeah.  Some of them.

24   Q.  Let me just flip over to the second page, please, to get to

25   the end of that e-mail.

1    It says, Please be -- Please be patient.  And then he says,

2    Do you have the ability to attend a new course that we set up

3    at another location here in NorCal?

4    Okay.  And then back to the first page.

5    Then the next e-mail we have in this chain is from

6    September 1, 2016?

7    A.  Yeah.

8    Q.  And is that an e-mail that you wrote to Rob?

9    A.  Yes.  Well, I wrote -- I wrote Rob.

10   Q.  You wrote Rob.

11   It says, Well, I suppose you have notice about USPA Today's

12   post.

13   What was that about?

14   A.  USPA did this communication that all these people that were

15   signed off by Yuri Garmashov through Rob Pooley were -- had no

16   ratings.  Some of us had to do, like, a -- some jumps to get

17   them, and some of us, we had to do, like, a whole training from

18   zero.

19   Q.  Then you say --

20        THE COURT REPORTER:  I'm sorry.  Slow down.

21   Q.  BY MR. SHARMA:  You say, Not be able to jump since my

22   ratings were never filed.

23   What does that mean?

24   A.  That when I knew that I had no ratings, I -- I stop doing

25   tandems, because if something happens and then they ask who was

1   jumping and where is the ratings and there is no ratings,

2   it's -- it would be trouble.

3   Q.  Okay.  And so when you say, This means I'm losing money

4   every weekend, is that because you couldn't do tandem jumps?

5   A.  Yes.

6   Q.  And then you say, I'll get my ratings again at Skydive San

7   Diego.

8       So now are you talking about the -- doing the whole new

9   course?

10  A.  Yeah.

11  Q.  And you ask him for a refund of the $1100 that we talked

12  about, right?

13  A.  Yeah.

14  Q.  Plus $400 of travel expenses.  And then it says another --

15  it looks like -- I think you meant 1500?

16  A.  1500.

17  Q.  And what was that extra 1500 for?

18  A.  The money I was not making because I was not jumping.  And

19  I had to pay another TI to come do the jumps instead of me.

20  Q.  Okay.  So that's the money you think you could have been

21  making had you gotten your ratings?

22  A.  Yes.

23  Q.  And that's what it says there.

24      And then you say, I hold the lawsuit with my lawyer.

25      So were you thinking of suing Rob Pooley at that point?

1    A.   Yeah.  I contact other friends that were in same situation,

2    and we were, like, trying to put things together to -- to do,

3    like, a collective lawsuit against what happened.  Never

4    happened.

5    Q.   It never happened?

6    A.   No.

7    Q.   All right.  Zoom out.

8         And then the last e-mail in this chain is dated

9    September 1st; so it's the same day, and it's from Rob to you?

10   A.   Yeah.

11   Q.   It says, Fabricio, you have no idea how sorry I am all this

12   happened.  I agree that many -- you and many other people

13   deserve a refund.  He goes on to stay some stuff.  Then he

14   says, That being said, I do acknowledge that I owe you.

15        Right?

16   A.   Yes.

17   Q.   Later on in the paragraph, he says, If you feel like you

18   need to seek legal action, I completely understand.  I would

19   hate to see you have to spend more money for legal fees, so I

20   must tell you I have no assets.

21        Did you see that statement as sort of discouraging you from

22   filing a lawsuit?

23   A.   Yes.

24   Q.   And then at the end, he says, I am honestly very sorry.

25        Right?  That's what he says?

1   A.  Yes.

2   Q.  Okay.  So you talked about retraining in that e-mail.  Did

3   you end up getting retrained?

4   A.  Yes.

5   Q.  At the Skydive San Diego?

6   A.  Yes.

7   Q.  Do you remember when you had to do that -- when you did

8   that?

9   A.  I don't remember.  Like, a -- when -- the next month.  I

10  don't have the exact date.

11  Q.  Okay.  And how much did you pay for that course; do you

12  remember?

13  A.  $2,000.

14  Q.  And was that with a different examiner?

15  A.  Yes.

16  Q.  Did you ever receive that refund that --

17  A.  Never.

18  Q.  -- Pooley was talking about?

19  A.  No.

20  Q.  Did he ever -- did he ever keep promises to you -- keep his

21  promises to you?

22  A.  I had never heard -- heard about him ever again.

23  Q.  You never got your ratings from Pooley?

24  A.  No.

25  Q.  And you never got a refund?

1   A.  No.

2            MR. SHARMA:  No further questions right now.

3            THE COURT:  You may cross-examine.

4            MS. CRAGER:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6   BY MS. CRAGER:

7   Q.  Good morning, Mr. Palomino.

8   A.  Good morning.

9   Q.  I'd like to begin by talking about Government's Exhibit 21.

10  If we could pull that up, please.

11  A.  It's in this same --

12  Q.  It will come up on your screen in just a moment; so you

13  don't have to do anything.

14      I'd like to talk about why you sent this e-mail and whether

15  it was Rob Pooley or somebody else who caused you to send it.

16      Before you sent this e-mail, you chatted with your friend

17  Sergii?

18  A.  Sergii.

19  Q.  And Sergii was already at the Lodi drop zone?

20  A.  Yes.

21  Q.  And you chatted with him on Facebook?

22  A.  Yes.

23  Q.  You asked him about how to get your ratings, and he said

24  he'd check with an examiner?

25  A.  Sorry.  What?

1   Q.  I'm sorry.  You asked him about how to get your ratings

2   there, and he said he would check with an examiner?

3   A.  I asked him that -- which examiner was there in -- in Lodi.

4   Q.  And he said he would check?

5   A.  Yeah.

6   Q.  He got back to you, and he said Yuri Garmashov, the

7   examiner, would be there in August?

8   A.  Yes.

9   Q.  And you asked, Are there any other examiners?

10  A.  I asked that.

11  Q.  And he didn't give you any names?

12  A.  No, he didn't.

13  Q.  He didn't give you Rob Pooley's name?

14  A.  No.

15  Q.  At that time, you had never heard of Rob Pooley?

16  A.  No.

17  Q.  So then you sent this e-mail that we're looking at right

18  now?

19  A.  Yeah.  I wrote directly to Parachute Center to see if there

20  was any other available examiner to go there and get my

21  ratings.

22  Q.  Got it.  Because you wanted to go in July?

23  A.  Yeah.

24  Q.  Okay.  Thank you.  We can take that down.

25      Just one moment.  Sorry.  My 3-year-old gave me a cold.

1      All right.  I'd like to talk now about what Rob Pooley told

2  you about how he was going to try to get your ratings.  You

3  communicated with Rob Pooley before you got there, right?

4  A.  Yes.

5  Q.  And then again when you showed up?

6  A.  He was not there.

7  Q.  You testified you -- you communicated with him by text

8  message; is that right?

9  A.  Yes.

10  Q.  Okay.  And he let you know in those communications that he

11  wasn't there?

12  A.  Yeah.

13  Q.  And that he would come later.  And he let you know that

14  later, you two would do some paperwork together?

15  A.  Yes.  That -- that's right.

16  Q.  Okay.  And you testified earlier that he said he was going

17  to sign you off?

18  A.  Yes.

19  Q.  Okay.  We'll talk about that.

20      Rob Pooley did tell you that there would be a person

21  signing off your paperwork, right?

22  A.  Again?

23  Q.  Rob Pooley told you that a person would sign off on your

24  paperwork?

25  A.  No.  That he -- well, he was examiner.  I suppose that he

1    was going to sign the -- the paperwork.

2    Q.  It's your testimony that Rob Pooley said, I'm an examiner,

3    and I'm going to sign your paperwork?

4    A.  Well, when we call by phone, he told me, I'm going to go --

5    I see you on Sunday to get your paperwork done and sign you

6    off, and you can leave.

7    Q.  Okay.  So he said, We'll get your paperwork done, and we'll

8    get you signed off?

9    A.  Yeah.

10   Q.  Okay.  And then Rob Pooley comes, and he gave you

11   paperwork?

12   A.  Yes.

13   Q.  All right.  I would like to --

14           MS. CRAGER:  Actually, may I approach?  I need to get

15   a binder for the witness.

16           THE COURT:  Yes.

17           MS. CRAGER:  All right.

18       (Pause in proceedings.)

19   Q.  BY MS. CRAGER:  All right.  I'd like you to turn to

20   Exhibit 614.

21   A.  Yeah.

22   Q.  When you're there, if you could turn to page 8.  And the

23   page number is on the little yellow stickers at the very

24   bottom.

25   A.  Yes.

1   Q.  Could you look at pages 8, 9, 10.

2   A.  Yeah.

3   Q.  And then page 16.

4   A.  Yeah.

5   Q.  And page 20.

6   A.  16.

7   Q.  And page 20 is the last one.

8   A.  Yeah.

9   Q.  Does that look approximately like what Rob Pooley handed

10  you?

11  A.  Yeah.  This is USPA forms.

12  Q.  Okay.

13          MS. CRAGER:  Your Honor, I --

14          THE WITNESS:  Sorry.

15          MS. CRAGER:  Your Honor, I move to admit Exhibit 614,

16  pages 8, 9, 10, 16, and 20.

17          THE COURT:  Just those pages?

18          MS. CRAGER:  Yes.

19          THE COURT:  Any objection?

20          MR. SHARMA:  I'm sorry.  Counsel, could you repeat

21  those pages, please?

22          THE COURT:  8, 9, 10, 16, 20.

23          MR. SHARMA:  Your Honor, I think the whole document

24  needs to come in.

25          THE COURT:  She's only offering those pages.  Do you

1    have any objection to those pages?

2              MR. SHARMA:  Yeah.  We object on the basis that it's

3    not the complete document.

4              THE COURT:  Well, if you want to offer the other

5    pages when it's your time to question the witness, I'll take it

6    up at that time.

7         All right.  Now, Exhibit 614, pages 8, 9, 10, 16, and 20

8    are received in evidence.

9              MS. CRAGER:  Thank you, Your Honor.  I'd like to

10   publish page 8, please.

11        (GOVERNMENT'S EXHIBITS 614, PAGES 8, 9, 10, 16, 20 ADMITTED

12   INTO EVIDENCE.)

13   Q.  BY MS. CRAGER:  So this is the USPA paperwork that looks

14   like what Rob Pooley handed you?

15   A.  Yes.

16   Q.  I'd like to go to page 9.

17        This is a continuation page 2 of that same paperwork?

18   A.  Yes.

19   Q.  This paperwork had Yuri Garmashov's name on it.

20   A.  Yes.

21   Q.  There were spaces on this paperwork for a tandem examiner's

22   name.

23   A.  Yes.

24   Q.  Including right here, what we're looking at; is that right?

25   A.  Yuri Garmashov.

1   Q.   And there are also spaces on these forms for a tandem

2   examiner's signature?

3   A.   Um-hum.

4   Q.   And one of them is right -- right here under the rating

5   recommendation?

6   A.   Yes.

7   Q.   And if we could pull out of that.  Thank you.

8        And there is another space right here for the course

9   examiner?

10  A.   Yes.

11  Q.   And another one right here for the course examiner to sign?

12  A.   Yes.

13  Q.   We can pull out of that.

14       And there is a space right here as well?

15  A.   Yes.

16  Q.   If we could go to page 10, please.

17       And these are some of the UPT forms that Rob Pooley gave

18  you?

19  A.   Yes.

20  Q.   And there is a space here for the name of the examiner?

21  A.   Yes.

22  Q.   And Yuri Garmashov's name was there?

23  A.   Yes.

24  Q.   And there are spaces for the examiner's signature?

25  A.   Yes.

1  Q.  If we can turn to 16 of that same exhibit.

2      And on these UPT forms that Rob Pooley gave you, there was

3  the name of the UPT examiner printed?

4  A.  Yes.

5  Q.  And the name was Yuri Garmashov?

6  A.  Yes.

7  Q.  You can pull that down.  Thank you.

8      Rob Pooley's name was not on your paperwork?

9  A.  I don't remember in that moment, because we were rushing

10 because I had to get a train.  I just saw that it was signed.

11 And he asked me to fill out all the blank spaces.  But yeah.

12 Q.  Rob Pooley's name was not on your paperwork?

13 A.  No.

14 Q.  And Rob Pooley's signature was not on your paperwork?

15 A.  No.

16 Q.  And at that time, you knew it was important to have a

17 tandem examiner because, otherwise, they couldn't sign off on

18 your paperwork?

19 A.  Yes.

20 Q.  All right.  I'd actually like to pull up that same

21 exhibit one more time on page 9.

22      Okay.  This says, Rating Recommendation.  I have personally

23 examined and recommend this applicant for the USPA tandem

24 instructor rating.

25      Is that what it says?

1    A.  Yes.

2    Q.  And it's signed here by Yuri Garmashov?

3    A.  Yes.

4    Q.  Now, that was a lie?

5    A.  What?  Sorry.

6    Q.  Well, Yuri Garmashov did not personally examine you?

7    A.  No.

8    Q.  And Yuri Garmashov did not personally recommend you?

9    A.  No.

10   Q.  Yuri Garmashov was not even there?

11   A.  No.

12   Q.  You testified earlier that you wanted some copies of this

13   paperwork sent to you?

14   A.  Yeah.

15   Q.  Isn't it true that at the time you filled out this

16   paperwork, you took pictures of it on your phone?

17   A.  No.

18   Q.  You didn't tell an agent in this case that you took

19   pictures of your paperwork?

20   A.  I don't remember it.  That was -- I don't even have that

21   phone or number again -- anymore.  But probably, I took some

22   pictures, but I -- I don't really remember.

23   Q.  So you might have taken some pictures on your phone?

24   A.  Probably, yes.

25   Q.  Okay.  Thank you.  We can pull that down now.

1       Earlier, you testified that you saw Yuri's signatures

2   there, but you never even asked Rob about them.

3   A.  I didn't ask.

4   Q.  All right.  I want to talk about that.

5       So you are, and were at the time, a drop zone owner?

6   A.  Yes.

7   Q.  And, in fact, in that first e-mail we looked at, you signed

8   off with your name and DZO?

9   A.  Yes.

10  Q.  And DZO stands for drop zone owner?

11  A.  Yes.

12  Q.  And, as you testified, it's important to you that your drop

13  zone follow the USPA rules?

14  A.  Yes and no, because in Mexico, we have no regulations.

15  We -- we keep USPA regulations, but it's not mandatory to have

16  any USPA or UPT regulations to keep with.

17  Q.  So it's not mandatory, but it is important to you as a

18  business owner?

19  A.  As a business, yes.

20  Q.  You actually advertise that as part of your business?

21  A.  Yes.

22  Q.  That you followed the US Parachute Association rules?

23  A.  Yes.

24  Q.  Okay.  And one of the rules, as you knew, is that only an

25  examiner can teach a course -- a tandem instructor course?

1  A.  At that time, I was super new, and -- I was super new in

2  the sport, and I just knew that to have an examiner.  But I

3  was, like, just learning.  I had -- I had 500 jumps --

4  Q.  But you knew that an examiner needed to teach the course?

5  A.  Yes.

6  Q.  And that was also discussed in some of the reading

7  materials that you reviewed?

8  A.  Yes.

9  Q.  Before you came to the drop zone, you got your friend's

10  advice?

11  A.  Sergii, yes.

12  Q.  Sergii, yes.

13      And when you asked about coming in July, Sergii said, Don't

14  do it?

15  A.  Yeah.  He -- he told me to wait until August.  But I -- I

16  don't have time to wait for August.

17  Q.  So he said come in August, not before?

18  A.  Yeah.

19  Q.  And he said the reason is Yuri Garmashov will be there in

20  August?

21  A.  Yes.

22  Q.  And he used Yuri Garmashov's name, and you had heard of

23  Yuri Garmashov?

24  A.  Yeah.

25  Q.  He's a celebrity?

1    A.   Well, not celebrity.  Prolific skydiver.

2    Q.   He's a prolific skydiver.

3         And Sergii told you the examiner, Yuri Garmashov, will be

4    there in August?

5    A.   Yes.

6    Q.   And you asked if there were any other examiners around?

7    A.   Yes.

8    Q.   And Sergii told you, You don't need any other if you want

9    to be professional?

10   A.   Yes.

11   Q.   You're not -- you were not quite sure exactly what Sergii

12   meant by that?

13   A.   No.

14   Q.   And you came in July anyway?

15   A.   Yes.

16   Q.   Okay.  So fast-forward to Lodi in July, and Rob hands you

17   paperwork.  The paperwork has Yuri Garmashov's name on it?

18   A.   Yes.

19   Q.   It is covered in Yuri Garmashov's signatures?

20        Was that a yes?

21   A.   Yes.

22   Q.   And Yuri Garmashov was not there?

23   A.   No.

24   Q.   Yuri Garmashov, the person Sergii had told you about, was

25   not there?

1    A.   No.  He was not there.

2    Q.   And Rob, as you testified, was walking around with several

3    copies of this paperwork with Yuri Garmashov's name and

4    signature?

5    A.   Yes.

6    Q.   You thought that was odd?

7    A.   I thought that was strange, yeah.

8    Q.   Okay.  And you maybe thought back to what Sergii had said,

9    which was you don't need anyone else if you want to be

10   professional?

11   A.   I cannot interpret that.

12   Q.   You're really not sure what he meant by that?

13   A.   Yes.

14   Q.   But he definitely didn't say there are other examiners

15   there?

16   A.   No.

17   Q.   Okay.  And your testimony is, today, that you saw this

18   paperwork with Yuri Garmashov's name on it, and you didn't even

19   ask Rob about it?

20   A.   No, I didn't ask because, as I mentioned earlier, you trust

21   who are representing and taking the money for you; so --

22   Q.   I see.  And you didn't even ask him why Yuri Garmashov's

23   name was there?

24   A.   I didn't ask.

25   Q.   This isn't the first time you talked about this case,

1    correct?

2    A.  Again?

3    Q.  You -- you -- I'm sorry.

4        You've asked -- answered other questions about this case

5    before today?

6    A.  Yes.

7    Q.  You have talked to federal agents about this case?

8    A.  Yes.

9    Q.  And you talked to a federal agent back in 2021?

10   A.  Yes.

11   Q.  And that federal agent asked you questions about Rob

12   Pooley?

13       Was that a yes?

14   A.  Yes.

15   Q.  And about the paperwork you filled out?

16   A.  Yes.

17   Q.  And what Rob told you about the paperwork?

18   A.  I don't remember.

19   Q.  Okay.  Well, at the time when they asked you in 2021,

20   didn't you tell them that you did ask Rob about the signatures?

21   A.  I don't -- I don't remember.

22   Q.  You don't remember?

23   A.  No.  It was, like, five years -- or -- three years ago.

24   Q.  So you may have told them, in 2021, that you did ask Rob

25   about those signatures?

1    A.   Yeah.   Probably.

2    Q.   I'd like to move now to who you believed your examiner was

3    back in 2021 -- sorry -- back in 2016, when you took the

4    course.

5         You testified today that Rob Pooley was your examiner?

6    A.   Yeah.   He -- yeah.   He's the first person -- well, when I

7    contacted Parachute Center, they lead me to him.   And then I

8    start the conversation with him to be trained.

9    Q.   Okay.   So you assumed at that point that Rob Pooley may --

10   A.   Was an examiner.

11   Q.   Okay.   But when you showed up there, Rob Pooley was not

12   there?

13   A.   Yes.

14   Q.   And Rob Pooley let you know that somebody else would be

15   teaching?

16   A.   Yes.

17   Q.   That person was Mike Spurgeon?

18   A.   Yes.

19   Q.   And he was an expert skydiver?

20   A.   Yeah, he had lots of experience.   But I -- I didn't know --

21   I didn't ask or know if he was an examiner.   But -- well, I

22   just started training and jumping with him.

23   Q.   Okay.   And you were aware he had about 25,000 skydives?

24   A.   Yes.

25   Q.   And he had about 16,000 tandem skydives?

1    A.  Yes.

2    Q.  And he seemed to be a respected member of the community

3    there?

4    A.  Super respected.

5    Q.  And he did your jumps with you?

6    A.  Yes.

7    Q.  And after each jump, he gave you feedback on your jumps?

8    A.  Yes.

9    Q.  And Mike Spurgeon trained you?

10   A.  Yes.

11   Q.  And you were aware that only a trainer with an examiner

12   rating could teach the course?

13   A.  Yes.

14   Q.  Rob showed up later -- a few days later?

15       Was that a yes?

16   A.  Yes.

17   Q.  Thank you.

18       And that's when you paid approximately $1100?

19   A.  I pay before, to Mike, a part of the money and then the

20   rest to -- to Rob.

21   Q.  Actually, most of the money went to Mike Spurgeon, right?

22   A.  Mike and Bill.

23   Q.  Okay.  About $950 went to Mike Spurgeon?

24   A.  Yes.

25   Q.  And the rest, about $150, was split between Rob Pooley and

1    the drop zone owner?

2    A.   Yes.

3    Q.   Isn't it true that at the time, you believed Mike Spurgeon

4    was your examiner?

5    A.   No.

6    Q.   All right.

7    A.   He conduct the jumps, but I thought that that person was

8    going to sign me off was Rob.  But because he was not there, I

9    start doing the jumping --

10   Q.   I see.

11   A.   -- to go ahead.

12   Q.   So you thought the person who would sign off on your

13   papers, that person would be the examiner?

14   A.   Yes.

15   Q.   Okay.  I would like you to turn now to another exhibit --

16            MS. CRAGER:  Your Honor, if I may approach, I'll get

17   another binder out.

18            THE COURT:  You may.

19            MS. CRAGER:  Thank you.

20   Q.   BY MS. CRAGER:  All right.  Now, you just testified that

21   you did not believe that Mike Spurgeon was your examiner; is

22   that right?

23   A.   Yeah.

24   Q.   All right.  But didn't you tell the agents in this case, I

25   have found --

1          MR. SHARMA:  Your Honor, I'm sorry.  What exhibit are

2    we talking about?

3          MS. CRAGER:  I'm sorry.  I'm at 2050-A.  I'm sorry

4    about that.

5          THE COURT:  Go ahead.  You can finish your question.

6          MS. CRAGER:  Thank you.

7    Q.  BY MS. CRAGER:  Didn't you tell the agents in this case, I

8    have found the name of the examiner who trained me, Mike

9    Spurgeon?

10   A.  Yes.

11   Q.  And during an interview with the agents, didn't you tell

12   them, I ran into trouble during my first jump with my examiner

13   acting as a student, Spurgeon?

14   A.  Yeah.  That was the cutaway.

15   Q.  Thank you.  All right.

16       I want to talk about why you're saying today that Rob

17   Pooley was your examiner.

18       In 2021, as we've talked about, you heard from a federal

19   agent?

20   A.  Um-hum.

21   Q.  And that's the first time they approached you and asked you

22   questions about this case?

23   A.  Yes.

24   Q.  They actually interviewed you multiple times in 2021?

25       Is that a yes?

1    A.  Yes.

2    Q.  Thank you.  And during those interviews in 2021, you never

3    said, My examiner was Rob Pooley?

4    A.  I don't remember.

5    Q.  You don't know if you ever said that?

6    A.  I don't remember if I said that.

7    Q.  Okay.  Later in 2021, you received from the agents a press

8    release?

9    A.  Yeah.  I -- I don't -- I don't remember.

10   Q.  Did you receive a press release about the charges being

11   filed in this case?

12          THE COURT:  Let's not talk about a press release,

13   unless you want to have it in evidence.

14          MS. CRAGER:  Your Honor, my point is just that he --

15          THE COURT:  I know what your point is, but let's not

16   talk about a press release.

17          MS. CRAGER:  That's fine.

18   Q.  BY MS. CRAGER:  In 2024, you were interviewed by the agents

19   some more?

20   A.  Yes.

21   Q.  And the prosecutors asked at that time a lot of questions

22   about whether Rob Pooley was holding himself out as an

23   examiner?

24   A.  Was holding what?

25   Q.  Was holding himself out as an examiner.

1   A.   Yes.

2   Q.   And today, your testimony is, Rob Pooley was my examiner?

3   A.   That's the one -- the person I contact and I wanted to do

4   the jumps with.  But he was not there.  He put me with Mike,

5   and then I conducted the jumps with Mike.

6             MS. CRAGER:  Okay.  Thank you.  Nothing further.

7             THE COURT:  Redirect?

8             MR. SHARMA:  Yes, Your Honor.

9                      REDIRECT EXAMINATION

10  BY MR. SHARMA:

11  Q.   When you -- when you spoke to Rob Pooley on the way to

12  Lodi, when you exchanged some text messages with him --

13  A.   Yes.

14  Q.   -- and he gave you instructions about the course --

15  A.   Yes.

16  Q.   -- he said, Mike Spurgeon will be -- Go to Mike Spurgeon

17  for the jumps?

18  A.   Yes.

19  Q.   And he told you that at the end of those jumps, you would

20  meet with him, and he would sign off on your paperwork?

21  A.   Yes.

22  Q.   And then on that Sunday when you met with him, he gave you

23  paperwork, right?

24  A.   Yeah.  Like, he told me to fill all the blank spaces.

25  Q.   He told you to fill the blank spaces?

1   A.   Yes.

2   Q.   That's the paperwork with the other signatures on them?

3   A.   Yes.

4   Q.   And it was his instructions that you followed?

5   A.   Yes.

6   Q.   And at that point, you'd already paid for the course?

7   A.   Yes.

8   Q.   You'd already taken the course?

9   A.   Already.

10  Q.   You'd done all your jumps at that point?

11  A.   Yes.

12  Q.   Now, you weren't an examiner at that point, right?

13  A.   No.

14  Q.   Okay.  So you listened to your examiner when he told you to

15  sign the paperwork or to fill --

16  A.   To fill out, yeah.

17  Q.   And you listened to the examiner that you had already paid?

18  A.   Yes.

19  Q.   And you listened to the examiner --

20           MS. CRAGER:  Objection.  Leading.

21           THE COURT:  Sustained.

22  Q.   BY MR. SHARMA:  Did you listen to your examiner about who

23  to take the jumps with?

24  A.   Again?  Sorry.

25  Q.   Did you listen to your examiner about who you should do

1    your jumps with?

