```
 1                  IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
 2

 3     United States of America,
               Plaintiff,
 4
       vs.                              Sacramento, California
 5                                      No. 2:21-cr-00111
       Robert Allen Pooley,            Tue., May 21, 2024
 6          Defendant.                  9:00 a.m.
       _____/
 7
                     PARITAL TRANSCRIPT OF JURY TRIAL
 8          BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
                            ---oOo---
 9

10     APPEARANCES:

11      For the Plaintiff:            United States Attorney
                                      501 I Street, Suite 10-100
12                                    Sacramento, California  95814
                                      By:  Katherine Lydon
13                                    Dhruv M. Sharma
                                      Assistants U.S. Attorney
14

15      For the Defendant:           Office of the Federal
                                      Defender
16                                    801 I Street, 3rd Floor
                                      Sacramento, California  95814
17                                    By: Mia Crager
                                      Meghan McLoughlin
18                                    Assistants Federal Defender

19

       Official Court Reporter:      Kimberly M. Bennett,
20                                    CSR, RPR, RMR, CRR
                                      501 I Street
21                                    Sacramento, CA 95814

22

23     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription
24

25
```

1                                    INDEX

2

GOVERNMENT WITNESSES:                                        PAGE:

3

4

REGGIE LEE

5    DIRECT EXAMINATION CONTINUED BY MS. LYDON...........4
CROSS-EXAMINATION BY MS. MCLOUGHLIN.................50

6    REDIRECT EXAMINATION BY MS. LYDON..................60
RECROSS-EXAMINATION BY MS. MCLOUGHLIN..............61

7
PAOLO HERNANDEZ

8    DIRECT EXAMINATION BY MR. SHARMA...................63
CROSS-EXAMINATION BY MS. MCLOUGHLIN................72

9
CORRY NOEL

10   DIRECT EXAMINATION BY MR. SHARMA...................76
CROSS-EXAMINATION BY MS. MCLOUGHLIN................98

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

2        NO.:                                                    PAGE:

3
         401, 402, 403, 404, 405, 406........................6
4        908...............................................13
         909...............................................15
5        907...............................................15
         906...............................................16
6        913...............................................18
         914, 915..........................................19
7        916...............................................21
         917...............................................22
8        921, PAGES 1 & 2..................................25
         904...............................................29
9        1603..............................................31
         1602, PAGE 1......................................33
10       1600..............................................35
         1601..............................................36
11       1002..............................................39
         9, 9P, 17.........................................41
12       51, 10............................................43
         1401, 19..........................................44
13       26................................................44
         42................................................45
14       13, 1402..........................................46
         14, 1403..........................................47
15       15, 1404..........................................47
         16, 1405..........................................48
16       61................................................49
         301, 302A, 305A, 305B, 306, 307, 309, 310, 311A.....66
17       600-620, 700-707, 1302, 1304, 1305-1314.............75
         1.................................................75
18       818...............................................83

19
                      DEFENSE EXHIBITS RECEIVED IN EVIDENCE
20
         NO.:                                                    PAGE:
21

22       2188.............................................103

23

24

25

1          (Call to order of the court, 9:00 a.m.)

2              THE COURT:  Good morning.  Please be seated.

3      While we're waiting, Agent Lee might as well resume the

4  stand.

5          (Jury present, 9:10 a.m.)

6              THE COURT:  Good morning, ladies and gentlemen.  All

7  of the jurors are present.  Defendant is present with counsel.

8  Mr. Lee is back on the stand.

9      And you may continue with your direct examination.

10      (The Witness, REGGIE LEE, previously sworn.)

11              MS. LYDON:  Thank you, Your Honor.

12                      DIRECT EXAMINATION CONTINUED

13  BY MS. LYDON:

14  Q.  Good morning, Special Agent Lee.

15  A.  Good morning.

16  Q.  All right.  Let's begin today with a discussion of an

17  interview.

18      Did you conduct an interview of Rob Pooley in 2021?

19  A.  Yes.

20  Q.  Where did you conduct this interview?

21  A.  We conducted an interview of Mr. Pooley outside the

22  Parachute Center in Lodi, California.

23  Q.  Okay.  Was at least part of the interview recorded?

24  A.  Yes.

25  Q.  Could you describe what happened there?

1   A.  Yes.

2        On April 27, 2021, we were about a year into the pandemic.

3   We went to my -- my colleague and I went to the Parachute

4   Center to interview Mr. Pooley.  We elected to speak to him

5   outside the Parachute Center, and it was a very windy day that

6   morning.  And we got verbal consent from Mr. Pooley to record

7   the interview.  However, in the middle of the interview, I

8   realized that the recorder had discontinued, at which point I

9   asked my colleague to begin taking handwritten notes.

10  Q.  Did you continue speaking with Mr. Pooley after the

11  recording stopped working?

12  A.  Correct.  We -- the interview continued.

13  Q.  Okay.  Let's talk about, first, the portion of the

14  interview that was recorded, and we can listen to clips of

15  that.

16       At one point in the interview, did you ask Mr. Pooley about

17  Government's Exhibit 2?

18       And could we put up Government's Exhibit 2, which I believe

19  is in evidence.

20       Government's Exhibit 2 is an e-mail from the defendant to

21  Fabricio Palomino at his Skydive Baja Mexico address.

22       Do you see that?

23  A.  Yes.

24  Q.  Did you ask Mr. Pooley about this exhibit?

25  A.  Yes, I did.

1   Q.  All right.  And did he respond that this communication and

2   this exhibit is exactly how he would have advertised and

3   communicated with his students?

4   A.  Yes.

5   Q.  Can we please play -- well, have you reviewed Government's

6   Exhibit 401, 402, 403, 404, 405, and 406?

7   A.  Yes.

8   Q.  Are they fair and accurate recordings of the audio

9   interview that you conducted of Mr. Pooley?

10  A.  Yes.

11          MS. LYDON:  Move to admit those six exhibits, 401

12  through 406.

13          THE COURT:  Any objections to any of them?

14          MS. MCLOUGHLIN:  No objection, Your Honor.

15          THE COURT:  Exhibits 401, 402, 403, 404, 405, and 406

16  are received in evidence.

17      (GOVERNMENT'S EXHIBITS 401, 402, 403, 404, 405, 406

18  ADMITTED INTO EVIDENCE.)

19          MS. LYDON:  I moved over to the screen instinctively,

20  but this one is an audio, not video recording; so we'll just

21  have to listen.

22      Could we please play Government 401.

23      (Media presented.)

24  Q.  BY MS. LYDON:  All right.  Was that advertised and

25  communicated with his students?

1    A.   Yes.

2    Q.   Sounds like it was pretty windy.

3    A.   Yes.

4    Q.   Okay.  Did, at another point in the interview, Mr. Pooley

5    admit that at the time that Mr. Kwon's paperwork was signed

6    off, Yuri Garmashov was out of the country?

7    A.   Yes.

8    Q.   Could we please play Government's Exhibit 402.

9         (Media presented.)

10        And did Pooley admit that he had trained Kwon himself?

11   A.   Yes.

12   Q.   Please play Government 404.

13        (Media presented.)

14             THE COURT:  Is that just the agent speaking or --

15             MS. LYDON:  It's a question.

16             THE COURT:  I can't hear whose voice is whose.

17             MS. LYDON:  It's harder with the audio, isn't it?

18   It's the agent, and then Mr. Pooley responds.

19   Q.   BY MS. LYDON:  At another point, did Mr. Pooley admit that

20   he knew that if he put his name on the student's paperwork,

21   USPA would never issue a rating?

22   A.   Yes.

23   Q.   Can we please play Government's Exhibit 403.

24        (Media presented.)

25        Did you discuss with him whether an examiner needed to be

1    on-site during the training?

2    A.  Yes.

3    Q.  And let's play Government's Exhibit 505.

4              THE COURT:  405?

5              MS. LYDON:  I'm sorry.  405.  Thank you, Your Honor.

6         (Media presented.)

7    Q.  BY MS. LYDON:  The wind does make it a little difficult to

8    understand.

9         Did he say, I don't know, in response to your question?

10   A.  Correct.

11   Q.  Did he continue to say, in sum and substance, Our opinion

12   was no, because I'm on-site.  USPA would say, You're not an

13   examiner.  And we would say, We don't care what you think?

14   A.  Correct.

15   Q.  That's USPA.

16        Did Pooley claim to you, in sum and substance, that he was,

17   over the summer of 2016, a valid UPT examiner and that UPT

18   would have been totally fine with him putting his name on the

19   paperwork?

20   A.  Yes.

21   Q.  Let's listen to that.

22        Actually, first, did you -- for purposes of the interview,

23   did you entertain Pooley's statements and opinions that USPA

24   was just -- a USPA rating was just a nice to have thing?

25   A.  Yes.

1   Q.   Okay.  Let's listen now to a longer clip, Government's

2   Exhibit 406.

3        (Media presented.)

4        All right.  So in sum and substance, did Mr. Pooley state

5   that would have been fine for him to sign his name on the UPT

6   stuff?

7   A.   Correct.

8   Q.   And that he was allowed to conduct training for UPT at the

9   time?

10  A.   Correct.

11  Q.   And did he claim that the reason that he sent the paperwork

12  for Mr. Kwon to Yuri was just what they did at the time?

13  A.   Yes.

14  Q.   Now, after the recording device failed, did you and Special

15  Agent Ficarelli continue to interview Mr. Pooley?

16  A.   Yes, we did.

17  Q.   Okay.  Did Pooley make any claims about whether there was

18  an understanding in the parachute community at the time as to

19  whether examiners needed to be on-site or not?

20  A.   Yes.  Mr. Pooley told me that in the skydiving community,

21  it was widely understood that the tandem examiner did not have

22  to be physically present on-site during tandem instructor

23  training.

24  Q.   Did you ask Mr. Pooley whether he had committed a scam?

25  A.   Yes, I did.

1    Q.   What did he say?

2    A.   I asked Mr. Pooley if he felt he committed a scam.   And

3    Mr. Pooley responded no, because he provided the proper

4    training and that FAA regulations require that the examiners

5    have the training regardless of their status with USPA or UPT.

6    Q.   All right.   That was his response to your question whether

7    he -- he believed he had committed a scam?

8    A.   Correct.

9    Q.   Did he make any assertions that the students knew the deal?

10   A.   No.

11   Q.   Did he make any assertions that he had told the students

12   that his examiner rating was suspended?

13   A.   No.

14   Q.   All right.   Let's switch modes to some e-mails.

15        In the course of the investigation, I think you testified

16   yesterday that agents obtained a search warrant for documents

17   from the Google accounts rpooley75@gmail.com and

18   yurig.garmashov@gmail.com.

19        Do you recall that?

20   A.   Yes.

21   Q.   All right.   And I think you testified that e-mail search

22   warrant was obtained in approximately July 2018?

23   A.   Correct.

24   Q.   Okay.   Let's go through some documents found in

25   Mr. Pooley's account.

1          MS. LYDON:  And it may make sense to move this into

2     evidence as a batch.  We've reached a foundational stipulation

3     regarding these e-mail exhibits.  There is Exhibit 910, 908,

4     909, 907, 906, 913, 914, 915, 916, 917, 920, 921, and 904.

5          THE COURT:  So you're moving them all into evidence

6     at this time?

7          MS. LYDON:  I am.

8          THE COURT:  Are there any objections to any of these

9     exhibits?

10         MS. MCLOUGHLIN:  Your Honor, I'm just looking at

11    these.

12         MS. LYDON:  All the ones I just read off except for

13    920, actually -- oh, no, that one also came from the

14    rpooley75@gmail.com.

15       I'll also have a chunk to move in of the Parachute Center

16    video desk and Yuri Garmashov.  We can do that in a moment.

17         THE COURT:  So let's take this one step at a time.

18    With respect to those numbers that you've read --

19         MS. LYDON:  Yes.

20         THE COURT:  -- Ms. Crager, any objections?

21         MS. MCLOUGHLIN:  Your Honor, these are e-mails that

22    have -- some of them -- like, 921, for example, is six pages.

23    I don't know if -- I would need some time to review all these

24    if we were going to do it as a batch.  It might make sense to

25    do these one by one.

1          THE COURT:  All right.  So let's do it one by one.

2          MS. LYDON:  Okay.

3          THE COURT:  Which one do you want to start with?

4          MS. LYDON:  That sounds great.

5      So the first one I was -- actually is already in evidence,

6  but I'd like to go over it briefly and note something.  It

7  is --

8      Can we please publish Exhibit 910.

9  Q.  BY MS. LYDON:  All right.  Exhibit 910 is a letter -- an

10  e-mail attaching a letter from UPT's Tom Noonan to Rob Pooley

11  on August 18, 2015.

12      Do you see that?

13  A.  Yes.

14  Q.  And Mr. Noonan states, Hi, Rob.  Based on our conversation

15  last night, attached please find our letter of reciprocity with

16  USPA.

17      Do you see that?

18  A.  Yes.

19  Q.  Turning to the second page, do you see that this letter

20  notifies Mr. Pooley that, In accordance with our agreement of

21  rating reciprocity with USPA, we will also be suspending your

22  UPT tandem examiner rating?

23  A.  Yes.

24  Q.  Can we please go back to that first page.

25      When -- what date would the conversation have been if they

1  spoke last night and he e-mailed on August 17th -- August 18th?

2  A.  It would have been August 17, 2015.

3  Q.  And I'm going to ask you to turn, in the binder that I will

4  come place in front of you in a moment, to Government's

5  Exhibit 908.

6      Do you see Government's Exhibit 908?

7  A.  Yes, I do.

8  Q.  And what is it?

9  A.  This is an e-mail from Mr. Pooley to himself on

10  August 17th, 2015, at 5:57 p.m.

11  Q.  What is the subject line?

12  A.  Subject line is, Yuri Signature.

13  Q.  Is there a jpg attachment?

14  A.  Yes, there is.

15  Q.  Did this document come from Mr. Pooley's Gmail account?

16  A.  Yes.

17          MS. LYDON:  Move to admit Government's 908.

18          THE COURT:  Any objection?

19          MS. MCLOUGHLIN:  No objection, Your Honor.

20          THE COURT:  Exhibit 908 is received in evidence.

21      (GOVERNMENT'S EXHIBIT 908 ADMITTED INTO EVIDENCE.)

22          MS. LYDON:  Please publish.

23  Q.  BY MS. LYDON:  All right.  So as you just stated, 908

24  appears to reflect an e-mail Rob Pooley sent to himself the

25  evening of August 17, 2015, at 5:57 p.m., with the subject,

1   Yuri Signature.

2       And, again, 910 reflected that he spoke with Tom Noonan on

3   the night of August 17, right?

4   A.  Correct.

5   Q.  And look at the second page, please.

6       And he appears to have e-mailed himself Yuri's signature

7   that night; is that correct?

8   A.  That is correct.

9   Q.  All right.  I think there is -- is there another attachment

10  to this?  It's just an iPhone signature image that will carry

11  through through some of these next ones as well.

