PHILLIP A. TALBERT
United States Attorney
KATHERINE T. LYDON
DHRUV M. SHARMA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:21-cr-00111-WBS |
| Plaintiff, | UNITED STATES' OPPOSITION TO POOLEY'S MOTION FOR JUDGMENT OF ACQUITTAL (DKT. NO. 143) |
| v. | |
| ROBERT ALLEN POOLEY, | |
| Defendant. | |

## I.   INTRODUCTION

This Court should deny the defendant's motion for a judgement of acquittal as to Count 5, for aggravated identity theft as to Pooley's use of Garmashov's signature on the USPA and UPT paperwork Pooley presented to YongHyeon Kwon, a victim about whom the jury heard significant evidence.

The defendant has already made the same argument advanced in his motion twice to this Court and to a properly instructed jury, and been rebuffed each time. At oral argument on Rule 29 motions, the defense confirmed to the Court that the jury instructions gave it what it needed to make its arguments to the jury about the signature not being at the crux of the defendant's identity theft crime. The jury rejected it and convicted on Count 5. Likewise, the Court has already twice denied the defendant's motion on Count 5, the day the government rested and the day the defense rested, and signaled that the motion would not prevail on the third try.[1] This Court's assessment immediately after hearing the trial,

---

[1] Specifically, after the defense noted that it intended to renew this motion in writing, the Court

Rule 29 arguments, and the parties' closing argument to the jury, was spot on. The jury's verdict was supported and should stand.

## II. LEGAL STANDARD

On a defendant's motion under Rule 29 of the Federal Rules of Criminal Procedure, brought within 14 days of a guilty verdict, a court may set aside the verdict and enter an acquittal on grounds that the evidence is insufficient to sustain a conviction. *See* Fed. R. Crim. Proc. 29. In evaluating sufficiency, the Court is "obliged to construe the evidence 'in the light most favorable to the prosecution,' and only then determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010) (en banc), *quoting Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The Ninth Circuit has explained that the first step of *Jackson*, "means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. *Nevils*, 598 F.3d at 1164, citing *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Nevils*, 598 F.3d at 1164, citing *Jackson*, 443 U.S. at 326 and *McDaniel v. Brown,* 130 S. Ct. 665, 673-74 (2010).

After resolving all inferences in favor of the government, the court moves to the second step of *Jackson* and asks whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Nevils*, 598 F.3d 1158 at 1163-64. "At this second step, however, a reviewing court may not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether "*any* rational trier of fact could have made that finding.'" *Nevils*, 598 F.3d 1164, quoting *Jackson*, 443 U.S. at 318-19. In ruling on a Rule 29(c) motion, a district court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United*

---

responded, "All right. I guess I can't stop you" and stated, "I don't think I'm going to dismiss Count 5, but I can't stop you from filing the motion." *See* Exh. A (partial transcript of proceedings).

*States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977), supplemented, 574 F.2d 476 (9th Cir. 1978).

### III.   ARGUMENT

**A. Pooley's use of Garmashov's signature in Count 5 was at the crux of the fraud, unlike in *Dubin*, where the use of the means of identification was ancillary.**

Pooley's argument, that the jury's verdict as to Count 5 should be set aside because a reasonable factfinder could not find beyond a reasonable doubt that Pooley's use of Garmashov's signature with respect to the documents in Count 5 was "at the crux" of the wire fraud alleged in the Indictment, should be rejected.

"At the crux" was defined in a jury instruction derived from *Dubin v. United States*, 599 U.S. 110, 117 (2023).

> A means of identification is used "during and in relation to" a crime when the means of identification is used in a manner that is fraudulent or deceptive toward the tandem instructor candidates and is at the crux of what makes the conduct criminal. Being "at the crux" requires more than a causal relationship between the means of identification and the wire fraud offense. The defendant must have used the means of identification itself to defraud or deceive the candidates.

Dkt. No. 130 at 16.  *See also United States v. Gladden*, 78 F.4th 1232, 1244 (11th Cir. 2023) ("Section 1028A's reach is thus limited to situations where "a genuine nexus" exists between the use of a means of identification and the predicate offense").  When a means of identification is used deceptively, it only constitutes aggravated identity theft if the deception goes to "who" is involved, rather than just "how" or "when" services were provided.  *Dubin*, 599 U.S. at 123.

Here, the Examiner's signature was clearly at the crux of the crime: it was the product the defendant sold.  It was the reason the victims paid Pooley money.  Each victim testified that they wanted to become a tandem instructor and they knew that they needed forms signed by a certified USPA and UPT tandem Examiner to achieve that.  Garmashov's signature was the tool the defendant had to commit the crime.  Pooley knew that he would not be able to execute his scheme without that signature, as shown by the fact that Pooley emailed himself Garmashov's scanned signature and initials the same night he found out about his suspension by UPT.  *See* Gov. Exh. 905, 908. The defendant admitted in a recorded interview, in response to an agent's question of why Pooley didn't put his own name on the forms, that it was "because the USPA won't approve it with my name.  So Yuri has to sign for them to

get their USPA stuff." Gov. Exh. 403. Former USPA Director of Safety and Training Jim Crouch corroborated Pooley's admission that the signature was central, explaining that the official tasked with processing forms had come to know the signatures of specific Examiners to the point that she had become adept at identifying forgeries. It also mattered for purposes of the fraud scheme that it was Garmashov's signature in particular, not some other Examiner, given that Pooley had told Crouch that Garmashov was the specific Examiner working at Lodi running the tandem courses 2016. Gov. Exh. 911. The jury reasonably found that Pooley's use of Garmashov's signature was at the crux of the fraud.

