HEATHER E. WILLIAMS, SBN 122664
Federal Defender
MIA CRAGER, SBN 300172
MEGHAN McLOUGHLIN, SBN 354051
Assistant Federal Defenders
801 I Street, Third Floor
Sacramento, California 95814
T: (916) 498-5700
F: (916) 498-5710

Attorneys for Defendant
ROBERT POOLEY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-CR-111-WBS |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL** |
| vs. | Judge: Hon. William B. Shubb |
| ROBERT POOLEY, | |
| Defendant. | |

## I.     INTRODUCTION

The government does not contend that Mr. Garmashov's signature – the means of identification – caused anyone to part with money. The government instead argues that the signature was involved in other aspects of the fraud. The defense disputes the factual accuracy of the government's claims. But regardless, even if the government were correct that the signature featured in the fraud scheme as a necessary "tool" or a "lulling misstatement," the signature still was not at the crux of the fraud for which Mr. Pooley stands convicted. Count 5 therefore cannot stand under *Dubin*.

## II.    ARGUMENT

**A. The signature was not a "key mover" in the predicate wire fraud offense.**

To discern whether the means of identification was "at the crux" of the wire fraud offense, it is helpful to begin with what the "crux" was. Here, the crux of the fraud – the reason

the candidates parted with their money – was that they were convinced that Mr. Pooley was a valid "tandem examiner." Three tandem instructor candidates testified. They each testified that they paid money because they thought Mr. Pooley was a tandem examiner who could validly teach and certify them.[1] No witness testified that he parted with money because he was convinced to do so by Yuri Garmashov's signature.[2]

---

[1] *See* Testimony of Fabian Munoz, Tr. of May 17, 2024 at 51:6-15 ("Q: Now, at any point in time . . . did Pooley tell you that his [tandem] examiner rating had been suspended?; A. Never, sir.; Q. And would you have attended the course at the Parachute Center if he had told you that he was suspended?; A. If I had known he did not have his certification, I would not have taken the trip – I would not have taken the trip from Chile, I would not have asked for a work permit to travel to the US, and I would not have spent my money."); *id.* at 33:21-34:7 ("Q. BY MR. SHARMA: Did you trust [Mr. Pooley's] statement that [Mr. Pooley] would be your tandem examiner?; A. Absolutely.; Q. Did you trust his statement that he would sign your paperwork? A. Definitely.; Q. And then based on that conversation, did you make the decision to travel to Parachute Center?; A. That's correct."); Testimony of Bradley North, Tr. of May 17, 2024 at 123:16-124:6 ("Q. Okay. Did Pooley lead you to believe that you could legitimately obtain your tandem instructor rating and UPT tandem parachute system certification from taking his course?; A. Yes.; Q. How did he do that?; A. He took my -- my money. . . . . Q. If he had told you that his examiner rating was suspended by USPA and UPT, would you still have paid him your money to take that course?; A. No."); *id.* at 196:24-197:25 ("Q. When you reached out to Rob Pooley about a tandem instructor course, who did you believe would teach that tandem instructor course?; A. Rob Pooley himself.; Q. Did you believe he was a certified, rated, current USPA and UPT tandem examiner?; A. I did.; Q. Did he say anything to dissuade you of that view?; A. No, he did not.; Q. And had he previously certified you, as an examiner, in your coach course?; A. Yes, he had.; Q. So as far as you knew, he knew you believed him to be an examiner?; A. Yes.; Q. And did he know you were looking for ratings?; A. Yes.; Q. And then when you drove to Parachute Center, did you believe him to be an examiner?; A. I did.; Q. Did you believe he would be signing the paperwork?; A. I did.; Q. And when you handed him $1100 in cash, why did you do that?; A. Because I trusted Rob as a mentor, somebody that had helped me become a, in my opinion, very talented and skilled skydiver, and I had no reason to think that he wouldn't be -- that he would lie to me."); Testimony of Fabricio Palomino, Tr. of May 20, 2024 at 18:8-19 ("Q. What was your understanding, from this e-mail, about what [Mr. Pooley] was offering you?; A. He was going to be my tandem examiner and was going to conduct our -- my jumps and training.; . . . . Q. BY MR. SHARMA: Did you trust his representations in this e-mail?; A. Yes."); *id.* at 39:12-18 ("Q. Okay. Now, at any point in time when you were at Parachute Center or before you got to Parachute Center, did Rob Pooley tell you that his examiner rating was suspended? A. No. Q. And if he had told you that, would you have still attended the course at Parachute Center? A. No."); *id.* at 34:24-35:1 ("Q. Okay. In total, did you pay the $1100 that Rob Pooley had said in his e-mail was cost of the course?; A. Yeah, was the total.").

