PHILLIP A. TALBERT
United States Attorney
DHRUV M. SHARMA
KATHERINE LYDON
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>      v.<br><br>ROBERT ALLEN POOLEY,<br><br>              Defendants. | CASE NO. 2:21-CR-00111-WBS<br><br>**UNITED STATES' RESPONSE TO POOLEY'S FORMAL OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT**<br><br>SENTENCING DATE: September 30, 2024<br>TIME: 10:00 a.m.<br>COURT: Hon. William B. Shubb |

**INTRODUCTION**

On May 24, 2024, a jury found Pooley guilty of three counts of wire fraud and two counts of aggravated identity theft for certifying skydivers to lead tandem skydives despite being unqualified to do so, and using another person's signature on certification documents to give them the appearance of legitimacy.[1] His offense enabled unqualified, uncertified skydivers to lead tandem skydives, and resulted in his students conducting tandem jumps with members of the public despite lacking the qualifications to do so. On August 6, 2016, one of Pooley's unqualified, poorly trained students died in a tandem skydive with a customer, 18-year-old T.T. The accident was attributed to the student's inability to address a minor malfunction with the parachute, which is a skill the student should have been taught by, and under the supervision of, a qualified teacher. Pooley's offense clearly exposed his students and the broader public

---

[1] The Court subsequently entered Judgements of Acquittal as to one count of wire fraud and both counts of aggravated identity theft.

to the conscious or reckless risk of death or serious bodily injury, a risk that ultimately manifested in two fatalities. For the reasons stated herein, the Court should overrule Pooley's objection, and apply the sentencing enhancement recommended by Probation.

## FACTUAL BACKGROUND

A.  **Tandem Skydiving is an Inherently Dangerous Activity. Federal Regulations and Industry Guidelines Exist to Enhance Safety.**

Tandem skydiving is a form of skydiving where a first-time or novice skydiver (often a paying member of the public) jumps in tandem with, and harnessed to the front of, a more experienced skydiver (known as a Tandem Instructor) who controls all operation of the parachute. Skydiving is an obviously dangerous activity; tandem skydiving further exposes to risk inexperienced members of the public who wholly rely on their Tandem Instructors to get them down safely. Adding to that risk is the fact that tandem skydiving is very different from solo skydiving, meaning that even experienced skydivers require specialized training in order to safely lead tandem jumps. This is because tandem skydiving involves new and different gear, is physically demanding, and introduces variables such as a customer's weight and body positioning. (*See* Exhibit 1 at POOLEY_00032964; *see also* Exhibit 2 at POOLEY_00028915).

Because of these inherent risks, tandem skydiving is a federally regulated activity. *See* 14 C.F.R. § 105.45; *see also* Parachute Operations, 66 FR 23543-01 ("Through this rule, the FAA intends to enhance the safety of parachute operation in the National Airspace System"). These regulations require, *inter alia*, that the person leading the tandem jump: (i) have a minimum of three years of experience in parachuting; (ii) complete a minimum of 500 freefall parachute jumps; (iii) possess a master parachute license issued by an organization recognized by the FAA; and (iv) complete a tandem instructor course given by, and be certified by, the manufacturer of the tandem parachute system. *See* 14 C.F.R. § 105.45(a)(1).

The United States Parachute Association (USPA) is the only organization recognized by the FAA to issue the master parachute license required by section 105.45 (which it calls a D-license) and has developed a course to teach students how to safely lead tandem jumps. (*See* Exhibit 1 at POOLEY_00032964). The course is called a Tandem Instructor Rating Course, and results in the issuance of a Tandem Instructor rating, which is the most recognized rating in the world and coveted by skydivers globally. (*See id.*) The USPA's emphasis on safety is reflected in its thorough requirements to become a

