# EXHIBIT A

## <u>SPECIAL CONDITIONS OF RELEASE</u>

Re: Pooley, Robert Allen
No.: 2:21-CR-00111-1
Date:June 22, 2021

1. You must report to and comply with the rules and regulations of the Pretrial Services Agency;

2. You must reside at a location approved by the pretrial services officer and not move or absent yourself from this residence for more than 24 hours without the prior approval of the pretrial services officer;

3. You must cooperate in the collection of a DNA sample;

4. You must restrict your travel to the Eastern District of California unless otherwise approved in advance by the pretrial services officer;

5. You must not apply for or obtain a passport or any other travel documents during the pendency of this case;

6. You must not possess, have in your residence, or have access to a firearm/ammunition, destructive device, or other dangerous weapon; additionally, you must provide written proof of divestment of all firearms/ammunition currently under your control;

7. You must refrain from excessive use of alcohol or any use of a narcotic drug or other controlled substance without a prescription by a licensed medical practitioner; and you must notify Pretrial Services immediately of any prescribed medication(s). However, medicinal marijuana prescribed and/or recommended may not be used; and,

8. You must report any contact with law enforcement to your pretrial services officer within 24 hours.

# EXHIBIT B

CERTIFIED TRUE COPY

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                   BEFORE THE HONORABLE
         WILLIAM B. SHUBB, DISTRICT JUDGE PRESIDING

4    _____

5    UNITED STATES OF AMERICA,        )  Case No. 2:21-cr-00111-WBS-1
                                      )
6    Plaintiff,                       )  Sentencing
                                      )
7              v.                     )  Date: 9/30/2024
                                      )
8    ROBERT ALLEN POOLEY,             )
                                      )
9    Defendant.                       )
                                      )
10   _____

11             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12                   Pages 1 through 73

13   APPEARANCES:

14   For the Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                              501 I Street
15                            Suite 10-100
                              Sacramento, California 95814
16                            By:  KATHERINE THERESA LYDON, ESQ.
                              By:  DHRUV M. SHARMA, ESQ.
17
     For the Defendant:       OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                            801 I Street
                              Third Floor
19                            Sacramento, California 95814
                              By:  MIA CRAGER, ESQ.
20                            By:  MEGHAN McLOUGHLIN, ESQ.

21   OFFICIAL REPORTER:       Abigail R. Torres, CSR, RPR/RMR, FCRR
                              CSR No. 13700
22                            United States District Court
                              Eastern District of California
23                            501 I Street, Suite 4-100
                              Sacramento, California 95814
24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

1    **SACRAMENTO, CALIFORNIA; MONDAY, SEPTEMBER 30, 2024; 10:00 A.M.**

2                     -oOo-

3         THE CLERK:  Calling Item 3, Criminal 21-111, *United*

4   *States v. Robert Allen Pooley.*

5         Counsel, your appearances, please.

6         MS. LYDON:  Good morning, your Honor.

7         Kathryn Lydon and Dhruv Sharma on behalf of the United

8   States.

9         MS. CRAGER:  Good morning, your Honor.

10         Mia Crager and Meghan McLoughlin on behalf of

11   Mr. Pooley.  He is present and out of custody.

12         THE COURT:  Thank you.

13         We had this matter previously listed as the third

14   matter on the calendar, but there have been lot of recent

15   violence in the matter that I thought we ought to address while

16   it's fresh in our mind, so we're taking it first.

17         I want to make sure that everybody got what was

18   recently filed.  There was a victim-impact statement and then

19   some response to that.

20         Did everybody receive the statements?

21         MS. LYDON:  Yes, your Honor.

22         MS. CRAGER:  Yes, your Honor.

23         THE COURT:  And the Government has responded to the

24   defendant's opposition to consideration of the statements;

25   correct?

```
 1              MS. CRAGER:  Yes, your Honor.

 2              THE COURT:  Is it your request that the victim be

 3    allowed to testify or just that the Court consider the

 4    statement?

 5              MS. LYDON:  The latter, your Honor, that they would

 6    allocute, not provide sworn testimony in some sort of

 7    evidentiary fashion but, rather, simply allocute under the

 8    CVRA.

 9              THE COURT:  And that they would address the Court

10    personally?

11              MS. LYDON:  Yes, your Honor.

12              THE COURT:  Both victims?

13              MS. LYDON:  No, your Honor.  Mr. Turner would like the

14    Government to read his statement, and Mrs. Turner would like to

15    read her statement personally.

16              THE COURT:  All right.  Now, let's discuss whether the

17    Court should hear her statement and whether the Court should

18    consider Mr. Turner's written statement.

19              What is the defendant's position?

20              MS. CRAGER:  Your Honor, the defense position, as

21    outlined in the motion to strike, is simply that this is not

22    the correct forum for this, that they are not victims of the

23    wire fraud offense that Mr. Pooley has been convicted of.  So

24    the defense is not trying to minimize the hurt that they have

25    been through and all of their pain.  The point is just that
```

1    this wire fraud case is not the correct forum for that.

2            THE COURT:  I thought there might be some merit to

3    your position when I read your brief.

4            But did you read the Government's reply?

5            MS. CRAGER:  Yes, your Honor, and I do have a response

6    to that.  The Government states that there is case law

7    interpreting the CVRA, which counsels that "the wisest course

8    of action is to allow even potential victims to allocute."

9            They cite no case law at that point in their brief on

10   page 3, and the case law they do cite doesn't say that.  The

11   case law they cite includes victims of the actual offense, some

12   of whom knew about the defendant's character and conduct.

13           In this case, the Turners, as far as I know, never met

14   Mr. Pooley and don't know anything about his character.  They

15   were not present at the trainings or any other place where he

16   was present.  So they had -- they had relevant information

17   about -- that beared [verbatim] on sentencing.

18           The second case that's cited, the *Ortiz* case, the

19   court in that case allowed victim merchants of a shoplifting

20   offense to allocute about things that were not directly related

21   to the offense but also about other losses they had suffered.

22   So there wasn't a question about whether they were victims.

23   They were certainly victims of the offense.

24           So the case law that the Government has cited does not

25   go to show that the Court should consider persons who are not

5

```
1   victims of the offense and allow them to allocute.  The point

2   is that they can talk about other things.  If they are victims

3   of the offense and if they have information about the

4   defendant's character and conduct, then the Court can hear them

5   about a broad range of topics.

6        THE COURT:  To perhaps overstate your respective

7   positions, you take the position that victims of a mail fraud

8   or wire fraud case are those who receive and rely upon the

9   fraudulent statements, and that potential victims are those

10  that might potentially rely upon those statements.

11        I think the Government's position is broader, and I

12  believe what they're saying is that anyone who could be injured

13  as a result of actions taken in reliance upon the false or

14  fraudulent statements is also a victim or potential victim.

15        Is that correct?

16        MS. LYDON:  Yes, your Honor.  That's our

17  interpretation of the CVRAs, and the articulation in *Fischer* in

18  particular, we found helpful.

19        THE COURT:  That's a complicated question because it

20  also involves some interpretation.

21        Are you saying that there are people who would be

22  injured by the statements or people who would be injured by the

23  conduct that someone might take in reliance upon the false or

24  fraudulent statements?

25        MS. LYDON:  I think the *Fischer* case is helpful in
```

1  parsing that in that it uses a "but for" test.  If the

2  defendant had not engaged in his conduct, the active

3  conviction, which in this case includes the fraudulent

4  statements, how would the world be different?

5        THE COURT:  Well, if somebody had not gotten up in the

6  morning, the world would be different than if they did, so

7  that's why we don't usually rely simply on "but for," but we

8  have a substantial-factor test and we have to determine

9  causation.

10        Are you saying that if it's anything that happens "but

11  for" the defendant's conduct?

12        MS. LYDON:  Yes.  I think that's what *Fischer* says.

13  It might not be the same test down the road when we come to

14  things like restitution, but for purposes of whether, under the

15  CVRA, someone has been harmed as a result of the defendant's

16  crime, I think *Fischer* tells us that we have a counterfactual

17  exercise about, if the defendant did not have -- commit that

18  crime, would the victim have suffered the loss that they did?

19        In this instance -- well --

20        THE COURT:  Ms. Crager, I think the best course for

21  the Court to take would be to hear what the victims -- alleged

22  victims have to say, and to consider their statements as one

23  statement, as I understand it --

24        Actually, I think there are two?

25        MS. LYDON:  Correct.

1          THE COURT:  -- and one allocution, which is not going

2     to overly burden the Court, and not make any determination as

3     to whether, in the legal sense, these people are or are not

4     victims, but I leave that up to another day.

5          MS. CRAGER:  Yes, your Honor.  I would like to briefly

6     respond to the Government's points, if I may.

7          As to the *Fischer* case, the idea that we should "use a

8     counterfactual to imagine the identical factual situation in

9     which the defendant's wrongful conduct is now corrected to the

10    minimal extent necessary" -- that's what *Fischer* says -- I

11    think it's unclear in this case what that means.

12         THE COURT:  It is.  That's one of the problems with

13    having a guideline or a case based on one set of circumstances,

14    and then trying to apply it to another situation with a

15    different set of circumstances.

16         I was just thinking of all kinds of examples when I

17    was reading your papers this morning.  If somebody had made a

18    false statement to the Government to cause him to buy a

19    particular part, and the Government had relied on that false

20    statement, bought the part, put it in an airplane, and the

21    airplane crashed; or put it in a nuclear power plant, and the

22    power plant had a major accident, under the Government's

23    interpretation of *Fischer*, I think everyone that was injured by

24    that plane crash or by that power-plant explosion would be a

25    victim.

1          Now, I'll leave that for another day because that's

2  not what we have here, but that's one of the problems with what

3  you're saying right now.  You're making that point, I think,

4  and I don't think this is the case where we need to address it.

5  That's what I'm saying.

6          MS. CRAGER:  Yes, your Honor.

7          And my last point would just be, there is -- that's a

8  Fifth Circuit case.  There is a Ninth Circuit case that we cite

9  in our brief on page 4, the *Reed* case, where the defendant, I

10 believe, possessed a firearm and then fled from police in a

11 high-speed chase, and the court ruled that someone injured in

12 that high-speed chase was not a victim of the offense because

13 it was other conduct that happened, but it wasn't directly

14 related to the offense that the defendant was convicted of.

15         THE COURT:  Another problem with relying on these

16 cases is they don't usually consider who is a victim for the

17 same purpose as we're considering it here, and there are

18 different purposes that might have to be considered when you're

19 determining whether somebody is a victim.

20         But I'm going to take the course that I mentioned

21 earlier, and I will hear both the individuals who want to

22 address the Court, and I'll consider their -- their written

23 statements.

24         Now, there's another preliminary issue here.  The

25 presentence report was prepared before the Court ruled on the

1   motion for judgment of acquittal on Count 5, and I granted that

2   motion.  Rather than have a new presentence report prepared, I

3   discussed the matter with the probation officer, and she

4   provided me with a redacted presentence report, which would --

5   would reflect how the presentence report should look without

6   Count 5, and I asked her to circulate that to both sides.

7               As I understand it, you're willing to proceed with the

8   original presentence report redacted and modified as the

9   probation officer has provided to me and to counsel, as well;

10  is that correct?

11              MS. LYDON:  Yes, your Honor.

12              THE COURT:  All right.

13              MS. CRAGER:  Yes, your Honor.

14              THE COURT:  So I would suggest that after we finish

15  and the Court makes its findings, that we have the probation

16  officer just file a new report that reflects the changes that

17  we have made.

18              MS. LYDON:  Yes, your Honor.  That makes sense.

19              MS. CRAGER:  Yes, your Honor.

20              THE COURT:  All right.  So with that in mind, let me

21  summarize what we have here, and there are numerous documents

22  before the Court even before we get to the ones that were filed

23  most recently.  I want to make sure that we're all in agreement

24  as to what the Court has here.

25              We had the presentence report before -- before the

1    Court ruled on the motion for judgment of acquittal on Count 5.

2    We had the formal objections to the presentence report filed on

3    September the 9th by defendant.  We had the Government's

4    response to the formal objections, filed on September the 23rd.

5    We had the Government's sentencing memorandum filed on that

6    same day, and the defendant's sentencing memorandum also filed

7    on that same day.  And then we had the defendant's request for

8    leave to file a reply to the Government's evidence.  A motion

9    to strike the victim-impact statement, and the Government's

10   opposition to that, which we have just addressed.