2    A.  Yes.

3    Q.  And that examiner was Pooley?

4    A.  Yes.

5            THE COURT:  Can you have more than one examiner?

6            THE WITNESS:  I don't -- I -- sometimes if they --

7    the examiner is on-site, someone can do the jumps with you, but

8    the examiner needs to be on-site.

9            THE COURT:  But -- all right.  But if -- okay.

10   Q.  BY MR. SHARMA:  So --

11           THE COURT:  I would ask a question, but I'm not the

12   lawyer.

13           MR. SHARMA:  Right.

14   Q.  BY MR. SHARMA:  So as part of your course, was it your

15   understanding you could do your jumps with someone other than

16   your examiner?

17   A.  Yes.

18   Q.  That doesn't change who your examiner is, right?

19   A.  No.

20   Q.  Your examiner was still Pooley?

21   A.  Yes.

22   Q.  So even though you did your jumps with Spurgeon --

23           MS. CRAGER:  Objection.  Leading.

24           THE COURT:  Sustained.

25   Q.  BY MR. SHARMA:  You did your jumps with Spurgeon?

1    A.   Yes.

2    Q.   Did that change who your examiner was?

3    A.   No.

4    Q.   Okay.  And then you gave the paperwork to Pooley after you

5    left?

6    A.   I fill it out, and I give it to him.

7    Q.   What was your understanding of what would happen with that

8    paperwork?

9    A.   Was going to be sent by e-mail or fax or whatever to

10   UPT/USPA.

11   Q.   And Pooley would send that?

12   A.   Yes.

13   Q.   I want to talk about this text chain that they were talking

14   about with Sergii.

15        So you talked to Sergii before you came to Parachute

16   Center, right?

17   A.   Yes.

18   Q.   You talked to him before you e-mailed Parachute Center?

19   A.   I talk first with him and then e-mail Parachute Center.

20   Q.   Right.  And you asked him, Is there any other examiner?

21   And he said, You don't need other if you want to be

22   professional?

23   A.   Yes.

24   Q.   That's what you testified on cross.

25        And then in the same conversation, you also said, Okay, I

1    can go on weekdays.  How much is to sleep in Lodi?  And then he

2    says to you, Tell me when you're coming, and I ask examiner.

3         Right?

4    A.  Yes.

5    Q.  Okay.  And then you contacted Parachute Center?

6    A.  Yes.

7    Q.  And who responded to your e-mail when you sent it to

8    Parachute Center?

9    A.  Rob.

10   Q.  Rob Pooley.  And he gave you the --

11   A.  The quote and the times and what -- what was meant to do

12   ahead to get the ratings.

13   Q.  Right.  And we saw that e-mail earlier?

14   A.  Yes.

15   Q.  I want to turn you to Exhibit 20R.  And I'm going to come

16   help you with that.

17        Do you recognize that document in front of you?

18   A.  Yes.

19   Q.  And what is it?

20   A.  It's an e-mail I send to Rob Pooley and Bill Dause.

21   Q.  And what's the date of that e-mail?

22   A.  Sorry.  What?

23   Q.  What's the date of that e-mail?

24   A.  October 31st --

25   Q.  Okay.

1    A.  -- 2016.

2            MR. SHARMA:  Your Honor, government moves to enter

3    Exhibit 20R into evidence.

4            MS. CRAGER:  I object as outside the scope.

5            MR. SHARMA:  Your Honor, his credibility is in

6    question.

7            THE COURT:  Credibility of every witness is an issue.

8       Let me look at Exhibit 20R.

9       All right.  I have 20.  Here is 20R.  Let me read it.

10           MR. SHARMA:  Specifically, Your Honor, it's a prior

11   consistent statement with his prior testimony.

12           MS. CRAGER:  Your Honor, I actually have no objection

13   to this.

14           THE COURT:  All right.  Exhibit 20R is received in

15   evidence.

16      (GOVERNMENT'S EXHIBIT 20R ADMITTED INTO EVIDENCE.)

17   Q.  BY MR. SHARMA:  So I'm focusing on the e-mail here.  And

18   the subject is Refund, right?

19   A.  Yes.

20   Q.  And the date is October 31st?

21   A.  Yes.

22   Q.  And it's sent to Rob?

23   A.  Rob and --

24   Q.  And in the body of the e-mail, you're actually talking to

25   both Bill and Rob, right?

1    A.   Yeah.

2    Q.   And it says you want a refund for the rest of the scam.

3    You were part of it; so let me know I'll be refund for the gear

4    rental and airplane slots.

5         Right?

6    A.   Yes.

7    Q.   And then, Rob, I don't get why I have to go through all

8    this if I handed cash to Mike Spurgeon because you were not

9    there.  And then we redacted some words.

10        Those are bad words, right?

11   A.   Yes.

12   Q.   You said some bad words.

13        Were you angry at these guys?

14   A.   Yes.

15   Q.   And then you talk about Pooley showing up on the last day

16   to check if you were trained by Mike, and, You were willing to

17   falsify my ratings.

18        Right?  That's what you said?

19   A.   Yes.

20   Q.   I hope to get, ASAP, my money back?

21   A.   Yes.

22   Q.   You included your PayPal info?

23   A.   Yes.

24   Q.   Did you get your money back?

25   A.   No.

1    Q.   Let me turn to Exhibit 23.

2         Actually, let me turn you to -- get 22R first.  It's the

3    one right before it.  Do you recognize that document?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's a conversation, Facebook Messenger, and Sergii.

7    Q.   With Sergii?

8    A.   Yes.

9    Q.   When was this conversation?

10   A.   I think after the -- like, I -- August 8th.  Around that.

11   Q.   Okay.

12         MR. SHARMA:  Your Honor, government moves to enter

13   22R into evidence.

14         THE COURT:  Any objection?

15         MS. CRAGER:  No objection, Your Honor.

16         THE COURT:  Exhibit 22R is received in evidence.

17   (GOVERNMENT'S EXHIBIT 22R ADMITTED INTO EVIDENCE.)

18   Q.   BY MR. SHARMA:  Okay.  So this is a Facebook chat that you

19   had with Sergii?

20   A.   Yes.

21   Q.   Is he a friend who was at Parachute Center?

22   A.   Yes.  He worked for me.

23   Q.   The timing of this, this is after you came back to Mexico?

24   A.   Yes.

25   Q.   Okay.  And so it starts out by --

```
 1                  THE COURT REPORTER:  I'm sorry.  Please slow down.
 2   Q.  BY MR. SHARMA:  It starts out by saying, I cannot
 3   understand what you're saying.
 4        So that's -- the gray is Sergii, right?
 5   A.  Yes.
 6   Q.  I suggest that you check the status of your ratings.
 7        And then in blue, it says, Why am I ask Yuri?  I don't
 8   even -- if I didn't even know him.
 9        So Sergii told you to ask Yuri for your ratings?
10   A.  Sorry?
11   Q.  Sergii told you to ask Yuri about your ratings?
12   A.  Yes.  To contact Yuri to know what was going on.
13   Q.  Okay.  And then he asks you, Where your paper that you
14   fill?  And you say, Rob has them.
15        Right?
16   A.  Yes.
17   Q.  And you say -- then he says, Contact Yura?
18   A.  Yes.
19   Q.  You say, What for?
20        He says, Simply contact.  He will explain.
21        And then you say, You fucked me with Yuri.
22        Right?
23   A.  Yes.
24   Q.  Okay.  What did you mean by that?
25   A.  I -- I didn't understood what was going on, if they were,
```

 1   like -- like -- I don't know -- I had -- that I had no ratings

 2   anymore or something like that.

 3   Q.  Let's turn to the next page of that.

 4       All right.  So then there is some more conversation with

 5   Sergii.  And you say, Okay.  Okay.  I contact Yura.

 6   A.  Yes.

 7   Q.  And then you find out, Well, I have no ratings.  Rob fucked

 8   me.

 9   A.  Yes.

10   Q.  Fucking Lodi.

11   A.  Yes.

12   Q.  All right.  Next page.

13       Then you say, Well, I went to get ratings to Lodi.  Bill

14   told me Rob was my examiner, and Mike trained me.  And I give

15   $1100 to get fucked with no ratings.

16       That's what you said?

17   A.  Yes.

18   Q.  I will sue Lodi, Bill, and Rob.

19       Right?

20   A.  Yes.

21   Q.  And then he says -- calls you a stupido.

22   A.  Yes.

23   Q.  Text Yuri.

24   A.  Yes.

25   Q.  Then you say -- it looks like you included the answer from

1    Yuri in this text.

2    A.  Yes.

3    Q.  It says, Hey, bud, I will talk to you tomorrow and give you

4    more details, but you don't have a tandem rating.  Anything

5    done with Rob have not been submitted and is under

6    investigation for using my signature.

7        Right?

8    A.  Yes.

9    Q.  Okay.  And then is there a next page?

10       So that's a conversation that you had with Sergii and when

11   you sort of found out that you --

12   A.  Had no ratings.

13   Q.  Okay.  And then did you have a conversation with -- with

14   Yuri?  You referenced a conversation there with Yuri, right?

15   A.  Yes.

16   Q.  Can I turn you to Exhibit 23.

17   A.  Yes.

18   Q.  What's that document in front of you?

19   A.  It's a communication with Yuri on August 8, 2016.

20   Q.  Okay.  Is this the conversation that you started after

21   Sergii told you to contact --

22   A.  Yes.

23   Q.  Okay.

24           MR. SHARMA:  Your Honor, government moves to enter

25   Exhibit 23 into evidence.

1          MS. CRAGER:  Your Honor, I do believe this one is

2    outside the scope.

3          MR. SHARMA:  It's not outside the scope, Your Honor.

4    It's --

5          THE COURT:  I don't know if it's just outside the

6    scope.  Yuri is not a witness.  Yuri is not a party.  Whatever

7    Yuri says is not admissible in this e-mail unless there is some

8    exception that I haven't been told about.

9          MR. SHARMA:  I think the exception to the Yuri

10   messages would be that -- it's the effect on the listener.  So

11   each time -- it's a conversation --

12         THE COURT:  There is no effect.  The effect -- the

13   objection is sustained.  I'm not going to get into an argument

14   about that, but the effect on this -- on this listener of

15   something that was said after the fact of all the transactions

16   that he had with the defendant is not relevant, and I'm

17   sustaining the objection.

18         MR. SHARMA:  Your Honor, can I respond to that point?

19         THE COURT:  No.

20         MR. SHARMA:  Okay.

21   Q.  BY MR. SHARMA:  You contacted Yuri?

22   A.  Yes.

23   Q.  Okay.  And you talked -- in that conversation with Yuri,

24   you told him that Rob --

25         THE COURT:  I thought I sustained the objection.

1              MR. SHARMA:  To the entire document, Your Honor?  I

2    thought we only talked about the stuff that Yuri said.

3              THE COURT:  Oh, you want just half of it to come in,

4    just one party?  I'm sustaining the objection to both sides.

5              MR. SHARMA:  Your Honor, it's a prior inconsistent

6    statement from his -- he's been questioned on cross about his

7    statements to Yuri and Pooley and his reactions to the fact --

8              THE COURT:  I don't know whether -- to his

9    statement --

10             MR. SHARMA:  The specific rule --

11             THE COURT:  He's been cross-examined about his

12   statements to Yuri and who else?

13             MR. SHARMA:  And to Rob Pooley.

14             THE COURT:  Okay.  Pooley, yes.  What was the

15   cross-examination about his conversations with Yuri?

16             MS. CRAGER:  We did not cross-examine him about that,

17   Your Honor, only his conversations with Rob Pooley.

18             THE COURT:  All right.

19             MR. SHARMA:  No.  He was cross-examined on the fact

20   that Yuri Garmashov's signatures were all over his paperwork,

21   that Yuri Garmashov -- that he did not know Yuri Garmashov; his

22   credibility was questioned --

23             THE COURT:  I thought you said he was cross-examined

24   about his conversations with Yuri.

25             MR. SHARMA:  No.  About Yuri -- he was cross-examined

1   about Yuri.

2          THE COURT:  Objection is sustained.

3          MR. SHARMA:  All right.

4   Q.  BY MR. SHARMA:  You asked Pooley for a refund right after

5   you came back to Mexico?

6   A.  Yes.

7   Q.  And you didn't get any money from him?

8   A.  No.

9   Q.  And you didn't get your ratings from him?

10  A.  No.

11         MR. SHARMA:  No further questions.

12         THE COURT:  Any recross?

13         MS. CRAGER:  Just briefly, Your Honor.

14                    RECROSS-EXAMINATION

15  BY MS. CRAGER:

16  Q.  You testified about some text message communications you

17  had with Rob Pooley?

18  A.  Yes.

19  Q.  And you no longer have those text messages?

20  A.  No.

21         MS. CRAGER:  Thank you.  Nothing further.

22         THE COURT:  All right.  Is there any reason we should

23  not excuse this witness?

24         MR. SHARMA:  No, Your Honor.  He can be excused.

25         MS. CRAGER:  No, Your Honor.

1            THE COURT:  All right.  Thank you, Mr. Palomino.

2    You're excused.

3            THE WITNESS:  Thank you.

4            THE COURT:  And we will take the midmorning recess at

5    this time.  15-minute recess, ladies and gentlemen.  Remember

6    the admonition.

7        (Recess taken, 10:37 a.m. - 10:53 a.m.)

8            THE COURT:  Who is the next witness?

9            MS. LYDON:  Peter Swan.

10           THE COURT:  All right.  Everybody ready?

11           MS. CRAGER:  Yes, Your Honor.

12           MS. LYDON:  Yes, Your Honor.

13           THE COURT:  Bring in the jurors.

14       (Jury present, 10:54 a.m.)

15           THE COURT:  Everyone is present.

16       You may call your next witness.

17           MS. LYDON:  Thank you, Your Honor.  The government

18    calls Peter Swan.

19           THE CLERK:  Sir, please step forward, all the way up

20    to the witness stand, and remain standing.  Up to the witness

21    stand.

22       Raise your right hand.

23       (The Witness, PETER SWAN, is sworn.)

24           THE WITNESS:  I do.

25           THE CLERK:  Thank you.  You may be seated.

1          Please state your full name.  Spell your last name for the

2     record.

3                    THE WITNESS:  Peter A. Swan.

4                    THE CLERK:  Can you pull the microphone down, please.

5                    THE WITNESS:  Peter A. Swan.  S-W-A-N.

6                              DIRECT EXAMINATION

7     BY MS. LYDON:

8     Q.  Good morning, Mr. Swan.

9     A.  Good morning.

10    Q.  Can you tell the jury what you do for a living?

11    A.  I'm a master parachute rigger.  I service parachutes, do

12    repairs for skydiving clients, pilots.  I will do consulting,

13    design, manufacturing, testing, and repair of parachutes and

14    related equipment for military and civilian clients.

15                   THE CLERK:  Excuse me.  Can you pull the microphone

16    closer to you?

17                   THE WITNESS:  How is that?

18    Q.  BY MS. LYDON:  All right.  And have you ever been a USPA-

19    and UPT-certified tandem instructor?

20    A.  Yes.

21    Q.  Do you also sport parachute for fun?

22    A.  Yes.

23    Q.  About how long have you been a parachutist?

24    A.  My first jump was in 1978.

25    Q.  And did you at one point work at or around Parachute Center

1    in Lodi?

2    A.   Yes.

3    Q.   Let's talk about your basis of knowledge of tandem

4    parachuting operations at Lodi Parachute Center.

5         How did you get associated with Lodi Parachute Center?

6    A.   In 1997, I approached the Parachute Center after doing some

7    contract work for them and started part-time employment and

8    worked into very full-time employment.

9    Q.   Okay.  Who did you approach?

10   A.   Bill Dause.

11   Q.   Who is he?

12   A.   He's the owner of the Parachute Center.

13   Q.   And what did you do when you began working at Parachute

14   Center in 1997?

15   A.   I did parachute rigging work, repairs, inspection,

16   maintenance.

17   Q.   Okay.  So you worked on parachute rigs that Parachute

18   Center owned?

19   A.   Yes.

20   Q.   Okay.  Were you ever -- you mentioned you were a tandem

21   instructor; is that right?

22   A.   Yes.

23   Q.   Let's briefly talk through that experience.

24        When was it that you were a tandem instructor?

25   A.   In the early 2000s.

1    Q.   Did you take a tandem instructor course?

2    A.   I did.

3    Q.   Where?

4    A.   At the Parachute Center.

5    Q.   With who?

6    A.   A man named Fred Smith.

7    Q.   And who is he?

8    A.   He was the USPA safety and training advisor and tandem

9    examiner.

10   Q.   Okay.  What did you want to get when you took that tandem

11   instructor course?

12   A.   A manufacturer issued rating and USPA endorsement.

13   Q.   Okay.  Anything else?

14   A.   Full knowledge to complete safe tandem parachute jumps.

15   Q.   Were you looking for anything with respect to paperwork?

16   A.   Yeah.  Mr. Smith, he -- he guided us through the process of

17   filling out applications, proficiency cards.

18   Q.   Okay.  About how many tandem jumps have you done?

19   A.   Little over 3,300.

20   Q.   Are you still a USPA and UPT tandem instructor?

21   A.   No.

22   Q.   Okay.

23   A.   No.  I retired from that years ago.

24   Q.   Let's talk about tandem operations ran at Parachute Center.

25        If a certified tandem instructor woke up in the morning and

1   wanted to do jumps at Parachute Center, how would they go about

2   that?

3   A.  They would show up at the Parachute Center.  If they were

4   known to the -- to the Parachute Center and had performed jumps

5   there before, they would sign their name on a board -- big

6   whiteboard that had their names down this way, and the aircraft

7   loads in sequence going that way.  And then they would be

8   issued numbers and proceed to work.

9   Q.  Okay.  From a customer perspective, if a member of the

10  public wanted to jump at Parachute Center, how would that work

11  from their perspective?

12  A.  They'd enter the Parachute Center, be directed to the front

13  desk, pay their fees, be issued their waiver paperwork.  And

14  once filling that out, watching the -- the tandem waiver video

15  at the same time they would do that, and then wait for their

16  number to be called.

17  Q.  Okay.  Let's talk about your vantage point to know what was

18  happening at Parachute Center, now, in the 2015, 2016 era.

19  Okay.

20      Where were you working physically at that time in 2015 and

21  2016?

22  A.  I would work out of my shop, which was about a quarter mile

23  to the North of the Parachute Center on the airport.

24  Q.  Okay.  So you -- were you, in 2015 and 2016, an employee of

25  the Parachute Center?

1    A.   No.

2    Q.   Were you -- what was your business relationship with the

3    Parachute Center then?

4    A.   I would do contract repairs, maintenance.  The heavy

5    maintenance would come to me.

6    Q.   Okay.  And your business, I think you said, was half -- a

7    quarter mile or so away from the Parachute Center?

8    A.   Correct.

9    Q.   And you still did contract work for the Parachute Center

10   itself?

11   A.   Yes.

12   Q.   Did you have any business relationship with the skydivers

13   at parachute center?

14   A.   Yes.

15   Q.   What was it?

16   A.   They would bring me their parachutes for inspection and

17   maintenance.

18   Q.   Okay.  How frequently did you visit the Parachute Center in

19   the '15, 2016 era?

20   A.   Sometimes multiple times a day.  Sometimes I would not show

21   up there at all.  Just depending on how -- my workload and

22   sometimes the heat.

23   Q.   Why was the heat relevant?

24   A.   Oh, I worked in a metal building and would have to get out,

25   de-fry my brain a little bit.

1  Q.  Your facility, was that the metal building?

2  A.  Yeah.

3  Q.  And how was the temperature at Parachute Center?

4  A.  It was a little bit cooler.

5  Q.  Okay.

6  A.  The building was insulated.

7  Q.  When you did go to Parachute Center, about how long would

8  you spend there?

9  A.  Anywhere from ten minutes to sometimes hours.

10  Q.  Was there a business purpose for your visits to the

11  Parachute Center?

12  A.  Yes.  I would check in with the riggers at the Parachute

13  Center themselves, check in with clients, make myself available

14  for consultation.

15  Q.  Did you have -- were a lot of your customers at the

16  Parachute Center?

17  A.  Yes.

18  Q.  So was it helpful to you to be there if they had problems?

19  A.  Yeah.

20  Q.  Okay.  I'd like to look at a few photos.

21          MS. LYDON:  May I approach to help with the binder?

22          THE COURT:  Yes.

23          MS. LYDON:  Thank you.

24  Q.  BY MS. LYDON:  Could you turn to the Tab 807, Government's

25  Exhibit 807.  It's a little bit back in the binder in front of

1    you, actually.  Just a few.

2        Do you recognize what's depicted in Government's

3    Exhibit 807?

4    A.  I do.

5    Q.  What is it?

6    A.  It is the view as you walked in the -- the doorway that

7    typically customers and staff would use.

8    Q.  Is it a fair and accurate depiction of that spot?

9    A.  Yes.

10            MS. LYDON:  Move to admit 807, please.

11            MS. CRAGER:  No objection.

12            THE COURT:  Exhibit 807 is received in evidence.

13        (GOVERNMENT'S EXHIBIT 807 ADMITTED INTO EVIDENCE.)

14            MS. LYDON:  Let's publish.

15   Q.  BY MS. LYDON:  So what specifically are the -- are against

16   the walls here?

17   A.  Lockers for staff and jumpers who would keep their

18   equipment at the Parachute Center.

19   Q.  Were those lockers commonly used?

20   A.  Yes.

21   Q.  Did you have a locker at the Parachute Center?

22   A.  I did.

23   Q.  Could you point it out by description?

24   A.  Against the far wall, up against the rollup door, and it's

25   the locker -- the steel locker on the right.

1    Q.  This one that I'm circling right now with no stickers on

2    it?

3    A.  Yes.

4    Q.  All right.  Could you look at Government's Exhibit 809,

5    please.  Just two tabs ahead.

6    A.  Um-hum.

7    Q.  What is it?

8    A.  It appears to be an open area with the video concession

9    booth.

10   Q.  Do you recognizes that spot?

11   A.  I do.

12   Q.  Is it a fair and accurate depiction of it?

13   A.  Yes.

14           MS. LYDON:  Move to admit 809.

15           MS. CRAGER:  No objection.

16           THE COURT:  Exhibit 809 is received in evidence.

17       (GOVERNMENT'S EXHIBIT 809 ADMITTED INTO EVIDENCE.)

18   Q.  BY MS. LYDON:  How is -- this spot at the Parachute Center

19   with the couches and the open-air area with the seating, how

20   was that used?

21   A.  Best described as a hangout area for people waiting to go

22   on jumps, resting after jumps.

23   Q.  Okay.  Can you look at 808, 810, and 831.  And my question

24   about these will just be what is that area.

25   A.  I think I'm --

1    Q.  Oh, yeah.

2    A.  Which ones would you like?

3    Q.  808, 810, and 831.

4    A.  I think I was confused with the photo and video booth.  So

5    808 is the photo/video booth.

6    Q.  Okay.  How about 810?

7    A.  That's an inside view of the screens and computer terminals

8    at the photo/video booth.

9    Q.  Okay.  And 831?

10   A.  31?

11   Q.  831.

12   A.  Okay.  That is an opposing view, like, from the -- from the

13   left side of it.  From the photo/video booth.

14   Q.  Are those three exhibits fair and accurate depictions of

15   the photo booth at the Parachute Center?

16   A.  Yes.

17            MS. LYDON:  Move to admit 808, 810, and 831.

18            MS. CRAGER:  No objection.

19            THE COURT:  Exhibits 808, 810, and 831 are received

20   in evidence.

21      (GOVERNMENT'S EXHIBITS 808, 810, 831 ADMITTED INTO

22   EVIDENCE.)

23            MS. LYDON:  Please publish 808.

24   Q.  BY MS. LYDON:  Here do you -- is the giant booth that says

25   photo and video on it.  Is that what you were referring to by

1   photo booth?

2   A.  Yes.

3   Q.  What is a photo booth -- what is this photo booth?

4   A.  At the time, it was a concession for customers who paid for

5   photos and video to receive their -- I think they used SD

6   card -- not SD cards but thumb drives to deliver the photos and

7   videos after tandem jumps.

8   Q.  So sometimes when people jumped out of planes, they could

9   pay for a video or photos of the experience?

10  A.  Yes.

11  Q.  Who typically manned this photo and video booth?

12  A.  Well, at the time, I believe it was Rob Pooley's

13  concession.  And there would be various people manning the

14  booth at his direction.

15  Q.  What was Rob Pooley's business at the time with respect to

16  photos and videos at Parachute Center?

17  A.  I believe he coordinated the efforts of -- of delivering

18  product.

19  Q.  Was he a videographer?

20  A.  Yes.  Yes.

21  Q.  Did he ever teach tandem courses in this area?

22  A.  Yes.

23  Q.  Did you ever observe him teaching tandem courses in this

24  area?

25  A.  I did.

1    Q.  Could we flip to 810, please.

2        And you mentioned that this is the -- another view of the

3    area behind the photo booth?

4    A.  Um-hum.  Yes, it is.

5    Q.  And 831, please.

6        Is that just another angle of the photo booth?

7    A.  It is.

8    Q.  Okay.  Could we look at Government's Exhibit 812, which is

9    already admitted.

10       And 138, already admitted.

11       And 817, already admitted.

12       Do you recognize the room with the mats depicted in these

13   three photos?

14   A.  I do.

15   Q.  Can you describe what happened in this room, what it was?

16   A.  That was a back-office area for the Parachute Center and

17   packing for the company equipment.

18   Q.  Okay.  Did you ever observe tandem courses taught here?

19   A.  Yes.

20   Q.  Did you observe Rob Pooley teaching tandem courses here?

21   A.  Yes, I did.

22   Q.  Okay.  Can you describe -- do you know Mr. Pooley?

23   A.  I do.

24   Q.  How do you know him?

25   A.  I don't know the exact year that he came to the Parachute

1    Center, but we were introduced slight -- you know, right

2    after -- during that time.

3    Q.  So you met him at work?

4    A.  Yes.

5    Q.  Okay.  At some point, did you know him to be a USPA and UPT

6    examiner?

7    A.  I did.

8    Q.  Did you know that as an examiner, he taught tandem classes?

9    A.  Yes.

10   Q.  Okay.  Was Parachute Center known as an attractive place

11   for people who wanted to get tandem instructor ratings?