12      Can you look at the binder in front of you, Exhibit 909.

13  A.  Okay.

14  Q.  What is it?

15  A.  This is an e-mail from Mr. Pooley to himself on August 17,

16  2015, at 6:25 p.m.

17  Q.  And what is the subject of the attachment?

18  A.  The subject is, Yuri.

19  Q.  Of the attachment?

20  A.  The attachment is a scanned copy of Mr. Garmashov's

21  initials.

22          MS. LYDON:  I'd move to admit Exhibit 909.

23          MS. MCLOUGHLIN:  No objection, Your Honor.

24          THE COURT:  Exhibit 909 is received in evidence.

25      ///

1          (GOVERNMENT'S EXHIBIT 909 ADMITTED INTO EVIDENCE.)

2     Q.  BY MS. LYDON:  Just as you said, did Mr. Pooley e-mail

3     himself, subject line, Yuri, at 6:25 the night of August 17?

4     A.  Yes.

5     Q.  Turn the page, please.

6          And the attachment was, Yuri's Initials?

7     A.  Yes.

8     Q.  All right.

9              MS. LYDON:  Can we move to admit 907?  Do you happen

10    to have it in front of you?

11             MS. MCLOUGHLIN:  I apologize.

12         No objection.

13             THE COURT:  Exhibit 907 is received in evidence.

14         (GOVERNMENT'S EXHIBIT 907 ADMITTED INTO EVIDENCE.)

15             MS. LYDON:  Please publish 907.

16    Q.  BY MS. LYDON:  All right.  Now, this next e-mail, does it

17    reflect that Mr. Pooley e-mailed himself a third time,

18    August 17th, this time at 7:04 p.m.?

19    A.  Yes.

20    Q.  And this time, the subject line was, Rob's Signature?

21    A.  Yes.

22    Q.  Take a look at the next page.

23         Does he appear to have e-mailed himself his own signature?

24    A.  Yes.

25    Q.  The next page and the page after that.

1        And his own initials?

2    A.  Yes.

3    Q.  All right.  Did you encounter an e-mail reflecting earlier

4    that same day, August 17, 2015, Parachute Center had connected

5    Mr. Pooley with a tandem candidate looking for a rating?

6    A.  Yes.

7            MS. LYDON:  Move to admit Government's 906.

8            THE COURT:  Any objection?

9            MS. MCLOUGHLIN:  Just a minute, Your Honor.

10       No objection, Your Honor.

11           THE COURT:  Exhibit 906 is received in evidence.

12       (GOVERNMENT'S EXHIBIT 906 ADMITTED INTO EVIDENCE.)

13   Q.  BY MS. LYDON:  All right.  Does the bottom e-mail of 906

14   appear to be an e-mail from Mr. Gavin Creagh to Bill and Kathy?

15       Do you know who Bill and Kathy are in the context of

16   Parachute Center?

17   A.  Yes.  Mr. Bill Dause and Ms. Kathy Dause.

18   Q.  Who are they?

19   A.  Mr. Bill Dause is the drop zone owner at the Parachute

20   Center.

21   Q.  Okay.

22   A.  And Ms. Kathy Dause is his spouse.

23   Q.  And Gavin Creagh advises he's flying over from Ireland

24   soon, will be arriving on the 20th of September, and wonders

25   when is the closest course date for the tandem rating.

1          Do you see that?

2     A.  Yes.

3     Q.  And we can zoom out.

4          And Kathy Dause responds to Mr. Creagh, copies Rob Pooley

5     at the rpooley75 Gmail address, and says, I'm going to give you

6     Rob Pooley's e-mail address, and you can set up a date with

7     him?

8     A.  Yes.

9     Q.  All right.  Can we please --

10         Did you find e-mails reflecting that the defendant was

11    setting up coach and tandem rating courses after his USPA and

12    UPT examiner ratings were suspended?

13    A.  Yes.

14    Q.  Okay.  We'll just look at a sampling of those.

15         Could you look at 913, please.  I'm sorry.  Yes, could you

16    look at 913 and just tell me what it is.

17    A.  Okay.

18    Q.  Can you give us the date of that document or the month of

19    that document?

20    A.  It is January of 2016.

21    Q.  And it's an e-mail exchange between Mr. Pooley and a

22    Richard Keir regarding a tandem rating course?

23    A.  Yes.

24              MS. LYDON:  Move to admit 913.

25              MS. MCLOUGHLIN:  No objection, Your Honor.

1    THE COURT:  Exhibit 913 is received in evidence.

2    (GOVERNMENT'S EXHIBIT 913 ADMITTED INTO EVIDENCE.)

3    Q.  BY MS. LYDON:  All right.  The bottom e-mail appears to be

4    Mr. Keir e-mailing Rob that, I recently e-mailed Kathy Dause at

5    Lodi regarding tandem rating courses.

6       Can we zoom back out of that.  And let's look at

7    Mr. Pooley's response.

8       Does he state, Hi, Richard.  We can do it here any time you

9    want?

10   A.  Yes.

11   Q.  And he says, Just let -- at the end of the e-mail, Just let

12   me know when you want to do it?

13   A.  Yes.

14   Q.  All right.  And then zooming back out.

15      Do Mr. Keir and Mr. Pooley continue corresponding for

16   another couple e-mails about the tandem rating course in Lodi?

17   A.  Yes.

18   Q.  All right.

19      MS. LYDON:  Just to save time, I'll move to admit

20   Government's 914 and 915.  And we can look at it, if there is

21   no objection, and talk about it.

22      THE COURT:  Do you have any objections to 914 or 915?

23      MS. MCLOUGHLIN:  No objection to 914, Your Honor.

24   And no objection to 915.

25      THE COURT:  Exhibits 914 and 915 are received in

1     evidence.

2          (GOVERNMENT'S EXHIBITS 914, 915 ADMITTED INTO EVIDENCE.)

3              MS. LYDON:  Please publish 914.

4     Q.  BY MS. LYDON:  All right.  This e-mail appears to be from

5     Mr. Pooley to a Ryan Alex Scott.

6          Do you see that?

7     A.  Yes.

8     Q.  And the subject is, Tandem.  Right?

9     A.  Yes.

10    Q.  And Mr. Pooley advises, We can do it here any time you

11    want.  The course is $1200.  And then provides further

12    instructions on things that need to be done and details, and

13    ends with, Just let me know when you want to do it.

14    A.  Correct.

15    Q.  Do you see that?

16    A.  Yes.

17    Q.  Have you seen versions of this e-mail sent by Mr. Pooley --

18    A.  Yes.

19    Q.  -- multiple times in the Gmail account?

20    A.  Yes.

21    Q.  And the date on that is January 18, 2016.

22         Is that during his suspension?

23    A.  That is.

24    Q.  Can we look at Government's Exhibit 915, please.  Again,

25    this -- can we look at -- the bottom e-mail is from Jack

1   Elford.  Hi, Rob.  I've been given your e-mail address from

2   Sean Haysom over here in Australia.  Explains he's a full-time

3   packer in Melbourne.

4        Go to the next page, please.

5        And he's looking at getting his tandem rating.  He asks

6   some questions.  And then the next paragraph says, Could I

7   please get some more info on the course you run over there?

8        Do you see that?

9   A.  Yes, I do.

10  Q.  All right.  Let's go back to the first page.

11       And does Mr. Pooley send a version of that same what

12  appears to be a copy/paste e-mail?

13  A.  Correct.

14  Q.  And he says, Sorry.  That was a copy/paste.

15       He appears to have not changed the name from Ryan to Jack?

16  A.  Correct.

17  Q.  All right.  And Mr. Elford responds and indicates he will

18  have to do a USPA -- or, I'll have to do a USPA conversion and

19  get a USPA instructor rating as well, and inquires how to

20  organize that?

21  A.  Correct.

22  Q.  Mr. Pooley responds, We can do all the USPA stuff.  No

23  problem.

24  A.  Correct.

25  Q.  Okay.  Did you find e-mails reflecting that during the

1   period of the charged fraud, May 20, 2016, through August 2,

2   2016, Rob Pooley, over that summer, had communications with

3   USPA officials regarding his request to reinstate his ratings?

4   A.  Yes.

5            MS. LYDON:  Move to admit 916.

6            MS. MCLOUGHLIN:  Just one moment, Your Honor.  No

7   objection, Your Honor.

8            THE COURT:  Exhibit 916 is received in evidence.

9       (GOVERNMENT'S EXHIBIT 916 ADMITTED INTO EVIDENCE.)

10           MS. LYDON:  If we could publish.

11  Q.  BY MS. LYDON:  We don't have to go over this one in detail,

12  but in sum and substance, does it reflect a back and forth

13  between Rob Pooley and Mr. Putnam Gordon at USPA in July

14  of 2016 over Mr. Pooley's reinstatement request?

15  A.  Yes.

16  Q.  All right.  You can take that down.

17      Then can you look at Government's Exhibit 917.

18           MS. LYDON:  And I'll move that into evidence.

19           THE COURT:  You didn't mention that earlier?

20           MS. LYDON:  Oh, no.  I was doing it in chunks.  So I

21  was --

22           THE COURT:  When you listed them all, you didn't list

23  it.  So 917 is also on your list?

24           MS. LYDON:  Yes, Your Honor.

25           THE COURT:  Any objection?

```
 1              MS. MCLOUGHLIN:  One moment, Your Honor.

 2         No objection, Your Honor.

 3              THE COURT:  Exhibit 917 is received in evidence.

 4         (GOVERNMENT'S EXHIBIT 917 ADMITTED INTO EVIDENCE.)

 5              MS. LYDON:  All right.  Please publish.  Thank you.

 6    Q.  BY MS. LYDON:  And this appears to be a letter -- or an

 7    e-mail attaching a letter on August 2, 2016, from John -- Jan

 8    Meyer at USPA to Rob Pooley.

 9         Do you see that?

10    A.  Yes.

11    Q.  And it contains the official disposition of your request

12    for examiner rating reinstatement, according to the cover

13    e-mail?

14    A.  Yes.

15    Q.  Flip to the second page.

16         And the second page is a formal letter informing Mr. Pooley

17    that the motion to reinstate his tandem instructor examiner

18    rating has failed?

19    A.  Correct.

20    Q.  All right.  And that, To obtain your examiner rating at

21    some point in the future, you'll need to request the full

22    board's approval at a future meeting.

23         Is that right?

24    A.  Correct.

25    Q.  All right.  We can take that down.
```

1      Did you also find in the Gmail account of Rob Pooley a late

2   August 2016 e-mail in which Pooley sent two documents,

3   including a screenshot of his communications with Yuri

4   Garmashov, to Josh Hall at USPA?

5   A.  Yes.

6          MS. LYDON:  Move to admit Government's 921.

7          THE COURT:  I think we need to discuss some of these

8   here.  Just a second.

9      I don't want to send the jury out, but I do need to talk to

10  you about one of these.  Could you go to sidebar, please.

11         MS. LYDON:  Of course, yes.

12     (Bench conference.)

13         THE COURT:  All right.  I wasn't reading these when

14  you were offering them and there was no objection.  But I do

15  just notice, and I'm not sure whether this is in more than one

16  exhibit or not, reference in Exhibit 916 to "endanger the

17  passenger."

18     Now, if there is discussion about the reasons for the

19  suspension in these exhibits, I did not intend to receive them

20  in evidence.

21     Would you like to clarify what's going on here?

22         MS. LYDON:  Yes.  The discussion -- he's comparing

23  other suspensions.  That's not relating to his suspension.  He

24  is saying, These other instructor examiners got six-month

25  suspensions for hook turns.  And he's saying that is

1    endangering the passenger.  And his issue is just a paperwork

2    issue.  So we didn't see that as --

3              THE COURT:  I see.

4       Do you agree?

5              MS. MCLOUGHLIN:  I agree.

6              THE COURT:  Okay.  If you see anything in any of

7    these --

8              MS. MCLOUGHLIN:  That's what I'm trying to go

9    through.

10             THE COURT:  I'll give you the time if you need it.

11             MS. MCLOUGHLIN:  I appreciate that, Your Honor.

12             THE COURT:  Yes.

13             MS. MCLOUGHLIN:  Some of these, I think 921, we just

14   received this morning.

15             MS. LYDON:  Do you have concerns about 921 while

16   we're here?

17             MS. MCLOUGHLIN:  I will continue to look at it

18   because I've been reviewing it.

19             THE COURT:  If you see anything that comes close to

20   safety, anything that comes close to something I said I wasn't

21   going to admit, you let me know.

22             MS. MCLOUGHLIN:  Absolutely.  And I may request a

23   sidebar.

24             MS. LYDON:  I don't think there will be anything

25   but -- I think we're all on the same page.  We're going to stay

1    away from those things.

2              THE COURT:  All right.  Thank you.

3        (Bench conference concluded.)

4    Q.  BY MS. LYDON:  All right.  Can you look only at the first

5    two pages of 921.  Some other pages were the -- the attachment

6    is wrong.  So we're only going to move in pages 1 and 2 of

7    Exhibit 921.

8    A.  Okay.

9    Q.  Does it appear to be an e-mail from Rob Pooley to Josh Hall

10   on August 24, 2016?

11   A.  Yes.

12             MS. LYDON:  Move to admit the first two pages only of

13   921.

14             MS. MCLOUGHLIN:  Your Honor, no objection.

15             THE COURT:  Pages 1 and 2 of Exhibit 921 are received

16   in evidence.

17       (GOVERNMENT'S EXHIBIT 921, PAGES 1 & 2 ADMITTED INTO

18   EVIDENCE.)

19             THE COURT:  Now, you skipped 920; is that correct?

20             MS. LYDON:  I'm going to go back to 920.

21             THE COURT:  All right.

22   Q.  BY MS. LYDON:  All right.  The first e-mail is on

23   August 15th; it references a conversation.

24       Then on Tuesday, August 16, 2016, Joshua Hall wrote, Please

25   send the letter as soon as you get it written.  Also have the

1  blank document with Yuri's signature sent as well.  If you can

2  get some screenshots of the e-mails you sent to Yuri regarding

3  paperwork to be submitted while he was out of the country, it'd

4  be really helpful.  Thank you.

5      Who is Josh Hall again?

6  A.  Josh Hall is a regional director with the USPA.

7  Q.  And can you zoom out of there.

8      And then on August 24, 2016, Mr. Pooley writes, You didn't

9  get this from me, to Mr. Hall, and attaches signedforms.xps and

10 yuriemail.jpg?

11 A.  Yes.

12 Q.  We do not have the signed forms attached to this e-mail --

13 or in this exhibit at this point.  We do have the Yuri e-mail.

14     Can we flip to -- JPG -- can we flip to the second page of

15 this exhibit.  And can we zoom in on there.

16     Is this a chain between Mr. Pooley and Mr. Garmashov,

17 entitled, Tandem Candidates?