This is a far cry from *Dubin,* the sole case the defendant relies on in his Rule 29 motion. In *Dubin*, the use of a given patient's billing number was ancillary to the underlying fraud of inflating the employee's qualifications for higher reimbursement – it did not matter to the inflated billing fraud scheme who the patient on the paperwork was.[2] The Court noted that the use of the identification in *Dubin* was not "at the crux" because the fraud misrepresented *how* and *when* services were provided to a patient, rather than *who* received the services. *Dubin*, 599 U.S. at 132. By contrast, in the instant case, Pooley's use of Garmashov's signature was at the crux of the fraud because Garmashov was a certified Examiner and Pooley was not. That was the whole scam. The signature was "a key mover in the criminality." *Dubin*, 599 U.S. at 123.

### B. The jury had sufficient evidence, both with respect to the fraud scheme generally and with respect to Kwon specifically, to convict Pooley for his use of Garmashov's signature.

The defendant previously made, and the jury rejected, the same argument the defendant now makes in his Rule 29 motion: that the signatures could not be at the crux because by the time the defendant gave the victims' paperwork with Garmashov's signature on them to the victims, he had

---

[2] The defendant in *Dubin* helped his father manage a psychological services company. *Dubin*, 599 U.S. at 114. The company submitted a claim for reimbursement to Medicaid for psychological testing by a licensed psychologist, but overstated the qualifications of the employee who actually performed the testing, resulting in a higher Medicaid payout. *Id*. The defendant was charged with healthcare fraud, but also with Aggravated Identity Theft because the defendant's fraudulent billing included a patient's Medicaid reimbursement number. *Id*. at 115. Focusing on the element requiring the use of the means of identification be in relation to the fraud, the Supreme Court held that it requires the use to be "at the crux of what makes the conduct criminal." *Id*. at 131-132. The Court also observed that the use of the patient's means of identification was an ancillary part of the Medicaid billing process. *Id*. at 114.

U.S. OPPOSITION TO POOLEY'S RULE 29 MOTION RE: COUNT 5

4

already received those victims' money.  *See* Mot. at 4.  As the government explained in closing, this argument is without merit both with respect to the fraud scheme generally, and Kwon specifically.

1. **The jury had sufficient evidence as to the entire fraud scheme (including but not limited to Kwon), from which to infer that Pooley had used Garmashov's signatures on the forms to falsely convey to the victims that they had gotten what they paid for, to avoid detection and to perpetuate the fraud scheme**.

The defendant ran a rolling fraud scheme, involving a series of classes.  The defendant's scheme depended on each victim believing they had gotten the signatures they sought and had become certified tandem instructors, and not complaining or causing an investigation, which would have brought the truth to light about Pooley's legitimacy as an Examiner and immediately stopped the flow of new paying tandem instructor candidates into Pooley's courses.  Victims, including Fabricio Palomino and Brad North, explained that the skydiving community was tight knit.  Once the news of Pooley's fraud did hit, it spread like wildfire.  Brad North explained he heard the news from many sources, essentially at the same time.   From this, the government argued and the jury could reasonably infer, that Pooley knew that if victims had not gotten the signed paperwork they paid for, meaning paperwork bearing the signature of a certified Examiner, victims would have notified the rest of the community and Pooley's income flow of about $1,200 per tandem instructor candidate would have immediately stopped.

The importance of the Examiner signatures to the fraud scheme can be shown, the government argued to the jury, by the victims' behavior when they did and did not receive signed forms.  Pooley gave Brad North signed paperwork, with Garmashov's pre-printed signatures on it, and instructed North to insert the dates and return it to him.  North's eyebrows went up at the fact that the signature was Garmashov's and not Pooley's, but he trusted Pooley to know the requirements, and the process seemed to be proceeding, so he followed Pooley's directions to fill it out and send it back.  *See* Gov. Exh. 30, 32r.  Pooley handed Fabricio Palomino the same pre-printed paperwork.  Palomino filled out his identifying information, gave the forms back to Pooley for submission to USPA and UPT, and caught his train back to Mexico, believing his official USPA and UPT instructor cards would be forthcoming.  In the weeks that followed, North and Palomino followed up with Pooley to ensure that Pooley had sent it to USPA and UPT and, when Pooley told Palomino he had not been able to yet, Palomino sent Pooley

an address to mail it to so that Palomino could submit it himself. Gov. Exhs. 3, 32r. Had it not been for the accident which brought Pooley's fraud to light, Pooley might have gotten away with it undetected by submitting the paperwork once Garmashov returned.[3]

By contrast, when victim Fabian Munoz did *not* receive signed paperwork at the end of the course, by contrast, he got upset, felt cheated, and threatened to go to the authorities. Specifically, Fabian Munoz testified that he saw others in his class had paperwork signed by someone else, not Pooley. Munoz told Pooley he needed *Pooley* to sign, no one else. Then, Pooley failed to provide Munoz with any paperwork. Munoz testified he hounded Pooley for his forms, morning and night, every day until he left to return to Chile. Munoz told Pooley that if did not get his signed paperwork, he would have to report him to USPA.