[2] *See supra* n.1. Furthermore, it is false to say that the signature "was the product [Mr. Pooley] sold." Opp. at 3:20-21. Instead, Mr. Pooley sold a valid tandem examiner course with the ability to gain valid tandem examiner ratings. That a signature was required by the USPA and the manufacturer of the skydiving equipment to actually obtain ratings does not mean that Mr.

According to the Supreme Court, whether a defendant committed aggravated identity theft hinges on "what the defendant does with the means of identification in particular. In other words, the means of identification specifically [must be] a key mover in the criminality." *See Dubin v. United States*, 599 U.S. 110, 122-23 (2023). Here, what Mr. Pooley did with the signature was provide it on paperwork to some of the candidates after they had finished their courses.[3] Mr. Pooley made no effort to point out the signature to the candidates.[4] Testimony further indicated that Mr. Pooley did not even give the signature to some of the candidates.[5] The government's theory in closing was that these witnesses were defrauded by Mr. Pooley because he gave them the "false impression that he was an examiner" capable of getting candidates proper ratings, when in fact he was not.[6] In the prosecutor's words, "Each testifying victim

---

Garmashov's signature was "the product" sold to the candidates.

[3] *See, e.g.*, Testimony of Bradley North, Tr. of May 17, 2024 at 196:19-197:25 (Q. Okay. The -- what was the first time that you knew that Yuri Garmashov's signatures were on the USPA and UPT paperwork in connection with the class?; A. When he handed them to me on the last day of my course, after we were done jumping.").

[4] One witness, Fabricio Palomino, testified he did not even realize whose signature was on the paperwork. *See* Testimony of Fabricio Palomino, Tr. of May 20, 2024 at 36:11-37:2 ("Q. Whose signatures were on [the paperwork Mr. Pooley gave you]?; A. Later, I knew it was Yuri Garmashov's signature. But I don't know Yuri Garmashov's signature. So that -- I don't -- when everything happened, I know that it was signed by Yuri.; Q. Signed by Yuri?; A. Yeah.; Q. Did it have Yuri Garmashov's name on it?; A. I don't remember.; Q. Okay.; A. But I seen a signature.; Q. Did it have Rob Pooley's name on it?; Did it have Rob Pooley's name on it?; A. I didn't check.").

[5] Witness Fabian Munoz testified that Mr. Pooley did not give him any paperwork at all. *See* Testimony of Fabian Munoz, Tr. of May 17, 2024 at 47:3-17 ("Q. Okay. And how did you get [the USPA and UPT paperwork] to fill out?; A. I went into the internet, and I had them print -- and I printed them.; Q. So you printed out the documents yourself?; A. That's right, sir.; Q. And did those documents need your examiner's signature on them?; A. Definitely.; Q. And so did you go to Mr. Pooley and ask for his signature?; A. Of course.; Q. And what did he say to you?; A. That not to worry, that everything was all right, and that he would sign the documents.; Q. But did he sign it in front of you?; A. He never gave me a document.").