USPA Tandem Instructor, which include, *inter alia*, a D-license, 500 jumps, a minimum of three years' experience in parachuting, five practice tandem cutaways wearing tandem equipment with a simulated student in the harness, and completion of the Tandem Instructor Rating Course, including training on tandem jumping equipment. (*See* Exhibit 3 at POOLEY_00025202 ("What is a Tandem Instructor?"); *see also* POOLEY_00025204-25205 ("What is Required to Pass This Course?")). A Tandem Instructor Proficiency Card lists all necessary training activities to pass the course, including safety-specific exercises like conducting tandem cutaways, establishing and maintaining stability throughout training tandem jumps, and recovering from instabilities on exit. (*See id*. at POOLEY_00025404-25405). The course can only be taught by a certified Tandem Examiner, and a Tandem Examiner must sign off on the Proficiency Card, attesting that he/she has "personally examined and recommend(s) this applicant for a USPA Tandem Instructor Rating" and that the student has "demonstrated the ability to train and jump with tandem students". (*See id*. at POOLEY_00025203 ("Who May Conduct This Course?"); POOLEY_00025405). The USPA has additional, stringent requirements for a person to be certified as a Tandem Examiner, including at least 500 actual tandem jumps, at least 50 solo student jump courses, 10 evaluation tandem jumps under the supervision of another Examiner, and the completion of an Examiner Rating Course. (*See id*. at POOLEY_00025203).

Similarly, United Parachute Technologies (UPT), a manufacturer of tandem parachute systems, issues a Tandem Instructor rating attesting to the completion of the course required by section 105.45. *See* 14 C.F.R. § 105.45(a)(1) (iv)-(v). Completion of this course requires at least 50 jumps in the last year, 3 years' experience, a number of training modules, and at least five jumps under the direct supervision of a qualified and currently rated Examiner. (*See* Exhibit 4 at POOLEY_00018955). UPT specifically requires Examiners to be present during the execution of the five certification jumps, and present and participating during all certification processes. (*See id*. at POOLEY_00018996 ("Your Role during Certification Jumps.")) At the end of the five certification jumps, an Examiner is expected to sign off on a UPT Tandem Instructor Certification Form. (*See e.g.* Exhibit 5 at POOLEY_00029464).

**B.     Pooley Had a Poor Disciplinary Record as an Examiner and was Suspended in 2014 and 2015.**

Between 2010 and 2015, Pooley held a Tandem Examiner rating for USPA and UPT, but

demonstrated a poor disciplinary record. In February of 2014, Pooley was suspended by USPA and UPT for failing to verify that one of his students had been skydiving for the minimum 3 years, an important safety regulation mandated by section 105.45. (*See* Exhibit 6). Not only did this mean that the student had insufficient experience to take the Tandem Instructor course with Pooley, but UPT also discovered that the student lacked a "Coach" rating, a prerequisite to the Tandem Instructor course that Pooley failed to verify. (*See* Exhibit 7). UPT noted that, as a result of Pooley's negligence, "there is a skydiver out there that has not met the standards for certification but has both been shown how to use the equipment and probably believes that they now possess the appropriate rating to do so" and that the fact that "he is now apparently skydiving in Mexico and out of reach, makes this issue even more troublesome." *Id*. As a result of this violation, Pooley was required to take a re-certification course in order to resume his Examiner rating, which he did. *Id*.

In April of 2015, USPA received allegations that Pooley was abusing prescription pills and began an inquiry. (*See* Exhibit 1, Spreadsheet attachment). It closed out the inquiry after speaking with him and receiving a letter from Pooley's medical provider stating that he was no longer using prescription medication. (*Id*.)[2] Barely two months later, in June of 2015, USPA discovered that Pooley failed to properly complete a student's paperwork and had approved a Tandem Instructor renewal application despite the student not possessing an FAA medical clearance. (*See* Exhibit 8). Notably, Pooley had violated these requirements only two months after completing his re-certification in 2014 for his prior violation. (*Id*.) USPA subsequently suspended Pooley's Tandem Examiner rating for one year beginning July 26, 2015, for "ongoing errors in candidate paperwork, and violating the USPA Basic Safety requirements by training USPA members to conduct tandem jumps without a USPA Tandem Instructor rating or valid medical." (*See* Exhibit 9). In reciprocity, UPT suspended him as well. (*See* Exhibit 10).