11          Does that cover everything?

12          MS. LYDON:  Yes, your Honor.

13          MS. CRAGER:  Yes, your Honor.

14          THE COURT:  All right.  Am I correct that the only

15   objection the Court needs to consider to the findings of the

16   presentence report is paragraph 41, the additional five points?

17          MS. CRAGER:  Yes, your Honor.

18          MS. LYDON:  Yes.

19          THE COURT:  All right.  So let's take a look at that.

20   This is substantial, and I don't want to minimize the

21   importance of it.

22          In paragraph 41, the probation officer states:  "The

23   defendant knew he was not certified to teach tandem instructor

24   courses or certify tandem instructor students during the time

25   of the instant offense.  Pooley's fraudulent conduct caused

1    students to believe they completed all required training and

2    were certified tandem instructors following completion of

3    courses given by the defendant.

4            "Defendant's fraud scheme caused a conscious or

5    reckless risk of death or serious bodily injury to the tandem

6    skydivers, given the inherent danger of the sport and

7    [certify]" -- "certification required.  A two-level increase

8    applies."

9            And she goes on to state that:  "As the resulting

10   offense level is less than a Level 14, five levels are added."

11           So that is what results from the application of

12   Section 2B1.1(b)(16)(A).

13           There's a lot to consider here.  It's unfortunate that

14   this is perhaps the tail that wags the dog at this stage of the

15   proceedings because of the substantial increase in the

16   guidelines that result from the application of this -- this

17   guideline.

18           There are cogent arguments on both sides of this, and

19   I want you to summarize -- I've read -- and I think the

20   probation officer and my law clerks can attest to the fact that

21   I've actually spent probably hours on this question alone.

22   I've tried to read your cases and carefully consider the

23   guideline.

24           The actual language of the guideline is a little

25   different than -- in paragraph 41 in that 2B1.1, the

1   Subsection (16) that we're considering here states:  "If the

2   offense involved...the conscious or reckless risk of death or

3   serious bodily injury," you "increase by 2 levels," and "If the

4   resulting offense level is less than...14, increase to

5   level 14."

6        The word "involved" is used.  The probation officer

7   uses the word "caused," and there's a difference.  She states:

8   "The defendant's fraud scheme caused a conscious or reckless

9   risk of death or serious bodily injury."  The guideline says to

10  increase the level "If the offense involved...the [serious] or

11  reckless risk of death or serious bodily injury."

12       I assume that both of these terms are meant to apply

13  to the state of mind of the defendant and not someone else.  So

14  I think we can probably agree on that, that we're supposed to

15  increase the level under this section if the defendant had "the

16  conscience or reckless" disregard -- although they don't use

17  the term "disregard" -- for the risk of death or bodily injury.

18       So I would like to hear from each of you summarizing

19  your position as to how this should be interpreted and how it

20  should be applied to this case.

21       And I think since the Government is asking for it, I

22  should hear from you first.

23       MS. LYDON:  Thank you, your Honor.

24       To start with Your Honor's observations -- that's a

25  great point -- that it "involved" rather than "caused."  And I

1    think we would support, if your Honor would like switching out

2    that language, to reflect that the defendant's broad scheme

3    involved a conscious or reckless risk.  I think --

4         THE COURT:  But I think we're all in agreement that it

5    involved the defendant's state of mind and not somebody else.

6         MS. LYDON:  I think the language of the subsection is

7    particularly helpful.  It's the offense.  The offense -- the

8    defendant's conduct "involved...the conscious or reckless risk

9    of death or serious bodily injury."

10        And here, the offense conduct was to hide from

11   students that he was not actually validly certified to teach

12   them these skills, to cause violations of a federal regulation

13   intended to protect the safety of tandem skydivers.

14        THE COURT:  So how do we know that that's the purpose

15   of this regulation?  I remember reading some statement -- I

16   think it was from the USPA -- saying that it was intended to

17   protect the integrity of the licensing process, not -- that's

18   my recollection -- but I don't know that it's that clear that

19   the regulation or the rule or the practice that Pooley

20   disregarded was for the purpose of protecting the safety of the

21   instructors or their students.

22        MS. LYDON:  Well, the reason I mentioned the purpose

23   being safety is the regulation is -- and I believe 14 CFR

24   145.105, and that subsection is all about safety in various

25   aeronautical contexts, and that subsection deals with safety in

1    skydiving.

2          THE COURT:  All right.  But Mr. Pooley's license was

3    revoked twice, and we're only concerned with the second

4    revocation, as I understand it.

5          Are you in agreement on that?

6          MS. LYDON:  Yes.

7          THE COURT:  All right.  So can you tell me what that

8    was for specifically?  I don't think that was -- that was

9    really clear during the trial because --

10          MS. LYDON:  Right.

11          THE COURT:  -- because it was not an issue.

12          MS. LYDON:  Exactly.  We discussed it far before

13    trial, and then it was excluded at trial because we didn't want

14    to talk about safety.

15          But, basically, I believe that a student named Thomas

16    Whitenberg, his paperwork was not -- he did not ensure that

17    Mr. Whitenberg had the adequate experience in the sport.  And

18    I'm going -- if you'll give me a moment, I will confirm this so

19    that I can speak completely and precisely on this, but

20    basically, he did not ensure that Mr. Whitenberg had the

21    requisite level of experience in order to meet USPA's and UPT's

22    requirements to be a safe tandem instructor.

23          He also lacked an FAA medical, which is necessary in

24    order to safely conduct tandem exercises because if you haven't

25    undergone an FAA medical exam to ensure that things like your

1   heart are safe to jump out of an airplane, as the parachutist

2   in command, that creates a danger to yourself and a danger to

3   anyone who may be jumping with you.

4           THE COURT:  So Whitenberg was a student similar to

5   Mr. Quan; correct?

6           MS. LYDON:  Yes.

7           THE COURT:  Okay.

8           MS. LYDON:  The -- with respect to Mr. Whitenberg, the

9   issue may have been limited to the FAA medical.  The issue of

10  the first suspension, I believe was the failure to confirm that

11  the person had an adequate number of jumps and, indeed, it

12  appeared that the person did not have an adequate number of

13  jumps, but I wanted to correct myself on that.

14          THE COURT:  So we can take that out of the discussion

15  because we're only concerned with the second suspension of

16  licensing privileges; correct?

17          MS. LYDON:  I think the second one is more relevant

18  because it's more recent.  Really, what's most relevant,

19  though, is the fact that he -- Mr. Pooley lacks any

20  certification and told students that he had it.  I think

21  both --

22          THE COURT:  But let's make sure we understand.

23          Was he -- was he certified again after the first

24  suspension?

25          MS. LYDON:  Yes.

1          THE COURT:  Okay.  So that breaks a chain of

2     causation, in my -- in my opinion.

3          MS. LYDON:  I agree with you on that.  I think any

4     relevance of it is that it goes to his history of disregarding

5     safety regulations, essentially.

6          THE COURT:  But that's an entirely different issue

7     from what we're addressing right now.  He was not suspended

8     because he had a history of violations or whatever you want to

9     call them.

10          MS. LYDON:  Oh, I hear you, your Honor.  I hear the

11     point you're making.  Okay.  Yes.

12          I think more -- the thrust of the enhancement is about

13     the offense of defrauding students by signing off fraudulently

14     on paperwork while he was not suspended.  Whatever the reason

15     for the suspension, and the risk that that created --

16          THE COURT:  Okay.

17          MS. LYDON:  -- that's the causation that I think the

18     Government is focused on, and the...

19          THE COURT:  So go back to where you were before I

20     interrupted you, and let's see where we go next.

21          MS. LYDON:  Okay.  So he pitched to students that he

22     was a validly certified examiner who could teach them to

23     skydive and certify them to skydive with students.  That was

24     false.  He lacked a certification to do that.

25          Then he used these prefilled-out forms, which instead

1    of him or a validly certified examiner actually signing,

2    evaluating whether the students had completed each exercise,

3    demonstrated each skill, were able to handle a variety of

4    malfunctions, and then at that point, once he had ensured that

5    they were capable, then signing off on that dotted line for

6    each of a number of skills, he used prefilled forms with

7    Mr. Garmashov's signature filled in.

8            THE COURT:  Was everything prefilled or just

9    Garmashov's signature?

10           MS. LYDON:  Garmashov's signatures were filled.

11           THE COURT:  But the rest of them wasn't filled?

12           MS. LYDON:  Correct, your Honor.

13           THE COURT:  So it's not quite like using a prefilled

14   form.  The only thing that was filled out ahead of time was the

15   signature.

16           MS. LYDON:  Signatures.  So there was --

17           THE COURT:  I know.

18           MS. LYDON:  -- there was the final certification --

19           THE COURT:  There were many of them on --

20           MS. LYDON:  Correct.  Yes.

21           THE COURT:  Okay.  But those are the ones that Pooley

22   would have had to sign if he was doing it correctly.

23           MS. LYDON:  Yes.

24           THE COURT:  So the only thing that was prefilled out

25   were the signatures, which Pooley should have signed, but he

 1    put Garmashov's signature on there.

 2            MS. LYDON:  Yes.  And those were the ones that they

 3    corresponded to skills and trainings.

 4            THE COURT:  Right.

 5            MS. LYDON:  So there's no way to know whether those

 6    were actually completed at all.

 7            THE COURT:  But what if, hypothetically, Pooley had

 8    put his own signature on those forms ahead of time?  Just said,

 9    "I've got my pen and my paper here.  I'm going to sign these

10    ahead of time, file them, until I'm satisfied that the students

11    met all the requirements"?

12            MS. LYDON:  I think a number of things would have

13    happened.

14            THE COURT:  We're not on the identity theft anymore.

15            So would that have changed -- would that have changed

16    the Counts 1, 2, and 3 in this case?

17            MS. LYDON:  Yes, because he wasn't a validly certified

18    examiner.  And Ron Bell from UPT and Crouch -- Jay Crouch from

19    USPA testified that if they'd sent in those forms with Pooley's

20    signature on them, that the students would not have received

21    ratings.

22            THE COURT:  Okay.  So go ahead.

23            MS. LYDON:  So he pitched himself as someone who is

24    qualified and certified.  He wasn't.  That got the students to

25    come.  He filled out these forms with preprinted signatures

1    instead of filling them out in a way that ensured that the

2    students had actually demonstrated the compliance with safety

3    regulations and were qualified to jump.  He did so in violation

4    of the safety regulation which the Jahanis --

5            THE COURT:  But we stopped --

6            MS. LYDON:  *Johansen* case --

7            THE COURT:  -- when you called that a "safety

8    regulation," and I'm not sure you satisfied me that it is a

9    safety regulation.  We were talking about that, but I wanted

10   you to satisfy me that the regulation that he did not comply

11   with here was a safety regulation.

12           MS. LYDON:  Okay.  So, I'm sorry, your Honor.  I was

13   unclear because we were talking about two different things.

14           The safety regulation that I've been referring to as a

15   safety regulation is a CFR, not about FAA medical, not about

16   ensuring that someone has a pilot license.

17           What that regulation says, and it's 14 CFR,

18   Section 105.45, and it is a safety regulation.  The preamble to

19   it says:  "Through this rule, the FAA intends to enhance the

20   safety of parachute operations in the national airspace

21   system."

22           One of the requirements of that safety regulation is

23   that the parachutist in command of any tandem operation, so

24   people like Quan, had to have been taught by an examiner of --

25   then certified examiner, essentially.  Complete a tandem

1    instructor course given by and be certified by the manufacturer

2    of the tandem parachute system.  That's UPT.  And by signing

3    off himself with Garmashov's forged signature at a time when he

4    was not actually a certified examiner, he ensured that all of

5    the parachute -- or the tandem parachuting operations that his

6    students engaged in would actually be in violation of that

7    safety regulation.

8         Mr. Quan's jump was in violation of a safety

9    regulation because Mr. Quan did not actually have a -- he did

10   not complete a tandem instructor course given by -- and he was

11   not certified by the manufacturer, the tandem parachute system.

12        THE COURT:  Now, the parts of that regulation that

13   Mr. Pooley didn't comply with, can you elaborate on that for

14   me?  What part of that regulation did he not comply with?

15        MS. LYDON:  He ensured that his students were not in

16   compliance with them because they thought they were certified,

17   but that they had completed a tandem instructor course given by

18   the manufacturer of the tandem parachute system.  They thought

19   that Pooley's course was that, and it wasn't because he was not

20   certified by the manufacture of the tandem parachute system.