12   A.  Yes.

13   Q.  Could you explain why it was attractive?

14   A.  The cost of the jumps was inexpensive.  There was a lot of

15   jump activity; so you could get jumps very fast and get them in

16   on -- the number of jumps required to get your rating

17   relatively easy.

18   Q.  Okay.  Did you learn in approximately August of 2015 that

19   Rob Pooley's tandem examiner rating was suspended by USPA and

20   UPT?

21   A.  Yes.

22   Q.  Did you talk to Rob Pooley about the suspension?

23   A.  I believe so, yes.

24   Q.  What did you -- what do you believe -- do you remember the

25   exact words that you used?

1          THE COURT:  He used or that Pooley used?

2          MS. LYDON:  I guess both.

3   Q.  BY MS. LYDON:  Do you remember exactly what you said to

4   each other or in sum and substance?

5   A.  I would say sum and substance.

6   Q.  Okay.

7   A.  It's been a long time.

8   Q.  When you asked Mr. Pooley about his suspension, in sum and

9   substance, what did you say to him, and what did he say to you?

10  A.  I would believe I asked what the reason was for suspension.

11  And --

12          THE COURT:  Wait.  We're not getting into the reason

13  for the suspension.  We all agreed to that.

14          MS. LYDON:  Did --

15          THE COURT:  Don't try to get something in on me.

16  Don't try to put one over on me.

17          MS. LYDON:  I'm not, Your Honor.  I'm trying to ask

18  did -- I'll ask a very targeted question.

19  Q.  BY MS. LYDON:  Did Pooley acknowledge that he was suspended

20  to you?

21  A.  Yes.

22  Q.  Okay.  After you learned that Pooley's rating had been

23  suspended, did you see Pooley conducting ratings courses?

24  A.  Yes.

25  Q.  Did you see Yuri Garmashov present for all of the tandem

1    instructor classes you saw Pooley conducting after Pooley's

2    examiner ratings were suspended?

3    A.  No.

4    Q.  Approximately how many times after Pooley's examiner

5    ratings were suspended did you see him conducting tandem

6    instructor courses without Yuri Garmashov present?

7    A.  Five to ten times.

8    Q.  Okay.  And did you ever see someone named YongHyeon Kwon

9    conducting tandem jumps with customers?

10   A.  Yes.

11   Q.  Approximately how many times?

12   A.  I would say a handful.

13   Q.  A handful?

14   A.  Yeah.

15          MS. LYDON:  Okay.  No further questions.

16          THE COURT:  Is there any cross-examination?

17          MS. MCLOUGHLIN:  Yes, please, Your Honor.

18          THE COURT:  All right.  You may proceed.

19                        CROSS-EXAMINATION

20   BY MS. MCLOUGHLIN:

21   Q.  Good morning.

22   A.  Good morning.

23   Q.  You've testified that you worked at the Parachute Center, I

24   think starting in '97, and you worked there for about 20 years,

25   right?

1    A.   21.

2    Q.   21 years.

3         So you have an understanding of how it operates, generally,

4    day-to-day?

5    A.   Yes.  At the time I was there, I did.

6    Q.   Right.  And you were there until -- I'm doing math in my

7    head, but that would be 2018, correct?

8    A.   Correct.

9    Q.   Okay.  So you have an understanding of who is there on-site

10   on the days that you were also there?

11   A.   Yes.

12   Q.   And generally how decisions get made there, you have an

13   understanding of that as well?

14   A.   Could you ask the question again?

15   Q.   Yes.  So in terms of major decisions, who is going on that

16   whiteboard you referred to, that would be a decision made by

17   Bill Dause, the owner, correct?

18   A.   Yes.

19   Q.   And those big decisions go through him?

20   A.   Typically, yes.

21   Q.   And he's there nearly every day, usually, when you were

22   there?  Bill Dause was there almost every day at the Parachute

23   Center?

24              THE COURT REPORTER:  I didn't hear an answer.

25              THE COURT:  Did he answer the question?

1    Q.  BY MS. MCLOUGHLIN:  Sorry.  Could you repeat your answer?

2    A.  To which question?

3    Q.  That Bill Dause was there nearly every day at the Parachute

4    Center.

5    A.  Yes.

6    Q.  And I'll say to you, whenever I'm asking, I'm just assuming

7    from the time you were working there from '97 to 2018.

8        And during that time, there was no area, physically, of the

9    Parachute Center that was off limits to him?

10   A.  No.

11   Q.  Okay.  Thank you.  At the front desk, usually someone named

12   Kathy Dause works there, correct?

13   A.  Yes.

14   Q.  And she's also worked there for many years, or she was

15   working there the entire time you were working there, correct?

16   A.  Yes.

17   Q.  Bill Dause tells Kathy exactly what to do in her job,

18   correct?

19          MS. LYDON:  Objection.  Relevance.

20          THE COURT:  I don't think anything he said so far

21   is -- has been relevant; so if that's the test, he wouldn't be

22   here.  But it does seem to relate to the same subject matter

23   that you asked him; so I'll overrule the objection.

24   Q.  BY MS. MCLOUGHLIN:  Does Bill Dause tell Kathy what to do

25   in her capacity working at the front desk?

1    A.  Typically.

2    Q.  You mentioned that the Parachute Center was attractive

3    because it's cheap, right?

4    A.  Yes.

5    Q.  That you can get lots of jumps in quickly because there's

6    lots of planes going up and down?

7    A.  Yes.

8    Q.  The Parachute Center doesn't do any outside marketing, does

9    it, that you know of?

10   A.  I don't know.  Yeah.

11   Q.  As far as you know, there is no outside marketing done for

12   the Parachute Center?

13   A.  I -- I don't know.

14   Q.  But generally, people are there because they find out or

15   know about the Parachute Center through word of mouth?

16   A.  I think there is some online presence, but I can't -- I

17   can't keep track of all that.

18   Q.  Understood.

19       You previously spoke with federal agents about this case

20   several times, correct?

21   A.  Yes.

22   Q.  And in April '24, they were asking you questions about the

23   course and any outside marketing being done for that course,

24   right?

25   A.  I don't remember the details of --

1    Q.   Okay.

2    A.   April 24th or April 2024?

3    Q.   April 2024.  And I can point you to exhibit -- an exhibit,

4    if looking at the notes of that interview would refresh your

5    recollection.

6    A.   Okay.

7    Q.   Okay.  If you could take out Exhibit No. 2178.  And that's

8    in Binder 7.  And I'm happy to help you look for that binder.

9         Again, that's 2178.

10   A.   Okay.

11   Q.   And I'm going to point you to the fifth paragraph down.

12   A.   Okay.

13   Q.   And it's the second-to-the-last sentence there.  You can

14   review that whole paragraph, and then I'll ask if that

15   refreshes your memory.

16            THE COURT:  Refreshes his recollection about what?

17            MS. MCLOUGHLIN:  About whether he told agents in 2024

18   that there was any outside marketing for the Parachute Center

19   for the course.

20            THE WITNESS:  Page 1?

21   Q.   BY MS. MCLOUGHLIN:  Page 1, fifth paragraph down.

22   A.   That begins with Swan?

23   Q.   Yes.  And you can just read it to yourself, please.

24   A.   Okay.  I've read it.

25   Q.   Thank you.

1      Does that refresh your recollection as to what you told

2  agents in April 2024 in a statement to them?

3  A.  It appears to be from us having an interview, yeah.  It

4  says, Swan was unaware of outside marketing.  Is that what

5  you're getting at?

6  Q.  Yes.

7  A.  Okay.

8  Q.  Does that refresh your recollection?

9  A.  It -- it must have happened.  I -- if it's -- if it's in

10  the notes.

11  Q.  Okay.  And so you told agents that you were unaware of any

12  outside marketing for the course, correct?

13  A.  Correct.

14  Q.  I want to talk specifically about Rob Pooley's 2015

15  suspension.

16      THE COURT:  Why are you going to talk to him about

17  Rob Pooley's suspension?  He doesn't know anything about it.

18      MS. MCLOUGHLIN:  I don't want to get into any

19  details, Your Honor, just the fact that he did know about.

20      THE COURT:  What difference does it make whether he

21  knew about it?

22      MS. MCLOUGHLIN:  I'm going to ask some other

23  questions about who he also spoke to about the suspension.

24      THE COURT:  No, you're not, because it's not

25  relevant.

1          MS. MCLOUGHLIN:  Well, Your Honor, I proffer that his

2     testimony --

3          THE COURT:  That he talked to somebody?  You're going

4     to get some hearsay in about the suspension?

5          MS. MCLOUGHLIN:  No, Your Honor.

6          THE COURT:  I'm going to tell you, proceed at your

7     own risk.  All right.  Go ahead.  It's up to you.

8          MS. MCLOUGHLIN:  Thank you, Your Honor.

9     Q.  BY MS. MCLOUGHLIN:  You had testified that you knew that

10    Rob Pooley's tandem examiner rating was suspended in

11    August 2015, correct?

12    A.  Yes, I did.

13    Q.  And that you spoke to him about it and that he acknowledged

14    it when you spoke to him?

15    A.  Yes.

16    Q.  Was it also common knowledge at the drop zone that he was

17    suspended?  Or it was common knowledge at the drop zone that he

18    was suspended?

19    A.  Possibly, you would say the staff.  The drop zone -- are

20    you including everyone?

21    Q.  I guess everyone who was there is who I'd be referring to.

22    But I guess what I'm asking is would you characterize that

23    knowledge as open news, the fact that he was suspended?

24    A.  No.

25    Q.  Okay.  This isn't the first time you've testified about

1  these issues, correct?

2  A.  I've testified in front of a grand jury.

3  Q.  Yes.  And during that -- during the grand jury proceedings,

4  that testimony was also under oath, correct?  You were under

5  oath to tell the truth?

6  A.  Yes.

7  Q.  I'd like to look at the transcript for your testimony.  And

8  that's in Binder 3, and I think you have Binder 7; so I'll help

9  you find the other one.

10     So you have Exhibit 2015 open in front of you?

11  A.  Yes.

12  Q.  And if you could look at page 11, starting at -- towards

13  the bottom of the page, line 24.  If you could read to yourself

14  from that point to page 12, line 7.

15  A.  To line 7?

16  Q.  Yes, please.

17  A.  Okay.

18  Q.  Thank you.

19     At the grand jury, you testified that Rob Pooley's tandem

20  examiner rating being suspended was pretty open news, correct?

21  A.  I did.

22  Q.  Okay.  Thank you.

23     You also testified that you saw Rob Pooley teaching tandem

24  instructor courses during the period when he was suspended,

25  right?

1    A.  Yes.

2    Q.  And you actually confronted Bill Dause about this, correct?

3              MS. LYDON:  Objection.  Hearsay.

4              THE COURT:  Confronted Bill Dause?  What do you mean,

5    confronted Bill Dause?

6              MS. MCLOUGHLIN:  I am going to ask whether he asked

7    Bill Dause why Rob Pooley was teaching the course, and Bill

8    Dause's answer would be offered not for the truth of the matter

9    but for the fact that there was an understanding of what Rob

10   was doing teaching courses while suspended.

11             THE COURT:  An understanding between whom?  This

12   witness has had nothing relevant to say about this case except

13   for you to bring out various things that may or may not open

14   the door to other things.  This witness's knowledge is not

15   relevant to this case in any way, shape, or form.

16        So what is it that's relevant about his conversation with

17   Bill Dause?

18             MS. MCLOUGHLIN:  Your Honor, my questioning would be

19   to the point that folks at the drop zone were aware that there

20   was a suspension.  But I understand.

21             THE COURT:  That who was aware there was a

22   suspension?

23             MS. MCLOUGHLIN:  That it was talked about, just --

24             THE COURT:  But it wasn't talked about with any of

25   the witnesses that have testified in this case.  There is no

1    testimony that it was -- that he can offer whether or not it

2    was discussed with any witness or any of the parties to any of

3    the transactions involved in this case.  It's just brought up

4    by you and by the other side to cloud the issues, to make it

5    difficult for me to rule on objections to other questions.  And

6    I -- I'm not happy about that.

7         All right.  Go ahead.  Ask your question.  Let's hear what

8    the answer is.

9              MS. MCLOUGHLIN:  Understood, Your Honor.  I'll move

10   on.

11   Q.  BY MS. MCLOUGHLIN:  Sir, I'd like to ask you about people

12   who have been at the drop zone during the times that you were

13   there.

14        You testified that you know about certain skydivers who

15   were at the drop zone while you were also working for the drop

16   zone, correct?

17        You were familiar with the skydivers who were jumping at

18   the drop zone, correct?

19   A.  Most of them, yeah.

20   Q.  Okay.  Sometimes you would spend hours at the drop zone?

21   A.  Yes.

22   Q.  You saw skydivers who were doing jumps at the drop zone?

23   A.  That's what people do at drop zones, yes.

24   Q.  I'd like to ask you if you recognize someone who was at the

25   drop zone.

1          If you could pull up Government's Exhibit 15.  And I

2     believe that's in their Binder 1.

3          I'll approach again.

4          Are you looking at Government's Exhibit No. 15?

5     A.  Yes.

6     Q.  Do you recognize that person?

7     A.  Off the top of my head, no.

8               MS. MCLOUGHLIN:  Okay.  That's all I have.  Thank

9     you.

10              THE COURT:  Redirect?

11              MS. LYDON:  Very briefly.

12                         REDIRECT EXAMINATION

13    BY MS. LYDON:

14    Q.  You were asked on cross about whether and to what degree

15    Rob Pooley's suspension was common knowledge or open news.  Do

16    you recall those questions?

17    A.  Yes.

18    Q.  Who knew about Rob Pooley's suspension at the drop zone?

19    A.  Staff.

20              MS. MCLOUGHLIN:  Objection, Your Honor.  Speculation.

21              THE COURT:  You shouldn't have asked the question to

22    start off with.  I told you to proceed at your peril.

23         Overruled.

24    Q.  BY MS. LYDON:  What category of people?  I don't need

25    names.

1    A.  Staff.  Staff, owners.

2    Q.  Permanent employees?

3    A.  In the structure, there was no permanent employees except

4    the owner.  But longtime staff members.

5    Q.  Longtime staff members knew.  Okay.

6        You weren't testifying, were you, that customers knew,

7    right?

8    A.  No.

9    Q.  Okay.

10   A.  Customers being --

11   Q.  Well, regular people who came to skydive there.

12   A.  There could be a certain percentage that knew, certain that

13   didn't.

14   Q.  Okay.  Tandem instructor candidates who took his course,

15   you weren't testifying they knew, right?

16       Tandem instructor candidates who came from abroad, you

17   weren't testified that they knew, right?

18   A.  I didn't testify to that, no.

19            MS. LYDON:  Okay.  Thank you.

20            THE COURT:  Is that it?  Any other questions?

21            MS. MCLOUGHLIN:  No.  Thank you, Your Honor.

22            THE COURT:  All right.  Thank you, Mr. Swan.  You're

23   excused.

24            THE WITNESS:  Thank you, Your Honor.

25            THE COURT:  You may call your next witness.

1          MR. SHARMA:  Yes, Your Honor.  Government calls David

2    Jensen.

3          THE CLERK:  Sir, step forward all the way up to the

4    witness stand.  All the way up to the stand, sir.

5       Remain standing, and face me.  Please raise your right

6    hand.

7       (The Witness, DAVID JENSEN, is sworn.)

8          THE WITNESS:  Yes.

9          THE CLERK:  Thank you.  You may be seated.

10      Please state your full name.  Spell your last name for the

11   record.

12         THE WITNESS:  David Jensen.

13         THE CLERK:  Spell your last name, please.

14         THE WITNESS:  I'm sorry?

15         THE CLERK:  Spell your last name.

16         THE WITNESS:  Spell?

17         THE CLERK:  Last name.

18         THE WITNESS:  J-E-N-S-E-N.

19                        DIRECT EXAMINATION

20   BY MR. SHARMA:

21   Q.  Good morning, Mr. Jensen.

22   A.  Good morning.

23   Q.  Let's see if we can get you out of here by lunch.  I'm

24   going to keep it real brief, just two topics.  I have to ask

25   you about a visit to the Parachute Center and a conversation

1  that you had with someone there.  Okay?

2  A.  Okay.

3  Q.  Who do you work for?

4  A.  Federal Aviation Administration.

5  Q.  Are you an inspector with them?

6  A.  Yes.

7  Q.  And was that your role in 2016?

8  A.  Yes.

9  Q.  All right.  So let's talk about a visit you made to the

10  Parachute Center in 2016.

11      Did you visit the Parachute Center on August 9th of 2016?

12  A.  Yes.

13  Q.  Did you meet with the owner of the Parachute Center on that

14  date?

15  A.  Yes.

16  Q.  Who was that person?

17  A.  Bill Dause.

18  Q.  And where did you meet Mr. Dause?

19  A.  That would be at his counter there in the hangar that they

20  have.

21  Q.  Okay.  Did you ask him for tandem instructor paperwork of a

22  skydiver named YongHyeon Kwon?

23  A.  Yes.

24  Q.  Did he give it to you?

25  A.  He did, yes.

1    Q.  All right.  I'm going to --

2              MR. SHARMA:  Your Honor, may I approach?

3              THE COURT:  Yes.

4    Q.  BY MR. SHARMA:  I'll turn your attention to Exhibit 5 in

5    the binder.

6         Do you recognize this document?

7    A.  Yes, I do.

8    Q.  And how do you recognize it?

9    A.  I recognize it with the name Kwon on it.

10   Q.  Is this the document that you received from Mr. Dause?

11   A.  Yes, it is.

12             MR. SHARMA:  Your Honor, government moves to enter

13   Exhibit 5 into evidence.

14             MS. CRAGER:  No objection.

15             THE COURT:  All right.  Exhibit 5 is received in

16   evidence.

17        (GOVERNMENT'S EXHIBIT 5 ADMITTED INTO EVIDENCE.)

18   Q.  BY MR. SHARMA:  Okay.  So it's a little light, but Yong

19   Kwon, is that the name you saw on it --

20   A.  Yeah.

21   Q.  -- where it says name, as it appears?

22   A.  Yes.

23   Q.  Let's flip over to the next page.

24        And this is a USPA new or renewing membership application;

25   is that right?

1   A.   Yes.

2   Q.   For -- again, for Mr. Kwon?

3   A.   Yes.

4   Q.   Let's flip over to the page -- next page.

5        On this page, do you see some signatures, some initials?

6   A.   Yes, I do.

7   Q.   You can look at the screen, sir.  I have it up on the

8   screen there.

9   A.   Okay.

10  Q.   Then in the corner, is it signed by someone?

11  A.   Yes.  I see Rob Pooley.

12  Q.   Okay.  You can zoom out.  And let's move over to the next

13  page.

14       Do you see some more signatures on there, sir?

15  A.   I do.  I see Rob Pooley's signatures.

16  Q.   Okay.

17  A.   And --

18  Q.   And in the corner there, do you see someone else's?

19  A.   I do.  I see a Yuri Garmashov.

20  Q.   Okay.  Next page.

21       Do you see another signature at the bottom over here on

22  this page?

23  A.   Yes, I do.

24  Q.   Whose signature?

25  A.   Yuri Garmashov.

1   Q.  Next page.

2       Now, this is a coach rating course proficiency card, right?

3   A.  Yes.

4   Q.  For Mr. Kwon?

5   A.  Yes.  Oops.  I pushed a button here, and something came up.

6   Q.  Let's not touch the screen.

7       Is that zoomed in?

8   A.  It disappeared.

9   Q.  All right.  And there is some more signatures on this page;

10  is that right?

11  A.  Yes.

12  Q.  Okay.  And the next page.

13      And looks like those signatures belong to a person in the

14  corner over there?

15  A.  Yep.  Yuri Garmashov.

16  Q.  Okay.  Next page.

17          THE COURT:  Looks like Mr. Garmashov signs his name

18  exactly the same way every time.

19          MR. SHARMA:  It's unusual, isn't it?

20  Q.  BY MR. SHARMA:  And then, Your Honor, tandem instructor

21  rating -- I'm sorry.

22      Mr. Jensen, the next page is tandem instructor rating

23  course proficiency card, right?

24  A.  Yes.

25  Q.  And that's, again, Mr. Kwon's document?

1    A.   Yes, it is.

2    Q.   And similar signatures that we saw before?

3    A.   Yes.

4    Q.   Let's flip the page over.

5         Then, in the corner, who is that signed by?

6    A.   Yuri Garmashov.

7    Q.   Okay.  And what is the -- what's the date on that

8    signature?

9    A.   That's a date of July 1, 2016.

10   Q.   If we can zoom out of that.

11        Do you see anyone else's signatures on there?

12   A.   I do.  I see Rob Pooley's signature there above.

13   Q.   All right.  Let's flip over to the next page.  And the next

14   page.  All right.

15        And on this page, do you see more of Mr. Garmashov's

16   pictures -- signatures?

17   A.   Yes, I do.

18   Q.   And this is a UPT -- zoom out -- a United Parachute

19   Technologies Tandem Instructor Certification Form, right?

20   A.   Yes, sir.

21   Q.   Next page.  That's all of them.

22        All right.  Let's talk about what happened after you got

23   these documents.

24   A.   Okay.

25   Q.   At some point, did you find out that Yuri Garmashov was not

1    in the country on July 1st?

2    A.   Yes.

3    Q.   Okay.  Did you then return to the Parachute Center?

4    A.   I did, yes.

5    Q.   Was that August 25, 2016?

6    A.   Yes.

7    Q.   When you returned to the Parachute Center, did you speak to

8    Rob Pooley?

9    A.   I did, yes.

10   Q.   Where was he when you had that conversation?

11   A.   Inside their hangar that they have.

12   Q.   Okay.  And at that point, did you confront him with the

13   fact that Yuri Garmashov's signature appeared on the document

14   even though Garmashov wasn't in the country on July 1st?

15   A.   Yes.

16   Q.   What did he say?

17   A.   He did not have an answer other than Bill Dause handles all

18   the paperwork.

19   Q.   Okay.  What was his demeanor when you confronted him?

20   A.   Nervous.

21   Q.   At the time you spoke with Mr. Pooley, did you know that

22   his tandem examiner rating had been suspended?

23   A.   Yes.

24   Q.   Did you confront him with that fact?

25   A.   I did, yes.

 1   Q.  What did he have to say about that?

 2   A.  He said he knew that that was the case, and there was

 3   something about a year's time.  He thought it would be

 4   re-invoked in a year's time.

 5           MR. SHARMA:  Okay.  No further questions.

 6           THE COURT:  You may cross-examine.

 7           MS. CRAGER:  I have nothing, Your Honor.

 8           THE COURT:  No questions.  All right.

 9       Thank you, Mr. Jensen.  We got you out of here before noon.

10           MR. SHARMA:  I promised.

11           THE WITNESS:  Okay.

12           THE COURT:  You may call your next witness.

13           MS. LYDON:  The government calls Special Agent Keum.

14           THE CLERK:  Sir, please step forward, all the way up

15   to the witness stand, and remain standing.

16       Please raise your right hand.

17       (The Witness, KYUNG KEUM, is sworn.)

18           THE WITNESS:  I do.

19           THE CLERK:  Thank you.  You may be seated.

20           MS. LYDON:  Good morning, Special Agent Keum --

21           THE CLERK:  Excuse me, Counsel.

22       Please state your full name.  Spell your last name for the

23   record.

24           THE WITNESS:  Yes, ma'am.  First name is Kyung,

25   K-Y-U-N-G.  Last name is Keum.  That's K-E-U-M.

1          MS. LYDON:  Thank you.

2                    DIRECT EXAMINATION

3     BY MS. LYDON:

4     Q.  What do you do for a living?

5     A.  I am a special agent currently with the US Department of

6     Agriculture, Office of Inspector General.

7     Q.  Okay.  And in -- what did you do before you became a

8     special agent with USDA OIG?

9     A.  In 2011, I started as a special agent with the State

10    Department's Diplomatic Security Service.  After that, in 2017,

11    July of that year, I became a special agent with the US Army's

12    Criminal Investigations Command.  And then in December of 2018,

13    I switched jobs to the Department of Transportation OIG.

14    Q.  Okay.  I'd like to focus today on your time with the

15    Department of Transportation OIG.

16         What position did you hold with DOT OIG?

17    A.  Special agent.

18    Q.  Okay.  While you were at -- while you were a special agent

19    with DOT OIG, did you work on the investigation that led to

20    this case?

21    A.  Yes, I did.

22    Q.  Okay.  At the point that you joined the investigation, had

23    a search warrant to Google already been issued for the accounts

24    rpooley75@gmail.com and yurig.Garmashov@gmail.com?

25    A.  Yes, they had.

1   Q.  Have you reviewed documents from those search warrants?

2   A.  I did.

3   Q.  Could you -- I'll approach and help you with a binder

4   briefly.  One moment.

5       (Pause in proceedings.)

6       Special Agent Keum, you just directed your attention to

7   Government's Exhibit 1100.  Do you recognize that document?

8   A.  Yes.

9   Q.  Is it a document obtained through one of the search

10  warrants I just discussed?

11  A.  Yes.

12  Q.  What is it?

13  A.  It is an e-mail from Yuri Garmashov at that

14  yurig.garmashov@gmail.com address to a Joshua Hall at

15  josh4way@gmail.com.

16  Q.  All right.

17          MS. LYDON:  Move to admit Government 1100.

18          MS. MCLOUGHLIN:  Objection, Your Honor.  Hearsay.

19          THE COURT:  All right.  Let me take a quick look at

20  it.

21      So there is the cover sheet and then two attachment sheets;

22  is that correct?

23          MS. LYDON:  Yes, Your Honor.

24          THE COURT:  All right.  Let me look at them.

25      Ms. Crager, the two attached pages are statements that

1  appear to be signed by Mr. Pooley; so that would mean that

2  they're not hearsay if they're offered by the government,

3  correct?

4          MS. CRAGER:  Our position is they haven't yet shown

5  that those statements are by Mr. Pooley.

6          THE COURT:  Okay.  So the objection is not hearsay

7  it's foundation.

8          MS. CRAGER:  As to those two -- the first page, we

9  believe it's hearsay, the e-mail.