18 A.  Yes.

19 Q.  Did we see a version of this e-mail that was photographed

20 by Special Agent Keum while he was at Yuri Garmashov's house?

21 A.  Yes.

22 Q.  Was that the day he received -- or he took photographs of

23 those notarized letters as well?

24 A.  Yes.

25 Q.  Do you recall that one of those letters indicated, in sum

1    and substance, that these communications were just innocuous?

2              MS. MCLOUGHLIN:  Objection, Your Honor.  Leading.

3              THE COURT:  Best evidence rule.

4              MS. LYDON:  Okay.

5    Q.  BY MS. LYDON:  All right.  Moving on.

6        Did you find e-mails in Mr. Pooley's Gmail account

7    reflecting that the account parachutecentervideodesk@gmail.com

8    belongs to Mr. Pooley?

9    A.  Yes.

10   Q.  Okay.  Can you look at 920, please.

11             MS. LYDON:  I move 920 into evidence.

12             MS. MCLOUGHLIN:  Just one moment, Your Honor.  Thank

13   you.

14             MS. LYDON:  While we're at it, 904, if you want to

15   look.

16             MS. MCLOUGHLIN:  Your Honor, we do object -- I

17   apologize.

18       Objection to Exhibit 920.  Relevance.

19             THE COURT:  It's fairly long.  And it's hard to read

20   e-mails because there is all the junk that the e-mail company

21   puts in there interspersed with the message itself, and it's

22   hard to tell which is which.

23       Can you show me the lines here you think are relevant?

24             MS. LYDON:  Yeah.  It's line 3.  And I might be able

25   to do it with just a question, without the actual document.  I

 1   agree it's hard to read.

 2            THE COURT:  Why don't you try to do that and see

 3   where it goes.

 4   Q.  BY MS. LYDON:  In October of 2015, did Mr. Pooley, from his

 5   rpooley75 Gmail account, ask that the e-mail

 6   parachutecentervideodesk@gmail.com be printed on a sign?

 7   A.  Yes.

 8   Q.  He placed that order by e-mail?

 9   A.  Correct.

10   Q.  Or corresponded with the sign maker via e-mail?

11   A.  Correct.

12            MS. LYDON:  That's all.  It's attribution.

13            THE COURT:  All right.  Then you don't -- you're not

14   offering 920?

15            MS. LYDON:  I think we've achieved the objective of

16   the e-mail without offering it.

17            THE COURT:  Okay.

18            MS. MCLOUGHLIN:  Your Honor, I would just -- with

19   regard to the questioning, I don't see that the

20   parachutecenter.com or the videodesk was on a sign in this

21   e-mail.

22            THE COURT:  It says, As big as possible.  I don't

23   know what -- what else he's -- I don't think the witness is in

24   a position to know whether that's on a sign or something else.

25   It just says, I want to have parachutecenter.com as big as

1  possible on one side, and then on the other side, I want our

2  e-mail and phone number.

3      And I'm frankly losing sight of whether that's relevant.

4              MS. LYDON:  It's only relevant --

5              THE COURT:  Otherwise, I don't want to get into a

6  long discussion about it.

7              MS. LYDON:  It's only relevant for attribution, Your

8  Honor.

9  Q.  BY MS. LYDON:  Is it a hundred percent sure it's a sign

10  that is being ordered, or is it just Mr. Pooley is asking that

11  the e-mail parachutecentervideo --

12              THE COURT:  How could he be a hundred percent sure?

13  All these are saying --

14              MS. LYDON:  That's what I'm saying.  I'm making clear

15  with the question.  It's not entirely clear, but he's asking

16  that e-mail address be printed on something.

17              THE WITNESS:  That's correct.

18              MS. LYDON:  Okay.  We can move on to 904.  Any

19  objection to 904?

20              MS. MCLOUGHLIN:  No objection.

21              THE COURT:  Exhibit 904 is received in evidence.

22      (GOVERNMENT'S EXHIBIT 904 ADMITTED INTO EVIDENCE.)

23              MS. LYDON:  All right.  Can we please publish.

24  Q.  BY MS. LYDON:  Okay.  Is 904 an e-mail from Google to Rob

25  Pooley on July 22, 2015, with the subject line, Your Password

1  Changed?

2  A.  Yes.

3  Q.  Okay.  Let me zoom back out of that.  And zoom in on the

4  bottom.

5      Does this e-mail appear to be a two-factor authentication

6  notification-type e-mail, where Mr. Pooley received a

7  notification that another -- at his rpooley75 Gmail account

8  that his parachutecentervideodesk e-mail account password had

9  been changed?

10  A.  Correct.

11  Q.  Okay.  And do you see, Your Google account

12  parachutecentervideodesk@gmail.com, here?

13  A.  Yes.

14  Q.  All right.  Did you find -- just two more on this

15  attribution -- a document received from Google containing --

16  did you receive a document from Google, in response to a search

17  warrant, containing subscriber information for

18  parachutecentervideodesk --

19  A.  Yes.

20  Q.  -- at gmail.com?

21          MS. LYDON:  Move to admit Government's 1603.

22          THE COURT:  All right.  So this is a new one.  1603.

23      Any objection?

24          MS. MCLOUGHLIN:  Just one moment, Your Honor.

25      No objection.

1           THE COURT:  Exhibit 1603 is received in evidence.

2        (GOVERNMENT'S EXHIBIT 1603 ADMITTED INTO EVIDENCE.)

3           THE COURT:  Let this be a lesson to everybody.  If

4   you've got a Google account, somebody later on is going to be

5   looking at it, trying to figure out what you were saying.

6           MS. LYDON:  Well, this would actually be a good time

7   to cover it.

8   Q.  BY MS. LYDON:  Did you get a search warrant for the

9   parachutecentervideodesk@gmail.com?

10          THE COURT:  We already had that.  That's evidence.

11          MS. LYDON:  Well, we had rpooley75.

12          THE COURT:  Okay.

13  Q.  BY MS. LYDON:  Did you get a search warrant, fairly

14  recently, actually, on or about April 18, 2024, for the

15  parachutecentervideodesk@gmail.com account?

16  A.  Yes.  That's correct.

17  Q.  Okay.  And did you encounter -- did you receive, in

18  response to that search warrant, Exhibit 1603?

19      Which I'll ask be published.

20  A.  Yes.

21  Q.  All right.  Is this subscriber information?

22  A.  Yes, it is.

23  Q.  Okay.  Does it contain subscriber information for the

24  parachutecentervideodesk@gmail.com account?

25  A.  Yes.

1   Q.  Does it list the person's birthday as March 31, 1975?

2   A.  Yes.

3   Q.  Zooming back out.

4       Does it list the account recovery e-mail as

5   rpooley75@gmail.com?

6   A.  Correct.

7   Q.  All right.  And a phone number associated with the

8   recovery -- the text that would be sent to recover the account?

9   A.  Correct.

10  Q.  That same account listed as the user phone number?

11  A.  Yes.

12  Q.  Okay.  We can get out of that.

13      Did you find -- we'll go over one more piece of

14  attribution.  Can you turn in your binder to Exhibit 1602.

15          MS. LYDON:  Move to admit Exhibit 1602.

16          MS. MCLOUGHLIN:  Objection, Your Honor.  Relevance.

17          MS. LYDON:  It's attribution.

18          THE COURT:  Well, the first page is five letters that

19  don't make any sense to me.  The second page is what you're

20  objecting to, I assume.

21      Right?

22          MS. MCLOUGHLIN:  Yes, Your Honor.

23          THE COURT:  Let me look at it.

24          It's a marriage certificate.

25          MS. LYDON:  It's the defendant's marriage

1    certificate, Your Honor, that he's e-mailing himself from the

2    parachutecentervideodesk e-mail --

3            THE COURT:  So you're trying to prove he's married?

4            MS. LYDON:  No.  That he controls the

5    parachutecentervideodesk account.

6            THE COURT:  You can do that without putting in his

7    marriage certificate.

8            MS. LYDON:  All right.

9            THE COURT:  Just the first page, if you want.

10           MS. LYDON:  Sure.  All right.  We can do that.  Let's

11   put in the first page of 1602.

12           THE COURT:  All right.  Page 1 of Exhibit 1602 is

13   received in evidence.

14       (GOVERNMENT'S EXHIBIT 1602, PAGE 1 ADMITTED INTO EVIDENCE.)

15   Q.  BY MS. LYDON:  On August 18, 2016, did Rob Pooley, using

16   the parachutecentervideodesk@gmail.com e-mail account, e-mail

17   himself, at his other Gmail account, his own marriage

18   certificate?

19   A.  Yes.

20   Q.  Okay.  Now let's turn to the documents you found in the

21   parachutecentervideodesk@gmail.com account.

22       I believe you testified that you served the search warrant

23   around April 11th of this year; is that right?

24   A.  Approximately April of 2024, yes.

25   Q.  Were there many e-mails left in the account at that point?

1    A.   No.  We sought a very limited scope.

2    Q.   Were there fewer than a hundred e-mails in the account?

3    A.   Yes.

4    Q.   Okay.  Did you, however, find an e-mail sending candidate

5    paperwork to UPT during the time of the suspension and an

6    e-mail from Pooley to Garmashov, updating him that he had done

7    so?

8    A.   I'm sorry.  Could you ask the question --

9    Q.   I'm sorry.  That was -- I'm asking about two e-mails.

10        First, did you find an e-mail from the

11   parachutecentervideodesk account sending candidate documents to

12   UPT during the time of Rob Pooley's suspension?

13   A.   I don't recall.

14   Q.   Okay.  Could you turn in the binder in front of you to

15   Government's 1600.

16   A.   Okay.

17   Q.   And do you recognize that document?

18   A.   Yes, I do.

19             MS. LYDON:  Move to admit 1600.

20             THE COURT:  Any objection?

21             MS. MCLOUGHLIN:  It's several pages, Your Honor.  I'm

22   going to take one moment.

23        Thank you, Your Honor.  No objection.

24             THE COURT:  Exhibit 1600 is received in evidence.

25        ///

1          (GOVERNMENT'S EXHIBIT 1600 ADMITTED INTO EVIDENCE.)

2               MS. LYDON:  Please publish.

3     Q.  BY MS. LYDON:  All right.  Okay.  Is this e-mail from Rob

4     Pooley at parachutecentervideodesk@gmail.com to Terry at UPT

5     Vector and someone with the e-mail address jcspurg@gmail.com?

6     A.  Yes.

7     Q.  On Monday, August 24, 2015?

8     A.  Correct.

9     Q.  And the subject line is, New TI paperwork package for Jason

10    Spurgeon?

11    A.  Correct.

12    Q.  The body of the e-mail reads, Paperwork for Jason Spurgeon.

13    Thank you, Yuri Garmashov.

14    A.  Correct.

15    Q.  Can you flip to just the first -- 002 of that document?

16    A.  Okay.

17    Q.  And it's a multipage document with a bunch of paperwork for

18    Mr. Spurgeon.  But just looking at that first page, does it

19    include Mr. Garmashov's preprinted signatures?

20    A.  Yes.

21    Q.  All right.  And then can you please look at Government's

22    Exhibit 1601.

23               MS. LYDON:  Move to admit it.

24               THE COURT:  So is this different?

25               MS. LYDON:  Yes.  This one is a communication from

1    Mr. Pooley to Mr. Garmashov, telling him what he did.

2              THE COURT:  But some of the same papers --

3              MS. LYDON:  Yes.

4              MS. MCLOUGHLIN:  No objection, Your Honor.

5              THE COURT:  Exhibit 1601 is received in evidence.

6         (GOVERNMENT'S EXHIBIT 1601 ADMITTED INTO EVIDENCE.)

7              MS. LYDON:  Could we please look at the first page.

8    Q.  BY MS. LYDON:  All right.  Is this e-mail sent the same day

9    as the last e-mail we looked at, and from Rob Pooley at that

10   same parachutecentervideodesk@gmail.com account?

11   A.  That is correct.

12   Q.  This time, it goes to yuri.garmashov@gmail.com?

13   A.  Yes.

14   Q.  You've seen -- I think we've seen two e-mail addresses for

15   Mr. Garmashov.  Most of the e-mail accounts we've seen -- the

16   e-mails we've seen are yurig.garmashov@gmail.com?

17   A.  Yes, with the "G."

18   Q.  Is -- the "G" account, the yurig.garmashov@gmail.com

19   account, is that the one you got the search warrant for?

20   A.  Yes, that's correct.

21   Q.  Have you also seen the e-mails, in the course of this case,

22   reflecting the yuri.garmashov@gmail.com account?

23   A.  Yes.

24   Q.  But more or less frequently?

25   A.  Far less frequently.

1    Q.   Okay.  Turning back to this e-mail, Mr. Pooley writes to

2    Mr. Garmashov, Attached is the completed paperwork for USPA and

3    UPT.  Do not send it in.  I already did.  This just for you to

4    take a look at if you want.

5         Do you see that?

6    A.   Yes.

7    Q.   And are the attachments all, like the last e-mail, UPT and

8    USPA documents?

9    A.   Correct.

10   Q.   Thanks.  Okay.

11        Could we take a look at Government's Exhibit 4, which is

12   already in evidence.

13        Did you find Government's Exhibit 4 in the

14   parachutecentervideodesk@gmail.com search warrant returns?

15   A.   No.

16   Q.   Did you find the attachments still in the Google account?

17   A.   Yes.

18   Q.   Moving on to the yurig.garmashov@gmail.com account, which

19   you also obtained a search warrant for -- or the agents in the

20   investigation obtained a search warrant for several years ago,

21   did you find e-mails reflecting Yuri Garmashov sharing his

22   location with Jim Crouch over the summer of 2016?

23   A.   Yes.

24   Q.   Did you find e-mails between Pooley and Garmashov in which

25   Pooley learns that Garmashov is in contact with Crouch while

1    Garmashov is abroad?

2    A.  Yes.

3              MS. LYDON:  Move to admit Government's 1002.

4              THE COURT:  Any objection?

5              MS. MCLOUGHLIN:  Just one moment, Your Honor.

6         Your Honor, I'm not sure how this is relevant.  So I would

7    object.

8              THE COURT:  It's getting a little complicated.

9         What's the relevance of 1002?

10             MS. LYDON:  It --

11             MS. MCLOUGHLIN:  And, I apologize, did you say 1002

12   or 1001?

13             MS. LYDON:  1002.

14             MS. MCLOUGHLIN:  I was looking at the correct one.

15   Yeah.  I would object on relevance.

16             THE COURT:  You said what?

17             MS. MCLOUGHLIN:  I do object to 1002 on the basis of

18   relevance.

19             THE COURT:  That's my question.  What's the

20   relevance?

21             MS. LYDON:  It's a communication between Garmashov

22   and Pooley where Garmashov tells Pooley that --

23             THE COURT:  Let's wait a minute --

24             MS. LYDON:  -- Jim Crouch -- it's relevant for

25   Pooley's knowledge.

1          THE COURT:  Pooley's knowledge of what?

2          MS. LYDON:  That Jim Crouch at USPA knows Yuri is

3    abroad over the summer of 2016.