From these contrasting reactions, the jury could reasonably infer that Pooley used Garmashov's signature to convince his students that they had received the ratings they had paid him for, and consequently, to continue signing up new students to his scheme.

The reactions of the students also constitutes sufficient facts for the jury to have rejected Pooley's argument that the signatures cannot be at the crux of the fraud because Pooley presented the victims with the paperwork bearing the signatures *after* they had paid him the money. *See* Mot. at 4-5. Pooley's timing-based argument depends on an artificially narrow construction of Pooley's fraud scheme, and flies in the face of the law that the scope of an ongoing fraud scheme can encompass post-payment actions taken to prevent victims from losing faith in the fraudster. *See, e.g., Schmuck v. United States*, 489 U.S. 705, 712 (1989). The jury could reasonably have inferred that Pooley's use of Garmashov's signature constituted a false representation to the tandem candidates that they had received what they paid him for—legitimate signatures from a certified Examiner that would result in Tandem Instructor ratings—and that those false representations were at the crux of the fraud scheme. The signatures also themselves constituted lulling misstatements to individual students, which were at the

---

[3] Of course, even if Pooley had managed to hoodwink USPA and UPT into issuing ratings for certain candidates, those individuals would still have been defrauded. Pooley promised and they paid for legitimate above-board ratings by a certified Examiner. The best Pooley could hope to deliver was ratings that were perpetually under a cloud and subject to revocation upon USPA and UPT's discovery of his scheme.

crux of the overall fraud scheme, because it led each student to believe they had valid tandem instructor ratings, dissuaded them from alerting the authorities and the rest of the skydiving community, and kept the next set of students coming.

### 2. The jury had sufficient evidence regarding Pooley's use of the signatures on Kwon's documents specifically.

The jury had ample basis for its verdict with respect to Pooley's use of the signatures with respect to Kwon, specifically. The jury heard Pooley himself explain Kwon's motivation and the materiality of the signatures to Kwon, in a clip from the videotaped deposition clip. Pooley admitted that the whole reason Kwon traveled to the US from South Korea was to obtain a tandem instructor rating from USPA and UPT. As Pooley phrased it, Kwon "just wanted to get his rating and go home." Gov. Exh. 209. Pooley explained on video why people want USPA and UPT ratings, and admitted, "Obviously Yong Kwon wanted to get his USPA licenses and ratings." Gov. Exh. 217, 218. The jury saw Pooley admit on video that he trained Kwon when Garmashov was out of the country, and that his USPA rating was suspended at the time he conducted Kwon's training. Gov. Exh. 206, 211, 214, 404. The jury saw a video clip in which, when asked who Kwon's Examiner was, Pooley responded, "me." Gov. Ex. 213. The jury could reasonably infer that Pooley likewise told Kwon he was his Examiner, just as Pooley had presented himself as an Examiner to Munoz, Palomino, and North. The jury also had the USPA and UPT documents underlying Count 5, and knew they were dated July 1, 2016, reflecting that Pooley gave the documents to Kwon more than a month before the August 6, 2016 accident. Gov. Exh. 5. The jury saw that Kwon signed the documents himself, using Korean characters. Gov. Exh. 5. The jury could infer that when Kwon received filled-out paperwork, purportedly signed by an Examiner, Kwon would have thought he got what he paid for. By providing the paperwork bearing Garmashov's signature, Pooley represented to Kwon that Kwon was now a certified Tandem instructor. And, the jury could infer that Kwon believed Pooley, because they heard evidence that Kwon then started jumping with customers. Fabricio Palomino and Pete Swan both testified they saw Kwon jumping with customers.

**IV.    CONCLUSION**

Far from being ancillary, Garmashov's signature was essential for Pooley's scheme to be successful. Pooley's use of Garmashov's signature was a deceit which went to "who" the certified Examiner was (*i.e*, Garmashov), rather than "how" or "when" the services were provided. *Dubin*, 599 U.S. at 123.   The jury's verdict, reflecting the jurors' finding that Pooley's use of Garmashov's signature on Kwon's USPA and UPT forms was at the crux of the fraud, was supported.  The facts of *Dubin* are far afield from the facts of this case and do not support the defendant's request for this Court to override the jury's verdict.

Dated:  June 24, 2024

PHILLIP A. TALBERT
United States Attorney

By:  /s/ KATHERINE T. LYDON
KATHERINE T. LYDON
Assistant United States Attorney