[6] *See, e.g.*, Gov't Closing Arg., Tr. of May 23, 2024 at 14-15; *id.* at 21:5-10 ("Pooley's false pretenses that he was an examiner who could get the students ratings, obviously, was capable of and did influence his students to part with money. Each testifying victim explained that the only reason they paid Pooley to take his course was they believed that he was a USPA and UPT examiner who could give them those USPA and UPT ratings.").

explained that the *only* reason they paid Pooley to take his course was they believed that he was a USPA and UPT examiner who could give them those USPA and UPT ratings."[7]

It is clear the signature was not at the crux of the fraud; it was not the reason – or even *a* reason – that the witnesses parted with their money. The deception – namely, leading candidates to believe that Mr. Pooley was a valid tandem examiner – could have been, and indeed was achieved without Mr. Garmashov's signature. The signature therefore was not "at the crux" or "central" to the fraud on the tandem instructor candidates. *See Dubin*, 599 U.S. at 123.

**B. The government's arguments place the signature within the scope of the fraud but not at its "crux."**

The government argues that the signature was relevant to the fraud in other ways, but none of them place the signature the "crux" of the fraud.

First, the government argues that Mr. Pooley "knew that he would not be able to execute his scheme without that signature[.]" Opp. (Dkt. 159) at 3:24-25. In other words, the government argues that the signature was a but-for cause of the scheme's success. As a preliminary matter, even in the light most favorable to the government, the evidence did not show that the Mr. Garmashov's signature was a but-for cause of the fraud on the candidates.[8]

---

[7] *Id.* at 21:5-10 (emphasis added).

[8] Indeed, Mr. Pooley did not use the signature to convince the candidates that he (Mr. Pooley) was a tandem examiner or that he could get them ratings. The deception – convincing the candidates that Mr. Pooley was a properly certified tandem examiner – was accomplished through oral and written communication between Mr. Pooley and the witnesses about his ability and availability to teach the course. *See* Testimony of Fabian Munoz, Tr. of May 17, 2024 at 33:21-34:4 ("Q. BY MR. SHARMA: Did you trust [Mr. Pooley's oral] statement that [Mr. Pooley] would be your tandem examiner?; A. Absolutely.; Q. Did you trust his statement that he would sign your paperwork?; A. Definitely.; Q. And then based on that conversation, did you make the decision to travel to Parachute Center?; A. That's correct."); Testimony of Fabricio Palomino, Tr. of May 20, 2024 at 18:8-19 ("Q. What was your understanding, from this e-mail, about what [Mr. Pooley] was offering you?; A. He was going to be my tandem examiner and was going to conduct our -- my jumps and training.; . . . . Q. BY MR. SHARMA: Did you trust his representations in this e-mail?; A. Yes."). Each witness was convinced to come to Lodi, part with money, and complete the course without ever seeing the signature. That Mr. Pooley supposedly needed the signature later to satisfy USPA's requirements does not mean that it was a but-for cause of the fraud on the candidates. In fact, the government's theory was that, as part of the fraud, Mr. Pooley never intended to submit the forms to USPA at all. *See* Indictment ¶ 36 (alleging that "[i]n furtherance of the ongoing scheme and to prevent its detection, including to

1   Regardless, even if the government were correct that the scheme could not have occurred

2   without Mr. Garmashov's signature, the Supreme Court has specifically rejected the

3   government's argument.  According to the Supreme Court, even if a means of identification was

4   the but-for cause of a fraud's success, that does not render the means of identification at the

5   "crux" of the fraud.  *See Dubin*, 599 U.S. at 131 ("To be clear, being at the crux of the

6   criminality requires more than a causal relationship, such as 'facilitation' of the offense or being

7   a but-for cause of its 'success.'").  Therefore, even if the government were correct that Mr.

8   Pooley needed the signature for the fraud to succeed, that does not make him guilty of

9   aggravated identify theft.

10       The government's other arguments about the purpose of the signature in the fraud are

11  also foreclosed by *Dubin*.  The government states that "Garmashov's signature was the tool the

12  defendant had to commit the crime."  Opp. at 3:23-24.  This is equivalent to saying that the

13  signature facilitated the fraud – another argument rejected by the Supreme Court.  *See Dubin*,

14  599 U.S. at 117, 122, 127 (rejecting the idea that a person is guilty of aggravated identity theft

15  where the means of identification "facilitates" or "furthers" a fraud scheme).