---

[2] Notably, this is around the same time that Galt Police Department arrested Pooley for trespassing and found in his truck a large amount of cash and four pill bottles of a prescription pain medication, Tramadol. Pooley's ex-wife told police that Pooley had a problem with pain pills, and Pooley admitted to buying the pills from a friend who in turn bought them in Mexico. (*See* PSR, ¶ 56). Tramadol is a controlled substance because of its potential for misuse and addiction. *See* "Tramadol" in the National Library of Medicine, National Center for Biotechnology Information, available at: https://www.ncbi.nlm.nih.gov/books/NBK537060/#:~:text=Since%20July%202014%2C%20the%20FDA,such%20as%20nonopioid%20pain%20medication

U.S. RESPONSE TO POOLEY'S OBJECTION TO PSR        4

Pooley acknowledged the terms of his suspension and that the courses needed to be run by another Tandem Examiner in an email exchange that he had with USPA's representative. (*See* Exhibit 11).

### C. Pooley Continued to Run Instructor Courses, Which Were Poorly Taught. He Falsely Certified Students Using Another Examiner's Signature, and Some of His Students Began Tandem Skydiving with Customers.

Despite his suspensions, Pooley continued running Tandem Instructor Ratings courses in 2015 and 2016. Students came from all over the world to attend his courses in the summer of 2016, unknowing of his suspension but relying on his promised expertise. One victim, Brad North, was intimidated by how tandem skydiving was different from solo skydiving, and thus sought expertise and training from someone who would provide honest feedback, trusting Pooley's assertion that he held a valid Tandem Examiner rating. (*See* Exhibit 2 at POOLEY_00028915; *see also* PSR ¶ 21). At the completion of the course, Pooley provided North with USPA and UPT Tandem Instructor certification documents that contained the pre-printed signatures of fellow Examiner Yuri Garmashov in order to get around the terms of his suspension. (*See* Exhibit 2 at POOLEY_00028916; *see also* Exhibit 5). Specifically, Pooley used Garmashov's signature to falsely attest to North's completion of five certification tandem jumps and a number of other training requirements, including safety-oriented exercises like recovering from instabilities and correctly rigging a student for a tandem jump. (*See id.*) North described Pooley as providing the absolute minimum training and felt that some students required additional training. (*See* Exhibit 2 at POOLEY_00028916). He also observed some of his classmates begin tandem skydiving with paying customers immediately after completing the course. (*Id.*)

Similarly, Fabricio Palomino traveled from Mexico to take a Tandem Instructor course with Pooley, which he understood could only be taught by a certified Tandem Examiner. (*See* Exhibit 12; *see also* PSR ¶ 22). Although Pooley invited Palomino to the course, Pooley did not participate in Palomino's course whatsoever, except showing up on the last day to do a jump with him and collect payment. (*Id.*) Even though he had no involvement in teaching or supervising Palomino's training, Pooley provided him with USPA/UPT certification documents, again falsely certified using Garmashov's signature. (*Id.*)

A third victim, D.O., described Pooley as inconsistent during the course, noting that there was no structure and that he would periodically be unavailable. (*See* Exhibit 13; *see also* PSR ¶ 23). He

specifically noted that Pooley did not go through emergency procedures in training. (*Id.*) D.O. also took the course because he understood Pooley to have a valid Examiner rating, and received paperwork pre-signed with Garmashov's signature. (*Id.*)

Fabian Munoz also took Pooley's course, relying on his explicit representation that he was a Tandem Examiner. (*See* Exhibit 14; *see also* PSR ¶ 25). Although Pooley reviewed a manual with his students and provided some training, he did not ultimately certify Munoz's paperwork. (*Id.*) Munoz stated that Pooley required everyone in his class to conduct a tandem jump with a paying customer to complete the course, and that Munoz did so, even though none of the students had been issued valid Tandem Instructor ratings at that point. (*Id.*) Munoz later re-trained with a different examiner and noted that the training was far better and more thorough, with the other examiner answering his questions and providing training on landing procedures. (*Id.*)

M.M. was another of Pooley's students that summer. (*See* Exhibit 15). He could not recall receiving any hands-on instruction or training from Pooley, who did not participate in any of his training jumps. (*Id.*) M.M. also received pre-signed paperwork containing Garmashov's signature. (*Id.*) Like Munoz, when M.M. later recertified, he felt reassured when his new examiner spent several hours teaching emergency procedures in a structured format whereas Pooley's course was conversational and checklist oriented. (*Id.*)