21        THE COURT:  So, ultimately, the issue you're

22   addressing here is whether he was conscious or recklessly

23   disregarded a risk of death or serious bodily injury; is that

24   right?

25        MS. LYDON:  Whether he created that risk, yes --

1      THE COURT:  Whether he created that risk, but does the

2 conscious and reckless modify the state of mind of the people

3 that he was training, or does it modify his state of mind?

4      That's where we started.

5      MS. LYDON:  I don't -- yeah.

6      THE COURT:  It sounds to me like you're saying he

7 created that state of mind in his -- in his students rather

8 than he had that state of mind.  There's a distinction there.

9 It may be subtle.

10      MS. LYDON:  I think he did have that state of mind,

11 and I think he created a situation where --

12      THE COURT:  Where they --

13      MS. LYDON:  -- the risk of death of serious bodily

14 injury was being disregarded by these violations.  The

15 language, I agree, is tricky to parse.

16      THE COURT:  Right.  Well, that's where we started the

17 discussion.

18      MS. LYDON:  Uh-huh.  I think it satisfied --

19      THE COURT:  Elaborate on how -- elaborate on how you

20 apply it.  Just tell me.

21      MS. LYDON:  I think it's definitely satisfied because

22 Mr. Pooley disregarded the risk of death or serious bodily

23 injury.  It doesn't use the word "disregard," but I think

24 that's kind of the thrust of it.

25      THE COURT:  Right.

1          MS. LYDON:  He violated --

2          THE COURT:  And he was conscious of the risk.

3          MS. LYDON:  Yeah.

4          THE COURT:  He was conscious of the risk.

5          MS. LYDON:  And Mr. Sharma is pointing out to me that

6   a case called *Henderson* -- although the guideline doesn't use

7   the word "disregard," *Henderson* interpreted it to say that the

8   guideline focuses on the defendant's disregard of risk rather

9   than the result.  So that supports Your Honor's focus on the

10  defendant's state of mind.

11         And I think that is met here.  I think that satisfies

12  the enhancement.

13         THE COURT:  All right.  I think that is a fair,

14  correct statement of the Government's position.

15         So let me ask Ms. Crager now to respond.

16         MS. CRAGER:  Yes, your Honor.  I wanted to start with

17  the difference between an offense that caused a risk versus an

18  offense that involved a risk.

19         We talked -- we started this hearing talking about

20  causation and how, you know, if someone gets up in the morning,

21  and they cause something to happen down the line.  So I think

22  there's one argument from the Government that Mr. Pooley caused

23  his students to be inadequately trained or caused Mr. Quan to

24  be where he was when he was with a tandem rig on and,

25  therefore, the Turners could be considered victims in that

1    sense.

2         THE COURT:  Well, we were addressing a different issue

3    at that time.

4         MS. CRAGER:  Yes, your Honor.

5         THE COURT:  So let's stay on the one we're addressing

6    now.

7         MS. CRAGER:  Right.  My point is an offense that

8    involves a risk of bodily injury, that talks about the offense

9    itself.  And so I think we have to go back to what the offense

10   was and, here, it was misrepresenting to students what they

11   could receive at the end of a training course.

12        The cases that have applied this enhancement, all of

13   those cases that we could find, the fraud itself involved the

14   defendant doing something dangerous or telling somebody else to

15   do something dangerous in order to get money.

16        So it was central to executing the fraud.  So those

17   were things like staging slip-and-fall accidents to get

18   insurance money, staging car accidents for personal injury

19   claims, performing unnecessary surgical procedures to get

20   Medicare reimbursements, telling truck drivers to drive on --

21   after their hours were done, to drive on no sleep.

22        These are all things where the fraud itself -- in

23   order to get the money that makes it fraud, there had to be

24   some danger involved, and I think that's separate from what's

25   going on in this case.

1          This -- the fraud here did not involve putting someone

2    in danger.  The fraud involved what the person could get at the

3    end of the course, whether the USPA would recognize that.  It

4    did not involve putting people in danger for money.

5          So I think --

6          THE COURT:  Well, I think the Government disagrees

7    with you there.  If Mr. Pooley had not made the statements,

8    which the jury has found to be false, none of the students that

9    he certified would have been allowed to teach; and, therefore,

10   would not have allowed to be -- to take tandem dives, and there

11   would be no -- there would be at least a lesser risk of injury

12   or death to others because there wouldn't be any other people

13   other than his students taking those dives.

14         So we're all clear on this, all of his -- all of

15   Mr. Pooley's students were already skydivers, so he didn't

16   cause anybody to skydive that wouldn't otherwise do it, but

17   the -- I think the Government's argument is that he caused them

18   to train other people and that those people were the ones that

19   were at risk, who would not have been at risk had he not made

20   the false statements.

21         MS. CRAGER:  Well, he caused his students to be -- to

22   take members of the public on skydives as -- on a tandem jump.

23   So his students weren't training other people.  They were just

24   taking themselves on a skydive but being paid to do a tandem

25   skydive.

```
 1              THE COURT:  State that again?

 2              MS. CRAGER:  So Mr. Pooley was training his students

 3    to be a tandem instructor.

 4              THE COURT:  Right.

 5              MS. CRAGER:  What "tandem instructor" means is that

 6    you can take somebody else attached to you on a tandem skydive.

 7              THE COURT:  Right.

 8              MS. CRAGER:  It uses the word "instructor," but

 9    there's actually no teaching involved in that, so I just wanted

10    to make sure that was clear.

11              THE COURT:  Okay.  Okay.  But they could teach if --

12              MS. CRAGER:  They couldn't -- they couldn't teach.

13    They -- what you can do when you're a tandem instructor is to

14    take people on tandem skydives.

15              THE COURT:  But if you're a tandem instructor, you're

16    teaching.  That's what "instructor" means, doesn't it?  Maybe

17    they're two different terms of art.

18              MS. CRAGER:  My understanding is that's just the

19    terminology that the Parachute Association developed to call

20    what this person was who can take someone on a tandem skydive.

21              THE COURT:  That's not the evidence.  All those people

22    that testified sat there.  They were teachers.  Some of them

23    came up from South America here.

24              MS. CRAGER:  Yeah.  So some of them had other

25    credentials.  And the person who came up from Mexico, he
```

1   actually owns a drop zone.  They had -- they had been in the

2   skydiving world for a long time and had other credentials to do

3   other things --

4          THE COURT:  So you're saying that in order to be a

5   teacher, they had to have some other credentials?

6          MS. CRAGER:  Correct.  Yes.

7          THE COURT:  Okay.  I follow you there.

8          But they -- but if you want to teach somebody the

9   right way, you should be able to do tandem instruction?

10          MS. CRAGER:  If you want to take someone on a skydive,

11   then, per the Parachute Association, you should have a tandem

12   instructor rating.

13          THE COURT:  Right.

14          MS. CRAGER:  That's actually not required by the

15   regulation.  The regulation only requires that you have a D

16   license from the Parachute Association.  So those are two

17   different things.

18          THE COURT:  Okay.

19          MS. CRAGER:  So I -- I wanted to start with the FAA

20   regulations, because I think it's wrong to say that signing off

21   on somebody when he wasn't -- when he had been suspended makes

22   it inherently dangerous, and I think the Government's argument

23   relies on that, and I think that's not true here.

24          First of all, these regulations -- the FAA actually

25   investigated to find out if he was violating these regulations

1   and determined that he was not violating the regulations.

2          So if we are trying to base this on him violating a,

3   quote/unquote, safety regulation, he was not violating the

4   regulations, according to the agency itself.

5          THE COURT:  Well, depends on which regulations you're

6   talking about, doesn't it?  They did determine he violated this

7   regulation that Ms. Lydon was reading.

8          MS. CRAGER:  No, he did not violate that regulation.

9   There is one regulation that governs tandem skydiving, and that

10  is the regulation that the Government was speaking about,

11  14 CFR 105.45.

12         The FAA investigated to determine if he had violated

13  that regulation and determined that he had not violated the

14  regulation.

15         MS. LYDON:  He created a situation where all his

16  students violated that regulation, including Quan.

17         MS. CRAGER:  I actually don't necessarily -- well,

18  putting that aside, I think this inquiry does need to do with

19  Mr. Pooley's state of mind, but I want to get there in a

20  moment.

21         I do want to keep talking about how, even if causing

22  somebody else to potentially violate the regulation, if that is

23  inherently dangerous, and in this case, I think it's

24  demonstrably not inherently dangerous, what he was doing.

25         THE COURT:  Where do you come up with the words

1   "inherently dangerous"?  I know that's what the probation

2   officer said, but that's not in the guidelines.

3           MS. CRAGER:  Right.  Yes, your Honor.

4           I'm saying -- I'm saying the Government is saying

5   every time you violate a regulation or make a potential that

6   somebody else might violate a violation, if we call that a

7   "safety regulation," then you get a five-level enhancement, and

8   I don't think that can possibly be the case based on the case

9   law.  I think there has to be something actually demonstrably

10  dangerous about what he was doing, and I think that's not this

11  case.

12          The Government was talking about him using prefilled

13  forms.  That would be a problem if he -- people just came in;

14  he said, "Here's your prefilled form.  Write whatever you want

15  on that.  There you go.  You have it."

16          He was actually providing the training, and that's

17  what people -- the witnesses at trial testified to, that they

18  came and did a training with him that lasted for days, and that

19  after each segment and each jump, they would put the dates that

20  they completed that requirement.

21          So the form itself was prefilled with signatures, but

22  that did not mean that he wasn't doing the training.  That did

23  not mean they didn't learn these essential things, and, in

24  fact, the witnesses testified that they did learn those things;

25  they did do all of those things.

1          THE COURT:  I think it's a little difficult for the

2   Court to make those kind of findings because I think there was

3   some dispute in the evidence that was presented to the

4   Department of Transportation in all those papers that were

5   provided to the Court.

6          And I think there may have been some disagreement as

7   to whether Mr. Pooley did do all those things with all of his

8   students.  And it's a little difficult for the Court to make a

9   finding because, let's face it, that's all hearsay unless

10  everybody agrees to it.  What went on in the Department of

11  Transportation is not evidence in this case, and it would only

12  be considered by the Court if the parties agreed that the Court

13  could consider it.

14         But given that, it sounds to me like you're in

15  agreement that some of these things could be considered, and

16  you're saying that there's a dispute as to other things that

17  were presented at the administrative hearing.

18         MS. CRAGER:  I don't believe there was an

19  administrative hearing.  So the FAA --

20         THE COURT:  Well, I got a lot of papers.  There must

21  have been something.  I guess -- what was the proceeding?  I

22  saw the -- all the papers, but there was no hearing or --

23         MS. LYDON:  Correct, there was no hearing.

24         THE COURT:  Well, how did they make all those

25  findings?

1          MS. LYDON:  Well, they stopped the analysis because

2     the person who had violated the regulation, Mr. Quan, had --

3     was dead, so no one could be --

4          THE COURT:  So how can I consider --

5          MS. LYDON:  I don't think --

6          THE COURT:  -- the difference in what you mean by

7     "hearing"?  You mean there was no testimony?

8          MS. LYDON:  There was no determination.  The case was

9     closed because it ultimately went criminal with charges against

10    Mr. Pooley.  I don't think, your Honor --

11         THE COURT:  What was the sense in providing all those

12    materials to the Court?

13         MS. LYDON:  From the Government's prospective, those

14    statements were relevant only insofar as they contained witness

15    statements which were then translated.

16         THE COURT:  Wait a minute.  How can you have witness

17    statements if there's no hearing?

18         MS. LYDON:  Their investigation involved interviewing

19    witnesses and -- but your Honor does not have to rely on that.

20         The key witness -- or the investigator testified at

21    trial, and he did not --

22         THE COURT:  In what trial?

23         MS. LYDON:  -- testify -- this trial.  Yes.

24         THE COURT:  Oh, this trial.  All right.

25         But I want to get back to all these materials that

 1   were presented to the Court, which I understood included

 2   testimony that was given at an administrative hearing.

 3          Now you're telling me there's no hearing.  So I don't

 4   know how I got all these witness statement if there was no

 5   hearing.

 6          MS. LYDON:  Those were memorandums of interview

 7   conducted in this investigation by the Department of

 8   Transportation agents.  Not all of those were presented at

 9   trial because the trial wasn't about safety.  So we attached --

10          THE COURT:  Do you agree that that's all hearsay?

11          MS. LYDON:  Yes, your Honor.

12          THE COURT:  And it shouldn't be considered by the

13   Court unless both sides agree?

14          MS. LYDON:  I think the standard for considering

15   something at an evidentiary hearing is indicia of reliability.