10          THE COURT:  The e-mail.  Well, the e-mail -- again,

11  you have to understand hearsay.  Hearsay is a statement that

12  was made out of court that's offered to prove the truth of the

13  matters asserted.  There are no matters asserted in here.

14          MS. MCLOUGHLIN:  Your Honor, the statement, I don't

15  know if Rob sent you this letter, but here is what he gave me

16  -- that Rob Pooley had given him that letter.

17          THE COURT:  Again, that just goes to the foundation.

18  All right.  So we'll talk about the foundation.

19      There is a valid objection as to foundation here because

20  you have not established that this, in fact, did come from

21  Mr. Pooley.

22          MS. LYDON:  Well, the defense counsel represented in

23  opening that Mr. Pooley signed this letter.

24          THE COURT:  Well, opening statements are not

25  evidence.

1          MS. LYDON:  Right.  But I did not understand that the

2     fact that he signed this letter to be contested based on

3     opening statement.

4          THE COURT:  Well, you can't do that.  Opening -- no.

5      The defense does not have the burden to call any witnesses

6     or to present any evidence.  The burden is -- of proof is

7     always on the government to prove its case, and you can't prove

8     it through the opening statements.

9          MS. LYDON:  Sure, Your Honor.  For purposes of the

10    104 determination of whether this is Mr. Pooley's statement,

11    we'd submit that the fact that it bears his signature is

12    sufficient to demonstrate that he signed this document.

13         THE COURT:  There is no evidence of what his

14    signature is.  There is no evidence of what his signature is or

15    looks like.  So I'm going to have to sustain the objection.

16    Q.  BY MS. LYDON:  All right.  Let's proceed in a -- through

17    some other documents that I believe will establish a foundation

18    that Mr. Pooley signed this document.  And then we'll go back

19    to this document, Special Agent Keum.

20      Did you conduct an interview of Mr. Yuri Garmashov on

21    March 5, 2020?

22    A.  Yes.

23    Q.  Did you arrive at a residence associated with him?

24    A.  Yes.

25    Q.  And did he show you some documents?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    A.  Yes.

2    Q.  I'm not going to ask you today about anything that you said

3    to him or he said to you, but I do want to talk about those

4    documents.  Okay?

5    A.  Yes.

6    Q.  All right.  Can you please look at Government's

7    Exhibit 1101.

8        What is that document?

9    A.  It's a picture of a letter that I took during that

10   interview.

11   Q.  Okay.  What does it appear to be?

12            THE COURT:  Well, it's the same as the previous

13   exhibit.

14            MS. LYDON:  Exactly.

15            THE COURT:  All right.  So we can take notice of

16   that.

17            MS. LYDON:  All right.  I'm not moving to introduce

18   it at this time.  I'm going to come back to that, too.

19            THE COURT:  Okay.

20   Q.  BY MS. LYDON:  But Mr. Garmashov showed you the same letter

21   that was Government's Exhibit 1100; is that right?

22   A.  Yes.

23   Q.  And you took a picture of it?

24   A.  Yes.

25   Q.  Okay.  Can you look at Government's Exhibit 1105, please.

1          What is Government's Exhibit 1105?

2    A.   It's an e-mail.

3    Q.   From who?

4    A.   From Rob Pooley at the rpooley75@gmail.com address.

5    Q.   Was this e-mail obtained through the search warrant on

6    Mr. Pooley's Gmail account?

7    A.   Yes.

8    Q.   Who is the letter -- or sorry.

9          What is this -- who is this e-mail sent to?

10   A.   Several individuals.  A Jan Meyer, Jim Crouch, Yuri

11   Garmashov.

12   Q.   All right.  What's the title or the subject?

13   A.   The subject is, Letter for Yuri G.

14   Q.   All right.  Can you flip to the next page.

15        Does this next page, Government's 1105, appear to bear the

16   same signature as the letter we just looked at?

17   A.   Yes.

18   Q.   And in sum and substance, does it attest that the letter

19   that we just looked at, Government's Exhibit 1100, is genuine?

20           THE COURT:  That's a question of admissibility.

21   There are cases in which the government has called handwriting

22   experts to testify as to whether the signature on one document

23   was written by the same person as the signature on another

24   document.

25        Now, he's not being held out as an expert, and there is no

1    objection, but this is not really the way to do this.

2        There is also no evidence because I guess there is no

3    disagreement about the fact that there was a subpoena to Google

4    and that these are the documents that were produced pursuant to

5    that subpoena.  That's -- that's the ordinary way to do it.  If

6    there is no objection, all right, we can -- we can accept that

7    fact; these documents were produced by Google.

8        All right.  Why don't we take the noon recess.  We can

9    straighten this out so we don't have to trouble the jury with

10   legal arguments.  They have enough to think about themselves

11   with regard to the facts.

12       So we'll take the noon recess until 1:30 and tell the jury

13   to remember the admonition, and we'll resume with them at that

14   time.

15           MS. LYDON:  Thank you.

16       (Jury not present, 11:52 a.m.)

17           THE COURT:  All right.  The jury is outside the

18   courtroom.  Let's see if we can get through this more easily.

19       You can stay there, or you can leave if you want while we

20   discuss this.

21       Talking to the witness.

22       The government is attempting to get in a two-page written

23   statement which the government says was written by Mr. Pooley.

24   There are a number of procedural hurdles that could be

25   addressed.  I don't know if they are really issues in the case

 1   that you want to address or not.  You know, one is whether

 2   these were actually produced pursuant to subpoena.  Ordinarily,

 3   the way to do that would be to call somebody from Google and

 4   lay the foundation for that.

 5       After they overcome that hurdle, the next question is

 6   whether this was actually something that was signed by

 7   Mr. Pooley.  And one way to do that is with a handwriting

 8   expert.  Another way to do it is to talk about who has access

 9   to his computer and so forth.  And I don't even know why the

10   government wants to use this statement.

11       So those are the things we can talk about.  I don't know

12   where you want to go from here.

13           MS. LYDON:  Thank you, Your Honor.  I can address

14   your points in turn.

15           THE COURT:  Let me hear from the defense.

16       Where do you want to go here?  Do you want to -- do you

17   want to put the government to the test, which you're entitled

18   to do, on these hurdles they have to accomplish, or do you

19   really care about this document?  I don't know.

20           MS. MCLOUGHLIN:  Well, Your Honor, we do have a

21   stipulation with the government that the e-mails from the

22   Google return are authentic; that would not be our contention.

23           THE COURT:  Okay.  So we got over that hurdle.  What

24   is your problem, then?

25           MS. MCLOUGHLIN:  The issue, Your Honor, is that this

1    is a letter that came from Yuri Garmashov, it appears, from the

2    Google returns, and that person is not here to testify.

3              THE COURT:  But that's where it came from.  But you

4    have no objection to the fact that it came off of -- whose

5    computer records?  Yuri's?

6              MS. LYDON:  Yes, Your Honor.

7              THE COURT:  You have no objection that it came off of

8    his -- his computer records.  So your point is maybe it was

9    sent by somebody else?  Say, for example, from -- from

10   Mr. Pooley's computer or something like that?

11             MS. MCLOUGHLIN:  Well, Your Honor, no.  So we don't

12   object -- we agree this is an e-mail and attached document that

13   came from Yuri Garmashov's Gmail account.  The question is

14   where Yuri Garmashov got the letter.

15             THE COURT:  Okay.  I got that.

16      So that's where they are.  What's your response to that?

17             MS. LYDON:  For purposes of admissibility of the

18   attachment, the letter signed by Rob Pooley, the government

19   needs to show, not beyond a reasonable doubt but by a

20   preponderance of the evidence, under 104 that it is what it

21   looks to be, which is a statement of a party opponent.  And the

22   rest of the documents in the 1100 series demonstrate that it

23   was written by Rob -- or that it was signed by -- signed by Rob

24   Pooley.

25             THE COURT:  What other documents tell you that?

1    There could be somebody sitting at his computer at all times

2    sending things out.

3              MS. LYDON:  I think it -- because it was e-mailed by

4    Yuri Garmashov, and the parties are in agreement about that.

5    There is no dispute that Yuri Garmashov e-mailed it to Josh

6    Hall.

7              THE COURT:  No.  I'm talking about Rob Pooley

8    e-mailing it to Yuri Garmashov.

9              MS. LYDON:  We don't have an e-mail of him e-mailing

10   it to Yuri Garmashov.  There are documents in the series which

11   go to the process by which it was drafted.  So it appears, if

12   you look at 101, that Yuri Garmashov spoke with an attorney

13   friend, told the attorney friend what happened; the attorney

14   friend drafted it, and then Mr. Garmashov e-mailed it twice to

15   Mr. Pooley.

16             THE COURT:  Drafted what?

17             MS. LYDON:  The letter.  The letter that is the

18   attachment to Exhibit 1100.

19             THE COURT:  Wait a minute.  So Mr. Pooley didn't

20   draft it?

21             MS. LYDON:  He didn't draft it, but he did sign it.

22             THE COURT:  Oh.

23             MS. LYDON:  Then, in Government 105 --

24             THE COURT:  Who proves that he signed it?

25             MS. LYDON:  Mr. Pooley does.  So --

1    THE COURT:  What does Mr. Pooley -- does Mr. Pooley

2    say, I signed it?

3    MS. LYDON:  Yes.  That is Government's Exhibit 1105,

4    the attachment.

5    Mr. Pooley sent, from his own Gmail account now, this

6    attached letter, 1105-002.  And the last paragraph of that

7    reads, A letter was written by myself on Yuri's behalf, stating

8    I did not believe he had any knowledge of what was going on at

9    Parachute Center while he was in Russia.  The validity of that

10   letter was questioned, and, therefore, in addition to e-mailing

11   this letter, I will make a notarized hard copy available.

12   The government also --

13   THE COURT:  Okay.  So now he's saying that was his

14   letter, right?

15   MS. MCLOUGHLIN:  Well, Your Honor, I don't think

16   that's entirely clear.  It refers to, A letter written by

17   myself on Yuri's behalf.

18   THE COURT:  Right.

19   MS. MCLOUGHLIN:  It's not referring to any dated

20   letter.  The only contents that it refers to is a one-sentence

21   summary.

22   THE COURT:  All right.  So you're saying he might be

23   referring to a different letter?

24   MS. MCLOUGHLIN:  He may be referring to a different

25   letter, or he's not necessarily -- he may be referring to a

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    different letter.

2              THE COURT:  Okay.  So what's your answer to that?

3              MS. LYDON:  There is not a different letter.  There

4    is the -- the substance of the letter that Mr. Pooley describes

5    that he wrote stating, I did not believe he had any knowledge

6    of what was going on at Parachute Center while he was in

7    Russia, is the main subject covered by the attachment to

8    Government 1100.

9         If you look at the bottom of that page --

10             THE COURT:  If that's true, wouldn't that go to the

11   weight of whether this is the same letter he's referring to?

12             MS. MCLOUGHLIN:  Your Honor, I think there is still a

13   chain of custody issue, where this letter came from and who had

14   it and the circumstances with which they -- under which they

15   obtained it, and this is not speaking to that.

16             THE COURT:  All right.  Then maybe the thing to do

17   would be to get the stipulations that you want to agree to on

18   the record so we know exactly what it is you're stipulating to

19   and exactly what you're not stipulating to.

20        Because you told me you're stipulating to the fact that

21   this came from Yuri's records.  You're stipulating to something

22   else -- stipulating to the fact that they were produced

23   pursuant to valid subpoena and so forth.  So I want to make

24   sure I don't want put any words in your mouth.  Let's get your

25   stipulation written out so we know exactly what it is.  And

1    then I will read whatever you have agreed upon as your

2    stipulation to the jury, because I've told them that the

3    evidence consists of the sworn testimony, the exhibits, and any

4    stipulations.  So I'll read them the stipulation.

5        And then whatever witness offers this into evidence,

6    whether it's this witness or another witness, I could let you

7    voir dire as to foundational questions on the -- on the

8    exhibit, and then I could rule on whether it comes into

9    evidence.  And if I decide it goes to the weight of the

10   evidence, I can so instruct the jury at that time.  Or if I

11   decide on some other limiting instruction, I can instruct the

12   jury at the time I receive it.

13           MS. MCLOUGHLIN:  Understood.

14           THE COURT:  So why don't we take the noon recess.

15   You come in at 1:15, and we'll go over this at that time.  You

16   come in with your stipulation signed, sealed, and delivered.

17           MS. LYDON:  We will endeavor to do that.

18       For purposes of the Rule 104 hearing, do I understand that

19   Your Honor will be examining whether or not we have

20   demonstrated that --

21           THE COURT:  I don't know that it's a 104 hearing.

22           MS. LYDON:  Maybe that was the wrong shorthand, Your

23   Honor.

24       What I meant was the preliminary question of admissibility

25   of whether the e-mail attachment in 1100 is a statement of Rob

1    Pooley or not.  Is that the question?

2            THE COURT:  Every time there is an objection there is

3    a discussion, and I rule on admissibility.  That doesn't mean

4    there was a 104 hearing every time there is an objection.  So

5    all I'm -- I'm not saying I'm going to have a 104 hearing.

6        But go ahead.

7            MS. LYDON:  I just want to make sure that we come

8    back from lunch prepared to address exactly what Your Honor is

9    interested in.  And is the issue whether or not we've shown by

10   a preponderance that the attachment was signed by Rob Pooley

11   such that it's a party admission?

12           THE COURT:  The question is whether it comes into

13   evidence.

14           MS. LYDON:  Right.

15           THE COURT:  One of the issues on that question is

16   whether that is his signature.

17           MS. LYDON:  Yes.

18           THE COURT:  I don't know that that's the only issue

19   that we're going to be addressing.

20           MS. LYDON:  Okay.  I will -- that's helpful.  Thank

21   you, Your Honor.

22       I'll also proffer that the government does plan to call two

23   notaries today and admit their notary books into evidence in

24   which Rob Pooley signed the letter that is Government's

25   Exhibit 105, as well as the Government's Exhibit -- I'm sorry.

1    Your Honor, one moment -- 10 -- 1109.  So that will serve as

2    additional evidence of what Rob Pooley's signature looks like.

3            THE COURT:  Yeah.  Not just what his signature looks

4    like, but there is also this issue, A letter was written by

5    myself on Yuri's behalf, stating, et cetera, whether that is

6    referring to the same letter that we're talking about in

7    Exhibits 1100 and 1101.

8            MS. LYDON:  Yes, Your Honor.  And I think we can --

9            THE COURT:  Because I think, you know, just to -- to

10   tell you my preliminary views about this, I think there is

11   enough evidence to create an inference that the trier of fact

12   can draw that this letter 10 -- 1105 refers to the other -- the

13   other exhibit.

14           MS. LYDON:  Thank you, Your Honor.

15           THE COURT:  Anybody looking at this, without being

16   overwhelmed by legalities, would probably come to the

17   conclusion that it's likely -- it's very likely -- it's

18   probably highly likely that these two pages were written by

19   Mr. Pooley.  That -- to conclude otherwise is to really bend

20   over backwards to give Mr. Pooley the benefit of the doubt.

21       So let's see where we end up when we get everything

22   together at 1:15.

23           MS. LYDON:  Thank you, Your Honor.

24       (Recess taken, 12:04 p.m. - 1:15 p.m.)

25           THE COURT:  All right.  It's 1:15.  It looks like

1    everybody that we need to have present is here.  We've got the

2    defendant, counsel on both sides.

3        Where do we stand on what we discussed just before we took

4    recess?

5            MS. LYDON:  I believe the parties have reached a

6    stipulation, Your Honor.

7        We have a series of e-mails from Google that we are

8    stipulating to the authenticity of.  The parties would still

9    reserve their objections with respect to any hearsay within

10   hearsay issues.  But with respect to foundation, it's

11   stipulated.  It's possible additional e-mails could be added by

12   either side, but right now, that is -- that is the step.

13           THE COURT:  All right.  Now, does that include the

14   Exhibit 1000 -- excuse me -- 1100 and 1101?

15           MS. LYDON:  It includes 1100.  Yes, it includes the

16   Gmails that we were discussing.

17           THE COURT:  Okay.  Is there any stipulation with

18   regard to the signature?

19           MS. MCLOUGHLIN:  No, Your Honor.

20           THE COURT:  All right.  So here's what we have right

21   now.  The letter is authentic; it has a signature which bears

22   similarities to Mr. Pooley's signatures on other documents.

23   There is another statement from him in which he indicates he

24   did sign the letter, and it was found in the e-mails of Yuri

25   with that signature on it.  So it sounds like there is enough

1    to let this go to the jury.

2       Bear this in mind.  In my instructions to the jury, I

3    routinely instruct them that if there is evidence that the

4    defendant made a statement, it's for them to determine, first,

5    whether the statement was made -- so we give that question to

6    them -- and, second, the circumstances under which it was made.

7       Now, I went back and looked at the defendant's trial brief,

8    and this appears to be the letter that they're talking about in

9    their trial brief that was written for Joshua Hall.

10      Now, in their trial brief, the defendants say that they're

11   going to have evidence that Mr. Pooley was, quote, forced to

12   sign the letter.  Now, I haven't seen that yet, but if it's

13   true, and they have evidence to that effect, then they would

14   not be precluded from presenting that evidence to the effect

15   that Mr. Pooley was forced to sign the letter.  We haven't got

16   to that yet, Ms. Crager.

17      What is your position with regard to that?

18          MS. CRAGER:  With regard to the evidence that he was

19   forced to sign it?

20          THE COURT:  Right.

21          MS. CRAGER:  Our understanding is that the government

22   will not be calling Joshua Hall, and so we would intend to call

23   him in our case-in-chief and present that evidence at that

24   time, and Your Honor can make a ruling at that time.

25          THE COURT:  All right.  Well, unless there is going

1    to be some objection to it, you wouldn't be precluded from

2    presenting that issue.  And if you did, that would be something

3    that in my instructions to the jury, I'd tell them they can

4    consider, A, whether the defendant made the statement and, B,

5    if so, the circumstances under which it was made.

6               MS. CRAGER:  Yes, Your Honor.

7               MS. LYDON:  May I, Your Honor?

8               THE COURT:  Yes.

9               MS. LYDON:  The government does object to calling

10   Joshua Hall in order to have him testify to a statement the

11   defendant made to him that he was forced to sign it.  That is

12   hearsay.

13              THE COURT:  All right.  But, you see, it is hearsay,

14   but they briefed this question, and you don't have an answer to

15   it in your brief.

16              MS. LYDON:  We do.  We do, Your Honor.

17              THE COURT:  Missed it again.  Missed it again.  Show

18   me where it is.

19              MS. LYDON:  I'm sorry, Your Honor.  I believe that

20   the defendant -- the fact that the defendant should not be

21   permitted to elicit his own hearsay is in the trial brief.  And

22   I'm just looking for the page number, Your Honor.

23              THE COURT:  All right.  Because they've got a rule;

24   they've got a case --

25              MS. LYDON:  Yes.

 1              THE COURT:  -- they discuss it in some detail.  I

 2   think all you had was, Hearsay is inadmissible.

 3              MS. LYDON:  I'm sorry, Your Honor.  I did intend to

 4   brief it more.  And I'm just looking for the page number for

 5   you right now.

 6      Under anticipated legal issues -- this is on page 11 --

 7   Pooley may not offer his own out-of-court statements because

 8   they are hearsay when presented by him.

 9      And then on page 12, we list some specific inadmissible

10   out-of-court statements, including the one to Josh Hall, which

11   the government anticipates the defense may attempt to offer.

12              THE COURT:  All right.  So let's look at the

13   evidence, which you say is Exhibit C --

14      Is that where it is?

15              MS. CRAGER:  I believe it is, Your Honor.

16              THE COURT:  -- from Josh Hall documenting

17   conversation with Mr. Pooley.

18              MS. CRAGER:  Yes, Your Honor.

19              THE COURT:  All right.  Let's look at Exhibit C.

20              MS. CRAGER:  That's Exhibit C to our trial brief,

21   yes.

22              THE COURT:  Do I have a copy of that?

23              MS. CRAGER:  It's attached to our trial brief at

24   Docket 99-1.  I can walk up a copy, Your Honor.

25              THE COURT:  Is it an exhibit here?

1          MS. CRAGER:  No.  It's only an exhibit to the trial

2     brief.

3          THE COURT:  Then I need to take a look at that.

4          MS. CRAGER:  May I approach?

5          THE COURT:  Yes.  Where is the defendant's statement?

6          MS. CRAGER:  Your Honor, we don't intend to put that

7     e-mail into evidence.

8          THE COURT:  Why not?

9          MS. CRAGER:  That e-mail documents the conversation

10    that he had with Mr. Pooley.  We would be eliciting his

11    testimony about the conversation with Mr. Pooley about the

12    statements.  That's his summary of that conversation.

13         THE COURT:  I'm looking at your brief, which makes

14    sense, and the logic of it holds together.  You cite United

15    States versus Lopez for the proposition that it was error to

16    admit the defendant's admission without also admitting the

17    defendant's qualifying statement.  And you argue that the

18    admission is contained in an e-mail which was submitted either

19    to or at the request of Joshua Hall.  And then you say it's

20    qualified by his oral statements to Joshua Hall to the effect

21    that it was written under threats.  And then you persuasively

22    point out that it doesn't have to be admissible per se; it

23    could be hearsay.  And you have that authority.

24       So you have made the argument that a statement, even though

25    it's not hearsay and it's otherwise admissible, can be

 1    qualified by another statement even though it's oral and not

 2    written and even though it's hearsay.  So you've made that

 3    argument.

 4            MS. CRAGER:  Yes.

 5            THE COURT:  But you haven't backed it up by showing

 6    me what that statement is that you want to admit.

 7            MS. CRAGER:  Yes.  The statement will be testimony by

 8    Joshua Hall that he spoke with Mr. Pooley right after the

 9    letter was sent and that Mr. Pooley indicated that he was

10    forced to sign it.  That will be the evidence.

11            THE COURT:  All right.  Then I really don't have the

12    government's response to that because that specific

13    authority -- look, you can argue all these things.  If you win

14    here, you've got to argue to the court of appeals.

15            MS. LYDON:  Of course.

16            THE COURT:  And you'd better be on pretty firm ground

17    to go through this whole trial and then have it hang on

18    something like this hearsay, inadmissible, when they've got a

19    case right on point that they're going to argue when they get

20    there.

21            MS. LYDON:  I agree, Your Honor.  Absolutely.  And we

22    did brief this --

23            THE COURT:  Don't tell me you briefed it.  I read the

24    brief.  It's not in there.

25            MS. LYDON:  We did cite the Lopez case --

1          THE COURT:  They cited the Lopez case.

2          MS. LYDON:  No.  We did on page 13.  We also had a

3  discussion of the Lopez case.  And I think the critical

4  issue --

5          THE COURT:  Is the Lopez case that you cited

6  different than the Lopez case they cited?

7          MS. LYDON:  I don't think so.

8          THE COURT:  Well, then I -- I've read that.  That's

9  what I'm referring to.

10          MS. LYDON:  Yes.  I agree.

11     The issue in Lopez is -- the critical inquiry is it has to

12  be the same statement.  It can't be that -- so the rule of

13  completeness provides that you can't excise a portion of a

14  statement that renders the rest of it -- the admitted part

15  misleading.

16     But here, we're admitting the entire statement, and they're

17  trying to admit a different statement in which Pooley tries to

18  walk it back.  That's not a rule of completeness issue.  That's

19  a, The defendant needs to take the stand and make that

20  assertion if he wants to in court.

21          THE COURT:  All right.  The defense says that

22  although before the 2023 amendment, the oral statement by

23  Mr. Pooley that he was forced to sign this may have been

24  inadmissible hearsay, but it is admissible under the current

25  vision -- version of Rule 106 as specified in the rule itself

1    and the advisory committee notes.

2        So I'm going to look at the advisory committee notes.

3        Would you like to direct my attention to which advisory

4    committee notes you're referring to?

5            MS. CRAGER:  Yes, Your Honor.

6        First, the rule itself specifies that it does not have to

7    be literally the same statement.

8            THE COURT:  That's what I want to look at.

9            MS. CRAGER:  Right.

10            THE COURT:  Let me find it here.

11            MS. CRAGER:  Yes.  It's 106, Your Honor.

12            THE COURT:  Then it's in the notes as well, right?

13            MS. CRAGER:  Yes.  And it's also discussed in the

14    notes.

15            THE COURT:  Okay.  106.  Hold on.

16        You see, Ms. Lydon, you go off the deep end here, and you

17    make statements, and if people didn't check up on them, they

18    might think you're correct, and when it gets up on appeal, it's

19    just going to come back down here.

20        Rule 106 says, If a party introduces all or part of a

21    statement, an adverse party may require the introduction at

22    that time of any other part -- or any other statement.

23        You just made the statement to me that it had to be part of

24    the statement.  And you made it in a very convincing way.  And

25    if Ms. Crager had not pointed this out and I didn't look it up,

1    I might have agreed with you, ruled in your favor, and it would

2    all be for naught.

3        The question is if, in fairness, it ought to be considered

4    at the same time.  That's the question.  Not whether it's just

5    part of the same statement.

6        And Lopez, it's cited for the proposition that in fairness,

7    it should be considered as -- at the same time.

8        Here is what I understand the evidence is.  Could be

9    otherwise.  Could be no evidence.  I haven't seen a single

10   witness on this subject yet.  But this letter was sent to

11   Mr. Hall; he questioned it; he called Mr. Pooley shortly after

12   he got it, and Mr. Pooley said, No, I was forced to say that.

13       Now I would say, in fairness, if you consider the contents

14   of the letter, you should also consider the explanation he gave

15   shortly afterwards to the same person to whom he wrote the

16   letter.  Now I would say that's true.  And I think the Ninth

17   Circuit would say the same thing.  Okay.  So if that's it, they

18   both come in, or neither one comes in.  That's the way I look

19   at it right now.

20       But you shouldn't have made that statement that it had to

21   be part of the same statement.  You shouldn't have said that.

22            MS. LYDON:  Your Honor, I apologize for -- if I spoke

23   too definitively about one aspect.

24            THE COURT:  You did.

25            MS. LYDON:  That's my error.  And I --

1          THE COURT:  Be careful about that.  You're

2    representing the government here.