4          THE COURT:  Okay.

5          MS. MCLOUGHLIN:  Understood.

6          THE COURT:  All right.  So for that purpose, and with

7    that understanding, Exhibit 1002 is received in evidence.

8       (GOVERNMENT'S EXHIBIT 1002 ADMITTED INTO EVIDENCE.)

9    Q.  BY MS. LYDON:  All right.  It reflects that on Friday,

10   July 1, 2016, Mr. Garmashov e-mails Mr. Pooley about a

11   candidate that -- apparently, they did his course.  I need the

12   documentation we used to verify his 500 jumps and three years

13   in the sport.  Jim Crouch is wondering.  Thanks, Yuri.

14   A.  Yes.

15   Q.  Mr. Pooley responds that he's on it.  I'll dig it up.  I'll

16   get back to you today.

17       And Mr. Garmashov writes back, Let's get this one straight.

18   Someone knocked USPA that he just had 160 jumps, and how can he

19   be a TI now.  Any idea who that might be?  And he indicates

20   that, in sum and substance, Jim Crouch is pestering him.

21   A.  Correct.

22   Q.  We can take that down.

23       All right.  You're almost finished.  Last topic is public

24   records that you obtained in the course of this investigation.

25       As part of the investigation, did you obtain certified

1    copies of DMV records?

2    A.  Yes, I did.

3    Q.  All right.  Did you pull photographs from those records?

4    A.  Yes, I did.

5    Q.  All right.

6           MS. LYDON:  Move to admit 7P.  Actually, we can --

7    never mind.  Skip 7P.  Move to admit Exhibit 9 and 9P.  And

8    17P.  9, 9P, 17P.

9           THE COURT:  Any objections to 9, 9P or 17P?

10          MS. LYDON:  P as in photo.

11          MS. MCLOUGHLIN:  You said -- no objection to

12   Exhibit 9 or 9P.

13      And 17P, I actually don't have that in this binder.

14          THE COURT:  Which binder is it in?

15          MS. LYDON:  Okay.  We'll just move to admit 17 in.

16          MS. MCLOUGHLIN:  No objection to 17.

17          THE COURT:  She already said she didn't have

18   objection to 9 or 9P.

19          MS. LYDON:  Right.  But 17 as well.  We were going to

20   do 17P.  We'll just do 17.

21          THE COURT:  I see.  Any objection to 17, then?

22          MS. MCLOUGHLIN:  No, Your Honor.

23          THE COURT:  All right.  Exhibits 9, 9P, and 17 are

24   received in evidence.

25      ///

1      (GOVERNMENT'S EXHIBITS 9, 9P, 17 ADMITTED INTO EVIDENCE.)

2   Q.  BY MS. LYDON:  All right.  Can we look at Government's

3   Exhibit 9, please.

4      And is this an excerpt of Mr. Garmashov's DMV file?

5   A.  Yes.

6   Q.  All right.  Does it show that Mr. Garmashov is a real

7   person who lives in California?

8   A.  Correct.

9   Q.  And does this reflect his -- the signature that's on file

10  with the Department of Motor Vehicles?

11  A.  Correct.

12  Q.  All right.  Put that away.

13     Publish 17, please.  This is just another person who has

14  come up in the investigation and this trial.

15     Who is this?

16  A.  This is Ms. Katherine Dause.

17  Q.  All right.  We can put that away.

18     All right.  Did you obtain records from the United States

19  Customs and Border Protection Agency?

20  A.  Yes, I did.

21  Q.  All right.  Did you get records of flights reflecting that

22  some of the tandem candidates and individuals relevant to the

23  case came into and out of the United States on particular days?

24  A.  Correct.

25  Q.  Did you also obtain certified photos of them that are taken

1    in the course of clearing customs when they're coming back into

2    the United States -- or into the United States?

3    A.  Yes.

4            MS. LYDON:  Okay.  For efficiency, it may make sense

5    for me to just read off a list and admit them in mass.

6            THE COURT:  How many?

7            MS. LYDON:  It's going to be about -- we can do it in

8    two batches, maybe, because it will be about 15.

9        The first ones pertain to Mr. YongHyeon Kwon, Government

10   51, 10, 1401, 19 -- that's pertaining to Sang Yeul Jeong.  The

11   next is Fabricio Palomino, Exhibit 26.  12, this is a different

12   person.  42.  13.  1402.  That's the first.

13           MS. MCLOUGHLIN:  Your Honor, if I could just have one

14   moment.

15           THE COURT:  All right.  Why don't we take them a

16   batch at a time.  If 51, 10, and 1401 are just Mr. Kwon, then

17   why don't we just address those first.

18       Any objection to those three?

19           MS. LYDON:  51 and 10.

20           THE COURT:  51 and 10?

21           MS. LYDON:  Um-hum.

22           MS. MCLOUGHLIN:  No objection.

23           THE COURT:  All right.  Exhibits 51 and 10 are

24   received in evidence.

25       ///

1          (GOVERNMENT'S EXHIBITS 51, 10 ADMITTED INTO EVIDENCE.)

2               MS. LYDON:  All right.

3               THE COURT:  And the clerk tells me 12 is already in

4     evidence.

5               MS. LYDON:  Yes.  Some of these have already come in

6     through witnesses.

7     Q.  BY MS. LYDON:  Are you aware that Mr. Kwon is passed away?

8     A.  Yes, I'm aware.

9     Q.  Okay.  Let's look at 51.

10         And does it reflect that the date of Mr. Kwon's entry into

11     the United States was June 21, 2016?

12     A.  That is correct.

13     Q.  All right.  On that particular document.  We can zoom out

14     of that.

15         Can we look at Government's Exhibit 10, please.

16         Is this a picture taken of Mr. Kwon on the day he entered

17     the United States, June 21st, when he was clearing customs?

18     A.  That is correct.

19     Q.  All right.  Move on to Mr. Sang Yeul Jeong.

20               MS. LYDON:  Move to admit 1401 and 19.

21               THE COURT:  Any objections?

22               MS. MCLOUGHLIN:  No objection.

23               THE COURT:  Sang Yeul Jeong.  Exhibits 1401 and 19

24     are received in evidence.

25          ///

```
 1           (GOVERNMENT'S EXHIBITS 1401, 19 ADMITTED INTO EVIDENCE.)
 2                MS. LYDON:  If we can look at 1401, please.
 3    Q.  BY MS. LYDON:  Does this record reflect that Mr. Jeong
 4    entered the United States on May 23, 2016 -- sorry.  Actually,
 5    can we zoom back out.  The two onboard records.
 6        He entered the United States on June 5, 2016, and departed
 7    August 31, 2016?
 8    A.  That is correct.
 9    Q.  Okay.
10                MS. LYDON:  Could we -- is Government 26 already in
11    evidence?
12                THE COURT:  Palomino?
13                MS. LYDON:  Yes.  Move to admit 26, please.
14                THE COURT:  Any objection?
15                MS. MCLOUGHLIN:  No objection.
16                THE COURT:  Exhibit 26 is received in evidence.
17         (GOVERNMENT'S EXHIBIT 26 ADMITTED INTO EVIDENCE.)
18    Q.  BY MS. LYDON:  All right.  So Mr. Palomino crosses into the
19    United States fairly regularly, right?
20    A.  That is correct.
21    Q.  All right.  Can we move over to the second page of this
22    document and zoom in on this line.  Thank you.
23        Okay.  Does this record indicate that Mr. Palomino entered
24    the United States on July 4, 2016?
25    A.  Yes.
```

1   Q.  And the date -- or the time listed is 23-46.  If we zoom

2   out.

3        The -- all of these dates are in Eastern time; is that

4   right?

5   A.  That is correct.

6   Q.  So does that indicate -- and the way he entered is,

7   Pedestrian?

8   A.  That is correct.

9   Q.  So does this record indicate that Mr. Palomino walked

10  across the border crossing at approximately 8:46 p.m. Pacific

11  time?

12  A.  That is correct.

13  Q.  Okay.  On July 4th?

14  A.  Correct.

15          MS. LYDON:  Move to admit -- Government 12 is already

16  in evidence.  Move to admit Government 42.

17          THE COURT:  Is that still Palomino?

18          MS. LYDON:  This is now Fabian Munoz.

19          THE COURT:  All right.

20          MS. MCLOUGHLIN:  No objection.

21          THE COURT:  Exhibit 42 is received in evidence.

22      (GOVERNMENT'S EXHIBIT 42 ADMITTED INTO EVIDENCE.)

23          MS. LYDON:  All right.  Could we look at 42, please.

24  Q.  BY MS. LYDON:  Is 42 a border crossing record reflecting

25  that Fabian Munoz entered the United States on July 6, 2016,

1    and left the United States on August 5, 2016?

2    A.  That is correct.

3    Q.  Okay.  Moving on to Mr. Carlos Obaid.  Could we take a

4    look --

5            MS. LYDON:  Move to admit 13 and 1402.

6            MS. MCLOUGHLIN:  No objection.

7            THE COURT:  Exhibits 13 and 1402 are received in

8    evidence.

9        (GOVERNMENT'S EXHIBITS 13, 1402 ADMITTED INTO EVIDENCE.)

10            MS. LYDON:  All right.  Could we look at 13, please,

11   first.

12   Q.  BY MS. LYDON:  Is this a picture of Carlos Obaid, taken

13   clearing customs in June of 2016?

14   A.  Correct.

15   Q.  Okay.  I believe Mr. Munoz testified that Carlos Obaid also

16   passed away; is that right?

17   A.  That is correct.

18   Q.  Okay.  Government's Exhibit 1402, please.

19       And is this the border crossing record, the two middle

20   onboard notations?

21   A.  Yes.

22   Q.  Does it indicate that Mr. Obaid entered the United States

23   on June 16, 2016, and left October 11, 2016?

24   A.  Yes.

25   Q.  Okay.  Four more folks, and then we're finished.

1          Can we talk about Carlos Martinez --

2               MS. LYDON:  Move to admit Government's 14 and 1403.

3               MS. MCLOUGHLIN:  No objection.

4               THE COURT:  Exhibits 14 and 1403 are received in

5     evidence.

6          (GOVERNMENT'S EXHIBITS 14, 1403 ADMITTED INTO EVIDENCE.)

7               MS. LYDON:  Please publish 14.

8     Q.  BY MS. LYDON:  Is this a picture of Carlos Martinez, taken

9     on June 9, 2016, clearing customs?

10    A.  Yes, it is.

11    Q.  Look at 1403, please.

12         And is this a border crossing record reflecting that

13    Mr. Martinez entered the United States on June 9, 2016, and

14    departed the United States on October 10, 2016?

15    A.  Yes, that is.

16              MS. LYDON:  Okay.  Move to admit documents pertaining

17    to Lachlan -- or Morgan Lachlan Mackay, Exhibits 15 and 1404.

18              THE COURT:  15 and 1404.  Any objection?

19              MS. MCLOUGHLIN:  No objection.

20              THE COURT:  Exhibits 15 and 1404 are received in

21    evidence.

22         (GOVERNMENT'S EXHIBITS 15, 1404 ADMITTED INTO EVIDENCE.)

23              MS. LYDON:  All right.  Can we look at 15, please.

24    Q.  BY MS. LYDON:  Did Mr. Mackay enter through an airport that

25    had a really close camera, apparently?

1    A.  Yes.

2    Q.  All right.  No date stamp, but could we look at

3    Government's 1404, please.

4        Does it -- do these border crossing records reflect that

5    Mr. Mackay entered the United States on March 27, 2016, and

6    stayed until November 30, 2016?

7    A.  I believe he entered on March 25th.

8    Q.  Okay.  Thank you.  Can we zoom out of there.  Yes.  Good

9    catch.  25th is onboard.

10       And then he was onboard departing on November 30th,

11   correct?

12   A.  Correct.

13   Q.  Thank you.  Next on to Danny Overeem.

14           MS. LYDON:  Could we admit, please, Government's

15   Exhibits 16 and 1404?

16           THE COURT:  You already have 1404 in evidence.

17           MS. LYDON:  I'm sorry.  1405.  Thank you.

18           THE COURT:  Any objections?

19           MS. MCLOUGHLIN:  No objection, Your Honor.

20           THE COURT:  Exhibits 16 and 1405 are received in

21   evidence.

22       (GOVERNMENT'S EXHIBITS 16, 1405 ADMITTED INTO EVIDENCE.)

23   Q.  BY MS. LYDON:  All right.  Let's look at 16, please.

24       Is this a picture of Danny Overeem taken at the airport --

25   A.  Yes, it is.

1    Q.   -- while he was entering the United States on June 14,

2    2016?

3    A.   Correct.

4    Q.   Can we look at 1405, please.

5         And do these border crossing records corroborate that

6    Mr. Overeem entered the United States on June 14, 2016,

7    departed the United States on August 26, 2016?

8    A.   That is correct.

9    Q.   All right.  Last exhibit.

10             MS. LYDON:  Move to admit border crossing records

11   pertaining to Mr. Garmashov, Exhibit 61.

12             THE COURT:  Any objection?

13        Just 61, right?

14             MS. LYDON:  Yes, Your Honor.

15             MS. MCLOUGHLIN:  No objection, Your Honor.

16             THE COURT:  Exhibit 61 is received in evidence.

17        (GOVERNMENT'S EXHIBIT 61 ADMITTED INTO EVIDENCE.)

18             MS. LYDON:  Can we look at the second page of that

19   document.

20   Q.  BY MS. LYDON:  Mr. Garmashov also travels quite a bit.

21             THE COURT:  I thought we already had it.

22             MS. LYDON:  We have his passport and the passport

23   photo stamp, but we'd also like the certified border crossing

24   records in.

25   Q.  BY MS. LYDON:  Do they reflect that Mr. Garmashov --

1          Actually, can we zoom back out there.  Thank you.

2          Does it reflect that Mr. Garmashov left the country on

3     May 20, 2016, and came back August 2, 2016?

4     A.   That is correct.

5               MS. LYDON:  No further questions.  Thank you, Special

6     Agent Lee.

7               THE COURT:  All right.  We'll take the midmorning

8     recess at this time.  Remember the admonition, ladies and

9     gentlemen.  15-minute recess.

10         (Recess taken, 10:24 a.m. - 10:40 a.m.)

11              THE COURT:  Everybody ready?

12              MS. LYDON:  Yes, Your Honor.

13              MS. CRAGER:  Yes, Your Honor.

14              THE COURT:  All right.  Bring the jury in.

15         (Jury present, 10:41 a.m.)

16              THE COURT:  Everyone is present.

17         You may cross-examine.

18              MS. MCLOUGHLIN:   Thank you, Your Honor.

19                          CROSS-EXAMINATION

20     BY MS. MCLOUGHLIN:

21     Q.   Good afternoon, Special Agent Lee.

22     A.   Good afternoon.

23     Q.   We started -- you've been testifying for a while.  We

24     started with most of Mr. Pooley's statements that he made to

25     you or to other folks.  I want to focus now on the statements

1    that he's made to the tandem instructor candidates.