16       Similarly, the government places the signature within the "scope of [the] ongoing fraud

17  scheme" by saying that, after the candidate parted with their money, the signature lulled the

18  candidates into believing that everything was alright.  Opp. at 6.  The defense disputes the

19  characterization of the signature as "lulling," since instead of allaying concerns about fraud, it

---

lull his victims," Mr. Pooley "falsely represented to at least some candidates that he would submit the USPA . . . and UPT [paperwork]"); Gov't Closing Arg., Tr. of May 23, 2024 at 13:13-18 ("And then after the course when [Fabian Munoz] didn't get paperwork and Fabian Munoz was following up with [Mr. Pooley] over and over, Pooley told him, 'No, no, don't report me to USPA. I'll get the paperwork to you tomorrow.'  You can infer that was false.  He didn't do it.  He didn't intend to."); *id.* at 11:15-19 ("Pooley knew he couldn't send the paperwork in to USPA or UPT.  Yuri was out of the country.  Submitting the paperwork would raise red flags, would blow the whole scheme up and put a stop to the classes and Pooley's income stream.").  Thus, in the light most favorable to the government, it would not matter to the success of the scheme whether Mr. Garmashov's signature was on the paperwork or not, because Mr. Pooley never intended to submit it to USPA or UPT.

"raised eyebrows" about the legitimacy of the paperwork.[9]  *See id.*  Regardless, placing a means of identification "within the scope" of a fraud does not render it "at the crux" of that fraud. *Dubin* "requires more than just that the means of identification was used during the fraud." *See United States v. Sheppard*, 2024 WL 2815278, at*8 (S.D. Fla. June 3, 2024).  *Dubin* requires that the signature be used during the fraud *and* that it be at the crux of that fraud.  These are two distinct inquiries that the government attempts to conflate into one.

Courts have rejected similar arguments to the ones the government makes here.  For example, in *Sheppard*, the court granted a motion for judgment of acquittal on aggravated identity theft counts even though the defendant forged a signature and the signature "lent credibility to the [underlying wire] fraud." *Id.*at *14.  In that case, the defendant submitted fraudulent applications for loans to the Small Business Association. *Id.* at *1.  The applications required applicants to provide their businesses' average monthly payroll expenses and number of

---

[9] The government suggests incorrectly that witness Fabian Munoz threatened to go to the authorities to report Mr. Pooley because he never received Mr. Garmashov's signature, while other candidates were "lulled" by Mr. Garmashov's signature. *See* Opp. at 6.  The testimony actually revealed the opposite: that Mr. Munoz's negative reaction resulted in part from seeing Mr. Garmashov's signature. *See* Testimony of Fabian Munoz, Tr. of May 17, 2024 at 47-48. Mr. Munoz saw the signature on someone else's forms and found it "strange" that a person not involved in the course had signed. *Id.* at 28:7-15 ("Q. The person whose signature you saw on that card, had they been involved in your course?; A. I never saw him.; Q. Did that strike you as being strange?; A. Definitely.; Q. Why did it strike you as being strange?; A. Because the -- usually, the people that do the course are the ones that sign the documents, and those would be the people that participated in all the classes.").  The government suggests that if Mr. Pooley had given Mr. Munoz the "lulling" signature of Mr. Garmashov, Mr. Munoz would not have threatened to go to the authorities. *See* Opp. at 6.  But actually Mr. Munoz testified that he would not have accepted Mr. Garmashov's signature. *Id.* at 48:16-23 ("Q. Did you talk to Mr. Pooley about someone else's signature on the cards [of another person in the course]?; A. Yes. I told him that I did not need the signature from someone else, that I needed his signature, the one who had given me the class.; Q. And why did you tell him that?; A. Because I saw -- I noticed that the documents that other people had were not the ones that I needed.").  The signature was the opposite of lulling.  It raised red flags and called into question whether Mr. Pooley was indeed a tandem examiner – because if he was, why did he need someone else to sign off as tandem examiner?  The signature was not lulling to the other witnesses either.  Bradley North testified that he thought it "strange" to have Mr. Garmashov's signature on his paperwork, but that he was satisfied by Mr. Pooley's reassurance that everything was fine. *Id.* at 151-152.  In the light most favorable to the government, it was Mr. Pooley's assurances – not the signature of Yuri Garmashov – that "lulled" the witnesses.