**D.     One of Pooley's Students Died in a Tandem Accident, Along with a Customer**

Pooley also taught YongHyeon Kwon that summer. (*See* Exhibit 16). Like his other students, Pooley used Garmashov's signature to falsely attest to the various training requirements, including the false attestation that Garmashov had "personally examined" and recommended Kwon for a Tandem Instructor rating. (*See* Exhibit 17). The quality of Kwon's training raised concerns with his fellow students. (*See* Exhibit 2 at POOLEY_00028916). But, certifications in hand, Kwon began jumping with paying customers. (*See* Exhibit 12, where Palomino confirms seeing Kwon jump with customers). On August 6, 2016, Kwon jumped with an 18-year-old customer, T.T. Neither man survived that jump. (*See* Exhibit 18).

An analysis of video footage captured of the jump by Peter Swan, an experienced skydiver with a master parachute license and a Tandem Instructor certificate, revealed that Kwon suffered a minor, but

known, malfunction with a component of the tandem parachute known as a drogue. (*See* Exhibit 19, at POOLEY_00026281, POOLEY_00026289-26292; *see also* Exhibit 18 at 00000083). A drogue parachute is a small parachute designed to stabilize and slow descent before the main parachute can be deployed. (*See* Exhibit 19 at POOLEY_00026289). In this case, the drogue to Kwon's parachute did not adequately deploy. Standard operating procedure calls for the drogue to be released when this happens, which should cause the main parachute to then be deployed. (*Id*. at POOLEY_00026289-90). Kwon, instead, tried to release the main parachute, which had not even been deployed. (*Id*. at POOLEY_00026291). Failing that, he then deployed his reserve, emergency parachute. (*Id*.) The reserve parachute opened into the drogue and became entangled, resulting in the pair plummeting to the ground, effectively with no parachute to slow their fall. (*Id*. *Id*. at POOLEY_00026291-92). Swan concluded that Kwon did not follow proper procedure, which is something that should have been taught in his Tandem Instructor course. (*Id*.)

About a week after the accident, Pooley came to Swan's workshop, visibly upset. (*See* Exhibit 19 at POOLEY_00026300-26301). Unsolicited, Pooley told Swan that the owner of the skydiving center had complained that the Tandem Instructor course was taking too long, and had told Pooley to speed up training, stating that the students did not need to know all safety protocol. (*Id*.) Swan interpreted Pooley's statements as an excuse for providing Kwon and other students with poor safety training. (*Id*.)

In the days following the accident, the FAA investigated and issued a report. It found that Pooley had conducted an unauthorized Tandem Instructor course with Kwon despite the suspension of his rating. (*See* Exhibit 20). Although Kwon's certification documents had purportedly been signed by Garmashov, this was impossible as Garmashov had not even been in the country that summer. (*Id*.) As a result, at the time of the accident, Kwon had not completed a course given by, and had not been certified by, the manufacturer of the tandem parachute, a violation of section 105.45. (*Id*.) The FAA concluded that Pooley demonstrated "recklessness, carelessness and lack of concern for life" by enabling Kwon to jump without emergency procedure training or appropriate certifications. (*See id*. at POOLEY_00022202; *see also* PSR, ¶¶ 28, 31).

The USPA conducted its own investigation and also determined that Pooley did not provide emergency procedure training to multiple Tandem Instructor candidates. (*See* Exhibit 1 at POOLEY_00032965; *see also* Exhibit 21 at POOLEY_00001393). Ultimately, this lack of confidence in

his teachings led USPA to determine after the accident that Pooley's students had not been properly taught and required all the involved tandem instructors and candidates to either undergo a refresher course or a full, new tandem instructor course. Approximately 140 students were impacted. (*See* Exhibit 22).