16          THE COURT:  But how can you --

17          MS. LYDON:  I think both sides have --

18          THE COURT:  How can it be indicia of reliability when

19   they didn't even complete the hearing?

20          MS. LYDON:  This is not about the hearing.  This is

21   just about interviews conducted by agents.

22          THE COURT:  Okay.  Why should there be an indicia of

23   reliability in interviews conducted by somebody employed by the

24   Department of Transportation?  No cross-examination.  No

25   determination as to the truth or not.

1          MS. LYDON:  I think your Honor is correct in that both

2    sides are accepting the reliability of that, and that -- so

3    we've been proceeding on the assumption that those interviews

4    are accurate.

5          THE COURT:  That's where we are.

6          MS. LYDON:  But --

7          THE COURT:  But I don't know -- because I think there

8    was some disagreement already from defense.

9          MS. LYDON:  Your Honor can set all of that aside, I

10   think.  We don't have to rely on the interviews to find that

11   Mr. Pooley's offense involved the conscious risk or reckless

12   risk of death or serious bodily injury.

13         THE COURT:  All right.  So let's go back to

14   Ms. Crager, then.

15         Finish up what you were saying.

16         MS. CRAGER:  Yes, your Honor.

17         THE COURT:  She's not relying on anything in those

18   interviews statements.

19         MS. CRAGER:  Okay.  In that case, I can cabinet to

20   what was testified to at trial, and the witnesses testified at

21   trial that they did the training; they did it for days; and

22   they did it with Mr. Pooley.

23         So I think there's sufficient evidence just from the

24   trial record that he was actually completing the trainings.  He

25   wasn't just handing them a prefilled form with checked boxes.

```
 1          THE COURT:  All right.  So the statement, wherever it

 2    was in the materials that was provided to me, by someone who

 3    said they didn't get the -- the right treatment, can be

 4    disregarded?

 5          MS. CRAGER:  Yes, your Honor.

 6          THE COURT:  Right?  I don't remember.  There was a

 7    lot.  I can't go back and cite where it is.  I do recall

 8    reading something from somebody who said they didn't get the

 9    right training -- training.

10          MS. LYDON:  Yeah.  A lot of people said that.

11          THE COURT:  Okay.  But now you're in agreement -- you

12    are now in agreement that we can disregard that?

13          MS. LYDON:  I think that your Honor should base the

14    enhancement on the testimony at trial and the evidence

15    introduced at trial.

16          THE COURT:  Right.

17          MS. LYDON:  And that we are way above the threshold

18    for that just based on that.  And if --

19          THE COURT:  But you're not going to rely upon or ask

20    the Court to even consider those statements in the interviews

21    from witnesses who said they did not receive the correct

22    training?

23          MS. LYDON:  I would ask that your Honor consider

24    what's in the PSR because that was not objected to.

25          THE COURT:  No.  That's -- that's just parroting
```

1    what's in the -- because I sat down with the probation officer,

2    and I asked where she got these things, and she told me she got

3    it from those reports that you provided.

4           MS. LYDON:  Right.

5           THE COURT:  So you can't -- that's even worse hearsay

6    now if --

7           MS. LYDON:  If they wanted to object, they should

8    have.  They didn't.

9           THE COURT:  Well, what do you have to say about that?

10          MS. CRAGER:  We did actually point out that there's

11   one line that says that the FAA investigator found that he

12   hadn't trained someone.

13          THE COURT:  Right.

14          MS. CRAGER:  We did note in our objection at the first

15   footnote that that was contradicted directly by trial

16   testimony.

17          THE COURT:  Okay.  Good.  Then, I am not going to

18   consider that statement.  She may not have technically objected

19   to it, but she did note that it was contradicted.  That's

20   enough for me to tell me that the parties do not agree on that

21   statement.

22          MS. LYDON:  Okay.

23          THE COURT:  Okay.

24          MS. CRAGER:  Thank you, your Honor.

25          So given that he was actually completing the training,

1   the problem was only that at the end of the training, the USPA

2   would not issue a tandem instructor rating to these people, and

3   they never got their tandem instructor ratings.

4          So in terms of whether they were sufficiently trained

5   to be a safe person who jumps tandem, they were.

6          THE COURT:  All right.  So, Ms. Lydon, take note of

7   what she just said right now, and I'm going to come back to you

8   a little later and ask you to respond to that.

9          MS. LYDON:  Absolutely.

10          THE COURT:  Okay.  Go ahead.

11          MS. CRAGER:  So I think the way that he conducted

12   himself, while the jury found that it was fraudulent, it was

13   not inherently dangerous, and so I don't think that it can be

14   said of this case that the fraud itself involved a risk of

15   bodily injury or death.

16          THE COURT:  Can you apply the so-called "but for" test

17   to this, or does it require more?  In other words, you started

18   off earlier by saying you get up in the morning and everything

19   you do after that is -- is caused by the fact that you got up,

20   and I pointed out -- that was another argument we had.

21          But apply that right here.  Can you apply it?

22          MS. CRAGER:  Well, I think that's where the difference

23   between "caused" and "involved" is because with the word

24   "caused," you can say everything that flowed down from that was

25   caused by this primary fraud that happened.  But the word

1   "involved," I believe, focuses on the fraud itself.  So what

2   exactly did the fraud involve?

3          THE COURT:  Good point, because the language of the

4   guideline is "if the offense involved," and so you're pointing

5   out here the offense was the fraud --

6          MS. CRAGER:  Yes, your Honor.

7          THE COURT:  -- which is correct.

8          So you're saying the fraud had to involve a -- a

9   conscious or reckless risk of death, et cetera.

10          MS. CRAGER:  Yes.

11          THE COURT:  All right.  So make a note of that.  I'm

12   going to come back to you on that, too.  All right.

13          MS. CRAGER:  And my final point on that would be that

14   there is at least one court who -- I'm sorry -- who used the

15   words "too attenuated to talk about this enhancement."

16          And while there's going to be no case exactly like

17   this one, and so delving exactly into the facts I don't think

18   is helpful, but just the idea that there could be lots of

19   things that flow from a fraudulent conduct, but some of them

20   are too attenuated to consider part of that core fraud.

21          THE COURT:  The examples that I gave, for example, of

22   the Three Mile Island and the plane crashes, and so forth, that

23   result from a false statement about whether a bolt was

24   adequate.  That court would probably say that those were too

25   attenuated.

1          MS. CRAGER:  Yes, your Honor, I believe so.  And I

2     think because the language of the guideline uses the word

3     "involved," I think that cabinets to a narrower inquiry.

4          THE COURT:  All right.  Now, would you respond to the

5     questions that I asked you to?

6          MS. LYDON:  Yes, please.  All right.

7          I think there are two main ones: whether they were

8     adequately trained or whether he created, through his offense,

9     conduct, a risk; and the "but for" discussion.

10          So to start with the first, Ms. Crager asserted that

11     the testimony at trial showed that Mr. Pooley actually did

12     provide all this training, that he basically did everything an

13     examiner was supposed to, but he simply lacked qualifications

14     or certifications.  So, essentially, no harm, no foul.  He

15     didn't create a risk.  He did everything he was supposed to.

16     He just wasn't certified or licensed.

17          THE COURT:  I don't think she said the testimony at

18     trial proved that he did everything he was supposed to.  I

19     think she was saying that it didn't suggest that he didn't do

20     anything that he was supposed to.

21          MS. LYDON:  She did say that, and it's wrong.

22          Fabrisio Palomino, for example, testified that he

23     arrived from Mexico after communicating with Pooley and Pooley

24     saying, "I'll be your examiner."

25          He showed up.  Pooley was nowhere to be found.  Pooley

1   had some issue with his girlfriend.  He didn't show up the

2   entire first day.  He instead said, "Oh, find Mike Spurgeon.

3   Mike Spurgeon will show you."

4          So he jumped with Mike Spurgeon, who I will proffer --

5   well, never find.  He jumped with Mike Spurgeon.  He didn't

6   jump with Pooley.

7          Pooley showed up on the second day to take the money.

8   He didn't train Fabrisio Palomino.  He didn't tell Fabrisio

9   Palomino anything that an examiner was supposed to do under the

10  regulations and under the course.

11         I think a second related point on this issue can just

12  be gleaned from the tandem-certification part itself, and it is

13  on page 11 of the response to Pooley's objections to the PSR,

14  which is Document 172.

15         These are the things that Pooley was supposed to do

16  during the course, things he was supposed to ensure, and under

17  each and everyone of them, he had Yuri Garmashov's preprinted

18  signature.

19         Number 8.  The student was to have demonstrated five

20  practice tandem cutaways, wearing tandem equipment, and with a

21  simulated student in the student harness in the presence of a

22  USPA tandem instructor or tandem instructor examiner.

23         This form does not reflect that Pooley ensured that

24  that happened.  He just had had a preprinted Garmashov

25  signature.

```
 1              THE COURT:  But that's why --

 2              MS. LYDON:  It goes on and on and on.

 3              THE COURT:  Right, it does.

 4          But I didn't understand Ms. Crager to be saying that

 5   the evidence showed that Mr. Pooley did comply with everything

 6   he was supposed to.  I think she was saying that the -- in

 7   essence, that the evidence was consistent with him doing

 8   everything they were supposed to do.  You've pointed out one

 9   with Mr. Palomino where he wasn't.

10          Now I'm not sure what you're saying now on page 11

11   here.

12              MS. LYDON:  That these are the things that needed to

13   be done to ensure that someone should strap themselves to a

14   member of the public and jump out of a plane.  And Pooley --

15              THE COURT:  Are you saying that there's some evidence

16   that Pooley didn't do that?

17              MS. LYDON:  Yes.

18              THE COURT:  What's the evidence that he didn't do it?

19              MS. LYDON:  Fabrisio Palomino said that he didn't do

20   any of it.

21              THE COURT:  Okay.  I understand.

22          You're still on Palomino?

23              MS. LYDON:  Yes.  And we didn't focus on safety.  We

24   focused very consciously not on safety.  We almost ignored the

25   contents of the course.
```

1          But your Honor can and should find, based on

2    Fabrisio's Palomino's testimony, that Mr. Pooley did not

3    adequately teach the course.  He didn't teach the course at

4    all, in some instances.

5          And based on the page 11, that -- the tandem

6    instructor forms, the actual contents of Mr. Pooley's forgery,

7    the things that he fraudulently signed off on were the safety

8    requirements.  Those were the things that an examiner needed to

9    ensure, that a tandem instructor needed to know in order to

10   save their life and the life of a student.

11         THE COURT:  Well, he had Garmashov's signature on

12   everything.  It's not that he focused on the safety

13   requirements.  He had Garmashov's --

14         MS. LYDON:  Yes.

15         THE COURT:  -- signature on everything.

16         MS. LYDON:  You're right.  He didn't focus on the

17   safety requirements.

18         THE COURT:  He didn't.

19         MS. LYDON:  He didn't.  He had Garmashov's preprinted

20   signature there.

21         THE COURT:  Right, right.

22         MS. LYDON:  Exactly.

23         THE COURT:  Okay.  But I thought you were saying he

24   was trying to avoid the safety requirements by forging or

25   placing Garmashov's signature on the document, but he put

1    Garmashov's signature on everything.

2           MS. LYDON:  Yes.

3           THE COURT:  And, incidentally, I already told you.  I

4    don't believe that Garmashov is innocent of anything.  Just

5    nobody ought to make a finding that -- that Garmashov didn't

6    agree to this, so...

7           MS. LYDON:  What I'm saying, your Honor, we don't --

8    this doesn't depend on Garmashov.

9           THE COURT:  I know.

10          MS. LYDON:  But the students were entitled to have an

11   examiner check that they knew how to do a cutaway, among

12   everything else on this page, and a validly certified examiner

13   didn't do that.  And this doesn't reflect that Pooley checked

14   it --

15          THE COURT:  And that's according to Palomino's

16   testimony.

17          MS. LYDON:  And that's according to this form which

18   shows --

19          THE COURT:  I don't see anything other than Palomino's

20   testimony, which is uncontradicted, so -- so you're entirely

21   appropriate in relying on it.  But I don't see anything in that

22   form that proves it any more than Palomino's testimony does.