3          MS. LYDON:  Exactly, Your Honor.  And we did cite the

4    amendments in our brief as well.

5       My point was that the gravamen of Rule 106 remains after

6    the amendment that another statement can come in if it is

7    needed to render the other statement not misleading.

8          THE COURT:  That's right.

9          MS. LYDON:  And -- yes.

10         THE COURT:  And I --

11         MS. LYDON:  Here --

12         THE COURT:  I think a fair reading here is that they

13   ought to both come in.  Then you can argue whatever you want

14   about the credibility of him writing this thing and then trying

15   to renege it later on.  Both sides can argue it, and you can

16   let the jury decide whether he was forced into writing this

17   thing or not.  That's what's fair.  Let the jury decide.  You

18   both wanted a jury trial.  Let's let the jury decide this

19   issue.

20      So that's my ruling.  If you're going to offer this Exhibit

21   1000 -- 1101 or 1100, that the defense gets to call Mr. Hall

22   and ask him about that oral discussion.

23         MS. LYDON:  Okay, Your Honor.

24         THE COURT:  Now, the question is they should both

25   come in at the same time.  So I have to also decide whether to

1    allow the letter in now without the explanation or to wait

2    until Mr. Hall is available and then bring them both in at the

3    same time, because it does say, at the same time.

4        People write these rules.  They don't remember that trials

5    don't always go by the book.  Sometimes something comes in at

6    one time, sometimes something comes in another time, the

7    evidence is broken up.  Nine tenths of the time, the people

8    that write these rules have never tried a case.  I'll tell you

9    that's true.  I'll tell you that's true.  I've put in for many

10   times to be on the committee for jury instructions, and I've

11   never been allowed to be on that committee.  And they've had

12   magistrate judges and other people on that committee that have

13   never tried a jury trial.  So there you are.

14       So what do you suggest?

15           MS. CRAGER:  Your Honor, the rule does -- in the

16   advisory committee notes, it does say that Your Honor has

17   discretion to admit the other statement later if that makes

18   practical sense.

19           THE COURT:  It would make practical sense that the

20   jury be able to hear them at the same time.  I instruct them

21   not to form or express any opinions on any issues until the

22   entire case has finally been submitted to them for their

23   deliberations, but sometimes that's hard to do.  And I'm a

24   little concerned that if I let them hear about this thing,

25   which amounts to not a confession but an admission, that they

1   might form or express an opinion about it -- they won't express

2   it, but they might form the opinion before they get a chance to

3   hear the explanation.  So ideally, I would like to have them

4   hear it at the same time.

5       Now, I can't force the government to put it on, but maybe I

6   can indirectly by telling them they can't put this in unless

7   they also allow you to call your witness out of order.  But

8   that's a little -- that's a little too complicated for any

9   other court that might review this to understand.  So I don't

10  think that's a good idea for me to do it that way.  So I don't

11  know what to do right now.

12      Are you willing to wait until later to put it on?

13          MS. LYDON:  I think, given Your Honor's ruling that

14  it comes in, the government is -- it comes in, they can call

15  Mr. Hall.  I think we need to bring the statements in now

16  through the witnesses that we have to authenticate those

17  statements.

18          THE COURT:  What about if I tell them, when it comes

19  in, that they're to keep an open mind about this statement

20  because I am told by counsel there is another witness that's

21  coming later that's going to talk about this statement?

22          MS. LYDON:  I don't think that instruction is

23  necessary.  I think that's in the nature of the defense putting

24  on a case and the government putting on a case.

25          THE COURT:  I'm going to give it if the defense wants

1   me to do that.  In other words, when you offer this exhibit, I

2   will just say, Keep an open mind about this exhibit.  I'm told

3   by the attorneys that there is another witness that's coming in

4   here later that may shed some further light on this exhibit.

5              MS. CRAGER:  Yes, Your Honor.

6              THE COURT:  All right.  That's what I'm going to do.

7       Is that what you want, Ms. Crager?

8              MS. CRAGER:  Yes, Your Honor.  Thank you.

9              MS. LYDON:  Are there any other objections that we

10  need to discuss to anything else in the 1100 series, or is that

11  resolved through this?

12             MS. CRAGER:  We maintain our objection that we think

13  the letter coming in is a chain of custody problem just because

14  they have the letter coming from the e-mail account of Yuri

15  Garmashov; the missing link is that Yuri Garmashov had the

16  letter from Mr. Pooley.  So that's our objection that we

17  continue to make.

18             THE COURT:  All right.  I think I covered that in

19  what I said.  There is a chain of evidence.  Chain -- every

20  link of a chain of evidence is not always as strong as the

21  other links, but there is a chain of evidence that would lead a

22  person to infer that it's authentic.  And I think I said that.

23      You've got this letter in Yuri's e-mail box; it came from

24  an address that belongs to Mr. Pooley --

25             MS. CRAGER:  I --

 1          THE COURT:  -- is that right?

 2          MS. CRAGER:  I don't believe it does.  It -- the

 3    letter comes from Mr. Garmashov -- Yuri Garmashov's e-mail

 4    address to Joshua Hall and others.

 5          THE COURT:  Well, there is more than one link to the

 6    chain.  I know I'm right here.  I'm just trying to explain it

 7    in a way that the court of appeals can understand it.

 8       So let's back up.

 9          MS. LYDON:  I think Your Honor might be thinking of

10    Government's Exhibit 1105 as the one that came from Mr. Pooley.

11          THE COURT:  Yes.  Okay.  So Mr. Pooley sends an

12    e-mail to these people -- or let's put it this way.  An e-mail

13    comes from Mr. Pooley's e-mail address to these other people,

14    and it says, Attached is a letter for Yuri.  And then it

15    describes in the second page what is in that e-mail.  And the

16    way it describes that e-mail leads any rational person to the

17    inference that it is the same letter that is in 1100 because it

18    says, A letter was written by myself on Yuri's behalf, stating

19    I did not believe that he had any knowledge of what was going

20    on at the Parachute Center while he was in Russia.  That is the

21    primary content of 1100.  So a person reading this would

22    conclude that it's the same letter that he's referring to here

23    as is in 1100.

24       So now the rest of what I said holds true.  Look, if they

25    don't understand this, they don't understand it.  I -- I can't

1    spoon feed everybody.  That's my ruling.  I'm satisfied it's

2    right.  If I'm wrong, I'll be happy to reconsider later on in a

3    new trial but not in this one.

4            MS. LYDON:  Thank you, Your Honor.

5            THE COURT:  All right.  Bring the jury back.

6       (Jury present, 1:41 p.m.)

7            THE COURT:  Defendant is still present with counsel.

8    The jurors have all returned.

9       Do you want to just pick up now where you left off on the

10   questioning?

11           MS. LYDON:  Yes, Your Honor.  Thank you.

12           THE COURT:  Had you offered Exhibit 1100 yet, or had

13   we just discussed that?

14           MS. LYDON:  We just discussed it.

15           THE COURT:  All right.

16           MS. LYDON:  All right.

17   Q.  BY MS. LYDON:  Let's go back then to Exhibit 1100, please.

18       Do you have it?

19   A.  Yes.

20   Q.  Terrific.

21       Is Exhibit 1100 from the e-mail account of Yuri Garmashov

22   that was obtained through a search warrant to Google?

23   A.  Yes.

24   Q.  Okay.

25           MS. LYDON:  Move to admit Government's Exhibit 1100.

 1          THE COURT:  Exhibit 1100 is received in evidence.

 2      (GOVERNMENT'S EXHIBIT 1100 ADMITTED INTO EVIDENCE.)

 3          THE COURT:  Now, ladies and gentlemen of the jury, I

 4   told you at the beginning not to form or express any opinions

 5   on any issue in the case until the entire case has been

 6   submitted to you for your deliberation.  I'm receiving this

 7   exhibit which consists of a couple of pages that appear to have

 8   been signed by Mr. Pooley.  I am informed by the attorneys that

 9   later on in the trial, there is going to be some more testimony

10   about these pages.  So just keep an open mind until you hear

11   all the evidence before you express -- excuse me -- before you

12   form any opinion on it.

13      Go ahead.

14          MS. LYDON:  Thank you, Your Honor.

15      Could we please publish Exhibit 1100.  Look at the header

16   and the body.

17   Q.  BY MS. LYDON:  All right.  This e-mail is from Yuri

18   Garmashov; do you see that?

19   A.  Yes.

20   Q.  And who is it to?

21   A.  To Joshua Hall.

22   Q.  Okay.  Do you know where Joshua Hall works?

23   A.  It's USPA.

24   Q.  All right.  And the subject reads, Letter From Rob.  New

25   doc.  And then in the body of the e-mail, Mr. Garmashov

                KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    indicates, I don't know if Rob sent you this letter, but here

2    is what he gave me.

3         Do you see that?

4    A.  Yes.

5    Q.  Can we please look at the attachment.

6         All right.  There is no date on this letter.

7         Do you see that?

8    A.  Yes, I see it.

9    Q.  And it is addressed, To whom it may concern re: Yuri

10   Garmashov.  My name is Rob Pooley.  He provides a number and

11   indicates that he is currently a suspended tandem instructor

12   examiner and used to be a tandem instructor.

13        Do you see that?

14   A.  Yes.

15   Q.  All right.  Can we look at that first paragraph.  Second

16   paragraph.  I'm sorry.

17        The letter indicates, Approximately one year ago,

18   July 25th, 2015, my certification from the US Parachute

19   Association and UPT was suspended for administrative reasons.

20   In order to continue working, I approached Yuri Garmashov to

21   see if I could work under him.  Yuri agreed that I could work

22   under his supervision while we were at the Parachute Center,

23   and explains their process.

24        Do you see that?

25   A.  Yes.

1    Q.   Zoom out.  Look at that next paragraph.

2         Mr. Pooley's letter explains, Around May 2016, Yuri left on

3    a trip for Europe and not return until August.  During that

4    time, I continued training students by myself.

5         Do you see that?

6    A.   Yes.

7    Q.   He also goes on to represent, To make sure students would

8    receive their ratings, I assisted the candidates in completing

9    their paperwork, signed their forms with Yuri's name without

10   him knowing, and held the paperwork for Yuri's return at which

11   time I could tell him about the situation.

12        Do you see that?

13   A.   Yes.

14   Q.   The sentence goes on, to be clear, but I'm only

15   highlighting portions.

16        He notes, In retrospect, I realize it was wrong to assume

17   Yuri would have been okay with the situation.  Yuri was not

18   aware of the training we were doing here while he was away.

19   Yuri did not consent to me signing his name.  Yuri was also not

20   compensated for me signing his name.

21        Is that right?  Or accurately read?

22   A.   Yes.

23   Q.   Thanks.  That last paragraph begins, Around August 12,

24   2016, I spoke with Joshua Hall from the USPA.  I told him that

25   I intended to send the paperwork to Yuri while he was in Europe

1   so he could review and submit.  Yuri did not know that.

2       And then it continues to the next page.  Yuri did not know

3   that this was my intent.

4       In the next paragraph, he makes specific representations

5   about one tandem instructor candidate.  One of the students I

6   instructed while Yuri was away was Yong Kwon.  Yuri did not

7   know that I instructed this student or that I assisted Yong in

8   completing his paperwork with Yuri's signatures.

9       Do you see that?

10  A.  Yes.

11  Q.  You can zoom out.

12      And next the letter states, I am giving this statement

13  freely without being pressured by any threats or being promised

14  anything in return.

15      Do you see that?

16  A.  Yes.

17  Q.  All right.  And then there is a signature here.

18      Do you see the signature appears to go over the,

19  "Sincerely" and the -- the last name, Rob Pooley?

20  A.  Yes.

21  Q.  Okay.  Did you also --

22      We can take that down.

23      Did you also encounter the e-mails in the binder in front

24  of you behind Tabs 1102, 1103, and 1104.

25  A.  Yes.

1    Q.  Do those three documents pertain to the -- to this letter?

2    A.  Yes.

3    Q.  And does 1102 pertain to the drafting process of it?  Or

4    reflect some of the drafting process?

5    A.  Yes.

6    Q.  All right.

7             MS. LYDON:  Move to admit 1102, 1103, and 1104.

8             THE COURT:  We didn't discuss these yet.  Is there

9    any objection we haven't already covered on these?

10            MS. MCLOUGHLIN:  One moment, Your Honor.  I'm just

11   reviewing.

12       No objection, Your Honor.

13            THE COURT:  All right.  Exhibits 1102, 1103, and 1104

14   are received in evidence.

15       (GOVERNMENT'S EXHIBITS 1102, 1103, 1104 ADMITTED INTO

16   EVIDENCE.)

17   Q.  BY MS. LYDON:  All right.  We won't go over these in

18   extreme detail.  I just want to hit the main points.

19       Can we look at 1102, the last page, please.  Or 003.  So

20   1102-003.

21       All right.  It appears on Monday, September 4th, someone

22   named Evan Beecher from a Gmail account wrote, Based on what

23   you told me, here is one way a letter could be worded.

24   Hopefully he will fess up.  Call if you want to discuss.

25            We can zoom out.

1          But does what follows appear to be a first draft of the

2     letter we looked at as Government's Exhibit 1100?

3     A.   Yes.

4     Q.   And does it contain some blanks?

5     A.   Yes.

6     Q.   Okay.  In pages 1 and 2 of this exhibit --

7          Can we look at page 1, please.

8          -- does Mr. Garmashov fill in some of those blanks, make

9     some changes, and send it back with, What do you think about

10    this?

11    A.   Yes.

12    Q.   And Mr. Beecher, in this middle of the page e-mail,

13    suggests an edit?

14    A.   Yes.

15    Q.   And then Mr. Beecher, on September 6th, sends a follow-up

16    e-mail indicating it would be better to have the letter

17    reviewed by Mr. Garmashov's own independent attorney.  As much

18    as I'd love to give some suggestions, I'm simply not

19    knowledgeable about this area at all?

20    A.   Yes.

21    Q.   All right.  We can zoom out of that.

22         Can we look at 1103, please.

23         Does 1103 appear to be a letter from -- an e-mail from

24    Mr. Garmashov to Mr. Pooley from their Gmail accounts?

25    A.   Yes.

1   Q.  With a -- thank you.  With a body that says, This is the

2   letter.  Please see?

3   A.  Yes.

4   Q.  And can we flip the page and just confirm that that's the

5   same attachment.

6        Next page.

7        Okay.  Can we look at page -- Exhibit 1104, please.

8        And does 1104 appear to be an e-mail from Yuri Garmashov to

9   Rob Pooley with the letter in the body of an e-mail?

10  A.  Yes.

11  Q.  Okay.  We can zoom out of there.

12        And now we can turn back to the topic we began to discuss

13  before the lunch break of you going to Mr. Garmashov's house,

14  or a residence associated with him, and receiving documents

15  from him.

16        Do you recall doing that?

17  A.  Yes.

18  Q.  Okay.  Can you -- did you photograph some of the documents

19  that he showed you?

20  A.  I did.

21  Q.  Can you please look at Government's Exhibit 1101.

22        What is Exhibit 1101?

23  A.  It's a picture of what I took -- of a picture that I took

24  of the letter when I saw Mr. Garmashov.

25            MS. LYDON:  Move to admit 1101, please.

1           THE COURT:  1101 is the same as 1100.  If the only

2   purpose is to say that that letter was found when he went to

3   Mr. Garmashov's house, he can just say that.

4           MS. LYDON:  All right.  We can do that.

5   Q.  BY MS. LYDON:  Did Mr. Garmashov show you the letter that

6   was in evidence as 1100?

7   A.  Yes.

8   Q.  And did you take a picture of it?

9   A.  Yes.

10  Q.  Okay.  Did he also show you -- well, can we look at,

11  please, Government's Exhibit 1105.

12      Did this exhibit come from Mr. Pooley's e-mail account?

13  A.  Yes.

14  Q.  And if you look at the attachment, does it appear to

15  pertain to the letter we just looked at as Exhibit 1100?

16          THE COURT:  Well, I don't know that that's for him to

17  determine.  It speaks for itself, I think.

18          MS. LYDON:  All right.

19          THE COURT:  We discussed this previously, and I think

20  that's the way we agreed to proceed.

21          MS. LYDON:  Certainly, Your Honor.  Okay.

22      Can we move to admit 1105?

23          THE COURT:  Exhibit 1105 is received in evidence.

24      (GOVERNMENT'S EXHIBIT 1105 ADMITTED INTO EVIDENCE.)

25  Q.  BY MS. LYDON:  1105 is an e-mail sent from Rob Pooley's

1   Gmail account on January 25, 2017.

2       Do you see that?

3   A.  Yes.

4   Q.  And it's to Jan Meyer, Jim Crouch, and Yuri Garmashov at

5   two different e-mail addresses?

6   A.  Yes.

7   Q.  The title is, Letter for Yuri G.  And the body reads,

8   Attached is a letter for Yuri Garmashov.

9       Is that right?

10  A.  Yes.

11  Q.  Let's look at the attachment.

12      The attachment is, again, undated but sent in January 2017,

13  and it reads, To whom it may concern, in regards to Yuri

14  Garmashov and his involvement in the tandem training at the

15  Parachute Center in Acampo, California, during the time he was

16  in Russia in the summer 2016.  It indicates Yuri Garmashov was

17  not taking part in any tandem training directly or indirectly

18  at the Parachute Center while he was out of town, and, To the

19  best of my knowledge would have had no information as to what

20  was happening during his absence.

21      Is that -- do you see that?

22  A.  Yes.

23  Q.  The final paragraph reads, A letter was written by myself

24  on Yuri's behalf, stating I did not believe he had any

25  knowledge of what was going on at the Parachute Center while he

1    was in Russia.  The validity of that letter was questioned,

2    and, therefore, in addition to e-mailing this letter, I will

3    make a notarized hard copy available.  Regards, Rob Pooley.

4    And a signature.

5         Do you see that?

6    A.  Yes.

7    Q.  When you went to Mr. Garmashov's house, did he show you a

8    notarized copy of this letter?

9    A.  I can't recall.  He did -- he did show me some paperwork,

10   but I can't recall if this was the exact letter I saw.

11   Q.  Would it refresh your recollection to -- as to whether it

12   was the exact letter to look at a picture of what Mr. Garmashov

13   showed you?

14   A.  Yes.

15   Q.  Could you take a look at Government 1107.

16        Has 1107 refreshed your recollection?

17   A.  Yes.

18   Q.  Did Mr. Garmashov show you a picture of the notarized

19   version of 1105?

20   A.  Yes.

21            MS. LYDON:  Move to admit 1107.

22            MS. MCLOUGHLIN:  Your Honor, we do object to this

23   under the best evidence rule.  This is a picture of a notarized

24   letter.  The letter itself has already been admitted under

25   1105.

1          MS. LYDON:  It's notarized.

2          THE COURT:  It's the notary -- it's the notary page.

3    And the best evidence rule would apply because the best

4    evidence rule is pretty strict.

5          MS. LYDON:  Your Honor, the best --

6          THE COURT:  There are exceptions if the original is

7    not available and so forth.

8       Do you have an exception?

9          MS. LYDON:  The original, to my knowledge, is not

10   available.  The copy --

11         THE COURT:  Why don't you see if you can establish

12   that.  If you can establish an exception to the best evidence

13   rule, then I'll admit it.  If you can't, I'm not going to do

14   that.  So see if you can establish an exception.

15         MS. LYDON:  Okay, Your Honor.

16   Q.  BY MS. LYDON:  Did you get a copy of the original from

17   Mr. Garmashov -- or did you get the original from

18   Mr. Garmashov?

19   A.  I did not.

20   Q.  Okay.  There was --

21         MS. LYDON:  Your Honor, there was discussion with

22   Mr. Garmashov on a separate date about getting the original,

23   but this witness doesn't have --

24   Q.  BY MS. LYDON:  Do you have any knowledge of the -- getting

25   the original discussion on a separate date?

 1   A.   No.

 2           THE COURT:  Then we'll have to hold off on

 3   admissibility of this.

 4           MS. LYDON:  Our argument here would be that under the

 5   best evidence rule, a picture or a copy is admissible to the

 6   same degree as the original, and we submit the picture is a

 7   copy.

 8           THE COURT:  Well, let me see what exception you're

 9   referring to.  Give me the number.

10           MS. LYDON:  Your Honor, I'm sorry.  My reference to

11   the copy was referring to 1103.  But under 102 --

12           THE COURT:  Right.  I want the rule number.

13           MS. LYDON:  1103 states that a duplicate is

14   admissible the same as the original unless --

15           THE COURT:  We're talking about the best evidence

16   rule.  So first you want me to look at 102?

17           MS. LYDON:  102, yes, which states that an original

18   writing, recording, or photo.  And this is the photo of the

19   notarized stamp.

20           THE COURT:  I'm not -- you said 102?

21           MS. LYDON:  I'm sorry.  1002.  I apologize, Your

22   Honor.

23           THE COURT:  Oh.  All right.  I'm going to have to

24   hear argument on this before I can rule on it.  Do you want to

25   do it now or later?

1              MS. LYDON:  We can do it now.

2              THE COURT:  All right.  We'll see if we can do this

3    in five minutes, ladies and gentlemen.  Remember the

4    admonition.  Please step outside.

5         (Jury not present, 2:01 p.m.)

6              THE COURT:  The jurors are outside.

7         Remember this.  We've already got the exhibit in evidence

8    with my clarifying statement to the jury that something else is

9    going to come out later that's going to bear on the same issue

10   and they should keep an open mind.  The only thing this adds is

11   the fact that Mr. Pooley did get it notarized, like he said he

12   was going to do in that e-mail.  That's the only purpose of

13   what it is to show.

14        And the best evidence rule is the best evidence rule, but

15   it says, in Rule 1003, A duplicate is admissible to the same

16   extent as the original unless a genuine question is raised

17   about the original's authenticity or the circumstances make it

18   unfair to admit the duplicate.

19        So we'll take these one at a time.

20        Is there a genuine question raised about the original's

21   authenticity?  The original being the notarized document.  Not

22   the contents of it, just the fact that it was notarized.  Is

23   there a genuine issue raised about the authenticity?

24              MS. MCLOUGHLIN:  Well, Your Honor, if the point is to

25   show that the document was notarized, we've never seen an

1   original version of that notarized letter.  And so, I mean,

2   if -- if the -- again, we're not objecting to the contents of

3   the letter.  The contents of the letter have already been

4   admitted.  But if this is an exhibit to emphasize --

5              THE COURT:  You think somebody could -- I got you.

6   Okay.  Let's play hardball.

7      She's right.  Unless you -- she hasn't seen it, a copy.

8   It's quite possible that somebody sat down and forged this

9   notarized -- this copy of this notarized document to make it

10  look like an original.  Would anybody ever do that?  I can't

11  imagine that anybody would ever do that.  But let's play

12  hardball.  Let's play by the rules.

13             MS. LYDON:  Sure.

14             THE COURT:  Okay.  There is a genuine issue now

15  raised about the authenticity.  But you know what you do?  You

16  bring in a notary.

17             MS. LYDON:  I've got the notary in the hall.

18             THE COURT:  Okay.  Good.

19             MS. LYDON:  I believe it's also admissible under

20  Rule 1002 because it is a photograph.  Now, they can argue that

21  it's just a photograph of the notary stamp and that -- even

22  after the notary testifies, they can make arguments there.

23             THE COURT:  But that's -- we already covered that.

24  That says, in 1002, An original writing, recording, or

25  photograph is required in order to prove its content.  That

1   means the photograph, not a photograph of the original writing.

2   That's what that means.  It means an original photograph.  You

3   can't -- you can't put in a photograph of a writing under

4   Rule 102.

5           MS. LYDON:  I -- okay.  I hear you, Your Honor.  I

6   was interpreting it as a photograph of the notary stamp, which

7   is a different thing.

8           THE COURT:  All right.  Now, I -- I'm not going to

9   say what some courts might have said, but I -- I've been

10  applying these rules ever since they were first passed, and

11  we've always interpreted that to mean an original photograph.

12          MS. LYDON:  Okay.  I hear you, Your Honor.  I was

13  drawing a distinction with the notary stamp.  What if we -- I

14  lay the foundation through this witness that he took the

15  picture and then call the notary?

16          THE COURT:  I think that's what you suggested

17  earlier.

18          MS. LYDON:  Excellent.  That's how we'll proceed.

19          THE COURT:  Let's do that.

20      Bring the jury back.  It's been five minutes.

21          MS. LYDON:  Do we have objections to anything else in

22  the 1100 series?

23          THE COURT:  We probably do.  Let's just get them over

24  one at a time.

25          MS. LYDON:  With respect to 1109, I'll proceed the

1   same way -- lay the foundation, and then the notary will bring

2   in the stamp and the rest of it.

3          MS. MCLOUGHLIN:  It would be the same objection.  So

4   that makes sense.

5          MS. LYDON:  Okay.  Mr. Keum also took photos of

6   e-mails.  Are you -- of the e-mails, we have 11 -- the e-mails

7   themselves come in through the stipulation.  11 -- 1111 is the

8   exhibit number that we have from the Gmail account.  Mr. Keum

9   also took a photo of them.  And the relevance of the photo is

10  just to show that it's the same e-mails.  And he took photos of

11  Mr. Garmashov's passport to verify he was out of the country.

12     Do you have any objections to those?

13         MS. MCLOUGHLIN:  I'm sorry.  1111, no objection.  And

14  then what was the picture of the passport?  I'm sorry.

15         MS. LYDON:  1112.

16         MS. MCLOUGHLIN:  No objection.

17         MS. LYDON:  Okay.  And 1110.

18         MS. MCLOUGHLIN:  Are these -- in terms of these

19  e-mails, what are -- they are the --

20         MS. LYDON:  Mr. Garmashov showed him 1110 and 11 --

21  sorry, 1109.

22         MS. MCLOUGHLIN:  Okay.  Just that Mr. Garmashov

23  showed it to him?

24         MS. LYDON:  Yes.

25         MS. MCLOUGHLIN:  Okay.

1          MS. LYDON:  Okay.

2          THE COURT:  All right.  Bring the jury back.

3      (Jury present, 2:08 p.m.)