2    A.  Okay.

3    Q.  And as a starting point, I just want to reiterate that on

4    direct, you had stated that, based on the e-mails, Mr. Pooley

5    had a conversation with Tom Noonan at UPT the night of August

6    17, correct?

7    A.  That is correct.

8    Q.  Okay.  Can we pull up Government's Exhibit 906, please,

9    which has already been admitted.  Please zoom in right there.

10   You know what?  Let me -- can you zoom out, actually.  I want

11   to reiterate what this e-mail is.

12        This is an e-mail originally from a Gavin Creagh, it looks

13   like, to the Parachute Center, asking about getting some tandem

14   ratings, right?

15   A.  Yes.

16   Q.  And we could zoom out.

17        And here, it looks like in the Parachute Center's reply,

18   that they cc Rob Pooley, correct?

19   A.  That is correct.

20   Q.  And also provide his information in the body of the e-mail,

21   correct?

22   A.  Correct.

23   Q.  Let's look at the date and time of this.

24        That e-mail was sent on August 17th, right?

25   A.  Yes.

1    Q.  At 10 a.m.?

2    A.  Yes.

3    Q.  So that would be before the conversation that Rob Pooley

4    had with Tom Noonan?

5    A.  Correct.

6    Q.  Okay.  Thank you.  We could zoom out of that.

7        Can we go to Exhibit 913, please, already admitted.

8        Now here is another e-mail from Rob Pooley directly to a

9    potential tandem instructor candidate, Richard Keir.

10       We can zoom out of that.  And there is a lot here; so let

11   me just make sure I get to the point that is important.

12       At the bottom here, it looks like Richard Keir e-mails Rob

13   about the tandem rating courses at the Parachute Center,

14   correct?

15   A.  Correct.

16   Q.  Thank you.  You can zoom out of that.

17       And in response, Mr. Pooley says, We can do it here any

18   time you want.  Right?

19   A.  Yes.

20   Q.  He also -- well, he also asks Mr. Keir to download the

21   Sigma manual from UPT, correct?

22   A.  Correct.

23   Q.  And to start going through it, correct?

24   A.  Correct.

25   Q.  And to work on the test, correct?

1    A.   Correct.

2    Q.   And, We want the test completed before we start the course.

3    Correct?

4    A.   Correct.

5    Q.   Thank you.  We can zoom out of that.

6         I'd like to look at Exhibit 914, already admitted, please.

7         Here is another e-mail around the same time frame, looks

8    like to another potential tandem instructor candidate, right?

9    A.   Yes.

10   Q.   We can zoom out of that.

11        And let's look at exactly what Mr. Pooley states to this

12   person.  He says here, again, in response -- or the subject

13   line is, Tandem.  But he says, We can do it here any time you

14   want.  Right?

15   A.   Yes.

16   Q.   He says, again, Download the Sigma manual from UPT,

17   correct?

18   A.   Correct.

19   Q.   To start going through it?

20   A.   Yes.

21   Q.   And to work on the test?

22   A.   Yes.

23   Q.   And that, We want the test completed before we start the

24   course?

25   A.   Correct.

1    Q.  Okay.  Thank you.  We can zoom out of that one.

2         Could we now go to Exhibit 915, already admitted.  Thank

3    you.

4         Is the subject line also, Tandem Course Opportunities?  And

5    this is an e-mail chain, right?

6    A.  Yes.

7    Q.  And this is an e-mail chain between Mr. Pooley and a Jack

8    Elford, correct?

9    A.  Correct.

10   Q.  Thank you.  I'm going to go down here a bit.

11        Now here, again, we actually have an exact copy/paste from

12   the previous e-mail, but I want to reiterate, again, he tells

13   this Mr. Elford, We can do it here any time you want, right?

14   A.  Yes.

15   Q.  He tells him to download the Sigma manual from UPT?

16   A.  Yes.

17   Q.  And to start going through it?

18   A.  Yes.

19   Q.  And to start working on the test?

20   A.  Correct.

21   Q.  And that, We want the test completed before we start the

22   course, correct?

23   A.  Correct.

24   Q.  Thank you.  And we can take that down.  Thank you.

25        I want to talk a little bit about different people you've

1    contacted who you thought were trained by Rob Pooley the summer

2    of 2016.

3    A.   Okay.

4    Q.   You reached out to Danny Overeem, correct?

5    A.   Yes.

6    Q.   You had several e-mail exchanges with him?

7    A.   Yes.

8    Q.   You coordinated interviews with him?

9    A.   Yes.

10   Q.   You conducted interviews?

11   A.   Yes.

12   Q.   Had some follow-up phone calls?

13   A.   Yes.

14   Q.   You also reached out to a Carlos Martinez?

15   A.   Yes.

16   Q.   Had several e-mail exchanges with him?

17   A.   Yes.

18   Q.   Coordinated an interview?

19   A.   Yes.

20   Q.   And conducted an interview?

21   A.   Yes.

22   Q.   You also reached out to a Joaquin Gomez Passi?

23   A.   Yes.

24   Q.   You had some e-mail exchanges with him?

25   A.   Yes.

1   Q.  Phone call?

2   A.  Yes.

3   Q.  And also an interview?

4   A.  Correct.

5   Q.  You also reached out to a Daniel Soto?

6   A.  Correct.

7   Q.  You initially corresponded by e-mail?

8   A.  I believe so.

9   Q.  And also conducted an interview with him?

10  A.  Yes, I believe so.

11  Q.  You also reached out to a Ryan Scott, correct?

12  A.  The name rings a bell but --

13  Q.  Would it refresh your recollection to look at your notes

14  from that interview?

15  A.  Yes, please.

16  Q.  Could you take a look at -- could you open up Binder 7.

17  And it's Exhibit 2174.  And I'm happy to help you if you need

18  it.

19            THE COURT:  He has it.

20            THE WITNESS:  Okay.  Thank you.

21  Q.  BY MS. MCLOUGHLIN:  Does that refresh your recollection?

22  A.  It does.  Thank you.

23  Q.  So did you conduct an interview with Ryan Scott as well?

24  A.  Correct, yes.

25  Q.  You also reached out to -- or attempted to contact a Sang

1   Yeul Jeong?

2   A.  Yes.

3   Q.  And so your investigation led to the indictment in this

4   case, correct?

5   A.  Yes.

6   Q.  And the indictment was filed on June 10, 2021, correct?

7   A.  I believe so, yes.

8   Q.  And, of course, as we know, the indictment charges

9   violations of wire fraud, right?

10  A.  Correct.

11  Q.  And fraud is where a person uses interstate wires to

12  further a scheme to defraud, right?

13  A.  That's my understanding, yes.

14  Q.  Wires could be e-mails, right?

15  A.  Yes.

16  Q.  Or messages sent over the internet?

17  A.  Correct.

18  Q.  And that could be something like Facebook Messenger?

19  A.  Correct.

20  Q.  Or WhatsApp?  That application?

21  A.  Yes.

22  Q.  Text messages, right?

23  A.  Yes.

24  Q.  Apple messages?

25  A.  Yes.

1    Q.   And so this case is about what Rob Pooley represented to

2    other people, correct?

3    A.   Yes.

4    Q.   Specifically and especially to tandem course candidates,

5    correct?

6    A.   Correct.

7    Q.   And some of those course candidates claim to have

8    communicated to Rob through e-mail, right?

9    A.   Yes.

10   Q.   Some of them also said that they communicated with him by

11   Facebook Messenger, correct?

12   A.   Yes.

13   Q.   They also said they communicated with him via text,

14   correct?

15   A.   Yes.

16   Q.   And Rob himself told you that he would primarily use his

17   phone to talk to candidates, correct?

18   A.   Correct.

19   Q.   That he would call candidates or other people about the

20   course?

21   A.   Yes.

22   Q.   And he would text people?

23   A.   Correct.

24   Q.   You obtained search warrants for Rob Pooley's personal

25   e-mail account.  We heard about those e-mails, right?

1    A.   Yes.

2    Q.   And also for Yuri Garmashov's personal e-mail account,

3    correct?

4    A.   Correct.

5         I just want to make it clear that I was not the affiant for

6    the search warrants.  But I did review them, yes.

7    Q.   Understood.  So as part of this investigation, those

8    records were obtained?

9    A.   Correct.

10   Q.   There weren't any other communication records obtained,

11   though?

12   A.   We did also execute -- serve a search warrant for the

13   parachutecentervideodesk.

14   Q.   But you didn't get a search warrant for Facebook messages

15   from Rob Pooley's Facebook account, did you?

16   A.   We did not.

17   Q.   You didn't get any of his phone records?

18   A.   I don't believe so.

19   Q.   You didn't get any of his call logs?

20   A.   I don't think so.

21   Q.   Any of his text messages?

22   A.   No.

23   Q.   You didn't seize his phone?

24   A.   We did not seize his phone.

25   Q.   You didn't get a search warrant for his phone?

1    A.   We did not.

2    Q.   You didn't even ask to look at his phone?

3    A.   We did not ask to see his phone.

4              MS. MCLOUGHLIN:   No further questions.   Thank you.

5              THE COURT:   Any redirect?

6              MS. LYDON:   Very briefly.

7                          REDIRECT EXAMINATION

8    BY MS. LYDON:

9    Q.   All right.   Can we pop up Exhibit 905R.   If we can just

10   look at the first page.

11        You were asked on cross-examination about the -- an e-mail

12   sent the morning of August 17 and the fact that the UPT

13   notification of Mr. Pooley's suspension was via phone the

14   evening of August 17th.

15        Do you recall that?

16   A.   Yes.

17   Q.   And my question is just does Government's 904 reflect that

18   Mr. Pooley received notification on at least August 7, 2015,

19   that he was suspended by UPT -- sorry -- USPA?

20   A.   Correct.

21   Q.   You were asked about your reaching out to a number of

22   tandem instructor candidates or people you were wondering

23   whether they might be tandem instructor candidates.

24        Do you recall that line of questioning?   Okay.

25        With respect to Danny Overeem, is Danny Overeem located,

1  geographically, abroad?

2  A.  Correct.

3  Q.  Is Carlos Martinez located abroad?

4  A.  That's correct.

5  Q.  Is Joaquin Gomez Passi located abroad?

6  A.  That is correct.

7  Q.  And is Sang Yeul Jeong located abroad?

8  A.  That is correct.

9  Q.  Okay.  I believe you reached out to Daniel Soto -- or you

10  tried to reach out to Daniel Soto?

11  A.  I believe so, yes.

12  Q.  Were you able to receive any confirmation that Mr. Soto was

13  the Daniel Soto who had been -- or a Daniel Soto who had been

14  taught by Mr. Pooley in the summer of 2016?

15  A.  No.

16  Q.  Same question with respect to Ryan Scott.

17  A.  Same answer.  No.

18        MS. LYDON:  No further questions.

19        THE COURT:  Anything else for Mr. Lee?

20        MS. MCLOUGHLIN:  Very, very briefly -- briefly, Your

21  Honor.

22                    RECROSS-EXAMINATION

23  BY MS. MCLOUGHLIN:

24  Q.  One of the other witnesses, Fabricio Palomino, who

25  testified earlier, is he located -- he's located abroad, isn't

1    he?

2    A.   Correct.

3    Q.   And another witness, Fabian Munoz, he's also located

4    abroad, correct?

5    A.   That is correct.

6             MS. MCLOUGHLIN:   Thank you.

7             THE COURT:   All right.   Mr. Lee, thank you.   You may

8    step down.   I assume you'll be available for the rest of the

9    trial.

10            THE WITNESS:   Yes, sir.

11            THE COURT:   You may call your next witness.

12            MR. SHARMA:   Thank you, Your Honor.   The government

13   calls Paolo Hernandez.

14            THE CLERK:   Please step forward, all the way to your

15   right, to the witness stand.

16       Please remain standing.   Face me.   You can step up.   Raise

17   your right hand.

18       (The Witness, PAOLO HERNANDEZ, is sworn.)

19            THE WITNESS:   I do.

20            THE CLERK:   Thank you.   You may be seated.

21       Please state your full name.   Spell your last name for the

22   record.

23            THE WITNESS:   My name is Paolo Hernandez.

24   H-E-R-N-A-N-D-E-Z.

25            THE CLERK:   Thank you.

DIRECT EXAMINATION

1

2   BY MR. SHARMA:

3   Q.  Good morning, Mr. Hernandez.

4   A.  Good morning, sir.

5   Q.  Who do you work for, sir?

6   A.  I'm currently retired.

7   Q.  Okay.  Well, congratulations.

8       Who did you work for in -- between 2016 and 2018?

9   A.  I was working with US Department of Transportation Office

10  of Inspector General as a special agent.

11  Q.  Okay.  Was that your only law enforcement job?

12  A.  No, sir.

13  Q.  Where else have you worked in law enforcement?

14  A.  Prior to Department of Transportation, I was a special

15  agent with Social Security Administration Office of Inspector

16  General doing social security fraud.

17  Q.  Anywhere else?

18  A.  Yes.  I was a law enforcement officer with United States

19  Forest Service, prior to Social Security.  And prior to that, I

20  was a police officer in the Bay Area.

21  Q.  As a special agent with the Department of Transportation,

22  could you tell us something -- some of your duties in that

23  role?

24  A.  I was mainly tasked to investigate program fraud, waste,

25  and abuse with the Department of Transportation.  Program

1  fraud, waste, and abuse.

2  Q.  Now, you said you conducted some investigations?

3  A.  That's correct.

4  Q.  So over the course of your time with the Department of

5  Transportation, how many -- ballpark -- investigations did you

6  conduct?

7  A.  Possibly conducted around six to seven or eight cases,

8  complex fraud investigations.

9  Q.  Then over the course of your time with law enforcement, how

10  many do you think you've conducted?

11  A.  Approximately 40 to 50 to 60 cases -- criminal cases.

12  Q.  Let's talk about why you're here.

13      In January of 2018, were you involved in serving a search

14  warrant on a skydiving center in -- called the Parachute

15  Center?

16  A.  That's correct.

17  Q.  When you were there in January of 2018, did you speak with

18  Robert Pooley?

19  A.  That's correct.

20  Q.  What time of the day was that?

21  A.  Approximately 9:30ish, 9:40 a.m.

22  Q.  And where did you speak with him?

23  A.  In front of the main building of the Parachute Center.

24  Q.  Did you record this interview with him?

25  A.  Yes, I did.

1   Q.  And was there someone else with you?

2   A.  That's correct.

3   Q.  Who was that?

4   A.  It was Special Agent Brian Dubois.

5   Q.  Did you both engage with him in conversation and ask him

6   questions?

7   A.  Yes, we did.

8            MR. SHARMA:  Your Honor, I believe the government has

9   a stipulation with the defense about a number of audio clips

10  that we're going to introduce.  I can list them off.