employees. *Id.* at *4.  In support of his applications, the defendant submitted tax returns containing false payroll figures and business information. *Id.*

The tax returns were supposedly signed by a Mr. Cupersmith, the defendant's tax preparer. *Id.*  However, Mr. Cupersmith had neither prepared nor signed the forms; the defendant himself had forged his tax preparer's signature. *Id.*  The jury convicted the defendant of wire fraud for submitting applications containing false payroll and business information and for aggravated identity theft in using the tax preparer's forged signature. *Id.* at *1.

The *Sheppard* court granted a motion for judgment of acquittal on the aggravated identity theft counts, holding that although the defendant had forged the signature, the signature itself was not at the crux on the fraud on the Small Business Association. *Id.* at *14.  Said differently, the forged signature of the tax preparer was not "at the heart of the deception." *Id.*  At the heart of the deception, the court concluded, was the false payroll and business information on the tax returns. *Id.* at *13.  Signing those forms with a real tax preparer's name[10] "lent credibility" to the false statements, but the signature itself was not a "key mover" in the fraud. *Id.*

Like in *Sheppard*, even if Mr. Garmashov's signature somehow lent credibility to the falsehoods to the candidates or lulled them into thinking all was fine, it was not "at the heart of the deception." *See id.*  The signature here was even farther afield of the "heart of the deception" than the signature in *Sheppard*.  Indeed, the signature at issue in *Sheppard* was on the very

---

[10] As here, the government in *Sheppard* argued that it was important to the fraud scheme that the defendant used Mr. Cupersmith's name and signature and not the name and signature of someone else. *Id.* at *13; Opp. at 4 ("It also mattered for purposes of the fraud scheme that it was Garmashov's signature in particular . . . .").  The *Sheppard* court rejected that argument, reasoning that although the signature misrepresented "who" was involved and lent credibility to the false payroll statements, the signature still was not central to the fraud. 2024 WL 2815278, at *11, *14.  The *Sheppard* court's analysis is consistent with *Dubin*, where it indeed mattered whose identities were used in the false billings. *See Dubin*, 599 U.S. at 137 (Gorsuch, J., concurring) ("Mr. Dubin could not have successfully billed the insurance provider without accurately offering up some specific patient's name and information.  Nor, as the United States notes, could Mr. Dubin have simply drawn a random name from a hat.  Rather, his fraud depended on purloining the specific identity of a 'Texas Medicaid enrollee who had at least three hours of psychological-testing reimbursement left in his or her account.'") (citation omitted). This court should equally reject the government's similar argument here; this is not aggravated identity theft just because "[i]t mattered" that the forms contained Mr. Garmashov's signature instead of someone else's.  *See* Opp. at 4.

documents meant to convince the victims to part with money. *See id.* at 4. Here, in contrast, the signature was on paperwork Mr. Pooley provided to some but not all of the candidates after the misstatements, deception, and payment had already occurred. If the signature in *Sheppard* was not "at the crux" of the fraud on the applications, Mr. Garmashov's signature equally was not at the crux of the fraud on the tandem instructor candidates.

### III. CONCLUSION

Even in the light most favorable to the government, the signature was at most an ancillary feature of the fraud on the candidates. The Supreme Court directs that an aggravated identity theft conviction cannot stand in these circumstances. The Court should enter a judgment of acquittal as to Count 5.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Date: July 2, 2024

*/s/ Mia Crager*
MIA CRAGER
MEGHAN McLOUGHLIN
Assistant Federal Defenders
Attorneys for Defendant
ROBERT POOLEY