## LEGAL AUTHORITY

The Sentencing Guidelines provide for a 2-level sentencing enhancement, or an increase to level 14, if the offense involved "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16). This guideline "focuses on the defendant's disregard of risk, rather than on the result," and, accordingly, "the Government need not show actual injury to any particular victim." *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir. 2018) (citing *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015); *see also United States v. Johansson*, 249 F.3d 848, 861 (9th Cir. 2001). A "defendant does not have to subjectively know that his conduct created the risk," *Johansson*, 249 F.3d at 859; rather, the enhancement is applicable when the risk "would have been obvious to a reasonable person." *United States v. Hernandez*, 606 F. App'x 230, 234 (5th Cir. 2015) (collecting cases).

This enhancement has frequently been applied in cases that involve the falsification of records. For example, it was applied against a trucking business owner for falsifying records to conceal violations of federal regulations designed to limit driver fatigue by limiting the number of hours drivers may drive. *Johansson*, 249 F.3d at 859-860. Similarly, it was applied against a defense contractor entity for falsely certifying that aluminum alloy parts it supplied for installation in military aircraft had been subjected to heat treating and testing as required by contract. *See United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 992 (9th Cir. 2001). It was applied against a corrections officer who falsified reports indicating that safety checks and counts had been performed when they had not. *Hernandez*, 606 F. App'x at 235-236. And it has frequently been applied in health care fraud cases. *See e.g. United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014) (health care provider certified patient charts falsely indicating he had supervised examinations performed); *United States v. Awad*, 551 F.3d 930, 941 (9th Cir. 2009) (doctor falsified billing records and failed to supervise administration of respiratory treatments).

## ARGUMENT

**A.     Pooley's Flouting of FAA Regulations Directly Placed His Students at Risk of Harm**

In running Tandem Instructor courses without the necessary qualifications, and then falsely

certifying training records, Pooley's actions resulted in the violation of FAA regulations specifically designed to make tandem skydiving a safer activity. Section 105.45's core purpose is to enhance safety, and it does so by imposing strict experience and training requirements on skydivers leading tandem jumps. Pooley's fraud violated specific provisions of, and undermined the very purpose of, this section. Because he was suspended, his students did not complete "a tandem instructor course given by the manufacturer of the tandem parachute system used in the parachute operation or a course acceptable to the Administrator," nor were they "certified by the appropriate parachute manufacturer or tandem course provider as being properly trained on the use of the specific tandem parachute system to be used." *See* 14 C.F.R. § 105.45 (a)(1)(iv)-(v). Simply put, Pooley's fraud caused violations of federal regulations designed to ensure the safe operation of tandem parachute systems.

This is similar to the conduct underlying the application of the enhancement in the cases discussed above. For example, in *Johansson*, the Ninth Circuit upheld the enhancement where a trucking business owner falsified records to conceal violations of federal safety regulations on hours of driving. *See Johansson*, 249 F.3d at 859-860. Noting that the regulations are designed to limit fatigue and reduce accidents, the Court disregarded the fact that there was no actual evidence that a driver was ever fatigued on any particular occasion, or that the defendant's company had a better than average safety record, instead focusing on the risk created when safety regulations are flouted. *Id.* at 861. Like *Johansson*, Pooley's conduct violated an important safety regulation governing tandem parachuting: the requirement that skydivers leading tandem jumps complete a course given by (and be certified by) the manufacturer of the parachute; a course that can only be taught by certified Examiners. Pooley's conduct created the risk that skydivers not qualified or certified on the operation of tandem parachutes would engage in tandem skydives, which is exactly what happened with some of his students, including Kwon.

**B.** **Pooley's Violations of USPA/UPT Rules Resulted in Students Not Receiving Training Under the Supervision of a Qualified Examiner**

Further, because Pooley was suspended, his students did not complete a USPA Tandem Instructor course under the supervision of a Tandem Examiner, as required. Practically, this meant that when they completed their training activities, they were not supervised by a teacher who had satisfied the necessary training, experience and performance safeguards designed to ensure the safety of the students and their

1 passengers. (*See* Exhibit 3 at POOLEY_00025203, "How to Become a Tandem Instructor Examiner) (describing stringent training and experience requirements of Examiners). For example, the students were not supervised by an Examiner when they practiced tandem cutaways wearing tandem equipment, nor when they demonstrated the ability to recover from instabilities on exit. (*See id*. at POOLEY_25405). They were not appropriately evaluated on their understanding of tandem jumping equipment and how to safely prepare and handle tandem students. (*See id*. at POOLEY_00025204).