23          That form is just a form that had Garmashov's

24   signature all over it.  And it -- it's entirely consistent with

25   Mr. Pooley doing all those things except for the fact that

1 | Palomino said he didn't.

2 | MS. CRAGER:  Your Honor, could I be heard about

3 | Mr. Palomino?

4 | THE COURT:  Okay.  She just -- I want her to think

5 | about what I just said and see if I'm -- if I'm wrong here.

6 | MS. LYDON:  I think the form -- the signature

7 | requirement is there for a reason.  Pooley was supposed to, as

8 | an examiner, actually do the things, and then he was supposed

9 | to sign it and make it happen.  And --

10 | THE COURT:  I know.

11 | MS. LYDON:  -- when you're going --

12 | THE COURT:  I asked this question in a different way

13 | earlier.  But if he had been certified, there would have been

14 | nothing criminally wrong about putting the signature on there

15 | first, as long as he went back and made sure he did all those

16 | things.

17 | So if it had been Pooley's signature instead of

18 | Garmashov's signature, and Pooley had actually been qualified

19 | to teach the course, this would not prove anything.

20 | MS. LYDON:  I think it still would prove something in

21 | that this form is there for a reason.  All of these lines are

22 | there for a reason.  They're intended to demonstrate knowledge.

23 | And the way that he utilized this form in the course of his

24 | offense showed that he did not pay attention to the actual

25 | safety requirements that were supposed to be demonstrated

```
 1   before someone was signed off on.

 2          THE COURT:  All right.

 3          MS. LYDON:  The second issue you wanted me to address

 4   was a "but for" test, whether that applies here, and the answer

 5   is no.

 6          The enhancement is specifically not focused on

 7   causation of any actual harm.  It is focused on whether the

 8   offense involved the risk of harm.  No harm need have resulted.

 9   And in many of the cases that -- where the enhancement has been

10   applied and affirmed, no harm did result.

11          But by flouting safety regulations in the variety of

12   cases that the Government cited, the person, the defendant,

13   like Pooley in this case, disregarded the risk of serious

14   bodily harm or death, and that's exactly what happened here.

15   There needs to be no causation demonstrated whatsoever.

16          THE COURT:  So, Ms. Crager, you wanted to respond on a

17   limited point before I decide the question?

18          MS. CRAGER:  Yes, your Honor.

19          As to Mr. Palomino, I wanted to talk about his

20   testimony because the Government has implied that he showed up

21   and no training was done.

22          What happened was, and according to trial testimony,

23   he showed up; Mr. Pooley wasn't there; Mr. Pooley communicated

24   to him, "I've set you up with another instructor," and that

25   person was Mike Spurgeon.
```

1          So I wanted to read from his testimony, which I have

2   on page 7 of my brief, Docket 175-1.

3          This is Mr. Palomino's testimony:

4          "QUESTION:  Rob Pooley let you know that somebody else

5   would be teaching?

6          "ANSWER:  Yes.

7          "QUESTION:  That person was Mike Spurgeon?

8          "ANSWER:  Yes.

9          "QUESTION:  He was an expert skydiver?

10         "ANSWER:  Yeah, he had a lot of experience.  I didn't

11  know -- I didn't ask or know if he was an examiner but -- well,

12  I just started training and jumping with him.

13         "Okay.  And you were aware that he had about 25,000

14  skydives?

15         "ANSWER:  Yes.

16         "QUESTION:  And you -- and he had about 16,000 tandem

17  skydives?

18         "ANSWER:  Yes.

19         "QUESTION:  And he seemed to be a respected member of

20  the community there?

21         "ANSWER:  Super respected.

22         "QUESTION:  And he did your jumps with you?

23         "Yes.

24         "And after each jump, he gave you feedback on your

25  jumps?

```
 1                  "Yes.

 2                  "And Mike Spurgeon trained you?

 3                  "Yes."

 4            I think passing along someone to be trained by another

 5    expert, probably more expert than Mr. Pooley, I don't think

 6    that --

 7            THE COURT:  He could be the biggest expert in the

 8    world and still not be qualified to do the training.

 9            MS. CRAGER:  Sure.  That's fair.

10            THE COURT:  So how did Palomino know that he was

11    entitled to do the training?

12            MS. CRAGER:  He didn't.  The point is that it

13    wasn't -- I don't think the Government can use Mr. Palomino to

14    show that people weren't trained.  Everyone was trained,

15    according to all of the witnesses who testified.  All of them

16    were trained.  They were either trained by Mr. Pooley for days,

17    or they were trained by another expert, maybe even more of an

18    expert than Mr. Pooley.

19            THE COURT:  All right.  There are very cogent

20    arguments on both sides of this question.  To be honest with

21    you, the Court could probably decide this question either way.

22            Listening to the arguments of counsel and having read

23    your briefs on the point, as well as having read the

24    presentence report, and the credence that ordinarily the Court

25    gives to probation officers in these matters, all of these
```

1    things considered, the Court is going to adopt the probation

2    officer's determination with respect to this enhancement in

3    paragraph 41.

4              And, again, I recognize that it is a very close

5    argument that could go either way.  I just think the more

6    persuasive reasons are those offered by the Government on this

7    question.

8              Now, I need to go back because the rules require the

9    Court to make these findings.  First, that the parties have

10   received the presentence report.

11             Let me ask the Government first:  Has the Government

12   received a copy of the presentence -- the final presentence

13   report?

14             MS. LYDON:  We have, your Honor, both the final and

15   the redacted version.

16             THE COURT:  Has the defendant, through his attorney,

17   received a copy of the final presentence report and the

18   redacted form, Ms. Crager?

19             MS. CRAGER:  Yes, your Honor.

20             THE COURT:  Mr. Pooley, have you received a copy of

21   the final presentence report and the redacted form that we're

22   talking about?

23             THE DEFENDANT:  I believe so.

24             THE COURT:  All right.  And have you discussed those

25   fully with Ms. Crager?

```
 1                THE DEFENDANT:  Yes.

 2                THE COURT:  You have.

 3           Do you need any further discussion with her about the

 4  presentence report?

 5                THE DEFENDANT:  Yes.  I would love more discussion.

 6  But, no, I think we've discussed it.

 7                THE COURT:  If you would love more discussion, I would

 8  give you that opportunity, but if you've had an ample

 9  opportunity to discuss it so far, there's no reason to do that.

10           You're satisfied?

11                THE DEFENDANT:  Yes.

12                THE COURT:  All right.

13           MS. LYDON:  If he'd like more discussion, just for the

14  sake of a clear record, so we do this once, I think we should

15  give him maybe an opportunity to trail this matter so that he

16  can discuss, and give him the option of whether he'd like that

17  time or not.

18                THE COURT:  Well, I don't want to trail this.

19           The reason I took this first is the issues involved in

20  this case, which still haven't been decided -- all I've decided

21  is this one guideline application -- they require a lot of

22  concentration on the part of the Court, on the part of counsel,

23  and require us to communicate our --

24                MS. LYDON:  Of course.

25                THE COURT:  -- our thoughts on this.
```

1          If he needs more time, I'll give it to him.  We'll

2    take a short recess so he can talk to Ms. Crager, but I don't

3    want to have all of us talking about other cases in the middle

4    of this one.  So --

5          MS. CRAGER:  One moment, your Honor.

6          THE COURT:  All right.

7          MS. CRAGER:  We're fine, your Honor.  He doesn't need

8    to discuss it with me more.

9          THE COURT:  All right.  You've discussed all this with

10   him previously; right?

11         MS. CRAGER:  Yes, your Honor.

12         THE COURT:  Are there any other objections to any of

13   the findings of the presentence report with regard to the

14   calculation of the sentencing guidelines?

15         MS. LYDON:  No, your Honor.

16         MS. CRAGER:  No, your Honor.

17         THE COURT:  The Court, having ruled upon the only

18   objection to the calculation of the sentencing guidelines, and

19   there being no other objections, the Court adopts the findings

20   of the probation officer as modified by the redacted report,

21   which we have all seen, and, accordingly, finds that the total

22   offense level is 16 and the criminal history category is 1.

23         Now, we need talk about the sentence that the Court is

24   going to actually impose, and I'll hear first from the

25   Government.

1     What would you like to say before the Court pronounces

2  judgment?

3     MS. LYDON:  I'm not going to repeat everything in our

4  sentencing brief.  We are willing to discuss anything about

5  which the Court has questions.  Suffice to say, this crime was

6  long-running, premeditated, and did serious harm.

7     A high-end, 27-month sentence is appropriate, given

8  the factors under 3553(a), including: the defendant's history

9  and characteristics; the fact that he's engaged in criminal

10  acts before; it's quite difficult to deter; the nature of the

11  offense; lying to students about something that's serious as

12  his qualifications to teach them to conduct tandem skydives for

13  over a year; and each of the rest of the factors of 3553(a) are

14  consistent with that.

15     With that, we'll submit on the 27-month recommendation

16  unless the Court has any questions.

17     THE COURT:  I don't have any questions.

18     You wanted -- was it Mr. Turner to talk or

19  Mrs. Turner?

20     MS. LYDON:  Yes, your Honor.  Mr. Turner would like

21  the Government to read his allocution.  Mrs. Turner would like

22  to read it herself.

23     THE COURT:  Okay.  Are they something different than

24  what the Court has already received?

25     MS. LYDON:  No, your Honor.

```
 1              THE COURT:  All right.  I will hear from you, and I
 2   will hear from her.  Although, I will state that I have read
 3   the written statements, as well, as well as there was at least
 4   one other victim-impact statement from one of the students that
 5   I've also read.
 6              MS. LYDON:  Yes.  Mr. North had indicated that he
 7   would like to read it and that -- Mr. North is here today --
 8   that he should also have the opportunity to allocute, and the
 9   defendant of course, as well.  I wasn't sure in what order you
10   were doing this.
11              THE COURT:  All right.  Well, I want to hear from the
12   Government's witnesses first.
13              Who would you like to have address the Court?
14              MS. LYDON:  Mr. North, would you like to come forward?
15              THE COURT:  You can stand in the middle microphone
16   here, Mr. North.  I'll see you there, and I can hear you as
17   well.
18              MS. LYDON:  Just a moment.  We're grabbing him a copy
19   of it.  This may have been one that was e-mailed or provided by
20   the Court, provided by --
21              THE COURT:  Well, I can go back and look at those, if
22   you want, but as I told you, I've read those.
23              MS. LYDON:  It will take me just a moment.
24              MS. BASABE:  Your Honor, Julie Basabe with probation.
25   May I approach the Government?  I have a statement.  I'd like
```

1    to see if it's the same that they're looking for.

2            THE COURT:  All right.  That may make it quicker.

3            Is that it, Mr. North?

4            MR. NORTH:  Yes, it is, your Honor.

5            THE COURT:  All right.  You may proceed.

6            MR. NORTH:  Okay.  As I met Rob very early on in my

7    skydiving journey, he occupied a position of trust in my

8    life-circle of acquaintances.  He became a mentor of mine

9    during my progression and helped me to attain skills that would

10   prove invaluable to my career in the sport.

11           Since this fraud, amidst deeds came to light, I found

12   difficulty building trust with new people, especially within

13   the skydiving community where trust is paramount to working

14   relationships.  This has limited me in my progression and my

15   drive to continue my career in the industry.

16           Furthermore, the pressure I have found on myself to

17   tell my story and convey the truth during the investigative

18   process over six years has subjected me to animosity and

19   distrust from some cohorts and entities within the industry I

20   have spent over a decade depending on for income and social

21   connection.

22           I find myself unable to fully trust my intuition and

23   judgment of character when meeting new people, which has

24   limited my drive to extend myself socially and professionally.

25   I harbored guilt for having recommended Rob as an instructor or

1   mentor to friends and students of my own who may have been

2   victimized by his behavior.

3          That's all.

4          THE COURT:  Thank you.

5          MS. LYDON:  There's an additional -- there's an

6   additional victim-impact statement that Mr. Fabrisio Palomino

7   submitted and requested that the prosecution read it.

8          I can read it at this time.

9          THE COURT:  What is it -- I can understand when

10   somebody is here and would like to address the Court.  People

11   seldom get the opportunity to address judges, and when they

12   have an interest in the case, I could understand why they would

13   like to do that.  But I've told you, I've read his statement.

14          What does that add to the case?

15          MS. LYDON:  That's fine, your Honor, if you've

16   reviewed it.  I just am observing that he that checks that

17   request, reading it instead of --

18          THE COURT:  Well, you can go back and report to him

19   that I did read his statement.