4          THE COURT:  Everyone has returned.

5      You may continue.

6          MS. LYDON:  Thank you, Your Honor.

7  Q.  BY MS. LYDON:  All right.  So we're not going to look at

8  government's 1107 now.  But just to confirm, did Mr. Garmashov

9  show you the document depicted in 1107?

10  A.  Yes.

11  Q.  And is 1107 a picture that you took of both pages of that

12  document?

13  A.  Yes.

14  Q.  Okay.  Could you turn in the binder in front of you to

15  Government's 1109.  My questions will be the same.

16      We won't look at it now, but what is -- did Mr. Garmashov

17  show you the document depicted in 1109?

18  A.  Yes.

19  Q.  And is 1109 a photograph you took of both pages of that

20  document?

21  A.  Yes.

22  Q.  Okay.  Are both of those true and accurate versions -- true

23  and accurate photos that you took?

24  A.  Yes, they're photos I took.

25  Q.  Okay.  Did Mr. Garmashov also show you the document in

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    Government's 1110?

2    A.  Yes.

3    Q.  And did you take a picture?

4    A.  Yes.

5    Q.  Is that picture Government's 1110?

6    A.  Yes.

7    Q.  Okay.

8              MS. LYDON:  Move to admit 1110.

9              THE COURT:  Why is it blue?  It's hard to read.  Why

10   are these all blue?

11             THE WITNESS:  I don't know, sir.

12             THE COURT:  Are these the pictures you took?

13             THE WITNESS:  Yes, they are, sir.

14             THE COURT:  And it turned out blue?

15             THE WITNESS:  I used my government cellphone to take

16   the pictures, sir.

17             THE COURT:  I have a government cellphone.  It takes

18   pictures like a camera.  But I guess yours takes them in blue.

19   All right.

20             MS. MCLOUGHLIN:  No objection.

21             THE COURT:  No objection to this one?

22             MS. MCLOUGHLIN:  No objection.

23             THE COURT:  This one is really hard to read.

24             MS. LYDON:  Fortunately, we have a better version

25   we're going to look at in just a moment.

1           THE COURT:  All right.  Exhibit 1110 is received in

2   evidence.

3      (GOVERNMENT'S EXHIBIT 1110 ADMITTED INTO EVIDENCE.)

4   Q.  BY MS. LYDON:  Okay.  We don't even need to look at this

5   right now.  We can just go straight to the good one.

6      Can you look at Government 1111.

7      Does this appear to be, at least with respect to the bottom

8   three e-mails, the same e-mail depicted in the photo that you

9   took as Government's 1110?

10          THE COURT:  I don't follow this.  Am I looking at the

11  right one?  It's just an e-mail.  There is no picture.  It

12  starts with 30 -- 30 -- 30ST?

13          MS. LYDON:  I think that the version that's printed

14  out, they go -- the e-mails go in opposite order.  Like, it

15  starts chronologically --

16          THE COURT:  I already have one page for Exhibit 1111.

17  You're looking at something different than I have.

18          MS. LYDON:  They're different versions.  I think when

19  it was received from Google, it was more condensed and more

20  readable.

21          THE COURT:  No.  Karen, would you show this to her?

22  See if I've got something wrong in this binder.

23          MS. LYDON:  This is correct, Your Honor.  They're

24  just in reverse -- they're in a different chronological order

25  because of whatever settings Mr. Garmashov has different from

1    the settings that Google produced it to you.  So they're more

2    spaced out in the printed-out version.  And --

3              THE COURT:  So is that -- let me see it again, then.

4       Okay.  So now we're looking at 1110.  These blue sheets are

5    1110, right?  Those are the ones I just asked him about.

6    They're -- they're --

7              MS. LYDON:  All of his pictures are blue.

8              THE COURT:  Karen, would you show these to her,

9    please?  Point out what I just pointed out to you.

10             MS. LYDON:  In Government's 1110, the earliest --

11             THE COURT:  1110 is already in evidence.

12             MS. LYDON:  Okay.

13             THE COURT:  That's the one I received in evidence,

14   and we had some jokes about how it was blue.

15             MS. LYDON:  Yes.

16             THE COURT:  Okay.  Now 1111 is the next page.  Turn

17   the page.  That's one white sheet.

18             MS. LYDON:  Yes.

19             THE COURT:  Okay.

20             MS. LYDON:  And it begins with the same e-mail, but

21   there, the e-mail is on the bottom rather than the top.

22             THE COURT:  Is there an e-mail on the bottom of that,

23   Karen?

24        (Pause in proceedings.)

25             THE COURT:  Okay.  I don't understand it, but it's

1    not necessary for me to understand it, only for the jury to

2    understand it.

3        So just go ahead.

4             MS. LYDON:  Okay.  Move to admit 1111.

5             THE COURT:  Any objections?

6             MS. MCLOUGHLIN:  No, Your Honor.

7             THE COURT:  All right.  Exhibit 1111 is received in

8    evidence.

9        (GOVERNMENT'S EXHIBIT 1111 ADMITTED INTO EVIDENCE.)

10            MS. LYDON:  All right.  Can we please publish 1111.

11   Q.  BY MS. LYDON:  And does this appear to be an e-mail chain

12   between Mr. Garmashov and Mr. Pooley in August of 2015?

13   A.  Yes.

14   Q.  Okay.

15            THE COURT:  This is not something you took a picture

16   of; this is an actual e-mail chain, right?

17            THE WITNESS:  The -- the 1111 is the copy from Gmail

18   -- or Google, sir.

19            THE COURT:  Right.  But it's not a picture you took?

20            THE WITNESS:  1110 is the picture that I took, Your

21   Honor.

22            THE COURT:  What is 1111?

23            MS. LYDON:  That's a search warrant return.  That's a

24   document received from Google.  It's a better -- it shows

25   dates --

 1                  THE COURT:  Okay.

 2                  MS. LYDON:  -- and --

 3                  THE COURT:  That's not something that he got when he

 4    went to visit Yuri?

 5                  MS. LYDON:  Correct, yes.

 6                  THE COURT:  All right.

 7                  MS. LYDON:  Yes.  Thank you.  We can take that down.

 8    Just one more document with this witness.

 9    Q.  BY MS. LYDON:  Did you take a picture of Mr. -- several

10    pictures of Mr. Garmashov's passport?

11    A.  Yes.

12                  MS. LYDON:  Okay.  Can we move to admit Government's

13    Exhibit 1112?

14                  MS. MCLOUGHLIN:  No objection.

15                  THE COURT:  Exhibit 1112 is received in evidence.

16        (GOVERNMENT'S EXHIBIT 1112 ADMITTED INTO EVIDENCE.)

17                  MS. LYDON:  Please publish.

18    Q.  BY MS. LYDON:  All right.  Is this the picture you took of

19    Mr. Garmashov's passport?

20    A.  Yes.

21    Q.  How do you know it's your picture?

22    A.  When I went there, I had the red folder.  And when I looked

23    at this picture again, it looks the same as my hand.

24    Q.  Okay.  Do you remember taking a picture of his passport?

25    A.  Yes.

1    Q.  All right.  We can flip over to the next page, please.

2        And does the passport bear a visa reflecting that he

3    returned to the United States on -- or he entered the United

4    States on August 2, 2016?

5    A.  I think it's a reentry stamp not a visa, but yes.

6    Q.  Oh.  Thank you.  All right.  We can zoom out.

7        And continue looking at the document.  Thank you.

8        And this one is upside down and hard to read, but, Special

9    Agent Keum, can you interpret what I just circled, the red

10   stamp?

11   A.  Yes.  It says Doha, which is the -- I believe the capital

12   of Qatar.  And the date on -- in red is 26 May 2016.

13   Q.  Okay.  Does that indicate he entered Qatar on that date?

14   A.  Yes.

15              MS. LYDON:  All right.  No further questions.

16              THE COURT:  You may cross-examine.

17              MS. MCLOUGHLIN:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MS. MCLOUGHLIN:

20   Q.  Good afternoon.

21   A.  Afternoon.

22   Q.  I'm just going to talk about these letters again.

23       Could we bring up Government's Exhibit 1100.  1100, please.

24   And to page 2, please.

25       So we looked at a lot of this letter.  I just want to

1    emphasize, this letter itself is not dated, right?

2    A.  I do not see a date, no.

3    Q.  And it's not notarized?

4    A.  No.

5    Q.  And this letter originally comes from --

6        If we could go to page 1 again.

7        This letter is originally sent from Yuri Garmashov,

8    correct?

9    A.  Yes.

10   Q.  Rob Pooley did -- well, you took a picture of this letter

11   -- right? -- as we discussed?

12   A.  Yes.

13   Q.  But Rob Pooley didn't give you the letter?

14   A.  No, he did not.

15   Q.  The letter you took a picture of was from Yuri Garmashov?

16   A.  Yes.

17   Q.  And as you were discussing on direct, that letter was

18   originally drafted by Yuri Garmashov and an Evan Beecher,

19   correct?

20   A.  It appears in that e-mail, yes.

21   Q.  Could we pull up 1102, please.  Could we go to page 2.

22       And we reviewed -- you reviewed this on direct, but it

23   looks largely similar to the final letter that was sent in that

24   e-mail from Yuri Garmashov, correct?

25   A.  Yes.

1   Q.  And I would just like to go back to 1100 again.  I

2   apologize.  On page 2, I want to look at some of the details of

3   this letter.

4       I know we went through it in a lot of detail.  I don't want

5   to spend too much time, but you've reviewed this letter, right?

6   A.  Yes.

7   Q.  There is no statement in this letter regarding what Rob

8   Pooley told to tandem instructor candidates, is there?

9       And we can go through it, too.  I don't want to put you on

10  the spot.

11  A.  If you don't mind.

12  Q.  Sure.  So this first paragraph here introduces the writer

13  as Rob Pooley, right?

14  A.  Yes.

15  Q.  And we can zoom out.

16      The next paragraph here, he discusses generally how he was

17  suspended in July; he approached Yuri Garmashov to see if he

18  could work under him -- and I'm paraphrasing a little bit just

19  because we've been through it -- that Yuri agreed that he could

20  work under his supervision, but Yuri would continue to have

21  primary responsibility, and that Rob Pooley would assist in

22  coordinating and evaluations.

23      Right?

24  A.  Yes.

25  Q.  There is nothing with regard to what he said to the tandem

1    instructor candidates?

2    A.  I don't see anything.

3    Q.  Okay.  We can zoom out.  Let's go down to this paragraph.

4        Again, just to summarize, this photograph discusses how

5    Yuri left on a trip to Europe in May 2016, did not return until

6    August, but that Rob Pooley continued training students, and

7    that he assisted them in completing their paperwork, signed the

8    forms with Yuri's name, held the paperwork for Yuri's return,

9    at which time Rob Pooley intended to tell him and give him the

10   paperwork to review.  Yuri was not aware.  Yuri did not

11   consent.  Yuri was not compensated.

12       Nothing in this paragraph indicates what Rob Pooley told

13   the tandem instructor candidates, does it?

14   A.  It does not say anything about them.

15   Q.  Okay.  Thank you.

16       In this paragraph, Rob talks about several of Yuri's

17   students, and he names them here.  He doesn't discuss what he

18   told tandem instructor candidates, does he?

19   A.  No, he does not.

20   Q.  While we're here, I do want to point out, the letter does

21   state that someone by the name of Richard Keir was one of

22   Yuri's students, correct?

23   A.  I'm kind of confused.

24   Q.  I apologize.  So it says here that -- it names several of

25   Yuri's students in this paragraph?

1    A.   Yes.  It says his students.

2    Q.   And one of them is Richard Keir?

3    A.   Yes.

4    Q.   Okay.  Thank you.

5         Then I'm going to go down to the last paragraph.  This is

6    about Rob Pooley speaking with Josh Hall.  He intended to send

7    the paperwork to Yuri while he was in Europe --

8         And we'll zoom out, and I'll go to the next page.

9         -- Yuri did not do anything wrong.  He regrets bringing him

10   into this situation.

11        There is nothing in that paragraph regarding what Rob

12   Pooley said to the tandem instructor candidates?

13   A.   Nothing.

14   Q.   Thank you.  We can zoom out, and we'll go to this paragraph

15   here.

16        This paragraph is about the fact that Rob had instructed

17   one candidate in particular, that Yuri did not know Rob Pooley

18   instructed this student, that he assisted Yong Kwon in

19   completing his paperwork, believes he was properly trained,

20   that Yuri had nothing to do with the training.

21        It doesn't include anything regarding what Rob Pooley told

22   this particular student or any other tandem instructor

23   candidate, does it?

24   A.   I don't see anything related to talking about what he

25   taught the student.

1    Q.  Thank you.  We can zoom out.

2         Just the last paragraph and the last sentence.  We'll

3    include both.  I'm sorry.  The one above that.

4         I am giving this statement freely.

5         This just states that he's giving this statement freely,

6    not being promised anything in return.  Nothing regarding what

7    he said to the tandem instructor candidates?

8    A.  That is correct.

9    Q.  Okay.  We can zoom out.

10        And the last sentence --

11        I won't -- I won't make you zoom in.

12        -- just states if he has any other questions.  Nothing

13   regarding what he said to the tandem instructor candidates?

14   A.  Correct.

15   Q.  Thank you.

16        Could we now -- I want to talk about the second letter you

17   discussed, and that's at Government's Exhibit 1105.  Let's take

18   another look at that letter, page 2, please.

19        There are a few things happening in this letter.  I want to

20   go to the third paragraph first, though.

21        So this paragraph states, A letter was written by myself on

22   Yuri's behalf, stating I did not believe he had any knowledge

23   of what was going on at the Parachute Center while he was in

24   Russia.

25        This paragraph references an early letter that Rob Pooley

1    wrote, right?  That's what it says?

2    A.  It appears so.

3    Q.  It doesn't state a letter that was signed by Rob Pooley?

4    A.  No.

5    Q.  This paragraph doesn't state that the other letter is true,

6    does it?

7    A.  It does not specifically state that.

8    Q.  It also doesn't state that Rob Pooley intends on notarizing

9    this other letter?

10   A.  The -- the two-page letter?

11   Q.  Right.  Yeah.  The previous letter.

12   A.  It does not mention that, no.

13   Q.  This only states that he intends to notarize this letter

14   that we're looking at right here, correct?

15   A.  I -- I don't know.  I -- I wasn't a party to the

16   conversation.

17   Q.  Well, I -- I guess I'm just referring to the last sentence,

18   The validity of that letter was questioned, and, therefore, in

19   addition to e-mailing this letter, I will make a notarized hard

20   copy available.

21       That sentence is referring to this letter, not any previous

22   letter, correct?

23   A.  I -- I don't know.

24   Q.  Okay.  Let's zoom out and look at the second paragraph.

25       This paragraph states that Yuri Garmashov was not taking

1   part in any tandem training at the Parachute Center while he

2   was out of town, correct?

3   A.  Yes.

4   Q.  And that to the best of Rob Pooley's knowledge, Yuri

5   Garmashov would have no information as to what was happening

6   during his absence?

7   A.  That's what it says.

8   Q.  This paragraph does not state that Rob Pooley used Yuri

9   Garmashov's signature without his permission, does it?

10  A.  It does not.

11  Q.  It doesn't say anything about what Rob Pooley told the

12  tandem instructor candidates, does it?

13  A.  It does not.

14          MS. MCLOUGHLIN:  That's all I have.  Thank you.

15          THE COURT:  Any redirect?

16          MS. LYDON:  No, Your Honor.

17          THE COURT:  Thank you, sir.  You're excused.

18      You may call your next witness.

19          MS. LYDON:  Thank you, Your Honor.  Government calls

20  Bobbi Lewis.

21          THE COURT:  Would you raise your right hand and be

22  sworn, please.

23      (The Witness, BOBBI LEWIS, is sworn.)

24          THE WITNESS:  I do.

25          THE COURT:  Please be seated.

 1          State your full name for the record.  And spell your last

 2   name.

 3                THE WITNESS:  Bobbi Lewis, L-E-W-I-S.

 4                        DIRECT EXAMINATION

 5   BY MS. LYDON:

 6   Q.  Good afternoon, Ms. Lewis.

 7       Where do you work?

 8   A.  Farmers and Merchants Bank, Central California --

 9   Q.  What do you do there?

10   A.  I'm a branch -- branch supervisor.

11   Q.  Are you also a notary?

12   A.  I'm also a notary.

13   Q.  What function does a notary perform?

14   A.  There are two main types of notary, either an

15   acknowledgment, where I am simply -- a signer has brought me a

16   document, they acknowledge to me they were the signer of the

17   document; or a jurat, where -- a jurat is where you administer

18   an oath or affirmation as to the truthfulness of the statement

19   of the document.  The signer will always dictate which type of

20   certificate is being attached; the notary never will.

21   Q.  Okay.  Can you turn in the binder in front of you to

22   Government's 1106C.

23   A.  I'm there.

24   Q.  And also, could you look at Government's 1106, which is a

25   physical version I'll bring you.

1          What is Government's 1106?

2    A.   That's my notary journal.

3    Q.   Could you hold it up?

4    A.   Yes.  My notary journal.

5    Q.   How do you know it's your notary journal?

6    A.   Well, because it has my initial; it has my writing in it,

7    has my information in it.

8               MS. LYDON:  Okay.  We'll use that as a demonstrative

9    if there is no objection.  We don't need to enter it into

10   evidence.

11              MS. MCLOUGHLIN:  No objection.

12              MS. LYDON:  All right.  I would move to --

13   Q.   BY MS. LYDON:  Well, now could you look in the binder at

14   1106C.

15   A.   All right.

16   Q.   It's a three-page document.  If you turn to the second and

17   third page, can you tell if it is a page from your notary book?

18   A.   It is.

19   Q.   Does it bear the name of Robert Pooley?

20   A.   It does.

21              MS. LYDON:  Move to admit Government's Exhibit 1106C.

22              THE COURT:  Well, there are a number of other

23   people's names in here, right?

24              MS. LYDON:  Um-hum.

25              THE COURT:  I'm going to exercise my discretion and

1    have you redact everything else other than the lines referring

2    to Mr. Pooley.

3              MS. LYDON:  All right, Your Honor.  That might take

4    just one moment.

5              THE COURT:  All right.  You do that.

6         With that understanding, 1106C is received in evidence.

7         (GOVERNMENT'S EXHIBIT 1106C ADMITTED INTO EVIDENCE.)

8    Q.  BY MS. LYDON:  While we're working on redacting that, I'd

9    like to turn your attention to another document in the binder.

10   Look, please -- can you please flip to Government's 1107.

11   A.  I'm there.

12   Q.  All right.  And the second -- it's a two-page document.  Do

13   you recognize anything on the second page of that document?

14   A.  That would be my notarial's acknowledgment certificate.

15   Q.  How can you tell that that's yours?

16   A.  It has my name, my signature, and my commission stamp on

17   there.

18   Q.  Okay.

19             MS. LYDON:  Move to admit 1107.

20             MS. MCLOUGHLIN:  No objection.

21             THE COURT:  Exhibit 1107 is received in evidence.

22        (GOVERNMENT'S EXHIBIT 1107 ADMITTED INTO EVIDENCE.)

23             MS. LYDON:  Okay.  Please publish.

24             THE COURT:  We don't have it on the screen yet.

25             MS. LYDON:  It's coming.

1   Q.  BY MS. LYDON:  All right.  1107 appears to be a picture of

2   a letter.

3       Do you see that?

4   A.  Yes.

5   Q.  And it has two signatures on it?

6   A.  Yes.

7   Q.  Flip to the second page.

8       Now, could you explain to the jury what appears on the

9   second page?

10  A.  The second page is my acknowledgment.

11  Q.  Okay.

12  A.  That's my notarial certificate, my acknowledgment

13  certificate.

14  Q.  All right.  And what does this signify?  What information

15  do you impart by preparing this acknowledgment?

16  A.  Sure.  An acknowledgment is simply the signer of the

17  document is acknowledging to the notary they were the person

18  who signed the document.

19  Q.  Okay.  Who is the person who signed the document that's the

20  first page?

21  A.  Looks like it was a Rob Pooley.

22  Q.  Okay.  On what date?

23  A.  February 2, 2017.

24  Q.  Is that the date he would have appeared before you?

25  A.  Yes.

1   Q.   Okay.  Is that your signature at the bottom?

2   A.   It is.

3   Q.   Okay.  And is the information in that stamp on the second

4   page consistent with your notary license?

5   A.   At the time, yes.

6   Q.   Okay.  Looking at that first page again, it has two

7   signatures on it?

8   A.   Um-hum.

9   Q.   Do customers who come to you for notarization sometimes

10   re-sign the document?

11   A.   They will.  An acknowledgment is simply the signer is

12   acknowledging to me that they were the person who signed the

13   document.  A lot of times, the signer will re-sign.  Before I

14   even have a chance to say, You don't need to do that, they'll

15   re-sign, saying, I need to sign this in front of you, and

16   they'll sign the document twice.

17   Q.   So there is not a legal requirement that they re-sign it in

18   front of you?

19   A.   No.

20   Q.   But some customers do?

21   A.   Yes.

22   Q.   Okay.  And can -- are we ready for the redacted version?

23        Nope.  Still working on it.  Okay.

24             MS. LYDON:  I could use the demonstrative and the

25   Elmo, Your Honor, and just cover up everyone else's.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1          THE COURT:  If you're close to being ready, we can

2   wait.  But if not, you can put it on the Elmo.

3      I just told them to cover up names of other people that

4   might come in.

5          MS. LYDON:  We'll see who can get there first.  All

6   right.

7   Q.  BY MS. LYDON:  All right.  So I'll just hold this up.  Does

8   a notary page go all the way across --

9   A.  It does.

10  Q.  -- the page?

11      So onto two separate pages?

12  A.  Correct.

13  Q.  We'll look first at the first page.

14      Do we see, on the Elmo here with the projector, on line 3

15  the date February 2, 2017?

16  A.  Yes.

17  Q.  And is that the date that your notarization --

18  A.  Yes.

19  Q.  Thank you.

20      -- indicated that Mr. Pooley appeared?

21  A.  Yes.

22  Q.  All right.  Here, there is a --

23  A.  Yes.

24  Q.  -- graph that says, Kind or type of notarization

25  certificate?

1    A.   So that would be the type of notarization, whether it's an

2    acknowledgment, jurat, what type of notarization.   And I marked

3    it -- that's actually ACK, acknowledgment.

4    Q.   Acknowledgment.   Okay.

5         And there is an address here as well?

6    A.   That's the address where the notary is performed.

7    Q.   Is that where you work?

8    A.   Yes, it is.

9    Q.   Okay.   Date of document is listed as NA?

10   A.   Right.

11   Q.   What --

12   A.   Because there was -- this document was not dated.

13   Q.   Okay.   It is -- I'm very bad at this --

14   A.   Yes.

15   Q.   -- but for the benefit of the court reporter, I will try to

16   let you finish your answer before I speak.   If you could let me

17   finish my question, it will make life easier for her, even if

18   you can tell where I'm going.

19        All right.   And the person that -- a name and address are

20   listed here.

21        Where do you get the names and addresses that you write

22   down in your notary journal?

23   A.   Usually from the identification provided.

24   Q.   Okay.   Let's see if we can repeat this redaction procedure.

25   One moment.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1     All right.  In this leftmost box on the next page, there

2     are several boxes that can be checked:  Personally known by the

3     notary; ID cards, describe each card below; or credible

4     witness, include signature of each witness.

5     Are those three ways that you can verify the identity of a

6     person who comes to you?

7     A.  Yes.

8     Q.  Okay.  And which one did you utilize in this instance?

9     A.  Identification.

10    Q.  All right.

11    A.  California.

12    Q.  You wrote down "CA ID" and then a number, D5583304.

13    Where would you have gotten that number?

14    A.  From the ID -- identification provided to me.

15    Q.  Okay.  And then there is a -- there are two dates.  What do

16    those two dates signify?

17    A.  The issue date and the expiration date of the

18    identification I was viewing.

19            MS. LYDON:  Okay.  We added an exhibit over lunch.

20    Has the defense gotten a copy of new Exhibit 18?  We can

21    provide a hard copy now.  While we're working on that, I'll

22    move through this.

23    Q.  BY MS. LYDON:  There is a -- in the next column there is a

24    phone number.  Where would you -- where do you get the phone

25    numbers that you write down in your notary journal?

1    A.   The signer of the document.

2    Q.   The signer of the document provides the phone number?

3    A.   Correct.

4    Q.   Okay.  And then there is a note.  Can you read what this

5    note says?

6    A.   Says, Letter attesting to Yuri Gurmanski [sic] -- I --

7    involvement in tandem jump.

8    Q.   Okay.  Where -- who wrote that?

9    A.   I wrote that.

10   Q.   How can you tell?

11   A.   My handwriting.

12   Q.   And where did you get that information?

13   A.   From the document that was provided for me.

14   Q.   Do you summarize documents, or --

15   A.   Yes.

16   Q.   -- what's the function?

17   A.   Yes.  Because the certificate that's being attached to the

18   document is called a looseleaf certificate; so I need to know

19   for future reference that the certificate that I notarized is

20   attached to the document that I had in front of me.  So I make

21   a note as to what it was that I'm notarizing, what -- basically

22   just a real quick, basically, this is -- this is what the

23   document was.  It's not about a dog bite; it's about a tandem

24   jump.

25   Q.   Okay.  And then there is a signature.

1    A.  Correct.

2    Q.  Who signs --

3    A.  The signer of the document.

4    Q.  -- or --

5    A.  The signer of the document.

6    Q.  Do you watch the person who appears before you --

7    A.  Yes.  In the journal, yes.

8    Q.  We have to avoid talking over each other.  No worries.  I'm

9    bad at that as well.

10       Finally, there is a fingerprint here.  How does that come

11   to be in your notary book?

12   A.  It's provided by the signer.

13   Q.  Okay.  Returning now to this California ID box ending in --

14   with a number ending in 3304.

15       Do you see that?

16   A.  I do.

17   Q.  Okay.  I'm going to put this away.

18           MS. LYDON:  Move to admit Government's 18.

19           MS. MCLOUGHLIN:  No objection.

20           THE COURT:  Exhibit 18 is received in evidence.

21       (GOVERNMENT'S EXHIBIT 18 ADMITTED INTO EVIDENCE.)