11           THE COURT:  All right.  I think you provided the

12  Court with a stipulation.  Is that the same one?

13           MR. SHARMA:  It did not concern -- mention these.

14           THE COURT:  All right.  Go ahead.

15      You have a stipulation?

16           MS. CRAGER:  Yes.  We've agreed.

17           THE COURT:  State the stipulation.

18           MR. SHARMA:  So the government will move to enter

19  Exhibits 301, 302A, 305A, 305B, 306, 307, 309, 310, and 311A.

20           THE COURT:  That's the stipulation?

21           MR. SHARMA:  That we would move those -- move those

22  exhibits into evidence, and they don't oppose that.

23           THE COURT:  All right.

24      Is that the stipulation, Counsel?

25           MS. MCLOUGHLIN:  Correct, Your Honor.  No objection.

1              THE COURT:  All right.  Exhibits 301, 302A, 305,

2    305B, 306, 307, 309, 310, and 311A are received in evidence.

3              MR. SHARMA:  Your Honor, it's 305A and 305B.  So 305

4    is not an exhibit we're entering.

5              THE COURT:  All right.

6              MR. SHARMA:  Sorry.  I know it's confusing.

7              THE COURT:  Go ahead.

8         (GOVERNMENT'S EXHIBITS 301, 302A, 305A, 305B, 306, 307,

9    309, 310, 311A ADMITTED INTO EVIDENCE.)

10   Q.  BY MR. SHARMA:  Have you listened to those clips,

11   Mr. Hernandez?

12   A.  Yes, I have.

13   Q.  Are those clips of your interview with Mr. Pooley?

14   A.  That's correct.

15   Q.  All right.  Now, during your interview, did Agent Dubois

16   ask Mr. Pooley if he provides any skydiving-related classes for

17   money?

18   A.  Yes, he did.

19   Q.  Could we play Exhibit 301, please.

20        (Media presented.)

21        There is a lot of sound on that video.  Is that because you

22   were doing it outside, the interview?

23   A.  Yes.

24   Q.  Is that part of the -- the point of the interview where the

25   defendant mentions how customers pay him for skydiving-related

1    cases -- training?

2    A.  Yes, it is.

3    Q.  Did he also mention the fact that the FAA doesn't care if

4    he has a rating to teach skydiving?

5    A.  Yes.

6    Q.  And -- but he did say you need a tandem rating from the

7    manufacturer, right?

8    A.  That's correct.

9           THE COURT REPORTER:  Counsel, slow down.

10          MR. SHARMA:  Sorry.

11   Q.  BY MR. SHARMA:  During this interview, did Agent Dubois

12   also ask the defendant what certifications he carried?

13   A.  Yes, he did.

14   Q.  Okay.  Can we play Exhibit 302A, please.

15      (Media presented.)

16      So at that part of the interview, did you hear the

17   defendant saying that he didn't have any certifications right

18   now, but at one point, he was a tandem instructor examiner?

19   A.  That's correct.

20   Q.  And that was the highest rating available?

21   A.  Yes.

22   Q.  And that he teach a number of customers for tandem

23   instructor course?

24   A.  That's correct.

25   Q.  And they would pay him?

1   A.   Yes.

2   Q.   And that he would sign their stuff?

3   A.   Yes.

4   Q.   Now, on the topic of ratings, did Agent Dubois ask him if

5   he helped candidates get USPA and manufacturer ratings

6   specifically?

7   A.   Yes.

8   Q.   Can we play Exhibit 310, please.

9        (Media presented.)

10       So right at the end there, he says, It depends on the

11  person, right?

12  A.   That's correct.

13  Q.   Manufacturer, USPA, or both?

14  A.   That's correct.

15  Q.   Now, did you and Agent Dubois specifically discuss the

16  tandem instructor paperwork of YongHyeon Kwon?

17  A.   Yes, we did.

18  Q.   And let's play Exhibit 305 -- 305A, please.

19       (Media presented.)

20       So right at the end there, he says he didn't sign off on

21  Kwon's paperwork because he was suspended at the time?

22  A.   That is correct.

23  Q.   Did Agent Dubois ask him who he was suspended by?

24  A.   Yes.

25  Q.   Can we play Exhibit 305B, please.

1                (Media presented.)

2           So he says in that interview he's suspended by the USPA,

3      right?

4      A.  Yes, he did.

5      Q.  But not by the manufacturer?

6      A.  Yes.

7      Q.  Now, did Agent Dubois ask the defendant if a person named

8      Yuri Garmashov signed the certification cards?

9      A.  Yes, he did.

10     Q.  Okay.  Can we play Exhibit 306.

11               (Media presented.)

12          And so there is he talking about having a stack of

13     documents that are preprinted with signatures?

14     A.  Yes, that's correct.

15     Q.  And he lists all the different forms that are in that

16     stack?

17     A.  Yes, he did.

18     Q.  Including a tandem proficiency card?

19     A.  Yes.

20     Q.  Did Agent Dubois ask the defendant if he ever provided

21     training when Mr. Garmashov wasn't physically at the Parachute

22     Center?

23     A.  Yes, he did.

24     Q.  Can we play Exhibit 307.

25               (Media presented.)

1      Okay.  So he did say that he provided classes when Yuri

2 Garmashov wasn't physically present at the Parachute Center?

3 A.  Yes, that's correct.

4 Q.  And he explained that by saying that Yuri just needed to be

5 available, right?

6 A.  Yes.

7 Q.  And that's because he trained and certified Yuri and made

8 him an examiner, right?  That's what he said?

9 A.  That's correct.

10 Q.  So he didn't really need to be there?

11 A.  Yes.

12 Q.  And then at the end, he said it was the USPA's biggest

13 thing that they did training when he wasn't physically there?

14 A.  Yes.

15 Q.  And he said at the end, I get it, but that's stupid; that's

16 what he said?

17 A.  Yes, he did.

18 Q.  All right.  Did Agent Dubois ask Mr. Pooley if Garmashov

19 was present when Kwon was trained?

20 A.  Yes, he did.

21 Q.  Can we play Exhibit 309, please.

22      (Media presented.)

23      All right.  So he told you that he didn't remember if

24 Garmashov was there when Kwon was trained, right?

25 A.  That is correct.

1    Q.   But he didn't really care if he was or not?

2    A.   That is correct.

3    Q.   And he just kind of found it silly that Yuri would need

4    oversee anything?

5    A.   That's correct.

6    Q.   And the signatures are just there to appease the USPA?

7    A.   Yes.

8    Q.   But he admits that it got them in trouble, right?

9    A.   Yes.

10   Q.   That was a poor attitude to have?

11   A.   Yes.

12   Q.   All right.  Just one more.

13        Did you and Agent Dubois ask the defendant about a letter

14   he wrote to USPA on behalf of Yuri Garmashov?

15   A.   Yes, we did.

16   Q.   Can we play Exhibit 311A, please.

17        (Media presented.)

18        All right.  So he talks about sending that letter to the

19   USPA in that conversation?

20   A.   Yes.

21   Q.   And he's like, What are they going to do it about it, take

22   my ratings away?

23   A.   Yes.

24   Q.   He says, clearly, that he wasn't pressured to write that

25   letter, right?

1    A.   That's correct.

2    Q.   And he wasn't forced to write that letter?

3    A.   Yes.

4    Q.   And that he told Yuri, You write it, and I'll sign it?

5    A.   Yes.

6              MR. SHARMA:  No further questions, Your Honor.

7              THE COURT:  Ms. McLoughlin, you may cross-examine.

8              MS. MCLOUGHLIN:  Thank you, Your Honor.

9                           CROSS-EXAMINATION

10   BY MS. MCLOUGHLIN:

11   Q.   Good afternoon.

12   A.   Good afternoon.

13   Q.   So this interview with Rob Pooley occurred in 2018, right?

14   A.   Yes.

15   Q.   That was the first time you had ever spoken to Rob Pooley,

16   right?

17   A.   That's correct.

18   Q.   So you didn't speak to him in 2017?

19   A.   No, I did not.

20   Q.   You didn't speak to him in 2016 either?

21   A.   No.

22             MS. MCLOUGHLIN:  Thank you.  No further questions.

23             THE COURT:  All right.

24             MR. SHARMA:  No redirect, Your Honor.

25             THE COURT:  All right.  Mr. Hernandez, thank you.

1    You may step down.  You're excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  You may call your next witness.

4              MR. SHARMA:  Thank you, Your Honor.  The government

5    calls Corry Noel.

6              THE CLERK:  Please step forward, all the way up to

7    the witness stand, and remain standing, please.

8         Raise your right hand.

9         (The Witness, CORRY NOEL, is sworn.)

10             THE WITNESS:  Yes, I do.

11             THE CLERK:  Thank you.  You may be seated.

12        Please state your full name.  Spell your name for the

13   record.

14             THE WITNESS:  My name is Corry, C-O-R-R-Y.  Middle

15   name Don, D-O-N.  Last name Noel, N-O-E-L, just like Christmas.

16             MR. SHARMA:  Your Honor, before we start, this is the

17   stipulation that we filed last night.

18             THE COURT:  Do you want to read that to the jury or

19   just file it?

20             MR. SHARMA:  Sure -- well, it's already filed.

21             THE COURT:  All right.

22             MR. SHARMA:  But I can --

23             THE COURT:  You had some boxes with it.  Did you want

24   to show it to the jury?

25             MR. SHARMA:  No, there is no boxes on this one.

1   But -- oh, yeah.  Sure.

2      So we have a stipulation with the defense to enter Exhibits

3   500 to 501 -- 500 through 519, 600 through 620, and 700 to 707,

4   and then 1301 through 1314.

5              THE COURT:  Now, are some of these already in

6   evidence?

7              MR. SHARMA:  No.  So we're entering them into

8   evidence now based on the stipulation.

9              THE COURT:  All right.  Hold on a second.

10     Wasn't the Tandem Instruction For Dummies already

11  mentioned?

12             MR. SHARMA:  Correct, Your Honor.  So the 500 series

13  were already discussed with a different agent.

14             THE COURT:  Were they received in evidence?

15             MR. SHARMA:  They were received in evidence, I

16  believe.

17             THE COURT:  Are we communicating here?  I thought I

18  asked you if any of these exhibits were already in evidence.

19  You said no.

20             MR. SHARMA:  Sorry.  I misunderstood the question.

21  The exhibits --

22             THE COURT:  I'm done asking questions.

23             MR. SHARMA:  Okay.

24             THE COURT:  What do you want me to do now?  Inform

25  the jury?

1              MR. SHARMA:  I'd like to enter Exhibits 600 through

2    620, 700 to 707, and 1302, 1304, 1305 to 1314 into evidence.

3              THE COURT:  That's part of your stipulation, Counsel?

4              MS. MCLOUGHLIN:  Yes, Your Honor.  No objection.

5              THE COURT:  All right.  Then that will be the order.

6    Exhibits 600 through 620, 700 through 707, and 1302, 1304, 1305

7    through 13 --

8              MR. SHARMA:  1314.

9              THE COURT:  -- 13 -- is it --

10             MR. SHARMA:  1314.

11             THE COURT:  -- through 1314 are received in evidence.

12       (GOVERNMENT'S EXHIBITS 600-620, 700-707, 1302, 1304,

13    1305-1314 ADMITTED INTO EVIDENCE.)

14             MR. SHARMA:  And then we just spoke about entering

15    Exhibit 1 into evidence as well.

16             THE COURT:  Any objection?

17             MS. MCLOUGHLIN:  No, Your Honor.

18             THE COURT:  Exhibit 1 is not in evidence yet,

19    correct?

20             MR. SHARMA:  Correct, Your Honor.

21             THE COURT:  Exhibit 1 is received in evidence.

22       (GOVERNMENT'S EXHIBIT 1 ADMITTED INTO EVIDENCE.)

23             MR. SHARMA:  Thank you, Your Honor.

24    ///

25    ///

1                           DIRECT EXAMINATION

2    BY MR. SHARMA:

3    Q.   Good morning, Mr. Noel.

4    A.   Good morning.

5    Q.   Let's start with why you're here.  Did you conduct a

6    forensic review of a number of devices that were seized from

7    Parachute Center?

8    A.   Yes, I did.

9    Q.   So let's talk about your educational background.

10   A.   Yes.

11   Q.   And what is your educational background?

12   A.   I have bachelor's and master's degrees, both in accounting.

13   Q.   Okay.  And who do you work for?

14   A.   I work for the US Department of Transportation Office of

15   Inspector General.

16   Q.   And how long have you worked there?

17   A.   I've been working there since January of 2006.

18   Q.   What's your role there?

19   A.   I am a criminal investigator with them.  I'm a federal law

20   enforcement officer.  But also, as my other hat that I wear

21   with them, I am a computer forensic specialist or examiner,

22   depends on who you're talking to.

23   Q.   Do you work within a special unit at the department?

24   A.   Yes.  Within the Office of the Inspector General, there is

25   a unit called data analytics --

1          THE COURT REPORTER:  I'm sorry.  You've got to slow

2     down.

3          THE WITNESS:  Sure.  I'll slow down.

4        It's the data analytics and computer crimes unit.

5     Q.  BY MR. SHARMA:  And how long have you worked in that

6     specific role?

7     A.  I began there with them full-time in 2014.

8     Q.  What are some of your duties in that computer forensics

9     role?

10    A.  We're responsible for assisting of the other general agents

11    throughout the country with reviewing and acquiring electronic

12    media of different types, whether it's phones, servers, laptop

13    computers, and of the like.

14    Q.  So when you get these media, like you said, do you look at

15    them as well?

16    A.  Yes.  We review them, yes.

17    Q.  You look for evidence on those devices?

18    A.  Yes, we do.

19    Q.  Do you -- did you receive any training in computer

20    forensics?

21    A.  Yes, I have.

22    Q.  What sort of training have you received?

23    A.  The basic training that we received as criminal

24    investigators is called the Seized Computer Evidence Recovery

25    Specialist.  Short for SCERS.  Of course we have acronyms for

1    everything in the government.  Pretty much the basic class you

2    take.  And then from there, each additional class is built upon

3    that.

4    Q.  Okay.  Any specific training -- those are all specific to

5    computer forensics?

6    A.  Yes.  I've taken umpteen pieces of training throughout my

7    career.  I can't list all of them.

8    Q.  Okay.  But you have a -- do you have a resumé with that

9    listed?

10   A.  Yes.

11   Q.  Have you received any certifications in computer forensics?

12   A.  Yes.  I have my CFCE, which is my Certified Forensics

13   Computer Examiner training from the International Association

14   of Computer Investigative Specialists.

15   Q.  And when did you get that certification?

16   A.  I got that in 2015.

17   Q.  Okay.  And do you have to go through a process where you

18   have to get that recertified?