Similarly, Pooley's fraud meant that his students were not appropriately supervised when they strived to satisfy UPT's training requirements. They did not conduct the necessary five training jumps under the direct supervision of a qualified and currently rated Examiner. (*See* Exhibit 4 at POOLEY_00018955). Nor were they trained by an Examiner who was "present and participating during all certification processes." (*Id*. at POOLEY_00018996).

Objectively, Pooley's flouting of nearly every safety-related rule attached to tandem skydiving exposed his students to the high probability that they were improperly trained, which, in an inherently dangerous sport like tandem skydiving, directly exposed them to the conscious or reckless risk of death or serious bodily injury. Because of his suspension, he simply lacked the qualification that he needed to teach his students the various components of the courses, including all the safety-related exercises, and he side-stepped nearly every guardrail in place to ensure the safety of tandem skydivers. And, because of his "rubber stamping" of certification documents, his students were not appropriately supervised in the completion of their training regimen, increasing the risk that they were improperly trained.

C. **Pooley's False Certifications Enabled His Students to Engage in Tandem Skydives.**

Pooley's false certifications were not mere paperwork inconsistencies, as he attempts to minimize. The falsified records enabled skydivers that had been improperly supervised and trained to take members of the public on tandem skydives. To his students, who sought out his expertise as an Examiner and relied on his false representations that he was one (implying his compliance with the stringent requirements to become one), his certifications conveyed that they had been trained and properly supervised by a certified Examiner in the completion of all requirements needed to safely take customers on tandem jumps. On the contrary, any training they received was not supervised by a qualified Examiner. Indeed, several students observed that the training was sub-standard (one describing it as the absolute minimum) and specifically

U.S. RESPONSE TO POOLEY'S OBJECTION TO PSR        10

lacking in emergency procedure training. Some indicated that Pooley did not participate in their training at all, even though he falsely certified their documents. Making matters worse, Pooley used pre-printed signatures to certify the documents, further establishing the absence of any real-time supervised training. Yet, because they had received certifications purportedly signed by an Examiner, these students were enabled to perform tandem skydives, notwithstanding the risk that their training may have been deficient.

One of these falsely certified skydivers was Kwon. Below is a portion of Kwon's Tandem Instructor Rating Course Proficiency Card, listing the specific training activities that Pooley falsely certified:

More specifically, Pooley used Garmashov's pre-printed signature to falsely certify that Kwon had adequately demonstrated five practice tandem cutaways to the satisfaction of an Examiner, or that he had been supervised conducting "basic group freefall skills," or that he had demonstrated the ability to "[e]stablish and maintain stability throughout the jump." Pooley falsely attested that a certified Examiner had "personally examined" Kwon's training, and that Kwon had demonstrated "the ability to train and jump with tandem students" to that Examiner. The attestations on this card validated a level of skill and training that had purportedly been demonstrated to the satisfaction of a certified Examiner. Yet, each one of those attestations was false, as the signing Examiner, Garmashov, had not been involved in Kwon's training whatsoever.

Not only did Pooley's courses result in uncertified students being enabled to lead tandem jumps, but several of his students actually took customers on tandem jumps after being falsely certified. At least one student, Munoz, indicated that he had been required to do so in order to pass the course. Relying on these certifications and on ratings they never received, these students exposed not just themselves to tremendous risk, but also innocent members of the public who trusted their very lives in the hands of their Tandem Instructors. It resulted in members of the public, like T.T., going on tandem skydives with Pooley's students, having taken what they thought was an informed risk, but that in reality was an uninformed decision. Ultimately, Pooley's fraudulently-run courses resulted in Kwon and T.T. jumping in tandem on that fateful day – but for the fraud, Kwon would not have possessed the paperwork he needed to conduct the tandem jump that resulted in his and T.T.'s deaths.