20          MS. LYDON:  I'll do that, your Honor.

21          THE COURT:  All right.  Now, what -- do you want me to

22   hear from Mrs. Turner now?

23          MS. LYDON:  Yeah.

24          MRS. TURNER:  Good morning, your Honor.

25          THE COURT:  Good morning.  Who do you have with you?

1          MRS. TURNER:  This is Mario and Casey, who were

2   Taylor's childhood friends all the way up until the day he

3   passed, and they were on the same skydiving trip with him and

4   jumped with him.

5          THE COURT:  All right.

6          MRS. TURNER:  Tyler Nicholas Turner, say his name.  He

7   was here and he matters.  My son meant the world to me.  And

8   there's nothing in the world anyone could do to fix it, but

9   there certainly can be some reparations which can be imposed.

10          Tyler was my life.  He and I spent enormous amounts of

11   time together.  Since he was a little boy, he'd always be by my

12   side, and he brought joy and happiness to everyone who knew

13   him, even those who didn't.  He was a kind and compassionate

14   and amazing son, brother, grandson, uncle, nephew, and very

15   good friend.  He had no enemies.  Literally everyone loved him.

16          He was strong in faith and a great leader and role

17   model.  He volunteered at his school, at church, and in the

18   community at multiple events, always giving and definitely

19   making sure he did as much as he could do for anyone who

20   crossed his path.

21          When Tyler died, I could not work.  I could -- I

22   almost lost my dance studio, my whole way of life.  This caused

23   such an immeasurable amount of pain that could never be

24   repaired, and stays with me to this day.  It will never leave

25   me.

1          Tyler promised to take care of me as I got older.  He

2     knew the value of caring.  Having various health issues,

3     including cerebral palsy, he learned firsthand what it took to

4     care for another person and their needs.

5          Numerous doctor visits over the years to make him have

6     the best life, and I'm now 60, and my future and the rest of my

7     life has changed forever.  The plans we had are now gone, and

8     I'm forced to forge a new path, one I did not ask for, and I'm

9     lost without him.

10          My heart was crushed in a million pieces.  On the day

11     I was there when he died, I was nonfunctional and had to seek

12     grief therapy to help manage the effect it had on my life.

13     Tyler's death caused a great ripple effect throughout the lives

14     of our entire family and Tyler's friends.  His sister and

15     brothers tried to hold me up, and I tried to hold them up; yet

16     we were all grieving so deeply, no one had the strength.

17          He was just beginning his adult life as a smart,

18     vibrant, capable young man.  He was working so hard his whole

19     life.  He managed to complete a year of college while he was

20     still in high school and was to start his UC Merced college

21     career with seven scholarships as a sophomore until his life

22     was cut short two weeks prior.

23          His friends you see here with me were all affected as

24     well.  You see, they were to be his roommates.  And one of them

25     his friend since first grade.  These close-knit friends

 1   begrudgingly had to start school somberly and in Tyler's honor;

 2   such as incredibly thing for each of them to do.

 3          All of these things caused by the illegal action of

 4   this man here.  Robert Pooley, as a direct result of your

 5   selfish, greedy choices, my son died.  You must be held

 6   accountable and pay the price for taking my beautiful son away

 7   from me.

 8          And I beg you, your Honor, to serve him a just

 9   sentence, worthy of my son's life.  Thank you.

10          THE COURT:  Thank you, Ms. Turner.

11          Are there any other witnesses you want to introduce to

12   the Court?

13          MS. LYDON:  I'm going to consult with Mr. Turner to

14   see whether he would like the Government to read it or

15   whether -- ask your Honor to read it.

16          THE COURT:  Why don't you go back and ask him?  Tell

17   him that I've read it.

18          MS. LYDON:  Your Honor, Mr. Turner has asked that we

19   read his statement into the record.

20          THE COURT:  All right.  The Government can say or read

21   anything it wants in its allocution.

22          You may proceed.

23          MR. SHARMA:  Thank you, your Honor.

24          I would like to say to this Court that my 18-year-old

25   son, Tyler Nicholas Turner, was a loving, caring human being.

1  He loved life, helping people, and being around those closest

2  to him.  His family and friends loved him very deeply.

3          As a child, Tyler never got into trouble.  He was

4  easy-going, happy, mellow in nature, and had a great sense of

5  humor.  He always wanted to make everyone smile.

6          Tyler turned out to be a very academically gifted

7  young man, as an honor student with a 4.3 to 4.5 high school

8  grade-point average.  He had a Fulbright scholarship to attend

9  UC Merced college, entering as a sophomore with the goal of

10  becoming a medical doctor with the specialty of working with

11  children suffering from disabilities.

12          To achieve the goal of starting UC Merced college as a

13  sophomore, he would go to a JC college after going to high

14  school all day, attending AP classes.  His education and future

15  were extremely important to Tyler, and he worked very hard to

16  get himself into college.

17          I remember many weekends he worked on homework and

18  extra-credit projects, often sacrificing time with family and

19  friends to achieve his goals.  I remember him telling me that

20  he did not want me or his mother to carry the burden of paying

21  for his college expenses, so he was going to work extra hard to

22  get a scholarship.  He was also adventurous and liked having

23  fun with his friends.

24          Tyler was also a God-fearing child who carried on the

25  traditions of reading the Bible nightly, which we did all day

1   as a family every night when he was growing up with his

2   siblings.

3         To further help demonstrate what kind of a person

4   Tyler was, he was able to talk two of his closest friends on

5   two separate occasions out of committing suicide.  So Tyler

6   saved two human lives before his own life was suddenly taken.

7         This tandem skydiving incident took place on

8   August 6, 2016, at Lodi Parachute Center, due to defendant,

9   Robert Allen Pooley, who was under the employ of owner Bill

10  Dause.  Mr. Pooley's criminal actions included but not limited

11  to aggravated identity theft, forgery, falsifying skydiving

12  instructor certifications, and cutting corners just to make a

13  few bucks.

14        The scam that Mr. Pooley was running ultimately took

15  the lives of both Mr. Quan and my son, who was tragically

16  killed since Mr. Quan was not properly certified as a tandem

17  instructor, and Mr. Pooley was an orchestrator who let it all

18  happen.

19        As a father, my life will never be the same without

20  having my son, Tyler, be a part of it.  My other children --

21  Todd II, Tiffany, and Troy -- will never see their brother

22  again, and my grandchildren, Charlie Ray and Memphis, will

23  never grow up without knowing their wonderful uncle or have him

24  in their lives.  This loss has shattered and devastated our

25  family to its core.

1          Robert Allen Pooley's nefarious actions, egregious

2     conduct, and gross negligence, deceit, and the white-collar

3     crimes that he knowingly committed without any regret or

4     remorse, ended up costing my son and Mr. Quan their lives.

5          Tyler's mother and I will both have to live with the

6     grief of losing our youngest son for the rest of our lives, but

7     Mr. Pooley will have to live with the death of our son on his

8     conscience.  And for that, I hope this haunts him every day and

9     night for the rest of his life.

10          There's not a day that goes by that I don't think of

11     my son.  So defendant, Robert Allen Pooley, should have to pay

12     the ultimate price with his freedom for as much as the law,

13     this Court, and Your Honor's discretion will allow.

14          I will never be able to talk to my son again, never

15     see him smile again, graduate, get married, enjoy being a

16     grandfather to his children, or any of the wonderful things

17     that a father would take pure joy in witnessing and sharing

18     with his son throughout the growing stages of his life.

19          Parents are not supposed to bury their children, and I

20     had to bury one of mine because of the defendant's actions.

21          On a personal note, Mr. Pooley, this is hard for me to

22     say, but may God have mercy on your soul, but may the courts

23     have no mercy on you.

24          Every day is a marathon for me just to get through it.

25     I have suffered from nightmares, post-traumatic stress

1    disorder, and depression, amongst other things, since the day

2    my son died.  It hurts in so many ways that there are just no

3    words to accurately describes how I feel, because unless you

4    have you lost a child, you will never know the pain I live with

5    every minute of every day.

6              May justice be served today on behalf of my son and

7    our entire family.

8              I would like to thank the Federal Government for

9    prosecuting this case, acting United States and assistant

10   United States attorneys, and special agents for the countless

11   hours of time and resources that were spent on seeking justice.

12             Sincerely, Todd Turner.

13             THE COURT:  Thank you.

14             Is there anything else the Government would like to

15   say before the Court pronounces judgment?

16             MS. LYDON:  No.  Thank you, your Honor.

17             THE COURT:  All right.  Ms. Crager, what would you

18   like to say on behalf of Mr. Pooley?

19             MS. CRAGER:  Thank you, your Honor.

20             I wanted to note first the consequences that

21   Mr. Pooley has already suffered as a result of this case,

22   because I believe that his life has been changed forever from

23   what it was.

24             He is now a felon.  This case has made him a felon.

25   Unlike a lot of first felonies, he has been blasted all over

1   the media.  His name is in dozens of news stories.  He was

2   fired from his job at the time.  This completely destroyed his

3   career that he had spent decades building.

4        He is now an outcast in the community.  He has been

5   shunned, as one witness at trial put it.  This has changed his

6   life forever.  He has also interacted now with the criminal

7   justice system here.

8        He was arrested in this case in front of his

9   coworkers.  He was taken to Sacramento County Jail during the

10  delta surge of the COVID pandemic, and quarantined there with

11  other new arrests, people coming down from drugs, people

12  convicted of violent offenses, and he did spend the night there

13  before being ordered released the next day.

14       He -- just suffice it to say that things are now

15  different for him than they were before, and it will never go

16  back.  He's now 50 years old, finding his footing.  He has been

17  now on pre-trial supervision for three years, being watched by

18  his pre-trial officer.  They can come by at any time, announced

19  or unannounced, and inspect his house.  This is a person who

20  has had his liberty restricted now for the last three years

21  since this case has been filed.

22       I did want to address briefly the Government's comment

23  earlier that he's, quote, "quite difficult to deter."  He has,

24  to be clear, one prior conviction which is a misdemeanor on his

25  record.  This is not a person with an extensive record who

1  needs a serious sentence to deter them.  And he has been on

2  pre-trial release for three years, committing no crime.

3         Even before that, this case was not filed for five

4  years, and in those five years, he committed no crime.  In

5  those five years, actually, he was trying to make this right

6  for people, and this happened immediately after it came out

7  that these people weren't going to get their ratings.

8         Your Honor sees a lot of defendants who come in this

9  courtroom and say how sorry they are after they've been

10  prosecuted, after they've spent some time in jail.  And this is

11  a person who the very next day was telling people that he was

12  sorry about what happened and he was trying to make it right.

13         He, the very next day, was on the phone with other

14  tandem examiners around the country, trying to get a

15  replacement course for these people in short order.  He knew

16  people had to get back on a plane to go wherever they came

17  from, and so he was trying to set out these courses, and he was

18  trying to financially pay for some of them.  He was able to

19  negotiate a course for only $300 with an expert examiner with

20  30 years of experience.  That person ended up canceling at the

21  last minute without telling Mr. Pooley.  But he did take active

22  steps to try to make this right for people.  He also did give

23  some refunds, as he could.

24         And the people involved with this -- one of the

25  Government's witnesses, who chose not to come testify, admitted

1    that he and others forcibly stole Mr. Pooley's belongings and

2    then forced him to sign something saying that he had sold them

3    to him.  So he did suffer consequences of this, even in the

4    immediate aftermath after this happened.

5           As to the financial piece, he has and will suffer

6    other financial consequences to this.

7           He's the only person charged here.  As --

8           THE COURT:  Do you think any of the collateral

9    punishment that you've referred to, including this, is the

10   result of his having lost his license, separate from this

11   conviction?

12          MS. CRAGER:  None of this -- I don't think any of this

13   would have happened except for that.  When he -- the license

14   that he lost, he was still able to do other things.  He would

15   have been able to coach in other ways, teach in other ways, and

16   a way to earn money in this career in other ways.  All of this

17   flowed from people realizing they couldn't get their ratings,

18   and the backlash from that.

19          THE COURT:  Right.  But it had nothing to do with the

20   conviction.  It had to do with them finding they couldn't get

21   their ratings.