22           MS. LYDON:  Can we publish 18, please.  Do I need to

23   turn off the Elmo?  It might take a minute to switch modes.

24       If it appears frozen, I can go back to the Elmo.

25           THE CLERK:  Pull it up with the lever.  The lever you

 1    just pulled.  There you go.  Thank you.

 2            MS. LYDON:  Thanks.  Appreciate it.

 3    Q.  BY MS. LYDON:  All right.  This is the second page of

 4    Government's 11.  It appears to be a -- or is a driver's -- a

 5    Department of Motor Vehicles document for Mr. Rob Pooley.

 6        Do you see that?

 7    A.  I see it.

 8    Q.  Okay.  And it includes a driver's license number D5583304.

 9        Do you see that?

10    A.  Yes.

11    Q.  All right.  Does that indicate to you that someone with

12    that driver's license number appeared before you?

13            THE COURT:  This is not a driver's license.

14            MS. LYDON:  It is a California Department of Motor

15    Vehicles certified document.

16            THE COURT:  But it's not a driver's license.

17            MS. LYDON:  Correct, Your Honor, yes.

18            THE COURT:  Okay.

19            MS. LYDON:  With that driver's license number is my

20    question.  I'll re-ask the question.

21    Q.  BY MS. LYDON:  Did someone with -- who presented

22    identification bearing number D5583304 appear before you on

23    February 2, 2017?

24    A.  Yes.

25    Q.  Okay.

1          THE COURT:  Is that Mr. Pooley?

2          MS. LYDON:  It is.  It is a prior driver's license

3  photo.

4          THE COURT:  Is that the same person?

5          MS. LYDON:  Yes, it is.

6          THE COURT:  All right.

7          MS. LYDON:  I have no further questions, Ms. Lewis.

8          THE COURT:  You may cross-examine.

9                    CROSS-EXAMINATION

10  BY MS. MCLOUGHLIN:

11  Q.  Good afternoon.

12  A.  Hello.

13  Q.  I just want to touch on something you already testified

14  about.  And you know what?  Let's pull up Exhibit 1107 while I

15  ask you.  And if we could go to page 2, please.  Page 2,

16  please.

17      So this acknowledgment certificate, this just is to

18  acknowledge that the person identified as Rob Pooley signed the

19  document, correct?

20  A.  Correct.

21  Q.  It does not certify the contents of the letter?

22  A.  Correct.

23  Q.  Or assure that they are true in any way?

24  A.  Correct.

25  Q.  It also does not acknowledge any other letters?

1    A.  Correct.

2    Q.  It would only be the letter attached to this

3    acknowledgment?

4    A.  Correct.

5    Q.  Which is the letter that you described in your -- in your

6    book as --

7    A.  Correct.

8    Q.  Can we go to page 2.  I just want to clarify.  Of the same

9    exhibit -- I'm sorry -- page 1.  And I'm going to -- yeah, you

10   can zoom in on the whole letter.  That's fine.  Thank you.  If

11   you can go down to this third paragraph, it refers -- I'm just

12   going to read it.

13       It refers to, A letter was written by myself on Yuri's

14   behalf, stating I did not believe he had any knowledge of what

15   was going on at the Parachute Center while he was in Russia.

16   The validity of that letter was questioned, and, therefore, in

17   addition to e-mailing this letter, I will make a notarized hard

18   copy available.

19       Obviously, you notarized this document.  Your notarization

20   does not do anything -- does not acknowledge or certify

21   anything with regard to any other letter?

22   A.  Correct.

23               MS. MCLOUGHLIN:  Thank you.

24               THE COURT:  Any further questions?

25               MS. LYDON:  No.  Thank you, Your Honor.

1            THE COURT:  All right.  Ms. Lewis, thank you for

2    coming.  You're excused.

3         You may call your next witness.

4            MS. LYDON:  Government calls Michael Pierce.

5            THE COURT:  Sir, please step forward, all the way

6    through to your right, all the way to the witness stand.

7         Please remain standing, and raise your right hand.

8         (The Witness, MICHAEL PIERCE, is sworn.)

9            THE WITNESS:  I do.

10           THE CLERK:  Thank you.  You may be seated.

11           MS. LYDON:  Good afternoon, Mr. Pierce.

12           THE WITNESS:  Good afternoon.

13           THE CLERK:  Excuse me.

14           MS. LYDON:  I'm sorry.

15           THE CLERK:  It's okay.

16        Please state your full name.  Spell your last name for the

17   record.

18           THE WITNESS:  Michael Pierce.

19           THE CLERK:  Spell your last name.

20           THE WITNESS:  P-I-E-R-C E.

21                         DIRECT EXAMINATION

22   BY MS. LYDON:

23   Q.  What do you do for work, Mr. Pierce?

24   A.  I work for F&M Bank.

25   Q.  What do you do there?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1   A.   Branch administration officer.

2   Q.   Okay.  For the court reporter, let's try to talk a little

3   slower than we normally do.

4            THE COURT:  Is F&M the Farmers and Merchants Bank?

5            THE WITNESS:  Yes, sir.  Yes, Your Honor.

6   Q.   BY MS. LYDON:  Let's also, even if you can tell where I'm

7   going, try not to start answering until I'm finished with my

8   question.

9   A.   Okay.

10  Q.   Thank you.

11       All right.  Are you -- were you a notary in 2019?

12  A.   I was, yes.

13  Q.   Okay.  I'm going to hand you what's been marked as

14  Government's 1108.

15       My question is do you recognize 1108?

16  A.   Yes, I do.

17  Q.   What is it?

18  A.   It's a notary journal -- my notary journal.

19  Q.   Your notary journal?

20  A.   Correct.

21  Q.   How can you tell it's your notary journal?

22  A.   All the entries are in my handwriting.

23  Q.   Okay.  Could you look in the binder in front of you at

24  1108C?

25  A.   Yes.

1    Q.   Can you look at the second and third page of that document?

2    A.   Um-hum.

3    Q.   What is 1108C?

4    A.   These are photocopies of the front of my journal, as well

5    as photocopies of pages from the journal itself.

6    Q.   Okay.  And does it appear from line 5 that a Mr. Robert

7    Pooley appeared before you on March 29, 2019?

8    A.   Yes, it does.

9    Q.   All right.

10         MS. LYDON:  I'll move to admit Government's 1108C.

11   And we can just use the physical journal as a demonstrative and

12   not admit it into evidence, if the defense is okay, under the

13   best evidence rule.

14         MS. MCLOUGHLIN:  No objection.

15         THE COURT:  All right.  1108C will be received in

16   evidence with the same instructions that I gave regarding the

17   previous exhibit, to expurgate those portions dealing with

18   other persons having nothing to do with this case.

19       (GOVERNMENT'S EXHIBIT 1108C ADMITTED INTO EVIDENCE.)

20         MS. LYDON:  Excellent.

21     Do we have a redacted version?  That's amazing.  Thank you.

22     Could we please look at the newly redacted version of

23   1108C.

24         Nothing is coming up on the monitors.  I have pressed

25   Attorney Table.

1          THE COURT:  What are we waiting for?

2          THE CLERK:  Seeing if they were connected, Your

3   Honor.  It's not -- their side is not working for some reason.

4          MS. LYDON:  I can do the rest of this examination on

5   the Elmo, and perhaps we can fix it during the break.

6          THE COURT:  All right.  Are you going to be having

7   any more of these notarized exhibits?

8          MS. LYDON:  Just this one.  But I've --

9          THE COURT:  Go ahead.  Finish with this one, then,

10  before we take the break.

11  Q.  BY MS. LYDON:  Okay.  All right.  Now, I folded it over in

12  an attempt to redact unrelated information.

13      What does -- perhaps we can just walk along the columns

14  from left to right.  What does the first column indicate to

15  you?

16  A.  That would indicate the date and time that I did the

17  notary.

18  Q.  The date and time of the notary?

19  A.  That the notary was performed, correct, that I did the

20  notarization.

21  Q.  Okay.  And in this instance, it appears to be March 29,

22  2019, at 10:15 a.m.; is that correct?

23  A.  That's correct, yes.

24  Q.  What does the second column indicate?

25  A.  It's an abbreviation for acknowledgment, which is the type

1    of notary I performed.

2    Q.   What's an acknowledgment?

3    A.   Basically where you're certifying the person in front of

4    you is the person who actually signed the form based off of

5    your verification of their identity.

6    Q.   Do you also verify their signature?

7    A.   Correct.

8    Q.   How do verify their signature?

9    A.   We compare it against their driver's license.  And then we

10   also compare their signature on the document they're notarizing

11   against the signature in our log to make sure they're

12   consistent.

13   Q.   Okay.  So you look at the document they provide, which has

14   a signature, and you compare it against the signature on their

15   driver's license; is that right?

16   A.   Correct.

17   Q.   And you also have them sign your notary book?

18   A.   Correct.

19   Q.   And all three should match?

20   A.   That's correct.

21   Q.   Okay.  The next column, what does that mean?

22   A.   That is the address where the notary was performed.

23   Q.   Okay.

24   A.   In this case, at my work.

25   Q.   The next column, what does that read?

1  A.  That's a description of the document.  That way we have a

2  reference to know what kind of document we actually performed

3  the notary for.

4  Q.  Who wrote that phrase?

5  A.  That's in my handwriting.

6  Q.  What does it say?

7  A.  Says, Letter regarding e-mails.

8  Q.  There is a "Date of Document" section which appears to say

9  NA.  In what circumstances do you write NA?

10  A.  When there is no formal date on the document.  The document

11  doesn't have a formal date.

12  Q.  Okay.  The final column has a name and an address.  Where

13  do you get the information that you write in this column of

14  your notary journal?

15  A.  The name is taken from the driver's license.  Typically,

16  we'll take the address from that as well unless the person

17  tells us they have a different address or they've moved since

18  their ID was issued.

19  Q.  Okay.  All right.  I have another amateurly redacted page

20  of your notary journal.  The first column that appears appears

21  to be the one that we just looked at; so it's a page from the

22  prior leaf of your journal; is that right?

23  A.  That's correct, yes.

24  Q.  Then this next full column includes -- well, what is it?

25  A.  This is the identifying information off of the driver's

1    license or ID that we use to identify the individual we're

2    notarizing.

3    Q.   There is a -- there is a date here.  Can you read what it

4    is?

5    A.   Looks like March 31, 2019.

6    Q.   Okay.  And what does that date signify?

7    A.   That would have been the expiration date of the driver's

8    license or ID that was used.

9    Q.   Okay.  And do you see that the -- there -- do you see that

10   the license ends in 3304?

11   A.   Correct, yes.

12   Q.   All right.  This is a document -- this is Government's

13   Exhibit 18, page 1.  This is a document from the Department of

14   California -- California Department of Motor Vehicles for

15   Mr. Robert Pooley.  Do you see that it has -- it bears an ID

16   number ending in 3304?

17   A.   Yes, it does.

18   Q.   And it relates to an ID with an expiration date of

19   3/31/2023.  Actually, it might have been an earlier version.

20       Do you see that?

21   A.   I do, yes.  Um-hum.

22   Q.   Going back to your notary book now, it says $15?

23   A.   That's correct, yes.  That's the fee we charge.

24   Q.   Okay.  And then there is a signature there.

25       How did that signature end up on your notary book?

1  A.  The individual would have signed that journal --

2  Q.  Okay.

3  A.  -- themselves.

4  Q.  There is also a thumbprint.

5      How does that work?

6  A.  I would have them thumbprint the document as well

7  themselves.

8  Q.  Okay.  Would you be there for that signing and that

9  thumbprinting?

10  A.  Correct, I would be.

11  Q.  Okay.  Can you turn in the binder in front of you to Tab

12  1109.  There is a signed document on the front.

13      Do you see that?

14  A.  I do, yes.  Um-hum.

15  Q.  Then turning to the second page, do you recognize what's on

16  the second page?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  That's my acknowledgment page, which is the attachment that

20  I put to the document that I'm notarizing to basically affirm

21  my notary with my seal and signature.

22          MS. LYDON:  Move to admit Government's 1109.

23          MS. MCLOUGHLIN:  No objection.

24          THE COURT:  Exhibit 1109 is received in evidence.

25  ///

1        (GOVERNMENT'S EXHIBIT 1109 ADMITTED INTO EVIDENCE.)

2   Q.   BY MS. LYDON:   And it's blue, which we previously

3   discussed, but does it appear to be a picture of a letter

4   regarding some e-mails?

5   A.   Yes, it does.

6   Q.   And what you wrote in your notary book, if I recall, was,

7   Letter re: e-mails.

8        Is that right?

9   A.   I believe it was letter regarding e-mails, correct.

10  Q.   And there is a signature there; is that correct?

11  A.   Yes, there is.

12  Q.   Is that the signature that you would have verified if you

13  had affixed your notary acknowledgment to it?

14  A.   Correct.

15  Q.   Okay.   Turning to the second page of this document, can you

16  describe again what this document is on the second page?

17  A.   Yeah.   The acknowledgment is basically the document we

18  attach to the document that we're notarizing to validate our

19  notary.   We stamp it with an official seal, sign it, and

20  indicate who we're actually notarizing, who the individual is

21  in front of us.

22  Q.   Okay.   Is -- this stamp with the seal, is that the way

23  you're referring to --

24  A.   That's my -- correct, yes.

25  Q.   We have to avoid talking over each other.

1         Is this your signature right here?

2    A.   Can -- I can't see it on the screen.  Oh.

3    Q.   Sorry.

4    A.   Yes, it is.

5    Q.   And would you have filled out the information in the top

6    specifically, that you're in the county of Sacramento, on

7    March 29, 2019, Michael Pierce, notary public, personally

8    appeared Robert Pooley?

9    A.   Yes, I did.

10   Q.   I might have left out some words on that.  But is this

11   document the memorialization that Robert Pooley appeared before

12   you and you witnessed him sign your notary book and checked

13   that signature against the document affixed to this document?

14   A.   Yes, it is.  Yes, it is.

15        MS. LYDON:  No further questions.  Thank you,

16   Mr. Pierce.

17        THE COURT:  Any cross-examination?

18        MS. MCLOUGHLIN:  Very briefly, Your Honor.

19                    CROSS-EXAMINATION

20   BY MS. MCLOUGHLIN:

21   Q.   Good afternoon.

22   A.   Good afternoon.

23   Q.   I just wanted to confirm that by notarizing the document,

24   you're just certifying that Robert Pooley was the person who

25   signed the document, correct?

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    A.   That's correct, yes.

2    Q.   You're not certifying the truth of whatever is stated in

3    the letter or the document?

4    A.   That's correct, yeah.

5    Q.   You're not certifying the truth of the contents of the

6    document in any way?

7    A.   Correct.

8    Q.   And the notarization doesn't confirm that Rob Pooley or

9    anybody signed any other documents, just this document, right?

10   A.   For me, just that document, correct.

11            MS. MCLOUGHLIN:   That's all.   Thank you.

12            THE COURT:   All right.   Thank you, Mr. Pierce.

13   You're excused.

14       And we will take the next recess at this time, ladies and

15   gentlemen.   15 minutes.   Remember the admonition.

16       (Jury not present, 3:07 p.m.)

17            THE COURT:   The jurors are outside the courtroom.

18       What do you have for the rest of the day?

19            MS. LYDON:   Special Agent Lee.

20            THE COURT:   Anybody else?

21            MS. LYDON:   Not today.   He's going to bring in a lot

22   of evidence; so a lot of photos, recordings, e-mails.

23            THE COURT:   All right.

24            MS. LYDON:   Thank you.

25       (Recess taken, 3:07 p.m. - 3:25 p.m.)

 1          THE COURT:  Here is a note from a juror that I'm not

 2   going to do anything about.  It says, Yes, I have no bananas.

 3   Yes means no.  No means yes.  Please clarify.  Blue does not

 4   always reproduce, it drops out as blank, I was a graphic

 5   artist, or hidden.

 6      So bring the jury back.  You can do with it what you want.

 7      (Jury present, 3:26 p.m.)

 8          THE COURT:  Jurors are all present.  Defendant is

 9   present with counsel.

10      You may call your next witness.

11          MS. LYDON:  Thank you, Your Honor.  The United States

12   calls Special Agent Reggie Lee.

13          THE CLERK:  Raise your right hand.

14      (The Witness, REGGIE LEE, is sworn.)

15          THE WITNESS:  Yes, I do.

16          THE CLERK:  Thank you.  You may be seated.

17      Please state your full name.  Spell your last name for the

18   record.

19          THE WITNESS:  Reggie Lee.  Last name Lee, L-E-E.

20                      DIRECT EXAMINATION

21   BY MS. LYDON:

22   Q.  Good afternoon, Special Agent Lee.

23   A.  Good afternoon.

24   Q.  What do you do for a living?

25   A.  I'm a special agent with the US Department of

1    Transportation Office of Inspector General, assigned to the

2    San Francisco office.

3    Q.  And what types of cases do you handle in your job?

4    A.  We conduct criminal investigations that affect the

5    Department of Transportation.

6    Q.  Okay.  Before you became a special agent with DOT OIG, can

7    you just run us briefly through your career?  What did you do?

8    A.  Sure.  I've been a special agent with the US Department of

9    Transportation for the last seven years.  Previously, I was a

10   special agent with the Air Force Office of Special

11   Investigations at Travis Air Force base.  Previous to that, I

12   was an active-duty staff sergeant in the US Air Force.

13   Q.  How long were you a special agent with the US Air Force

14   Office of Special Investigations?

15   A.  Approximately two and a half years.

16   Q.  Okay.  And how long were you a staff sergeant with the US

17   Air Force?

18   A.  Approximately five years.

19   Q.  Did you work before that?

20   A.  I did.  I was in college and just retail jobs.

21   Q.  Okay.  Did you deploy while you were with the Air Force?

22   A.  Yes, I did.  In the spring of 2011, I was deployed to Al

23   Udeid airbase in Qatar.

24   Q.  Okay.  Let's turn now to your work on this case.  We're

25   going to cover discrete pieces of evidence, just go section by

1    section.  Okay.

2       Were you part of a team that executed a search warrant at

3    Lodi Parachute Center on January 30, 2018?

4    A.  Yes, I was.

5    Q.  Were there photographs taken in the course of that search

6    warrant?

7    A.  Yes.

8    Q.  Did you take the photos?

9    A.  No, I did not.

10   Q.  Have you reviewed the photographs in the 800 series of

11   government exhibits?

12   A.  Yes, I did.

13   Q.  Are those photographs fair and accurate depictions of the

14   Parachute Center as it was on the day that you and other agents

15   searched it?

16   A.  Yes.

17   Q.  All right.  We're going to go through some of the photos,

18   not all of them.  Could we take a look at one that is already

19   admitted, Government's 825.

20      All right.  Other witnesses -- this has been referred to as

21   the counter or the manifest; is that right?

22   A.  That's correct.

23   Q.  If we could zero in here.

24      Do you see some hanging orange straps?

25   A.  Yes, I do.

 1   Q.  All right.  Could you look in the binder in front of you

 2   to -- at Government's 830?

 3   A.  Okay.  Okay.

 4   Q.  What is it?

 5   A.  It's an open safe.

 6   Q.  Do you see those hanging orange straps?

 7   A.  Yes, I do.

 8   Q.  Does it have money in it?

 9   A.  Yes.  There are two cash in a pack in a rubber band.

10   Q.  Do you mean two stacks of cash?

11   A.  Two stacks of cash, yes.

12           MS. LYDON:  Move to admit Government's 830.

13           THE COURT:  Any objection?

14           MS. MCLOUGHLIN:  No objection.

15           THE COURT:  Exhibit 830 is received in evidence.

16       (GOVERNMENT'S EXHIBIT 830 ADMITTED INTO EVIDENCE.)

17           THE COURT:  Now, how many different photos are you

18   going to have numbered so that we don't have to do them one at

19   a time?

20           MS. LYDON:  Not many with this witness.  The next

21   ones are 824, 821, 822, 823, 826 -- 807 has already been

22   admitted -- and Government's Exhibit 1303.

23           THE COURT:  All right.  Go ahead.

24           MS. LYDON:  If there is no objection, I can move them

25   all in now and flip them through quickly.

 1              THE COURT:  Would you like to see if we can do that?

 2              MS. MCLOUGHLIN:  Sure.  If I could just have one

 3   moment to look through them, Your Honor.

 4              THE COURT:  824, 821, 822, 823, 826, and 1303.

 5              MS. LYDON:  Yes.

 6              MS. MCLOUGHLIN:  No objection to -- up to 826.

 7              THE COURT:  How about 1303?

 8              MS. MCLOUGHLIN:  I'll just have to grab the other

 9   binder quickly.

10              THE COURT:  All right.  While she's looking, Exhibits

11   821, 822, 823, 824, and 826 are all received in evidence.

12       (GOVERNMENT'S EXHIBITS 821, 822, 823, 824, 826 ADMITTED

13   INTO EVIDENCE.)

14              MS. MCLOUGHLIN:  Your Honor, no objection to 1303.

15              THE COURT:  Exhibit 1303 is received in evidence.

16       (GOVERNMENT'S EXHIBIT 1303 ADMITTED INTO EVIDENCE.)

17              MS. LYDON:  Thank you.

18   Q.  BY MS. LYDON:  All right.  Is Government's Exhibit 830 a

19   picture of the safe that appears to be behind the counter or

20   within the counter at Parachute Center?

21   A.  That is correct.

22   Q.  Okay.  Let's look at 824 briefly.

23       Does this appear to be just a different angle or the back

24   of the counter?

25   A.  Yes.  Correct.

1   Q.   Okay.  Can we look at 821, please.

2        Do you recognize what's depicted here?

3   A.   These are the tents that are located in the hangar next to

4   the Parachute Center or the -- adjacent to the Parachute

5   Center.

6   Q.   Adjacent to the Parachute Center?

7   A.   Yes.  Well, they're connected to the Parachute Center.

8   Q.   Okay.  Did you encounter this scene when you arrived at the

9   Parachute Center?

10  A.   Yes.  On the day of the search warrant, I entered the

11  Parachute Center through this entrance, and I recall the tents

12  that are depicted in the photographs.

13  Q.   Was there anyone in them?

14  A.   Yes.  There were a couple of skydivers.  Approximately two

15  to four skydivers were sleeping.

16  Q.   Were they surprised to see you?

17  A.   Yes, they were.

18  Q.   Okay.  Let's just flip through, quickly.  822.  823.  826.

19  All right.  Can we look at already admitted 807.

20       And does this depict lockers at Parachute Center?

21  A.   Yes.

22  Q.   Did the computer crimes unit take a picture of Rob Pooley's

23  locker?

24  A.   Yes, they did.

25  Q.   Can we look at -- well -- yes.  Can we look at Government's

1   Exhibit 1303.

2        All right.  Did you seize items from this locker?

3   A.  Yes, I did.

4   Q.  How did you know it was Robert Pooley's locker?

5   A.  There were a couple of items that had Mr. Pooley's name.  I

6   recall a FedEx envelope that was addressed to Mr. Pooley.

7   There was also an invoice addressed to Mr. Pooley.  And I

8   believe there was also a FAA medical certificate that was

9   addressed to Mr. Pooley.

10  Q.  When you say -- with respect to the FAA medical

11  certificate, do you mean that it was for Mr. Pooley?

12  A.  Correct.

13  Q.  Okay.  So it was his?

14  A.  Yes.

15  Q.  All right.  Did you seize items in and below the manila

16  folder I just circled?

17  A.  Yes.

18  Q.  And did you seize this open binder on the bottom -- or

19  second-to-bottom row of the locker?

20  A.  Yes, I did.

21  Q.  And did you find -- did those items that we just discussed

22  relate to the fraud charged in this case?

23  A.  Yes.

24  Q.  Okay.  I'm going to look at some of those.  I'm going to

25  try the Elmo again.

1          Special Agent Lee, have you been keeping custody of this

2     box?

3     A.   Yes.  Our office has.

4     Q.   Okay.  And every time you look at it, do you seal it up and

5     not look at it again until you open it yourself?

6     A.   That's correct.

7     Q.   Okay.  Did you examine the contents of this box before

8     coming to court and opening it today?

9     A.   Yes.

10    Q.   Okay.  And does this box contain Pooley -- the items you

11    seized from Pooley's locker?

12    A.   Can you please spin the box?

13         Yes.

14    Q.   I don't think it will zoom out anymore, but what I have

15    just put on the Elmo is Government's Exhibit 500.

16         What is this document or this object?

17    A.   It's a binder labeled, Tandem Instruction For Dummies.

18    Q.   Okay.  Did you seize it from Mr. Pooley's locker?

19    A.   Yes, I did.

20    Q.   The Elmo won't zoom all the way out; so I will just display

21    this to the jury, and then we'll zoom in on particular

22    documents.

23         Okay?

24    A.   Okay.

25    Q.   All right.  Does it contain a number of colored file

1    folders with USPA and UPT documents within it?

2    A.  Yes.

3    Q.  Do some of those documents have pre-signed signatures?

4    A.  They do.

5    Q.  Does this appear to be a USPA membership application?

6    A.  Yes.

7    Q.  On the other side of the file folder, is there a USPA

8    Parachute Association -- USPA license application?

9    A.  Yes.

10   Q.  Are there blank USPA coach rating course proficiency cards?

11   A.  Yes.

12   Q.  With no signatures?

13   A.  Correct.

14   Q.  Is there also a tandem instructor rating course proficiency

15   card, or several tandem instructor rating course proficiency

16   cards --

17   A.  Yes.

18   Q.  -- bearing preprinted Yuri Garmashov signatures?

19   A.  Yes.

20   Q.  Are they single-sided and -- double-sided?

21   A.  Yes.

22   Q.  There are a few of them?

23   A.  Yes, correct.

24   Q.  I won't go through all the documents in this binder.

25       Flipping a bit ahead, is there a paperwork checklist for

1  tandem instructors flagged with a red flag with a checkmark on

2  it?

3  A.  Yes, there is.

4  Q.  Is there also an instructor examiner checklist for USPA

5  courses indicating, in parentheses, items to USPA?

6  A.  Yes.

7  Q.  Are there tandem Sigma exam question sheets?

8  A.  Yes.

9  Q.  And answer sheets?

10 A.  Yes.

11 Q.  We won't go through all of them, but does this binder

12 contain other USPA and UPT blank documents?