19   A.  Yes.  It's every three years.

20   Q.  Every three years?

21   A.  Yes.  And I'm due for it this year, yes.

22   Q.  Got it.  So you will then be recertified in 2018, 2021?

23   A.  That is correct.

24   Q.  And what do you need to do to get recertified?

25   A.  There is a recertification test that we have to take.  But

1    also, I have a minimum of 120 hours every three years, just

2    about an average of about 40 hours per year.

3    Q.  This is all on computer forensics?

4    A.  That is correct.

5    Q.  And while you've been in this role, how many -- how many

6    cases have you worked on where you've engaged in computer

7    forensic examinations?

8    A.  Oh, probably -- probably hundreds.

9    Q.  Hundreds?

10   A.  Yes.

11   Q.  More than 200?

12   A.  About that.  It's probably about that.  Maybe a little bit

13   more.

14   Q.  Okay.  And in those cases, have you rendered opinions about

15   evidence that you obtained from devices that you examined?

16   A.  Yes, I have.

17          MR. SHARMA:  Your Honor, the government wishes to

18   tender Special Agent Noel as an expert in the field of computer

19   forensics.

20          THE COURT:  Would you like to ask any questions on

21   voir dire?

22          MS. MCLOUGHLIN:  No, Your Honor.  No objection.

23          THE COURT:  Proceed.

24   Q.  BY MR. SHARMA:  All right.  Now let's switch over to the

25   Parachute Center.

1   A.  Yes.

2   Q.  Were you involved in an investigation into a skydiving

3   operation known as the Parachute Center?

4   A.  Yes.

5   Q.  And as part of that investigation, were you involved in the

6   search of a premises of the Parachute Center?

7   A.  Yes, I was.

8   Q.  And was that on January 30, 2018?

9   A.  Yes.

10  Q.  Turn your attention to Exhibit 801.  This is already in

11  evidence.

12      Do you recognize that building?

13  A.  Yes, I do.

14  Q.  Is that where you performed the search warrant?

15  A.  Yes.

16  Q.  Okay.  And I can turn you to Exhibit 808, also in evidence.

17      Do you generally recognize what this picture is?

18  A.  Yes, I do.

19  Q.  And what is it?

20  A.  It's the inside of the building.  I believe it was Building

21  A.

22  Q.  Okay.  Were there other agents involved in your search?

23  A.  Yes.

24  Q.  What was your specific role that day?

25  A.  In addition to actually clearing the building to ensure it

1    was safe to search the facility, my secondary role was to go in

2    and find pieces of electronic media.

3    Q.   And when you found -- when you say "media," do you mean,

4    like, computers and other devices?

5    A.   Yes.  It's kind of a catchall term, yes.

6    Q.   Got it.  And when you -- when you identified a media or a

7    device, what was the process for looking at it?

8    A.   One, we would determine where we found it within the

9    facility.  And then we would determine whether we wanted to

10   take it by -- eventually get to the point where we want to make

11   a copy of it.

12   Q.   Okay.  So when you see a device you want to make a copy of,

13   what do you mean by that?

14   A.   Meaning we take the -- we go inside the media -- inside of

15   the media, and within the media, there is a storage area within

16   there, and we want to make a copy of that storage area.

17   Q.   Okay.  And you make this copy onto another device?

18   A.   Yes.

19   Q.   Is the copy an identical copy of what's on the device?

20   A.   Yes, it is.

21   Q.   And then are you able to look at that copy at a later date?

22   A.   Yes.

23   Q.   To -- okay.

24        Now, during your search, did you seize a HP A2E desktop

25   computer?

1    A.   Yes, we did.  Yes.

2    Q.   Turn your attention to Exhibit 816.

3         Do you recognize this picture?

4    A.   Yes.  I believe that's the wall where -- in Building A --

5    one of the walls in Building A.

6    Q.   And let me just zoom in to this.

7         Did you notice a desktop computer sitting there?

8    A.   Yes.  You can see the keyboard and the monitor on the desk

9    right there.

10   Q.   Is that the desktop computer you seized?

11   A.   Yes.

12   Q.   Okay.  Turning to Exhibit 818 in the binder.  Let me just

13   come help you.

14   A.   You said 818?

15   Q.   Do you recognize that picture?

16   A.   Yes, I do.

17   Q.   What's it a picture of?

18   A.   It's a picture of the desktop where the computer was found.

19   Q.   That's another picture?

20   A.   Yes.

21           MR. SHARMA:  Government moves to enter 818 into

22   evidence.

23           THE COURT:  Any objection?

24           MS. MCLOUGHLIN:  No objection.

25           THE COURT:  Exhibit 818 is received in evidence.

1              (GOVERNMENT'S EXHIBIT 818 ADMITTED INTO EVIDENCE.)

2                   MR. SHARMA:  Can we publish, please.

3    Q.  BY MR. SHARMA:  It's a little dark on the screen, but can

4    you see sort of that blue -- looks like a cover?

5    A.  Yes.

6    Q.  Was that on the computer you seized or around the computer

7    you seized?

8    A.  Yes.  It was laid over the top of it, yes.

9    Q.  Got it.  Now flip you over to Exhibit 1302.  This is in

10   evidence.

11   A.  1302?

12   Q.  You don't have to look at it.  It's already -- it will show

13   up on the screen.

14        Is this another picture of the desktop?

15   A.  Yes, it is.

16   Q.  Okay.  Let's flip to the pages.

17        So the next page, just another picture of it?

18   A.  Yes.  With the cover removed from it, yes.

19   Q.  Next page.

20        What's this a picture of?

21   A.  It's the back of the computer, the network connections and

22   things of that nature.

23   Q.  Got it.  The next page, what's this a picture of?

24   A.  This is a picture of the -- the screen inside the computer,

25   showing the operating system it is and other specs of the

1    computer.

2    Q.   What was the computer system?

3    A.   Windows 7 Professional.

4    Q.   All right.  Let's flip you over.

5         And what's happening now?

6    A.   This is the desktop computer with the -- part of the

7    chassis removed off one side of it.

8    Q.   Okay.  And why did you take off the cover?

9    A.   It was to get to the hard drive that's inside of the

10   computer.

11   Q.   All right.  Flip you over.

12        Is that the hard drive you're talking about?

13   A.   Yes.

14   Q.   Okay.  And then one more.

15        And is that the same hard drive?

16   A.   Yes.

17   Q.   Did you clean it?

18   A.   Yes.

19   Q.   Okay.  I think that's the end of it.

20        Okay.  Now once you extracted the hard drive from this

21   device, did you make a copy of the contents like you talked

22   about earlier?

23   A.   Yes, we did.  Yes.

24   Q.   And then did you look through those contents?

25   A.   Yes.

1    Q.  Was the computer sort of organized into folders?

2    A.  Yes.  That's the way the operating system organizes things,

3    yes.

4    Q.  Can I show you Exhibit 1305, please, already in evidence.

5        Is this what it looked like?

6    A.  Yes, it is.

7    Q.  Okay.  And did you open any of these folders?

8    A.  Yes, I did.

9    Q.  Did you open the folder that's marked -- that says Bill?

10   A.  Yes, I did.

11   Q.  Okay.  Can we flip you over to 1306, please.

12       Is this the -- sort of the contents of that folder?

13   A.  Yes.  It is one of the folders, yes.

14   Q.  Flipping to the next page over, on 1306.  All right.

15       So can you -- can you explain the top part over here,

16   the -- looks like it's the file path of the folder?

17   A.  Yes.  That's exactly what it is.  That is the file path of

18   where it was found on that computer.

19   Q.  All right.  So this folder is the Complete Paperwork

20   Package folder?

21   A.  Yes.

22   Q.  And New Docs folder?

23   A.  Yes.

24   Q.  In a folder called Robs Docs?

25   A.  Yes.

1    Q.   Okay.  Let's zoom out.

2         And then some of the documents here are, New A License Prof

3    Card; USPA Membership App; Yur underscore Rob Canopy Prof Card;

4    Yuri Tandem Prof Card Signed; Yuri UPT Waiver.

5         Do you see all that?

6    A.  Yes, I see it.  Yes.

7    Q.  Now did you -- did you happen to look at some of those

8    documents?

9    A.  Yes, I did.

10   Q.  Before we go there, let me just flip you back over a page,

11   please.  And zoom in to this section over here.

12        Now there are some dates next to these documents.  Could

13   you explain what -- what the date -- what the date created

14   means and why it's the same date?

15   A.  Yes.  In my opinion, it looks as if these documents were

16   copied from another piece of media at the same time.  Those are

17   the dates in which they were copied.

18   Q.  Okay.  And then what does the date mean -- the modified

19   date mean?

20   A.  The modified date means the date in which the file was

21   changed.

22   Q.  Okay.  So created doesn't necessarily mean that that's when

23   the documents were created but only when they were moved to

24   this device?

25   A.  Moved to this device.  This copy in this location.  It's

1    more specific than that.

2    Q.  Got you.

3    A.  Yes.

4    Q.  Got you.

5         Now you looked through some of these documents, right?

6    A.  Yes, I did.

7    Q.  Can I take you to 601, please.

8         And is this one of the documents you looked at?

9    A.  Yes, it is.

10   Q.  Flip you over to the next page.

11        And it's got a signature on the bottom corner there?

12   A.  Yes.

13   Q.  Okay.  Let's look at 602.

14        And you see some more signatures on this document?

15   A.  Yes, I do.

16   Q.  And the next page.  And then 603.

17        Same thing here?

18   A.  Yes.

19   Q.  One of the documents you looked at?

20   A.  Yes, it is.

21   Q.  With the signature at the bottom?

22   A.  Yes.

23   Q.  Okay.  Let's do 605, please.

24        This is a UPT -- United Parachute Technologies tandem

25   instructor certification form, right?

1    A.   Yes.  That's what it says, yes.

2    Q.   It's got a number of signatures?

3    A.   Yes.

4    Q.   And it says, Name of Examiner, Yuri Garmashov?

5    A.   Yes, it does.

6    Q.   606, please.

7         And this is a tandem instructor rating course proficiency

8    card?

9    A.   Yes.

10   Q.   And it also has a number of signatures?

11   A.   Yes.

12   Q.   But no other information on it?

13   A.   That is correct.

14   Q.   Next page over, please.

15        And then in the corner, under rating recommendation, it

16   says, Yuri Garmashov?

17   A.   Yes.

18   Q.   Okay.  Let's go to 607, please.  And can we just look --

19   flip through the pages.  Keep going.  Next.

20        And another signature on this one?

21   A.   Yes.

22   Q.   So these are all documents you found in that Robs Docs

23   folder?

24   A.   Yes.

25   Q.   Now, did you navigate to other folders?

1    A.  Yes, I did.

2    Q.  Let's go to Exhibit 1307, please.

3        Now, are these some of the folders you looked at on the

4    computer?

5    A.  Yes.

6    Q.  Did you go to the folder named Sent Items?

7    A.  Yes, I did.

8    Q.  Show you Exhibit 1308, please.  Let's go to the next page.

9        All right.  So is this sort of a zoomed in version of that

10   last page?

11   A.  Yes, it is.

12   Q.  Were these documents found in that Sent Items folder?

13   A.  Yes.

14   Q.  All right.  Let's go back one.  Actually, I'll take you

15   to --

16       Did you open these files?

17   A.  Yes, I did.

18   Q.  Can I take you to Exhibit 1A, please -- 1.  Sorry.

19       Is this one of the e-mails or the documents that you opened

20   up on that folder?

21   A.  Yes, it is.

22   Q.  In the Sent Mail folder?

23   A.  Yes.

24   Q.  And this is an e-mail from Parachute Center to Rob Pooley,

25   right?

```
 1   A.   That is correct.

 2   Q.   Dated June 28, 2016?

 3   A.   Yes.

 4   Q.   And the subject is, Forward, Tandem Ratings?

 5   A.   Yes.

 6   Q.   And the bottom zoom, that e-mail looks like an e-mail from

 7   Skydive Baja that says, I want more info about getting my

 8   tandem ratings with you guys, right?

 9   A.   Yes.

10   Q.   It asks some questions?

11   A.   Yes.

12   Q.   Let's zoom out.

13        And then the forward part of it from Kathy Dause to Rob,

14   correct?

15   A.   Yes.

16   Q.   Saying, I think this is more your expertise?

17   A.   Yes.

18   Q.   Okay.  And then can we go to Exhibit 700, please.

19        Now these are more e-mails?

20   A.   Yes.

21   Q.   Right at the bottom, this is an e-mail from Lassi-Pekka

22   Ruuskanen to paractr@softcom.net?

23   A.   Yes.

24   Q.   It says, Looking for a tandem instructor job for next

25   winter?
```

1    A.  Yes.

2    Q.  Okay.  Let's get out of that one -- or zoom out, please.

3        And right at the top, it says, We use Sigma rigs here, but

4    Rob Pooley can switch you over to that rating, right?

5    A.  Yes.

6    Q.  Tandems pay $20 plus tips?

7    A.  Yes.

8    Q.  The subject of the e-mail was, Looking For Tandem

9    Instructor Job?

10   A.  Yes.

11   Q.  Let's go to 701.

12       All right.  This is an e-mail from Kathy Dause to Gavin

13   Creagh?

14   A.  Yes.

15   Q.  Tandem Rating September?

16   A.  Yes.

17   Q.  And in the body of the e-mail, Kathy says, I'll give you

18   Rob's e-mail address?

19   A.  Yes.

20   Q.  And the original e-mail from Gavin says, Wondering when the

21   closest course date is for tandem rating?

22   A.  Yes, it is.

23   Q.  Let's go to 703.

24       This is another e-mail where Parachute Center says, Hi,

25   Rob.  I think you can answer this better than I can?

1    A.   Yes.

2    Q.   And the body of the e-mail below, it says, The person wants

3    to do a strong tandem master course?

4    A.   Yes.

5    Q.   704.  Again, an e-mail from Parachute Center to Rob --

6    A.   Yes.

7    Q.   -- right?

8         Could you answer this for me, please?

9    A.   Yes.

10   Q.   Dated August 1, 2016?

11   A.   Yes.

12   Q.   And in the body of it, the person seems to be asking for

13   tandem master lessons?

14   A.   Yes.

15   Q.   Okay.  Over to 705.

16        Another similar e-mail?

17   A.   Yes.

18   Q.   Rob Pooley is who you need to speak to?

19   A.   Yes.

20   Q.   He can give you all the information on tandem ratings,

21   right?

22   A.   Yes.

23   Q.   And that's, again, from Parachute Center to Lachlan Fox?

24   A.   Yes.

25   Q.   With the subject, Tandem Rating?

1    A.   Yes.

2    Q.   And then one -- 706.

3         706 is from Parachute Center to Mickey Jeffet?

4    A.   Yes.

5    Q.   Let's move over to the next page, please.

6         And right at the bottom, kind of, see that he says, He's

7    coming this summer in order to train and get tandem AFF

8    ratings.

9         Do you see that?

10   A.   Yes, I do.

11   Q.   Zoom out.

12        The response to that is, Hi, Mickey.  I forwarded your

13   e-mail to Rob Pooley, and he should be answering shortly,

14   right?

15   A.   Yes.

16   Q.   On the tandem AFF course?

17   A.   Yes.

18   Q.   Okay.  And then one more.  707, please.

19        And this is from Parachute Center to Richard Keir with a cc

20   to Rob Pooley?

21   A.   Yes.

22   Q.   Give you Rob Pooley's e-mail address; he's the one that

23   gives tandem ratings?

24   A.   Yes.

25   Q.   Thank you.  All right.

1          Now, did you, during your search, also seize a Western

2     Digital hard drive?

3     A.  Yes, we did.

4     Q.  Look at Exhibit 1304, please.  One three zero four.

5          Is that the hard drive you seized?

6     A.  Yes.

7     Q.  Okay.  Did you look at the -- did you copy the contents

8     just like the other device?

9     A.  Yes, we did.

10    Q.  And you looked at those contents?

11    A.  Yes.

12    Q.  All right.  Let me turn your attention to 1309.

13         Are these folders that you saw on that hard drive?

14    A.  Yes.

15    Q.  Did you open that Rob folder?

16    A.  Yes.

17    Q.  Let's look at 1310.  And let's look at the next page.

18         Is this a zoomed-in version of that last page?

19    A.  Yes.

20    Q.  Now this is a folder called Robs Docs, right?

21    A.  Yes.

22    Q.  And see two images -- two jpegs down there, Yuri Initials

23    and Yuri Signature?

24    A.  Yes.

25    Q.  Did you look at those -- those pictures?

1    A.  Yes, I did.

2    Q.  Can I show you 609, please.

3        Is that the Yuri Initials --

4    A.  Yes, it is.

5    Q.  -- picture?

6    A.  Yes, it is.

7    Q.  And then 600.

8        Is that the Yuri Signature --

9    A.  Yes, it is.

10   Q.  -- file?

11       And turning you back to 1311.  Next page.

12       All right.  So now the same -- is this the same hard drive?

13   A.  Yes, it is.

14   Q.  Same folder -- different folder but the same sort of file?

15   A.  Yes.

16   Q.  Again, in a folder called New Docs in Robs Docs?

17   A.  Yes.

18   Q.  And you see a number of different documents in here?

19   A.  Yes.

20   Q.  Okay.  Did you look at those documents?

21   A.  Yes, I did.

22   Q.  Can we quickly go through 611.

23       Now I'll just flip through these quickly.  But can you just

24   tell me if these are the documents you saw in that folder?

25   A.  Yes.

96

1    Q.  611?

2    A.  Yes.

3    Q.  613?

4    A.  Yes.

5    Q.  615 -- sorry -- 614?

6    A.  Yes.

7    Q.  Flip it over a page, please.

8        615?

9    A.  Yes.

10   Q.  615 [sic]?

11   A.  Yes.

12   Q.  And 617?

13   A.  Yes.

14   Q.  Flip that over a page, please.

15   A.  Yes.  I've seen this, yes.

16   Q.  Take you back to 1312.

17       Is this another folder that you looked up on that device?

18   A.  Yes.

19   Q.  And zoom over on to the next page, please.

20       And did you see a file called Lachlan Mackay on this

21   folder?

22   A.  Yes.

23   Q.  And, again, this is a folder called Candidate Paperwork on

24   a folder called Robs Docs?

25   A.  Yes.

1    Q.  Okay.  Can I flip you to 618, please.

2        Is that the document that was entitled Lachlan Mackay?

3    A.  Yes.

4    Q.  Next page over.

5        Same document?

6    A.  Yes, same document.

7    Q.  Okay.  And then I'll take you to Exhibit 1313.

8        Are these more folders on that device?

9    A.  Yes, it is.

10   Q.  Okay.  Did you open a folder called Transcoded Files?

11   A.  Yes.

12   Q.  And that was contained in a folder called Robs Docs?

13   A.  Yes.

14   Q.  Can we go to 1314.  And let's just zoom in right here.

15       So on this folder, did you see some images, Yuri Initials,

16   Yuri Signature, Rob Signature, and Rob Initials?

17   A.  Yes.

18   Q.  Okay.  Let's zoom out and take you to 612.

19       Did you look at those files?

20   A.  Yes, I did.

21   Q.  Is this the file entitled Yuri Initials?

22   A.  Yes.

23   Q.  Let's go to 616.

24       And is that Yuri's Signature?

25   A.  Yes, it is.

```
1    Q.  And 619.

2        Is that Rob Initials?

3    A.  Yes.

4    Q.  And 620.

5        Rob Signature?

6    A.  Yes.

7    Q.  And those are all files that you looked at?

8    A.  Yes.

9            MR. SHARMA:  No further questions, Your Honor.

10           THE COURT:  Any cross-examination?

11           MS. MCLOUGHLIN:  Yes, please, Your Honor.

12                        CROSS-EXAMINATION

13   BY MS. MCLOUGHLIN:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16           THE COURT:  It's still morning.

17           THE WITNESS:  Yeah.

18           MS. MCLOUGHLIN:  Oh.  Good morning.  Yes.  Thank you,

19   Your Honor.

20           THE WITNESS:  We've got 13 minutes.

21           MS. MCLOUGHLIN:  Okay.  Well, at least I was close.

22   Q.  BY MS. MCLOUGHLIN:  Okay.  I'd like to start discussing the

23   hard drive -- the first device that you were talking about --

24   the computer, the desktop.

25   A.  The desktop.  Gotcha.
```

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    Q.  Let's bring up a picture of that.  That would be

2    Government's Exhibit 816.

3         So you said the computer was right there, correct?

4    A.  Yes.

5    Q.  And we can zoom out of that, actually.  Thank you.

6         This desktop is not in an office, right?  It's not

7    separated from the rest of this room?

8    A.  Correct.

9    Q.  There is no walls surrounding it?

10   A.  That is correct, yes.

11   Q.  There is no door to get into the space where the computer

12   is?

13   A.  From what I can tell, yes, that's correct.

14   Q.  This looks like a large open area, right?

15   A.  Yes.

16   Q.  With many, many items in it?

17   A.  Oh, yeah.

18   Q.  Okay.  So you said you found documents referred to -- or

19   documents in the folder labeled Bill, correct?

20   A.  Yes.

21   Q.  Let's go to Exhibit 1305.

22        And that's right here, right?

23   A.  Yes.

24   Q.  Okay.  This user profile wasn't password protected, was it?

25   A.  I don't remember.  I don't remember.

1   Q.  Okay.  There was no password to enter any of these folders,

2   was there?

3   A.  Oh, I -- I don't remember.

4   Q.  Okay.

5   A.  Because we don't look at it through the operator system.

6   Passwords are looked at through the operator system.

7   Q.  Understood.

8      Now I'd like to --

9      We can take that away.  Thank you.

10     And I want to talk about one e-mail you found on the

11   computer, just to revisit one of the exhibits you were looking

12   at.  And I will just continue to walk back and forth between

13   these two podiums.  If we could bring up Exhibit 706, please.

14     And so this is an exhibit of one of the e-mails you found

15   on that desktop, correct?

16   A.  Yes.

17   Q.  The latest e-mails, it looks like, are dated July 1, 2015,

18   correct?

19   A.  According to that header, yes.

20   Q.  Let's go to page 2, please.  And down here, I'll zoom in

21   right here.

22     You had noted on direct that there was discussion here

23   about tandem ratings -- tandem ratings and -- there was a

24   discussion about tandem ratings here, right?

25   A.  Yes.

1    Q.  And the date here is April 26, 2015?

2    A.  Yes.

3    Q.  And the date on which someone from the Parachute Center

4    responded was on April 27, 2015?

5    A.  Yes.

6    Q.  And can we zoom out again, please.  Thank you.

7        I'm just going to do one more.  And the first discussion is

8    on May 18, 2015, correct?

9    A.  Yes.

10   Q.  Thank you.

11       Now I'd like to move on to the other device that you took a

12   look at, that other hard drive.

13       Could we pull up Government's Exhibit 1312.  And this is

14   very small, but I think it zooms well.

15       You looked at this folder called Candidate Paperwork,

16   correct?

17   A.  Yes.

18   Q.  And let's go to page -- zoom out and go to page 2.

19       It looks like a folder with different people's names,

20   different types of paperwork, organized by -- by the person's

21   name, right?

22   A.  Yes.

23   Q.  Okay.  And let's zoom out.  And go to the previous page.

24   The first page.  Thank you.

25       You were talking about the significance between the date

1   created and the date modified, right?

2   A.   Yes.

3   Q.   And you had said that the date created was not necessarily

4   the date the actual file was originally created but a date that

5   it was copied onto this device at this location, right?

6   A.   That copy of it, yes.

7   Q.   And that copy of it.  Yes.

8   A.   Yes.

9   Q.   I almost got all of it.

10  A.   Yes.

11  Q.   But the date modified was the date that the file was

12  actually changed?

13  A.   Yes.

14  Q.   Substantively changed in some way?

15  A.   Yes.  The content of the file.

16  Q.   The content of the file, right?

17  A.   Yes.

18  Q.   So I want to zoom in on -- I'm sticking with this one.

19  We'll see how this goes.  I want to zoom in on one file here.

20  And I want to go the entire -- up until that length.  Let's

21  look at this line here.  I'm going to highlight it so we can

22  all see.

23       The filename of this document is Brad North USPA, correct?

24  A.   Yes.

25  Q.   And, you know, there are two dates here.  I -- we're zoomed

1   in; so you can't see the label of that row.  But the first date

2   here is under the created date --

3   A.  Yes.

4   Q.  -- right?

5       Do you see that?

6   A.  I see it.

7   Q.  And the second date that we see is the date modified,

8   correct?

9   A.  That is correct.

10  Q.  And the date we see here for this particular document is

11  October 13, 2015?

12  A.  Yes.

13  Q.  Let's take a look at that file.  I want you to take a look

14  at Exhibit 2188.  And that would be in the defendant -- the

15  defense Exhibit Binder 7.  And I could go up there and help you

16  take a look at it because you made need to rifle through some

17  things.

18  A.  Okay.  All right.

19          MS. MCLOUGHLIN:  Your Honor, I'd like to move to

20  admit Defense Exhibit 2188.  That's also included in the

21  stipulation by the parties.

22          THE COURT:  2188.

23          MR. SHARMA:  No objection, Your Honor.

24          THE COURT:  Exhibit 2188 is received in evidence.

25      (DEFENDANT'S EXHIBIT 2188 ADMITTED INTO EVIDENCE.)

1    Q.   BY MS. MCLOUGHLIN:  You have that in front of you?

2    A.   Yes.  I'm looking at it, yes.

3    Q.   So let's look at this document entitled Brad North USPA.

4    You know, let's just go to page 2, actually.  That might be

5    easier.

6         This looks like it's a coach rating course proficiency

7    card, right?

8    A.   Yes.  That's what it says, yes.

9    Q.   And it's an application specifically for a Bradley

10   D. North, correct?

11   A.   Correct.

12   Q.   And he indicates he's got a USPA No. 253058, right?

13   A.   Right.  Correct.

14   Q.   And let's zoom out of that.  I'm going to continue to go

15   down here.

16        It also appears there is also some personal information

17   here.  Okay.  Including a phone number --

18   A.   Yes.

19   Q.   -- and an e-mail address, right?

20   A.   Yes.

21   Q.   And that e-mail address looks like it says

22   deviltakeshindmost@gmail.com?

23   A.   Yes.  That's -- that's what I'm reading.  Yes.

24   Q.   And the occupation of this applicant is a skydive

25   videographer, correct?

1  A.  Yes.

2  Q.  Let's zoom out, please.  And let's zoom in right here.

3      Here, it looks like we have several signatures that are

4  exactly the same, right?

5  A.  Yes.

6  Q.  Looks like they're preprinted onto this document or digital

7  signatures, right?

8  A.  They look the same, yes.  They look the same.

9  Q.  The dates, on the other hand, look handwritten, don't they?

10  A.  They're in a different color ink.

11  Q.  They're in a different color ink.  And they're all slightly

12  different in there, the way they're written, right?

13  A.  Yes.

14  Q.  Can we zoom out, please.  Go to the next page.  Zoom in

15  here.

16      Here, on this side, we have more of the same -- and you

17  don't need to zoom in.  I'm sorry.

18      We have more of the same signatures -- right? -- that look

19  exactly the same?

20  A.  Yes.  That's the same signature, yes.

21  Q.  And the same one right here as well?

22  A.  Yes.

23  Q.  And the name above that, printed, is Yuri Garmashov, right?

24  A.  Correct.

25  Q.  It is not Rob Pooley?

1    A.  Correct.

2    Q.  Now, the dates on this page -- and if we could zoom out --

3    are all October 13, 2015, right?

4    A.  Correct.

5    Q.  Can we go to the first page again.  Or -- I'm sorry -- the

6    second page.

7        All dates here are listed as October 13, 2015, correct?

8    A.  Correct.

9    Q.  Now I just want to take a look at another exhibit already

10   admitted.  Could we put up -- pull up Government's Exhibit 30.

11       This is another application for Bradley North, right?

12       And I may have made that more difficult to read.

13       Bradley North, right?

14   A.  It appears to be, yes.

15   Q.  Okay.  And we've got this number, 949-412-5339, right?

16   A.  Yes.

17   Q.  And let's go -- I'm going to ask you to go page by page,

18   but let's go to the next page.  The next page.  Next page,

19   please.  Next page.  Next page.  Next page.  Next page.  Next

20   page.  One more.  Another two more, I think.  I apologize.

21   This one is good.  Thank you.  Let's zoom in right here.

22       This USPA number listed here is, again, USPA No. 25308,

23   right?

24   A.  058?

25   Q.  Yeah.  253058.

1    A.  Yes.

2    Q.  And there is another e-mail down here.  It says,

3    deviltakeshindmost@gmail -- I believe it continues --

4    gmail.com, right?

5    A.  Yes.

6           THE COURT:  It's noon.  Would you like to take a

7    lunch break now?

8           MS. MCLOUGHLIN:  Your Honor, I'm finished.  Thank

9    you.

10          THE COURT:  You're finished?

11          MS. MCLOUGHLIN:  No further questions.

12          THE COURT:  How much time do you have?

13          MR. SHARMA:  No redirect, Your Honor.

14          THE COURT:  What?

15          MR. SHARMA:  I don't need redirect.

16          THE COURT:  No redirect.  All right.  Thank you,

17   Mr. Noel.  You're excused.

18       And we will now take the lunch break.  We'll resume at

19   1:30.  Remember the admonition, ladies and gentlemen.  1:30.

20       (Recess taken, 12:01 p.m.)

21       (Further proceedings held.)

22                           --o0o--

23

24

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4                              /s/ Kimberly M. Bennett
                               KIMBERLY M. BENNETT
5                              CSR No. 8953, RPR, CRR, RMR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25