Going further, in fact, there is sufficient evidence to indicate that Kwon's poor training led to the accident. The accident was attributed to Kwon's failure to perform a release of the drogue parachute when it malfunctioned, which Swan described as a minor malfunction that Kwon should have been taught to address in his course. In other words, had Kwon taken a legitimate USPA Tandem Instructor course, he would have learned how to address this malfunction under the supervision of, and to the satisfaction of, a certified Examiner in order to obtain his rating. But, because Pooley was not a certified Examiner, and because there was no other certified Examiner involved in his training, Kwon's ability to address this malfunction was not appropriately supervised (if the skill was taught at all). Pooley essentially acknowledged that the accident was a result of poor training when he spoke to Swan and attempted to

blame the skydiving center's owner for cutting corners on "safety stuff."

In sum, Pooley's fraudulent courses enabled students who had received inadequate, improperly supervised training to lead tandem skydives with the public. His offense clearly exposed his students and their customers to the risk of death or serious bodily harm, and that risk was manifested into reality when Kwon took T.T. on the tandem jump that resulted in their deaths.

### D. Pooley Consciously and Recklessly Disregarded the Risk Associated With His Offenses.

The risk in flouting safety rules and regulations and in enabling skydivers to be trained without appropriate supervision is obvious to a reasonable person, which in itself establishes that Pooley's conduct was conscious and/or reckless. *See Hernandez*, 606 F. App'x at 234. But Pooley's culpability is enhanced by the fact that he had been caught violating these regulations on two prior occasions and had been reeducated on the safety-related consequences of his actions. In 2014, he was advised that his failure to verify the experience level or training pre-requisites for one of his students meant that an unqualified skydiver was engaging in tandem skydiving in Mexico. As a result of this violation, Pooley was required to take a re-certification course. Then, in 2015, he was suspended for violating basic safety requirements by failing to properly complete training documents and for renewing a student's credentials even though the student did not have a valid FAA medical clearance. His suspension reflected the leading industry organizations' loss of confidence in Pooley's ability to be an Examiner.

This fact refutes the assertion in his objection that the "quality" of his training was consistent and not to blame. What was consistent was Pooley's inability to follow safety rules and regulations. Stated plainly, on at least two prior occasions, Pooley improperly enabled a student to lead jumps as a Tandem Instructor, which is exactly what he did through his unauthorized courses in 2016. Despite his retraining, and the fact that he had been previously reprimanded twice, his decision to nonetheless continue Tandem Instructor courses after his 2015 suspension reflect a conscious decision to disregard the risks involved.

### E. Pooley's Reliance on *Holmes* is Unavailing

Pooley cites *United States v. Holmes*, 2023 WL 149108 (N.D. Cal. Jan. 10, 2023) for the proposition that the risk of death or serious injury was too attenuated from his conduct to justify the sentencing enhancement. His reliance on *Holmes* is unavailing. The defendant in *Holmes* was convicted

of conspiracy and wire fraud towards investors in her company, Theranos, that sought to produce and mass-market a blood-testing device that did not perform as represented. *Id*. at *10. Stressing that the defendant was acquitted of all charges relating to the users/patients of her company's devices, the court held that the "link between the convicted crime, i.e. conspiracy to [] defraud investors, is too attenuated to connect Ms. Holmes to the risk of death or serious bodily injury to the patients receiving Theranos' blood tests" and that the government had not shown "evidence that Ms. Holmes disregarded the risk of harm to Theranos patients when she committed the conduct for which she was convicted, i.e., making fraudulent misrepresentations to Theranos investors." *Id*.

Pooley's conduct in this case is easily distinguishable. Unlike Holmes, Pooley was not convicted of defrauding investors, but the Tandem Instructor candidates who then engaged (or would reasonably be expected to engage) in tandem jumps with paying customers. There is a direct connection between his conduct and the risk of death or serious bodily injury to the students he falsely certified as Tandem Instructors, and to their customers. *Holmes* offers Pooley no reprieve and should be disregarded by the Court.

## CONCLUSION

For the reasons stated herein, the Court should overrule Pooley's objection, and adopt Probation's recommendation to apply the enhancement provided by section 2B1.1(b)(16).

Dated:  September 23, 2024                                    PHILLIP A. TALBERT
                                                              United States Attorney


                                                     By:   /s/ DHRUV M. SHARMA
                                                              DHRUV M. SHARMA
                                                              Assistant United States Attorney