22          MS. CRAGER:  Yes.  Right.  Yes, your Honor.  Yes.

23          But I'm saying it flowed directly from the events --

24          THE COURT:  So much of the loss that you're talking

25   about would have occurred anyway without the prosecution,

```
 1   without the conviction?

 2            MS. CRAGER:  Yes.

 3            THE COURT:  All right.

 4            MS. CRAGER:  Yes, your Honor.

 5            As to the prosecution itself, the prosecution has

 6   chosen to charge only him, and we know that there were other

 7   people involved with this.  The --

 8            THE COURT:  I don't know that.

 9            MS. CRAGER:  Well, as your Honor noted, we do believe

10   that Yuri Garmashov was a knowing participant, and he's never

11   been charged with anything.

12            THE COURT:  That's true.

13            Anybody else you're talking about?  Because I don't

14   know of anyone else.

15            MS. CRAGER:  The owner of the parachute center knew of

16   the suspension, gave him a space to continue teaching, and

17   accepted most of the money that came from these students, and

18   that came out in trial testimony, as cited in my brief.

19            THE COURT:  But did he know about the fraud?

20            MS. CRAGER:  He knew that he shouldn't be teaching,

21   and he knew that he was teaching, and he was providing him

22   space to teach, and he was taking the money.  There wasn't

23   testimony about whether he had spoken individually to these

24   students.

25            The -- most of the money actually went to the
```

1   parachute center.  It didn't go to Mr. Pooley, but because he's

2   the only person in charge, he's the only person answering for

3   this, and he's the only person who will be ordered to pay

4   restitution, so he will continue to be the only person punished

5   for this going forward.

6          THE COURT:  Do you agree with the amount of

7   restitution suggested in the presentence report, $10,800?

8          MS. CRAGER:  We don't, your Honor, and we indicated

9   that we were looking for a restitution hearing in our

10  objections.  My understanding from the practice in the district

11  is that that would occur at a later date.

12         THE COURT:  Go ahead.

13         MS. CRAGER:  Thank you, your Honor.

14         My request would be that any -- any time that his

15  liberty needs to be further restricted would be done on home

16  detention.  He does have a stable home.  He has shown that he's

17  able to comply with all conditions.  And we believe that home

18  detention, in light of all the consequences he suffered, in

19  light of becoming a felon and losing his valuable civil rights

20  under this conviction, we believe that would be appropriate in

21  this case, your Honor.

22         THE COURT:  Mr. Pooley, is there anything you'd like

23  to say in your own behalf?

24         THE DEFENDANT:  No.  I think she covered it.  Thank

25  you.

```
 1              THE COURT:  Pardon?

 2              THE DEFENDANT:  I believe she covered it.  Thank you.

 3              THE COURT:  All right.  The case has been argued at

 4    all stages of the proceedings very thoroughly on both sides,

 5    and I'm not going to add anything to those arguments.

 6              I will state for the record that the Court makes no

 7    finding in this matter that Mr. Pooley is legally responsible

 8    for the death of Mr. Turner or for injury or death to any other

 9    person.  That is not a matter before this Court, and the Court

10    does not make any assumptions with that regard in imposing the

11    sentence in this case.

12              I believe that I've -- the sentence I'm going to

13    impose is going to be sufficient, but not greater than

14    necessary to accomplish all of the purposes of sentencing as

15    set forth in the sentencing guideline -- sentencing guidelines

16    and the relevant sentencing factors.  I have considered all of

17    the relevant sentencing factors, as well as the guidelines.

18              And pursuant to the Sentencing Reform Act of 1984, it

19    is the judgment of the Court that the defendant is hereby

20    committed to the custody of the Bureau of Prisons to be

21    imprisoned for a term of 24 months on each of Counts 2 and 3,

22    to be served concurrently to each other for a total term of

23    24 months.

24              The defendant shall pay a special penalty assessment

25    of $200, payment to begin immediately.  The Court finds that
```

1   Mr. Pooley does not have the ability to pay a fine and,

2   therefore, the imposition of a fine is waived.

3          With regard to restitution, the Court will set a

4   hearing to determine restitution at a later date, and the

5   defendant shall be required to make such restitution as will be

6   ordered as a part of this judgment.

7          The payment of any restitution or any unpaid criminal

8   monetary penalty in this case is due to be paid during the term

9   of imprisonment at a rate to be set, and will be made through

10  the Bureau of Prisons Inmate Financial Responsibility Program.

11         I'm looking for the part of the judgment that imposes

12  the mandatory assessment that was $200.

13         Upon release from imprisonment, the defendant shall be

14  placed on supervised release for a term of 36 months on each of

15  Counts 2 and 3, all to be served concurrently, for a total term

16  of 36 months.

17         Within 72 hours of release from the custody of the

18  Bureau of Prisons, the defendant shall report in person to the

19  probation office in the district to which he's released.

20         While on supervised release, the defendant shall not

21  commit another federal, state, or local crime, and shall not

22  illegally possess controlled substances.  He shall make

23  restitution in accordance with this order or any other statute

24  authorizing a sentence of restitution.  And he should cooperate

25  in the collection of DNA as directed by the probation officer

 1   and shall comply with the standard conditions which have been

 2   recommended by the United States Sentencing Commission and

 3   adopted by this Court.

 4        Further, he shall refrain from any unlawful use of a

 5   controlled substance.  He shall submit to one drug test within

 6   15 days of release from imprisonment and at least two periodic

 7   drug tests thereafter, not to exceed four drug tests per month.

 8        Ms. Crager, have you gone over the special conditions

 9   listed on pages 3 and 4 of the presentence report with

10   Mr. Pooley?

11        MS. CRAGER:  Yes, your Honor.

12        THE COURT:  Mr. Pooley, have you read those special

13   conditions and do you understand them?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  The Court adopts the special conditions

16   recommended by the United States Probation Officer in the

17   sentencing recommendation report, and imposes all of those

18   listed as special conditions.

19        Is there a place of confinement you think the Court

20   should recommend?

21        MS. CRAGER:  In California, your Honor.

22        THE COURT:  All right.  Any objection?

23        MS. LYDON:  No, your Honor.

24        THE COURT:  The Court will recommend that Mr. Pooley

25   be incarcerated at an institution in California only insofar as

```
1    that recommendations accords with security classification and

2    space availability.

3              How about a date for surrender?

4              MS. CRAGER:  We'd ask for six weeks, your Honor.

5              THE COURT:  Any objection?

6              MS. LYDON:  If he waives presence at the restitution

7    hearing -- I'm not sure when we're planning on scheduling

8    that -- that would work.  If he'd like to be there, we should

9    coordinate that scheduling.

10             MS. CRAGER:  We can move to continue --

11             THE COURT:  Well, if you can do it in six weeks, we

12   don't have to have him waive presence.

13             MS. LYDON:  Yes, exactly.

14             THE COURT:  I think that would be preferable.

15             MS. LYDON:  Yes.

16             THE COURT:  When do you suggest -- what date for the

17   hearing?

18             MS. LYDON:  The Government is generally available on

19   Mondays when the Court -- or at the Court's convenience.

20             I'd expect both parties would want to submit some

21   briefing in advance, so perhaps no sooner than --

22             THE COURT:  Maybe you can get some idea right now what

23   that's going to involve.

24             What's the Government's position with regard to

25   restitution?  You think the $10,800 is the appropriate sum?
```

1          MS. LYDON:  I think it will be slightly adjusted,

2    based on the victim-impact statements that have been submitted.

3          THE COURT:  How are you going to calculate the

4    restitution?

5          MS. LYDON:  We're going to itemize it and submit a

6    spreadsheet to the Court.

7          THE COURT:  And is all that material on Mr. Turner's

8    declaration?  Is that all included?

9          MS. LYDON:  That will be, yes.

10          THE COURT:  Anything else?  What else is it going to

11    include?

12          MS. LYDON:  I have not crosschecked the initial

13    restitutions because we were doing an initial -- a restitution

14    hearing.  I believe there were some small differences from the

15    amounts initially submitted with the restitution spreadsheet

16    versus the amounts claimed on the victim-impact statement, so I

17    want to crosscheck those, but the Government will prepare a

18    restitution brief supported by a spreadsheet and documentation

19    and submit it.

20          THE COURT:  Ms. Crager, do you think we can do this in

21    the next couple of weeks?

22          MS. CRAGER:  We would ask for maybe three or

23    four weeks.

24          THE COURT:  I'm going to be gone after October 16th

25    for a couple of weeks.  If we can do it before then, I would be

```
 1   available.  If not, we'd probably have to go into November.

 2          MS. LYDON:  Perhaps the first week of November?  That

 3   way he could still surrender on the suggested date of

 4   November 15th.

 5          THE COURT:  How about that?

 6          MS. CRAGER:  That's fine, your Honor.

 7          THE COURT:  How about -- Karen, can we do it on the

 8   4th of November?

 9          THE CLERK:  One moment, your Honor.

10          THE COURT:  Are there going to be witnesses, or are we

11   just going to argue the -- any witnesses going to be called?

12          MS. LYDON:  I think we can submit it based on the

13   documents, unless the --

14          THE COURT:  We're probably going back to the question

15   of who are victims, and that's probably a legal question.

16          MS. LYDON:  That will be an important question.

17          MS. CRAGER:  I don't anticipate there will be

18   testimony, but I don't -- at this point, I don't know for sure.

19          THE COURT:  So if there is, it will be brief; right?

20          MS. CRAGER:  Yes.

21          THE CLERK:  Then I would prefer the 12th of November.

22          THE COURT:  12th.

23          MS. CRAGER:  Yes, your Honor.

24          THE COURT:  All right.  November the 12th.

25          MS. LYDON:  Yes, your Honor.
```

```
 1              THE CLERK:  November 12th, just to be safe.
 2              THE COURT:  Do you want to do it in the afternoon or
 3   the morning, Karen?
 4              THE CLERK:  Morning.
 5              THE COURT:  Morning.  Okay.  10:00 o'clock in the
 6   morning.  All right.
 7              So Mr. Pooley is ordered to turn himself in to the
 8   institution designated by the Bureau of Prisons by noon on
 9   November the 5th --
10              MS. LYDON:  15th?
11              THE COURT:  15th.  Yes, 15th.  I'm sorry.
12              THE CLERK:  You said November 15th, your Honor?
13              THE COURT:  November 15th.  That will be after the
14   hearing so he can be present at the hearing.  Let's make it the
15   following week, because he may have to travel to wherever he's
16   going.  So we'll make it the 19th.  All right.  The 19th, noon
17   on November the 19th.
18              Now, Mr. Pooley, you have a right to appeal from your
19   conviction and/or your sentence.  If you wish to appeal, you
20   must file a written notice of appeal with the Clerk of the
21   Court -- I believe it's 15 days.
22              Is that correct, Ms. Lydon?
23              MS. LYDON:  Fourteen days, your Honor.
24              THE COURT:  Fourteen days.
25              So let's do the calculations right now.
```

```
1              If you wish to appeal, you must file a written notice

2    of appeal with the Clerk of the Court.  By my calculations,

3    that's October the 15th because the 14th is a holiday.

4              Are we all in agreement?

5              MS. CRAGER:  I believe so, your Honor.

6              MS. LYDON:  Yes, your Honor.

7              THE COURT:  I don't know -- that's a good question --

8    if the clerk is going to be able to enter judgment today, which

9    would be the date from which we start to count the 14 days.

10             Ms. Crager, I assume there's going to be an appeal; am

11   I correct?

12             MS. CRAGER:  Yes.  Yes, your Honor.

13             THE COURT:  Would you make sure that the notice of

14   appeal is filed promptly and timely?

15             MS. CRAGER:  Yes, your Honor.

16             THE COURT:  All right.  And the Government may want to

17   file an appeal, too.  So you make sure that on behalf of the

18   Government, that you're prompt and timely if you're going to

19   file a notice of appeal.

20             MS. LYDON:  Yes, your Honor.

21             THE COURT:  And I guess that's it.

22             Anything else?

23             MS. LYDON:  No.  Thank you, your Honor.

24             MS. CRAGER:  No, your Honor.

25             MS. BASABE:  Your Honor, Julie Basabe with probation.
```

1          I would just ask that the defendant be advised that

2    all conditions of pre-trial release shall remain in effect

3    until the defendant surrenders in accordance with the

4    voluntary-surrender order.

5          THE COURT:  All right.  That's the order.  I don't

6    think I do that in every case.

7          Is this different?

8          MS. BASABE:  Yes.  If they are on pre-trial

9    supervision, it just reminds them that they are to continue on

10   pre-trial supervision.

11         THE COURT:  Somebody better remind me to do that in

12   every case, then, because I don't think I do that routinely.

13         Anything else?

14         MS. LYDON:  No.  Thank you, your Honor.

15         THE COURT:  All right.

16         (The proceedings were adjourned at 12:32 p.m.)

17                              -oOo-

18                    **C E R T I F I C A T E**
          I, Abigail R. Torres, certify that I am a duly
19   qualified and acting Official Court Reporter for the United
     States District Court; that the foregoing is a true and
20   accurate transcript of the proceedings as taken by me in the
     above-entitled matter on 9/30/2024, and that the format used
21   complies with the rules and requirements of the United States
     Judicial Conference.
22                              Dated:  10/11/24
                                /s/ Abigail R. Torres
23                              _____

                                Abigail R. Torres, RPR/RMR, FCRR
24                              CSR No. 13700
                                U.S. Official District Court Reporter

25

# EXHIBIT C

U.S. Court of Appeals Summary – 12-Month Period Ending December 31, 2023

| | | | | DC | 1ST | 2ND | 3RD | 4TH | 5TH | 6TH | 7TH | 8TH | 9TH | 10TH | 11TH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overall Caseload Statistics | Appeals Filed | | Total | 1,084 | 1,127 | 3,585 | 2,373 | 3,647 | 5,499 | 3,355 | 2,588 | 2,809 | 7,813 | 1,751 | 4,265 |
| | | | Prisoner | 81 | 140 | 520 | 577 | 1,008 | 1,128 | 747 | 932 | 688 | 1,542 | 454 | 1,105 |
| | | | Other | 446 | 597 | 1,691 | 1,157 | 1,269 | 2,088 | 1,456 | 1,008 | 1,084 | 3,112 | 714 | 1,954 |
| | | | Criminal | 220 | 286 | 643 | 448 | 1,090 | 1,935 | 917 | 559 | 915 | 910 | 466 | 1,021 |
| | | | Administrative | 337 | 104 | 731 | 191 | 280 | 348 | 235 | 89 | 122 | 2,249 | 117 | 185 |
| | | Percent Change in Total Filings Current Year | Over Last Year | 9.4 | 9.3 | -9.6 | -7.6 | -4.7 | -4.9 | 4.0 | 9.6 | 7.2 | -5.5 | 6.3 | -6.9 |
| | | | Over 2018 | 1.9 | -4.3 | -11.0 | -19.0 | -16.4 | -26.9 | -19.4 | -8.0 | 0.2 | -25.6 | -2.1 | -25.4 |
| | Appeals Terminated | | Total | 803 | 987 | 3,488 | 2,510 | 3,858 | 5,868 | 3,451 | 2,529 | 2,847 | 8,429 | 1,735 | 4,331 |
| | | | Consolidations & Cross Appeals [2] | 129 | 38 | 198 | 109 | 150 | 532 | 165 | 71 | 123 | 233 | 32 | 87 |
| | | | Procedural | 282 | 282 | 1,408 | 823 | 1,018 | 1,887 | 1,142 | 1,259 | 733 | 3,153 | 582 | 1,893 |
| | | On The Merits | Total | 392 | 667 | 1,882 | 1,578 | 2,690 | 3,449 | 2,144 | 1,199 | 1,991 | 5,043 | 1,121 | 2,351 |
| | | | Prisoner | 24 | 100 | 301 | 438 | 637 | 552 | 464 | 299 | 500 | 1,053 | 257 | 513 |
| | | | Other | 255 | 312 | 928 | 685 | 943 | 1,092 | 851 | 573 | 632 | 1,944 | 467 | 1,063 |
| | | | Criminal | 41 | 196 | 374 | 326 | 930 | 1,547 | 675 | 289 | 787 | 530 | 324 | 683 |
| | | | Administrative | 72 | 59 | 279 | 129 | 180 | 258 | 154 | 38 | 72 | 1,516 | 73 | 92 |
| | | | Percent by Active Judges | 83.6 | 47.6 | 60.8 | 78.0 | 78.7 | 81.2 | 68.5 | 79.4 | 95.0 | 60.5 | 80.3 | 85.5 |
| | Pending Appeals | | | 1,528 | 1,467 | 3,801 | 1,879 | 2,800 | 3,292 | 2,537 | 1,851 | 1,504 | 7,070 | 1,139 | 3,172 |
| Actions per Active Judge [1] | Termination on the Merits | | | 125 | 226 | 270 | 273 | 504 | 581 | 272 | 284 | 548 | 328 | 252 | 512 |
| | Procedural Terminations | | | 17 | 6 | 29 | 40 | 44 | 67 | 30 | 56 | 58 | 44 | 34 | 51 |
| | Written Decisions | | Total | 34 | 72 | 126 | 86 | 160 | 160 | 91 | 96 | 172 | 107 | 84 | 163 |
| | | | Signed | 11 | 19 | 123 | 58 | 36 | 21 | 46 | 26 | 37 | 7 | 65 | 17 |
| | | | Unsigned | 23 | 51 | 2 | 21 | 124 | 139 | 46 | 70 | 47 | 100 | 19 | 140 |
| | | | Without Comment | - | 3 | - | 7 | - | - | - | - | 88 | - | - | 6 |

[1] Includes only judges active during the entire 12-month period.

[2] Prior to December 2011, cases disposed of by consolidation and cross appeals were counted separately. From December 2011 forward, they are counted as a subset of procedural and merit terminations to reflect the manner in which the appeal was disposed.

**U.S. Court of Appeals Summary -- 12-Month Period Ending December 31, 2023**

| | | | | DC | 1ST | 2ND | 3RD | 4TH | 5TH | 6TH | 7TH | 8TH | 9TH | 10TH | 11TH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Number of Judgeships/ Number of Panels | | 11 / 3.7 | 6 / 2.0 | 13 / 4.3 | 14 / 4.7 | 15 / 5.0 | 17 / 5.7 | 16 / 5.3 | 11 / 3.7 | 11 / 3.7 | 29 / 9.7 | 12 / 4.0 | 12 / 4.0 |
| | | Number of Sitting Senior Judges | | 6 | 6 | 15 | 10 | 4 | 8 | 13 | 4 | 3 | 22 | 7 | 10 |
| | | Number of Vacant Judgeship Months [2] | | 4.4 | 5.6 | 0.0 | 3.1 | 14.9 | 12.0 | 8.7 | 5.9 | 0.0 | 5.4 | 0.0 | 4.5 |
| Actions per Panel [1] | Appeals | Filed | Total | 296 | 564 | 827 | 509 | 729 | 970 | 629 | 706 | 766 | 808 | 438 | 1,066 |
| | | | Prisoner | 22 | 70 | 120 | 124 | 202 | 199 | 140 | 254 | 188 | 160 | 114 | 276 |
| | | | All Other Civil | 122 | 299 | 390 | 248 | 254 | 368 | 273 | 275 | 296 | 322 | 179 | 489 |
| | | | Criminal | 60 | 143 | 148 | 96 | 218 | 341 | 172 | 152 | 250 | 94 | 117 | 255 |
| | | | Administrative | 92 | 52 | 169 | 41 | 56 | 61 | 44 | 24 | 33 | 233 | 29 | 46 |
| | | Terminated | Total | 219 | 494 | 805 | 538 | 772 | 1,036 | 647 | 690 | 776 | 872 | 434 | 1,083 |
| | | | Consolidations & Cross Appeals [3] | 35 | 19 | 46 | 23 | 30 | 94 | 31 | 19 | 34 | 24 | 8 | 22 |
| | | | Procedural | 77 | 141 | 325 | 176 | 204 | 333 | 214 | 343 | 200 | 326 | 146 | 473 |
| | | | On The Merits — Total | 107 | 334 | 434 | 338 | 538 | 609 | 402 | 327 | 543 | 522 | 280 | 588 |
| | | | On The Merits — Prisoner | 7 | 50 | 69 | 94 | 127 | 97 | 87 | 82 | 136 | 109 | 64 | 128 |
| | | | On The Merits — Other | 70 | 156 | 214 | 147 | 189 | 193 | 160 | 156 | 172 | 201 | 117 | 266 |
| | | | On The Merits — Criminal | 11 | 98 | 86 | 70 | 186 | 273 | 127 | 79 | 215 | 55 | 81 | 171 |
| | | | Administrative | 20 | 30 | 64 | 28 | 36 | 46 | 29 | 10 | 20 | 157 | 18 | 23 |
| | | Pending Appeals | | 417 | 734 | 877 | 403 | 560 | 581 | 476 | 505 | 410 | 731 | 285 | 793 |
| Median Time | | Median Time From Filing Notice of Appeal to Disposition | | 11.1 | 13.3 | 13.6 | 8.2 | 8.8 | 8.0 | 8.8 | 9.2 | 5.1 | 13.6 | 9.5 | 9.5 |
| Other Caseload per Judgeship | | Applications for Interlocutory Appeals | | - | 2 | 4 | 3 | 1 | 2 | 1 | 2 | 1 | 3 | 1 | 2 |
| | | Petitions for Rehearing | | 16 | 42 | 32 | 65 | 58 | 36 | 43 | 23 | 86 | 41 | 31 | 58 |

[1] See "Explanation of the Judicial Caseload Profiles."

[2] See "Explanation of Selected Terms."

[3] Prior to December 2011, cases disposed of by consolidation and cross appeals were counted separately. From December 2011 forward, they are counted as a subset of procedural and merit terminations to reflect the manner in which the appeal was disposed.

# EXHIBIT D

# WARNING

## IMPORTANT NOTICE

Sport parachuting or skydiving is a potentially dangerous activity that can result in injury or death. **EACH INDIVIDUAL PARTICIPANT, REGARDLESS OF EXPERIENCE, HAS FINAL RESPONSIBILITY FOR HIS OR HER OWN SAFETY.**

**THE FOLLOWING INFORMATION IS PRESENTED AS A MEMBERSHIP SERVICE BY THE UNITED STATES PARACHUTE ASSOCIATION (USPA). USPA MAKES NO WARRANTIES OR REPRESENTATIONS AND ASSUMES NO LIABILITY CONCERNING THE VALIDITY OF ANY ADVICE, OPINION OR RECOMMENDATION EXPRESSED IN THIS MATERIAL. ALL INDIVIDUALS RELYING ON THIS MATERIAL DO SO AT THEIR OWN RISK.**

An individual's safety can be enhanced by exercising proper precautions and procedures. This manual contains some of the knowledge and practices that, in the opinion of USPA, will promote the safe enjoyment of skydiving.

The UNITED STATES PARACHUTE ASSOCIATION is a not-for-profit, voluntary membership organization of the participants and supporters of the sport of parachuting. The sport is also referred to as skydiving. USPA has no involvement in the conduct or operations of any skydiving center, parachute center, or drop zone. **USPA, AS A PRIVATE, NON-REGULATORY ORGANIZATION WHICH HAS NO LEGAL AUTHORITY TO REGULATE OR CONTROL INDIVIDUALS OR CORPORATIONS, CANNOT BE HELD LIABLE FOR ANY JUMP OR TRAINING OPERATIONS THAT RESULT IN INJURY OR DEATH TO ANY PARTY.** Regardless of any statements made in any USPA publications, USPA has neither been given nor has it assumed any duty to anyone. USPA has no obligation to anyone concerning his or her skydiving activities.

All references by USPA to self-regulation refer to each individual person regulating or being responsible for him or herself.

USPA issues various licenses, ratings, awards, and appointments and provides various types of information, advice, and training but does not authorize anyone in any capacity to act for USPA as an agent or representative in connection with the regulation or control of skydiving operations.

It is the responsibility of each student to ask whatever questions are necessary for him or her to have a thorough understanding of the actions and procedures that he or she must perform in order to make a safe jump. Each skydiver has the responsibility to exercise certain practices and perform certain actions to maintain safety for himself or herself and for other people.

**USPA MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, AS TO THE INFORMATION SET FORTH IN THIS MANUAL. PEOPLE RELYING THEREON DO SO AT THEIR OWN RISK.**

**THIS MANUAL PROVIDES PROCEDURES TO ADDRESS MANY FORESEEABLE SITUATIONS, BUT EACH SITUATION IS DIFFERENT. DEVIATIONS FROM THESE RECOMMENDATIONS DOES NOT IMPLY NEGLIGENCE.**

U.S. v. Robert Pooley
Government's Trial Exhibit
2:21-CR-00111 WBS

80-002