13 A.  Yes.

14         THE COURT:  Are you offering that in evidence?

15         MS. LYDON:  Oh.  Yes, I am.  Sorry.  I thought I

16 already did, Your Honor.  Thank you.

17         THE COURT:  That was 500?

18         MS. LYDON:  It was.  Thank you.

19         THE COURT:  Any objection?

20         MS. MCLOUGHLIN:  No, Your Honor.

21         THE COURT:  Exhibit 500 is received in evidence.

22     (GOVERNMENT'S EXHIBIT 500 ADMITTED INTO EVIDENCE.)

23         MS. LYDON:  All right.

24 Q.  BY MS. LYDON:  In that manila envelope and below the manila

25 envelope, did you find filled out candidate forms?

1    A.  Yes, I did.

2    Q.  Did you find candidate forms spanning the period from

3    before Robert Pooley's suspension in the summer of 2015 and

4    after the period of the suspension?

5    A.  That is correct.

6    Q.  Did you notice a change in practice?

7    A.  Yes.

8    Q.  Could you briefly describe the change in practice?  And

9    then we'll go through specific documents.

10   A.  Sure.  Prior to Mr. Pooley's suspension in August of 2015,

11   the paperwork had Mr. Pooley's signature.  Sometimes it was wet

12   signed; sometimes it was preprinted.  Following his suspension

13   in August of 2015, a lot of the paperwork began to shift to

14   Mr. Garmashov's signature.

15   Q.  And are Government's Exhibits 501 all the way through 519

16   candidate packets that you found in Mr. Garmashov --

17   Mr. Pooley's locker?

18   A.  Yes.

19           MS. LYDON:  Move to admit Government's Exhibits 501

20   through 519.

21           THE COURT:  Any objection?

22           MS. MCLOUGHLIN:  No objection, Your Honor.

23           THE COURT:  Exhibits 501 through 519 are all received

24   in evidence.

25   ///

1    (GOVERNMENT'S EXHIBITS 501-519 ADMITTED INTO EVIDENCE.)

2    Q.  BY MS. LYDON:  All right.  We won't spend a ton of time

3    going through all of these in detail.  I'll spend a little bit

4    more time on the first one and then -- to show changes and

5    practice over time.

6        Does Government's 501 appear to be a packet starting with

7    the tandem instructor rating course proficiency card for

8    Mr. Busanello?

9    A.  Yes.

10   Q.  And do you see signatures?

11   A.  Yes, I do.

12   Q.  Who do they belong to?

13   A.  There is a signature of the skydiver and also a signature

14   of Mr. Pooley.

15   Q.  Can you tell if they're preprinted or what -- sorry --

16   Mr. Pooley's signatures?

17   A.  They appear to be preprinted.

18   Q.  Looking at the second page, there is a rating

19   recommendation.  Does it -- with Robert Pooley's name.  Does

20   the signature appear to be preprinted or wet?

21   A.  Preprinted.

22   Q.  Can you read the date?

23   A.  October 4, 2012.

24   Q.  Okay.  We won't go through all these documents, but just to

25   get a sense, there is a typical packet; is that right?

1    A.   That is correct.

2    Q.   Sometimes the exact composition of documents in the packet

3    change depending on what the candidate is seeking certification

4    for, but the documents become fairly familiar; is that right?

5    A.   That's right.

6    Q.   Okay.  So it appears Mr. Busanello had an FAA medical; he

7    was applying for a USPA license.  Is that right?

8    A.   That's correct.

9    Q.   And this bears Mr. Pooley's signature.

10        Does it appear to be preprinted or wet?

11   A.   Appears to be wet.

12   Q.   There is UPT documents here as well bearing Mr. Pooley's

13   signature.

14        Do those appear to be preprinted or wet?

15   A.   They appear to be wet signatures.

16   Q.   There is test sheets.  Do you see those?

17   A.   Yes.

18   Q.   We'll set that aside.  So that one is from 2012?

19   A.   Correct.

20   Q.   Government's Exhibit 502 appears to relate to a Ms. or

21   Mr. Gilchrist; is that right?

22   A.   That's correct.

23   Q.   And, again, it's a USPA packet.

24        Can you tell what date the jumps for this tandem instructor

25   rating course proficiency card occurred?

1    A.   May 30th of 2013.

2    Q.   And whose signatures are on the page with respect to the

3    examiner instructor?

4    A.   Mr. Pooley's.

5    Q.   Preprinted or wet?

6    A.   They appear to be preprinted.

7    Q.   I see more preprinted signatures on the back.  It also

8    includes -- this packet also includes a UPT tandem instructor

9    certification form.

10        Whose signatures are there?

11   A.   Mr. Pooley's.

12   Q.   There are a few more documents; is that right?

13   A.   That's correct.

14   Q.   We also have as Government 503 UPT form -- or a whole

15   packet, really, but beginning with a UPT form for Mr. Ricardo

16   Santos.

17        Do you see that?

18   A.   Yes, I do.

19   Q.   Now we're into the 2014 era; is that right?

20   A.   That's correct.

21   Q.   Mr. Pooley is still using his own signature.

22        Do you see that?

23   A.   I do.

24   Q.   Some pre -- most preprinted.  Looks like he has one wet

25   signature on this coach rating course proficiency card.

1          Do you see that on this page?

2     A.  I'm sorry.  I can't see that on the screen.

3     Q.  I'm sorry.

4     A.  Yes.  I see one wet signature.

5     Q.  All right.  Government 504 is also 2014; is that right?

6     A.  That's correct.

7     Q.  505 is 2014; is that right?

8     A.  That's correct.

9     Q.  506, we get to 2015.  It begins with a UPT tandem

10    instructor certification form for a Kenton Outtrim.

11         Do you see that?

12    A.  I do.

13    Q.  And the signatures appear to belong to who?

14    A.  Mr. Pooley.

15    Q.  Wet or preprinted?

16    A.  They appear to be wet signatures.

17    Q.  Just flipping through.  And the final endorsement for

18    Mr. -- Mr. Kenton Outtrim is Rob Pooley as the printed name of

19    the examiner, a wet signature, and a date of 6/15/2015; is that

20    right?

21    A.  That's correct.

22    Q.  All right.  And 507 and 508 and 509, we won't go through

23    specifically, but are they also documents that you found in

24    Mr. Pooley's locker with jumps in June of 2015?

25    A.  Correct.

1    Q.  All right.  Government's Exhibit 510 has several dates and

2    several signatures on it.  One of them -- they relate to a

3    Mr. Guillermo Canatta Sosa.  It includes a USPA license

4    proficiency card and application, and that document appears to

5    be digitally signed by Rob Pooley.

6        Do you see that?

7    A.  I do.

8    Q.  With a date of 8/7/2015?

9    A.  Yes.

10           MS. MCLOUGHLIN:  Objection, Your Honor.  There is a

11   lot of leading.

12           THE COURT:  She --

13           MS. MCLOUGHLIN:  Leading.

14           THE COURT:  That's all right.  It's already in

15   evidence.  Overruled.

16   Q.  BY MS. LYDON:  There is a canopy piloting proficiency card

17   with a mix of signatures.

18   A.  That's correct.

19   Q.  Do you see some Pooley signatures here?

20   A.  Yes, I do.

21   Q.  And then for the first time in these set of exhibits, whose

22   signature -- whose preprinted signature and name appears at the

23   bottom right of the third page of this exhibit?

24   A.  I see Mr. Yuri Garmashov's signature.

25   Q.  There is also a tandem instructor rating course proficiency

1  card for Mr. Canatta, and in each of the signature lines for

2  the USPA instructor or examiner or evaluator, whose preprinted

3  signature do you see?

4  A.  Mr. Garmashov.

5  Q.  And whose name appears before the final certification?

6  A.  Mr. Garmashov.

7  Q.  At this point in August -- or on August 17th of 2015, had

8  Mr. Pooley been suspended?

9  A.  Yes.

10  Q.  Generally, did that pattern continue through the rest of

11  the documents that you saw?

12  A.  Correct.

13  Q.  Could you describe Mr. Pooley's practice following his

14  suspension, as reflected in the documents that you seized from

15  his locker?

16  A.  Following his -- Mr. Pooley's suspension from the USPA and

17  UPT, we noticed that he was using Mr. Garmashov's signature

18  where a tandem examiner endorsement was required.

19  Q.  Did you notice his signature still appeared in other

20  situations where the signer didn't need to have the seniority

21  level of an examiner?

22  A.  Correct.  Parts of the signature -- where Mr. Pooley could

23  sign, we continued to see Mr. Pooley's signature.

24  Q.  Just do a couple quick examples and move on.

25       So Mr. -- Government's Exhibit 511 is a series of documents

1    for USPA, a license application with Yuri Garmashov's name

2    listed as the instructor examiner.  It also includes -- oh,

3    well, this one spans different periods of time.

4         So do you see on the bottom right of the second page, with

5    the signature identification, you've got Rob Pooley, a wet

6    signature, and a date of 7/13/15?

7    A.   Yes.

8    Q.   And then there is a coach rating course proficiency card

9    with the jumps at the -- on August 31, 2015.  And whose

10   signature appears next to those dates?

11   A.   Mr. Garmashov.

12   Q.   And whose signature appears next to the final rating

13   recommendation?

14   A.   Mr. Garmashov's.

15   Q.   And we don't need to go through 512 through 519

16   individually because they're all in evidence.  But my question

17   is does that pattern continue through those documents with some

18   Pooley signatures and some Garmashov signatures?

19   A.   That's correct.

20   Q.   All right.  That might be the end of the Elmo for the day.

21   Moving to a different topic.

22        Did you receive a video recording of the deposition of

23   Mr. Pooley?

24   A.   I did.

25   Q.   Did you review it?

1    A.  I did.

2    Q.  In that video, did Pooley make statements related to some

3    of the tandem instructor courses at issue in this case?

4    A.  Yes, he did.

5    Q.  In one part of the video, did Mr. Pooley admit that when he

6    conducted the tandem instructor course for YongHyeon Kwon, his

7    USPA rating was suspended?

8    A.  Yes.

9              MS. LYDON:  Move to admit Government 206.

10             THE COURT:  Is that the entire video of the

11   deposition?

12             MS. LYDON:  No, Your Honor.  These are specific

13   clips.

14             THE COURT:  Well, all right.  How many are you going

15   to offer?

16             MS. LYDON:  If I count them up, fewer than 15, Your

17   Honor.  They've all been provided to the defense.

18             THE COURT:  How long is the total of the length of

19   the deposition?

20             MS. LYDON:  I'm not positive, Your Honor.  I believe

21   approximately -- hours.  But I'm not sure how many.  I can look

22   that up.

23             THE COURT:  So let me ask defense counsel, how do you

24   intend to proceed with that deposition?  They're offering a

25   specific number of excerpts.  What is your position with regard

1    to that?

2           MS. MCLOUGHLIN:  We reviewed the excerpts.  We've

3    been before Your Honor with regard to the admissibility of

4    each.  If the question is whether we should admit the entire

5    transcript, we would like to just proceed on the --

6           THE COURT:  You've been before me with regard to the

7    admissibility of each?

8           MS. MCLOUGHLIN:  We had previous discussions

9    yesterday, I believe.  I just mean we don't object to the

10   exhibits that include the clips that the government has

11   provided.

12          THE COURT:  I don't recall discussing each of these

13   clips.  I'm not sure we're referring to the same thing.

14          MS. LYDON:  The discussion was with reference to the

15   transcript of the deposition; so that's what we were looking

16   at.

17          THE COURT:  All right.  All right.  So you have no

18   objection to proceeding individually with the clips?

19          MS. MCLOUGHLIN:  Correct, Your Honor.

20          THE COURT:  All right.  So let's identify each of

21   those clips now.

22          MS. LYDON:  Okay.  206, 205, 207, 216, 209, 210, 218,

23   and 213.

24          THE COURT:  Now, are you just going to -- are you

25   going to admit them consistent with the Court's rulings

1    previously on --

2              MS. LYDON:  Yes.

3              THE COURT:  -- each of those -- all right.

4        So other than what we discussed yesterday, are there any

5    objections?

6              MS. MCLOUGHLIN:  No, Your Honor.

7              THE COURT:  All right.  Now, the last one was 213,

8    correct?

9              MS. LYDON:  Yes.

10             THE COURT:  So Exhibits 205, 206, 207, 209, 210, 213,

11   216, and 218 are received in evidence.

12        (GOVERNMENT'S EXHIBITS 205, 206, 207, 209, 210, 213, 216,

13   218 ADMITTED INTO EVIDENCE.)

14             MS. LYDON:  Thank you, Your Honor.  All right.  Could

15   we play Government's Exhibit 206, please.

16             THE COURT:  So let me explain to the jury what this

17   is, if we understand.

18        There was a session for which Mr. Pooley sat, and questions

19   were asked to him, and he answered those questions.  They have

20   taken now some of those questions and his answers and put them

21   in the form of a video that they're going to show to you one

22   piece at a time.

23        Now, is there any sense in the order of these or --

24             MS. LYDON:  So I've tried to put them in a sensible

25   order.  They're not in the chronological order of the

1    deposition.

2          THE COURT:  Just so the jury understands, this is not

3    necessarily the same chronological order that the questions

4    were asked.

5          So with that understanding, go ahead.

6          MS. LYDON:  Thank you.

7    Q.  BY MS. LYDON:  And to clarify, Mr. Lee -- Special Agent --

8        Could we pause a moment?  Thank you.

9        -- you weren't questioning at this deposition, right?

10   A.  That is correct.

11   Q.  You just received the deposition?

12   A.  That is correct.

13   Q.  Okay.

14         THE COURT:  Can you enlighten us, because I don't

15   know, who was asking the questions?

16         MS. LYDON:  We'll just say it's an unrelated matter.

17         THE COURT:  All right.

18         MS. LYDON:  Okay.  All right.  Could we please start

19   from the beginning of 206.

20       (Media presented.)

21   Q.  BY MS. LYDON:  All right.  And did he make some specific

22   claims about the qualification -- the certifications held by

23   Mr. Kwon?

24   A.  Yes.

25   Q.  Could we please play 205.

1              (Media presented.)

2         All right.  He refers to a master parachute license.  Do

3    you understand that to be a USPA D license?

4    A.  That is correct.

5    Q.  And in sum and substance, in this video, did Mr. Pooley

6    claim that he had verified that Kwon had all those

7    qualifications?

8    A.  That is correct.

9    Q.  In sum and substance, did Pooley claim in another video

10   that -- another excerpt here that the examiner didn't have to

11   do anything in the course and, if they trusted the evaluator,

12   could just sign off on the paperwork?

13   A.  Yes.

14   Q.  Could we look at Government 207, please.

15             (Media presented.)

16        So there, did you hear Mr. Pooley say that theoretically,

17   the examiner would just take someone else's word and sign off?

18   A.  Correct.

19   Q.  Does he go on to make specific statements regarding

20   Mr. Garmashov?

21   A.  Correct.

22   Q.  Let's resume.

23             THE COURT:  It's 216 now?

24             MS. LYDON:  Yes.  Oh, I'm sorry.  No.  That was 207.

25             THE COURT:  Are we going to 216 now?

1        MS. LYDON:  No.  We were -- I just paused because

2    this is kind of a lengthy one.

3        THE COURT:  Oh.  Okay.

4     (Media presented.)

5        MS. LYDON:  I think I messed this one up.  We can

6    resume here.  Yes.  Thank you.

7     (Media presented.)

8    Q.  BY MS. LYDON:  Okay.  So there is a bit in that somewhat

9    longer clip.

10       Did you hear him state that he's aware that Garmashov

11   denies it?

12   A.  Correct.

13   Q.  Did Pooley claim that he -- that all the documents were

14   e-mailed to Garmashov, and Garmashov sent them to USPA and UPT

15   via e-mail?

16   A.  Correct.

17   Q.  And that he -- he meaning Pooley -- would e-mail them to

18   him most of the time?

19   A.  Correct.

20   Q.  Did you check Rob Pooley's e-mail account?

21   A.  I did.

22   Q.  And did you check Garmashov's e-mail account?

23   A.  I did.

24   Q.  Did you find any e-mails from Pooley to Garmashov,

25   e-mailing USPA packets for Yong Kwon?

1    A.  I did not find that e-mail.

2    Q.  Did you find e-mails from Pooley to Garmashov with USPA or

3    UPT documents for Fabian Munoz?

4    A.  I did not find that e-mail.

5    Q.  For Fabricio Palomino?

6    A.  No, I did not find that e-mail.

7    Q.  For Lachlan Mackay?

8    A.  I did not find that e-mail.

9    Q.  In fact, did you find Government's Exhibit 4, which was

10   from Rob Pooley at Parachute Center video desk, attaching

11   Mr. Mackay's paperwork going directly to USPA?

12   A.  That's correct.

13   Q.  But he signed it "Yuri"?

14   A.  That's correct.

15   Q.  Okay.  How about Danny Overeem, did you find any documents

16   where -- or e-mails where Pooley had e-mailed Garmashov the

17   documents for Danny Overeem?

18   A.  No.

19   Q.  All right.  Carlos Obaid?

20   A.  No.

21   Q.  Carlos Martinez?

22   A.  No.

23   Q.  Okay.  Did Pooley -- shifting to another topic -- or

24   another clip, did Pooley claim in the deposition that the way

25   that Garmashov verified the forms was just that someone told

1    him that the things were counted and those things happened?

2    A.  Correct.

3    Q.  Could we please play Exhibit 216.

4        (Media presented.)

5        All right.  Did he say that one thing it could mean that

6    Kwon's D license is listed as pending is that it was just being

7    processed?

8    A.  Correct.

9    Q.  And he said you could start the course once the D license

10   has been mailed in?

11   A.  Correct.

12   Q.  Okay.  Does Pooley go over Kwon's USPA forms in the

13   deposition as well?

14   A.  Yes.

15   Q.  Was that just 217?  216?  Okay.  Could we please play 217.

16              THE CLERK:  It's not --

17              MS. LYDON:  It's not in?

18              THE COURT:  209 is next.

19              THE CLERK:  You've got 218.

20              MS. LYDON:  All right.  I would also like to move in

21   217, 211, and 214.  I was actually working off of --

22              THE COURT:  Any objection to those?

23              MS. MCLOUGHLIN:  You said 217?

24              MS. LYDON:  17, 211, and 214.

25              MS. MCLOUGHLIN:  No objection, Your Honor.

1          THE COURT:  Exhibits 217, 211, and 214 are received

2  in evidence.

3      (GOVERNMENT'S EXHIBITS 217, 211, 214 ADMITTED INTO

4  EVIDENCE.)

5          MS. LYDON:  Thank you.  217, please.

6      (Media presented.)

7  Q.  BY MS. LYDON:  All right.  So did Pooley explain --

8          THE COURT:  Was that 209 or 217?

9          MS. LYDON:  217, Your Honor.

10 Q.  BY MS. LYDON:  Did Pooley explain some reasons that people

11 would want USPA certifications?

12 A.  Yes, he did.

13 Q.  Okay.  And went over Garmashov's signatures on Kwon's

14 paperwork?

15 A.  Correct.

16 Q.  All right.  In another clip, did Pooley admit that he knew

17 Kwon's purpose for being in the United States was to get the

18 tandem rating?

19 A.  Yes.

20 Q.  Let's play 209.

21     (Media presented.)

22     All right.  Did -- in another clip, did he also admit that

23 his USPA examiner rating was suspended at the time of Kwon's

24 training?

25 A.  Yes.

1    Q.  Please play 211.

2         (Media presented.)

3         Did he also admit in another clip that he was not

4    authorized to conduct USPA courses?

5    A.  Yes.

6    Q.  Let's look at -- let's play 214, please.

7         (Media presented.)

8         All right.  Just two more clips.

9         Did Mr. Pooley admit in another clip that USPA cared about

10   whether an examiner had a current rating?

11   A.  Yes.

12   Q.  And did he say, obviously, Kwon wanted his USPA rating?

13   A.  Correct.

14   Q.  Please play Government 218.

15        (Media presented.)

16        All right.  And then at one point, despite all the

17   discussion about Garmashov, does Pooley claim that he was the

18   examiner for Kwon?

19   A.  Yes.

20   Q.  Let's play 213.

21        (Media presented.)

22          MS. LYDON:  That's all we have.  This may be a good

23   time to take a break.

24          THE COURT:  All right.  This is the time for us to

25   take the evening recess.  Remember the admonition, ladies and

1   gentlemen.  We'll resume with the trial tomorrow morning at

2   9 o'clock.

3       Incidentally, we are going to be able to meet every day

4   this week.  Have a nice evening.

5       (Jury not present, 4:29 p.m.)

6           THE COURT:  All right.  The jurors are outside the

7   courtroom.  Are you in a position to tell us who the witnesses

8   are going to be for tomorrow?

9           MS. LYDON:  For the government, we'll be continuing

10  Special Agent Lee and calling Special Agent Hernandez to

11  testify about -- or clips of another interview and Special

12  Agent Noel to admit evidence obtained from a computer seized

13  from the Parachute Center, and then the government expects to

14  rest.

15          THE COURT:  Do you see any legal issues that might

16  come up with these three witnesses, Counsel?

17          MS. MCLOUGHLIN:  Yes, Your Honor.  With regard to the

18  audio clips of the interview conducted by Special Agent

19  Hernandez, there are some disagreements between the parties as

20  to what should come in and what shouldn't, pursuant to

21  Rule 403.

22          THE COURT:  Do you have those transcripts that we can

23  look at now?

24          MS. MCLOUGHLIN:  I believe so.  I have at least one

25  copy, Your Honor.

1          THE COURT:  How do you want to work it?  Do you want

2   me to look at one while you --

3          MS. LYDON:  We may be able to talk about that tonight

4   and meet early tomorrow morning.  It's possible we'll be able

5   to resolve some things, Your Honor, so that we don't burden

6   you.

7          THE COURT:  All right.

8          MS. LYDON:  I don't know how extensive you'd like the

9   discussion to be.  We could do 8:30, 8:40.

10          THE COURT:  If you agree on everything, we don't have

11   to do anything.  If you can't agree on anything, we have to do

12   a lot.

13          MS. CRAGER:  If we could know which exhibits you

14   intend to admit, that would help us understand.

15          THE COURT:  Take about three or four minutes to talk

16   now, and then we can have another discussion before we break.

17          MS. LYDON:  Okay.

18      (Pause in proceedings.)

19          THE COURT:  Are you ready?

20          MR. SHARMA:  Yes, Your Honor.

21          THE COURT:  All right.  What have you agreed upon?

22          MS. LYDON:  Virtually everything, with one dispute

23   and one, probably, we'll get to a resolution tonight.

24      I'll let Mr. Sharma handle the one that we have a

25   disagreement on.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1                    THE COURT:  Okay.

2                    MR. SHARMA:  So, Your Honor, it's on -- it's actually

3      a binder behind you.  It's Government's Exhibit, Volume 5 of 5,

4      number 9 for you, sir.

5                    THE COURT:  Which number?  Number 9?  Give me the

6      number.

7                    MR. SHARMA:  It's page number 12 -- sorry.  It's

8      Exhibit 300T.

9                    THE COURT:  Okay.  Page 12?

10                   MR. SHARMA:  Page 12, line 238 running through page

11     14, 278.

12                   THE COURT:  All right.  Give me a couple of minutes

13     here.

14        Okay.  What's the problem with this?

15                   MS. CRAGER:  We just think that the first part is not

16     relevant.  It's about other kinds of training.  So we would

17     propose that it starts at the top of -- at the top of page 14.

18                   THE COURT:  Okay.  At the end of 12; so you want all

19     of 13 out?

20                   MS. CRAGER:  Yes, Your Honor.

21                   THE COURT:  But even the top of 14 talks about

22     accelerated free fall.

23                   MS. CRAGER:  That's true, Your Honor.

24                   THE COURT:  So there isn't much left, then.  It

25     sounds to me like this is a generalization of what happens when

1  somebody walks into the center, and a point could be made that

2  it's not relevant if that's not what happened here.

3      What's the relevance of this?

4          MR. SHARMA:  Your Honor, he's holding himself out to

5  be a teacher to the customers.  He's offering, like you said,

6  general comments about the services he offers and the fact that

7  he accepts payments from customers and instructors when they

8  come in.

9          THE COURT:  Yeah.  He -- he says they pay him.  And,

10 actually, some of those that we've already heard about, they --

11 they pay somebody else.

12         MR. SHARMA:  Exactly.  He offers them

13 certifications --

14         THE COURT:  So what's the harm of all this?

15         MS. CRAGER:  I just think it's not entirely relevant

16 to this, but I --

17         THE COURT:  It doesn't take that much time.

18         MS. CRAGER:  That's fine, Your Honor.

19         THE COURT:  All right.  So we'll leave it in.

20         MR. SHARMA:  Great.  Thank you, Your Honor.

21         THE COURT:  So that's it.  And you'll probably work

22 out the one other thing you were talking about, correct?

23         MR. SHARMA:  That's right, Your Honor.

24         THE COURT:  All right.  So you want to meet with me

25 before 9 o'clock or just at 9 o'clock?  You'll work it out?

1          MR. SHARMA:  We'll work it out, Your Honor.  I think

2    we'll be fine.

3          THE COURT:  All right.  So unless I -- I'll be here

4    earlier, but unless I hear that you need to talk to me, we

5    won't -- we won't get together until 9 o'clock with the jury.

6          MS. LYDON:  Excellent, Your Honor.

7          THE COURT:  All right.  And what's your estimate now

8    of how long the government will take with its case?

9          MS. LYDON:  We're hoping to rest tomorrow.  So after

10   that, it's up to the defense.

11         THE COURT:  All right.  Keep that in mind.

12         MS. CRAGER:  Yes, Your Honor.

13         THE COURT:  See you tomorrow.

14         MS. LYDON:  Thank you, Your Honor.

15         MR. SHARMA:  Thank you, Your Honor.

16              (Proceedings adjourned, 4:47 p.m.)

17                         ---oOo---

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20

21              /s/ Kimberly M. Bennett
                KIMBERLY M. BENNETT
22              CSR No. 8953, RPR, CRR, RMR

23

24

25

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC